## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* Application of RICARDO BENJAMIN SALINAS PLIEGO & CORPORACIÓN RBA S.A. C.V., for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding | Case No._____<br><br>**DECLARATION OF EDUARDO GONZALEZ SALCEDA SANCHEZ IN SUPPORT OF RICARDO BENJAMIN SALINAS PLIEGO & CORPORACIÓN RBS S.A. de C.V. EX PARTE APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 AUTHORIZING DISCOVERY FOR USE IN A FOREIGN PROCEEDING**<br><br>Date: \_\_\_\_<br>Time: 10:00 AM<br>Courtroom: \_\_\_\_\_ |

I, EDUARDO GONZALEZ SALCEDA SANCHEZ, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    I hold the position of Vice President (Financial Investment & Analysis) in a group of companies called Grupo Salinas.

2.    Save where otherwise stated, the facts and matters set out in this affidavit are within my own knowledge and I believe them to be true. Where I refer to information supplied by others, the source of the information is identified; facts and matters derived from other sources are true to the best of my knowledge and belief. My first language is Spanish, but I am fluent in English and I have made this affidavit in English.

3.    Applicants' related action in England (the "**English Action**"), described below , and for which I understand the Applicants are seeking foreign discovery in this Court, names Astor Asset Management 3 Limited ("**Astor 3**"), Vladimir "Val" Sklarov ("**Sklarov**"), Weiser Global Capital Markets Ltd. ("**Weiser**"), Tavira Monaco SAM ("**Tavira**"), Cornelius Vanderbilt Capital Management Ltd. ("**Vanderbilt**") and Astor Capital Fund Ltd ("**Astor**

1

**Capital**"). For the sake of convenience and consistency with affidavits that I submitted on Applicants' behalf in the English Action, I may collectively refer to the parties just described as "**Respondents**" in this Declaration where it concerns their role in the English Action.

**A. Introduction**

4.      By way of background, the First Applicant, Ricardo Salinas Pliego ("**Mr. Salinas**") is one of the wealthiest individuals in Mexico with a net worth of several billion US dollars. He is the founder and chairman of Grupo Salinas, a conglomerate with interests in many different businesses in Mexico (including financial services, retail, media, telecommunications and the internet). The Second Applicant Corporación RBS S.A. C.V. ("**RBS**") is a Mexican company beneficially owned and controlled by Mr. Salinas.

5.      The companies within Grupo Salinas include another Mexican company called Grupo Elektra SAB De CV ("**Elektra**"), which is listed on the Mexican Stock Exchange. Elektra operates a large and well-known chain of retail stores (which sell consumer goods and also provide various financial services) in Mexico and Central and South America. Mr. Salinas is the direct or indirect beneficial owner or controller of approximately 67,544,413 shares in Elektra, representing 30.47% of Elektra's share capital (disregarding the impact of the fraudulent scheme described below).

6.      On July 25, 2024, after a consultation with the Applicants' legal advisers on (the details of which are privileged), I discovered that there were credible grounds for suspecting that the Respondents are engaged in a fraudulent scheme to misappropriate Elektra shares belonging to Mr. Salinas with a value of up to MXN 7,565,879,616 (Mexican peso), equivalent to approximately $416,394,035 USD at current exchange rates.[1]

---

[1] The share values described here reflect Applicants' calculations upon the filing of the English Action. Any variation in value, either within relevant markets or under current exchange rates, between the date Applicants filed that action and any time thereafter, including before and after the date of this Declaration.

7.      On the same day, the Applicants appointed a forensic investigation firm known as Forward Risk to investigate the potential fraud as a matter of urgency. Forward Risk have prepared a preliminary report on the matter (the "Forward Risk Report") (**Exhibit 1**).

8.      It appears that the scheme to misappropriate Mr. Salinas' Elektra shares has been orchestrated by an individual in the United States known as Vladimir "Val" Sklarov ("**Mr. Sklarov**"), who is the Fourth Respondent in the English Action. Mr. Sklarov has been connected similar frauds against a number of third parties (as confirmed by a series of court decisions and arbitral awards).

9.      The Applicants are continuing to investigate the precise identities of those behind the fraud, as well as their current places of residence (so as to determine where and how they can be served in the English Action) or otherwise identified to prevent further harm to Applicants. Some of those involved do not appear to be real people and are simply aliases of Mr. Sklarov. If Applicants reveal other culprits in this fraud through their investigation, the reserve the right to seek injunctive relief through the appropriate legal authorities and courts against them.

## B.    Factual background

Overview

10.     The First Respondent in the English Action, Astor 3, and the Applicants are parties to a stock loan agreement dated July 28, 2021 (the "SLA") (**Exhibit 2**). Under the SLA:

a)      Astor 3 is the "Lender";

b)      RBS is the "Borrower"; and

c)      Mr. Salinas is the "Guarantor".

Ex. 2, § II.

11.    Pursuant to the SLA, Astor 3 agreed to advance loans of up to MXN 3,008,580,000 to RBS, secured over certain Elektra shares owned by Mr. Salinas. *Id*. at § II.1(a).

12.    The relevant Elektra shares are (or should be) held by two custodians, Weiser and Tavira. (the "**Depository Brokers**"). *Id*. at § III.4.

13.    Weiser is incorporated in the Bahamas. Tavira is incorporated in Monaco. They are parties to two separate agreements (the "**Depository Agreements**"), namely:

   a) A custodian management agreement dated July 28, 2021, between RBS, Mr. Salinas, Astor 3 and Weiser (the "**Weiser Agreement**") (**Exhibit 3**); and

   b) A control agreement dated November 1, 2021, between RBS, Mr. Salinas, Astor 3, and Tavira (the "**Tavira Agreement**") (**Exhibit 4**).

14.    Five loans have been advanced by Astor 3 pursuant to the SLA, with a total principal amount of MXN 2,154,218,552.55 (approximately $113,892,458 USD). These loans were advanced on five dates between 2021 and 2023 (namely August 9, 2021, September 17, 2021, February 7, 2022, June 22, 2022, and September 15, 2023) in accordance with five "Closing Statements" (**Exhibits 5–9**).

15.    A total of 7,204,296 Elektra shares belonging to Mr. Salinas have been posted as collateral for the loans advanced by Astor 3 under the SLA. These shares are collectively referred to herein as the "**Collateral Shares**", and they are described as the "Pledged Collateral" in the SLA. Ex. 2, § II.7. This number reflects the aggregate number of Collateral Shares set out in the Tranche 5 Closing Statement (as defined below) (being 5,476,089) and certain additional Collateral Shares which were posted in response to a margin call (being 1,728,207). Ex. 9. Per these tranches, my calculation is that 935,913 of the Collateral Shares should be held by Weiser and 6,268,383 of the Collateral Shares should be held by Tavira.

16.    Unfortunately, the investigation to date suggests that Astor 3, Mr. Sklarov and their collaborators misappropriated at least a substantial number of the Collateral Shares as part of a scheme that they continue to perpetrate against the Applicants. There is also compelling and extensive information that the other Respondents are each associates of Mr. Sklarov.

17.    For reference, it is necessary for me to explain the background of the SLA.

**C. Background of the SLA.**

18.    In 2021, I began exploring raising finance for Grupo Salinas by offering Shares in Elektra as collateral. I was the primary person responsible for negotiating the SLA on behalf of the Applicants. I did so with Mr. Salinas' express authority. At the outset of negotiations, I explained the basic features of the commercial bargain to Mr. Salinas. Amongst other things, I explained that the arrangement would involve a stock-backed lending arrangement in respect of Elektra stock held by Mr. Salinas. Mr. Salinas gave me the authority to negotiate the transaction on behalf of Mr. Salinas and RBS.

19.    It is my understanding that the SLA was designed to provide a source of liquidity without the need for Mr. Salinas to sell any Elektra shares. Similar arrangements are commonplace among wealthy individuals with substantial shareholdings in companies that they have founded.

20.    During negotiations, Astor 3 represented itself as part of a corporate group variously described as Astor Wealth Group, Astor Asset Group, or Astor Asset Management ("**Astor**").

21.    I was introduced to Astor 3 by Alexandre Torti ("**Mr. Torti**") of "Fininvesta", a financial advisory firm. Mr. Torti provided me with an initial pitch document put together by Astor on April 6, 2021. Mr. Torti has provided financial advisory services to Mr. Salinas and his related entities for more than 20 years. Mr. Torti appears to have been introduced to Astor by Zara Akbar ("**Ms. Akbar**") of "Enness", another financial advisory firm. I now have

concerns about the role of Ms. Akbar and her relationship with Astor, but I did not have any such concerns at the time.

22.     Prior to Mr. Torti's introduction, I did not have any business relationship with Ms. Akbar (and, to my knowledge, neither did Mr. Salinas or his related entities). However, it was normal for me to be introduced to potential commercial counterparties by Mr. Torti.

23.     In May 2021, Mr. Torti assured me and Ms. Ms. Akbar, Mr. Torti assured us that he would conduct due diligence on Astor. I believed at the time that such due diligence had been carried out by Mr. Torti. However, in light of what I have learned in recent weeks, I no longer believe that Mr. Torti carried out any adequate form of due diligence.

24.     During the SLA negotiations, I believed that Astor was a legitimate lending firm. Mr. Torti assured me that Astor was owned by the wealthy Astor family in the United States (and I understood that Ms. Akbar told him this).

25.     Subsequently, I was on various email chains involving me, Mr. Torti Ms. Akbar, and various individuals representing themselves as Astor personnel. The key Astor personnel at that time were identified as "Thomas Mellon" ("**Mr. Mellon**") and "Gregory Mitchell" ("**Mr. Mitchell**"). In more recent communications from this year, Astor communicated via an individual identified as "Albert Yuen" ("**Mr. Yuen**"). I now believe these names may have all been aliases or pseudonyms for other individuals, and that the actual persons just named do not exist.

26.     There was some confusion as to the identity of the legal entity that would act as the Lender under the SLA. The initial version (dated May 1, 2021) was signed by a Californian company called Astor Asset Management Ltd (**Exhibit 10**). This was then replaced by another version of the SLA dated July 14, 2021, between the same parties (**Exhibit 11**). However, Mr. Mitchell (of Astor) indicated that he wanted the Lender to be a newly incorporated Canadian company, namely Astor 3, but he was waiting on some sort of incorporation documents from

the Canadian authorities. I do not know why Mr. Mitchell wanted to use a newly incorporated

Canadian company as the Lender. At the time, I did not realise that this was a potential "red

flag" for fraud. On July 28, 2021, the SLA was re-executed by Astor 3 in place of Astor Asset

Management Ltd. Ex. 2. This is the version of the contract that I refer to as the "SLA" in the

remainder of this Declaration.

27.     As far as I am aware, no external lawyers were involved in the negotiation of

the SLA for any party. I assumed that I was dealing with a reputable financial institution and

that the SLA was a standard form of contract that could not be extensively negotiated (similar

to a mortgage or loan offered by a bank), so I did not consider it necessary to engage lawyers.

28.     I was also introduced to the Depository Brokers, Weiser and Tavira, through

Astor. The Applicants did not have any pre-existing relationship with either of the Depository

Brokers. Indeed, I never heard of them before. Astor told me, initially, that the appointment of

Weiser as the custodian was a condition of the Loan and there was no option to appoint any

other custodian. When, as described below, Weiser was replaced as the custodian, I was

similarly told that there was no option to appoint a custodian other than Tavira. I was

responsible for opening the accounts with each Depository Broker. The process for opening

such accounts was broadly consistent with what I would expect for a financial institution.

**D. Terms of the SLA**

29.     I will not seek to summarise all the terms of the SLA in this Declaration, only

those that may be relevant to the Application.

30.     The following is a non-exhaustive summary of the SLA's basic commercial

terms:

    a)   By Clause II.1(a), RBS (as Borrower) is entitled to request loan advances in a
        "Loan Principal Amount" of up to MXN 3,008,580,000 from Astor 3 (as
        Lender). These loans shall be secured by a "Lien" over the "Pledged Collateral",
        which consist of Elektra shares belonging to Mr. Salinas (as Guarantor).

b)  By Clause II.1(c), the maximum available lending amount is equal to 55% of the fair market value ("FMV") of the Pledged Collateral. I refer to 55% as the "loan-to-value" or "LTV" ratio. The LTV ratio was subsequently reduced (see below).

c)  By Clause II.1(a), the normal interest rate is equal to 1.15% per annum. After an Event of Default, the interest rate increases very significantly (to 1.5% per month): see Clause II.1(b). There are also various fees payable in connection with the SLA: see Clause II.3.

d)  By Clause II.6(a), the Loan Principal Amount is repayable on the date falling 5 years after the "Loan Term" begins (the "Maturity Date").

e)  By Clause III.1, the SLA is a non-recourse lending arrangement. This means that Astor 3 cannot bring proceedings against the Borrower or the Guarantor in the event of non-payment (and can only have recourse to the Pledged Collateral).

f)  By Clause III.4, the Pledged Collateral is to be held with a "Depository Broker" appointed by the Lender. For the first two tranches of lending under the SLA, the Depository Broker was Weiser. For the third to fifth tranches of lending under the SLA, the Depository Broker was Tavira. I explain the reasons for this change below.

g)  By Clause VII, the SLA is governed by English law and is subject to the exclusive jurisdiction of the English Court.

Ex. 2.

31.     At this juncture, I should refer to a particularly important section of the SLA, namely Clause V (entitled "Lender Warranties and Representations"). This clause takes the form of a series of representations and warranties given by Astor 3, and the clause begins as follows: "*Lender represents and warrants to Borrower that …*"

32.     The provisions of Clause V were explicitly discussed in pre-contractual negotiations. These included email discussions concerning the prohibitions on short-selling and front-running at Clauses V.4 and the section of term sheets prepared by Astor entitled "*Restrictions on Lender*". Astor's representations and warranties at Clause V were of great importance to me and Mr. Salinas. Without those representations and warranties, the Applicants would not have entered the SLA.

33.     I refer, in particular, to the following provisions of Clause V in Exhibit 2:

8

a) By Clause V.2, Astor 3 represented and warranted that it would deposit "Cash Collateral" into an account held by RBS at the Depository Broker, which would then be released at "Closing" to fund the Loan Principal Amount. This provision was designed to ensure that Astor 3 would fund the lending from its own cash resources (and not by selling the Pledged Collateral belonging to Mr. Salinas, which I would regard as fraudulent).

b) By Clause V.3, Astor 3 represented and warranted that all dividends on the Pledged Collateral would be credited to Mr. Salinas.

c) By Clause V.4(b), Astor represented and warranted as follows: "*During the Loan Term, provided that there has not been an Event of Default, the Lender will not sell or short-sell the shares of the Pledged Collateral on any publicly traded securities exchange. However, upon the occurrence of an incurable Event of Default, the Lender reserves the right to dispose of the Collateral on any publicly traded securities exchange, but is not obligated in doing so.*"

d) By Clause V.5, Astor 3 represented and warranted as follows: "*Payments received from sale of Collateral upon Event of Default shall be applied in the following order: (i) firstly, to all outstanding Principal balance, interest and fees ...*"

e) By Clause V.6, Astor 3 represented and warranted as follows: "*The Lender will not transfer the securities to its own account unless an incurable Event of Default has taken place. Only upon an incurable Event of Default will Lender request the Depository Broker to transfer securities in the Guarantor's account to Lender's sole control and custody in order to satisfy Obligations of Borrower and Guarantor*".

f) By Clause V.8, Astor 3 represented and warranted that "*it will fully cooperate with the registered owner of the securities of Issuer [Elektra] in exercising its Voting Rights …*"

34.    The same contractual provisions were contained in the drafts of the SLA which were circulated to the Applicants for execution (and also the version executed on July 14, 2021, which was then superseded by the version executed on July 28, 2021). Importantly, the SLA defines the Collateral Shares as the *actual* shares that Mr. Salinas supplied as Guarantor, and not some substitute or equivalent. Ex. 2, § II.7

35.    In light of the matters set out above, I understood Astor 3 to have made the following representations (prior to the execution of the SLA on July 28, 2021):

a) that Astor 3 was a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities; and

b) that Astor 3 intended to comply with its obligations under the SLA including in particular its obligations not to sell the Elektra shares prior to maturity or default. (Together, the "**Key Representations**.")

36.    On July 28, 2021, Applicants executed the SLA in reliance on the Key Representations.

37.    I and the Applicants relied upon the Key Representations as the basis for entering into the SLA on July 28, 2021 – coupled with the fact that Astor 3 held itself out as a reputable financial institution that would (naturally) comply with its contractual obligations.

38.    I would also emphasise that the Key Representations were apparent from the Pitch Deck I received, which was circulated to me in April 2021 and was the basis upon which I decided to pursue a stock-backed lending arrangement with Astor. For example, the Pitch Deck stated as follows:

| **Restrictions on Lender:** | During the Loan term and while the Loan remains in full force and effect, Lender shall not engage in short selling or selling of the Securities. |
|---|---|

39.    I now believe that the Key Representations were made dishonestly by Astor 3 in order to perpetrate a fraud against the Applicants. Astor 3 never had any intention to act in accordance with its contractual obligations in relation to the Pledged Collateral. Rather, it was always Astor 3's intention to misappropriate the Pledged Collateral. I believe that the lending advanced by Astor 3 under the SLA was funded, in whole or in substantial part, by selling the Pledged Collateral itself. I explain the basis for these beliefs in detail later in this declaration.

The Closing Statements

40.    I will now address the precise contractual mechanism by which Astor 3 advanced five tranches of funding under the SLA.

41.    This was achieved by a series of Closing Statements (Exhibits 5 to 9). I summarise the five Closing Statements below.

42.    The first Closing Statement is dated 9 August 2021 (the "**Tranche 1 Closing Statement**"). Pursuant to the Tranche 1 Closing Statement, a sum of MXN 501,591,693 was advanced by Astor 3 to RBS, secured over 563,569 shares in Elektra owned by Mr. Salinas. These shares were held in an account maintained by Weiser as Depository Broker in the name of Mr. Salinas.

43.    The second Closing Statement is dated 10 September 2021 (the "**Tranche 2 Closing Statement**"). Pursuant to the Tranche 2 Closing Statement, a sum of MXN 327,497,030 was advanced by Astor 3 to RBS, secured over an additional 372,344 shares in Elektra owned by Mr. Salinas. These shares were held in an account maintained by Weiser as Depository Broker in the name of Mr. Salinas.

44.    The third Closing Statement is dated 4 February 2022 (the "**Tranche 3 Closing Statement**"). Pursuant to the Tranche 3 Closing Statement, a sum of MXN 532,484,020 was advanced by Astor 3 to RBS, secured over an additional 1,299,497 shares in Elektra owned by Mr. Salinas. These shares were held in an account maintained by Tavira as Depository Broker in the name of Mr. Salinas. I explain the reasons for the change of the Depository Broker below.

45.    The fourth Closing Statement is dated 22 June 2022 (the "Tranche 4 Closing Statement"). Pursuant to the Tranche 4 Closing Statement, a sum of MXN 613,000,000 was advanced by Astor 3 to RBS, secured over an additional 2,796,290 shares in Elektra owned by Mr. Salinas. These shares were held in an account maintained by Tavira as Depository Broker in the name of Mr. Salinas.

46.    The fifth and final Closing Statement is dated 15 September 2022 (the "Tranche 5 Closing Statement"). Pursuant to the Tranche 5 Closing Statement, a sum of MXN 179,645,808 was advanced by Astor 3 to RBS, secured over an additional 444,389 shares in

Elektra owned by Mr. Salinas. These shares were held in an account maintained by Tavira as Depository Broker in the name of Mr. Salinas.

47.     The result, therefore, is that five loans have been advanced by Astor 3 pursuant to the SLA, with a total principal amount of MXN 2,154,218,552.55. These loans were secured over a total of 5,476,089 Elektra shares belonging to Mr. Salinas as collateral for the loans advanced by Astor 3 under the SLA (the "**Collateral Shares**"). The position is set out in the Tranche 5 Closing Statement as follows:

FUNDING PROCEEDS AND COLLATERALIZATION RECORD

| | LTV | FMP (MXN) | Facility (MXN) | Shares Pledged | Avg. Volume[3] |
|---|---|---|---|---|---|
| | 35% | MXN  1,155.01 | MXN 1,974,572,743.94 | 444,389 | 48,850 |

| Tranche No. | Date | Price (MXN) | | Gross Funding Amount (MXN) | | Collateralized Shares | Net Funds after Deductions (USD) | |
|---|---|---|---|---|---|---|---|---|
| 1 | 9-Aug-21 | MXN | 1,618.23 | MXN | 501,591,693.09 | 563,569 | MXN | 500,000,000.00 |
| 2 | 17-Sep-21 | MXN | 1,599.19 | MXN | 327,497,030.23 | 372,344 | MXN | 300,000,000.00 |
| 3[4] | 7-Feb-22 | MXN | 1,353.54 | MXN | 532,484,020.62 | 1,299,497 | MXN | 510,000,000.00 |
| 4[5] | 22-Jun-22 | MXN | 1,150.00 | MXN | 613,000,000.00 | 2,796,290 | MXN | 592,871,767.12 |
| 5 | 15-Sep-23 | MXN | 1,155.01 | MXN | 179,645,808.61 | 444,389 | MXN | 173,586,459.31 |
| | Total Funding to Date: | | | MXN | 2,154,218,552.55 | | | |
| | Current FMV of Collateralized Shares: | | | MXN | 6,324,937,555.89 | | | |

48.     On March 24, 2023, Astor 3 made a margin call for 1,728,207 additional Elektra shares. Mr. Salinas complied with that margin call and transferred the relevant shares to his account with Tavira.

The Depository Agreements

49.     Depository Agreements (Ex. 3 & 4), govern the terms on which the Depository Brokers held the Collateral Shares. These comprise the Weiser Agreement (which is relevant to the first two lending tranches lending) and the Tavira Agreement (which is relevant to the third, fourth and fifth lending tranches).

50.     The Tavira Agreement is stated to be effective as of November 1, 2021, although it was in fact executed at a later time. (For example, it appears that Tavira executed the document on December 13, 2021.)

51.     Tavira was appointed as the Depository Broker for the final three tranches of lending following a curious incident that took place in October 2021, the details of which are set out in an email chain involving Mr. Torti, Ms. Akbar and Weiser (**Exhibit 12**). In summary, the Applicants were notified by Weiser in an email dated October 5, 2021, that Astor 3 had issued an "Entitlement Order" to transfer 935,913 Collateral Shares held by Weiser to the account of Astor Capital, an previously unknown entity which appears to be entity affiliated with Astor 3. The Applicants asked Mr. Torti to raise a complaint with Weiser, which he did on October 19, 2021. Weiser responded on October 22, 2021, that it was required to comply with any Entitlement Order given by Astor 3. On October 23, 2021, Mr. Torti wrote to Ms. Akbar as follows:

> "… it looks like the party which is the source of all this trouble is Astor. Could you kindly transmit this message to Astor and get their position and clear explanation as to what is causing all this mess?"

52.     Later that day, Mr. Torti chased Ms. Akbar for a response:

> "It is very important that you have the sensibility of the necessity for the shares to return to the collateral contract until no later than in this week, since if the account statement is issued without the shares there could be trigger an alienation with great tax implications!
>
> Please we really need your help to make Astor and Weiser understand that they are breaching and violating the contracts."

53.     On October 25, 2021, Ms Akbar responded as follows:

> "I am happy to advise that I have been informed by Astor that the instructions for the transfer of the 935,913 (collateralised) shares of Group Elektra S.A.B. de CV (ELEKTRA*:MX) shall be reversed back to the account # 200-804765 of Mr. Ricardo B. Salinas Pliego within the next 24 hours.
>
> So we should see the shares reappear back into the account later today or tomorrow.
>
> Please let me know if you have any further questions."

54.    I was reassured to learn that Astor 3 had returned the shares. I assumed that there was a mistake or misunderstanding (perhaps involving Weiser) rather than a fraud. Furthermore, Astor 3 appears to have accepted that it was not entitled to take the shares for itself, which is presumably why it returned the shares.

55.    Since this dispute arose, it is no longer clear to me whether Astor 3 did in fact return any shares in October 2021. However, I did not realise these matters at the time.

56.    In any event, the Applicants insisted that Weiser should be replaced with another Depository Broker for all future tranches of lending, and that is why Tavira was appointed. Tavira was introduced to the Applicants by Astor 3.

**F. Addenda to the SLA**

57.    The SLA was amended on four occasions pursuant to a series of "Addenda" (**Exhibits 13 to 16**).

58.    The first Addendum ("Addendum 1") is dated July 31, 2021. Its principal purpose is to record that the version of the SLA executed between the Applicants and Astor 3 on July 28, 2021, supersedes and **replaces** the prior versions of the SLA executed on May 1, 2021 and July 14, 2021.

59.    The second Addendum ("**Addendum 2**") is dated December 6, 2021. It was executed in response to the Applicants' concerns as to whether Astor 3 and/or Weiser had wrongfully disposed of the Collateral Shares. The operative clause states as follows:

> "*It is mutually agreed, understood and represented that all Entitlement Orders issued by Lender in relation to the Custodian Management Agreement executed by and between the Lender, the Depository Broker and the Guarantor will be in accordance with the terms of the Loan Agreement.*"

60.    The third Addendum ("**Addendum 3**") is dated June 13, 2022. Its principal purpose is to amend the SLA so as to make the terms more favourable to Astor 3. Clause I states that the LTV ratio is reduced to 35% (which meant that Astor 3 had an even greater level

of security than before). Clause II expands the circumstances in which Astor 3 can make a margin call for yet more security.

61.    The fourth and final Addendum ("**Addendum 4**") is dated July 19, 2022. It deals with the release of a dividend to the Borrower.

62.    My understanding is that Astor 3 repeated the Key Representations on each of the dates when the Addenda were executed.

### G.    Interactions with Astor prior to July 25, 2024

The Source of the Applicants' Concerns

63.    Although Elektra is a listed company, it is largely concentrated in private hands. As I mention above, Mr. Salinas is the direct or indirect beneficial owner or controller of approximately 67,544,413 shares in Elektra, representing 30.47% of Elektra's share capital (disregarding the impact of the fraudulent scheme perpetrated by the Respondents).

64.    Mr. Salinas and his team receive a significant amount of data concerning the trading of the Elektra shares (including matters such as trading volume). At the end of November 2021, I was aware that a seller of Elektra shares in the Mexican market had been participating with a significant percentage of the daily trading volume. The sales were made through different Mexican brokers. I have good relationships with the major Mexican brokers, and I was therefore advised of these transactions by the relevant brokers. Given the closely-held nature of the Elektra stock, and the known identity of the private individuals who control a large proportion of the Elektra stock, it is surprising that someone would represent such a large portion of the daily trading volume without our knowing their identity.

65.    I feared that the cause of this unusual situation might be Astor 3, which had the practical ability (even if it lacked the legal right) to sell the Collateral Shares. Moreover, as I have explained above, a similar incident had in fact taken place in October 2021 (although Astor 3 purported to return the shares that it had disposed of on that occasion).

66.    As a consequence of these circumstances, I contacted a number of counterparties of the Applicants in relation to transactions collateralised by Elektra shares, including Astor. As part of that contact, I sought to arrange a physical meeting with representatives of Astor in November 2023. That meeting was in New York and was attended by persons describing themselves as Ms. Akbar and Mr. Yuen. Mr. Mitchell was also supposed to be in attendance at that meeting, but I was told that he was not able to attend (supposedly because he had contracted COVID-19).

Interactions with Astor prior to July 25, 2024

67.    In April 2024, Tavira attempted to reassure me that it was still holding the Collateral Shares in custody. I did not find their correspondence to be entirely convincing, and Mr. Torti pressed for further information.

68.    Following the last Elektra shareholders' meeting, it was clear that the amount of existing shares did not match our records and so the decision was taken to send letters to all banks and custodians of Elektra shares in order to confirm that the Elektra shares were still being validly held. As part of this process, on June 10, 2024, Mr. Salinas wrote to Weiser (**Exhibit 17**) and Tavira (**Exhibit 28**). The letters stated that Weiser and Tavira should not dispose of the Collateral Shares and sought information as to the quantity of Collateral Shares that had been disposed of.

69.    Weiser and Tavira did not respond by way of letter. However, on June 13, 2024, Astor 3 responded with a letter of its own (**Exhibit 19**), apparently because Weiser and Tavira had provided Astor 3 with copies of the correspondence from Mr. Salinas. The letter from Astor 3 is dated June 12 but was sent on June 13. The letter is unusual in several respects. It is not written on what I recognise as a normal corporate letterhead, and it does not identify any individual who sent the letter. The letter itself was sent by email from the "Operations"

department at Astor Asset Management Group, and the email did not identify any individual who could be contacted to discuss the letter (**Exhibit 20**).

70.     In the letter, Astor 3 asserted that it had an unrestricted right to dispose of the Collateral Shares. I do not agree with this assertion (which is inconsistent with the Key Representations set out above).

71.     At this stage, Astor 3 did not assert that any Event of Default had occurred under the SLA. Instead, Astor 3 stated that Mr. Salinas should cease to "*interfere*" with the Depository Brokers.

72.     Based on Astor 3's letter, I became concerned that Astor 3 had disposed of a significant quantity of the Collateral Shares. Far from denying that disposals had taken place, Astor 3 effectively accepted that this had occurred (but sought to justify the disposals).

73.     On July 2, 2024, I contacted Gregory Mitchell (of Astor 3) by telephone and explained that the Applicants wished to prepay all sums owing to Astor 3 (in exchange for the return of the Collateral Shares). I followed up with emails to Mr. Mitchell and Mr. Yuen on July 5 and July 12, 2024, to which I only received further vague emails from Mr. Yuen that an unnamed committee at Astor 3 would consider my communications.

74.     This only exacerbated my concerns, and Applicants, through counsel, began investigating Astor 3, including hiring Forward Risk, an outside forensic vendor.

**H.    Investigation for Fraud**

75.     I now believe that the Applicants have been the victims of a fraud committed by the Respondents in the English Action. These matters came to my attention between Thursday July 25, 2024 (the date of the privileged consultation with the Applicants' legal advisers) and Wednesday July 31, 2024 (when Forward Risk reported their findings to me).

76.     My current understanding is that stock-backed lending arrangements are a relatively common source of fraud in the financial markets. I have since read various legal

17

resources and other materials that associate various stock-backed lending fraud claims with an individual known as Vladimir "Val" Sklarov. I now suspect that Mr. Sklarov is in control of the Depository Brokers. Before I deal with the latter point, I should detail what I have since learned about Mr. Sklarov.

Vladimir "Val" Sklarov

77.    I reviewed different materials where Mr. Sklarov is described as a resident of Illinois (US), Florida (US) and Ukraine: see paragraph 6 of the Satterfield Complaint; paragraph 27 of the Barclays Complaint; and the NYSE Decision (each as defined below). Because I am not a licensed attorney, I describe these legal actions as I understand them based on my review of the facts alleged and the ultimate ruling in each case to consider similarities in my own work negotiating with parties like Astor 3, and my ultimate role in ordering the investigations described herein and underlying the Applicants' 1782 Application. Accordingly, I do not opine on the law analysed in those decisions or the merits of each case.

78.    In the 1990s, I understand that Mr. Sklarov was convicted of felony charges arising out of a Medicare fraud, sentenced to one year in prison and ordered to pay US$14 million in restitution: see *USA v. Sklarov, et al.*, 97-cr-00176 (DJL) (W.D. Pa.) **Exhibit 21**.

79.    Mr. Sklarov has also been sued or found to have impersonated legitimate financial institutions such as the New York Stock Exchange, Barclays and Rothschild. For example, in a complaint I reviewed that was filed by Barclays against Mr. Sklarov in the United States District Court for the Southern District of New York dated October 2020 (the "Barclays Complaint") (**Exhibit 22**), Mr. Sklarov was sued for impersonating a lengthy list of entities associated with Barclays. On March 19, 2021, Judge Lewis Kaplan entered a permanent injunction against Mr. Sklarov and his attorney, an individual known as Jaitegh "JT" Singh ("**Singh**") (**Exhibit 23**). Notably, the order was made with the consent of Mr. Sklarov and Mr. Singh, who signed the consent order. I also reviewed the decisions made in the cases involving

the New York Stock Exchange (the "**NYSE Decision**") (**Exhibit 24**) and Rothschild (**Exhibit 25**).

80.    Mr. Sklarov was also found in contempt of court in another case (**Exhibit 26**).

81.    In recent years, it appears that Mr. Sklarov was repeatedly accused of stock-backed lending fraud. For example, the Barclays Complaint states as follows (at ¶¶ 124 to 125):

> "*124. Sklarov also has been sued by multiple parties for civil fraud in connection with the purported offering of securities-backed loans.*
>
> *125. Although Sklarov has used various shell companies to perpetuate each alleged fraud, the fact patterns underlying each of the schemes are nearly identical: a Sklarov-related entity promises to provide a loan to a borrower backed by securities owned by the borrower; the borrower pledges the shares as collateral to the Sklarov-controlled entity; the Sklarov-controlled entity provides little if any of the promised loan funds to the borrower and then sells or attempts to sell the shares proffered only as collateral, and retains the proceeds.*"

82.    Paragraphs 126 to 143 of the Barclay's Complaint provide a useful summary of the stock-backed lending frauds which associated with Mr. Sklarov. In a separate 2019 complaint filed against Mr. Sklarov in New York by Brent Satterfield (the "Satterfield Complaint") (**Exhibit 27**), similarly stock-backed lending frauds are listed (see ¶¶ 52 to 62. Paragraph 60 of the Satterfield Complaint lists one example involving a company generally associated with the "America 2030" business name, that I now understand to be commonly associated with Mr. Sklarov:

> "*In the UK, the CEO of a company named Angus Energy had to step down, after the company disclosed he had transferred his Angus Energy shares to a company called America 2030 Capital Limited for "nil consideration". It was said to be "in contemplation of a possible equity linked loan against his shareholding". Unbelievably, the company reports that America 2030 sold 10 million shares (a value of over $100 million) before it was discovered.*"

83.    In another example, a Singapore company called Sunpower Group announced that trading in its shares would be halted after two of its substantial shareholders had informed the company that "*they had placed 14 million shares each with a lender, America 2030 Capital Ltd., as collateral for a loan, and said the shares were no longer in the depository broker*

*account*": see paragraph 56 of the Satterfield Complaint. Notably, the custodian in that case was Weiser. The Satterfield Complaint asserts that the High Court of St. Kitts and Nevis ruled that Mr. Sklarov (under the alias "Mark Simon Bentley") and Weiser had conspired to commit a stock-backed loan fraud (**Exhibit 28**). Another summary can be found in a later Bermudian judgment that recognised and enforced the Nevis judgment (**Exhibit 29**).

84.    Mr. Satterfield eventually managed to obtain an arbitration award against Mr. Sklarov in July 2021 (the "Satterfield Award") (**Exhibit 30**). Weiser was also involved and gave evidence on behalf of Mr. Sklarov: see paragraph 113 of the Satterfield Award.

85.    The contents of the Satterfield Award are notable for several reasons that I feel qualified to address or otherwise seem straightforward to me based on the plain language of that decision. First, it is apparent that the lending documentation in that case was drafted in very similar terms to the SLA in the present case: see below. Second, the Satterfield Award contains a detailed description of Mr. Sklarov's fraudulent scheme and says that he gave false and dishonest evidence to the tribunal: see e.g. paragraphs 177 and 178.

86.    As mentioned above, Mr. Sklarov appears to be associated with an attorney called Jaitegh "JT" Singh, who frequently acts for him in litigation: see the Barclays Complaint at paragraph 33 (Ex. 38). I address Mr. Singh in further detail below.

87.    It is unclear how many of Mr. Sklarov's associates or accomplices are fictitious creations of Mr. Sklarov's own mind, and how many of them are real people. He appears to deploy an extensive range of pseudonyms, aliases and alter egos.

Astor 3 Red Flags

88.    In light of the matters set out above, Applicants carried out an investigation to consider whether Astor 3 might be controlled by Mr. Sklarov, which revealed further concerns about Astor 3 as a legitimate enterprise.

89.     I now understand that Astor 3 is not a conventional financial institution, and its affairs are shrouded in secrecy. For example:

a)  Astor 3's letter dated July 12, 2024, is not on a normal corporate letterhead and does not identify any individual person who sent the letter.

b)  The website and email addresses set out in the SLA for Astor 3 appear to be invalid.

c)  Page 31 of the SLA identifies five offices around the world where Astor 3 is said to be located, but these all appear to be flexible / serviced offices. It appears there is no evidence that Astor 3 has any meaningful physical presence anywhere.

d)  I now understand that the SLA itself is very poorly drafted, and there is no indication that Astor 3 has conventional legal representation.

e)  In those circumstances, Applicants now doubt that Astor 3 could fund loans worth hundreds of millions of dollars from its own capital (or by borrowing the money from legitimate third parties).

90.     The SLA suggests that Astor 3 is registered in Vancouver, British Columbia. However, this looks incorrect. Furthermore, I note that the British Columbia Securities Commission issued an Early Intervention Alert on April 9, 2020, as follows (**Exhibit 31**):

> "*Astor Capital Fund Limited (Astor)*
> *Astor claims to have an office in Vancouver, British Columbia (BC), and offers wealth management and advisory services.*
> *Astor is not registered to trade in, or advise on, securities or derivatives in BC.*
> *We urge BC residents to exercise caution when dealing with firms that are not registered to trade or advise in BC.*"

91.     The Tavira Agreement, meanwhile, states that Astor 3 is registered in Quebec. It also appears that Astor 3 was being incorporated at the same time as the SLA was being prepared (hence the last-minute changes between different Astor entities).

92.     I have reviewed an extract from Astor 3's entry on the Quebec company registry (**Exhibit 32**). The register purports to identify Astor 3's directors and beneficial owners, but the information creates other questions as to the propriety of the company:

21

a) According to the register, Astor 3 has a single director/administrator known as Jonathan Clifford Bibi (whose address is in the Seychelles). The same individual can be identified on Companies House in England (**Exhibit 33**); his date of birth is in July 1984. This individual appears to be a former defender on the Seychelles national soccer team (**Exhibit 34**). Perhaps more importantly, the same Jonathan Bibi from the Seychelles has been involved in a series of cryptocurrency scams, and he was named as a fraudster by the State of Missouri in 2018 (**Exhibit 35**).

b) The SLA and the other contractual documents are ostensibly signed by "Mariia Mitsa" on behalf of Astor 3. She is described as a "Managing Member" of Astor 3. However, no such person is identified in the Quebec register, and the name "Mariia Mitsa" returns zero Google search results. This name is probably a pseudonym.

c) The register also states that the beneficial owner of Astor 3 is a person known as "Oksana Hryn", who is said to be resident in Ukraine (and is a known associate of Mr. Sklarov). I address this individual in detail below.

93.    Astor 3's logo (as shown in the SLA) is the same as the logo of "Astor Wealth Group" (**Exhibit 36**). Astor Wealth Group was founded by one "Thomas Mellon", the same individual copied on various emails when the SLA was being negotiated.

94.    "Thomas Mellon" claims to be a member of the wealthy Astor family, although there is little information available that this is true. He is mentioned in a number of suspicious publications (and which may have been written by an artificial intelligence application), containing colourful references to his supposed intellectual brilliance and family wealth (**Exhibits 37 and 38**). He is not mentioned anywhere in conventional media. His account on "X" (formerly Twitter) has 12,600 followers, but his tweets only receive 2 to 4 "likes" per tweet. On his "X" account, he refers to his "*Supreme Elegance and Artistry in Contemporary Investing*", a phrase that is also used on the Astor Wealth Group website. (**Exhibit 39**)

22

95.    Applicants' forensic investigation, which I approved and reviewed, suggests that Mellon does not exist at all, and that "Thomas Mellon" is an alias of Mr. Sklarov. Ex. 1.

96.    It is also notable that Astor 3 (and "Astor Wealth Group") have names that are similar to a legitimate mutual fund manager known as Astor Investment Management LLC. However, the latter entity appears to have completely different ownership from the Astor entities that are involved in the SLA. It may well be that Astor 3 and "Astor Wealth Group" were selected precisely in the hope of creating confusion with an existing legitimate investment manager.

Reasons to believe that Mr. Sklarov is in control of Astor 3 and the Depository Brokers

97.    Several reasons indicate that Mr. Sklarov is Astor 3's true beneficial owner and controller.

98.    First, Indiana corporate records show that an entity called Astor Capital was registered in the state as a foreign corporation in June 2019. When this entity was registered, Mr. Sklarov was listed as the CEO. By April 2020, "Thomas Mellon" had replaced Mr. Sklarov in the corporate records and became the CEO, director, and registered agent of Astor Capital Mr. Singh, Mr. Sklarov's attorney, was the legal representative of Astor Capital who signed the document authorising "Thomas Mellon" as head of the company. Mr. Singh appears as the entity's legal representative. See the Forward Risk Report (Ex. 1).

99.    Second, the sole beneficial owner of Astor 3, a Ukraine resident described as "Oksana Hryn"), appears to be a known associate of Mr. Sklarov. As to this:

a) In October 2021, "Oksana Hryn" was named as a co-plaintiff in a lawsuit alongside numerous other shell companies that can be traced to Mr. Sklarov. Weiser was one of the defendants, and damages of US$450 million were sought. It was voluntarily dismissed after only 4 days.

b) In August 2023, Mr. Sklarov's attorney (JT Singh) wrote a letter on behalf of "Oskana Hryn" to OffshoreAlert, a website that tracks "[r]ed flags in high-value international finance," offering to pay the site $25,000 USD to remove an unfavourable article (**Exhibit 40**). The letters and emails from JT Singh to OffshoreAlert are available online. (**Exhibit 41**).

100.    Third, Mr. Sklarov (via Mr. Singh) attempted to register a trademark in the name of "Astor Capital". This incident is described in paragraph 240 of the Barclays Complaint.

101.    Fourth, at least one of Astor 3's employees (namely "Albert Yuen") is a known associate of Mr. Sklarov. In this respect, Albert Yuen and Mr. Singh are co-directors of an English company called Luxfin Capital Ltd. (see **Exhibit 42**).

102.    Fifth, the SLA is notably similar to the contractual documents used in other reported cases where Mr. Sklarov has been found liable for stock-backed lending fraud. The Satterfield Award (Ex. 30) is a particularly good example. In that case:

a) There was the same deliberate confusion as to the identity of the lender (see paragraph 38).

b) There was the same use of a series of confusing Addenda (see paragraph 11).

c) The key operative provisions were essentially the same as the SLA in the present case (see paragraph 73).

d) The contract contained a similar lengthy disclaimer at Clause 10 (see paragraph 80).

e) The same "Closing Statements" were used (see paragraphs 82*ff*).

f) There were numerous other distinctive words and phrases which are the same or materially the same as those found in the SLA.

103.    Sixth, there is at least one reported case (from the Supreme Court of Jamaica) in which Astor 3 appears to have engaged in a stock-backed lending fraud (**Exhibit 43**). Injunctive relief was apparently granted in Hong Kong to restrain Astor 3 from disposing of

the shares (although the case was ultimately resolved on the basis that Astor 3 had operated in breach of the Hong Kong regulatory regime): see paragraph 7. The underlying facts of that case have all the hallmarks of the other fraud schemes alleged against Mr. Sklarov, and the contractual arrangements bear a striking similarity to the present case.

104. Finally, there is reason to believe that both of the Custodians appointed by Astor 3 (i.e. Weiser and Tavira) are associated with Mr. Sklarov, and they appear to have previously been involved in stock-backed lending fraud. For example:

a) So far as Weiser is concerned, I explain above that the High Court of St. Kitts and Nevis ruled that Mr. Sklarov and Weiser conspired to commit a stock-backed loan fraud.

b) Weiser was also involved in the Satterfield matter and gave evidence on behalf of Mr. Sklarov.

c) Weiser communicates in the same tone and style as Astor 3. For example, on June 22, 2021, I received an email from an anonymous "Collateral Services" department at Weiser without any identifiable individual being named anywhere in Weiser's email. I accordingly suspect Weiser and Astor 3 are under common control.

d) As regards Tavira, Tavira recently sent me an email on July 29, 2024, which is in the same tone and style as the emails from Astor 3 and Weiser. The email is stated to be from an anonymous department called "INTL Operations".

105. I acknowledge that there is uncertainty as to the precise status of Weiser and Tavira.

106. Based on the forgoing, it seems likely that the Applicants have fallen victim to a stock-backed lending fraud carried out by Mr. Sklarov, who appears to have some control or ownership within Weiser and/or Tavira.

107.   After my review of Mr. Sklarov's legal history, I also doubt that Astor 3 funded the five lending tranches pursuant to the SLA from its own resources. The more likely conclusion – and the one that reflects the apparent approach taken by Astor 3 (and Mr. Sklarov) in other cases and consistent with my own experience in finance – is that the lending advanced by Astor 3 under the SLA was funded, in whole or in substantial part, by selling the Collateral Shares belonging to Mr. Salinas.

108.   It now appears that Astor 3's intended purpose from the very moment that it was incorporated on June 28, 2021, (shortly before the SLA was executed on July 28, 2021) was to target Applicants in this scheme. We now doubt Astor 3 ever had any intention to act in accordance with its contractual obligations in relation to the Collateral Shares.

E.   **The Applicants' reaction to the discovery of the fraud**

109.   On 26 July 2024, Elektra issued the following press release (**Exhibit 44**):

> *"MEXICO CITY, July 26, 2024 /PRNewswire/ -- Grupo Elektra, S.A.B. de C.V. (BMV: ELEKTRA\* Latibex: XEKT), Latin America's leading specialty retailer and financial services company, and the largest non-bank provider of cash advance services in the United States, informs investors that it has received information from its controlling group regarding a possible fraud by depositaries of their shares, which could cause unusual movements of its share price on the stock markets.*
>
> *Thereafter, the company informs that it has made contact with the corresponding authorities to determine the applicable measures."*

110.   On the same date, Elektra's shares were suspended from trading by the Mexican stock exchange. This has provided some limited protection to the Applicants, since it is now more difficult for Astor 3 to continue selling the Collateral Shares (if there are any left).

111.   I understand from my legal advisors in Mexico that the protection created by the trading suspension is temporary (since the suspension could be lifted at any time), and Astor 3 may be able to continue misappropriating the Collateral Shares (or the proceeds thereof). Although the trading suspension should prevent further sales of the Collateral Shares to bona fide third parties on the Mexican stock exchange (for as long as the suspension remains in