# EXHIBIT 9



Astor Asset Management

# SECURITIES-BACKED FINANCING

**A Fixed Instrument, Collateralized Non-Recourse Facility**

## CLOSING STATEMENT AND SETTLEMENT

Prepared Exclusively for a Shareholder of

**GRUPO ELEKTRA, S.A.B. DE C.V.**

# NOTICE TO BORROWER AND GUARANTOR

PLEASE TAKE NOTICE THAT A COLLATERALIZED, SECURED FIXED INSTRUMENT BASED LOAN TRANSACTION MAY INVOLVE SUBSTANTIAL ELEMENTS OF RISK THAT INVOLVE SHARES IN PUBLICLY TRADED SECURITIES WHICH MAY BE SUBJECT TO ADVERSE CREDIT RISKS, ADVERSE TAX RISKS AND/OR ADVERSE MARKET CONDITIONS THAT COULD NEGATIVELY IMPACT ALL OR PART OF THE COLLATERALIZED, SECURED, FIXED INSTRUMENT LOAN TRANSACTION. ALWAYS CONSULT WITH A REGISTERED INVESTMENT ADVISOR AND YOUR ATTORNEYS BEFORE INVESTING OR ENGAGING IN MARGIN BORROWING.

THIS CLOSING STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY ANY SECURITIES REGULATORS OR COMMISSIONS OR SECURITIES EXCHANGES IN ANY JURISDICTION (THE "SECURITIES REGULATORS").

NO SECURITIES REGULATORS HAVE ISSUED A RULING ON EITHER THE ACCURACY OR LEGAL SUFFICIENCY OF THIS CLOSING STATEMENT NOR OF THE UNDERLYING COLLATERALIZED, SECURED, FIXED INSTRUMENT LOAN TRANSACTION (THE "TRANSACTION") THAT THIS CLOSING STATEMENT PROMULGATES.

NEITHER THIS CLOSING STATEMENT NOR THE UNDERLYING TRANSACTION IS INTENDED IN ANY WAY TO BE A PUBLIC OFFERING, BUT INSTEAD IS A CLOSING FOR AN UNDERLYING COLLATERALIZED, SECURED, FIXED-INSTRUMENT FINANCING TRANSACTION TO BE OFFERED TO AND AS AGREED TO BY QUALIFIED INVESTORS, AS DEFINED BY SECURITIES REGULATORS AND/OR BY ANY APPLICABLE SECURITIES ACT. MARGIN BORROWING ENTAILS RISK, AND THE BORROWER AND GUARANTOR ARE AWARE OF SUCH RISKS AND HAVE EFFECTIVE MANAGEMENT STRATEGIES IN PLACE TO REDUCE OR ELIMINATE RISK AS A RESULT OF MARGIN BORROWING.

LENDER INTENDS TO FUND THE BORROWER IN ACCORDANCE WITH THE STOCK LOAN AGREEMENT EXECUTED BETWEEN BORROWER, GUARANTOR AND LENDER. LENDER WILL AT ALL TIMES MAINTAIN ITS ABILITY TO RETURN AN EQUIVALENT NUMBER OF ISSUER SECURITIES VALUED AT FAIR MARKET VALUE. THE FUNDING WILL CONSIST OF MULTIPLE TRANCHES WITH DURATION BETWEEN EACH TRANCHE AND THE FUNDING AMOUNT DEPENDENT ON MARKET CONDITIONS AND LENDERS SOLE DISCRETION. ALL CALCULATIONS SHOULD BE VERIFIED BY BORROWER AND GUARANTOR UPON RECEIPT AS LENDER TAKES NO RESPONSIBILITY FOR ERRORS. CALCULATIONS INCLUDE COSTS, DEDUCTIONS, EXPENSES AND ADJUSTMENTS RECITED.

# CLOSING STATEMENT

**Gross Proceeds: MXN 179,645,808.61**
**Funds Settled (Net): MXN 173,586,459.31**
**Tranche 5**
**September 15, 2023**

**WHEREAS**, Astor Asset Management 3 Limited ("Lender"), Corporacion RBS SA de CV ("Borrower") and **Ricardo** Benjamin Salinas Pliego ("Guarantor"), collectively herein known as the "Parties", have entered into an agreed upon collateralized, secured fixed instrument-based loan transaction (the "Loan Transaction"); and

**WHEREAS**, the Parties entered into an agreed upon and fully executed Stock Loan Agreement (the "SLA") established as of July 28, 2021 to facilitate and collateralize the agreed upon Loan Transaction by and between the Parties; and

**WHEREAS,** the Parties subsequently entered into the Addendum to SLA dated July 31, 2021 and the Second Addendum to SLA dated December 6, 2021 and a Third Addendum to SLA dated June 13, 2022, and a Fourth Addendum dated July 19, 2022, each of which remains in full force and effect to date; and

**WHEREAS,** on the date of July 30, 2021 ("Confirmation Day") Lender received the required confirmation from the Depository Broker that three million six hundred thousand (3,600,000) shares (the "Shares") of Grupo Elektra, S.A.B. de C.V., ELEKTRA:MX, (the "Issuer") posted to Guarantor's account at Weiser Global Capital Markets, the Depository Broker (the "Pledged Collateral"), pursuant to the SLA; and

**WHEREAS,** on the date of June 22, 2022 ("Confirmation Day") Lender received the required confirmation from the Depository Broker that one million four hundred thirty-one thousand seven hundred (1,431,700) shares (the "Shares") of Grupo Elektra, S.A.B. de C.V., ELEKTRA:MX, (the " Issuer") were posted to Guarantor's account at the Depository Broker (the "Pledged Collateral"), pursuant to the SLA; and

**WHEREAS**, on the date of September 13, 2023 ("Confirmation Day") Lender received the required confirmation from the Depository Broker that four hundred forty-four thousand three hundred eighty-nine (444,389) shares (the "Shares") of Grupo Elektra, S.A.B. de C.V., ELEKTRA:MX, (the "Issuer") posted to Guarantor's account at the Depository Broker (the "Pledged Collateral"), pursuant to the SLA; and

**WHEREAS,** the Parties now wish to enter into this Fifth Addendum whereby the Lender agrees to make an additional loan to the Borrower in the amount up to One Hundred and Ninety-Two Million, One hundred Thousand Mexican Pesos (MXN 192,100,000), or such lesser amount as determined by Lender in accordance with the SLA and this Fifth Addendum, against four hundred forty four thousand three hundred eighty nine (444,389) newly pledged shares of Grupo Elektra, S.A.B. de C.V. ("ELEKTRA:MX") pledged by Guarantor and transferred to the account of Ricardo Benjamin Salinas Pliego located at Tavira Monaco SAM and known as TMC-63 to be pledged to Lender for duration of Loan Term until maturity on June 22, 2027.

**WHEREAS**, the Loan-to-Value ratio (the "LTV") of the Loan was originally set in the SLA at fifty-five percent (55%) of the Shares' Fair Market Value (the "FMV"), and it has been mutually agreed that the LTV of the Loan is hereby adjusted to thirty-five percent (35%); and

**WHEREAS**, acceptance of funds constitutes Borrower's and Guarantor's further recognition and acknowledgment of all terms and conditions herein; and

**WHEREAS**, the Loan Transaction proceeds as more fully stated herein in this Closing Statement, have been or shall imminently be transferred to Borrower upon or post the Tranche Date listed herein, in accordance with the SLA and this Closing Statement; and

**WHEREAS**, as per the SLA, the Shares have been pledged to Lender and shall be collateralized by Lender in order to release the Loan Transaction proceeds and to provide the funding facility in accordance with the SLA, which has become legally binding and in full force and effect by and between the Parties; and

**NOW, THEREFORE**, in consideration of the premises and of the representations, warranties, covenants and agreements herein contained, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

## STATEMENT OF TRANCHE PROCEEDS

| | | |
|---|---:|---|
| Tranche Proceeds (Gross): | 179,645,808.61 | MXN |
| | | |
| Deductions: | | |
| Custodian Management Charge: 0.0375% per quarter | 48,289.81 | MXN |
| Maintenance Fee: 0.0625% per quarter[1] | 112,278.63 | MXN |
| Origination Fee: 1%[2] | 898,229.04 | MXN |
| Foreign Exchange & Bank Fees 2.5% | 4,491,145.22 | MXN |
| Quarterly Advance Interest: 1.15% per annum | 509,406.61 | MXN |
| **Net Settled Funds** | **173,586,459.31** | **MXN** |

### FUNDING PROCEEDS AND COLLATERALIZATION RECORD

| | LTV | FMP (MXN) | Facility (MXN) | Shares Pledged | Avg. Volume[3] |
|---|---|---|---|---|---|
| | 35% | MXN 1,155.01 | MXN 1,974,572,743.94 | 444,389 | 48,850 |

| Tranche No. | Date | Price (MXN) | Gross Funding Amount (MXN) | Collateralized Shares | Net Funds after Deductions (USD) |
|---|---|---|---|---|---|
| 1 | 9-Aug-21 | MXN 1,618.23 | MXN 501,591,693.09 | 563,569 | MXN 500,000,000.00 |
| 2 | 17-Sep-21 | MXN 1,599.19 | MXN 327,497,030.23 | 372,344 | MXN 300,000,000.00 |
| 3[4] | 7-Feb-22 | MXN 1,353.54 | MXN 532,484,020.62 | 1,299,497 | MXN 510,000,000.00 |
| 4[5] | 22-Jun-22 | MXN 1,150.00 | MXN 613,000,000.00 | 2,796,290 | MXN 592,871,767.12 |
| 5 | 15-Sep-23 | MXN 1,155.01 | MXN 179,645,808.61 | 444,389 | MXN 173,586,459.31 |
| | **Total Funding to Date:** | | **MXN 2,154,218,552.55** | | |
| | **Current FMV of Collateralized Shares:** | | **MXN 6,324,937,555.89** | | |

---

1. *Maintenance Fee in the exact same amount as initial charge is due in advance every three months; future payments must be paid by Borrower to Lender in advance every three months on the quarterly anniversary of the Tranche 1 Closing Statement for the term of the Loan Transaction without further notice or repeated demand.*
2. *Pursuant to the SLA, 50% of the Origination Fee applicable to each tranche is deducted from the Loan Principal Amount. The balance of the 1% Origination Fee in the exact same amount as the initial deduction listed in each Closing Statement is due without further notice or repeated demand on the first annual anniversary of each respective Tranche Date.*
3. *Daily Average Volume for one month preceding collateral settlement per Yahoo Finance.*
4. *Collateralized shares are adjusted to reflect reduction of Loan to 45% LTV.*
5. *Collateralized shares reflect reduction of Loan to 35% LTV and current tranche price.*

Borrower and Guarantor hereby acknowledge, understand and agree that the current FMV of the shares, as stated above, is the FMV of the shares at the time of funding and is for this tranche, as per the Schedules in this Closing Statement.

Borrower and Guarantor further hereby acknowledge, understand and agree that each subsequent tranche of the Loan Principal Amount and its loan proceeds accordingly may vary and may likely fluctuate due to market conditions, risk management, daily trading price of the Shares at time of funding and changes in Borrower or Guarantor qualification, and Lender may issue future Closing Statements without requiring the signature of Borrower and Guarantor.

Borrower and Guarantor shall note that the Custodian Management Charge for the first three (3) months has been deducted from loan proceeds. Borrower is responsible for these and all Custodian and third-party fees related to custody. Tranche 1 Closing Statement includes a Custodian Management Charge adjustment in favor of Borrower which is reversed in Tranche 2 Closing Statement, and the Custodian Management Charge for the initial period is deducted from loan proceeds in Tranche 2 Closing Statement. For each subsequent quarterly period, the Custodian Management Charge for Tranche 5 in the amount of MXN 48,289.81 must be remitted by Borrower to Lender at least fourteen (14) days prior to each quarterly anniversary of the Effective Date of the SLA without further notice or repeated demand.

Borrower and Guarantor shall additionally note that quarterly interest shall be due and payable in advance on the 1st of the month every three (3) months, with interest accruing from the date Cash Collateral is deposited by Lender to Borrower's account.

Borrower and Guarantor hereby acknowledge and agree that Lender reserves the right to deduct from loan proceeds foreign exchange and banking costs incurred by Lender in funding the Loan Transaction which is denominated in Mexican Pesos, and any such costs may be applied retroactively after Lender determines costs incurred.

All Parties hereby agree that Tavira Securities Limited ("Tavira"), as the agreed-upon Depository Broker, is not a party to the transaction between Lender, Borrower and Guarantor, nor does Tavira take responsibility or assume any liability in coordinating, structuring or overseeing any aspect of the underlying Loan Transaction and merely acts as a custodian over the collateral Shares. Any and all arrangements between Lender, Borrower and Guarantor have been negotiated and determined by and between their respective counsel.

Borrower and Guarantor expressly agree that the SLA and all of its provisions, warranties, rights, terms and conditions are valid and in full legal force and effect as of the date of this Closing Statement and there are no material changes.

Borrower and Guarantor expressly agree that failure to remedy any event of default or other deficiency in this Loan Transaction, other loan facilities between the Parties or any other loan or debt facility of the Borrower or Guarantor ("All Facilities") will constitute a default of All Facilities between the Parties.

Borrower and Guarantor expressly represent that they are not subject to, part of nor the subject of any criminal investigation where the Pledged Collateral may be exposed to seizure or claim.

Borrower and Guarantor expressly represent that there has not been any material change to the Shares or the shares of the Issuer, Borrower or Guarantor which may undermine the value of the Pledged Collateral, and, to the best of Borrower's and Guarantor's knowledge, the Issuer of the Shares is not subject to any criminal investigation or misconduct and has timely filed all of its required reports with the stock exchange where Shares are traded.

Borrower and Guarantor expressly represent and agree to cooperate with the Lender, Depository Broker, Global Custodian and sub-Custodian and any third-party due diligence and compliance firm in furnishing any further required audited financial records and due diligence.

Borrower and Guarantor expressly represent that they are currently registered, domiciled and in Good Standing in their corporate home jurisdiction, have not declared bankruptcy in the last seven (7) years and are fully solvent.

Borrower and Guarantor expressly represent that the pledged securities as above stated are not restricted in any way, are free trading and that neither Borrower nor Guarantor have received any notice of any kind from any stock exchange or any broker-dealer which has informed or advised Borrower or Guarantor that the pledged securities are in any way restricted, under a special watch, are on a special hotlist or stop trade limitation and, further that Borrower and Guarantor are not aware of any such notice or alert that any issued security of the Issuer of the Shares is limited or restricted in trading in any way.

Borrower and Guarantor expressly represent that no representations or warranties of any kind have been made by Lender to Borrower or Guarantor, other than those in the written and executed loan agreement by and between the Parties to this Loan Transaction.

Borrower and Guarantor hereby acknowledge, understand and agree that in the event of any inconsistency or conflict with the signed and executed SLA, this Closing Statement shall be the final and controlling document, and the protective covenants and provisions of this Closing Statement shall prevail over any previous document, and furthermore, Borrower and Guarantor expressly agree that in section II.3(b) of the SLA the reference to "every four months" is replaced by "every three months" and in section VI.3(b) of the SLA the reference to "Hereinafter a new FMP" is replaced by "Thereafter a new Margin Call threshold" and the reference to "original FMP" is replaced by "original Margin Call threshold".

Borrower and Guarantor expressly represent that they are not a resident or citizen of the United States of America, that they to the best of their knowledge are not subject to the Securities and Exchange Acts of 1933 and 1934 and are not a subject of any investigation or action by the United States Securities & Exchange Commission or any other regulatory or enforcement agency of the United States of America.

Borrower and Guarantor hereby acknowledge, understand and agree that failure of Lender to exercise any right, power or remedy provided under this Closing Statement or the SLA or

otherwise available in respect hereof at law or in equity, or to insist upon compliance by any party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by Lender of its right to exercise any such or other right, power or remedy available to it at any time or to demand such compliance at any time in the future. Lender's acceptance of late or partial payments remitted by Borrower or Borrower's tardy compliance with any term or provision of the SLA will not be a waiver of Lender's rights. At no time shall funding be construed to be a waiver of any kind including funding provided after an Event of Default. Lender reserves the right to continue funding and invoke an Event of Default at any time in the future. All of Lender's rights are reserved.

Borrower and Guarantor expressly represent that at all times they have been represented by competent legal counsel and that Borrower and Guarantor have had ample opportunity to consult separately with independent legal counsel in order to make an informed decision whether to agree to execute the SLA and this Closing Statement.

Borrower and Guarantor expressly represent that this Closing Statement has not been modified, edited or altered in any way and expressly agree this Closing Statement cannot be modified except by written addendum thereto fully executed by the Parties herein.

Borrower and Guarantor further and expressly represent that they are Qualified/Professional Investors, have agreed to this Closing Statement and all of its representations, warranties, covenants and agreements herein contained of their own free will, based upon their independent judgment and upon the advice of competent independent legal counsel.

Borrower and Guarantor further and expressly understand that Lender's underwriting may change at any time up-until funding or during funding if such funding is in tranches and market conditions, changes in Pledged Collateral or deterioration of Borrower's or Guarantor's qualifying criteria, in Lenders sole discretion, warrant it. Borrower and Guarantor further understand and expressly agree that the Lock-Up Period for Prepayment of the Loan Transaction shall be extended to coincide with loan Maturity Date. Lender does not guarantee funding or voting rights and all funding is at Lenders sole discretion until disbursement.

Borrower and Guarantor are capable and willing to post margin when required to do so.

## I. CASH & STOCK TOP UP ACCOUNT INFORMATION:

| | |
|---|---|
| Institution's Name | Tavira Securities Limited |
| Account Number | TMC-63 |
| Account Name | Ricardo Benjamin Salinas Pliego |

## II. INTEREST, PRINCIPAL & FEE PAYMENT INFORMATION:

| | |
|---|---|
| Beneficiary | Astor Client Management Account |
| Beneficiary Bank | Dime Community Bank |
| Beneficiary Account Number | 5000227657 |
| Beneficiary Bank SWIFT | BHNBUS3B |
| Reference | Astor interest payment from RBS SA de CV |

It is Borrower's and Guarantor's responsibility to notify Lender of transfers and confirm each transaction is processed by the receiving institution before any applicable due date.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

IN WITNESS WHEREOF, the Parties hereto have caused this Closing Statement and Addendum to be duly executed as of the day and year written below. Each Party has consulted their respective legal counsel and agree to the terms written herein.

**BORROWER:** Corporacion RBS SA de CV

| | | |
|---|---|---|
| _____ | RICARDO B. SALINAS PLIEGO | SEPTEMBER 19, 2023 |
| Signature | Name and Title | Date |

_____

Seal

_____
Witness
Witness is only certifying Borrower's Signature

**GUARANTOR:** Ricardo Benjamin Salinas Pliego

| | | |
|---|---|---|
| _____ | RICARDO B. SALINAS PLIEGO | SEPTEMBER 19, 2023 |
| Signature | Name and Title | Date |

_____

Seal

_____
Witness
Witness is only certifying Guarantor's Signature

**LENDER:** Astor Asset Management 3 Limited

| | | |
|---|---|---|
| _____ | Mariia Mitsa, Managing Member    20 September 2023 |
| Signature | Name and Title                                     Date |



# EXHIBIT 10

**Astor Capital Fund**

## STOCK LOAN AGREEMENT ("SLA")

This Stock Loan Agreement is established as of May 1ˢᵗ, 2021 (the "Effective Date") between Astor Asset Management 3 Limited, a corporation with its office located at 777 Dunsmuir Street, Suite 1400, Vancouver, British Columbia, Canada V7Y 1K4 ("Lender") and:

Corporacion RBS SA de CV, with a principal place of business located at Ave. Ferrocarril de Rio Frio 419 A99, Cuchilla del Moral 1, Iztapalapa 09319 Ciudad de Mexico, Mexico, ("Borrower"), mutually hereinafter the Borrower and Lender shall be referred to as the ("Parties").

This Agreement shall remain in effect until (a) fully satisfied and mutually terminated in writing upon mutual satisfaction; (b) all Indebtedness is paid in full and Borrower is released by Lender in writing; or (c) the Agreement is terminated in writing by Lender in accordance with the covenants and terms provided herein.

### WITNESSETH

**STOCK LOAN AGREEMENT** On this date, and from time-to-time hereafter, Lender may make Loans to Borrower. Borrower and Lender (collectively, the "Parties") enter into this Stock Loan Agreement ("SLA") which, together with the applicable supplement(s) and other Loan Documents, shall govern each separate Loan and all indebtedness between the Parties. Unless stated to the contrary elsewhere, the provisions of all Loan Documents are incorporated by reference herein as if stated in full. This SLA supersedes all previous term sheets, emails, representations, warranties and discussions and is the final documentation of the Parties' undertakings. For the value received, Borrower promises to pay Lender, all indebtedness governed by this Agreement. Nothing herein shall be construed to obligate Lender to restructure or renew any unpaid balance, forgive any part thereof, fund in full, or to make any additional or future loans or financial accommodations to Borrower.

### I.    DEFINED TERMS WITHIN AGREEMENT:

1) **"Acceleration Notice"** shall mean a written notice given to Borrower after the occurrence and continuation of an Event of Default declaring all amounts and sums accrued and unpaid to be immediately due and payable, at which point the Loan is in state of Default.

2) **"Advance"** shall for purposes of this Agreement refer to any sum of money and in any currency, paid out to any account of Borrower, or any third-party account, whether controlled by Borrower or not, if directed to do so by Borrower, for and on behalf of Borrower. All payments made to any third-party for or on behalf of Borrower shall constitute as payment having been made to Borrower.

3) **"Agreement"** shall mean this Stock Loan Agreement, including any supplements or attachments hereto, and other subsequent written agreements, which shall be incorporated by reference along with all amendments, modifications, and restatements thereof in written form. Emails are expressly excluded, are not binding, and are not to be construed as part of any agreement or modification.

4) **"Approved Loan Amount"** shall mean the maximum total amount the Lender is willing to fund to Borrower based on Pledged Collateral to be deposited with Depository Broker represented throughout as Loan Principal Amount or Principal. For purposes of this Agreement, the Approved Loan Amount may be paid out in draws or in lump sum.

## Astor Capital Fund

5) **"Balance Payment"** shall mean the Loan Principal Amount less any Origination Fee, costs, or expenses, if applicable, not satisfied in cash by Borrower.

6) **"Borrower"** shall mean the entity or individual described herein and no other for purposes of this Agreement.

7) **"Breach"** shall mean any of the Events of Default specified in this Agreement and unless specified otherwise, other Loan Documents that constitute a default.

8) **"Business Day"** shall mean any day other than Saturday, Sunday or a holiday observed by applicable laws.

9) **"Cash Collateral"** shall mean the Loan Principal Amount to be funded to Borrower, which at all times shall be computed by Lender and reflected in the Closing Statement. The Cash Collateral shall be the net amount to be funded, less fees and costs as stipulated in this Agreement and the Closing Statement and disbursed on the Closing Date.

10) **"Closing"** shall have the same meaning as Closing Date and used interchangeably throughout.

11) **"Closing Date"** shall occur after the Confirmation Day and shall mean the date(s) on which the Closing Statement is issued and thereafter the Loan Principal Amount is disbursed to Borrower. When Loan Principal Amount is disbursed in several tranches, in each case a Closing Statement will be issued. Erratic or unforeseen market conditions may warrant an untimely issuance and delay in funding.

12) **"Closing Statement"** shall mean a Lender issued and determined document which references the final financial provisions, currency conversions and terms of the Loan prior to disbursement.

13) **"Collateral"** shall mean publicly traded securities of Issuer, together with any split-up or dividend payable to shareholder of record.

14) **"Confirmation"** shall have the same meaning as Confirmation Day and used interchangeably.

15) **"Confirmation Day"** shall mean the Business Day after the Pledged Collateral has been received, settled and posted in favor of Lender at the Depository Broker and is adequately ready and valid in all respects to be registered as Pledged Collateral. The Depository Broker shall notify the Borrower and Lender in writing of this event.

16) **"Cure Period"** shall mean a period of time when a Party that breaches a contract can remedy the breach without penalty, provided a Cure Period is afforded and stated as such. The Cure Period when provided as per this Agreement is five (5) Business Days.

17) **"Currency"** shall mean Mexican Pesos ("MXN"). Currency shall include the Loan, including all interest and fees thereof, and any funds transferred in this Agreement. If Pledged Collateral is a security that is priced and traded in a market and currency other than MXN, the Parties agree to convert to MXN for all purposes. Conversions for such currency shall be selected by Lender's choice of bank or those published by Yahoo Finance or comparable news source. Any conversions selected by the Lender's choice of bank the Borrower shall assume a 1.50% - 2.50% conversion rate computed according to the purchase of USD exchange rate published by Banamex, if the Borrower elects to receive funding in Mexican Pesos.

 **Astor Capital Fund**

18) **"Default"** shall mean a breach of this Agreement and have the same meaning as Event of Default.

19) **"Depository Broker"** shall mean a regulated financial institution selected by Lender for the receipt of the securities, specifically the Pledged Collateral and any top-up. A Depository Broker is a firm that facilitates the custody of the Pledged Collateral acting as an intermediary between the Borrower and Lender and which will adhere to an executed Custodian Management Agreement, in accordance with all terms and conditions set herein this Agreement.

20) **"Effective Date"** shall mean the date the Agreement is effective.

21) **"Encumbrance"** shall mean Lender's legal claim on Pledged Collateral that affects the Borrower's ability to transfer ownership to anyone or to dispose of the Pledged Collateral without Lenders prior written authorization. For purposes of this definition, Encumbrance shall mean lien, mortgage, charge, hypothecation, rehypothecation, rights, barter, pawn, trade, dispose, deal-in, pledge, re-pledge, repo, borrow or transfer of security interest in Collateral. The Pledged Collateral will be restricted to Borrower and Encumbrance rights exclusively granted to Lender.

22) **"Event of Default"** with respect to this Loan or any, shall mean any of the events specified in Clause VI hereof in addition to any omission or failure to perform a legal or contractual duty as obligated, stated or outlined herein. An Event of Default will cause Acceleration of the Loan.

23) **"Fair Market Price" ("FMP")** shall mean the lower of, the average of the last sale price of the Pledged Collateral on three (3) consecutive Business Days prior to closing or recording of the pledge at the Transfer Agent or Depository Broker or the lowest trading price at Closing. The average price shall be the per-share price of the Pledged Collateral establishing its Fair Market Value ("FMV").

24) **"FMV"** shall mean the amount, expressed in Mexican Pesos (MXN), equating to the FMP for each share of the Pledged Collateral multiplied by the number of such shares pledged or transferred for lending purpose.

25) **"Hybrid Loan"** shall have the same meaning as a Loan with respect to purpose, but shall mean that this Agreement is structured as an Investment and a Loan, resulting in a Hybrid Loan.

26) **"Interest"** shall mean the sum of money paid regularly at a particular rate for the use of money lent. It represents a charge imposed by Lender for all funds advanced to Borrower in a form of a Loan.

27) **"Investment"** shall mean that this Loan may be construed as a speculative Investment. Borrower being considered a sophisticated professional investor, and Borrower being aware of all the risks associated with making a major Investment where the outcome is unpredictable.

28) **"Investment Risk"** means that margin borrowing entails risk which is commensurate with any type of a speculative investment where the results and the outcome are both unpredictable and whereby the consequences could be materially negative. Borrower is fully informed of all risks, is a seasoned professional investor and is prepared to accept an unpredictable outcome having realized that this is a speculative undertaking.

![Astor Capital Fund]

**Astor Capital Fund**

29) **"Issuer"** shall mean the corporate entity that has issued and distributed the shares of: **Grupo Elektra SAB DE CV (ELEKTRA*:MM)**.

30) **"Lender"** shall mean specifically the Lender described herein and not any other for purposes of this Agreement.

31) **"Lender's Discretion"** means Lender shall have the right to not proceed with the funding at any time up until the Closing Date.

32) **"Lender's Remedy"** shall mean Acceleration of the Loan and Principal and the termination of this Agreement, specifically termination of the Loan and forfeiture of the Pledged Collateral per Clause VI.4 as provided herein, which may result because of a default by Borrower; in any case, excess funds received by Lender from the sale of Collateral in Event of Default will be returned to Borrower.

33) **"Lien"** shall mean any Encumbrance of any kind referenced herein concerning the Pledged Collateral. A lien is the Lender's right to retain possession of property belonging to Borrower until a debt owed by that Borrower is fully discharged per this Agreement.

34) **"Loan"** shall mean the total contractual gross amount computed together when proportionally Advanced or lent by Lender to Borrower on a nonrecourse basis for the specified duration and subject to the stated conditions. The Loan is funded based on FMP of the Pledged Collateral. For purposes of this agreement, all fees and costs due to Lender shall fall within this definition. For purposes of this Agreement, the Loan can be sent by bank wire transfer to Borrower or deposited by Lender into Borrower's own account held at the Depository Broker.

35) **"Loan Documents"** shall mean collectively, this Agreement, Custodian Management Agreement, the Closing Statement and any other agreements, documents, instruments, exhibits, or statements delivered in connection with the Loan. Each to be read and construed together in a manner to give meaning and effect to all their provisions.

36) **"Loan Principal Amount"** shall mean full or allotment of monies borrowed by Borrower or advanced by Lender under Clause II.1.a hereof, in accordance with Loan to Value and is due and owed to the Lender. The Loan Principal Amount represents the Approved Loan Amount.

37) **"Loan Term"** see meaning of Term of Loan. For purposes of this Agreement, the phrases may be used interchangeably throughout, but shall have the same meaning.

38) **"Loan-to-Value (LTV)"** shall mean the ratio describing the total amount of the loan in relation to the value of the secured collateral pledged or transferred.

39) **"Material Event"** shall mean any event or possible outcome which may undermine or alter value of Collateral or prejudice Lender's standing Lien.

40) **"Maturity"** shall have the same meaning as Maturity Date and used interchangeably.

41) **"Maturity Date"** shall have the meaning provided in Clause II.6.a herein.

42) **"Obligations"** shall mean any and all promises, commitments and requirements, monetary and otherwise, made by Borrower to Lender. Borrower is morally and legally bound and has a duty to perform as obligated itself herein.

## Astor Capital Fund

43) **"Party"** shall mean Lender or Borrower, as the case may be, and their agents, representatives, successors, affiliates, and assigns.

44) **"Parties"** when capitalized, the word means both Borrower and Lender and no other. When not capitalized, shall refer to any other third party.

45) **"Pay-Off Amount"** shall mean the amount expressed in Mexican Pesos that Borrower will need to pay to satisfy the Terms of the Loan. Borrower shall request the Pay-Off Amount of Lender in writing ten (10) Business Days in advance of the actual Pay-Off Date. The Pay-Off Amount shall be sent by Borrower to Lender by wire transfer in Mexican Pesos to Lenders designated Depository Broker or Lenders commercial bank account at least three (3) Business Days prior to the Pay-Off Date. The Pay-Off Amount shall be in Mexican Pesos equal to the Loan Principal Amount as referred to in the Closing Statement.

46) **"Pay-Off Date"** shall mean the date determined by Lender on which Borrower will tender the Pay-Off Amount to Lender in exchange for Lender discharging the Lien over the Pledged Collateral being held at the Depository Broker.

47) **"Pledged Collateral"** shall mean the total actual shares pledged to Lender as consideration for the Loan and any shares or proceeds resulting from any transaction, split-up, revision, reclassification, or other like change that may take place of the Pledged Collateral during the Term of the Loan. The contemplated pledged securities are not a gift or a purchase, instead being pledged to Lender for Loan purposes.

48) **"Principal"** shall have the same meaning as Approved Loan Amount and used interchangeably.

49) **"Proof of Funds"** shall mean written proof of cash or liquid securities held in the Borrower's name.

50) **"Security Interest"** shall mean a Lien or Encumbrance granted by Borrower to Lender in real property such as securities as Collateral for a loan. The Security Interest granted to Lender prevents the Borrower from disposing or transferring the property or securities until such time as the Loan is repaid to Lender.

51) **"Statement of Knowledge"** shall mean any statements, representations or warranties which are based upon the knowledge of the Borrower, constructive or otherwise, whether Borrower knew or should have known or was expected to know.

52) **"Term of the Loan"** shall mean the period beginning on the first day when the Approved Loan amount is fully funded to the Borrower and ending on Maturity Date, calculated in months or years.

53) **"Tranche"** shall mean that parts into which the payment of this financial arrangement are divided into.

54) **"Transfer Agent"** shall mean the organization selected by Issuer to maintain and record the ownership of shares by Issuer of securities.

55) **"Underwriting"** shall mean a discretionary and subjective credit qualification process using factors such as stock market dynamics, liquidity, earnings, public data by which Lender

**Astor Capital Fund**

approves a Loan based on its risk management policy, Collateral in question and Borrower's ability to repay the Loan.

56) **"Valuation Event"** shall mean that the FMP of the Pledged Collateral has fallen to less than seventy percent (70%) of the FMP used to calculate the Loan Principal Amount as reflected by the average of the last sale price on three (3) consecutive Business Days on a national or international securities exchange. A Valuation Event may also be triggered by erratic market conditions or news reasonably expected to impact the securities of Issuer.

57) **"Voting Rights"** shall mean the right given to shareholder of Issuer to allow shareholder to vote on various matters of corporate policy or issues before the Issuer.

**IN CONSIDERATION THEREOF:** Each Party agrees that the fair value of consideration it is receiving, has been received, and will continue to receive under this Agreement equals to or exceeds the fair value of the consideration it is delivering to the other Party. In consideration of mutual promises provided or to be provided, and other good, valuable, sufficient, equitable consideration, and mutual covenants, the receipt of, adequacy and sufficiency of which is hereby acknowledged, exchanged, and satisfied by all and between all parties, and intending to be bound hereby the performance thereof, and such represents reasonably just, equitable, adequate and reasonable in value, the parties hereto covenant and agree to and stipulate. Consideration will include monetary and non-monetary exchanges, services, in-kind, of every nature and type and otherwise as well as other covenants which the Parties may choose to agree to exchange in the performance thereof. The parties hereto agree as follows:

## II.   SUBSTANTIVE TERMS OF THE LOAN

### 1. Principal Amount.

a) Subject to and upon the terms and conditions set forth herein, Borrower and Lender hereby further set forth their rights and obligations to one another and Borrower hereby grants to Lender Lien rights over the Pledged Collateral and in exchange, the Lender agrees to advance to Borrower a Loan consisting of funds up to **THREE BILLION EIGHT MILLION FIVE HUNDRED EIGHTY THOUSAND (3,008,580,000.00)** Mexican Peso (MXN) (constituting the **"Approved Loan Amount"**) of the current FMV of the Pledged Collateral of: **Grupo Elektra SAB DE CV (ELEKTRA*:MM)** subject to all the terms, covenants and conditions of this Agreement. The said sum represents the Loan Principal Amount and is advanced to Borrower not permanently, but temporarily for the duration of the subject Loan Term. Funding of Loan Principal Amount will be initiated within one (1) Business Day of the Closing Day (the "Closing Day") and shall be memorialized by Lender's issuance of an executed Closing Statement. The Loan Principal Amount to be secured by Cash Collateral to be deposited by Lender into Borrowers account at the Depository Broker within twenty-four (24) hours of delivery of Pledged Collateral.

b) The Borrower shall be entitled to the appreciation, if any, of the FMV of the Collateral if the Loan is repaid in full by Maturity.

c) The amount that Lender may make available under Loan shall be calculated by multiplying fifty-five percent (55%) of the value of Pledged Collateral by the FMV.

### 2. Interest Rate.

**Astor Capital Fund**

a) All outstanding amounts of the Loan shall bear an interest rate in an amount equal to **one and fifteen one hundredths of a percent (1.15%)** per year to be paid to Lender in quarterly installments, as directed by Lender, by the issuance of payment statement in advance of due date. Interest payment shall be collected in advance of Loan and shall accrue daily both before and after any default of the loan, demand, court judgment, or arbitral award, and shall be calculated based on the actual number of days elapsed and on the basis of a year of three hundred and sixty-five (365) days (three hundred and sixty-six (366) days in a leap year).

b) All interest and principal must be paid by way of bank certified check, wire transfer or other immediately available funds without undue delay or further demand to address or bank account indicated herein, or as further may be directed by Lender. In Event of Default, to the extent permitted by applicable law, the interest rate on Loan shall be computed at a rate equal to one and one-half percent (1.5%) per month and shall continue until satisfied and cured by Borrower or released by Lender.

c) The first interest payment shall be subtracted from Loan proceeds at the time of the funding. Further interest payments for the Loan shall be due timely on the first Business Day of each month following the Closing Date, and such payment schedule shall be based on twelve months per calendar year, regardless of the actual number of days between the applicable Closing Date and the date such first interest payment is due.

d) Any funds received as payment from or on behalf of the Borrower shall be applied by Lender in accordance with the following: (i) first, if applicable, to all outstanding interest and fees; (ii) second, to fees and costs due to third-parties engaged by Lender to enforce covenants and provisions of this agreement; (iii) third, to any outstanding Principal balance; and (iv) fourth, any excess funds received by Lender from the sale of Collateral in Event of Default to be returned to Borrower.

## 3. Loan Fees and Costs.

a) **Origination Fee.** Borrower shall pay to Lender an agreed-upon Loan Origination Fee of one percent (1%) of Loan Principal Amount contemporaneous with the funding of the Loan by Lender. (**"Lender's Origination Fee"**) to be paid to Lender. The Lender is authorized to deduct the 50% of the subject Origination Fee from Loan Principal Amount, with the balance to be paid by the Borrower on the 1st Anniversary of the Loan. The fee is non-refundable and fully earned.

b) **Maintenance Fee.** Borrower shall pay Lender every three (3) months the maintenance fee of six and twenty-five hundredths basis points (0.0625%) of the Loan Principal Amount (**"Lender's Maintenance Fee"**). The Lender is authorized to deduct the Maintenance Fee in advance from the Loan Principal Amount for the first period, it shall be memorialized in the Closing Statement and the same exact amount shall be paid by Borrower, automatically and without further demand, every four months thereafter for all the years constituting the Term of the Loan. Lender's Maintenance Fee is non-refundable and will be paid in advance.

c) **Liquidated Damages.** If Borrower fails to deliver in full, within forty-five (45) days, the required Pledged Collateral to the Depository Broker into the account of Borrower after both the duly signed Agreement and the Custodian Management Agreement to catalyze and bring about the Approved Loan Amount, then there shall be Liquidated Damages equal to two percent (2%) of the stated Approved Loan Amount. The Liquidated Damages are effective upon the execution of this Agreement by both Parties and shall be Lender's only claim against Borrower for damages as a result of Borrower's failure to deliver the Pledged Collateral to custodian

**Astor Capital Fund**

Depository Broke into the account of Borrower. The two percent (2%) Liquidated Damages applies only to Borrower's failure to deliver the Pledged Collateral and does not apply to other Event(s) of Default, which is covered under Clause VI of this Agreement. This two percent (2%) Liquidated Damages if applied due to failure by Borrower to proceed or in failing to deliver Pledged Collateral to the Depository Broker in full, is therefore Lender's rightful claim.

d) **Expenses.** Borrower agrees to pay all of Lender's reasonable costs and fees, including legal fees and out of pocket expenses that might arise in the course of Lender enforcing, collecting, defending, executing, and maintaining this Agreement. For the services provided, the Depository Brokers engaged in the performance of this Agreement are entitled to an annual custodian management charge to be paid by Borrower based on the cumulative net asset value of all Dedicated Depository Account(s) at time of delivery of the Pledged Collateral and limited to fifteen hundredths of one (0.15%) percent. The annual custodian management charge is exclusive of any transaction fee, transfer fee, exit fee, or other administrative costs and fees which Depository Broker may possibly impose. Such fee shall be nonrefundable and shall be paid one (1) year in advance. First year's fee may be deducted from the Loan proceeds or charged to Borrower's account directly by the Depository Broker. In subsequent years, the Borrower will remit to Lender the exact same fee every year at least fourteen (14) days prior to the Effective Date, to be remitted by Lender to Depository Broker.

4. **Additional Loan Amount.** In the event of an increase in the FMV of the Pledged Collateral, the Borrower has the right to request that Lender increase the Loan Principal Amount at the same LTV as provided herein, at which time an amendment to this Agreement regarding additional funds to be provided will be incorporated. Lender will have sole discretion in determining whether to fund any additional funds in addition to the Loan Principal Amount, up to the full FMV of the Pledged Collateral at the time of the written request by Borrower. Borrower may exercise this provision not more than once every three (3) months.

5. **Early Prepayment.** There shall be no early prepayment ("Prepayment") of the Loan Principal Amount or of any interest due under the Loan permitted during the first sixty (60) months of the Loan Term ("**Lock-Up Period**") unless any payments are to be received according to a Change in Collateral event or with written permission from Lender. The Borrower may prepay the Loan Principal Amount after a "Lock-Up Period" but shall be subject to a half of one percent (0.5%) administrative and closure fee. Until resolved, the "Lock-Up Period" shall be extended in the event of Lender's inability due to regulatory constraints placed on the securities, Borrower's willful lack of cooperation, circumstances outside of Lender's control or restrictions placed on securities.

6. **Term and Maturity Date of Loan.**

a) **Maturity Date:** The Loan Principal Amount together with all accrued interest and fees and shall be due and payable, five (5) years after the Loan Term begins and subsequently ends (the "Maturity Date"). The Borrower may extend the Maturity Date if the Lender agrees to do so in writing. A fee in the amount of one percent (1%) of the Loan Principal Amount (the "Extension Fee") shall be due and payable on the original Maturity Date if the Lender agrees to extend the Maturity Date at the annual interest rate at the time of an extension. If Lender does not receive the overdue Loan Principal Amount and other Obligations within ten (10) Business Days of the original Maturity Date, Lender will send a notice to Borrower advising Borrower that the Loan will terminate under the default provisions of this Agreement. The Loan Principal Amount is due in entirety at Maturity Date and is irrespective of any action taken by Lender over the Pledged Collateral.

## Astor Capital Fund

**b) Loan Completion:** No later than thirty (30) calendar days before the Maturity Date, the Borrower shall communicate to Lender in writing whether Borrower intends to repay the Loan Principal Amount on the Maturity Date by requesting the Pay-Off Amount in writing and specifying the Pay-Off Date and Lender shall provide the Pay-Off Amount in written form within three (3) Business Days. No later than fourteen (14) calendar days before the Maturity Date, Borrower shall provide Proof of Funds to repay the Loan Principal Amount plus any other Obligations due to Lender on the Maturity Date.

7. **Loan Termination and Redelivery of Collateral.** This Agreement shall terminate when all of Borrower's Obligations have been paid in full, or in the Event of Default. Upon Event of Default, Lender will diligently and in good conscience dispose of Collateral in order to satisfy Obligations of Borrower and return to Borrower any excess stock. Lender confirms and will maintain its full ability to release and discharge the Lien and return the Pledged Collateral, to Borrower, free of any Encumbrance within three (3) Business Days of Borrower's satisfaction of its Obligations. Provided, however, that this Agreement shall be reinstated if any payment in respect of the Loan's Obligations is rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be restored or returned by Lender for any reason. A return of identical securities means a return of the Pledged Collateral as modified as a result of any split-up, revision, conversion, reclassification, degradation, or other like change of the Pledged Collateral. Any cash or shares tendered to buy down the Loan as a result of a Valuation Event are subject to redelivery and shall become part of the Pledged Collateral to be returned to Borrower.

8. **Closing.** The Closing Date in most cases will be no later than one (1) Business Day after the Confirmation Day, provided the conditions to Lender's Obligations as outlined in Clause V herein are satisfied and the written receipt by Lender of a Confirmation that the Pledged Collateral has been deposited and verified with the Depository Broker in a form and manner satisfactory to Lender and its counsel. The balance payment ("Balance Payment") shall be paid within one (1) Business Days of Closing Date. The Balance Payment shall be paid to the Borrower's account at the Depository Broker or to an account of Borrower at a commercial bank account per the following instructions outlined in Schedule A annexed to the back of this Agreement.

### III.    LOAN AND COLLATERAL FEATURES AND ATTRIBUTES

1. **Non-Recourse Loan.** Lender agrees that it will at all times look only to the Pledged Collateral identified in this Agreement for payment of Borrower's Obligations and will not make any claim or institute any action or proceeding against Borrower or any representatives, agents, successors, assigns, or affiliates of Borrower for any deficiency remaining after applying the Pledged Collateral to any sums due Lender. This is a Non-Recourse loan except for the provisions provided under Clause II.3.c of this Agreement.

2. **Due Diligence.** Lender has the right but not the obligation to perform enhanced due diligence on the Pledged Collateral and the Borrower shall fully cooperate.

3. **Material Information.** Borrower has tendered any and all relevant and material information regarding the Pledged Collateral and of the Issuer and all such relevant and material information has been disclosed and provided by Borrower to Lender. During the Loan Term, Borrower will continue to voluntarily provide all such relevant and material information to Lender and not withhold information deemed to be Material.

 **Astor Capital Fund**

4. **Depository Broker.** Lender shall have the exclusive right to appoint a Depository Broker which will provide custody for the Pledged Collateral through a known global bank.

## IV.   BORROWER'S WARRANTIES AND OBLIGATIONS

Borrower represents and warrants to Lender that:

1. **Accredited Investor.** Borrower is a "professional accredited investor" as may be defined by ordinance of Borrower domicile, the jurisdiction of securities Issuer or jurisdiction of Governing Law of this Agreement.

2. **Announcement.** Neither Lender nor Depository Broker assume any responsibility or liability for filing on behalf of Borrower regulatory announcement(s) that are or may be required by the laws, rules, and regulations of any securities regulatory authorities or agencies that may have jurisdiction over any transactions with respect to the securities, including without limitation, loan transactions in which the securities are pledged as collateral. Borrower acknowledges and agrees that as a condition for the closing of the loan transaction described in this Agreement, Borrower shall comply with such laws, rules, and regulations, and assumes all such responsibilities and liabilities, including liability for all legal, administrative, and any and all other costs and expenses associated with making and filing all regulatory announcement(s). In the event Borrower fails, refuses or does not timely fulfill its regulatory announcement Obligations described in this Section, then in addition to any and all other remedies available to Lender and/or Depository Broker on account of Borrower's non-compliance, Lender or Depository Broker may, in their sole and absolute discretion, prepare, file and publish any and all regulatory announcements that either of them may deem to be necessary and/or appropriate in such jurisdictions that Lender or Depository Broker determine to be necessary or appropriate, including without limitation in Borrower's country of residence or domicile. In such event, and notwithstanding any confidentiality or other provisions in this Agreement or any other documents or agreement among the parties, Borrower may publish and/or file regulatory announcements that include, without limitation: a disclosure of Borrower's pledge and the number of shares that Borrower pledged to secure a loan; the current disposition of the securities; any party's purchases, sales, conversions, holdings, and exits from such holdings; changes of beneficial or legal ownership of the securities; changes involving successors-in-interest to the securities; repayment of loan principal in whole or in part and termination of the loan; and proxy and other filings involving voting or other control and management of the securities of Issuer, per the laws, rules, and regulations of the governing securities authority or agency.

3. **Depository Broker.** Borrower hereby affirms to fully abide by the Terms and Conditions of the Depository Broker and if there is any inconsistency between this Agreement and the Terms and Conditions of the Depository Broker, then the Terms and Conditions of the Depository Broker will prevail over this Agreement.

4. **Full Disclosure.** Borrower further represents and warrants that all statements and documentation it has provided to Lender directly or through its agents in connection with this Agreement are true, complete, and do not omit any material facts or information, which if provided, would have impacted Underwriting prudency. Borrower consents to provide to Lender any and all relevant material information which is necessary for any Lender to conduct a prudent risk assessment evaluation of Issuer and Borrower.

**Astor Capital Fund**

5. **Knowledge.** None of the rights of Borrower arising as the legal and beneficial owner of the Pledged Collateral have been surrendered, cancelled or terminated. Borrower has no knowledge of any material non-public information, inside information or similar terms as defined by applicable law with respect to governing the Issuer, which has not been generally disclosed to Lender or the public.

6. **Intentionally left in blank.**

7. **Liens; Reliance; and Cooperation.** As of the date of this Agreement, the securities constituting the Pledged Collateral are owned by Borrower free and clear of any Liens, Encumbrance or contractual, statutory, or regulatory limitation or restriction of whatever nature; are in good standing in accordance with their country of issue; and are freely tradable and transferable securities and Borrower hereby grants absolute first position Security Interest as a Lien and Encumbrance rights to Lender in exchange for receiving a Loan. Borrower further represents and warrants that it has not relied on, and that Lender has not made, any representation, advice, or recommendation with respect to securities, either directly or through publication. Borrower has not relied on any marketing materials or any other written or oral statements of fact or otherwise made by anyone prior to entering into this agreement, and any such materials and/or statements or representations, if any, written or oral, shall be purged from existence as if never having existed. All previous agreements, representations, statements both written or oral, express or implied with respect to subject matter hereof, are superseded by this Agreement and hereby merged into this Agreement. It is encumbered upon Borrower to initiate and facilitate the transfer of the Pledged Collateral. Borrower will cooperate in executing documents provided by Lender, Lender's Depository Broker, and clearinghouse/registry as requested by Lender, Depository Broker, applicable laws and regulations. Borrower further represents that it shall in good faith cooperate to facilitate this Loan transaction in a timely manner.

Borrower represents, warrants, and covenants that it understands that securities borrowing is highly speculative and requires sophistication and that Borrower may lose and forfeit the Pledged Collateral when engaging in margin borrowing. Borrower should only attempt margin borrowing if Borrower completely understands its potential losses; is a seasoned speculative securities investor; is an accredited professional investor; and has solid risk management strategies in place in the event of margin-call or any other warranty, representation or action of Lender or market performance of Collateral.

8. **Necessary Filings.** Borrower warrants and concedes that any regulatory announcement associated with this Agreement is the sole responsibility of the Borrower, and Borrower will comply with all requirements placed by local securities regulatory authorities and any costs associated with such announcements are the sole responsibility of the Borrower. Lender is not responsible for filing any necessary reports for or on behalf of the Borrower, but at its option may elect to do so in order to comply with regulations imposed.

9. **Notification to Lender.** Upon occurrence of any of the foregone events or whenever they shall occur, the Borrower shall promptly inform Lender in writing if a) Borrower has filed for bankruptcy or filed any petition seeking creditor protection; b) any creditor of Borrower has taken legal action against Borrower to recover debts owed to it; c) any creditor has sought or is threatening to seek confiscation or garnishment of property of Borrower. Absent of the preceding events, Borrower will once per year, on each anniversary of the Effective Date, submit a written attestation to Lender representing that to the best of Borrower's knowledge, none of the preceding events had taken place.

 **Astor Capital Fund**

10. **Waiver.** Borrower will not take any suit or action against third parties or affiliates who may be acting on behalf of or for the Lender within the scope of this Agreement. Any dispute or controversy with third parties arising from this Agreement will solely be limited to this Agreement which must be resolved in accordance with the dispute resolution provision of Clause VII herein. It is hereby agreed that third parties such as the Depository Broker, Transfer Agent, referral sources or other affiliates, agents, or assignees of Lender facilitating the scope of this Agreement are hereby indemnified, released, forever discharged and absolved from any claim, controversy or action whatsoever. Should there be an incurable Event of Default, unjust enrichment, extreme remedy and right of redemption are hereby waived by the Borrower, and the Borrower will not assert any right or claim against the forfeited collateral transferred to Lender as a result of an incurable Event of Default. During the pendency of this Loan, Borrower will not seek injunctive relief or interference from any court of law, regulatory body, Transfer Agent, custodian, sub-custodian, Depository Broker, central depository or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement or freeze the shares. Injunctive relief by Borrower or any interference by Borrower, central depository or regulatory agency shall be an immediate and an incurable Event of Default. Borrower will not interfere in any way or challenge the validity or enforceability of this Agreement, and the same shall be a Breach thereof.

11. **Suitability.** Borrower has carefully considered, and has discussed with the Borrowers own professional legal, tax and financial advisers the suitability of this Agreement and Investment Risk associated with it and has fully considered for purposes of this Loan the risks of this Investment, and understands that (i) this loan is an Investment and is suitable only for an investor who is able to bear the economic consequences of losing its entire Investment, (ii) the margin loan backed by the Securities is a speculative Investment which involves a high degree of risk, (iii) that there is lack of predictability in final loan amount, (iv) potential forfeiture of the Collateral, (v) that there are various unforeseen financial implications, independent and dependent on actions of Borrower, including the fluctuating and final value of the Collateral, (vi) Borrowers inability to receive back the Collateral and its adverse value.

## V.    LENDER WARRANTIES AND REPRESENTATIONS

Lender represents and warrants to Borrower that:

1. **Best Efforts Approach.** Despite stock market volatility, erratic trading volume, and pricing fluctuations, best efforts will be employed by Lender to facilitate the funding of the Loan in its entirety for the full Approved Loan Amount, in accordance with this Agreement and as contemplated herein by both Parties. Lender will not act in bad faith at any time during the Term of the Loan.

2. **Cash Collateral.** The lender will deposit Cash Collateral into Borrowers designated account at the Depository Broker which shall coincide with Loan Principal Amount to be funded and released to Borrower at Closing upon execution of the Closing Statement.

3. **Dividend Distributions.** Lender will credit the Borrower for any, and all dividends received or credited to the Lender. If dividends are not received or credited to the Borrower's account at the Depository Broker, then Borrower is not entitled to any to be credited. Lender shall credit Borrower for all dividends if any, at Maturity of the loan to be subtracted from outstanding principal balance. No dividends will be credited to Borrower if the issuer does not pay them to the Depository Broker for any reason whatsoever. Dividends may not be used to offset any

**Astor Capital Fund**

sums due to Lender prior to Loan Maturity unless requested so in advance by Borrower and approved by Lender in writing.

### 4. Dealing with Securities.

a) The Borrower acknowledges and agrees that upon the transfer of the Pledged Collateral to the Depository Broker, the subject Pledged Collateral will: (i) have been given value by the Lender for the use of the Pledged Collateral, for purpose of determining Fair Market Value ("FMV"), in establishing that the Lender has Lien and Encumbrance rights in the Pledged Collateral; (ii) including the power to transfer rights in such Pledged Collateral as may be contemplated by Lender, in accordance with the herein Agreement.

b) During the Loan Term, provided that there has not been an Event of Default, the Lender will not sell or short-sell the shares of the Pledged Collateral on any publicly traded securities exchange. However, upon the occurrence of an incurable Event of Default, the Lender reserves the right to dispose of the Collateral on any publicly traded securities exchange, but is not obligated in doing so.

c) The Borrower acknowledges and agrees that the Pledged Collateral will be utilized by Lender to assert its preferential Lien over it.

d) The Lender will not engage in short-selling the Pledge Collateral by borrowing the shares of same Issuer from any entity or person and later buying the shares in the same security, then returning the borrowed shares in an effort to make a profit.

e) The Lender will not engage in Front Running, by buying or selling ahead of arrival of the Pledged Collateral.

### 5. Order of Payment. Payments received from sale of Collateral upon Event of Default shall be applied in the following order: (i) firstly, to all outstanding Principal balance, interest and fees; (ii) second, to any costs and fees charged by Custodian to Lender; and (iii) lastly, to any excess proceeds of sale of Collateral to be returned to Borrower. Notwithstanding the forgoing, in case of an incurable Event of Default, nothing contained herein shall obligate the Lender to maximize sales proceeds, sell at market, on any specific platform or exchange, or at any specific price, provide accountability on the forfeited Collateral or to qualify the return to Borrower remaining balance of any proceeds.

### 6. Transfer of Securities. The Lender will not transfer the securities to its own account unless an incurable Event of Default has taken place. Only upon an incurable Event of Default will Lender request the Depository Broker to transfer the securities in the Borrower's account to Lender's sole control and custody in order to satisfy Obligations of Borrower.

### 7. Funding Guarantee and Borrowers Remedy. The Lender guarantees to begin funding the stated Loan and the Approved Loan Amount within one (1) Business Days from the Closing Date. If the Lender or the Depository Broker fails to release the stated funding partially or in full within the one (1) Business Days of Closing Date, then Borrower shall have the right to terminate this Agreement, provided that the shares were in fact delivered in full to effectuate the Approved Loan Amount, all of the conditions stipulated herein have been met, shares are not restricted, are free-trading and Borrower did not interfere with the Depository Broker or central depository, trading of the Issuer shares were not halted and force majeure conditions did not interfere or prevent Lender from funding.

**Astor Capital Fund**

Should Lender fail to return to Borrower the Pledged Collateral within five (5) Business Days of receipt of Pay-Off Amount, the Lender shall be liable to Borrower for two (2) times the amount of the Pledged Collateral on deposit at the Depository Broker.

8. **Voting Rights.** Lender represents that it will fully cooperate with the registered owner of the securities of Issuer in exercising its Voting Rights on issues brought by the Issuer before its shareholders and the Lender will either instruct the Depository Broker to vote on behalf of registered owner of the securities of Issuer, or the Lender will vote on registered owner's behalf in accordance with instructions issued by the registered owner. Should the registered owner request that Lender vote on behalf of the registered owner, the registered owner may assign in writing the Voting Rights to Lender and Lender will agree to accept such Voting Rights from the registered owner. However, in no event will the Lender be liable in any way to Borrower or any registered owner as a result of any voting action or inaction.

## VI.   CONDITIONS TO FUNDING; EVENTS OF DEFAULT; AND REMEDIES

1. **Conditions Precedent.** The obligation of the Lender to fund the Loan is subject to the fulfillment of the following conditions precedent to the satisfaction of Lender: (a) The delivery of duly executed Stock Loan Agreement, Closing Statement, Custodian Management Agreement (CMA); (b) that all matters, facts, representations, documentation, announcements, filings, due diligence, regulatory compliance, and instruments in connection with Pledged Collateral, Issuer, and the Loan have been met and are in form and substance satisfactory to Lender's compliance, underwriting team, Global Custodian and Intermediary Custodian, as well its counsel; (c) the delivery of the stock in electronic form to Lender's Depository Broker representing the Pledged Collateral; and (d) Borrowers transfer of Security Interest in the Collateral as a Pledge.

2. **Valid Transactions and Events of Default.** In order for the transaction to be completed to Maturity by the Borrower, the Borrower must fulfill in the performance of and observance of any covenant, representation, provision or agreement contained herein and not default in any other loan document or provision.

3. Borrower is obliged to remedy the following matters, if occurred, in order to avoid being in breach of this or any other loan Agreement:

a) Failure by Borrower to pay the interest and all applicable fees or charges when due as stipulated, or the Approved Loan Amount when due, or any other default in the performance of an obligation that is not cured within the applicable Cure Period;

b) If the Collateral has fallen to less than seventy percent (70%) of the Fair Market Price ("FMP") utilized to compute the Loan Amount published by the average of the closing price on three (3) Business Days by the securities exchange (the "Margin-Call"). If this occurs, then the Borrower will, within five (5) Business Days and without further demand, automatically transfer to the Depository Broker a top-up of shares or cash equal to twenty percent (20%) more than the FMV and cure the deficiency. Hereinafter a new FMP is established at seventy-five percent (75%) of the original FMP. There will not be opportunity to cure if the Pledged Collateral falls by more than fifty percent (50%) of FMP as the Lender will sell the securities to satisfy the Loan Obligations and terminate this Agreement with no further recourse to Borrower;

c) If the class of securities provided as Pledged Collateral is delisted or trading is halted for five (5) or more Business Days by a regulatory agency or otherwise;

 **Astor Capital Fund**

d) If any representation or warranty made by Borrower in this Agreement or in any statement furnished in contemplation of obtaining a Loan shall prove to have been knowingly untrue, omitted or misleading in any material respect;

e) If any of the Loan Documents shall at any time after their execution and delivery for any reason, cease to be in full force and effect or shall be declared invalid, null or void or the validity, obligations hereunder or enforceability thereof shall be contested, repudiated, disaffirmed or challenged by Borrower, it's agents or counsel or by any other person or entity acting on behalf of or for the Borrower;

f) A governmental agency which controls the actions of Issuer has commenced an investigation of the Issuer;

g) A Material Event upon the financial condition of Borrower or Issuer;

h) The Issuer is seeking or applied for an extension in which to file the required regulatory reports;

i) An incurable Event of Default occurring in any other Loan between Lender and Borrower.

4. **Lender's Remedy.** If the Obligations aforementioned are not met, the Lender's remedy shall include and not be limited to any course of action against Borrower for Breach of this Agreement, including the occurrence of any of the foregoing Event(s) of Default, if not cured within the designated Cure Period, and if applicable, shall terminate the Stock Loan Agreement, result in Acceleration of all Loan amounts, interest, costs, expenses, and fees due thereunder, and cause forfeiture of the Pledged Collateral; any and all excess proceeds of the sale of Collateral in Event(s) of Default will be returned to Borrower.

Notwithstanding the above, in case of an incurable Event of Default, nothing contained herein shall obligate or create any duty upon the Lender in any way to apply the proceeds of any sale of the Pledged Collateral to the Loan Principal or against any other Obligation of Borrower or to return remaining balance of proceeds realized as a result of any sale of Pledged Collateral, to maximize sales proceeds, sell the Pledged Collateral in the market, or at any specific price, or in any specific order, or on any specific day or to provide accounting or accountability with respect to the disposition of the Pledged Collateral as a result of an incurable Event of Default. There is no duty owed or implied to Borrower by Lender to maximize the sale of Pledged Collateral upon incurable Event of Default.

5. **Market Conditions.** If the Pledged Collateral experiences a Material Event or Valuation Event, Borrower's lack of cooperation, restriction or material change in price prior to or post-funding, the Lender will have the right to cease the funding of the Loan or amend the Underwriting criterion, until such circumstances are dissipated and cured, or adjust funding based on new Underwriting criterion.

## VII.   GOVERNING LAW. JURISDICTION.

a) This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of England Wales.

**Astor Capital Fund**

b) Each party hereto irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against any other party hereto in any way relating to this Agreement or the transactions contemplated hereby, in any forum other than the State or Federal courts of the United Kingdom, and any appellate court from any thereof. Each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees that any such action, litigation or proceeding may be brought in any such United Kingdom court or, to the fullest extent permitted by applicable law, in such federal court of United Kingdom. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

c) Each party hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court referred to in Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

d) Irrespective of any outcome of any such legal proceeding, the Lender will be awarded all of its reasonable legal fees and costs in enforcing, collecting, defending, executing, and maintaining this Agreement.

## VIII.  INDEMNIFICATION AND LIMITED LIABILITY RELEASE

1. Lender will not be liable for any indirect, incidental, special, punitive, opportunity loss, or consequential damages, forgone or speculative profit, including loss of revenue or profits or losses arising from Lender's performance under this Agreement. However, the Borrower will be liable for Lender's recovery, speculative profit and opportunity loss when Borrower willfully obstructs or delay's Lender's recovery and enforcement efforts. Borrower agrees to indemnify the Lender, each legal entity, if any, who controls, is controlled by or is under common control with the Lender, and each of their respective directors, assignees, officers and employees (the "Indemnified Parties"), and to hold each Indemnified Party of Lender harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of Borrower), in connection with or arising out of or relating to the matters referred to in this Agreement whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Lender, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority. The indemnity agreement contained in this Section shall survive the termination of this Agreement, payment of any amounts hereunder and the assignment of any rights hereunder.

2. Borrower shall not hold Lender, its agents, directors, shareholders, assignees, Depository Broker or other known and unknown persons responsible for any fluctuations or depreciation in the value of the Pledged Collateral that Borrower may experience during the pendency of Loan. Borrower agrees to indemnify Lender for and to hold Lender harmless from, any loss or

## Astor Capital Fund

expense that such Borrower may sustain or incur as a consequence of default by Borrower in making a borrowing. This covenant shall survive the termination of this Agreement.

## IX.    GENERAL PROVISIONS

1. **Amendments.** Amendments to this Agreement (including the adding or updating of any annexes, appendices, or schedules) will not be enforced unless such amendment is in writing and signed by authorized signatories on behalf of both Parties and added as an Addendum, with the exception of either Party informing the other of change of banks and only notice of such change is sufficient. Electronic email exchanges will not modify this Agreement. No amendment, modification or waiver in respect to this Agreement will be effective unless in writing (including writing evidenced by a facsimile transmission) and executed by each of the Parties.

2. **Assignment.** This Agreement, its equities, and Obligations shall be freely transferrable, pledge-able or assignable in whole or in part as the Parties may see fit or as may be in their best interest. Any transfer or assignment action by either Party shall be followed up by written notice to the other Party.

3. **Balance of Equities.** In the event that this Agreement is reviewed, interpreted or evaluated by any judiciary body or arbitration tribunal in assessing the balance of equities based on this Agreement and law, notwithstanding any of the other terms within this Agreement, the outcome of any decision shall be interpreted to weight in favor of and benefit the Lender at all times irrespective of unjust enrichment and extreme remedy.

4. **Clog on Redemption.** This Agreement is not a mortgage and will not be construed as a mortgage by the Parties or any tribunal or court of law. This is a Hybrid Loan requiring an Investment through Pledge of Collateral. In case there is an Event of Default, Borrower shall not have equity of redemption or right to redeem the Pledged Collateral and no incurable Event of Default shall be construed as a clog on equity of redemption and Lenders right to forfeiture of the Pledged Collateral will trump and supersede any right of redemption. No provision of this Agreement or any action of Lender upon an incurable Event of Default will be construed as a clog on equity of redemption and Lenders right to forfeiture of Pledged Collateral is absolute and final. Borrower shall be able to redeem its Pledged Collateral after the Lock-Up period, provided that all Obligations of Borrower are satisfied, and the Loan has not experienced an incurable Event of Default.

5. **Confidentiality.** This Agreement is to be kept confidential and is not to be reproduced in any manner whatsoever for persons other than the Parties hereto. Specifically, each Party agrees to maintain the confidentiality of the business, trade, finances, and methods ("Confidential Information") of the other Party and not disclose the Confidential Information to any person other than those whose knowledge is essential for the performance of this Loan. Lender will not reveal the existence of this Agreement to the media or any regulatory body or government agency unless ordered to do so by a court of law. Lender may reveal the contents of this Agreement to defend Lender's dignity and reputation and dispel incorrect public information about the subject transaction. A default under this Agreement by the Borrower will deem this clause invalidated. The Parties acknowledge that the existence and the terms of this Agreement and any oral or written information exchanged between the Parties in connection with the preparation and performance of this Agreement are regarded as confidential information. Each Party shall maintain confidentiality of all such confidential information, and without obtaining the written consent of the other Party, it shall not disclose any relevant