# EXHIBIT 22

Eric J. Shimanoff (ejs@cll.com)
Joelle A. Milov (jam@cll.com)
COWAN, LIEBOWITZ & LATMAN, P.C.
114 West 47th Street
New York, New York 10036
(212) 790-9200
*Attorneys for Plaintiffs Barclays PLC and Barclays Capital Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

BARCLAYS PLC and BARCLAYS CAPITAL INC.

         Plaintiffs,

   -against-

VLADIMIR "VAL" SKLAROV, individually and dba "SHEARSON LEHMAN BROTHERS," "SHEARSON LEHMAN," "LEHMAN BROTHERS," "SHEARSON LEHMAN BROTHERS INVESTMENT BANKING" and "SHEARSON LEHMAN INVESTMENT BANKING"; OSMAN QUREISHI, individually and dba "SHEARSON LEHMAN BROTHERS," "SHEARSON LEHMAN," "LEHMAN BROTHERS," "SHEARSON LEHMAN BROTHERS INVESTMENT BANKING" and "SHEARSON LEHMAN INVESTMENT BANKING"; BLACK ROCK CAPITAL LLC; NEWBURGH CAPITAL LTD.; LINCOLN CAPITAL LTD.; JAITEGH "JT" SINGH; JOHN DOES 1-10; and XYZ CORPORATIONS 1-10,

         Defendants.

-------------------------------------------------------------- x

Civil Action No. 20-cv-8437

**COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

NATURE OF THE ACTION ........................................................................................ 10

THE PARTIES ............................................................................................................... 10

JURISDICTION AND VENUE ................................................................................... 13

FACTS ............................................................................................................................ 14

    Lehman Brothers' Long Use of the LEHMAN Names and Marks ......................... 14

    Barclays' Use of the LEHMAN Names and Marks ................................................. 21

    The LEHMAN Names and Marks Have Long Been and Still Are Famous ............ 24

    Barclays' Protection of the LEHMAN Names and Marks ....................................... 30

    Defendant Sklarov's History of Criminal and Alleged Civil Fraud ........................ 34

    The *Rothschild* Trademark Injunction against Sklarov and Black Rock ................ 38

    Defendants' Unlawful Use of the LEHMAN Names and Marks ............................ 43

    Defendants' Unlawful Registration of the Infringing Names and Marks ............... 56

    Defendants' Other Unlawful Acts that Seek to Create False Connections with
    Famous Financial Services Names and Brands ...................................................... 63

    Defendants Have Refused to Stop their Unlawful Activities .................................. 68

CAUSES OF ACTION .................................................................................................. 71

Plaintiffs Barclays PLC and Barclays Capital Inc. (collectively, "Plaintiffs"), by and through their undersigned counsel, as and for their Complaint against Vladimir "Val" Sklarov, individually and dba "Shearson Lehman Brothers," "Shearson Lehman," "Lehman Brothers," "Shearson Lehman Brothers Investment Banking" and "Shearson Lehman Investment Banking," Osman Qureishi, individually and dba "Shearson Lehman Brothers," "Shearson Lehman," "Lehman Brothers," "Shearson Lehman Brothers Investment Banking" and "Shearson Lehman Investment Banking," Black Rock Capital LLC, Newburgh Capital Ltd., Lincoln Capital Ltd., Jaitegh "JT" Singh and John Does 1-10 and XYZ Corporations (collectively, "Defendants"), allege as follows:

## INTRODUCTION

1.      Lehman Brothers is one of the most famous firms and names associated with financial services.

2.      Operating continuously for nearly 170 years under company names, domain names and trademarks containing or comprising LEHMAN, including at times LEHMAN BROTHERS and SHEARSON LEHMAN BROTHERS (collectively, the "LEHMAN Names and Marks"), Lehman Brothers was the nation's fourth largest investment bank with hundreds of billions of dollars' worth of assets when it filed for the largest bankruptcy in U.S. history in 2008.

3.      As part of the bankruptcy, Barclays purchased many of Lehman Brothers' assets, including the LEHMAN Names and Marks, which Barclays then licensed back to Lehman Brothers for use in connection with the firm's continuing business and operations.

4.      Since 2008, Lehman Brothers has continued to engage with clients, existing counterparties, market participants, creditors, employees and numerous others, all under the LEHMAN Names and Marks.  Lehman Brothers' activities over the past 12 years have included

-1-

investing in, managing and selling its sizable real estate, equity, debt and other assets, settling its vast portfolio of derivative swaps, managing and reporting on its bankruptcy plan and maintaining and defending numerous litigations.

5.      While the LEHMAN Names and Marks had become household names prior to 2008, Lehman Brothers' financial troubles and bankruptcy in 2008 made the LEHMAN Names and Marks some of the most ubiquitous monikers thereafter.  Each and every detail of Lehman Brothers' pre-financial crisis activities, financial troubles, bankruptcy and subsequent business activities has been widely publicized in the press and reflected in popular culture, including as the subject of two recent Academy-award winning films and a recent Broadway play.

6.      Myriad articles concerning Lehman Brothers' continuing business operations and financial dealings since 2008 have consistently appeared in widely disseminated, major publications across the country.  One such article from *Bloomberg BusinessWeek* entitled "Welcome to Lehman Brothers. We're Open for Business" reported that Lehman Brothers "is an operating company" that "still controls tens of billions in assets" and "its lawyers and traders will gladly take your business."

7.      Public recognition of the LEHMAN Names and Marks in connection with financial services is just as strong today as it was at the time of Lehman Brothers' bankruptcy.

8.      Given this strong consumer recognition, several third parties have attempted to misappropriate the LEHMAN Names and Marks as their own and cause consumer confusion. Barclays thus has vigorously protected the LEHMAN Names and Marks against misuse by third parties worldwide.

9.      In one such recent action where a third party sought to register the mark LEHMAN BROTHERS in connection with its own goods and services, the United States Patent and Trademark Office rejected the application based on Barclays' prior rights, finding:

> Barclays has common law rights in the LEHMAN BROTHERS trademark and tradename [which are] still being used [pursuant to license] in connection with activities pertaining to winding down [Lehman Brothers] . . . . Moreover, in view of the well-known reputation established in LEHMAN BROTHERS by Barclays' predecessor, the more likely a sufficient residual goodwill remains in the LEHMAN BROTHERS trademark, especially when Barclays' acts have not been of such character as to cause the mark to lose its significance as an indication of origin.  In view of the foregoing, we find that LEHMAN BROTHERS continues to function as a mark for Barclays.

10.      Intentionally seeking to take a free ride on the consumer recognition in the LEHMAN Names and Marks and to pass themselves off as the legitimate Lehman Brothers, Defendants have engaged in a scheme to mislead and to deceive consumers by purporting to offer financial services under names and marks containing or comprising "Lehman Brothers" and/or "Shearson Lehman" (collectively, the "Infringing Names and Marks").

11.      The Infringing Names and Marks misappropriated by Defendants include "Lehman Brothers," "Shearson Lehman Brothers," "Shearson Lehman," "Shearson Lehman Brothers Investment Banking," "Shearson Lehman Investment Banking" and <shearsonlehmanbrothers.com>.

12.      Defendants frequently present the Infringing Names and Marks in a font long used by the legitimate Lehman Brothers and in a stylization identical to that used and registered by Lehman Brothers when it was known as SHEARSON LEHMAN BROTHERS, including as shown below:

-3-









13.     Defendants have used the Infringing Names and Marks in connection with purported financial services, including securities-backed loans, *inter alia* on a website located at www.shearsonlehmanbrothers.com, in email and oral communications, in marketing and recruiting flyers and in press releases, including as shown below:

-4-







28827/162/3557472









28827/162/3557472

14.     To further deceive consumers and create a false connection with the legitimate Lehman Brothers, Defendants represent numerous times in various media that they are a "Lehman Brothers company," claim as their current address the former New York offices of Lehman Brothers and use language that would be associated with or would describe the legitimate Lehman Brothers and its long history of offering financial services, including: "We have managed billions of dollars of client assets . . . for more than 100 years" and "We invented investment banking."

15.     Although Defendants use some of the Infringing Names and Marks in connection with some aspect of their fraudulent scheme, and other Infringing Names and Marks in connection with other aspects of their fraudulent scheme, often inconsistently, for ease of reference, Plaintiffs shall refer herein to Defendants' purported companies simply as the "Fake 'Shearson Lehman Brothers.'"

16.     Defendant Vladimir "Val" Sklarov is a convicted felon for Medicare fraud.  A federal Court recently enjoined Sklarov against impersonating the famous financial services firm Rothschild & Co.  Several other third parties have sued Sklarov for fraud in connection with unlawfully and prematurely selling borrowers' public shares pledged as collateral for securities-backed loans that Sklarov never provided to the borrowers.  Sklarov is the apparent "ring-leader" of the fraudulent scheme to impersonate Lehman Brothers and has directed and controlled most if not all of the unlawful actions described herein.  Upon information and belied, Sklarov typically engages in his unlawful actions through one or more "shell" companies that he controls and directs, including Defendants Black Rock Capital LLC, Newburgh Capital Ltd., Lincoln Capital Ltd.  Sklarov has used these shell companies here in an unlawful attempt to officially register as trademarks several of the Infringing Names and Marks, including in the U.S.

17.     Defendant Osman Qureishi, who previously worked for Sklarov at "America 2030," one of Sklarov's companies sued numerous times for fraud, is the "Senior Executive Vice President, Wealth Management" and the public face of Defendants' Fake "Shearson Lehman Brothers."  Qureishi responds to inquiries to the Fake "Shearson Lehman Brothers" including via the website at www.shearsonlehmanbrothers.com.  Qureishi also recruits potential brokers, agents and borrowers, and creates and distributes marketing materials, press releases and agreements for, the Fake "Shearson Lehman Brothers."

18.     Defendant Jaitegh "JT" Singh for many years has served as attorney for Sklarov and the companies he controls, including in defense of numerous litigations alleging fraud, and has represented himself as an officer of one or more of the corporate defendants.  Ostensibly to assist Sklarov and Qureishi in their impersonation of Lehman Brothers and in an attempt to provide an air of legitimacy to the Fake "Shearson Lehman Brothers," Singh filed trademark applications for the Infringing Names and Marks, knowing that Defendants were not entitled to register or use such names and marks and that the use and registration of such names and marks would cause consumers to mistakenly believe that Defendants were affiliated or associated with the legitimate Lehman Brothers.

19.     On behalf of Sklarov and his shell companies, Singh also filed trademark applications for myriad other trademarks containing or comprising famous names and marks associated with financial services, with which Defendants clearly have no affiliation or association, including: Credit Suisse First Boston; Samuel Walton Capital; UBS Paine Webber; Price Waterhouse Coopers; Arthur Andersen; John D. Rockefeller; Andrew Carnegie; Bear Stearns; George Soros Capital; Warren Buffet Capital; Dean Witter Reynolds and Salomon Smith Barney.

20.     Not surprisingly, the United States Patent and Trademark Office rejected each and every one of these trademark applications filed by Singh on behalf of Sklarov, finding the marks therein would deceive consumers and falsely suggest connections with unaffiliated third parties, including Lehman Brothers and Barclays.

21.     Not satisfied with merely impersonating Rothschild & Co and Lehman Brothers, Sklarov apparently is involved in a similar scheme to defraud consumers by impersonating the former financial services firm Bear Stearns, including by purporting to offer financial services under a logo that is identical to that long used by the legitimate firm:



22.     Despite numerous demands by Barclays, Defendants have refused to cease and desist from their unlawful activities.  Instead, with full knowledge of Barclays' rights in the LEHMAN Names and Marks, and Barclays' trademark and related claims, Defendants have actually increased their unlawful activities and doubled down on their efforts to deceive consumers and to pass themselves off as affiliated with the legitimate Lehman Brothers.

23.     Given Sklarov's history of criminal and civil fraud lawsuits and Defendants' blatant disregard for the intellectual property rights of third parties, consumers and the public at large are at a significant risk not only of likely confusion that Defendants are associated or affiliated with Lehman Brothers, but also that they will be defrauded by Defendants in their purported financial dealings.  As such, Defendants' unlawful actions must be stopped.

## NATURE OF THE ACTION

24.     This is an action for false designation of origin, cybersquatting and trademark dilution under the Lanham Act of 1946, as amended, 15 U.S.C. § 1501 *et seq.* (the "Lanham Act") and trademark dilution, deceptive trade practices and unfair competition under the laws of the state of New York.

## THE PARTIES

25.     Plaintiff Barclays PLC is a public limited company organized and existing under the laws of England and Wales with offices at 1 Churchill Place, Canary Wharf, London E14 5HP, United Kingdom.

26.     Plaintiff Barclays Capital Inc. is a corporation organized and existing under the laws of the state of Connecticut with offices located at 745 Seventh Avenue, New York, New York 10019.

27.     Upon information and belief, Defendant Vladimir "Val" Sklarov ("Sklarov") is an individual currently residing in the state of Florida.  Upon information and belief, Sklarov is doing business under the names "Shearson Lehman Brothers," "Shearson Lehman," "Lehman Brothers," "Shearson Lehman Brothers Investment Banking" and "Shearson Lehman Investment Banking," including in the United States and in New York, New York, with a claimed address at 200 Vesey Street, New York, New York 10281.  Upon information and belief, Sklarov has directed, controlled, ratified, participated in, and/or was the moving force behind all the infringing and unlawful acts and activities alleged herein, and is therefore personally liable for such acts.

28.     Upon information and belief, Defendant Osman Qureishi ("Qureishi") is an individual currently residing in Texas.  Upon information and belief, Qureishi is doing business under the names "Shearson Lehman Brothers," "Shearson Lehman," "Lehman Brothers" and

-10-

"Shearson Lehman Investment Banking," including in the United States and in New York, New York, with a claimed address at 200 Vesey Street, New York, New York 10281.

29.    Upon information and belief, Defendant Black Rock Capital LLC ("Black Rock") is a limited liability company organized and existing under the laws of the Bahamas with an address at Old Fort #4 - Western Road, SP-63 771 Nassau, New Providence Bahamas.

30.    Upon information and belief, Defendant Newburgh Capital Ltd. ("Newburgh") is a limited company organized and existing under the laws of Belize with an address at New Horizon Building, Ground Floor, 3 ½ Miles Philip S.W. Goldson Highway, Belize City, Belize.

31.    Upon information and belief, Defendant Lincoln Capital Ltd. ("Lincoln") is a limited company organized and existing under the laws of Belize with an address at New Horizon Building, Ground Floor, 3 ½ Miles Philip S.W. Goldson Highway, Belize City, Belize.

32.    Upon information and belief, Black Rock, Newburgh and Lincoln are "shell" companies formed at the direction of and controlled by Sklarov as vehicles to perpetuate many of the infringing, deceptive and unlawful acts set forth herein.  Upon information and belief, Sklarov exercises dominion and control over Black Rock, Newburgh and Lincoln, and disregards the separateness of those legal entities to such an extent that these entities are used by Sklarov as a mere instrumentality for Sklarov to perpetrate his unlawful and deceptive schemes, as described below, and to evade liability for his acts.  Upon information and belief, all acts undertaken through Black Rock, Newburgh and Lincoln, including the infringing and wrongful acts alleged herein, were directed by Sklarov.  As such, the Court should disregard the independent existence of those entities, rendering such entities subject to this Court's personal jurisdiction if they are not otherwise subject thereto, and rendering Sklarov personally liable for acts purportedly undertaken through such corporate entities.

33.     Upon information and belief, Defendant Jaitegh "JT" Singh ("Singh") is an individual residing in the state of New York and an attorney licensed to practice in the state of New York with offices at 10 Grand Central, 155 E. 44th Street, 6th Floor, New York, New York 10017.  Upon information and belief, Singh materially contributed to, encouraged and actively participated in the other Defendants' unlawful acts and activities alleged herein, while specifically knowing such actions violated Barclays' intellectual property rights and were likely to deceive and confuse consumers, including by taking infringing actions as an officer of Black Rock, Lincoln and Newburgh and by continuing to facilitate and file infringing trademark application on behalf of the other Defendants, including Black Rock, Lincoln, Newburgh and Sklarov.

34.     Upon information and belief, Defendants John Does 1-10 are individuals who reside or do or transact business in this District, and have engaged and participated in, directly or contributorily, the unlawful acts set forth herein.  The true identities of Defendants John Does 1-10 are not presently known to Plaintiffs.  Plaintiffs will amend their complaint upon discovery of the identities of such Defendants.

35.     Upon information and belief, Defendants XYZ Corporations 1-10 are businesses that reside or do or transact business in this District, and have engaged and participated in, directly or contributorily, the unlawful acts set forth herein.  The true identities of Defendants XYZ Corporations 1-10 are not presently known to Plaintiffs.  Plaintiffs will amend their complaint upon discovery of the identities of such Defendants.

36.     Upon information and belief, Defendants, while engaging and participating in the unlawful acts set forth herein, were agents and collaborators of one another.  Indeed, as described herein, Defendants each knowingly and willfully materially contributed to a scheme to pass themselves off as affiliated or associated with the famous Lehman Brothers firm and the LEHMAN

Names and Marks and to mislead consumers about the source, affiliation and nature of their purported (and potentially fraudulent) financial services.

## JURISDICTION AND VENUE

37. This Court has subject matter jurisdiction over the federal false designation of origin, trademark dilution and cybersquatting claims arising under the Lanham Act pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338. The Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

38. This Court has personal jurisdiction over Defendants pursuant to NY CPLR 301 because Defendants purport to do business and maintain offices in the state of New York, including in this District. Moreover, upon information and belief, Defendant Singh resides in the state of New York, is a licensed attorney in New York and has offices in New York, including in this District.

39. This Court has personal jurisdiction over Defendants pursuant to NY CPLR 302(a)(1) because Defendants purport to transact business in the state of New York, including in this District.

40. This Court has personal jurisdiction over Defendants pursuant to NY CPLR 302(a)(2) because Defendants have committed torts of false designation of origin, unfair competition, trademark dilution, cybersquatting and deceptive trade practices within the state of New York, including in this District.

41. This Court has personal jurisdiction over Defendants pursuant to NY CPLR 302(a)(3) because Defendants have committed torts of false designation of origin, unfair competition, trademark dilution, cybersquatting and deceptive trade practices without the state of New York, causing injury to Plaintiffs within the state of New York, including in this District.

Defendants also regularly do or solicit business in the state of New York, including in this District, have engaged in a persistent course of conduct within the state of New York, including in this District, should reasonably expect their tortious acts herein to have consequences in the  state of New York, including in this District, and claim to derive  substantial  revenue  from  interstate  or international commerce.

42.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c).

## FACTS

**Lehman Brothers' Long Use of the LEHMAN Names and Marks**

43.     Nearly 170 years before Defendants began their unlawful acts described herein, Lehman Brothers Holdings Inc. ("LBHI"), its present and former subsidiaries and affiliates, and/or each of their predecessors, licensees, assignors and assigns (collectively, "Lehman Brothers") began using the LEHMAN Names and Marks in connection with a wide variety of financial services, including investment banking, equity and fixed-income trading, credit and lending, research, investment management and private banking services.

44.     Founded by brothers Henry, Emmanuel and Mayer Lehman in 1850, Lehman Brothers became a member of the New York Stock Exchange in 1887 and underwrote its first public offering in 1889.

45.     Beginning many decades ago and continuing to the present, Lehman Brothers consistently and continuously has presented the LEHMAN Names and Marks in a serif font identical or similar to the font shown below:

## LEHMAN BROTHERS

(the "Lehman Font").

46. During the mid-1980s through the mid-1990s, when Lehman Brothers was owned by American Express, the firm used and was referred to by names and marks containing or comprising SHEARSON LEHMAN, including SHEARSON LEHMAN and SHEARSON LEHMAN BROTHERS (collectively, the "SHEARSON LEHMAN Names and Marks"), including in the following stylizations:




These stylizations are referred to as the "Shearson Lehman Stylizations," and include the SHEARSON LEHMAN Names and Marks presented in an all caps version of the Lehman Font with the "S" at the beginning of "Shearson" dipping below the rest of the mark and a line underneath the mark.

47. During this time, Lehman Brothers owned several federal trademark registrations for the SHEARSON LEHMAN Names and Marks, including in Shearson Lehman Stylizations, in connection with various financial services, including as follows:

| Mark | Registration No. | Services | Registration Date |
|---|---|---|---|
| SHEARSON LEHMAN BROTHERS | 1417691 | 36: securities brokerage, financial and investment consulting, and investment banking services | November 18, 1986 |
|  | 1714151 | 36: securities brokerage, financial and investment consulting, and investment banking services | September 8, 1992 |

| | | | |
|---|---|---|---|
| **SHEARSON LEHMAN BROTHERS** | 1714152 | 36: securities brokerage, financial and investment consulting, and investment banking services | September 8, 1992 |
| SHEARSON LEHMAN HUTTON | 1534622 | 36: securities brokerage, financial and investment consulting, and investment banking services | April 11, 1989 |

48.     American Express spun off Lehman Brothers in or about 1994 and Lehman Brothers resumed operations under the name and mark LEHMAN BROTHERS, including in the Lehman Font.

49.     By 2008, Lehman Brothers had become the fourth largest investment bank in the United States, with hundreds of billions of dollars' worth of assets under management and over 25,000 employees in offices worldwide, including at its headquarters in a then recently-built thirty-two story office building located 745 Seventh Avenue, New York, New York 10019, which prominently displayed the LEHMAN Names and Marks, including as shown in the images below:

 

50.     Like other major financial firms that invested heavily in subprime mortgage backed securities, Lehman Brothers began experiencing financial difficulties in 2007.  Unable to satisfy its obligations, LBHI filed for Chapter 11 bankruptcy protection on September 15, 2008.  Several

-16-

LBHI subsidiaries and affiliates, including its brokerage subsidiary Lehman Brothers Inc. ("LBI"), filed for bankruptcy protection later in 2008 and in 2009. The Lehman Brothers bankruptcy was and remains the largest bankruptcy in U.S. history.

51.     Plaintiff Barclays PLC (with its affiliates, including its ultimately wholly owned subsidiary Plaintiff Barclays Capital Inc., collectively, "Barclays") is one of the world's oldest and leading providers of financial and related services. Founded over 300 years ago, Barclays operates in dozens of countries, including in the United States since 1932, and engages in a wide range of financial services, including commercial and corporate banking, retail banking, credit and lending, investment banking, research, private banking, cash management, credit and debit cards and mortgage banking.

52.     Pursuant to an asset purchase agreement dated September 16, 2008 (the "APA"), Barclays purchased several of Lehman Brothers' businesses and other assets for approximately $1.3 billion. As part of the APA, Lehman Brothers assigned to Barclays all of Lehman Brothers' rights in the LEHMAN Names and Marks, including LEHMAN BROTHERS, all trademark applications and registrations therefor, and the goodwill associated therewith.

53.     Pursuant to the APA, as amended, Barclays granted Lehman Brothers a perpetual, worldwide, non-exclusive license to use the LEHMAN Names and Marks for any of Lehman Brothers' then-existing goods and services and in connection with Lehman Brothers' retained and continuing businesses and operations. Under the APA, all goodwill and consumer recognition arising from Lehman Brothers' use of the LEHMAN Names and Marks inures to Barclays' benefit.

54.     Since 2008, Lehman Brothers continuously and consistently has maintained its operations and engaged in myriad financial and business activities and transactions, all under the LEHMAN Names and Marks.

55.     When Lehman Brothers filed for bankruptcy, the financial institution held hundreds of billions of dollars' worth of assets.

56.     Since 2008, Lehman Brothers has invested in, improved, maintained, managed and sold its sizable assets, including billions of dollars' worth of commercial real estate properties and securities.

57.     Since 2008, Lehman Brothers also has engaged in trades pursuant to, and is settling its vast portfolio of, derivative swap agreements and managed and reported its bankruptcy plan, in addition to its general corporate operations.

58.     Since 2008, Lehman also has maintained and sold its interests in various commercial loans and private equity investments.

59.     Since 2008, Lehman Brothers also has maintained and defended numerous litigations.

60.     Since 2008, Lehman Brothers has continued to engage with clients, existing counterparties, market participants, creditors, employees and numerous others in business and financial transactions.

61.     The LEHMAN Names and Marks, including LEHMAN BROTHERS, have surrounded every aspect of these dealings.

62.     LBHI has employed numerous employees over the past 12 years and has maintained corporate headquarters in various offices in New York City.

63.     Beginning in or about 2009 and continuing through in or about 2017, LBHI maintained offices in the Time & Life Building, 1271 Avenue of the Americas, New York, New York 10020.  These offices contained reception areas featuring prominent signage branded with the LEHMAN BROTHERS name and logo.



64.     When members of the public telephoned LBHI at these offices, the receptionist identified the company as LEHMAN BROTHERS HOLDINGS.

65.     In connection with its continuing business, LBHI's employees have utilized business cards, stationery and other forms and documents that contain the LEHMAN BROTHERS name and mark, including as shown below:




66.     LBHI employees also have utilized and continue to utilize email addresses that end with the domain name @lehmanholdings.com and have used the LEHMAN BROTHERS name and in their email signature blocks.

67.     Some employees at LBHI have worn uniforms branded with the LEHMAN BROTHERS name and logo.  LBHI employees also have carried and sometimes have worn security identification badges branded with the LEHMAN BROTHERS name and logo.

68.     When engaging in business and financial transactions since 2008, LBHI employees have represented themselves as such and frequently have utilized the LEHMAN Names and Marks, including LEHMAN BROTHERS, in both written and oral communications, contracts and other business materials.

69.     Since 2008, Lehman Brothers has maintained filings with various regulatory agencies and the states of New York and Delaware.

70.     Through a third-party vendor, Lehman Brothers maintains websites that prominently and frequently utilize the LEHMAN Names and Marks, including LEHMAN BROTHERS, and provide information about Lehman Brothers' business dealings, including the status of assets, derivative swap settlements, litigations, the bankruptcy proceedings and payments to creditors.   The websites are located at https://dm.epiq11.com/case/lehman/info and https://dm.epiq11.com/case/lehmantrustee/info.

71.     LBI owns and utilizes the domain name LEHMANTRUSTEE.COM, which resolves to the LBI bankruptcy website and has been used since 2008 in connection with numerous bankruptcy-related documents and communications.

72.     LBHI emerged from bankruptcy in 2012 and continues many of its above-described operations and financial and business activities and transactions today, with dozens of employees at offices at 277 Park Avenue, 46th Floor, New York, New York 10017.

73.     LBHI just signed a new multi-year lease for office space at 110 East 42nd Street, New York, New York 10017, to begin on or about November 1, 2020.

74.     All of the goodwill and consumer recognition derived from Lehman Brothers' continued use of the LEHMAN Names and Marks inures to Barclays, as the owner and licensor of the names and marks.

**Barclays' Use of the LEHMAN Names and Marks**

75.     Lehman Brothers is not the only entity that legitimately, continuously and consistently has used the LEHMAN Names and Marks since 2008.

76.     Since 2008, Barclays itself has used the LEHMAN Names and Marks in connection with its own financial services.

77.     Although Barclays rebranded most of the assets it acquired from Lehman Brothers, including the LEHMAN-branded indices, until about early-2010, Barclays continued to operate and provide clients with access to LEHMAN LIVE, an online portal offering research, analytics and other reports, guides and materials across a broad range of Barclays' financial divisions, including equities, commodities, securitization and indices.

78.     Since 2008, Barclays has maintained, utilized, offered and distributed to its clients and others in the financial industry legacy LEHMAN BROTHERS research, analytics and other reports, guides and materials, including the well-known *Guide to the Lehman Brothers Global Family of Indices*, a singular "super index primer" guide to all of the indices transferred from Lehman Brothers to Barclays.

  

79.     Since 2008, Barclays continuously has maintained: (a) until in or about 2020, a website at www.lehman.com, which provided information about and links to LBHI's bankruptcy

website and websites related to other transferred Lehman Brothers businesses; (b) the Market Participant Identifier (MPID) code LEHM, short for LEHMAN, in connection with executing broker trades regulated by the Financial Industry Regulatory Authority (FINRA); and (c) domain name registrations worldwide for the LEHMAN Names and Marks;

80.     Since 2008, Barclays continuously has maintained numerous trademark registrations worldwide for the LEHMAN Names and Marks, including in major jurisdictions such as the European Union, China, Brazil, Canada, Hong Kong, Japan, the United Kingdom, the United Aram Emirates and India.  Attached hereto as **Exhibit 1** is a list of Barclays' current trademark registrations and applications worldwide for the LEHMAN Names and Marks, most of which date back to the 1990s.

81.     In or about December 2015, Barclays agreed to sell to Bloomberg LP Barclays' bond indices business known as Barclays Risk Analytics and Index Solutions Ltd. (BRAIS), an asset Barclays mostly acquired from Lehman Brothers.  Pursuant to that agreement, Barclays maintained ownership of the LEHMAN Names and Marks and licensed such marks to Bloomberg for use in connection with the bond index business, including in connection with Bloomberg's own use and distribution of legacy LEHMAN BROTHERS research materials.

82.     Since Barclays' acquisition of the LEHMAN Names and Marks, at least one third party has approached Barclays seeking to license the LEHMAN BROTHERS mark.

83.     Lehman Brothers previously was the owner of two federal trademark registrations for the mark LEHMAN BROTHERS, including one in the Lehman Font, as shown below:

| Mark | Registration No. | Services | Registration Date |
|---|---|---|---|
| LEHMAN BROTHERS | 1717171 | 36: securities brokerage services; investment consulting services; investment banking services; and merchant banking services | September 15, 1992 |
| LEHMAN BROTHERS | 1755687 | 36: securities brokerage services; investment consulting services; investment banking services; and merchant banking services | March 02, 1993 |

(the "Prior LEHMAN BROTHERS Registrations").  Attached hereto as **Exhibit 2** are the official United States Patent and Trademark Office ("USPTO") status records for the Prior LEHMAN BROTHERS Registrations.  Barclays acquired the Prior LEHMAN BROTHERS Registrations in 2008 pursuant to the APA.

84.    Although the Prior LEHMAN BROTHERS Registrations lapsed due to oversight, on October 2, 2013, Barclays filed with the USPTO new Application Serial No. 86081143 to register the mark LEHMAN BROTHERS for "Securities brokerage services; investment consulting services; investment banking services; merchant banking services; financial and investment management services; financial planning and investment advisory services; financial research services; administration and valuation of financial investments; financial sponsorship of sporting, charitable and educational events; providing consultancy, information and advisory services relating to all the foregoing" in International Class 36 (the "New LEHMAN BROTHERS Application").

-23-

85.     Barclays overcame the USPTO's surname refusal under Section 2(e) of the Lanham Act, 15 U.S.C. § 1052(e), regarding the New LEHMAN BROTHERS Application, by establishing that the LEHMAN BROTHERS mark had significant acquired distinctiveness and consumer recognition as the source of financial services.

86.     The USPTO recently rejected a third-party challenge to the New LEHMAN BROTHERS Application and to Barclays' rights in the LEHMAN BROTHERS mark, finding:

> Barclays has common law rights in the LEHMAN BROTHERS trademark and tradename [which are] still being used [pursuant to license] in connection with activities pertaining to winding down [Lehman Brothers] . . . . Moreover, in view of the well-known reputation established in LEHMAN BROTHERS by Barclays' predecessor, the more likely a sufficient residual goodwill remains in the LEHMAN BROTHERS trademark, especially when Barclays' acts have not been of such character as to cause the mark to lose its significance as an indication of origin.  In view of the foregoing, we find that LEHMAN BROTHERS continues to function as a mark for Barclays.

Attached hereto as **Exhibit 3** is a copy of the USPTO's opinion.

## The LEHMAN Names and Marks Have Long Been and Still Are Famous

87.     As a result of Leman Brothers' long-term, wide-spread and exclusive use and promotion of the LEHMAN Names and Marks in connection with a broad range of financial services, the LEHMAN Names and Marks had developed substantial public recognition among members of the consuming public and had become some of the most famous monikers among the general public in connection with financial services well prior to the early 2000s.

88.     Between 1850 and mid-2008, Lehman Brothers and its financial and other services offered under the LEHMAN Names and Marks were the subject of significant unsolicited media attention.  During this time period, various media organizations, including such prominent and widely circulated publications as *The New York Times* and *The Wall Street Journal*, published thousands of news articles about Lehman Brothers.  These articles detail numerous financial

services provided by Lehman Brothers under the LEHMAN Names and Marks. Articles dating back as early as 1895 refer to Lehman Brothers as a "prominent" financial services firm. A February 17, 1897 article from *The New York Times* referred to Lehman Brothers as "one of the wealthiest and best-known firms in the trade." An August 3, 1913 article in *The New York Times* referred to Lehman Brothers as "one of New York's largest private banking firms."

89.     While the LEHMAN Names and Marks had been the subject of significant long-term and wide-spread media coverage during Lehman Brothers' first one-hundred and fifty-eight years of providing financial services, Lehman Brothers' financial troubles in 2007 through 2008, which culminated in its filing for the largest bankruptcy in U.S. history and selling much of its U.S. investment banking businesses to Barclays, exponentially heightened Lehman Brothers' presence in the media and recognition among consumers.

90.     During 2007-2008, a staggering number of news articles concerning Lehman Brothers and its services, financial difficulties, bankruptcy and asset sale to Barclays appeared in such highly-regarded and widely-circulated media outlets such as *The New York Times*, *The Wall Street Journal*, *The Washington Post*, *The Los Angeles Times* and *The Chicago Tribune*. For significant periods of time, articles concerning Lehman Brothers and its financial services appeared on the front pages of these publications.

91.     Lehman Brothers' business operations, financial transactions, derivative swap deals, asset management and sales, payments to creditors, bankruptcy plans and reporting and litigations frequently have been reported in the media since 2008. Thousands of articles concerning these topics have appeared in prominent and widely circulated media publications such as *The Wall Street Journal*, *The New York Times*, *The Washington Post*, *Bloomberg Businessweek*, *Fortune*, *CNN*, *The Los Angeles Times* and *The Chicago Tribune*.

92.    For example, a July 12, 2012 article in *Bloomberg Businessweek* reported:

Today the offices of Lehman Brothers are tucked away on two floors in the Time & Life Building, half a block away, where about 430 workers labor to unwind derivatives trades and sell illiquid assets . . . . While Lehman Brothers' bankruptcy filing—the largest ever in the U.S.—froze credit markets and plunged the economy into the deepest slump since the Great Depression, it didn't kill the company.

Attached hereto as **Exhibit 4** is a copy of this article.

93.    On September 21, 2012, *Bloomberg BusinessWeek* published an article entitled "Welcome to Lehman Brothers. We're Open for Business," noting that Lehman Brothers "is an operating company" with "deals to do." The article noted that Lehman Brothers "still controls tens of billions in assets, and if you would like to purchase any of it—a real estate property, say, or part of a private equity deal—its lawyers and traders will gladly take your business." The article also described the conditions observed at Lehman Brothers' then New York offices:

Lehman occupies one-and-a-half nondescript floors of the skyscraper, looking more or less like any other investment bank, minus some of the polish and most of the bustle. Employees work in Excel spreadsheets on dual monitors. Cubicles and offices are decorated with sports memorabilia, children's artwork, and the odd bit of gallows humor . . . . Private equity staffers, seen huddling in a conference room, have a portfolio of 200 investments to manage. The real estate team tracks Lehman's $10 billion worth of properties around the world. On Wednesday, Bloomberg reported that the company sold its interest in eight Texas office buildings. In August, it filed papers to take its largest asset, the apartment building colossus Archstone, public. The derivatives group works at unpacking a tangle of 8,000 contracts with 6,500 counterparties—a collection that once held a notional value of $39 trillion. The work is so complicated that at its peak, this was the bankrupt bank's largest division, with 250 employees.

Attached hereto as **Exhibit 5** is a copy of this article.

94.    On September 11, 2012, *The New York Times* published an article that begins:

Lehman Brothers is having a great year. The bank, which almost destroyed the global economy four years ago this week, recently emerged from bankruptcy, resolved a third of its debts and executed the largest U.S. real estate deal of the year. Today, the company appears an awful lot like a normal investment bank. Its trading floor — on one of the two floors Lehman occupies in the Time & Life Building in Midtown Manhattan — is filled with dozens of young people who stare at financial

-26-

graphs on Bloomberg terminals and talk in the hallways about the deals they're working on.

Attached hereto as **Exhibit 6** is a copy of this article.

95.     A September 16, 2013 article from *CNN Money* reported that "Lehman Brothers is still big," and similarly detailed Lehman Brothers' continued operations and business dealings. Attached hereto as **Exhibit 7** is a copy of this article.

96.     On September 30, 2014, *The New York Times* published an article on the front page of its Business section entitled "Revisiting the Lehman Brothers Bailout That Never Was," which chronicled Lehman Brothers' financial services, economic difficulties, bankruptcy and continued operations.  Attached hereto as **Exhibit 8** is a copy of this article.

97.     On September 18, 2015, *Fortune* published an article entitled "Here are the crazy stocks Lehman Brothers is still trading," which detailed Lehman Brothers' management and sales of significant equities holdings over the past years and also included a photo of Lehman Brothers' then New York headquarters.  Attached hereto as **Exhibit 9** is a copy of this article.

98.     Numerous articles about Lehman Brothers and its business and financial dealings still appear in many prominent and widely circulated media publications to this day.

99.     Millions of webpages reference Lehman Brothers and the LEHMAN Names and Marks, many of which webpages are devoted specifically to detailing Lehman Brothers' financial services, bankruptcy and history.  These webpages derive from popular websites such as those maintained by Wikipedia, Investopedia, Bloomberg and Harvard University.

100.     On LinkedIn, approximately 50,000 employee pages have listed Lehman Brothers in their employment history.

101.     A search of YouTube for "Lehman Brothers" has yielded over 44,000 videos that have been viewed by millions of people.

102.    Lexis-Nexis news database searches similarly have yielded many thousands of articles since 2008 concerning Lehman Brothers and its continued operations.

103.    Harvard Business School maintains the "Lehman Brothers Collection" as part of its permanent Contemporary Business Archives.  The collection consists of company business records and deal books, which document many of Lehman Brothers' investment projects from the 1920s to the 1980s.  Harvard describes the collection as "an important resource for the study of modern business history and provides scholars with a rare opportunity to access twentieth-century corporate records."

104.    Lehman Brothers and its financial services, business dealings, financial troubles and bankruptcy also have been the subject of several recent major films, television shows and plays, including: *Inside Job* (Sony Pictures Classics, 2010), which won an Academy Award for Best Documentary; *The Last Days of Lehman Brothers* (BBC/CNBC 2010);  *Too Big to Fail* (HBO 2011); *Margin Call* (Lionsgate 2011), which portrayed a fictionalized Wall Street firm based on and likened in the press to Lehman Brothers; *The Case Against Lehman Brothers* (CBS 60 Minutes 2012); *The Big Short* (Paramount, 2015), which was nominated for a 2016 Academy Award for Best Picture and won a 2016 Academy Award for Best Adapted Screenplay; and the recent off-Broadway play, *The Lehman Trilogy*, which was slated to open on Broadway in March 2020, but postponed its opening due to mandatory COVID-19 theatre closures in New York City.

105.    Since 2008, numerous books have been written about Lehman Brothers, including: *The Murder of Lehman Brothers, An Insider's Look at the Global Meltdown* (2009); *Lehman Brothers' Dance with Delusion: Wrestling Wall Street* (2010); *Lehman Brothers: Politics, Law & Business* (2010); *The Devil's Casino: Friendship, Betrayal, and the High Stakes Games Played Inside Lehman Brothers* (2011); *Street Freak: Money and Madness at Lehman Brothers* (2011);

-28-

*The Last of the Imperious Rich: Lehman Brothers, 1844-2008* (2012); and *Gorillas, markets and the search for economic values - Rethinking Lehman Brothers and the Global Financial Crises. A Nyenrode Perspective* (2013).

106.    Lehman Brothers consistently has been parodied in various media since 2008.  For example, a 2009 Black Eyed Peas lyric states: "Imma be a brother, but my name ain't Lehman."  In the 2010 film *Despicable Me*, the lead character visits a bank for super-villains named the "Bank of Evil."  As he enters the bank, above the doors and beneath the name of the bank hangs a sign that states: "FORMERLY LEHMAN BROTHERS."  In 2012, a YouTube user published a video entitled "Lehman in too Deep (We could have had a bail-out)," set to the music of and sung in the style of Adele's "Rolling In The Deep," which satires Lehman Brothers' pre-bankruptcy business dealings and financial troubles.  In the 2016 animated film *Zootopia*, the primary characters visit the "Lemming Brothers Bank."  And the 2019 Showtime series *Black Monday* presented as recurring characters two fictional identical twin "Lehman" brothers, who head the real investment firm in the fictional series.

107.    Consumer recognition today of the LEHMAN Names and Marks, including LEHMAN BROTHERS, in connection with financial services is just as strong as (or even stronger than) it was at the time of the Lehman Brothers bankruptcy, when the firm was one of the largest financial institutions in the world.  The LEHMAN Names and Marks, which still are legitimately used today, are still famous among the general consuming public and operate as unique source identifiers associated with Barclays and its licensee Lehman Brothers.

108.    Moreover, the LEHMAN Names and Marks have been famous since long before Defendants began their unlawful activities as described herein.

109.    Even if Lehman Brothers and Barclays had not continuously and consistently used the LEHMAN Names and Marks since 2008, given the long-term and wide-spread use and promotion of the names and marks for over 150 years, culminating with the then-largest bankruptcy filing in U.S. history, the names and marks still would be famous to consumers and possess significant residual goodwill and serve as unique source identifiers in connection with financial services.

**Barclays' Protection of the LEHMAN Names and Marks**

110.    Because of the continuing world-wide fame and consumer recognition in the LEHMAN Names and Marks, various third parties have sought to unlawfully misappropriate the monikers to create a false connection with Lehman Brothers and/or sought to deprive Barclays of its legal right in such names and marks.  In response to these unlawful acts, Barclays has taken firm action to protect the LEHMAN Names and Mark and to avoid consumer confusion.

111.    For example, seeking to take a free-ride on the fame of the LEHMAN Names and Marks, third party Tiger Lily Ventures Ltd. ("Tiger Lily") filed in the USPTO Application Serial Nos. 85868892 and 86298069 to register the mark LEHMAN BROTHERS in connection with "Beer" in International Class 32, "Spirits" in International Class 33 and "Bar services; Restaurant services" in International Class 43 ("Tiger Lily's Applications").

112.    The USPTO twice rejected Application Serial Nos 85868892 (which Tiger Lily filed a year before filing Application Serial No. 86298069), finding the mark would falsely suggest a connection with the financial institution Lehman Brothers in violation of Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a).  The USPTO specifically found:

> In this case, the applied-for mark 'LEHMAN BROTHERS' appears in the identical spelling as the mark 'Lehman Brothers' used by the investment firm.  Therefore, the applied-for mark would be uniquely and unmistakably recognized by consumers to refer to the former investment firm.  Although the investment firm

-30-

did not distribute or produce beer or spirits, the institution associated with the 'Lehman Brothers' name is so famous that a connection to the firm would be presumed if the applicant were to use the mark in connection with its goods . . . . [T]he fact that Lehman Brothers has declared bankruptcy does not diminish the connection drawn to the investment firm . . . .

Attached hereto as **Exhibit 10** are copies of the USPTO's office actions initially refusing to register Tiger Lily's Application Serial No. 85868892 for the mark LEHMAN BROTHERS.

113.    After the USPTO eventually allowed Tiger Lily's Applications to proceed to publication, Barclays filed in the USPTO's Trademark Trial and Appeal Board ("TTAB") Opposition Nos. 91219477 (Parent) and 91219478 against both of Tiger Lily's Applications, including based on likelihood of confusion under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d).

114.    On or about September 30, 2020, the TTAB issued final judgement in favor of Barclays, rejecting the Tiger Lily Applications.  Finding Tiger Lily's Applications were likely to cause confusion with the LEHMAN BROTHERS mark, the TTAB held that: (1) Barclays had continuing common law rights in the LEHMAN BROTHERS mark, including based on Lehman Brothers' continued use of the mark since 2008 as Barclays' licensee; and (2) "LEHMAN BROTHERS is still sufficiently known . . . such that Tiger Lily's use of LEHMAN BROTHERS would lead to a presumption that Barclays and Tiger Lily are somehow connected."  *See* Exhibit 3 hereto.

115.    The LEHMAN Names and Marks, including LEHMAN BROTHERS, are so well-known that the dispute with Tiger Lily has been the subject of several news articles, including a February 8, 2016, article on the front page of *The Wall Street Journal*.

116.    On or about November 11, 2014, third party Trademarkers N.V. filed a revocation proceeding against Barclays' European Trademark No. 83261 for Barclays' registered LEHMAN BROTHERS mark in the European Union Intellectual Property Office ("EUIPO") based on alleged abandonment.

117.    On or about September 30, 2016, the EUIPO denied the revocation against the LEHMAN BROTHERS mark in Class 36 for "Financial services; securities brokerage services; investment consulting services; investment banking services; merchant banking services," maintaining the registration for those services.  Finding "that genuine use was shown for all the services in Class 36," the Cancellation Division of the EUIPO held:

> The evidence filed not only proves that LBIE traded during the relevant period being in administration. It also shows that for every category of services in this class - financial services; securities brokerage services; investment consulting services; investment banking services; merchant banking services - (which actually overlap) the sign LEHMAN BROTHERS was genuinely used. It has been proved that the LEHMAN BROTHERS sign was used in connection with recovering and returning trust property, admitting unsecured creditor's claims and making distribution to creditors, recovering and/or realising House Assets on a managed basis, derivatives, financial transactions, prime brokerage accounts, securities trading and exchange traded derivatives etc. (e.g. the Administrators' report under VGM4) which are included in the listed services above and are generally classified as financial services and, as a subcategory, investment services.

Attached hereto as **Exhibit 11** is copy of the EUIPO's opinion.

118.    On or about September 5, 2017, Barclays filed oppositions in the Portuguese Institute of Industrial Property ("INPI") against applications to register the marks LEHMAN BROTHERS ASSET MANAGEMENT (Portugal Application No. 578171) and LEHMAN BROTHERS ENCORE (Portugal Application No. 578166), both filed by third party Fashion International Limited ("Fashion International") for financial services in International Class 36.  In both instances, the INPI issued decisions affirming Barclays' rights to the LEHMAN BROTHERS name and mark and sustaining the oppositions.  Attached hereto as **Exhibit 12** are copies of the INPI's opinions with certified translations.

119.    On or about February 20, 2018, Barclays filed an opposition in the United Kingdom Intellectual Property Office ("UKIPO") against an application to register the mark LEHMAN BROTHERS ENCORE filed by Fashion International for services in International Classes 38 and

43 (UK Application No. 3252222).  Fashion International failed to file its counterstatement to that opposition and, on or about May 8, 2018, and May 30, 2018, the UKIPO sustained the opposition as conceded.  Attached hereto as **Exhibit 13** are copies of the UKIPO's decisions.

120.    On or about January 29, 2018, Barclays filed an opposition in the Benelux Office for Intellectual Property ("BOIP") against an application to register the mark LEHMAN BROTHERS ASSET MANAGEMENT, filed by third party CKL Holdings N.V. ("CKL") for services in International Classes 35, 36, and 38 (Benelux Application No. 1359661). The application proceeded to registration after CKL deleted International Class 36 (financial services) from the application, but Barclays filed an application to invalidate the registration on or about May 13, 2020.  To date, Barclays continues its prosecution of that invalidation proceeding, which remains pending before the BOIP.

121.    On or about October 29, 2018, Barclays field an opposition in the Mexican Institute of Industrial Property ("MIIP") against an application to register the mark LEHMAN BROTHERS for financial services in International Class 36 (Mexico Application No. 2100116), filed by third party Carlos Megias ("Megias"), and later assigned to Marcelino Garcia Flores in an attempt to avoid liability after Barclays sent a cease and desist letter to Megias, a resident of Florida.

122.    On or about August 26, 2020, the MIIP sustained the opposition and refused to register the third-party application, finding:

> as is apparent from the proposed symbol, it consists of the name LEHMAN BROTHERS, that is, identical to the name of the financial institution LEHMAN BROTHERS founded by the Lehman brothers in 1850 in the United States and which in 2008 was purchased by the BARCLAYS CAPITAL, INC. company; In such a way, the inappropriateness of the registration is evident, since MARCELINO GARCIA FLORES is a person who does not have the corresponding rights for its legal use, since its symbol is likely to mislead or induce the public to make a mistake by constituting false indications as to the business origin of the services intended, consisting precisely of financial matters,

Attached hereto as **Exhibit 14** is a copy of the MIIP's opinion with a certified translation.

-33-

**Defendant Sklarov's History of Criminal and Alleged Civil Fraud**

123.    Defendant Sklarov is a convicted criminal, who served time in federal prison after pleading guilty to felony charges of fraud.  Attached hereto as **Exhibit 15** is a copy of the docket sheet for *USA v. Sklarov, et al.*, 97-cr-00176 (DJL) (W.D. Pa.).

124.    Sklarov also has been sued by multiple parties for civil fraud in connection with the purported offering of securities-backed loans.

125.    Although Sklarov has used various shell companies to perpetuate each alleged fraud, the fact patterns underlying each of the schemes are nearly identical: a Sklarov-related entity promises to provide a loan to a borrower backed by securities owned by the borrower; the borrower pledges the shares as collateral to the Sklarov-controlled entity; the Sklarov-controlled entity provides little if any of the promised loan funds to the borrower and then sells or attempts to sell the shares proffered only as collateral, and retains the proceeds.

126.    For example, in *Satterfield v. VStock Transfer*, Index No. 650311/2019 (Sup. Ct., N.Y. County), Brent Satterfield ("Satterfield") filed suit for fraud against Sklarov, his companies America 2030 Capital, LLC ("America 2030"), America 2030 Capital Ltd. ("America 2030 Ltd.") and Bentley Rothschild Capital Ltd. Corp. ("Bentley Rothschild"), and an unaffiliated broker, VStock Transfer LLC ("VStock").

127.    Satterfield alleged that, after he pledged 2 million shares of stock in Co-Diagnostics, Inc. as collateral for a $3.5 million loan, Sklarov and his related entities: began selling Satterfield's stock collateral before Satterfield received the loan; realized over $1.1 million from selling Satterfield's shares; provided to Satterfield less than $67,000 of the promised loan; and demanded more shares as collateral once the shares had decreased in value due to Sklarov's premature "dumping" of the shares.

128.    The *Satterfield* complaint further details legal proceedings in Hong Kong, Singapore and the United Kingdom, in which proceedings Sklarov allegedly perpetrated similar fraudulent securities-backed loan schemes.  Attached hereto as **Exhibit 16** is copy of the complaint in *Satterfield*.

129.    The *Satterfield* Court issued temporary restraining orders enjoining the transfer agent, America 2030 and/or Bentley Rothschild, were "from selling, transferring, assigning, encumbering or otherwise disposing of any shares of Co-Diagnostics, Inc."  Attached hereto as **Exhibit 17** are copies of the temporary restraining orders issued by the *Satterfield* Court.

130.    Despite the temporary restraining orders, Sklarov and his companies later allegedly attempted to dispose or transfer shares of the Satterfield's stock.  In granting a preliminary injunction against Sklarov and his companies and finding irreparable harm, the *Satterfield* Court found: "informing this Court's decision is the possibility that someone is not just threatening to do, but actually violating this Court's order and actually doing the thing that the plaintiff is asking them to not do."  Attached hereto as **Exhibit 18** are copies of the transcript on the hearing on the motion for preliminary junction and the Court's preliminary injunction order in the *Satterfield* case.

131.    In ruling on subsequent motions, the *Satterfield* Court found that Sklarov and his companies had engaged in actions that evidenced a fraudulent scheme: "[d]ocumentary evidence corroborates that the [stock loan agreement] was amended to avoid the SEC's jurisdiction over the shares and transactions here which evidences a fraudulent scheme;" "the court finds that the second addendum signed by Satterfield containing the St. Kitts & Nevis arbitration provision was permeated with fraud."  Attached hereto as **Exhibit 19** are copies of these decisions in *Satterfield*.

132.    In one of those decision, the *Satterfield* Court found it had personal jurisdiction over Sklarov acting as a principal through his corporate agents: "[t]he record indicates either explicitly or implicitly that Sklarov controls [America 2030] because he is the only individual directing the LLC's activities."  The Court additionally found that it had jurisdiction over Bentley Rothschild, a St. Kitts & Nevis corporation, because it allegedly conspired with America 2030 and Sklarov to commit torts in New York.

133.    Upon information and belief, the *Satterfield* litigation currently is stayed pending arbitration in New York.

134.    In *Two Rivers Water & Farming Co. v. America 2030 Capital Limited et al.*, No. 19-cv-1640 (D. Col.), Two Rivers Water & Farming Company ("TRWF") alleged that Sklarov's companies, America 2030 Ltd. and Bentley Rothschild Capital Limited, agreed to lend TRWF $1.1 million secured by 6.8 million shares of stock, that TRWF transferred the shares to Sklarov's companies, that the companies did not provide TRWF the loan and then the companies sought to remove the restricted legends on the stock certificates to prepare their liquidation.

135.    The Court issued two temporary restraining orders enjoining the removal of the restricted legend on the shares.  Finding that TRWF was likely to succeed on the merits of its fraud claims, the Court held it was likely that the "that [the loan] contract is void and unenforceable [as] procured through fraud" and that TRWF was a victim of "unfair trade practices."  Attached hereto as **Exhibit 20** are copies of the *Two Rivers Water & Farming* Court's temporary restraining orders. The Court eventually converted its temporary restraining orders into a preliminary injunction.

136.    In *America 2030 Capital Limited v. Prescient Investment Limited*, Case No. 1:18-cv-04875-AT (N.D. Ga.), a Sklarov-controlled company, America 2030 Ltd., filed suit against Prescient Investment Limited ("Prescient") and Maximum Success Capital Partners Brokerage

Ltd. ("Maximum Success") for breach of contract and related claims, alleging that Prescient executed a loan agreement for $117 million whereby Prescient was required to pledge as collateral $200 million in stocks.

137. In response, Prescient claimed that, before the loan was made, America 2030 Ltd., through Sklarov, ordered a broker to sell shares deposited with Maximum Success and to place the proceeds in a brokerage account owned by America 2030 Ltd. and later to an America 2030 Ltd. bank account.

138. Upon information and belief, Prescient received an interlocutory injunction from a Hong Kong Court to prevent Maximum Success from disposing of the shares, and Sklarov, through America 2030 Ltd., filed the federal lawsuit to harass Prescient and Maximum Success and avoid his legal obligations and the Hong Kong injunction. Maximum Success moved to dismiss the complaint and moved for sanctions against America 2030 Ltd. and its counsel.

139. In response to Maximum Success's motion to dismiss and for sanctions, the parties entered into a consent order, whereby the Court dismissed with prejudice America 2030 Ltd.'s claims against Maximum Success and granted in part Maximum Success's motion for sanctions. The Consent Order is signed by Sklarov as "Officer of Plaintiff America 2030 . . . Limited, and of Plaintiff's Affiliates, on behalf of himself personally and those entities." Attached hereto as **Exhibit 21** is a copy of the Consent order.

140. In support of the consent order, the parties jointly submitted a memorandum, which stated that "[t]he Plaintiff and the lender are both controlled by Val Sklarov . . . as part of the America 2030 group of companies. . . . He signed the loan documents . . . and controls this litigation." Attached hereto as **Exhibit 22** is a copy of that memorandum.

141.    In *Fortunate Drift Ltd. v. America 2030 Capital, LLC*, Index No. 652158/2018 (Sup. Ct., N.Y. County), Fortunate Drift Limited ("FDL") and Yangtze River Port and Logistics Limited ("YRIV") filed suit for fraud against America 2030 and third party broker VStock.  FDL, an investment company that was one of the largest YRIV shareholders, alleged that America 2030 agreed to lend FDL $8 million secured by 2 million shares in YRIV.  FDL averred that it pledged the shares to America 2030, but America 2030 did not provide the promised loan.  FDL then cancelled the loan agreement.  America 2030, however, then asked YRIV's agent, VStock, to transfer the shares to America 2030's account so America 2030 could sell them to third parties, causing YRIV's stock price to drop.  Attached hereto as **Exhibit 23** is a copy of the verified petition in the *Fortunate Drift Ltd.* action.

142.    FDL sought a preliminary injunction and temporary restraining order to prevent America 2030, VStock and related individuals and entities from disposing of the shares pending determination of an arbitration before the Hong Kong International Arbitration Center concerning the parties' dispute.

143.    The parties later entered into a Stipulation of Settlement whereby America 2030 and VStock agreed that America 2030 and VStock would not to dispose of YRIV shares pending the remainder of a 30-day contractual settlement negotiation period, or, should such negotiations be unsuccessful, a Hong Kong arbitration.  Attached hereto as **Exhibit 24** is a copy of that Stipulation.

**The *Rothschild* Trademark Injunction against Sklarov and Black Rock**

144.    As noted above, in connection with some of his alleged fraudulent securities-backed loan schemes, Sklarov has acted through companies using names and marks containing or comprising ROTHSCHILD, including the corporate names "Bentley Rothschild Capital Limited"

and "Bentley Rothschild Financial LLC," the domain name bentleyrothschild.com (and the corresponding website www.bentleyrothschild.com) and the mark BENTLEY ROTHSCHILD (the "Bentley Rothschild Marks").

145.    Upon information and belief, names and marks containing or comprising ROTHSCHILD (the "ROTHSCHILD Marks") have been used for over 200 years by financial services firms associated with or traced back to the famous European Rothschild banking family (collectively, the "Rothschild Companies").

146.    Upon information and belief, Sklarov and his companies are not affiliated in any manner with the Rothschild Companies.

147.    After learning of Sklarov's use of the Bentley Rothschild Marks in connection with allegedly fraudulent financial services, several of the Rothschild Companies sued Sklarov, Black Rock and four other companies controlled by Sklarov for *inter alia* trademark infringement, trademark dilution, unfair competition and deceptive trade practices under federal and state law. Attached hereto as **Exhibit 25** is a copy of the complaint (without exhibits) in *Rothschild & Co Continuation Holdings A.G. v. Sklarov*, 19-cv-03561 (N.D. Ga.).

148.    Among other things, the Rothschild Companies alleged that Sklarov and his companies were: (1) offering purported financial services, including securities-backed loans, using the intentionally confusingly similar Bentley Rothschild Marks; and (2) making explicitly and/or impliedly false representations in marketing materials that Sklarov and his companies were affiliated or associated with the legitimate Rothschild Companies.

149.    For example, a purported term sheet for securities backed loans offered by the purported "Bentley Rothschild," stated:

> Rothschild family started offering securitized financing in the early part of the 19th century.  Bentley Rothschild Capital Limited is honored to continue to engage in

the tradition of global finance by offering loans against publicly traded securities for our high-net worth clients located throughout the world.  Our service is as exceptional now as it has been by the Rothschild dynasty during the past 250 years.

Attached hereto as **Exhibit 26** is a copy of the term sheet.

150.    The term sheet also listed in its copyright notice: "Rothschild Family of Companies ©1986-2019 All Rights Reserved."  Upon information and belief, the Rothschild Companies went public and reorganized under the name Rothschild & Cie in 1986, the first year in the copyright notice listed on the "Bentley Rothschild" term sheet.

151.    Upon information and belief, Sklarov made these false and misleading statements and used the Bentley Rothschild Marks with intent to usurp the goodwill and consumer recognition in the ROTHSCHILD Marks and to sow consumer confusion in the marketplace such that consumers would mistakenly believe that Sklarov and his companies are somehow affiliated or associated with the Rothschild Companies and/or its services, and/or the ROTHSCHILD Marks.

152.    Upon information and belief, in furtherance of his scheme to impersonate the Rothschild Companies, Sklarov instructed Defendant Singh to file (through Sklarov's foreign shell company Black Rock) USPTO Application Serial No. 88457938 to register the mark BENTLEY ROTHSCHILD for various financial services in International Class 36 (the "BENTLEY ROTHSCHILD Application").

153.    Upon information and belief, when filing the BENTLEY ROTHSCHILD Application, Sklarov, Black Rock and Singh copied and pasted therein the description of financial services as set forth exactly in the legitimate Rothschild Companies Trademark Registration No. 3447667 for the mark ROTHSCHILD, and merely added "stock loans," to create the false impression that the BENTLEY ROTHSCHILD Application was connected with the legitimate trademark registration owned by the Rothschild Companies.

154.    After the Rothschild Companies filed their complaint and their motion for a preliminary injunction, upon information and belief, Sklarov instructed Singh to file (through Sklarov's foreign shell company Lincoln) new USPTO Application Serial No. 88568356 for the mark MAYER AMSCHEL ROTHSCHILD CAPITAL for various financial services in International Class 36 (the "MAYER AMSCHEL ROTHSCHILD Application").

155.    Upon information and belief, MAYER AMSCHEL ROTHSCHILD is the name of the founder of the Rothschild banking dynasty that now does business as the Rothschild Companies under the ROTHSCHILD Marks.

156.    Upon information and belief, Sklarov, Lincoln and Singh filed the MAYER AMSCHEL ROTHSCHILD Application to usurp the goodwill and consumer recognition in the ROTHSCHILD Marks and to sow consumer confusion in the marketplace such that consumers would mistakenly believe that Sklarov and his companies are somehow affiliated or associated with the Rothschild Companies and/or its services, and/or the ROTHSCHILD Marks.

157.    During the hearing on the Rothschild Companies' motion for a preliminary injunction, the Court directly questioned Singh about his filing of the MAYER AMSCHEL ROTHSCHILD Application—especially since the mark in the application contained the exact name of the founder of the Rothschild Companies and the application was filed well after the Rothschild Companies had sent several demand letters, filed their complaint and sought preliminary injunctive relief.  Singh responded:

> With regards to what is in the application, it was asked by the company for me to put it that way.  I did advise them against it.  They wanted to continue forward with the language that is in there.  So therefore it was submitted.  However, after the fact, I do believe the company is looking to actually withdraw those applications.  And it just hasn't been proceeded by my office yet.  But they are looking to withdraw those applications.

158.    Upon information and belief, neither Sklarov, Singh, Black Rock nor Singh expressly withdrew the MAYER AMSCHEL ROTHSCHILD Application or the BENTLEY ROTHSCHILD Application.  Instead, the USPTO rejected both applications, finding such marks were likely to cause confusion with the Rothschild Companies' registered ROTHSCHILD Marks.  The USPTO also found registration of the mark MAYER AMSCHEL ROTHSCHILD would falsely suggest a connection with the founder of the Rothschild Companies.  Attached hereto as **Exhibit 27** are copies of these office actions.

159.    The Court in the *Rothschild* litigation granted the Rothschild Companies' motion for a preliminary injunction, enjoining Sklarov's and his companies' and agents' use and registration of names, marks and domain names containing or comprising ROTHSCHILD.  Attached hereto as **Exhibit 28** is a copy of the Court's Preliminary Injunction Order and Memorandum in the *Rothschild* litigation.

160.    Finding that the Rothschild Companies were likely to succeed on the merits of their trademark infringement and related claims, the Court found:

> substantial evidence in the record that Defendants Sklarov [and related entities] deliberately adopted and used the 'Bentley Rothschild' mark in order to profit from the substantial goodwill Plaintiffs have created in the ROTHSCHILD Marks . . . . [s]uch deliberately infringing conduct creates a substantial likelihood of confusion, tarnishment of the ROTHSCHILD Marks, and harm to Plaintiffs."

161.    The Court further found that "[i]rreparable injury and tarnishment also arise from the number of lawsuits charging Bentley Rothschild entities with allegedly having participated in stock loan fraud. . . . The risk of tarnishment of the 'Rothschild' name caused by association with allegations of fraud cannot be fully compensated for by money damages."

162.    Over the objections of Sklarov and his companies, the Court held the injunction should apply extraterritorially, including over Black Rock, which is a Bahamian company.  The Court found that such extraterritorial relief was available under the Lanham Act because Sklarov,

a participant in all acts of infringement, resided in the United States, and two U.S.-based Bentley Rothschild entities operated in conjunction with the foreign-based Bentley Rothschild entity; the Rothschild Companies sufficiently alleged that the Sklarov's and his shell companies' extraterritorial actions had a substantial impact on domestic commerce; and applying the injunction extraterritorially would not affect another country's sovereignty.  The Court further held that the Rothschild Companies' irreparable injury could only be stopped by an extraterritorial injunction.

163.    The Court also denied Black Rock's motion to dismiss for lack of personal jurisdiction, finding sufficient the Rothschild Companies' allegations that Black Rock transacted business in the state of Georgia.

164.    After the Court issued its preliminary injunction order, Sklarov, Black Rock and his other shell companies entered into a Consent Order for Permanent Injunction permanently enjoining their use of the ROTHSCHILD Marks.  Attached hereto as **Exhibit 29** is a copy of that Consent Order.

## **Defendants' Unlawful Use of the LEHMAN Names and Marks**

165.    Undeterred by the injunctions in the *Rothschild* litigation and other civil fraud actions, Sklarov and his shell companies, along with Defendants Singh and Qureishi, are engaging in nearly identical unlawful activities in connection with the purported offering of securities-backed loans—this time using names and marks that are confusingly similar to, dilutive of and create a false association with the LEHMAN Names and Marks.

166.    Defendants have used in commerce in connection with purported financial services the Infringing Names and Marks, including: "LEHMAN BORTHERS," "SHEARSON LEHMAN BROTHERS," "SHEARSON LEHMAN," "SHEARSON LEHMAN BROTHERS

-43-

INVESTMENT BANKING," "SHEARSON LEHMAN INVESTMENT BANKING" and the domain name <shearsonlehmanbrothers.com>.

167.    Upon information and belief, Sklarov, either directly, or through one or more companies he directs and controls, registered the domain name <shearsonlehmanbrothers.com> in or about June 2019.  Upon information and belief, Sklarov utilized Domains By Proxy, LLC, a proxy service, to mask the true identity and contact information of the owner of the domain name in an effort to prevent discovery of his unlawful acts.  Attached hereto as **Exhibit 30** is a copy of the WhoIs records for the domain name <shearsonlehmanbrothers.com>.

168.    At some point thereafter, upon information and belief, Sklarov caused the domain name <shearsonlehmanbrothers.com> to resolve to an active website located at www.shearsonlehmanbrothers.com, for the Fake "Shearson Lehman Brothers" (the "Infringing Website").  The Infringing Website currently is active today.  Attached hereto as **Exhibit 31** are screenshots of the Infringing Website, an excerpt of which appears below:

**[REST OF PAGE INTENTIONALLY LEFT BLANK]**

28827/162/3557472



169.    The Infringing Website purports to offer financial services, including for wealth and investment management, financial advisory and asset management solutions, investment banking, securities and mutual funds, credit, lending and financing, including in the United States ("Defendants' Purported Services").

170.    In a clear attempt to pass itself off as the same as or affiliated with the legitimate Lehman Brothers and the legitimate LEHMAN Names and Marks owned by Barclays, the Infringing Website uses the name and mark "Shearson Lehman Brothers"—the former name and registered mark used by the legitimate Lehman Brothers for many years when the firm was owned by American Express—as well as other "Lehman" and "Shearson Lehman" formative names and marks, including "Lehman Brothers."

171.    The Infringing Website falsely claims that the Fake "Shearson Lehman Brothers" is "a Lehman Brothers Company."

172.    The Infringing Website presents several of the Infringing Names and Marks in the Lehman Font and Shearson Lehman Stylizations.



| Marks Used and Previously Registered by Lehman Brothers | The Infringing Names and Marks |
|---|---|

173.    The Infringing Website lists 200 Vesey Street, New York, New York 10281 as the United States address for the purported "Shearson Lehman Brothers," as shown below:



174.    As noted above, 200 Vesey Street, New York, New York 10281 is the former address of the legitimate Lehman Brothers when the firm was owned by American Express.

175.    The Infringing Website uses language that would be associated with or would describe the legitimate Lehman Brothers and its long history of offering financial services, including:

- "With more than 100 years of industry presence . . ."

- "We invented investment banking."

- "Decades of experience as a market leader, the old is behind us, the new is here.  The New Shearson Lehman Brothers Investment Banking. We invented investment banking."

- "We have managed billions of dollars of client assets and have provided consistent and secure portfolio management services for our clients for more than 100 years"

- "We have provided these and other wealth management services for our clients for more than 100 years."

176.    Upon information and belief, the Fake "Shearson Lehman Brothers" has not been active for more than 1-2 years, does not have billions of dollars' worth of assets under management and does not provide wealth management or investment banking services.

177.    Defendant Qureishi represents himself as "Senior Executive Vice President, Wealth Management," of the Fake "Shearson Lehman Brothers."  Qureishi also claims to have been a "Senior Loan Advisor" at the Sklarov-controlled America 2030 company.  Attached hereto as **Exhibit 32** is a copy of Qureishi's LinkedIn profile, an excerpt of which appears below:



178.    Upon information and belief, Qureishi responds to inquires made to the Fake "Shearson Lehman Brothers" via the Infringing Website, including from persons in the United States, and purports to represent the company and its purported business.

179.    Upon information and belief, Sklarov and Qureishi designed and provided all content for the Infringing Website, or expressly instructed others to do so and then approved of and endorsed the Infringing Website, its design and content, and adopted it as their own.

180.    Upon information and belief, Defendants Sklarov and Qureishi caused the Infringing Website to be programmed such that it would not be directly accessible from an IP address in the United States, in an effort to prevent Barclays and their attorneys in the United States

from discovering the site. The site, however, is accessible from the United States using simple and common tools such as a VPN (virtual private network).

181.    Upon information and belief, Qureishi uses the below signature line and the email address Osman.Qureishi@ShearsonLehmanBrothers.com in email communications to prospective clients of and others interested in doing business with the fake "Shearson Lehman Brothers":

**Osman Qureishi**

*Senior Executive Vice President*

Wealth Management Division

Telephone: 332.228.0152

Direct: 212.208.0900

Yoll Free: 888.418.7999

Cell Phone: 917.704.3276

Fax: 212.428.6707

Email:Osman.Qureishi@shearsonlehmanbrothers.com

182.    Upon information and belief, Qureishi has represented to prospective agents and brokers of the Fake "Shearson Lehman Brothers," including in the United States, that the firm currently ***only*** offers security loans borrowed against assets of investment portfolios and does not currently offer investment or wealth management services or any of the other of Defendants' Purported Services promoted and advertised on the Infringing Website.

183.    Upon information and belief, Qureishi has represented to prospective agents and brokers for the Fake "Shearson Lehman Brothers" that the firm:

- Offers security loans within the United States.

- Uses custodian accounts within the United States to facilitate loans.

- Has offices in New York, New York.

- Has the ability to do title transfer loans in the United States and recently secured a resource within the United States to assist with such transfers.

- Has been in business only for three years.

184.    Upon information and belief, Qureishi has sent to prospective agents and brokers for the Fake "Shearson Lehman Brothers," including in the United States, a form "Securities Lending Referral Agreement" (the "SLRA"), which is attached hereto as **Exhibit 33**, the cover and back of which are shown below:




185.    Upon information and belief, the purpose of the SLRA is to engage independent agents to refer "prospective borrowers to [the fake] Shearson Lehman for the purpose of obtaining Loans backed by Securities."

186.    The SLRA uses multiple times the Infringing Names and Marks <shearsonlehmanbrothers.com>, "Shearson Lehman Brothers Investment Banking," "Shearson

-50-

Lehman" and "Lehman Brothers," the latter two marks presented prominently in the Lehman Font and Shearson Lehman Stylizations on the front and back covers and at the top of each page of the agreement.

187.   Upon information and belief, Qureishi has sent the SLRA to prospective agents and brokers who contact the Fake "Shearson Lehman Brothers" via the website www.shearonlehmanbrothers.com or via an email address using the domain name <shearsonlehmanbrothers.com>.

188.   The SLRA also lists on its front and back covers 200 Vesey Street, New York, New York 10281 as the United States address for the purported Fake "Shearson Lehman Brothers."  As noted above, this was the address for the legitimate Lehman Brothers when the firm was owned by American Express.

189.   The SLRA also lists a telephone number with a New York, New York area code and the email address us.office@shearsonlehmanbrothers.com.

190.   Upon information and belief, Sklarov and Qureishi designed and provided all content for the SLRA, or expressly instructed others to do so and then approved of and endorsed the SLRA, its design and content, and adopted it as their own.

191.   Upon information and belief, Qureishi also has published and distributed to potential referral agents for the Fake "Shearson Lehman Brothers," including in the United States, a Broker Affiliate Dealer flyer (the "Broker Flyer"), a copy of which is attached hereto as **Exhibit 34**, and which is reproduced below:



192. Qureishi publicly posted the Broker Flyer on his LinkedIn account, including at the URL https://www.linkedin.com/posts/osman-qureishi-ab2434100_broker-dealers-world-wide-we-are-funding-activity-6663894856533979136-0gsS/.

193. The Broker Flyer uses the Infringing Names and Marks "Shearson Lehman," "<shearsonlehmanbrothers.com> and "Shearson Lehman Investment Banking," the latter presented in the Lehman Font and Shearson Lehman Stylizations.

194. The Broker Flyer also claims that that the fake "Shearson Lehman" is an "investment banking firm" that provides "wealth management" services "worldwide."

195. Like the Infringing Website and the SLRA, the Broker Flyer lists telephone numbers with New York, New York area codes.

-52-

196.    Upon information and belief, Sklarov and Qureishi designed and provided all content for the Broker Flyer, or expressly instructed others to do so and then approved of and endorsed the Broker Flyer, its design and content, and adopted it as their own.

197.    Upon information and belief, Qureishi has also distributed to potential agents, brokers and borrowers of the Fake "Shearson Lehman Brothers," including in the United States, a flyer entitled "Direct Lender for Global Securities Backed Lending Program" (the "Direct Lender Flyer"), a copy of which is attached as **Exhibit 35** hereto and which is reproduced below:



198.    The Direct Lender Flyer, which advertises and promotes purported securities backed lending services offered by Defendants, uses the Infringing Names and Marks "<shearsonlehmanbrothers.com>", "Shearson Lehman" and "Lehman Brothers," the latter two presented in the Lehman Font and Shearson Lehman Stylizations.

199.    The Direct Lender Flyer also claims the Fake "Shearson Lehman Brothers" is "A Lehman Brothers Company," lists the former address of the legitimate Lehman Brothers—200 Vesey Street, New York, New York 10281—as its own address and lists a telephone number with a New York area code.

200.    Upon information and belief, Sklarov and Qureishi designed and provided all content for the Direct Lender Flyer, or expressly instructed others to do so and then approved of and endorsed the Direct Lender Flyer, its design and content, and adopted it as their own.

201.    Upon information and belief, Qureishi has published, including in the United States, several press releases for the Fake "Shearson Lehman Brothers" and its purported financial services (the "Press Releases").  Attached hereto as **Exhibit 36** are copies of the Press Releases.

202.    The Press Releases—entitled "Shearson Lehman is Entering into Negotiations to Invest $250 million in Alternative Energy" (March 20, 2020), "Shearson Lehman Brothers Investment Banking Broker Dealer Affiliate Program is Available World Wide" (April 7, 2020), "Shearson Lehman Adds a New Local Custodian and Eases SBL Requirements in Hong Kong!" (May 1, 2020) and "Asia's Alternative Energy Sector Becomes Front-Page News as Shearson Lehman Vows to Invest Millions" (August 24, 2020)—purport to report on potential multi-million-dollar investments "Shearson Lehman" is making or has made in various industries and touts the company's purported wealth management and investment banking services.

203.    These Press Releases use the Infringing Names and Marks "Shearson Lehman Brothers Investment Banking," "Shearson Lehman," "Lehman Brothers" and "<shearsonlehmanbrothers.com>."

204.    Each of these Press Releases uses the Infringing Names and Marks "Shearson Lehman" and/or "Shearson Lehman Brothers Investment Banking" in its title and prominently

-54-

displays the Infringing Name and Mark "Shearson Lehman Brothers Investment Banking" in the Lehman Font and Shearson Lehman Stylizations, including as shown below:



205.    One of these Press Releases lists Qureishi as the "Media Contact" for the Fake "Shearson Lehman Brothers," each lists an email address of wealthmanagement@shearsonlehmanbrothers.com for the purported firm and one explicitly lists a web address of www.shearsonlehmanbrothers.com for the purported firm.

206.    One of the Press Releases refers twice to the Fake "Shearson Lehman Brothers" as "a Lehman Brothers company."

207.    Upon information and belief, Sklarov and Qureishi designed and provided all content for the Press Releases, or expressly instructed others to do so and then approved of and endorsed the Press Releases, their design and content, and adopted them as their own.

208.    Defendants do not have (and never have had) permission from Barclays or Lehman Brothers to use the Infringing Names and Marks or to engage in any of the unlawful activities described herein.

209.    Barclays established rights in the LEHMAN Names and Marks—including as assignee of Lehman Brothers' prior rights from use of the names and marks dating back to 1850 and licensor of Lehman Brothers' use since 2008 of the names and marks—long before Defendants began their unlawful activities described herein.

210.    Defendant's use the Infringing Names and Marks is likely to cause consumer confusion as to the source and origin of Defendants' Purported Services and to cause mistake, or to deceive the public by misleading consumers into believing that Defendants' Purported Services emanate from, are approved, authorized, endorsed or sponsored by, or are in some way associated or connected with Barclays and/or its services, Lehman Brothers and/or its services and/or the LEHMAN Names and Marks.

211.    Upon information and belief, Defendants acted with intent to usurp the goodwill and consumer recognition in the LEHMAN Names and Marks and to sow consumer confusion in the marketplace such that consumers would mistakenly believe that Defendants are somehow affiliated or associated with Barclays and/or its services, Lehman Brothers and/or its services and/or the LEHMAN Names and Marks.

212.    Upon information and belief, despite their representations to the contrary in commercial advertising, including in the Infringing Website, the SLRA, the Broker Flyer, the Direct Lending Flyer and the Press Releases, the Defendants do not provide any financial services other than security backed loans and have not made any of the investments set forth therein.

**Defendants' Unlawful Registration of the Infringing Names and Marks**

213.    Upon information and belief, in furtherance of their scheme to impersonate Lehman Brothers and to create a false association with the LEHMAN Names and Marks, and in an attempt to provide an air of legitimacy to Defendants' unlawful actions, Defendants have registered and

28827/162/3557472

attempted to register the Infringing Names and Marks as trademarks in the United States and certain foreign jurisdictions.

214.   Upon information and belief, Sklarov, through his shell company Black Rock, caused Singh to file with the USPTO intent to use applications to register the following marks:

| Mark | Application No. | Services | Application Date |
|---|---|---|---|
| SHEARSON LEHMAN | 88457946 | 36: Financial services, namely, advising corporations on debt and financial restructuring, bankruptcy reorganization and divestitures, namely, sales of entities and their stock and assets; strategic planning and capital raising for corporations, start-ups, emerging companies, private equity fund and other similar corporate entities; stock loans; arranging financing for start-ups, emerging companies, private equity funds and other similar corporate entities; merchant banking; investment banking; underwriting, namely, underwriting offers of securities as manager, co-manager or syndicate member; private placements; investment management and advice; financial consultancy, planning, research and appraisal of corporate entities; financial evaluation and other wealth management services, namely, for high net worth individuals, for pension and other institutional accounts; trading and dealing in stocks, securities and other financial products, namely, bonds and advisory services relating thereto; brokerage and dealer services in the field of stocks and securities; providing financial news and information via a global communication network; financial investment and financial advisory services in the field of real estate; leasing of real estate; real estate acquisition services; real estate appraisal; real estate equity sharing, namely, managing and arranging for co-ownership of real estate; | June 3, 2019 |

| | | and real estate investment and real estate management | |
| SHEARSON LEHMAN HUTTON | 88536436 | 36: Financial services, namely, corporate workout, debt restructuring, receivership, and loan resolution for commercial loans | July 25, 2019 |

(the "Infringing Applications"). Attached hereto as **Exhibit 37** are copies of the Infringing Applications.

215. Singh signed both Infringing Applications as "General Counsel" of Black Rock.

216. Singh also listed his own name as affiliated with the Black Rock name and address as Correspondent of Record for the Infringing Application Serial No. 88536436.

217. Thus, upon information and belief, when filing the Infringing Applications, Singh was acting as an officer of Black Rock.

218. At the time Singh filed each of the Infringing Applications, he was required to sign a declaration that:

> the applicant believes the applicant is entitled to use the mark in commerce on or in connection with the goods or services specified in the application [and t]o the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive.

(the "Trademark Declaration").

219. Upon information and belief, at the time Singh signed the Trademark Declaration for each of the Infringing Applications, Singh knew of Barclays' superior and prior rights in the LEHMAN Names and Marks and that Black Rock's and Sklarov's registration and use of the marks SHEARSON LEHMAN and SHEARSON LEHMAN HUTTON would cause consumers to mistakenly believe that BlackRock and Sklarov were somehow affiliated or associated with Lehman Brothers, Barclays and/or the LEHMAN Names and Marks.

220.    Indeed, as discussed below, Barclays already had sent a cease and desist letter to Singh before he filed Infringing Application Serial No. 88536436 for the mark SHEARSON LEHMAN HUTTON.  Moreover, the LEHMAN Names and Marks are some of the most famous names and marks associated with financial services and still are used today by Lehman Brothers and Barclays, as would be evidenced by a simple Internet search.  It would be implausible for any of the Defendants, including Singh, to claim ignorance of Barclays' and Lehman Brothers' prior and current rights in the LEHMAN Names and Marks.

221.    As noted above, Singh has admitted in at least one other context that he knowingly filed a trademark application with the USPTO when he knew another party had superior rights and that the mark in the application was likely to cause confusion with that senior mark and/or create a false suggestion of a connection with that other party.  Specifically, Singh willingly testified before the Court in the *Rothschild* litigation that he knew of Rothschild's superior rights in the ROTHSCHILD Marks when Sklarov instructed him to file the infringing application for MAYER AMSCHEL ROTHSCHILD CAPITAL, advised Sklarov that he should not file the application, yet filed it anyway.

222.    Thus, upon information and belief, in furtherance of Defendants' scheme to impersonate Lehman Brothers and to commit fraud upon the public and on the USPTO, Singh made material misrepresentations to the USPTO with the intent to deceive the USPTO into granting registration of the SHEARSON LEHMAN and SHEARSON LEHMAN HUTTON marks in the Infringing Applications, which Black Rock and Sklarov were not entitled to register.

223.    Shortly after Singh filed the Infringing Applications, Singh, upon information and belief, at the direction and instruction of Sklarov, sought to amend Infringing Application Serial No. 88457946 to list Sklarov's shell company Lincoln as the current applicant.  The USPTO did

not accept this amendment.  Upon information and believe, Singh was acting as an officer of Lincoln when he attempted to amend Application Serial No. 88457946.

224.    Barclays filed Letters of Protest against the Infringing Applications, accompanying each of which were news and Internet articles about Lehman Brothers, including its former use of the SHEARSON LEHMAN Names and Marks, and information about Barclays' prior-filed pending Application Serial No. 86081143 for the mark LEHMAN BROTHERS in International Class 36 (the "Letters of Protest").

225.    The USPTO accepted the Letters of Protest and referred Barclays' news and Internet articles to the examining attorneys for the Infringing Applications, noting "evidence submitted by the protestor is relevant and may support a reasonable ground for refusal in ex parte examination," namely, "[p]ossible false association" with Barclays and/or Lehman Brothers.

226.    The USPTO also instructed the examining attorney to consider Barclays' prior-filed pending Application Serial No. 86081143 for the mark LEHMAN BROTHERS in International Class 36 as a potential obstacle to Infringing Application Serial No. 88536436 for the mark SHEARSON LEHMAN HUTTON.

227.    The USPTO ultimately issued office actions rejecting the Infringing Applications. In each office action, the examining attorney cited Barclays' prior-filed pending application for the LEHMAN BROTHERS mark as a potential bar to registration based on a likelihood of confusion between the Barclays' LEHMAN BROTHERS marks and the marks in the Infringing Applications in violation of Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d).

228.    Recognizing the fame of the SHEARSON LEHMAN and SHEARSON LEHMAN HUTTON marks, the USPTO also required Black Rock to provide information concerning its connection with Lehman Brothers:

> Due to the renown of the institution . . . named in the mark . . ., and the fact that there is no information in the application record regarding a connection with applicant, applicant must specify whether the . . . institution named in the mark has any connection with applicant's . . . services, and if so, must describe the nature and extent of that connection.

Attached hereto as **Exhibit 38** are copies of these office actions.

229.   Black Rock, Sklarov and Singh failed to respond to these office actions and the USPTO ultimately rejected the Infringing Applications as abandoned.  Attached hereto as **Exhibit 39** are copies of the current status records from the USPTO for the Infringing Applications.

230.   Undeterred by the USPTO's rejection of the Infringing Applications and Barclays' demand letters, Sklarov, through his shell companies, filed applications to register the marks LEHMAN BROTHERS, SHEARSON LEHMAN BROTHERS and SHEARSON LEHMAN in at least two foreign jurisdictions.

231.   Upon information and belief, Newburgh, at the direction of Sklarov, filed applications in the Office of Trademarks of the Principality of Andorra ("OTPA") to register the marks LEHMAN BROTHERS and SHEARSON LEHMAN for "Brokerage; repayment; loan (finance); secured loans; financing services" in International Class 36.  Upon information and belief, the OTPA does not publish trademark applications for opposition by third parties prior to granting registration.  Nor is Andorra a member of the EUIPO, which recently has recognized the continuing validity of Barclays' LEHMAN BROTHERS mark.  Upon information and belief, Sklarov and Newburgh intentionally chose to register marks in this jurisdiction to make it more difficult for Barclays to enforce its legitimate rights.

232.   Upon information and belief, in February 2020, the OTPA granted registration to Newberg to the marks LEHMAN BROTHERS (Andorra Registration No. 41125) and SHEARSON LEHMAN (Andorra Registration No. 41044 ) (the "Andorra Registrations").  Upon information and belief, the Andorra Registrations were first made public in or about March 2020,

a month after the applications matured to registrations.  Barclays first learned about the Andorra Registrations on or about April 22, 2020.  Attached hereto as **Exhibit 40** are copies from the official OTPA records showing the status of the Andorra Registrations.

233.    Upon information and belief, on or about January 30, 2020, Lincoln, at the direction of Sklarov, filed Application Serial No. M279372-01 in the Directorate General of the Industrial Property Registry - Ministry of Commerce and Industries in Panama ("DIGERPI") to register the mark SHEARSON LEHMAN BROTHERS & Design (using the Lehman Font as follows: SHEARSON LEHMAN BROTHERS ) for "Collateralized loans; financing services; securities brokerage; stock brokerage" in International Class 36 (the "Panama Application").  Upon information and belief, the Panama Application was first made public and published by the DIGERPI on or about July 9, 2020.  Barclays first learned about the Panama Application on or about July 24, 2020. Attached hereto as **Exhibit 41** are copies from the official DIGERPI records showing the status of the Panama Application.  Barclays has filed an opposition against the Panama Application.

234.    Upon information and belief, Defendant Sklarov instructed and directed each of these foreign trademark filings and Singh coordinated with and instructed local counsel in the relevant jurisdictions to effectuate the filings, all as part of a continuing and intentional scheme to deceive consumers and sow confusion in the marketplace.

235.    Defendants do not have (and never have had) permission from Barclays or Lehman Brothers to file the Infringing Applications, the Andorra Registrations or the Panama Application.

236.    Barclays established rights in the LEHMAN Names and Marks—including as assignee of Lehman Brothers' prior rights from use of the names and marks dating back to 1850 and licensor of Lehman Brothers' use since 2008 of the names and marks—long before Defendants

first sought to file the Infringing Applications, the Andorra Registrations or the Panama Application.

237.    Defendants' filing of and attempts to file the Infringing Applications, the Andorra Registrations and the Panama Application, are likely to cause consumer confusion as to the source and origin of Defendants' Purported Services and to cause mistake, or to deceive the public by misleading consumers into believing that Defendants' Purported Services emanate from, are approved, authorized, endorsed or sponsored by, or are in some way associated or connected with Barclays and/or its services, Lehman Brothers and/or its services and/or the LEHMAN Names and Marks.

238.    Upon information and belief, Defendants filed the Infringing Applications, the Andorra Registrations and the Panama Application with intent to usurp the goodwill and consumer recognition in the LEHMAN Names and Marks and to sow consumer confusion in the marketplace such that consumers would mistakenly believe that Defendants are somehow affiliated or associated with Barclays and/or its services, Lehman Brothers and/or its services and/or the LEHMAN Names and Marks.

**Defendants' Other Unlawful Acts that Seek to Create False Connections with Famous Financial Services Names and Brands**

239.    The LEHMAN Names and Marks and the ROTHSCHILD Marks are not the only famous financial services names and marks with which Defendants have falsely sought to associate themselves in an apparent attempt to cause confusion in the marketplace and mislead consumers.

240.    At or about the same time Singh filed the Infringing Applications on behalf of Black Rock and at the direction of Sklarov, Singh also filed applications in the names of Black Rock, Lincoln and Newburgh, seeking to register trademarks containing or comprising famous names

and marks associated with financial services, with which those defendants clearly had no affiliation or association, including:

| Lincoln: | CREDIT SUISSE FIRST BOSTON; BNP PARIBAS FORTIS; FORTIS N.V.; ASTOR CAPITAL; MAYER AMSCHEL ROTHSCHILD CAPITAL; SAMUEL WALTON CAPITAL; LAZARD FRERES & CO. |

| Black Rock: | UBS PAINE WEBBER; PRICE WATERHOUSE COOPERS; ARTHUR ANDERSEN; CORNELIUS VANDERBILT; JOHN D. ROCKEFELLER; ANDREW CARNEGIE; SAL. OPPENHEIM; OPPENHEIM; BENTLEY ROTHSCHILD; PENN STATE FINANCIAL; WASHINGTON MUTUAL; BEAR STEARNS; DREYFUS FINANCIAL. |

| Newburgh: | GEORGE SOROS CAPITAL; WARREN BUFFET CAPITAL; DEAN WITTER REYNOLDS; SALOMON SMITH BARNEY; PRUDENTIAL – BACHELOR; DL & J DONALDSON, LUFKIN, & JENRETTE; BACHE & CO. |

(the "Other Infringing USPTO Marks"). Attached hereto as **Exhibit 42** are copies of the USPTO status records for the applications for the Other Infringing USPTO Marks.

241.    Upon information and belief, Sklarov directed Singh to file applications for the Other Infringing USPTO Marks on behalf of Black Rock, Lincoln and Newburgh.

242.    When filing each of the applications for the Other Infringing USPTO Marks, Singh listed his own name as affiliated with the respective shell company name and address as Correspondent of Record. He signed several of the applications for the Other Infringing USPTO Marks Infringing Applications as "General Counsel" of the respective shell company. Thus, upon information and belief, when filing the Other Infringing USPTO Marks, Singh was acting as an officer of the respective company in whose name the application was filed.

243.    As with the Infringing Applications, at the time Singh filed each of the applications for the Other Infringing USPTO Marks, he was required to sign the Trademark Declaration.

-64-

244.   Upon information and belief, at the time Singh signed the Trademark Declaration for each of applications for the Other Infringing USPTO Marks, he knew of third parties' superior and prior rights in those name and marks and that Black Rock's, Newburgh's, Lincoln's and Sklarov's registration and use of Other Infringing USPTO Marks would cause consumers to mistakenly believe that BlackRock, Newburgh, Lincoln and Sklarov were somehow affiliated or associated with each of those third parties.

245.   Thus, upon information and belief, in furtherance of Defendants' scheme to commit fraud upon the public and the USPTO, Singh made material misrepresentations to the USPTO with the intent to commit fraud and to deceive the USPTO into granting the registration for the Other Infringing USPTO Marks, to which Black Rock, Newburgh, Lincoln and Sklarov were not entitled to register.

246.   The USPTO rejected each and every one of the applications for the Other Infringing USPTO Marks based on potential or actual likely confusion or false suggestion of a connection with the name or brand that each of the Other Infringing USPTO Marks sought to impersonate.

247.   Upon information and belief, Sklarov, through his shell companies Lincoln and Newburgh, also filed applications to register in foreign jurisdictions, including Andorra and Panama, trademarks containing or comprising famous names and marks associated with financial services, with which Defendants' clearly have no legitimate affiliation or association.

248.   Many of these applications are identical or nearly identical to the Other Infringing USPTO Marks rejected by the USPTO, and include:

Andorra:   ANDREW CARNEGIE GLOBAL CAPITAL LT; BEAR STEARNS COMPANIES; CORNELIUS VANDERBILT CAPITAL MANAGEMENT LT; DREYFUS CORPORATION; EUROBANC FINANCIAL; FIDELITY INVESTMENTS; JOHN D ROCKEFELLER INVESTMENTS LIMITED LTD; LUXEMBOURG CAPITAL PARTNERS; SALOMON BROTHERS; WARREN

BUFFET CAPITAL; ARTHUR ANDERSEN FINANCIAL; BACHE & CO SECURITIES; BANC ONE FINANCIAL; BENTLEY ROTHSCHILD CAPITAL LIMITED; DLJ, DONALDSON, LUFKIN & JENRETTE AND DESIGN; GUGGENHEIM; J. PAUL GETTY; PRICE WATERHOUSE COOPERS; SAL. OPPENHEIM; WESTINGHOUSE

Panama:   BEAR STEARNS COMPANIES; DREYFUS CORPORATION; SAL. OPPENHEIM

Benelux:   BENTLEY ROTHSCHILD CAPITAL LIMITED

Chile:   CORNELIUS VANDERBILT

Ireland:   SAL. OPPENHEIM

(the "Other Foreign Infringing Marks").

249.   Upon information and belief, Defendant Sklarov instructed and directed each of the trademark filings for the Other Foreign Infringing Marks and Singh coordinated with and instructed local counsel in the relevant jurisdictions to effectuate these filings, all as part of a continuing and intentional scheme to deceive consumers and sow confusion in the marketplace.

250.   Upon information and belief, Defendant Sklarov, either directly, or through a company he directs and controls, also is purporting to do business as "Bear Stearns" and attempting to intentionally mislead consumers to mistakenly believe that he and his purported services are affiliated with or originate from the global investment bank The Bear Stearns Companies, Inc. ("Bear Stearns"), which was acquired by JPMorgan Chase in 2008.

251.   Upon information and belief, Sklarov, either directly, or through a company he directs and controls, registered the domain name <bearstearnscompanies.com> in or about June 2019.  Upon information and belief, Sklarov utilized Domains By Proxy, LLC, a proxy service, to mask the true identity and contact information of the owner of the <bearstearnscompanies.com> domain name in an effort to shield himself from liability for his unlawful acts.  Attached hereto as **Exhibit 43** is a copy of the WhoIs records for the domain name <bearstearnscompanies.com>.

252.     The <bearstearnscompanies.com> and the <shearsonlehmanbrothers.com> domain names were registered on the same date with the same registrar, utilize the same proxy service to mask the true identity of the registrant, use the same nameservers, and resolve to websites hosted by the same Internet service provider.

253.     At some point thereafter, upon information and belief, Sklarov caused the <bearstearnscompanies.com> domain to resolve to a currently active website located at www.bearstearnscompanies.com, for a financial services company that purports to be named "Bear Stearns" (the "Fake Bear Stearns Website").

254.     Attached hereto as **Exhibit 44** are screenshots from the Fake Bear Stearns Website, an excerpt of which appears below:



255.     A pop-up window on the home page of the Fake Bear Stearns Website falsely claims the owners of the site have a registered trademark for BEAR STEARNS in the United States and cite to USPTO Application Ser. No. 88457949, which is the application filed by Sklarov, Black Rock and Singh that was rejected by the USPTO.

> Registration: Bear Stearns is a registered trademark applicant with the United States of America Patent and Trademark Office, registration number 88457949

256.    The Fake Bear Stearns Website purports to offer financial services, including investment banking and asset management, references numerous times the legitimate Bear Stearns, calls itself the "New Bear Stearns" and utilizes a logo identical to that long used and previously registered by the legitimate Bear Stearns:

| *Logo Used and Previously Registered by Bear Stearns* | *Defendants' Logo* |
|---|---|
|  |  |

257.    Defendants' registration of and/or attempts to register the Other USPTO Infringing Marks and the Other Foreign Infringing Marks, Defendants' current impersonation of Bear Stearns and Defendants' prior impersonation of Rothschild all are strong evidence of Defendants' bad faith intent and pattern to usurp the goodwill and consumer recognition in existing famous financial names and trademarks with which Defendants' have no legitimate affiliation and to sow consumer confusion in the marketplace, including with respect to Lehman Brothers and the LEHMAN Names and Marks.

**Defendants Have Refused to Stop their Unlawful Activities**

258.    Despite Barclays' multiple demands, Defendants have refused to cease and desist from, and instead have intentionally increased, their unlawful activities.

259.    Shortly after learning that Black Rock and Singh had filed the first of the Infringing Applications with the USPTO (Application Serial No. 88457946 for the mark SHEARSON LEHMAN), on or about July 22, 2019, Barclays sent a letter to Black Rock and Singh demanding that they cease and desist from all attempts to register and use any mark containing, comprising or confusingly similar to the LEHMAN Names and Marks, including SHEARSON LEHMAN, and abandon Application Serial No. 88457946.

260.    Instead of complying with Barclays' demands, three days later, Black Rock and Singh increased their infringing activities by filing the second of the Infringing Applications with the USPTO (Application Serial No. 88536436 for the mark SHEARSON LEHMAN HUTTON).

261.    When Black Rock and Singh formally responded to Barclays' demand letter on July 29, 2020, they falsely claimed that Lehman Brothers was no longer an active company, refused to comply with Barclays' demands and, in an astonishing display of bad faith, offered to sell the SHEARSON LEHMAN mark and application to Barclays.

262.    On August 8, 2020, Barclays reiterated its demands, with which Black Rock and Singh again refused to comply.

263.    After the USPTO accepted Barclays' Letters of Protest and rejected the Infringing Applications, in or about March 2020, Barclays saw no evidence that Defendants were using the Infringing Marks.

264.    Unbeknownst to Barclays at that time, Sklarov, though his shell companies, had already obtained the Andorra Registrations, filed the Panama Application and were using the Infringing Names and Marks in connection with purported financial services, all despite Barclays' notice and demands months prior.

265.    Shortly after Barclays learned about the Andorra Registrations, on or about April 28, 2020, Barclays sent a letter to Sklarov (and his shell companies) and Singh, demanding again that they cease and desist from all attempts to register and use any mark containing, comprising or confusingly similar to the LEHMAN Names and Marks, including LEHMAN BROTHERS and SHEARSON LEHMAN and abandon the Andorra Registrations.

266.    Despite several additional correspondence between the parties, Sklarov and Singh refused to comply with Barclays' demands.

267.    Attached hereto as **Exhibit 45** are copies of the correspondence between Barclays and Defendants concerning Barclays' demands.

268.    Upon information and belief, Sklarov and/or Singh informed Qureishi of Barclays' prior rights in the LEHMAN Names and Marks and demands to cease and desist from use and registration of the Infringing Names and Marks.

269.    Sklarov and Singh did not disclose in any correspondence, including a letter sent as recent as July 27, 2020, that Defendants actually were and for many months had been using the Infringing Names and Marks, including through the Infringing Website, the SLRA, the Broker Flyer, the Direct Lending Flyer, the Press Releases and Qureishi's actions and representations described above.  Upon information and belief, Defendants intentionally hid and attempted to conceal their unlawful activities from Barclays and its counsel.  Barclays independently learned about these activities shortly before initiating this action.

270.    Upon information and belief, unless and until Defendants are enjoined from any further unauthorized use and registration of the Infringing Names and Marks or any name or mark containing, comprising or confusingly similar to the LEHMAN Names and Marks, Defendants will continue to use and to register the Infringing Names and Marks, to intentionally attempt to

deceive, confuse and mislead consumers that they are affiliated with Lehman Brothers and to violate Barclays' valuable trademark rights.

271.    Upon information and belief, by virtue of their unlawful conduct described above, Defendants have made or will make substantial profits and gains to which they are not in law or equity entitled.

272.    Upon information and belief, Defendants' unlawful conduct described above has resulted caused damage to Barclays and its LEHMAN Names and Marks.

273.    Upon information and belief, as a result of Defendants' unlawful actions described above, Plaintiffs have been or will be damaged and have suffered, and will continue to suffer, immediate and irreparable injury for which Plaintiffs have no adequate remedy at law.

## CAUSES OF ACTION

### COUNT I
### (False Designation of Origin, Lanham Act, §43(a)(1)(A))

274.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-273 above with the same force and effect as if set forth fully herein.

275.    Defendants' conduct as described above constitutes false designations of origin in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A).

### COUNT II
### (Cybersquatting, Lanham Act, §43(d))

276.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-275 above with the same force and effect as if set forth fully herein.

277.    Defendants have registered, trafficked in and used the domain name <shearsonlehmanbrothers.com>, which is identical to or confusingly similar to the LEHMAN Names and Marks.

278.    The LEHMAN Names and Marks were distinctive at the time Defendants registered the domain name <shearsonlehmanbrothers.com>.

279.    As described herein, Defendants' acts were committed with a bad faith intent to profit from and to cause confusion with Plaintiffs' LEHMAN Names and Marks.

280.    Defendants' conduct as described above constitutes cybersquatting in violation of Section 43(d) of the Lanham Act, 15 U.S.C. §1125(d).

## COUNT III
### (Federal Dilution, Lanham Act §43(c))

281.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-280 above with the same force and effect as if set forth fully herein.

282.    The LEHMAN Names and Marks are famous among the general consuming public and distinctive and enjoyed such fame and distinctiveness since long prior to Defendants' use of the Infringing Names and Marks.

283.    Defendants' conduct as described above is likely to cause dilution of the distinctive quality of the famous and distinctive LEHMAN Names and Marks, in violation of Section 43(c) of the Lanham Act, 15 U.S.C. §1125(c).

284.    Defendants' conduct as described above also is likely to cause dilution by tarnishment by harming the reputation of the famous and distinctive LEHMAN Names and Marks, in violation of Section 43(c) of the Lanham Act, 15 U.S.C. §1125(c).

## COUNT IV
### (State Law Dilution, New York General Business Law §360-l)

285.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-284 above with the same force and effect as if set forth fully herein.

286.     The LEHMAN Names and Marks are famous and distinctive in the state of New York and enjoyed such fame and distinctiveness in the state of New York since long prior to Defendants' use of the Infringing Names and Marks.

287.     Defendants' conduct as described above causes a likelihood of injury to Plaintiffs' business reputation and dilution of the distinctive quality of the LEHMAN Names and Marks in violation of New York General Business Law § 360-l.

## COUNT V
### (Unfair Competition – New York Law)

288.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-287 above with the same force and effect as if set forth fully herein.

289.     Defendants' conduct as described above constitutes unfair competition under the common law of the state of New York.

## COUNT VI
### (Deceptive Trade Practices  – New York General Business Practices § 349)

290.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-289 above with the same force and effect as if set forth fully herein.

291.     Defendants' conduct as described above constitutes a significant risk of harm to the public interest in the state of New York.

292.     Defendants' conduct as described above constitutes deceptive trade practices in violation of New York General Business Practices § 349.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor and against Defendants as follows:

A.      Ordering that Defendants and their agents, servants, representatives, employees, successors and assigns, and all those persons or entities in active concert or participation with any of them who receive actual notice of the injunctive order: (1) be enjoined, preliminarily and permanently, from (a) using, registering or seeking to register the Infringing Names and Marks or any name or mark containing, comprising or confusingly similar to the LEHMAN Names and Marks worldwide; and (b) from making any statements or taking any actions likely to cause consumers to believe mistakenly that Defendants are affiliated or associated with Lehman Brothers and/or Barclays; (2) transfer to Plaintiffs the domain name <shearsonlehmanbrothers.com> and any other domain name containing, comprising or confusingly similar to the LEHMAN Names and Marks; and (3) expressly withdraw and abandon the Andorra Registrations and the Panama Application and any other trademark applications owned or controlled by Defendants for the Infringing Names and Marks or for marks that contain, comprise or are confusingly similar to the LEHMAN Names and Marks.

B.      Ordering that Defendants be directed to file with the Court and serve upon Plaintiffs, within 30 days after entry of final judgment, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the provisions set forth in Paragraph A above.

C.      Ordering Defendants to account to Plaintiffs for all gains, profits and advantages derived from Defendants' wrongful acts, together with interest therein.

D.      Ordering Defendants pay to Plaintiffs any damages sustained by Plaintiffs by reason of Defendants' wrongful acts in an amount to be determined at trial, together with interest thereon.

E.      Ordering Defendants pay to Plaintiffs trebled damages.

F.     Ordering that Plaintiffs recover their reasonable attorneys' fees from Defendants, together with the costs of this action.

G.     Ordering that Plaintiffs be granted such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues triable as such.

Dated:   October 9, 2020

Respectfully submitted,
COWAN, LIEBOWITZ & LATMAN, P.C.

By: _____

    Eric J. Shimanoff (ejs@cll.com)
    Joelle A. Milov (jam@cll.com)
114 West 47th Street
New York, New York 10036
(212) 790-9200
*Attorneys for Plaintiffs Barclays PLC and Barclays Capital Inc.*

-75-

# EXHIBIT 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

BARCLAYS PLC and BARCLAYS CAPITAL INC.

       Plaintiffs,

  -against-

VLADIMIR "VAL" SKLAROV, individually and dba "SHEARSON LEHMAN BROTHERS," "SHEARSON LEHMAN," "LEHMAN BROTHERS," "SHEARSON LEHMAN BROTHERS INVESTMENT BANKING" and "SHEARSON LEHMAN INVESTMENT BANKING"; OSMAN QUREISHI, individually and dba "SHEARSON LEHMAN BROTHERS," "SHEARSON LEHMAN," "LEHMAN BROTHERS," "SHEARSON LEHMAN BROTHERS INVESTMENT BANKING" and "SHEARSON LEHMAN INVESTMENT BANKING"; BLACK ROCK CAPITAL LLC; NEWBURGH CAPITAL LTD.; LINCOLN CAPITAL LTD.; JAITEGH "JT" SINGH; JOHN DOES 1-10; and XYZ CORPORATIONS 1-10,

       Defendants.

------------------------------------------------------------ x

No. 20-cv-8437 (LAK)

**CONSENT JUDGMENT AND PERMANENT INJUNCTION**

  **WHEREAS**, Plaintiffs Barclays PLC and Barclays Capital Inc. (collectively, "Plaintiffs") are the owners of record of names and trademarks containing or comprising LEHMAN, including without limitation LEHMAN BROTHERS, in connection with financial and related goods and services (the "LEHMAN Names and Marks").

  **WHEREAS**, Defendants Vladimir "Val" Sklarov, individually and dba "Shearson Lehman Brothers" "Shearson Lehman," "Lehman Brothers," "Shearson Lehman Brothers Investment Banking" and "Shearson Lehman Investment Banking" ("Sklarov"), Osman

Qureishi, individually and dba "Shearson Lehman Brothers," "Shearson Lehman," "Lehman Brothers," "Shearson Lehman Brothers Investment Banking" and "Shearson Lehman Investment Banking" ("Qureishi"), Black Rock Capital LLC ("Black Rock"), Newburgh Capital Ltd. ("Newburgh"), Lincoln Capital Ltd. ("Lincoln"), Jaitegh "JT" Singh ("Singh") and XYZ Corporation 1, now identified as Cerebequity Holdings Ltd. ("Cerebequity") (collectively, "Defendants"), have directly and/or indirectly used, registered and/or sought to register names, trademarks and/or domain names containing or comprising "Lehman Brothers" and/or "Lehman" in connection with financial and related services, including without limitation "Lehman," "Lehman Brothers," "Shearson Lehman Brothers," "Shearson Lehman," "Shearson Lehman Brothers Investment Banking," "Shearson Lehman Investment Banking" and <shearsonlehmanbrothers.com>, including without limitation in the following stylizations:





2

(collectively, the "Infringing Names and Marks").

**WHEREAS**, Defendant Sklarov represents that he owns and controls Black Rock, Newburgh, Lincoln and Cerebequity and has the authority to execute this Consent Judgment and Permanent Injunction on their behalf.

**WHEREAS**, Plaintiffs commenced this action against Defendants for false designation of origin, cybersquatting and trademark dilution under the Lanham Act of 1946, as amended, 15 U.S.C. § 1501 *et seq.* and trademark dilution, deceptive trade practices and unfair competition under the laws of the state of New York.

**WHEREAS**, in this Consent Judgment and Permanent Injunction:

    a.    "Lehman Brothers" shall mean Lehman Brothers Holdings Inc., its present and former subsidiaries and affiliates, and/or each of their predecessors, licensees, assignors and assigns.

    b.    "Lehman Font" shall mean the following font:



    c.    "Shearson Lehman Stylizations" shall mean the following stylizations:



3

28827/169/3701046

# SHEARSON
## LEHMAN
### BROTHERS

d.    "Infringing Website" shall mean Defendants' website located at www.shearsonlehmanbrothers.com, excerpts from which are attached hereto as **Exhibit A**.

e.    "Querishi's LinkedIn Profile" shall mean the LinkedIn profile currently located at https://www.linkedin.com/in/osman-qureishi-ab2434100/, excerpts from which are attached hereto as **Exhibit B**.

f.    "SLRA" shall mean Defendants' document entitled "Securities Lending Referral Agreement," a copy of which is attached hereto as **Exhibit C**.

g.    "Broker Flyer" shall mean Defendants' document entitled "2020 Broker Dealer Affiliate Program," a copy of which is attached hereto as **Exhibit D**.

h.    "Direct Lender Flyer" shall mean Defendants' document entitled "Direct Lender for Global Securities Backed Lending Program," a copy of which is attached hereto as **Exhibit E**.

i.    "Press Releases" shall mean Defendants' press releases entitled "Shearson Lehman is Entering into Negotiations to Invest $250 million in Alternative Energy" (March 20, 2020), "Shearson Lehman Brothers Investment Banking Broker Dealer Affiliate Program is Available World Wide" (April 7, 2020), "Shearson Lehman Adds a New Local Custodian and Eases SBL Requirements in Hong Kong!" (May 1, 2020) and "Asia's Alternative Energy Sector Becomes Front-Page News as Shearson Lehman Vows to Invest Millions" (August 24, 2020), copies of which are attached hereto as **Exhibit F**.

j.    "Andorra Registrations" shall mean Trademark Registration No. 41125 for the mark LEHMAN BROTHERS and Trademark Registration No. 41044 for the mark SHEARSON LEHMAN, both filed in the name of Newburgh with the Office of Trademarks of the Principality of Andorra.

k.    "Panama Application" shall mean Trademark Application No. M279372-01 for the mark SHEARSON LEHMAN BROTHERS &

4

SHEARSON LEHMAN BROTHERS

Design (                    ), filed in the name of Lincoln with the Directorate General of the Industrial Property Registry - Ministry of Commerce and Industries in Panama.

l. "Serbia Application" shall mean Trademark Application No. 2020/0000906 for the mark LEHMAN filed in the name of Cerebequity with the Intellectual Property Office of the Republic of Serbia.

m. "Slovenia Application" shall mean Trademark Application No. 202070650 for the mark LEHMAN filed in the name of Cerebequity with the Slovenian Intellectual Property Office.

n. "Anguilla Application" shall mean Trademark Application No. 99312264 for the mark LEHMAN filed in the name of Cerebequity with the Commercial Registry the Government of Anguilla.

o. "Philippines Application" shall mean Trademark Application No. 42020513991 for the mark LEHMAN filed in the name of Cerebequity with the Intellectual Property Office of the Philippines.

p. "Cayman Islands Registration" shall mean Registration No. T0001738 for the mark LEHMAN filed in the name of Cerebequity with the Cayman Islands Intellectual Property Office.

q. "Nepal Application" shall mean Trademark Application No. 7667 for the mark SHEARSON LEHMAN BROTHERS field in the name of Newburgh with the Nepal Ministry of Industry.

r. "Belize Applications" shall mean Trademark Application No. 15947.20 for the mark SHEARSON LEHMAN BROTHERS filed by Black Rock and another application for the mark LEHMAN filed by Cerebequity with the Belize Intellectual Property Office.

**WHEREAS**, Plaintiffs and Defendants have reached an amicable agreement for resolution of this action;

**NOW, THEREFORE**, upon consent of the parties, it is hereby Ordered, Adjudged and Decreed as follows:

1. This Court has jurisdiction over the parties hereto and over the subject matter in issue, and venue is proper in this district.

5

28827/169/3701046

2. Defendants and their agents, servants, representatives, employees, successors and assigns, and all those persons or entities in active concert or participation with any of them who receive actual notice of this Consent Judgment and Permanent Injunction, are and shall be permanently enjoined and restrained world-wide from:

a. using, registering or seeking to register any name, designation, corporate name, domain name, URL, email address, social media handle, account name, trade name, trade mark or service mark containing, comprising or confusingly similar to the LEHMAN Names and Marks, SHEARSON, BARCLAYS or BARCLAY, including without limitation the Infringing Names and Marks, including without limitation orally and in all media, including without limitation the Infringing Website or any other website, Qureishi's LinkedIn profile or any other social media platform, emails and correspondence, agreements, including without limitation the SLRA, marketing and recruiting documents, including without limitation the Broker Flyer and the Direct Lender Flyer, the Press Releases and any other press release distributed by Defendants;

b. making any statements or taking any actions likely to cause consumers to believe mistakenly that Defendants are affiliated or associated with Lehman Brothers or Barclays, including without limitation by: (i) using the address 200 Vesey Street, New York, New York or any other address previously or currently associated with Barclays or Lehman Brothers; (ii) using the Lehman Font or Shearson Lehman Stylizations; and (iii) using other names or marks previously or currently associated with Barclays or Lehman Brothers, including without limitation NOMURA, NEUBERGER, BERMAN, AURORA, CROSSROADS, KUHN, LOEB, AMERICAN EXPRESS, HUTTON and STIFEL; and

c. encouraging, directing or assisting others to do the same.

3. Defendants and their agents, servants, representatives, employees, successors and assigns, and all those persons or entities in active concert or participation with any of them who receive actual notice of this Consent Judgment and Permanent Injunction, shall perform the following within thirty (30) calendar days of the entry of this Order :

a. disable access world-wide to the Infringing Website;

6

b.      transfer to Plaintiffs the domain name <shearsonlehmanbrothers.com>, and any other domain name in their possession, custody or control containing, comprising or confusingly similar to the LEHMAN Names and Marks;

c.      retract the Press Releases and any other press releases by Defendants that use the LEHMAN Marks and/or the Infringing Names and Marks;

d.      withdraw and permanently abandon or cause to withdraw and to permanently abandon all registrations or applications to register marks, within their possession, custody or control or over which they have authority, containing, comprising or confusing similar to the LEHMAN Marks world-wide, including without limitation the Andorra Registrations, the Panama Application, the Serbia Application, the Slovenia Application, the Anguilla Application, the Philippines Application, the Cayman Islands Registration, the Nepal Application and the Belize Applications.

4.      Defendants are directed to file with the Court and serve upon Plaintiffs, within sixty (60) calendar days after entry of this Consent Judgment and Permanent Injunction, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the provisions set forth above, including the deletion, removal, transfer, destruction, recall, withdrawal, abandonment or cancellation of any materials or documents as required herein.

5.      Each and every term of this Consent Judgment and Permanent Injunction shall be deemed to be separately enforceable.

6.      This Court shall retain jurisdiction over the subject matter in issue and the parties for the purpose of enforcement of this Consent Judgment and Permanent Injunction and each of the provisions hereof.

7.      No bond or posting of security is required in connection with the entry of this Consent Judgment and Permanent Injunction.

7

8.      Defendants agree to email service in any proceedings for contempt of or to enforce this Consent Judgment and Permanent Injunction.

9.      The parties waive their right to appeal or otherwise contest this Consent Judgment and Permanent Injunction, which may be entered without further notice to any party.

10.     This Consent Judgment and Permanent Injunction may be executed in multiple counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. Faxed and/or emailed signatures will be valid and enforceable as if originals.

11.     The undersigned individuals hereby warrant and represent they have full authority to execute this Consent Judgment and Permanent Injunction on behalf of the party for which they signed.

**[REST OF PAGE INTENTIONALLY LEFT BLANK]**

8

**AGREED AS TO FORM AND SUBSTANCE BY THE PARTIES:**

**BARCLAYS PLC**

By_____

Name: Marcus Southerden
Title: Head of IP Legal EME and APAC
Date: 5 March 2021

**BARCLAYS CAPITAL INC.**

By  /s/ Andrew Tannenbaum_____

Name: Andrew Tannenbaum
Title: Managing Director, Legal
Date: 2 March 2021

**BLACK ROCK CAPITAL LLC**

By_____

Name:
Title:
Date:

**NEWBURGH CAPITAL LTD.**

By_____

Name:
Title:
Date:

**LINCOLN CAPITAL LTD.**

By_____

Name:
Title:
Date:

**CEREBEQUITY HOLDINGS LTD.**

By_____

Name:
Title:
Date:

**VLADIMIR "VAL" SKLAROV**

_____

Date:

**OSMAN QUREISHI**

_____

Date:

**JAITEGH "JT" SINGH**

_____

Date:

**AGREED AS TO FORM AND SUBSTANCE BY THE PARTIES:**

**BARCLAYS PLC**

By_____

Name:
Title:
Date:

**BARCLAYS CAPITAL INC.**

By _Andrew Tannenbaum_
    1/8AFF14CA29199

Name:   Andrew Tannenbaum
Title:   Managing Director, Legal
Date:  3/8/2021

**BLACK ROCK CAPITAL LLC**

By_____

Name:
Title:
Date:

**NEWBURGH CAPITAL LTD.**

By_____

Name:
Title:
Date:

**LINCOLN CAPITAL LTD.**

By_____

Name:
Title:
Date:

**CEREBEQUITY HOLDINGS LTD.**

By_____

Name:
Title:
Date:

**VLADIMIR "VAL" SKLAROV**

_____

Date:

**OSMAN QUREISHI**

_____

Date:

**JAITEGH "JT" SINGH**

_____

Date:

9

28827/169/3701046

**AGREED AS TO FORM AND SUBSTANCE BY THE PARTIES:**

**BARCLAYS PLC**

By_____

Name:
Title:
Date:

**BARCLAYS CAPITAL INC.**

By_____

Name:
Title:
Date:

**BLACK ROCK CAPITAL LLC**

By_____

Name: Val J Klum
Title: ~~Member~~ ~~CE, Oct~~ Manager
Date: March 15, 2021

**NEWBURGH CAPITAL LTD.**

By_____

Name: Val slclorov
Title: Manager
Date: March 15, 2021

**LINCOLN CAPITAL LTD.**

By_____

Name: Val Sklarov
Title: Manager
Date: March 15, 2021

**CEREBEQUITY HOLDINGS LTD.**

By_____

Name: Val Sklarov
Title: Manager
Date: March 15, 2021

**VLADIMIR "VAL" SKLAROV**

_____

Date: March 15, 2021

**OSMAN QUREISHI**

_____

Date:

**JAITEGH "JT" SINGH**

_____

Date: 03/15/2021

AGREED AS TO FORM AND SUBSTANCE BY THE PARTIES:

**BARCLAYS PLC**

By _____

Name:
Title:
Date:

**BARCLAYS CAPITAL INC.**

By _____

Name:
Title:
Date:

**BLACK ROCK CAPITAL LLC**

By _____

Name:
Title:
Date:

**NEWBURGH CAPITAL LTD.**

By _____

Name:
Title:
Date:

**LINCOLN CAPITAL LTD.**

By _____

Name:
Title:
Date:

**CEREBEQUITY HOLDINGS LTD.**

By _____

Name:
Title:
Date:

**VLADIMIR "VAL" SKLAROV**

_____

Date:

**OSMAN QUREISHI**

_____

Date:

**JAITEGH "JT" SINGH**

_____

Date:

9

28827.169 3701046

**AGREED AS TO FORM AND SUBSTANCE BY COUNSEL FOR THE PARTIES:**

COWAN, LIEBOWITZ & LATMAN, P.C.

By:_____
        Eric J. Shimanoff, Esq.

114 West 47th Street
New York, NY 10036
(212) 790-9200
ejs@cll.com

*Attorneys for Plaintiffs*

Dated:_____03/17/2021_____

LAW OFFICES OF MICHAEL B.
MCCRACKEN, PC

By:_____
        Michael T. McCracken, Esq.

10 South LaSalle Street, Suite 1600
Chicago, IL 60603
(630) 926-5696
michael.t.mccracken@gmail.com

*Attorneys for Defendants*

Dated: 3/17/21

**APPROVED AND SO ORDERED** this 17 day of March, 2021.

_____
Lewis A. Kaplan, United States District Judge

10

# EXHIBIT A







Case 1:20-cv-08437-LAK   Document 41   Filed 03/17/21   Page 18 of 47



# EXHIBIT B

Title: Osman Qureshi | LinkedIn
Link: https://www.linkedin.com/in/osman-qureshi-ab2e345957?trk=recent-activity
Date: 08-14-2020







Osman Qureshi

Bitter Deal

Shearson Lehman Brothers Investment Banking can help with block sale backs. We will provide your money subject to underwriting. We can offer DVP and fund deals fast. Non-14 business days. I would be glad to get your quote please send me via a direct message on LinkedIn.

Like · Comment · Share · Send

Be the first to react



Osman Qureshi

Invest Lehman World Wise

Shearson Lehman Brothers Investment Banking is looking to develop key partnerships through out the world. We are a direct lender for securities backed lending. Our loan start at 3% and are fixed up to 10 years. There are no personal or corporate guarantees required. A simple streamlined process utilizing technology to maximize our client results. We can fund deals from $0.5 Million to $6 Million in their 14 business days. If you are interested in learning more about our Affiliated or introducer program contact me today. You may become a direct message on LinkedIn. Also our affiliate broker dealers can earn an origination fee any where from a minimum of the loan amount.

1 Comment

Like · Comment · Share · Send



Osman Qureshi

Hong Kong Companies Have No Safety Net in Fight for Survival

Like · Comment · Share · Send

Be the first to react

Osman Qureshi



Mikel B., CPHR, MAHRI (L.I.O.N.) · 3rd+
Senior HR Leader Consultant and Resource Leader
#thefutureofwork #humanresources

DOUBLE TAP

74 · 3 Comments

Like · Comment · Share · Send



Osman Qureshi

Hello

Shearson Lehman Brothers Investment Banking is looking for talented business development professionals through out the following regions Asia Europe and parts of Middle East. If you are interested please send me a direct message. We offer lucrative commission where you can earn anywhere from 1% to 1%. Vacancies are limited. If you have the experience and bank of business, contact me right away.

Shearson Lehman Brothers is a direct lender and we can fund deals from 2.5 million dollars to 500 million dollars could end.

SHEARSON LEHMAN

DIRECT LENDER FOR GLOBAL SECURITIES
BACKED LENDING PROGRAM



+ Follow



Be the first to comment on this

Osman Qureshi
Senior Executive Vice
President Wealth
Management Division of
Shearson Lehman Brothers
Investment Banking

Follower

+ Follow



**Osman Qureshi** · 3d ·
Senior Executive Vice President Wealth Management Division at Shearson Lehman Brothers · Edited · ⊕



China to inject $174 billion of liquidity on Monday as markets reopen

Be the first to comment on this

**Osman Qureshi** · 3d ·
Senior Executive Vice President Wealth Management Division at Shearson Lehman Brothers · ⊕

Broker dealers,

If you have deals that require funding we would be happy to get you a quote. We fund deals world wide our loans are non recourse ranging from 2.5 million to 500 million dollars. Earn referral fee anywhere from 2-6%. See attached flyer for more details regarding our securities lending program! If you would like to get in touch with me please send me a direct message or message me on what's app at 917.704.1376 my email is enclosed in the flyer as well. Looking forward to working with you soon!




Osman Qureshi
Senior Executive Vice
President Wealth
Management Division of
Shearson Lehman Brothers
Investment Banking

Follower

+ Follow

Messaging

Be the first to comment on this

**Osman Qureshi** · 2d ·
Senior Executive Vice President Wealth Management Division at Shearson Leh... · ⊕

Hello LinkedIn

Our wealth management division is currently expanding our securities lending program world wide. We are actively seeking sales professionals and broker dealers. Our loans range from 2.5million to 500 million dollars. We pay commissions





# EXHIBIT C

SHEARSON LEHMAN
A Lehman Brothers Company

# SECURITIES LENDING REFERRAL AGREEMENT ("SLRA")

This Securities Lending Referral Agreement ("SLRA"), established as of _____
between Shearson Lehman Brothers Investment Banking ("Shearson Lehman"), and
_____, a

Securities Lending

Agent ("Agent") who resides at _____
, both known hereafter in this SLRA, as the ("Parties") and individually as the ("Party").

In consideration of the mutual terms, premises, conditions, and covenants in this Agreement,
satisfaction of which is acknowledged, Shearson Lehman and Agent hereby agree to as follows:

## 1. Background and Engagement

Agent has expressed an interest in becoming an independent contractor to refer prospective
borrowers to Shearson Lehman for the purpose of obtaining Loans backed by Securities, and
Shearson Lehman has agreed to engage Agent as an independent contractor to identify and
introduce prospective borrowers interested in such Loans. Accordingly, Shearson Lehman hereby
engages Agent as an independent contractor for such purpose, pursuant to the terms and
conditions in this SLRA.

## 2. Agent Duties and Responsibilities

Agent shall identify and locate prospects and shall market Shearson Lehman's Securities Backed
Lending program to those borrowers. Agent shall forward all forms, applications, and prospective
client information to Shearson Lehman once a prospective borrower has firmly expressed an
interest in procuring a Loan backed by Securities. Agent shall not make any representations or
warranties to any borrowers, nor guarantee that Shearson Lehman will fund. Agent is expressly
prohibited from executing any documents on Shearson Lehman's behalf and is never allowed to
do so.

## 3. No Exclusive Relationship

Agent is not an exclusive Agent for the marketing of Shearson Lehman's Securities Backed
Lending Program. Shearson Lehman works with other referral sources, and nothing in this SLRA

precludes Agent from referring clients to other competing companies. If more than one agent refers the same prospective borrower to Shearson Lehman within a sixty-day period, Shearson Lehman shall inform and evaluate the multiple referrals and, to the extent that the borrower closes a Securities Loan with Shearson Lehman, Shearson Lehman will allocate commissions to one or several agents under its sole and absolute discretion, which decision shall not be contested.

## 4. Commissions

Shearson Lehman shall pay to Agent commission for each successful Securities Loan that Shearson Lehman closes for borrower referred by Agent, within five (5) business days of a Securities Loan closing and funding. Commissions are contingent upon borrower transferring publicly traded securities into a specified custodial account, funding of the transaction and disbursement of the loan proceeds.

Commissions shall be calculated as follows:

a) Shearson Lehman commission to Agent will be referred to as "Loan Origination Fee," and will be that which will be reflected as the Loan Origination Fee in the Term Sheet issued and Loan Contract between borrower and Shearson Lehman. The final commission payable will be solely based on amount funded to borrower and that which will result in a successful closing. Commissions will not be paid for Loans which are not successfully funded.

b) Agent will also earn an additional Back-End Commission ("BEC") of up to two and a half percent (2.5%) of the principal Loan amount successfully funded to borrower.

c) Shearson Lehman shall bear no responsibility or liability to payout any third-party affiliates that the Agent utilizes. Agent will defend, indemnify, and hold Shearson Lehman harmless for all third-party claims for compensations from persons or entities that Agent so retains.

d) Shearson Lehman shall make all commission payments to Agent via wire transfer into Agent's provided personal account. In the event that an Agent chooses not to proceed via wire transfer, commission will be held in a custodian account. All commission is paid as 1099 income from

3

independent contracting; therefore, taxes are not withheld. Agent shall bear the sole liability and responsibility for remitting taxes on all commissions that Shearson Lehman pays to Agent.

## 5. Duration of Agreement

This SLRA shall commence on the date of execution hereof and shall continue in full force and effect for three (3) years ("Term"). Shearson Lehman and Agent may by mutual agreement choose to extend this SLRA. If either Party desires to terminate this SLRA before its natural Term, a written notice is required at least seven (7) days in advance.

Shearson Lehman shall remain obligated for one hundred twenty (120) days after termination of this SLRA to pay any and all commissions due to the Agent with respect to Agent referred and procured successful Securities Loan(s) closed by Shearson Lehman.

## 6. Agent's Warranties and Representations

During the Term of this SLRA while Agent is an independent contractor for Shearson Lehman, Agent warrants that at all times it will comply with any and all statutes, rules, and regulations as promulgated by the U.S. Securities & Exchange Commission ("SEC"), the Securities Acts of 1933 (as amended), the Securities and Exchange Act of 1934 (as amended), and any other State and international securities regulatory authorities, and shall assume any and all costs associated with such compliance.

## 7. Shearson's Warranties and Representations

Shearson Lehman will use all reasonable efforts to close and fund any and all Securities Loans with prospective borrowers referred to Shearson Lehman by Agent, in accordance with and as contemplated by this SLRA and its underwriting policies.

## 8. Confidentiality

This (I) SLRA and the terms and conditions described herein, and (II) Shearson Lehman's business, business methods, internal affairs, results of operations, financial statements, services, trade sources, clients, contacts, vendors, subsidiaries, other prospective financial interests and investment information are confidential and proprietary information of Shearson Lehman, and

4

Agent may not disclose or reproduce this SLRA in whole or in part for any purpose other than to effectuate its terms.

## 9. Non-Interference

During the Term of this Agreement, and for three (3) years after its termination, the Agent shall not: (i) solicit, encourage, or cause any client, third party or individual not to do business with or to reduce any part of its business with Shearson Lehman Brothers, (ii) market, sell or provide to any client, third party or individual any services or products that are competitive with or a substitute for Shearson Lehman's services or products, (iii) solicit, contact, encourage, interfere with or cause others to solicit, contact or interfere with any securities custodian, broker dealer, trustee or sub-custodian which has a known relationship with Shearson Lehman Brothers, (iv) make inquiries with or to any securities custodian, broker dealer , trustee or sub-custodian which has a known relationship with Shearson Lehman Brothers, (v) make any disparaging comments about Shearson Lehman Brothers or its business, services, officers, managers, shareholders, directors or employees, whether in writing, verbally, or on any online forum, (vi) assist or encourage anyone else to engage in any of the conduct prohibited by this Section.

## 10. Liability and Indemnification

Agent agrees to defend, indemnify, and hold harmless Shearson Lehman and each of Shearson Lehman's respective directors, officers, contractors, and employees (the "Indemnified Parties") from any and all liabilities for any and all claims, damages, losses, and expenses, including counsel fees, which may occur or which may be asserted against any Indemnified Party due to the default or bad faith actions of Agent in connection with or arising out of, or relating to, the matters referred to in this SLRA.

Agent further and expressly agrees to defend, indemnify, and hold the Indemnified Parties harmless for, from, and against any intentional, reckless or grossly negligent tort, defamation, slander, libel, tortious interference with business and/or malicious act made against Shearson Lehman by Agent or as a result of Agent's conduct in respect of Shearson Lehman's business.

SHEARSON LEHMAN
A Lehman Brothers Company

## 11. Dispute Resolution

The Parties hereby mutually agree to resolve any dispute, claim, or controversy between them arising out of any application, breach, interpretation, enforcement, performance, implementation, Termination or validity of this agreement at binding arbitration, as conducted by One (1) agreed-upon Arbitrator of the Conflict Resolution Service in St. Kitts & Nevis and which shall be construed in accordance with, covered by, and interpreted under, UNCITRAL Arbitration Rules, in force at the time as such Notice of Arbitration is submitted. The Arbitrator's decision shall be legally binding and non-appealable by either Party to this Agreement and shall be subject to enforcement in any courts having jurisdiction over the Parties thereto.

In the event of arbitration mandated to enforce any provision of this SLRA, the prevailing party thereto shall be entitled to recover reasonable attorneys' fees and expenses incurred therein, in addition to any substantive award made by the Arbitrator thereof.

## 12. Force Majeure

In the event that either Party is unable to perform its obligations under the terms and conditions of this Agreement because of Force Majeure, including, but not limited to acts of God, acts of war or terrorism, fire, floods, strikes, embargos, utility or communication disruption, omissions or delays in acting by any government authority, or other causes reasonably beyond its control, such Party shall not be liable for damages to the other for any damages resulting from such failure to perform or otherwise or otherwise from such clause.

## 13. General Provisions

All notices and communications to either of the Parties by the other shall be in writing, sent by government post, electronic mail, or by a reputable commercial carrier and shall be deemed duly given on the date any such notice is sent. Either Party may designate by notice in writing to the other an address to which notices, requests, and other communications hereunder shall be given.

Amendments to this SLRA (including the adding or updating of any annexes, appendices, or schedules) will not be enforced unless they are in writing and signed by authorized signatories on behalf of both Parties and added as an Addendum hereto.

6

This Agreement and any dispute or claim arising out of or in connection with it, its subject matter, validity, formation, and/or enforcement shall be governed by and construed in accordance with the laws of the Federation of St. Kitts & Nevis during the Term of this Agreement and thereafter.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement regardless of the number in existence or the number of copies distributed.

The Parties shall not intentionally make, or intentionally cause any other Person to make any public statement that is intended to criticize or disparage the other Party, any of its affiliates, directors, nominees, agents, and/or any of their respective officers, managers or employees thereto.

Except as herein provided, each of the Parties' representations, warranties, waivers, obligations, releases, indemnities and covenants made in this SLRA, shall remain in full force and survive the execution, delivery, cancellation and termination of this SLRA.

If any of the provisions of this SLRA is found to be unlawful and/or void thereto, then such provisions shall be deemed to be excised from this SLRA and the remaining terms, provisions, conditions, and covenants of this SLRA shall remain in full force and effect.

No waiver of any provision of this Agreement shall be effective unless agreed to in writing by the Parties.

Agent is not an employee shall never become an employee of Shearson Lehman, and at no time shall represent itself as an employee of the Shearson Lehman. Agent shall at all times and under all conditions remain an independent contractor, and Agent shall not be entitled to any rights, remedies, or benefits that might otherwise be provided to Shearson Lehman's employees.

Agent is and shall be solely responsible for all taxes and withholdings, and all other statutory and/or contractual obligations of any sort with respect to their independent contractor status, as prescribed by law, regardless of jurisdiction.

This Agreement contains the entire Agreement between the Parties hereto, is legally binding upon them as of the date of the execution hereof, and supersedes all previous written and oral negotiations, commitments, and understandings by and between the Parties therein.

7

IN WITNESS WHERE OF the parties have executed this Securities Lending Referral Agreement as of the date first written above.


Dated: May 1, 2020


**SHEARSON LEHMAN BROTHERS**                    **AGENT**


_____                    _____
Signature                                        Signature


_____                    _____
Signatory Name                                   Signatory Name


_____                    _____
Date                                             Date

8

# EXHIBIT D



# EXHIBIT E

# SHEARSON LEHMAN
### A Lehman Brothers Company

## DIRECT LENDER FOR GLOBAL SECURITIES BACKED LENDING PROGRAM

**ASIA | SOUTH AMERICA | EUROPE | MIDDLE EAST | AUSTRALIA | CANADA | CENTRAL AMERICA**

SHEARSON LEHMAN is dedicated and committed to providing unparallel client services around the globe. We can largely fund transactions from $2.5 million up to $500 million for international stock exchanges. We are flexibile and can accommodate loan origination in any currency with no conversion fees.

- FIXED LOW INTREST RATES STARTING AS LOW AS **3%**
- LOAN TERM AS LOW AS **1 YEAR**
- NON RECOURSE LOAN
- UP TO **65% LTV**
- QUICK LOAN CLOSING IN **14** BUSINESS DAYS

## NO UPFRONT FEES
## APPLY TODAY!

**ALL COLLATERAL SECURITIES MUST BE IN ELECTRONIC FORMAT AND UNRESTRICTED.
ALL LOAN REQUESTS ARE SUBJECT TO UNDERWRITING.**

### WHY SECURITIES BACKED LENDING?

- It's a simple and transparent process that provides near immediate cash liquidity from your non marginable publicaly traded securities.

- There is NO credit check and personal or corporate guarantee required.

- It's a convenient alternative solution to maximize wealth with tax advantages.

- Borrower is entitled to earn all dividends as owner of record.

### SUBMIT ITEMS LISTED BELOW TO DETERMINE IF YOUR SECURITY QUALIFIES!

1. Security/Ticker Symbol

2. Stock Exchange

3. Number of Shares to be Pledged

4. Loan Amount



For more information please contact

## OSMAN QUREISHI

Senior Executive Vice President
Wealth Management Division

**Office:** 212.208.0900
**Toll to free:** 888.418.7999
**E-mail:** Osman.Qureishi@ShearsonLehmanBrothers.com

---

Telephone: 332.228.0152 | Direct: 212.208.0900 | Toll Free: 888.418.7999
NY, New York City - Brookfield Place, 200 Vesey Street, 24th Floor, New York, 10281, USA
www.shearsonlehmanbrothers.com

# EXHIBIT F

**PRLOG**
Press Release Distribution

[Search]

PR Home | Latest News | News Feeds | Subscribe | Submit Free Press Release | For Bloggers | PR Newswire Distribution |

**News By Tag**
* Europe, Asia
* More Tags...

**Industry News**
* Financial
* More Industries...

**News By Place**
* New York City
  New York
  United States
* More Locations...

**Country(s)**
United States
Australia
India
Hong Kong
England
China
- - -
More Countries

Industry News

[ All News ]

[ Exclusive News ]

**October 2020**

| We | Tu | Mo | Su | Sa | Fr | Th |
|----|----|----|----|----|----|----|
| 7  | 6  | 5  | 4  | 3  | 2  | 1  |

**SHEARSON LEHMAN**
Brothers Investment Banking

# Shearson Lehman is Entering into Negotiations to Invest $250 million in Alternative Energy

By Shearson Lehman Brothers Investment Banking

NEW YORK - March 20, 2020 - PRLog –
Shearson Lehman Brothers Investment Banking announces its plans to invest $250 million in public and private international alternative energy corporations. Shearson Lehman proposes to inject $100 million in a European company specializing in wind turbines operating in Europe, Hong Kong, and Australia. An additional $150 million investment is projected with a leading renewable energy firm in Spain, South America, and Africa manufacturing and producing solar and wind energy, and electrical engineering.

5 Best Stocks To Invest In >

Top Companies To Invest In >

Top 10 Startups To Invest In >

Sponsored

According to top executives of Shearson Lehman, he negotiations started earlier this year in January 2020. The conglomerates are seeking to finalize the deal by the end of 3rd quarter.

**Spread the Word**

----- Listed Under -----

Tag:
• Europe, Asia

Industry:
• Financial

Location:
• New York City - New York - US

Innovation, changing technologies, and increase in demand for clean energy throughout he world offers tremendous growth opportunities for Shearson Lehman as it develops strategic partners in the regions to support clean, modern, sustainable energy solutions.

This venture will expand Shearson Lehman's portfolio including investment banking products and services. Shearson Lehman has received an overwhelming response towards its Securities Backed Lending (SBL) program in various markets including Hong Kong, Indonesia, Malaysia, Singapore, United Kingdom, Turkey, Latin America and many more. SBL program is a very attractive, quick, and easy solution for institutional investors, and high net-worth shareholders of publicly traded companies to quickly arrange financing at competitive annual interest rates ranging from 2% to 6% for a term of 1 to 10 years.

The vast increase in demand has driven high recruitment activity at Shearson Lehman. The company is aggressively hiring Business Development Professionals throughout Asia, Europe and South America.

For further information visit www.shearsonlehmanbrothers.com

**Media Contact**
Osman Qureishi
weal hmanagment@shearsonlehmanbrothers.com

........End........................................................................................................................................

[Follow] [Embed] [PDF / Print]

Email : ***@shearsonlehmanbrothers.com
Posted By : ***@shearsonlehmanbrothers.com ✓

Account Email Address ✓   Account Phone Number ✓   Disclaimer   Report Abuse

Page Updated Last on: Apr 21, 2020

**Most Viewed**

Rusesabagina Family to Hold Press Conference, Thursday, October 1 - 1861 views

Rapper ALRIGHT puts Antelope Valley on the map, auditions for Major Record Label - 1087 views

SpringHill Suites Albuquerque University Area, New Mexico Opens - 754 views

Whitechapel Holdings, Provides Update on PPE Website Launch - 697 views

"The Central Authority" Movie Wraps Production - 611 views

**Top Daily News**

New Halloween Designs Released - 177 views

Film Director Hezues R and "Suicide Saint" Cast Participate In Upcoming World Mental Health Day Event in NYC - 162 views

Remediation Products, Inc. Petitioner Vs. Innovative Environmental Technologies, Inc. Patent Owner - 160 views

Get Business Credit & Financing For Your Business - 151 views

Devontail Prepares For Release Of New Single "Brown Sugar Thang" - 147 views

**PTC News**

Whitechapel Holdings, Provides Update on PPE Website Launch - 697 views

Journey Medical Corp Kicks Off "Journey with the Experts" Educational Initiative with Rania Agha, MD - 575 views

Batman, Shadowhunters, Bruce Campbell Last Fan Standing Among New Wizard World Virtual Experiences - 200 views

Mar 20, 2020 News

# PRLOG
Press Release Distribution

| Search |

PR Home | Latest News | News Feeds | Subscribe | Submit Free Press Release | For Bloggers | PR Newswire Distribution |

**News By Tag**
* Broker Dealer, Stock Loans
* More Tags...

**Industry News**
* Loans
* More Industries...

**News By Place**
* New York City
  New York
  United States
* More Locations...

**Country(s)**
United States
Australia
India
Hong Kong
England
China
- - -
More Countries

Industry News

[All News]

[Exclusive News]

**October 2020**
| We | Tu | Mo | Su | Sa | Fr | Th |
| 7 | 6 | 5 | 4 | 3 | 2 | 1 |

## SHEARSON LEHMAN
Brothers Investment Banking

## Shearson Lehman Brothers Investment Banking Broker Dealer Affiliate Program is Available World Wide

*By: Shearson Lehman Brothers Investment Banking*

**NEW YORK - April 7, 2020** - *PRLog* – Shearson Lehman Brothers Investment Banking is proud to be building over 500 new Broker Dealer relationships worldwide to fund transactions anywhere from $2.5 Million to $500 Million. Shearson Lehman's distinguished Securities Backed Lending (SBL) program is rapidly gaining attraction in global markets as the demand for alternative financing rises. Shearson Lehman's Broker Dealer Affiliate program creates key business relations and provides lucrative financial opportunities.

Affiliate Marketing
For Beginners             >

Best Investments For
Seniors                  >

High Yield Safe
Investments              >

One of  he top producing Brokers in Asia reveals,   Sponsored |
"Shearson Lehman is one of the few direct lenders that has industry experts who value and understand the securities lending market landscape as well as the needs and cultures of their clients. Their loan process is transparent, simple, fast, and easy to follow."

Current market conditions make it the perfect opportunity to take advantage of record low interest rates. SBL program offers non-recourse loans up to 65% LTV wi h no personal or corporate guarantee. Shearson Lehman also provides  he flexibility of providing both Title Transfer Loan and Non-Title Transfer Loan.

Shearson Lehman is a global brand that appreciates different cultures and firmly believes in establishing keen contractual relationships. If you are interested to learn more about the Broker Dealer Affiliate program, please contact Shearson Lehman Brothers Investment Banking weal h management division at wealthmanagement@shearsonlehmanbrothers.com.

For information visit www.shearsonlehmanbrothers.com

**Contact**
Shearson Lehman Brothers Investment Banking
weal hmanagement@shearsonlehmanbrothers.com
...... End ....

[Follow] [Embed] [PDF / Print]

Email    : ***@shearsonlehmanbrothers.com ✓
Tags     : Broker Dealer, Stock Loans
Industry : Loans
Location : New York City - New York - United States

Account Email Address ✓   Account Phone Number ✓   Disclaimer   Report Abuse

**Most Viewed**
Rusesabagina Family to Hold Press Conference, Thursday, October 1 - 1861 views

Rapper ALRIGHT puts Antelope Valley on the map, auditions for Major Record Label - 1087 views

SpringHill Suites Albuquerque University Area, New Mexico Opens - 754 views

Whitechapel Holdings, Provides Update on PPE Website Launch - 697 views

"The Central Authority" Movie Wraps Production - 611 views

**Top Daily News**
New Halloween Designs Released - 177 views

Film Director Hezues R and "Suicide Saint" Cast Participate In Upcoming World Mental Health Day Event in NYC - 162 views

Remediation Products, Inc. Petitioner Vs. Innovative Environmental Technologies, Inc. Patent Owner - 160 views

Get Business Credit & Financing For Your Business - 151 views

Devontai Prepares For Release Of New Single "Brown Sugar Thang" - 147 views

**PTC News**
Whitechapel Holdings, Provides Update on PPE Website Launch - 697 views

Journey Medical Corp Kicks Off "Journey with the Experts" Educational Initiative with Rania Agha, MD - 575 views

Batman, Shadowhunters, Bruce Campbell Last Fan Standing Among New Wizard World Virtual Experiences - 200 views

Apr 07, 2020 News

# PRLOG
Press Release Distribution

[ Search ]

PR Home | Latest News | News Feeds | Subscribe | Submit Free Press Release | For Bloggers | PR Newswire Distribution |

**Most Viewed**

Rusesabagina Family to
Hold Press Conference,
Thursday, October 1 - 1860
views

Rapper ALRIGHT puts
Antelope Valley on the map;
auditions for Major Record
Label - 1075 views

SpringHill Suites
Albuquerque University
Area, New Mexico Opens -
751 views

Whitechapel Holdings,
Provides Update on PPE
Website Launch - 696 views

"The Central Authority"
Movie Wraps Production -
607 views

**Top Daily News**

New Halloween Designs
Released - 175 views

Film Director Hezues R and
"Suicide Saint" Cast
Participate In Upcoming
World Mental Health Day
Event In NYC - 161 views

Get Business Credit &
Financing For Your Business
- 150 views

Devontail Prepares For
Release Of New Single
"Brown Sugar Thang" - 145
views

Remediation Products, Inc.
Petitioner Vs. Innovative
Environmental Technologies,
Inc. Patent Owner - 87 views

**PTC News**

Whitechapel Holdings,
Provides Update on PPE
Website Launch - 696 views

Journey Medical Corp Kicks
Off "Journey with the
Experts" Educational
Initiative with Rania Agha,
MD - 566 views

Batman, Shadowhunters,
Bruce Campbell Last Fan
Standing Among New
Wizard World Virtual
Experiences - 200 views

May 01, 2020 News

## News By Tag
* Securities, financing
* More Tags...

## Industry News
* Banking
* More Industries...

## News By Place
* Hong Kong
  Hong Kong Island
  Hong Kong
* More Locations...

## Country(s)
United States
Australia
India
Hong Kong
England
China
- - -
More Countries

Industry News

[ All News ]

[ Exclusive News ]

**October 2020**

| Wu | Tu | Mo | Su | Sa | Fr | Th |
|----|----|----|----|----|----|----|
| 7 | 6 | 5 | 4 | 3 | 2 | 1 |

## SHEARSON LEHMAN
Brothers Investment Banking

# Shearson Lehman Adds a New Local Custodian and Eases SBL Requirements in Hong Kong!

By: Shearson Lehman Brothers Investment Banking

**HONG KONG - May 1, 2020** - PRLog —
Shearson Lehman Brothers Investment Banking has entered a new Broker Dealer relationship with ZD Securities. ZD Securities has officially agreed to be the Custodian for Shearson Lehman in Hong Kong. This new custodian is an addi ion to the existing business portfolio which includes financial ins itutions such as Citibank, HSBC, and Deutsche Bank to name a few. The recent ease of restrictions for Hong Kong based Securities Backed Lending (SBL) program at Shearson Lehman has increased popularity for SBL financing making it an energetic, aggressive market.

▷ ✕

### 3-Minute WACC Video

**2,301 Likes 464,403 Views**

Weighted Average Cost of Capital, Free
Playlist of Selected Finance Videos
mbabull.com

OPEN

**Spread the Word**

---- Listed Under ----

Tag:
· Securities, financing

Industry:
· Banking

Location:
· Hong Kong - Hong Kong
  Island - Hong Kong

Recently, Shearson Lehman has funded mul iple transactions in Hong Kong ranging from $10 Million - $150 Million. Fixed Interest rates start at 2% and loan terms range from 1-10 years. Shearson Lehman now offers SBL program to both restricted and non-restricted securities in Hong Kong. Boldly, Shearson Lehman waives daily trading volume requirement to ease eligibility and qualification process.

Additionally, Shearson Lehman's SBL program offers non-recourse loans up to 65% LTV with no personal or corporate guarantee. Shearson Lehman also allows the flexibility of providing both Title Transfer Loan and Non-Title Transfer Loan. Shearson Lehman's recognized SBL program is a very attractive and simple solution compared to traditional financing methods for institu ional investors and ultra-high net-worth clients to quickly obtain access to funds from their investment portfolio.

Shearson Lehman understands and values building healthy client relationships in the Hong Kong region that will grow with this new local venture with ZD Securities as one of the Custodians. Shearson Lehman is an international investment banking boutique that appreciates different cultures and understands the importance of developing strong contractual bonds. To learn more, please contact Shearson Lehman Brothers Investment Banking at wealthmanagement@shearsonlehmanbrothers.com.

**Contact**
weal hmanagement@shearsonlehmanbrothers.com

...... End ................................................................................

[ Follow ] [ Embed ] [ PDF / Print ]

Email : ***@shearsonlehmanbro hers.com ✔

Account Email Address ✔    Account Phone Number ✔    Disclaimer    Report Abuse

# PRLOG
Press Release Distribution

| | Search |

PR Home | Latest News | News Feeds | Subscribe | Submit Free Press Release | For Bloggers | PR Newswire Distribution |

**News By Tag**
* Investment
* More Tags...

**Industry News**
* Banking
* More Industries...

**News By Place**
* New York City
  New York
  United States
* More Locations...

**Country(s)**
United States
Australia
India
Hong Kong
England
China
- - -
More Countries

Industry News

All News

Exclusive News

**October 2020**
| We | Tu | Mo | Su | Sa | Fr | Th |
| 7 | 6 | 5 | 4 | 3 | 2 | 1 |

## SHEARSON LEHMAN
Boutique Investment Banking

# Asia's Alternative Energy Sector Becomes Front-Page News as Shearson Lehman Vows to Invest Millions

Shearson Lehman eyes Asia for its next big renewable energy investment

*By: Shearson Lehman Brothers Investment Banking*

**NEW YORK - Aug. 24, 2020** - *PRLog* – In a move that the pundits in the energy investment industry have been expecting for a while now, Shearson Lehman – a Lehman Brother company that offers specialized and personalized wealth management solutions and services – has announced that it will soon be turning to the Asian markets for its next set of investments in alternative energy.

Earlier this year, the company announced a $250 million investment in international alternative energy, $100 million out of which went into a European company with wind turbines operations in Asia, Australia and Europe and the other $150 million were invested in a Spanish company for its solar and wind energy projects in South America and Africa.

Sponsored

According to company representatives, Shearson Lehman is already vetting project proposals and negotiating with multiple parties whose work in wind and solar energy has received praise from industry gurus.

It is expected that the over the next few months, as the effects of the COVID-19 pandemic recede, Shearson Lehman will go through a final round of project selection and negotiations before choosing the projects the company wants to back and announce the magnitude of its investment.

This series of investment decisions spanning over multiple continents is a strategic move by Shearson Lehman evidently aimed at expanding the company's presence in the multi-continental alternative energy markets and may add a new dimension to the company's already impressive portfolio of investment products and services to its prestigious clientele.

Shearson Lehman's clientele has recently shown immense interest in his new direction and the Securities Backed Lending (SBL) program in key markets on virtually all continents, including Hong Kong, Indonesia, Latin America, Malaysia, Singapore, Turkey, United Kingdom, among others.

The company aims to secure its investment for Asia's alternative energy projects from its growing portfolio of blue-chip enterprise and individual clients. It is expected that this new body of investments could also amount to over $150 million.

Speaking about this direction for the company's imminent future, Senior Executive Vice President of Shearson Lehman's Wealth Management Division said, "We are headed towards another revolutionary change which requires investing into the proper channels to building a better and greater future of tomorrow filled with growth and prosperity."

**Company Contact Information**

Shearson Lehman is a Lehman Brothers company. It is a premier boutique investment banking firm offering direct financing solutions to a global clientele. More details about Shearson Lehman can be found on their business website (https://www.shearsonlehmanbrothers.com) or via email

**Spread the Word**

**Listed Under**

**Tag:**
• Investment

**Industry:**
• Banking

**Location:**
• New York City - New York - US

Best Energy Sector Stocks >

5 Best Stocks To Invest In >

Renewable Energy Stocks To Buy >

**Most Viewed**

Rusesabagina Family to Hold Press Conference, Thursday, October 1 - 1860 views

Rapper ALRIGHT puts Antelope Valley on the map: auditions for Major Record Label - 1075 views

SpringHill Suites Albuquerque University Area, New Mexico Opens - 751 views

Whitechapel Holdings, Provides Update on PPE Website Launch - 696 views

"The Central Authority" Movie Wraps Production - 607 views

**Top Daily News**

New Halloween Designs Released - 175 views

Film Director Hezues R and "Suicide Saint" Cast Participate In Upcoming World Mental Health Day Event in NYC - 161 views

Get Business Credit & Financing For Your Business - 150 views

Devontali Prepares For Release Of New Single "Brown Sugar Thang" - 145 views

Remediation Products, Inc. Petitioner Vs. Innovative Environmental Technologies, Inc. Patent Owner - 87 views

**PTC News**

Whitechapel Holdings, Provides Update on PPE Website Launch - 696 views

Journey Medical Corp Kicks Off "Journey with the Experts" Educational Initiative with Rania Agha, MD - 566 views

Batman, Shadowhunters, Bruce Campbell Last Fan Standing Among New Wizard World Virtual Experiences - 200 views

Aug 24, 2020 News



(wealthmanagement@shearsonlehmanbrothers.com) while inquiries can also be made via phone calls
to (332) 228-0152.

Follow    Embed    PDF / Print

Email     : ***@shearsonlehmanbrothers.com
Phone     : 3322280152
Tags      : Investment
Industry  : Banking
Location  : New York City - New York - United States

Account Email Address    Account Phone Number    Disclaimer    Report Abuse

**Shearson Lehman Brothers
Investment Banking PRs**

Shearson Lehman Adds a New Local Custodian
and Eases SBL Requirements in Hong Kong!

Shearson Lehman is Entering into Negotiations to
Invest $250 million in Alternative Energy

**Trending News**

Remediation Products, Inc. Petitioner Vs.
Innovative Environmental Technologies, Inc.
Patent Owner

United Midwest Savings Bank Facilitates SBA
Loan To Innovative Minority Small Business

Susteen partners with Cyan Forensics to deliver
rapid scanning of smartphones in the field

Adelante SCM and P NC Launch the First Annual
State of Yard Management Report

MarketKeep Partners with The Law Offices of
Nicholas J Del Pizzo

**Most Viewed**

Rusesabagina Family to Hold Press Conference,
Thursday, October 1 - 1880 views

Rapper ALRIGHT puts Antelope Valley on the
map auditions for Major Record Label - 1075
views

SpringHill Suites Albuquerque University Area,
New Mexico Opens - 751 views

Whitechapel Holdings, Provides Update on PPE
Website Launch - 696 views

"The Central Authority" Movie Wraps Production -
607 views

**Top Daily News**

New Halloween Designs Released - 175 views

Film Director Hezues R and "Suicide Saint" Cast
Participate In Upcoming World Mental Health Day
Event in NYC - 151 views

Get Business Credit & Financing For Your
Business - 150 views

Devontali Prepares For Release Of New Single
"Brown Sugar Thang" - 145 views

Remediation Products, Inc. Petitioner Vs.
Innovative Environmental Technologies, Inc.
Patent Owner - 87 views

Se ect Loan Amount

$
**$225,000**

Calculate Payment

SiteMap | Privacy Policy | Terms of Service | Copyright Notice | About | Advertise |

**Like PRLog?**

9K    2K    1K

# EXHIBIT 24



# DECISION

NYSE Group, Inc. v. Val Sklarov / BentleyTek / America 2030 Capital
Claim Number: FA1709001748855

## PARTIES

Complainant is NYSE Group, Inc. ("Complainant"), represented by Richard L. Cruz of DLA Piper LLP , Pennsylvania, USA.  Respondent is Val Sklarov / BentleyTek / America 2030 Capital ("Respondent"), Ukraine.

## REGISTRAR AND DISPUTED DOMAIN NAMES

The domain names at issue are <nyseloan.com><nyse-loan.com> <nyseloans.com><nyse-loans.com><nyse.tips><nysetrading.net> <nysemarket.net><nyse.email><nyse.vip> <nyse.pro> <nyse-exchange.com> <nyse.technology><nyse-trading.org> <nyse.cloud><nyse.directory> <nyse.rocks> <nyse-stocks.com><nyse-trader.net><nyse-trading.net><nyse-trader.com>, and <nyse.solutions>registered with GoDaddy.com, LLC .

## PANEL

The undersigned certifies that he or she has acted independently and impartially and to the best of his or her knowledge has no known conflict in serving as Panelist in this proceeding.

Daniel B. Banks, Jr., as Panelist.

## PROCEDURAL HISTORY

Complainant submitted a Complaint to the Forum electronically on September 13, 2017; the Forum received payment on September 14, 2017.

On Sep 14, 2017, GoDaddy.com, LLC confirmed by e-mail to the Forum that the <nyseloan.com><nyse-loan.com><nyseloans.com><nyse-loans.com> <nyse.tips><nysetrading.net><nysemarket.net><nyse.email><nyse.vip> <nyse.pro><nyse-exchange.com><nyse.technology><nyse-trading.org> <nyse.cloud><nyse.directory> <nyse.rocks> <nyse-stocks.com><nyse-trader.net>, <nyse-trading.net><nyse-trader.com>and <nyse.solutions>domain names are registered with GoDaddy.com, LLC and that Respondent is the current registrant of the names.  GoDaddy.com, LLC has verified that Respondent is bound by the GoDaddy.com, LLC registration agreement and has thereby agreed to resolve domain disputes brought by third parties in accordance with ICANN's Uniform Domain Name Dispute Resolution Policy (the "Policy").

On September 18, 2017, the Forum served the Complaint and all Annexes, including a Written Notice of the Complaint, setting a deadline of October 10, 2017 by which Respondent could file a Response to the Complaint, via e-mail to all entities and persons listed on Respondent's registration as technical, administrative, and billing contacts, and to postmaster@nyseloan.com, postmaster@nyse-loan.com,

postmaster@nyseloans.com, postmaster@nyse-loans.com, postmaster@nyse.tips, postmaster@nysetrading.net, postmaster@nysemarket.net, postmaster@nyse.email, postmaster@nyse.vip, postmaster@nyse.pro, postmaster@nyse-exchange.com, postmaster@nyse.technology, postmaster@nyse-trading.org, postmaster@nyse.cloud, postmaster@nyse.directory, postmaster@nyse.rocks, postmaster@nyse-stocks.com, postmaster@nyse-trader.net, postmaster@nyse-trading.net, postmaster@nyse-trader.com, postmaster@nyse.solutions.  Also on September 18, 2017, the Written Notice of the Complaint, notifying Respondent of the e-mail addresses served and the deadline for a Response, was transmitted to Respondent via post and fax, to all entities and persons listed on Respondent's registration as technical, administrative and billing contacts.

A timely Response was received and determined to be complete on October 9, 2017.

On October 13, 2017, pursuant to Complainant's request to have the dispute decided by a single-member Panel, the FORUM appointed Daniel B. Banks, Jr., as Panelist.

Having reviewed the communications records, the Administrative Panel (the "Panel") finds that the FORUM has discharged its responsibility under Paragraph 2(a) of the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules") "to employ reasonably available means calculated to achieve actual notice to Respondent" through submission of Electronic and Written Notices, as defined in Rule 1 and Rule 2.

## RELIEF SOUGHT

Complainant requests that the domain names be transferred from Respondent to Complainant.

## PARTIES' CONTENTIONS

A. Complainant

Complainant, NYSE Group, Inc., operates the leading global exchange for trading in securities under its iconic brand. In connection with this business, Complainant uses the NYSE mark.  Complainant has rights in the NYSE mark based upon multiple registrations with the United States Patent and Trademark Office ("USPTO") as well as other national trademark agencies (e.g. Reg. No. 909,350, registered Mar. 2, 1971). Respondent's domain names are confusingly similar to the NYSE mark, as they each contain the mark in its entirety, to which generic terms such as "loans," "trading," "stock," "market," and "exchange" have been added. In some instances, the additional generic terms are part of the domain name and the generic top-level domain ("gTLD") ".com," ".org," or ".net" is added; in other instances, the domain name consists exclusively of Complainant's NYSE mark, and the only change is the addition of a descriptive gTLD.

Respondent has no rights or legitimate interests in the disputed domain names. Respondent is not commonly known by the domain names, nor has Complainant licensed or authorized Respondent to use the NYSE mark for any reason. Respondent's use of the domain names does not amount to a bona fide offering of goods or services or a legitimate noncommercial or fair use. Rather, each of the domain names resolves to a parked page.

Respondent has registered and is using the disputed domain names in bad faith. Respondent exhibits a pattern of bad faith registration of domain names containing well-known marks. Respondent also registered and is using the disputed domain names to confuse and attract Internet users. Also, Respondent is failing to actively use the names. Finally, due to the fame and notoriety of Complainant's NYSE mark, and the fact that many of the disputed domain names were registered within minutes of Respondent responding to a cease-and-desist letter from Complainant; Respondent clearly registered the domain names opportunistically in bad faith.

B. Respondent

Complainant does not have rights in the NYSE mark throughout the world, specifically in Ukraine, where Respondent resides. Complainant does not conduct business in Ukraine, and does not target Ukrainian customers. Ukraine is a sovereign country which has its own Trademark and Patent Office and does not adhere to trademark protection on its territory afforded to third parties in other countries. Further, the letters "Y" and "S" do not exist in the Cyrillic alphabet, so Ukrainian consumers would not be confused by the domain names.

Respondent intends to launch a website named "New York Services Enterprise" ("NYSE") which will offer mortgages, business and real estate loans, auto loans, insurance, credit cards, financial consulting, real estate sales and construction services to customers in Ukraine. Respondent has been offering these services since March 2015 under the name "America 2030 Capital, LLC."

Respondent did not and could not have bought the domain names in bad faith because Complainant has no trademark protection in Ukraine. Respondent did not purchase the domain names in order to disrupt the business of Complainant, because Complainant does not do business in Ukraine, and Respondent is involved in a different business than Complainant. Respondent could not have known of Complainant's NYSE mark, because the mark does not exist in Ukraine.

## FINDINGS

1 - The disputed domain names are identical or confusingly similar to a trademark or service mark in which Complainant has rights.
2 - Respondent has no rights or legitimate interests in respect of the domain names.
3 - The domain names have been registered and are being used in bad faith.

## DISCUSSION

Paragraph 15(a) of the Rules instructs this Panel to "decide a complaint on the basis of the statements and documents submitted in accordance with the Policy, these Rules and any rules and principles of law that it deems applicable."

Paragraph 4(a) of the Policy requires that Complainant must prove each of the following three elements to obtain an order that a domain name should be cancelled or transferred:

(1) the domain name registered by Respondent is identical or confusingly similar to a trademark or service mark in which Complainant has rights; and

(2) Respondent has no rights or legitimate interests in respect of the domain name; and

(3) the domain name has been registered and is being used in bad faith.

<u>Identical and/or Confusingly Similar</u>

Complainant claims rights in the NYSE mark based upon registration of the mark with the USPTO (e.g. Reg. No. 909,350, registered Mar. 2, 1971). Registration of a mark with the USPTO is sufficient to establish rights in that mark. See Home Depot Product Authority, LLC v. Samy Yosef / Express Transporting, FA 1738124 (FORUM July 28, 2017) (finding that registration with the USPTO was sufficient to establish the complainant's rights in the HOME DEPOT mark). The fact that the mark is not registered in the jurisdiction of Respondent is not dispositive in a Policy ¶ 4(a)(i) analysis. See Viber Media S.à r.l. v. Kristaps Sirmais / SIA "FUN FACTORY", FA 1626671 (FORUM Aug. 4, 2015) ("Accordingly, even though Respondent reportedly resides in Latvia, the Panel finds that Complainant's USPTO registration is sufficient under Policy ¶ 4(a)(i)."). The Panel finds that Complainant's registration of the NYSE mark with the USPTO is sufficient to establish rights in the mark under Policy ¶ 4(a)(i).

Complainant also complains that the disputed domain names are identical or confusingly similar to the NYSE mark:

Complainant contends the <nyse.tips> <nyse.email> <nyse.vip> <nyse.pro> <nyse.technology> <nyse.cloud> <nyse.directory> <nyse.rocks> and <nyse.solutions> are identical to the NYSE mark, as they each consist entirely of the mark and merely add various gTLDs to the mark. Addition of a gTLD to mark is insufficient to distinguish the domain name from the mark for the purposes of Policy ¶ 4(a)(i). See Marquette Golf Club v. Al Perkins, FA 1738263 (FORUM July 27, 2017) ("When a respondent's domain name incorporates a mark in its entirety and merely adds a generic top-level domain (gTLD), ".com", then the Panel may find that the disputed domain name is identical to Complainant's mark."). Complainant contends that some of the gTLDs chosen by respondent are descriptive and may enhance the confusing similarity. The Panel therefore finds the nine domain names to be identical to the NYSE mark for the purposes of Policy ¶ 4(a)(i).

Complainant also asserts that the <nyseloan.com> <nyse-loan.com> <nyseloans.com> <nyse-loans.com> <nysetrading.net> <nysemarket.net> <nyse-exchange.com> <nyse-trading.org> <nyse-stocks.com> <nyse-trader.net> <nyse-trading.net> and <nyse-trader.com> domain names are confusingly similar to the mark, as they each contain the NYSE mark in its entirety and merely adds one of the descriptive terms "loan," "loans," "trading," "market," "exchange," "stocks," or "trader;" and a gTLD. Some also add a hyphen. Addition of a descriptive or generic term and a gTLD are insufficient to distinguish a mark from a domain name per Policy ¶ 4(a)(i). See Microsoft Corporation v. Thong Tran Thanh, FA 1653187 (FORUM Jan. 21, 2016) (determining that confusing similarity exists where [a disputed domain name] contains Complainant's entire mark and differs only by the addition of a generic

or descriptive phrase and top-level domain, the differences between the domain name and its contained trademark are insufficient to differentiate one from the other for the purposes of the Policy.). Also, the addition of hyphens is irrelevant in a Policy ¶ 4(a)(i) confusing similarity analysis. See Health Devices Corp. v. Aspen S T, FA 158254 (FORUM July 1, 2003) ("[T]he addition of punctuation marks such as hyphens is irrelevant in the determination of confusing similarity pursuant to Policy ¶ 4(a)(i)."). The Panel therefore finds that the remaining twelve domain names are confusingly similar to the NYSE mark for the purposes of Policy ¶ 4(a)(i).

<u>Rights or Legitimate Interests</u>

The Panel finds that Complainant has made a prima facie case that Respondent lacks rights and legitimate interests in the disputed domain names under Policy ¶ 4(a)(ii). The burden then shifts to Respondent to show it does have rights or legitimate interests. See Hanna-Barbera Prods., Inc. v. Entm't Commentaries, FA 741828 (FORUM Aug. 18, 2006) (holding that the complainant must first make a prima facie case that the respondent lacks rights and legitimate interests in the disputed domain name under UDRP ¶ 4(a)(ii) before the burden shifts to the respondent to show that it does have rights or legitimate interests in a domain name); see also AOL LLC v. Gerberg, FA 780200 (FORUM Sept. 25, 2006) ("Complainant must first make a prima facie showing that Respondent does not have rights or legitimate interest in the subject domain names, which burden is light.  If Complainant satisfies its burden, then the burden shifts to Respondent to show that it does have rights or legitimate interests in the subject domain names.").

Complainant argues that Respondent has no rights or legitimate interests in the disputed domain names, as Respondent is not commonly known by the disputed domain names, nor has Complainant authorized Respondent to use the NYSE mark in any way. In a Policy ¶ 4(c)(ii) analysis, WHOIS information can support a finding that the respondent is not commonly known by a disputed domain name. See Chevron Intellectual Property LLC v. Fred Wallace, FA1506001626022 (FORUM July 27, 2015) (finding that the respondent was not commonly known by the <chevron-europe.com> domain name under Policy ¶ 4(c)(ii), as the WHOIS information named "Fred Wallace" as registrant of the disputed domain name). The WHOIS information of record identifies Respondent as "Val Sklarov." Additionally, lack of evidence in the record to indicate that the respondent had been authorized to register a domain name using a complainant's mark supports a finding that Respondent does not have rights or legitimate interests in said domain name. See Navistar International Corporation v. N Rhamany, FA1505001620789 (FORUM June 8, 2015) (finding that the respondent was not commonly known by the disputed domain name where the complainant had never authorized the respondent to incorporate its NAVISTAR mark in any domain name registration). The Panel finds, under Policy ¶ 4(c)(ii), that Respondent has not been commonly known by the disputed domain names.

Complainant argues that Respondent's lack of rights and legitimate interests in the disputed domain names is demonstrated by its failure to use the names to make a bona fide offering of goods or services or for a legitimate noncommercial or fair use. Rather, Complainant contends each of the domain names resolves to a parked page,

which is not a use indicative of rights or legitimate interests per Policy ¶¶ 4(c)(i) or (iii). *See Kohler Co. v xi long chen*, FA 1737910 (Forum Aug. 4, 2017) ("Respondent has not made a **bona fide** offering of goods or services, or a legitimate non-commercial or fair use of the domain.  Respondent's <kohler-corporation.com> resolves to an inactive webpage displaying the message "website coming soon!"). Respondent's domain names each resolve to a page which only states "website coming soon!" The Panel therefore finds that Respondent lacks rights and legitimate interests per Policy ¶¶ 4(c)(i) and (iii).

Registration and Use in Bad Faith

Complainant argues that Respondent has registered the disputed domain names in bad faith as part of a pattern of such bad faith registrations. Bad faith registration and use can be demonstrated under Policy ¶ 4(b)(ii) through a showing of a history of such registrations, or multiple registrations containing a complainant's mark. *See Australian Stock Exch. v. Cmty. Internet (Australia) Pty. Ltd*, D2000-1384 (WIPO Nov. 30, 2000) (finding bad faith under Policy ¶ 4(b)(ii) where the respondent registered multiple infringing domain names containing the trademarks or service marks of other widely known Australian businesses); *see also Microsoft Corporation and Skype v. zhong biao zhang / Unknown company / zhong zhang*, FA1401001538218 (Forum Feb. 20, 2014) (holding that the respondent's registration of three domain names incorporating variants of the complainant's SKYPE mark reflected a pattern of bad faith registration under Policy ¶ 4(b)(ii)). Complainant claims Respondent has registered domain names incorporating the well-known marks of other companies in the financial sector. *See* Compl. Annexes Z–AA. The Panel notes that Respondent has registered 21 domain names containing the NYSE mark. The Panel therefore finds that Respondent registered and used the domain names in bad faith per Policy ¶ 4(b)(ii).

Complainant also contends that Respondent registered the disputed domain names in order to confuse and attract Internet users. Such use can demonstrate bad faith per Policy ¶ 4(b)(iv). *See DatingDirect.com Ltd. v. Aston*, FA 593977 (Forum Dec. 28, 2005) ("the Panel finds the respondent is appropriating the complainant's mark in a confusingly similar domain name for commercial gain, which is evidence of bad faith registration and use pursuant to Policy ¶4(b)(iv)."); *see also Phat Fashions, LLC v. Kruger*, FA 96193 (Forum Dec. 29, 2000) (finding bad faith under Policy ¶ 4(b)(iv) even though the respondent has not used the domain name because "it makes no sense whatever to wait until it actually 'uses' the name, when inevitably, when there is such use, it will create the confusion described in the Policy"). Complainant contends that its NYSE mark is so notorious that any use of the domain names by Respondent would be infringing. The Panel agrees and find Respondent to have registered and used the domain names in bad faith per Policy ¶ 4(b)(iv).

Complainant also asserts, along the same lines, that Respondent's registration and use of the domain names was opportunistic. Opportunistic bad faith can be found when a complainant can show the registration of a domain name was done in order to take advantage of the complainant's famous mark. *See Twitch Interactive, Inc. v. Jason Hardwick*, FA1501001601323 (Forum Feb. 25, 2015) (finding that the respondent had

engaged in opportunistic bad faith pursuant to Policy ¶ 4(a)(iii), where the respondent registered the <twitchtv.net> domain name just two days after the complainant's launch announcement for TwitchTV (which received widespread news coverage)); see also Arizona Board of Regents, for and on behalf of Arizona State University v. Weiping Zheng FA1504001613780 (FORUM May 28, 2015) (finding that the respondent had acted in opportunistic bad faith according to Policy ¶ 4(a)(iii), when it registered the disputed domain name just one week after the complainant filed applications to register the SUB DEVIL LIFE mark, and just days after those applications became public through the USPTO's website). The Panel finds that Respondent originally registered four domain names—<nyseloan.com> <nyse-loan.com> <nyseloans.com> and <nyse-loans.com>—and registered the remaining seventeen domain names at issue the same day it received and responded to a letter acknowledging Complainant's rights in the NYSE mark. The Panel therefore finds Respondent to have registered and used the disputed domain names in bad faith per Policy ¶ 4(a)(iii).

Complainant also contends that Respondent is not actively using the disputed domain names, which further demonstrates its bad faith. Inactive holding of a domain name can demonstrate bad faith per Policy ¶ 4(a)(iii). See VideoLink, Inc. v. Xantech Corporation, FA1503001608735 (FORUM May 12, 2015) ("Failure to actively use a domain name is evidence of bad faith registration and use pursuant to Policy ¶ 4(a)(iii)."). The evidence establishes that the disputed domain names do not resolve to active websites. The Panel finds that Respondent's failure to make an active use of the domain names demonstrates its bad faith per Policy ¶ 4(a)(iii).


## DECISION

Having established all three elements required under the ICANN Policy, the Panel concludes that relief shall be GRANTED .

Accordingly, it is Ordered that the <nyseloan.com><nyse-loan.com> <nyseloans.com><nyse-loans.com><nyse.tips><nysetrading.net> <nysemarket.net><nyse.email><nyse.vip> <nyse.pro> <nyse-exchange.com> <nyse.technology><nyse-trading.org> <nyse.cloud> <nyse.directory> <nyse.rocks> <nyse-stocks.com><nyse-trader.net><nyse-trading.net><nyse-trader.com>, and <nyse.solutions>domain names be TRANSFERRED FROM RESPONDENT TO COMPLAINANT.


Daniel B. Banks, Jr., Panelist
Dated: October 23, 2017

Click Here to return to the main Domain Decisions Page.

Click Here to return to our Home Page

# EXHIBIT 25

too infrequent to constitute a violation of either provision. Furthermore, there was a lack of additional harassing conduct, such as continued calls after an oral request from Plaintiff that Defendant cease calling or Defendant calling at inconvenient times. Additionally, Plaintiff did not present authority that it was harassment for Defendant to call him after Plaintiff declared he could not pay the debt or after he told Defendant that he does not speak to debt collection services. As a result, nothing about Defendant's calls "represent[ ] the type of coercion and delving into the personal lives of debtors that the FDCPA in general, and § 1692d in particular, was designed to address." *Middlebrooks*, 775 F. App'x. at 597 (citing *Miljkovic*, 791 F.3d at 1305).

## SUMMARY

It is **RECOMMENDED** that Defendant Nationwide Recovery Service's motion for summary judgment (Doc. 17) be **GRANTED.**

**IT IS SO REPORTED AND RECOMMENDED** this <u>16th</u> day of <u>December</u>, 2019.



**ROTHSCHILD & CO. CONTINUATION HOLDINGS A.G., et al., Plaintiffs,**

**v.**

**Val SKLAROV, et al., Defendants.**

**Civil Action No. 1:19-cv-03561-AT**

United States District Court, N.D. Georgia, Atlanta Division.

Signed February 13, 2020

**Background:** Trademark holder, a provider of corporate finance, financial advisory, and general investment banking services, brought action against alleged infringer and companies he controlled for trademark infringement-related claims under Lanham Act and Georgia state law. Trademark holder also moved for preliminary injunction, seeking to enjoin defendants from engaging in allegedly infringing use of mark. Defendants moved to dismiss for lack of personal jurisdiction.

**Holdings:** The District Court, Amy Totenberg, J., held that:

(1) St. Kitts and Nevis entity and Wyoming limited liability company transacted business in Georgia sufficient to satisfy Georgia's long-arm statute, and thus district court's exercise of personal jurisdiction over them was proper;

(2) limited liability company created under laws of Bahamas transacted business in Georgia sufficient to satisfy Georgia's long-arm statute, and thus district court's exercise of personal jurisdiction over it was proper; and

(3) trademark holder was entitled to opportunity to discover facts that would support its allegations that district court had personal jurisdiction over Colorado corporation and Colorado limited liability company.

Motion denied.

**1. Federal Courts ⟺2791**

The plaintiff bears the burden of establishing personal jurisdiction.

**2. Federal Courts ⟺2792**

In the context of a motion to dismiss for lack of personal jurisdiction in which no evidentiary hearing is held, the plaintiff bears the burden of establishing a prima

facie case of jurisdiction over the movant, non-resident defendant. Fed. R. Civ. P. 12(b)(2).

**3. Constitutional Law ⟺3964**

**Federal Courts ⟺2721, 3025(4)**

A federal court undertakes a two-step inquiry to determine whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. U.S. Const. Amend. 14.

**4. Constitutional Law ⟺3964**

**Federal Courts ⟺2721, 3025(4)**

District courts in Georgia cannot conflate the two steps of the inquiry for determining whether personal jurisdiction exists, i.e., whether the exercise of jurisdiction is appropriate under the Georgia long-arm statute and does not violate the Due Process Clause, because Georgia's long-arm statute does not provide jurisdiction that is coextensive with due process. U.S. Const. Amend. 14; Ga. Code Ann. § 9-10-91.

**5. Courts ⟺13.2**

Georgia's long-arm statute imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process. U.S. Const. Amend. 14; Ga. Code Ann. § 9-10-91.

**6. Federal Courts ⟺2791**

A court considering a motion to dismiss for lack of personal jurisdiction construes the allegations in the complaint as true to the extent that they are uncontroverted by defendant's evidence. Fed. R. Civ. P. 12(b)(2).

**7. Federal Courts ⟺2791**

If a defendant who moves to dismiss for lack of personal jurisdiction submits

affidavits challenging the allegations in the complaint, the burden shifts back to the plaintiff to produce evidence supporting jurisdiction. Fed. R. Civ. P. 12(b)(2).

**8. Federal Courts ⟺2791**

Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, a court deciding a motion to dismiss for lack of personal jurisdiction must construe all reasonable inferences in favor of the plaintiff. Fed. R. Civ. P. 12(b)(2).

**9. Courts ⟺13.2**

Federal courts interpret the Georgia long-arm statute literally. Ga. Code Ann. § 9-10-91.

**10. Courts ⟺13.3(11)**

There is a three-part test to determine whether long-arm jurisdiction exists under the provision of the Georgia long-arm statute allowing the exercise of personal jurisdiction over a nonresident who transacts any business within Georgia: the first part asks whether the nonresident defendant has purposefully done some act or consummated some transaction in Georgia; the second part examines whether the cause of action arises from or is connected with such act or transaction; and the third part is whether the exercise of jurisdiction by the courts of the state does not offend traditional fairness and substantial justice. Ga. Code Ann. § 9-10-91.

**11. Constitutional Law ⟺3964**

In determining whether the exercise of jurisdiction over a nonresident defendant would violate the Due Process Clause, a court considers: (1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefit of

**ROTHSCHILD & CO. CONTINUATION HOLDINGS v. SKLAROV**    **1387**
Cite as 440 F.Supp.3d 1385 (N.D.Ga. 2020)

the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice.  U.S. Const. Amend. 14.

**12. Federal Courts ⟷2734, 2760(1)**

First company, a St. Kitts and Nevis entity, and second company, a Wyoming limited liability company, transacted business in Georgia sufficient to satisfy Georgia's long-arm statute, and thus district court's exercise of personal jurisdiction over them was proper, where companies' website offered to supply broad range of financial services from United States to non-United States residents from Atlanta office, term sheet issued by companies identified Atlanta office as only United States address for companies, and second company transacted business in Georgia through its agent, who was resident of Georgia.  Ga. Code Ann. § 9-10-91(1).

**13. Federal Courts ⟷2760(1)**

Limited liability company created under laws of Bahamas transacted business in Georgia sufficient to satisfy Georgia's long-arm statute, and thus district court's exercise of personal jurisdiction over it was proper, where company applied and authorized business use of allegedly infringing trademark in Georgia, and company was closely associated with other defendants over which court had personal jurisdiction, as its counsel, who filed application to register with United States Patent and Trademark Office (USPTO), also represented other defendants in pre-litigation correspondence with counsel for plaintiffs, whose trademark was allegedly infringed, and had appeared as co-counsel for defendants.  Ga. Code Ann. § 9-10-91(1).

**14. Federal Civil Procedure ⟷1275.5**

Trademark holder, which alleged that Colorado corporation and Colorado limited liability company infringed on its trademarks, was entitled to opportunity to discover facts that would support its allegations that federal district court in Georgia had personal jurisdiction over defendants, where holder had shown evidence of concerted interaction between at least one of the defendants and other entities over which court had jurisdiction and discovery could show Georgia contacts by defendants sufficient to meet Georgia long-arm statute's requirements, and as result of contradictory or confusing statements regarding location and organization of defendants, it was unclear whether there was any meaningful distinction between them.  Ga. Code Ann. § 9-10-91.

**15. Federal Civil Procedure ⟷1275.5**

A qualified right to take jurisdictional discovery exists where the jurisdictional question is genuinely in dispute.

**16. Federal Civil Procedure ⟷1275.5**

Where the jurisdictional question is genuinely in dispute, a plaintiff should be given the opportunity to discover facts that would support his allegations of jurisdiction.

————————

Andrew L. Deutsch, DLA Piper LLP, Los Angeles, CA, Christopher G. Campbell, Delia Gervin Frazier, DLA Piper LLP, Atlanta, GA, Kerry Anne O'Neill, DLA Piper LLP, New York, NY, for Plaintiffs.

Michael Thomas McCracken, The Law Offices of Michael T. McCracken, Chicago, IL, Timothy F. Coen, TFCoen Law Firm, Atlanta, GA, for Defendant Val Sklarov.

Michael Thomas McCracken, The Law Offices of Michael T. McCracken, Chicago, IL, for Defendants Bentley Rothschild Capital Limited, Bentley Rothschild Fi-

nancial LLC, America 2030 Capital, LLC, America 2030 Capital Limited, Black Rock Capital LLC.

## MEMORANDUM OPINION ON JURISDICTIONAL RULING

AMY TOTENBERG, UNITED STATES DISTRICT JUDGE

On October 10, 2019, the Court dismissed Defendants' Motion to Dismiss (Doc. 23) in an Order from the bench. (*See* Transcript, Doc. 34 at 4–5, 46–47.) The Court issues this written memorandum to address in further detail its exercise of jurisdiction over the Defendants and to clarify and modify the Court's Bench Order that encompassed Defendants America 2030 LLC, and America 2030 Capital Limited.

### I. Background

On August 6, 2019, Plaintiffs filed a Complaint against Defendants, alleging trademark infringement-related claims under the Lanham Act, as well as under Georgia state law. (Complaint, Doc. 1.) Plaintiffs are part of the Rothschild & Co. Group, which provides financial services throughout the world. (Doc. 1 at ¶ 27.) The Rothschild & Co. Group is controlled by members of the Rothschild family, "one of the most important and successful banking families in the world." (*Id.*)

The Rothschild & Co. Group in the United States includes (1) Plaintiff Rothschild & Co. US Inc., a registered broker-dealer that provides corporate finance, financial advisory, and general investment banking services, including to clients in Georgia; (2) Plaintiff Rothschild & Co. Asset Management US Inc., which provides financial investment services to individuals and institutions, including clients in Georgia; and (3) Plaintiff Rothschild & Co. Continuation Holdings AG, a Swiss joint-stock company that directly or indirectly owns the other Rothschild Plaintiffs. (*Id.* at ¶¶ 32–33.) Rothschild & Co. Continuation Holdings AG is the registered owner of two U.S. trademark registrations for financial services.[1] This entity also licenses other Rothschild & Co. entities to use the marks. (Doc. 1 at ¶ 36.)

The Complaint alleges the Rothschild marks have acquired substantial reputation and good will, distinctiveness, fame, and secondary meaning, and have become associated in the U.S. and the world with the financial services businesses of the Rothschild Group members operating in the U.S. (Doc. 1 at ¶ 38.) The Complaint further alleges that Defendant Val Sklarov and companies he controls (including several named defendants in this case) have been involved in litigation in the U.S. and Hong Kong in which Sklarov and his companies are alleged to have engaged in fraud in connection with stock loans. (*Id.* at ¶¶ 44–52.) The Complaint alleges Sklarov controls and directs the corporate defendants, caused the corporate defendants to be organized, and that he was the moving force behind the alleged infringements. (*Id.* at ¶¶ 18–19.) The Plaintiffs also filed a Motion for Preliminary Injunction (Doc. 6-1) seeking to enjoin Defendants from engaging in the allegedly infringing use of the ROTHSCHILD mark, anywhere in the world.

The main allegation in the Complaint – and the basis for seeking injunctive relief – is that Sklarov and the other Defendants have been infringing on Plaintiffs' trade-

---

**1.** ROTHSCHILD (U.S. Reg. No. 3447667); and ROTHSCHILD & CO (U.S. Reg. No. 5614371). (Doc. 1 at ¶ 36.)

mark rights by using the mark "Bentley Rothschild" to identify financial services offered within the U.S.[2]

On October 1, 2019, in lieu of an Answer, Defendants filed what was styled "Defendants' Rule 12(b) Motions." (Doc. 23.) Defendants argued (1) the Complaint against Defendants Bentley Rothschild Capital Limited (St. Kitts and Nevis), Bentley Rothschild Financial LLC, America 2030 Capital Limited, and Black Rock Capital LLC, should be dismissed for lack of personal jurisdiction; (2) the Complaint failed to allege facts showing personal liability of Defendant Sklarov; (3) Count IV of the Complaint, alleging violation of O.G.C.A. § 10-1-451(b), should be dismissed because Plaintiffs did not allege a mark registered with the State of Georgia; (4) Count V, to the extent it seeks recovery of damages, should be dismissed with prejudice because O.C.G.A. § 10-1-370 allows only injunctive relief; (5) the Complaint should be dismissed or a more definitive statement required because the Complaint is a "shotgun pleading"; (6) allegations relating to the Term Sheet should be stricken because the Court lacks subject matter jurisdiction over alleged acts of infringement occurring outside of the United States; and (7) certain allegations in the Complaint relating to Sklarov's alleged history of criminal conviction and "cybersquatting" should be stricken as scandalous. During the October 10, 2019 hearing, the Court denied Defendants' motion from the bench. (Doc. 34 at 4–5, 46–47.)

## II. Standard of Review

**[1, 2]** A plaintiff's complaint is subject to dismissal if there is a lack of personal jurisdiction over the defendant. Fed. R. Civ. P. 12(b)(2). Plaintiff bears the burden of establishing jurisdiction in this Court. *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000); *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010). "In the context of a motion to dismiss for lack of personal jurisdiction in which no evidentiary hearing is held, the plaintiff bears the burden of establishing a *prima facie* case of jurisdiction over the movant, non-resident defendant." *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988).

**[3–5]** A federal court "undertakes a two-step inquiry to determine whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Diamond Crystal*, 593 F.3d at 1257–58 (citation and quotations omitted). District courts in Georgia cannot conflate these two inquiries because Georgia's long-arm statute[3] does not provide jurisdiction that is coextensive with due process. *Id.* at 1259. Instead, the long-arm statute "imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process." *Id.* (footnote omitted).

**[6–8]** The Court construes the allegations in the complaint as true to the extent that they are uncontroverted by defendant's evidence. *Morris*, 843 F.2d at 492; *Allegiant Physicians Services, Inc. v. Sturdy Memorial Hosp.*, 926 F. Supp. 1106, 1112 (N.D. Ga. 1996); *Foxworthy v. Custom Tees, Inc.*, 879 F. Supp. 1200, 1207 n.10 (N.D. Ga. 1995). If the defendant submits affidavits challenging the allegations

---

**2.** For more on the Plaintiffs' allegations and basis for seeking injunctive relief, see the Motion for Preliminary Injunction. (Doc. 6.)

**3.** O.C.G.A. § 9-10-91.

in the complaint, the burden shifts back to the plaintiff to produce evidence supporting jurisdiction. *Diamond Crystal Brands, Inc.*, 593 F.3d at 1257; *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002). "Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Diamond Crystal*, 593 F.3d at 1257 (internal quotation marks omitted) (quoting *Meier*, 288 F.3d at 1269).

Four of the Defendants (termed the "Corporate Defendants") claim that the Court does not have personal jurisdiction over them. The first is Bentley Rothschild Capital Limited ("BRC SK"), which is a St. Kitts and Nevis entity.[4] The second entity is Bentley Rothschild Financial LLC ("BRF"), alleged to be a Wyoming limited liability company. The third entity is Black Rock Capital LLC ("Black Rock"), alleged to be a limited liability company created under the laws of the Bahamas.[5] The fourth entity is America 2030 Capital Limited ("America 2030 Corp."), alleged to be a Colorado corporation. A fifth entity, America 2030 Capital, LLC ("America 2030 LLC"), alleged to be a Colorado limited liability company, did not challenge exercise of personal jurisdiction over it, and did not join the Motion to Dismiss. However, since it appears on the basis of the record that America 2030 LLC is closely intertwined with America 2030 Corp., the Court examined its exercise of jurisdiction over both America 2030 entities.

Defendant Val Sklarov is alleged to be a Georgia resident (Doc. 1 at 6.), and Corporate Defendant Bentley Rothschild Capital Limited (Georgia) is alleged to be an entity formed and operating in Georgia (Doc. 1 at 6–7.). The Complaint plainly alleges adequate facts to support the Court's exercise of personal jurisdiction over these Defendants.

### A. The Court Exercises Jurisdiction Over Corporate Defendants BRC SK, BRF, and Black Rock

BRC SK's opposition to the Court's exercise of personal jurisdiction over it is based largely on the decision in *RMS Titanic, Inc. v. Zaller*, 978 F. Supp. 2d 1275 (N.D. Ga. 2013), in which Judge Duffey considered the exercise of personal jurisdiction over foreign defendants, and ultimately followed the analytical framework from a First Circuit decision *McBee v. Delica Co., Ltd.*, 417 F.3d 107 (1st Cir. 2005) rather than the framework applied by the Eleventh Circuit. *Int'l Café, S.A.L. v. Hard Rock Cafe Int'l (U.S.A.), Inc.*, 252 F.3d 1274 (11th Cir. 2001) (applying framework from *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 640 (2d Cir. 1956)).

*RMS Titanic, Inc.* involved a Lanham Act claim against an individual defendant and entities he controlled, which allegedly infringed on the trade dress of the plaintiff in exhibiting artifacts from the salvage of the Titanic. *See RMS Titanic, Inc. v. Zaller*, 978 F. Supp. 2d 1275 (N.D. Ga. 2013). Judge Duffey found there was no personal jurisdiction in Georgia over a Singapore company where the plaintiff did not allege any infringing activity by that company in the U.S. or any substantial effect on U.S. commerce caused by the Defendant's conduct. *Id.* at 1290–91. The

---

4.  This entity is not the same as a different Defendant, Bentley Rothschild Capital Limited ("BRC GA"), which is alleged to be a Georgia corporation.

5.  Black Rock is named in the suit because it filed an application with the USPTO to register BENTLEY ROTHSCHILD as a U.S. trademark.

Court viewed the fact that the Singapore company maintained an office in the U.S. and managed some accounting functions from that office as an insufficient predicate for the exercise of personal jurisdiction. *Id.* Judge Duffey also rejected the plaintiffs' "reverse alter ego" theory. *Id.* at 1302 (applying *Home-Stake Prod. v. Talon Petroleum*, 907 F.2d 1012 (10th Cir. 1990)). However, Judge Duffey deferred a ruling on personal jurisdiction over another defendant incorporated in Nevada and instead permitted limited jurisdictional discovery as to that entity. *Id.* Plaintiffs contend they do not rely on a "reverse alter ego" theory of personal jurisdiction over the Corporate Defendants. (Doc. 28 at 6–7, 10–11.) They maintain the Complaint alleges that each of the Corporate Defendants transacts business in Georgia and that each of them use the allegedly infringing "Bentley Rothschild" mark in Georgia, either directly or through Sklarov acting as their agent. (*Id.* at 11.) The Complaint adequately alleges that some of the Corporate Defendants transact business in Georgia, including using the allegedly infringing mark here in connection with their business.

In *Int'l Café*, the Eleventh Circuit found that jurisdiction was appropriate "over extraterritorial disputes involving trademark infringement and unfair competition when: 1) Defendant is a United States corporation; 2) the foreign activity had substantial effects in the United States; and 3) exercising jurisdiction would not interfere with the sovereignty of another nation." *Int'l Café, S.A.L. v. Hard Rock Cafe Int'l (U.S.A.), Inc.*, 252 F.3d 1274, 1278 (11th Cir. 2001) (citing *Steele v. Bulova Watch Co.*, 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952)). Although the Eleventh Circuit does not explicitly adopt the framework of the Second Circuit's *Vanity Fair* decision, that framework is employed throughout the Eleventh Circuit's opinion and is clear-

ly the cornerstone of the Court's analysis. *See, e.g., Int'l Café, S.A.L.*, 252 F.3d at 1278 (citing *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 643 (2nd Cir. 1956) ("[T]he absence of one of the [*Bulova*] factors might well be determinative and [ ] the absence of both is certainly fatal."). All three factors are met here. The Corporate Defendants are either incorporated in the United States, or are alleged to be the alter egos of Sklarov, a Georgia resident, who allegedly disregards the separateness of the various entities in a way that abuses the corporate form. *See RMS Titanic, Inc. v. Zaller*, 978 F. Supp. 2d 1275, 1291 (N.D. Ga. 2013) (quoting *Rasheed v. Klopp Enters., Inc.*, 276 Ga. App. 91, 95 n. 4, 622 S.E.2d 442 (Ga. Ct. App. 2005)). Even Defendants' counsel is unclear on the various corporate entities, and why they are organized the way that they are. (*See* Transcript, Doc. 34 at 28 ("I also share the Court's confusion concerning what is the interplay between all of these corporations.").) Lastly, there is simply no evidence or claim made whatsoever that the sovereignty of another nation might be interfered with by this Court's exercise of jurisdiction, or that there exists another case concerning this controversy elsewhere outside of the United States.

In support of their challenge, Defendants submit the affidavit of Val Sklarov, in which Mr. Sklarov flatly denies the allegations in the Complaint and attests that he does not "exercise dominion and control over Defendants or . . . disregard the separateness of those legal entities to such an extent that these entities are used by me as a mere instrumentality." (Doc. 23-2 at 2–3.) Plaintiffs submitted numerous exhibits in support of their Motion for Preliminary Injunction, as well as their Reply. (*See, generally*, Doc. 6 & Doc. 26.) Accordingly, where the evidence supplied in these declarations (and from other sources) con-

flicts, the Court construes them in the light most favorable to Plaintiff. *Diamond Crystal Brands, Inc.*, 593 F.3d at 1257.

The question is therefore whether, on the basis of these facts and inferences, the Court has personal jurisdiction over the nonresident Corporate Defendants. This requires examination of the Georgia long-arm statute.

**[9]**   The first step in the two-step inquiry under *Diamond Crystal* is to determine whether the exercise of personal jurisdiction is appropriate under the Georgia long-arm statute. *Diamond Crystal*, 593 F.3d at 1257–58. Subsection 1 of the Georgia long-arm statute allows the exercise of personal jurisdiction over a nonresident when he or she "[t]ransacts any business within this state." O.C.G.A. § 9-10-91 (1). Federal courts interpret the long-arm statute literally. *Diamond Crystal*, 593 F.3d at 1264.

**[10]**   There is a three-part test to determine whether long-arm jurisdiction exists under subsection (1). The first part asks whether "the nonresident defendant has purposefully done some act or consummated some transaction in this state . . . ." *Meyn Am., LLC v. Tarheel Distribs., Inc.*, 36 F. Supp. 3d 1395, 1402–03 (M.D. Ga. 2014) (citing *Amerireach.com, LLC v. Walker*, 290 Ga. 261, 269, 719 S.E.2d 489, 496 (Ga. 2011)). The second part examines whether the cause of action "arises from or is connected with such act or transaction," and the third part is whether "the exercise of jurisdiction by the courts of the state does not offend traditional fairness and substantial justice." *See Aero Toy Store, LLC v. Grieves*, 279 Ga. App. 515, 518–519, 631 S.E.2d 734 (Ga. Ct. App. 2006).

**[11]**   The second step of the two-step inquiry under *Diamond Crystal* is to determine whether the exercise of personal jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Diamond Crystal*, 593 F.3d at 1257–58. Due Process considers,

> (1) whether the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice."

*Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339 (11th Cir. 2013) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73, 474–75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *see also Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220–21 (11th Cir. 2009); *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 630–31 (11th Cir. 1996)).

**[12]**   The Court is satisfied that Defendants Bentley Rothschild Capital Limited – St. Kitts and Nevis (BRC SK) and Bentley Rothschild Financial LLC – Wyoming (BRF), transact business in Georgia sufficient to satisfy the long-arm statute, and therefore the Court's exercise of personal jurisdiction over them is proper. The Complaint sufficiently alleges that these companies hold themselves out as doing business and using a trademark in providing financial services from a location in Georgia, and this constitutes transacting business in Georgia within the meaning of O.C.G.A. § 9-10-91(1). The documents submitted by Plaintiffs show that BRC SK and BRC GA, the two entities carrying on

business as "Bentley Rothschild Capital Limited," transact business in Georgia. These include (1) the Website, which offers to supply a broad range of financial services from the U.S. to non-U.S. residents from an Atlanta office (Doc. 27-4), and (2) the Term Sheet, identifying the lender as "Bentley Rothschild Capital Limited, member of Rothschild family of companies" and the Atlanta office as the only U.S. address for "Bentley Rothschild Capital Limited." (Doc. 1-14). Screenshots of the Bentley Rothschild website show that Defendants boast "325 Active Clients" across "6 Headquarters Worldwide" for a "96 Satisfaction Rate." (Doc. 1-11 at 3–4.) Another portion of the website boasts that "BENTLEY ROTHSCHILD is one of the largest infrastructure fund managers globally, having raised more than $10 billion of capital since the inception of the business in 2006." (Doc. 1-13 at 29–30.) The Complaint alleges that the Defendants' allegedly infringing activities have a substantial effect on commerce in the United States, and the materials supplied by the Plaintiffs – materials allegedly created by Defendants – support this claim.

Defendants offered only the affidavit of Val Sklarov to rebut the allegations relating to personal jurisdiction, but the affidavit is merely a series of denials from Mr. Sklarov, and does not tend to disprove any of the allegations in the Complaint. For example, Mr. Sklarov denies that he controls the Defendant companies, or that they all have connections to Georgia, and he says that that Term Sheet was "issued to a citizen of Indonesia residing in Indonesia for Indonesian stock prepared by Bentley Rothschild Capital Limited, a St.

Kitts and Nevis entity and there is no nexus whatsoever to the United States of America." (Doc. 23-2 at 3.) But the Term Sheet itself lists four different office locations under Contacts: Bahamas, Offshore; Nevis, Offshore; USA; and United Kingdom. (Doc. 1-14.) The "USA" address is in Atlanta, Georgia. (*Id.*) Although Defendants want the Court to view the two "Bentley Rothschild Capital Limited" entities as distinct, this document – which is held out to potential customers – clearly combines them.[6] There is no specification on the Term Sheet as to whether the "Bentley Rothschild Capital Limited" entity making this offer is incorporated in St. Kitts and Nevis (as Sklarov claims) or in Georgia (as Plaintiff alleges). What's more, the Term Sheet lists addresses for both locations, indicating strongly that these entities are used interchangeably, and are held out as one and the same. Despite Mr. Sklarov's statement, the nexus between the Term Sheet and the United States of America is clear: the company was, at the very least, holding itself out as doing business from Georgia, among other locations.

The Plaintiffs have provided detailed factual allegations reflecting that BRF is transacting business in Georgia through its agent, Sklarov, who in turn does not dispute he is a resident of Georgia. The Plaintiffs thus have sufficiently alleged that Sklarov took actions on behalf of BRF and BRC SK entities in Georgia as their agent, and therefore this Court may exercise personal jurisdiction over BRF and BRC SK. *See* O.G.C.A. § 9-10-91(1).

**[13]**  The Complaint further sufficiently alleges Defendant Black Rock's transac-

---

**6.**  *Cf. RMS Titanic, Inc. v. Zaller,* 978 F. Supp. 2d 1275, 1291 (N.D. Ga. 2013) ("To justify piercing the corporate veil, 'the plaintiff must show [that] the owner abused the corporate form by disregarding the separateness of legal entities by commingling [funds] on an inter-

changeable or joint basis or confusing the otherwise separate properties, records, or control.'") (quoting *Rasheed v. Klopp Enters., Inc.,* 276 Ga. App. 91, 95 n. 4, 622 S.E.2d 442 (Ga. Ct. App. 2005)).

tion of business in Georgia, through its attempt to register BENTLEY ROTHS-CHILD as a U.S. trademark for financial services virtually identical to those furnished by Plaintiffs under the ROTHS-CHILD Marks. Black Rock is closely associated with the other Defendants over which the Court has personal jurisdiction: its General Counsel, JT Singh, who filed the application to register with the USPTO (Doc. 1-1), also represented Sklarov, BRC SK, and BRF in pre-litigation correspondence with counsel for Plaintiffs (Doc. 1-17), and has appeared as co-counsel for Defendants in this action. (Transcript, Doc. 34 at 3–4). Black Rock seeks to register rights in the BENTLEY ROTHSCHILD mark for use by the Bentley Rothschild entities in U.S. commerce, which they conduct from Georgia. Any use of the BENT-LEY ROTHSCHILD mark by the Bentley Rothschild entities in Georgia inures to the benefit of the claimed owner of the mark, Black Rock. *See* 15 U.S.C. § 1055 ("Where a . . . mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the . . . applicant for registration . . ."). By filing the application and authorizing the business use of the BENTLEY ROTHSCHILD mark in Georgia by the Bentley Rothschild Defendants, Black Rock has transacted business in the state and is subject to personal jurisdiction under O.C.G.A. § 9-10-91(1).

## B. Limited Jurisdictional Discovery Regarding Defendants America 2030 Capital, LLC, and America 2030 Capital Limited is Warranted

[14] In *America 2030 Capital Limited v. Prescient Investment Ltd., et al.*, Case No. 1:18-cv-04875-AT (N. D. Ga. 2018) ("*Prescient*"), a case currently before this Court, a defendant alleged that Sklarov used different corporations with some vari-

ation of the name "America 2030 Capital" (incorporated in either Colorado, Hong Kong, or the United Kingdom) in a "shell game" to falsely create diversity in the litigation. (*Prescient*, D.'s Resp., Doc. 7-1 at 4–5). In a consent order presented to the Court by the parties, counsel for the Plaintiff, America 2030 Capital Limited, acknowledged that Val Sklarov controls the America 2030 Group of companies. (*Prescient*, Doc. 16, at 4–5 ("The Plaintiff [America 2030 Capital Limited - Colorado] and the lender [America 2030 Capital Limited – Hong Kong] are both controlled by Val Sklarov (also known as Vladimir Sklarov) as part of the America 2030 group of companies.").) It is apparent that the America 2030-related Defendants have at least once legally stipulated to the statement that Val Sklarov controls the companies.

The allegations in the Complaint and the Motion for Preliminary Injunction adequately allege that Sklarov controls the Bentley Rothschild group of companies and has created multiple "Bentley Rothschild" companies, similarly to how he has structured the America 2030 group of companies. For purposes of personal jurisdiction, the Court considers all of the Bentley Rothschild companies to be acting as a single enterprise and to transact business in Georgia through their principal agent, Val Sklarov.

The Plaintiffs contend that the America 2030 Defendants have participated in the U.S. activities of the Defendants over which the Court has personal jurisdiction. For example, "America 2030 Capital" is identified as registrant of the domain www.bentleyrothschild.com. (Doc. 1-10.) Defendant America 2030 LLC issued a press release on January 12, 2019, in which it announced "Stock Loan Financing in . . . USA," and that America 2030 LLC "is utilizing Bentley Rothschild Capital Ltd. of

ROTHSCHILD & CO. CONTINUATION HOLDINGS v. SKLAROV    **1395**
Cite as 440 F.Supp.3d 1385 (N.D.Ga. 2020)

Nevis and Bahamas to structure and fund several of its global stock loan transactions. The executives at America 2030 Capital believe that the Bentley Rothschild name will be a major player in structuring and funding publicly traded companies and its major shareholders for years to come." (Doc. 1-15). But the Court finds the foregoing limited facts insufficient to provide a foundation for the Court's exercise of personal jurisdiction over America 2030 LLC and America 2030 Corp. at this time.

**[15, 16]** The Plaintiffs assert that the Complaint adequately alleges facts which support the Court's exercise of personal jurisdiction over all of the Defendants, but the Plaintiffs also sought leave to conduct limited jurisdictional discovery in the event the Court did not find an adequate basis for exercising personal jurisdiction over some of the Defendants. (Doc. 28 at 11 n.3.) A qualified right to take jurisdictional discovery exists where the jurisdictional question is "genuinely in dispute[.]" *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 729 (11th Cir. 1982). In such circumstances, a plaintiff "should be given [the] opportunity to discover facts that would support his allegations of jurisdiction." *Majd-Pour v. Georgiana Cmty. Hosp., Inc.*, 724 F.2d 901, 903 (11th Cir. 1984). Plaintiffs have shown some evidence of concerted interaction between at least one of the America 2030 Capital defendants and the BRC entities, and discovery may show Georgia contacts by the America 2030 Capital defendants sufficient to meet the Georgia long-arm statute's requirements. What's more, in the *Prescient* litigation, the America 2030 group seeks to bring that case in this same Court, stating in the Complaint, "[t]he Plaintiff America 2030 is an international Lending Company incorporated in Colorado but domiciled in Georgia with principal address at 1301 Shiloh Rd, Suite 1231, Kennesaw[,] Georgia, 30144." (*Pres-*

*cient*, Doc. 1 at 1.) Plaintiff in that case further states that jurisdiction is proper in this Court because "the case is international between the Plaintiff, a Corporation domicile[d] in Georgia and . . . foreign corporations domiciled in Hong Kong." (*Prescient*, Doc. 1 at 2.) In that same Complaint, Plaintiff alleges, "[v]enue is proper as [a] substantial transaction regarding this contract was carried out between the Plaintiff and the Defendants in Georgia over the Internet." (*Id.*) The "substantial transaction" referred to in that portion of the Complaint involved emails sent from Val Sklarov concerning the contract in question in that matter. (*See Prescient*, Doc. 21-1 at 11–16 (emails).) As a result of the contradictory or confusing statements regarding the location and organization of America 2030, it is unclear to the Court whether there is any meaningful distinction between the various America 2030 entities, as well as whether the facts as alleged are sufficient for the Court to exercise personal jurisdiction over the America 2030 group of companies.

While Plaintiffs' Complaint does not yet set forth an adequate factual basis upon which the Court can definitively exercise personal jurisdiction over the America 2030 Defendants, the Court finds that jurisdictional discovery is appropriate given the facts currently alleged as well as evidence adduced in Plaintiffs' Motion for Preliminary Injunction.

## III. Conclusion

For the reasons stated above, the Court finds that the Complaint sets forth an adequate factual basis upon which the Court may exercise personal jurisdiction over Defendants Val Sklarov (Georgia), Bentley Rothschild Capital Limited (Georgia), Bentley Rothschild Capital Limited (St. Kitts and Nevis), Bentley Rothschild Fi-

**1396**        **440 FEDERAL SUPPLEMENT, 3d SERIES**

nancial LLC (Wyoming), and Black Rock Capital LLC (Bahamas).

While Plaintiffs' Complaint does not yet set forth an adequate factual basis upon which the Court can definitively exercise personal jurisdiction over Defendants America 2030 LLC, and America 2030 Capital Limited, the Court finds that jurisdictional discovery is appropriate given the facts currently alleged as well as evidence adduced in Plaintiffs' Motion for Preliminary Injunction. The Court therefore **GRANTS** limited jurisdictional discovery in connection with these specific defendants (America 2030 LLC, and America 2030 Capital Limited) for a period not to exceed **sixty (60) days**. No later than **fourteen (14) days** after the conclusion of this jurisdictional discovery period or at any time prior to that date, Plaintiffs **SHALL** file a brief addressing the factual and legal basis for their assertion that jurisdiction over these Defendants (America 2030 LLC, and America 2030 Capital Limited) may be properly invoked in this Court, with supporting record evidence as appropriate. Defendants' response, with record evidence as appropriate, shall be due within **fourteen (14)** days of the filing of Plaintiffs' brief. Plaintiffs' Reply brief is due **ten (10) days** after the filing of Defendants' brief.

**IT IS SO ORDERED** this 13th day of February, 2020.



---

**O'NEAL CONSTRUCTORS, LLC, Plaintiff,**

**v.**

**DRT AMERICA, LLC, Defendant.**

**CIVIL ACTION FILE NO. 1:19-CV-1640-SCJ**

United States District Court, N.D. Georgia, Atlanta Division.

Signed February 14, 2020

**Background:** Contractor brought action against client in state court seeking the confirmation of an arbitration award in favor of sub-contractor and against client in the amount of $650,090, which remained on the award after client made a partial payment. Client removed the case to federal court. Contractor moved to confirm arbitration award and client moved to vacate part of arbitration award.

**Holdings:** The District Court, Steve C. Jones, J., held that:

(1) contractor was a resident of the district in which arbitration took place for purposes of determining what methods of service were appropriate for motion to vacate arbitration award;

(2) contractor did not consent to electronic service of client's motion to vacate arbitration award in contract with client;

(3) even if contractor expressly consented to electronic service, client's e-mail to contractor did not qualify as service of the motion;

(4) client's filing of its application to vacate arbitration award in the district court's docketing software did not constitute valid service upon contractor; and

(5) contractor was not estopped from denying that it had been timely served with notice of client's motion to vacate arbitration award.

# EXHIBIT 26

AMERICAN ARBITRATION ASSOCIATION

AAA Case No. 01-20-0007-5777

BRENT SATTERFIELD V. VAL SKLAROV, AMERICA 2030 CAPITAL, LLC, BENTLEY ROTHSCHILD FINANCIAL LLC, AND BENTLEY ROTHSCHILD CAPITAL LIMITED CORP.



DECISION AND ORDER ON MOTION OF THE UNITED STATES SUPREME COURT OF THE STATE OF NEW YORK

30 April 2022

View the document on jusmundi.com

# Table of Contents

- Decision and Order on Motion of the United States Supreme Court of the State of New York.................................................0
- Background .................................................................................................................................................................1
- Contempt Hearing ......................................................................................................................................................3
- Legal Standard............................................................................................................................................................4
- Discussion ..................................................................................................................................................................5

i

# Decision and Order on Motion of the United States Supreme Court of the State of New York

[1].

Upon the foregoing documents, it is

[2].

In motion sequence number 020, plaintiff Brent Satterfield moves, by order to show cause, for enforcement of this court's November 12, 2021 Decision and Order (Prior Order) (NYSCEF Doc. Nos. [NYSCEF] 449 and 450, Decision and Order [mot. seq. nos. 010 and 011]), and for an order of contempt and sanctions against defendants Val Sklarov, Bentley Rothschild Financial LLC (Rothschild), Bentley Rothschild Capital Limited Corp. (BRCLC), and America 2030 Capital, LLC (A2030C). Specifically, plaintiff seeks an order directing defendants to:

1. Immediately pay to plaintiff the $15,327.58 in interest accrued since the January 3, 2022 Judgment;

2. Immediately pay to Brent Satterfield $39,000 in reimbursement of plaintiff's post-Judgment attorneys' fees;[1]

3. Immediately pay to plaintiff $1,000,000 in damages incurred by plaintiff as a result of the judgment defendants' contempt;

4. Immediately return to plaintiff all of the Shares of CoDiagnostics (NASDAQ: CODX) (the Shares) in the possession, custody, or control, directly or indirectly, of the judgment defendants, including any such shares held at Dolfin Financial (Dolfin) in London (Dolfin Shares) or wherever else they may be, including Shares held at defendant VStock Transfer, LLC (VStock) (VStock Shares);

5. Immediately facilitate, expedite, and, as necessary, execute any paperwork that may be necessary or expedient to effectuate the return of the shares to plaintiff including but not limited to changing the ownership of the shares held at Dolfin from the A2030C U.K entity (or whatever name is holding CODX shares) to plaintiff, instructing the appropriate officials at Dolfin or the Special Administrators in charge of the Dolfin liquidation to transfer the CODX shares to plaintiff's personal account at Stifel, New York; and

6. Immediately provide irrevocable transfer instructions to Dolfin to effect the transfer of ownership and accounts to Brent Satterfield.

(NYSCEF 559, Order to Show Cause [mot. seq. no. 020].)

# Background

---

[1] At the time of this application, "Plaintiff's February bill ha[d] not been finalized, but Plaintiff incurred over $39,000 in attorneys' fees between January 3, 2022 and February 10, 2022. January's final bill was $22,000 ... and so far in February, Plaintiff has incurred another $19,000." (NYSCEF 550, Salisbury affirmation ¶ 18 [Feb. 11, 2022].) Plaintiff has since submitted additional invoices. (NYSCEF 659, Invoices.)

[3].

       The background of this case is set forth in this court's decision of motion sequence number 004 and will not be repeated here except as relevant to this decision finding defendants in contempt of court. (NYSCEF 200, Decision and Order [mot. seq. no. 004].) Sklarov is the principal of and controls all of the defendants. (NYSCEF 418, Final Arbitration Award at 58[2].) The court's reference to Sklarov encompasses all of the defendants.

[4].

       In January 2021, Dolfin informed A2030C, Sklarov's U.K. entity holding the Dolfin Shares, that since it was no longer registered with the U.K. corporate registrar, the shares could be forfeited. (*See* NYSCEF 656, Plaintiff's Exhibit 7, Anne Salisbury Email to all defendants [Jan. 4, 2022] at 21-22.[3])

[5].

       On February 4, 2021, the American Arbitration Association (AAA) Panel directed the parties to put the Shares in escrow at Stifel Trust Company, N.A. (Stifel) to which the parties stipulated on May 20, 2021. (NYSCEF 285, Stipulation.) The stipulation was so ordered by the court on June 8, 2021. (NYSCEF 286, So Ordered Stipulation.) The shares were never transferred.

[6].

       On July 9, 2021, the AAA Panel issued its award directing defendants: (1) to pay plaintiff within 30 days $1,152,538.70 for the improper sale of 905,926 Shares; (2) to return to plaintiff the Shares held at VStock; and (3) to return to plaintiff the Dolfin Shares. (NYSCEF 418, Final Award at 70.) Defendants failed to comply.

[7].

       Dolfin went into insolvency, freezing defendants' account. (NYSCEF 550, Salisbury aff ¶ 8.) On January 4, 2021, plaintiff provided defendants with the paperwork necessary to restore A2030C UK. *(Id.* ¶ 10.) There is no evidence before the court that defendants paid the franchise tax to avoid forfeiture before or after Dolfin went into insolvency or took any steps to release the Dolfin Shares to plaintiff.

[8].

       On November 21, 2021, the court ordered defendants to
"immediately return to Plaintiff Brent Satterfield all of the First Tranche of shares in the possession, custody, or control, directly or indirectly, of [the Judgment Defendants] including such shares held at Dolfin Financial in London or wherever else they may be and to immediately facilitate, expedite, and, as necessary, execute any paperwork that may be necessary or expedient to effectuate the return of said shares to said plaintiff."

       (NYSCEF 449, Prior Order [mot. seq. no. 010].)

[9].

---

[2] Pages refer to NYSCEF generated pagination.

[3] Plaintiff is reminded to file each exhibit separately in NYSCEF, as by doing so, each of plaintiff's exhibits are assigned their own electronic docket number. Plaintiff must also identify the internal exhibit number and describe the exhibit when uploading each exhibit separately. Failure to do so will result in delay.

View the document on jusmundi.com                    2

On February 14, 2022, the VStock Shares were returned to plaintiff as a result of plaintiff's efforts to get a court order. (NYSCEF 536, So Ordered Stipulation [mot. seq. no. 015].)

[10].

On February 25, 2022, Jaitegh Singh, Esq., filed a notice of appearance as counsel to defendants when all other counsel to defendants asked to be relieved. (NYSCEF 581.)

[11].

On February 26, 2022, Singh received Sklarov's subpoena. (NYSCEF 592.) While there were motions to quash other subpoenas, including a subpoena on Singh, defendants failed to make such a motion. *CVL Real Estate Holding Co., LLC v Weinstein,* 74 AD3d 565, 566 [1st Dept 2010] [when defendant refused to appear in court in response to plaintiff's motion to hold defendant in contempt, the court found proper service where defendant failed to move to quash the subpoena].)

[12].

On March 2, 2022, Singh, executed a stipulation with plaintiff, so ordered on March 21, 2022, reiterating the court's Prior Order that plaintiff is the rightful owner of the Dolfin Shares and agreeing that the Shares should be returned to plaintiff. (NYSCEF 640, So Ordered Stipulation.) To date, the Dolfin Shares have not been returned to plaintiff.

## Contempt Hearing

[13].

On February 14, 2022, the court directed the parties to appear for argument on this motion for contempt on February 17, 2022 and scheduled an in-person hearing on contempt for March 4, 2022. (NYSCEF 560, Order to Show Cause.) On March 2, 2022, at 4:11 p.m., Sklarov's counsel filed an affirmation saying that his client could not appear for the contempt hearing against him. (NYSCEF 599, Singh aff ¶ 4.) The court rejected counsel's affirmation as counsel failed to disclose the whereabouts of his client and had no personal knowledge of any factual assertions in his affirmation. On March 3, 2022, at 9:11 am, Sklarov filed an affidavit allegedly notarized by a notary in Butler County, Pennsylvania on March 3, 2022. (NYSCEF 609, Sklarov affidavit [Mar. 3, 2022].) Again, without disclosing his whereabouts, Sklarov claimed to be too busy to appear because of the war in Ukraine. (*Id.)* In his affidavit, Sklarov additionally represented to the court that "[i]n an effort not to prolong this matter indefinitely, I am willing to appear via video conference at any future date and time which this Court determines is acceptable with the exception of this Friday, March 4, 2022." (*Id.*)

[14].

On March 3, 2022, the court granted Sklarov's request, noted the Pennsylvania notarization, and adjourned the in-person contempt hearing to April 1, 2022 at 10:00 a.m. (NYSCEF 620, Order.) Next, the court was informed that Sklarov was not in Pennsylvania and his attorney had no idea where he was located. (*See* NYSCEF 621, Order.) The court then immediately ordered Sklarov to disclose his location so the court could determine if his affidavit was valid. (*Id.*)

[15].

Pursuant to court's order, in a March 4, 2022 affidavit, Sklarov claimed to be in the Maldives. (NYSCEF 622, Sklarov aff [Mar. 4, 2022].) His affidavit was again notarized in Pennsylvania with no indication that the notary knew where Sklarov was or whether the notarization complies with the law where Sklarov was purportedly located. Pennsylvania notary law allows Pennsylvania notaries to notarize individuals even if the individual is not presently in Pennsylvania. (57 Pa Stat Ann § 306.1 [b] [4] [ii].) However, the Pennsylvania law is contingent on the law where the individual is located; the notarization must be consistent with the law in that jurisdiction. (*See id.*) There is no evidence before this court that the Pennsylvania notary complied with the law of the Maldives, if that is actually where Sklarov was located. Indeed, there is no indication that the notary knew where Sklarov was at the time of the notarization to comply with the strictures of Pennsylvania law; this is accentuated by the admission that Sklarov's own attorney had no idea where he was. Further, Sklarov has failed to provide the court with any proof demonstrating that the notarization is consistent with the law of the Maldives or proof that Sklarov was actually located there. Accordingly, the court finds the documents (NYSCEF 609 and 622), to be unsworn and unreliable.

[16].

In a March 23, 2022 email to the court, Sklarov's counsel informed the court that Sklarov would not be appearing at the contempt hearing against him on April 1, 2022 either because he had allegedly complied with the court's Prior Order and returned the shares, which was not true, or because his family was in Ukraine, though Sklarov's whereabouts were again undisclosed.[4] On March 25, 2022, the court agreed to Sklarov's virtual appearance on April 1, 2022. At the hearing, Sklarov failed to appear virtually; this failure to appear not only constituted his default, but also another instance of contempt of court.

[17].

After the court found Sklarov in default, and on April 4, 2022 at 1:45 p.m., Sklarov contacted the court by email to object to any penalty for the default and finding of contempt. Again, Sklarov failed to offer any proof as to his whereabouts.

## Legal Standard

[18].

Under the Judiciary Law, the court has the power to punish a party for contempt by fine, imprisonment, or both. (Judiciary Law § 753 [A][3].) Under CPLR 5104, any "final judgment or order ... may be enforced by serving a certified copy of the judgment or order upon the ... person required ... to obey it and, if he refuses or wilfully neglects to obey it, by punishing him for a contempt of the court." The purpose of civil contempt is "the vindication of a private right of a party to litigation and any penalty imposed upon the contemnor is designed to compensate the injured private party for the loss of or interference with that right." *(McCormick v Axelrod,* 59 NY2d 574, 583 [1983].) Judiciary Law § 773 authorizes the Court to impose a fine on the contemnor for the civil contempt for an amount that is sufficient to indemnify the aggrieved

---

[4]  Counsel is directed to file all emails with the court in NYSCEF, including emails sent to the court on March 3, 2022 and on April 4, 2022.

party. (*Id.*) The contemnor is entitled to an opportunity to purge himself of the contempt within ten days after service of the order. (*Id.*; *Davidowitz v Hamroff,* 196 Misc 209 [Sup Ct, Kings County 1949] [service on attorney for a party suffices; personal service is required for a nonparty].) The contemnor may be committed to prison until the fine, plus costs and expenses, is paid or until he is discharged according to law. (Judiciary Law § 773.) When the contemnor willfully refuses to make a court-ordered payment, incarceration as a coercive remedy is justified. *(Melanie C. v Carlo B.,* 192 AD3d 624, 624 [1st Dept 2021] [father who willfully violated his child support obligations could be incarcerated up to six months or suspension of commitment].) The imprisonment ends with the performance of the act and the payment of the fine. (Judiciary Law § 774 [1]; *N.A. Dev. Co. Ltd. v Jones,* 99 AD2d 238, 240 [1st Dept 1984].) "Where it is in the power of the offender to perform the act directed, it is immaterial that he may be imprisoned for a long time, for he has it in his power to perform the act ordered." (*Id.*) If the imprisonment is indefinite or for more than three months, the imprisoned contemnor must be brought before the sentencing judge at least once every 90 days to determine whether the offender should be discharged from prison. (Judiciary Law § 774 [2].) Finally, "subsequent obedience does not discharge liability for previous disobedience" or the damage caused by each contempt. *(Root v Conkling,* 108 Misc 234, 235 [Sup Ct, Otsego County 1919], *aff'd* 199 AD 90 [3d Dept 1921].)

# Discussion

[19].

At the hearing on April 1, 2022, plaintiff established by clear and convincing evidence the elements necessary for a finding of civil contempt under Judiciary Law § 753(A)(3). "First, 'it must be determined that a lawful order of the court, clearly expressing an unequivocal mandate, was in effect.'" *(El-Dehdan v El-Dehdan,* 26 NY3d 19, 29 [2015] [citation omitted].) This is an action for fraud in which plaintiff has, since 2018, sought return of the Shares he pledged for an alleged loan. (*See* NYSCEF 130, Complaint.) Since February 4, 2021, defendants have been ordered to transfer the shares either to escrow or to plaintiff; the orders are all simple and could not be clearer. (*See* NYSCEF 286, Stipulation; NYSCEF 418, Final Award; NYSCEF 449, Decision and Order [mot. seq. no. 010; NYSCEF 450, Decision and Order [mot. seq. no. 010].)

[20].

"Second, '[i]t must appear, with reasonable certainty, that the order has been disobeyed.'" *(El-Dehdan v El-Dehdan,* 26 NY3d 19, 29 [2015]) [citation omitted].) The VStock Shares were not transferred to plaintiff until February 14, 2022, in excess of three months from issuance of the court's Prior Order, while the Dolfin Shares have never been returned to plaintiff. Likewise, the damage award of $1,152,538.70 remains unpaid and there is no claim of indigence. Indeed, there is some evidence that defendants have upwards of $80 million and a line of credit for $150 million. (NYSCEF 454, Salisbury tr at 29:6, 30:18 [mot. seq. nos. 010 and 011] [referencing defendants' testimony at the arbitration].)

[21].

Defendants made it crystal clear that they had the ability to comply with the court's order but chose not to after plaintiff refused to capitulate to defendants' demand cloaked as a "confidential

settlement offer." On January 6, 2022, counsel to defendants emailed plaintiff threatening to file for bankruptcy and offered to comply with the court's Prior Order by transferring the VStock Shares "without delay" to plaintiff in exchange for defendants keeping the Dolfin Shares. (NYSCEF 656, Plaintiff's exhibit 24 at 63.) CPLR 4547, the provision governing the admissibility of compromise and offers to compromise, states that "[e]vidence of (a) furnishing, or offering or promising to furnish, or (b) accepting, or offering or promising to accept, any valuable consideration in compromising or attempting to compromise a claim *which is disputed as to either validity or amount of damages,* shall be inadmissible as proof of liability for or invalidity of the claim or the amount of damages." (Emphasis added.) Critically, the language of CPLR 4547 imposes the requirement that the claim must be in dispute, as to validity or amount of its damages. A settlement negotiation or offer to settle a claim that is not disputed, either as to its validity or amount of damages, is thus admissible. *(Java Enters. v Loeb, Block & Partners LLP,* 48 AD3d 383, 384 [1st Dept 2008].) Here, the claim is <u>unequivocally</u> not in dispute because of the parties' Stipulation, (NYSCEF 286), AAA Panel's Final Award, (NYSCEF 418), and this court's Prior Order (NYSCEF 449; NYSCEF 450). The email is admissible. The mere inclusion of the words "settlement negotiation," or variations thereof, do not make it an offer to compromise barred by CPLR 4547. *(Nineteen Eighty-Nine, LLC v Ichan,* 96 AD3d 603, 607 [1st Dept 2012].) Here, it matters not that defendants' counsel included a disclaimer at the bottom of his email which stated in part: "This correspondence is directly related to settlement negotiations and, as such, any and all information contained herein is protected." The inclusion of this superfluous disclaimer is ineffective and contrary to law.

[22].

"Third, 'the party to be held in contempt must have had knowledge of the court's order.'" *(El-Dehdan v El-Dehdan,* 26 NY3d 19, 29 [2015].) Defendants had knowledge of the court's order and the ability to comply; defendants have been represented by counsel throughout this entire proceeding. The court's orders are publicly filed in NYSCEF. As to the VStock Shares, defendants did nothing to comply with the orders despite at least six emails from plaintiff requesting assistance. (NYSCEF 656, Plaintiff's Exhibits at 34, 38-61.) As to Dolfin, the alleged settlement offer confirms that defendants understood the orders. (*Id.* at 63 ["Clients propose that the shares held at V-Stock would be transferred to Mr. Satterfield without delay and my clients will cooperate in any sort of way necessary to help expedite that transfer. In return, Mr. Satterfield relinquishes the right to any of the shares at Dolfin in the UK, which would be retained by clients."]; *see also* NYSCEF 569, Singh email to Salisbury [Feb. 16, 2022] ["I've been able to reach the client for a short period. He's agreed to cooperate on a vstock and dolphin."].) And, for what it is worth, Sklarov's affidavit (NYSCEF 609, Sklarov aff [Mar. 3, 2022]), demonstrate that he is fully aware of the court's Prior Order and that there was a contempt hearing for his disobedience.

[23].

"Fourth, 'prejudice to the right of a party to the litigation must be demonstrated.' *(El-Dehdan v El-Dehdan,* 26 NY3d 19, 29 [2015] [citation omitted].) Since the order issued, the price of the Shares has plummeted, fluctuating from a $8.67 (close price on November 22, 2021) to $4.68 (open price on April 25, 2022). Over the last year, the stock has ranged from a high price of $11.82 and to a low price of $4.66.[5]

[24].

---

[5]  This is publicly available information, available at https://finance.yahoo.com/quote/CODX/.

The court heard testimony from plaintiff and Anne Salisbury, plaintiff's attorney, who both testified credibly. The court directed Sklarov to appear on March 4, 2022, and adjourned the March 4, 2022 proceeding, at Sklarov's request, to April 1, 2022. Again, Sklarov was ordered to appear in person, but failed to do so.[6] "[A] party may be held in contempt upon his default in appearing at the contempt hearing." (*See Green v Green,* 288 AD2d 436 [2d Dept 2001] [holding failure to appear at a contempt hearing, resulting in a default, also constitutes a waiver of any due process rights].) The facts of this case are analogous to the facts presented in *CVL Real Estate Holding Co. v Weinstein.* (74 AD3d 565, 565 [1 st Dept 2010].) There, a judgment debtor was found in contempt and an arrest warrant issued after the judgment debtor failed to comply with prior court orders and failed to appear at his contempt hearing even though his counsel was present. (*Id.* [affirming trial court order granting contempt motion and directing a warrant for arrest and finding no violation of due process].)

[25].

"The right to arrest in a civil action is a drastic remedy, regarded as penal in nature. Owing to the severity of the relief, the courts do not look with favor upon its pursuit, except where it is necessary to protect the interests of plaintiff." *(Burns v Newman,* 274 AD301, 302 [1st Dept 1948] [citations omitted].) The court in *Burns* opined that the requisite necessity could be found when the plaintiff has suffered damage by reason of defendant's false representations in a case involving claims for loss of property by false representation. (*Id., citing Peterson v* Kirby, 192 AD 707 [1st Dept 1920].) Here, Sklarov's utter disregard and contempt for this court could not be any clearer. Plaintiff has been damaged, maybe even irreparably damaged as evidenced by the difference in share price from November 22, 2021 until today. Sklarov shall have five (5) business days to comply with the Prior Order, or no later than May 3, 2022 at 12 noon EST. If he fails to comply, a warrant will issue. A daily financial penalty would be ineffectual based on this record. Sklarov shall be incarcerated until such time as the Shares are transferred.

[26].

Plaintiff's request for attorneys' fees and expenses is denied without prejudice for failure to explain the services provided and failure to file an affirmation of services. There was no explanation as to why the court should grant attorneys' fees related to work performed in connection to opposing motions to withdraw as counsel. (*See e.g.,* NYSCEF 659, Invoices at 3 ["1/ 25/2022 AWS Prepared and served opposition to counsel withdrawal."].)

[27].

Accordingly, it is
ORDERED that plaintiff's motion for an order adjudicating defendants Val Sklarov, Bentley Rothschild Financial LLC, Bentley Rothschild Capital Limited Corp., and America 2030 Capital, LLC, in civil contempt is granted; and it is further

ORDERED that plaintiff is directed to submit the April 1, 2022 transcript to be so ordered; and it is further

ORDERED that defendants' disobedience has defeated, impaired, impeded and prejudiced plaintiff's rights under the court's Prior Order dated November 12, 2021 and subsequent orders,

---

[6] In addition to the court having personal jurisdiction over the parties, Sklarov and his entities were also served with subpoenas or service was attempted at last known addresses. (NYSCEF 592, Salisbury email [Feb. 26, 2022].)

and the misconduct of the defendants is further found to have consisted of an omission to perform an act or duty which it was within defendants' power to perform and plaintiff has no alternative effective remedies available; and it is further

ORDERED that defendants are held in Civil Contempt and are directed within five business days of this order to purge the contempt, such period ending on May 6, 2022 no later than 12 noon EST, by immediately returning to plaintiff all of the CODX shares in the possession, custody, or control, directly or indirectly, of the defendants including such shares held at Dolfin Financial in London or wherever else they may be and to immediately facilitate, expedite, and, as necessary, execute any paperwork that may be necessary or expedient to effectuate the return of said shares to said plaintiff; and it is further

ORDERED in the event defendants fail to comply with this order to purge, within five business days, such period ending on May 6, 2022 no later than 12 noon EST, a civil arrest warrant shall issue for Sklarov's arrest; and it is further

ORDERED that if defendants fail to comply, then plaintiff shall submit an affidavit to the court by email and filed in NYSCEF and a warrant of arrest shall issue; and it is further

ORDERED that any relief not expressly addressed has nonetheless been considered and is denied without prejudice; and it is further

ORDERED that plaintiff shall submit an affirmation detailing the services performed and identifying all timekeepers including brief descriptions of their jobs and level of experience on NYSCEF and by email (SFC-Part48@nycourts.gov) within ten days of this order.

DATE 4/30/2022

# EXHIBIT 27

# EXHIBIT 16


SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X     Index No.: 650311/2019

BRENT SATTERFIELD,

                                        Plaintiffs,                **COMPLAINT**

                - against –

VSTOCK TRANSFER, LLC, AMERICA 2030 CAPITAL,
LLC, (a/k/a BENTLEY ROTHSCHILD
CAPITAL LTD CORP.), BENTLEY ROTHSCHILD
CAPITAL LTD CORP., AMERICA 2030 CAPITAL,
LIMITED, BENTLEY ROTHSCHILD INVESTMENTS,
XYZ CORPORATION (1-10 fictitious names), and VAL
SKLAROV,

                                        Defendants.

-------------------------------------------------------------------X

Plaintiff Dr. Brent Satterfield ("Satterfield" or "Plaintiff"), by and through his counsel,

Guzov, LLC, as and for his complaint against the above-named defendants, states as follows:

<u>**Introduction**</u>

1.      This action seeks redress for an increasingly prevalent form of fraud:  a Stock

Loan Fraud.  In this form of fraud, an individual owning shares in a corporation is induced to

pledge those shares as collateral for a loan.  Rather than making the loan, however, the purported

"lender" immediately sells the pledged collateral and pockets the proceeds, leaving the

"borrower" with neither cash nor shares.

2.      This is precisely what befell Satterfield in this case.  Defendant Val Sklarov,

together with Sklarov's corporate affiliates, defendants America 2030 Capital, LLC ("America

2030"), America 2030 Capital, Limited ("America 2030 Limited") Bentley Rothschild Capital

Ltd. Corp. ("Bentley Rothschild"), Bentley Rothschild Investments, ("BR Investments")

(collectively the "Sklarov Corporate Defendants" and with Sklarov, the "Sklarov Defendants"),

1

each participated in a scheme to defraud Satterfield by convincing him to pledge over 2 million shares in non-party Co-Diagnostics, Inc. ("Co-Diagnostics") (the "Shares") as security for a loan of up to $3.5 million.

3. Of course, the Sklarov Defendants never had any intention of making a loan to Satterfield: their only goal was to obtain control over Satterfield's Shares and sell them as soon as they possibly could. The Sklarov Defendants proceeded to do exactly that, and in fact began to sell the purported "collateral" before providing Satterfield with a penny in "loan" proceeds. All told, the Sklarov Defendants realized over $1.1 million in proceeds from sales of the shares, while providing Satterfield with only $66,709.00 of his "loan."

4. Satterfield brings this action for injunctive relief against defendant VStock Transfer, LLC, the transfer agent used by the Sklarov Defendants, to obtain control over the remainder of his Shares. Satterfield also seeks damages based on fraud and conversion against each of the Sklarov Defendants, as well as, in the alternative, rescission of his purported loan agreements.

## The Parties

5. Plaintiff Dr. Brent Satterfield is a natural person residing in Wichita County, Texas. He is the Chief Technology Officer of non-party Co-Diagnostics, a publicly traded company which provides molecular diagnostic tools for use in the medical and agricultural industries.

6. Defendant Val Sklarov ("Sklarov") is a natural person who, on information and belief, resides in Chicago Illinois.

7. Defendant America 2030 is a limited liability company organized and existing under the laws of the State of Colorado with offices located in Kennesaw, Georgia. Defendant

2

America 2030 represents itself on LinkedIn.com as maintaining an office on 48th Street, New York, NY.

8.      On information and belief, Defendant America 2030 Limited is a corporation organized and existing under the laws of the country of St. Kitts & Nevis.

9.      Defendant Bentley Rothschild. is a corporation organized and existing under the laws of the country of St. Kitts & Nevis.

10.      On information and belief, Defendant BR Investments is a corporation organized and existing under the laws of the country of St. Kitts & Nevis.

11.      Defendant VStock Transfer, LLC, is a limited liability corporation organized and existing under the laws of the State of Delaware with its principal offices located in Woodmere, New York.

12.      On information and belief, Sklarov exercises dominion and control over America 2030, America 2030 Limited, Bentley Rothschild, and BR Investments, and disregards the corporate form of those entities to such an extent that the independent existence of those entities should be disregarded, and the corporate veil pierced, rendering Sklarov personally liable for acts purportedly undertaken through such corporate entities.

13.      Defendants XYZ Corp. 1-10 are corporations, limited liability corporations, partnerships, or limited partnerships who are owned or controlled by one or more of Sklarov or the Sklarov Defendants.  At present, Plaintiff is unable to provide additional details concerning the identity or existence of these fictitious defendants, but expects to be in a position to do so in the future, and at that time will amend or supplement this Complaint.

**Jurisdiction and Venue**

14.      The amount in controversy in this action exceeds the jurisdictional minimum

3

required for subject-matter jurisdiction in this Court.

15.    This Court has personal jurisdiction over defendant Sklarov pursuant to CPLR 302(a) (2) based upon his commission of tortious acts within the State of New York.

16.    This Court has personal jurisdiction over defendants, VStock, and America 2030 based upon CPLR 301, in that such defendants are present within this State.  In particular, America 2030 maintains an office for the conduct of its business on 48th Street in Manhattan, and defendant VStock maintains its principal place of business at 18 Lafayette Place, Woodmere, NY.

17.    This Court may exercise personal jurisdiction over the remaining defendants other than Sklarov, America 2030, and VStock because such remaining defendants participated, along with Sklarov, and America 2030, in a conspiracy to defraud Plaintiff.  Each defendant committed particular acts in furtherance of the conspiracy as set forth in detail below.

18.    This Court may exercise in rem jurisdiction based upon CPLR 314 over that portion of Plaintiff's Shares (as defined below) which are in the custody of VStock within the State of New York, including without limitation entering judgments against any Defendant adjudicating such Defendant's right, title and interest to the Shares held by VStock.

19.    Venue is proper in this county pursuant to CPLR based upon CPLR 503 because defendant America 2030 maintains an office in New York county, and because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in New York county.

## **Statement of Facts**

### **Plaintiff Is Introduced to Defendant Sklarov**

20.    Plaintiff is a resident of Wichita Falls, Texas. He is the Chief Technology Officer

Case, Case 1:20-cv-03987     Document 1-16     Filed 06/03/24     Page 167 of 270

of Co-Diagnostics.

21.     On or about July 12, 2017, Co-Diagnostics became a publicly traded company,
traded on the NASDQ Exchange in New York. As part of the initial public offering of Co-
Diagnostics, Plaintiff received approximately 2 million restricted shares.  As required by federal
securities regulations, these shares were restricted from being traded, and bore legends to that
effect.

22.     During the restricted period Plaintiff could not sell any Shares. However, it was
brought to his attention that it was possible to obtain a loan using those shares as collateral if he
required cash flow while the Shares were restricted.

23.     Plaintiff was introduced to a "finder" in New York City, non-party Leib Schaeffer,
who then introduced Plaintiff to defendant Sklarov. Sklarov told Plaintiff he was the head of a
company named America 2030 Capital, LLC, located in Georgia, but with offices in New York
City.

24.     Plaintiff personally dealt extensively with Sklarov, who claimed to be connected
with America 2030's New York City office on 48th Street.  Sklarov would often refer to America
2030 and other Sklarov Corporate Defendants as a "Wall Street Firm."

25.     When Plaintiff began dealing with Sklarov, he did not know that Sklarov had
been convicted of Medicare fraud and money laundering, and had served time in federal prison.
Nor was Plaintiff aware that the Sklarov Defendants were being sued by other individuals and
corporate entities claiming to have been defrauded in connection with stock loan transactions.
Had Plaintiff been aware of these facts, he would not have dealt with Sklarov.

5

Case 1:20-cv-06274-BAF Document 1-16 Filed 08/05/24 Page 168 of 270

**Defendants' Fraudulent Scheme**

26.     In the spring of 2018, Sklarov's proposal was as follows: his company, America 2030 would loan Plaintiff up to $1.5 million which was later revised to be up to $3.5 million. This money could be repaid over the course of a five-year period. The first interest payment would be due three months after the loan funded. As security for this loan, Plaintiff would use the Shares, which were worth over $7 million at that time.  The Shares were, at that time, still with the transfer agent, defendant VStock, because they were still restricted.

27.     During emails and telephone calls in the spring of 2018, Defendant Sklarov made a variety of representations to Plaintiff in order to induce him to pledge his shares as collateral. These representations are also summarized on America 2030's website, as follows:

- Annual interest of only 4%-6%.
- Loan to Value (LTV) up to 80% of value of stock.
- The stock shares are kept in a bank custodian account in your home country.
- The stock shares are never short traded, sold, reassigned, transferred or traded.
- The stock shares remain in the name of company or client in local custodian bank.
- Loan will be closed in borrower's country and funds can be disbursed in any currency and free to be transferred anywhere. No restriction whatsoever on use of funds.
- No borrower requirement. Securities are the collateral. Loan is against stock & securities, not borrower.
- Loan proceeds to be used for any purpose and not restricted in any way.
- No ownership transfer of stock or securities.
- Dividends are paid to stock & securities owner because owner is still official owner of record.
- Simple interest is paid quarterly.

28.     On or about March 30, 2018, and in reliance on these representations, Plaintiff, without the assistance of an attorney, executed a document provided by Sklarov entitled "Master Loan Agreement," (the "MLA"). When Plaintiff asked if he needed an attorney, Sklarov said it was a simple, standard loan document, that his firm relied on their international reputation, and there is no need to consult an attorney.

29.     Plaintiff relied upon defendant Sklarov for assistance in completing the MLA and

6

related documents. For instance, Plaintiff completed America 2030's "Know Your Customer"

application. When filling out the "Know Your Customer" form, Plaintiff continually expressed

his lack of understanding of securities terms and regulations. Plaintiff was instructed to just fill

out his name, and America 2030 or non-party Schaeffer would "work on the missing pieces of

the forms."

30.     On or about March 9, 2018 before filling in the Know Your Customer booklet,

Plaintiff called non-party Schaeffer to ask questions about how to fill in the information.

Schaeffer again indicated what he told Plaintiff on or about March 6 – that the stock would be

free-trading by the time the loan was done, and that Plaintiff should so indicate on the Know

Your Customer form.

31.     Plaintiff also reminded Sklarov that the "freely tradeable" shares mentioned in 4.2

of the MLA were still paper certificates in need of a legal opinion to be tradeable, which legal

opinion may or may not be complicated by the fact that Plaintiff was a 10% shareholder, officer,

and director of Co-Diagnostics. Sklarov said it was not a problem and that the language was just

a legal formality; the shares would be freely tradeable before the loan was finalized

32.     Subsequently Mr. Sklarov provided Plaintiff with several Addenda to the MLA.

The first Addendum changed the form of the transaction from a transfer of shares, to a pledge, as

is required by the restrictive legend on the shares.

33.     No matter what the designation, ownership of Plaintiff's shares were never to be

actually transferred to any Defendant- that would not have even be possible, as the Shares were

restricted. They were to be held as collateral for the loan reflected in the MLA.

34.     Under the Sklarov Defendants' fraudulent scheme, approximately half of

Plaintiff's shares would have become freely tradeable on or around December 11, 2018, and the

7

other half on or around January 17, 2019. As the first half of Plaintiff's Shares were set to go unrestricted in December 2018, Plaintiff started hearing from Sklarov in late November. Sklarov pressured Plaintiff for help in removing the transfer restrictions on the Shares, explaining that he could not fund the "loan" without doing so. Plaintiff was unfamiliar with the loan process, and Sklarov represented that this was a procedural requirement.

35.     Whenever Plaintiff inquired about the loan process, his inquiries were met with threats. In particular, in late 2018, Sklarov began to threaten to sell half of Plaintiff's shares if Plaintiff did not sign additional addenda to the MLA.

36.     Plaintiff told non-party Schaeffer that he did not like the threatening way Sklarov was starting to conduct business and that there was no way Plaintiff was going to agree to Sklarov's requests if Plaintiff was going to have to sue to get half of his stock back in two weeks. Schaeffer said that Plaintiff should call Sklarov directly.

37.     In a phone call with Sklarov, Plaintiff repeated to Sklarov what he told Schaeffer and said that he saw no reason to execute the requested addenda. Sklarov said he needed to make the changes for administrative reasons. He then asked if Plaintiff was worried about being screwed out of his stock in two weeks, and said that if they were going to screw Plaintiff, they would have done it six months ago, as they had had the Shares this whole time. In effect, Sklarov was telling Plaintiff that the Sklarov Defendants were trustworthy since they had access to his shares and had not "yet" stolen them. Sklarov then added the implicit threat that Plaintiff was already in default because the Shares were not free-trading. Plaintiff protested, reminding Sklarov that both he and Schaeffer knew that the stock was not free-trading and had promised they could get it to be free-trading. Sklarov eventually promised to make changes to the addenda, and Plaintiff agreed to execute them.

8

Case 1:20-cv-03482-RA    Document 60    Filed 08/23/24    Page 171 of 270

## The Purported "Closing" and Defendants' Sales of Shares Prior Thereto

38.     The supposed transaction at issue had a projected "closing" date of December 15, 2018, on which date Plaintiff signed documents purporting to be closing documents. Prior to the "closing," Plaintiff arranged to have the Shares transferred to what he assumed to be an escrow account, in preparation for the "closing".

39.     On or about December 11, 2018, Sklarov notified Plaintiff by email that the legend had been removed from the Shares used as the collateral for the loan.

40.     Between about December 13, 2018 (on or about the date the restriction on the first half of the Shares was removed and the shares reached the broker) and December 27, 2018 (the date the Defendants sent Satterfield their Notice of Default, discussed more fully herein below), and thus a period of only about two weeks, the price of Co-Diagnostics shares dropped precipitously, from $2.18 to $1.15.  This is a nearly 50% drop.  The company's stock is thinly traded and has shown volatility in the past, but this type and magnitude of a price drop was wholly unprecedented.  However, unbeknownst to Plaintiff, the decline in price was being caused by the Sklarov Defendants' sales of his collateral.

41.     On or about December 17, 2018, America 2030 countersigned the "Closing Statement and Addendum" form.  Plaintiff, having played no part in the drafting of that document and at this point being unaware of the fraud scheme that was being perpetrated, signed the closing documents and awaited funding of the loan.

42.     On December 26, 2018, Plaintiff received a "First Disbursement Statement" dated December 25, 2018 from America 2030.  The Statement indicated that America 2030 was providing a "Disbursement Amount" of $100,000, but had deducted fees, expenses and interest of $33,291. This left a "Balance Payment Due to Borrower" of $66,709. A wire transfer for this

9

Case 1:20-cv-06400-AKH   Document 41-60   Filed 08/23/2024   Page 172 of 270

token amount was sent to Plaintiff.

43.     The next day, only just over a week after the "closing", on or about December 27, 2018, America 2030 Limited sent Plaintiff document dated December 27, 2018 entitled "Margin Call." In it, the Defendants demand a "top-up" of their collateral under the MLA based on the share price for the Co-Diagnostics stock having fallen to below $1.50 per share over the previous three trading days, i.e., December 21, 24 (Christmas Eve) and 26 (the Day after Christmas Day). Unbeknownst to Plaintiff, Defendants had caused this price drop by dumping the Shares, thereby manipulating the stock price, during the prior weeks.

44.     The details and timing of this critical period reveal that the Defendants had meticulously planned and timed this fraud scheme and their execution of it.

45.     After receipt of third-party discovery, Plaintiff now knows that the Defendants actually took and sold the Shares before the purported closing even took place, and before a single cent was loaned to Plaintiff.  Plaintiff also knows that the Sklarov Defendants continued to sell the shares, even after Plaintiff expended enormous effort and resources to get a preliminary injunction in this case.

46.     On information and belief, the drop in the price of Co-Diagnostics shares to below $1.50 was caused, in whole or in part, by the Sklarov Defendants' sales of the Shares.

47.     Records subpoenaed in connection with this action from Bank of NY show that the 2030 Defendants actually took, and sold, 10,760 shares on December 13, 2018 (for $23,120.24) and 28,900 shares on December 14, 2018 (for $58,447.93)—days before the "closing" was supposed to take place.

48.     They continued selling on almost every trading day since then in ever increasing manner:

Case 1:20-cv-03389-AKH Document 4-60 Filed 08/12/2024 Page 172 of 270

| Trade Date | Principal Amount | Shares/Par | Local Price |
|---|---|---|---|
| 12/13/2018 | 23,120.24 | -10,760.00 | 2.1509 |
| 12/14/2018 | 58,447.93 | -28,800.00 | 2.0315 |
| 12/17/2018 | 18,193.90 | -9,434.00 | 1.9305 |
| 12/18/2018 | 9,118.75 | 5,000.00 | 1.8256 |
| 12/19/2018 | 8,852.02 | -5,000.00 | 1.7722 |
| 12/20/2018 | 8,219.16 | -5,000.00 | 1.643832 |
| 12/21/2018 | 7,520.97 | -5,000.00 | 1.5057 |
| 12/27/2018 | 5,660.07 | -4,100.00 | 1.3854 |
| 12/28/2018 | 6,231.42 | -5,000.00 | 1.2503 |
| 1/2/2019 | 10,243.03 | -7,521.00 | 1.3646 |
| 1/4/2019 | 36,653.75 | -29,341.00 | 1.2505 |
| 1/3/2019 | 38,774.69 | -30,000.00 | 1.2938 |
| 1/7/2019 | 49,065.09 | -40,810.00 | 1.2022811 |
| 1/8/2019 | 61,917.21 | -50,000.00 | 1.2396 |
| 1/8/2019 | 52,672.29 | -43,705.00 | 1.2064 |
| 1/10/2019 | 31,722.59 | -26,311.00 | 1.2069 |
| 1/11/2019 | 64,580.08 | -57,249.00 | 1.1292 |
| | | - | |
| 1/14/2019 | 323,585.71 | 246,416.00 | 1.3145 |
| 1/15/2019 | 74,082.70 | -64,761.00 | 1.1451 |
| 1/16/2019 | 77,697.76 | -71,982.00 | 1.0805 |
| **1/18/2019** | **41,478.34** | **-37,315.00** | **1.1127** |
| 1/17/2019 | 68,662.66 | -62,100.00 | 1.1068 |
| **1/22/2019** | **76,038.34** | **-70,321.00** | **1.0824** |
| | $1,152,538.70 | -905,926 | |

49.     The trades indicated in red on the above chart were initiated *after* this Court granted temporary restraining orders against America 2030 and Bentley Rothschild enjoining them from further sales of the Shares.

50.     So far, the Sklarov Defendants have now pocketed **$1,152,000** as a result of fraudulent sales of Plaintiff's shares. Plaintiff received a loan of $66,709, but over $1,152,000 in supposed "collateral" for that loan has been disposed of, and the proceeds pocketed by Defendants.

51.     Approximately 1,134,897 restricted shares of Co-Diagnostics are currently held

11

by Defendant VStock pursuant to a preliminary injunction entered by this Court on February 4, 2019.

**Defendants' Prior Fraudulent Schemes**

52.     The Sklarov Defendants have been involved with the same stock-loan scheme in the recent past, and, according to court filings and press reports, are currently the subject of injunctions in Hong Kong and Singapore restraining America 2030 and Sklarov from continuing to trade shares that were supposed to be held as "collateral".

**Hong Kong**

53.     The docket and filings in a District Court of Georgia action, styled *America 2030 Capital Limited v. Prescient Investment Limited, et.al*, 1:18-cv-04875-AT (the "Georgia Case"), reveal that an injunction is currently in effect in Hong Kong restraining America 2030 and Sklarov from transferring and trading shares in a company whose shares were obtained in the exact same way as here (indeed the "MLA" in that case appears to be identical).

54.     In the Georgia Case, the Hong Kong executives pledged their shares as collateral as part of an MLA with America 2030. When America 2030 tried to liquidate and transfer the shares, the Borrower objected because, like here, America 2030 had not yet made the loan. The borrower obtained an injunction from a Hong Kong court prohibiting the transfer agent from transferring the shares. In response, America 2030 filed the Georgia Case. In that case, America 2030 claims that the loan documents permitted it, to sell the collateral in the absence of making the loan. See Georgia case, 1:18-cv-04875-AT, Document 16.

55.     The case was dismissed on jurisdictional grounds, and America 2030 was sanctioned. In a Rule 11 Sanctions Order issued last week in the District Court in Georgia, the

12

Case 1:24-mc-00144-ABJ   Document 1-60   Filed 03/22/2024   Page 175 of 270

Court sanctioned Val Sklarov personally and enjoined him and the following entities the judge deemed affiliated entities;

- America 2030 Capital Limited (incorporated in Hong Kong);

- America 2030 Capital Limited (incorporated in the United Kingdom);

- America 2030 Capital Limited (incorporated in Colorado)

- America 2030 Capital LLC  (incorporated in Colorado)

- Any company doing business as America 2030 Capital Limited or America 2030

Capital Limited Co. and associated with the plaintiff or its officers; and

- All affiliates of the plaintiff.


### Singapore

56.     In late 2018, in a press release, a Singapore company named Sunpower Group, announced it had to halt trading in its shares after two of its substantial shareholders had informed the company that, on November 3, 2018:

> …they had placed 14 million shares each with a lender, America 2030 Capital Ltd., as collateral for a loan, and said the shares were no longer in the depository broker account.

57.     After these executives commenced legal action in Singapore, America 2030 announced it was bringing an arbitration against these two executives in Nevis against:

> …entities owned by two key executives of Sunpower Business Group LTD for amongst other things, breach of contract, default, tortuous [sic]interference, defamation and slander.

58.     This is underafter, like here, these executives had gone into Court in Singapore to restrain trading in shares that had been essentially stolen from them.

Case 1:20-cv-09471-AKH Document 160 Filed 08/23/2024 Page 16 of 31 of 270

59.     The two executives have launched a complaint with regulatory agencies in
Singapore: https://www.businesstimes.com.sg/companies-markets/sunpowers-exec-chairman-
exec-director-lodge-report-with-cad-over-unauthorised.

**United Kingdom**

60.     In the UK, the CEO of a company named Angus Energy had to step down, after
the company disclosed he had transferred his Angus Energy shares to a company called America
2030 Capital Limited for "nil consideration". It was said to be "in contemplation of a possible
equity linked loan against his shareholding". Unbelievably, the company reports that America
2030 sold 10 million shares (a value of over $100 million) before it was discovered.

**Sklarov's Prior Criminal History**

61.     This action is only one of many in which Sklarov personally and his company
America 2030 and its affiliates have been accused of fraud, conspiracy, antitrust collusion,
LIBOR manipulation and stock-loan fraud.

62.     In a case entitled *USA v. Sklarov, et al.,* 97-cr-00176 (DJL) (W.D. Pa.), Sklarov
was convicted of fraud and sentenced to one year in prison and $14,000,000 restitution,
stemming from Medicare fraud.

**AS AND FOR A FIRST CAUSE OF ACTION**
(Fraud as against Defendant Sklarov)

63.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through
62 above as if set forth in full herein.

64.     Sklarov made repeated misrepresentations of material fact concerning, *inter alia,*
the nature of the transaction he was proposing to Plaintiff, his intent to provide loan funding to

14

Plaintiff, and his intent to safeguard Plaintiff's collateral. These misrepresentations were made via emails and telephone calls from Sklarov to Plaintiff.

65.     At the time Sklarov made these representations he knew they were false, and he intended that Plaintiff would rely upon them. Plaintiff also caused the Sklarov Corporate Defendants to sell the Shares prior to the closing, and after the closing but before providing any funds to Plaintiff, in order to manipulate the price of the Shares.

66.     Plaintiff did in fact rely upon Sklarov's misrepresentations by executing the MLA, executing the addenda to the MLA, executing the purported closing documents, and providing the Shares to Sklarov and the Sklarov Defendants.

67.     Plaintiff's reliance was justifiable.

68.     Plaintiff has suffered damages caused by Sklarov's fraud in an amount to be proven at trial but believed to be in excess of $1.1 million. In addition, Sklarov's actions were wanton, reprehensible, and egregious, so as to warrant the imposition of punitive damages in an amount to be determined at trial but believed to be in excess of $2,000,000.

## AS AND FOR A SECOND CAUSE OF ACTION
(Aiding and Abetting Fraud as against the Sklarov Corporate Defendants)

69.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 68 above as if set forth in full herein.

70.     Defendant Sklarov executed a fraudulent scheme against Plaintiff as described above.

71.     Each of the Sklarov Corporate Defendants knew of Sklarov's fraudulent scheme and intended to materially assist Sklarov in perpetrating it.

72.     The Sklarov Corporate Defendants provided substantial assistance to Sklarov in perpetrating his fraudulent scheme against Plaintiff, as follows:

15

Case 1:23-mc-00494-AKH Document 16 Filed 08/22/24 Page 17 of 20

a. America 2030 provided documentation to Plaintiff in furtherance of the scheme, including but not limited to the purported closing documents;

b. America 2030 Limited provided documentation to Plaintiff in furtherance of the scheme, including but not limited to the purported margin call notice;

c. Bentley Rothschild and BR Investments sold the Shares at issue, despite the lack of a default by Plaintiff and despite the fact that only a fraction of the value of the loan was ever funded.

73.     Plaintiff has suffered damages caused by Sklarov's fraud as aided and abetted by the Sklarov Corporate Defendants in an amount to be proven at trial but believed to be in excess of $1.1 million.  In addition, the Sklarov Corporate Defendants' actions were wanton, reprehensible, and egregious, so as to warrant the imposition of punitive damages in an amount to be determined at trial but believed to be in excess of $2,000,000.

### AS AND FOR A THIRD CAUSE OF ACTION
(Conversion as against Sklarov and the Sklarov Corporate Defendants)

74.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 73 above as if set forth in full herein.

75.     Plaintiff has a current possessory right and interest in the Shares.

76.     The Shares constitute separate and identifiable property.

77.     Sklarov and the Sklarov Defendants have exercised, and are continuing to exercise, dominion over the shares in derogation of Plaintiff's rights.

78.     Plaintiff has been damaged by this conversion in an amount to be proven at trial but believed to be in excess of $1.1 million.  In addition, Sklarov and the Sklarov Corporate Defendants' actions were wanton, reprehensible, and egregious, so as to warrant the imposition of punitive damages in an amount to be determined at trial but believed to be in excess of

16

Case 1:20-cv-03459-GBD Document 416 Filed 08/23/2024 Page 179 of 270

$2,000,000. Alternatively, Plaintiff is entitled to the return of the Shares wrongfully taken by Defendants, including but not limited to the shares currently held by Defendant VStock.

## AS AND FOR A FOURTH CAUSE OF ACTION
(Conspiracy to commit fraud and conversion as against Sklarov and the Sklarov Corporate Defendants)

79.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 78 above as if set forth in full herein.

80.     Sklarov has committed fraud against Plaintiff, aided and abetted by the Sklarov Corporate Defendants.

81.     Sklarov and the Sklarov Corporate Defendants have committed conversion against Plaintiff.

82.     An agreement to conspire to commit the torts of fraud and conversion existed between and among Sklarov and the Sklarov Corporate Defendants.

83.     Each of Sklarov and the Sklarov Corporate Defendants committed overt acts in furtherance of the conspiracy as alleged in detail above.

84.     By reason of the foregoing, Plaintiff has been damaged in an amount to be proven at trial but believed to be in excess of $1.1 million. In addition, Sklarov and the Sklarov Corporate Defendants' actions were wanton, reprehensible, and egregious, so as to warrant the imposition of punitive damages in an amount to be determined at trial but believed to be in excess of $2,000,000.

## AS AND FOR A FIFTH CAUSE OF ACTION
(Preliminary and Permanent Injunctive Relief as against VStock

85.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through

17

Case 1:20-cv-08438-AKH   Document 4-60   Filed 08/22/24   Page 19 of 31

62 above as if set forth in full herein.

86.     VStock currently holds more than 1.1 million of the Shares pursuant to this Court's Preliminary Injunction dated February 4, 2019.

87.     Plaintiff's right, title and interest in the Shares held by VStock is superior to VStock's, or that of any other Defendant.

88.     Plaintiff lacks an adequate remedy at law.

89.     By reason of the foregoing, Plaintiff is entitled to temporary, preliminary and permanent injunctive relief directing VStock to return all Shares in its possession, custody or control to Plaintiff.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Unjust Enrichment against Sklarov and the Sklarov Corporate Defendants)

90.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 62 above as if set forth in full herein.

91.     Defendants Sklarov and the Sklarov Corporate Defendants have wrongfully sold Shares which belong to Plaintiff, and have refused to turn over any portion of the proceeds of such sales to Plaintiff.

92.     The above-named defendants would be unjustly enriched if they are permitted to retain the proceeds of their wrongful sale of the Shares.

93.     Plaintiff lacks an adequate remedy at law.

94.     Plaintiff has been damaged in an amount to be proven at trial but believed to be in excess of $1.1 million.

WHEREFORE, Plaintiff demands a judgment as follows:

Case 1:20-cv-06522-AKH   Document 4-60   Filed 08/23/24   Page 20 of 21

1. On the first cause of action, a judgment in favor of Plaintiff against Defendant Sklarov awarding damages in an amount to be proven at trial but believed to be in excess of $1,100,000.00, plus punitive damages in an amount to be determined at trial but believed to be in excess of $2,000,000.

2. On the second cause of action, a judgment in favor of Plaintiff against the Sklarov Corporate Defendants awarding damages, jointly and severally, in an amount to be proven at trial but believed to be in excess of $1,100,000.00, plus punitive damages in an amount to be determined at trial but believed to be in excess of $2,000,000.

3. On the third cause of action, a judgment in favor of Plaintiff against Defendant Sklarov, and the Sklarov Corporate Defendants awarding damages in an amount to be proven at trial but believed to be in excess of $1,100,000.00, plus punitive damages in an amount to be determined at trial but believed to be in excess of $2,000,000, or, in the alternative, an order directing Defendants Sklarov and the Sklarov Corporate Defendants to return any and all Shares in their possession to Plaintiff.

4. On the fourth cause of action, a judgment in favor of Plaintiff against Defendants Sklarov, and the Sklarov Corporate Defendants awarding damages in an amount to be proven at trial but believed to be in excess of $1,100,000.00, plus punitive damages in an amount to be determined at trial but believed to be in excess of $2,000,000.

5. On the fifth cause of action, an order constituting a preliminary and permanent injunction directing Defendant VStock to transfer any Shares currently in its possession to Plaintiff.

6. On the sixth cause of action, a judgment in favor of Plaintiff against Defendants Sklarov, and the Sklarov Corporate Defendants awarding damages in an amount to be proven at trial but believed to be in excess of $1,100,000.00.

19

Case 1:24-cv-03454-AKH    Document 160    Filed 08/23/24    Page 20 of 20 of 270

7. Together with interest, attorneys' fees, and such other and further relief as the Court may deem just and proper, including the costs and disbursements of this action.

## DEMAND FOR A JURY TRIAL

Plaintiff respectfully demands a trial by jury for all issues so triable in this action.

Dated:  New York, New York
       March 13, 2019

                GUZOV, LLC

                By:_____ _____
                Debra J. Guzov, Esq.
                Anne W. Salisbury, Esq.
                805 Third Avenue, 8th Floor
                New York, N.Y. 10022
                Tel:    (212) 371-8008
                dguzov@guzovllc.com
                *Attorneys for Plaintiff*

20

# EXHIBIT 28

**EASTERN CARIBBEAN SUPREME COURT**
**SAINT CHRISTOPHER AND NEVIS**
**(NEVIS CIRCUIT)**

**IN THE HIGH COURT OF JUSTICE**

**CLAIM NO: NEVHCV2019/141**

**BETWEEN:**

**(1)  SUNPOWER BUSINESS GROUP PTE LTD**
**(2)  TOURNAN TRADING PTE LTD**

Claimants

- and-

**(1)  AMERICA 2030 CAPITAL LIMITED**
**(2)  MARK SIMON BENTLEY (also known as VAL SKLAROV)**
**(3)  WEISER GLOBAL CAPITAL MARKETS LTD (formerly known as WEISER ASSET**
**MANAGEMENT LTD.)**

Defendants

**AND**

**CLAIM NO: NEVHCV2019/0023**

**IN THE MATTER OF THE ARBITRATION ACT CAP. 3.01**
**BETWEEN:**

**(1)  SUNPOWER BUSINESS GROUP PTE LTD**
**(2)  TOURNAN TRADING PTE LTD**
**(3)  GUO HONG XIN**
**(4)  MA MING**

Claimants

**-and-**

**(1)  AMERICA 2030 CAPITAL LIMITED**

1st Defendant

**(2)  KAREN HILL-HECTOR**

2nd Defendant

**Appearances:**

Mr. Nicholas Peacock with Ms. Elizabeth Harper of counsel for the claimants
Mrs. Angela Cozier of counsel for the 1st defendant in case NEVHCV2019/0023 and the defendants in case number NEVHCV2019/0141
Mr. Michael Hayton of counsel for the 2nd defendant in case NEVHCV2019/0023

------------------------------------------------------------------------
**2020:  June 15th**
**July, 10th**
------------------------------------------------------------------------

**Reasons for Decision**

[1]   **Moise, J.:** On 15th June, 2020, the court dismissed two applications for the strike out of cases NEVHCV2019/0023 and 0141. I undertook to give written reasons for my decision. I do so now. However, before addressing the substance of the applications it is important to highlight a number of facts which are relevant to both cases. I also wish to note that the cases are consolidated solely for the purpose of providing my reasons to the parties as promised on 15th June, 2020.

**The Facts**

[2]   The 1st and 2nd claimants (hereinafter referred to as SBG and Tournan respectively) are both limited liability companies incorporated in Singapore. In claim NEVHCV2019/0023, the 3rd and 4th claimants are shareholders of SBG and Tournan respectively. The 1st defendant (hereinafter referred to as America 2030(N)) is a company registered in Nevis. The 2nd defendant in claim NEVHCV2019/0141 (hereinafter referred to as Mr. Sklarov) is a citizen of the United States of America of Ukrainian origin and is the principal owner and operator of the America 2030(N). NEVHCV2019/0141 was also brought against Weiser Asset Management Ltd (hereinafter referred to as Weiser) which is a company registered in the Bahamas as a registered broker dealer.

[3]   The claimants assert that in or about May, 2018, they were introduced to Mr. Sklarov and his America 2030 companies, one of which was registered in Hong Kong. SBG and Tournan were in need of finance and Mr. Sklarov presented America 2030 as a specialist in stock loan agreements. Essentially, as I understand it, America 2030 agreed to loan up to an amount of $25,000,000.00US to SBG and Tournan in return for a deposit of pledged collateral to a depository broker. This agreement was dated 12th June, 2018 and referred to as the "master loan agreement". The agreement contained the express terms that:

(a) America 2030 would maintain its full ability to return the pledged collateral upon satisfaction of the borrower's obligations to repay the loan;

(b)  The pledged collateral would remain with America 2030 until all outstanding loans and interests were repaid, when it would be returned to the borrower; and

(c)  America 2030 would not sell or trade in the shares for any reason whatsoever unless the borrower was in default or a material event occurred.

[4]   Essentially, the allegation is that the shares deposited with the broker were to be used solely for the purpose of providing collateral for the loans. They were not to be used by America 2030 in anyway, save in the event of a default on the part of the claimants. The agreement also dictated that America 2030 was entitled to trade in a small number of shares for the sole purpose of testing the market price. The claimants however complain, in their statement of claim in case NEVHCV2019/0141, that there were significant disclaimers contained in the master loan agreement. In addition to that, the agreement contained a breakup fee of 5% of the fair market value of the approved loan in the event that the claimants failed to deliver up the pledged collateral.

[5]   The claimants assert that following the execution of the master loan agreement they requested loans of up to $3,000,000.00US. Mr. Sklarov responded to this by indicating that if there were to be any amount loaned under the agreement, the breakup fee would be calculated on the maximum loan contemplated in the amount of $25,000,000.00US. He stated further that there had to be novation of the rights and obligations of America 2030 in favour of America 2030(N) and that the governing law had to be changed to Saint Kitts and Nevis law and the arbitration provisions under the original contract were to be amended to provide for arbitration by "The Arbitrator Conflict Resolution Service of Saint Kitts and Nevis." The claimants assert that despite their protestations, they eventually relented and on 3rd September, 2018 the parties entered into a Supplemental Agreement.

[6]   On 19th September, 2018, the claimants, America 2030(N) and Wieser entered into a Power of Attorney and Custodian Management Agreement. This agreement conferred control of an omnibus account into which the claimants each deposited 14,000,000 shares in Sunpower Business Group PTE Ltd. These shares were deposited into the account on 16th and 17th October, 2018. The claimants assert that Mr. Sklarov was aware of this transfer no later than

3

21st October, 2018. It was also asserted that as at 23rd October, 2018 the value of the shares by far exceeded the amount to be loaned to the claimants. However, between 22nd October and 2nd November, 2018 some 15,290,500 shares were sold leaving a balance of 12,709,500. It is alleged that this high volume of trading led to queries being raised by the Singapore exchange and resulted in a significant reduction in the value of the shares. It is also important to note that, as the claimants assert, at this time no funds had been transferred to them from America 2030(N) in keeping with the loan agreement.

[7]    The claimants also assert that the selloff of the shares took place on Mr. Sklarov's instruction. Despite this, America 2030(N) issued a default and acceleration notice to the claimants. It claimed an entitlement to terminate the agreement and to demand payment of the breakup fee in the sum of $1,250,000.00US. The claimants refused this request and sought and obtained injunctive relief in the High Court in Singapore in addition to filing a substantive action in that jurisdiction (The Singapore Proceedings). Subsequent to that, America 2030(N) commenced arbitration proceedings in Nevis in which it sought a declaration of its entitlement to forfeit the Sunpower shares. The arbitration proceedings were to be conducted by Ms. Karen Hill-Hector. In addition to that, arbitration proceedings were also commenced against the claimants seeking substantial sums in damages for defamation.

**The Fixed Date Claim**

[8]    On 15th February, 2019 the claimants commenced an action in Nevis by way of Fixed Date Claim seeking various orders against the validity of the arbitration proceedings, or in the alternative the removal of Ms. Karen Hill-Hector as the Arbitrator and injunctive relief against the defendants as it relates to proceeding with the arbitration. Together with the Fixed Date Claim, the claimants lodged an application for an interim injunction with a certificate of urgency. They sought from this court an injunction prohibiting the arbitration proceedings from taking place until the final determination of the case. Along with the Claim Form and the Notice of Application, the claimants also filed an affidavit of Guo Hong Xin. Mr. Xin indicated that he made *"this affidavit in support of the Claimant's applications in the claim form and notice of application herein."* On 27th February, 2019, the court ordered a stay of the arbitration proceedings and granted leave to America 2030(N) to file evidence and submissions in

4

opposition to the application. On 3rd May, 2019 the parties appeared before the court and agreed that the interim injunction granted on 27th February, 2019 would remain in effect with a full hearing of the application to take place on 5th June, 2019. Ms. Hill-Hector indicated that she would play no formal part in the proceedings and undertook to abide by any decision which the court makes in the outcome of this case.

[9] The Fixed Date Claim came up for hearing on 5th June, 2019 before Justice Raulston Glasgow. At that hearing the parties agreed that the interim injunction would remain in place until the final disposal of the matter. Glasgow J identified 6 issues to be tried and gave further case management directions. The claimants however assert that subsequent to this they became aware that they had fallen victim to a broader fraud scheme perpetuated by Mr. Sklarov. On the basis of information they claim to have received, the claimants lodged a separate claim in this court on 5th December, 2019 in which they sought to rescind the agreement altogether on account of fraud, misrepresentation and breach of contract. They applied for an obtained a worldwide freezing order against America 2030(N), Mr. Sklarov and Weiser.

**The Singapore Proceedings**

[10] It is important to outline the facts presented to this court which relate directly to the proceedings in Singapore. The applications to strike out were supported by affidavit evidence sworn to by Mr. Dwight Cozier. Mr. Cozier is an employee with the law firm of Cozier & Associates. He states in his affidavit that he read the chamber file in these matters and concluded that:

> "… it is clear from my reading of the Fixed Date Claim Form that the injunctive relief from arbitration is the central issue therein, but I am aware from my reading of the Chamber file that the issue of arbitration in Nevis was already determined by the High Court in Singapore and I am advised by Counsel and do verily believe that this issue is therefore barred from being litigated again here in Nevis."

[11] Mr. Cozier exhibited an order from the court in Singapore which stated that *"all proceedings in this action brought by the 2nd applicant against the respondent are stayed pursuant to section 6 of the International Arbitration Act"*. That was the full extent of the evidence presented in the application as it relates to the Singapore proceedings. I note that this evidence was presented to support the proposition that the claims should be struck out on the basis of issue estoppel and res judicata. During the course of the hearing I expressed some reservation as to whether this was sufficient evidence on which to base such an assertion. The order contains no reason for the decision of the court apart from its reliance on section 6 of the legislation in force in that jurisdiction. Mr. Cozier's affidavit relays no information whatsoever concerning these proceedings and the issues which were under consideration in Singapore. He claims to have been able to swear to this affidavit on the basis of instructions from counsel on behalf of the applicants and on the basis of what he had read in the court's file. I cannot help but to comment that this is entirely deficient information upon which such an application can be based.

[12]  However, in response to the application, the claimants relied on affidavit evidence filed by Ms. Michelle Slack which shed some further light on the Singapore proceedings. Ms. Slack informs the court that there were two motions filed with the court in Singapore. These proceedings were commenced by Ma Ming and Tournan against America 2030 and Guo Hong Xin and SBG against America 2030. Neither Mr. Sklarov nor Weiser is a party to those proceedings. The originating summonses in Singapore sought the following declarations:

(a)  That America 2030 is not entitled to a breakup fee under clause 2.4(d) of the agreements between the parties;

(b)  That there has been no event of default under clause 7 of the agreement;

(c)  That Tournan and SGB are entitled to terminate the agreements;

(d)  An injunction restraining America 2030 from selling, forfeiting, transferring or otherwise dealing with the pledged collateral;

(e)  An order for the return of the pledged collateral; and

(f)  Any other relief which the court deems fit

[13]  According to the evidence presented by Ms. Slack, an interim injunction was granted as prayed for by the claimants in the Singapore proceedings. However, on 1st March, 2019, subsequent to the commencement of the Nevis proceedings, America 2030 issued a summons in the High Court in Singapore. The summons sought a discharge of various orders made by the court in Singapore and in the alternative an order for a stay of the proceedings pursuant to section 6 of the Singapore International Arbitration Act. I understand this section to oblige the court in Singapore to grant a stay of proceedings where there is a valid arbitration clause contained in a commercial contract. The affidavit in support of that summons was sworn to by Mr. Sklarov. As Ms. Slack puts it, America 2030 was unable to obtain a stay of the proceedings against Ma Ming and Guo Hong Xin as neither of these claimants was party to the contract.

[14]  In submissions filed on behalf of America 2030 in the Singapore proceedings, the court was made aware of the proceedings which were commenced by Fixed Date claim in Nevis. By that time the court in Nevis had in fact granted injunctive relief restraining the arbitration proceedings pending the outcome of the claim. It is also worth noting that in his evidence before the Singapore court, Mr. Sklarov did point out that the proceedings in that jurisdiction did not seek orders rendering the contract null and void. In fact, it appears to be rather clear to me that the issues raised in the Fixed Date Claim, especially as it relates to the impartiality of the arbitrator and the process in general, were not before the court in Singapore. In the end on 26th March, 2019, the court in Singapore granted a stay of the originating motion pursuant to section 6 of the International Arbitration Act of that jurisdiction. The injunctive relief granted in that court nonetheless remained in effect. At that time case NEVHCV2019/0141 had not yet been filed. I turn now to examine the issues relating to that case.

**NEVHCV2019/0141 – The Fraud Case**

[15]  On 5th December, 2019, the claimants filed a separate claim in the High Court in Nevis on the basis of information they state were discovered subsequent to the lodging of the Fixed Date Claim. At paragraphs 5 to 17 of this claim, the claimants provide a summary of what they claim to have discovered were a number of unscrupulous actions on the part of Mr. Sklarov. They claim to have discovered that Mr. Sklarov has a long history of criminal convictions and dishonest business practices. They claim that his most recent activity centered on an elaborate stock loan fraud scheme carried out through a number of companies incorporated in a number of jurisdictions. These companies all contain variations of the names America 2030 or Bentley Rothchild. The claimants assert in their Statement of Claim that the schemes entail Sklarov's representations, through a number of commercial entities under his control, purporting to offer substantial non-recourse loan facilities on attractive terms to shareholders of listed companies, secured against the shares of those companies.

[16]  The claimants assert that these shareholders are induced into depositing these shares with a depository broker in advance of disbursement of loan financing by representations and/or warranties that the shares stand as security for repayment of the loans once made and would not be traded save to test the market price or in the event of default of payment. However, the claimants assert, that once the shares are deposited they are heavily traded on Mr. Sklarov's instructions, causing a dramatic drop in share price. At that point Mr. Sklarov seeks to establish inadequacy of the security provided for the loans and an entitlement to both withhold disbursement of the loans and demand payment of a financial penalty or a forfeiture of the shares.

[17]  In their Statement of Claim, the claimants assert that the contracts negotiated between the parties are "uncommercial", one sided agreements, which are subsequently amended to incorporate provisions for arbitration in Nevis by "The Arbitrator Conflict Service of Saint Kitts and Nevis." According to the claimant, the Nevis jurisdiction is one which is relatively unknown to the parties. At paragraphs 30 to 45 of the Statement of Claim, the claimants have highlighted what they claim to be a number of examples of Mr. Sklarov's alleged schemes. These include evidence of criminal convictions in the United States and other examples of

fraud. In cases similar to the present, courts in the United States have ordered injunctions against arbitration, notwithstanding the clauses contained in some of these contracts. It is also alleged that Mr. Sklarov adopts significant tactics of intimidation against victims, for example by lodging actions for defamation claiming ruinous sums in damages.

[18] The claimants also plead what they claim to be evidence of Mr. Sklarov's representations in other jurisdiction of his impecuniosity; despite his representations to the parties to his agreements of his ability to provide substantial amounts of money in loans. The claimants go on to plead the particular circumstances of their dealings with Mr. Sklarov and seek remedies such as the rescission of the agreements, a declaration that the agreements are void for uncertainty, a return and account of the shares deposited with Weiser and their traceable proceeds, damages for breach of contract, relief from forfeiture and damages for deceit and fraud. It is of note that the claimants have also pleaded their case on the basis of the court's powers pursuant to section 24(2) and (3) of the UK Arbitration Act of 1950. It is also important to note that neither defendant has filed a defence to this case. In fact, by decision delivered on 7th February, 2020 this court had already ruled that the claimants were entitled to judgment in default against the 1st defendant and 3rd defendants. The settlement of the terms of that judgment was deferred pursuant to the provisions of rule 12.9 and 12.10(4) and (5) of the CPR given that the 2nd defendant had not yet been served with the claim. In addition to this, the court had invited submissions from the parties as to whether case NEVHCV2019/0023 should be stayed in light of the developments in case NEVHCV2019/0141.

[19] In addition to the Claim Form and Statement of Claim, the claimants also filed an application for a worldwide freezing order. This application was supported by an affidavit of Mr. Guo Hong Xin. Mr. Xin indicated that as a result of the events which unfolded, a decision was taken to investigate Mr. Sklarov. In his affidavit he states that following extensive research over several months, a wealth of information and evidence was uncovered. In that very affidavit, Mr. Xin repeats the allegations contained in the statement of claim. He specifically exhibits a number of documents which he claims were discovered in order to substantiate his allegations. It would suffice to say at this stage that the worldwide freezing order was granted and remains in effect to date. The applicants also seek to have this injunction set aside but have however, presented no evidence or submissions as to why the court should exercise this discretion.

9

**The Applications to Strike Out**

[20] The application to strike out claim NEVHCV2019/0023 was based on the following:

(a) The Fixed Date Claim is in breach of rules 8.1(4) and (5) of the CPR2000 as it does not satisfy any of the circumstances for filing such a form;

(b) This defect in the Fixed Date Claim is incurable as it discloses a blatant disregard for the rules displayed by the respondents in bringing a Fixed Date Claim in the manner it was filed  and cannot be set right at this late stage without causing great prejudice to the applicant;

(c) Any attempt to correct this abuse at this stage in the proceedings would be prejudicial to the applicant's rights to natural justice and contrary to the overriding objective in rule 1.1 of the CPR2000;

(d) The breach is therefore fatal to the survival of the claim and the damage to the process of the court is irreparable at this stage so that the court has no alternative but to order the Fixed Date Claim be struck out with costs to the applicant on this ground alone;

(e) The Fixed Date Claim is in contravention of Part 11 of the CPR in that where affidavits are produced significant parts of the affidavits are scandalous and irrelevant, in breach of rule 30.3(3) of the CPR2000;

(f) Accordingly the Fixed Date claim should be struck out pursuant to rule 26.3(1) (a) of the CPR;

(g) The claims made in the Fixed Date Claim are clearly unsubstantiated, contrary to rule 8.6 of the CPR and the Fixed Date Claim should be struck out pursuant to rule 26.3(1) (b) of the CPR as it fails to disclose any reasonable ground for bringing the claim at bar;

(h) The Fixed Date Claim is barred from the proceedings disclosed therein by the principle of res judicata and party estoppel, as the issue of arbitration in Nevis was determined between the same parties by a Singapore High Court of parallel jurisdiction; and

(i)    Accordingly, the Fixed Date Claim is an abuse of process and is likely to obstruct the just disposal of the proceedings, pursuant to rule 26.3(1)(c) of the CPR.

[21]  The application to strike out claim NEVHCV2019/0141 was based on the following:

(a)    The Claim Form and Statement of Claim filed by the respondents on the 5th December 2019 are in breach of Rules 26. 3 (a), (b), (c) and (d) of the CPR 2000 as the claim seeks to relitigate an issue, (namely the  jurisdiction for determination of breach of contract) that has been ordered stayed by the Singapore High Court, a court of parallel jurisdiction to this Honourable court, pursuant to section 6 of the International Arbitration Act Cap. 143A, and which is to be determined by arbitration proceedings;

(b)    This defect in the Statement of Claim is incurable as it discloses no other cause for bringing or defending the claim filed on the 5th December 2019 and cannot be set right unless the entire claim is re-written which is not permitted by the rules of court;

(c)    Any attempt to amend the breach would amount to a new claim being brought which would be prejudicial to the applicants' rights to natural justice and contrary to the overriding objective in Rule 1.1 (1) of the CPR 2000;

(d)    The breach is therefore fatal to the survival of the claim and the damage to the process of the court is irreparable at this stage so that the court has no alternative but to order the Statement of Claim to be struck out with costs to the applicants on this ground alone;

(e)    Additionally, the Statement of Claim is in contravention of Rule 30.3 (3) of the CPR 2000 in that it is prolix and parts of it are scandalous and irrelevant and accordingly, the Statement of Claim should be struck out pursuant to 26.3 (1) (c) and (d) of the CPR 2000 on these grounds;

(f)    The allegations made in the Statement of Claim are clearly unsubstantiated, contrary to Rule 8. 6 of the CPR 2000, and the Statement of Claim should be struck out pursuant to Rule 26.3(1) (b) of the CPR 2000, as the Statement of Claim fails to disclose any reasonable ground for bringing the claim at bar;

11

(g) The Statement of Claim is barred from raising the of issue of the determination of contractual breach in the proceedings disclosed therein, by the principle of res judicata, both issue and party estoppel, as the issue of arbitration of a contractual dispute was determined by a Singapore High Court of parallel jurisdiction to be an issue to be determined by arbitration pursuant to the International Arbitration Act Cap 143A;

(h) Accordingly, the Statement of Claim is an abuse of the process of the court, and is likely to obstruct the just disposal of the proceedings, pursuant to Rule 26.3 (1) (c) of the CPR 2000 and should be struck out on this ground also

[22] In addition to the issues raised above, the applicant has identified what was described as 24 grounds on which the application was based. In my view however, many of these appear to be legal submissions rather than outright grounds for the application per se and will not be repeated here in their entirety.

[23] To my mind, the issues raised in the application in both cases can be summarized into two broad headings. The first is the issue of res judicata and whether the claimants are entitled to raise the issues in the Fixed Date and Fraud claims on the basis of issue estoppel. The defendants also raise the issue of whether the claims amount to an abuse of the court's process, given the stay of the proceedings in the Singapore Court. The grounds for these submissions are largely the same as in res judicata and I propose to deal with them as one issue. Finally, the court must consider the question of whether there are procedural defects in the claims which warrant the nuclear option of striking out the claims. It must be observed that these are not applications to stay the proceedings pending arbitration, but rather to strike them out altogether.

**Res Judicata/Issue Estoppel**

**The Defendant's submissions**

[24] In written submissions filed on 10th June, 2020 counsel for the defendants argues that the claims claim contravenes of rule 26.3 (a), (b), (c) and (d) of the CPR2000. which grants the court powers to strike out a statement of case if:

(a) *there has been a failure to comply with a rule, practice direction, order or direction given by the court in the proceedings;*

(b) *the statement of case or the part to be struck out does not disclose any reasonable ground for bringing or defending a claim;*

(c) *the statement of case or the part to be struck out is an abuse of the process of the court or is likely to obstruct the just disposal of the proceedings; or*

(d) *the statement of case or the part to be struck out is prolix or does not comply with the requirements of Part 8 or 10.*

[25] Counsel goes on to submit that the claimants are seeking to relitigate an issue which has been ordered stayed by the High Court in Singapore. That issue, according to counsel, is that of breach of contract. Counsel argues that the court in Singapore determined that there was no jurisdiction to litigate that issue in light of the arbitration agreement in force between the parties. Accordingly, it is argued that the claimant is barred from raising this issue as the need for arbitration of the contractual dispute was determined by the court in Singapore. In addition to that, it is argued that claim NEVHCV2019/0141 seeks to relitigate issues in claim NEVHCV2019/0023 in this very jurisdiction. These defects, according to counsel, are fatal to the claim and cannot now be cured. Counsel goes on to argue that *"all the paragraphs and sub-paragraphs of the claim form and statement of claim are res judicata and an abusive collateral attack on the decision of the Singapore High Court, which the claimants are barred by law from doing."* For these same reasons it is argued that the claim is an abuse of the court's process.

[26] Counsel for the defendants refers the court to the UK Arbitration Act of 1950 and, quite rightfully, pointed out that this act is the applicable legislation in force in Nevis. Counsel goes

13

on to state that on the basis of that legislation the court has no jurisdiction over the arbitration proceedings until a decision is made by the arbitrator. Despite this very forceful submission, counsel does not point the court to any section in the Act which substantiates this assertion. In fact, for reasons which I will explain later on, counsel seemed to have completely ignored certain express powers granted to the court under the Act.

[27] Counsel goes on to refer the court to the case of *Premium Nafta Products Limited et al (Respondents) v. Fili Shipping Company Limited et al (Appellants)[1].* In that case, the UK House of Lords came to consider the question of whether the court should entertain a claim notwithstanding the fact that the parties had entered into an arbitration agreement. Of particular significance was the question of whether the court should determine the matter on the basis of an allegation that one party had induced the other into the agreement on account of bribery. The court noted the following a paragraphs 9 and 10 of that judgment:

> *9. There was for some time a view that arbitrators could never have jurisdiction to decide whether a contract was valid. If the contract was invalid, so was the arbitration clause. In Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd [1988] 2 Lloyd's Rep 63, 66 Evans J said that this rule "owes as much to logic as it does to authority". But the logic of the proposition was denied by the Court of Appeal in Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd [1993] QB 701 and the question was put beyond doubt by section 7 of the Arbitration Act 1996:*
>
> > *"Unless otherwise agreed by the parties, an arbitration agreement which forms or was intended to form part of another agreement (whether or not in writing) shall not be regarded as invalid, non-existent or ineffective because that other agreement is invalid, or did not come into existence or has become ineffective, and it shall for that purpose be treated as a distinct agreement."*

---

[1] [2007] UKHL 40

14

> **10. This section shows a recognition by Parliament that, for the reasons I have given in discussing the approach to construction, businessmen frequently do want the question of whether their contract was valid, or came into existence, or has become ineffective, submitted to arbitration and that the law should not place conceptual obstacles in their way.**

[28] Counsel's argument is simply that the parties had agreed that any dispute between them would be settled by arbitration in Saint Kitts and Nevis. As a result of that, there is no basis for a claim against the defendants. Counsel also states that in accordance with section 6 of the legislation in Singapore, such proceedings were stayed. The particular section states as follows:

> **"… where any party to an arbitration agreement to which this Act applies institutes any proceedings in any court against any other party to the agreement in respect of any matter which is the subject of the agreement, any party to the agreement may, at any time after appearance and before delivering any pleading or taking any other step in the proceedings, apply to that court to stay the proceedings so far as the proceedings relate to that matter."**

[29] I take counsel's argument to suggest, that given the order of the Singapore court, the claimants are not entitled to seek the relief which they seek in Nevis. The argument is that the High Court of Singapore is a court of concurrent jurisdiction and has already decided that the matter should be subject to arbitration.

**The claimants' submissions**

[30] The respondents make 3 broad submissions in response to the Applications. Firstly, it is argued that the issue of res judicata and issue estoppel cannot arise as there was no final order on the merits of the case in Singapore. Secondly, it is argued that, in any event, the issues raised by the claims in Nevis are entirely different from what was before the court in Singapore.

[31] Counsel refers the court to the case of ***Desert Sun Loan Corp v Hill***[2] where the following was stated:

> *There is no reason in principle why such an issue should not be decided in a decision on a procedural matter as opposed to the final determination of the cause of action or proceedings. But the decision must be final and conclusive and not provisional or subject to revision. The expression 'interlocutory' is used in two distinct senses in English law, which can give rise to confusion unless the distinction is borne in mind. Some decisions or orders are interlocutory in the sense that they are made pending final determination of the case. The obvious example of this is an interlocutory injunction pending trial. Such a decision cannot give rise to an issue estoppel because it is not final. The other use is to distinguish between those decisions where leave to appeal to the Court of Appeal is required and those where it is not. Some of the former decisions can determine finally the issue which is raised. I prefer therefore to use the expression procedural in the sense that I have defined, rather than interlocutory.*

[32] Counsel also referred the court to the case of ***The Sennar (No 2)*** [3] where it was decided that in order to give rise to issue estoppel the decision must be ***"one that cannot be varied, reopened or set aside by the court that delivered it or any other court of co-ordinate jurisdiction although it may be subject to appeal to a court of higher jurisdiction".*** The argument put forward is that all the Singapore court did was to stay the proceedings on account of the arbitration exercise in Nevis. This was not a final order on the merits of the case in any way and therefore cannot give rise to issue estoppel.

[33] Counsel for the claimants also go on to argue that, in any event, the court must proceed with caution on such an application to strike out and give due regard to three issues which were cited by Lord Reid in the case of ***Carl-Zeiss***[4] and cited with approval in ***Desert Sun Loan v. Hill***[5] these are*:*

---

[2] [1996] 2 All ER 847
[3] [1985] 1 WLR 490
[4] [1967] 1 AC 853
[5] [1996] All ER 847

(1)  the differences in modes of procedure between this Court and those in foreign countries;

(2)  the practical difficulties encountered by a defendant who might not have been required to put forward his full case before the foreign court; and

(3)   whether the issue was finally disposed of, so that the matter cannot be raised again in the foreign court, which is a question of foreign law

[34] It is argued further, that even if the order in Singapore was final, the defendants would have to show that the specific fact in issue in these proceedings were raised before, and decidedly by, the Singapore court. It is therefore submitted that the court in Singapore was simply not considering the same issues which were brought before this court and that the parties to these proceedings are, to some extent, different. As such there could therefore be no issue estoppel which arises.

[35] Counsel for the claimants argue that the proceedings in Singapore sought declarations as to the contractual effect, or lack thereof, of the Master Loan Agreements and Supplemental Agreements made between SBG, Tournan and America 2030, an injunction restraining America 2030 from dealing with the pledged collateral and an order for the return of the shares. On the other hand, the Fixed Date Claim in this jurisdiction seeks declarations with respect to the arbitration and the removal of Ms. Hill-Hector as the Arbitrator. The claim also seeks an injunction retraining the future conduct of the arbitration. The fraud claim seeks to invoke the court's jurisdiction by virtue of section 24(2) and (3) of the Arbitration Act in a claim for fraud, fraudulent misrepresentation, deceit and breach of contract. These it is argued are different proceedings, not adjudicated on by the court in Singapore.

[36] The claimants also argue that the jurisdiction being exercised by the Singapore Court was fundamentally different from those in Nevis. By virtue of the very agreement between the parties, Nevis is in fact the seat of the arbitration and seized with supervisory jurisdiction over the conduct of the arbitration. The court is also being asked to exercise a power which is specific to this jurisdiction as contained in section 24(2) and (3) of the Act. In fact the issues

raised in the fraud claim are all issues discovered subsequent to the Singapore proceedings and not raised in that jurisdiction.

### The Court's Conclusions

[37] I generally agree with the submissions put forward by counsel for the claimants, although in my view some issues must be placed into context. I take the arguments of counsel for the defendants to be that the question of whether the parties should be subject to arbitration has already been decided by the court in Singapore. The issue raised may very well not be whether the claims are substantively the same, but whether the question of the parties being subject to the arbitration proceedings have already been decided to the extent that they should no longer be litigated here in Nevis. Despite this distinction, I am of the view that the distinguishing elements of the various cases are important in the general discussion on whether an issue estoppel arises. There is also an argument being made here that claim NEVHCV2019/0141 re-litigates issues contained in claim NEVHCV2019/0023 right here in Nevis.

[38] If I may firstly address the issue of the Fixed Date Claim. I am in agreement with the submission of counsel for the claimants that no issue estoppel arises. I am of that view for a number of reasons. Firstly, it appears from the facts presented that the court in Singapore was fully aware that the claimants had in fact commenced proceedings in Nevis when it came to consider the application for a stay in that jurisdiction. That court was also made aware of the interim injunctions granted in the case in Nevis. The order of that court however, did not seek in any way to trouble the process in Nevis; and I rather doubt that it had the jurisdiction to do so. All that was done was to stay the Singapore proceedings pending the outcome of the arbitration in Nevis.

[39] One possible outcome was that of a potential success on the claimants' part in seeking to put an end to these arbitration proceedings altogether or to have the arbitrator replaced. This is perhaps one of the reasons why courts are encouraged to stay proceedings pending arbitration, rather than striking out the proceedings altogether. The court's desire to honour arbitration agreements are not designed to oust its jurisdiction over disputes, but rather to

seek an alternative form of resolution and to honour contractual arrangements entered into freely by the parties. By staying the proceedings it is possible for the litigation to be recommenced. Arbitration clauses are not designed to deny access to justice in a broad sense.

[40]  Further, I agree with the submissions of the claimants where it is argued that it is this court which is seized with supervisory jurisdiction over the arbitration proceedings in Nevis. Although courts are encouraged into a position of non-interference in the arbitration of disputes, that principle does not detract from the court's power, either under the Supreme Court Act or its inherent jurisdiction, to grant injunctions restraining arbitration proceedings if it is just and convenient to do so. As Chief Justice Pereira has noted ***"it would be astonishing to say the least, if the statement to the effect that the Act is founded on the principle that 'the court shall not interfere in the arbitration of a dispute' is to be construed as having thereby, without any specifically expressed and clear language, swept away the court's jurisdiction to grant injunctive relief where warranted."***[6] This inherent jurisdiction to grant injunctive relief, as the claimants seek in the Fixed Date Claim, is an important part of the court's jurisdiction to relieve a litigant against ***"unconscionable conduct, or conduct the aim of which is to undermine the court's lawful process."***[7]

[41]  Though the courts are cautious in ensuring, and perhaps demanding, that parties honour their agreements to arbitrate their disputes, what it never does is to abandon its equitable jurisdiction to grant injunctions against arbitration if to do so would meet the ends of justice. When one examines the allegations made in the Fixed Date Claim and the parties to that claim, it is clear that the claim seeks injunctive relief and the court would therefore not be minded to strike it out altogether at this stage in the proceedings. In addition to that I am not of the view that this is an issue which was considered by the court in Singapore sufficient to find that the claimants are prohibited from raising these issues on the basis of issue estoppel or res judicata in this court.

---

[6] BVIHCMAP2015/0005
[7] Ibid

[42] Further, to my mind, the issues raised here are similar to those raised in relation to 'anti-suit injunction' orders. As Lord Hobhouse noted in the case of *Turner v. Grovit and Others*[8] *"when an English Court ... makes a restraining order, it is making an order which is addressed only to a party which is before it. The order is not directed against a foreign court."* An order of this nature cannot demand that a *"foreign court desist from exercising the jurisdiction given to it by its own domestic law."* In my view therefore, when the court in Singapore ordered a stay of its own proceedings, it did so on the basis of its own domestic law. That in no way takes away from the jurisdiction of this court to consider the claimants' claim as outlined in the Fixed Date Claim; especially as this is the seat of the arbitration and that the proceedings in Nevis were well underway when the Court in Singapore granted a stay of its own proceedings. I doubt very much that the court in Singapore could have decided to bring an end to proceedings in Nevis while presiding over its own exclusive jurisdiction.

[43] In any event, when a court stays proceedings pending arbitration, it does so on the assumption that the arbitration would be fair and observe the rules of natural justice. As Anderson JCCJ noted in the case of *Belize Natural Energy Ltd. v. Maranco Ltd*[9] *"the courts do retain residual responsibility for guaranteeing the integrity of the arbitral process in ensuring, for example, the application of the principles of natural justice..."* A party is therefore entitled to seek relief from the court if it is of the view that the process would undermine these principles. Given the court's supervisory role as the seat of this arbitration I am not of the view that the order in the Singapore court ousts the jurisdiction in Nevis to consider the issues raised in the Fixed Date Claim. This is not subject to an estoppel in any way. In light of that I refer to Mustill and Boyd in their publication *Commercial Arbitration*[10] where they state:

> *"with the exercise of common sense a situation should never arise in which the arbitrator's personal impartiality is put in question. A person who is approached to act and knows that he has some kind of relationship with one of the parties should remember that there is no keener sense of injustice that is felt by someone who has doubts about whether the arbitrator is doing his*

---

[8] [2002] 1 WLR 107
[9] CCJ Apeal BZCV2014/004
[10] Lexis Nexis Butterworths

> *honest best. He should also bear in mind that the question is not just whether*
> *he really is impartial but whether a reasonable outsider might take this view."*

[44] This passage was cited with approval in the case of **Eckhart v. the Attorney General**[11] in which the court came to consider an application for the removal of an arbitrator on account of bias. In the present case apart from the injunctive relief being sought in the Fixed the Claim, the claimants also seek the removal of the arbitrator. This court is seized with the power to do so and the order in the court in Singapore does not take away the right of the claimants to seek this specific relief. No issue estoppel can therefore arise in the present circumstances.

[45] As it relates to the fraud case, I am also not of the view that the case should be struck out on the basis of res judicata or issue estoppel. Although the claim does repeat in some way the issues of breach of contract, these are, to a great extent, predicated on difference issues. The claimants claim to have discovered a significant history of fraud on the part of Mr. Sklarov, who by the way was not a party to the Singapore proceedings. The fraud case, unlike the case in Singapore, seeks to rescind the agreement altogether, rather than enforce it. What the claimants seek to do in this jurisdiction is to invoke the powers of this court pursuant to section 24(2) and (3) of the 1950 UK Arbitration Act to determine this dispute despite the arbitration clause in the agreement on the basis of fraud. It is noteworthy that the very contracts established Saint Kitts and Nevis law as what is applicable to its interpretation.

[46] The defendant's reliance on the case of **Premium Nafta Products Limited et al (Respondents) v. Fili Shipping Company Limited et al (Appellants)**[12] is not of much assistance to this court as it does not consider the issue of the peculiar powers conferred on this court by section 24(2) and (3) of the 1950 Arbitration Act. As the claimants have rightly pointed out, the case of **Cunningham-Reid et al v. Buchanan-Jardine**[13] is authority for the proposition that this is a discretion which the court has and should consider carefully. However, the decision of the Court of Appeal in that case is also worth some analysis.

---

[11] DOMHCV1992/0570
[12] [2007] UKHL 40
[13] [1981] 1 WLR 678

[47] In **Cunningham-Reid et al v. Buchanan-Jardine,** the English Court of Appeal came to consider an appeal against an order denying a stay of the proceedings in provisions similar to those currently in force in Nevis. The judge at first instance allowed an appeal against the decision of a master who had himself granted a stay of the proceedings notwithstanding the fact that the claimant had pleaded fraud. The judge took the view that the plaintiffs had made an allegation of fraud and that there was strong and convincing evidence which led him to the conclusion that it was not appropriate that there should be an arbitration. The court of appeal overturned that decision and determined that in a case where a party to a contract which incorporates an arbitration clause has commenced an action on the contract alleging fraud, the court would, on an application brought by the party against whom fraud has been alleged, normally exercise its discretion under sections 4 and 24(3) of the Act of 1950 by granting a stay of the proceedings pending arbitration. This would be the normal course to follow, unless a good reason against arbitration existed. The court also found that even strong prima facie evidence of fraud would not on its own be a sufficient reason for refusing a stay.

[48] In that case extensive arguments were led on a particular statement of Lord Wilberforce in the case of **Camilla Cotton Oil Co. v. Granadex S.A[14]** where he said that "**the fraud relied on must be fraud by the party opposing the stay: see Russell v. Russell, 14 Ch.D. 471, so that any alleged fraud by the appellants is irrelevant.**" The difficulty with this statement by Lord Wilberforce is that he relied on the case of **Russell v. Russell** as precedent for that proposition. A close reading of the case of **Russell v. Russell** clearly shows that Lord Wilberforce's statement was not compatible with what was decided in that case. In **Russell v. Russell** what was stated was as follows:

> "*Where the party charged with the fraud desires it, I can perfectly understand the court saying, 'I will not refer your character against your will to a private arbitrator.' It seems to me in that case it is almost a matter of course to refuse the reference, but I by no means think the same consideration follows when the publicity is desired by the person charging the fraud. His character is not at stake, and the other side may say, 'The very object that I have in desiring the arbitration is that*

---

[14] [1976] 2 Lloyd's Rep. 10

*the matter shall not become public. It p is very easy for you to trump up a charge of fraud against me, and damage my character, by an investigation in public."*

[49]   The judge in *Russell v. Russell* also went on to state the following:

*"The next question I have to consider is, what foundation there is for the charges, because, if the mere making of a charge of fraud would entitle the person making it to call upon the court, in the exercise of its discretion, to refuse to refer to arbitration, there would be a very easy way of getting rid of all these clauses of arbitration. I am satisfied that the mere making of a charge will not do that, even in a case where the court ought to exercise its discretion by refusing to refer the case to arbitration. There must be sufficient prima facie evidence of fraud, not conclusive or final evidence, because it is not the trial of the action, but sufficient C prima facie evidence."*

[50]  In light of these it is difficult to conclude that Lord Wilberforce was correct when he stated that *Russell v. Russell* was authority for the proposition that "*the fraud relied on must be fraud by the party opposing the stay... so that any alleged fraud by the appellants is irrelevant."* It seems to me that the legislation does not limit the court's discretion to deny a stay of the proceedings on account of a pleading of fraud by either party. Wolf LJ was somewhat critical of Lord Wilberforce's statement but felt bound by it, although it was argued that it may have been said obiter as it was found in that case that there was no basis for an allegation of fraud. Wolf LJ nonetheless concluded that in relying on *Russell v. Russell* there was nothing in Lord Wilberforce's statement which sought to indicate that he was dissenting or differing from the views expressed therein. He concluded that:

*I do not believe Lord Wilberforce was suggesting that in no circumstances could a charge of fraud be of any relevance where the fraud was being Q relied on by the party making the allegation of fraud, rather than the person charged with fraud, in support of a contention that an action should not be stayed. The passage does, however, give some support for the view that, in circumstances where the party charging fraud is seeking to oppose a stay, the court's normal*

> *approach will not be to accede to arguments advanced on his behalf against a stay when the sole matter relied on is the charge of fraud.*

[51] The proper approach therefore is that where a party seeks to stay the proceedings on account of an arbitration clause, the court would normally accede to that request if it is made by the party against whom fraud has been alleged. This retains the court's discretion to try the case notwithstanding the arbitration clause, but there must be good reason, other than a mere allegation of fraud for doing so[15] if the party opposing the stay is the one who has made the allegation of fraud.

[52] I thought it important to place the case of **Cunningham-Reid** into context, given the claimants' reliance on it in opposition to the application to strike out. What is important to note is that rather than seeking a stay of the proceedings, the defendants seek to strike the claim out altogether. These calls for different considerations. As I have stated earlier, the legislation regarding arbitration encourages the court to stay proceedings pending arbitration, rather than striking them out. This is because the court retains general supervision over the arbitration process within its jurisdiction. An arbitration clause is therefore not a basis upon which a claim is to be struck out but rather stayed pending arbitration. The legislation does not deny either party the right to bring an action in court, but rather grants powers to the court to stay the proceedings if one or all of the parties wish to invoke the arbitration clause. Commencing an action in these circumstances does not amount to an abuse of process.

[53] This court is not of the view that the issues raised in this fraud claim are similar to those raised in Singapore, save and except the issues of breach of contract, which, as I indicated, was based on a different premise. Even then, these issues have not been fully litigated given the fact that the proceedings in that jurisdiction are stayed. Here Mr. Sklarov is a party to the proceedings in Nevis, unlike the claim in Singapore. Significant allegations of fraud are made against him directly. Weiser is also not a party to the proceedings in Singapore. This defendant has not even so much as filed an acknowledgement of service in this claim. If the court were to have considered a stay in accordance with the decision in **Cunningham-Reid**

---

[15] See also the judgment of Belle J in **Baron Gabriel van der Elst v LPA International Inc. SLUHCV2008/0158**

then a proper application of that nature had to have been brought with evidence upon which the court could have exercised its discretion pursuant to sections 4 and 24(2) and (3) of the 1950 Arbitration Act. This was not pursued and the court is not minded to strike out the claims brought by the claimants as it is not of the view that the issues contained therein have been decided by the court in Singapore, neither has that court's order prohibited the claimants from bringing such an action in Nevis. For these same reasons I am also not of the view that there has been an abuse of the court's process in any way.

***The Procedural Issues***

[54]  During the course of the oral hearing, the court made it clear that it was not minded to elevate form over substance in the manner which was pursued by counsel for the defendants. It is important however, to elaborate on the court's reasons to deny the strike out applications on the procedural defects complained of by the defendants.

[55]  Firstly, it is alleged that the Fixed Date Claim process ought not to have been used to commence claim NEVHCV2019/0023. I understand that this was an issue raised before Justice Glasgow during case management. He nonetheless proceeded to manage this case pursuant to the CPR. In any event, I would certainly not be minded to strike out a case on this basis. As counsel for the claimants have rightly pointed out, it is not unusual for cases of this nature to be commenced by way of Fixed Date Claim in the jurisdictions of the Eastern Caribbean Supreme Court. Further, the court would have been empowered to put matters right pursuant to rule 26.3 of the CPR. It would certainly be an unjust exercise of its powers for the court to strike out the claim on that basis.

[56]  It was also argued by the defendants that the Fixed Date Claim was not supported by an affidavit as required by rule 8 of the CPR. This is factually inaccurate. As I indicated earlier, on the very day of the filing of the Fixed Date Claim, the claimants also filed an application for an injunction. An affidavit was also filed by Guo Hong Xin which clearly indicated that the claimants were also relying on that affidavit in support of the Fixed Date Claim. On that premise the matter had gone through its case management stages to the extent that the 1st defendant had in fact filed affidavit evidence in response. Justice Glasgow had given clear

case management directions identifying 6 issues to be tried. Yet the 1st defendant comes at this stage to say that there is no affidavit evidence in support of the claim. I do not accept that this is the case and would certainly not be minded to strike out the case on that basis as the parties are well aware of the pleadings on which the claimants rely.

[57] As it relates to claim NEVHCV2019/0141, it is alleged that the claimants have failed to attach the documents on which they rely in their Statement of Claim. I note that in addition to the fraud claim an application had also been made for an interim worldwide freezing order. That application was supported by an affidavit which, to a great extent, duplicates much of the information contained in the Statement of Claim. The claimants attached the documentation on which they relied to that affidavit. Insofar as that is the case it would seem that any breach of the rules was limited to the claimants simply not duplicating the exhibition of the documents in the Statement of Claim. That can hardly be a reason on which to base an application to strike out the claim. The documents are clearly exhibited in the claim in general and served on the defendants. In any event, as I pointed out to counsel, if the defendants were concerned with the lack of documentation then a request for information could have certainly been made. This is not a basis on which the claim should be struck out.

[58] Lastly, and perhaps somewhat substantively, the defendants assert that the claims should be struck out for breach of rule 8.6 of the CPR in that the entirety of claim NEVHCV2019/0141 raises no reasonable basis for bringing the claim and that claim number 23 does not raise any issue against the 1st defendant. In addition it is argued that both claims are a prolix and raise a number of scandalous and irrelevant issues against the defendants in breach of rule 30.3 of the CPR. I do not agree with these submissions.

[59] Firstly, it seems very clear to me that claim NEVHCV2019/0023 raises issues such as the validity of the arbitration proceedings commenced by America 2030(N) and whether these proceedings should be brought to an end by the court. The claimants also seek orders relating to the impartiality of the arbitrator and an order revoking her authority. If America 2030(N) wished to play no part in these proceedings then it was free to do so but the case was substantive enough to have gone through the entire case management process. I do not propose to discuss the substance of the case in its entirety but it would suffice to say that I am

of the view that the 6 issues identified by Justice Glasgow are substantive and valid issues which would not warrant the nuclear option of being struck out at this stage on the basis put forward by counsel for the defendants.

[60] Secondly, as it relates to case NEVHCV2019/0141 I am of the view that there are substantive allegations of fraud, misrepresentation and breach of contract raised in this case. Insofar as it relates to counsel's arguments that the substance of the case is a prolix and unnecessarily scandalous I do not agree with them. To my mind, the Statement of Claim goes into some detail of facts which the claimants claim to have discovered even subsequent to the lodging of the Fixed Date Claim and the proceedings in Nevis. The claim seems to center on the fact that Mr. Sklarov has represented himself as a reputable businessman with the capability of providing loans to the claimants. The facts which they claim to have discovered are alleged to have undermined this view of Mr. Sklarov. Insofar as there may have been damaging information I am not of the view that this amounts to a prolix given the peculiar circumstances of this case. In any event, as I pointed out to counsel during the oral hearing of this matter, even if the court were to exclude all of the evidence which the defendants find offensive, there would still remain a substantive claim against the defendants. The court is not minded to strike out this claim.

**Conclusions**

[61] In the circumstances, this court does not find that the issues raised in either case are barred by the doctrine of res judicata, neither are the matters an abuse of the process of the court. Further, the procedural issues raised by the defendants are not bases upon which the court would be minded to exercise the nuclear option of striking out these claims.

[62] In the circumstances I make the following orders:

(a) The application to strike out case number NEVHCV2019/0023 is dismissed;

(b) The application to strike out case number NEVHCV2019/0141 is dismissed;

(c) Insofar as the applications have requested an order setting aside the injunctive relief granted in both claims, these are also dismissed;

(d)  Given the nature of the applications and the manner in which they were litigated I make a consolidated order for costs against the applicants on these applications;

(e)  If the parties are unable to agree on reasonable costs within 21 days from the date of delivery of this judgment, the claimants are entitled to bring an application for the assessment of those costs within the provisions of the CPR.

**Ermin Moise**
High Court Judge

**By the Court**

**Registrar**

28

# EXHIBIT 29

**COMMONWEALTH OF THE BAHAMAS**
**IN THE SUPREME COURT**

**COMMON LAW AND EQUITY DIVISION**

**2022/CLE/gen/00120**

**In the Matter of** the Reciprocal Enforcement of Judgments Act, 1924

**And**

**In The Matter of** a Judgment of the High Court of Justice of the Federation of Saint Christopher and Nevis dated 16 June, 2020 and obtained on 18 June, 2020, in proceedings numbered NEVHCV2019/141

**Entitled**

**(1) SUNPOWER BUSINESS GROUP PTE LTD**
**(2) TOURNAN TRADING PTE LTD**

Claimants/Applicants

- and -

**(1) AMERICA 2030 CAPITAL LIMTED**
**(2) MARK SIMON BENTLEY (also known as VAL SKLAROV)**
**(3) WEISER GLOBAL MARKETS LTD (formerly known as WEISER ASSET MANAGEMENT LTD.)**

Defendants/Respondents

**BETWEEN**

Sunpower Business Group Pte Ltd.

First Plaintiff

Tournan Trading Pte Ltd

Second Plaintiff

And

America 2030 Capital Limited

First Defendant

Weiser Global Capital Markets Ltd

Second Defendant

1

| | |
|---|---|
| **Before:** | **Her Ladyship The Honourable Madam Senior Justice Deborah Fraser** |
| **Appearances:** | **Mrs. Courtney Pearce-Hanna for the First and Second Plaintiffs/Applicants** |
| **Judgment Date:** | **09 August 2023** |

**Registration of a Foreign Judgment – Section 3 of the Reciprocal Enforcement of Judgments Act, 1924 – Just and Convenient - Extension of Time**

## JUDGMENT

1. This is an ex-parte application on behalf of Sunpower Business Group Pte Ltd ("**SBG**") and Tournan Trading Pte Ltd ("**Tournan**" and collectively "**Applicants**") pursuant to section 3 of the Reciprocal Enforcement of Judgments Act, 1924 ("**Act**") to register a Judgment Order made by the High Court of St. Christopher and Nevis on 16 June 2020 and filed on 18 June 2020 ("**Nevis Judgment**").

2. There is also an application for extension of time to make the application for registration.

### *Background*

3. The Applicants are both Bermudan companies publicly listed on the Singapore stock exchange since 2005.

4. America 2030 Capital Limited was an international business corporation incorporated in the island of Nevis operating as an investment company ("**America 2030**"). America 2030 has property in The Bahamas, namely the shares (defined below) held by Weiser Global Capital Markets Limited, formerly known as Weiser Asset Management Limited, ("**Weiser**") in its capacity as Custodian.

5. Weiser is a regulated financial services firm in The Bahamas which, at all material times, acted as depository broker in a transaction involving the Applicants and America 2030.

6. In June of 2018, the Applicants entered into Master Loan Agreement ("**MLA**") with America 2030 whereby the Applicants, respectively, would deposit

14,000,000 shares in Sunpower Group Limited as collateral ("**Shares**") in exchange for loans of up to USD$25,000,000.00 from America 2030.

7. Custodian Management Agreements provided for Tournan and SBG respectively to deposit the pledged collateral into depository accounts held by Weiser.

8. Materially identical Supplemental Loan Agreements ("**SMLA's**") amended the terms of the MLA's to, inter alia, reduce the loan amount to USD$3,000,000.00 and substituted America 2030 with America 2030 (N)(the Nevis Entity) as the lender. Accordingly, America 2030 was meant to advance loans of USD$3,000,000.00 each to Tournan and SBG and the Shares were to stand as security for repayment.

9. However, no funds were ever advanced and, almost immediately, upon deposit of the Shares (which were to remain in Sunpower and Tournan's respective names via a non-title transfer), America 2030 instructed Weiser to sell a large portion of same.

10. Consequently, the Applicants sought injunctive relief. America 2030 responded by purporting to commence arbitration proceedings in Nevis, relying on arbitration clauses contained in the agreements. The Applicants challenged the validity of the arbitration proceedings in the Nevis court proceedings.

_The Nevis Proceedings_

11. Following an investigation into America 2030 and its principal, Val Sklarov (also known as Mark Bentley)("**Sklarov**"), the Applicants initiated court proceedings in Nevis against America 2030, Sklarov and Wieser for fraud ("**Fraud Claim**") and obtained a worldwide freezing order against America 2030 and Sklarov and an asset preservation order against Weiser restraining it from dealing with or disposing of the Shares or any sales proceeds of same.

12. The Fraud Claim was not resisted by any of the defendants and none of them complied with disclosure directions under the aforesaid orders, despite being served with such orders.

13. Accordingly, Judgement in Default was obtained against all of the defendants. An appeal by America 2030 and Sklarov to set aside the Judgment in Default was dismissed by the Court of Appeal of the Eastern Caribbean Supreme Court. The judgment was served on the attorneys for America 2030 and Weiser as well as the registered offices of the two companies.

14. The Nevis Court ruled that America 2030 carried out a stock loan fraud against each of the Applicants; that all agreements were vitiated due to the fraud; that the Applicants are entitled to return of the Shares and all proceeds of sale thereof held by Weiser in favor of America 2030; and that America 2030 and Weiser

must provide an account to the Applicant of all dealings with the Shares and their sale proceeds.

15. No further appeal was lodged by America 2030 nor Weiser.

*The Bahamian Proceedings*

16. On 01 April 2019, Weiser initiated proceedings in the Supreme Court of the Commonwealth of The Bahamas and secured an injunction to maintain the status quo of the Shares and their proceeds pending resolution of the dispute between the parties ("**Bahamian Proceedings**").

17. On 11 November 2020, the Applicants filed an ex-parte application in the Bahamian Proceedings to vary/discharge the freezing injunction made on 01 April 2019. The Summons was subsequently amended to seek additional relief, namely, that the Court recognize the Judgment Order ("**Amended Summons**").

18. The Amended Summons was initially heard on 30 April 2021. While the Court made an order with respect to certain of the reliefs sought, questions concerning the discharge and recognition of the Judgment Order remained extant.

19. Arguments concerning the extant matters raised in the Amended Summons were heard in July and August of 2021. On 26 April 2022, the Honourable Justice Neil Braithwaite made a ruling ("**Brathwaite Ruling**") at which time he refused the reliefs sought by the Applicants and found that recognition by a Bahamian Court of the Nevis Judgment could only be effected by registration under the Act or by initiation of a common law action.

20. The Applicants then made the instant application under the Act to register the Nevis Judgment.

21. The Applicants also seek an extension of time to make their application for registration as the application has been brought more than twelve months after the Nevis Judgment was made.

## Issues

22. The issues that the Court must decided are: (i) Whether the Court will grant an extension of time to make the application for registration of the Judgment Order? (ii) Whether the Court will grant the order sought by the Applicants and register the Judgment Order?

## Discussion

***Whether the Court will grant an extension of time to make the application for registration of the Judgment Order?***

4

23. By virtue of **section 3 of the Reciprocal Enforcement of Judgments Act, 1924**, the Court is permitted to register judgments made outside of the jurisdiction. Section 3(1) provides:

> **"3. (1) Where a judgment has been obtained in a superior court outside The Bahamas the judgment creditor may apply to the Supreme Court, at any time within twelve months after the date of the judgment, or such longer period as may be allowed by the court, to have the judgment registered in the court, and on any such."**

24. It is noted that the Nevis Judgment was made on 16 June 2020 and subsequently filed on 18 June 2023. This instant application for registration was made some two (2) years later. The Applicants rely on the case of **Ogelegbanweir and ors v President of the Federal Republic of Nigeria and ors [2016] WEHC 8** ("**Ogelegbanweir**") for the proposition that extension of time can be granted once there is no prejudice caused by such extension. There, an extension of time was granted to make an application for registration where the application was made some seventeen (17) months late.

25. In that case, the Applicants sued the President of Nigeria, the Attorney General and a Major-General of a task force due to the government deploying a military task force against the inhabitants of the Gbaramatu Kingdom of Warri South West Local Governement Area of Delata State in Nigeria. The deployment of the military task force caused the decimation of the Applicants' communities causing destruction of property and displacement of members of the community. As a result, the Applicants brought proceedings in the High Court of Nigeria and were awarded the equivalent of £400 million. They were unable to satisfy the debt in Nigeria and sought to enforce the award in the United Kingdom (as the defendants were known to have assets there). In the circumstances and based on the evidence, the court acceded to the application as against the Major-General only.

26. The **Ogelegbanweir** case can, however, be distinguished from the instant case. First, in that case, the defendants who were ordered to make payments to the applicants made a number of assurances for payment, hence why the applicants delayed in pursuing enforcement of the award made. Second, the Court had evidence confirming that the defendants were in a much stronger position than the applicants and were ultimately in charge of any enforcement proceedings that the applicants were able to pursue. The circumstances are not similar in the instant case.

27. The Applicants' counsel submits that there is no prejudice as an injunction remains in place restraining the Defendants' access to the Shares or the proceeds of same.

28. The Applicant's counsel contends, however, that there would be prejudice suffered if the Applicants are unable to register the judgment for enforcement as they have been deprived of the value and benefit of the shares for nearly five (5) years while the Second Defendant continues to draw down fees and disbursements from the proceeds of the wrongful sale of a portion of the Shares.

29. It is noted that the Applicants have also brought an application for extension of time under **Order 3 rule 4 of the Rules of the Supreme Court, 1978** ("**RSC**"), which provides:

> **"4. (1) The Court may, on such terms as it thinks just, by order extend or abridge the period within which a person is required or authorised by these Rules, or by any judgment, order or direction, to do any act in any proceedings.**
>
> **(2) The Court may extend any such period as is referred to in paragraph (1) although the application for extension is not made until after the expiration of that period.**
>
> **(3) The period within which a person is required by these Rules, or by any order or direction, to serve, file or amend any pleading or other document may be extended by consent (given in writing) without an order of the Court being made for that purpose"**

30. The rule permits the court to grant an extension of time within which to comply with a rule under the RSC, a judgment, order or direction. The Applicants seek an extension of time to bring this application, which is governed by an entirely different piece of legislation – The Reciprocal Enforcement of Judgments Act, 1924. Accordingly, this excerpt from the RSC does not apply.

31. Section 3(1) of the Act does, however, state that the Court may grant a longer period of time to register the Nevis Judgment. As the Defendants have not attempted to appeal the Nevis Judgment and the Applicants have made several applications attempting to move the Court in as timely a manner as possible to have the Nevis Judgment registered, the Court hereby grants the requested extension.

***Whether the Court will grant the order sought by the Applicants and register the Judgment Order***

32. In relation to whether the Court will permit the registration of the Nevis Order, **section 2 of the Act** states:

> **"judgment" means any judgment or order given or made by a court in any civil proceedings whether before or after the passing of this Act and includes an award in proceedings on an arbitration if the award has, in pursuance of the law in force in the place where it was made, become enforceable in the same manner as a judgment given by a court in that place;"**

33. **Section 6(1) of the Act** provides:

> **"6. (1) Where the Governor-General is satisfied that reciprocal provisions have been made by the legislature of any country for the enforcement within that other country of judgments obtained in the Supreme Court, the Governor-General may by Order declare that this Act shall extend to judgments obtained in a superior court in that country, and on any such Order being made this Act shall extend accordingly."**

34. Orders under section 6 of the Act include the Leeward Islands of the Caribbean, which includes St. Kitts and Nevis (which is where the Nevis Judgment was made). Accordingly, the Nevis Judgment is deemed a judgment under the Act as it is an order emanating from a court in civil proceedings from one of the Leeward Islands.

35. Based on evidence before the Court, the Nevis Judgment has not been set aside nor appealed and the matter is thus, *res judicata*. The Judgment Order, thus remains valid and enforceable.

36. The Court must also consider if any of the exclusions under **section 3(2) of the Act** applies. The section reads:

> **"(2) No judgment shall be ordered to be registered under this section if —**
>
> **(a) the original court acted without jurisdiction;**
>
> **(b) the judgment debtor, being a person who was neither carrying on business nor ordinarily resident within the jurisdiction of the original court, did not voluntarily appear or otherwise submit or agree to submit to the jurisdiction of that court;**
>
> **(c) the judgment debtor, being the defendant in the proceedings, was not duly served with the process of the original court and did not appear, notwithstanding that he was ordinarily resident or was carrying on business within the jurisdiction of that court or agreed to submit to the jurisdiction of that court;**
>
> **(d) the judgment was obtained by fraud;**
>
> **(e) the judgment debtor satisfies the registering court either that an appeal is pending or that he is entitled or intends to appeal against the judgment;**
>
> **(f) the judgment was in respect of a cause of action which for reasons of public policy or for some other similar reason could not have been entertained by the registering court."**

37. Based on the circumstances of the case and the evidence provided, none of the exclusions under section 3(2) of the Act apply to the instant case. The Nevis

Court did have jurisdiction as America 3030 made representations and applications at that time before that court and jurisdiction was not challenged.

38. Further, it was noted at the Court of Appeal in St. Christopher and Nevis that all defendants made certain assertions in the court below and that Weiser was indeed a party to the Fraud Claim. The Court of Appeal in St. Christopher and Nevis also noted that Weiser participated in Striking Out proceedings in the lower court of St. Christopher and Nevis.

39. In addition, the Nevis Judgment was duly served on the First and Second Defendants and none of the Defendants sought to have the Nevis Judgment set aside for fraud.

40. The Court does note, however, that there are presently two separate injunctions over the Shares in differently constituted proceedings. As the Court observed in **The Public Institution for Social Security v Fahad Maziad Rajaan Al-Rajann 2020/CLE/gen/00976**:

> **"The test to be applied in determining whether to register a foreign judgment or order is whether in the circumstances of the case, "it is just and convenient" that the judgment or order be enforced in The Bahamas: section 3 of the [Reciprocal Enforcement of Judgments] Act."**

41. The Court relies on the "*just and convenient*" element as expressly stated in section 3(1) of the Act. According to the Affidavit of Elizabeth Harper filed on 23 August 2022, there is presently an injunction over the Shares and its sale proceeds in another court matter before a different judge. The Court notes there are, in fact, two injunctions regarding the Shares and their sale proceeds. The Nevis Judgment, however, covers more than just the Shares and the sale proceeds of same – it also includes, *inter alia*, several awards of damages.

42. I have also reviewed the injunctions. Based on the wording, the injunctions remain in effect to this day and shall remain so until final determination of proceedings in Singapore. It mentions that the injunctions are also subject to the St. Christopher and Nevis proceedings, but that matter has already been determined.

43. As this application is merely to register the Nevis Judgment in this jurisdiction, I am prepared to grant such relief.

44. In the circumstances, I hereby grant leave to register the Nevis Judgment in accordance with the Reciprocal Enforcement of Judgments Act, 1924 and the Rules of Court (Reciprocal Enforcement of Judgments), 1952.

**Senior Justice Deborah Fraser**

**Dated this 09th day of August 2023**

# EXHIBIT 30

# AMERICAN ARBITRATION ASSOCIATION

## AAA Case No. 01-20-0007-5777

### BRENT SATTERFIELD V. VAL SKLAROV, AMERICA 2030 CAPITAL, LLC, BENTLEY ROTHSCHILD FINANCIAL LLC, AND BENTLEY ROTHSCHILD CAPITAL LIMITED CORP.

---

### FINAL AWARD

---

09 July 2021

Tribunal:
Charles J. Moxley, Jr. (President)
Edna Sussman (Co-Arbitrator)
Richard F. Ziegler (Co-Arbitrator)

View the document on jusmundi.com

Table of Contents

- Final Award ..................................................................................................................................0
- I. FACTUAL AND PROCEDURAL BACKGROUND .................................................................1
- A. Nature of the Case ....................................................................................................................1
- B. The Shares ..................................................................................................................................2
- C. The Agreement ..........................................................................................................................3
- 1. Master Loan Agreement ...........................................................................................................4
- 2. April 3, 2018 Addendum ...........................................................................................................4
- 3. May 29, 2018 Addendum ...........................................................................................................5
- 4. November 30, 2018 Addendum ................................................................................................7
- 5. December 15, 2018 Closing Statement and Addendum ........................................................8
- D. Parties and Related Entities ....................................................................................................8
- E. Justice Masley's Decisions and Orders ................................................................................10
- 1. June 20, 2019 Decision and Order .........................................................................................11
- 2. October 30, 2019 Decision and Order ...................................................................................11
- 3. December 5, 2019 Decision and Order ..................................................................................12
- F. Disagreement as to Justice Masley's October 30, 2019 Decision and Order and the Transaction....................12
- 1. Summary...................................................................................................................................12
- 2. Disagreement as to the October 30, 2019 Decision and Order ..........................................12
- 3. Disagreement as to Nature of the Transaction .....................................................................12
- G. Sklarov's Actions Following Receipt of First Tranche of Shares ......................................14
- 1. Execution of Master Loan Agreement ...................................................................................14
- 2. Sklarov's Putting First Tranche Shares into Name of America 2030 UK ...........................14
- 3. Sales of the Shares ...................................................................................................................15
- 4. December 25, 2018 First Disbursement Statement ..............................................................16
- 5. December 27, 2018 Margin Call .............................................................................................16
- 6. January 18, 2019 Notice of Default ........................................................................................17
- H. Detailed Provisions of the Agreement .................................................................................18
- 1. Duty to Loan ............................................................................................................................18
- 2. Duty to Preserve and Protect Collateral ...............................................................................21
- 3. Duty to Return Collateral Upon Repayment .........................................................................21
- 4. Transfer or Pledge of Collateral ............................................................................................22
- 5. Disbursement Date for Loan ..................................................................................................23
- 6. Term Sheet for the Transaction .............................................................................................23
- I. The Parties' Allegations ..........................................................................................................24
- J. Evidentiary Hearing and Procedural History ......................................................................26
- K. Analysis and Conclusions ......................................................................................................27
- 1. Summary...................................................................................................................................27
- 2. Contract Unenforceability ......................................................................................................28
- 4. Fraud ........................................................................................................................................32
- 5. Conversion ...............................................................................................................................39
- 6. Unjust Enrichment ..................................................................................................................40
- 7. Conspiracy ...............................................................................................................................41
- 8. Unclean Hands ........................................................................................................................41
- 9. Joint and Several Liability ......................................................................................................42
- 10. Relief ......................................................................................................................................43
- 11. Counterclaims ........................................................................................................................43
- 12. Alleged Prior Bad Acts ..........................................................................................................44
- 13. Charges of the AAA and Arbitrators ....................................................................................44
- 14. Other ......................................................................................................................................44
- II. FINAL AWARD .......................................................................................................................45

i



# Final Award

[1].

WE, THE UNDERSIGNED ARBITRATORS, having been duly designated in accordance with the arbitration agreement entered into on or about April 2, 2018, between Claimant Brent Satterfield and Respondent America 2030 Capital, LLC; and Respondent Bentley Rothschild Capital Limited having become a party to said arbitration agreement by the "Second Addendum" thereto dated November 30, 2018; and Respondents Val Sklarov and Bentley Rothschild Financial LLC having submitted to this arbitration by consent; and Claimant Brent Satterfield having been represented by Anne W. Salisbury, Esq. and David J. Kaplan, Esq., of Guzov LLC and on the papers by John B. Kinchen, Esq., and Luis Fabrega, Esq. of Hughes Arrell Kinchen LLP; Respondent Val Sklarov, having been represented by Jonathan P. Bach, Esq., Eric S. Olney, Esq., and Amelia Courtney Hritz, Esq., of Shapiro Arato Bach LLP; Respondent America 2030 Capital, LLC, having been represented by Michael Conway and Louis M. Tambaro, Esq., of Offit Kurman P.A.; Respondents Bentley Rothschild Financial LLC, and Bentley Rothschild Capital Limited Corp., having been represented by Jason M. Koral, Esq. of Press Koral LLP; said Respondents having also been previously represented in the case by Jaitegh T. Singh, Esq., and Emily Garner, Esq., of the Singh Law Firm, P.A., and M. Salman Ravala, Esq., and Ross E. Pitcoff, Esq. of Criscione Ravala, LLP before said attorneys and firms were replaced as counsel by the above-named counsel for said Respondents, as described; and having been duly sworn; and having heard the allegations, proofs, and arguments of the parties, do hereby issue this FINAL AWARD.

# I. FACTUAL AND PROCEDURAL BACKGROUND

# A. Nature of the Case

[2].

This is a dispute between Claimant Brent Satterfield ("Satterfield") and Respondents Val Sklarov ("Sklarov"), America 2030 Capital, LLC ("America 2030"), Bentley Rothschild Financial LLC ("Bentley Rothschild Financial"), and Bentley Rothschild Capital Limited Corp. ("Bentley Rothschild Nevis") (Bentley Rothschild Financial and Bentley Rothschild Nevis are at times referred to herein as the "Bentley Rothschild Entities "), arising out of a stock loan transaction (the "Stock Loan Transaction" or the "Transaction") set forth in an agreement, the Master Loan Agreement (the "Master Loan Agreement") as revised pursuant to various Addenda (collectively, the "Agreement").

[3].

The Stock Loan Transaction was initially between Satterfield and America 2030 and thereafter between Satterfield and the following entities controlled by Sklarov as assignees: Bentley



Rothschild Nevis and non-party America 2030 Capital Limited ("America 2030 Nevis") (America 2030, Bentley Rothschild Nevis, and America 2030 Nevis are at times collectively referred to herein as the "Lenders" and Satterfield is at times referred to herein as the "Borrower").

[4].

Pursuant to the Stock Loan Transaction, the Lenders were to loan Satterfield some $3.5 million (depending on stock values at the time of funding) (the "Loan"), based on collateral (the "Collateral") consisting of 2,269,795 shares of stock Satterfield held in Co-Diagnostics, Inc. ("Co-Diagnostics") (the "Shares"), a public company of which Satterfield was a founder, executive, board member, and, at 18%, the largest shareholder, with Satterfield turning the Shares over to America 2030 following his execution of the Master Loan Agreement.

[5].

Except for the net amount of $66,709 after fees, Respondents did not fund the Loan, but nonetheless, Respondents, because of Satterfield's alleged breaches of the underlying loan agreement, asserted the right to retain and, subject to certain preliminary injunctions described hereinafter, have retained the Collateral and Respondents' proceeds of selling Shares held as the Collateral.

## B. The Shares

[6].

Once Satterfield delivered the Shares at Sklarov's direction to American 2030 as Collateral on or about April 27, 2018, Sklarov caused the Shares to be deposited into an account of America 2030 at Co-Diagnostics' transfer agent, VStock, LLC ("VStock").

[7].

On December 6, 2018, America 2030 transferred 1,134,898 of the Shares (the "First Tranche") from its account at VStock to an account of one of Sklarov's entities, non-party America 2030 Capital Limited ("America 2030 UK"), shortly after those Shares, as hereinafter described, became freed of restrictions and freely tradeable.

[8].

As further described hereinafter, Sklarov thereupon, in the period from December 13, 2018 through January 22, 2019, sold 905,926 of the 1,134,898 First Tranche Shares, receiving $1,152,538.70 in proceeds (the "Proceeds") in the foregoing account of America 2030 UK at the Daniel Stewart & Company securities firm in London ("Daniel Stewart"). At the evidentiary hearing in this matter (the "Hearing"), Sklarov, as hereinafter described, testified he did not know or remember where the Proceeds of $1,152,538.70 went or where they are now.

[9].

Sklarov returned 70,000 of the First Tranche Shares to Satterfield apparently because of certain issues having to do with certain TROs and preliminary injunctions described hereinafter. The remaining approximately 158,972 of the First Tranche Shares apparently remain in the

referenced account of America 2030 UK at Dolfin Financial ("Dolfin") in London, which took over the account when Daniel Stewart went out of business. Given Sklarov's control over America 2030 UK, such Shares appear to be subject to the preliminary injunction that, as hereinafter described, Justice Andrea Masley ("Justice Masley"), Supreme Court, New York County, issued on December 5, 2019 against Sklarov, enjoining and restraining him from "selling, transferring, assigning, encumbering or otherwise disposing of any shares of Co-Diagnostics, Inc, which are the subject of this action."

[10].

As to the 1,134,897 Shares making up the second half of the Collateral (the "Second Tranche"), America 2030, as hereinafter described, transferred those Shares to an account of another Sklarov entity, Bentley Rothchild Financial at VStock on July 18, 2018. Given Sklarov's control over Bentley Rothchild Financial and the presence of those Shares in a VStock account, those Shares appear to be subject to the preliminary injunction against Sklarov issued by Justice Masley on December 5, 2019 and to the further preliminary injunction against VStock issued by Justice Masley on January 23, 2019 (collectively, the "Preliminary Injunctions").

## C. The Agreement

[11].

The Parties' Agreement with respect to the Stock Loan Transaction consists of the following:
• The Master Loan Agreement between Satterfield and America 2030 dated on or about April 2, 2018 (the "Master Loan Agreement");

• The April 3, 2018 Addendum between Satterfield and America 2030 to the Master Loan Agreement one day later (the "April 3, 2018 Addendum");

• The May 29, 2018 Addendum between Satterfield and America 2030 to the Master Loan Agreement (the "May 29, 2018 Addendum");

• The November 30, 2018 "Second" Addendum among Satterfield, America 2030, America 2030 Nevis, as "Assignee," and Bentley Rothschild Nevis, as Second Assignee, to the Master Loan Agreement (the "November 30, 2018 Addendum");[1] and

• The December 15, 2018 Closing Statement and Addendum between Satterfield and America 2030 Nevis to the Master Loan Agreement (the "December 15, 2018 Closing Statement and Addendum").

[12].

The Master Loan Agreement, the April 3, 2018 Addendum, the May 29, 2018 Addendum, the November 30, 2018 Addendum (subject to the hereinafter described dispute as to the content and effect of Justice Masley's October 30, 2019 Decision and Order), and the December 15, 2018 Closing Statement and Addendum, as noted above, are referred to herein as the "Agreement."

---

[1]  As hereinafter described, the status of this addendum is disputed, given the parties' differing interpretation as to the content and effect of Justice Masley's October 30, 2019 Decision and Order finding the November 30, 2018 Addendum "permeated with fraud."



Sklarov signed the Master Loan Agreement, the April 3, 2018 and May 29, 2018 Addenda on behalf of America 2030. Sklarov signed the November 30, 2018 Addendum on behalf of America 2030, America 2030 Nevis, and Bentley Rothschild Nevis. Sklarov signed the December 15, 2018 Closing Statement and Addendum on behalf of America 2030 Nevis.

[13].

Following is a description of the various documents making up the Agreement.

# 1. Master Loan Agreement

[14].

This was the original agreement between Satterfield and America 2030. It purported to set forth the parties' overall agreement as to the Transaction, including the parties' respective rights and obligations and extensive disclaimers of the Lenders. We discuss below how, if at all, the Master Loan Agreement and the Addenda thereto address such matters as whether the Lenders have a duty to loan thereunder and whether they have a duty to preserve the Collateral and to return it to Satterfield at the end of the Term of Agreement if and when Satterfield were to repay the Loans. We also address various of the extensive disclaimers the Lenders make in the Master Loan Agreement as well as in the Addenda.

# 2. April 3, 2018 Addendum

[15].

This Addendum increased the amount of the Loan from $1.5 million to $3.5 million, while providing that the Lender would return to Satterfield any Pledged Collateral "not used by Lender."

[16].

This Addendum followed discussions between Sklarov and Satterfield that Sklarov would determine the amount of the Loan, pursuant to Section 2.1(b) of the Master Loan Agreement, based on 45% of the market value of the Collateral at the time of funding of the Loan, and would return any "unused" Collateral. While the Master Loan Agreement had referred to the Collateral as "Transferred Collateral," the April 3, 2018 Addendum referred to it as "Pledged Collateral." As to returning unused Collateral, the April 3, 2018 Addendum provided, "Lender shall undertake to return to Borrower any excess shares of [Co-Diagnostics] not used by Lender as a Pledged Collateral in accordance with the [Master Loan Agreement]."

[17].

This Addendum also provided that voting rights for the Shares would be reassigned back to Satterfield.



# 3. May 29, 2018 Addendum

[18].

    While Satterfield and Sklarov disagree, as hereinafter described, as to whether Satterfield disclosed to Sklarov before entering into the Master Loan Agreement that the Shares were restricted, it is undisputed that the Shares were in fact restricted, that is, not eligible under the federal securities laws to be traded on a public exchange, when Satterfield turned them over to Sklarov and put them into an account of America 2030 at VStock.

[19].

    The restricted nature of the Shares created a delay in the Transaction. Both Sattterfield and Sklarov still wanted to proceed with the Transaction, but Sklarov would not close on or fund the Loan until the restrictions were lifted. This led to an extended period essentially from around May 16, 2018 to around December 12, 2018 during which Sklarov, directly and through attorneys and others, and Satterfield attempted to convince VStock to recognize the Shares as eligible for public trading.

[20].

    During this period, Sklarov continuously and repeatedly told Satterfield he would fund the Loan once the Shares were released from restrictions and became freely tradeable. He did this verbally and in writing, including in chats with Satterfield and Leib Schaeffer ("Schaeffer"), the intermediary who had introduced Satterfield to Sklarov and continued throughout the Transaction to deal with Satterfield on Sklarov's behalf in attempting to get the Shares freed of restrictions and in communicating Sklarov's intentions as to the Transaction to Satterfield.

[21].

    Perhaps the most memorable expression by Sklarov of his intent to fund the Loan once the restrictions on the Shares could be lifted was his statement on June 1, 2018 in a three way chat among Sklarov, Schaeffer, and Satterfield, that, if the restrictions on the Shares were lifted that day, Sklarov would fund a loan in the amount of $6 million.[2]

[22].

    Thus, in real time when the issue of the restricted nature of the Shares surfaced, Satterfield and Sklarov at least appeared to have a common interest—to get the restriction on the Shares removed. The obstacle, the entity that had to be convinced, was VStock. As transfer agent for Co-Diagnostics at which the Shares were held in an account in the name of America 2030, VStock, as a practical matter, controlled whether and, if so, in what circumstances, the Shares could or would be deemed unrestricted. While Sklarov and Satterfield discussed trying to get Co-Diagnostics to change transfer agents, this never happened. As transfer agent, VStock appeared to take its responsibilities in this regard very seriously.

---

[2]  According to the statement of stock value of Co-Diagnostics put in the record by Respondents, the stock reached a high of 5.94 on that day, yielding a value of $13,482,582 for Satterfield's 2,269,795 Shares. Using the loan to value ratio (LTV) of 45% set forth at Section 2.1(b) of the Master Loan Agreement, the lendable amount would have been some $6,067,000, although the market price for the stock for that day closed at $4.79 per share, which would have yielded a somewhat lower loan amount.



[23].

      VStock saw several obstacles to the release of the restrictions. First, VStock read the Master Loan Agreement as providing that Satterfield had transferred the Shares, ostensibly as a gift, to America 2030, and not merely turned them over as collateral for a loan. On this basis, VStock concluded that under the U.S. securities laws America 2030 could not take advantage of Satterfield's six month holding period, but rather was subject to its own six month period before it, as owner, could conduct trades in the Shares.

[24].

      Secondly, VStock, because of the volume of shares involved, saw America 2030 as having become an affiliate of Co-Diagnostics under the securities laws, subjecting itself to various reporting requirements and restrictions since the transfer of the Shares to America 2030 constituted the transfer of over 10% of the outstanding shares of Co-Diagnostics.

[25].

      The May 29, 2018 Addendum was designed by Sklarov to address these obstacles. It provided that Satterfield had turned the Shares over to America 2030 under the Master Loan Agreement as a *bona fide* pledge of security for a loan and not as a transfer. It further provided that those of the Shares that exceeded 9.99% of Co-Diagnostics' outstanding shares would be assigned to another "third party lender" of America 2030's choice, thereby "bifurcating the Loan."

[26].

      VStock, however, did not accept the premise of the May 29, 2018 Addendum that Satterfield had only pledged and not transferred the Shares to America 2030 under the Master Loan Agreement. In VStock's view, the May 29, 2018 Addendum was not effective in this regard, since the horses were already out of the barn: By the Master Loan Agreement Satterfield had already transferred the Shares to America 2030 and this could not be papered over by the retroactive recharacterization attempted by the May 29, 2018 Addendum

[27].

      VStock thus stuck with its conclusion that America 2030 was required under the securities laws to hold the Shares for an additional six months. As a result, it was only in late November 2018, some six months later, as reflected in Sklarov's November 30, 2018 email to his broker at the Daniel Stewart securities firm in London, that VStock recognized or was about to recognize the First Tranche Shares as unrestricted and free-trading. *See* Claimant's Exh. 32. According to Dolfin, the successor firm for Daniel Stewart when the latter went out of business, the 1,134,898 in First Tranche Shares were received in the account on December 10, 2018. *See* Claimant's Exh. 34.[3]

[28].

      In a point that becomes relevant later in this narrative, Sklarov further told his London broker in the November 30, 2018 email that the Shares (the First Tranche Shares) soon to arrive would be in the name of America 2030, but would be deposited into the account of America 2030 Capital Limited. As hereinafter discussed, the latter is the name we have referenced and defined herein as America 2030 Nevis. However, it developed in the course of Sklarov's testimony at the Hearing that this America 2030 Capital Limited in London was a different America 2030 Capital Limited

---

[3]  Although the parties did not request findings of fact and conclusions of law in this case, the Tribunal includes herein some illustrative rfeferences to the record in the case.

than the one he had previously identified to Satterfield as an entity to whom the Agreement was being assigned. Specifically, the America 2030 Capital Limited in London to which Sklarov transferred the First Tranche Shares was an entity with the same name that was organized in the UK. *See* Tr. at 575. It thus appears that the First Tranche Shares as of that time had been assigned by America 2030 to America 2030 Nevis, but nonetheless remained in the account of America 2030 at VStock, and Sklarov then transferred them to America 2030 UK in London.

# 4. November 30, 2018 Addendum

[29].

Given further issues with VStock in connection with its non-acceptance of the intended effect of the May 29, 2018 Addendum to enable America 2030 to take advantage of Satterfield's six month holding period, Sklarov decided to take the Transaction off-shore purportedly in order to avoid further problems under the U.S. securities laws. As discussed above, it was already contemplated by the May 29, 2018 Addendum that America 2030 would be bifurcating the Loan by having an affiliated entity extend to Satterfield so much of the Loan as was over 9.99% of the outstanding shares of Co-Diagnostics.

[30].

Sklarov thus told Satterfield in connection with the November 30, 2018 Addendum that he wanted to assign both bifurcated tranches of the Loan to offshore entities affiliated with America 2030, one-half to America 2030 Nevis and one-half to Bentley Rothschild Nevis, substituting them as the Lenders. Sklarov, however, told Satterfield this did not mean that the Shares would be moved to Nevis, but rather only that the Lenders would have been incorporated there. *See* Claimant's Exh. 28.

[31].

Satterfield balked at taking the Transaction offshore, telling Sklarov he was not comfortable with it. Satterfield testified and presented documentary evidence at the Hearing that Sklarov pressured him into accepting the November 30, 2018 by threatening that, if he didn't, Sklarov would declare him in default of the Agreement and retain the First Tranche of Shares— that he would simply retain them totally and not return them to Satterfield even though America 2030 had not yet by that time made any loan under the Agreement.

[32].

This threat was conveyed to Satterfield by Schaeffer in a November 14, 2018 chat. Schaeffer told Satterfield Sklarov was offering Satterfield "half your stock back," if Satterfield would not agree to take the Transaction offshore and that Sklarov would keep the balance: "He keeps the balance." *See* Claimant's Exh. 22. Schaeffer told Satterfield Sklarov was saying that, however, if Satterfield agreed to take the Transaction offshore and thereby avoid the U.S. securities laws and the SEC, Sklarov would "start monetizing it all." *Id.*

[33].

Satterfield testified that, after Schaeffer told him that, if he didn't agree to take the Transaction



offshore, Sklarov would take half of the Shares, he (Satterfield) telephoned Sklarov about the matter. Satterfield testified that, in the call, Sklarov enlarged the threat, telling him he was already technically in default—that "we could seize all of your shares today, 100 percent of them." Tr. at 378. Satterfield testified that he objected and Sklarov reassured him he wanted to make the Loan and the only issue was that Satterfield had to agree to the November 30, 2018 Addendum taking the Transaction offshore and Sklarov would fund the Loan. Tr. at 379-380

[34].

Satterfield contends he signed onto the November 30, 2018 Addendum as a result of this threat and pressure by Sklarov, believing that, if he did so, and the Shares became tradeable, Sklarov would make the Loan. Sklarov denies coercing Satterfield, contending that Satterfield badly wanted the Loan and readily agreed to this Addendum.

[35].

Satterfield thus signed the November 30, 2018 Addendum, whereby America 2030 assigned the first half of the Shares, the First Tranche, to America 2030 Nevis and the second half to Bentley Rothschild Nevis.

## 5. December 15, 2018 Closing Statement and Addendum

[36].

This Addendum provided that America 2030 Nevis would be making a Loan based on 45% of the market value of the First Tranche, which amounted to a loan of $1,113,334.00, but that that loan amount would be paid out in tranches of $100,000-300,000 every two-three weeks, provided the Shares "maintains current support level and does not experience significant downward pressure or price adjustment."

[37].

The December 15, 2018 Closing Statement and Addendum differs substantially from the Form of Closing Statement attached to the Master Loan Agreement. By way of example, the December 15, 2018 Closing Statement adds substantial disclaimers, including the statement that "LENDER DOES NOT GUARANTEE FUNDING and ALL FUNDING IS AT LENDERS DISCRETION UNTIL DISBURSEMENT." It also adds the statement, "IN THE EVENT OF ANY INCONSISTENCY WITH THE MLA, THIS CLOSING STATEMENT WILL BE THE CONTROLLING DOCUMENT."

## D. Parties and Related Entities

[38].

Satterfield is the Claimant. Sklarov conducted the Transaction with Satterfield through various entities ("Sklarov Entities") that Sklarov controlled, some of which Satterfield included as Respondents in this arbitration and some of which he did not. Following is a summary



description of the roles of such Sklarov Entities focused on in this matter:

• America 2030 Entities[4]

o America 2030 Capital, LLC ("America 2030"): original Lender under the Master Loan Agreement.

o America 2030 Capital Limited ("America 2030 Nevis"): Entity established under the laws of Nevis to which, pursuant to the November 30, 2018 Addendum, Sklarov through America 2030 purported to assign America 2030's interest as Lender in the Master Loan Agreement with respect to the First Tranche of Shares.

o America 2030 Capital Limited ("America 2030 UK"): Entity of the same name but, according to Sklarov (see Tr. at 575), established under the laws of the "UK," to which Sklarov through America 2030 Nevis transmitted the First Tranche of Shares to be sold in the entity's UK securities account, also controlled by Sklarov, at the Daniel Stewart securities firm in London, which was later replaced by the Dolfin securities firm in London, when Daniel Steward went out of business (Dolfin apparently had been clearing for Daniel Steward and inherited the account when Daniel Stewart went out of business.

• Bentley Rothschild Entities

o Bentley Rothschild Capital Limited Corp. ("Bentley Rothschild Nevis"): entity established under the laws of Nevis to which, pursuant to the November 30, 2018 Addendum, Sklarov through America 2030 purported to assign the role of America 2030 as Lender under the Master Loan Agreement with respect to the Second Tranche of Shares and to which Sklarov purported to have transferred the Second Tranche of Shares.

o Bentley Rothschild Financial LLC ("Bentley Rothschild Financial"): Entity to which Sklarov appears to have actually transmitted the Second Tranche of Shares (the record does not appear to reflect the jurisdiction in which this entity was organized).

[39].

As noted, the Bentley Rothschild Respondents in this case are Bentley Rothschild Nevis and Bentley Rothchild Financial. As discussed during at the Hearing (Tr. 527-528), these are the Bentley Rothschild Respondents who appeared at the Hearing and are Respondents in this arbitration.[5]

[40].

The Tribunal had previously had the impression that only Bentley Rothschild Financial was a Respondent in the case and raised the question at the opening of the Hearing (Tr. at 7-8), requesting further input from the Parties. When the parties did not come back to the Tribunal on the matter in the ensuing days, the Tribunal further reviewed the record of the case and advised

---

[4] Justice Masley in her June 20, 2019 Decision and Order lamented the "imprecision of the parties," noting that "[b]oth parties fail to distinguish one entity from another with identical names." This lack of precision continued in this arbitration, including through the Hearing.

[5] By orders of the Tribunal that came out of prior conferences with Counsel, the Tribunal, in advance of the Hearing, had understood that Bentley Rothschild Financial was the only Bentley Rothschild entity proceeded against as a Respondent in the arbitration (see Pre-Hearing Order No. 14, dated March 21, 2021; Pre-Hearing Order No. 1, dated November 16,2020, although, as noted above, at the Hearing it became evident that Bentley Rothschild Capital, as well as Bentley Rothschild Nevis, is a Respondent in the case and the matter was not disputed by Bentley Rothschild Capital at the Hearing.



the parties of its understanding, based on that review, that both Bentley Rothschild Nevis and Bentley Rothschild Financial are Respondents in the case and again invited counsel to advise if this understanding was in any way different from theirs (Tr. at 527-528).

[41].

No disagreement with the Tribunal's stated conclusion in this regard was thereafter expressed by either of the Bentley Rothschild Entities, in a context where both of them were represented at the hearing. Accordingly, the Tribunal concludes that Bentley Rothschild Nevis and Bentley Rothschild Financial have subjected themselves to the jurisdiction of this Tribunal and are Respondents in this case.

[42].

As to the two America 2030 entities other than America 2030 itself – America 2030 Nevis and America 2030 UK – Satterfield has not included those entities as respondents in the case, although, notably, Sklarov did not distinguish between the Entities in his defense of the case. While Satterfield initially named America 2030 Nevis as a Respondent in the case and continued at times to use a caption in the case that named America 2030 Nevis, Satterfield did not press the matter when Respondents objected to the inclusion of America 2030 Nevis and that entity was not overtly represented by counsel in the case, including at the Hearing.

[43].

Satterfield did, however, broadly assert—and present evidence at the Hearing for the proposition—that the various America 2030 and Bentley Rothschild Entities involved in the Transaction are all entities through whom Sklarov acted at relevant times with respect to the Transaction and are essentially interchangeable without regard to any purported corporate form they may have and were used as vehicles by Sklarov in defrauding Satterfield. Respondents dispute the foregoing assertions by Satterfield. They contend that each such entity is a separate legal entity, although Sklarov was only able or willing at the Hearing to identify one other person associated with them, his stepdaughter, who was at the time between 19-20 years old.

## E. Justice Masley's Decisions and Orders

[44].

Justice Masley issued several decisions identified in this arbitration as relevant to the case, including the following:
• June 20, 2019 Decision and Order

• October 30, 2019 Decision and Order

• December 5, 2019 Decision and Order

[45].

Following is a description of such Decisions and Orders.



## 1. June 20, 2019 Decision and Order

[46].

> By Decision and Order dated June 20, 2019, Justice Masley, following a two day hearing, *inter alia*, enjoined Sklarov, America 2030 and Bentley Rothchild Nevis from participating in an arbitration in Nevis that America 2030 Nevis and Bentley Rothchild Nevis had initiated in Nevis pursuant to the November 30, 2018 Addendum. Justice Masley found that Satterfield had shown a likelihood that he would be successful in establishing that the Nevis arbitration provision in the November 30, 2018 Addendum was permeated by fraud, but stated she was not reaching the issue of whether the overall Agreement was permeated with fraud. *See* Decision and Order at 14. Justice Masley stated, "Due to the expedited nature of the proceeding, the court confines its finding of success on the merits to the Nevis arbitration provision. The issue of whether the [Master Loan Agreement] and addendums are permeated with fraud must await the court's decision on the Defendants' motion to dismiss." *Id.*

[47].

> In enjoining America 2030, Bentley Rothchild Nevis, and Sklarov from proceeding with arbitration against Satterfield in Nevis pursuant to the provision of the November 30, 2018 Addendum providing for arbitration in Nevis of any dispute under the Agreement, Justice Masley found, "[Satterfield] established with credible testimony a likelihood of success on the merits that the Nevis arbitration is permeated with fraud." *Id.* at 13.

## 2. October 30, 2019 Decision and Order

[48].

> This Decision and Order addressed the motion of America 2030, America 2030 Nevis, Bentley Rothchild Nevis, and Sklarov (1) to dismiss for lack of jurisdiction and, in the alternative, (2) to compel arbitration. Finding that America 2030 Nevis had not been served, Justice Masley upheld personal jurisdiction over Sklarov, America 2030 and Bentley Rothchild Nevis and directed them to arbitrate this dispute in New York pursuant to the arbitration clause in the Master Loan Agreement. Justice Masley further stated, "[T]he court finds that the [November 30, 2018 Addendum] was permeated with fraud." *See* p. 19 in the last conclusory paragraph.

[49].

> While this Decision and Order was based in part on allegations which mirror Satterfield's complaint in the case, it also relied on testimony, apparently testimony that had been taken in the hearing underlying Justice Masley's Decision and Order dated June 20, 2019 discussed above. *See, e.g.*, Decision and Order dated October 30, 2019 at 18, including fn. 6 discussing Justice Masley's Decision and Order dated June 20, 2019.



## 3. December 5, 2019 Decision and Order

[50].

By her December 5, 2019 Decision and Order, Justice Masley, *inter alia*, enjoined Sklarov from selling or otherwise disposing of the Shares.

## F. Disagreement as to Justice Masley's October 30, 2019 Decision and Order and the Transaction

### 1. Summary

[51].

The Parties disagree as to the meaning, status, and enforceability of the Agreement and as to the meaning and effect of Justice Masley's findings as to the November 30, 2018 Addendum. Satterfield contends the Agreement is unenforceable as a matter of law, including, *inter alia*, based on its alleged illusory character, lack and failure of consideration, and fraud, as well as based on theories of conversion and unjust enrichment. Respondents deny any wrongdoing and contend the Agreement is enforceable and that Satterfield breached it in multiple respects.

### 2. Disagreement as to the October 30, 2019 Decision and Order

[52].

As to Justice Masley's October 30, 2019 Decision and Order, Satterfield contends Justice Masley in that order preclusively found the November 30, 2018 Addendum to be fraudulent and that this Tribunal is bound by that determination. Respondents deny that Justice Masley made any such finding and contend that, in any event, such a finding by Justice Masley under the Federal Arbitration Act would not be binding on the Tribunal.

### 3. Disagreement as to Nature of the Transaction

[53].

The Parties disagree as to the fundamental character of the Transaction. Satterfield contends the Transaction was supposed most fundamentally to consist of a secured loan transaction with the



following main components:
• America 2030 was supposed to loan Satterfield the agreed amount specified in the Agreement subject to the market value of the Shares at the time of funding;

• Satterfield was supposed to transmit the Shares to America 2030 as collateral;

• America 2030 was supposed to preserve and protect that collateral during the Term of the Loan; and

• America 2030 was supposed to return the Shares to Satterfield at the end of the Term of the Loan when and if Satterfield repaid the Loan.

[54].

Sklarov presents multiple characterizations of the Transaction, with such characterizations being inconsistent with one another and with Satterfield's characterization. Sklarov's formal position before its evolution at the Hearing appeared to be essentially the following:
• America 2030 was supposed to loan Satterfield the agreed amount provided for in the Agreement;

• Satterfield was supposed to transfer the Shares to America 2030, giving America 2030 full ownership, dominion and control over them without limitation and could sell the stock at his discretion

• America 2030 was supposed to return an equal number of shares of Co- Diagnostics to Satterfield or the value thereof when and if Satterfield paid off the Loan at the end of its Term.

[55].

As the Hearing proceeded, Sklarov's position evolved, including as follows:
• Sklarov could not point to any place in the Agreement and there appears to be none that required America 2030 or the other Lenders to actually loan any particular amount to Satterfield, even any amount *vis-à-vis* the value of the Shares at the time the Loan was funded. In addition, while there was language in the Agreement that Sklarov asserted obligated America 2030 to make the Loan to Satterfield, there was extensive other language in the Agreement that limited and ultimately negated any obligation of America 2030 or the other Lenders to make any loan whatsoever to Satterfield;

• Sklarov could not point to any place in the Agreement and there appears to be none that required America 2030 to return the Shares or comparable shares or the value thereof to Satterfield when and if Satterfield paid off the Loan at the end of the Term of the Agreement.

[56].

The Agreement, upon examination, does not reflect the foregoing characterizations of the Transactions by either Satterfield or Sklarov. Specifically, as hereinafter discussed, the Agreement is quite different in substance from what Satterfield says he understood he was getting and what Sklarov says he (through his Entities) was providing Satterfield.



# G. Sklarov's Actions Following Receipt of First Tranche of Shares

## 1. Execution of Master Loan Agreement

[57].

Satterfield and Sklarov signed the Master Loan Agreement on March 30, 2018 and April 2, 2018 respectively, with, as noted, Sklarov signing on behalf of America 2030. Satterfield was not represented by counsel. The parties disagree, as also noted, as to whether Satterfield disclosed to Sklarov before signing the Master Loan Agreement that the Shares were restricted and not freely tradeable.

[58].

Satterfield contends he told Schaeffer the Shares were not yet with a broker, by which he meant they were restricted, and that Schaeffer told him not to worry about it, notwithstanding that the Master Loan Agreement provided that the Shares would be free trading, since America 2030 would handle the paperwork to get the Shares free trading and they would be free-trading when the Transaction closed. Satterfield testified this was a big benefit to him that Sklarov would handle the paperwork to get the restriction removed, one less thing he would have to do.

[59].

Sklarov denies knowing in advance that the Shares were restricted. Schaeffer in his deposition testified he did not remember Satterfield's telling him in advance the Shares were restricted. An exchange of emails on March 26, 2018 confirms Schaeffer's telling Satterfield to fill out as much of the application (the Know Your Customer Questionnaire) as he could and send it on, seeming to confirm that Schaeffer had a role in Satterfield's filling out the form. *See* Claimant's Exh. 44.

[60].

Once Satterfield delivered the Shares on April 27, 2018, it became evident they were restricted. There then ensued, as described above, a long period of time essentially from May 16, 2018, when Sklarov told Satterfield that VStock had advised that the Shares were not registered, to December 11, 2018, when Sklarov advised Satterfield that VStock had released the restriction on the First Tranche. During this period, Sklarov worked with Satterfield and with VStock to try to get VStock to recognize the Shares as free and clear for trading.

## 2. Sklarov's Putting First Tranche Shares into Name of America 2030 UK

[61].



By December 11, 2018, VStock, according to an email of that date from Sklarov to Satterfield, had recognized the First Tranche of Shares as released from the restrictions and eligible to be traded. As of that point in time, the Shares, notwithstanding purportedly having been assigned to America 2030 Nevis through the November 30, 2018 Addendum, were held in an account of America 2030 at VStock. Upon VStock's recognition of the ending of the restrictions, Sklarov, as noted above, transferred these Shares to an account he maintained in the name of yet another America 2030 entity, America 2030 UK at Daniel Stewart in London.

## 3. Sales of the Shares

[62].

Once the Shares were in his UK account for America 2030 UK, Sklarov immediately started selling them. This was before the December 15, 2018 Closing Statement and Addendum and in the absence of any loan having been made.

[63].

Based on Satterfield's Exhibits 35 and 77 and Respondents' Exhibit 48, Sklarov's sales of Shares from the First Tranche and the volume of those trades *vis-à-vis* total trades for the given days were as follows, pursuant to trading information not in dispute among the parties, with such sales starting shortly after Sklarov's December 11, 2018 email to Satterfield notifying him that the restrictions on the First Tranche Shares had been released:

| Trade Date | Principal Amount (US $) | Number of Shares Sold | Price per Share[6] | Percentage of Daily Volume Sold |
|---|---|---|---|---|
| 12/13/2018 | 23,120.24 | 10,760.00 | 2.1509 | 70% |
| 12/14/2018 | 58,447.93 | 28,800.00 | 2.0315 | 30% |
| 12/17/2018 | 18,193.90 | 9,434.00 | 1.9305 | 41% |
| 12/18/2018 | 9,118.75 | 5,000.00 | 1.8256 | 41% |
| 12/19/2018 | 8,852.02 | 5,000.00 | 1.7722 | 24% |
| 12/20/2018 | 8,219.16 | 5,000.00 | 1.643832 | 25% |
| 12/21/2018 | 7,520.97 | 5,000.00 | 1.5057 | 18% |
| 12/27/2018 | 5,660.07 | 4,100.00 | 1.3854 | 15% |
| 12/28/2018 | 6,231.42 | 5,000.00 | 1.2503 | 16% |

---

[6]  This is the price per share used by Satterfield in the chart submitted to Justice Masley and to this Tribunal. The numbers are generally but not precisely consistent with those reflected in Respondents' Exhibit 48, a listing of stock prices for Co-Diagnostics for the period July 13, 2017 through March 12, 2021. The numbers in the above chart were not challenged by Respondents at the Hearing as being in any way inaccurate.



| 1/2/2019 | 10,243.03 | | 7,521.00 | | 1.3646 | 26% |
|---|---|---|---|---|---|---|
| 1/4/2019 | 36,653.75 | | 29,341.00 | | 1.2505 | 64% |
| 1/3/2019 | 38,774.69 | | 30,000.00 | | 1.2938 | 52% |
| 1/7/2019 | 49,065.09 | | 40,810.00 | | 1.2022811 | 69% |
| 1/8/2019 | 61,917.21 | | 50,000.00 | | 1.2396 | 59% |
| | | | | | | |
| 1/8/2019 | 52,672.29 | 43,705.00 | 1.206455% | | | |
| 1/10/2019 | 31,722.59 | 26,311.00 | 1.206952% | | | |
| 1/11/2019 | 64,580.08 | 57,249.00 | 1.129250% | | | |
| 1/14/2019 | 323,585.71 | 246,416.00 | 1.314522% | | | |
| 1/15/2019 | 74,082.70 | 64,761.00 | 1.145122% | | | |
| 1/16/2019 | 77,697.76 | 71,982.00 | 1.080525% | | | |
| 1/18/2019 | 41,478.34 | 37,315.00 | 1.112719% | | | |
| 1/17/2019 | 68,662.66 | 62,100.00 | 1.10688% | | | |
| 1/22/2019 | 76,038.34 | 70,321.00 | 1.082414% | | | |
| | $1,152,538.70 | 905,926 | | | | |

[64].

       Based upon the evidence adduced at the Hearing, it appears that the remaining approximately 158,972 First Tranche Shares, made up of the original 1,134,898 First Tranche shares minus the 905,926 shares Sklarov sold and the 70,000 shares he returned to Satterfield, remain in the account of America 2030 UK at Dolfin in London and are subject to Justice Masley's December 5, 2019 Preliminary Injunction.

[65].

       As to the $1,152,538.70 in Proceeds Sklarov received from selling the above First Tranche Shares, the whereabouts of such Proceeds, as noted above, are unknown. Sklarov professes not to remember where they went or where they are now. *See* Tr. at 599-601.

## 4. December 25, 2018 First Disbursement Statement

[66].

       Some twelve days after he started selling the Shares, Sklarov issued the First Disbursement Statement dated December 25, 2018 and on December 26, 2018 transmitted to Satterfield the net amount of $66,709, purporting to represent a loan of $100,000 net of fees. By this point in time, America 2030, as reflected in the above chart, had received over $130,000 in proceeds from selling First Tranche Shares.

## 5. December 27, 2018 Margin Call

[67].

Two days after the First Disbursement Statement, Sklarov sent Satterfield a Margin Call dated December 27, 2018, demanding that Satterfield "top-up" the number of Shares he had transferred as security under the Agreement, claiming that the price of the stock had declined to less than 75% of its value ($2.50 per share) on the date the $100,000 principal advance was made under the Loan. The letter advised that the stock was trading on average for less than $1.63 on the three preceding consecutive business days and that such circumstances constituted a "Valuation Event" under Section 7.1(g) of the Master Loan Agreement, which entitled the Lenders to demand a "top-up" of the Collateral by a payment in funds or stock equal to 25% of the Collateral's fair market value on the day of the principal advance. Satterfield testified that the requested top-up amounted to some $750,000 (Tr. at 73, 225); Sklarov does not appear to have provided a top-up number.

[68].

Satterfield declined to pay the Margin Call. Satterfield's rejection of a demand to deliver an additional $750,000 in value is understandable, as Sklarov was purporting to apply the "Valuation Event" provision of the Master Loan Agreement to circumstances in which only $100,000 ($66,709 net of fees) had been funded by Sklarov and the Lenders were in possession of stock worth, even at the new low price, well over $2 million.[7] On December 31, 2018 Satterfield offered instead to repay the $100,000 plus fees, for a total of $105,909, in exchange for a consensual rescission of the Loan. Sklarov responded by declaring the Loan in default.

## 6. January 18, 2019 Notice of Default

[69].

By his Notice of Default dated January 18, 2019, Sklarov declared Satterfield in default, *inter alia*, on the following grounds:

• That the Shares, as delivered to Sklarov and his Entities, were restricted and not free and clear, as required by Sections 4.2 and 7.1(b) of the Master Loan Agreement; and

• That Satterfield failed to top-up the Collateral in response to the Margin Call, as required by Section 7.1(g).

[70].

The Notice of Default declared that under the Agreement the Shares were transferred and not pledged and hence belong to America 2030 Nevis and Bentley Rothschild Nevis and that Satterfield knew at all times that he had transferred ownership of the Shares to Sklarov's Entities and no longer owned them himself. The Notice of Default further declared that, as a result of

---

[7]  Satterfield alleges in this proceeding that Sklarov's stock sales starting on December 11 had resulted in the decline in the stock price. Amended Statement of Claim ¶¶ 33, 36. Although that allegation appears plausible since Respondents' sales of Co-Diagnostics stock accounted for a significant percentage of the trades in the stock in the period immediately preceding the margin call (ranging from 15% - 70% of the daily trading volume, as shown in the chart above), Satterfield did not offer any expert testimony to establish that fact. Respondents called expert Jordan Milev, who opined that the stock sales did not materially affect the stock's trading price. The Tribunal did not find his analysis persuasive, however, as it omitted consideration of several important issues. *See, e.g.*, Tr. at 764-780. The Tribunal has reached its determination without regard to Sklarov's alleged responsibility for the decline in the stock price.

View the document on jusmundi.com



Satterfield's non-compliance with Sections 4.2, 7.1(b), and 7.1(g) of the Master Loan Agreement, the Sklarov Entities were released from any further obligation to Satterfield.

[71].

Satterfield and Sklarov thereafter ended up in arbitration in Nevis initiated by Sklarov, America 2030 Nevis and Bentley Rothschild Nevis, in litigation before Justice Masley initiated by Satterfield, and then in this arbitration.

## H. Detailed Provisions of the Agreement

[72].

Following is a review of applicable provisions of the Agreement, with particular reference to such questions as the following:
• <u>Duty to Loan</u>: Whether the Lenders were obligated to loan any monies to Satterfield?

• <u>Duty to Preserve and Protect Collateral:</u> Whether the Lenders had any obligation to preserve and protect the Collateral during the term of the Loan?

• <u>Duty to Return Collateral upon Repayment:</u> Whether the Lenders had any obligation under the Agreement to return the Collateral or the value thereof to Satterfield at the end of the Term of the Agreement if and when Satterfield repaid the Loan?

• <u>Transfer or Pledge of Collateral:</u> Whether the Collateral was provided as a transfer or a pledge?

## 1. Duty to Loan

[73].

Section 2.1 of the Master Loan Agreement provides as follows as to the Loan to be made by the Lenders under the Master Loan Agreement.
**2.1 <u>Loan Principal Amount.</u>**

(a) Subject to all of the terms and conditions of this Agreement, Lender agrees to lend to Borrower funds equal to up to One and a Half Million ($1,500,000.00) USD of the current FMV of the Transferred Collateral. The Loan Principal Amount shall typically be funded within three (3) Business Days of the receipt by Lender of a confirmation that the Transferred Collateral has been deposited with the Depository Broker and shall be memorialized in a Closing Statement as example [*sic*] in the form of <u>Exhibit 1</u> hereto, which is hereby incorporated by reference.

(b) For purposes of Section 2.l(c), the amount that Lender may make available under the Loan shall be calculated by multiplying (i) forty five percent (45%) of the Transferred Collateral by (ii) the FMV.



(c) Lender reserves the right not to fund the Loan at any one time more than four and nine tenths of one percent (4.9%) of the total shares outstanding of CO-DIAGNOSTICS (CODX:NASDAQ).

[74].

The Master Loan Agreement, in addressing the subject of "Loan Principal Amount," thus refers to a loan of "up to" $1.5 million, with the April 3, 2018 Addendum increasing that amount to $3.5 million. The question arises as to what it means under the Agreement that America 2030 agreed to loan Satterfield an amount "up to" the $1.5 million and, later, $3.5 million.

[75].

Sklarov testified at the Hearing that Section 2.1(a) required America 2030 to loan Satterfield $1.5 million, subject to the other terms of the Agreement. When it was pointed out to him that Section 2.1(a) said "up to" $1.5 million and he was asked whether America 2030 was required by the Agreement to loan Satterfield any specific amount, he was unable to point to any provision in the Agreement so providing (*see* Tr. at 1003-1006), notwithstanding his generally manifesting at the Hearing a deep familiarity with the provisions of the Agreement. Respondents have not identified any provision of the Agreement actually requiring the Lenders to loan any specific amount, even any amount *vis-à-vis* the value of the Shares at the time of the funding of a loan.

[76].

A similar issue arose in connection with the reference in Section 2.1(b) of the Master Loan Agreement to the loan amount that America 2030 "may make available." After testifying that Section 2.1(b), like Section 2.1(a), required America 2030 to loan the $1.5 million to Satterfield (*see* Tr. at 824, 1001-1005), Sklarov, when asked to focus on Section 2.1(b), recognized it imposed no such requirement and, as noted above, could point to no provision in the Agreement so requiring. *See* Tr. 1003-1006.

[77].

As to Section 2.1(c) of the Master Loan Agreement to the effect that America 2030 reserves the right not to fund a loan more than 4.9% of the total shares of Co-Diagnostics, Sklarov testified that that meant that America 2030 would not be required by the Master Loan Agreement to fund a loan based on shares that constituted more than 4.9% of the outstanding shares of Co-Diagnostics.[8] *See* Tr. at 1000. It is clear that the Shares Satterfield tendered to Sklarov as security for the Loan represented some 18% of the outstanding shares of Co-Diagnostics. *See, e.g.,* Tr. at 86.

[78].

Section 1.3 of the Master Loan Agreement makes the lack of obligation on the part of the Sklarov Entities express, "**Lender's Discretion**. Lender has the discretion and right to elect to not proceed with this Agreement at any time up until the Closing Date."

[79].

The Agreement contains numerous other provisions limiting or negating any obligation of America 2030 to make any loan thereunder. For example, Section 10.9 of the Master Loan

---

[8]  While Sklarov did no shed light on what the "at any one time" provision of Section 2.1(c) means, his testimony seemed clear that the focus of the Section was on the Lenders not being obligated to lend based on Shares that constituted more than 4.9% of the outstanding shares of Co-Diagnostics.

View the document on jusmundi.com



Agreement provides as follows:

**Force Majeure.** Notwithstanding any provision of this Agreement, neither Party shall be liable for its inability in performing any of its obligations hereunder if such inability is caused by or arises as a result of circumstances beyond its reasonable control **(Force Majeure Event").** For the purposes of this Clause, a Force Majeure Event shall include, without limitation, inability or delay in performance caused through acts of God, fire, flood, riot, *degradation in stock value, stock market crash and other adverse market conditions*, lightning, explosion, civil commotion, malicious damage, storm, tempest, electronic malfunctions, acts or omissions of telecommunications carriers, acts of government or other regulatory authority, acts or omissions of persons or bodies for whom the Party affected thereby is not responsible, and any other circumstances beyond the reasonable control of the relevant Party.

(emphasis supplied).

[80].

Section 10.13, a long single-spaced difficult-to-penetrate seemingly boilerplate block disclaimer extending over some three pages at the end of the Master Loan Agreement provides in bold, "MARKET CONDITIONS OR FORCE MAJEURE MAY CAUSE LENDER TO ADVANCE THE LOAN IN DISBURSEMENTS OR POSTPONE FUNDING."

[81].

The December 15, 2018 Closing Statement and Addendum provides in bold, "LENDERS UNDERWRITING MAY CHANGE AT ANY TIME UP-UNTIL FUNDING.*"*

[82].

The December 15, 2018 Closing Statement and Addendum further provides in bold, "LENDER MAY AT ITS SOLE AND ABSOLUTE DISCRETION POSTPONE FUNDINGS OR ORDER FUNDING IN TRANCHES. IF LOAN PROCEEDS ARE PAID IN TRANCHES, THEY ARE CALCULATED ON LTV TO MARKET PRICE OF THE SECURITY AT TIME OF DISBURSEMENT AND PAID AT LENDER'S DISCRETION."

[83].

The December 15, 2018 Closing Statement and Addendum further provides in bold, "LENDER DOES NOT GUARANTEE FUNDING AND ALL FUNDING IS AT LENDERS DISCRETION UNTIL DISBURSEMENT." This Addendum further provides in bold that, in the event of any inconsistency with the Master Loan Agreement, the Addendum "WILL BE THE CONTROLLING DOCUMENT."

[84].

As to the amount of the loan to be made under the December 15, 2018 Closing Statement and Addendum, that document, as noted, provides that disbursements would take place every two to three weeks, "provided the stock maintains current support level and does not experience significant downward pressure or price adjustment."

[85].

Further addressing the issue of whether the Lender under the Master Loan Agreement had any obligation to actually lend funds, Section 6.2, Market Conditions, provides, "Should the



Transferred Collateral experience a material Valuation Event or material change in average daily trading volume, Lender shall have the right to cease the funding of the Loan until the circumstances are dissipated or cured. The Transferred Collateral to remain with Lender."

## 2. Duty to Preserve and Protect Collateral

[86].

Section 5.2 of the Master Loan Agreement provides as follows:

**5.2 <u>Risk Management.</u>** In order to conform with governmental regulations and regulatory protocol regarding lender reserve requirements and risk management, Lender will take those actions warranted to safeguard and preserve Lender's Transferred Collateral as part of its compliance program and general risk management strategy.

[87].

Sklarov made it clear in his testimony at the Hearing that Section 5.2 in his view imposed no restraints on his ability or that of his companies to do whatever they wanted whenever they wanted with the Shares as a general matter at any time under any circumstances. Once Satterfield turned the Shares over to Sklarov and his Entities, the Shares belonged to them and Satterfield had no remaining ownership interest in them. *See* Tr. 1014-1020. Sklarov testified he and his companies were subject to no accountability and could spend the Collateral the next day after receiving it. Tr. 1014-1015.

[88].

When asked at the Hearing what he or his Entities in fact did with the $1,152,538.70 in Proceeds from selling the First Tranche Shares, Sklarov professed not to know, saying they went into general funds and then he didn't know what happened to them. *See* Tr. 1016.

## 3. Duty to Return Collateral Upon Repayment

[89].

Section 2.5 of the Master Loan Agreement provides as follows as to what happens at the end of the Term of the Loan:

2.5 <u>Term of Loan and Maturity Date of Loan</u>

(a) The Loan shall mature, and the Loan Principal Amount together with all accrued Interest thereon shall be due and payable, five (5) years subsequent to the occurrence of the Closing Date (the "**Maturity Date**" or "**Maturity**").

(b) The Maturity Date may be extended by the Lender if agreed to by the Lender in writing. A fee in the amount of two percent (2%) of the Loan Principal Amount (the "**Extension Fee**") shall be



due and payable on the original Maturity Date if the Lender agrees to extend such Maturity Date.

(c) No later than sixty (60) calendar days prior to the Maturity Date, Borrower shall communicate to Lender in writing whether it intends to repay the Loan Principal Amount on the Maturity Date. No later than thirty (30) calendar days prior to the Maturity Date, Borrower shall provide proof of funds to repay the Loan Principal Amount plus any other obligations due to Lender (as detailed in Section 2.9) on the Maturity Date (the "**Proof of Funds**").

[90].

Notably missing from this Section addressing Satterfield's potential repayment of the Loan is any provision requiring the Lenders to return the Collateral to Satterfield upon loan repayment. While Sklarov testified that Respondents had a duty to return the Collateral or the value thereof at the end of the Transaction upon repayment of the Loan, when asked by the Tribunal where the Agreement requires such a return, he was unable to identify any such contractual provision. *See* Tr. at 998. Respondents did not thereafter identify any provision in the Agreement so providing and there does not appear to be any such provision.

# 4. Transfer or Pledge of Collateral

[91].

The Master Loan Agreement repeatedly states that Satterfield is transferring the Shares to Respondents and not merely pledging them. Indeed, the title page of the Master Loan Agreement bears the heading "Non-Recourse Title Transfer Loan." Similarly, the Maser Loan Agreement defines the Shares provided by Satterfield to America 2030 as "Transferred Collateral."

[92].

Section 3.3 of the Master Loan Agreement provides, "Borrower acknowledges that Lender has all the rights associated with the Transferred Collateral, including title and beneficial ownership, and any rights, offerings, options, warrants, dividends, or other distributions associated with the Transferred Collateral."

[93].

Section 10.13 at Page 16 of the Master Loan Agreement, as part of the long run-on "disclaimer" section provides in bold, "LENDER HAS THE PRIVILEGE TO SAID TRANSFERRED COLLATERAL AND LENDER IS NOT ESTOPPED FROM ASSERTING ITS RIGHTS TO SAID COLLATERAL IN ACCORDANCE WITH LENDER'S RISK MANAGEMENT POLICY AND IN ORDER TO PROTECT ITS INTERESTS."

[94].

Section 10.13 provides at Page 17 as follows in bold: "LENDER MAY EXERCISE DOMINION OVER THE TRANSFERRED COLLATERAL IN ACCORDANCE WITH THIS AGREEMENT. BORROWER CONCEDES TO LENDER'S RIGHT TO TRANSACT IN THE TRANSFERRED COLLATERAL."



[95].

The Master Loan Agreement further provides in bold in Section 10.13, "WHETHER AS A RESULT OF DEFAULT OR OTHERWISE, LENDER IS AUTHORIZED TO CONVERT COLLATERAL IN ORDER TO PROTECT LENDER'S INTEREST AND INDUCE LENDER TO PROVIDE FINANCING."

[96].

As noted above, however, the April 3, 2018 and May 29, 2018 Addenda refer to the Shares as "Pledged" Collateral and the May 29, 2018 Addendum provides at several places that the Shares provided by Satterfield as the Collateral were provided as a pledge and were not transferred.

[97].

As we also saw above, the November 30, 2017 Addendum again referred to the Shares as "Transferred" and not as "Pledged."

[98].

Satterfield contends he believed the Shares were only pledged and that the April 3 and May 29, 2018 Addenda confirm this. He further contends that, while the November 30, 2018 Addendum purported to reverse this, he was pressured into signing that Addendum and Justice Masley found it to be fraudulent.

## 5. Disbursement Date for Loan

[99].

As to the timing of the Loan, Section 2.6 of the Master Loan Agreement provides that the Closing Date will be no later than three Business Days after the Verification Day, which is defined in Section 1.1 as the Business Day after the Transferred Collateral is received and posted to Lender's account prior to the Closing Date. Section 2.6 provides that the net Loan Principal Amount shall be paid within three Business Days of the Lender's receipt of a confirmation that the Transferred Collateral has been deposited with the Depository Broker.

## 6. Term Sheet for the Transaction

[100].

Sklarov's Term Sheet (the "Term Sheet") memorializing the anticipated terms of the Agreement set forth such terms as the following:
• "Lender guarantees return of shareholders shares at loan expiration." [Line 12]

• "Shareholder to receive all share appreciation if any, subject to loan agreement." [Line 13]

• "The Lender shall not, at any time, short sell the securities, pledge or lend to others." [Line 7]

---



[101].

As to the "transfer" of the Co-Diagnostics shares to be the subject of the Transaction, the Term Sheet provided, "Shares will be deposited with Lender at Fidelity Investments USA." [Line 14]

[102].

In its description of "TYPICAL LOAN PROCEDURE," the Term Sheet provided at Step 8 "client transfers shares to custodian account," and at Step 9 "share transfer is confirmed." The Term Sheet, at Line 4, states, "[T]he Co-Diagnostics shares to be provided would be free-trading, unrestricted and unencumbered."

# I. The Parties' Allegations

[103].

The parties' claims and legal theories evolved over the course of the case. In his Amended Statement of Claim, Satterfield alleged the following causes of action:
• Fraud as against Sklarov;

• Aiding and abetting fraud as against the entity Respondents;

• Conversion as against Sklarov and the entity Respondents;

• Conspiracy to commit fraud and conversion as against Sklarov and the entity Respondents;

• Turnover of shares; and

• Unjust enrichment as against Sklarov and the entity Respondents.

[104].

Respondents, by their Answer and Counterclaims, denied Satterfield's claims. Addressing the underlying facts, Respondents admitted Satterfield's central contention that the Shares were only provided by Satterfield as pledged collateral. Respondents alleged:
4. On or about March 30, 2018, Claimant and Respondent duly executed a Master Loan Agreement (MLA) which provided that Respondent would loan Claimant $1.5 Million USD for the exchange of pledged collateral in the form of shares of Co-Diagnostics.

[105].

Through their counterclaims (the "Counterclaims"), Respondents alleged Satterfield's breach of the Agreement, based on three alleged "Violations," alleging, as Respondents contended at the Hearing, that these violations entitle Respondents to retain the Shares held as the Collateral and the Proceeds of Sklarov's sales of First Tranche Shares:
• Violation I: No Liens or Restriction, alleging that Satterfield was supposed to have delivered unrestricted shares, but instead delivered restricted shares;



• Violation II: Events of Default, alleging that Satterfield failed to top-up, i.e., to provide additional collateral when required to do so by the Margin Call; and

• Violation III: Waivers, alleging that Satterfield breached the Agreement by filing an action for injunctive relief before Justice Masley.

[106].

By his Reply to Respondents' Counterclaims, Satterfield denied them, contending that the Agreement is null and void, essentially an instrument of fraud. Satterfield asserted eight Affirmative Defenses:
• First Affirmative Defense, alleging the Agreement's voidness *ab initio* based on fraud, including fraud in the inducement;

• Second Affirmative Defense, alleging that the Counterclaims were barred because Respondents' conduct was fraudulent and criminal;

• Third Affirmative Defense, alleging unclean hands;

• Fourth Affirmative Defense, alleging that Respondents never made the Loan, which Satterfield characterized as being of a fictional nature;

• Fifth Affirmative Defense, alleging frustration of purpose;

• Sixth Affirmative Defense, alleging estoppel;

• Seventh Affirmative Defense, alleging breach of the covenant of good faith and fair dealing; and

• Eighth Affirmative Defense, alleging impossibility of performance.

[107].

By the time of their pre-hearing briefs, the Parties' claims or characterizations thereof had evolved. Satterfield proceeded to the Hearing on essentially the following legal theories:
• That the Agreement does not actually contain a commitment by Respondents, rendering it void, invalid, and unenforceable for such reasons as:

o Illusory agreement;

o Lack of consideration;

o Failure of consideration;

o Fraudulent agreement; and

o criminal/illegal agreement;

• Fraud, including fraud in the inducement and continuing misrepresentations during the course of Sklarov's alleged performance of the Agreement; and



• Violation of the requirements of the UCC, including the requirement that a secured lender safeguard collateral and account for any amount by which the proceeds received through disposition of the collateral exceed the loan amount.

[108].

Respondents in their pre-hearing briefs contended that the Agreement is fully valid and enforceable, that Satterfield is an experienced businessperson, and that unsecured stock loans are very risky for lenders, justifying Respondents in having onerous provisions in their agreements.

[109].

Most fundamentally, Respondents contended that the Transaction was an entirely valid and appropriate one in which the Lenders' had a duty to lend Satterfield the $1.5 million and later the $3.5 million, subject to the provisions of the Agreement and were obligated to return the Shares in kind or the value thereof to Satterfield if and when he paid off the Loan. Respondents contended they were prepared to proceed to loan Satterfield the agreed amount under the Agreement, subject to the terms of the Agreement, but that Satterfield prevented this from happening by his breaches of the Agreement, including particularly his failure to top-up pursuant to the Margin Call to him and his going to court to seek an injunction.

[110].

Satterfield, in his Closing Memorandum of Law focused primarily on the following legal theories
• That the Agreement is fraudulent and should be overturned; and

• That, even if the Agreement is enforceable, Respondents have no right to either bar Claimant from obtaining the balance of the Shares held at V-Stock and Dolfin or to keep the proceeds of the Shares Sklarov has already sold.

[111].

In his Reply Memorandum of Law in Closing, Satterfield contended the Agreement is void and unenforceable based on Respondents' fraud, conversion and unjust enrichment.

[112].

Respondents in their post- hearing briefs focused heavily on what they characterized as Satterfield's lack of credibility and improper motivation and conduct in connection with the Transaction and on their denial of any wrongdoing by themselves.

## J. Evidentiary Hearing and Procedural History

[113].

The Hearing was held in this matter on March 30, 2021 through April 2, 2021 and was conducted by agreement of the parties on the Zoom remote videoconference platform hosted by the Veritext



court reporting service. Satterfield testified and presented expert witness Duncan Levin, Esq. Sklarov testified on behalf of Respondents, along with Respondents' expert witness, Jordan Milev, and non-party witness Chris Livadas of Weiser Asset Management.

[114].

This case was heavily litigated by the Parties throughout. Based on issues presented by the parties, the Tribunal issued some 14 pre-hearing orders, addressing such matters as applications concerning the admissibility of an expert witness's anticipated testimony; discovery disputes; requests for adjournments; schedule changes based upon Respondents' substitution of new counsel several times; considerations as to how best to conduct the hearing on a virtual basis through Zoom, pursuant to the parties' agreement; evidentiary issues; and other such matters.

[115].

Based upon extensive briefing by the Parties, the Tribunal granted Respondents a contested adjournment and rescheduling, leading to the final agreed hearing dates. Considerable attention was focused on discovery issues, including issues concerning document production by Respondents and the deposition of Sklarov, which he made challenging to schedule even though it was limited to four hours and was conducted over remote videoconference.

[116].

Throughout the proceeding, the Tribunal was available, essentially on a 24-hour basis, to address applications and concerns of the parties. The Hearing was only closed after each side confirmed on the record that it had had a full and complete opportunity to present all the witnesses and make all the arguments it wanted and consented to the closing of the Hearing, subject to the submission of post-hearing memoranda. *See* Tr. at 1098-1099.

[117].

Following the parties' submissions of two rounds of post-hearing briefing, the hearing was closed on May 24, 2021 and July 9, 2021 was agreed by the parties as to the due date for the Final Award in this matter.

## K. Analysis and Conclusions

## 1. Summary

[118].

Satterfield has established that the Agreement is unenforceable as illusory and lacking in consideration running from the Lenders to Satterfield. Satterfield has also established Respondents' fraud, conversion of the Shares and the Proceeds, and unjust enrichment through taking and retaining the Shares and Proceeds.



[119].

> Based on such wrongdoing by Respondents, Respondents are liable and hereby directed, jointly and severally, to deliver and restore to Satterfield the Shares held by Respondents or in their name or under their control and the Proceeds in the amount of $1,152,538.70, along with interest at the rate of 9% per annum, simple interest, calculated from December 31, 2018 through the earlier of satisfaction of this Final Award or entry of judgment

## 2. Contract Unenforceability

[120].

> The Agreement is unenforceable as a matter of law. It was illusory and lacking in consideration. Contrary to the impression Sklarov and his Entities created in the term sheet and their description of the Transaction to Satterfield and even to the Tribunal, the Agreement imposed no obligation upon the Sklarov Entities used by Sklarov as "Lenders," including, most centrally, no duty to loan and no duty to return the Collateral or the value thereof at the end of the Term upon Satterfield's repayment of the Loan.

[121].

> While Section 2.1(a) of the Agreement, as amended by the April 3, 2018 Addendum, may appear to require the Lenders to loan Satterfield $3.5 million and Sklarov testified that that is what it does, a closer reading discloses that the "obligation" is only to loan "up to" that amount. Similarly, while Section 2.1(b), again as amended by the April 3, 2018 Addendum, may appear to require the Lender to lend the $3.5 million and, again, Sklarov testified that that is what it does, a closer reading discloses that the $3.5 million is only the amount that the Lender "may make available."

[122].

> Similarly, as to the meaning of Section 2.1(c) of the Master Loan Agreement, it is evident that, while, under the Agreement, Sklarov received from Satterfield some 2,269,795 shares of Co-Diagnostics constituting some 18% of the outstanding shares of the company, he, at the same time, provided through Section 2.1(c) that the Lenders had no obligation to make any loan based on such shares exceeding the first 4.9%.

[123].

> No doubt, if one, like Satterfield, thought he was entering into a legitimate loan agreement that obligated the Lenders to make a loan, as Sklarov and his Entities claim is the case here, one could reasonably read Section 2.1 as setting forth such an obligation, thinking that the limiting language was some kind of hedging boilerplate, as, in effect, Sklarov suggested by his characterization of the Section.

[124].

> Yet that is not what Section 2.1 provides. Section 2.1(a) imposes no obligation on Sklarov's Entities to loan any amount, nor does Section 2.1(b). And Section 2.1(c) greatly limits any potential obligation of the Lenders, even if there otherwise were such an obligation, to make a loan. It means that Sklarov's Entities had no obligation to loan based on the bulk of the Shares Satterfield



provided as Collateral.

[125].

Thus, it is clear that the Agreement, in the place where the topic of the "Loan Principal Amount" is addressed in the Master Loan Agreement—at Section 2.1—does not require the Lenders to make any loan to Satterfield. However, even if one were to read Section 2.1 otherwise, as Sklarov urges, as containing the normal provision in a loan agreement that the lender will make a loan, other provisions of the Agreement, including of the Master Loan Agreement and the Addenda thereto, negate—totally eviscerate—any such obligation on the part of the Lenders. Specifically, other provisions of the Agreement when reviewed with particular care make it clear that whether the Lenders make a loan under the Agreement is totally subject to the unbridled discretion of the Lenders—in effect, of Sklarov.

[126].

Specifically, if there were any question about the fact that the Agreement is illusory and lacking in consideration, it is removed by the many other provisions of the Agreement that provide that the Lenders have no such obligation. Section 10.9 of the Master Loan Agreement provides that the Lender is excused from any obligation thereunder, *inter alia*, by "adverse market conditions," broad and undefined provisions. The December 15, 2018 Closing Statement and Addendum provides that the Lender may change its underwriting standards "at any time up until funding."

[127].

That the Lender is not obligated to make any loan and that any loans are at the Lender's discretion was also evident from the provisions of the December 15, 2018 Closing Statement and Addendum that "LENDER MAY AT ITS SOLE AND ABSOLUTE DISCRETION POSTPONE FUNDINGS OR ORDER FUNDINGS IN TRANCHES. IF LOAN PROCEEDS ARE PAID IN TRANCHES, THEY ARE CALCULATED ON LTV TO MARKET PRICE OF THE SECURITY AT TIME OF DISBURSEMENT AND PAID AT LENDER'S DISCRETION."

[128].

And lest there be any doubt that the Lender is not obligated to do anything, the December 15, 2018 Closing Statement and Addendum provided expressly, "LENDER DOES NOT GUARANTEE FUNDING AND ALL FUNDING IS AT LENDER'S DISCRETION UNTIL DISBURSEMENT." This Addendum further provided that, in the event of any inconsistency with the Master Loan Agreement, the Addendum "WILL BE THE CONTROLLING DOCUMENT."

[129].

The same is true as to the absence of any obligation of the Sklarov Entities to return the Collateral to Satterfield upon his repayment of the Loan at the end of the Term of the Agreement. Section 2.5 of the Agreement addresses Satterfield's repayment of the Loan, but contains no provision requiring the Sklarov Entities to return the Collateral upon Satterfield's repayment of any Loan under the Agreement at the end of the Term, nor does any other provision of the Agreement impose such any such obligation on the Sklarov Entities as Lenders.

[130].

As Satterfield argues, New York law makes illusory agreements that impose no obligation on a contract party unenforceable for lack of mutual obligation. Quite simply, a contract term that is



of a "I'll do it if I feel like it" nature does not constitute a contractual obligation or constitute genuine consideration. The fact that the obligations of Sklarov's Entities under the Agreement are entirely at the discretion of the Lenders, in effect, Sklarov's discretion, precludes the enforceability of the Agreement. *See, e.g., Curtis Properties Corp. v. Greif Companies*, 212 A.D.2d 259, 265, 628 N.Y.S.2d 628 (2nd Dept. 1995); *Dorman v. Cohen*, 66 A.D.2d 411, 415, 413 N.Y.S.2d 377 (1st Dept. 1979); Strong v. Sheffield, 144 N.Y. 392, 396, 39 N.E. 330 (1895); *Structured Capital Solutions, LLC v. Commerzbank AG*, 177 F. Supp. 3d 816 (S.D. N.Y. 2016); *Chiapparelli v. Baker; Kellog & Co.*, 252 N.Y. 192, 200 (1929).

[131].

As the Court said in *Cohen*, mutuality of obligation exists only where "each party [is] bound to some extent." 66 A.D.2d at 415.

[132].

Similarly, as the Court found in *Strong*, a creditor's statement that he would refrain from putting a promissory note out for collection until he wanted payment did not constitute an enforceable agreement:

The [creditor] testified that there was an express agreement on his part to the effect that he would not pay the note away, nor put it in any bank for collection, but (using the words of the [creditor]) I will hold it until such time as I want my money, I will make a demand on you for it. And again: No, I will keep it until such time as I want it. Upon this alleged agreement the [guarantor] indorsed the note. It would have been no violation of the [creditor's] promise if, immediately on receiving the note, he had commenced suit upon it. Such a suit would have been an assertion that he wanted the money and would have fulfilled the condition of forbearance. The debtor and the [guarantor], when they became parties to the note, may have had the hope or expectation that forbearance would follow, and there was forbearance in fact. But there was no agreement to forbear for a fixed time or for a reasonable time, but an agreement to forbear for such time as the plaintiff should elect. The consideration is to be tested by the agreement, and not by what was done under it. It was a case of mutual promises, and so intended. We think the evidence failed to disclose any consideration for the defendant's indorsement, and that the trial court erred in refusing so to rule.

144 N.Y. at 395-396.

[133].

The situation presented in this case falls squarely within this category of purported agreements where a party's promise, the "consideration" it purports to provide, is essentially that it will "perform if it so desires." The Agreement, insofar as concerns the obligations of the Sklarov Entities, is a quintessential situation of parties' agreement to perform—in this instance, to make a loan—if they want to.

[134].

Nor, as is evident from the *Strong* case, does it change this conclusion that Sklarov made the "Loan" of $66,709 to Satterfield on December 26, 2018 from the over $130,000 in Proceeds his Entities had received, as of that time, from selling First Tranche Shares Satterfield had presented to America 2030 as the Collateral for the Loan. As the Court made clear in *Strong*, whether a



purported contract provides for consideration turns on what that contract provides, not on what the purported obligor did. As the Court in *Strong* stated, "The consideration is to be tested by the agreement, and not by what was done under it." 144 N.Y. at 396.

[135].

Indeed, on the evidence presented at the Hearing, under both measures of consideration, the Agreement and what was done, the conclusion is compelling that Sklarov disbursed the $66,709 as part of his fraudulent scheme described hereinafter. Based on the evidence presented, that disbursement was intended to appear to provide some patina of legitimacy and support to Sklarov's soon-to-be announced call for Satterfield to top-up the Collateral and the follow-up Notice of Default to Satterfield.

[136].

New York law similarly makes contracts lacking in consideration, as well as illusory contracts, unenforceable. *See Weiner v. McGraw-Hill, Inc.,* 57 N.Y.2d 458, 464, 443 N.E.2d 441, 444 (1982); *NCSPlus Inc. v WBR Mgt. Corp.*, 37 Misc. 3d 227, 236 (Sup. Ct. N.Y. Cty. 2012); *Granite Partners, L.P. v Beα1, Stearns & Co. Inc.*, 58 F Supp 2d 228, 252 (S.D.N.Y. 1999); *Matter of Anchorage Boat Sales, Inc.*, 29 B.R. 275 (Bankr. E.D.N.Y. 1983). Although Respondents argue correctly that New York law disfavors interpreting a contract to be illusory (*see* Respondents' Supplemental Letter-Brief, March 26, 2021), here the illusory nature of the Agreement does not turn on an interpretation of ambiguous terms but on the plain language of the numerous provisions quoted above that make clear the Lenders had no obligation to fund a loan.

[137].

Justice Masley in her June 20, 2019 Decision and Order identified the question of whether Satterfield, in accepting the $66,709, did so knowing the Agreement was fraudulent. Decision and Order at 12. The evidence at the Hearing established that he did not. Satterfield was not aware at that time of Sklarov's sales of his stock and, even at that late date, Satterfield still believed that Sklarov was a legitimate operator and was going to make the Loan, albeit, per the December 15, 2018 Closing Statement and Addendum pursuant to a drawn out schedule of $100,000-300,000 every two-three weeks.

[138].

For example, Satterfield in a December 20, 2018 email to Sklarov shortly before the disbursement, thanked him for updating information and effusively expressed wishes that he have a wonderful holiday season. Satterfield wanted to monetize his Shares and it was starting to happen, he thought, and that was his focus—to get the Loan funded, with the specific timing of disbursements being secondary. He still thought he was dealing with a legitimate lender who was going to lend him the agreed amount.

[139].

The Agreement is similarly unenforceable under the Uniform Commercial Code (UCC), which is clearly applicable to the Transaction. Under the UCC, lenders are required to preserve and protect collateral and generally to return collateral upon the repayment of the loan, failing which a loan is unenforceable. *See, e.g.,* N.Y. U.C.C. Law §§ 9-207, 9-615(d)(1) and 9-602(e)(McKinney). On the evidence presented in the Hearing in this matter, the Lenders failed to comply with such requirements in that the Agreement contained no such obligations on the Lenders to preserve



and protect and ultimately return the Collateral upon repayment and, in addition, because, as discussed hereinafter, Respondents acted fraudulently and in bad faith in the Transaction, an utter lack of the good faith required of creditors under the UCC.

[140].

Respondents' arguments that Satterfield did not allege breach of contract in his Amended Statement of Claim and did not sufficiently raise the issue in the course of this arbitration and that, to the extent he raised the issue, it was only in defense of the Counterclaims, is unfounded. As described above, by the time of the pre-hearing papers, at the Hearing, and in his post-hearing papers, Satterfield repeatedly contended that the Agreement was unenforceable based, *inter alia*, on its illusory nature and a lack of consideration, and that this entitled him to have the Transaction rescinded, such that Respondents should be ordered, *inter alia*, to return the Shares and Proceeds to him.

[141].

The issue of the unenforceability of the Agreement was fully briefed by the parties—both sides—and addressed by them at the Hearing, as well as in their post-hearing papers. At the Hearing, the Tribunal gave both sides considerable leeway to present testimony of their witnesses—essentially Satterfield and Sklarov themselves—as to their respective views as to the language of the Agreement, including what, in their respective views, the Agreement was supposed to provide and did provide.

[142].

Thus, Respondents' argument that the issue of the enforceability of the Agreement is not fully in contention in this arbitration and has not been fairly alleged and developed is unfounded. It is also noteworthy that, in arbitration, including under the Commercial Rules of the American Arbitration Association, pleadings are considerably less important a part of a case than in court, whether under the CPLR or the Federal Rules of Civil Procedure. In arbitration, broad allegations of a few paragraphs or even sentences are all that is required in many cases, although the areas of dispute are generally fleshed out, *inter alia*, as cases proceed through discovery, motion practice, and pre-hearing briefing, as happened in this case.

[143].

Accordingly, Sklarov personally, both directly and through entities or other contrivances he may control, along with the other Respondents in this arbitration, are required and hereby directed to return the Shares and Proceeds to Satterfield.

# 4. Fraud

[144].

Satterfield focused heavily in the case, including at the Hearing, on his contention that Respondents, including Sklarov personally, defrauded him through the Transaction, including through the use of the Agreement and that the Respondents aided and abetted one another in this regard. Satterfield's overriding argument is that the entire Transaction—the Agreement itself— is



a fraud. Satterfield further argues to the Tribunal that it need not actually decide the issue of Respondents' alleged fraud because Justice Masley in her October 30, 2019 Decision and Order found that the November 30, 2018 Addendum was "permeated with fraud." Satterfield contends that this finding by Justice Masley, as he sees it, is binding on this Tribunal.

[145].

Respondents deny any fraud, contest that Justice Masley made any such finding, and argue that, in any event, any such finding, under U.S. Supreme Court precedent, would not be binding on this Tribunal.

[146].

The Tribunal, based on the evidence presented Hearing, has reached its own decision on the issue. Because that decision appears to be consistent with Justice Masley's October 30, 2019 Decision and Order, we do not reach the issue of the meaning of that Decision and Order in this regard or whether it is binding on us in this arbitration.

[147].

Specifically, based upon our independent evaluation of the matter, we have concluded that Satterfield is correct that the Transaction and Respondents' implementation of the Agreement were permeated by fraud which each of the Respondents committed and aided and abetted. Sklarov and through him the other Respondents fraudulently induced Satterfield to enter into the Agreement and to cooperate with Sklarov in convincing VStock to permit Sklarov and his Entities to trade in the Shares.

[148].

Most fundamentally, Sklarov, on his own behalf and that of the other Respondents, falsely represented to Satterfield repeatedly and continuously that Respondents intended to make the Loan to Satterfield if VStock could be convinced to release the Shares for trading. Respondents knew this representation was false when they made it. Satterfield reasonably relied on the representation. Based on this reliance, he (1) worked with Respondents and their lawyers to convince VStock to release the Shares or some of them and (2) agreed to and signed the May 29, November 30 and December 15, 2018 Addenda. As a result of his reliance, Satterfield was damaged by Respondents' said misrepresentations in that he lost control of the Shares and the Proceeds and did not get the Loan except for the $66,709 that Respondents disbursed to him as part of the fraud. Sklarov was able, *inter alia*, to sell most of the First Tranche Shares off-shore and take and hide the Proceeds thereof through his Entities and gain potential access to the Second Tranche Shares except for the Preliminary Injunctions.

[149].

Satterfield's testimony establishes Respondents' above representations and that Sklarov's denials were not credible. There is also ample documentary evidence of the representations. A memorable example was Sklarov's telling Satterfield on June 1, 2018 that, if the Shares could be freed up for trading that day, Respondents would make the Loan to him in the amount of $6 million. Schaeffer told Satterfield in the chat, "$6M to you as of today is riding on this" and Sklarov told him. "We can fund in lump sum if this was received today."

[150].



Similarly, by email dated May 22, 2018, one of Sklarov's attorneys, Paul Crockett, sent Satterfield what was apparently a draft of the May 29, 2018 Addendum, telling him in effect that he should sign the Addendum so as to get the Loan: "This document should aid in us getting approval from VStock and thereby fund the loan." There had been prior discussion of Sklarov's possibly declaring Satterfield in default based on the restricted nature of the Shares, and applying a regulatory exception that permits pledged collateral to be sold despite restrictions. Sklarov's lawyer told Satterfield in this email, in language that seemed to confirm that Sklarov did not intend to declare a default, "It is not our intention to use the default method to fund the loan ...." *See* Claimant's Exh. 48 at 833.

[151].

The next day, Adam Simon, another representative of Sklarov, in an email to VStock on which Sklarov, but not Satterfield was copied, stated, at a time when no Loan had been made, "[T]he shareholder is a lender who received the stock as a pledge for a loan. The loan is now in default." Claimant's Exh. 25.

[152].

Respondents' deceit here is blatant. To induce Satterfield's cooperation in trying to convince VStock to release the Shares for trading, Respondents are telling Satterfield they intend to fund the Loan and will not invoke a default, while, in separate discussions with VStock, they are contending Satterfield is in default—one of the grounds on which they later send Satterfield the Default Notice once they obtained access to the Shares with Satterfield's help.

[153].

Sklarov reiterated his intent to fund in his May 29, 2018 email to Satterfield, transmitting the May 29, 2018 Addendum for signature, stating, "I also see the stock is up today and funding is of course based on the LTV, so this little delay actually helped us, assuming the stock price will stay up." Respondents' Exh. 14.

[154].

Sklarov similarly restated the representation that he would fund the Loan in a July 19, 2018 email to Satterfield and Schaeffer, "Just to update you that we have bifurcated the Securities with one of our affiliate company's and the first 1.1M shares should be free trading in little over 3 months and then we can fund." Respondents' Exh. 43 at 854.

[155].

The falsity of Respondents' representations in this regard was clear from Sklarov's testimony at the Hearing and actions with respect to the Transaction. Most memorable is that, even as he was inducing Satterfield to cooperate with him and his lawyers by telling him that was the way to get the Loan, Sklarov had no intent to make the Loan. Sklarov could not have been clearer at the Hearing that he regarded Satterfield as having breached the Agreement by providing restricted Shares and saw himself as having no obligation to make the Loan. See Tr. at 632-635. His testimony was also clear that he viewed himself as entitled to sell Satterfield's Shares as he wished, regardless of the amount of any loan he actually funded.

[156].

For example, when asked by the Tribunal about the meaning of Section 5.2 of the Master Loan



Agreement, which contains language suggesting that the Lenders have some obligation to "safeguard and preserve" the Collateral, Sklarov pushed back. He said, "So the way I'm reading this is we have no obligation whatsoever to keep funds, because it's ours...." Tr. at 1014.

[157].

Sklarov went on to deny that the Lenders have to "produce any sort of accountability." *Id.* Referring to Section 2.7 of the Master Loan Agreement, Sklarov went on to say, "We don't have any obligation to Mr. Satterfield, we can spend the money the next day if we wanted to according to 2.7." Tr. at 1015.

[158].

Lest there be any question, Sklarov further added, "We don't owe the borrower anything. No accountability." *Id.* Asked whether Respondents were under any constraints by Justice Masley's TRO on January 23, 2019, Sklarov testified that it only blocked them from selling— and, as drafted, imposed no requirement that Respondents "segregate funds or keep funds in any way so we could do whatever we want." Tr. at 1017.

[159].

As to the nature of the Collateral, Sklarov testified:
So under books it's transferred collateral. We can call it whatever we want to but it's transferred collateral, we're the owners of it. Legally under the federal law we are the owners of this collateral.

Tr. at 1020.

[160].

This lack of obligation on Sklarov's part and that of his Entities, as he viewed the matter, and his intent to sell Satterfield's stock and convert the Proceeds is dispositive. From Sklarov's actions as to the Transaction, the inference is inescapable that, at a minimum, if he wasn't obligated to make the Loan, he certainly would not do it but would instead sell Satterfield's shares as quickly as possible.

[161].

Satterfield's reliance on Sklarov's representations—his trust, albeit misplaced, in Sklarov's legitimacy—was evident at the Hearing and from the documentary evidence in the case. It could be seen not only by Satterfield's action in reliance on the representations, but also, for example, from his telling Sklarov in a May 30, 2018 email to him that he appeared to be a "fairly straight shooter." *See* Respondents' Exh. 42 at 170.

[162].

It was even more evident in Satterfield's willingness to take Sklarov's word that, even though the May 29, 2018 Addendum provided that the Loan was a recourse loan, subjecting Satterfield to personal liability, neither Sklarov nor his other Lender entities would go after Satterfield personally in the event of a default: "[W]e will not pursue collections beyond the pledged collateral." *See* Respondents' Exh. 48 at 838.



[163].

This email also substantiates Satterfield's contention that Sklarov characterized the Shares as pledged as collateral and not as the property of Sklarov or his Entities. In this email, Sklarov tells Satterfield, "[W]e will retain the pledged collateral in the event of a default; that's the recourse."

[164].

The circumstances around the Transaction made it reasonable for Satterfield to rely on Sklarov's fundamental and consistent representations that he was entering into a loan transaction in which he would borrow money and would get his stock back if he timely repaid the loan. Sklarov, by his website, the Term Sheet, his Linked-in account, his purported membership in a worldwide network of stock loan providers, the proliferation of law firms and lawyers representing him throughout the Transaction, certain language of the Agreement, and his apparent expertise, along with his continuing email and verbal assurances, made it reasonable for Satterfield to rely on Sklarov at least to the limited extent of believing (a) Sklarov's entity would lend him money, and (b) his Shares would serve as "Collateral" to secure the loan and would not be sold except as warranted to address a default.

[165].

The Tribunal thus finds Satterfield's testimony credible that, in entering into the Transaction, he believed he was entering into a loan agreement and that the Lenders would actually make the Loan to him and would return the stock to him if he repaid the Loan. Indeed, such credibility is buttressed by Sklarov's own testimony, even as late as at the Hearing, that this was the case: that, under the Agreement, the Lenders were obligated to make the Loan and return the Collateral to Satterfield at the end of the Term upon repayment. The Tribunal finds that, in such circumstances, it was reasonable of Satterfield to believe Sklarov's characterization of the Transaction as a legitimate loan transaction and accordingly to be induced to turn over the Shares to Sklarov for purposes of the Transaction.

[166].

It is noteworthy—and further illustrative of the faith and trust Satterfield placed in Sklarov, believing him to be a high level and respectable professional in the stock loan area— that Satterfield, although, as a senior executive of a public company, he had lawyers available to him, did not consult or otherwise get the advice of an attorney in entering into the Agreement. Satterfield's testimony (*see, e.g.,* Tr.at 248-249) that he thought he was entering into a standardized form of agreement, like a credit card application or a mortgage, with essentially no room to negotiate, was credible.

[167].

While, as Respondents argue and Sklarov testified at length at the Hearing, there are numerous places where the collateral is referred to as "Transferred Collateral" and numerous places in the Master Loan Agreement where it is stated that America 2030 gets full ownership and rights of ownership in the Shares, the evidence clearly shows that Sklarov, including in other parts of the Agreement and in emails, also repeatedly told Satterfield that the Shares were merely pledged as collateral for the Loan—and that at all times Sklarov and his Entities and documents referred to them as "collateral." Given the totality of Sklarov's communications to Satterfield concerning the Transactions, it is clear that, given Sklarov's true view of the nature of the collateral, as expressed at the Hearing (that it was all and totally his without qualification), Sklarov falsely



misrepresented the nature of the Collateral under the Agreement.

[168].

At bottom, it was not unreasonable for Satterfield to believe, on the basis of Sklarov's and Sklarov's lawyer's statements and conduct and the written characterization of the Agreements as providing for a "Loan" and describing the Shares as "Collateral," and notwithstanding the seeming boilerplate in the Agreement that clearly disclaimed any actual obligation for the Loan to be funded, that he was not at material risk of losing his pledged stock, if he timely repaid any loan amount he received. This is particularly the case because the Loan was to be non-recourse to any of Satterfield's assets beyond the collateral, while the default was predicated in part on Satterfield's failure to pay a margin call amount that, as discussed above, he understood to be approximately $750,000 and that Sklarov appears not to have calculated.

[169].

It is also clear that Satterfield was harmed by Respondents' fraud, including the losses resultant of Sklarov's being able to take control of the First Tranche of Shares and sell most of them and the enabling of Sklarov's taking the Transaction off-shore and putting them in the names of off-shore entities, as well as the general loss of the Shares and Proceeds to Sklarov and his Entities.

[170].

Sklarov's attack on Satterfield's credibility was unpersuasive and ironic. Unpersuasive because Satterfield was clear about what he thought he was doing: pledging the Shares as security for a stock loan based on a .45 LTV, based on the market value of the applicable Shares and the amount of the Loan, the very Transaction Respondents purport to recognize they were required to provide him under the Agreement. And ironic, because the very idea of a stock loan as providing a way for an insider in a public company to monetize part of the share value without having to sell or be perceived by shareholders or management as selling the shares and thereby showing a lack of confidence in his company—this type of transaction, which Respondents now characterize as nefarious and inappropriate of Satterfield to have wanted to have entered into, is the very transaction that Sklarov offered to Satterfield and purports to have delivered.

[171].

Indeed, the Tribunal finds that it is the credibility of Sklarov that, based upon the evidence presented at the Hearing, is suspect, including his numerous misrepresentations to Satterfield to induce him to help convince VStock to recognize the Shares as unrestricted and free and clear for trading and his continuing misrepresentations, including even at the Hearing, that he was obligated under the Agreement and intended to make a Loan and to return the Shares upon Satterfield's repayment of the Loan at the end of the Term.

[172].

Our finding that Sklarov's testimony was not credible in material respects is further buttressed by the disclosure on cross-examination that he had executed an affidavit in a Georgia state court proceeding in which he was the plaintiff, in which he stated:
Plaintiff is indigent with no economic resources whatsoever and is struggling to survive on a daily basis.



Plaintiff has been surviving by selling off his personal belongings and borrowing money.

Plaintiff, along with his family, are indeed on the imminent verge of moving to a shelter and becoming a public charge and a burden on society.

Claimant's Exh. 66.

[173].

Sklarov executed this affidavit on April 13, 2018, when he was in the midst of negotiating the Loans with Satterfield. Sklarov admitted having signed the affidavit and testified in this proceeding that its contents were true (Tr. at 700-701, 943) at the time, emphasizing that the affidavit pertained to his personal assets and that he, like many people—many billionaires—chooses not to have assets in his own name. He testified:
As I mentioned yesterday, I do not own assets under my name. I do not, and most of my life have not, owned assets under my name. I am one of those individuals that chooses not to have assets under my name.

7 There are billionaires who do not own assets under my name and I do not own assets under my name when that affidavit was filed.

Tr. at 942; *see also* 702, 946.

[174].

This testimony and Sklarov's earlier affidavit undermine Sklarov's credibility in asserting that he had large amounts of money available to do the stock loans he was purportedly doing and purported to intend to do and to be prepared to do with Satterfield. It also undermines the impression Sklarov created in his sworn statements to the Tribunal that he had substantial personal funds with which to make the Loan to Satterfield.

[175].

In his witness statement setting forth his direct testimony, he told us, "My business requires me to have funds and facilities available to meet my obligations as a lender, and I make it my practice to do so." Witness statement at ¶6. Then, after asserting that he had substantial financing available and has successfully drawn down on it, he further told us, "In addition, I have substantial independent funds well in excess of my obligations to Mr. Satterfield." *Id.*

[176].

He further acknowledged this point in his initial testimony on cross-examination before he knew Satterfield's counsel had the affidavit:
You put in your direct testimony a statement that you also had personal assets, significant personal assets at that time; is that true? A True.

Tr. at 696-697.

[177].



Also undermining Sklarov's credibility was his refusal, even when asked repeatedly by the Tribunal, to disclose what assets America 2030 had at times when he would have funded the Loans to Satterfield, with Sklarov refusing to answer the question on the ground that Satterfield's attorneys would use the information to go after such assets. *See* Tr. at 704-711. At one point, he testified America 2030, aside from financing sources, had approximately $85 million of "its own assets" as of the time of the Master Loan Agreement. Tr. at 710-711. However, Sklarov again refused to disclose where such alleged funds are. Tr. at 711-715.

[178].

Accordingly, based on their fraud and aiding and abetting fraud, Sklarov personally, both directly and through entities or other contrivances he may control, along with the other Respondents in this arbitration, are required and hereby directed to return the Shares and Proceeds to Satterfield.

[179].

The Tribunal notes that, in reaching the above conclusions, it has not considered the testimony of Satterfield's expert witnesses, Duncan Levin, a former prosecutor with extensive experience in prosecuting fraud cases. The central thrust of Mr. Levin's report and testimony largely related to how to characterize Respondents' actions and omissions at issue in this case, matters quintessentially the responsibility of the Tribunal.

# 5. Conversion

[180].

Satterfield alleges that Sklarov and the other Respondents converted the Shares and Proceeds. Respondents defend, *inter alia*, on the basis that they are not subject to liability for conversion because they hold the Shares and Proceeds as a matter of right under the Agreement. The Master Loan Agreement provides in Section 10.13 at page 16 in bold, "WHETHER AS A RESULT OF DEFAULT OR OTHERWISE, LENDER IS AUTHORIZED TO CONVERT COLLATERAL IN ORDER TO PROTECT LENDER'S INTEREST AND TO INDUCE LENDER TO PROVIDE FINANCING."

[181].

Because, however, the Tribunal has found that the Agreement is unenforceable as illusory and lacking in consideration and on the ground of fraud, such contract-based defenses of Respondents and their contention that they hold the Shares and Proceeds as a matter of right are unfounded. As a result, Satterfield's claim of conversion against Respondents must be determined based on the requirements under New York law for such a claim.

[182].

As Satterfield demonstrated in his papers, "Conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights," citing *State of New York v. Seventh Regiment Fund*, 98 N.Y.2d 249, 259 (2002). The evidence establishes that this is what Respondents did in this instance with respect to the Shares and the Proceeds. They have no contractual or legal right to them and are wrongly holding them



and withholding them from Satterfield.

[183].

Satterfield has established these elements of his conversion claim. Sklarov, both personally and through the Entity Respondents, obtained dominion and control over the Shares and Proceeds through wrongfully inducing Satterfield to turn them over on the pretense that they would be used as Collateral for the Loan. This was a false pretense and accorded Respondents no legal right to possession of the Shares and accordingly their taking and retention of the Shares and Proceeds are without legal basis and constitute conversion.

[184].

The Tribunal makes this finding against Sklarov personally, as well as against the Entity Respondents, since the evidence establishes that Sklarov, through his personal activities and those of his Entities, exercised dominion and control over the Shares, as did the Entities, moving them around seamlessly from one paper entity to another without being subject to any formalities as to the different Entities.

[185].

For example, when, through the November 30, 2018 Addendum, Sklarov purported to make Bentley Rothschild Nevis the assignee of the Second Tranche Shares, he, in fact, put those shares in an account of Bentley Rothschild Financial, even while providing in the Addendum that, as of the date thereof, Bentley Rothschild Nevis was "in possession" of said 1,134,897 Shares of Co-Diagnostics. and while signing that Addendum on behalf of Bentley Rothschild Nevis.

[186].

Similarly, while, pursuant to the November 30, 2018 Addendum, the First Tranche of the Transaction was assigned to America 2030 Nevis, Sklarov, once the First Tranche Shares were released from restrictions, as noted above, sold most of them through an account of yet a third America 2030 entity of similar name, America 2030 UK, and thereafter moved the Proceeds to some other account(s) or location, the identify of which, even at the Hearing, Sklarov refused to disclose (his testimony of not remembering where over $1 million went being less than credible), nor did Sklarov in his testimony otherwise meaningfully distinguish between the various America 2030 and Bentley Rothschild Entities.

[187].

Accordingly, Sklarov personally, both directly and through entities or other contrivances he may control, and the other Respondents in this arbitration are required and hereby directed to return the Shares and Proceeds to Satterfield.

## 6. Unjust Enrichment

[188].

The standard for a claim of unjust enrichment under New York law is as follows:

To prevail on an unjust enrichment claim under New York law, plaintiff must show: "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.,*373 F.3d 296, 306 (2d Cir. 2004).

*Structured Capital Solutions,* 177 F. Supp. 3d at 831.

[189].

Satterfield has established each of these elements. Except (1) as restrained by Justice Masley's Preliminary Injunctions and (2) for the $66,709 disbursed to Satterfield, Respondents have been enriched by receiving and retaining the Shares and the Proceeds. The Shares belong to Satterfield and he is entitled to the Proceeds from Sklarov's sales of some 905,926 of them. There is no basis in equity or good conscience for Respondents or any of them to retain the Shares or the Proceeds.

[190].

In short, Respondents' retention of the Shares and Proceeds is without any entitlement in contract, law, or equity and hence is unjust, requiring that Respondents return the Shares and Proceeds to Satterfield. Contrary to their contentions, Respondents were at all times on notice, after Satterfield refused to go along with the demand for the top-up, that Satterfield regarded their retention of the Shares and Proceeds as wrongful, including as a product of fraud, and was demanding their return to him.

# 7. Conspiracy

[191].

Satterfield asserted as his fourth cause of action a claim against Respondents for conspiracy to commit fraud and conversion. As Respondents argue, New York law does not provide a private cause of action for civil conspiracy, however, so we deny that claim.

# 8. Unclean Hands

[192].

Respondents have failed to establish their asserted defense that Satterfield has unclean hands in the Transaction and is thereby precluded from recovering the relief set forth herein. The Tribunal finds on the evidence presented that Satterfield at all times acted fairly and appropriately with Respondents with respect to the Transaction. He wanted the stock loan from Respondents, believed it to be lawful and legitimate, trusted Sklarov, and thought Respondents were going to provide the Loan to him, but, as described herein, the reality was to the contrary due to the wrongdoing of Respondents led and controlled by Sklarov and participated in by all of them.



# 9. Joint and Several Liability

[193].

    The evidence in this matter is clear that, acting through Sklarov, the entity Respondents in this arbitration, along with Sklarov personally, committed the fraud, along with related aiding and abetting, and conversion and are beneficiaries of the unjust enrichment described above. Each of the entity Respondents in the case acted through Sklarov, who was the dominant actor for each of them insofar as concerns the Transaction, and performed actions that constitute bases of the Tribunal's findings of fraud, conversion, and unjust enrichment and each of them aided and abetted said fraud.

[194].

    For example, acting through Sklarov, America 2030 and the Bentley Rothschild Entities induced Satterfield to accept and sign the May 29, 2018 Addendum through holding out the prospect that this would lead to getting the Loan funded. These actions by the entity Respondents enabled the events that followed, including the release of the First Tranche Shares to Sklarov for trading and his trading in them and concealing the location of the Proceeds. They also led to the "bifurcation" of the Loan to America 2030 Nevis and Bentley Rothschild Nevis and to Sklarov's putting the Shares in accounts of America 2030 UK and Bentley Rothschild Financial.

[195].

    The May 29, 2018 Addendum purported, *inter alia*, to make the Loan of a recourse nature, as opposed to the non-recourse nature provided for in the Master Loan Agreement, and to bifurcate loan into the two Tranches. Speaking on behalf of the America 2030 and the Bentley Rothschild Entities that were purportedly to become Lenders, Sklarov, in order to induce Satterfield's acceptance of the Addendum. promised that none of them would proceed against Satterfield personally for any default notwithstanding the Addendum's provision as to recourse.

[196].

    For example, in a May 30, 2018 email to Satterfield, Sklarov stated, *inter alia*, "We can also represent that the other lender will also waive any deficiency and you are hereby indemnified against any claim or loss by us in case they will attempt to pursue for any such deficiency, but as a matter of course and policy they will not." Claimant's Exh. 48. Sklarov's attorney, Paul Crockett, told Satterfield, "[The May 29, 2018 Addendum] should aid in us getting approval from VStock and thereby fund the loan." *Id.* Based on these and other inducements, Satterfield signed the May 29, 2018 Addendum on May 31, 2018. *Id.*; Respondents' Exh. 100.

[197].

    Acting on behalf of the entity Respondents, Sklarov also represented to Satterfield in this series of communications in a May 30, 2018 email, "The fact that I already stated in the previous email what we will not pursue any deficiency, is legally binding and enforceable. Emails are legally binding forms of communication and contract." *See* Claimant's Exh. 48. Such actions of the entity Respondents through Sklarov constitute their active performance of actions that are bases of the Tribunal's findings, as described above of fraud, aiding and abetting fraud, conversion, and unjust enrichment.



[198].

The Tribunal accordingly finds Respondents jointly and severally liable to Satterfield on the grounds of fraud, aiding and abetting fraud, conversion and unjust enrichment.

# 10. Relief

[199].

Based upon the Tribunal's findings as to the unenforceability of the Agreement and Respondents' wrongdoing described herein, Satterfield is entitled to have Respondents turn the Shares and Proceeds over to him—and Respondents are directed to do so. This includes (a) the approximately 158,972 First Tranche Shares held at Dolfin, (b) the $1,152,538.70 in Proceeds from the sale by Sklarov of the 905,926 First Tranche Shares in the period December 13, 2018 through January 22, 2019, with interest at 9% per annum, simple interest, calculated from December 31, 2018 through the earlier of satisfaction of this Final Award or entry of judgment and (b) the 1,134,897 Second Tranche Shares held at VStock. Respondents are further directed to immediately facilitate, expedite, and, as necessary, execute any paperwork that may be necessary or expedient to effectuate the turn-over of the Shares to Satterfield.

[200].

Satterfield is not granted damages or other relief beyond than set forth herein. While he alleged generally an entitlement to damages beyond recovery of the Shares and Proceeds, along with interest, he did not establish his entitlement to such damages or any particular amount of damages, nor were Respondents provided fair notice of any such claims.

# 11. Counterclaims

[201].

Respondents' Counterclaims, which are based on Satterfield's alleged breaches of the Agreement, are unfounded, *inter alia*, because, for the reasons set forth above, the Agreement is unenforceable.

[202].

Indeed, Sklarov's assertions in his testimony in this matter that the Transaction was a legitimate one requiring the Lenders to loan the agreed amount to Satterfield and to return the Collateral to Sklarov upon his repayment of the Loans was a continuation of the fraud. The Agreement, as noted above, lacks any such obligations on the part of the Lenders. The inference from the evidence presented at the Hearing is compelling that Sklarov and his Entities never intended to make the Loans or return the Collateral at an appropriate time. Quite to the contrary, Sklarov saw the Transaction as a way to convert and otherwise take from Satterfield his substantial shareholder interest in Co-Diagnostics. Accordingly, the Counterclaims have no merit.



## 12. Alleged Prior Bad Acts

[203].

    Satterfield, in support of his claims in this arbitration, relied on certain alleged bad acts of Satterfield, including a prior conviction years ago and alleged wrongdoing by Sklarov in other stock loan transactions. However, other than as to the prior conviction, Satterfield's assertions in this regard were predominantly based upon *allegations* against Sklarov and/or entities associated with him. The Tribunal, in reaching its conclusions in this arbitration, has not relied upon or even considered such allegations relating to other stock loan transactions, nor have we given any weight to Sklarov's criminal conviction of many years ago. Nor have we considered or given weight to Satterfield's prior criminal conviction of many years ago or allegations asserted against him in other cases.

## 13. Charges of the AAA and Arbitrators

[204].

    The Tribunal has discretion under [Rule 47(c) of the AAA Commercial Rules](#) to allocate the administrative costs and arbitrators' fees incurred in this proceeding. Since Satterfield is unquestionably the prevailing party, and in the context of the findings herein of Respondents' fraud and other violations of law and the overall nature of Respondents' conduct concerning the Transaction, the Tribunal is awarding Satterfield the fees and other charges of the AAA and compensation of the Arbitrators in this matter. The Tribunal accordingly directs that Respondents pay the fees and other charges of the AAA and the compensation of the Arbitrators.

[205].

    Because the arbitration agreement does not authorize the Tribunal to award attorneys' fees and expenses to the prevailing party, and only one party (Satterfield) requested such fee-shifting, Satterfield has predicated his request for fee-shifting on the exception to the "American Rule" where the adverse party engages in bad faith in the conduct of the proceeding, citing *Reliastar Life Ins. Co. of N.Y. v. EMC National Life Co.,* 564 F.3d 81 (2d. Cir. 2009). Although, as noted, we are troubled by Sklarov's testimony and Counterclaims that in effect sought the Tribunal's assistance to enforce his fraudulent scheme, we conclude that Sattterfield has not established his entitlement to recover attorneys' fees under that exception. Consequently, each side is to bear its own attorneys' fees and disbursements other than the fees and charges of the AAA and the compensation of the Arbitrators addressed above.

## 14. Other

[206].



All claims, defenses and arguments of the parties not specifically addressed herein have been determined by the Tribunal to be without merit, consistent with the conclusions set forth herein, or mooted by such conclusions.

## II. FINAL AWARD

[207].

For the foregoing reasons, we award as follows:

1. Within 30 days from the date hereof, Respondents Val Sklarov, America 2030 Capital, LLC, Bentley Rothschild Financial LLC, and Bentley Rothschild Capital Limited Corp. are directed, jointly and severally, to pay to Claimant Brent Satterfield the $1,152,538.70 received from the sale of the 905,926 Shares of Co-Diagnostics included within the First Tranche Shares, along with interest on said amount at the rate of 9 percent per annum, simple interest, calculated from December 31, 2018 through the earlier of satisfaction of this Final Award or entry of judgment.

2. Respondents Val Sklarov, America 2030 Capital, LLC, Bentley Rothschild Financial LLC, and Bentley Rothschild Capital Limited Corp. are directed, jointly and severally, to immediately return to Claimant Brent Satterfield all of the First Tranche Shares in the possession, custody, or control, directly or indirectly, of said Respondents, including any such shares held at Dolfin Financial in London or wherever else they may be. Said Respondents are further directed to immediately facilitate, expedite, and, as necessary, execute any paperwork that may be necessary or expedient to effectuate the return of said Shares to said Claimant.

3. Respondents Val Sklarov, America 2030 Capital, LLC, Bentley Rothschild Financial LLC, and Bentley Rothschild Capital Limited Corp., are directed, jointly and severally, to immediately return to Claimant Brent Satterfield the 1,134,897 Second Tranche Shares held at VStock, Inc or wherever else they may be. Said Respondents are further directed to immediately facilitate, expedite, and, as necessary, execute any paperwork that may be necessary or expedient to effectuate the return of said Shares to said Claimant.

4. The Counterclaims of Respondents Val Sklarov, America 2030 Capital, LLC, Bentley Rothschild Financial LLC, and Bentley Rothschild Capital Limited Corp., are denied and dismissed with prejudice.

5. The fees and expenses of the American Arbitration Association totaling $16,175.00 and the compensation and expenses of the Arbitrators totaling $315,005.00 shall be borne, jointly and severally, by Respondents Val Sklarov, America 2030 Capital, LLC, Bentley Rothschild Financial LLC, and Bentley Rothschild Capital Limited Corp. Therefore, Respondents Val Sklarov, America 2030 Capital, LLC, Bentley Rothschild Financial LLC, and Bentley Rothschild Capital Limited Corp shall reimburse Claimant Brent Satterfield the sum of $170,977.50, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant Brent Satterfield.

6. This Final Award is in final settlement of all claims, counterclaims, affirmative defenses, and set-offs submitted to this Arbitration. All claims, counterclaims, affirmative defenses, and set-offs



not expressly granted herein are hereby denied.

7. This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute this Final Award.

[208].

We hereby certify that, for purposes of Article I of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award is made in New York, New York, USA.
Date July 9, 2021