# EXHIBIT 31

Home  >  Enforcement  >  Early Intervention  >  Investment Caution List  >  2020  >  Astor Capital Fund Limited (Astor)

◀ **Enforcement**

Find more about
**Early Intervention**

# Astor Capital Fund Limited (Astor)

**Date:**

2020-04-09

**Contact:**

http://www.astorcapitalfund.com

**Background:**

Astor claims to have an office in Vancouver, British Columbia (BC), and offers wealth management and advisory services.

Astor is not registered to trade in, or advise on, securities or derivatives in BC.

We urge BC residents to exercise caution when dealing with firms that are not registered to trade or advise in BC.

For information on how to become better informed about investment products and services, please visit InvestRight at
https://www.investright.org.



About     Who We Are     What We Do     News & Events     Careers     Contact Us

Subscribe to our updates

Reception: 604-899-6500
Contact Centre: 604-899-6854 or
1-800-373-6393
Fax: 604-899-6506



701 West Georgia Street
P.O. Box 10142, Pacific Centre
Vancouver, BC V7Y 1L2

© 2024 BC Securities Commission

Privacy    |    Sitemap    |    Legal

# EXHIBIT 32



# Rechercher une entreprise au registre

## État de renseignements d'une personne morale au registre des entreprises

Renseignements en date du 2024-07-23 07:39:24

## État des informations

### Identification de l'entreprise

| | |
|---|---|
| Numéro d'entreprise du Québec (NEQ) | 1176785997 |
| Nom | GESTION D'ACTIF ASTOR 3 LTÉE |
| Version du nom dans une autre langue | ASTOR ASSET MANAGEMENT 3 LTD |

### Adresse du domicile

| | |
|---|---|
| Adresse | 18C-3107 av. des Hôtels<br>Québec (Québec) G1W4W5<br>Canada |

### Adresse du domicile élu

| | |
|---|---|
| Adresse | Aucune adresse |

### Immatriculation

| | |
|---|---|
| Date d'immatriculation | 2021-07-27 |
| Statut | Immatriculée |
| Date de mise à jour du statut | 2021-07-27 |
| Date de fin d'existence prévue | Aucune date de fin d'existence n'est déclarée au registre. |

### Forme juridique

| | |
|---|---|
| Forme juridique | Société par actions ou compagnie |
| Date de la constitution | 2021-07-26 Constitution |
| Régime constitutif | QUÉBEC : Loi sur les sociétés par actions (RLRQ, C. S-31.1) |
| Régime courant | QUÉBEC : Loi sur les sociétés par actions (RLRQ, C. S-31.1) |

### Dates des mises à jour

| | |
|---|---|
| Date de mise à jour de l'état de renseignements | 2024-01-05 |
| Date de la dernière déclaration de mise à jour annuelle | 2024-01-05 2023 |

| | |
|---|---|
| Date de fin de la période de production de la déclaration de mise à jour annuelle de 2024 | 2025-02-01 |
| Date de fin de la période de production de la déclaration de mise à jour annuelle de 2023 | 2024-02-01 |

### Faillite

L'entreprise n'est pas en faillite.

### Fusion, scission et conversion

Aucune fusion ou scission n'a été déclarée.

### Continuation et autre transformation

Aucune continuation ou autre transformation n'a été déclarée.

### Liquidation ou dissolution

Aucune intention de liquidation ou de dissolution n'a été déclarée.

### Activités économiques et nombre de salariés

### 1$^{er}$ secteur d'activité

| | |
|---|---|
| Code d'activité économique (CAE) | 9999 |
| Activité | Autres services |
| Précisions (facultatives) | provide business and management consultation and improvement services to clients to implement successfully business strategies and techniques |

### 2$^{e}$ secteur d'activité

Aucun renseignement n'a été déclaré.

### Nombre de salariés

Nombre de salariés au Québec

Aucun

Proportion de salariés qui ne sont pas en mesure de communiquer en français au travail

Non tenue de déclarer cette information

## Convention unanime, actionnaires, administrateurs, dirigeants, bénéficiaires ultimes et fondé de pouvoir

### Actionnaires

**Premier actionnaire**
Le premier actionnaire est majoritaire.

| | |
|---|---|
| Nom de famille | Bibi |
| Prénom | Jonathan Clifford |
| Adresse du domicile | Ile Perseverance S12-56-4 Mahe Seychelles |
| Adresse professionnelle | |

## Convention unanime des actionnaires

Il n'existe pas de convention unanime des actionnaires conclue en vertu d'une loi du Québec ou d'une autre autorité législative du Canada.

## Liste des administrateurs

| | |
|---|---|
| Nom de famille | Bibi |
| Prénom | Jonathan Clifford |
| Date du début de la charge | 2021-07-26 |
| Date de fin de la charge | |
| Fonctions actuelles | Administrateur |
| Adresse du domicile | Ile Perseverance S12-56-4 Mahe Seychelles |
| Adresse professionnelle | |

## Dirigeants non membres du conseil d'administration

Aucun dirigeant non membre du conseil d'administration n'a été déclaré.

## Déclaration relative aux bénéficiaires ultimes

Tous les bénéficiaires ultimes de l'entreprise ont été retracés et identifiés.

## Liste des bénéficiaires ultimes

| | |
|---|---|
| Nom de famille | Hryn |
| Prénom | Oksana |
| Autres noms utilisés | |
| Date du début du statut | 2021-07-26 |
| Date de fin du statut | |
| Situations applicables au bénéficiaire ultime | Plus de 75 % des droits de vote |
| Adresse du domicile | Street Kos-Anatolskoho Building 4, Flat 225, Lviv 79066 Ukraine |
| Adresse professionnelle | |

## Fondé de pouvoir

Aucun fondé de pouvoir n'a été déclaré.

## Administrateurs du bien d'autrui

Aucun administrateur du bien d'autrui n'a été déclaré.

# Établissements

Aucun établissement n'a été déclaré.

## Documents en traitement

Aucun document n'est actuellement traité par le Registraire des entreprises.

**Index des documents**

### Documents conservés

| Type de document | Date de dépôt au registre |
|---|---|
| DÉCLARATION DE MISE À JOUR ANNUELLE 2023 | 2024-01-05 |
| DÉCLARATION DE MISE À JOUR ANNUELLE 2022 | 2022-12-15 |
| Déclaration initiale | 2021-08-24 |
| Certificat de constitution | 2021-07-27 |

## Index des noms

| Date de mise à jour de l'index des noms | 2021-07-26 |
|---|---|

### Nom

| Nom | Versions du nom dans une autre langue | Date de déclaration du nom | Date de déclaration du retrait du nom | Situation |
|---|---|---|---|---|
| GESTION D'ACTIF ASTOR 3 LTÉE | ASTOR ASSET MANAGEMENT 3 LTD | 2021-07-26 | | En vigueur |

### Autres noms utilisés au Québec

Aucun autre nom utilisé au Québec n'a été déclaré.

Québec ✦✦

© Gouvernement du Québec

# EXHIBIT 33

# Cookies on Companies House services

We use some essential cookies to make our services work.

We'd also like to use analytics cookies so we can understand how you use our services and to make improvements.

Accept analytics cookies          Reject analytics cookies

**View cookies (/help/cookies)**

 **GOV.UK**

# Find and update company information

Companies House does not verify the accuracy of the information filed (http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)
Advanced company search (/advanced-search)

# Jonathan Clifford BIBI

## Filter appointments

☐
Current appointments

Apply filter

## Total number of appointments 1

Date of birth
    July 1984

---

### PRIME CONSULTING SOLUTIONS LTD (14720169)

Company status    Active

Correspondence address    House No 04, Ile Perseverance, Mahe, Seychelles

Role Active Director

Appointed on 11 September 2023

Nationality Citizen Of Seychelles

Country of residence Seychelles

Occupation Technician

Tell us what you think of this service (https://www.smartsurvey.co.uk/s/getcompanyinformation/) Is there anything wrong with this page? (/help/feedback?sourceurl=https://find-and-update.company-information.service.gov.uk/officers/yTu2qGnLX7DbvX1nQhrAbTwPWmo/appointments)

Policies Link opens in new tab

Cookies (https://beta.companieshouse.gov.uk/help/cookies)

Contact us Link opens in new tab

Accessibility statement (https://beta.companieshouse.gov.uk/help/accessibility-statement)

Developers Link opens in new tab

Built by Companies House                                    © Crown copyright

# EXHIBIT 34



# Jonathan Bibi

Jonathan Bibi (born 28 July 1984) is a Seychellois football player. He is a defender on the Seychelles national football team.

Bibi helped Seychelles win the football tournament at the 2011 Indian Ocean Games in August 2011.[1]

## References

1. "Seychelles win first football gold medal" (https://web.archive.org/web/20180806054953/http://www.nation.sc/index.php?art=24570). Seychelles Nation. 13 August 2011. Archived from the original (http://www.nation.sc/index.php?art=24570) on 6 August 2018. Retrieved 19 December 2011.

## External links

- Jonathan Bibi (https://web.archive.org/web/20150905/http://www.fifa.com/fifa-tournaments/players-coaches/people=196459/index.html) – FIFA competition record (archived)
- Jonathan Bibi (https://www.national-football-teams.com/player/5889.html) at National-Football-Teams.com

Retrieved from "https://en.wikipedia.org/w/index.php?title=Jonathan_Bibi&oldid=1217957823"

# EXHIBIT 35

This is the html version of the file https://www.sos.mo.gov/CMSImages/Securities/orders/AP-16-18.pdf. Google automatically generates html versions of documents as we crawl the web.

Tip: To quickly find your search term on this page, press Ctrl+F or ⌘-F (Mac) and use the find bar.

Page 1

## STATE OF MISSOURI
## OFFICE OF SECRETARY OF STATE

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| ZULUTOYS LIMITED, d/b/a RBOptions.com; | ) | |
| JORDAN GATSBY; and JOSEPH WOLF, | ) | |
| | ) | |
| Respondents. | ) | AP-16-18 |
| | ) | |
| Serve: | ) | |
| | ) | |
| Zulutoys Limited, d/b/a RBOptions | ) | |
| Trust Company Complex | ) | |
| Ajeltake Road, Ajeltake Island | ) | |
| Majuro, MH96960 Marshall Islands | ) | |
| | ) | |
| Jordan Gatsby | ) | |
| Trust Company Complex | ) | |
| Ajeltake Road, Ajeltake Island | ) | |
| Majuro, MH96960 Marshall Islands | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Joseph Wolf | ) | |
| Trust Company Complex | ) | |
| Ajeltake Road, Ajeltake Island | ) | |
| Majuro, MH96960 Marshall Islands | ) | |

and via e-mail: legal@rboptions.com                    )

ORDER TO CEASE AND DESIST AND ORDER TO SHOW CAUSE WHY
RESTITUTION, CIVIL PENALTIES, AND COSTS SHOULD NOT BE IMPOSED

On April 11, 2016, the Enforcement Section of the Missouri Securities Division of the Office of Secretary of State ("Enforcement Section"), through Director of Enforcement John R. Phillips, submitted a Petition for Order to Cease and Desist and Order to Show Cause why Restitution, Civil Penalties, and Costs Should not be Imposed. After reviewing the petition, the Commissioner issues the following order:

1

Page 2

## I. ALLEGATION OF FACTS

The petition alleges the following facts:

### A. Respondents and Related Parties

1.    RBOptions.com ("RBOptions") is a website that is purported to be owned by Zulutoys Limited ("Zulutoys"), Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands, MH96960.

2.    Joseph Wolf ("Wolf") is listed as the Canada & Europe Desk Manager on RBOptions website.

3.    Jordan Gatsby ("Gatsby") is purported to be a broker at RBOptions.

4.    As used herein, the term "Respondents" refers to Wolf, Gatsby, and Zulutoys d/b/a RBOptions.

5.    RB Secured Processing LTD ("RBSP") is a private limited company in the United Kingdom, which was incorporated on November 16, 2015. The registered office address of RBSP is Office 3.11, Nwms Center 3rd Floor, 31 Southampton Row, London, UK WC1B 5HJ. The director is listed as Jonathan Bibi, who has an address as S1256, Ft. No. 4 ILE Perseverance, Vitoria Mahe, Seychelles, 0000. Zulutoys is listed as the only member with share capital on the registration documents.

6.    Michael Furlong was purported to be a Legal Officer for RBOptions Legal Department, 161 Bay Street, 26th Floor, Toronto, Canada M5J 2S1.

7.    At all times relevant to this matter, Respondents have never been registered in Missouri as investment advisers, investment adviser representatives, broker-dealers, broker-dealer agents, and/or issuer agents.

8. At all times relevant to this matter, there was no registration, granted exemption, or notice filing indicating status as a "federal covered security" for the securities offered and/or sold by Respondents.

9. According to the National Futures Association's BASIC database, at all times relevant to this matter, Respondents were not registered as any type of commodity merchant or intermediary in connection with futures trading. [1]

B. Enforcement Section Investigation

10. From in or around January 14, 2016 through March 31, 2016, the Enforcement Section was in contact with and received information from an 82-year-old Chesterfield, Missouri

[1] BASIC is a database containing information regarding the registration status of futures commission merchants or intermediaries with the Commodities Futures Trading Commission.

2

---

Page 3

resident ("MR"). Information received from MR revealed the following:

a. In or around July 2014, MR began looking for a way to make money by trading online. MR was not looking to purchase and hold stocks;

b. MR wanted to find a company that would assist MR in making trades, because MR did not understand all of the different kinds of investments;

c. On or about July 22, 2014, after reviewing RBOptions' website, MR contacted RBOptions via telephone at 647-846-8237 to discuss making an investment. During the telephone call, an RBOptions representative told MR that if she did not know how to make trades, a broker could make all of the trades for MR;

d. Gatsby was assigned as MR's broker; and told MR "there was something happening the next week" and Gatsby could make MR "some good money";

e. Gatsby told MR that RBOptions would match any investment amount made by MR, and that RBOptions would "guarantee to cover any losses, if that happened";

f. MR's intention was to only invest $250, which was the minimum amount one could invest with RBOptions, but Gatsby "pitched a hard sale" and tried to persuade MR to invest an additional $10,000;

g. MR declined to invest the additional $10,000, but Gatsby charged MR's credit card for $10,000, without authorization from MR;

h. MR complained to Gatsby's supervisor and MR's $10,000 was refunded;

i.  In or around September 2014, MR's RBOptions account statement showed multiple $5,000 trades, all of which had made $3,800 in profit, except for one trade that lost $750;

j.  Since MR's investment appeared to be doing well, MR decided to invest for a second time with RBOptions, on or about November 17, 2014 for $10,000, via MR's credit card;

k.  A few weeks later, when some of MR's "trades were about end," MR began having serious health issues and attempted to withdraw MR's money;

l.  MR contacted RBOptions via telephone and was told Gatsby no longer worked there and was assigned a new broker;

m.  RBOptions switched MR to a total of six different brokers. MR asked each different broker to withdraw MR's investment money, but they would not release MR's funds;

3

Page 4

n.  Wolf was the last broker assigned to MR;

o.  In or around January 2015, MR discovered that RBOptions had withdrawn $5,000 from MR's credit card without MR's authorization;

p.  MR has not been able to contact RBOptions via phone since early 2015;

q.  MR has requested a refund of all investment monies both via telephone and e-mail without success; and

r.  Including fees, MR has lost a total of $15,450 investing with RBOptions.

C.  Bank Records

11.  A review of MR's bank records confirms MR's expenditures of $15,450 with RBOptions.

D.  RBOptions.com

12.  As of March 31, 2016, RBOptions' website states and/or contains the following:

a.  "The website is owned by Zulutoys Limited in Marshall Islands…";

b.  "The clearing services with respect to the website and the Company [Zulutoys]

are provided by RB Secured Processing LTD. UK company number 09872729...";

c.      "Call us +1-647-846-8231";

d.      "RBOptions offers over 100 tradable assets including Forex, Stocks, Commodities and Indices.";

e.      "Keep up to date with Market movement and indicators with RBOptions' daily market review.";

f.      "At the heart of RBoptions' core values are honesty and straight forward trading experience. We believe any trader should have immediate access to any invested funds. That's why RBOptions is the only binary options broker to offer same day withdrawal approvals! Once your account is verified (See compliance policy) you will receive your funds as early as 24 hours (with Skrill) after a withdrawal request was submitted. No hassle. No questions asked. This is the RBOptions Guarantee.";

g.      "RBoptions is proud to be the first and ONLY binary options broker to GUARANTEE same day withdrawal approvals!";

4

Page 5

h.      "After the economic crises of recent years, we feel that transparent pricing, straight forward trading, and responsible financial handling is of the utmost importance. That's why we've assembled a team of uncompromisingly professional traders, investors, and financial gurus to offer the highest level of trading experience. You never have to worry about any thing [sic] other than your trades. We take care of the rest.";

i.      "RBoptions offers the highest paying platform in the industry - Up to 88% profit per successful trade, where most broker [sic] out there fall behind with a 70% payout average. Additionally, RBoptions offers an exclusive Stop-Loss feature allowing you to sell your position before expiry to cap potential losses if your understanding of the market had changed mid-trade.";

j.      "All traders at RBoptions will have access to 24/7 live chat support from our customer service team. For customers wishing to trade in higher volumes, a 24/7 dedicated management team is available, consisting of 2 senior brokers and a dedicated customer service representative to ensure your inquiries and trading requirements are met 24/7.";

k.     A "USA Toll Free" phone number of 866-443-4797;

l.     A world map depicting RBOption's locations under the "Contact Us" tab. The map has dots over what appear to be New York and Toronto in North America;

m.     "All personal information and financial transactions are secured by a cutting edge 256 Bit SSL Encryption. The same used in leading financial institutions such as HSBC, J.P. Morgan Chase and TD Waterhouse."; and

n.     An investigator from the Enforcement Section, clicked on the "Open Account" button at RBOptions.com and the following message was displayed; "Unfortunately RBOptions does not accept registration or traders from your country of residence."

13.     Respondents both offered commodity contracts and securities, and acted as a broker-dealer and a commodity merchant or board of trade for transactions. Respondents offered a profit and guaranteed against any losses, through the trading of binary options on their platform. These binary options derived their value from currencies or commodities. If a currency or commodity performs as the investor speculated, the investor gains some amount of money (up to 100% of the investment), but loses the entire investment if the currency or commodity does not perform as the investor speculated.

14.     On February 5, 2016, the Enforcement Section sent a letter of inquiry to Respondent RBOptions via US Post Office international mail and e-mail. The letter requested a claim of exemption from registration or exception from definition upon which Respondents relied in offering unregistered securities in the State of Missouri. The letter also requested additional information about offers to any other Missouri residents.

5

Page 6

15.     Between February 5, 2016 and March 24, 2016, the Enforcement Section was in contact with RBOptions via e-mail, in regards to its letter of inquiry, and an incomplete response was received from RBOptions. RBOption's initial response and the subsequent e-mails transpired as follows:

a.     On February 5, 2016, the Enforcement Section received an e-mail from the "Compliance Department" at compliance@rboptions.com, stating a reference number had been created to track our inquiry, ticket number 39173;

b.     On February 8, 2016, the Enforcement Section received an e-mail from the "Legal Department" at legal@rboptions.com, stating "...that for the last 12 months RBOptions trading as Zulu Toys has not accepted, and still does not accept, any clients from Missouri and the USA as a whole...All USA IPs are blocked and USA customers cannot open up trading accounts...Further we have no customers that are resident [sic] of Missouri." The e-mail was written by Michael Furlong,

Legal Officer, at RBOptions. The e-mail listed RBOptions' Legal Department as having an address of 161 Bay Street, 26th Floor, Toronto, Canada;

c.  On February 8, 2016, the Enforcement Section sent an e-mail to RBOptions' Legal Department that contained the following:

   i.  a statement that it has supporting documents regarding MR's account;

   ii.  the name and e-mail address associated with MR's account;

   iii.  a request for all account and transaction information related to MR's account; and

   iv.  another request to provide all information from the Enforcement Section's February 5th letter of inquiry;

d.  On February 9, 2016, the Enforcement Section received an e-mail from the Legal Department/Michael Furlong at RBOptions that stated, among other things, the following:

   i.  MR's account "was opened before last year when we blocked USA funds";

   ii.  MR's "account was not been logged into [sic] and nor has there been any transactions or requests since March of last year"; and

   iii.  that MR's account does not have a valid credit card associated with it so no funds in the account can be refunded until wire details have been received from MR;

6

Page 7

e.  On February 9, 2016, the Enforcement Section sent an e-mail to RBOptions Legal Department which stated:

   "If RBOptions is seeking a method to refund money to Missouri investors, the Missouri Securities Division has a Restitution Fund which may be used for such a process. Please send a detailed description of all accounts that have been closed for Missouri clients and for which RBOptions is holding money, including but not limited to the one for MR. The Missouri Securities Division can then contact investors and distribute the money. Please advise if this is acceptable. If so, we will supply you with appropriate wire instructions";

f.     On February 22, 2016, the Enforcement Section sent an e-mail to RBOptions Legal Department asking the status of their response;

g.     On March 24, 2016, the Enforcement Section sent an e-mail to RBOptions Legal Department stating "We still have not received a response to our offer to assist RPOptions.com [sic] in refunding investment monies to Missouri investors/clients. Please let us know how you would like to proceed as soon as possible."; and

h.     After February 9, 2015, the Enforcement Section has not received any further communications from RBOptions.

## E.     Additional Findings

16.     The phone number on RBOptions website, 647-846-8231 is to a "pay as you go" cell phone based in Toronto, Ontario, Canada.

17.     The Ontario Securities Commission added RBOptions to their Investors Warning List on March 18, 2014. The Warning List is located on the Commission's website, and contains individuals and companies that appear to be engaging in activities that may pose a risk to investors. Specific RBOptions information from the list states:

> "RBOptions doing business as www.rboptions.com is not registered to engage in the business of (i) trading in securities or (ii) advising anyone with respect to investing in, buying or selling securities."

18.     On February 19, 2016, the Financial and Consumer Affairs Authority of Saskatchewan, Canada issued a decision that contained among other things, the following findings and orders:

a.     Zulutoys and RBOptions acted as dealers by engaging in the business of trading in securities or exchange contracts or holding themselves out as engaging in the business of trading in securities or exchange contracts in Saskatchewan;

7

Page 8

b.     At no time were Zulutoys and RBOptions registered as a dealer in accordance with The Securities Act, 1988;

c.     All exemptions in the Saskatchewan securities law do not apply to Zulutoys and RBOptions;

d.     Zulutoys and RBOptions shall cease trading and/or acquiring securities or

exchange contracts;

    e.    Zulutoys and RBOptions shall pay an administrative penalty in the amount of $25,000;

    f.    Zulutoys and RBOptions shall pay compensation to each person or company found to have sustained financial loss as a result, in whole or in part, of Zulutoys and RBOptions contraventions of the Act, in an amount to be determined; and

    g.    Zulutoys and RBOptions shall pay the costs relating to the hearing in this matter.

19.    In connection with the offer and/or sale of securities, Respondents failed to disclose to MR, among other things, the following:

    a.    Respondents were not registered to offer or sell securities in the State of Missouri;

    b.    that the securities were not registered or exempt from registration in the State of Missouri; and

    c.    Respondents were not registered with the Commodity Futures Trading Commission.

## II. COMMISSIONER'S DETERMINATION AND FINDING

### Multiple Violations of Offering and Selling Unregistered, Non-Exempt Securities

THE COMMISSIONER DETERMINES    that Respondents offered and sold unregistered, non-exempt securities in the State of Missouri to MR when Respondents offered and sold binary options to MR.

20.    This activity constitutes the offer to sell and sale as those terms are defined in Section 409.1-102 (26), RSMo (Cum. Supp. 2013). [2]

21.    "[P]ut, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency" is enumerated in the list of items that are securities in Section 409.1-102(28).

[2] Unless otherwise specified, all statutory references are to the 2013 cumulative supplement to the Revised Statutes of Missouri.

8

Page 9

22.    The investments Respondents offered and sold to MR, are either binary options deriving whatever value may have existed from an underlying asset, or a commodity or foreign currency. The investments offered and sold were securities as that term is defined in Section 409.1-102(28).

23.    At all times relevant to this matter, there was no registration, granted exemption, or notice filing indicating status as a "federal covered security" for the securities offered and sold by Respondents.

24.    Respondents offered and sold securities in Missouri without these securities being (1) a federal covered security, (2) exempt from registration under Sections 409.2-201 or 409.2-203, or (3) registered under the Missouri Securities Act of 2003.

25.    At the time Respondents engaged in the conduct set forth above, MR was over sixty years old and was an elderly person as that term is defined under Section 409.6-604(d)(3)(B).

26.    Respondents offered and sold unregistered securities in violation of Section 409.3-301.

27.    Respondents' conduct in violation of Section 409.3-301 constitutes an illegal act, practice, or course of business, and such conduct is, therefore, subject to the Commissioner's authority under Section 409.6-604.

Multiple Violations of Transacting Business as an Unregistered Broker-Dealer

28.    THE COMMISSIONER FURTHER DETERMINES    that Respondent RBOptions transacted business as an unregistered, non-exempt broker-dealer in the State of Missouri by:

a.    opening a trading account for MR; and

b.    effecting transactions in the account on behalf of MR.

29.    These activities constitute transacting business as a broker-dealer in the State of Missouri under Section 409.1-102(4).

30.    At all times relevant to this matter, Respondent RBOptions was not registered as a broker-dealer in the State of Missouri.

31.    Respondent RBOptions transacted business in Missouri without being registered or exempt from registration as a broker-dealer in violation of Section 409.4-401(a).

32.    Respondent RBOptions' conduct in violation of Section 409.4-401(a) constitutes an illegal act, practice, or course of business, and such conduct is, therefore, subject to the Commissioner's authority under Section 409.6-604.

9

https://webcache.googleusercontent.com/search?q=cache:se638YnKS_UJ:https://www.sos.mo.gov/CMSImages/Securities/orders/AP-16-18.pd…    10/21

Multiple Violations of Employing Unregistered Broker-Dealer Agents

33.     THE COMMISSIONER FURTHER DETERMINES       that Respondent RBOptions
         employed or associated with multiple agents, who on behalf of the Respondent
         RBOptions offered and/or sold securities to MR.

34.     Respondent RBOptions' activities constitute employing or associating with an agent in
         the State of Missouri under Section 409.4-402(d).

35.     At all times relevant to this matter, the agents who Respondent RBOptions employed or
         with whom Respondent RBOptions was associated were not registered as a broker-dealer
         agents in the State of Missouri.

36.     Respondent RBOptions employed or associated with unregistered agents who transacted
         business in the State of Missouri in violation of Section 409.4-402(d).

37.     Respondent RBOptions' conduct in violation of Section 409.4-402(d) constitutes an
         illegal act, practice, or course of business, and such conduct is, therefore, subject to the
         Commissioner's authority under Section 409.6-604.

Multiple Violations of Section 409.5-501 - Securities Fraud

38.     THE COMMISSIONER FURTHER DETERMINES       that in connection with the offer,
         sale or purchase of a security, Respondents employed a device, scheme, or artifice to
         defraud, made untrue statements of material fact or omitted to state a material fact
         necessary in order to make the statement made, in light of the circumstances under which
         it is made, not misleading, and engaged in multiple acts, practices, or courses of business
         that would operate as a fraud or deceit upon another person by, among other things, the
         following:

         a.     In connection with the offer, sale or purchase of a security, Respondents made
                untrue statements of material fact or omitted to state a material fact necessary in
                order to make the statement made, in light of the circumstances under which it is
                made, not misleading by, among other things:

                i.     Telling MR that "there was something happening the next week" and
                        Gatsby could make MR "some good money";

                ii.    Telling MR that RBOptions would match any investment amount made by
                        MR, and that RBOptions would "cover any losses, if that happened";

                iii.   Creating an account statement for MR that showed multiple $5,000 trades,
                        all of which had made $3,800 in profit, except for one trade that lost $750;

                iv.    Telling MR when MR sought a withdrawal via phone that Gatsby no
                        longer worked there and was assigned a new broker;

10

        v.      Switching MR to a total of six different brokers in an effort to keep MR from attempting to withdraw MR's investment money;

        vi.     Not releasing MR's funds when MR requested such a withdrawal on at least seven occasions;

        vii.    Making an unauthorized charge of $5,000 on MR's credit card;

        viii. Ceasing to communicate with MR after MR made multiple attempts to withdraw MR's investment funds; and

        ix.     Stating on the RBOptions.com website the following:

           1.     "At the heart of RBoptions' core values are honesty and straight forward trading experience. We believe any trader should have immediate access to any invested funds. That's why RBOptions is the only binary options broker to offer same day withdrawal approvals! Once your account is verified (See compliance policy here) you will receive your funds as early as 24 hours (with Skrill) after a withdrawal request was submitted. No hassle. No questions asked. This is the RBOptions Guarantee.";

           2.     "RBoptions is proud to be the first and ONLY binary options broker to GUARANTEE same day withdrawal approvals!";

           3.     "After the economic crises of recent years, we feel that transparent pricing, straight forward trading, and responsible financial handling is of the utmost importance. That's why we've assembled a team of uncompromisingly professional traders, investors, and financial gurus to offer the highest level of trading experience. You never have to worry about any thing [sic] other than your trades. We take care of the rest."; and

           4.     "RBoptions offers the highest paying platform in the industry - Up to 88% profit per successful trade, where most broker [sic] out there fall behind with a 70% payout average. Additionally, RBoptions offers an exclusive Stop-Loss feature allowing you to sell your position before expiry to cap potential losses if your understanding of the market had changed mid-trade."

    b.     Any and all of the above statements are either untrue or misleading because of omissions of material fact, including, but not limited to:

        i.      Omitting that Respondents were not registered nor exempt from registration as a broker-dealer firm in the State of Missouri even though they are required to be registered or exempt;

https://webcache.googleusercontent.com/search?q=cache:se638YnKS_UJ:https://www.sos.mo.gov/CMSImages/Securities/orders/AP-16-18.pd…    12/21

Page 12

    ii.    Omitting that the securities Respondents purported to sell to MR were not registered nor exempt from registration in the State of Missouri, even though the securities required registration or exemption;

    iii.    Failing to inform MR as to the risks associated with the investment, including but not limited to:

        1.    The fact that currency, currency option, and binary option trading are highly volatile investments; and

        2.    The volatility of the securities offered through RBOptions may greatly reduce the funds in investor's RBOptions accounts;

    iv.    In addition, Respondents failed to provide any substantiation or documentation for promised returns.

    c.    Further, in connection with the offer, sale or purchase of a security, Respondents employed a device, scheme, or artifice to defraud and engaged in multiple acts, practices, or courses of business that would operate as a fraud or deceit upon another person, when they engaged in lulling MR in order avoid or delay detection by:

    i.    Telling MR when MR sought a withdrawal via phone that Gatsby no longer worked there and was assigned a new broker;

    ii.    Switching MR to a total of six different brokers in an effort to keep MR from attempting to withdraw MR's investment money;

    iii.    Not releasing MR's funds when MR requested such a withdrawal on at least seven occasions;

    iv.    Making an unauthorized charge of $5,000 on MR's credit card; and

    v.    Ceasing to communicate with MR after MR made multiple attempts to withdraw MR's investment funds.

39.    At the time Respondents engaged in this conduct, MR was over sixty years old and was an elderly person as that term is defined under Section 409.6-604(d)(3)(B).

40.    Respondents employed a device, scheme, or artifice to defraud, made untrue statements of material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading and engaged in multiple acts, practices, or courses of business that would operate as a fraud or deceit upon MR in violation of Section 409.5-501.

12

Page 13

41.     Respondents' actions in violation of Section 409.5-501 constitute an illegal act, practice, or course of business, and such conduct is, therefore, subject to the Commissioner's authority under Section 409.6-604.

Multiple Violations of Offering and Entering into Prohibited Commodities Contracts

42.     THE COMMISSIONER FURTHER DETERMINES        that Respondents offered to enter into, entered into, or confirmed the execution of, foreign currency commodity contracts and foreign currency commodity option contracts with MR, without being exempt or excluded pursuant to Sections 409.803.2 and 409.806 RSMo (2000), when, among other things, they:

a.     Solicited investments in accounts where currency and currency options trading was to occur;

b.     Accepted payment for currency and currency options trades;

c.     Confirmed investments in accounts meant for currency and currency options trading via phone; and/or

d.     Logged purchases of currency and currency options trades in customer accounts.

43.     This activity constitutes an offer to sell and sale as those terms are defined in Sections 409.800(11) and (14), RSMo (2000).

44.     Respondents offered and sold commodity contracts and commodity option contracts as those terms are defined in Sections 409.800(5) and (9), RSMo (2000).

45.     Respondents offered to enter into, entered into, or confirmed the execution of, foreign currency commodity contracts and foreign currency commodity option contracts in violation of Section 409.803.1, RSMo (2000).

46.     The actions of Respondents in offering and entering into prohibited commodities contracts constitute an illegal act or practice and thus such actions are subject to the Commissioner's authority under Section 409.823, RSMo (2000).

Multiple Violations of Engaging in Unregistered and/or
Unlicensed Commodity Merchant Business

47.     THE COMMISSIONER FURTHER DETERMINES        that Respondents engaged in the commodity merchant business with, among others, MR, when, among other things, they failed to register with the Commodity Futures Trading Commission as required to qualify

as a registered commodity merchant.

48.     This activity constitutes engaging in a trade or business or otherwise acting as a commodity merchant as that term is defined in Section 409.800(8), RSMo (2000).


13


Page 14


49.     THE COMMISSIONER FURTHER DETERMINES        that Respondents created and maintained a board of trade, or place for the trading of commodity contracts or commodity option contracts required to be traded on or subject to the rules of a contract market designated by the Commodity Futures Trading Commission and which had not been so designated, when, among other things, they engaged in buying or selling commodities or receiving the same for sale.

50.     This activity constitutes acting as a board of trade as that term is defined in Section 409.800(2), RSMo (2000).

51.     Respondents conducted unregistered commodity merchant business in violation of Sections 409.808.1 and 409.808.2, RSMo (2000).

52.     The actions of Respondents in conducting unregistered commodity merchant business constitute an illegal act or practice and thus such actions are subject to the Commissioner's authority under Section 409.823, RSMo (2000).

Multiple Violations of Engaging in Prohibited Acts in Connection with the
Sale of Commodity Contracts – Commodities Fraud

53.     THE COMMISSIONER FURTHER DETERMINES        that in connection with the purchase or sale of, the offer to sell, the offer to enter into, or the entry into of, a commodity contract or commodity option contract related to foreign currency as described above, Respondents cheated or defrauded, attempted to cheat or defraud, or employed a device, scheme or artifice to cheat or defraud a Missouri investor, made one or more of the following untrue statements of material fact, or engaged in a transaction, act, practice or course of business which would operate as a fraud or deceit upon a Missouri investor, or misappropriated or converted the funds, security or property of a Missouri investor by, among other things:

a.     Making one or more of the following untrue statements of material fact, or engaging in a transaction, act, practice or course of business which would operate as a fraud or deceit upon a Missouri investor, or misappropriated or converted the funds, security or property of a Missouri investor by, among other things:

i.     Telling MR that "there was something happening the next week" and Gatsby could make MR "some good money";

    ii.    Telling MR that RBOptions would match any investment amount made by MR, and that RBOptions would "cover any losses, if that happened";

    iii.    Creating an account statement for MR that showed multiple $5,000 trades, all of which had made $3,800 in profit, except for one trade that lost $750;

14

Page 15

    iv.    Telling MR when MR sought a withdrawal via phone that Gatsby no longer worked there and was assigned a new broker;

    v.    Switching MR to a total of six different brokers in an effort to keep MR from attempting to withdraw MR's investment money;

    vi.    Not releasing MR's funds when MR requested such a withdrawal on at least seven occasions;

    vii.    Making an unauthorized charge of $5,000 on MR's credit card;

    viii. Ceasing to communicate with MR after MR made multiple attempts to withdraw MR's investment funds; and

    ix.    Stating on the RBOptions.com website the following:

        1.    "At the heart of RBoptions' core values are honesty and straight forward trading experience. We believe any trader should have immediate access to any invested funds. That's why RBOptions is the only binary options broker to offer same day withdrawal approvals! Once your account is verified (See compliance policy here) you will receive your funds as early as 24 hours (with Skrill) after a withdrawal request was submitted. No hassle. No questions asked. This is the RBOptions Guarantee.";

        2.    "RBoptions is proud to be the first and ONLY binary options broker to GUARANTEE same day withdrawal approvals!";

        3.    "After the economic crises of recent years, we feel that transparent pricing, straight forward trading, and responsible financial handling is of the utmost importance. That's why we've assembled a team of uncompromisingly professional traders, investors, and financial gurus to offer the highest level of trading experience. You never have to worry about any thing [sic] other than your trades.

We take care of the rest."; and

4. "RBoptions offers the highest paying platform in the industry - Up to 88% profit per successful trade, where most broker [sic] out there fall behind with a 70% payout average. Additionally, RBoptions offers an exclusive Stop-Loss feature allowing you to sell your position before expiry to cap potential losses if your understanding of the market had changed mid-trade."

b. Any and all of the above statements are either untrue or misleading because of omissions of material fact, including, but not limited to:

15

Page 16

i. Failing to inform MR as to the risks associated with the investment, including but not limited to:

1. The fact that currency, currency option, and binary option trading are highly volatile investments; and

2. The volatility of the securities offered through RBOptions may greatly reduce the funds in investor's RBOptions accounts;

ii. Failing to honor MR's repeated requests for withdrawals; and

iii. Failing to provide any substantiation or documentation for promised returns.

c. Further, Respondents cheated or defrauded, employed a device, scheme, or artifice to defraud and engaged in multiple acts, practices, or courses of business that would operate as a fraud or deceit upon another person, and misappropriated or converted funds when they engaged in lulling MR in order avoid or delay detection by:

i. Telling MR when MR sought a withdrawal via phone that Gatsby no longer worked there and was assigned a new broker;

ii. Switching MR to a total of six different brokers in an effort to keep MR from attempting to withdraw MR's investment money;

iii. Not releasing MR's funds when MR requested such a withdrawal on at least seven occasions;

iv. Making an unauthorized charge of $5,000 on MR's credit card; and

v.  Ceasing to communicate with MR after MR made multiple attempts to withdraw MR's investment funds.

54.  Respondents' cheated or defrauded, attempted to cheat or defraud, made untrue statements of material fact, employed any device, scheme artifice to cheat or defraud, any other person, engaged in any transaction, act, practice or course of business, including, without limitation, any form of advertising or solicitation, which operated or would operate as a fraud or deceit upon any Missouri investor, or misappropriated or converted the funds, security or property of any Missouri investor in violation of Section 409.810, RSMo (2000), and such actions constitute illegal acts or practices, and thus such actions are subject to the Commissioner's authority under Section 409.823, RSMo (2000).

55.  This order is in the public interest and is necessary to carry out the provisions of the Missouri Securities Act of 2003 and Sections 409.800 to 409.863, RSMo (2000).

16

Page 17

## III. ORDER

NOW, THEREFORE,   it is hereby ordered that Respondents, their agents, employees and servants, and all other persons participating in or about to participate in the above-described violations with knowledge of this order be prohibited from violating or materially aiding in any violation of:

A.  Section 409.3-301 by offering or selling any securities as defined by Section 409.1-102(28), in the State of Missouri unless those securities are registered with the Securities Division of the Office of the Secretary of State in accordance with the provisions of Section 409.3-301;

B.  Section 409.4-401(a) by transacting business as an unregistered broker-dealer firm;

C.  Section 409.4-402(d) by employing or associating with an unregistered broker-dealer agent;

D.  Section 409.5-501 by, in connection with the offer or sale of securities, making an untrue statement of a material fact or omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading or engaging in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person;

E.  Section 409.803, RSMo (2000) by selling or purchasing, or offering to sell or purchase any commodity contract or any commodity option while not being

registered with the applicable regulatory bodies;

F.      Sections 409.808.1 and 409.808.2, RSMo (2000) by engaging in the trade or business or otherwise acting as a commodity merchant while not being registered or temporarily licensed with the Commodities Futures Trading Commission; and

G.      Section 409.810, RSMo (2000) by, directly or indirectly, cheating or defrauding, attempting to cheat or defraud, or employing any device scheme or artifice to cheat or defraud any other person, making untrue statements of material fact, engaging in any transaction, act, practice or course of business including advertising or solicitation, which operates or would operate as a fraud or deceit upon any person, or misappropriating or converting the funds of any other person, all in the connection with the purchase or sale of, the offer to sell, the offer to enter into, or the entry into of any commodity contract or commodity option contract.

## IV. STATEMENT

Pursuant to Section 409.6-604(b), the Commissioner hereby states that he will determine whether to grant the Enforcement Section's requests for:

17

Page 19

## STATE OF MISSOURI
## OFFICE OF SECRETARY OF STATE

| | |
|---|---|
| IN THE MATTER OF: | ) |
| | ) |
| ZULUTOYS LIMITED, d/b/a RBOptions.com; | ) |
| JORDAN GATSBY; and JOSEPH WOLF, | ) |
| | ) |
| Respondents. ) AP-16-18 |
| | ) |
| Serve: | ) |
| | ) |
| Zulutoys Limited, d/b/a RBOptions | ) |
| Trust Company Complex | ) |
| Ajeltake Road, Ajeltake Island | ) |
| Majuro, MH96960 Marshall Islands | ) |

|                                                | )   |
| ---------------------------------------------- | --- |
| Jordan Gatsby                                  | )   |
| Trust Company Complex                          | )   |
| Ajeltake Road, Ajeltake Island                 | )   |
| Majuro, MH96960 Marshall Islands               | )   |
|                                                | )   |
| and                                            | )   |
|                                                | )   |
| Joseph Wolf                                    | )   |
| Trust Company Complex                          | )   |
| Ajeltake Road, Ajeltake Island                 | )   |
| Majuro, MH96960 Marshall Islands               | )   |
|                                                | )   |
| and via e-mail: legal@rboptions.com            | )   |

NOTICE

TO: Respondents and any unnamed representatives aggrieved by this Order:

You may request a hearing in this matter within thirty (30) days of the receipt of this Order pursuant to Sections 409.6-604(b), RSMo (Cum. Supp. 2013), 409.843 RSMo (2000), and 15 CSR 30-55.020.

19

Page 20

Within fifteen (15) days after receipt of a request in a record from a person or persons subject to this order, the Commissioner will schedule this matter for a hearing.

A request for a hearing must be mailed or delivered, in writing, to:

Andrew M. Hartnett, Commissioner of Securities
Office of the Secretary of State, Missouri
600 West Main Street, Room 229
Jefferson City, Missouri, 65102

20

Page 21

# EXHIBIT 36



---

## ABOUT US

**Astor Wealth Group** functions as a premier asset management and securities finance company in Singapore, operating specifically with high-net-worth individuals, corporate and institutional clientele spread across Asia, Oceania and Middle East. Our long-standing financing and wealth management clientele are comprised of prominent institutions such as sovereign wealth funds, investment banks, multi-national corporations, family offices, and private equity groups.

We provide our clientele both traditional and alternative financing solutions- securities, real estate, digital assets and rare art and collectibles- ethical, responsible risk-management, and a full suite of origination and advisory services.

---

# WHAT OUR WEALTH MANAGEMENT FIRM OFFERS





# ASSET MANAGEMENT AND ADVISORY

As a global asset management firm, we have progressively honed our focus on Oceania, Asia, and the Middle East. This strategic emphasis enables us to deliver specialized Discretionary Asset Management, Wealth Advisory, and Foundation and Legacy solutions to our select clients within these regions.



# FINANCING

Our suite of financing solutions encompasses both traditional and non-traditional avenues, offering financing against a diverse range of collateral including stock lending, real estate, digital assets, transportation systems, and rare art and collectibles. We excel in devising innovative and efficient strategies to leverage our clients' assets, thereby facilitating creation of liquidity.





# MERGERS AND ACQUISITIONS

We provide comprehensive advisory and transactional services in the realm of mergers and acquisitions (M&A) to our distinguished clientele across Singapore, various regions in Asia, and the Middle East. We specialize in delivering financing and capital solutions that are seamlessly integrated with merger and acquisition activities, aiming to furnish customized strategies that support business expansion, industry consolidation, and the acquisition of new business segments.



# INTELLECTUAL PROPERTY AND INTANGIBLES

We are adept at delivering finance and consulting services to clients whose primary value is derived from intangible and intellectual property assets, including patents, trademarks, brands, and other proprietary intellectual property forms.

---

# OUR GLOBAL ASSET MANAGEMENT TEAM



Thomas Mellon

7/31/24, 8:56 PM
Case 1:24-mc-00394-LAK    Document 4-1    Filed 08/23/24    Page 43 of 186
Our Management and Finance Group in Singapore

Chief Executive Officer





## Tim Grayson

Executive Director of Finance





## Nathanial Strickland

Director of Legal and Ethics







## Christopher Hunt

Regulatory Compliance





## Niklaus Zürcher

Chief Risk Officer

 



---

# LATEST NEWS AND ARTICLES



## The Paradox of Securities Lending: A Critical Look

February 26, 2024

Securities lending, a cornerstone in the edifice of modern financial...

Read More »





## The Double-Edged Sword of Securities Lending: Navigating the Profits and Pitfalls

February 25, 2024

The Double-Edged Sword of Securities lending, the often-arcane engine behind...

Read More »



## Charting CBDCs: Navigating Digital Currency's Future

November 16, 2023

In a world where technological advancements and financial innovations are...

Read More »

LOAD MORE

# JOIN OUR NEWSLETER

Email Address

☐ I consent to receive promotional emails about your products and services.

Subscribe Now

By subscribing, you agree with our privacy policy and our terms of service.



## Our Addresses

79 Robinson Rd, #25-01,
Singapore 068897

12 Marina View, Asia Square
Tower 2 Singapore, 018961

## Want to send us an email?

Info@AstorWealthGroup.com

## Phone

+65 3158 3625

+65 3158 2834



TERMS AND CONDITIONS                    PRIVACY POLICY

©All Rights Reserved.                    Designed by **ASTOR WEALTH GROUP LTD**



# EXHIBIT 37





# Astor Asset Management: The History of Astor

**Agencies**

3 September 2021 · 6-min read



Astor Asset Management, in addition to being a top financial company in North America, Asia and Europe, also bears the heavy responsibility of carrying on the family name and legacy.

**Also Read |** Benjamin Herzog Continues His Legacy – Business, Love and New Projects

Thomas Mellon, CEO of Astor Asset Management, is a descendent of the famed Astor family, a fact not lost on the prestigious financier. As Mellon worked his way up to the top of the financial game, he never lost sight of the fact that he stood on the shoulders of giants before him. With a financial legacy dating back 200 years, the Astor name is legendary. That



## Humble Beginnings

**Also Read |** **How To Get the Perfect Tan With Byrokko Best Selling 'Shine Brown'**

The story begins with John Jacob Astor. For without John Astor, there would be no Astor Asset Management.

One of the most successful entrepreneurs of his time, John Jacob Astor was a fur trader and real estate investor and built the foundation of the legacy that we still know today. Astor birthed an American dynasty, but also set the bar high for so many entrepreneurs who would follow his example. To understand the legacy, one must not ignore the humble beginnings.

John Jacob Astor was born on July 17, 1763, in Waldorf, Germany. Astor was not born with a silver spoon or considered generationally wealthy in any way. He was the son of a butcher. Although he came from somewhat humble circumstances, the seeds of mercantilism were planted early. He worked hard until eventually achieving mega-wealth status in New York City; but it didn't come easily.

In his late teens, Astor journeyed to London to begin working for his older brother George, who made musical instruments. By 1784, only a few short years after arriving in London, he made the decision to venture out on his own. Arriving with only twenty-five dollars and a self-possessed confidence, he emigrated to the United States to start a new life.

After arriving in Baltimore, Astor moved North to New York City where he joined his older brother, Henry. On September 19, 1785, Astor married Sarah Cox Todd. Throughout the marriage, he'd often recognize her as the backbone of the business. It was Sarah, when Astor would travel, who would manage all the financial affairs while he was away on expeditions.

With the emergence of the fur trade, Astor opened his own fur shop in 1786. Often, he'd make the trek to desolate areas in the Great Lakes and Canada, to procure the best fur pelts for his New York

store. With a solid decade behind him, it finally paid off. The Astor empire began a major expansion from New York to the American West. Once his fur business was thriving, Astor sought to invest in real estate. Later, he would export furs to China as well as import Chinese silk and tea. Finally, in 1808, he merged all the fur businesses into the American Fur Company. With that, he became the first multi- millionaire in the United States.



3/9

end of the century, he owned much of the landscape that made up New York City back then.

During their marriage, John Jacob Astor and Sarah Cox Todd had eight children. Among them, John Jacob Astor Jr. and William Backhouse were two of the most well-known. Sarah died in 1834, leaving the elder Astor utterly bereft. However, at his death in 1848, he was still known as the wealthiest individual in the United States. His estate was reported to be worth at least $20 million. Today, that valuation would translate into the hundreds of millions.

He was always a philanthropist. So, he bequeathed $400,000 to build the Astor Library in New York (now the New York Public Library). Astor left the bulk of his fortune to his second son William as his son, John Jr., a poet, was not mentally stable. William became an American business magnate, and besides being heir to a fortune, he acquired much of his wealth through Manhattan real estate acquisitions like his father.

John Jacob "Jack" Astor IV, born July 13, 1864, was the youngest of five. He was the only son of a businessman, collector, and racehorse breeder William Backhouse Astor, Jr. He was the nephew of financier/philanthropist John Jacob Astor III, and great-nephew of occasional poet and disabled, John Jacob Astor Jr.

Jack, albeit a very wealthy mogul in his own right, was notorious for his death on the sinking of the Titanic in 1912. Notably, the richest passenger aboard the ship at the time of his death, he was estimated to be among the wealthiest people in the world. His net worth was $87 million. At his death, he was survived by his pregnant (second) wife, Madeleine, and first child, Vincent.

John Jacob "Jakey" Astor VI was born in August 1912, four months after his father's passing on the fated voyage in April of that year. Destined to follow in his name sakes' footsteps, Jakey became an American socialite and shipping magnate.

John Astor's entrepreneurial spirit is attached to so many significant landmarks still today. His name is recognized all over the Big Apple in places like Astor Place, The Waldorf Astoria, and the familiar Astoria, Queens neighborhood just outside Manhattan. As the New York Public Library founder, the famous lions that stand guard at the entrance were once affectionately named Leo Astor and Leo Lenox (after cofounder James Lenox). Later nicknamed Lord Astor and Lady Lenox, the proud Leos sit



years after a young John Astor dared to dream of more.

The Astor Legacy Continues

As the CEO of Astor Asset Management, Thomas Mellon has continued the bold legacy built by his ancestors over 200 years ago. In 2013, Mellon led the company through a significant expansion in China, Europe, and North America. Branded initially as Astor Capital Fund, the SEC objected to any abbreviation of the name, so Mellon launched a rebranding in 2020 after posting excellent send quarter growth even amid a pandemic. Today, Mellon is one of the decade's most influential financial leaders.



LATEST STORIES



USA TODAY

**His son died by suicide. He wants every parent to know what he found on his kid's phone.**

His 23-year-old son died by suicide in February. What he saw on his son's phone was horrifying: "If he hadn't seen this, he would be alive today."

a day ago

The Daily Beast





yahoo!life

Sign in                     Mail

Life    Shopping    Travel    Health    Style    Celebrity    Entertainment    Parenting    Watch



Ad  •  eToro

**The Top 5 Stocks To Watch In H2 2024 [Start Today]**

✕



The Guardian

**South Korea's 'coolest' markswoman Kim Yeji shoots to fame after Paris Olympics**
Social media erupts over 'main character energy' and cool demeanour of pistol shooter Kim Yeji, who won silver at Paris 2024 Games

14 hours ago



Cosmo

**Blake Lively's nude floral lace dress is a subtle nod to flower fashion**
Blake Lively wore a Michael Kors nude leather laser-cut lace-effect floral pattern dress and flower-stem Christian Louboutin heels to promote 'It Ends With Us.'

a day ago



Cinema Online

**Jenny Tseng makes fun of Na Ying's "Singer 2024" win**
The opinionated singer expresses her annoyance over the result that matched what she had previously speculated

2 days ago



Ad  •  UltraCut

**Use This and Never Have to Change Your Whipper Snipper Line Again**

⋯



The Independent

**Prince William 'banned' Meghan Markle from wearing Princess Diana's jewellery**
Prince William reportedly wanted Meghan Markle to know her rank

a day ago



The Telegraph

**Pictured: 'Curious kiss' between Macron and French sports minister**
Photos of Emmanuel Macron's sports minister planting a kiss close to his neck at the Olympic Games opening ceremony have caused a stir in France.

a day ago



Associated Press

**Hamas' top political leader is killed in Iran in strike that risks triggering all-out regional war**
Hamas' top political leader was killed Wednesday by a predawn airstrike in the Iranian capital, Iran and the militant group said, blaming Israel for a shock assassination that risked escalating into an all-out regional war. Iran's supreme leader vowed revenge against Israel. Israeli Prime Minister Benjamin...

17 hours ago

HOME | MAIL | NEWS | FINANCE | SPORT | ENTERTAINMENT | LIFE | SEARCH | SHOPPING | MORE...

yahoo!life                                                                    Sign in    Mail

Life    Shopping    Travel    Health    Style    Celebrity    Entertainment    Parenting    Watch

✕



Hello!

### Princess Kate's rule-breaking sheer dress she could never wear now

The Princess of Wales showed off her daring pre-royal wardrobe in London, wearing a sheer backless dress weeks after she rekindled her romance with Prince William in 2007.

a day ago



Kotaku

### Olympics Sharpshooter Looks Like A Cool Video Game Character And People Are Obsssesed

The 2024 Paris Olympics are in full swing right now and they're already generating some real heat. Just the other day, some fencer was jumping in his opponent's face like he was in a fighting game, and now there's a sharpshooter that could very well be the next agent added to Valorant. It's a wild world we live...

a day ago



The Telegraph

### Xi Jinping's lackeys 'hid behind Chinese flags to beat up protesters in San Francisco'

Pro-Communist supporters allegedly used China's national flag to hide that they were beating protesters during a summit between Xi Jinping and Joe Biden in San Francisco last year.

a day ago



Ad • New Energy Findings                                                        ...

Forget Metformin, This Household Item Helps Your Blood Sugar! Try It!



The Independent

### Suspect got away with Hawaii's most famous cold-case murder for decades. A hospital bed sheet closed the case

Dana Ireland, a 23-year-old tourist from Virginia, was kidnapped, raped and left for dead in the Kapoho area of Hawaii on Christmas Eve 1991

a day ago



People

### "Top Chef" Alum Shirley Chung Diagnosed with Stage 4 Tongue Cancer: 'I Have a Tough Long Road to Recovery'

The celebrity chef said she opted to keep her tongue after doctors suggested "100% removal" to increase her survival rate

23 hours ago



Associated Press

### 1 dead and dozens sickened after eating roasted eel from a Japanese department store

One person died and nearly 150 others were sickened after eating grilled eel prepared by a restaurant chain and sold at a department store near Tokyo, officials said. Keikyu Department Store said 147 customers as of Monday had reported symptoms such as vomiting and diarrhea after eating grilled eel...

a day ago



Ad • Experts In Savings | Over 50s                                              ...

Born Before 1974? You May Be Eligible For This £10/Month Funeral Cover



HOME    MAIL    NEWS    FINANCE    SPORT    ENTERTAINMENT    LIFE    SEARCH    SHOPPING    MORE...

yahoo!life

Sign in    Mail

Life    Shopping    Travel    Health    Style    Celebrity    Entertainment    Parenting    Watch

✕



HuffPost

**Hillary Clinton Gives Trump And His GOP Cronies Some Brutally Honest Election Advice**

The former secretary of state mocked Republicans with some unsolicited advice.

2 days ago



Associated Press

**Chinese women beat reigning Olympic champion United States in volleyball**

The U.S. women's volleyball team had a bad enough start in its Olympic title defense. The Americans lost the first two sets to China on Monday in a pool play format where total points and sets won can become playoff tiebreakers. "We obviously didn't have the start that we wanted, but the third, fourth and fifth...

2 days ago



Ad • Health Advice Today    ⋯

**Dr: Alleviate Knee Pain (Takes 15 Minutes)**



SETHLUI.COM

**Private dining Chef Kang's closing down after 8 consecutive years of Michelin stars**

The post Private dining Chef Kang's closing down after 8 consecutive years of Michelin stars appeared first on SETHLUI.com.

18 hours ago



HuffPost

**'Daily Show' Spots The Odd Moment Trump 'Lost A Debate With Himself'**

Ronny Chieng mocked the former president's back-and-forth comments about debating Kamala Harris.

8 hours ago



Associated Press

**Another Chinese doping controversy pops up during Olympic swimming competition**

The New York Times reported Tuesday that two top Chinese swimmers — including one on this year's Olympic team — tested positive for a banned steroid in 2022 but were eventually cleared to compete by Chinese officials. The World Anti-Doping Agency accepted the results of the Chinese investigations. "I sa...

a day ago



# EXHIBIT 38

# Thomas Mellon: The Driving Force Behind Astor Wealth Group

 Thomas R · *Follow*

2 min read · Aug 29, 2023

⊙ Listen    ⬆ Share



Open in app ↗                                              Sign up    Sign in

**Medium**    🔍 Search                                    



Astor Wealth Group

At the helm of the Astor Wealth Group, pioneering financial innovations and market supremacy, stands Thomas Mellon. Serving as the CEO, Mellon is instrumental in steering the sails of this asset management entity. A subsidiary of the Astor Capital

Fund, Astor Wealth Group distinctly zeroes in on Asian and emerging market investments, a territory oft-described as challenging by peers in the industry.

Under the astute leadership of Thomas Mellon, Astor Wealth Group has blossomed as a premier asset management firm. Their core competencies lie in servicing high-net-worth individuals, multinational corporations, institutional clients.

The cornerstone of Astor Wealth Group's success lies in its enduring relationships with iconic financial institutions, investment banks, private equity groups, family offices, and sovereign wealth funds. It's through these steadfast partnerships that Astor Wealth Group has cultivated an unwavering trust that enables it to identify and swiftly act on market imperfections across a myriad of rapidly evolving sectors and industries with unparalleled agility and precision.

Astor Wealth Group's ability to tread the path of financial innovation allows them to present an extensive array of services to their clientele. Their financing prowess, always supported by relentless ethical guidelines and responsible risk-management mechanisms, helps their clients explore and readily capitalize on opportunities in emerging markets.

Highlighting the multifaceted services of Astor Wealth Group is their distinguished lending platform. Being perpetually at the forefront of dynamic financial shifts, they skillfully cater to non-traditional avenues that are revolutionizing market channels, including securities, real estate and digital asset-backed lending platforms.

Under the guidance of Thomas Mellon, Astor Wealth Group has established a strong presence in both Asian and emerging markets, setting the standard for excellence in the asset management industry. Mellon's strategic approach leverages the immense potential of these regions, reflecting a blueprint of intelligent diversification and sustained growth.

The Astor Wealth Group takes pride in one of its key specialties- Digital Asset and Securities-Backed Lending. The firm profound engagement in all aspects of digital asset and security backed finance, including cryptocurrency investments, blockchain technology, asset-backed securities, financial engineering and structuring, as well as risk management and regulatory compliance. Find more information at AstorWealthGroup.com

Thomasmellon    Mellon    Astorwealthgroup    Finance



Follow    

# Written by Thomas R

0 Followers

Finance world is my world ;)

---

# Recommended from Medium

**Amazon.com**                                                      Seattle, WA
*Software Development Engineer*                        Mar. 2020 – May 2021
- Developed Amazon checkout and payment services to handle traffic of 10 Million daily global transactions
- Integrated Iframes for credit cards and bank accounts to secure 80% of all consumer traffic and prevent CSRF, cross-site scripting, and cookie-jacking
- Led Your Transactions implementation for JavaScript front-end framework to showcase consumer transactions and reduce call center costs by $25 Million
- Recovered Saudi Arabia checkout failure impacting 4000+ customers due to incorrect GET form redirection

## Projects

**NinjaPrep.io** (React)
- Platform to offer coding problem practice with built in code editor and written + video solutions in React
- Utilized Nginx to reverse proxy IP address on Digital Ocean hosts
- Developed using Styled-Components for 95% CSS styling to ensure proper CSS scoping
- Implemented Docker with Seccomp to safely run user submitted code with < 2.2s runtime

**HeatMap** (JavaScript)
- Visualized Google Takeout location data of location history using Google Maps API and Google Maps heatmap code with React
- Included local file system storage to reliably handle 5mb of location history data
- Implemented Express to include routing between pages and jQuery to parse Google Map and implement heatmap overlay

 Alexander Nguyen in Level Up Coding

## The resume that got a software engineer a $300,000 job at Google.

1-page. Well-formatted.

 Jun 1 · 👏 15.3K · 💬 235



 Karolina Kozmana

## Common side effects of not drinking

By rejecting alcohol, you reject something very human, an extra limb that we have collectively grown to deal with reality and with each...

Jan 21 · 👏 42K · 💬 1115

## Lists

 **Self-Improvement 101**
20 stories · 2433 saves

 **Business 101**
25 stories · 1076 saves

 **Work 101**
26 stories · 158 saves

 **Leadership**
53 stories · 394 saves

7/31/24, 8:58 PM    Thomas Mellon: The Driving Force Behind Astor Wealth Group | by Thomas McFarlin...

Case 1:24-mc-00394-AK    Document 4-11    Filed 08/23/24    Page 65 of 186



Michelle Teheux ✔ in Minds Without Borders

## We Could Learn a Lot About Sex From the Dutch

My Dutch relative's views shocked me, but I immediately realized she was right

✦ Jul 17    👏 23K    💬 289                                          🔖

---



Sufyan Maan, M.Eng in ILLUMINATION

## What Happens When You Start Reading Every Day

Think before you speak. Read before you think. — Fran Lebowitz

✦ Mar 12    👏 28K    💬 644                                          🔖



 Khyati Jain in In Fitness And In Health

## You Destroy Your Brain Health Rapidly With These 4 Stupid Daily Habits

Your lifestyle is the main culprit for a distracted brain.

 Apr 25 ·  11.4K · 💬 183 



 Unbecoming

## 10 Seconds That Ended My 20 Year Marriage

It's August in Northern Virginia, hot and humid. I still haven't showered from my morning trail run. I'm wearing my stay-at-home mom...



⭐  Feb 16, 2022     👏 83K     💬 1137                                          ⊟⁺

See more recommendations

# EXHIBIT 39

8/1/24, 8:55

X

Home

Explore

Notifications

Messages

Grok

Bookmarks

Communities

Premium

Verified Orgs

Profile

More

**Post**

← **Thomas Mellon**
  92 posts



R WEALTH GROUP

···  **Follow**

**Thomas Mellon**
@Thomas_Mellon82

Chief Executive Officer, Astor Wealth Group
Supreme Elegance and Artistry in Contemporary Investing; Wealth Management,
Advisory and Financing

📍 United States    🔗 AstorWealthGroup.com    📅 Joined March 2019

**9** Following    **12.6K** Followers

Not followed by anyone you're following

**Posts**          Replies          Media

📌 Pinned

**Thomas Mellon** @Thomas_Mellon82 · Oct 31, 2023    ···
We are the artificers of fortunes, seers endowed with not just sight, but
insight; indebted to the wisdom passed down through our Astor lineage.



ASTOR WEALTH GROUP

0:09

💬          ⟲ 34          ♡ 4          439          🔖  ⬆

⟲ Thomas Mellon reposted

**Tucker Carlson** ✅ 🇺🇸 @TuckerCarlson · Feb 6    ···
Why I'm interviewing Vladimir Putin.



💬 57K          ⟲ 168K          ♡ 625K          119M          🔖  ⬆

**Thomas Mellon** @Thomas_Mellon82 · Feb 4    ···
The true essence of wealth management lies in understanding the nuanced
tapestry of global economics. At #AstorWealthGroup, we're weaving a
masterpiece. #GlobalPerspective #WealthManagement

🔍 Search

**You might**

Rajesh
@Rajes

Aslend
@aslen

SaChil
@SslSa

Show more

**What's ha**

WATCH
LIVE
JULY 3 - AUGUST 29

Trending in Unite
**#EndBadGov**
76.3K posts

Trending in Unite
**RIP Derek**

Trending in Unite
**Southport**
Trending with  #

Trending in Unite
**Downing Stre**
74.1K posts

Show more

Terms of Service
Accessibility  A

**Matthew Bradly**
@matthe_brad    ···

# EXHIBIT 40

**From:** **Consulting Specialists** consultingspecialists1111@gmail.com
**Subject:** Re: URL Removal Request
**Date:** August 23, 2023 at 8:27 PM
**To:** Emily Garner egarner@singhfirm.com, Offshore Alert editor@offshorealert.com
**Cc:** editor@offshorealert.com, marchant@offshorealert.com



Dear Offshore Alert Editor,

We are prepared to pay the sum of $25K USD for removal.

Please advise.

Thank you

Best Regards,

Consulting Specialists

On Aug 5, 2023, at 4:14 AM, Emily Garner <egarner@singhfirm.com> wrote:

Dear Mr. Marchant,

We trust you are well. Please find the attached letter of today's date.

We look forward to hearing from you.

Thank you,

--



**Emily Garner**
*Attorney at Law*



☎ 866-SINGH-LAW





This e-mail and any attachments are confidential and legally privileged. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you have received this in error, please notify the sender by reply e-mail and then delete the e-mail completely from your system.
<OffshoreAlert Removal Request - August 4 2023.pdf>



**SINGH LAW FIRM, P.A.**
305 Broadway
Floor 7
New York, NY 10007

701 Brickell Avenue,
Suite 1550
Miami, FL 33131

Tel: 866 SINGH LAW
www.singhfirm.com

August 4, 2023

Offshore Alert
Attn: David Marchant
113 SE 1st Ave, #173
Miami, FL 33131
editor@offshorealert.com
marchant@offshorealert.com

*Sent Via Email Only*

**RE: Removal Request**

Dear Mr. Marchant:

We trust you are well. We represent Ms. Oksana Hryn, and several of the other plaintiffs whose names appear in Civil Case No. 1:21-cv-08437, Hryn et al v Weiser Global Capital Markets Ltd et al, the lawsuit which is the subject of the following URL: https://www.offshorealert.com/tag/weiser-global-capital-markets/ (the "URL"). As you are likely aware, and as is clear from the content of the URL, the subject lawsuit was voluntarily dismissed on October 18, 2021 by the plaintiffs. To date, no other related actions have been filed.

Thus, given that the URL information is outdated and no longer relevant or useful to the general public, we would respectfully request that such content be removed from your website. We recognize that any removal likely requires time and resources, and as such, we would be more than willing to compensate Offshore Alert for said removal.

We thank you for your prompt attention to this matter, and look forward to hearing from you.

Sincerely,

---

**Securities Litigation | International Arbitration | Complex Business Transactions**
**Complex Commercial Litigation | Mergers & Acquisitions | International Law**
**Initial Public Offerings | Federal Civil Litigation | Criminal Defense**

Jaitegh Singh, Esq.
Partner at Singh Law Firm, P.A.
Licensed in (NY, NJ, FL & CO)
jsingh@singhfirm.com

# EXHIBIT 41



AUGUST 23, 2023

# 'We'll pay you $25K to remove content', writes rep. for Ukraine's Oksana Hryn, 'Bear Stearns' et al

An email offering OffshoreAlert $25,000 for the removal from our website of an article and documents about a bizarre and seemingly-frivolous lawsuit filed by four Ukraine citizens and 35 suspiciously-named firms purportedly domiciled in some of the seediest offshore jurisdictions, including "Bear Stearns Companies", "Blackrock Capital", "Cornelius Vanderbilt Capital", "Dreyfus Corporation", and "State Street Global Advisors", against Bahamas-domiciled securities broker Weiser Global Capital Markets Ltd. and others.



DOCUMENT.PDF
File Size: 263.99 KB

---

PAGES:

3

DATE:

August 23, 2023

## RELATED CONTENT

- Oksana Hryn et al v. Weiser Global Capital Markets Ltd. et al: Voluntary Dismissal <https://www.offshorealert.com/oksana-hryn-et-al-v-weiser-global-capital-markets-ltd-et-al-voluntary-dismissal/>
- Bizarre lawsuit by 'Bear Stearns' alleges '$450M fraud' by Bahamas-licensed securities broker <https://www.offshorealert.com/bizarre-lawsuit-by-bear-stearns-and-others-alleges-450m-by-bahamas-licensed-securities-broker/>
- Oksana Hryn et al v. Weiser Global Capital Markets Ltd. et al: Complaint <https://www.offshorealert.com/oksana-hryn-et-al-v-weiser-global-capital-markets-ltd-et-al-complaint/>
- Oksana Hryn et al v. Weiser Global Capital Markets Ltd. et al: TRO Motion <https://www.offshorealert.com/oksana-hryn-et-al-v-weiser-global-capital-markets-ltd-et-al-tro-motion/>

---



7/31/24, 9:23 PM
Case 1:24-mc-00394-LAK    Document 4-11    Filed 08/23/24    Page 76 of 186
'We'll Pay You $25K' to remove content, writes rep for Ukraine's Oksana Hryn, 'Bear Stearns' (sic) et al - OffshoreAlert

Copyright© 1997-2021 OffshoreAlert. All Rights Reserved. www.offshorealert.com



# EXHIBIT 42

Cookies on Companies House services

We use some essential cookies to make our services work.

We'd also like to use analytics cookies so we can understand how you use our services and to make improvements.

Accept analytics cookies    Reject analytics cookies

View cookies (/help/cookies)

 GOV.UK

# Find and update company information

Companies House does not verify the accuracy of the information filed (http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)
Advanced company search (/advanced-search)

# LUXFIN CAPITAL LTD

Company number 10285479

Follow this company

File for this company
(https://beta.companieshouse.gov.uk/company/10285479/authorise?
return_to=/company/10285479/officers)

| Overview | Filing history | People | More |
|---|---|---|---|

- Officers
- Persons with significant control (/company/10285479/persons-with-significant-control)

## Filter officers

☐

Current officers

Apply filter

# 6 officers / 3 resignations

## ROLE, Santa

Correspondence address 124 City Road, London, England, EC1V 2NX

Role Active Director

Date of birth September 1984

Appointed on 1 September 2023

Nationality Latvian

Country of residence England

Occupation Director

## SINGH, Jaitegh, Dr

Correspondence address 155e., 44th Street, 6th Floor, New York, United States, 10017

Role Active Director

Date of birth December 1987

Appointed on 22 April 2021

Nationality American

Country of residence United States

Occupation Lawyer

## YUEN, Albert Chi Chin

Correspondence address 124 City Road, London, England, EC1V 2NX

Role Active Director

Date of birth November 1980

Appointed on 22 June 2021

Nationality American

Country of residence United States

Occupation Director

## JENNINGS, Shelley Anne

Correspondence address 124 City Road, London, England, EC1V 2NX

Role Resigned Director

Date of birth November 1983

Appointed on 1 July 2021

Resigned on 16 June 2023

Nationality South African

Country of residence England

Occupation Director

## SADDIQI, Gulzamir

Correspondence address 26 Leigh Road, Eastleigh, United Kingdom, SO50 9DT

Role Resigned Director

Date of birth January 1977

Appointed on 19 July 2016

Resigned on 22 April 2021

Nationality British

Country of residence United Kingdom

Occupation Entrepreneur

## ZIMMERMAN, Ray James, Dr

Correspondence address 124 City Road, London, England, EC1V 2NX

Role Resigned Director

Date of birth September 1958

Appointed on 6 July 2021

Resigned on 16 June 2023

Nationality American

Country of residence England

Occupation Director

Tell us what you think of this service (https://www.smartsurvey.co.uk/s/getcompanyinformation/) Is there anything wrong with this page? (/help/feedback?sourceurl=https://find-and-update.company-information.service.gov.uk/company/10285479/officers)

7/31/24, 9:25 PM
Case 1:24-mc-00394-LAK  Document 4-11  Filed 08/23/24  Page 81 of 186
AAFIN Company people and anti-money-laundering activities

Policies Link opens in new tab

Cookies (https://beta.companieshouse.gov.uk/help/cookies)

Contact us Link opens in new tab

Accessibility statement
(https://beta.companieshouse.gov.uk/help/accessibility-
statement)

Developers Link opens in new tab



Built by Companies House

© Crown copyright

# EXHIBIT 43



[2024] JMCC Comm 23

**IN THE SUPREME COURT OF JUDICATURE OF JAMAICA**

**COMMERCIAL DIVISION**

**CLAIM NO: SU2021CD00543**

| | | |
|---|---|---|
| **BETWEEN** | **ASTOR ASSET MANAGEMENT 3 LIMITED** | **CLAIMANT** |
| **AND** | **ZS CAPITAL FUND SPC** | **1st DEFENDANT** |
| **AND** | **MA DANYU** | **2nd DEFENDANT** |
| **AND** | **ZHANG NINGNING** | **3rd DEFENDANT** |
| **AND** | **ZHOU YIHUI** | **4th DEFENDANT** |

**IN CHAMBERS BY VIDEO-CONFERENCE**

**Appearances: Mrs. Trudy - Ann Dixon - Frith & Ms. Samantha Grant instructed by DunnCox Attorneys-at-Law for the Respondent/Claimant**

**Mrs. Tana'ania Small Davis KC & Ms. Analiese Minott instructed by Livingston Alexander & Levy for Applicants/Defendants**

**Heard: 18th December 2023 and 9th May 2024**

**Arbitration Act – Jurisdiction of Court to intervene in Arbitral proceedings – Whether S. 55 is a mandatory provision – Setting aside Arbitral Award– Summary Judgment**

**BROWN BECKFORD J**

**INTRODUCTION**

*Oh, what a journey, full of strife,*

*As the lender fights for their presumed rights.*

*Will they succeed? Only time will tell,*

*In this legal dance, where twists compel.*

*What a curfuffle!*

[1]     The dispute in this claim arose from a story as old as time, a loan agreement gone south. The parties, as businesses are wont to do in the modern era, made their own arrangements for the settlement of any dispute arising between them. They chose arbitration, with the seat of arbitration being in Jamaica, to resolve their disputes. In due

course, a dispute having arisen, arbitral proceedings were commenced. The Arbitral Tribunal decided against the lender, which has sought the aid of the Court with a view, it seems, to a more amenable decision. The borrowers have given short shrift to the claim by the lender and by this application seeks to bring an end to this venture. The lender and the borrowers will be referred to herein as the "Claimant" and "the Defendants" respectively.

**[2]**    The Claimant, Astor Asset Management 3 Limited, instituted its claim by Claim Form filed 13th December 2021 as amended 18th March 2022  against ZS Capital Fund Spc, Ma Danyu, Zhang Ningning, Zhou Yihui, the 1st, 2nd, 3rd and 4th Defendants, respectively, for the setting aside of arbitral proceedings. The Claimant sought the following declarations:

1. The Final Award and or the Costs Award deals with a dispute not contemplated by or not falling within the terms of the submission to arbitration or contains decisions on matters beyond the scope of the submission to arbitration; and or
2. The subject matter of the dispute between the parties was not capable of settlement by arbitration under the laws of Jamaica; and or
3. The Final Award and or the Cost Award is in conflict with the public policy of Jamaica.

**[3]**    The Defendants have by way of Notice of Application for Court Orders sought the following orders:

1. A declaration that the Court has no jurisdiction [for alternatively, declines to exercise its jurisdiction] with respect to the Claim.
2. An order striking out the Claim.
3. Alternatively, summary judgement in favour of the Defendants.
4. If the court permits the claim to stand, an order that the Claimant provide security for the Defendants' cost of and occasioned by these proceedings and this Application in the sum of Fifty-Seven Thousand One Hundred United States Dollars ($57,100.00) within fourteen days of the date of this Order.
5. The abovementioned sum shall be paid into an interest-bearing account at a licensed financial institution in the joint names of DunnCox and Livingston, Alexander & Levy, the Attorneys-at-Law for the parties, and held in escrow as security for the Defendants' costs of this action until the determination of the claim herein or further order of this Honourable Court.
6. The Claimant's claim shall be stayed until such time as the security for costs as ordered above is provided in accordance with paragraphs 4 and 5.
7. In the event the said sum of Fifty-Seven Thousand One Hundred United States Dollars (US $57,100.00) is not paid by the Claimant in accordance with the terms of

this Order, this claim against the Defendants shall stand as struck out, with costs to the Defendants.

8.    Costs to the Defendants to be taxed if not agreed.

9.    Such further and other relief as this Honourable Court deems just.


**BACKGROUND**

**[4]**    On 12th May 2020, the Defendants contracted with the Claimant, to borrow in total the sum of Thirty-One Million Eight Hundred Thousand United States Dollars **(USD $31,800,000.00)**. The Defendants each executed identical Stock Loan Agreements **("SLAs")**, save for the name of the borrower and the sum agreed to be advanced to that Defendant. Pursuant to the SLAs, the Defendants offered security and collateral for the loan in the form of shares in a company called Zhejiang Cangnan Instrument Group Limited **("Cangnan Shares")**, a company incorporated in China.

**[5]**    Subsequently, the parties executed four Collateral Management Agreements **("CMAs")** which permitted the Cangnan Shares to be held within the custody of a Depository (Custodian) Broker, Zundiao Securities Limited, **("Zundiao")** a licensee of the Securities and Futures Commission in Hong Kong. The respective Cangnan Shares were deposited by the Defendants with Zundiao on 25th May 2020. Clause VI of the CMAs provides for the forfeiture of the Cangnan Shares in the event of an incurable default of the terms by the Defendants.

**[6]**    The Claimant disbursed the loan to each Defendant in tranches. However, before the full amount of the loan was disbursed, a dispute arose between the parties. To date, the aggregate sum advanced to the Defendants is Two Million Seven Hundred and Fifty Thousand United States Dollars **(USD$2,750,000.00)**.

**[7]**    Following checks conducted by the Defendants at the Central Clearing and Settlement System **("CCASS")** of the Hong Kong Stock Exchange, the Defendants discovered that between 1st June 2020 and 17th June 2020, a total of 926,800 of the Cagnan shares were transferred to Phillip Securities (Hong Kong) Ltd., DBS Vickers (Hong Kong) Ltd. and Citibank N.A. Consequently, the Defendants applied successfully for an *ex parte* injunction to restrain the Claimant from disposing of the Cangnan Shares.

**[8]**    Pursuant to Clause VII of the SLAs, on 4th July 2020, the Claimant issued Notices of Arbitration to the Defendants referring the matter to arbitration. On 15th November 2021, the Arbitral tribunal, M. Georgia Gibson Henlin KC, handed down her Final Award in respect to the dispute between the parties, and on 21st February 2022 delivered her final award in respect of costs. The Claimant seeks to set aside both awards in the instant claim.


**SUBMISSIONS ON BEHALF OF THE DEFENDANTS/APPLICANTS**

**[9]**    Counsel on behalf of the Defendants, Mrs. Tana'ania Small Davis KC, argued that the Court has no jurisdiction to hear the Claimant's challenge to the arbitral awards, as the parties agreed that the arbitration is final and conclusive. She asserted that similarly to **Article 34 of the UNCITRAL Model Law on International Commercial Arbitration**, **S. 55 of the Arbitration Act** was not manadatory; therefore the parties, by virtue of Clause VII of the Stock Loan Agreement, could contract out of **S. 55**. She drew support from the writers of the *Handbook of UNICITRAL Arbitration, Sweet & Maxwell* and the case of **Noble China Inc. v Lei** 1998 42 OR (3d) 69.

**[10]**    On that basis it was contented that the claim is an abuse of process, and should be struck out. She also submitted that the grounds for challenging the award was a mere disguise for a second attempt to argue the issues determined in the arbitration. To this end, she relied on **Johnson v Gore Wood & Co** 2 A.C. 1.

**[11]**    Counsel further submitted that the application for Summary Judgment ought to be granted on the basis that **S. 55 of the Act**  gives a limited scope for challenging an arbitral award, and such scope does not include recourse against an award on the ground of errors of law. She relied on, in support of this argument, **S. 103 of the 1996 UK Arbitration Act**, **Swain and Hillman** *(supra)*, **Sagicor Bank Jamaica Limited v Marvalyn Taylor Wright** [2018] UKPC 12, **Somerset Enterprises Limited and anor v National Export Import Bank** [2021] JMCA Civ 12, **Kabab-Ji Sal (Lebanon) v Kout Food Group (Kuwait)** [2021] UKSC 48.

**[12]**    Counsel submitted in the alternative, that if it is found that the Court has jurisdiction to hear the claim and/or does not strike out the claim, the Defendants should be awarded security for costs. Counsel mounted this argument on the inference that the Claimant is impecunious, owing to the fact that the Claimant was struck off the register of companies in Nevis for failing to pay its annual fees. Further, the Claimant has not identified its assets, therefore neither the Defendants nor the Court has any material to assess obstacles to enforcement against those assets. This argument was supported by **Part 24 of the CPR**, **Symsure Limited v Kevin Moore** *(supra)* and **Pisante and others v Logothetis and others** [2020] EWHC 332 (Comm).

**SUBMISSIONS ON BEHALF OF THE CLAIMANT/RESPONDENT**

**[13]**    Counsel on behalf of the Claimant, Mrs. Dixon-Frith, contended that the Acknowledgment of Service filed 30th August 2022, which did not indicate that the jurisdiction of the Court was being challenged, in conjunction with the letter dated 20th September 2022, seeking security for costs, and the filling of the application seeking summary judgment and striking out, all constitute the Defendants' submission to the jurisdiction of the Court. To this end, Counsel relied on **Rules 9.5 and 9.6 of the Civil Procedure Rules ("CPR") 2002 (as amended on the 3rd of August 2020)**, **Global**

- 5 -

**Multimedia International Limited v Ara Media Services and Another** [2007] 1 ALL ER (COMM) 1160, **Hoddinot & Others v Persimmon Homes (Wessex) Limited** [2008] 1 WLR 806, **B & J Equipment Rental Limited v Joseph Nanco** [2013] JMCA Civ 2 and **Hunter v Richards & Anor** [2020] JMCA Civ 17.

[14]    Mrs. Dixon-Frith accepted that arbitral awards are unappealable, but held the view that this does not mean they are immune to challenge on prescribed statutory grounds as posited by the writers in *Butterworth's Challenges in Arbitration: a Guide to Challenges against Arbitrators, Awards and Enforcement*. She submitted that in accordance with **S. 2 of the Arbitration Act**, the seat of arbitration is in Jamaica, therefore the **Arbitration Act** is applicable to these proceedings. The Claimant's application to set aside the arbitral award, being grounded on **S. 55 of the Arbitration Act**, overrides the provision of the SLAs relative to the decision of the Arbitral Tribunal being final and not capable of being challenged. She argued that, **S. 55 of the Act** is mandatory and cannot be waived by the parties. Reliance was placed on **Universal Petrochemicals Limited v Rajasthan State Electricity** (2001) 2 CALLT 417 HC.

[15]    It was also submitted that the Court not only derives it jurisdiction from statute, but also has a common law and inherent jurisdiction to set aside the final award of the Arbitral Tribunal. The cases of **National Transport Co-operative Society Limited v Attorney General of Jamaica** [2010] JMCA Civ 48, **Construction Developers Associates Limited v Attorney General of Jamaica et al** [2014] JMCC Com 3 and **Josa Investments Limited v Promotions and Print Essentials Limited** [2018] JMCC Comm 37. Further, Mrs. Dixon-Frith argued that if the Court finds that it has jurisdiction to try the claim, it should not decline to exercise its jurisdiction as the Defendants have not pleaded forum non conveniens or lis alibi pendens. She relied on **IMS SA & Others v Capital Oil & Gas Industries Ltd** [2016] 4 WLR 163.

[16]    It was also Counsel's contention that Clause VII of the Stock Loan Agreements, which precludes the Court from reviewing the decision of the Arbitral Tribunal, amounts to an ouster clause. On this basis it was submitted that Clause VII is void and contrary to public policy. She relied on the cases of **Scott Avery** [1843-60] All ER Rep 1, **Doleman and Sons v Ossette Corporation** [1912] 3 KB 257, **Jack Bradley Maritimes Limited v Modern Construction Limited** [1966] NBJ No. 8, **Ford v Clarkson Holiday Limited** [1971] 1 WLR 1412, **CLLS Power System Sdn Bhd v Sara Timer Sdn Bhd** [2015] 11 MLJ 455 and **Uber Technologies Inc and others v Heller (Attorney General of Ontario and others intervening)** 2020 SCC 16.

[17]    Mrs. Dixon-Frith's advanced the argument that the Arbitral Tribunal made the Final Award without any appreciation that the issue of jurisdiction by virtue of Preliminary Award No. 3 was *res judicata* between the parties, and/or that an issue of estoppel arose in favour of the Claimant. Therefore evidence on the issue was inadmissible at the

- 6 -

substantive hearing. This argument was buttressed by reference to the cases of **Gbangbola and another v Smith & Sherriff Ltd.** [1998] 3 All ER 730, **PJSC National Bank Trust and another v Mints and others** [2022] 1 WLR 3099, **Western Australia of CBI Constructors Pty Ltd. V Chevron Australia Pty Ltd** [2023] BC202300111.

**[18]**    Further, she submitted, the Arbitral Tribunal, in finding that the Claimant was a *"money lender"*, failed to consider whether the Claimant is entitled to benefit from an exemption under the Money Lending Ordinance of Hong Kong. This failure, Counsel sumitted, was a breach of natural justice as found in **Front Row Investments v Daimler South East Asia** [2010] SGHC 80, **AKN & Anor v ALC & Others** [2015] SGCA 15 and **Oil & Natural Gas Corpn. Ltd vs Western Geco International Ltd.** AIR 2015 Supreme Court 363.

**[19]**    Counsel also argued that the  Arbitral Tribunal  acted ultra vires to **S. 49(1) of the Arbitration Act** when it ruled that costs were payable by the losing party at arbitration, the Claimant. She bolstered this argument on the cases of **Fitzsimmons v Lord Mostyn** [1904] AC 46 and **Mansfield v Robinson** [1928] 2 KB 353.

**[20]**    On these premises, she urged the Court that the Defendants have not demonstrated that the statutory grounds have not been engaged. Therefore, the Claimant does have a reasonable prospect of succeeding on the claim. Support was drawn from the cases of **Cecelia Laird v Critchlow & Anor** [2012] JMSC Civ 157.

**[21]**    Consequently, Counsel submitted that Summary Judgment would be inappropriate in these circumstances as the Court would be conducting a mini-trial and forming preliminary views of evidence which is incomplete before the Court.  In furtherance of this Counsel relied on **Cammock (Deceased and substituted by Nephew, Fitzroy Phillips) and Another v Hemmings and another** [2014] JMSC Civ 184 and **Lewis & Others v NCB Ja Ltd** [2018] JMSC Civ 40.

**[22]**    Mrs. Dixon-Frith's position was also that the Defendants' orders seeking striking out of the claim ought not to be granted on the basis that the Claimant is exercising a statutory right of action granted by the **Arbitration Act**. Accordingly, the claim is neither frivolous nor vexatious as the claim would not bring the administration of justice into disrepute. She relied on **Civil Court Practice (The Green Book)**, **Douglas et al v National Commercial Bank Jamaica Limited** [2013] JMSC Civ 85, **West Indies Petroleum Limited v Wilkinson and Levy** [2023] JMCA Civ 2. In this light Counsel argued that it cannot be said that the cause of action, on the face of the pleadings, is unsustainable or does not plead a complete claim. To this end, she relied on **Trillian Dougals v the Commissioner of Police** [2017] JMSC Civ. Further, a striking out order should not be granted in an area of developing jurisprudence as noted in **Farah v British Airways PLC and another PLC and another [2000] Times, 26th of January CA** and **Equitable Life Assurance Society v Ernst Young** [2003] 2 BCLC 603.

**[23]**   Lastly, Counsel contended that in light of the fact that the Defendants have displayed no intention to repay the disbursements, the order for security for costs should not be granted. To bolster this argument, Counsel relied on **Rule 24.2 (1) of the CPR**, **White Book 2004**, **Leyvand v Barasch**, **The Times, March 23, 2000**, **Symsure Limited v Kevin Moore** [2016] JMCA Civ. 8 and **Ras Al Khaimah Investment Authority v Farhad Azima and others** [2022] EWHC 1295 (Ch). However, if the Court is minded to find in the contrary, Counsel urged the Court to reduce the sum being claimed for security for costs. Reliance was placed on **Blackstone's Civil Practice 2005** and **Carey – Hazell v Getz Bros & Co (Aus) Pty Ltd** [2004] FCA 1334.


**ISSUES**

**[24]**   The issues raised in this application are reflected in the questions posed below:

   (1) What is the jurisdiction of the court to intervene in an arbitral award?

   (2) Whether **S.55 of the Arbitration Act** is a mandatory provision from which the parties may not by agreement derogate?

   (3) Whether the Claimant can successfully invoke any of the grounds under **S.55 of the Arbitration Act** to set aside the arbitral award?


**LAW AND ANALYSIS**

*JURISDICTION*

**[25]**   Contrary to the submissions of Counsel for the Claimant, this matter does not engage **CPR Rule 9.6**, and the usual discourse involved in disputing the court's jurisdiction. Rather, the matter is centred around the court's jurisdiction to review an award made by an arbitral tribunal. **The Arbitration Act 2017 ("the Act")** incorporates the **UNCITRAL Model Law on International Commercial Arbitration (1985)**, with amendments as adopted in 2006 (**UNCITRAL Model Law)** into domestic law. A central feature of the **UNCITRAL Model Law** is the limit placed on the court's ability to intervene in arbitral disputes. **Article 5** of the **Model Law**, dealing with the extent of the court's intervention, states, *"no court shall intervene except where so provided in this Law."* In the **Explanatory Note by the UNCITRAL Secretariat on the 1985 Model Law on International Commercial Arbitration as amended in 2006**, limiting a court's intervention in arbitral proceedings is said to be a salient feature of the **Model Law**. It says:[1]

_____

[1] UNCITRAL secretariat on the 1985 Model Law on International Commercial Arbitration as amended in 2006, para 17

> *Article 5 thus guarantees that all instances of possible court intervention are found in the piece of legislation enacting the Model Law, except for matters not regulated by it (for example, consolidation of arbitral proceedings, contractual relationship between arbitrators and parties or arbitral institutions, or fixing of costs and fees, including deposits). Protecting the arbitral process from unpredictable or disruptive court interference is essential to parties who choose arbitration (in particular foreign parties).*

The Claimant argued that the Court has inherent and or common law jurisdiction to review arbitral awards. The cases relied on by Counsel all predate the **Arbitration Act** which came into effect in 2017. With respect, this argument can be shortly answered by reference to **S.8 of the Act**. It follows **Article 5 of the Model Law**. It provides that:

> **8.** In matters governed by this Act, no court shall intervene except where so provided in this Act.

Consequently, since **the Act** came into effect, the court's jurisdiction to intervene in arbitral awards is solely conferred by **the Act.**

*SECTION 55 OF THE ARBITRATION ACT*

**[26]**    The claim invokes **S.55 of the Act** which mirrors **Article 34 of the UNCITRAL Model Law**. **S. 55** gives the court jurisdiction to set aside an arbitral award in specific circumstances. (There are other provisions in **the Act** giving the court jurisdiction which are not relevant to this judgment.)[2] The relevant portions read as follows:

> 55.- (1) Recourse to the Court against an arbitral award may be made only by an application for setting aside in accordance with subsections (2) and (3).
>
>   (2) An arbitral award may be set aside by the Court only
>
> If-
>
> (a) the party making the application furnishes proof that-
>
>> (i) a party to the arbitration agreement referred to in section 10 was under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of Jamaica;
>>
>> (ii) the party making the application was not given proper notice of the appointment of an arbitrator or of the arbitral proceedings or was otherwise unable to present his case;

---

[2] **S.9 of the Arbitration Act**

(iii) the award deals with a dispute not contemplated by or not falling within the terms of the submission to arbitration, or contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, only that part of the award which contains decisions on matters not submitted to arbitration may be set aside; or

(iv) the composition of the arbitral tribunal or the arbitral procedure was not in accordance with the agreement of the parties, unless such agreement was in conflict with a provision of this Act from which the parties cannot derogate, or, failing such agreement, was not in accordance with this Act; or

(b) the Court finds that-

(i) the subject-matter of the dispute is not capable of settlement by arbitration under the laws of Jamaica; or

(ii) the award is in conflict with the public policy of Jamaica.

[27]    Underpinning **S.55** are some underlying principles found in **S.4(1)** and **(2)**; **S.5(a)**,**(b)** and **(c)** and **S.8** of **the Act**. The relevant sections read as follows:

**4.–** (1) In the interpretation of this Act, regard shall be had to its international origin and to the need to promote uniformity in its application and the observance of good faith.

(2) Questions concerning matters governed by this Act which are not expressly settled in it are to be settled in conformity with the principles set out in section 3(5).

**5.** The objects of this Act are to-

(a)    facilitate domestic and international trade and commerce by encouraging the use of arbitration as a method of resolving disputes;

(b)    facilitate and obtain the fair and speedy resolution of disputes by arbitration without unnecessary delay and expense;

(c)    facilitate the use of arbitration agreements made in relation to domestic and international trade and commerce;

…

**8.–** In matters governed by this Act, no court shall intervene except where so provided in this Act.

**[28]**  These principles were elucidated in **Betamax Ltd v State Trading Corp (Mauritius)** [2021] UKPC 14 **("Betamax")** by the Privy Counsel, which  stated:[3]

> *18. A number of principles relevant to the issue in the appeal are clearly set out in the International Arbitration Act:*
>
> > *(1)* ***Very limited court intervention.*** *Section 2A enacts the principle of very limited court intervention as set out in article 5 of the Model Law:*
> >
> > > *"In matters governed by this Act, no Court shall intervene except where so provided in this Act."*
> >
> > *(2)* ***Finality****. Section 36(7), modelled on section 19B of Singapore's International Arbitration Act and reflecting discussions within the UNCITRAL working group, provides:*
> >
> > > *"An award shall be final and binding on the parties and on any person claiming through or under them with respect to the matters determined therein, and may be relied upon by any of the parties in any proceedings before any arbitral tribunal or in any Court of competent jurisdiction."*
> >
> > *This provision is reinforced by section 39(1) (enacting part of article 34 of the Model Law) which makes clear that* ***applications to set aside the award are strictly confined:***
> >
> > > *"Any recourse against an arbitral award under this Act may be made only by an application to the Supreme Court for setting aside in accordance with this section."*
> >
> > *(3)* ***Exclusion of appeals on questions of law.*** *The International Arbitration Act requires specific consent for an appeal on a question of law. Under section 3B, the parties must expressly agree to opt in to such an appeal under provisions made in the First Schedule to the International Arbitration Act.*
> >
> > *(4)* ***Jurisdiction and Separability****. In accordance with modern international arbitration law, section 20, enacting article 16 of the Model Law with one change not material to the present appeal, provides for* ***the arbitral tribunal's ability to rule on its own jurisdiction*** *(referred to in the Travaux Préparatoires as "competence competence") and for* ***the separability of the arbitration clause:***
> >
> > > *"(1) An arbitral tribunal may rule on its own jurisdiction, including on any objection with respect to the existence or validity of the arbitration agreement.*
> > >
> > > *(2) An arbitration clause which forms part of a contract shall be treated for the purposes of subsection (1) as an agreement independent of the other terms of the contract, and a decision by the arbitral tribunal that the contract is null and void shall not entail ipso jure the invalidity of the arbitration clause."*
> >
> > *Procedural provisions for these issues are set out in the Act.*

---

[3] 2021] UKPC 14, paras 18-21

19. Section 2B of the International Arbitration Act sets out the applicable **principles of interpretation**. It provides that in interpreting the Act and in developing the law applicable to international arbitration in Mauritius:

> "(a) regard shall be had to the origin of the Amended Model Law, the corresponding provisions of which are set out in the Third Schedule, and to the need to promote uniformity in the application of the Model Law and the observance of good faith;
>
> (b) any question concerning matters governed by the Amended Model Law which is not expressly settled in that Law shall be settled in conformity with the general principles on which that Law is based; and
>
> (c) recourse may be had to international materials relating to the Amended Model Law and to its interpretation, including –
>
>> (i) relevant reports of UNCITRAL;
>>
>> (ii) relevant reports and analytical commentaries of the UNCITRAL Secretariat;
>>
>> (iii) relevant case law from other Model Law jurisdictions, including the case law reported by UNCITRAL in its CLOUT database; and
>>
>> (iv) textbooks, articles and doctrinal commentaries on the Amended Model Law."

20. The Travaux Préparatoires made clear at para 17(a) that:

> "First and foremost, the success of Mauritius as a jurisdiction of choice for international arbitration will be largely dependent on the uniform and consistent application by the Mauritian Courts of modern international arbitration law, and (in particular) on their **strong adhesion to the principles of non-interventionism which is at the heart thereof**. To this end:
>
>> (i)  The Act strictly adopts the Amended Model Law's very limited voie de recours against arbitral awards: see section 39, which reproduces article 34 of the Amended Model Law…"

Section 39 is described as enacting "the all-important provisions of article 34 of the Amended Model Law without any significant modifications". The modifications are effected by the addition of the provisions in section 39(2)(b)(iii) and (iv) (fraud or corruption, and breach of the rules of natural justice). These provisions are akin to those enacted in Singapore in section 24 of Singapore's International Arbitration Act.

21. Article 34 of the Model Law, as the UNCITRAL Explanatory Note to the Model Law makes clear, contains **an exclusive list of grounds for setting aside an award.** This is essentially the same list as that contained in the provision in article 36 of the Model Law for the recognition and enforcement of arbitral awards which was itself taken from article V of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards 1958 (the "New York Convention"). As "public policy" is determined in the courts of the state before which proceedings are brought, there may well be differences in the view taken as to the nature and scope of the public policy between a supervisory court which is considering setting aside the award and a court enforcing the award in a different state. However, there is no reason for difference as to the extent of a court's right of intervention in respect of public policy under articles 34 and 36 and the decisions in this respect on enforcement are applicable in respect of applications to set aside. (Emphases mine)

**[29]**    The first attack on the claim by the Defendants is that the Court has no jurisdiction to entertain the claim. This was as the parties to the SLAs themselves chose to exclude any intervention by a court into an arbitral award by virtue of Clause VII of the agreements. Clause VII states:

> *There will be no appeal from the decision of the Arbitral Tribunal on questions of fact, error, public policy, impartiality, process, jurisdiction, or law, nor will any court deviate from this paragraph, it's (sic) provisions and wish of the Parties. The arbitration award will be final and binding in resolving any controversy.*

The question which thus arises first for the Court's determination is whether the parties could contract out of **S. 55 of the Act**. If a valid term of the contract, then it is a complete answer to the Claimant's claim. If it is a mandatory provision which the parties could not contract out of, then the provisions of **S.55** are applicable.

### *Is S.55 of the Arbitration Act a mandatory provision?*

**[30]**    **S. 4 of the Act** specifically stipulates that it should be interpreted in accordance with its international origin, with one objective being to give effect to the **UNCITRAL Model Law**[4]. There being no decided cases in this jurisdiction on this issue, it is useful to look to the interpretation of **Article 34 of the UNCITRAL Model Law** or its equivalent in model law jurisdictions in the interpretation **of S.55**.

**[31]**    The Defendants referred the Court to the Canadian case of **Noble China Inc. v Lei** 1998 42 OR (3d) 69 **("Noble China")** in support of their argument that parties to an arbitration agreement can contract out of **Article 34 of Model Law**. In **Noble China**, the Ontario Superior Court of Justice had before it for determination, inter alia, an application to dismiss the setting aside of an arbitral award. This application was grounded on the premise that the parties had limited the grounds for review of the award through the inclusion of an exclusion clause in the arbitration agreement. Justice Lax upheld the exclusion clause on the basis that the parties could agree to contract out of **Article 34** so long as the agreement did not conflict with a mandatory provision of **Model Law** or is contrary to public policy. Justice Lax noted that arbitral proceedings were a consensual process which was designed with the intention of the parties in mind, and that a court should give effect to such intentions. She stated:[5]

> *In summary, art. 34 is not a mandatory provision of the Model Law. Parties may therefore agree to exclude any rights they may otherwise have to apply to set aside an award under this article. They may do so as long as their agreement does not conflict with a mandatory provision of the Model Law. The arbitration agreement here does not conflict with any mandatory provision of the Model Law, nor does it confer powers on the arbitration tribunal which is in conflict with Ontario public policy.*

Justice Lax made it known that her interpretation of **Article 34** was being made obiter.

---

[4] **S.5(e) of the Arbitration Act**
[5] 1998 42 OR (3d) 69, para 98

- 13 -

[32]    The decision in **Noble China** was considered, and it appears rejected, in **Popack v Lipszyc** 2015 Carswell Ont 8001, 2015 ONSC 3460 **("Popack")**, another Canadian case from a court of equal jurisdiction. In **Popack**, the parties also attempted to contract out of **Article 34**. In **Popack** Justice Matheson concluded that **Article 34** was a mandatory provision which the parties could not contract out of. She reasoned that if **Article 34** could be derogated from, then there would be no remedy for the breach of any of the mandatory provisions of the Model Law. In considering **Noble China**, she said:[6]

> The respondents rely on the decision in Noble China Inc. v. Cheong (1998), 42 O.R. (3d) 69 (Gen. Div.) in support of their position that Article 34 is not a mandatory provision of the Model Law and therefore can be excluded by agreement. In that case, in self-described obiter, the Court did say that Article 34 is not mandatory. However, to focus on that statement in isolation mis-describes the Court's findings. The Court identified a number of circumstances in which an attempt to exclude Article 34 by agreement would be ineffective. The Court found that Article 34(2)(a)(i)(ii) and (iii) are "independent grounds" to bring an application to set aside an award "without regard to the effect of any agreement." Next, the Court found that if the parties purported to agree in a manner that derogated from a mandatory provision of the ICAA such as Article 18, that agreement would be "ineffective" and not stand in the way of an application under Article 34. Similarly, with respect to the second part of Article 34, the Court concluded that an arbitration agreement may not confer powers on a tribunal to conduct an arbitration in a manner contrary to public policy. These findings are all different ways of showing that parties cannot effectively contract out of Article 34 for all purposes.

The finding of Justice Matheson in **Popack** was that **Article 34** is immune from contractual opt-out. She stated:[7]

> 46. … if parties can contract out of Article 34 for all purposes, there would be no jurisdiction for a court to set aside an award as a remedy for breach of these admittedly mandatory provisions. Noble China illustrates that this is not the case.

> 47. I conclude that the proper approach is to consider to what extent the Arbitration Agreement seeks to exclude Article 34, and if it does, to what extent it is effective in doing so given the specific matters at issue.

[33]    This approach is not unheard of in our jurisprudence. In **Peterkin, Arlene v Natural Resources Conservation Authority, Town and Country Planning Authority and National Housing Trust** [2022] JMSC Civ. 153 Anderson  K. J posited:[8]

> In Matthews v The State [2000] 60 WIR 390, a decision of Trinidad and Tobago's Court of Appeal, which has been consistently applied in our jurisdiction, the court considered the use of the word 'shall' in a statutory context. It is cited at page 403 as follows: 'Turning to the argument based on the language of s 18, courts no longer accept that it is possible merely by looking at the language used by the legislature, to distinguish between mandatory or imperative provisions, the penalty for breach of which is nullification, and provisions that are merely directory for breach of which the legislation is deemed to have intended a less drastic consequence. The fact of the matter is that most directions given by the legislature in statutes are in a form that is mandatory. It is now accepted that in order to determine what is the result of failure to comply with something prescribed by a statute, one has to look beyond the language and consider such matters

---

[6] 2015 Carswell Ont 8001, 2015 ONSC 3460, para 44
[7] Ibid. paras 46 - 47
[8] [2022] JMSC Civ. 153, paras 57-58

- 14 -

> *as the consequences of the breach and the implications of nullification in the circumstances of the particular case.'*

> *[58] The word 'may' does not always connote a discretionary scenario, but may also, be an imperative.*

**[34]**    **Popack** was followed and **Noble China** was rejected by the Supreme Court of British Columbia in **lululemon athletica canada Inc v Industrial Color Productions Inc** 2021 BCSC 15. The introduction is sufficient for these purposes to establish the relevance of the case.[9]

> *1.    lululemon athetica canada inc. ("lululemon") seeks an order pursuant to s. 34(2)(a)(iv) of the International Commercial Arbitration Act, R.S.B.C. 1996, c. 233 [ICA Act] to set aside the portion of a commercial arbitration award requiring it to pay Industrial Color Productions Inc. ("ICP") $1,081,967 (USD) plus interest.*

> *2.    In particular, lululemon claims the arbitrator went beyond the scope of the submission to arbitration in making an award that it says was not pleaded by ICP.*

After referring to paragraphs 44 to 47 of **Popack**, the chambers judge concluded that,[10] *"In short, a party cannot waive the statutory right to apply to set aside an arbitral award."* On appeal, in upholding the decision of the chambers judge, this issue was not addressed.[11]

**[35]**    **Article 34** distinguishes itself from other provisions that influence ongoing arbitral proceedings, as its operational scope is exclusively post-award. The importance of **Article 34** lies in its provision of the supervisory jurisdiction of the Court on the grounds enumerated. In my estimation, **Article 34** must in most, if not in all, circumstances, be construed as a mandatory provision, indispensable to the integrity of the arbitral process.

**[36]**    I find support for these conclusions from the fact that the drafters of the Model Law included certain provisions which gave parties the ability to derogate from them. Commentary was made on this observation by Thomas G. Heintzman O.C., Q.C., FCIArb in an article titled, **Can The Parties Contract Out Of The UNCITRAL Model Law?**. There Mr. Heintzman stated:

> *… the Model Law does expressly state in numerous articles that the parties can otherwise agree. Thus, Articles 3(1), 10(1), 11(2), 13(1), 17, 19(1), 21, 23(2), 24(1), 25, 28(1)-(3), 29, 31(2), 33(1). 33(1)(b) and 33(32) expressly state that the Article applies "unless the parties agree otherwise" or that the "parties are free to agree upon" other provisions, or words to the same effect. Article 4 refers to "a provision of this Law from which the parties may derogate", and requires a party to make a timely complaint about the non-compliance, failing which that party is deemed to waive the objection. The words "unless the parties agree otherwise", "the parties are free to agree" and "may derogate" imply that the parties may not agree otherwise or derogate from other provisions. Having stated in about 18 separate Article and sub-Articles that the parties may "otherwise agree" or are "free to agree upon" other provisions, it seems that the drafters thought they had stated*

---

[9] 2021 BCSC 15, paras 1-2
[10] Ibid., para 54
[11] **lululemon athletica canada inc. v. Industrial Color Productions Inc**. 2021 BCCA 428

> *which Articles and sub-Articles were non-mandatory and had thereby delineated between the mandatory and non-mandatory sections, and most unlikely they would have intended that the parties could contract out of the other provisions. If that is not so, and if the line between the two is not drawn by reference to those Articles and sub-Articles, then no clear line between the mandatory and non-mandatory Articles is apparent.*

**[37]**    On closer examination, in addressing whether the provisions of **S.55** are mandatory, there is no real difference between **Noble China** and **Popack**, in that what is sought to be excluded determines whether the provisions of **S.55** are mandatory or discretionary. The Court must look to the Arbitration Agreement to see to what extent it purports to exclude **S.55**. The relevant section of the agreement reads:[12]

> *There will be no appeal from the decision of the arbitral tribunal on questions of fact, error, public policy, impartiality, process, jurisdiction, or law, nor will any court deviate from this paragraph, its provisions and wish of the Parties. The arbitration award will be final and binding in resolving any controversy.*

Though this Court has a preference for the reasoning in **Popack**[13], if the Court were to adopt either the approach of Justice Lax in **Noble China** or Justice Matheson in **Popack**, the result would be the same. The wide-sweeping attempt to exclude the court's statutory jurisdiction, which may include breaches of the mandatory provisions, including public policy, must be ineffective. In **Betamax**, it was held that the determination of the nature and extent of public policy was a question of law (of Singapore) for determination by the courts (of Singapore).

*Clause VII: Ouster of court's jurisdiction*

**[38]**    Counsel for the Claimant argued that Clause VII of the SLA amounted to an ouster clause and was illegal, void and contrary to public policy and therefore could not serve to oust the Court's jurisdiction to set aside the award. Having regard to the Court's finding in respect of **S. 55**, it is not necessary to deliberate further on this issue. In any event, the agreement provided that such a clause could be severed from the agreement.

*Whether statutory grounds to set aside award were made out?*

**[39]**    On this premise, the Court is now free to consider the bases on which the Claimant seeks to set aside the arbitral award.

**[40]**    The threshold requirement to bring an application under **S. 55** is that it is time bound. **S.55(3)** mandates the time by which the application to set aside the arbitral award must be made. The section reads:

---

[12] Clause VII of the SLAs

[13] Justice Matheson also found that what was excluded was an appeal and not as was before her an application to set aside the award.

(3) An application for setting aside may not be made after three months have elapsed from the date on which the party making that application had received the award or, if a request had been made under section 48, from the date on which that request had been disposed of by the arbitral tribunal.

In the case at bar, there is no dispute that the application to set aside the arbitral award was made in time.

**[41]**    The bases on which the Claimant seeks to set aside the arbitral award are set out in the three grounds adumbrated in the Claim Form which will form the subheadings for the discussion below.

(a)    *The Final Award and or the Costs Award deals with a the dispute not contemplated by or not falling within the terms of the submission to arbitration or contains decisions on matters beyond the scope of the submission to arbitration.*

**[42]**    The Particulars of Claim discloses that challenged under this ground is the Arbitrator's failure to make findings of fact on matters in dispute; failure to make findings on the substantive merits of the issues in the proceedings; acting in excess of jurisdiction in granting the cost award and acting ultra vires **S49(1) of the Act** in granting the cost award.

**[43]    S.55(2)(a)(iii) of the Arbitration Act** mirrors **Article 34(2)(a)(iii) of the UNCITRAL Model Law**. This article concerns the setting aside of an arbitral award on the basis that the arbitrator acted in excess of his jurisdiction. In interpreting what is meant by exceeding jurisdiction in the context of arbitration proceedings, I refer to the case of **Lesotho Highlands Development Authority v Impregilo SpA and others** [2005] UKHL 43 **("Lesotho")**. In that case the provision in question was S.68(2)(B) of the Arbitration Act which provided for the setting aside of an arbitral award on the ground that the arbitrator had exceeded his jurisdiction. S.68(2)(B) also mirrored **Article 34 of the UNCITRAL Model Law**. In **Lesotho**, the House of Lords had to determine whether the arbitral tribunal exceeded its jurisdiction when it concluded that it had the power to order payment in any currency it deemed appropriate. This ground was also raised by the respondents in relation to the tribunal's conclusion that the "otherwise" agreed provisions in the agreement, which concerned interest, did not exclude the tribunal's powers to award interest. In coming to the determination of the court, Lord Steyn stated:

> *[29] It will be observed that the list of irregularities under s 68 may be divided into those which affect the arbitral procedure, and those which affect the award. But nowhere in s 68 is there any hint that a failure by the tribunal to arrive at the "correct decision" could afford a ground for challenge under s 68. On the other hand, s 68 has a meaningful role to play. An example of an excess of power under s 68(2)(b) may be where, in conflict with an agreement in writing of the parties under s 37, the tribunal appointed an expert to report to it. At the hearing of the appeal my noble and learned friend, Lord Phillips of Worth Matravers MR, also gave the example where an arbitration agreement expressly permitted only the award of simple interest and the arbitrators in disregard of the agreement*

*awarded compound interest. There is a close affinity between s 68(2)(b) and s 68(2)(e). The latter provision deals with the position when an arbitral institution vested by the parties with powers in relation to the proceedings or an award exceeds its powers. The institution would exceed its power of appointment by appointing a tribunal of three persons where the arbitration agreement specified a sole arbitrator.*

*…*

*[31] By its very terms s 68(2)(b) assumes that the tribunal acted within its substantive jurisdiction. It is aimed at the tribunal exceeding its powers under the arbitration agreement, terms of reference or the 1996 Act. Section 68(2)(b) does not permit a challenge on the ground that the tribunal arrived at a wrong conclusion as a matter of law or fact. It is not apt to cover a mere error of law. This view is reinforced if one takes into account that a mistake in interpreting the contract is the paradigm of a "question of law" which may in the circumstances specified in s 69 be appealed unless the parties have excluded that right by agreement. In cases where the right of appeal has by agreement, sanctioned by the Act, been excluded, it would be curious to allow a challenge under s 68(2)(b) to be based on a mistaken interpretation of the underlying contract. Moreover, it would be strange where there is no exclusion agreement, to allow parallel challenges under s 68(2)(b) and s 69.*

*[32] In order to decide whether s 68(2)(b) is engaged it will be necessary to focus intensely on the particular power under an arbitration agreement, the terms of reference, or the 1996 Act which is involved, judged in all the circumstances of the case. In making this general observation it must always be borne in mind that the erroneous exercise of an available power cannot by itself amount to an excess of power. A mere error of law will not amount to an excess of power under s 68(2)(b).*

*[33] For these reasons the Court of Appeal erred in concluding that the tribunal exceeded its powers on the currency point. If the tribunal erred in any way, it was an error within its power. [emphasis mine]*

This decision also makes it clear that **Article 34(2)(a)(iii)** must be construed restrictively so as not to re-examine the merits of the award.

> (i) <u>Did the Arbitrator's failure to determine several issues amount to a failure to arbitrate?</u>

**[44]**   The Claimant's assertion that the Arbitrator's failure to arbitrate and exceeding her jurisdiction by failing to render factual findings on contested issues that precipitated the arbitration, failing to consider numerous issues and showing a lack of regard for the party's submissions amounted to a breach of natural justice, and was accordingly a breach of public policy is misconceived. The Arbitrator is not required to determine every issue between the parties.

**[45]**   I find guidance on this from the case of **Secretary of State for the Home Department v Raytheon Systems Ltd** [2014] Bus LR 626, where the court, in determining whether to set aside an arbitral award, reviewed several authorities and distilled the following principles:[14]

---

[14] [2014] Bus LR 626, para 33

*(iv) However, there will be a failure to deal with an 'issue' where the determination of that 'issue' is essential to the decision reached in the award (World Trade Corporation v C Czarnikow Sugar Ltd [2005] 1 Lloyd's Rep 422 at paragraph 16). An essential issue arises in this context where the decision cannot be justified as a particular key issue has not been decided which is critical to the result and there has not been a decision on all the issues necessary to resolve the dispute or disputes (Weldon Plan Ltd v The Commission for the New Towns [2000] BLR 496 at paragraph 21).*

*…*

***(x) A tribunal does not fail to deal with issues if it does not answer every question that qualifies as an "issue". It can "deal with" an issue where that issue does not arise in view of its decisions on the facts or its legal conclusions. A tribunal may deal with an issue by so deciding a logically anterior point such that the other issue does not arise…***

*(xi) It is up to the tribunal how to structure an award and how to address the essential issues; if the issue does not arise because of the route the tribunal has followed for the purposes of arriving at its conclusion, Section 68(2)(d) will not be engaged. [Emphasis mine]*

[46]    In the present case, the dispute central to the case concerned the Claimant's status as a money lender pursuant to the MLO. That question having been found in the affirmative, the Arbitral Tribunal went on to conclude that it lacked jurisdiction to grant the reliefs sought as any relief could only be granted by the Hong Kong High Court pursuant to the proviso of the MLO. Thus, further factual and legal findings became moot. The issues not addressed in the arbitration were matters relevant to the consideration of the question of whether the Claimant is entitled to relief pursuant to the proviso.

[47]    The Particulars of the Failure to Arbitrate and Acting in Excess of Jurisdiction in the Particulars of Claim do not disclose in any way that there was a failure by the Arbitral Tribunal to decide on the relevant issues. What is contended is that the arbitral tribunal came to an incorrect decision which as shown above would not engage **S.55(2)(a)(iii)** of the **Arbitration Act.**

    (ii)    <u>Did the Arbitrator exceed her jurisdiction when she awarded Costs to the Defendants?</u>

[48]    The Claimant argued that the Arbitrator acted in excess of her jurisdiction when she ruled that costs were payable to the losing party contrary to **S.49 of the Arbitration Act** and the terms of the SLAs. **S. 49 of the Act** conferred upon the parties the autonomy to negotiate and determine their own costs arrangments. Pursuant to the section, the SLAs provided for all costs to be borne by the Defendants irrespective of the party who was successful at the arbitration.

[49]    The Claimant relied on the cases of **Mansfield v Robinson** [1928] 2 K.B. 353 **("Mansfield")** and **Fitzsimmons And Lord Mostyn** [1904] A.C. 46 **("Fitzsimmons")** to support its argument that the agreed terms in the SLAs in relation to costs should supersede the discretion of the arbitrator to grant costs. However, these cases are

distinguishable from the case at bar. In both cases the parties maintained their position in relation to their prior agreements as to the costs of proceedings.

[50]    In **Mansfield**, the parties had previously agreed that the prevailing party would be entitled to costs on the High Court scale. However, this agreement was not disclosed to the arbitrator. Consequently, the arbitrator ruled in favor of the claimant but ordered each party to bear its own costs. On appeal, the Claimant sought to enforce the original agreement, and the court ultimately upheld the appeal, deeming the agreement valid and enforceable, notwithstanding the arbitrator's discretion under the Act. Noteworthy, the court in that case referenced the case of **Walter v. Bewicke, Moreing & Co**. 90 L. T. 410 in stating that costs orders could be overridden by the agreement of the parties.

[51]    In **Fitzsimmons v Lord Mostyn** [1904] A.C. 46 **("Fitzsimmons")** the subject of the dispute between the parties involved a lease which included a renewal covenant requiring the lessor to renew at the lessee's request and expense, with a fine based on the term's remaining years and property value. When the parties disagreed on the fine, they referred the issue to arbitration. The court held that the lessee must pay the arbitration costs as part of the renewal expenses.

[52]    In **Mansfield and Fitzsimmons** none of the parties opted to deviate from or modify the terms of the prior agreed cost arrangements. In the case at bar, following a preliminary meeting on 13th August 2021, the subsequent order was made with the consent of the parties, *"Costs are to be awarded by the Tribunal to the successful party."* The arbitrator commented on this by stating:[15]

> *This award was sent to the parties by email of the 18th of August 2021. There was no application for correction on the basis now indicated. As indicated the order was made with the consent of the parties. The Tribunal found itself bound by the terms of this order coming as it did, after the agreement evidenced by the SLAs. The Claimant's motion for costs is therefore refused.*

[53]    The Arbitrator's commentary aligns with the obiter of the court in **Mansfield**, which established that prior cost arrangements can be superseded by the mutual agreement of the parties. In accordance with this, I find that the Claimant explicitly waived its right under the prior cost arrangements stipulated in the SLAs. Consequently, the Claimant is now precluded from taking a position that the Arbitrator's ruling, based on the subsequent agreement as to costs, was in excess of the arbitrator's jurisdiction.

*(b)    The subject matter of the dispute between the parties was not capable of settlement by arbitration under the laws of Jamaica*

[54]    Under this ground, the Claimant takes issue that contravention of the criminal law was a matter of the public forum for a court of law. The Claimant also contended that

---

[15] Reasons for Award on Counerclaim and Costs, paras 25-26

- 20 -

issues of fraud and fraud related acts are criminal offences and are matters of the public forum and one for a court of law.

**[55]**    The Claimant asserted that the dispute was not capable of arbitration as the determination of a breach of the MLO was exclusive to the criminal jurisdiction of Hong Kong and thus outside of the jurisdiction of the Arbitrator. The Defendants are on good ground when they argue that the Arbitrator was not exercising criminal jurisdiction. A similar issue arose in **London Steamship Owners' Mutual Insurance Association Ltd v Kingdom of Spain and another** [2015] EWCA Civ 333. The dissertation on the issue is comprehensive and I adopt it.[16]

> *E. Are the claims arbitrable?*
>
> *[77] Mr Smouha submitted that the claims made by the Appellants in the Spanish proceedings were inherently incapable of being determined by arbitration because a conviction in the proceedings was an essential element of the cause of action against the insurer. Since an arbitrator cannot convict a person of a criminal offence, the claim cannot be constituted in arbitration proceedings.*
>
> *[78] It was not disputed that in the ordinary way an arbitrator has jurisdiction to find facts which constitute a criminal offence (fraud being an all too common example) or that in an appropriate case an arbitrator also has jurisdiction to find that a criminal offence has been committed. As the judge pointed out, however, it is necessary to distinguish between a finding of criminal conduct and a conviction which provides the basis for a penal sanction. It may also be important in this context to distinguish between a claim and a dispute or difference.*
>
> *[79] Before the judge, as before us, the central plank of the Appellants' argument was that liability under art 117 depends on a conviction. The text of arts 109, 116 and 117, to which I have already referred, suggests that the liability is civil in nature and that a conviction is merely a precondition to the right to pursue such claims in criminal proceedings. Any doubt about that, however, is in my view removed by paras 106 and 107 of the judgment below. In para 106 the judge found that although claims of this kind are brought under the Penal Code, the relevant provisions are civil in nature and are construed according to civil principles of law. Although the Public Prosecutor has a right to bring claims on behalf of third parties, they remain the third parties' claims, with the result that any judgment is rendered in favour of the third party.*
>
> *[80] The judge dealt with the Appellants' argument in the following way:*
>
>> *"107 . . . whether the claim is brought under Article 76 or Article 117, the right to recover from the insurer depends on proof of an insured liability under the insurance contract and does not require a finding of criminal liability. Even if it did, it would not be a finding involving criminal responsibility or criminal penal consequences. It would simply be a step towards establishment of a civil law monetary claim. Further, it would be remarkable if civil claims advanced in criminal proceedings were inarbitrable, whereas if the same claims had been advanced in civil proceedings they would not have been, so that arbitrability would effectively be at the option of the Claimant."*

---

[16] [2015] EWCA Civ 333, paras 77-82

- 21 -

*[81] In my view this passage amounts to a finding that a conviction is not an integral element of the cause of action. The distinction is important, because even if a conviction were a pre-condition to the right to recover against the insurer, there would be no reason why an arbitrator should not determine a claim of this kind, taking into account whether the condition has or has not been satisfied. He cannot, on the other hand, formally convict any person of a criminal offence.*

*[82] The argument does not end there, however, because the arbitration agreement is not concerned with claims as such but with differences and disputes. The principal disputes between the Appellants and the Club were whether the Appellants were bound by the arbitration clause in the Club's rules and whether the "pay to be paid" clause was effective to defeat their claims. Those were the disputes which the Club referred to arbitration and the grounds on which it sought declaratory awards confirming that it was under no liability. They could be determined by the arbitrator without having to decide whether any of the accused in the Spanish criminal proceedings had committed any offences, since in those proceedings neither of the Appellants was seeking to enforce any right against the Club. In my view the matters referred to the arbitrator were capable of being the subject of an award, although the court is entitled to have the final word on jurisdiction. I would grant the Appellants permission to appeal on this additional ground, but in my view it does not provide a basis for allowing the appeal.*

**[56]**    The instant case is even clearer. The Arbitrator found, as she was entitled to, that the SLAs were in breach of the MLO, and that though a criminal offence, the Hong Kong courts have the power to grant relief to the lender. The Arbitrator did not make a finding of criminal responsibility. Put another way, if the possibility of relief was not given to the lender in the MLO, the Arbitrator could have made a finding that the loans were in breach of the MLO, and deny the relief sought, which would have in effect settled the dispute between the parties without any finding of criminal liability by the lender.

   *(c)*    *The Final Award and or the Cost Award is in conflict with the Public Policy of Jamaica*

**[57]**    It was contended by the Claimant that the Final Award was in breach of the principles of natural justice. The purported breaches were a regurgitation of the allegations of the failure to arbitrate. In the alternative, it was argued that they were errors of law. For the reasons previously given, this argument is without merit

**[58]**    It was also submitted that in granting the Costs Award, the Arbitral Tribunal acted in breach of the principles of natural justice when she failed to apply the terms of the arbitration agreement contained in the SLAs. Again for reasons given earlier, this submission cannot succeed.

**[59]**    I refer to the decision of the court in **Betamax**. In this case, Betamax Ltd**,** the appellant, entered into a contract with the State Trading Corporation, the respondent, for the supply of petroleum products. The Government of Mauritius announced that it would terminate the agreement on the basis that the agreement was in contravention with the country's public procurement laws and was therefore illegal and unenforceable. Betamax Ltd. referred the matter to arbitration. The arbitral tribunal ruled in Betamax Ltd's favour,

on the premise that the agreement did not breach the procurement laws. On the State Trading Corporation's application to the Supreme Court to set aside the award, the Supreme Court found that the agreement was illegal and on that premise, the award of the arbitral tribunal should be set aside as it conflicted with Mauritian public policy. On appeal to the Privy Council, the Board found that the interpretation of the procurement laws did not give rise to an issue of public policy. On this premise the appeal was allowed. The Privy Council after reviewing cases referred to it stated:[17]

> *The intervention of the court is specifically limited to setting aside the award on the grounds set out in section 39(2) of the International Arbitration Act. In relation to the issue of whether the award conflicts with public policy, the court's intervention proceeds on the court's application of public policy to the findings (whether of fact or law) made in the award. To read section 39(2)(b) more widely would be contrary to the clear provisions as to the finality of awards. The provision can be given full application by respecting the finality of the matters determined by the award and confining the ambit of the section to the public policy of the state in relation to the award. **The question for the court under section 39(2)(b)(ii) is whether, on the findings of law and fact made in the award, there is any conflict between the award and public policy. For example, if the Arbitrator had held that the COA had been concluded in breach of the PP Act, but the contract was enforceable as it was not contrary to public policy, the court would be entitled to determine under section 39(2)(b)(ii) whether that decision by the Arbitrator conflicted with the public policy of Mauritius. The effect of section 39(2)(b)(ii) is simply to reserve to the court this limited supervisory role which requires the court to respect the finality of the award. It cannot, under the guise of public policy, reopen issues relating to the meaning and effect of the contract or whether it complies with a regulatory or legislative scheme.** [Emphasis mine]*

[60]    The case of **Betamax** serves to affirm the paramountcy of upholding arbitral awards, maintaining their finality and the enforceability of arbitration decisions. Moreover, it provides valuable insight as to the scope of the public policy ground to set aside an award. Notably, the case also makes strikingly clear that public policy and errors of law are two distinct concepts in the context of arbitration. The key difference between them is that public policy refers to the principles and values that underscore the legal system and society as a whole. It is concerned with ensuring that awards do not offend against fundamental principles of illegality, immorality, or unconscionability. Errors of law refer to mistakes made by the arbitrator in the interpretation and application of the law. It is concerned with ensuring that the arbitrator has correctly applied the relevant legal principles. It is clear that there is no issue that the award is in conflict with the public policy of Jamaica.

*STRIKE OUT*

[61]    **Rule 26.3 (1) of the CPR** provides the circumstances in which the court may strike out a litigant's statement of case. The rule provides:

---

[17] [2021] UKPC 14, para 49

- 23 -

> *26.3 (1) In addition to any other powers under these Rules, the court may strike out a statement of case or part of a statement of case if it appears to the court –*
>
>> a) *that there has been a failure to comply with a rule or practice direction or with an order or direction given by the court in the proceedings;*
>>
>> b) *that the statement of case or the part to be struck out is an abuse of the process of the court or is likely to obstruct the just disposal of the proceedings;*
>>
>> c) *that the statement of case or the part to be struck out discloses no reasonable grounds for bringing or defending a claim; or*
>>
>> d) *that the statement of case or the part to be struck out is prolix or does not comply with the requirements of Parts 8 or 10.'*

**[62]**    As the Court has found in favour of the Claimant on the jurisdiction issue, it is only ground c that would be applicable. This is the same basis on which the Court will consider the application for summary judgment.

*SUMMARY JUDGMENT*

**[63]**    **Part 15 of the CPR** empowers the court to grant summary judgment on a claim, or on a particular issue, where the court considers that the claimant, or the defendant, has no real prospect of successfully defending the claim or issue. The relevant law is well trod in several cases so it is sufficient to set out the applicable principles here.  In the oft-cited case of **Swain v Hillman and another** [2001] 1 All ER 91, Lord Woolf MR defined what is meant by *"no real prospect of succeeding"* as:[18]

> *… The words 'no real prospect of succeeding' do not need any amplification, they speak for themselves. The word 'real' distinguishes fanciful prospects of success … they direct the court to the need to see whether there is a 'realistic' as opposed to a 'fanciful' prospect of success.*

The burden of proof lies on the applicant to prove that the respondent has no real prospect of successfully defending the claim.  In  **Howell (Delroy) v Royal Bank of Canada et al and Ocean Chimo Ltd v Royal Bank of Canada et al** [2021] JMCA Civ 19 **("Howell")**, Phillips JA said:[19]

> *It appears to be well settled now that the burden of proof on an application for summary judgment rests on the applicant to prove that the respondent's case has no real prospect of success. However, once the applicant asserts their belief on credible grounds, a respondent seeking to resist an application for summary judgment is required to show that he has a case that is better than merely arguable (**ED&F Man Liquid Products Ltd v Patel and another [2003] EWCA Civ 472**).*

The respondent is not required to prove the certainty of success.

---

[18] [2001] 1 All ER 91 at pg 92
[19] [2021] JMCA Civ 19, para 114

- 24 -

**[64]**    In **Somerset Enterprises Limited and anor v National Export Import Bank** [2021] JMCA Civ 12 **("Somerset")**, Brooks P, summed up these requirements and gave guidance for a court considering an application for summary judgment. He stated: [20]

> *[25] The party that seeks the summary judgment must assert that the respondent's case has no real prospect of success. If that party asserts that belief, on credible grounds, a respondent seeking to resist an application for summary judgment is required to show that he has a case "which is better than merely arguable". In order to successfully resist the other party's assertion, the respondent must prove that its case has "a 'realistic' as opposed to a 'fanciful' prospect of success" (see paragraphs [14] and [15] of **ASE Metals NV v Exclusive Holiday of Elegance Limited** [2013] JMCA Civ 37). **In determining whether there is any real prospect of succeeding, the judge should not conduct a mini-trial.***
>
> *[26] The Privy Council has also offered guidance on the matter, in **Sagicor Bank Jamaica Limited v Marvalyn Taylor Wright** [2018] UKPC 12. Lord Briggs stated that summary judgment allows the court to determine whether the matter requires a trial. **He added that if a trial of the issues between the parties does not affect the claimant's entitlement to the relief sought then the trial is unnecessary** (see paragraphs 16-21).*
>
> *[27] **Although the judge considering a summary judgment application is not to conduct a mini-trial, he must carefully examine each party's statement of case and the supporting documents, in order to determine the merits.** It is against this background that this matter is to be viewed.* (Emphasis mine)

**[65]**    Despite the Court not finding favour with the Defendants' submissions that the jurisdiction of the Court to set aside the arbitral award is ousted by Clause VII of the Arbitration Agreement, the Defendants' assertion that the claim has no real prospect of success is sound. The Claimant has failed to show that it can establish any of the grounds under **S.55** for the Court to exercise its jurisdiction to set aside the arbitral award. The Claimant therefore has no real prospect of succeeding on the claim.


**ORDERS**

1. Summary judgment is hereby granted in favour of the Applicants/Defendants against the Respondent/Claimant on the basis that it has no real prospect of succeeding on the claim.
2. Verbal Notice of Leave to Appeal given.
3. Parties to file and serve written submissions in respect of the notice of leave to appeal by 24th May 2024
4. Parties to file and serve written submissions on Costs by 24th May 2024
5. Applicant's attorney to prepare, file and serve Orders.

_____

Judge

_____

[20] [2021] JMCA Civ 12, paras 25-27

# EXHIBIT 44

## Grupo Elektra SAB de CV

# Grupo Elektra Announces Material Fact

JUL 26 2024 19:31 BST

MEXICO CITY , July 26, 2024 /PRNewswire/ -- Grupo Elektra, S.A.B. de C.V. (BMV: ELEKTRA* Latibex: XEKT), Latin America's leading specialty retailer and financial services company, and the largest non-bank provider of cash advance services in the United States, informs investors that it has received information from its controlling group regarding a possible fraud by depositaries of their shares, which could cause unusual movements of its share price on the stock markets.

Thereafter, the company informs that it has made contact with the corresponding authorities to determine the applicable measures.

As of the second quarter 2024, the company has reported solid performance on its financial and commercial businesses, and its operation continues as usual.

Company Profile:

Grupo Elektra is Latin America's leading financial services company and specialty retailer and the largest non-bank provider of cash advance services in the United States. The group operates more than 6,000 points of contact in Mexico, the United States, Guatemala, Honduras, and Panama.

Grupo Elektra is a Grupo Salinas company ( www.gruposalinas.com ), a group of dynamic, fast-growing, and technologically advanced companies focused on creating economic value through market innovation and goods and services that improve standards of living; social value to improve community well-being; and environmental value by reducing the negative impact of its business activities. Created by Mexican entrepreneur Ricardo B. Salinas ( www.ricardosalinas.com ), Grupo Salinas operates as a management development and decision forum for the top leaders of member companies. These companies include TV Azteca (www.TVazteca.com; www.irtvazteca.com), Grupo Elektra ( www.grupoelektra.com.mx ), Banco Azteca ( www.bancoazteca.com.mx ), Purpose Financial ( havepurpose.com ), Afore Azteca ( www.aforeazteca.com.mx ), Seguros Azteca ( www.segurosazteca.com.mx ), Punto Casa de Bolsa ( www.puntocasadebolsa.mx ), Total Play (irtotalplay.mx;

www.totalplay.com.mx) and Total Play Empresarial (totalplayempresarial.com .mx). TV Azteca and Grupo Elektra trade shares on the Mexican Stock Market and in Spain's' Latibex market. Each of the Grupo Salinas companies operates independently, with its own management, board of directors and shareholders. Grupo Salinas has no equity holdings. The group of companies shares a common vision, values, and strategies for achieving rapid growth, superior results, and world-class performance.

Except for historical information, the matters discussed in this press release are concepts about the future that involve risks and uncertainty that may cause actual results to differ materially from those projected. Other risks that may affect Grupo Elektra  and its subsidiaries are presented in documents sent to the securities authorities.

Investor Relations:

Bruno Rangel                                Rolando Villarreal

Grupo Salinas                              Grupo Elektra, S.A.B. de C.V.

Tel. +52 (55) 1720-9167              Tel. +52 (55) 1720-9167

jrangelk@gruposalinas.com.mx   rvillarreal@elektra.com.mx

Press Relations:

Luciano Pascoe

Tel. +52 (55) 1720 1313 ext. 36553

lpascoe@grup osalinas.com.mx

View original content: https://www.prnewswire.com/news-releases/grupo-elektra-announces-material-fact-302207819.html

SOURCE Grupo Elektra, S.A.B. de C.V.

# EXHIBIT 45

**From:** Global Operations <global.operations@astorassetgroup.com>
**Date:** July 30, 2024 at 02:01:55 PDT
**To:** egonzalez@gruposalinas.com.mx, Eduardo Gonzalez Salceda Sanchez
<egsalceda@gruposalinas.com.mx>
**Subject: Notice of Default Letter**

Good Day,

Please see attached letter containing Notice of Default.

This is a Notice of Default and we reserve the right to amend it at any time
and will be doing so.

According to the Loan Agreement, the Loan is now Accelerated and all sums
thereunder are now due, which includes loan amount, custody fees,
maintenance fees, collateral transfer fees and any other fees and costs imposed
by the Custodian Brokers or Astor Asset Management 3 Ltd.

We bring to your attention that the default interest rate according to the Loan
Agreement is 1.5% per month and will accrue for all outstanding debts
effective immediately. This represents an annual fee of 18%.

Should you wish to discuss an informal settlement without prejudice and
avoid the publicity surrounding your default, you may do so by contacting us.
If your preference is to litigate, we will in the courts of England and Wales
seek full remedy afforded to us under the Loan Agreement, including the
return of all monies and fees computed at a monthly 1.5% default interest rate
until such time as you make full settlement of all debts owed.

We would also be willing to enter into a a "Confidential Forbearance
Agreement", whereby this Event of Default will be stayed indefinitely
confidentially.

This Notice of Default and proposed confidential settlement discussion is
being served upon you without prejudice and we reserve all rights afforded to
us under the Loan Agreement and subsequent Addendums executed by the
Lender, Borrower and Guarantor.

**Global Operations**
777 Dunsmuir Street, Suite 1400, Vancouver, BC V7Y 1K4
+1 888 823 0028
Canadian Business #790932503RC0001
Money Service License # M21136919
AstorAssetGroup.com



Please note that while we do our best to respond all inquiries within 24-48 hours, a reply in some instances may take longer.

This e-mail, including attachments, is intended for the person(s) or company named and may contain confidential and/or legally privileged information. Unauthorised disclosure, copying or use of this information may be unlawful and is prohibited. If you are not the intended recipient, please delete this message immediately and notify the sender.

# EXHIBIT 46

# ASTOR ASSET MANAGEMENT 3 LIMITED

July 27, 2024

Corporacion RBS SA de CV
Ave. Ferrocarril de Rio Frio 419 A99
Cuchilla del Moral 1
Iztapalapa
09319 Ciudad de Mexico
Mexico
Tel: 0052551720[0089]
egonzalez@gruposalinas.com.mx


Ricardo Benjamin Salinas Pleigo
Cristobal Colon 79 INT C
Mexico 09360
Tel: +5215530091016
egsalceda@gruposalinas.com.mx


## NOTICE OF DEFAULT

To Whom It May Concern,

This Notice of Default is being served upon you by Astor Asset Management 3 Ltd (the "Lender" or "Astor"). As such, this correspondence shall serve as formal notice that you are in default of the Stock Loan Agreement (the "SLA") that was duly executed between Astor and Corporacion RBS SAD de CV (the "Borrower") on July 14, 2021. The basis for this default is as follows: 1) the failure to timely pay interest and other fees and costs of the Loan; 2) the government investigations related to the Issuer of certain shares of Grupo Elektra SAB DE CV (ELECTRA:MX); 3) your non-payment/failure to comply with local tax requirements which constitutes a Material Event as defined; 4) your failure to disclose material information and provide requisite notification to the Lender that assets of Salinas/Grupo Elektra had been threatened with confiscation; 5) your failure to comply with Annual Notice Provisions you owed

# ASTOR ASSET MANAGEMENT 3 LIMITED

to the Lender; 6) your repeated interference in the custody of the Pledged Collateral; 7) tax liability to government of Mexico of Four Billion Eight Hundred Million United States Dollars and your refusal to pay it (US$4,800,000,000); 8) material degradation on Issuer earnings; 9) government confiscation of assets of Guarantor; 9) failure to make a regulatory announcement; 10) Fitch downgrade of Issuer on concerns of mismanagement; and 11) a Material Event upon the financial condition of Borrower, Guarantor or Issuer.  Therefore, for the reasons contained herein, you are hereby notified that you are in default of the SLA which has resulted in the Lender terminating the SLA and accelerating any and all amounts due thereunder together with any other remedy which may be afforded to the Lender.

## Failure to Pay Interest and Fees & Costs of the Loan

As you are aware, the SLA provided that the Loan would bear interest at the rate of one and fifteen hundredths of a percent (1.15%) per year to be paid to Lender in monthly installments (with the first interest payment being deducted from the Loan proceeds at the time of funding), and subsequent interest to be paid on the first Business Day of each month.  See, Section 2(a) and 2(c) of the SLA, the applicable parts of which are set forth below:

### 2. *Interest Rate*

*2(a)  All outstanding amounts of the Loan shall bear an interest rate in an amount equal to one and fifteen one hundredths of a percent (1.15%) per year.*

*2(c)  The first interest payment shall be subtracted from Loan proceeds at the time of the funding.  Further interest payments for the Loan shall be due timely on the first Business Day of each month following the Closing Date, and such payment schedule shall be based on twelve months per calendar year, regardless of the actual number of days between the applicable Closing Date and the date such first interest payment is due.*

# ASTOR ASSET MANAGEMENT 3 LIMITED

It is significant that in 2022, 2023 and 2024, you repeatedly failed to make timely interest payments more than two (2) dozen times.  In May 2023, you finally (and only after numerous collection attempts on Lender's part) paid interest which had been overdue for at least seven months.  Earlier in 2024 you paid for interest due for the entire preceding year in a lump sum as

opposed to monthly. Failing to pay interest when due is an Event of Default under Section VI, subsection 3(a) of the SLA which reads as follows:

> *Failure by Borrower or Guarantor to pay the interest and all applicable frees or charges when due as stipulated or the Approved Loan Amount when due, or any other default in the performance of an obligation that is not cured within the applicable Cure Period.*

As you are also aware, you were required to pay a Maintenance Fee of 0.0625% of the Loan Principal Amount every three (3)months of the Loan Term.  See, Section 3(b) of the SLA which is set forth below:

> *Maintenance Fee.  Borrower shall pay Lender every three (3)month's the maintenance fee of six and twenty-five hundredths basis points (0.0625%) of the Loan Principal Amount ("Lender's Maintenance Fee").  The Lender is authorized to deduct the Maintenance Fee in advance from the Loan Principal Amount for the first period, it shall be memorialized in the Closing Statement and the same exact amount shall be paid by Borrower, automatically and without further demand, every four months thereafter for all the years constituting the Term of the Loan.  Lender's Maintenance Fee is non-refundable and will be paid in advance.*

You repeatedly failed to pay Maintenance Fees when due as required under the SLA, and as such, an Event of Default has occurred under Section VI(3)(a) as set forth above.

Additionally, the SLA required you to pay an annual Custodian Management Charge based on the cumulative net asset value of all Dedicated Depository Account(s) at time of delivery of the Pledged Collateral and limited to fifteen hundredths of one (0.15%) percent.  See, Section 3(d) of the SLA which states, in applicable part, as follows:

# ASTOR ASSET MANAGEMENT 3 LIMITED

*Expenses.  For the services provided, the Depository Brokers engaged in the performance of this Agreement are entitled to an annual custodian management charge to be paid by Borrower based on the cumulative net asset value of all Dedicated Depository Account(s) at time of delivery of the Pledged Collateral and limited to fifteen hundredths of one (0.15%) percent.  The annual custodian management charge is exclusive of any transaction fee, transfer fee, exit fee, or other administrative costs and fees which Depository Broker may possibly impose. Such fee shall be nonrefundable and shall be paid one (1) year in advance.  First year's fee may be deducted from the Loan proceeds or charged to Borrowers account directly by the Depository Broker.  In subsequent years, the Borrower will remit to Lender the exact same fee every year at least fourteen (14) days prior to the Effective Date, to be remitted by Lender to Depository Broker.*

The failure to timely pay the Custodian Management Charge constitutes an additional Event of Default under Section VI(3)(a) as set forth above. You have ignored repeated demands to pay the Custodian Management Charge.

## Government Investigation

As you are aware, on November 30, 2022, the Federal Court of Administrative Justice ordered the Issuer[1] to pay nearly Five Billion Pesos (5,000,000,000) in taxes (the "November 30th Order" or "Order"); this Order was made in direct response to the Issuer's improperly generated tax losses.  No doubt, such an Order is the culmination of an investigation into the Issuer and its reported tax losses. Section VI.3(f) states that an Event of Default occurs if:

*A governmental agency which controls the actions of Issuer has commenced an investigation of the Issuer.*

We have recently determined thru media that there are 17 open court tax cases against the Guarantor.

---

[1] Grupo Elektra

# ASTOR ASSET MANAGEMENT 3 LIMITED

Therefore, given that there was an investigation into the Issuer by a government agency that most certainly can and does control the actions of the Issuer, an Event of Default has occurred for which there is no cure.

## Material Event – Non-Payment of Taxes

Moreover, the aforementioned November 30th, 2022 Order constitutes a Material Event given that an order to pay nearly Five Billion Pesos (5,000,000,000) is certainly an event which may, and in all likelihood, will, undermine or alter the value of the Collateral. The SLA defines a "Material Event" as "*any event of possible outcome which may undermine or alter the value of the Collateral or prejudice Lender's standing Lien*". Given this, the Order undoubtedly constitutes a Material Event as defined which is an Event of Default under Section VI.3(g) of the SLA. Section VI.3(g) states:

> *A Material Event upon the financial condition of the Borrower, Guarantor, or Issuer.*

On or about March 20th, 2024 the tax authorities of government of Mexico stated that Ricardo Salinas owes the Mexican government Sixty Three Billion Pesos (63,000,000,000) or Three Billion Eight Hundred Million United States Dollars (US$3,800,000,000), has 17 open and unresolved tax lawsuits and proceed to seize a golf course owned by Ricardo Salinas. Some media outlets report that a number of companies, including the Issuer may be seized and confiscated by the Mexican tax authorities. We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

Mr. Ricardo Salinas had immediately stated publicly that he will not pay the tax obligations and will challenge them in court. According to public articles, a threat of further confiscation of assets is a possibility, including his shares of ELEKTRA:MX as Mr. Ricardo Salinas continues to demonstrate his defiance to pay taxes due. We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

# ASTOR ASSET MANAGEMENT 3 LIMITED

On or about June 13th, 2024 it is publicly reported that the Mr. Ricardo Salinas has been ordered to pay One Billion United States Dollars (US$1,000,000,000) in taxes. The court rulings are not final and represent a substantial amount of Mr. Ricardo Salinas assets. We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

Therefore, yet another Event of Default has occurred for which there is no cure.

**Misrepresentation on Know Your Client Form**

On the KYC Form, you had misrepresented that there are no lawsuits, arbitrations, claims or demands for damages.

**Failure to Make Regulatory Announcement**

As an "Affiliate Entity/Insider" you were obligated to make a regulatory announcement as to this loan, yet you had failed to do so. We deem this to be a Material Event as defined and an Event of Default under Section IV.2 of the SLA.

**Suspension of Trading of Issuer**

On Friday July 26th, 2024 you had requested of Mexican Stock Exchange that the securities of Issuer are suspended from trading. This undermines the Collateral and is a breach of the SLA. We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

**Public Announcement as to Fraud of Issuer**

777 Dunsmuir Street, Suite 1400
Vancouver, British Columbia, Canada V7Y 1K4

# ASTOR ASSET MANAGEMENT 3 LIMITED

On Friday July 26th, 2024 you had released a public announcement declaring that you had learned of a "possible fraud by depositories of your shares". We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

**Downgrade of Issuer by Fitch**

On March 11th, 2024 Fitch downgrades Issuer and states; "The downgrade reflects Fitch's concerns about corporate governance practices at Grupo Salinas, which controls Elektra, Total Play and TV Azteca".

**History of Non-Payment of Liabilities**

The Guarantor has a history of failing to pay his creditors as it the case with TV Azteca, threat of bankruptcy and Guarantor releasing public statements that his firm is "too poor to pay US bondholders the tens of millions owed". We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

**Failure to Disclose Material Information and Provide Requisite Notification to Lender**

It has come to our attention that Mexican tax authorities had threated to confiscate assets of Salinas/Grupo Elektra which you failed to disclose to the Lender.  Such information involving the confiscation of the Borrower's assets is deemed a "Material Event" pursuant to Section I subsection 40 of the SLA because if the Borrower's Collateral were to be confiscated, it would undoubtedly affect the Lender's lien:

> *"Material Event"* shall mean any event or possible outcome which may undermine or alter the value of Collateral or prejudice Lender's standing Lien.

A Material Event upon the financial condition of Borrower, Guarantor or Issuer is an Event of Default pursuant to Section VI.3(g) of the SLA.

# ASTOR ASSET MANAGEMENT 3 LIMITED

Moreover, your failure to disclose the threatened confiscation of assets to the Lender is a direct violation of the Material Information clause contained in Section III, subsection 3 of the SLA which is set forth below:

> **Material Information.** *Borrower and Guarantor have tendered any and all relevant and material information regarding the Pledged Collateral and of the Issuer and all such relevant and material information has been disclosed and provided by Borrower and Guarantor to Lender. During the Loan Term, Borrower and Guarantor will continue to voluntarily provide all such relevant and material information to Lender and not withhold information deemed to be Material.*

The aforementioned lack of disclosures also constitutes a breach of the "Full Disclosure" provisions contained in Section IV.3 of the of the SLA as follows:

> **Full Disclosure.** *Borrower and Guarantor further represents and warrants that all statements and documentation it has provided to Lender directly or through its agents in connection this Agreement are true, complete, and do not omit any material facts or information, which if provided, would have impacted Underwriting prudency. Borrower and Guarantor consent to provide to Lender any and all relevant material information which is necessary for any Lender to conduct a prudent risk assessment evaluation of Issuer, Guarantor and Borrower.*

Additionally, Section IV of the SLA contains *"Borrower's Warranties and Obligations" and* subsection 9 therein requires the Borrower and Guarantor to promptly inform the Lender in writing if any creditor has sought or is threatening to seek confiscation of the Borrower or Guarantor's property. See, Section IV, subsection 9 of the SLA set forth below:

> **Notification to Lender.** *Upon occurrence of any of any of the foregoing events or whenever they shall occur, the Borrower or Guarantor shall promptly inform Lender in writing if a) Borrower or Guarantor has filed for Bankruptcy or filed any petition seeking creditor protection; b) any creditor of Borrower or Guarantor has*

# ASTOR ASSET MANAGEMENT 3 LIMITED

*taken legal action against Borrower or Guarantor to recover debts owed to it; c) any creditor has sought or is threatening to seek confiscation or garnishment of property of Borrower or Guarantor. Absent of the preceding events, Borrower and Guarantor will once per year, on each anniversary of the Effective Date, submit a written attestation to Lender representing that to the best of Borrower's knowledge none of the preceding events had taken place.*

Pursuant to Section IV, subsection 9 of the SLA, the Borrower unequivocally should have provided written notification to the Lender that the Mexican tax authorities had threatened to confiscate the assets of Salinas/Grupo Elektra. At no time had you contacted the Lender to provide material information as required. The Borrower's failure to provide such written notification is obviously an "omission" intended to mislead the Lender, and as such, it is an Event of Default under Section VI(d) of the SLA.

*If any representation or warranty made by Borrower or Guarantor in this Agreement or in any statement furnished in contemplation of obtaining a Loan shall prove to have been knowingly untrue, omitted or misleading in any material respect.*

## Failure to Comply with Annual Notice Provision

Section IX.23 of the SLA required the Borrower and Guarantor to provide an annual statement on the anniversary of the Effective Date throughout the Term of the Loan, declaring whether Borrower or Guarantor had obtained other loans from any third parties by pledging securities of the same Issuer; whether there has been a material change in the Borrower's or Guarantor's financial condition such as bankruptcy or insolvency; or if any material lawsuits had been filed against them. See, Section IX.23 of the SLA, which is set forth below:

*Notice. Borrower and Guarantor further represent and warrant that they will yearly, on the anniversary of the Effective Date, submit a written statement to Lender by means of declaration stating whether Borrower or Guarantor obtained*

# ASTOR ASSET MANAGEMENT 3 LIMITED

*any other loans from any third parties pledging securities of same Issuer and whether there has been a material change in Borrowers or Guarantors financial condition, such as bankruptcy or insolvency filing of Borrower or Guarantor or of any entity controlled by Borrower or Guarantor. Borrower and Guarantor must also declare if any material lawsuit has been filed against it.*

The Borrower and Guarantor were mandated to produce the requisite annual statement. They have completely and utterly failed to provide this to the Lender as required under Section IX.23 of the SLA for any year. We deem this to be a Material Event as defined and a breach of Section IX.23 of the SLA.

**Material Earnings Event**

Simply Wall Street has released an analysis on July 26, 2024 that the Issuer's earnings have declined by 34% per year over the past 5 years and deemed this to be a major risk. Second Quarter earnings for Issuer are reported as MXN$2.90 loss per share, versus MX$N22.34 profit Second Quarter of 2023.

The Issuer reported a MXN$7.3 billion loss versus a profit of MXN$4.94 billion for the same period last year.

On Friday July 26, 2024 the stock of the Issuer dropped ten percent (10%), which according to Bloomberg Financial News is the "biggest intraday drop since June of 2017".

We deem this to be a Material Event upon the Issuer as defined and an Event of Default under Section VI.3(g) of the SLA.

A Material Event is defined within the SLA as:

777 Dunsmuir Street, Suite 1400
Vancouver, British Columbia, Canada V7Y 1K4

# ASTOR ASSET MANAGEMENT 3 LIMITED

*Material Event"* shall mean any event or possible outcome which may undermine or alter value of Collateral or prejudice Lender's standing Lien.

**Custody of Collateral Interference**

On multiple occasions you and your agents have contacted the Custodian Brokers interfering in the custody of the Collateral and dictating to Lender where and how the Collateral should be custodied. This conduct has been consistent and started in the Fourth Quarter of 2021 when you demanded that the Collateral move from Weiser Global Capital Markets ("Weiser") elsewhere. We accommodated your request and moved the uncollateralized portion of the Collateral to Tavira Monaco SA ("Tavira"). You continued in years 2022 and 2023 and 2024 to question where and how the Collateral is custodied, demanding to know where and how and who the sub-custodians are of Weiser and Tavira and what they should and should not be doing with the Collateral. We reference your letter to Lender and Custodian Brokers dated June 10th, 2024 which contains numerous breaches of the SLA, demanding that the Collateral not be lent out, when in the SLA you expressly agreed and understood that the Collateral will be subject to provisions of the Encumbrance Clause and your agents were repeatedly told to read the SLA and its provisions.

Your June 10th, 2024 letter to Custodian Brokers contains numerous demands and threats which are very serious, are deemed as interference and are contrary to the Terms and Conditions of the SLA which you had willingly executed while being represented by counsel.

The Know Your Client form which you had completed for both the Borrower and for the Guarantor, you had ticked the box that you were being represented by an attorney. Thus, you were aware and advised of your contractual obligations under the SLA. That, together with the fact that the Guarantor is a highly seasoned and sophisticated professional investor who commands perfect knowledge of the English language, there is no basis for you to repeatedly defy the SLA and its Terms and Conditions.

You repeatedly continued to demand that the Collateral from Weiser and Tavira is moved to a brand new Custodian, despite being repeatedly told that custody and selection of Custodian Broker is not for Borrower or Guarantor to decide as is clearly stated in Section IV.10 of the SLA, thus

# ASTOR ASSET MANAGEMENT 3 LIMITED

continuing to defy and challenge your contractual obligations. We deem this to be a Material Event as defined and a breach.

The SLA is very clear that the Lender selects the Custodian Broker, yet you continue to demand how and where the Collateral is custodied demanding to know who the sub-custodians are, making demands upon the sub-custodians and what should happen to the Collateral which is in the control of Lender and the Custodian Brokers, in violation of the SLA.  Interference is strictly prohibited under the SLA Section III.4 and Section IV.10 which states:

> *During the pendency of this Loan, neither the Borrower nor Guarantor will seek injunctive relief or interference from any court of law, regulatory body, Transfer Agent, custodian, sub-custodian, Depository Broker, central depository or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement or freeze the shares. Injunctive relief by Borrower or Guarantor or any interference by Borrower or Guarantor, central depository or regulatory agency shall be an immediate and an incurable Event of Default. Neither Borrower nor Guarantor will interfere in any way or challenge the validity or enforceability of this Agreement, and the same shall be a Breach thereof.*

Amongst other provisions, the SLA states:

> *Neither Borrower nor Guarantor will undermine or interfere with securities of Issuer.*

> *Lender reserves the right to maintain dominion over the Collateral during the Loan Term, which affords Lender the right to deal-in, dispose or convert over the Pledged Collateral.*

## Lock-Up Breach

In the month of July 2024, you have repeatedly demanded to repay the Loan early, despite being repeatedly told that the SLA does not provide for an early repayment. This is a breach of Section VI(3)(e)(f) and Section II(5) and Section IV.3 prohibiting early termination

# ASTOR ASSET MANAGEMENT 3 LIMITED

**Lender's Remedy**

It is important to note that Pursuant to Section VI.2 of the SLA, the Lender is not obligated to complete the Loan transaction to Maturity if the Borrower and Guarantor fail to comply with the terms and conditions of the SLA.

> *Valid Transactions and Events of Default. In order for the transaction to be completed to Maturity by the Borrower, the Borrower and Guarantor must fulfill in the performance of and observance of any covenant, representation, provision or agreement contained herein and not default in any other loan document or provision.*

This letter has set forth in detail some but not all of the breaches of the SLA and Events of Default that have occurred. Ultimately, as you have failed to cure the Events of Default detailed herein and not able to cure them, the Lender hereby declares an Event of Default and hereby accelerate all costs and fees due thereunder.

This letter is without prejudice to all of Astor's rights and remedies in accordance with the SLA. We reserve the right to amend this Notice of Default at any time of our choosing.

Sincerely,

*Astor Asset Management 3 Ltd*

Astor Asset Management 3 Ltd.
Global Operations Department

# EXHIBIT 47

**From:** Ayaz Rashid <ayaz.rashid@tavira.group>
**Date:** August 1, 2024 at 03:27:52 AKDT
**To:** Javier Gayo <javier.gayo@fininvesta.com>, Luke Harris
<luke.harris@tavira.group>, INTL Operations
<INTLOperations@tavirasecurities.com>
**Cc:** Alexandre Torti <alexandretorti@hotmail.com>, Zara Akbar <zara@enness.je>,
Eduardo Gonzalez Salceda Sanchez <egsalceda@gruposalinas.com.mx>
**Subject: RE: TMC63 end of month statement**

Dear Javier

Under the terms of the CMA the lender (Astor) instructed us to move the shares to
Astor's account.

Thanks

**From:** Javier Gayo <javier.gayo@fininvesta.com>
**Sent:** Thursday, 1 August 2024 1:37 PM
**To:** Ayaz Rashid <ayaz.rashid@tavira.group>; Luke Harris <luke.harris@tavira.group>; INTL Operations <INTLOperations@tavirasecurities.com>
**Cc:** Alexandre Torti <alexandretorti@hotmail.com>; Zara Akbar <zara@enness.je>; Eduardo Gonzalez Salceda Sanchez <egsalceda@gruposalinas.com.mx>
**Subject:** Fwd: TMC63 end of month statement
**Importance:** High

Good morning,

Please confirm us where did you transferred the shares?

Nominal of 6,268,383shs

Regards
JGS

# F I N I N V E S T A

Javier Gayo Somoza
javier.gayo@fininvesta.com
Cell: +41.78.657.25.86

Début du message réexpédié :

**De:** Ayaz Rashid <ayaz.rashid@tavira.group>
**Objet: TMC63 end of month statement**
**Date:** 1 août 2024 à 12:21:46 UTC+2
**À:** Javier Gayo <javier.gayo@fininvesta.com>
**Cc:** alexandre torti <alexandretorti@hotmail.com>, Zara Akbar <zara@enness.je>, Luke Harris <luke.harris@tavira.group>, INTL Operations <INTLOperations@tavirasecurities.com>

Good Morning

Pls see attached the end of month statement for TMC63.

Thanks

# EXHIBIT 48

**31/07/2024  21:00:00 PM**



**Client Information**

| Name | TMC63- Ricardo Salinas | Address | Cristobal Colon 79 Int c<br>Mexico 09360 | Account ID TMClient63<br>Trade Date 20240731 |
| --- | --- | --- | --- | --- |

**Positions Overview**

| ACCOUNT | SECURITY | DESCRIPTION | ISIN | SEDOL | QUANTITY | PRICE | CURRENCY | VALUE LOCAL CCY | VALUE |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| TMClient63 | CASH MXN | MXN CASH BALANCE | | | 20,000.00 | - | MXN | 20,000.00 | 1,091.90 |
| TMClient63 | CASH USD | USD CASH BALANCE | | | 1,223.90 | - | USD | 1,223.90 | 1,223.90 |
| | | | | | | | | TOTAL | 2,315.80 |

Tavira Monaco Sam<br>6 BD des Moulins 9800 Monaco<br>RCI 09 S 05059

31/07/2024  21:00:00 PM

## Trades Overview



| TRADE DATE | SETTLE DATE | ACCOUNT ID | ISIN | SECURITY DESCRIPTION | ORDER | Gross Price | Quantity | NOTIONAL AMOUNT | COMMISH AMT | FEES AMT | SEC CCY | NET PRICE | SEC CCY AMT | SETTLE CCY | SETTLE CCY AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15/12/2021 | 15/12/2021 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 2,350,000.00 | - | - | - | MXN | - | - | MXN | 0 |
| 18/01/2022 | 20/01/2022 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 186,078.00 | - | | | MXN | - | - | MXN | 0 |
| 20/01/2022 | 20/01/2022 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 120,000.00 | | | | MXN | - | - | MXN | 0 |
| 19/01/2022 | 19/01/2022 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 7,395,224.00 | 7,395,224.00 | | | MXN | - | 7,395,224.00 | MXN | 7,395,224 |
| 25/02/2022 | 25/02/2022 | TMClient63 | | MXN Cash Received | Cash Received | 0 | 7,395,224.00 | 7,395,224.00 | | | MXN | - | 7,395,224.00 | MXN | 7,395,224 |
| 22/06/2022 | 22/06/2022 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 1,431,700.00 | | | | MXN | | | MXN | 0 |
| 14/06/2022 | 14/06/2022 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 3,309,489.09 | 3,309,489.09 | | | MXN | - | 3,309,489.09 | MXN | 3,309,489 |
| 28/06/2022 | 28/06/2022 | TMClient63 | | Elektra Dividend | Cash Received | 0 | 21,298,092.40 | 21,298,092.40 | | | MXN | - | 21,298,092.40 | MXN | 21,298,092 |
| 07/06/2022 | 07/06/2022 | TMClient63 | | MXN Cash Withdrawal Fee | Cash Paid | 0 | 1,000.00 | 1,000.00 | | | MXN | - | 1,000.00 | MXN | 1,000 |
| 14/07/2022 | 18/07/2022 | TMClient63 | | MXNUSD FX | Sell | 0 | 17,968,000.00 | 857,411.43 | | | MXN | 0.047719 | 17,968,000.00 | USD | 857,411 |
| 20/07/2022 | 20/07/2022 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 857,411.44 | 857,411.44 | | | USD | - | 857,411.44 | USD | 857,411 |
| 20/07/2022 | 20/07/2022 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 237,973.00 | 237,973.00 | | | USD | - | 237,973.00 | USD | 237,973 |
| 07/06/2022 | 07/06/2022 | TMClient63 | | USD Received | Cash Received | 0 | 237,973.07 | 237,973.00 | | | USD | - | 237,973.00 | USD | 237,973 |
| 15/12/2022 | 15/12/2022 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 6,346,114.77 | 6,346,114.77 | | | USD | - | 6,346,114.77 | USD | 6,346,115 |
| 03/04/2023 | 03/04/2023 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 128,207.00 | | | | MXN | | | MXN | 0 |
| 04/04/2023 | 04/04/2023 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 1,600,000.00 | | | | MXN | | | MXN | 0 |
| 24/04/2023 | 24/04/2023 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 30,284,768.80 | 30,284,769.00 | | | MXN | - | 30,284,769.00 | MXN | 30,284,769 |
| 12/09/2023 | 12/09/2023 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 340,000.00 | | | | MXN | | | MXN | 0 |
| 12/09/2023 | 12/09/2023 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 104,389.00 | | | | MXN | | | MXN | 0 |
| 12/09/2023 | 12/09/2023 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 2,000.00 | 2,000.00 | | | MXN | - | 2,000.00 | MXN | 2,000 |
| 21/09/2023 | 21/09/2023 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 30,262,768.80 | 30,262,768.80 | | | MXN | - | 30,262,768.80 | MXN | -30262769 |
| 15/12/2023 | 15/12/2023 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 157,644.35 | 157,644.35 | | | USD | - | 157,644.35 | USD | -157644 |
| 23/01/2024 | 23/01/2024 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 157,644.35 | 157,644.35 | | | USD | - | 157,644.35 | USD | 157,644 |
| 18/01/2024 | 18/01/2024 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 21,210.00 | 21,210.00 | | | USD | - | 21,210.00 | USD | 21,210 |
| 27/03/2024 | 27/03/2024 | TMClient63 | | USD Received | Cash Received | 0 | 22,000.00 | 22,000.00 | | | USD | - | 22,000.00 | USD | 22,000 |
| 25/04/2024 | 25/04/2024 | TMClient63 | | Elektra Dividend | Cash Received | 0 | 32,595,591.60 | 32,595,591.60 | | | MXN | - | 32,595,591.60 | MXN | 32,595,592 |
| 14/05/2024 | 14/05/2024 | TMClient63 | | USD Buy | Cash Received | 0 | 32,595,591.60 | 32,595,591.60 | | | MXN | - | 32,595,591.60 | MXN | 32,595,592 |
| 14/05/2024 | 14/05/2024 | TMClient63 | | Elektra Dividend | Cash Received | 0 | 1,936,847.33 | 1,936,847.33 | | | USD | - | 1,936,847.33 | USD | 1,936,847 |
| 14/05/2024 | 14/05/2024 | TMClient63 | | Transfer to TMC04 | Cash Paid | 0 | 1,771,080.04 | 1,771,080.04 | | | USD | - | 1,771,080.04 | USD | 1,771,080 |
| 14/05/2024 | 14/05/2024 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 168,849.55 | 168,849.55 | | | USD | - | 168,849.55 | USD | 168,850 |
| 29/07/2024 | 29/07/2024 | TMClient63 | MX01EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Delivery Out | 0 | 6,268,383.00 | | | | MXN | | | MXN | 0 |

Tavira Monaco Sam
6 BD des Moulins 98000 Monaco
RCI 09S 05059

# EXHIBIT 49

Claim No: CL-2024-000450

CL-2024-000450

IN THE HIGH COURT OF JUSTICE

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

COMMERCIAL COURT (KBD)

IN PRIVATE

On 2 August 2024

Before the Honourable Mr Justice Jacobs


BETWEEN:

(1) RICARDO BENJAMIN SALINAS PLIEGO

(2) CORPORACION RBS SA DE CV

Applicants/Claimants

-and-

(1) ASTOR ASSET MANAGEMENT 3 LIMITED

(2) WEISER GLOBAL CAPITAL MARKETS LTD

(3) TAVIRA MONACO SAM

(4) VLADIMIR "VAL" SKLAROV

Respondents/Defendants

-------------------------------------------------------

FREEZING AND PROPRIETARY ORDER
-------------------------------------------------------


PENAL NOTICE


IF YOU ASTOR ASSET MANAGEMENT 3 LIMITED, WEISER GLOBAL CAPITAL MARKETS LTD, TAVIRA MONACO SAM AND VLADIMIR "VAL" SKLAROV DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE RESPONDENTS TO BREACH THE TERMS OF THIS ORDER

**MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

**THIS ORDER**

1.  This order contains a freezing injunction made against: (1) the First Respondent, Astor Asset Management 3 Limited; and (2) the Fourth Respondent, Vladimir "Val" Sklarov. This Order also contains proprietary injunctions and orders for associated relief against: (1) the First Respondent; (2) the Second Respondent, Weiser Global Capital Markets Ltd; (3) the Third Respondent, Tavira Monaco SAM; and (4) the Fourth Respondent (together, "**the Respondents**"). This order was made on 2 August 2024 by Mrs/Mr Justice Jacobs on the application of: (1) Ricardo Benjamin Salinas Pliego; and (2) Corporacion RBS SA DE CV ("**the Applicants**"). The Judge read the Affidavit listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order.

2.  This order was made at a hearing without notice to the Respondents, at which the Court was satisfied that it was in the interests of justice to sit in private. Pursuant to CPR rule 39.2(5), this order is not to be published on the judiciary website. The Respondents have a right to apply to the Court to vary or discharge the order—see paragraph 18 below.

3.  There will be a further hearing in respect of this order on 29 August 2024 with a time estimate of 1½ hours ("**the return date**").

4.  This order is effective against any Respondent on whom it is served or who is given notice of it.

**FREEZING INJUNCTION AGAINST THE FIRST AND FOURTH RESPONDENTS**

5.  Until after the return date or further order of the Court, each of the First and Fourth Respondent must not:

    (a)  remove from England and Wales any of its or his assets which are in England and Wales up to the value of MXN 5,411,000,000 ("**the Limit**"); or

    (b)  in any way dispose of, deal with or diminish the value of any of its or his assets which are in or outside England and Wales up to the Limit.

6.   Paragraph 5 applies to all of the First and Fourth Respondents' assets whether or not they are in its or his own name and whether they are solely or jointly owned. For the purpose of this order, the First and Fourth Respondents' assets include any asset which it or he has the power, directly or indirectly, to dispose of or deal with as if it were its or his own.

7.   The prohibition at paragraph 5 includes the following assets in particular:

(a)   Any money standing to the credit of the First or Fourth Respondents in any bank account including the amount of any cheque drawn on such accounts which has not been cleared.

(b)   Any interest under any trust or similar entity including any interest which can arise by virtue of the exercise of any power of appointment, discretion or otherwise howsoever.

(c)   Any shareholdings beneficially owned by the First or Fourth Respondents or the proceeds of sale if any of them have been sold.

8.   If the total value free of charges or other securities ("**unencumbered value**") of each of the First and Fourth Respondents' assets in England and Wales exceeds the Limit, the relevant Respondent may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of the Respondent's assets still in England and Wales remains above the Limit.

9.   If the total unencumbered value of each of the First and Fourth Respondent's assets in England and Wales does not exceed the Limit, the relevant Respondent must not remove any of those assets from England and Wales and must not dispose of or deal with any of them. If the relevant Respondent has other assets outside England and Wales, he or it may dispose of or deal with those assets outside England and Wales so long as the total unencumbered value of all its or his assets whether in or outside England and Wales remains above the Limit.

**PROPRIETARY INJUNCTION AGAINST ALL OF THE RESPONDENTS**

10.   Until the return date or further order of the court, the Respondents must not in any way dispose of, diminish, deal with, charge, pledge or in any way howsoever deal with the

legal or equitable title to or diminish the value of any of the Collateral Shares or their proceeds if they have been sold or otherwise disposed of. The term "Collateral Shares" is defined in paragraph 21 below.

**PROVISION OF INFORMATION BY ALL OF THE RESPONDENTS**

11.    Subject to paragraph 13 below:

    (a)   each of the First and Fourth Respondents must by 5pm London time on 6 August 2024 and to the best of their ability inform the Applicants' solicitors in writing of:

        (i)   all their assets worldwide exceeding £10,000 in value whether in their own name or not and whether solely or jointly owned, giving the value, location and details of all such assets;

        (ii)   whether they hold any Collateral Shares and/or their traceable proceeds and if so the value of said shares or proceeds; and

    (b)   each of the Second and Third Respondents must by 5pm London time on 5 August 2024 and to the best of their ability inform the Applicants' solicitors in writing of whether they hold any Collateral Shares and/or their traceable proceeds and if so the value of said shares or proceeds.

12.    Subject to paragraph 13 below, within 7 days of being served with this order, each of the Respondents must swear and serve on the Applicants' solicitors an affidavit providing the information requested in paragraph 11 above and Schedule C below.

13.    If the provision of any of this information is likely to incriminate the Respondent, she or he may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of Court and may render the Respondent liable to be imprisoned, fined or have its, her or his assets seized.

**EXCEPTIONS TO THIS ORDER**

14.    This order does not prohibit the Respondents from dealing with or disposing of any of its assets in the ordinary and proper course of business and does not prevent the Respondents from spending a reasonable sum on legal advice and representation (so

long as this money does not come from the assets set out in paragraph 10 of this order). Further, this order does not prohibit the Fourth Respondent from spending £10,000 a month towards his ordinary living expenses.

15.    The Respondents may agree with the Applicants' legal representatives that the above spending limit should be increased or that this order should be varied in any other respect, but any agreement must be in writing.

16.    The order will cease to have effect as against each Respondent if it or he:

(a)    provides security by paying an amount equivalent to the Limit (as set out in paragraph 5 of this order) into Court, to be held to the order of the Court; or

(b)    makes provision for security in that sum by another method agreed with the Applicants' legal representatives.

**COSTS**

17.    The costs of this application are reserved to the Judge hearing the application on the return date.

**VARIATION OR DISCHARGE OF THIS ORDER**

18.    Anyone served with or notified of this order may apply to the Court at any time to vary or discharge this order (or so much of it as affects that person), but they must first give the Applicants' solicitors three working days' notice of their intention to do so. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicants' solicitors.

**INTERPRETATION OF THIS ORDER**

19.    A Respondent who is an individual who is ordered not to do something must not do it herself or himself or in any other way. She or he must not do it through others acting on her or his behalf or on her or his instructions or with her or his encouragement.

20.    A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

21.   The term "Collateral Shares" shall mean any shares (or interests in shares) in the capital of Grupo Elektra SAB De CV held or formerly held by or for the First Applicant (and includes, for the avoidance of doubt, the traceable proceeds thereof if they have been sold or otherwise disposed of).

**PARTIES OTHER THAN THE APPLICANTS AND RESPONDENTS**

22.   **Effect of this order**

It is a contempt of Court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

23.   **Set off by banks**

This injunction does not prevent any bank from exercising any right of set of it may have in respect of any facility which it gave to the respondent before it was notified of this order.

24.   **Withdrawals by the Respondents**

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondents if the withdrawal appears to be permitted by this order.

25.   **Persons outside England and Wales**

(a)   Except as provided in paragraph 25(b) below, the terms of this order do not affect or concern anyone outside the jurisdiction of this Court.

(b)   The terms of this order will affect the following persons in a country or state outside the jurisdiction of this Court:

(i)   the Respondents or their officers or their agents appointed by power of attorney;

(ii)  any person who–

1.   is subject to the jurisdiction of this Court;

2.   has been given written notice of this order at its, her or his residence or

place of business within the jurisdiction of this Court; and

     3.    is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this order; and

(iii)  any other person, only to the extent that this order is declared enforceable by or is enforced by a Court in that country or state

26.    **Assets located outside England and Wales**

Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party from complying with:

(a)  what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

(b)  any orders of the Courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicants' solicitors.

**SEALING OF THE COURT FILE**

27.    Until the Applicants inform the Court in writing that this order has been served on the Respondents, pursuant to CPR 5.4B and 5.4C(4):

(a)  the documents on the Court file shall not be open to inspection on the Court file by any person, and shall be kept sealed;

(b)  the documents on the Court file shall not appear on any Electronic Working Case File (as defined in paragraph 2.4 of Practice Direction 51O) or on any part of the Website (as defined in paragraph 2.3(a) of Practice Direction 51O);

(c)  no person other than the Applicants shall be entitled to inspect or obtain copies of any of the documents on the Court file.

**COMMUNICATIONS WITH THE COURT**

All communications to the Court about this order should be sent to the Admiralty and Commercial Court Listing Office, 7 Rolls Building, Fetter Lane, London, EC4A 1NL quoting

the case number. The telephone number is 020 7947 6826.

The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.

Dated 2 August 2024

**NAME AND ADDRESS OF APPLICANTS' LEGAL REPRESENTATIVES**

The Applicants' legal representatives are-

Paul, Weiss, Rifkind, Wharton & Garrison LLP
20 Air Street
London
W1B 5AN, U.K.

Attn: Stefan J. Arnold-Soulby

Telephone: +44 207 367 1613

Email: SArnoldSoulby@paulweiss.com

## SCHEDULE A — AFFIDAVITS

The Applicants relied on the following affidavit:

(1)    The First Affidavit of EDUARDO GONZALEZ SALCEDA SANCHEZ.

## SCHEDULE B — UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT

(1)     If the Court later finds that this order has caused loss to the Respondents (or any of them), and decides that the relevant Respondent should be compensated for that loss, the Applicants will comply with any order the Court may make.

(2)     As soon as practicable the Applicants will issue a claim form and application notice seeking the relief in this order in the form of the draft produced to the Court and serve in accordance with the order of this Court regarding service of documents on the Respondents dated 2 August 2024.

(3)     The Applicants will serve upon the Respondents in addition to this order as soon as reasonably practicable:

1.   copies of the affidavits and exhibits containing the evidence relied upon by the Applicant, and any other documents provided to the Court on the making of the application;

2.   the claim form;

3.   the Applicants' skeleton argument and a transcript (if available) or note of the hearing; and

4.   an application notice for continuation of the order.

(4)     Anyone notified of this order will be given a copy of it by the Applicants' legal representatives.

(5)     The Applicants will pay the reasonable costs of anyone other than the Respondents which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondents' assets and if the Court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicants will comply with any order the Court may make.

(6)     If this order ceases to have effect (for example, if the Respondents provide security as provided for above) the Applicants will immediately take all reasonable steps

to inform in writing anyone to whom they have given notice of this order, or who they have reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

(7)     The Applicants will not without the permission of the Court use any information obtained as a result of this order for the purpose of any civil or criminal proceedings, either in England and Wales or in any other jurisdiction, other than this claim.

(8)     The Applicants will not without the permission of the Court seek to enforce this order in any country outside England and Wales or seek an order of a similar nature including orders conferring a charge or other security against the Respondents or the Respondents' assets.

## SCHEDULE C — INFORMATION REQUESTS

Requests of the First Respondent:

1.   If and insofar as you hold any of the Collateral Shares, please identify:

   (a)   The dates on which the Collateral Shares were transferred to you; and

   (b)   The basis on which the Collateral Shares were transferred to you;

2.   If and insofar as you held but have subsequently disposed of or transferred away any of the Collateral Shares:

   (a)   Identify the date of every such disposal/transfer and the name of the transferee.

   (b)   Please identify the location of the proceeds of any Collateral Shares that have been disposed of.

Requests of the Second and Third Respondents:

1.   If and insofar as you held but no longer hold any of the Collateral Shares, please:

   (a)   Identify who you transferred the shares to and the dates of each transfer.

   (b)   Identify the basis on which you transferred the shares, including by answering the following questions:

      (i)   On whose instructions you were acting?

      (ii)   If known, who is the specific human person who gave the relevant instructions?

Requests of the Fourth Respondent:

1.   Have you directly or indirectly caused the Collateral Shares to be disposed of?

2.   If the answer to question (1) is "yes":

   (a)   Identify the date of every such disposal and the name of the transferee.

   (b)   What has happened to the proceeds of any Collateral Shares that have been disposed of? Full and complete details must be provided.

# EXHIBIT 50

Claim No: CL-2024-000450

02 Aug 2024

CL-2024-000450

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**IN PRIVATE**

**On 2 August 2024**

**Before the Honourable Mr Justice Jacobs**

**BETWEEN:**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

**Applicants/Claimants**

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS LTD**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV**

**Respondents/Defendants**

**ORDER**

**UPON** the Claimants' claim (the **Claim**) filed by way of claim form dated 2 August 2024 (the **Claim Form**)

**AND UPON** the Claimants' application (the **Service Application**) for permission to serve the Claim Form and all other documents in these proceedings out of the jurisdiction (including for the avoidance of doubt the Claimants' application for interim relief dated 2 August 2024 and any order the Court makes on that application (the **Injunction Application**))

**AND UPON** the Court reading the evidence filed

**AND UPON** this order being made at a hearing without notice to the Respondents

**AND UPON** hearing Stephen Robins KC, counsel for the Claimants

**IT IS ORDERED THAT:**

1.    The Claimant has permission pursuant to CPR 6.36 to serve the Claim Form on the Defendants out of the jurisdiction.

2.    The Claimant has permission pursuant to CPR 6.37(5)(b)(ii) to serve any other documents in these proceedings on the Defendants without obtaining further permission of the Court under CPR 6.36.

3.    The Claimant has permission pursuant to CPR 6.37(5)(b)(i) to serve all documents in these proceedings on the Defendants by email at the following email addresses:

    (a)    Astor Asset Management 3 Limited and Vladimir "Val" Sklarov: albert.yuen@astorassetgroup.com; gregory.mitchell@astorassetgroup.com; operations@astorassetgroup.com; investments18@msn.com; boychic@tivejo.com

    (b)    Weiser Global Capital Markets Ltd: Collateralservices@weiser.com.bs; info@weiser.com.bs; openaccount@weiser.com.bs

    (c)    Tavira Monaco SAM: INTLOperations@tavirasecurities.com; Patrick@fietje.com; patrick.fietje@tavirasecurities.com; eliotgoodfellow@gmail.com; eliot.goodfellow@taviramonaco.com; eliot.goodfellow@tavirasecurities.com; compliance@tavirasecurities.com; backup@tavirasecurities.com; simon.mason@tavirasecurities.com

Service of documents by email as provided for in this paragraph is to be deemed as served on the relevant Defendant at the time the relevant email is sent, even if there is a bounce back from any one or more of the emails.

4.    The following time periods apply following service of the Claim Form in accordance with paragraph 3 above on the Defendants:

    (1)    within 14 days, the Defendants must file an acknowledgment of service and, if appropriate, file and serve an admission;

    (2)    within 28 days of the filing of an acknowledgment of service which indicates an intention to defend, the Claimants must serve particulars of claim; and

    (3)    within 28 days from the service of the particulars of claim, the Defendants must file and serve a defence.

5.    The costs of this application are costs in the case.

**<u>Service of the order</u>**

The Court has provided a sealed copy of this Order to the serving party:

The Claimant, care of its solicitors, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 20 Air St, London W1B 5AN

# EXHIBIT 51

**Alex Jenkins**

| | |
|---|---|
| **From:** | Conformité Tavira Monaco <conformite@taviramonaco.com> |
| **Sent:** | 05 August 2024 16:12 |
| **To:** | Arnold-Soulby, Stefan J |
| **Subject:** | CLAIM NUMBER: CL-2024-000450 - WORLDWIDE FREEZING INJUNCTION - Tavira Monaco SAM |
| **Attachments:** | Elektra.xlsx; AA Redemptions.xlsx; CV Redemptions.xlsx; JIQ Wiring Instructions.pdf; TMC63 Trade Report 20240731.pdf; TMC64 Trade Report 20240731.pdf |

Dear Paul, Weiss, Rifkind, Wharton & Garrison LLP

We refer to the Freezing and Proprietary Order of Mr Justice Jacobs issued and served on 2 August 2024 (the Order).

We are writing in our capacity as the Third Respondent to the Order.

Please find below and attached, pursuant to paragraph 11(b) of the Order, the following information:

Tavira currently holds in custody 336,475 shares of Grupo Elektra SAB De CV valued at USD 15,709,093.

Astor Asset Management 3 Limited rehypothecated the shares to Cornelius Vanderbilt Capital Management Ltd.

The attached Excel file (Elektra.xlsx) shows the dates and amounts of share sales undertaken by Cornelius Vanderbilt Capital Management Ltd.

Astor Asset Management 3 Limited currently has in custody with Tavira USD 963k in cash in its account.

Cornelius Vanderbilt Capital Management Ltd holds in custody with Tavira USD 10.46m in cash plus USD 6.7m worth of other shareholdings.

Attached are the cash redemptions for both Astor Asset Management 3 Limited (AA Redemptions) and Cornelius Vanderbilt Capital Management Ltd (CV Redemptions).

These redemption proceeds were sent to their lawyers' trust account held at JP Morgan Chase (see attached JIQ Wiring Instructions)

Also attached are the trade reports for both Ricardo Salinas and Corporacion RBS SA de CV which show the share and cash movements in the accounts.

In relation to Schedule C of the Order:

If and insofar as you held but no longer hold any of the Collateral Shares, please:

(a) Identify who you transferred the shares to and the dates of each transfer.

6,268,383 shares were transferred from Ricardo Benjamin Salinas Pliego's account to Astor Asset Management 3 Limited's account on 29th July 2024.

(b) Identify the basis on which you transferred the shares, including by answering

the following questions:

(i) On whose instructions you were acting? Tavira was instructed by Astor Asset Management 3 Limited. Astor Asset Management 3 Limited informed Tavira that there had been a loan agreement default and issued an entitlement order under the terms of the Custodian Management Agreement to transfer the shares.

(ii) If known, who is the specific human person who gave the relevant instructions? Elizaveta Lata

Further to paragraph 12 of the Order, please provide us with a draft of the affidavit we are required to submit on behalf of the Third Respondent.

Yours sincerely

Tavira Monaco SAM

(the Third Respondent)

# EXHIBIT 52

| TRADE DATE | SETTLE DATE | ORDER | SECURITY | PORT QTTY | PRICE |
|---|---|---|---|---|---|
| 12/16/2021 | 12/20/2021 | Sell | ELEKTRA*.MX | 2,871.00 | 1,384.6486 |
| 12/17/2021 | 12/21/2021 | Sell Short | ELEKTRA*.MX | 28,667.00 | 1,386.4112 |
| 12/20/2021 | 12/22/2021 | Sell Short | ELEKTRA*.MX | 1,711.00 | 1,398.9724 |
| 12/21/2021 | 12/23/2021 | Sell | ELEKTRA*.MX | 11,655.00 | 1,389.9535 |
| 12/22/2021 | 12/24/2021 | Sell Short | ELEKTRA*.MX | 1,041.00 | 1,391.9327 |
| 12/23/2021 | 12/27/2021 | Sell Short | ELEKTRA*.MX | 9,614.00 | 1,393.1417 |
| 12/24/2021 | 12/28/2021 | Sell Short | ELEKTRA*.MX | 16,284.00 | 1,391.4193 |
| 12/27/2021 | 12/29/2021 | Sell Short | ELEKTRA*.MX | 57,000.00 | 1,386.7296 |
| 12/28/2021 | 12/30/2021 | Sell Short | ELEKTRA*.MX | 50,000.00 | 1,383.2595 |
| 12/28/2021 | 12/30/2021 | Sell Short | ELEKTRA*.MX | 17,155.00 | 1,384.2849 |
| 12/29/2021 | 12/31/2021 | Sell Short | ELEKTRA*.MX | 29,068.00 | 1,398.9195 |
| 12/30/2021 | 1/3/2022 | Sell Short | ELEKTRA*.MX | 50,000.00 | 1,431.5900 |
| 12/31/2021 | 1/4/2022 | Sell Short | ELEKTRA*.MX | 60,000.00 | 1,516.2300 |
| 1/3/2022 | 1/5/2022 | Sell Short | ELEKTRA*.MX | 8,574.00 | 1,472.0200 |
| 1/4/2022 | 1/6/2022 | Sell Short | ELEKTRA*.MX | 11,689.00 | 1,424.1355 |
| 1/5/2022 | 1/7/2022 | Sell Short | ELEKTRA*.MX | 1,651.00 | 1,401.4500 |
| 1/6/2022 | 1/10/2022 | Sell Short | ELEKTRA*.MX | 19,054.00 | 1,384.2130 |
| 1/7/2022 | 1/11/2022 | Sell Short | ELEKTRA*.MX | 10,846.00 | 1,385.9100 |
| 1/10/2022 | 1/12/2022 | Sell Short | ELEKTRA*.MX | 14,083.00 | 1,395.1400 |
| 1/11/2022 | 1/13/2022 | Sell Short | ELEKTRA*.MX | 16,000.00 | 1,423.3600 |
| 1/12/2022 | 1/14/2022 | Sell Short | ELEKTRA*.MX | 15,694.00 | 1,449.2000 |
| 1/13/2022 | 1/17/2022 | Sell | ELEKTRA*.MX | 100,000.00 | 1,399.0200 |
| 1/13/2022 | 1/17/2022 | Sell Short | ELEKTRA*.MX | 40,800.00 | 1,402.1200 |
| 1/13/2022 | 1/17/2022 | Sell Short | ELEKTRA*.MX | 20,000.00 | 1,417.3600 |
| 1/14/2022 | 1/18/2022 | Sell Short | ELEKTRA*.MX | 10,785.00 | 1,399.5000 |
| 1/17/2022 | 1/19/2022 | Sell Short | ELEKTRA*.MX | 1,448.00 | 1,409.7450 |
| 1/18/2022 | 1/20/2022 | Sell Short | ELEKTRA*.MX | 17,002.00 | 1,391.5600 |
| 1/19/2022 | 1/21/2022 | Sell Short | ELEKTRA*.MX | 20,395.00 | 1,391.1258 |
| 1/20/2022 | 1/24/2022 | Sell Short | ELEKTRA*.MX | 28,653.00 | 1,354.4160 |
| 1/21/2022 | 1/25/2022 | Sell Short | ELEKTRA*.MX | 10,393.00 | 1,352.3300 |
| 1/24/2022 | 1/26/2022 | Sell Short | ELEKTRA*.MX | 4,978.00 | 1,359.1559 |
| 1/25/2022 | 1/27/2022 | Sell Short | ELEKTRA*.MX | 5,303.00 | 1,359.5620 |
| 1/26/2022 | 1/28/2022 | Sell Short | ELEKTRA*.MX | 5,996.00 | 1,355.2325 |
| 1/27/2022 | 1/31/2022 | Sell Short | ELEKTRA*.MX | 7,725.00 | 1,348.0630 |
| 1/28/2022 | 2/1/2022 | Sell Short | ELEKTRA*.MX | 19,519.00 | 1,341.9927 |
| 1/31/2022 | 2/2/2022 | Sell Short | ELEKTRA*.MX | 6,071.00 | 1,347.9600 |
| 2/2/2022 | 2/4/2022 | Sell Short | ELEKTRA*.MX | 9,398.00 | 1,348.6155 |
| 2/2/2022 | 2/4/2022 | Sell Short | ELEKTRA*.MX | 8,673.00 | 1,346.8476 |
| 2/3/2022 | 2/8/2022 | Sell Short | ELEKTRA*.MX | 1,970.00 | 1,353.3680 |
| 2/4/2022 | 2/9/2022 | Sell Short | ELEKTRA*.MX | 7,771.00 | 1,340.5759 |
| 2/8/2022 | 2/10/2022 | Sell Short | ELEKTRA*.MX | 10,517.00 | 1,336.0519 |
| 2/9/2022 | 2/11/2022 | Sell Short | ELEKTRA*.MX | 13,045.00 | 1,343.7739 |
| 2/10/2022 | 2/14/2022 | Sell Short | ELEKTRA*.MX | 7,993.00 | 1,345.6400 |
| 2/11/2022 | 2/15/2022 | Sell Short | ELEKTRA*.MX | 17,356.00 | 1,336.5600 |
| 2/14/2022 | 2/16/2022 | Sell Short | ELEKTRA*.MX | 20,498.00 | 1,335.4930 |

21

| | | | | | |
|---|---|---|---|---|---|
| 2/15/2022 | 2/17/2022 | Sell Short | ELEKTRA*.MX | 5,580.00 | 1,345.4500 |
| 2/16/2022 | 2/18/2022 | Sell Short | ELEKTRA*.MX | 3,715.00 | 1,348.0494 |
| 2/17/2022 | 2/21/2022 | Sell Short | ELEKTRA*.MX | 2,017.00 | 1,352.0400 |
| 2/18/2022 | 2/22/2022 | Sell Short | ELEKTRA*.MX | 10,045.00 | 1,338.5856 |
| 2/21/2022 | 2/23/2022 | Sell Short | ELEKTRA*.MX | 1,111.00 | 1,343.3190 |
| 2/22/2022 | 2/24/2022 | Sell Short | ELEKTRA*.MX | 3,060.00 | 1,347.5854 |
| 2/23/2022 | 2/25/2022 | Sell Short | ELEKTRA*.MX | 10,852.00 | 1,338.6566 |
| 2/24/2022 | 2/28/2022 | Sell Short | ELEKTRA*.MX | 27,090.00 | 1,305.1400 |
| 2/28/2022 | 3/2/2022 | Sell Short | ELEKTRA*.MX | 2,578.00 | 1,335.5774 |
| 3/1/2022 | 3/3/2022 | Sell Short | ELEKTRA*.MX | 22,352.00 | 1,320.2400 |
| 3/2/2022 | 3/4/2022 | Sell Short | ELEKTRA*.MX | 18,655.00 | 1,326.6488 |
| 3/3/2022 | 3/7/2022 | Sell Short | ELEKTRA*.MX | 13,449.00 | 1,319.9400 |
| 3/4/2022 | 3/8/2022 | Sell Short | ELEKTRA*.MX | 6,170.00 | 1,321.8121 |
| 3/7/2022 | 3/9/2022 | Sell Short | ELEKTRA*.MX | 4,736.00 | 1,314.4000 |
| 3/8/2022 | 3/10/2022 | Sell Short | ELEKTRA*.MX | 23,003.00 | 1,299.8100 |
| 3/9/2022 | 3/11/2022 | Sell Short | ELEKTRA*.MX | 20,327.00 | 1,279.9600 |
| 3/10/2022 | 3/14/2022 | Sell Short | ELEKTRA*.MX | 17,355.00 | 1,276.7100 |
| 3/11/2022 | 3/15/2022 | Sell Short | ELEKTRA*.MX | 6,300.00 | 1,279.0300 |
| 3/14/2022 | 3/16/2022 | Sell Short | ELEKTRA*.MX | 10,600.00 | 1,277.8868 |
| 3/15/2022 | 3/17/2022 | Sell Short | ELEKTRA*.MX | 10,097.00 | 1,286.1814 |
| 3/16/2022 | 3/18/2022 | Sell Short | ELEKTRA*.MX | 16,000.00 | 1,287.1291 |
| 3/17/2022 | 3/22/2022 | Sell Short | ELEKTRA*.MX | 10,970.00 | 1,283.2300 |
| 3/18/2022 | 3/23/2022 | Sell Short | ELEKTRA*.MX | 40,000.00 | 1,292.1900 |
| 3/22/2022 | 3/24/2022 | Sell Short | ELEKTRA*.MX | 10,416.00 | 1,291.6516 |
| 3/23/2022 | 3/25/2022 | Sell Short | ELEKTRA*.MX | 8,266.00 | 1,279.6600 |
| 3/24/2022 | 3/28/2022 | Sell Short | ELEKTRA*.MX | 7,880.00 | 1,277.0712 |
| 3/28/2022 | 3/30/2022 | Sell Short | ELEKTRA*.MX | 1,000.00 | 1,281.4670 |
| 3/31/2022 | 4/4/2022 | Sell Short | ELEKTRA*.MX | 7,152.00 | 1,290.6176 |
| 4/1/2022 | 4/5/2022 | Sell Short | ELEKTRA*.MX | 4,500.00 | 1,291.4347 |
| 4/4/2022 | 4/6/2022 | Sell Short | ELEKTRA*.MX | 12,000.00 | 1,286.1203 |
| 4/5/2022 | 4/7/2022 | Sell Short | ELEKTRA*.MX | 8,610.00 | 1,275.8471 |
| 4/6/2022 | 4/8/2022 | Sell Short | ELEKTRA*.MX | 12,590.00 | 1,268.8743 |
| 4/7/2022 | 4/11/2022 | Sell | ELEKTRA*.MX | 12,000.00 | 1,269.5129 |
| 4/8/2022 | 4/12/2022 | Sell Short | ELEKTRA*.MX | 5,406.00 | 1,254.5141 |
| 4/11/2022 | 4/13/2022 | Sell Short | ELEKTRA*.MX | 7,645.00 | 1,254.5819 |
| 4/12/2022 | 4/18/2022 | Sell Short | ELEKTRA*.MX | 8,115.00 | 1,253.3896 |
| 4/13/2022 | 4/19/2022 | Sell Short | ELEKTRA*.MX | 9,730.00 | 1,253.5043 |
| 4/18/2022 | 4/20/2022 | Sell Short | ELEKTRA*.MX | 14,300.00 | 1,269.4849 |
| 4/19/2022 | 4/21/2022 | Sell Short | ELEKTRA*.MX | 4,641.00 | 1,269.2700 |
| 4/20/2022 | 4/22/2022 | Sell Short | ELEKTRA*.MX | 6,800.00 | 1,268.1200 |
| 4/21/2022 | 4/25/2022 | Sell Short | ELEKTRA*.MX | 5,397.00 | 1,259.7300 |
| 4/22/2022 | 4/26/2022 | Sell Short | ELEKTRA*.MX | 15,190.00 | 1,255.4400 |
| 4/25/2022 | 4/27/2022 | Sell Short | ELEKTRA*.MX | 13,763.00 | 1,253.8400 |
| 4/26/2022 | 4/28/2022 | Sell Short | ELEKTRA*.MX | 14,264.00 | 1,249.7400 |
| 4/27/2022 | 4/29/2022 | Sell Short | ELEKTRA*.MX | 16,012.00 | 1,245.0500 |
| 4/28/2022 | 5/2/2022 | Sell Short | ELEKTRA*.MX | 16,000.00 | 1,241.8100 |
| 4/29/2022 | 5/3/2022 | Sell Short | ELEKTRA*.MX | 23,066.00 | 1,225.6300 |

| | | | | | |
|---|---|---|---|---|---|
| 5/2/2022 | 5/4/2022 | Sell Short | ELEKTRA*.MX | 13,885.00 | 1,183.9906 |
| 5/3/2022 | 5/5/2022 | Buy Cover | ELEKTRA*.MX | 15,000.00 | 1,191.0266 |
| 5/4/2022 | 5/6/2022 | Sell Short | ELEKTRA*.MX | 2,432.00 | 1,142.8487 |
| 5/9/2022 | 5/11/2022 | Sell Short | ELEKTRA*.MX | 5,720.00 | 1,099.0077 |
| 5/10/2022 | 5/12/2022 | Sell Short | ELEKTRA*.MX | 9,266.00 | 1,083.8600 |
| 5/11/2022 | 5/13/2022 | Sell Short | ELEKTRA*.MX | 10,343.00 | 1,074.1628 |
| 5/12/2022 | 5/16/2022 | Sell Short | ELEKTRA*.MX | 7,645.00 | 1,077.6500 |
| 5/13/2022 | 5/17/2022 | Sell Short | ELEKTRA*.MX | 15,975.00 | 1,066.9400 |
| 5/16/2022 | 5/18/2022 | Sell Short | ELEKTRA*.MX | 16,491.00 | 1,068.3200 |
| 5/17/2022 | 5/19/2022 | Sell Short | ELEKTRA*.MX | 24,187.00 | 1,050.9800 |
| 5/18/2022 | 5/20/2022 | Sell Short | ELEKTRA*.MX | 23,511.00 | 1,049.3285 |
| 5/19/2022 | 5/23/2022 | Sell | ELEKTRA*.MX | 24,667.00 | 1,084.0688 |
| 5/20/2022 | 5/24/2022 | Sell Short | ELEKTRA*.MX | 23,199.00 | 1,107.6053 |
| 5/23/2022 | 5/25/2022 | Sell Short | ELEKTRA*.MX | 17,789.00 | 1,108.4396 |
| 5/24/2022 | 5/26/2022 | Sell Short | ELEKTRA*.MX | 13,529.00 | 1,133.8535 |
| 5/25/2022 | 5/27/2022 | Sell Short | ELEKTRA*.MX | 40,335.00 | 1,144.9874 |
| 5/26/2022 | 5/30/2022 | Sell Short | ELEKTRA*.MX | 26,295.00 | 1,147.8051 |
| 5/27/2022 | 5/31/2022 | Sell Short | ELEKTRA*.MX | 15,820.00 | 1,149.9400 |
| 5/30/2022 | 6/1/2022 | Sell Short | ELEKTRA*.MX | 11,180.00 | 1,156.1426 |
| 5/31/2022 | 6/2/2022 | Sell Short | ELEKTRA*.MX | 20,642.00 | 1,157.9386 |
| 6/1/2022 | 6/3/2022 | Sell | ELEKTRA*.MX | 17,208.00 | 1,147.1536 |
| 6/2/2022 | 6/6/2022 | Sell | ELEKTRA*.MX | 7,506.00 | 1,155.0004 |
| 6/3/2022 | 6/7/2022 | Sell | ELEKTRA*.MX | 10,081.00 | 1,159.7000 |
| 6/6/2022 | 6/8/2022 | Sell | ELEKTRA*.MX | 14,435.00 | 1,157.1596 |
| 6/7/2022 | 6/9/2022 | Sell | ELEKTRA*.MX | 13,535.00 | 1,160.3800 |
| 6/8/2022 | 6/10/2022 | Sell | ELEKTRA*.MX | 11,276.00 | 1,162.5272 |
| 6/9/2022 | 6/13/2022 | Sell | ELEKTRA*.MX | 21,221.00 | 1,155.9662 |
| 6/10/2022 | 6/14/2022 | Sell | ELEKTRA*.MX | 18,857.00 | 1,153.3000 |
| 6/13/2022 | 6/15/2022 | Sell | ELEKTRA*.MX | 20,700.00 | 1,156.3800 |
| 6/14/2022 | 6/16/2022 | Sell | ELEKTRA*.MX | 15,631.00 | 1,154.7218 |
| 6/15/2022 | 6/17/2022 | Sell | ELEKTRA*.MX | 15,869.00 | 1,152.6033 |
| 6/16/2022 | 6/20/2022 | Sell | ELEKTRA*.MX | 24,074.00 | 1,141.7800 |
| 6/17/2022 | 6/21/2022 | Sell | ELEKTRA*.MX | 37,975.00 | 1,118.0300 |
| 6/20/2022 | 6/22/2022 | Sell | ELEKTRA*.MX | 8,092.00 | 1,103.8336 |
| 6/21/2022 | 6/23/2022 | Sell | ELEKTRA*.MX | 9,156.00 | 1,147.5879 |
| 6/22/2022 | 6/24/2022 | Sell | ELEKTRA*.MX | 14,068.00 | 1,152.4373 |
| 6/23/2022 | 6/27/2022 | Sell | ELEKTRA*.MX | 9,134.00 | 1,151.7300 |
| 6/24/2022 | 6/28/2022 | Sell | ELEKTRA*.MX | 32,233.00 | 1,141.8200 |
| 6/27/2022 | 6/29/2022 | Sell | ELEKTRA*.MX | 12,354.00 | 1,135.5315 |
| 6/28/2022 | 6/30/2022 | Sell | ELEKTRA*.MX | 13,319.00 | 1,124.2900 |
| 6/29/2022 | 7/1/2022 | Sell | ELEKTRA*.MX | 14,031.00 | 1,104.1200 |
| 6/30/2022 | 7/4/2022 | Sell | ELEKTRA*.MX | 9,004.00 | 0.0000 |
| 7/1/2022 | 7/5/2022 | Sell | ELEKTRA*.MX | 8,991.00 | 1,118.5500 |
| 7/4/2022 | 7/6/2022 | Sell | ELEKTRA*.MX | 1,230.00 | 1,115.8157 |
| 7/5/2022 | 7/7/2022 | Sell | ELEKTRA*.MX | 8,217.00 | 1,113.8345 |
| 7/6/2022 | 7/8/2022 | Sell | ELEKTRA*.MX | 17,053.00 | 1,102.1300 |
| 7/13/2022 | 7/15/2022 | Sell | ELEKTRA*.MX | 8,396.00 | 1,102.1479 |

23

| | | | | | |
|---|---|---|---|---|---|
| 7/14/2022 | 7/18/2022 | Sell | ELEKTRA*.MX | 9,251.00 | 1,079.7072 |
| 7/14/2022 | 7/18/2022 | Sell | ELEKTRA*.MX | 2,247.00 | 1,075.5549 |
| 7/15/2022 | 7/19/2022 | Sell | ELEKTRA*.MX | 10,883.00 | 1,081.0244 |
| 7/18/2022 | 7/20/2022 | Sell Short | ELEKTRA*.MX | 7,717.00 | 1,091.8924 |
| 7/19/2022 | 7/21/2022 | Sell Short | ELEKTRA*.MX | 7,933.00 | 1,101.5500 |
| 7/20/2022 | 7/22/2022 | Sell Short | ELEKTRA*.MX | 11,845.00 | 1,131.1859 |
| 7/21/2022 | 7/25/2022 | Sell Short | ELEKTRA*.MX | 10,339.00 | 1,146.1341 |
| 7/22/2022 | 7/26/2022 | Sell Short | ELEKTRA*.MX | 7,967.00 | 1,138.0919 |
| 7/25/2022 | 7/27/2022 | Sell Short | ELEKTRA*.MX | 2,518.00 | 1,156.7700 |
| 7/26/2022 | 7/28/2022 | Sell Short | ELEKTRA*.MX | 4,437.00 | 1,172.1288 |
| 7/27/2022 | 7/29/2022 | Sell Short | ELEKTRA*.MX | 9,345.00 | 1,171.4031 |
| 7/28/2022 | 8/1/2022 | Sell Short | ELEKTRA*.MX | 2,198.00 | 1,179.5300 |
| 7/29/2022 | 8/2/2022 | Sell Short | ELEKTRA*.MX | 5,065.00 | 1,194.5498 |
| 8/1/2022 | 8/3/2022 | Sell Short | ELEKTRA*.MX | 3,660.00 | 1,174.0700 |
| 8/2/2022 | 8/4/2022 | Sell Short | ELEKTRA*.MX | 12,473.00 | 1,171.6763 |
| 8/3/2022 | 8/5/2022 | Sell Short | ELEKTRA*.MX | 8,718.00 | 1,171.8298 |
| 8/4/2022 | 8/8/2022 | Sell | ELEKTRA*.MX | 3,772.00 | 1,173.3794 |
| 8/5/2022 | 8/9/2022 | Sell | ELEKTRA*.MX | 8,295.00 | 1,168.8663 |
| 8/8/2022 | 8/10/2022 | Sell Short | ELEKTRA*.MX | 8,975.00 | 1,168.8700 |
| 8/9/2022 | 8/11/2022 | Sell Short | ELEKTRA*.MX | 2,723.00 | 1,168.6683 |
| 8/10/2022 | 8/12/2022 | Sell Short | ELEKTRA*.MX | 11,509.00 | 1,165.1800 |
| 8/11/2022 | 8/15/2022 | Sell Short | ELEKTRA*.MX | 10,619.00 | 1,149.4800 |
| 8/15/2022 | 8/17/2022 | Sell Short | ELEKTRA*.MX | 11,637.00 | 1,150.4103 |
| 8/16/2022 | 8/18/2022 | Sell Short | ELEKTRA*.MX | 5,700.00 | 1,150.3867 |
| 8/17/2022 | 8/19/2022 | Sell Short | ELEKTRA*.MX | 8,820.00 | 1,147.4600 |
| 8/18/2022 | 8/22/2022 | Sell | ELEKTRA*.MX | 34.00 | 1,154.1259 |
| 8/19/2022 | 8/23/2022 | Sell Short | ELEKTRA*.MX | 8,787.00 | 1,147.2462 |
| 8/22/2022 | 8/24/2022 | Sell Short | ELEKTRA*.MX | 11,081.00 | 1,140.3000 |
| 8/23/2022 | 8/25/2022 | Sell Short | ELEKTRA*.MX | 12,100.00 | 1,131.5600 |
| 8/24/2022 | 8/26/2022 | Sell Short | ELEKTRA*.MX | 15,473.00 | 1,105.3200 |
| 8/25/2022 | 8/29/2022 | Sell Short | ELEKTRA*.MX | 13,135.00 | 1,076.4616 |
| 8/29/2022 | 8/31/2022 | Sell Short | ELEKTRA*.MX | 10,735.00 | 1,040.6577 |
| 8/30/2022 | 9/1/2022 | Sell Short | ELEKTRA*.MX | 1,392.00 | 1,056.2100 |
| 8/31/2022 | 9/2/2022 | Sell Short | ELEKTRA*.MX | 13,807.00 | 1,029.2835 |
| 9/1/2022 | 9/5/2022 | Sell Short | ELEKTRA*.MX | 10,071.00 | 1,029.6900 |
| 9/2/2022 | 9/6/2022 | Sell Short | ELEKTRA*.MX | 11,250.00 | 1,026.7140 |
| 9/5/2022 | 9/7/2022 | Sell Short | ELEKTRA*.MX | 580.00 | 1,036.2112 |
| 9/6/2022 | 9/8/2022 | Sell Short | ELEKTRA*.MX | 16,456.00 | 1,020.8300 |
| 9/7/2022 | 9/9/2022 | Sell Short | ELEKTRA*.MX | 11,686.00 | 1,015.4200 |
| 9/12/2022 | 9/14/2022 | Sell Short | ELEKTRA*.MX | 15,400.00 | 1,019.8200 |
| 9/13/2022 | 9/15/2022 | Sell Short | ELEKTRA*.MX | 8,800.00 | 1,010.7170 |
| 9/14/2022 | 9/19/2022 | Sell Short | ELEKTRA*.MX | 16,058.00 | 1,004.4300 |
| 9/15/2022 | 9/20/2022 | Sell Short | ELEKTRA*.MX | 8,012.00 | 1,019.4400 |
| 9/19/2022 | 9/21/2022 | Sell Short | ELEKTRA*.MX | 6,412.00 | 1,032.8744 |
| 9/20/2022 | 9/22/2022 | Sell Short | ELEKTRA*.MX | 4,766.00 | 1,043.2182 |
| 9/21/2022 | 9/23/2022 | Sell Short | ELEKTRA*.MX | 6,450.00 | 1,046.7800 |
| 9/22/2022 | 9/26/2022 | Sell Short | ELEKTRA*.MX | 3,887.00 | 1,046.0100 |

24

| | | | | | |
|---|---|---|---|---|---|
| 9/23/2022 | 9/27/2022 | Sell Short | ELEKTRA*.MX | 10,630.00 | 1,040.5000 |
| 9/26/2022 | 9/28/2022 | Sell Short | ELEKTRA*.MX | 9,286.00 | 1,024.9884 |
| 9/27/2022 | 9/29/2022 | Sell Short | ELEKTRA*.MX | 9,050.00 | 1,009.4875 |
| 10/3/2022 | 10/5/2022 | Sell | ELEKTRA*.MX | 5,502.00 | 1,011.6661 |
| 10/4/2022 | 10/6/2022 | Sell Short | ELEKTRA*.MX | 5,134.00 | 1,007.9800 |
| 10/5/2022 | 10/7/2022 | Sell Short | ELEKTRA*.MX | 2,678.00 | 1,006.3390 |
| 10/6/2022 | 10/10/2022 | Sell Short | ELEKTRA*.MX | 10,290.00 | 1,011.4600 |
| 10/7/2022 | 10/11/2022 | Sell Short | ELEKTRA*.MX | 2,239.00 | 1,009.7800 |
| 10/10/2022 | 10/12/2022 | Sell Short | ELEKTRA*.MX | 2,453.00 | 1,004.2421 |
| 10/11/2022 | 10/13/2022 | Sell Short | ELEKTRA*.MX | 7,081.00 | 995.4300 |
| 10/12/2022 | 10/14/2022 | Sell Short | ELEKTRA*.MX | 11,030.00 | 993.3900 |
| 10/13/2022 | 10/17/2022 | Sell Short | ELEKTRA*.MX | 21,689.00 | 984.7100 |
| 10/14/2022 | 10/18/2022 | Sell Short | ELEKTRA*.MX | 15,000.00 | 999.7400 |
| 10/14/2022 | 10/18/2022 | Sell Short | ELEKTRA*.MX | 4,625.00 | 999.2700 |
| 10/17/2022 | 10/19/2022 | Sell | ELEKTRA*.MX | 4,549.00 | 997.0281 |
| 10/18/2022 | 10/20/2022 | Sell Short | ELEKTRA*.MX | 13,849.00 | 996.0000 |
| 10/19/2022 | 10/21/2022 | Sell Short | ELEKTRA*.MX | 4,500.00 | 999.0600 |
| 10/20/2022 | 10/24/2022 | Sell Short | ELEKTRA*.MX | 26,662.00 | 988.2300 |
| 10/21/2022 | 10/25/2022 | Sell Short | ELEKTRA*.MX | 20,527.00 | 995.0400 |
| 10/24/2022 | 10/26/2022 | Sell Short | ELEKTRA*.MX | 12,416.00 | 1,006.0000 |
| 10/25/2022 | 10/27/2022 | Sell Short | ELEKTRA*.MX | 18,713.00 | 1,024.4900 |
| 10/26/2022 | 10/28/2022 | Sell Short | ELEKTRA*.MX | 6,493.00 | 1,047.3700 |
| 10/27/2022 | 10/31/2022 | Sell Short | ELEKTRA*.MX | 13,327.00 | 1,032.8420 |
| 10/28/2022 | 11/1/2022 | Sell Short | ELEKTRA*.MX | 21,790.00 | 995.1100 |
| 10/31/2022 | 11/3/2022 | Sell Short | ELEKTRA*.MX | 15,930.00 | 992.5700 |
| 11/1/2022 | 11/4/2022 | Sell Short | ELEKTRA*.MX | 10,224.00 | 982.7100 |
| 11/3/2022 | 11/7/2022 | Sell Short | ELEKTRA*.MX | 20,321.00 | 980.0700 |
| 11/4/2022 | 11/8/2022 | Sell Short | ELEKTRA*.MX | 28,889.00 | 957.2762 |
| 11/4/2022 | 11/8/2022 | Sell Short | ELEKTRA*.MX | 15,550.00 | 955.4820 |
| 11/7/2022 | 11/9/2022 | Sell Short | ELEKTRA*.MX | 17,433.00 | 957.4237 |
| 11/7/2022 | 11/9/2022 | Sell Short | ELEKTRA*.MX | 16,386.00 | 955.0600 |
| 11/9/2022 | 11/11/2022 | Sell Short | ELEKTRA*.MX | 42,660.00 | 948.4800 |
| 11/10/2022 | 11/14/2022 | Sell Short | ELEKTRA*.MX | 16,689.00 | 966.9200 |
| 11/11/2022 | 11/15/2022 | Sell Short | ELEKTRA*.MX | 40,731.00 | 963.6300 |
| 11/14/2022 | 11/16/2022 | Sell Short | ELEKTRA*.MX | 17,068.00 | 969.3800 |
| 11/15/2022 | 11/17/2022 | Sell Short | ELEKTRA*.MX | 15,933.00 | 986.3797 |
| 11/16/2022 | 11/18/2022 | Sell Short | ELEKTRA*.MX | 21,031.00 | 994.4930 |
| 11/17/2022 | 11/22/2022 | Sell Short | ELEKTRA*.MX | 8,803.00 | 992.7920 |
| 11/18/2022 | 11/23/2022 | Sell Short | ELEKTRA*.MX | 20,733.00 | 1,003.0700 |
| 11/22/2022 | 11/24/2022 | Sell Short | ELEKTRA*.MX | 5,686.00 | 993.2600 |
| 11/23/2022 | 11/25/2022 | Sell Short | ELEKTRA*.MX | 11,553.00 | 986.3600 |
| 11/24/2022 | 11/28/2022 | Sell Short | ELEKTRA*.MX | 7,438.00 | 987.1900 |
| 11/25/2022 | 11/29/2022 | Sell Short | ELEKTRA*.MX | 13,104.00 | 1,010.2400 |
| 11/28/2022 | 11/30/2022 | Sell Short | ELEKTRA*.MX | 9,415.00 | 1,026.5400 |
| 11/29/2022 | 12/1/2022 | Sell Short | ELEKTRA*.MX | 12,007.00 | 1,020.6900 |
| 11/30/2022 | 12/2/2022 | Sell Short | ELEKTRA*.MX | 8,417.00 | 1,016.4000 |
| 12/1/2022 | 12/5/2022 | Sell Short | ELEKTRA*.MX | 11,666.00 | 1,023.0000 |

25

| | | | | | |
|---|---|---|---|---|---|
| 12/2/2022 | 12/6/2022 | Sell Short | ELEKTRA*.MX | 12,312.00 | 1,038.4973 |
| 12/5/2022 | 12/7/2022 | Sell Short | ELEKTRA*.MX | 8,261.00 | 1,038.4048 |
| 12/6/2022 | 12/8/2022 | Sell Short | ELEKTRA*.MX | 9,264.00 | 1,023.8978 |
| 12/7/2022 | 12/9/2022 | Sell Short | ELEKTRA*.MX | 15,401.00 | 1,018.3656 |
| 12/8/2022 | 12/13/2022 | Sell Short | ELEKTRA*.MX | 11,633.00 | 1,030.6800 |
| 12/9/2022 | 12/14/2022 | Sell Short | ELEKTRA*.MX | 14,095.00 | 1,047.2400 |
| 12/13/2022 | 12/15/2022 | Sell Short | ELEKTRA*.MX | 14,660.00 | 1,044.1200 |
| 12/14/2022 | 12/16/2022 | Sell Short | ELEKTRA*.MX | 11,631.00 | 1,049.8108 |
| 12/15/2022 | 12/19/2022 | Sell Short | ELEKTRA*.MX | 22,115.00 | 1,047.6200 |
| 12/16/2022 | 12/20/2022 | Sell Short | ELEKTRA*.MX | 21,279.00 | 1,033.4500 |
| 12/19/2022 | 12/21/2022 | Sell Short | ELEKTRA*.MX | 17,126.00 | 1,033.7900 |
| 12/20/2022 | 12/22/2022 | Sell Short | ELEKTRA*.MX | 15,176.00 | 1,050.8779 |
| 12/21/2022 | 12/23/2022 | Sell Short | ELEKTRA*.MX | 21,860.00 | 1,079.9568 |
| 12/22/2022 | 12/26/2022 | Sell Short | ELEKTRA*.MX | 13,001.00 | 1,081.9788 |
| 12/23/2022 | 12/27/2022 | Sell Short | ELEKTRA*.MX | 6,701.00 | 1,068.9793 |
| 12/27/2022 | 12/29/2022 | Sell Short | ELEKTRA*.MX | 13,400.00 | 1,097.8700 |
| 12/28/2022 | 12/30/2022 | Sell Short | ELEKTRA*.MX | 15,294.00 | 1,097.4600 |
| 12/29/2022 | 1/2/2023 | Sell Short | ELEKTRA*.MX | 587.00 | 1,101.5200 |
| 12/30/2022 | 1/3/2023 | Sell Short | ELEKTRA*.MX | 990.00 | 1,097.0900 |
| 1/2/2023 | 1/4/2023 | Sell Short | ELEKTRA*.MX | 636.00 | 1,100.2700 |
| 1/3/2023 | 1/5/2023 | Sell Short | ELEKTRA*.MX | 6,420.00 | 1,077.3200 |
| 1/4/2023 | 1/6/2023 | Sell Short | ELEKTRA*.MX | 1,897.00 | 1,090.6400 |
| 1/5/2023 | 1/9/2023 | Sell Short | ELEKTRA*.MX | 1,691.00 | 1,102.9600 |
| 1/6/2023 | 1/10/2023 | Sell Short | ELEKTRA*.MX | 3,001.00 | 1,089.4918 |
| 1/9/2023 | 1/11/2023 | Sell Short | ELEKTRA*.MX | 9,925.00 | 1,080.7228 |
| 1/10/2023 | 1/12/2023 | Sell Short | ELEKTRA*.MX | 9,925.00 | 1,084.6500 |
| 1/12/2023 | 1/16/2023 | Sell Short | ELEKTRA*.MX | 850.00 | 1,071.2400 |
| 1/13/2023 | 1/17/2023 | Sell Short | ELEKTRA*.MX | 2,500.00 | 1,059.3325 |
| 1/16/2023 | 1/18/2023 | Sell Short | ELEKTRA*.MX | 2,125.00 | 1,065.9567 |
| 1/17/2023 | 1/19/2023 | Sell Short | ELEKTRA*.MX | 9,128.00 | 1,051.1905 |
| 1/18/2023 | 1/20/2023 | Sell Short | ELEKTRA*.MX | 8,148.00 | 1,045.0079 |
| 1/18/2023 | 1/20/2023 | Sell Short | ELEKTRA*.MX | 1,401.00 | 1,093.3400 |
| 1/19/2023 | 1/23/2023 | Sell Short | ELEKTRA*.MX | 1,407.00 | 1,057.9500 |
| 1/20/2023 | 1/24/2023 | Sell Short | ELEKTRA*.MX | 8,278.00 | 1,052.5400 |
| 1/23/2023 | 1/25/2023 | Sell Short | ELEKTRA*.MX | 11,181.00 | 1,046.9043 |
| 1/24/2023 | 1/26/2023 | Sell Short | ELEKTRA*.MX | 9,720.00 | 1,074.4235 |
| 1/26/2023 | 1/30/2023 | Sell Short | ELEKTRA*.MX | 8,902.00 | 1,074.7257 |
| 1/27/2023 | 1/31/2023 | Sell Short | ELEKTRA*.MX | 8,311.00 | 1,067.2600 |
| 1/30/2023 | 2/1/2023 | Sell | ELEKTRA*.MX | 11,307.00 | 1,047.7823 |
| 1/31/2023 | 2/2/2023 | Sell | ELEKTRA*.MX | 1,348.00 | 1,032.4829 |
| 2/1/2023 | 2/3/2023 | Sell Short | ELEKTRA*.MX | 1,160.00 | 1,018.9029 |
| 2/2/2023 | 2/7/2023 | Sell Short | ELEKTRA*.MX | 10,890.00 | 1,002.8333 |
| 2/3/2023 | 2/8/2023 | Sell Short | ELEKTRA*.MX | 3,818.00 | 998.2600 |
| 2/7/2023 | 2/9/2023 | Sell Short | ELEKTRA*.MX | 13,926.00 | 1,014.4300 |
| 2/8/2023 | 2/10/2023 | Sell Short | ELEKTRA*.MX | 2,221.00 | 1,004.2000 |
| 2/9/2023 | 2/13/2023 | Sell Short | ELEKTRA*.MX | 9,394.00 | 992.5000 |
| 2/10/2023 | 2/14/2023 | Sell Short | ELEKTRA*.MX | 10,856.00 | 966.0516 |

| | | | | | |
|---|---|---|---|---|---|
| 2/13/2023 | 2/15/2023 | Sell Short | ELEKTRA*.MX | 10,488.00 | 961.7137 |
| 2/14/2023 | 2/16/2023 | Sell Short | ELEKTRA*.MX | 2,611.00 | 937.9800 |
| 2/23/2023 | 2/27/2023 | Sell Short | ELEKTRA*.MX | 4,700.00 | 931.3779 |
| 2/24/2023 | 2/28/2023 | Sell Short | ELEKTRA*.MX | 1,722.00 | 969.5784 |
| 2/27/2023 | 3/1/2023 | Sell Short | ELEKTRA*.MX | 3,563.00 | 964.4049 |
| 2/28/2023 | 3/2/2023 | Sell Short | ELEKTRA*.MX | 5,756.00 | 960.5714 |
| 3/1/2023 | 3/3/2023 | Sell Short | ELEKTRA*.MX | 4,276.00 | 952.0049 |
| 3/2/2023 | 3/6/2023 | Sell Short | ELEKTRA*.MX | 7,500.00 | 938.1600 |
| 3/3/2023 | 3/7/2023 | Sell Short | ELEKTRA*.MX | 8,801.00 | 968.6000 |
| 3/6/2023 | 3/8/2023 | Sell Short | ELEKTRA*.MX | 7,261.00 | 956.5088 |
| 3/7/2023 | 3/9/2023 | Sell Short | ELEKTRA*.MX | 5,290.00 | 942.9000 |
| 3/8/2023 | 3/10/2023 | Sell Short | ELEKTRA*.MX | 8,965.00 | 940.2000 |
| 3/9/2023 | 3/13/2023 | Sell Short | ELEKTRA*.MX | 3,243.00 | 943.5558 |
| 3/10/2023 | 3/14/2023 | Sell Short | ELEKTRA*.MX | 7,806.00 | 941.3300 |
| 3/13/2023 | 3/15/2023 | Sell Short | ELEKTRA*.MX | 5,144.00 | 954.5700 |
| 3/14/2023 | 3/16/2023 | Sell Short | ELEKTRA*.MX | 3,812.00 | 945.2300 |
| 3/15/2023 | 3/17/2023 | Sell Short | ELEKTRA*.MX | 6,400.00 | 935.0400 |
| 3/17/2023 | 3/22/2023 | Sell Short | ELEKTRA*.MX | 19,552.00 | 937.4100 |
| 3/21/2023 | 3/23/2023 | Sell Short | ELEKTRA*.MX | 3,901.00 | 940.5244 |
| 3/22/2023 | 3/24/2023 | Sell Short | ELEKTRA*.MX | 11,447.00 | 932.7230 |
| 3/23/2023 | 3/27/2023 | Sell Short | ELEKTRA*.MX | 11,596.00 | 933.9114 |
| 3/24/2023 | 3/28/2023 | Sell Short | ELEKTRA*.MX | 9,255.00 | 948.5600 |
| 3/27/2023 | 3/29/2023 | Sell Short | ELEKTRA*.MX | 3,222.00 | 965.8988 |
| 3/28/2023 | 3/30/2023 | Sell Short | ELEKTRA*.MX | 5,881.00 | 961.4214 |
| 3/29/2023 | 3/31/2023 | Sell Short | ELEKTRA*.MX | 2,198.00 | 967.2500 |
| 3/30/2023 | 4/3/2023 | Sell Short | ELEKTRA*.MX | 625.00 | 991.8500 |
| 3/31/2023 | 4/4/2023 | Sell Short | ELEKTRA*.MX | 1,600.00 | 1,020.0910 |
| 4/3/2023 | 4/5/2023 | Sell Short | ELEKTRA*.MX | 5,730.00 | 1,019.8300 |
| 4/4/2023 | 4/10/2023 | Sell Short | ELEKTRA*.MX | 6,870.00 | 1,054.2652 |
| 4/5/2023 | 4/11/2023 | Sell Short | ELEKTRA*.MX | 2,568.00 | 1,062.5132 |
| 4/13/2023 | 4/17/2023 | Sell Short | ELEKTRA*.MX | 4,289.00 | 1,106.8900 |
| 4/17/2023 | 4/19/2023 | Sell Short | ELEKTRA*.MX | 3,214.00 | 1,116.1900 |
| 4/18/2023 | 4/20/2023 | Sell Short | ELEKTRA*.MX | 3,062.00 | 1,111.3300 |
| 4/19/2023 | 4/21/2023 | Sell Short | ELEKTRA*.MX | 3,700.00 | 1,115.3200 |
| 4/20/2023 | 4/24/2023 | Sell Short | ELEKTRA*.MX | 7,055.00 | 1,120.7600 |
| 4/21/2023 | 4/25/2023 | Sell Short | ELEKTRA*.MX | 4,123.00 | 1,110.0200 |
| 4/24/2023 | 4/26/2023 | Sell Short | ELEKTRA*.MX | 1,500.00 | 1,106.0284 |
| 4/25/2023 | 4/27/2023 | Sell Short | ELEKTRA*.MX | 1,967.00 | 1,100.6600 |
| 4/26/2023 | 4/28/2023 | Sell Short | ELEKTRA*.MX | 12,114.00 | 1,103.2600 |
| 4/27/2023 | 5/2/2023 | Sell Short | ELEKTRA*.MX | 2,718.00 | 1,119.3168 |
| 4/28/2023 | 5/3/2023 | Sell Short | ELEKTRA*.MX | 7,935.00 | 1,129.7545 |
| 5/2/2023 | 5/4/2023 | Sell Short | ELEKTRA*.MX | 6,717.00 | 1,142.9603 |
| 5/3/2023 | 5/5/2023 | Sell Short | ELEKTRA*.MX | 3,771.00 | 1,141.3023 |
| 5/4/2023 | 5/8/2023 | Sell Short | ELEKTRA*.MX | 6,656.00 | 1,142.9603 |
| 5/5/2023 | 5/9/2023 | Sell Short | ELEKTRA*.MX | 7,107.00 | 1,158.9200 |
| 5/8/2023 | 5/10/2023 | Sell Short | ELEKTRA*.MX | 1,889.00 | 1,145.8301 |
| 5/9/2023 | 5/11/2023 | Sell Short | ELEKTRA*.MX | 2,755.00 | 1,148.1100 |

27

| | | | | | |
|---|---|---|---|---|---|
| 5/10/2023 | 5/12/2023 | Sell Short | ELEKTRA*.MX | 7,785.00 | 1,149.9900 |
| 5/11/2023 | 5/15/2023 | Sell Short | ELEKTRA*.MX | 7,423.00 | 1,175.4105 |
| 5/12/2023 | 5/16/2023 | Sell Short | ELEKTRA*.MX | 1,013.00 | 1,202.6500 |
| 5/15/2023 | 5/17/2023 | Sell Short | ELEKTRA*.MX | 3,444.00 | 1,204.7139 |
| 5/16/2023 | 5/18/2023 | Sell Short | ELEKTRA*.MX | 6,684.00 | 1,210.8329 |
| 5/17/2023 | 5/19/2023 | Sell Short | ELEKTRA*.MX | 3,378.00 | 1,196.6245 |
| 5/18/2023 | 5/22/2023 | Sell Short | ELEKTRA*.MX | 2,996.00 | 1,181.5900 |
| 5/22/2023 | 5/24/2023 | Sell Short | ELEKTRA*.MX | 7,109.00 | 1,191.6364 |
| 5/22/2023 | 5/24/2023 | Sell Short | ELEKTRA*.MX | 4,311.00 | 1,177.8604 |
| 5/23/2023 | 5/25/2023 | Sell Short | ELEKTRA*.MX | 7,137.00 | 1,152.2800 |
| 5/24/2023 | 5/26/2023 | Sell Short | ELEKTRA*.MX | 7,911.00 | 1,134.7292 |
| 5/25/2023 | 5/29/2023 | Sell Short | ELEKTRA*.MX | 7,400.00 | 1,132.5100 |
| 5/26/2023 | 5/30/2023 | Sell Short | ELEKTRA*.MX | 2,200.00 | 1,139.9765 |
| 5/29/2023 | 5/31/2023 | Sell Short | ELEKTRA*.MX | 520.00 | 1,146.5400 |
| 5/30/2023 | 6/1/2023 | Sell Short | ELEKTRA*.MX | 3,029.00 | 1,154.2200 |
| 5/31/2023 | 6/2/2023 | Sell Short | ELEKTRA*.MX | 9,164.00 | 1,146.9890 |
| 6/1/2023 | 6/5/2023 | Sell Short | ELEKTRA*.MX | 8,360.00 | 1,157.7810 |
| 6/2/2023 | 6/6/2023 | Sell Short | ELEKTRA*.MX | 1,916.00 | 1,151.1700 |
| 6/5/2023 | 6/7/2023 | Sell Short | ELEKTRA*.MX | 703.00 | 1,148.5700 |
| 6/6/2023 | 6/8/2023 | Sell Short | ELEKTRA*.MX | 3,500.00 | 1,148.2100 |
| 6/7/2023 | 6/9/2023 | Sell Short | ELEKTRA*.MX | 6,240.00 | 1,159.4600 |
| 6/8/2023 | 6/12/2023 | Sell Short | ELEKTRA*.MX | 1,520.00 | 1,147.1900 |
| 6/9/2023 | 6/13/2023 | Sell Short | ELEKTRA*.MX | 7,845.00 | 1,144.6900 |
| 6/12/2023 | 6/14/2023 | Sell Short | ELEKTRA*.MX | 2,100.00 | 1,138.4400 |
| 6/13/2023 | 6/15/2023 | Sell Short | ELEKTRA*.MX | 7,685.00 | 1,129.5400 |
| 6/15/2023 | 6/19/2023 | Sell Short | ELEKTRA*.MX | 12,872.00 | 1,149.6621 |
| 6/15/2023 | 6/19/2023 | Sell Short | ELEKTRA*.MX | 3,135.00 | 1,157.1770 |
| 6/16/2023 | 6/20/2023 | Sell Short | ELEKTRA*.MX | 7,693.00 | 1,125.7600 |
| 6/19/2023 | 6/21/2023 | Sell Short | ELEKTRA*.MX | 7,739.00 | 1,120.5400 |
| 6/20/2023 | 6/22/2023 | Sell Short | ELEKTRA*.MX | 9,515.00 | 1,128.8300 |
| 6/21/2023 | 6/23/2023 | Sell Short | ELEKTRA*.MX | 7,459.00 | 1,120.8175 |
| 6/22/2023 | 6/26/2023 | Sell Short | ELEKTRA*.MX | 6,252.00 | 1,117.0137 |
| 6/23/2023 | 6/27/2023 | Sell Short | ELEKTRA*.MX | 1,056.00 | 1,121.8354 |
| 6/26/2023 | 6/28/2023 | Sell Short | ELEKTRA*.MX | 1,236.00 | 1,121.3528 |
| 6/27/2023 | 6/29/2023 | Sell Short | ELEKTRA*.MX | 1,624.00 | 1,120.4800 |
| 6/28/2023 | 6/30/2023 | Sell Short | ELEKTRA*.MX | 3,024.00 | 1,121.8500 |
| 6/29/2023 | 7/3/2023 | Sell Short | ELEKTRA*.MX | 8,989.00 | 1,122.0900 |
| 6/30/2023 | 7/4/2023 | Sell Short | ELEKTRA*.MX | 9,546.00 | 1,147.9500 |
| 7/3/2023 | 7/5/2023 | Sell Short | ELEKTRA*.MX | 591.00 | 1,155.1970 |
| 7/4/2023 | 7/6/2023 | Sell Short | ELEKTRA*.MX | 1,121.00 | 1,165.0000 |
| 7/5/2023 | 7/7/2023 | Sell Short | ELEKTRA*.MX | 5,665.00 | 1,165.1775 |
| 7/6/2023 | 7/10/2023 | Sell Short | ELEKTRA*.MX | 9,472.00 | 1,148.6600 |
| 7/7/2023 | 7/11/2023 | Sell Short | ELEKTRA*.MX | 1,371.00 | 1,160.8843 |
| 7/10/2023 | 7/12/2023 | Sell Short | ELEKTRA*.MX | 8,646.00 | 1,180.4388 |
| 7/11/2023 | 7/13/2023 | Sell | ELEKTRA*.MX | 9,722.00 | 1,187.8920 |
| 7/12/2023 | 7/14/2023 | Sell | ELEKTRA*.MX | 1,344.00 | 1,214.4360 |
| 7/14/2023 | 7/18/2023 | Sell Short | ELEKTRA*.MX | 9,208.00 | 1,197.8100 |

| | | | | | |
|---|---|---|---|---|---|
| 7/17/2023 | 7/19/2023 | Sell Short | ELEKTRA*.MX | 1,253.00 | 1,200.7755 |
| 7/18/2023 | 7/20/2023 | Sell Short | ELEKTRA*.MX | 8,125.00 | 1,208.2239 |
| 7/19/2023 | 7/21/2023 | Sell Short | ELEKTRA*.MX | 8,856.00 | 1,207.9394 |
| 7/20/2023 | 7/24/2023 | Sell Short | ELEKTRA*.MX | 1,936.00 | 1,227.5800 |
| 7/21/2023 | 7/25/2023 | Sell Short | ELEKTRA*.MX | 7,625.00 | 1,218.3900 |
| 7/24/2023 | 7/26/2023 | Sell Short | ELEKTRA*.MX | 1,659.00 | 1,231.0400 |
| 7/25/2023 | 7/27/2023 | Sell Short | ELEKTRA*.MX | 1,111.00 | 1,236.4148 |
| 7/26/2023 | 7/28/2023 | Sell Short | ELEKTRA*.MX | 1,260.00 | 1,263.1570 |
| 7/27/2023 | 7/31/2023 | Sell Short | ELEKTRA*.MX | 8,627.00 | 1,243.6400 |
| 7/28/2023 | 8/1/2023 | Sell Short | ELEKTRA*.MX | 1,617.00 | 1,253.4700 |
| 7/31/2023 | 8/2/2023 | Sell Short | ELEKTRA*.MX | 8,977.00 | 1,253.1700 |
| 8/2/2023 | 8/4/2023 | Sell Short | ELEKTRA*.MX | 2,056.00 | 1,239.3771 |
| 8/2/2023 | 8/4/2023 | Sell Short | ELEKTRA*.MX | 1,455.00 | 1,252.0133 |
| 8/3/2023 | 8/7/2023 | Sell Short | ELEKTRA*.MX | 1,936.00 | 1,219.5200 |
| 8/4/2023 | 8/8/2023 | Sell Short | ELEKTRA*.MX | 8,245.00 | 1,206.7700 |
| 8/7/2023 | 8/9/2023 | Sell Short | ELEKTRA*.MX | 5,041.00 | 1,215.4500 |
| 8/8/2023 | 8/10/2023 | Sell Short | ELEKTRA*.MX | 8,042.00 | 1,192.1500 |
| 8/9/2023 | 8/11/2023 | Sell Short | ELEKTRA*.MX | 8,107.00 | 1,168.5300 |
| 8/10/2023 | 8/14/2023 | Sell Short | ELEKTRA*.MX | 1,547.00 | 1,179.8862 |
| 8/11/2023 | 8/15/2023 | Sell Short | ELEKTRA*.MX | 10,512.00 | 1,162.5323 |
| 8/14/2023 | 8/16/2023 | Sell Short | ELEKTRA*.MX | 718.00 | 1,167.7461 |
| 8/15/2023 | 8/17/2023 | Sell Short | ELEKTRA*.MX | 8,380.00 | 1,164.9500 |
| 8/16/2023 | 8/18/2023 | Sell Short | ELEKTRA*.MX | 8,100.00 | 1,168.1800 |
| 8/17/2023 | 8/21/2023 | Sell Short | ELEKTRA*.MX | 1,271.00 | 1,157.3882 |
| 8/18/2023 | 8/22/2023 | Sell Short | ELEKTRA*.MX | 2,928.00 | 1,165.0389 |
| 8/21/2023 | 8/23/2023 | Sell Short | ELEKTRA*.MX | 10,727.00 | 1,140.8348 |
| 8/22/2023 | 8/24/2023 | Sell Short | ELEKTRA*.MX | 2,375.00 | 1,145.4283 |
| 8/23/2023 | 8/25/2023 | Sell Short | ELEKTRA*.MX | 1,384.00 | 1,139.7897 |
| 8/24/2023 | 8/28/2023 | Sell Short | ELEKTRA*.MX | 7,439.00 | 1,140.0700 |
| 8/25/2023 | 8/29/2023 | Sell Short | ELEKTRA*.MX | 8,275.00 | 1,149.8100 |
| 8/28/2023 | 8/30/2023 | Sell Short | ELEKTRA*.MX | 7,624.00 | 1,153.4800 |
| 8/29/2023 | 8/31/2023 | Sell Short | ELEKTRA*.MX | 13,202.00 | 1,161.9928 |
| 8/30/2023 | 9/1/2023 | Sell Short | ELEKTRA*.MX | 3,030.00 | 1,179.7285 |
| 8/31/2023 | 9/4/2023 | Sell Short | ELEKTRA*.MX | 971.00 | 1,169.5100 |
| 9/1/2023 | 9/5/2023 | Sell Short | ELEKTRA*.MX | 1,997.00 | 1,163.4300 |
| 9/4/2023 | 9/6/2023 | Sell Short | ELEKTRA*.MX | 461.00 | 1,161.1421 |
| 9/5/2023 | 9/7/2023 | Sell Short | ELEKTRA*.MX | 10,365.00 | 1,152.2309 |
| 9/6/2023 | 9/8/2023 | Sell Short | ELEKTRA*.MX | 9,472.00 | 1,158.7801 |
| 9/7/2023 | 9/11/2023 | Sell Short | ELEKTRA*.MX | 1,175.00 | 1,157.4724 |
| 9/8/2023 | 9/12/2023 | Sell Short | ELEKTRA*.MX | 2,860.00 | 1,155.1660 |
| 9/11/2023 | 9/13/2023 | Sell Short | ELEKTRA*.MX | 10,439.00 | 1,149.0300 |
| 9/12/2023 | 9/14/2023 | Sell Short | ELEKTRA*.MX | 12,087.00 | 1,148.7296 |
| 9/14/2023 | 9/18/2023 | Sell Short | ELEKTRA*.MX | 2,476.00 | 1,157.9665 |
| 9/14/2023 | 9/18/2023 | Sell Short | ELEKTRA*.MX | 1,600.00 | 1,160.5000 |
| 9/15/2023 | 9/19/2023 | Sell Short | ELEKTRA*.MX | 8,249.00 | 1,165.7121 |
| 9/18/2023 | 9/20/2023 | Sell Short | ELEKTRA*.MX | 6,068.00 | 1,152.7226 |
| 9/19/2023 | 9/21/2023 | Sell Short | ELEKTRA*.MX | 2,954.00 | 1,161.8299 |

29

| | | | | | |
|---|---|---|---|---|---|
| 9/20/2023 | 9/22/2023 | Sell Short | ELEKTRA*.MX | 10,264.00 | 1,174.5700 |
| 9/21/2023 | 9/25/2023 | Sell Short | ELEKTRA*.MX | 1,753.00 | 1,170.1100 |
| 9/22/2023 | 9/26/2023 | Sell Short | ELEKTRA*.MX | 10,214.00 | 1,169.9100 |
| 9/26/2023 | 9/28/2023 | Sell Short | ELEKTRA*.MX | 10,992.00 | 1,158.8700 |
| 9/27/2023 | 9/29/2023 | Sell Short | ELEKTRA*.MX | 14,020.00 | 1,152.1400 |
| 9/28/2023 | 10/2/2023 | Sell Short | ELEKTRA*.MX | 2,052.00 | 1,150.9693 |
| 9/29/2023 | 10/3/2023 | Sell Short | ELEKTRA*.MX | 4,540.00 | 1,149.0239 |
| 10/2/2023 | 10/4/2023 | Sell Short | ELEKTRA*.MX | 3,304.00 | 1,154.1577 |
| 10/3/2023 | 10/5/2023 | Sell Short | ELEKTRA*.MX | 13,576.00 | 1,165.3800 |
| 10/4/2023 | 10/6/2023 | Sell Short | ELEKTRA*.MX | 12,970.00 | 1,150.0500 |
| 10/6/2023 | 10/10/2023 | Sell Short | ELEKTRA*.MX | 12,442.00 | 1,166.9600 |
| 10/9/2023 | 10/11/2023 | Sell Short | ELEKTRA*.MX | 1,791.00 | 1,165.1000 |
| 10/10/2023 | 10/12/2023 | Sell Short | ELEKTRA*.MX | 14,650.00 | 1,178.2300 |
| 10/11/2023 | 10/13/2023 | Sell Short | ELEKTRA*.MX | 13,679.00 | 1,182.2111 |
| 10/12/2023 | 10/16/2023 | Sell Short | ELEKTRA*.MX | 14,026.00 | 1,178.5100 |
| 10/13/2023 | 10/17/2023 | Sell Short | ELEKTRA*.MX | 1,780.00 | 1,182.4006 |
| 10/16/2023 | 10/18/2023 | Sell Short | ELEKTRA*.MX | 13,082.00 | 1,185.9487 |
| 10/17/2023 | 10/19/2023 | Sell Short | ELEKTRA*.MX | 12,978.00 | 1,183.2231 |
| 10/19/2023 | 10/23/2023 | Sell Short | ELEKTRA*.MX | 2,860.00 | 1,185.0745 |
| 10/19/2023 | 10/23/2023 | Sell Short | ELEKTRA*.MX | 1,674.00 | 1,179.0874 |
| 10/20/2023 | 10/24/2023 | Sell Short | ELEKTRA*.MX | 3,827.00 | 1,177.2756 |
| 10/23/2023 | 10/25/2023 | Sell Short | ELEKTRA*.MX | 2,255.00 | 1,175.7900 |
| 10/24/2023 | 10/26/2023 | Sell Short | ELEKTRA*.MX | 1,718.00 | 1,170.3248 |
| 10/25/2023 | 10/27/2023 | Sell Short | ELEKTRA*.MX | 15,420.00 | 1,157.5320 |
| 10/26/2023 | 10/30/2023 | Sell Short | ELEKTRA*.MX | 12,088.00 | 1,158.1832 |
| 10/27/2023 | 10/31/2023 | Sell Short | ELEKTRA*.MX | 3,011.00 | 1,155.0400 |
| 10/30/2023 | 11/1/2023 | Sell Short | ELEKTRA*.MX | 1,175.00 | 1,152.7200 |
| 10/31/2023 | 11/3/2023 | Sell Short | ELEKTRA*.MX | 15,228.00 | 1,150.8229 |
| 11/1/2023 | 11/6/2023 | Sell Short | ELEKTRA*.MX | 1,755.00 | 1,149.4700 |
| 11/3/2023 | 11/7/2023 | Sell Short | ELEKTRA*.MX | 2,168.00 | 1,150.5100 |
| 11/6/2023 | 11/8/2023 | Sell Short | ELEKTRA*.MX | 1,154.00 | 1,150.0500 |
| 11/7/2023 | 11/9/2023 | Sell Short | ELEKTRA*.MX | 2,798.00 | 1,149.8100 |
| 11/8/2023 | 11/10/2023 | Sell Short | ELEKTRA*.MX | 1,025.00 | 1,151.3100 |
| 11/9/2023 | 11/13/2023 | Sell Short | ELEKTRA*.MX | 985.00 | 1,153.0604 |
| 11/10/2023 | 11/14/2023 | Sell Short | ELEKTRA*.MX | 678.00 | 1,154.7243 |
| 11/13/2023 | 11/15/2023 | Sell Short | ELEKTRA*.MX | 706.00 | 1,158.8916 |
| 11/14/2023 | 11/16/2023 | Sell | ELEKTRA*.MX | 8,124.00 | 1,155.7197 |
| 11/15/2023 | 11/17/2023 | Sell Short | ELEKTRA*.MX | 2,141.00 | 1,160.7447 |
| 11/16/2023 | 11/21/2023 | Sell Short | ELEKTRA*.MX | 8,264.00 | 1,166.0823 |
| 11/17/2023 | 11/22/2023 | Sell Short | ELEKTRA*.MX | 7,888.00 | 1,162.3000 |
| 11/21/2023 | 11/23/2023 | Sell Short | ELEKTRA*.MX | 12,555.00 | 1,173.0960 |
| 11/22/2023 | 11/24/2023 | Sell Short | ELEKTRA*.MX | 11,185.00 | 1,184.7679 |
| 11/23/2023 | 11/27/2023 | Sell Short | ELEKTRA*.MX | 8,629.00 | 1,184.6898 |
| 11/24/2023 | 11/28/2023 | Sell Short | ELEKTRA*.MX | 12,060.00 | 1,192.9100 |
| 11/27/2023 | 11/29/2023 | Sell Short | ELEKTRA*.MX | 9,515.00 | 1,189.1322 |
| 11/28/2023 | 11/30/2023 | Sell Short | ELEKTRA*.MX | 12,487.00 | 1,180.7592 |
| 11/29/2023 | 12/1/2023 | Sell Short | ELEKTRA*.MX | 11,599.00 | 1,167.8400 |

| | | | | | |
|---|---|---|---|---|---|
| 11/30/2023 | 12/4/2023 | Sell Short | ELEKTRA*.MX | 12,027.00 | 1,180.4591 |
| 12/1/2023 | 12/5/2023 | Sell Short | ELEKTRA*.MX | 3,697.00 | 1,163.5340 |
| 12/4/2023 | 12/6/2023 | Sell Short | ELEKTRA*.MX | 2,047.00 | 1,165.9047 |
| 12/5/2023 | 12/7/2023 | Sell Short | ELEKTRA*.MX | 9,859.00 | 1,164.7700 |
| 12/6/2023 | 12/8/2023 | Sell Short | ELEKTRA*.MX | 5,349.00 | 1,173.3580 |
| 12/7/2023 | 12/11/2023 | Sell Short | ELEKTRA*.MX | 11,575.00 | 1,166.2400 |
| 12/7/2023 | 12/11/2023 | Sell Short | ELEKTRA*.MX | 2,000.00 | 1,166.1100 |
| 12/8/2023 | 12/13/2023 | Sell Short | ELEKTRA*.MX | 2,043.00 | 1,161.9100 |
| 12/11/2023 | 12/14/2023 | Sell Short | ELEKTRA*.MX | 10,359.00 | 1,156.3898 |
| 12/13/2023 | 12/15/2023 | Sell Short | ELEKTRA*.MX | 10,662.00 | 1,149.8800 |
| 12/14/2023 | 12/18/2023 | Sell Short | ELEKTRA*.MX | 4,074.00 | 1,153.7900 |
| 12/15/2023 | 12/19/2023 | Sell Short | ELEKTRA*.MX | 7,613.00 | 1,150.2300 |
| 12/15/2023 | 12/19/2023 | Sell Short | ELEKTRA*.MX | 2,000.00 | 1,149.7400 |
| 12/18/2023 | 12/20/2023 | Sell Short | ELEKTRA*.MX | 2,567.00 | 1,150.5300 |
| 12/19/2023 | 12/21/2023 | Sell Short | ELEKTRA*.MX | 6,845.00 | 1,149.7900 |
| 12/21/2023 | 12/26/2023 | Sell Short | ELEKTRA*.MX | 2,716.00 | 1,168.4090 |
| 12/22/2023 | 12/27/2023 | Sell | ELEKTRA*.MX | 1,031.00 | 1,169.6158 |
| 12/26/2023 | 12/28/2023 | Sell Short | ELEKTRA*.MX | 11,432.00 | 1,171.0012 |
| 12/27/2023 | 12/29/2023 | Sell Short | ELEKTRA*.MX | 15,450.00 | 1,172.1900 |
| 12/28/2023 | 1/2/2024 | Sell Short | ELEKTRA*.MX | 12,295.00 | 1,164.1700 |
| 12/29/2023 | 1/3/2024 | Sell Short | ELEKTRA*.MX | 2,958.00 | 1,172.1000 |
| 1/2/2024 | 1/4/2024 | Sell Short | ELEKTRA*.MX | 1,449.00 | 1,161.6200 |
| 1/3/2024 | 1/5/2024 | Sell Short | ELEKTRA*.MX | 10,209.00 | 1,170.8853 |
| 1/4/2024 | 1/8/2024 | Sell Short | ELEKTRA*.MX | 10,874.00 | 1,163.0300 |
| 1/5/2024 | 1/9/2024 | Sell Short | ELEKTRA*.MX | 1,862.00 | 1,170.9900 |
| 1/8/2024 | 1/10/2024 | Sell Short | ELEKTRA*.MX | 14,714.00 | 1,161.7363 |
| 1/9/2024 | 1/11/2024 | Sell Short | ELEKTRA*.MX | 4,128.00 | 1,150.0500 |
| 1/10/2024 | 1/12/2024 | Sell Short | ELEKTRA*.MX | 12,608.00 | 1,149.8900 |
| 1/11/2024 | 1/15/2024 | Sell Short | ELEKTRA*.MX | 1,975.00 | 1,166.9000 |
| 1/12/2024 | 1/16/2024 | Sell Short | ELEKTRA*.MX | 11,252.00 | 1,158.9389 |
| 1/15/2024 | 1/17/2024 | Sell Short | ELEKTRA*.MX | 12,614.00 | 1,150.9600 |
| 1/16/2024 | 1/18/2024 | Sell Short | ELEKTRA*.MX | 14,167.00 | 1,150.1600 |
| 1/17/2024 | 1/19/2024 | Sell Short | ELEKTRA*.MX | 6,978.00 | 1,151.7800 |
| 1/18/2024 | 1/22/2024 | Sell Short | ELEKTRA*.MX | 1,985.00 | 1,157.9200 |
| 1/19/2024 | 1/23/2024 | Sell Short | ELEKTRA*.MX | 3,941.00 | 1,150.4797 |
| 1/22/2024 | 1/24/2024 | Sell Short | ELEKTRA*.MX | 1,541.00 | 1,149.8600 |
| 1/23/2024 | 1/25/2024 | Sell Short | ELEKTRA*.MX | 9,937.00 | 1,149.0700 |
| 1/24/2024 | 1/26/2024 | Sell Short | ELEKTRA*.MX | 15,098.00 | 1,149.2200 |
| 1/25/2024 | 1/29/2024 | Sell Short | ELEKTRA*.MX | 17,789.00 | 1,150.4556 |
| 1/26/2024 | 1/30/2024 | Sell Short | ELEKTRA*.MX | 11,192.00 | 1,155.9200 |
| 1/29/2024 | 1/31/2024 | Sell Short | ELEKTRA*.MX | 6,739.00 | 1,156.2201 |
| 1/30/2024 | 2/1/2024 | Sell Short | ELEKTRA*.MX | 17,079.00 | 1,149.3400 |
| 1/31/2024 | 2/2/2024 | Sell Short | ELEKTRA*.MX | 2,358.00 | 1,150.4669 |
| 2/1/2024 | 2/6/2024 | Sell Short | ELEKTRA*.MX | 4,838.00 | 1,150.9192 |
| 2/2/2024 | 2/7/2024 | Sell Short | ELEKTRA*.MX | 10,943.00 | 1,155.1200 |
| 2/6/2024 | 2/8/2024 | Sell Short | ELEKTRA*.MX | 16,607.00 | 1,174.3000 |
| 2/7/2024 | 2/9/2024 | Sell Short | ELEKTRA*.MX | 15,185.00 | 1,176.3800 |

31

| | | | | | |
|---|---|---|---|---|---|
| 2/8/2024 | 2/12/2024 | Sell Short | ELEKTRA*.MX | 12,052.00 | 1,175.4900 |
| 2/9/2024 | 2/13/2024 | Sell Short | ELEKTRA*.MX | 15,587.00 | 1,166.3500 |
| 2/12/2024 | 2/14/2024 | Sell Short | ELEKTRA*.MX | 2,429.00 | 1,168.2100 |
| 2/13/2024 | 2/15/2024 | Sell Short | ELEKTRA*.MX | 11,890.00 | 1,164.5800 |
| 2/14/2024 | 2/16/2024 | Sell Short | ELEKTRA*.MX | 1,474.00 | 1,160.0100 |
| 2/15/2024 | 2/19/2024 | Sell Short | ELEKTRA*.MX | 12,810.00 | 1,157.0700 |
| 2/16/2024 | 2/20/2024 | Sell Short | ELEKTRA*.MX | 13,750.00 | 1,170.7100 |
| 2/19/2024 | 2/21/2024 | Sell Short | ELEKTRA*.MX | 638.00 | 1,182.0112 |
| 2/20/2024 | 2/22/2024 | Sell Short | ELEKTRA*.MX | 2,883.00 | 1,194.0500 |
| 2/21/2024 | 2/23/2024 | Sell Short | ELEKTRA*.MX | 16,698.00 | 1,195.6900 |
| 2/22/2024 | 2/26/2024 | Sell Short | ELEKTRA*.MX | 11,298.00 | 1,180.7900 |
| 2/23/2024 | 2/27/2024 | Sell | ELEKTRA*.MX | 12,500.00 | 1,197.6107 |
| 2/26/2024 | 2/28/2024 | Sell Short | ELEKTRA*.MX | 2,458.00 | 1,195.2499 |
| 2/27/2024 | 2/29/2024 | Sell Short | ELEKTRA*.MX | 4,449.00 | 1,196.4876 |
| 2/28/2024 | 3/1/2024 | Sell Short | ELEKTRA*.MX | 2,352.00 | 1,189.4783 |
| 2/29/2024 | 3/4/2024 | Sell Short | ELEKTRA*.MX | 6,584.00 | 1,187.1600 |
| 3/1/2024 | 3/5/2024 | Sell Short | ELEKTRA*.MX | 3,113.00 | 1,191.3700 |
| 3/4/2024 | 3/6/2024 | Sell Short | ELEKTRA*.MX | 11,709.00 | 1,182.2379 |
| 3/5/2024 | 3/7/2024 | Sell Short | ELEKTRA*.MX | 4,265.00 | 1,175.3915 |
| 3/6/2024 | 3/8/2024 | Sell Short | ELEKTRA*.MX | 13,437.00 | 1,186.2446 |
| 3/7/2024 | 3/11/2024 | Sell Short | ELEKTRA*.MX | 2,803.00 | 1,175.1600 |
| 3/8/2024 | 3/12/2024 | Sell Short | ELEKTRA*.MX | 3,089.00 | 1,160.4300 |
| 3/11/2024 | 3/13/2024 | Sell Short | ELEKTRA*.MX | 3,036.00 | 1,150.6454 |
| 3/12/2024 | 3/14/2024 | Sell | ELEKTRA*.MX | 5,593.00 | 1,148.6706 |
| 3/13/2024 | 3/15/2024 | Sell Short | ELEKTRA*.MX | 3,770.00 | 1,146.5712 |
| 3/14/2024 | 3/19/2024 | Sell Short | ELEKTRA*.MX | 4,095.00 | 1,148.6935 |
| 3/15/2024 | 3/20/2024 | Sell | ELEKTRA*.MX | 14,582.00 | 1,149.6624 |
| 3/19/2024 | 3/21/2024 | Sell | ELEKTRA*.MX | 18,819.00 | 1,150.5723 |
| 3/20/2024 | 3/22/2024 | Sell | ELEKTRA*.MX | 13,267.00 | 1,148.5200 |
| 3/21/2024 | 3/25/2024 | Sell | ELEKTRA*.MX | 17,969.00 | 1,149.5900 |
| 3/22/2024 | 3/26/2024 | Sell | ELEKTRA*.MX | 14,404.00 | 1,149.7100 |
| 3/25/2024 | 3/27/2024 | Sell | ELEKTRA*.MX | 11,036.00 | 1,149.4400 |
| 3/26/2024 | 4/1/2024 | Sell | ELEKTRA*.MX | 17,940.00 | 1,151.3499 |
| 3/27/2024 | 4/2/2024 | Sell | ELEKTRA*.MX | 9,958.00 | 1,150.9211 |
| 2024-04-01 | 2024-04-03 | Sell | ELEKTRA* MF Equity | 11,276 | 1,150.06 |
| 2024-04-02 | 2024-04-04 | Sell | ELEKTRA* MF Equity | 3,779 | 1,148.63 |
| 2024-04-03 | 2024-04-05 | Sell | ELEKTRA* MF Equity | 10,063 | 1,150.35 |
| 2024-04-04 | 2024-04-11 | Sell | ELEKTRA* MF Equity | 1,940 | 1,150.16 |
| 2024-04-05 | 2024-07-05 | Sell | ELEKTRA* MF Equity | 1,105 | 1,149.38 |
| 2024-04-08 | 2024-04-10 | Sell | ELEKTRA* MF Equity | 1,322 | 1,149.17 |
| 2024-04-09 | 2024-04-11 | Sell | ELEKTRA* MF Equity | 2,097 | 1,148.91 |
| 2024-04-11 | 2024-04-15 | Sell | ELEKTRA* MF Equity | 1,589 | 1,148.99 |
| 2024-04-12 | 2024-04-16 | Sell | ELEKTRA* MF Equity | 9,851 | 1,150.25 |
| 2024-04-15 | 2024-04-17 | Sell | ELEKTRA* MF Equity | 3,239 | 1,149.13 |
| 2024-04-16 | 2024-01-05 | Sell | ELEKTRA* MF Equity | 5,913 | 1,148.62 |
| 2024-04-17 | 2024-04-19 | Sell | ELEKTRA* MF Equity | 12,788 | 1,149.35 |
| 2024-04-18 | 2024-04-22 | Sell | ELEKTRA* MF Equity | 10,953 | 1,149.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2024-04-19 | 2024-04-23 | Sell | ELEKTRA* MF Equity | 2,057 | | 1,153.40 |
| 2024-04-22 | 2024-04-24 | Sell | ELEKTRA* MF Equity | 2,507 | | 1,149.34 |
| 2024-04-23 | 2024-05-20 | Sell | ELEKTRA* MF Equity | 13,449 | | 1,116.91 |
| 2024-04-24 | 2024-04-26 | Sell | ELEKTRA* MF Equity | 12,531 | | 1,101.31 |
| 2024-04-25 | 2024-05-16 | Sell | ELEKTRA* MF Equity | 13,501 | | 1,098.32 |
| 2024-04-26 | 2024-04-30 | Sell | ELEKTRA* MF Equity | 1,805 | | 1,107.59 |
| 2024-04-29 | 2024-05-22 | Sell | ELEKTRA* MF Equity | 12,592 | | 1,110.41 |
| 2024-04-30 | 2024-03-05 | Sell | ELEKTRA* MF Equity | 13,200 | | 1,105.64 |
| 2024-05-02 | 2024-05-22 | Sell | ELEKTRA* MF Equity | 3,703 | | 1,111.43 |
| 2024-05-03 | 2024-06-03 | Sell | ELEKTRA* MF Equity | 9,172 | | 1,109.88 |
| 2024-05-06 | 2024-05-08 | Sell | ELEKTRA* MF Equity | 9,581 | | 1,108.99 |
| 2024-05-07 | 2024-05-09 | Sell | ELEKTRA* MF Equity | | 911.00 | 1,109.18 |
| 2024-05-07 | 2024-05-09 | Sell | ELEKTRA* MF Equity | | 655.00 | 1,109.25 |
| 2024-05-08 | 2024-06-03 | Sell | ELEKTRA* MF Equity | 8,493 | | 1,104.21 |
| 2024-05-09 | 2024-05-13 | Sell | ELEKTRA* MF Equity | 12,497 | | 1,107.24 |
| 2024-05-13 | 2024-05-15 | Sell | ELEKTRA* MF Equity | 9,906 | | 1,109.01 |
| 2024-05-14 | 2024-05-16 | Sell | ELEKTRA* MF Equity | 1,301 | | 1,104.28 |
| 2024-05-15 | 2024-06-17 | Sell | ELEKTRA* MF Equity | 9,948 | | 1,102.80 |
| 2024-05-16 | 2024-05-20 | Sell | ELEKTRA* MF Equity | 1,628 | | 1,101.15 |
| 2024-05-17 | 2024-05-21 | Sell | ELEKTRA* MF Equity | 1,266 | | 1,101.79 |
| 2024-05-20 | 2024-05-22 | Sell | ELEKTRA* MF Equity | | 990.00 | 1,104.47 |
| 2024-05-21 | 2024-05-23 | Sell | ELEKTRA* MF Equity | 11,357 | | 1,099.80 |
| 2024-05-22 | 2024-05-24 | Sell | ELEKTRA* MF Equity | 3,279 | | 1,098.83 |
| 2024-05-23 | 2024-05-27 | Sell | ELEKTRA* MF Equity | 2,229 | | 1,099.47 |
| 2024-05-24 | 2024-05-28 | Sell | ELEKTRA* MF Equity | 8,345 | | 1,102.85 |
| 2024-05-27 | 2024-05-28 | Sell | ELEKTRA* MF Equity | 9,876 | | 1,098.02 |
| 2024-05-28 | 2024-05-29 | Sell | ELEKTRA* MF Equity | 11,990 | | 1,095.57 |
| 2024-05-29 | 2024-05-30 | Sell | ELEKTRA* MF Equity | 7,900 | | 1,098.92 |
| 2024-05-30 | 2024-06-03 | Sell | ELEKTRA* MF Equity | 7,093 | | 1,095.28 |
| 2024-05-31 | 2024-06-03 | Sell | ELEKTRA* MF Equity | 8,279 | | 1,094.77 |
| 2024-06-03 | 2024-06-04 | Sell | ELEKTRA* MF Equity | 16,521 | | 1,080.98 |
| 2024-06-03 | 2024-06-04 | Sell | ELEKTRA* MF Equity | 1,000 | | 1,078.12 |
| 2024-06-04 | 2024-06-06 | Sell | ELEKTRA* MF Equity | 6,557 | | 1,095.61 |
| 2024-06-05 | 2024-06-06 | Sell | ELEKTRA* MF Equity | 4,292 | | 1,080.47 |
| 2024-06-06 | 2024-06-07 | Sell | ELEKTRA* MF Equity | 5,245 | | 1,078.84 |
| 2024-06-07 | 2024-06-10 | Sell | ELEKTRA* MF Equity | 9,628 | | 1,062.42 |
| 2024-06-10 | 2024-06-11 | Sell | ELEKTRA* MF Equity | 12,324 | | 1,065.18 |
| 2024-06-11 | 2024-06-12 | Sell | ELEKTRA* MF Equity | 10,817 | | 1,076.37 |
| 2024-06-12 | 2024-06-14 | Sell | ELEKTRA* MF Equity | 9,903 | | 1,069.91 |
| 2024-06-13 | 2024-06-14 | Sell | ELEKTRA* MF Equity | 1,925 | | 1,082.48 |
| 2024-06-14 | 2024-06-17 | Sell | ELEKTRA* MF Equity | 1,603 | | 1,073.63 |
| 2024-06-17 | 2024-06-18 | Sell | ELEKTRA* MF Equity | 2,639 | | 1,078.84 |
| 2024-06-18 | 2024-06-19 | Sell | ELEKTRA* MF Equity | 8,222 | | 1,093.58 |
| 2024-06-19 | 2024-06-20 | Sell | ELEKTRA* MF Equity | 1,574 | | 1,080.83 |
| 2024-06-20 | 2024-06-21 | Sell | ELEKTRA* MF Equity | 5,507 | | 1,064.70 |
| 2024-06-21 | 2024-06-24 | Sell | ELEKTRA* MF Equity | 43,512 | | 1,064.54 |
| 2024-06-24 | 2024-06-25 | Sell | ELEKTRA* MF Equity | 5,476 | | 1,069.47 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2024-06-25 | 2024-06-26 | Sell | ELEKTRA* MF Equity | 8,249 | | 1,070.71 |
| 2024-06-26 | 2024-06-27 | Sell | ELEKTRA* MF Equity | 10,889 | | 1,065.85 |
| 2024-06-27 | 2024-06-28 | Sell | ELEKTRA* MF Equity | 6,396 | | 1,058.59 |
| 2024-06-28 | 2024-07-01 | Sell | ELEKTRA* MF Equity | 3,380 | | 1,054.97 |
| 2024-07-01 | 2024-07-02 | Sell | ELEKTRA* MF Equity | 8,647 | | 1,055.05 |
| 2024-07-02 | 2024-07-03 | Sell | ELEKTRA* MF Equity | 7,436 | | 1,050.85 |
| 2024-07-03 | 2024-07-04 | Sell | ELEKTRA* MF Equity | 9,052 | | 1,052.60 |
| 2024-07-04 | 2024-07-05 | Sell | ELEKTRA* MF Equity | | 205.00 | 1,050.61 |
| 2024-07-08 | 2024-07-09 | Sell | ELEKTRA* MF Equity | 2,668 | | 1,054.39 |
| 2024-07-09 | 2024-07-10 | Sell | ELEKTRA* MF Equity | 5,426 | | 1,048.79 |
| 2024-07-09 | 2024-07-10 | Sell | ELEKTRA* MF Equity | 4,222 | | 1,049.08 |
| 2024-07-10 | 2024-07-12 | Sell | ELEKTRA* MF Equity | 12,190 | | 1,048.45 |
| 2024-07-11 | 2024-07-12 | Sell | ELEKTRA* MF Equity | 10,991 | | 1,049.50 |
| 2024-07-12 | 2024-07-15 | Sell | ELEKTRA* MF Equity | 2,919 | | 1,052.40 |
| 2024-07-15 | 2024-07-16 | Sell | ELEKTRA* MF Equity | 3,112 | | 1,048.98 |
| 2024-07-16 | 2024-07-17 | Sell | ELEKTRA* MF Equity | 14,047 | | 1,048.64 |
| 2024-07-17 | 2024-07-18 | Sell | ELEKTRA* MF Equity | 14,274 | | 1,047.93 |
| 2024-07-18 | 2024-07-19 | Sell | ELEKTRA* MF Equity | 12,520 | | 1,048.76 |
| 2024-07-19 | 2024-07-22 | Sell | ELEKTRA* MF Equity | 8,345 | | 1,049.12 |
| 2024-07-22 | 2024-07-23 | Sell | ELEKTRA* MF Equity | 12,940 | | 1,050.48 |
| 2024-07-23 | 2024-07-24 | Sell | ELEKTRA* MF Equity | 15,178 | | 1,048.03 |
| 2024-07-24 | 2024-07-25 | Sell | ELEKTRA* MF Equity | 4,337 | | 1,043.05 |
| 2024-07-25 | 2024-07-26 | Sell | ELEKTRA* MF Equity | 16,128 | | 1,046.92 |
| 2024-07-26 | 2024-07-29 | Sell | ELEKTRA* MF Equity | 5,409 | | 988.93 |

# EXHIBIT 53

| TRADE DATE | SETTLE DATE | ORDER | SECURITY | PORT QTTY | PRICE | NOTES |
|---|---|---|---|---|---|---|
| 1/31/2022 | 1/31/2022 | Cash Paid | CASH USD | 23,229,156 | 1.0000 | Client Redemption |
| 10/17/2022 | 10/17/2022 | Cash Paid | CASH USD | 17,995,892 | 1.0000 | Client Redemption |
| 7/10/2023 | 7/10/2023 | Cash Paid | CASH USD | 1,800,000 | 1.0000 | Client Redemption |

# EXHIBIT 54

| TRADE DATE | SETTLE DATE | SECURITY | PORT QTTY | | NOTES |
|---|---|---|---|---|---|
| 1/31/2022 | 1/31/2022 | CASH USD | 16,580,424 | Client Redemption | |
| 5/12/2022 | 5/12/2022 | CASH USD | 35,000,000 | Client Redemption | |
| 7/15/2022 | 7/15/2022 | CASH USD | 9,000,000 | Client Redemption | |
| 8/10/2022 | 8/10/2022 | CASH USD | 6,280,000 | Client Redemption | |
| 11/22/2022 | 11/22/2022 | CASH USD | 22,000,000 | Client Redemption | |
| 12/14/2022 | 12/14/2022 | CASH USD | 7,000,000 | Client Redemption | |
| 3/23/2023 | 3/23/2023 | CASH USD | 25,000,000 | Client Redemption | |
| 7/5/2023 | 7/5/2023 | CASH USD | 15,300,000 | Client Redemption | |
| 10/31/2023 | 10/31/2023 | CASH USD | 9,000,000 | Client Redemption | |
| 12/7/2023 | 12/7/2023 | CASH USD | 18,000,000 | Client Redemption | |
| 3/21/2024 | 3/21/2024 | CASH USD | 33,500,000 | Client Redemption | |
| 4/29/2024 | 4/29/2024 | CASH USD | 17,000,000 | Client Redemption | |
| 7/5/2024 | 7/5/2024 | CASH USD | 15,000,000 | Client Redemption | |

36

# EXHIBIT 55



**J U R I S T I Q**

World-Wide Legal Services
Provider

Jurist IQ Corp
530 Fifth Ave
9th Floor
New York, NY 10036

We are Open 24/7 at:
+1 (888) 380-0088
+1 (212) 656-1524 (Fax)

www.JuristIQ.com

**INCOMING WIRING INSTRUCTIONS**

Beneficiary's Bank Information:
JP Morgan Chase Bank NA
270 Park Ave
New York, NY 10017

ABA Number (Domestic): 021000021
SWIFT Code (International): CHASUS33

Bank Phone Number: (212) 819-2743

Beneficiary Information:
Jurist Iq Corp Attorney Trust Account IOLA
530 Fifth Ave
9th Floor
New York, NY 10036

Bank Account Number: 695365152

Jurist IQ and their Attorneys are Currently
Licensed to Practice in Alabama, Florida,
Colorado, New Jersey & New York.

# EXHIBIT 56



**31/07/2024  21:00:00 PM**

**Client Information**

| Name | TMC63- Ricardo Salinas | Address | Cristobal Colon 79 Int c | Account ID TMClient63 |
|------|------------------------|---------|--------------------------|------------------------|
|      |                        |         | Mexico 09360             | Trade Date 20240731    |

**Positions Overview**

| ACCOUNT | SECURITY | DESCRIPTION | ISIN | SEDOL | QUANTITY | PRICE | CURRENCY | VALUE LOCAL CCY | VALUE |
|---------|----------|-------------|------|-------|----------|-------|----------|-----------------|-------|
| TMClient63 | CASH MXN | MXN CASH BALANCE | | | 20,000.00 | - | MXN | 20,000.00 | 1,091.84 |
| TMClient63 | CASH USD | USD CASH BALANCE | | | 1,223.90 | - | USD | 1,223.90 | 1,223.90 |
| | | | | | | | | TOTAL | 2,315.74 |

Tavira Monaco Sam
6 BD des Moulins 9800 Monaco
RCI 09 S 05059

**Trades Overview**

31/07/2024 -21:00:00 PM

| TRADE DATE | SETTLE DATE | ACCOUNT ID | ISIN | SECURITY DESCRIPTION | ORDER | Gross Price | Quantity | NOTIONAL AMOUNT | COMMISH AMT | FEES AMT | SEC CCY | NET PRICE | SEC CCY AMT | SETTLE CCY | SETTLE CCY AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15/12/2021 | 15/12/2021 | TMClient63 | MXO1EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 2,350,000.00 | - | - | - | MXN | - | - | MXN | 0 |
| 18/01/2022 | 20/01/2022 | TMClient63 | MXO1EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 186,078.00 | - | - | - | MXN | - | - | MXN | 0 |
| 18/01/2022 | 20/01/2022 | TMClient63 | MXO1EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 120,709.00 | - | - | - | MXN | - | - | MXN | 0 |
| 19/01/2022 | 19/01/2022 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 7,395,224.00 | 7,395,224.00 | - | - | MXN | - | 7,395,224.00 | MXN | 0 |
| 25/02/2022 | 25/02/2022 | TMClient63 | | MXN Cash Received | Cash Received | 0 | 7,395,224.00 | 7,395,224.00 | - | - | MXN | - | 7,395,224.00 | MXN | 0 |
| 22/06/2022 | 22/06/2022 | TMClient63 | MXO1EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 1,431,700.00 | - | - | - | MXN | - | - | MXN | 0 |
| 14/06/2022 | 14/06/2022 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 3,309,489.09 | 3,309,489.09 | - | - | MXN | - | 3,309,489.09 | MXN | 0 |
| 28/06/2022 | 28/06/2022 | TMClient63 | | Elektra Dividend | Cash Received | 0 | 21,298,092.40 | 21,298,092.40 | - | - | MXN | - | 21,298,092.40 | MXN | 0 |
| 07/06/2022 | 07/06/2022 | TMClient63 | | MXN Cash Withdrawal Fee | Cash Paid | 0 | 1,000.00 | 1,000.00 | - | - | MXN | - | 1,000.00 | MXN | 0 |
| 14/07/2022 | 18/07/2022 | TMClient63 | | MXN USD FX | Sell | 0 | 17,968,000.00 | 857,411.43 | - | - | MXN | 0.047719 | 17,968,000.00 | USD | 0 |
| 20/07/2022 | 20/07/2022 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 857,411.44 | 857,411.44 | - | - | USD | - | 857,411.44 | USD | 0 |
| 07/09/2022 | 07/09/2022 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 237,973.00 | 237,973.00 | - | - | USD | - | 237,973.00 | USD | 0 |
| 07/09/2022 | 07/09/2022 | TMClient63 | | USD Received | Cash Received | 0 | 237,973.07 | 237,973.07 | - | - | USD | - | 237,973.00 | USD | 0 |
| 15/12/2022 | 15/12/2022 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 6,346,114.77 | 6,346,114.77 | - | - | USD | - | 6,346,114.77 | USD | 0 |
| 03/04/2023 | 03/04/2023 | TMClient63 | MXO1EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 128,207.00 | - | - | - | MXN | - | - | MXN | 0 |
| 04/04/2023 | 04/04/2023 | TMClient63 | MXO1EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 1,600,000.00 | - | - | - | MXN | - | - | MXN | 0 |
| 24/04/2023 | 24/04/2023 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 30,284,768.80 | 30,284,769.00 | - | - | MXN | - | 30,284,769.00 | MXN | 0 |
| 12/09/2023 | 14/09/2023 | TMClient63 | MXO1EL000003 | Elektra Dividend | Cash Received | 0 | 340,000.00 | - | - | - | MXN | - | - | MXN | 0 |
| 12/09/2023 | 14/09/2023 | TMClient63 | MXO1EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Receive | 0 | 104,389.00 | - | - | - | MXN | - | - | MXN | 0 |
| 12/09/2023 | 12/09/2023 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 2,000.00 | 2,000.00 | - | - | MXN | - | 2,000.00 | MXN | 0 |
| 21/09/2023 | 21/09/2023 | TMClient63 | | MXN Cash Debit | Cash Paid | 0 | 30,262,768.80 | 30,262,768.80 | - | - | MXN | - | 30,262,768.80 | MXN | 0 |
| 15/12/2023 | 15/12/2023 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 157,644.35 | 157,644.35 | - | - | USD | - | 157,644.35 | USD | -167644 |
| 23/01/2024 | 23/01/2024 | TMClient63 | | USD Cash Debit | Cash Received | 0 | 157,644.35 | 157,644.35 | - | - | USD | - | 157,644.35 | USD | 167644 |
| 18/01/2024 | 18/01/2024 | TMClient63 | | USD Cash Debit | Cash Paid | 0 | 21,210.00 | 21,210.00 | - | - | USD | - | 21,210.00 | USD | -21000 |
| 27/03/2024 | 27/03/2024 | TMClient63 | | USD Received | Cash Received | 0 | 22,000.00 | 22,000.00 | - | - | USD | - | 22,000.00 | USD | 22000 |
| 25/04/2024 | 25/04/2024 | TMClient63 | | Elektra Dividend | Cash Received | 0 | 32,595,591.60 | 32,595,591.60 | - | - | MXN | - | 32,595,591.60 | MXN | 3456692 |
| 14/05/2024 | 14/05/2024 | TMClient63 | | USD Buy | Buy | 0 | 32,595,591.60 | 32,595,591.60 | - | - | MXN | - | 32,595,591.60 | MXN | 3456692 |
| 14/05/2024 | 14/05/2024 | TMClient63 | | MXN Cash Debit | Cash Received | 0 | 1,936,847.33 | 1,936,847.33 | - | - | USD | - | 1,936,847.33 | USD | 1936847 |
| 14/05/2024 | 14/05/2024 | TMClient63 | | Transfer to TMC04 | Cash Paid | 0 | 1,771,080.04 | 1,771,080.04 | - | - | USD | - | 1,771,080.04 | USD | -1771080 |
| 14/05/2024 | 14/05/2024 | TMClient63 | | USD Cash Debit | | 0 | 168,849.55 | 168,849.55 | - | - | USD | - | 168,849.55 | USD | -168850 |
| 29/07/2024 | 29/07/2024 | TMClient63 | MXO1EL000003 | GRUPO ELEKTRA SAB DE CV | FOP Delivery Out | 0 | 6,268,383.00 | - | - | - | MXN | - | - | MXN | 0 |

Tavira Monaco Sam
6 BD des Moulins 98000 Monaco
RCI 09 S 05058

# EXHIBIT 57

**31/07/2024 21:00**

**TAVIRA**

**Client Information**

| | | | |
|---|---|---|---|
| **Name** | TMCG4- Corporacion RBS SA de CV | **Address** | AV FFCC de Rio Frio 419 V Cuchilla De Moral 1 Iztapalapa, '09319, Ciudad de Mexico |
| | | **Account ID** | TMClient64 |
| | | **Trade Date** | 20240731 |

**Positions Overview**

| ACCOUNT | SECURITY | DESCRIPTION | ISIN | SEDOL | QUANTITY | PRICE | CURRENCY | VALUE LOCAL CCY | VALUE |
|---|---|---|---|---|---|---|---|---|---|
| TMClient64 | CASH USD | USD CASH BALANCE | | | 5.29 | 1.00 | USD | 5 | 5.29 |
| | | | | | | | TOTAL | | 5.29 |

Tavira Monaco Sam
6 BD des Moulins 9800 Monaco
RCI 09 S 05059

40

31/07/2024

**Trades Overview**



| TRADE DATE | SETTLE DATE | ACCOUNT ID | ISIN | SECURITY DESCRIPTION | ORDER | QUANTITY | GROSS PRICE | NOTIONAL AMOUNT | COMMISH AMT | FEES AMT | SEC CCY | NET PRICE | SEC CCY AMT | SETTLE CCY | SETTLE CCY AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25/02/2022 | 25/02/2022 | TMClient64 | | MXN CASH BALANCE | Transfer | 7,395,224 | - | 7,395,224 | - | - | MXN | - | -7395224 | MXN | -7,395,224 |
| 25/02/2022 | 25/02/2022 | TMClient64 | | MXN CASH BALANCE | Received | 510,000,000 | - | 510,000,000 | - | - | MXN | - | 510000000 | MXN | 510,000,000 |
| 28/02/2022 | 28/02/2022 | TMClient64 | | MXN CASH BALANCE | Cash Paid | 10,000 | - | 10,000 | - | - | MXN | - | -10000 | MXN | -10,000 |
| 02/03/2022 | 02/03/2022 | TMClient64 | | MXN CASH BALANCE | Cash Paid | 502,594,776 | - | 502,594,776 | - | - | MXN | - | -502594776 | MXN | -502,594,776 |
| 02/03/2022 | 02/03/2022 | TMClient64 | | USD CASH BALANCE | Cash Paid | 120 | - | 120 | - | - | USD | - | -120 | USD | -120 |
| 27/06/2022 | 27/06/2022 | TMClient64 | | MXN CASH BALANCE | Cash Received | 592,871,767 | - | 592,871,767 | - | - | MXN | - | 592871767 | MXN | 592,871,767 |
| 28/06/2022 | 28/06/2022 | TMClient64 | | MXN CASH BALANCE | Cash Paid | 25,000 | - | 25,000 | - | - | MXN | - | -25000 | MXN | -25,000 |
| 30/06/2022 | 30/06/2022 | TMClient64 | | MXN CASH BALANCE | Cash Paid | 592,844,267 | - | 592,844,267 | - | - | MXN | - | -592844267 | MXN | -592,844,267 |
| 30/06/2022 | 30/06/2022 | TMClient64 | | MXN CASH BALANCE | Cash Paid | 2,500 | - | 2,500 | - | - | MXN | - | -2500 | MXN | -2,500 |
| 05/07/2022 | 05/07/2022 | TMClient64 | | USD CASH BALANCE | Cash Received | 120 | - | 120 | - | - | USD | - | 120 | USD | 120 |
| 11/05/2023 | 11/05/2023 | TMClient64 | | USD CASH BALANCE | Cash Received | 1,832,470 | - | 1,832,470 | - | - | USD | - | 1832470 | USD | 1,832,470 |
| 15/05/2023 | 15/05/2023 | TMClient64 | | USD CASH BALANCE | Cash Paid | 1,832,465 | - | 1,832,465 | - | - | USD | - | -1832465 | USD | -1,832,465 |
| 21/06/2023 | 21/06/2023 | TMClient64 | | MXN CASH BALANCE | Cash Received | 173,586,459 | - | 173,586,459 | - | - | MXN | - | 173586459 | MXN | 173,586,459 |
| 22/06/2023 | 22/06/2023 | TMClient64 | | MXN CASH BALANCE | Cash Paid | 173,586,459 | - | 173,586,459 | - | - | MXN | - | -173586459 | MXN | -173,586,459 |
| 14/05/2024 | 14/05/2024 | TMClient64 | | USD CASH BALANCE | Cash Received | 1,771,080 | - | 1,771,080 | - | - | USD | - | 1771080 | USD | 1771080 |
| 17/05/2024 | 17/05/2024 | TMClient64 | | USD CASH BALANCE | Cash paid | 1,771,080 | - | 1,771,080 | - | - | USD | - | -1771080 | USD | -1771080 |

41

Tavira Monaco Sam
6 Bd des Moulins 9800 Monaco
RCI 09 S 05659

# EXHIBIT 58A

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

20 AIR STREET
LONDON W1B 5AN
TELEPHONE +44 (0) 20 7367 1600

NEW YORK          SAN FRANCISCO
BEIJING           TOKYO
BRUSSELS          TORONTO
HONG KONG         WASHINGTON, DC
LOS ANGELES       WILMINGTON

HFW
Friary Court
65 Crutched Friars
London
EC3N 2AE

6 August 2024

By email to: andrew.williams@hfw.com and frazer.watt@hfw.com

Dear HFW

**Ricardo Benjamin Salinas Pliego & Another v Astor Asset Management 3 Limited and Others – CL-2024-00045**

We refer to your letters of 5 August 2024, and our email of 2 August 2024 sent at 16:31.

As set out in our email of yesterday, you have now received further documents pursuant to Schedule B(3) of the Freezing and Proprietary Injunction dated 2 August 2024 (the Freezing Order). Sealed documents will be provided to you in due course, but this should not impact your ability to advise your client.

Whilst we appreciate that the period between your client being served with the Freezing Order and the time for a response is short, it is not oppressive. Your client is a depository broker, it should know how many shares it is holding and the other relevant information. The requested information should therefore be readily available. It is absurd to suggest that four to eight weeks may be required to investigate the position. By way of indication, the Third Defendant, Tavira Monaco SAM, was able to provide its response to us by the deadline as set out in the Freezing Order.

Your client was to provide its response by 5pm yesterday and it failed to do so, it is therefore in breach of the Freezing Order, and consequently the Penal Notice. Your client should therefore apply to the Court for relief from sanctions.

In the circumstances, our clients would not object to a short extension until noon tomorrow for the information to be provided. If your client fails to so, we reserve our clients' rights to seek to enforce the terms of the Freezing Order.

Your proposal that a confidentiality club should be formed in respect of the disclosure of information by your client is unnecessary. Adequate protections are provided by the collateral use restriction set out in the CPR.

The requirements of the Freezing Order are clear, please now provide the information.

Yours faithfully,
**Paul, Weiss, Rifkind, Wharton & Garrison**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP IS A LIMITED LIABILITY PARTNERSHIP ESTABLISHED IN THE STATE OF DELAWARE AND IS AUTHORISED AND REGULATED BY THE SOLICITORS REGULATION AUTHORITY (SRA) (UNDER SRA NUMBER 800684O). THE LLP'S REGISTERED OFFICE ADDRESS IS 20 AIR STREET, LONDON W1B 5AN. THE TERM "PARTNER" REFERS TO A MEMBER OF THE LLP OR AN EMPLOYEE OR A CONSULTANT WITH EQUIVALENT STANDING AND QUALIFICATIONS. A LIST OF THE PARTNERS AND THEIR PROFESSIONAL QUALIFICATIONS CAN BE INSPECTED ON OUR WEBSITE OR AT THE REGISTERED OFFICE. FOR FURTHER INFORMATION ABOUT OUR REGULATORY POSITION PLEASE REFER TO OUR WEBSITE: HTTPS://WWW.PAULWEISS.COM/NOTICES/LEGAL-NOTICE. TO FIND OUT MORE ABOUT HOW WE COLLECT, USE, AND PROTECT DATA, PLEASE SEE OUR PRIVACY POLICY.

# EXHIBIT 58B



**HFW**
Friary Court
65 Crutched Friars
London EC3N 2AE
United Kingdom

**T** +44 (0)20 7264 8000
**F** +44 (0)20 7264 8888
DX1069 London City EC3

**hfw.com**

Paul, Weiss, Rifkind, Wharton & Garrison LLP
20 Air Street
London
United Kingdom
W1B 5AN

**By email to:** nsachdev@paulweiss.com; sarnoldsoulby@paulweiss.com; jaycohen@paulweiss.com; and asohanpall@paulweiss.com;

| | | | | | |
|---|---|---|---|---|---|
| **Your Ref**: | TBC | **Direct Line:** | 020 7264 8364 | **Date:** | 7 August 2024 |
| **Our Ref:** | AZW/ADT/106608/1 | **Email:** | andrew.williams@hfw.com frazer.watt@hfw.com | | |

Dear Sirs

**Claim No. CL-2024-000450 – Ricardo Benjamin Salinas Pliego & Another v Astor Asset Management 3 Limited and Others**

1.    We refer to your letter dated 6 August 2024.

2.    Our client is endeavouring to investigate fully and urgently the position as to the Collateral Shares and is keen to continue to comply with the requirements of the WFO. However, our client is also concerned to ensure that it complies with its contractual and/or regulatory obligations, including as to customer account confidentiality.

3.    Our client will endeavour to respond further to your clients' information requests as soon as it is in a position to do so. This is notwithstanding that:

(a)    our client is yet to receive a copy of the Claim Form (notwithstanding the undertaking provided by your clients in paragraph 2 of Schedule B of the WFO). We would appreciate it if an unsealed version could be provided if a sealed version is not yet available; and

(b)    in any event, on the basis of the documents available:

(i)    it is not clear what cause of action is alleged against our client; and

(ii)    our client does not appear to be accused of any wrongdoing.

4.    Finally, we would request that your clients provide a transcript (in addition to the hearing note) of the without notice hearing on 2 August 2024.

5.    We reserve all of our client's rights, including in respect of jurisdiction.

Yours faithfully

**HFW**

**Americas | Europe | Middle East | Asia Pacific**

HFW is Holman Fenwick Willan LLP, which is a limited liability partnership registered in England and Wales (with registered number OC343361) and is authorised and regulated by the UK Solicitors Regulation Authority, with registered number 509977. A list of members' names is open to inspection at the registered office, Friary Court, 65 Crutched Friars, London EC3N 2AE.

VAT No GB 243 4838 55