# EXHIBIT 58C

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

20 AIR STREET
LONDON W1B 5AN
TELEPHONE +44 (0) 20 7367 1600

NEW YORK
BEIJING
BRUSSELS
HONG KONG
LOS ANGELES

SAN FRANCISCO
TOKYO
TORONTO
WASHINGTON, DC
WILMINGTON

8 Bishopsgate,
London
EC2N 4BQ

7 August 2024

Dear HFW

**Ricardo Benjamin Salinas Pliego & Another v Astor Asset Management 3 Limited and Others – CL-2024-000450**

We refer to our letter of 6 August 2024.

In our letter we notified you that your client was in breach of the Freezing Order and the Penal Notice, and that consequently your client should apply to the Court for relief from sanctions. We also noted that our clients would not object to a short extension to noon today for your client to provide us with the information that it is obligated to provide pursuant to paragraph 11(b) of the Freezing Order.

Your client has provided no response to us in respect of these matters. Our clients will now take appropriate steps to enforce the terms of the Freezing Order, without further reference to you or your client.

Yours faithfully

**Paul, Weiss, Rifkind, Wharton & Garrison**

Paul, Weiss, Rifkind, Wharton & Garrison LLP is a limited liability partnership established in the State of Delaware and is authorised and regulated by the Solicitors Regulation Authority (SRA) (under SRA number 8006840). The LLP's registered office address is 20 Air Street, London W1B 5AN. The term "partner" refers to a member of the LLP or an employee or a consultant with equivalent standing and qualifications. A list of the partners and their professional qualifications can be inspected on our website or at the registered office. For further information about our regulatory position please refer to our website: https://www.paulweiss.com/notices/legal-notice. To find out more about how we collect, use, and protect data, please see our Privacy Policy.

# EXHIBIT 59

# ASTOR ASSET MANAGEMENT 3 LIMITED

August 3, 2024

Corporacion RBS SA de CV
Ave. Ferrocarril de Rio Frio 419 A99
Cuchilla del Moral 1
Iztapalapa
09319 Ciudad de Mexico
Mexico
Tel: 0052551720[0089]
egonzalez@gruposalinas.com.mx

Ricardo Benjamin Salinas Pleigo
Cristobal Colon 79 INT C
Mexico 09360
Tel: +5215530091016
egsalceda@gruposalinas.com.mx

## AMENDED NOTICE OF DEFAULT

To Whom It May Concern,

    This Notice of Default is being served upon you by Astor Asset Management 3 Ltd (the "Lender" or "Astor"). As such, this correspondence shall serve as formal notice that you are in default of the Stock Loan Agreement (the "SLA") that was duly executed between Astor and Corporacion RBS SAD de CV (the "Borrower") on July 14, 2021. The basis for this default is as follows: 1) the failure to timely pay interest and other fees and costs of the Loan; 2) the government investigations related to the Issuer of certain shares of Grupo Elektra SAB DE CV (ELECTRA:MX); 3) your non-payment/failure to comply with local tax requirements which constitutes a Material Event as defined; 4) your failure to disclose material information and provide requisite notification to the Lender that assets of Salinas/Grupo Elektra had been threatened with confiscation; 5) your failure to comply with Annual Notice Provisions you owed

# ASTOR ASSET MANAGEMENT 3 LIMITED

to the Lender; 6) your repeated interference in the custody of the Pledged Collateral; 7) tax liability to government of Mexico of Four Billion Eight Hundred Million United States Dollars and your refusal to pay it (US$4,800,000,000); 8) material degradation on Issuer earnings; 9) government confiscation of assets of Guarantor; 9) failure to make a regulatory announcement; 10) Fitch downgrade of Issuer on concerns of mismanagement; 11) a Material Event upon the financial condition of Borrower, Guarantor or Issuer; 12) Fraud and securities manipulation; 13) suspension or halting of trading of Collateral; and 14) implication of bribery of US Congressman by bank owned by Gurantor.  Therefore, for the reasons contained herein, you are hereby notified that you are in default of the SLA which has resulted in the Lender terminating the SLA and accelerating any and all amounts due thereunder together with any other remedy which may be afforded to the Lender.

**Failure to Pay Interest and Fees & Costs of the Loan**

As you are aware, the SLA provided that the Loan would bear interest at the rate of one and fifteen hundredths of a percent (1.15%) per year to be paid to Lender in monthly installments (with the first interest payment being deducted from the Loan proceeds at the time of funding), and subsequent interest to be paid on the first Business Day of each month. See, Section 2(a) and 2(c) of the SLA, the applicable parts of which are set forth below:

*2.  Interest Rate*

*2(a)  All outstanding amounts of the Loan shall bear an interest rate in an amount equal to one and fifteen one hundredths of a percent (1.15%) per year.*

*2(c)  The first interest payment shall be subtracted from Loan proceeds at the time of the funding.  Further interest payments for the Loan shall be due timely on the first Business Day of each month following the Closing Date, and such payment schedule shall be based on twelve months per calendar year, regardless of the actual number of days between the applicable Closing Date and the date such first interest payment is due.*

# ASTOR ASSET MANAGEMENT 3 LIMITED

It is significant that in 2022, 2023 and 2024, you repeatedly failed to make timely interest payments more than two (2) dozen times.  In May 2023, you finally (and only after numerous collection attempts on Lender's part) paid interest which had been overdue for at least seven months.  Earlier in 2024 you paid for interest due for the entire preceding year in a lump sum as

opposed to monthly. Failing to pay interest when due is an Event of Default under Section VI, subsection 3(a) of the SLA which reads as follows:

> *Failure by Borrower or Guarantor to pay the interest and all applicable frees or charges when due as stipulated or the Approved Loan Amount when due, or any other default in the performance of an obligation that is not cured within the applicable Cure Period.*

As you are also aware, you were required to pay a Maintenance Fee of 0.0625% of the Loan Principal Amount every three (3)months of the Loan Term.  See, Section 3(b) of the SLA which is set forth below:

> ***Maintenance Fee***.  *Borrower shall pay Lender every three (3)month's the maintenance fee of six and twenty-five hundredths basis points (0.0625%) of the Loan Principal Amount ("Lender's Maintenance Fee").  The Lender is authorized to deduct the Maintenance Fee in advance from the Loan Principal Amount for the first period, it shall be memorialized in the Closing Statement and the same exact amount shall be paid by Borrower, automatically and without further demand, every four months thereafter for all the years constituting the Term of the Loan.  Lender's Maintenance Fee is non-refundable and will be paid in advance.*

You repeatedly failed to pay Maintenance Fees when due as required under the SLA, and as such, an Event of Default has occurred under Section VI(3)(a) as set forth above.

Additionally, the SLA required you to pay an annual Custodian Management Charge based on the cumulative net asset value of all Dedicated Depository Account(s) at time of delivery of the Pledged Collateral and limited to fifteen hundredths of one (0.15%) percent.  See, Section 3(d) of the SLA which states, in applicable part, as follows:

# ASTOR ASSET MANAGEMENT 3 LIMITED

*Expenses. For the services provided, the Depository Brokers engaged in the performance of this Agreement are entitled to an annual custodian management charge to be paid by Borrower based on the cumulative net asset value of all Dedicated Depository Account(s) at time of delivery of the Pledged Collateral and limited to fifteen hundredths of one (0.15%) percent. The annual custodian management charge is exclusive of any transaction fee, transfer fee, exit fee, or other administrative costs and fees which Depository Broker may possibly impose. Such fee shall be nonrefundable and shall be paid one (1) year in advance. First year's fee may be deducted from the Loan proceeds or charged to Borrowers account directly by the Depository Broker. In subsequent years, the Borrower will remit to Lender the exact same fee every year at least fourteen (14) days prior to the Effective Date, to be remitted by Lender to Depository Broker.*

The failure to timely pay the Custodian Management Charge constitutes an additional Event of Default under Section VI(3)(a) as set forth above. You have ignored repeated demands to pay the Custodian Management Charge.

## Government Investigation

As you are aware, on November 30, 2022, the Federal Court of Administrative Justice ordered the Issuer[1] to pay nearly Five Billion Pesos (5,000,000,000) in taxes (the "November 30[th] Order" or "Order"); this Order was made in direct response to the Issuer's improperly generated tax losses. No doubt, such an Order is the culmination of an investigation into the Issuer and its reported tax losses. Section VI.3(f) states that an Event of Default occurs if:

*A governmental agency which controls the actions of Issuer has commenced an investigation of the Issuer.*

We have recently determined thru media that there are 17 open court tax cases against the Guarantor.

---

[1] Grupo Elektra

# ASTOR ASSET MANAGEMENT 3 LIMITED

Therefore, given that there was an investigation into the Issuer by a government agency that most certainly can and does control the actions of the Issuer, an Event of Default has occurred for which there is no cure.

## Material Event – Non-Payment of Taxes

Moreover, the aforementioned November 30th, 2022 Order constitutes a Material Event given that an order to pay nearly Five Billion Pesos (5,000,000,000) is certainly an event which may, and in all likelihood, will, undermine or alter the value of the Collateral. The SLA defines a "Material Event" as "*any event of possible outcome which may undermine or alter the value of the Collateral or prejudice Lender's standing Lien*". Given this, the Order undoubtedly constitutes a Material Event as defined which is an Event of Default under Section VI.3(g) of the SLA. Section VI.3(g) states:

> *A Material Event upon the financial condition of the Borrower, Guarantor, or Issuer.*

On or about March 20th, 2024 the tax authorities of government of Mexico stated that Ricardo Salinas owes the Mexican government Sixty Three Billion Pesos (63,000,000,000) or Three Billion Eight Hundred Million United States Dollars (US$3,800,000,000), has 17 open and unresolved tax lawsuits and proceed to seize a golf course owned by Ricardo Salinas. Some media outlets report that a number of companies, including the Issuer may be seized and confiscated by the Mexican tax authorities. We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

Mr. Ricardo Salinas had immediately stated publicly that he will not pay the tax obligations and will challenge them in court. According to public articles, a threat of further confiscation of assets is a possibility, including his shares of ELEKTRA:MX as Mr. Ricardo Salinas continues to demonstrate his defiance to pay taxes due. We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

# ASTOR ASSET MANAGEMENT 3 LIMITED

On or about June 13th, 2024 it is publicly reported that the Mr. Ricardo Salinas has been ordered to pay One Billion United States Dollars (US$1,000,000,000) in taxes. The court rulings are not final and represent a substantial amount of Mr. Ricardo Salinas assets. We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

Therefore, yet another Event of Default has occurred for which there is no cure.

**Misrepresentation on Know Your Client Form**

On the KYC Form, you had misrepresented that there are no lawsuits, arbitrations, claims or demands for damages.

**Failure to Make Regulatory Announcement**

As an "Affiliate Entity/Insider" you were obligated to make a regulatory announcement as to this loan, yet you had failed to do so. We deem this to be a Material Event as defined and an Event of Default under Section IV.2 of the SLA.

**Suspension of Trading of Issuer**

On Friday July 26th, 2024 you had requested of Mexican Stock Exchange that the securities of Issuer are suspended from trading. The securities of Issuer have not traded now for six (6) trading days. This undermines the Collateral and is a breach of the SLA. We deem this to be a Material Event as defined and an Event of Default under Section VI.3(c) of the SLA which states:

*If the class of securities provided as Pledged Collateral is delisted or trading is halted for five (5) or more Business Days by a regulatory agency or otherwise.*

# ASTOR ASSET MANAGEMENT 3 LIMITED

**Public Announcement as to Fraud of Issuer**

On Friday July 26th, 2024 you had released a public announcement declaring that you had learned of a "possible fraud by depositories of your shares". We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

**Downgrade of Issuer by Fitch**

On March 11th, 2024 Fitch downgrades Issuer and states; "The downgrade reflects Fitch's concerns about corporate governance practices at Grupo Salinas, which controls Elektra, Total Play and TV Azteca".

**History of Non-Payment of Liabilities**

The Guarantor has a history of failing to pay his creditors as it the case with TV Azteca, threat of bankruptcy and Guarantor releasing public statements that his firm is "too poor to pay US bondholders the tens of millions owed". We deem this to be a Material Event as defined and an Event of Default under Section VI.3(g) of the SLA.

**Failure to Disclose Material Information and Provide Requisite Notification to Lender**

It has come to our attention that Mexican tax authorities had threated to confiscate assets of Salinas/Grupo Elektra which you failed to disclose to the Lender.  Such information involving the confiscation of the Borrower's assets is deemed a "Material Event" pursuant to Section I subsection 40 of the SLA because if the Borrower's Collateral were to be confiscated, it would undoubtedly affect the Lender's lien:

*"**Material Event**" shall mean any event or possible outcome which may undermine or alter the value of Collateral or prejudice Lender's standing Lien.*

# ASTOR ASSET MANAGEMENT 3 LIMITED

A Material Event upon the financial condition of Borrower, Guarantor or Issuer is an Event of Default pursuant to Section VI.3(g) of the SLA.

Moreover, your failure to disclose the threatened confiscation of assets to the Lender is a direct violation of the Material Information clause contained in Section III, subsection 3 of the SLA which is set forth below:

**Material Information.**  *Borrower and Guarantor have tendered any and all relevant and material information regarding the Pledged Collateral and of the Issuer and all such relevant and material information has been disclosed and provided by Borrower and Guarantor to Lender.  During the Loan Term, Borrower and Guarantor will continue to voluntarily provide all such relevant and material information to Lender and not withhold information deemed to be Material.*

The aforementioned lack of disclosures also constitutes a breach of the "Full Disclosure" provisions contained in Section IV.3 of the of the SLA as follows:

**Full Disclosure**.  *Borrower and Guarantor further represents and warrants that all statements and documentation it has provided to Lender directly or through its agents in connection this Agreement are true, complete, and do not omit any material facts or information, which if provided, would have impacted Underwriting prudency.  Borrower and Guarantor consent to provide to Lender any and all relevant material information which is necessary for any Lender to conduct a prudent risk assessment evaluation of Issuer, Guarantor and Borrower.*

Additionally, Section IV of the SLA contains *"Borrower's Warranties and Obligations" and*   subsection 9 therein requires the Borrower and Guarantor to promptly inform the Lender in writing if any creditor has sought or is threatening to seek confiscation of the Borrower or Guarantor's property.  See, Section IV, subsection 9 of the SLA set forth below:

**Notification to Lender.**  *Upon occurrence of any of any of the foregoing events or whenever they shall occur, the Borrower or Guarantor shall promptly inform*

# ASTOR ASSET MANAGEMENT 3 LIMITED

*Lender in writing if a) Borrower or Guarantor has filed for Bankruptcy or filed any petition seeking creditor protection; b) any creditor of Borrower or Guarantor has taken legal action against Borrower or Guarantor to recover debts owed to it; c) any creditor has sought or is threatening to seek confiscation or garnishment of property of Borrower or Guarantor. Absent of the preceding events, Borrower and Guarantor will once per year, on each anniversary of the Effective Date, submit a written attestation to Lender representing that to the best of Borrower's knowledge none of the preceding events had taken place.*

Pursuant to Section IV, subsection 9 of the SLA, the Borrower unequivocally should have provided written notification to the Lender that the Mexican tax authorities had threatened to confiscate the assets of Salinas/Grupo Elektra. At no time had you contacted the Lender to provide material information as required. The Borrower's failure to provide such written notification is obviously an "omission" intended to mislead the Lender, and as such, it is an Event of Default under Section VI(d) of the SLA.

*If any representation or warranty made by Borrower or Guarantor in this Agreement or in any statement furnished in contemplation of obtaining a Loan shall prove to have been knowingly untrue, omitted or misleading in any material respect.*

## Failure to Comply with Annual Notice Provision

Section IX.23 of the SLA required the Borrower and Guarantor to provide an annual statement on the anniversary of the Effective Date throughout the Term of the Loan, declaring whether Borrower or Guarantor had obtained other loans from any third parties by pledging securities of the same Issuer; whether there has been a material change in the Borrower's or Guarantor's financial condition such as bankruptcy or insolvency; or if any material lawsuits had been filed against them. See, Section IX.23 of the SLA, which is set forth below:

*Notice. Borrower and Guarantor further represent and warrant that they will yearly, on the anniversary of the Effective Date, submit a written statement to Lender by means of declaration stating whether Borrower or Guarantor obtained*

# ASTOR ASSET MANAGEMENT 3 LIMITED

*any other loans from any third parties pledging securities of same Issuer and whether there has been a material change in Borrowers or Guarantors financial condition, such as bankruptcy or insolvency filing of Borrower or Guarantor or of any entity controlled by Borrower or Guarantor.  Borrower and Guarantor must also declare if any material lawsuit has been filed against it.*

The Borrower and Guarantor were mandated to produce the requisite annual statement. They have completely and utterly failed to provide this to the Lender as required under Section IX.23 of the SLA for any year. We deem this to be a Material Event as defined and a breach of Section IX.23 of the SLA.

**Material Earnings Event**

Simply Wall Street has released an analysis on July 26, 2024 that the Issuer's earnings have declined by 34% per year over the past 5 years and deemed this to be a major risk. Second Quarter earnings for Issuer are reported as MXN$2.90 loss per share, versus MX$N22.34 profit Second Quarter of 2023.

The Issuer reported a MXN$7.3 billion loss versus a profit of MXN$4.94 billion for the same period last year.

On Friday July 26, 2024 the stock of the Issuer dropped ten percent (10%), which according to Bloomberg Financial News is the "biggest intraday drop since June of 2017".

We deem this to be a Material Event upon the Issuer as defined and an Event of Default under Section VI.3(g) of the SLA.

A Material Event is defined within the SLA as:

# ASTOR ASSET MANAGEMENT 3 LIMITED

**Material Event"** *shall mean any event or possible outcome which may undermine or alter value of Collateral or prejudice Lender's standing Lien.*

## Custody of Collateral Interference

On multiple occasions you and your agents have contacted the Custodian Brokers interfering in the custody of the Collateral and dictating to Lender where and how the Collateral should be custodied. This conduct has been consistent and started in the Fourth Quarter of 2021 when you demanded that the Collateral move from Weiser Global Capital Markets ("Weiser") elsewhere. We accommodated your request and moved the uncollateralized portion of the Collateral to Tavira Monaco SA ("Tavira"). You continued in years 2022 and 2023 and 2024 to question where and how the Collateral is custodied, demanding to know where and how and who the sub-custodians are of Weiser and Tavira and what they should and should not be doing with the Collateral. We reference your letter to Lender and Custodian Brokers dated June 10th, 2024 which contains numerous breaches of the SLA, demanding that the Collateral not be lent out, when in the SLA you expressly agreed and understood that the Collateral will be subject to provisions of the Encumbrance Clause and your agents were repeatedly told to read the SLA and its provisions.

Your June 10th, 2024 letter to Custodian Brokers contains numerous demands and threats which are very serious, are deemed as interference and are contrary to the Terms and Conditions of the SLA which you had willingly executed while being represented by counsel.

The Know Your Client form which you had completed for both the Borrower and for the Guarantor, you had ticked the box that you were being represented by an attorney. Thus, you were aware and advised of your contractual obligations under the SLA. That, together with the fact that the Guarantor is a highly seasoned and sophisticated professional investor who commands perfect knowledge of the English language, there is no basis for you to repeatedly defy the SLA and its Terms and Conditions.

You repeatedly continued to demand that the Collateral from Weiser and Tavira is moved to a brand new Custodian, despite being repeatedly told that custody and selection of Custodian Broker is not for Borrower or Guarantor to decide as is clearly stated in Section IV.10 of the SLA, thus

# ASTOR ASSET MANAGEMENT 3 LIMITED

continuing to defy and challenge your contractual obligations. We deem this to be a Material Event as defined and a breach.

The SLA is very clear that the Lender selects the Custodian Broker, yet you continue to demand how and where the Collateral is custodied demanding to know who the sub-custodians are, making demands upon the sub-custodians and what should happen to the Collateral which is in the control of Lender and the Custodian Brokers, in violation of the SLA. Interference is strictly prohibited under the SLA Section III.4 and Section IV.10 which states:

> *During the pendency of this Loan, neither the Borrower nor Guarantor will seek injunctive relief or interference from any court of law, regulatory body, Transfer Agent, custodian, sub-custodian, Depository Broker, central depository or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement or freeze the shares. Injunctive relief by Borrower or Guarantor or any interference by Borrower or Guarantor, central depository or regulatory agency shall be an immediate and an incurable Event of Default. Neither Borrower nor Guarantor will interfere in any way or challenge the validity or enforceability of this Agreement, and the same shall be a Breach thereof.*

Amongst other provisions, the SLA states:

> *Neither Borrower nor Guarantor will undermine or interfere with securities of Issuer.*

> *Lender reserves the right to maintain dominion over the Collateral during the Loan Term, which affords Lender the right to deal-in, dispose or convert over the Pledged Collateral.*

## Lock-Up Breach

In the month of July 2024, you have repeatedly demanded to repay the Loan early, despite being repeatedly told that the SLA does not provide for an early repayment. This is a breach of Section VI(3)(e)(f) and Section II(5) and Section IV.3 prohibiting early termination

# ASTOR ASSET MANAGEMENT 3 LIMITED

**Repudiation of Loan Agreement**

On August 2nd, 2024, acting for and on behalf of Borrower and Guarator, Mr. Eduardo Gonzalez Salceda Sanchez had sent an email rescinding the Loan Agreement, the Closing Statements and the Custodian Management Agreement. This is a breach of Section VI(2)(e) which states:

*If any of the Loan Documents shall at any time after their execution and delivery for any reason, cease to be in full force and effect or shall be declared invalid, null or void or the validity, obligations hereunder or enforceability thereof shall be contested, repudiated, disaffirmed or challenged by Borrower or Guarantor, its agents or counsel or by any other person or entity acting on behalf of or for the Borrower or Guarantor.*

Further, by sending the subject email, you had breached Section IX.31 which states:

*Early termination or rescission is not permitted under the Agreement, regardless of the reason or need to do so, and this Agreement will be valid and in full force and effect after its execution for its full Term, provided it can only be terminated after its maturity, jointly by both Parties in written form only and memorialized as an Addendum or mutual written release, or as stipulated herein and for no other reason. If the Loan Documents shall, at any time after their execution and delivery for any reason, cease to be in full force and effect or shall be cancelled, declared invalid or enforceability thereof shall be contested or challenged by Borrower, Guarantor or by any other person for or on the Borrower's or Guarantor's behalf, the Loan will be considered in default. The Lender retains the right to convert the Collateral during the Loan Term, and thereafter should Borrower or Guarantor default.*

**Fraud and Deception**

The Lender has recently learned that Ricardo Benjamin Salinas Pleigo ("Guarantor") directly and indirectly has been manipulating the price of ELEKTRA shares for years. Substantial part of Guarantors net worth is tied to the shares of ELEKTRA and Guarantor has

# ASTOR ASSET MANAGEMENT 3 LIMITED

deployed various tactics to artificially prop-up shares of ELEKTRA and withhold this information from the general public and the Mexican regulators. Lender believes public disclosure of this will cause the value of Collateral to drastically diminish, thus undermining the Collateral.

The Lender has recently learned that in addition to the above, the Guarantor has in 2005 was charged with fraud and swindling investors by the United States Securities and Exchange Commission in an elaborate scheme to conceal Guarantors role in a series of transactions through which he personally profited US$109,000,000 USD. Executives of TV Azteca who directly worked under the direction of Guarantor were also charged with fraud in the "elaborate scheme'. According to SEC, the charges are the first against a Mexican company trading on a US stock exchange.

The United States Securities and Exchange Commission ("SEC") charged Guarantor with filing false reports with respect to TV Azteca, who's US counsel resigned due to the concealment and false reporting. As part of a settlement with the United States Securities and Exchange Commission, the Guarantor agreed to a fine of US$7,500,000 USD and was barred for life to serve in a position of officer or director in any United States public company.

Also, as a result, TV Azteca was delisted from the United States public securities exchange. The SEC stated that it will use the proceeds of the fine to compensate investors who were defrauded by the Guarantor.

Mexican Finance Minister Francisco Gil Diaz asked prosecutors to bring criminal charges against the Guarantor for insider trading and stock manipulation. In 2005 the Guarantor paid a fine of US$2,300,000 to Mexican regulators for insider trading and securities law violations.

We deem this to be a Material Event upon the Issuer as defined and an Event of Default under Section VI.3(g) of the SLA.

**Bribery Allegation**

In May of 2024 a bank owned by the Guarantor has been accused of bribing a US congressman, Representative Henry Cuellar. As a result, the congressman has been charged by the US Justice Department. An investigation is under way by the US Justice Department to determine any involvement by the Guarantor himself. We deem this to be a Material Event upon the Issuer as defined and an Event of Default under Section VI.3(g) of the SLA.

# ASTOR ASSET MANAGEMENT 3 LIMITED

**Lender's Remedy**

It is important to note that Pursuant to Section VI.2 of the SLA, the Lender is not obligated to complete the Loan transaction to Maturity if the Borrower and Guarantor fail to comply with the terms and conditions of the SLA.

*Valid Transactions and Events of Default. In order for the transaction to be completed to Maturity by the Borrower, the Borrower and Guarantor must fulfill in the performance of and observance of any covenant, representation, provision or agreement contained herein and not default in any other loan document or provision.*

This letter has set forth in detail some but not all of the breaches of the SLA and Events of Default that have occurred. Ultimately, as you have failed to cure the Events of Default detailed herein and not able to cure them, the Lender hereby declares an Event of Default and hereby accelerate all costs and fees due thereunder.

This letter is without prejudice to all of Astor's rights and remedies in accordance with the SLA. We reserve the right to amend this Notice of Default at any time of our choosing.

Sincerely,

*Astor Asset Management* 3 *Ltd*

Astor Asset Management 3 Ltd.
Global Operations Department

# EXHIBIT 60

**From:** Global Operations <global.operations@astorassetgroup.com>
**Date:** August 5, 2024 at 14:22:22 CDT
**To:** Eduardo Gonzalez Salceda Sanchez <egsalceda@gruposalinas.com.mx>,
Ricardo Benjamin Salinas Pliego <rsalinas@gruposalinas.com>
**Subject: Notice of Default Letter**


Good Day,

You are hereby advised that your loan has now Accelerated and you owe the amount funded plus various costs, fees, charges and expenses which you failed to pay. This is how the loan agreement reads, which you executed at the advise of counsel which represented you at the time.

You have until third Friday August  9, 2024 to resolve this, after which we will no longer afford any settlement resolution and we will pursue all sums owed according to the Loan Agreement.

At the present time, we estimate that your debt to us is approximately $120M USD, which will accrue at the default interest rate of 18% annually. We intend to vigorously prosecute our right to these funds and we intend to do so in the court of law.

The Loan Agreement clearly states that a default will cause Loan Acceleration plus forfeiture of the Pledged Collateral. Hence, we have a contractual right to all the loan proceeds disbursed to you plus the Collateral.

This email is being sent without prejudice and we reserve all of our rights according to the Loan Documents.

**Global Operations**
777 Dunsmuir Street, Suite 1400, Vancouver, BC V7Y 1K4
+1 888 823 0028
Canadian Business #790932503RC0001
Money Service License # M21136919
AstorAssetGroup.com



Please note that while we do our best to respond all inquiries within 24-48 hours, a reply in some instances may take longer.

This e-mail, including attachments, is intended for the person(s) or company named and may contain confidential and/or legally privileged information. Unauthorised disclosure, copying or use of this information may be unlawful and is prohibited. If you are not the intended recipient, please delete this message immediately and notify the sender.

# EXHIBIT 61

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHENMING HOLDINGS (HONG KONG)
LIMITED, *a Hong Kong limited company,*

                          Plaintiff,

                -against-

JOHN DOES 1-10, individuals and/or entities
whose names are currently unknown to Plaintiff,

                          Defendants.

Civil Case No. 24-cv-935

**VERIFIED COMPLAINT AND
JURY TRIAL DEMANDED**

Plaintiff Chenming Holdings (Hong Kong) Limited ("Chenming" or "Plaintiff"), by and
through its attorneys, King & Wood Mallesons LLP, as and for its Verified Complaint against
Defendants John Does 1-10 (collectively "Defendants"), alleges as follows:

<u>NATURE OF THE ACTION</u>

1.      This is a civil action for conversion, unjust enrichment, fraudulent inducement,
and conspiracy to defraud, arising under the laws of the State of New York.

2.      Plaintiff seeks relief under the laws of the State of New York, including equitable
and monetary relief, punitive damages, costs, legal expenses and reasonable attorneys' fees, and
all other appropriate relief to which it is entitled under law.

<u>PARTIES</u>

3.      Chenming is a company organized under the laws of the Hong Kong Special
Administrative Region ("Hong Kong") with its registered address at No. C, 16/F., Chinaweal
Centre, 414-424 Jaffe Road, Wanchai, Hong Kong.

4.      The true name and capacity of Defendants are unknown to Plaintiff at this time.
Upon information and belief, Defendants are the ultimate beneficiary owners and/or alter egos of

1

Union Pacific Capital 1 Ltd. ("UPC1"), Astor Asset Management 2 Limited ("Astor2"),

Cornelius Vanderbilt Capital Management LTD ("Vanderbilt," together with UPC1 and Astor2,

"Lenders").  Acting under the direction and on behalf of the Defendants, the Lenders entered into

three separate loan transactions underlining the fraudulent scheme with Plaintiff.

5.     Upon information and belief, Defendants reside in or have their principal places

of business in the following States: New York, California, North Carolina, and/or Georgia.

6.     Plaintiff reasonably believes that information obtained through discovery will

lead to the identification of Defendants' true names, identities, and locations.  Plaintiff reserves

its right to amend the Complaint upon ascertaining the identities of Defendants and the nature

and extent of their involvement in the fraudulent scheme.

## JURISDICTION AND VENUE

7.     Jurisdiction is proper in this Judicial District pursuant to 28 U.S.C. § 1332.

Complete diversity exists in this action as Plaintiff is a Hong Kong company and Defendants are

citizens and/or subjects of the States of New York, California, North Carolina, and/or Georgia.

In addition, the amount in controversy exceeds $75,000.

8.     Venue in this Judicial District is proper under 28 U.S.C. § 1391(b).  Although the

true identity of Defendants is unknown to Plaintiff at this time, Defendants, upon information

and belief, may be found in this District, and/or a substantial part of the acts complained on

herein occurred in this District.  Upon information and belief, personal jurisdiction in this

District is also proper, because Defendants are the ultimate beneficiary owners of multiple bank

accounts including, but not limited to, JPMorgan Chase Bank NA; Citibank, NA, New York; and

Community Federal Savings Bank accounts, which are established within this District and

Defendants, through the Lenders, directed Plaintiff to send deposits, interest, maintenance fees,

and/or custody fees in connection with the loan transactions to these bank accounts located in this District.

## FACTUAL BACKGROUND

9.    Between January 2020 and April 2021, Defendants, under the cover of separate shell companies, entered into three separate securities loan transactions with Plaintiff and loaned a sum of approximately $67.5 million ("Loans") to Plaintiff.

10.    Plaintiff is the shareholder of a public company Shandong Chenming Paper Holdings Limited ("ListCo"), whose shares are listed on the Shenzhen Stock Exchange and Hong Kong Stock Exchange.  To secure the Loans, Plaintiff provided 210,717,563 Class B shares and 153,414,000 Class H shares of the ListCo (200488:SZ; 01812:HK) as collateral ("Collateral") to the Loans.

11.    Upon information and belief, the Lenders executed the loan agreements under different fictitious names: Michael Romanoff (Astor2), Christopher Warner (Vanderbilt), Winstone Carrington (UPC1).  Plaintiff has never communicated with or met any individual with these names.  These fictitious names had never appeared in any communication between Plaintiff and the Lenders *prior to* the execution of the loan agreements, and have never appeared in any subsequent communications.

12.    Plaintiff diligently performed its obligations under the loan agreements, including by making payments of principal and interest as required, and "topping up" a substantial amount of additional shares of the ListCo as well as cash, following repeated threats by Lenders that the Collateral was subject to immediate forfeiture due to its alleged drop in market price and Lenders would declare Events of Default unless Plaintiff deposited additional shares or cash.

13.     On or about February 10, 2023, upon full repayment of the loan principal under the Astor2 Agreements (defined below), Plaintiff demanded that Astor2 return the shares provided to secure the Astor2 Loan pursuant to the parties' agreement.  Astor2, however, ignored Plaintiff's multiple requests in February and March 2023, and refused to return the shares or refund additional cash deposited by Plaintiff following Margin Calls[1].

14.     This was the first time Plaintiff realized that Lenders, acting under the direction of Defendants, never intended to return the Collateral to Plaintiff.

15.     By that time, however, Plaintiff had already substantially paid off the principal amount of the Vanderbilt Loan (defined below) and had been making regularly scheduled payments relating to the UPC1 Loan (defined below).

16.     Concerned about the security of the Collateral, Plaintiff withheld further repayments on the UPC1 and Vanderbilt Loans and demanded that UPC1 and Vanderbilt provide proof that the shares it deposited under the respective loan agreements remained safe in custody with the custodian broker appointed by the parties and reassurances that UPC1 and Vanderbilt intend to return the shares upon the full repayment of the UPC1 Loan and Vanderbilt Loan.

17.     UPC1 refused to disclose the whereabouts of the Collateral and refused to provide any reassurance.  Instead, UPC1 accused Plaintiff of breaching the UPC1 Agreement (defined below) by failing to make further repayments and used that as an excuse to issue notices of default against Plaintiff.  Vanderbilt, on the other hand, never responded to Plaintiff's requests.

_____

[1] "Margin Calls" is defined in the Astor2 Agreements and requires Chenming to top up shares or cash equal to 20% more than the fair market price of the Collateral in the event the Collateral falls to less than 60% of its fair market price.

18.     Left with no choice, Plaintiff had to resort to other means to locate the Collateral, including by making an application to the High Court of Hong Kong, only to find out, to its complete surprise, that almost all of the shares had been fraudulently transferred or sold by Lenders shortly after they were deposited with the custodian broker.

19.     What is even more concerning is the fact that Lenders procured significant revenues—in amounts substantially higher than the face value of the Loans—from the fraudulent sale of the Collateral.  Nonetheless, Lenders and Defendants intentionally withheld these facts and relentlessly demanded repayments and additional deposits from Plaintiff.

20.     This action therefore involves a carefully designed scheme by Defendants to enter into sham loan transactions with Plaintiff under the cover of separate shell companies, and fabricate defaults by Plaintiff under the loan agreements, in order to ultimately take possession and control of the Collateral and deprive Plaintiff of its rights to and interest in the same.

### The Astor2 Agreements

21.     On January 17 and September 17, 2020, Plaintiff entered into two Stock Loan Agreements ("Astor2 Agreements") with Astor2, pursuant to which Astor2 agreed to loan Plaintiff up to $35,000,000 ("Astor2 Loan").  The agreements are governed by Hong Kong law.

22.     To secure the Astor2 Loan, Plaintiff provided 110,000,000 Class B shares of the ListCo under the first agreement ("Astor2 B Shares Agreement"), and 95,000,000 Class H shares of the ListCo under the second agreement ("Astor2 H Shares Agreement").  The value of the Class B and H shares provided to Astor2, based on their trading prices at the time the shares were deposited with the custodian broker, was approximately $88,662,546.86.

23.     Plaintiff also entered into two Custodian Management Agreements and deposited those shares with a custodian broker designated by Astor2, i.e., Weiser Global Capital Markets,

an entity registered in Bahamas ("Weiser"). Because Weiser was not a qualified holder of B or H shares, it in turn appointed China Merchants Securities (HK) Co., Ltd ("CMS") and ICBC International Securities Limited ("ICBCI"), who are qualified holders, as custodians. Weiser subsequently opened accounts with CMS and ICBCI and instructed Chenming to deposit shares into these accounts.

24.     A person with the name "Michael Romanoff" whose title appears to be "Managing Member" signed the agreements on behalf of Astor2. Plaintiff had never heard of or met this person prior to the signing of the Astor2 Agreements and has never received any communication from this person.

25.     Plaintiff drew a total of $40,292,899.39 in loan principal under the Astor2 Agreements, consisting of $15,593,873.64 under the Astor2 B Shares Agreement and $24,699,025.75 under the Astor2 H Shares Agreement.

26.     On or about May 9, 2022, Astor2 issued a Margin Call Notice, demanding Chenming to deposit additional shares and cash. On or about May 15, 2022, Chenming proposed full repayment of the Astor2 Loan in exchange for the return of the Collateral. Astor2 declined Chenming's proposal.

27.     On or about May 19, 2022, pressed by Astor2's threats to forfeit the Collateral, Plaintiff deposited additional cash in the amount of $8,105,800 and $7,866,000 as further security under the Astor2 B Shares Agreement and Astor2 H Shares Agreement, respectively, into the bank account designated by Astor2.

28.     Between January and April 2023, Astor2 intentionally and fraudulently induced Plaintiff to make full repayment on the Astor2 Loan by repeatedly reassuring Plaintiff that it would ask its "loan committee" to approve and "swift[ly]" process the return of the Collateral

6

upon the full satisfaction of all loan amounts.  Relying on these promises, Plaintiff fully repaid the Astor2 Loan funds on February 10, 2023.  However, Astor2 repeatedly invented new excuses to delay the return of the Collateral, such as that the weekly loan committee meeting did not take place.  On April 17, 2023, Astor2 issued a letter notifying Plaintiff that its "loan committee" decided to reject Plaintiff's request for the return of the shares and declare the immediate acceleration of the loan, and considered the "filed closed."

29.     Plaintiff was outraged and devastated.  As explained *supra*, Plaintiff had fully repaid the Astor2 Loan by February 2023.  Specifically, in addition to paying off the loan principal, Plaintiff made interest and fee payments on the Astor2 Loan in the following amounts: (a) $2,178,386.31 in interest, $116,992.56 as maintenance fees, $243,174.00 as custody fees, $864,465.90 as origination fees, and $1,000 in legal expenses under the Astor2 B Shares Agreement; and (b) $1,312,023.79 in interest, $136,329.52 as maintenance fees, $281,867.59 as custody fees, $486,348.00 as origination fees, and $1,000 in legal expenses under the Astor2 H Shares Agreement.

30.     Astor2 directed Plaintiff to send payments to the following bank accounts in this District:

        Deltec Bank and Trust Limited
        Deltec House Lyford Cay, P.O. Box N-3229, Nassau, Bahamas
        Bank: Citibank, NA, New York
        Beneficiary Account Number: 25602100
        Beneficiary Bank ABA: 021000089
        Beneficiary Bank SWIFT: CITIUS33XXX

        Sierra Universal Corp
        5830 E. 2nd Street, Ste. 7000 #2419 Casper, WY 82609
        Bank: JPM Chase
        Beneficiary Account Number: 675179672
        Beneficiary Bank: JPM Chase
        Beneficiary Bank Address: 270 Park Ave 31st Floor, New York, NY
        10017, United States

Beneficiary Bank ABA: 021000021
Beneficiary Bank SWIFT: CHASUS33XXX

31.     To date, Astor2 has refused to return the shares and the additional deposits.

### The UPC1 Agreement

32.      On October 19, 2020, Plaintiff and UPC1 entered into a Securities Loan Agreement ("UPC1 Agreement")[2].  Pursuant to the UPC1 Agreement, UPC1 agreed to loan Plaintiff up to $17,000,000.00 ("UPC1 Loan").  The UPC1 Agreement is governed by the laws of England & Wales.

33.     A person with the name "Winstone Carrington" whose title appears to be "Senior Vice President" signed the UPC1 Agreement on behalf of UPC1.  Plaintiff had never heard of or met this person prior to the signing of the UPC1 Agreement and has never received any communication from this person.

34.     UPC1 loaned Plaintiff $14,674,492.77 under the UPC1 Agreement.  To secure the loan, Plaintiff provided a total of 80,000,000 Class B shares of the ListCo and deposited the same with the same custodian broker Weiser pursuant to a similar Custodian Management Agreement. The value of the Class B shares, based on their trading prices at the time the shares were deposited with the custodian broker, was approximately $31,729,653.04.

35.     Plaintiff had been making regular and timely payments on the UPC1 Loan until around April 2023, when it discovered the fraudulent scheme by Defendants.  As of the end of 2023, Plaintiff had paid off $2,037,307.53 in loan principal, plus $992,651.36 in interest,

---

[2] The UPC1 Agreement was dated September 18, 2020, but it was executed by Chenming on October 19, 2020.

$122,760.00 as maintenance fees, $371,372.64 as custody fees, $440,234.79 in loan generation

fees, and $5,000 in closing costs.

36.     UPC1 directed Plaintiff to send payments to the following bank accounts in this

District:

> Deltec Bank and Trust Limited
> Deltec House Lyford Cay, P.O. Box N-3229, Nassau, Bahamas
> Beneficiary Bank: Citibank, NA, New York,
> Beneficiary Account Number: 25602100
> Beneficiary Bank ABA: 021000089
> Beneficiary Bank SWIFT: CITIUS33XXX
>
> UPC Holdings Ltd.
> 155 E. 44th Street
> New York, NY 10017, USA
> Bank: Community Federal Savings Bank
> Beneficiary Bank Address: 89-16 Jamaica Ave
> Woodhaven, NY 11421, USA
> Beneficiary Account Number: 822000317861
> Beneficiary bank SWIFT: CMFGUS33
>
> Lviv Estate Holdings Ltd
> 142 Gold Springs Ct
> Canton, GA 30114, USA
> Bank: JP Morgan Chase Bank NA
> Beneficiary Bank Address: 270 Park Ave
> New York, NY 10017, USA
> Beneficiary Account Number: 727275510
> Beneficiary bank SWIFT: CHASUS33

37.     In or around early May 2023, Plaintiff began to investigate into the whereabouts

of the B Shares provided as collateral under UPC1 Agreement.  Plaintiff requested the complete

transaction records held by the shareholders of those shares from China Securities Depository

and Clearing Co. Ltd., a central securities depository.  Based on the records disclosed by the

central depository, Plaintiff was unable to identify accounts that could possibly hold the 80

million shares.

38.     Concerned about the security of the shares, Plaintiff wrote to UPC1 on May 5, 2023, seeking disclosure of the whereabouts of the shares and proposing a conference call with UPC1.  Several hours later, UPC1 sent Plaintiff a Margin Call Notice purportedly pursuant to the drop of the share price, demanding additional shares or cash as further security, but otherwise refused to disclose the whereabouts of the shares or hold a conference call with Plaintiff.

### The Vanderbilt Agreement

39.     On April 17, 2021, Plaintiff entered into a Collateralized Securities Loan Agreement ("Vanderbilt Agreement")[3] with Vanderbilt, pursuant to which Vanderbilt agreed to loan Plaintiff up to $45,000,000 ("Vanderbilt Loan").  The Vanderbilt Agreement is governed by Singapore law.

40.     A person with the name "Christopher Warner" whose title appears to be "Executive Vice President" signed the agreement on behalf of Vanderbilt.  Plaintiff had never heard of or met this person prior to the signing of the Vanderbilt Agreement and has never received any communication from this person.

41.     Vanderbilt issued $12,572,187.35 in loan funds to Plaintiff.  To secure the Vanderbilt Loan, Plaintiff pledged 58,414,000 Class H shares of the ListCo and deposited the same with Weiser as the custodian broker, pursuant to a similar Custodian Management Agreement.

42.     In response to Margin Call Notices issued by Vanderbilt on August 2, 2021 and June 16, 2022, Plaintiff deposited additional cash in the amount of $5,640,000 and $5,851,421.50, respectively, as further security to the Vanderbilt Loan.  In or around February

---

[3] The Vanderbilt Agreement was dated April 12, 2021.

2023, Plaintiff further deposited an additional 20,717,563 shares of Class B stock of the ListCo

with another broker appointed by Vanderbilt, Armira Capital Limited, pursuant to a separate

Custodian Management Agreement.  The value of the Class B and H shares provided to

Vanderbilt, based on their trading prices at the time the shares were deposited with the custodian

broker, was approximately $48,594,383.04.

43.     As of April 2023, Plaintiff has paid off $6,150,327.92 in loan principal and the

following amounts in interest and fees: $439,614.77 in interest, $62,860.94 as maintenance fees,

$182,602.45 as custody fees, $408,596.09 in loan generation fees, and $5,000 in closing costs.

44.     Vanderbilt directed Plaintiff to send payments to the following bank accounts in

this District:

> Deltec Bank and Trust Limited
> Deltec House Lyford Cay, P.O. Box N-3229, Nassau, Bahamas
> Beneficiary Bank: Citibank, NA, New York,
> Beneficiary Account Number: 25602100
> Beneficiary Bank ABA: 021000089
> Beneficiary Bank SWIFT: CITIUS33XXX
>
> C Vanderbilt Management Ltd.
> 600 Broadway Albany, NY 12207
> Beneficiary Bank: JP Morgan Chase Bank NA
> Beneficiary Bank Address: 270 Park Ave
> New York, NY 10017, USA
> Beneficiary Account Number: 856519621
> Beneficiary Bank SWIFT: CHASEUS33
>
> C Vanderbilt Management Ltd.
> 600 Broadway Albany, NY 12207
> Beneficiary Bank: Community Federal Savings
> Beneficiary Bank Address: 89-16 Jamaica Ave
> Woodhaven, NY 11421, USA
> Beneficiary Account Number: 822000321912
> Beneficiary Bank SWIFT: CMFGUS33

45.     Moreover, the value of the additional cash and shares deposited by Plaintiff in

June 2022 far exceeds the outstanding amount of the Vanderbilt Loan. Vanderbilt continues to

11

withhold these substantial assets, including $5,851,421.50 in cash, and refuses to return the same to Plaintiff in accordance with the Vanderbilt Agreement.

**UPC1 Further Impedes Plaintiff's Efforts to Recover the Collateral by Filing Arbitration**

46.     On or about June 14, 2023, UPC1 commenced arbitration proceedings in the London Court of International Arbitration ("LCIA") against Plaintiff, seeking declaratory judgment and damages for alleged disparaging statements made by Plaintiff, among other things ("LCIA Arbitration"), even though UPC1's remedy under the agreement is strictly limited. Section 4.2 of the UPC1 Agreement provides:

> Limited Recourse. Lender's sole recourse for nonpayment of the Loan is the Collateral and *Lender shall make no claim against Borrower* or any affiliate, successor, or assign of Borrower ("Borrower's Affiliates") or institute any litigation or claim (however described) against Borrower or any of Borrower's Affiliates in the event the value of the Collateral is insufficient to cover amounts due Lender hereunder.

*See* UPC1 Agreement § 4.2.

47.     The LCIA Arbitration is but another concerted attempt by the Lenders and Defendants to further their fraudulent scheme and delay Plaintiff's efforts in recovering the Collateral.  The alleged "disparaging statements" UPC1 complained of are those statements in Plaintiff's demand letters that UPC1 has unreasonably refused to disclose the whereabouts of the shares and fraudulently disposed of the same in violation of the UPC1 Agreement.  Those statements are accurate and true.

48.     Plaintiff asserted counterclaims, seeking redemption of the UPC1 Collateral, or, in the alternative, monetary damages equal to the difference between the value of the shares provided to UPC1 and the face value of the UPC1 Loan, as at the date of the appropriation of the Collateral or the Award, and the return of paid interests and fees.

49.     On August 17, 2023, UPC1 suddenly changed its position and revised the estimated value of its claims in the arbitration from $264,423,911.01 to $1.00.  The explanation offered by UPC1 was that it decided to lower the amount of its claimed damages "based solely upon the par value of the shares pledge by the [Plaintiff] as collateral for the loan" and "given the shares have no par value, this claim should now be valued as a nominal amount of $1.00 USD."

50.     On October 31, 2023, UPC1 changed course again by further adjusting the amount of its claims.  Among other things, UPC1 claimed for forfeiture of the Collateral and monetary damages in the amount of $1,000,000.

51.     Remarkably, UPC1 has resisted discovery in the LCIA Arbitration, including by refusing to produce any fact witness. Although the tribunal has ordered the parties to complete document production by June 2024, it is doubtful whether and to what extent UPC1 would obey in view of how it conducted itself throughout and the tactics it has employed in the arbitration.

52.     This action is therefore imperative and, the only viable alternative, for Plaintiff to discover the true identity of the fraudulent actors behind the so-called Lenders.

**Further Evidence of Defendants' Fraudulent Scheme**

53.     In July 2023, Plaintiff made an application before the High Court of Hong Kong, seeking a Norwich Pharmacal Order requiring non-party disclosures from the two custodian banks CMS and ICBCI regarding the transaction documents of the accounts that received the Collateral under the Loan Agreements.

54.     On October 4, 2023, CMS and ICBCI disclosed certain transaction documents to Plaintiff upon the orders by the High Court of Hong Kong.  Plaintiff's suspicion and concern regarding the fraudulent scheme was further corroborated by the disclosures it received, which

conspicuously show that Defendants began transferring or trading the pledged shares shortly after the shares were deposited and *before* the occurrence of any Event of Default.

55. The disclosures indicate that the first share transfer by Astor2 occurred on May 15, 2020, merely 38 days after the shares were deposited, when it transferred 5,000,000 Class B shares to DBS Vickers Securities. By no later than December 8, 2020, Astor2 had fraudulently sold or transferred the entirety of 110,000,000 Class B shares that were deposited as Collateral. By no later than January 27, 2021, Astor2 had fraudulently sold or transferred the entirety of the 95,000,000 Class H shares that were deposited as Collateral.

56. In the case of UPC1, by January 21, 2021, it had transferred or sold the entirety of the 80,000,000 Class B shares that were deposited as Collateral on November 27, 2020 and January 7, 2021.

57. As to Vanderbilt, by August 4, 2021, it had transferred or sold 58,414,000 Class H shares that were deposited as Collateral. Upon information and belief, 414,000 Class H shares were and may remain in the custody of Weiser, and 20,717,563 Class B shares, valued at approximately $6,561,884.58, were and may remain in the custody of Amira Capital Limited.

58. Upon information and belief, all of these transfers and sales were carried out unilaterally and fraudulently by the Lenders, pursuant to instructions by Defendants, without Plaintiff's knowledge or consent and without or prior to any purported breach by Plaintiff under the Loan Agreements.

59. Significantly, Lenders and Defendants procured a tremendous amount of proceeds from the unauthorized fraudulent sale of the shares, totaling HK$540,983,978.63, approximately $69,280,000, by trading a total of 185,000,000 Class B shares. The remaining 5,000,000 Class B

shares, valued at approximately $1,812,903.23, have been transferred to a third-party custodian (DBS Vickers Securities).

60.     Moreover, Lenders and Defendants received HK$321,027,564.16, approximately over $41,110,000 in proceeds, by trading a total of 77,462,000 Class H shares.  They have further transferred 75,538,000 Class H shares, valued at approximately $47,204,452.82,[4] to third-party custodians Citibank, Zundiao Securities Limited, and Fidelity Clearing Canada.

**Plaintiff Discovers the Relationship among the Lenders**

61.     Upon information and belief, all three Lenders are closely affiliated, owned, and controlled by the same Defendants and used as instruments of Defendants' fraudulent scheme.

*Astor2 and UPC1 Are Represented by the Same U.S. Law Firm*

62.     In relation to the Astor2 Loan, in or around January 2023, Astor2 directed Plaintiff to send loan payments to its law firm's "client escrow account," the name of that law firm is Jurist IQ Corp ("Jurist IQ").  Jurist IQ has a New York-based business address at 530 Fifth Ave, 9th Floor, New York, NY 10036.

63.     On August 17, 2023, the same law firm Jurist IQ served a demand letter on Plaintiff on behalf of UPC1 demanding the return of loan funds under the UPC1 Agreement.

64.     More recently, in the LCIA Arbitration commenced by UPC1 against Plaintiff, UPC1's counsel, Fred W. Freitag IV, Esq., submitted a letter from Jurist IQ confirming Jurist IQ's payment of the deposit of arbitration fees on behalf of UPC1.  In that letter, Jurist IQ explicitly stated that it "regularly acts as general counsel for UPC."  Based on information

---

[4] The average share price was calculated by dividing total value of the Class H shares deposited by the total number of Class H shares deposited under each agreement.

published by the Disciplinary Board of the Supreme Court of Pennsylvania,[5] Mr. Freitag is an

active member of the State Bar of Pennsylvania with a business address at 1041 Applejack Drive,

Gibsonia, PA 15044.

65.　　Moreover, on October 19, 2023, in his communication with the LCIA, Mr. Freitag

inadvertently attached documents from what appears to be another arbitration concerning a

similar loan dispute, where Astor Asset Management 1 Limited ("Astor1") was the claimant.

Upon information and belief, Astor1 and Astor2 are affiliated entities.  Mr. Freitag represents

both Astor entities.

66.　　Astor2 is established under the laws of St Kitts & Nevis whereas UPC1 is

established under the laws of Belize.  Neither Lender has any apparent connection with the

United States.  The fact that they are represented by the same U.S.-based law firms in separate

transactions and/or arbitration proceedings governed by different foreign laws indicates that the

individuals or entities behind the Lenders reside or are located in the United States.

*UPC1 and Vanderbilt*

67.　　On or about May 5, 2023, Plaintiff received an email from UPC1 with an

attachment titled "Vanderbilt Chenming MOU Addendum – May 3, 2023 – 6-42 PM.pdf."  The

document, however, is an addendum to the UPC1 Agreement and does not concern Vanderbilt.

---

[5] On June 28, 2019, Mr. Freitag received a Public Reprimand from the Disciplinary Board of the
Supreme Court of Pennsylvania, for engaging in professional misconduct by failing to segregate
client-entrusted funds and personal funds and misappropriating client funds.  The Disciplinary
Board also found that Mr. Freitag "has a substantial history of professional discipline," which
constitutes "an aggregating factor" warranting a Public Reprimand.  *See* DB Order No. 188 DB
2017, available at https://www.pacourts.us/assets/opinions/DisciplinaryBoard/out/188DB2017-
Freitag.pdf (last visited November 29, 2023).

This further confirms Plaintiff's belief that all three Lenders are affiliated and controlled by the same Defendants.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Fraud in the Inducement
(Against All Defendants)

68.     Plaintiff repeats and realleges paragraphs 1 through 67 as if fully set forth herein.

69.     Plaintiff executed the Loan Agreements and delivered the Collateral in reliance on material misrepresentations by Defendants, including material misrepresentations made through Lenders, that they would return the Collateral to Plaintiff upon full repayment of the Loan funds.

70.     Those material misrepresentations and false promises are distinct and separate from UPC1's, Astor2's, and Vanderbilt's representations or obligations under the separate Loan Agreements.

71.     Defendants intentionally made those misrepresentations and false promises designed to induce Plaintiff to enter into the Loan Agreements and to deliver the Collateral to and for the benefit of Defendants.

72.     Defendants acted with scienter by making knowingly false representations and promises that they would return the Collateral upon Plaintiff's performance of its obligations under the Loan Agreements, when in fact they had no intention, from day one, of honoring these false representations and promises.  Defendants made the material misrepresentations and false promises as part of a fraudulent scheme to deprive Plaintiff of its rights to and interest in the Collateral.

17

73.     Plaintiff had no reason to doubt the truthfulness of Defendants' false representations and promises about their intention to return the Collateral upon Plaintiff's performance of its contractual obligations.

74.     Plaintiff relied to its detriment on those material misrepresentations and false promises by entering into the Loan Agreements and delivering the Collateral to Defendants.

75.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $121,697,216.41.

76.     Defendants' actions were wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Fraud
(Against All Defendants)

77.     Plaintiff repeats and realleges paragraphs 1 through 76 as if fully set forth herein.

78.     Defendants imposed upon Plaintiff a fraudulent scheme, with concerted efforts from Lenders, by intentionally and falsely representing to Plaintiff that they were willing to provide financing to Plaintiff in exchange for Plaintiff's execution of Loan Agreements and delivery of the Collateral as security under the Loans.

79.     Upon information and belief, Defendants never intended to provide financing to Plaintiff. Their plan all along was to keep the Collateral for themselves and make profits by trading the Collateral, while requiring Plaintiff to repay the Loan principal and interest in full.

80.     Following the execution of the Loan Agreements, Defendants repeatedly threatened to forfeit the Collateral by manufacturing Events of Default and pressured Plaintiff into depositing additional shares and cash as security under the agreements. While Plaintiff

reluctantly obliged, due to fear of forfeiture of the Collateral, Defendants secretly and fraudulently transferred and sold a majority of the Collateral, in some cases immediately after they were deposited and in most cases before the occurrence of any alleged default had occurred.

81.     Defendants exerted enormous economic gain in trading the Collateral. Nonetheless, it continued to require Plaintiff to pay off the Loan principal and interest by knowingly and deliberately misrepresenting to Plaintiff that they were prepared to return the Collateral upon full payment of the Loans.  They never intended to return the Collateral.  In fact, they *cannot* return the Collateral, because a significant majority of the shares have already been disposed of by the Defendants.

82.     Defendants' scheme was successful.  Relying on their material misstatements, Plaintiff entered into the Loan Agreements, delivered the Collateral, deposited additional shares and cash, and paid off the entirety of the principal of the Astor2 Loan and a significant portion of the principal of the UPC1 and Vanderbilt Loans.

83.     To this date, Defendants continue to refuse to return the Collateral to Plaintiff.

84.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $121,697,216.41.

85.     Defendants' actions were wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### Conspiracy to Defraud
(Against All Defendants)

86.     Plaintiff repeats and realleges paragraphs 1 through 85 as if fully set forth herein.

19

87. Upon information and belief, Defendants are the ultimate beneficiary owners and/or alter egos of Lenders UPC1, Astor2, and Vanderbilt.

88. Further, upon information and belief, Defendants are the beneficiary owners of various bank accounts (described *supra* in paragraphs 30, 36 and 44), which received deposits and payments from Plaintiff.

89. Defendants made an agreement and conspired with Lenders to fraudulently induce Plaintiff to enter into sham loan transactions with Lenders, by wrongfully exercising dominion over and taking possession of the Collateral, among other things, Defendants acted in furtherance of the fraudulent scheme to deprive Plaintiff of its rights to and interest in the Collateral.

90. Defendants knowingly and voluntarily participated in the fraudulent scheme, by fraudulently, including through Lenders, inducing Plaintiff into signing the Loan Agreements and Custodian Management Agreements.

91. As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $121,697,216.41.

92. Defendants' actions were wanton, willful, and malicious, and thus Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### Conversion
(Against All Defendants)

93. Plaintiff repeats and realleges paragraphs 1 through 92 as if fully set forth herein.

94. Plaintiff is the legal owner of the Collateral, which is a specific identifiable property. Plaintiff had ownership, possession and control over the Collateral before its conversion by Defendants.

95.     Defendants exercised an unauthorized dominion over the Collateral to the exclusion of Plaintiff's rights and deprived Plaintiff of its interest in the same, by, among other things, refusing to return the Collateral and coercing Plaintiff into forfeiting the same through wrongfully manufacturing an Event of Default under the Loan Agreements.

96.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $121,697,216.41.

### FIFTH CAUSE OF ACTION

#### Unjust Enrichment
(Against Defendants)

97.     Plaintiff repeats and realleges paragraphs 1 through 96 as if fully set forth herein.

98.     Defendants have wrongfully and unjustly been enriched through its exercise of unauthorized dominion over the Collateral, by, among other things, refusing to return the Collateral to Plaintiff and fraudulently transferring and selling the Collateral for their own financial gain.

99.     As alleged herein, Plaintiff has conferred a benefit upon Defendants and Defendants have obtained and retained such benefit without adequately compensating Plaintiff. It is against equity and good conscience to permit Defendants to retain the benefit.

100.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiff has suffered monetary damages in an amount to be determined at trial, but not less than $121,697,216.41.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Chenming demands judgment in its favor against Defendants as follows:

21

A. As to the First, Second and Third Causes of Action, awarding Plaintiff
   compensatory and punitive damages against Defendants, including interest
   thereon, in an amount to be determined at trial, but in any event not less
   than $121,697,216.41;

B. As to the Fourth Cause of Action, permanently enjoining and restraining all
   Defendants, their agents, servants, employees, representatives, and all persons
   acting in concert or participating with Defendants or any one of them, from
   further trading, transferring, or otherwise disposing of the Collateral;

C. As to the Fourth and Fifth Causes of Action, ordering all Defendants to
   immediately return the Collateral to Plaintiff or, to the extent the Collateral is no
   longer retrievable, awarding Plaintiff compensatory and punitive damages against
   all Defendants, including interest thereon, in an amount to be determined at trial,
   but in any event, not less than $121,697,216.41;

D. As to the First, Second, and Fifth Causes of Action, ordering Defendants to
   disgorge any proceeds and profits procured from wrongfully transferring, selling,
   and trading the Collateral, in an amount to be determined at trial, but in any event,
   not less than $121,697,216.41;

E. As to all Causes of Action, awarding Plaintiff its costs, legal expenses, and
   reasonable attorneys' fees incurred in connection with this action; and

F. As to all Causes of Action, awarding Plaintiffs such other and further relief as the
   Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

Dated:  New York, New York
          February 8, 2024

                                        Respectfully submitted,
                                        KING & WOOD MALLESONS LLP

                                        By: ____/s/ Vincent Filardo, Jr._____
                                              Vincent Filardo, Jr.
                                              Aaron T. Wolfson
                                              500 Fifth Avenue, 50th Floor
                                              New York, NY 10110
                                              (212) 319-4755
                                              vincent.filardo@us.kwm.com
                                              aaron.wolfson@us.kwm.com

**VERIFICATION**

SHANDONG PROVINCE            )

                                            ) ss.:

PEOPLE'S REPUBLIC OF CHINA    )


Zheng Chunxing, declare pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  I am an employee of Chenming Holdings Co., Ltd., Plaintiff Chenming Holdings (Hong Kong) Limited's sole shareholder, in the above captioned case and have authorized the filing of this complaint. I have reviewed the allegations made in the complaint, and to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on information and documents kept by Plaintiff in the ordinary course of business, and I believe them to be true.

_____

Zheng Chunxing

Chenming Holdings (Hong Kong) Limited

24