# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* Application of RICARDO BENJAMIN SALINAS PLIEGO & CORPORACIÓN RBS S.A. C.V., for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding | Case No._____<br><br>**RICARDO BENJAMIN SALINAS PLIEGO & CORPORACIÓN RBS S.A. de C.V. MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR EX PARTE APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 AUTHORIZING DISCOVERY FOR USE IN A FOREIGN PROCEEDING**<br><br>Date: _____<br>Time: 10:00 AM<br>Courtroom: _____ |

## <u>DECLARATION OF EDWARD ALLEN</u>

I, Edward John Whitney Allen, declare under penalty of perjury under the laws of the United States and pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am admitted to practice law, as a solicitor, before the Senior Courts of England and Wales. I am the Managing Partner of Enyo Law LLP ("**Enyo**"), a law firm located in London, United Kingdom. My firm acts for Ricardo Benjamin Salinas Pliego ("**Mr Salinas**") and Corporación RBS S.A. de C.V. ("**RBS**") (together, the "**Claimants**"), in relation to a case in England and Wales entitled: (1) Ricardo Benjamin Salinas Pliego (2) Corporación RBS S.A. de C.V., vs (1) Astor Asset Management 3 Limited ("**Astor 3**") (2) Weiser Global Capital Markets Ltd ("**Weiser**") (3) Tavira Monaco SAM ("**Tavira**") (4) Vladimir "Val" Sklarov ("**Mr Sklarov**"),

1

and (5) Cornelius Vanderbilt Capital Management Ltd ("**Vanderbilt**"), bearing claim number CL-2024-000450 (the "**English Action**"). The English Action is being conducted in the Commercial Court, a division of the English High Court.

2.      I respectfully submit this declaration in support of the Claimants' application and petition for an order to conduct discovery for use in foreign proceedings pursuant to 28 U.S.C. § 1782 (the "**1782 Application**") to discover and confirm the whereabouts of certain assets, including (a) those held in bank accounts opened by Jurist IQ Corp. ("**Jurist IQ**") at JP Morgan Chase Bank N.A. ("**JPMC**"), and (b) information known to the principal of Jurist IQ, Jaitegh "JT" Singh ("**Mr Singh**"), and his law firm Singh Law Firm, P.A. in aid of the English Action.

3.      Nothing in this statement is intended, and I am not authorized, to waive any legal privilege on behalf of the Claimants. I am authorized by the Claimants to make this declaration on their behalf.

4.      Unless otherwise indicated, all facts set forth in this declaration are based upon: (a) my personal knowledge (b) my review of relevant documents, and (c) information supplied to me by the Claimants or professionals retained by the Claimants. Where the facts are not within my own knowledge, but from other sources of information or belief, they are true to the best of my knowledge, information and belief.

## I      <u>INTRODUCTION</u>

5.      I qualified as a solicitor of England and Wales in 2005 into the litigation department of an international law firm. I was part of the group which founded Enyo in 2010, a specialist disputes only law firm based in London.  I became a partner at Enyo in 2012 and Managing Partner in 2022. My practice has been primarily focused on large-scale commercial disputes, generally

with an international element.  Further details of my qualifications and experience can be found on my profile at my firm's website.[1]

6.      During my career, I have been involved in a number of cases before the English Court where one or more of the parties has sought evidence in the United States pursuant to USC §1782 applications. Based upon my experience, I am aware that the English Courts will generally admit evidence that has been obtained using the USC §1782 procedure and I believe that it would do so in this case.

7.      The admission of evidence obtained using the USC §1782 procedure is well-established in English case-law. The House of Lords (as it was then called prior to being reconstituted as the Supreme Court in 2009) held in South Carolina Insurance Co v Assurantie Maatschappij "de Zeven Provincien" [1987] A.C. 24 that there was nothing necessarily improper in using foreign procedures to obtain pre-trial discovery for the ultimate purpose of use in concurrent English proceedings (**Exhibit 1**). Further, it held that use of information obtained from a U.S.C. §1782 application was held not to be inherently objectionable and abusive because it interfered with the court's control of its own procedure. In that case an injunction had been granted by the lower courts restraining the claimants from proceeding with a USC §1782 application. The House of Lords discharged the injunction, holding that it was up to a party to obtain by his own means the evidence it required to support its own case provided those means were lawful in the country in which they were used.

8.      A similar decision was reached in Nokia Corporation v. Interdigital Technology Corp [2004] EWHC 2920 (Pat) (**Exhibit 2**). There the English court denied a request to restrain a party from making a USC §1782 application in the United States and stated that: "*it cannot be said*

---

[1]      https://enyolaw.com/team/edward-allen/

*a priori or that the material which would be obtained on discovery in this case, as sought in the section 1782 proceedings, would not be capable of being deployed in these proceedings.*"  The court further stated that: "*the English court should not seek to circumscribe the discretion possessed by the* [US District Court] *by imposing its own view as to the appropriateness of the classes of documents sought by reference to the issues in proceedings as they stand. It is legitimate for the requesting party to use the* [USC §1782 procedure to] *request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings, if necessary after appropriate amendment.*"

9.      On rare occasions, the English court has granted injunctions to prevent USD §1782 applications where they have been held to be "*abusive, unconscionable or vexatious*", which I do not consider the 1782 Application to be.

## II      BACKGROUND TO THE ENGLISH ACTION

10.     I summarise briefly below the key background facts that are relevant to the English Action, addressing first the key documents:

11.     First, a stock-lending agreement was executed on 28 July 2021 (the "**SLA**") between (a) Astor 3 as lender (b) RBS as borrower and (c) Mr Salinas as guarantor, pursuant to which Astor 3 agreed to advance loans of up to MXN 3,008,580,000 (c.USD 161 million) to RBS, secured over shares in Grupo Elektra SAB De CV (**"Elektra")** owned by Mr Salinas.

12.     Second, a custodian management agreement dated 28 July 2021 was entered into between Weiser, RBS, Mr Salinas and Astor 3 (the **"Weiser Agreement"**).

13.     Third, a control agreement dated 1 November 2021 between Tavira, RBS, Mr Salinas and Astor 3 (the **"Tavira Agreement"**) (together with the Weiser Agreement, the **"Depository Agreements"**).

14.     Pursuant to the SLA and Depository Agreements, Astor 3 advanced a total of five loans to RBS with a total principal amount of MXN 2,154,218,552.55 (c.USD 116 million). These loans were secured over a total of 7,204,296 Elektra shares belonging to Mr Salinas (the **"Collateral Shares"**). 935,913 Collateral Shares should be held by Weiser, and 6,268,383 should be held by Tavira pursuant to the Depository Agreements.

15.     The Claimants say that they were induced to enter into the above agreements on the basis of representations (express or implied) by Astor 3 to the effect that: (a) Astor 3 was a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities, and (b) Astor 3 intended to comply with its obligations under the SLA, including in particular its obligations not to sell the Collateral Shares prior to maturity or default (the **"Representations"**).

16.     In recent months, the Claimants developed concerns about the conduct of Astor 3 and associated parties and started to investigate the position. The Claimants are now aware that: (a) Astor 3 is controlled by Mr Sklarov who has a long history of fraudulent schemes; and (b) Astor 3 is an entity used by Mr Sklarov to perpetrate stock-lending fraud.

17.     As the existence of the fraud has been revealed, it appears that Astor 3 has given instructions to Weiser and/or Tavira to misappropriate at least some of the Collateral Shares. For example: (a) on 29 July 2024, one of Mr Sklarov's associates (Ms Elizabeta Lata) authorised the transfer of 6,268,383 Collateral Shares to Astor 3, and (b) on 30 July 2024, Weiser executed sale at a significant undervalue of 935,716 Collateral Shares to another of Mr Sklarov's companies, Astor Capital Fund Ltd ("**Astor Capital**" and the "**Astor Capital Transaction**").

18.     The Claimants believe that they have been victims of a major international stock-lending fraud conducted by Mr Sklarov via his companies and that the Representations were fraudulent.

## III     THE ENGLISH ACTION

**Introduction**

19.     Since the fraudulent scheme was uncovered, the Claimants have taken urgent steps in the English Action: (a) to commence legal proceedings with a view to obtaining judgments which can be enforced against the perpetrators for the recovery of the Collateral Shares and their proceeds as well as damages and other relief (b) to obtain freezing orders and proprietary injunctions seeking to secure and prevent further dissipation of the Collateral Shares and their proceeds, and (c) to seek information from the parties involved as to the location of the Collateral Shares and their proceeds, with a view being able to secure those assets and identify further individuals who may have been involved in the fraudulent scheme and / or hold the Collateral Shares and their proceeds.

Jurisdiction of the English court

20.     The Claimants have brought the English Action in England since the SLA is subject to an English exclusive jurisdiction clause (see clause VII of the SLA, **Exhibit 3**). Whilst the Claimants have rescinded the SLA, the jurisdiction clause continues to bestow exclusive jurisdiction on the English court notwithstanding such rescission with the result that England is the correct venue for its claims against Astor 3. As such, Astor 3 acts as the 'anchor defendant' for the Claimants' claims and the other defendants are necessary or proper parties. I exhibit hereto a copy of the Claimants' skeleton argument prepared for the hearing on 2 August 2024 (described

below). (**Exhibit 4**). Paragraphs 153-174 provide further detail about the jurisdictional aspects as to why England is the proper jurisdiction for the English Action.

**The claims**

21.    In terms of the claims themselves: (a) Astor 3 is being sued for fraudulent misrepresentation (also known as the tort of deceit), and (b) Astor 3, Mr Sklarov, Vanderbilt and (subject to permission being granted by the court to add it as a party) Astor Capital are being sued for economic tort claims of intention to cause harm through unlawful means and/or conspiracy to cause harm through unlawful means. The Claimants have not issued personal claims seeking damages for wrongdoing against Tavira and Weiser (but reserve the right to do so) but are seeking proprietary remedies in relation to the Collateral Shares and the proceeds thereof arising from the recession of the SLA and its supporting transaction documents. I exhibit hereto the Claimants' draft re-amended claim form and the brief details of claim which provides further information (**Exhibit 5**). The green text reflects the draft amendments which have yet to have been formally approved by the court.

**Injunctive relief**

22.    There are two principal aspects to the injunctive relief obtained by the Claimants to date: (a) freezing orders over the assets of Astor 3, Mr Sklarov, Vanderbilt and Astor Capital, and (b) proprietary injunctive relief to secure and prevent further dissipation of the Collateral Shares and their proceeds obtained against the same parties as well as Tavira and Weiser. I briefly address the legal basis for both aspects below.

23.    In order to obtain a freezing order, the applicant needs to establish two key elements which I summarize below. Paragraphs 137-149 of the Claimants' skeleton argument for the hearing on 2 August 2024 addresses these elements in more detail (Ex. 3).

24.    <u>First</u>, an applicant must show that he has a 'good arguable case' on the merits. There are different formulations as to what this means in the authorities. Some cases refer to the applicants having to show the better of the argument on the merits of the claim, taking into account what is known at this early stage of the litigation process. Other cases place the threshold slightly lower, stating that the claims have to be more than capable of serious argument but not necessarily claims which a judge would consider will succeed on the balance of probabilities. In the English Action, the Claimants have established that their claims meet either threshold. Therefore, the English court has been satisfied that the Claimants' claims have real merit.

25.    <u>Second</u>, the applicant must also satisfy the court that there is a good arguable case that there is, without an injunction, a real risk that a judgment in favour of the applicant would go unsatisfied, in the sense that - unless restrained by an injunction - the defendant will dissipate or dispose of his assets other than in the ordinary course of business. Further, it is not necessary to show that a judgment would be completely defeated. It is enough to show that the enforcement of any judgment would be more difficult. It is this risk of dissipation which necessitates most freezing orders to be issued without notice to the respondents with the result that the order is obtained on an *ex parte* basis. Once served, the respondent has the ability to apply to court to discharge or vary the terms of the freezing order.

26.    The requirements for a proprietary injunction are different to those for a freezing order. An applicant must show that: (a) there is a serious issue to be tried (b) damages would not be an adequate remedy, and (c) the balance of convenience, or balance of justice, favour the granting of an injunction. Unlike the granting of a freezing order, the test does not require a real risk of the relevant assets being disposed of, although this is relevant to the court's assessment of

whether to grant such injunction. Paragraphs 133-136 of the Claimants' skeleton argument for the hearing on 2 August 2024 addresses the legal test in more detail (Ex. 4).

27.　　A freezing order and proprietary injunction are amongst the most draconian of the remedies available to the English court in civil proceedings. As such, they bear a penal notice making it clear that: (a) if a respondent to the order breaches its terms, the respondent may be held in contempt of court and may be imprisoned, fined or have their assets seized, and (b) any third party who knows of the order and does anything which helps or permits the respondents to breach its terms may be held in contempt of court and may be imprisoned, fined or have their assets seized.

28.　　As a matter of English legal theory, a worldwide freezing order and a proprietary injunction are extra-territorial orders, in that they apply throughout the world.

29.　　However, in practice, there are limits to the territorial jurisdiction of the English court, and it is usually necessary for a claimant to commence proceedings in other relevant jurisdictions in order to enforce the English court's orders, or obtain comparable or supporting relief, in those other jurisdictions.

30.　　Further, the form of order also includes what is known as the 'Baltic proviso' (after Baltic Shipping Co Ltd v Translink Shipping Ltd [1995] 1 Lloyd's Rep 673) making it clear that the order does not prevent any non-party from complying with: (a) what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the respondent, and (b) any orders of the courts of that country or state, provided that reasonable notice of any application for such an order is given to the applicant's solicitors.

31.　　Finally, I note that freezing orders and proprietary injunctions, as is the case in relation to injunctions obtained in the English Action, are generally accompanied by directions

requiring the respondents to provide certain disclosure to allow the applicant and English court to police the terms of such orders. The respondent is generally directed to provide such information informally at the first instance and then in the form of an affidavit a short period of time after the application is granted.

**Chronology of key events**

32.    I set out below a summary of the progress of the English Action to date which, as is frequently the case in such situations, has developed as further information has come to light.

33.    On 2 August 2024, the Claimants commenced the English Action against Astor 3, Weiser, Tavira and Mr Sklarov seeking the substantive relief described above (**Exhibit 7**).

34.    The same day, on the urgent *ex parte* application of the Claimants, Mr Justice Jacobs granted the Claimants: (a) a worldwide freezing order against the assets of Astor 3 and Mr Sklarov up to the sum of MXN 5,411,000,000 (c.USD 290 million) (b) a proprietary injunction against each of Astor 3, Weiser, Tavira and Mr Sklarov prohibiting dealing with the Collateral Shares, and (c) directions for disclosure of information about the whereabouts of the Collateral Shares and their proceeds (the "**2 August Order**", **Exhibit 8**).

35.    With regard to the worldwide freezing order, I set out below how this was summarized in the Claimants' skeleton argument:

> "*140.   On the Applicants' case, Astor 3 and Mr Sklarov have carried out a fraudulent scheme to misappropriate the property of Mr Salinas, worth many hundreds of millions of US dollars. It is submitted that the Applicants have a good arguable case.*
>
> *141.   Further, it is likely that the Respondents have assets against which the Applicants could enforce. After all, the Respondents have (on the Applicants' case) carried out an enormous fraud, and the fruits of that fraud must be found somewhere.* It is possible that any assets held by Respondents are held on trust for the Applicants, but that is not necessarily the case. The Applicants could easily find themselves in a position where they need to execute a sizeable judgment against the Respondents' assets.*

142. *Accordingly, there are grounds for believing that the Respondents own assets that will be caught by the proposed worldwide freezing order and that any such order will not be futile: see Ras Al Khaimah Investment Authority v Bestfort Development LLP [2017] EWCA Civ 1014; [2018] 1 WLR 1099 at [39].*

143. *It is unknown where the Respondents' assets are located, but they could be anywhere around the world. To take Astor 3 as an example, this is an entity incorporated in Canada with a sole purported director in the Seychelles and a sole purported beneficial owner in Ukraine. Tavira is incorporated in Monaco and Weiser is incorporated in the Bahamas. Mr Sklarov is said to be resident in either the United States or Ukraine. This illustrates why a worldwide freezing order is required.*

144. *There is a real risk of dissipation. This is a risk that must necessarily arise in circumstances where the Respondents have conspired to commit a large-scale international fraud against the Applicants.*

145. *For the same reasons, the Applicants submit that it is just and convenient for a worldwide freezing injunction to be granted.*

146. *The draft Order provides that the freezing order is limited to the sum of MXN 5,411,000,000 which is the value of the shares (MXN 7,565,879,616) less the principal amount of the loans (MXN 2,154,218,552), rounded down to the nearest MXN 1 million.*

147. *The Applicants are willing to give an unlimited cross-undertaking in damages (in the standard form set out in the Commercial Court Guide). As noted above, Mr Salinas is one of the wealthiest individuals in Mexico.*

148. *The Applications have been made without notice to the Respondents because the Respondents are carrying out a scheme to defraud the Applicants. Mr Sklarov is an experienced and sophisticated fraudster. It is necessary for interim relief to be granted against the Respondents before they have a chance to misappropriate any remaining Collateral Shares (or the proceeds thereof.*

149. *That is also the reason why the Applications are urgent and need to be heard as quickly as possible. In this regard, the Applicants have acted promptly to issue the Applications. The Applicants and their legal team moved as quickly as possible after the privileged report from Forward Risk was received on Wednesday 31 July 2024, and that report was commissioned on the very same day (Thursday 26 July 2024) that the Applicants were advised by their legal team that a fraud was potentially being committed. Further, the recent correspondence with Tavira that suggests that the entirety of the Collateral*

*Shares formerly held by it have now been transferred to Astor 3 it is imperative that the Applicants obtain interim protection urgently to prevent any further misappropriation of the Collateral Shares or their proceeds*" (emphasis added, Ex. 6).

36.    Mr Justice Jacobs also granted the Claimants permission to serve documents in the English Action out of the jurisdiction to specified email addresses (the "**2 August Service Order**").

37.    To date, only Tavira and Weiser have purported to comply with the terms of the 2 August Order. Neither Astor 3 or Mr Sklarov have done so.

38.    Pursuant to the 2 August Order, Tavira provided information which identified for the first time that Astor 3 had rehypothecated some of the Collateral Shares with Vanderbilt, which appears to be another company controlled by Mr Sklarov.

39.    On 7 August 2024, the Claimants amended the Claim Form to add Vanderbilt as a defendant on the basis that it appeared to have been actively involved in the fraudulent scheme (**Exhibit 9**). On the same day, Mr Justice Jacobs granted a freezing order, a proprietary injunction and directions for disclosure against Vanderbilt (the "**7 August Order**", **Exhibit 10**). He also granted the Claimants permission to serve documents in the English Action out of the jurisdiction on Vanderbilt (the "**7 August Service Order**"), which the Claimants duly did. Vanderbilt has not complied with disclosure obligations contained in the 7 August Order.

40.    On 9 August 2024, Weiser provided information pursuant to the 2 August Order that identified for the first time the Astor Capital Transaction. Astor Capital appears to be a further company controlled by Mr Sklarov.

41.    On 13 August 2024, His Honour Judge Pelling KC granted a freezing order, a proprietary injunction and directions for disclosure against Astor Capital (the "**13 August Order**",

**Exhibit 11**). He also granted the Claimants permission to serve documents in the English Action out of the jurisdiction on Astor Capital (the "**13 August Service Order**"), which the Claimants duly did. The Claimants have also applied for permission to add Astor Capital as a defendant to the English Action. This application is likely to be determined at a hearing on 29 August 2024. Astor Capital has not complied with the disclosure obligations contained in the 13 August Order.

42.    On 15 August 2024, His Honour Judge Pelling KC made minor corrections to the 2 August Service Order, the 7 August Service Order, and the 13 August Service Order to correct the time for the Defendants to file a court form called an 'acknowledgment of service' (described further below) (**Exhibit 12**).

43.    On 20 August 2024 Astor 3, Mr Sklarov, Vanderbilt and Astor Capital (the "**Sklarov Parties**"), filed an application (the "**Discharge Application**"), with an accompanying letter to the court from their lawyers (DWF Law LLP) requesting that the English court discharge (i.e. set aside) the 2 August Order, the 7 August Order and the 13 August Order (the "**Injunction Orders**").

44.    The Discharge Application was supported by a witness statement by Mr Sklarov (**Exhibit 13**). In that evidence, Mr Sklarov openly admitted that the Sklarov Parties are in deliberate breach of the Injunction Orders stating at paragraph 9:

> "*Given the blatant abuse of the Court's process, including obtaining a draconian order against me and the other Respondents without any sort of hearing beforehand, it has been very difficult for me to accept that I should provide Mr Salinas with information which might enable him to inflict yet further damage beyond what the Injunction Orders have already enabled. **I have been advised (without waiving privilege) as to the risks involved in not complying with an order of the Court...**" (emphasis added).*

45.    On 22 August 2024, the Claimants filed an application (with an accompanying letter to the court from my firm) seeking an order that the Discharge Application be struck out

unless the Sklarov Parties comply within 48 hours with the disclosure obligations contained in paragraphs 11 and 12 of each of the Injunction Orders (the "**Unless Order Application**") (**Exhibit 14**).

**Next procedural steps**

46.    As mentioned above, a 90-minute hearing has been listed for 29 August 2024 to assess whether to continue the Injunction Orders. The Claimants will seek a direction for the continuation of these orders, thereby, continuing to freeze the assets of Astor 3, Sklarov, Vanderbilt and Astor Capital as well as continuing the injunctive relief over the Collateral Shares and their proceeds held by all of the Defendants.

47.    On 22 August 2024, the court indicated that the Unless Order Application would also be listed for the hearing on 29 August 2024, although it will ultimately for the judge on the day to determine whether it is appropriate to deal with that application on that day (or to defer it to a later date). The court has also indicated that it will not also hear the Discharge Application on the 29 August 2024. Instead, depending on the outcome of the Unless Order Application, the court may give directions (i.e. a timetable) for the hearing of the Discharge Application at a later date (probably in September).

48.    As mentioned above, the Defendants need to file acknowledgments of service in response to the claims. This is a 1-page form by which Defendants indicate whether they intend to: (a) admit the claim (in whole or part) (b) defend the claim, or (c) challenge the jurisdiction of the English court. With the exception of Astor Capital who has not yet been formally added as a party to the English Action, the acknowledgments of service for the other Defendants are variously due to be filed between 29 and 31 August 2024.

49.    Assuming that no party admits the claims, there are three potential scenarios. (a) A party challenges the jurisdiction of the English court. If this occurs, it will be determined as a preliminary issue at a hearing later this year or early in 2025. (b) A party indicates that it intends to defend the English Action. If this occurs, the standard court process to trial will follow with the first step being exchange of pleadings setting out the parties' respective cases. (c) If a party does not file an acknowledgment of service, then it will be susceptible to judgment in default of appearance or (potentially) summary judgment on the basis that the relevant defendant has no realistic prospect of success of defending the claim issued against it.

## IV.    DISCLOSURE FROM THIRD PARTIES

### Information provided Tavira

50.    As mentioned above, Tavira was directed to provide certain information about the Collateral Shares and their proceeds in the 2 August Order.

51.    On 5 August 2024, the Claimants' English solicitors (who, at that point, were Paul, Weiss, Rifkind, Wharton & Garrison LLP) received an email from Tavira purporting to discharge its disclosure obligations (**Exhibit 15**). This information was subsequently attested to in the form of an affidavit from Mr Luke Harris (which has yet to be provided in sworn form) (**Exhibit 16**).

52.    The information revealed that the Astor 3 had rehypothecated some of the Collateral Shares to Vanderbilt who currently holds in custody with the Tavira USD 10.46 million in cash and USD 6.7 million of "*other shareholdings*".

53.    The supporting information included a document purportedly setting out the details of the bank account for which the cash redemptions for the Collateral Shares were paid on behalf of the Astor 3 and Vanderbilt. The account is with '*Jurist Iq Corp Attorney Trust Account IOLA"*

held by JPMC in New York. Jurist IQ is a law firm associated with Mr Singh. He is listed as the CEO of Jurist IQ on the New York State Division of Corporations (**Exhibit 17**).

54.     Mr Singh is associated with the activities of Mr Sklarov. For example, Barclays issued a complaint in the SDNY in October 2020 against Mr Sklarov for impersonating financial institutions such as Barclays, the New York Stock Exchange and Rothschild (Exhibit …). On 19 March 2021, Judge Kaplan entered a permanent injunction against Mr Sklarov and Mr Singh (**Exhibit 18**).

55.     In their efforts to (a) discover the location of the Collateral Shares and their proceeds, and (b) uncover the fraud perpetrated upon them, the Claimants wish to seek information from JPMC, Jurist IQ and Mr Singh regarding Jurist IQ's bank account with JPMC and, in the case of Jurist IQ and Mr Singh, (c) any further information available to them about the location of the assets of Mr Sklarov, Astor 3, Astor Capital and Vanderbilt, particularly since none of these parties have responded to the Injunction Orders (as applicable). This information will be of utility both in relation to the identification of the Collateral Shares, or any proceeds arising from their sale or conversion and in respect of the claims being brought (in particular, the fraudulent scheme that the Applicants allege has been orchestrated by Mr Sklarov). In short, the Applicants are seeking to discover what has happened to the Collateral Shares and/or the proceeds of the Collateral Shares in order to fully particularise and support their claims in England.

**Limitations under English law**

56.     Under English law, the English courts have jurisdiction to make orders requiring third parties mixed up in wrongdoing to provide information. Such orders are known as Norwich Pharmacal orders after Norwich Pharmacal Co v Customs and Excise Commissioners [1974] AC 133 (**Exhibit 19**). There is also a separate equitable jurisdiction known as a Bankers Trust orders

after <u>Bankers Trust Co v Shapira</u> [1980] 1 W.L.R. 1274 (**Exhibit 20**). Whilst a separate jurisdiction, the same considerations apply, in particular in relation to their extra-territorial effect (described below).

57.    In principle, the English court has power to order a person over whom it has jurisdiction to provide documents held abroad. For example, the English court could order a London branch of a foreign bank to provide documents held by the bank's head office abroad. However, the granting of such relief is discretionary, and the English court will be careful not to make any orders which are oppressive. Further, in the cross-border context, the English court will act with restraint to avoid creating any conflict with foreign laws or authorities.

58.    In <u>Scenna v Persons Unknown and Others</u> [2023] EWHC 799 (Ch), the English court considered whether it should make a Bankers Trust disclosure order against a foreign bank. (**Exhibit 21**). I believe that same or similar considerations would also apply in relation to a Norwich Pharmacal order against an individual situated abroad.

59.    <u>Scenna</u> confirmed that the English court could, in the appropriate case, make a Bankers Trust order against a foreign bank. As regards the discretionary considerations, the court cited the decision of Hoffmann J in <u>Mackinnon v Donaldson, Lufkin & Jenrette Corp</u> [1986] Ch 482 (**Exhibit 22**):

> *"In principle and on authority it seems to me that the court should not, save in exceptional circumstances, impose such a requirement upon a foreigner, and, in particular, upon a foreign bank. The principle is that a state should refrain from demanding obedience to its sovereign authority by foreigners in respect of their conduct outside the jurisdiction… (493G)*

> *The need to exercise the court's jurisdiction with due regard to the sovereignty of others is particularly important in the case of banks. Banks are in a special position because their documents are concerned not only with their own business but with that of their customers. They will owe their customers a duty of confidence regulated by the law of the country where the account is kept… (494B-D)*

> *International law generally recognises the right of a state to regulate the conduct of its own nationals even outside its jurisdiction, provided that this does not involve disobedience to the local law. But banks, as I have already said, are in a special position. The nature of banking business is such that if an English court invokes its jurisdiction even over an English bank in respect of an account at a branch abroad, there is a strong likelihood of conflict with the bank's duties to its customer under the local law. It is therefore not surprising that any bank, whether English or foreign, should as a general rule be entitled to the protection of an order of the foreign court before it is required to disclose documents kept at a branch or head office abroad... (496)*

> *It seems to me that in a case like this, where alternative legitimate procedures are available, an infringement of sovereignty can seldom be justified except perhaps on the grounds of urgent necessity... (499F)"*

60.    In <u>Scenna</u>, the court held that it should therefore take into account: (a) whether there was a real risk that in providing such disclosure, the respondent bank would put itself in breach of local law (b) whether there was a viable alternative method of obtaining the disclosure in the local courts where the respondent bank was located, and (c) whether the applicant was in 'hot pursuit' of information in urgent attempts to discover what has happened to its assets.

61.    In the circumstances of this case, I believe that the Claimants are in 'hot pursuit' of information about the significant international fraud of which they have been victims (which I address further below in the context of urgency). However, where the 'targets' for the purposes of further disclosure involve a New York bank and law firm, and a US attorney, it appears likely that the English court would be concerned by the prospect of compliance with the English court order amounting to a breach of US laws. Further, the English court would be unlikely to make any order that could potentially result in a breach of US laws if there were other means available in the US to obtain the same or substantially the same information. In the present case, there is a well-trodden path available to the Claimants in the form of a USC §1782 application. Therefore, I consider the more appropriate legal remedy for the Claimants to be the 1782 Application. As such, the Claimants are not attempting to circumvent any foreign proof-gathering restrictions or other

policies of England or the United States but pursuing the appropriate path open to them regarding information-gathering.

**Urgency**

62.     I believe that the 1782 Application is extremely urgent and would request that it is heard as soon as possible. This is because the Claimants are in hot pursuit of the Collateral Shares, their proceeds, assets which have been frozen and information about the fraud perpetrated upon them.

63.     It may well be the case that, if granted, the information provided by the 1782 Application leads to: (a) further chains of enquiry which need to be pursued rapidly (b) the discovery of the Collateral Shares or their proceeds, or assets of those parties subject to the freezing orders in relation steps to which can be taken to preserve such assets, and (c) information which assists the Claimants in prosecuting the English Action, including potentially leading to the joinder of further parties.

64.     I also note that the Claimants have acted promptly upon the discovery of the fraud. Without waiver of privilege, I note that the Claimants concluded on 26 July 2024 that they may have been victims of a fraud. The same day, investigators (Forward Risk) were appointed. As described above, this led to the English Action being issued on 2 August 2024 and the granting of the 2 August Order. Following these initial steps, further orders were obtained on 7 and 13 August 2024. On 5 August 2024, information was provided by Tavira which has been the catalyst for the 1782 Application. Therefore, I do not think it can fairly be suggested that the Claimants have been dilatory in pursuing the legal remedies available to them. To the contrary, they have moved with very significant expedition.

Executed this 23rd day of August, 2024

_____
EDWARD ALLEN

# EXHIBIT 1

24

Lord Mackay
of Clashfern

Reg. v. Shivpuri (H.L.(E.))                    [1987]

with the Lord Chancellor's view. Otherwise I agree with the reasons    A
given by my noble and learned friend, Lord Bridge.

*Appeal against conviction dismissed.*
*Costs of appellant and respondent to*
*be paid out of central funds.*

*Solicitors: Francis & Co., Cambridge; Solicitor, Customs and Excise.*    B

C. T. B.

C

[HOUSE OF LORDS]

SOUTH CAROLINA INSURANCE CO.        .        .    RESPONDENTS

AND                                                                          D

ASSURANTIE MAATSCHAPPIJ "DE ZEVEN
    PROVINCIEN" N.V.      .      .      .      .    APPELLANTS

SOUTH CAROLINA INSURANCE CO.        .        .    RESPONDENTS

AND

AL AHLIA INSURANCE CO. AND ANOTHER        .        .    APPELLANTS    E

1986 May 6, 7;        Lord Bridge of Harwich, Lord Brandon of Oakbrook,
    July 29              Lord Brightman, Lord Mackay of Clashfern and
                                        Lord Goff of Chieveley

*Injunction—Jurisdiction   to   grant—Foreign   proceedings—Action*    F
    *brought in England—Defendants lodging petition in United States*
    *court for pre-trial discovery—Whether defendants to be restrained*
    *from proceeding with petition under court's inherent jurisdiction*

The plaintiffs were an American insurance company, and,
having reinsured the liability of another American insurance
company, U.N.I., they reinsured the risk with the defendants in
London. The plaintiffs claimed under the contract of reinsurance
and, when the defendants disputed liability, they brought    G
proceedings in the Commercial Court. Before the defence was
served, the defendants lodged a petition in a United States
district court seeking, *inter alia,* an order for pre-trial discovery
of documents relevant to the claim and the plaintiffs' contract of
reinsurance with U.N.I., against persons resident in the United
States, who were not parties to the English action. On the
plaintiffs' application in the Commercial Court, the judge made    H
an order restraining the defendants from taking any further step
in the American proceedings or enforcing any order made
therein. On appeal by the defendants, the Court of Appeal
dismissed the appeal.

1 A.C.                   South Carolina Co. v. Assurantie N.V. (H.L.(E.))

A
On appeal by the defendants;—

*Held,* allowing the appeal, that although the power of the
High Court to grant injunctions, which was a statutory power
conferred by section 37(1) of the Supreme Court Act 1981, was
very wide it was limited, save for two exceptions irrelevant to
the present proceedings, to the situations (Lord Mackay of
Clashfern and Lord Goff of Chieveley dubitante) (i) where one
party to an action could show that the other party had either
B
invaded, or threatened to invade, a legal or equitable right of
the former for the enforcement of which the latter was amenable
to the jurisdiction of the court, and (ii) where one party to an
action had behaved, or threatened to behave, in an unconscion-
able manner; that in the circumstances the plaintiffs had failed
to show either that the defendants' conduct towards the plaintiffs
was amenable to the jurisdiction of the court, or that it was
unconscionable in the sense that it interfered with the due
C
process of the High Court's jurisdiction, and that, accordingly,
the injunctions granted would be discharged (post, pp. 31c–D,
39H—40D, 41A–D, 44A–B, C–D, E, F).

*Siskina (Owners of cargo lately laden on board) v. Distos
Compania Naviera S.A.* [1979] A.C. 210, H.L.(E.); *Castanho v.
Brown & Root (U.K.) Ltd.* [1981] A.C. 557, H.L.(E.) and
*British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58,
D
H.L.(E.) applied.

*Per Lord Goff of Chieveley.* I am reluctant to accept the
proposition that the power of the court to grant injunctions is
restricted to certain exclusive categories. That power is unfettered
by statute and it is impossible at the present time to foresee
every circumstance in which it may be thought right to make
the remedy available (post, p. 44G).

E
Decision of the Court of Appeal [1986] Q.B. 348; [1985] 3
W.L.R. 739; [1985] 2 All E.R. 1046 reversed.


The following cases are referred to in their Lordships' opinions:

*Bank of Tokyo Ltd. v. Karoon (Note),* post, p. 45; [1986] 3 W.L.R. 414;
[1986] 3 All E.R. 468, C.A.

*British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58; [1984] 3
F
W.L.R. 413; [1984] 3 All E.R. 39, H.L.(E.)

*Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557; [1980] 3 W.L.R.
991; [1981] 1 All E.R. 143, H.L.(E.)

*Court of Commissioner of Patents for Republic of South Africa, In re* (1980)
88 F.R.D. 75

*Deere (John) Ltd. and Deere & Co. v. Sperry Corporation* (1985) 754 F. 2d
132

G
*MacShannon v. Rockware Glass Ltd.* [1978] A.C. 795; [1978] 2 W.L.R. 362;
[1978] 1 All E.R. 625, H.L.(E.)

*Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera
S.A.* [1979] A.C. 210; [1977] 3 W.L.R. 818; [1977] 3 All E.R. 803,
H.L.(E.)


The following additional cases were cited in argument:

H
*Armstrong v. Armstrong* [1892] P. 98
*Erhmann v. Ehrmann* [1896] 2 Ch. 611, C.A.
*Mike Trading and Transport Ltd. v. R. Pagnan & Fratelli (The Lisboa)*
[1980] 2 Lloyd's Rep. 546, C.A.
*North Carolina Estate Co. Ltd., In re* (1889) 5 T.L.R. 328

South Carolina Co. v. Assurantie N.V. (H.L.(E.))                [1987]

*Straker Brothers & Co. v. Reynolds* (1889) 22 Q.B.D. 262          A
*Westinghouse Electric Corporation Uranium Contract Litigation M.D.L.
Docket No. 235 (Nos. 1 and 2), In re* [1978] A.C. 547; [1978] 2 W.L.R.
81; [1978] 1 All E.R. 434, H.L.(E.)

APPEAL from the Court of Appeal.
This was an appeal by leave of the House of Lords (Lord Scarman,
Lord Templeman and Lord Mackay of Clashfern) dated 19 November      B
1985 by the defendants, Assurantie Maatschappij "De Zeven Provincien"
N.V., in the first action, and by the first defendants, Al Ahlia Insurance
Co., and by the second defendants, Arabian Seas Insurance Co. Ltd., in
the second action brought by the plaintiffs, South Carolina Insurance
Co. from the judgment dated 23 May 1985 of the Court of Appeal
(Griffiths, Slade and Lloyd L.JJ.) which affirmed orders made on 25     C
April 1985 by Hobhouse J., the effect of which was to restrain the
defendants from taking any further steps in proceedings before a Federal
District Court of the United States for production and inspection of
documents against a number of companies and individuals not party to
the present actions.
The facts are set out in the opinion of Lord Brandon of Oakbrook.

D

*Robert Alexander Q.C.* and *Jonathan Sumption Q.C.* for the
defendants. The point raised by this appeal is novel. The question can
be stated in this way: in what circumstances (if any) may the English
courts restrain a party to an English action from availing himself of the
process of a foreign court for the purpose of obtaining evidence relevant
to the English action? The most authoritative decisions in this branch of   E
the law are those of this House in *Siskina (Owners of cargo lately laden
on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210; *Castanho
v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557 and *British Airways
Board v. Laker Airways Ltd.* [1985] A.C. 58.
In the present case the defendants against whom injunctive relief is
sought availed themselves of a right open to them under the federal law    F
of the United States and applied to a United States district court for an
order requiring persons resident in the United States, but who were not
parties to the English proceedings, to give pre-trial discovery of
documents relevant to the English action. The particular issue, therefore,
in this appeal is whether in the present circumstances it is right for the
English court to restrain the defendants from prosecuting further the
proceedings in the United States district court.                          G
The rules of procedure in England provide a means whereby
discovery can be obtained between parties to an action and witnesses
can be subpoenaed to appear at the trial with relevant documents in
their possession. The rules of procedure do not provide an exhaustive or
exclusive code which prohibit a party from obtaining documents in any
way other than those provided by the rules. For example, if a stranger     H
to the action is prepared to give documents voluntarily to a party, that
party is entitled to receive them without obtaining a subpoena. Further,
a party may use the facilities of the courts of a friendly foreign state if
that state is willing for them so to do. The defendants concede that

A     there are limits to this principle. Thus, it is inapplicable where it would be unconscionable for a party to obtain discovery, for example, of documents which in this country are subject to professional privilege.

    The documents sought are relevant to the defences pleaded in the action which in turn reflect enquiries which were pursued before the action was brought. The plaintiffs obtained the injunction in spite of refusing the defendants consent to have access to the documents in
B     question. Since then they have granted the defendants access but it is the view of the defendants' solicitors that the strangers to the action have not made proper disclosure. The documents are not in the power or possession or control of the plaintiffs; therefore it is difficult to see why they object to disclosure. If the strangers to the action were in this country they could be required to produce the documents by subpoena duces tecum. As to any suggestion that the defendants could have
C     applied for letters rogatory under R.S.C., Ord. 39, r. 2, the procedure is cumbersome and expensive and they can be issued only where other efforts have been made to obtain the documents in question.

    As stated previously, after the Court of Appeal gave judgment the plaintiffs did arrange for the defendants to have controlled access to certain documents in the possession of certain third parties resident in
D     the United States. This was a facility which the defendants hoped would make the prosecution of the present appeal unnecessary. However, the restrictions imposed upon the defendants' inspection of documents made the facilities which were offered to them most unsatisfactory. They have therefore with regret concluded that certain documents have been withheld in a manner which can be remedied only by the compulsory
E     procedure of the United States district court.

    28 United States Code, section 1782, is a clear provision enabling parties to an English action to obtain from the courts of the United States documents for use in proceedings in this country. That being the rule, the question then arises: on what principle should the English court prevent disclosure where the United States courts would allow disclosure directed to a company which is subject to the jurisdiction of the United States courts? It is the plaintiffs' contention that in the circumstances it
F     is unconscionable for the defendants to apply for disclosure of these documents. The Court of Appeal held that in principle a party to litigation in this country should not avail itself of 28 United States Code, section 1782, against non-parties resident in the United States.

    Reliance is placed on the following propositions: (i) In principle it is
G     open to the defendants to seek material to enable them to conduct their case and to obtain that material as early as possible. A party can gather evidence for use in litigation either through the use of English procedures or through other means. (ii) There is no objection to these other means including means provided by United States proceedings. This does not, as the Court of Appeal suggested, deprive the English court of control over the proceedings. (iii) Caution is required before the conduct of any
H     foreign proceedings is restrained. (iv) The use of the United States processes could be restrained by injunction if it involved the breach of some legal or equitable right of the party claiming the injunction or was unjust or unconscionable to that other party but not otherwise. The

A

defendants dissent from the general approach of the Court of Appeal in the present case.

As to the authorities, reliance is placed on *Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210, 211c–d, 255f–g, 256e–257, *per* Lord Diplock. As to *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557, see *per* Lord Scarman, at pp. 572f–g, and 574d. It is to be noted that that was a forum conveniens case. In *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58, the observations of Lord Diplock at pp. 80a–b et seq., and Lord Scarman at p. 95c, show that the category of cases there under discussion have no relevance to the issue in the present case. The defendants would apply by analogy to the present case the observations of Dunn L.J. in *Mike Trading and Transport Ltd. v. R. Pagnan & Fratelli (The Lisboa)* [1980] 2 Lloyd's Rep. 546, 551.

B

C

On the facts of the present case it is not unreasonable or unjust for the defendants to apply for the documents in question. It is said that the documents would be obtained earlier than if they were obtained by subpoena in the English proceedings. But this is only a quirk of English procedure. The advantage of being able to obtain the documents at an earlier stage of the proceedings is in no way unconscionable to the plaintiffs. This is particularly so since otherwise they are not likely to be obtained at all. The defendants do not accept that the procedure by way of letters rogatory is open to them. Further, it is an expensive procedure. It cannot be unjust or unconscionable for the defendants to take the "direct route" for obtaining these documents.

D

As to the United States authorities cited by Griffiths L.J. [1986] Q.B. 348, 357, those authorities are not contemplating the situation which has arisen in the present case. The principles laid down by the Court of Appeal here it may be said to act unconscionably against the defendants rather than the plaintiffs. [Reference was also made to *In re North Carolina Estate Co. Ltd.* (1889) 5 T.L.R. 328; *Straker Brothers & Co. v. Reynolds* (1889) 22 Q.B.D. 262, and *Bank of Tokyo Ltd. v. Karoon (Note)* [1987] A.C. 45.]

E

*Kenneth Rokison* Q.C., *Christopher Symons* and *Thomas Weitzman* for the plaintiffs. Attention is drawn to the width of the inquiry requested by the defendants in the United States proceedings. They are seeking third party discovery which would not be allowed at all in England. The United States court will not allow that which would not be allowed by the court hearing the substantive issue between the parties. The defendants are in effect seeking to take part of the English proceedings out of the jurisdiction and control of the English court. The difference between the disclosure of documents as a result of letters of request and the present case is that the defendants here have first gone to the foreign court and requested that court to make an order in English proceedings.

F

G

*In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C. 547, is the antithesis of the present case. The House there held that an English court will not, even when so requested by a foreign court, make an order in respect of an English person or company requiring that person or company to give

H

A documentary or testamentary discovery for the purposes of the foreign proceedings. The present case is the reverse position since although the American court is being asked to assist the English court, the American court is being asked to admit a wider class of documents than is allowable under English procedure. It is thus an even stronger case than the *Westinghouse* case. The correct way for the defendants to proceed in the present issue is under R.S.C., Ord. 39, r. 1. Further, Ord. 38, r. 9

B specifically relates to depositions in any cause or matter and links them to those under Ord. 39, r. 1.

The approach of Griffiths L.J. in the Court of Appeal is adopted. The plaintiffs are prejudiced by the American procedure because the defendants can obtain documents which could not be obtained under English procedure. Further, the plaintiffs are necessarily prejudiced by

C the costs and expense of the American proceedings for they are bound to take part in those proceedings to protect their interests. The question also arises whether, if the English court would not make an order for third party discovery as sought by the defendants, the American court would make any order at all. It is plain from the American decisions in *In re Court of Commissioner of Patents for Republic of South Africa* (1980) 88 F.R.D. 75, 77, and *John Deere Ltd. and Deere & Co. v.*

D *Sperry Corporation* (1985) 754 F. 2d 132, 135, 136, that a United States court will only grant an applicant an order under 28 United States Code, section 1782, if it is satisfied that an order of the same nature would be made in like circumstances by the foreign court seised of the dispute at that stage of the proceedings. The effect of those decisions is that any American court properly advised as to English law on discovery would deny the defendants' request as being for third party discovery which is

E not allowable under English procedure. If it be said that this question can be left for the United States district court to decide, the answer is that it is better for the English court to deal with the matter and "nip it in the bud." It may be that the United States court would not be properly advised as to the relevant English law.

The English court has jurisdiction to restrain a party to proceedings

F pending in England from seeking or continuing to seek interlocutory orders in a foreign jurisdiction for the purposes of those proceedings. The English court has an inherent jurisdiction to control its own proceedings. Further, it is well established that where proceedings are pending before the English court, and proceedings are brought in a foreign jurisdiction which concern the same issues, the English court has

G a discretionary jurisdiction either to stay the English proceedings or to restrain by injunction a party to those proceedings from continuing to proceed in the foreign court. This jurisdiction was recognised by this House in *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58, 80D–F *per* Lord Diplock. This jurisdiction is commonly invoked in the so-called "forum conveniens" cases, where there is a choice of forum for determination of substantive issues between the parties. See *per* Lord

H Scarman, at p. 95D. This jurisdiction must also exist where the foreign proceedings are of a purely interlocutory nature, but which overlap with the normal interlocutory processes before the English court. Indeed, it is an obvious and an "a fortiori" case. Thus here the United States

proceedings are only ancillary proceedings and therefore there is no A
reason why the English court should not have granted the injunction
appealed against.

*The Lisboa* [1980] 2 Lloyd's Rep. 546 is distinguishable because that
was a case where proceedings were started in Venice in order to obtain
security if the action was subsequently instituted in Italy. That case
cannot be described as one of a foreign court's interlocutory jurisdiction
being invoked in English proceedings. It was not an interlocutory B
application for the purposes of English proceedings. The line of cases
cited by Robert Goff L.J. in *Bank of Tokyo Ltd. v. Karoon (Note)*
[1987] A.C. 45, is closer to the present case. The present case is one
where it is proper to grant an injunction to protect the jurisdiction of
the English court.

*Armstrong v. Armstrong* [1892] P. 98 lays down the correct approach C
to the present problem; the principles stated there are applicable to the
present case. The essential question is: who should have control over the
present matter? The true answer is that it should be the English court
which should have control.

Suppose that in the present case the plaintiffs had attempted in the
United States Court to obtain pre-trial depositions from the defendants'
employees. Such an application would surely be restrained because it D
would be so alien to English procedure. So also third-party discovery is
alien to English procedure. The matter can be tested by the following
example. If a party went to an English court and asked it to issue letters
rogatory in relation to third parties' documents under Order 39, such an
application would be dismissed. If the party then went to the United
States court and requested it under 28 United States Code, section 1782, E
the English court should intervene on the ground that it was vexatious;
the party having failed before the English court, it cannot obtain the
evidence by utilising a foreign jurisdiction. But the answer cannot be
any different merely because the party in question goes to the United
States court first as in the present case.

*Erhmann v. Ehrmann* [1896] 2 Ch. 611, shows that the English court
will not grant letters rogatory except in relation to evidence which is F
directly relevant to the issues in the case. Wider "discovery" will not be
made the subject of letters rogatory—let alone in respect of documents
held by a third party.

In conclusion, it is the plaintiffs' contention that they have a legal or
equitable right which it is appropriate for the English court to protect by
injunction, namely the right, as parties to proceedings in the English G
court, to have those proceedings conducted in accordance with the
procedural laws and practices of England, and of no other jurisdiction.
Moreover, it is their contention that the defendants' application for
interlocutory relief in the United States is unconscionable and unjust to
the plaintiffs. If granted, it would allow the defendants to take advantage
of procedural steps and remedies available under English procedural
law, while at the same time avoiding some of the restrictions on those H
steps and remedies which would nevertheless continue to impinge upon
the plaintiffs.

*Symons* followed.

A    *Alexander Q.C.* in reply. In the present case it is accepted that there is an advantage under the foreign proceedings which cannot be obtained in the English proceedings. It is this factor which distinguishes the present case from *Armstrong v. Armstrong* [1892] P. 98, as applied by Robert Goff L.J. in the *Tokyo Bank* case *(Note)* [1987] A.C. 45. The defendants rely on the principle on which they opened this appeal, namely, that the plaintiffs can only succeed if they can show that the

B    defendants' application before the United States court is unconscionable. As to the principle adumbrated by Griffiths L.J. below, the manner in which a party gathers evidence is for that party. It may gather it voluntarily or in pursuance of a contract. These methods do not deprive the English court in any way of control of its own proceedings.

[Reference was also made to *In re Westinghouse Electric Corporation*

C    *Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C. 547, 562B–F.]

Their Lordships took time for consideration.

29 July.  LORD BRIDGE OF HARWICH.  My Lords, for the reasons given in the speech of my noble and learned friend, Lord Brandon of

D    Oakbrook, with which I agree, I would allow this appeal.

LORD BRANDON OF OAKBROOK.  My Lords, the question for decision in this appeal is a novel one and can be stated in this way. An action between A and B is pending before an English court. While it is pending B, exercising a statutory right potentially available to him under

E    the federal law of the United States, applies to a district court of the United States for an order that persons resident in the United States, who are not parties to the action before the English court, should give him pre-trial discovery of documents relevant to the issues in that action. In those circumstances, is it right for the English court, on the application of A, to grant an injunction against B prohibiting him from prosecuting further his proceedings in the United States district court?

F    Hobhouse J. at first instance, and the Court of Appeal (Griffiths, Slade and Lloyd L.JJ.) on appeal from him, have held that it is right for such an injunction to be granted. The parties enjoined (for in the instant case there are three of them) now bring a further appeal with the leave of your Lordships' House.

The background of the case is to be found in what can conveniently

G    be described as a three-tier insurance arrangement. The company which first insured the relevant risks was a United States company, United National Insurance Co. ("United National"). United National re-insured the risks which it had insured with another United States company, South Carolina Insurance Co. ("South Carolina"). South Carolina in turn re-re-insured the risks which it had re-insured with a number of other insurance companies in the London market. These other insurance

H    companies included a Dutch company, Assurantie Maatschappij "De Zeven Provincien" (Seven Provinces) and two Middle or Far Eastern companies, Al Ahlia Insurance Co. ("Al Ahlia") and Arabian Seas Insurance Co. ("Arabian Seas"). In or about 1984 South Carolina called

Lord Brandon
of Oakbrook     South Carolina Co. v. Assurantie N.V. (H.L.(E.))    **[1987]**

upon Seven Provinces, Al Ahlia and Arabian Seas to pay substantial  A
sums which South Carolina claimed to be due from them under the
contracts of re-re-insurance concerned. Seven Provinces, Al Ahlia and
Arabian Seas refused to make the payments asked for, denying that they
were liable to do so.

    As a result South Carolina brought two actions in the Commercial
Court here in order to recover the sums which they claimed to be
payable, together with interest on such sums. In the first action, which  B
was begun on 12 December 1984, Seven Provinces is the sole defendant.
In the second action, which was begun on 28 February 1985, Al Ahlia is
the first defendant and Arabian Seas is the second defendant. It was the
original intention of the solicitors acting for South Carolina to seek
summary judgment in both actions under R.S.C., Order 14. However,
at an application to fix a date for the hearing of the Order 14  C
proceedings against Seven Provinces, counsel for the latter indicated that
a number of substantial defences would be raised to South Carolina's
claim. These defences included (1) misrepresentation or non-disclosure
regarding the retention position on the part of South Carolina; (2) non-
disclosure of a previous bad loss record on the business concerned; (3)
excessive deductions from premiums; and (4) payment of claims outside
the limits of the relevant treaty.  D

    The underwriting agent for United National through whom business
was placed with it was Pacific General Agency Inc. ("P.G.A."). The loss
adjusters who investigated the claims made against United National
were Arthur Campbell-Husted and Co. ("Campbell-Husted"). The
principal place of business of both P.G.A. and Campbell-Husted is in
the State of Washington.  E

    My Lords, Seven Provinces, Al Ahlia and Arabian Seas ("the re-re-
insurers") are, by reasons of their position, remote from the facts in
dispute, and obliged to rely for detailed information about them on such
documents as they can obtain from South Carolina or P.G.A. and
Campbell-Husted. The latter two, however, were not the agents of
South Carolina in connection with the relevant transactions; it follows
that discovery of documents by South Carolina in the two actions in  F
England would not extend to relevant documents held by them. In this
situation, if the re-re-insurers are to achieve their legitimate object of
inspecting and copying where necessary, relevant documents held by
P.G.A. and Campbell-Husted, some other means have to be found to
enable them to do so.

    In November 1984, after South Carolina had put forward its claims
against the re-re-insurers, but before the two actions in England were  G
begun, the latter had asked P.G.A. if they could inspect the documents
in which they were interested at Seattle on 7 December 1984. P.G.A.
referred the request to their principal, United National, which in turn
consulted South Carolina. It appears that, on the advice of South
Carolina's English solicitors, the request for inspection was, in effect,
refused. The two actions in England were subsequently begun.  H

    My Lords, 28 United States Code, section 1782, provides:

      "Assistance to foreign and international tribunals and to litigants
    before such tribunals. (a) The district court of the district in

A

which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a foreign or international tribunal. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a

B

person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or in part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not

C

prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure."

On 28 March 1985, before the re-re-insurers had served their points of defence and counterclaim in the two actions against them in England,

D

they applied by motion to the district court of the United States, Western District of Washington, at Seattle, for an order under section 1782 above. The motion, the title of which referred to the two actions in England, asked for an order against P.G.A. and Campbell-Husted involving two matters. The first matter was the production and inspection of numerous specified classes of documents of the kind which could reasonably be expected to have come into being in the course of the

E

transaction of the insurance business which had led to United National, having settled claims itself, to recover from South Carolina as its re-insurers, and to South Carolina then claiming to recover over from the re-re-insurers. The second matter was the appearance of three named persons from P.G.A. and Campbell-Husted to give testimony by deposition. The motion was supported by a memorandum and an

F

affidavit.

Notice of the re-re-insurers' motion was served on P.G.A. and Campbell-Husted. South Carolina was also served with notice of the motion, or otherwise made aware of its having been lodged. Neither P.G.A. nor Campbell-Husted appeared before the district court to resist the application. South Carolina, however, did so appear, and having indicated their objection to it, was given until 29 April 1985 to file its

G

affidavit in opposition. It is to be inferred from the foregoing that neither P.G.A. nor Campbell-Husted objects to producing the documents listed in the motion for inspection, and where necessary for copying, by the re-re-insurers, and that it is only the objection of South Carolina that has stood in the way of their doing so.

H

On 24 April 1985, before the date fixed for filing its affidavit in opposition in the United States district court, South Carolina issued summonses in the two actions in England. By their summonses South Carolina sought (1) an order that the re-re-insurers should withdraw their application to the United States district court, (2) an injunction

restraining the re-re-insurers from proceeding further with such    A
application, and (3) a declaration that the application was an abuse of
the process of the English court.

My Lords, the summonses were heard by Hobhouse J. on 25 April
1985. He declined to make the declaration asked for, but granted South
Carolina injunctions restraining the re-re-insurers until further order
from taking any further steps in their motion before the United States    B
district court and from enforcing any order made by that court on such
motion. The main ground on which Hobhouse J. decided to grant such
injunctions appears from pp. 10 and 11 in Appendix I to the printed
case. Having set out what he called the framework of the matter, he
said:

> "It involves a question of principle as to whether or not the English
> court should retain the control of its own procedure and the    C
> proceedings that are before it. I have no doubt that the answer to
> be given to that question is that the English court should retain that
> control."

The decision of Hobhouse J. was, as I indicated earlier, affirmed by
the Court of Appeal [1986] Q.B. 348. Griffiths L.J. gave the principal
judgment, with which Slade and Lloyd L.JJ. both agreed. The main    D
reason which Griffiths L.J. gave for his decision was similar to that
relied on by Hobhouse J. He said, at p. 358:

> "Once the parties have chosen or accepted the court in which their
> dispute is to be tried they must abide by the procedure of that
> country and that court must be master of its own procedure.    E
> Litigation is expensive enough as it is, and if a party fighting a case
> in this country has to face the prospect of fighting procedural battles
> in whatever other jurisdiction his opponent may find a procedural
> advantage it may impose intolerable burdens, and encourage the
> worst and most oppressive form of procedural forum shopping. We
> should set our face against any such situation developing.

> "Severe dislocation to the timetable of the English litigation is a    F
> readily foreseeable consequence of unrestrained access to foreign
> procedural remedies. This is likely to cause hardship or inconvenience
> not only to the other party to that litigation but will also affect
> other litigants whose cases are listed upon forecasts dependent upon
> litigation being conducted in accordance with our own rules of
> procedure. As the judge said, the court will lose control of its own    G
> proceedings. Furthermore, one party might be able to gain a very
> unfair advantage in the English procedure if he was able to take the
> deposition of and cross-examine a witness whom he would never
> call on his own behalf at the trial, for example, the employees or
> business associates of his opponent. I think Mr. Sumption [counsel
> for the re-re-insurers] recognised this when he said he would be
> content to accept the stay in respect of his application to take the    H
> depositions of the witnesses from P.G.A. and Arthur Campbell-
> Husted & Co. I am therefore satisfied that as a matter of principle
> the court must have an inherent jurisdiction to make any necessary

A     order to ensure that the litigation is conducted in accordance with its own procedures."

My Lords, before examining the question whether Hobhouse J. and the Court of Appeal were right or wrong to grant the injunctions now appealed against, it is necessary to draw attention to a number of preliminary matters.

B     The first matter to which attention needs to be drawn is the existence of an essential difference between the civil procedures of the High Court in England on the one hand, and of courts of the United States on the other, with regard to what may be compendiously described as pre-trial discovery. Under the civil procedure of the High Court in England, pre-trial discovery may take two forms. The first form, which is far and away the more common, is by way of disclosure and inspection of

C     relevant documents under R.S.C., Ord. 24. The second form, which is comparatively rare, is by way of the asking and answering on oath of interrogatories under R.S.C., Ord. 26. Such discovery is, however, subject to two important limitations, one relating to its scope and the other to the stage of an action at which it normally takes place. So far as the scope of discovery is concerned, it is limited to the disclosure and inspection of documents in the possession or power of the parties to the

D     action, or to the asking and answering on oath of interrogatories as between such parties. So far as the stage of an action at which discovery normally takes place is concerned, it is the general rule that the two forms of discovery to which I have referred do not take place until the formal pleadings by both sides have been completed and the issues in disputes thereby fully and clearly defined. In this connection, however,

E     it is right to say that the court has power to order either form of discovery at any stage of an action, including a stage earlier than the completion of pleadings; but such power is rarely exercised and then only on special grounds, for instance when discovery is needed in order that justice may be done in interlocutory proceedings.

    Because of the first limitation to which I have referred, there is no

F     way in which a party to an action in the High Court in England can compel pre-trial discovery as against a person who is not a party to such action, either by way of the disclosure and inspection of documents in his possession or power, or by way of giving oral or written testimony. I would, however, stress the word "compel" which I have used in the preceding sentence, for there is nothing to prevent a person who is not a

G     party to an action from voluntarily giving to one or other or both parties to it either disclosure and inspection of documents in his possession or oral or written testimony.

    The procedure of the High Court in England, while not enabling parties to an action to compel pre-trial discovery as against a person who is not a party to such action, nevertheless affords ample means by which such a person, provided that he is within the jurisdiction of the

H     court, can be compelled either to give oral testimony, or to produce documents in his possession or power, at the trial of the action itself. Under R.S.C., Ord. 38, Part II, such a person may be compelled to give oral testimony at the trial by the issue and service on him of a subpoena

Lord Brandon
of Oakbrook          South Carolina Co. v. Assurantie N.V. (H.L.(E.))          [1987]

A
ad testificandum, or to produce documents in his power or possession (so long as they are adequately described and defined) by the issue and service on him of a subpoena duces tecum. The issue of such subpoenas is in the first instance a ministerial rather than a judicial act, and a party may therefore issue subpoenas of either kind as he thinks fit; the court, however, has power to set aside any subpoena on proper grounds, for instance, irregularity of form, irrelevance, oppressiveness or abuse of the
B process.

The procedure of the High Court in England includes a further power of the court, conferred on it by R.S.C., Ord. 38, r.13, to order any person to attend any proceedings in a cause or matter and produce any document to be specified or described in the order, the production of which appears to the court to be necessary for the purpose of that
C proceeding. It has, however, long been established that this rule is not intended to be used, and cannot properly be used, to enable a party to an action to obtain pre-trial disclosure and inspection of documents in the possession or power of a person who is not a party to such action. It is a rule of limited application, involving the production of a document or documents to the court itself rather than to either of the parties to an action.

D My Lords, the civil procedure of courts in the United States differs essentially from that in the High Court in England in that under it parties to an action can compel, as against persons who are not parties to it, a full measure of pre-trial discovery, including both the disclosure and production for inspection and copying of documents, and also the giving of oral or written testimony. This power of compulsion can be, and regularly is, used at an early stage of an action.

E The second matter to which attention needs to be drawn is that 28 United States Code, section 1782, as appears from its terms which I set out earlier, expressly provides that an order made under it may prescribe the practice and procedure, which may be in whole or in part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the
F document or other thing; and that, to the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Procedure.

Reference was made in the two courts below and again in your Lordships' House to certain United States authorities which bear on the exercise of a district court's powers under section 1782. In a decision of
G the United States District Court of Pennsylvania, *In re Court of the Commissioner of Patents for Republic of South Africa* (1980) 88 F.R.D. 75, 77, Judge Newcomer said:

"[1, 2] It is of great concern to this court that counsel for opponent has not been able to represent to this court that the documents and testimony for which opponents request a discovery order are discoverable under South African law. Indeed, *discussions with*
H counsel lead this court to suspect that these materials would *not* be available through South African procedures. Clearly, this court should not by its exercise of the discretion allowed it under section

1 A.C.          South Carolina Co. v. Assurantie N.V. (H.L.(E.))          Lord Brandon
of Oakbrook

A    1782 allow litigants to circumvent the restrictions imposed on discovery by foreign tribunals. Few actions could more significantly impede the development of international co-operation among courts than if the courts of the United States operated to give litigants in foreign cases processes of law to which they are not entitled in the appropriate foreign tribunals."

B    Further in *John Deere Ltd. and Deere & Co. v. Sperry Corporation* (1985) 754 F.2d 132, 135, Judge Garth, giving the judgment of the United States Court of Appeals for the Third Circuit, said:

"As a co-operative measure, section 1782 cannot be said to ignore those considerations of comity and sovereignty that pervade international law. A grant of discovery that trenched upon the clearly established procedures of a foreign tribunal would not be within section 1782."

C

My Lords, it was contended for South Carolina, on the basis of these authorities, that the re-re-insurers' application to the district court of the United States was bound to fail. The ground relied on was that, since the procedure of the High Court in England did not enable parties to an action to compel pre-trial discovery against persons not parties to it, the district court would not permit the re-re-insurers to circumvent that limitation by granting them an order for such discovery under section 1782.

D

It appears to me that there may well be considerable force in this contention. It is not possible, however, for your Lordships, on the limited material before you, to decide for yourselves in advance how the United States district court would see fit to exercise the discretion conferred on it by section 1782, in the particular circumstances of this case, and having regard to the characteristics of civil procedure in the High Court in England which I endeavoured to summarise earlier.

E

The third matter to which attention needs to be drawn concerns certain changes in the positions of the parties which have occurred since the original hearing of South Carolina's two summonses before Hobhouse J. The first change of position relates to the memorandum lodged in support of the re-re-insurers' application to the United States district court, in which they asserted:

F

"As evidenced by the attached affidavit of Francis Otley Mackie the petitioners herein are seeking this court's assistance in obtaining information and documentation which is necessary, material and relevant to litigation pending in the courts of England for use in those proceedings. The affidavit further establishes that were all the parties residents of England, the requested discovery would be permitted pursuant to the rules of procedure and discovery in England. Accordingly, the petitioners' motion for taking of testimony and the production of documents should be granted."

G

H    Mr. Mackie, whose affidavit is referred to at the beginning of the above passage, is a partner in the firm of solicitors acting for the re-re-insurers in the two actions in England. The relevant part of that affidavit is paragraph 12, in which Mr. Mackie deposed, inter alia, as follows:

A    "Discovery of such documentation and testimony is permitted according to the English rules of procedure . . . . Petitioners would be able to obtain writs of subpoena duces tecum issued by the High Court of England . . . directing these entities to produce the documents requested and directing them individually to appear and give testimony at depositions."

B    These statements in the re-re-insurers' memorandum and Mr. Mackie's affidavit were criticised by Hobhouse J. and by Griffiths L.J. in the Court of Appeal as giving such an incomplete and inaccurate account of the procedure of the High Court in England with regard to discovery as seriously to mislead the United States district court. Griffiths L.J., however, expressly acquitted Mr. Mackie of any deliberate intention to mislead. Before your Lordships Mr. Robert Alexander, who appeared C    as leading counsel for the appellant re-re-insurers, accepted unreservedly that the passages in question were incomplete and inaccurate, and as a consequence liable to mislead. The main error, as will be apparent, is the failure to distinguish clearly between compelling a person not a party to an action to give pre-trial discovery on the one hand, and compelling him to give oral evidence and produce documents at the trial itself on the other hand. I think that it is right for your Lordships to say that the D    criticisms of that error made by the two courts below were fully justified and that it is most unfortunate that it should ever have occurred. That said, however, having regard to the admission of such error freely made by Mr. Alexander for the re-re-insurers, and having regard further to the summary which I endeavoured to give earlier of the relevant procedure of the High Court in England, it seems to me that the error is E    no longer of significance in the consideration of this appeal.

The second change of position concerns the scope of the re-re-insurers' application to the United States district court. As I indicated earlier, that application as originally framed covered two distinct matters: first, the production and inspection of specified classes of documents; and, secondly, the appearance of three named persons from P.G.A. and Campbell-Husted to give testimony by depositions. On the face of the F    motion it appeared that what the re-re-insurers were seeking in relation to the second of these matters was the taking of oral evidence from the persons named relevant to the issues in the English actions, such evidence to be recorded in depositions. Before the Court of Appeal, however, Mr. Sumption for the re-re-insurers expressly abandoned any intention to achieve this end, and before your Lordships Mr. Alexander G    made it clear that the appearance of the named persons was only sought for the purpose of their producing and identifying the relevant documents held by P.G.A. and Campbell-Husted, and in no way for the purpose of their giving oral evidence to be recorded in depositions with regard to issues of fact arising in the English actions.

The third change of position arises from the stage which the two actions in England have now reached. At the time when South Carolina's H    applications first came before Hobhouse J. the re-re-insurers had not yet served their points of defence and counterclaim, so that the issues between the parties had not yet been defined by pleadings and no

1 A.C.          South Carolina Co. v. Assurantie N.V. (H.L.(E.))          Lord Brandon
of Oakbrook

A  discovery of documents as between the parties had yet taken place. Hobhouse J. regarded this as a significant matter in exercising the discretion to grant injunctions which he held that he had. During the hearing before the Court of Appeal, however, the re-re-insurers served points of defence and counterclaim, and since then discovery of documents as between the parties has taken place. The actions in England are, therefore, much further advanced than they were when

B  South Carolina's applications first came before the judge.

The fourth change of position is this. Following the decision of the Court of Appeal South Carolina arranged for the re-re-insurers to have controlled access to certain documents held by P.G.A. and Campbell-Husted. According to the re-re-insurers, however, substantial restrictions were imposed by South Carolina on the documents which they were

C  allowed to inspect under this arrangement. It is the re-re-insurers' case, therefore, that their application to the United States district court remains necessary in order to enable them to have inspection of other documents to which, by reason of the control exercised by South Carolina, they have not so far had access. Your Lordships were not asked to go into the details of these matters, which are in dispute between the parties, and it is right, I think, for the purposes of this

D  appeal for your Lordships to proceed on the basis that the re-re-insurers have at least an arguable case with regard to them.

The fifth and final matter to which attention should be drawn is that the judge of the United States district court before whom the re-re-insurers' application under section 1782 is pending has helpfully directed that further proceedings in that application should be stayed until the determination first of the re-re-insurers' appeal to the Court of Appeal,

E  and then of their further appeal to your Lordships' House.

My Lords, having drawn attention to these various preliminary matters, I turn to consider whether the injunctions granted by Hobhouse J. and affirmed by the Court of Appeal should be allowed to stand. I put the question in that form because of the various ways described by me above in which the positions of the parties have

F  changed since the original hearing before Hobhouse J.

As appears from the passages from the judgments of Hobhouse J. and Griffiths L.J. which I set out earlier, both courts below treated South Carolina's applications for injunctions as raising matters of principle for decision. I have no doubt that they were right so to treat them. Putting the point differently, the question which your Lordships have to decide is whether the circumstances of the case are such as to

G  give the court power to grant the injunctions at all, and not whether, there being such power, it was a proper exercise of discretion to grant them rather than to refuse them.

In considering the question which I have formulated, it will be helpful in the first place to state certain basic principles governing the grant of injunctions by the High Court. The first basic principle is that

H  the power of the High Court to grant injunctions is a statutory power conferred on it by section 37(1) of the Supreme Court Act 1981, which provides that "the High Court may by order (whether interlocutory or final) grant an injunction in all cases in which it appears to the court to

Lord Brandon
of Oakbrook         South Carolina Co. v. Assurantie N.V. (H.L.(E.))         [1987]

be just and convenient to do so." That provision is similar to earlier    A
provisions of which it is the successor, namely, section 45(1) of the
Supreme Court of Judicature (Consolidation) Act 1925 and section 25(8)
of the Supreme Court of Judicature Act 1873. The second basic principle
is—that, although the terms of section 37(1) of the Act of 1981 and its
predecessors are very wide, the power conferred by them has been
circumscribed by judicial authority dating back many years. The nature
of the limitations to which the power is subject has been considered in a    B
number of recent cases in your Lordships' House: *Siskina (Owners of
cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979]
A.C. 210; *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557; and
*British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58. The effect
of these authorities, so far as material to the present case, can be
summarised by saying that the power of the High Court to grant    C
injunctions is, subject to two exceptions to which I shall refer shortly,
limited to two situations. Situation (1) is when one party to an action
can show that the other party has either invaded, or threatens to invade,
a legal or equitable right of the former for the enforcement of which the
latter is amenable to the jurisdiction of the court. Situation (2) is where
one party to an action has behaved, or threatens to behave, in a manner
which is unconscionable. The third basic principle is that, among the    D
forms of injunction which the High Court has power to grant, is an
injunction granted to one party to an action to restrain the other party
to it from beginning, or if he has begun from continuing, proceedings
against the former in a foreign court. Such jurisdiction is, however, to
be exercised with caution because it involves indirect interference with
the process of the foreign court concerned.    E

The latter form of injunction may be granted in such circumstances
as to constitute an exception to the second basic principle stated above.
This may occur where one party has brought proceedings against another
party in a foreign court which is not the forum conveniens for the trial
of the dispute between them, as that expression was defined and applied
in *MacShannon v. Rockware Glass Ltd.* [1978] A.C. 795. In such a case
the party who has brought the proceedings in the foreign court may not,    F
by doing so, have invaded any legal or equitable right of the other
party, nor acted in an unconscionable manner. The court nevertheless
has power to restrain him from continuing his foreign proceedings on
the ground that there is another forum in which it is more appropriate,
in the interests of justice, that the dispute between the parties should be
tried. The present case, however, is not concerned with a choice    G
between two competing forums for the trial of a dispute, and the
exception to which I have just referred is therefore not relevant to it.

The power of the court to grant *Mareva* injunctions may also, before
it was statutorily recognised, have been a further exception to the
second basic principle stated above. That power, however, has now
been expressly recognised by section 37(3) of the Supreme Court Act
1981, and again the present case is in no way concerned with it.    H

Ignoring these exceptions, therefore, and applying the basic principles
which I have stated to the present case, the first question for
consideration is whether South Carolina has shown that what I have

1 A.C.          South Carolina Co. v. Assurantie N.V. (H.L.(E.))          Lord Brandon
                                                                         of Oakbrook

A   described above as situation (1) exists. Has South Carolina shown that the re-re-insurers, by beginning and intending to prosecute their application to the United States district court, has invaded, or threatened to invade, a legal or equitable right of South Carolina for the enforcement of which the re-re-insurers are amenable to the jurisdiction of the court? It was contended by Mr. Rokison on behalf of South Carolina that South Carolina did indeed have such a legal or equitable

B   right, but it appeared to me that he had great difficulty in formulating the legal or equitable right on which he relied. Neither of the courts below decided as they did on the basis that the re-re-insurers had by their conduct invaded a legal or equitable right of South Carolina, and I cannot see how such a case can be made out. I would therefore hold that South Carolina has not shown that situation (1) exists.

C   The second question for consideration is whether South Carolina has shown that what I have described above as situation (2) exists. Has South Carolina shown that the re-re-insurers, by beginning and intending to prosecute their application to the United States district court, have acted in a manner which is unconscionable? It is difficult, and would probably be unwise, to seek to define the expression "unconscionable conduct" in anything like an exhaustive manner. In my opinion, however,

D   it includes, at any rate, conduct which is oppressive or vexatious or which interferes with the due process of the court.

   Although neither Hobhouse J. at first instance, nor Griffiths L.J. in the Court of Appeal, stated in terms that they thought it right to grant injunctions on the ground that the conduct of the re-re-insurers in making their application to the United States district court was

E   unconscionable, it seems to me to be implicit in their reasons that they regarded it as being so. Hobhouse J. based his decision expressly on the need for the court to retain control of its own process, with the necessary implication that the re-re-insurers' conduct was an interference with such control and therefore an interference with the due process of the court. Griffiths L.J. based his decision on three grounds: first (like Hobhouse J.), that the court must retain control of its own process;

F   secondly, that the civil procedure of United States courts is significantly different from that of English courts, and the parties, by submitting to the jurisdiction of an English court, must be taken to have accepted its procedure; and, thirdly, that unrestricted access to foreign procedural remedies was liable to produce hardship in the form of increased costs and inconvenience. I shall consider each of these grounds in turn.

G   I consider, first, the ground that the re-re-insurers' conduct was an interference with the court's control of its own process. It is not clear to me why this should be so. Under the civil procedure of the High Court the court does not, in general, exercise any control over the manner in which a party obtains the evidence which he needs to support his case. The court may give him help, certainly; for instance by discovery of documents inter partes under R.S.C., Ord. 24; by allowing evidence to

H   be obtained or presented at the trial in various ways under Orders 38 and 39; and by the issue of subpoenas under Part II of Order 38, to which I referred earlier. Subject, however, to the help of the court in these various ways, the basic principle underlying the preparation and

42

**Lord Brandon of Oakbrook**    South Carolina Co. v. Assurantie N.V. (H.L.(E.))    [1987]

A

presentation of a party's case in the High Court in England is that it is for that party to obtain and present the evidence which he needs by his own means, provided always that such means are lawful in the country in which they are used. It was not in dispute that, if P.G.A. and Campbell-Husted, uninfluenced by the control exercised over them by South Carolina on the advice of the latter's English solicitors, had freely and voluntarily allowed the re-re-insurers to inspect, and where necessary to copy, all the documents referred to in the latter's application, it could not possibly have been said that there had been any interference with the English court's control of its own process. That being so, I cannot see why, since the Federal law of the United States authorises an application of the kind made by the re-re-insurers in this case, the making of such application, which may or may not succeed in whole or in part, should be regarded as being such an interference either. I cannot, therefore, agree with the first ground of decision relied on by the Court of Appeal.

B

C

I consider, secondly, the ground that the procedure of United States courts is significantly different from that of English courts, and the parties, by submitting to the jurisdiction of an English court, must be taken to have accepted its procedure. It is, no doubt, true that the re-re-insurers, by entering unconditional appearances in the two English actions, can be said in a certain sense to have accepted the procedure of that court. Your Lordships were not, however, informed of any ground on which the re-re-insurers could, with any prospect of success, have contested the jurisdiction of the High Court in England in respect of the disputes which are the subject matter of the two actions concerned. Be that as it may, I cannot see that the re-re-insurers, by seeking to exercise a right potentially available to them under the Federal law of the United States, have in any way departed from, or interfered with, the procedure of the English court. All they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe that they need in order to prepare and present their case. It was said that the re-re-insurers could have applied to the High Court under R.S.C., Ord. 39, r. 2, for letters of request to issue to the proper judicial authorities in the United States. But 28 United States Code, section 1782, allows an application to be made either indirectly by the foreign court concerned or directly by an interested party, and I can see no good reason why the re-re-insurers should not have chosen whichever of these two alternatives they preferred. It is, I think, of the utmost importance to appreciate that the reason why English procedure does not permit pre-trial discovery of documents against persons who are not parties to an action is for the protection of those third parties, and not for the protection of either of the persons who are parties to the action. I cannot, therefore, agree with the second ground of decision relied on by the Court of Appeal.

D

E

F

G

I consider, thirdly, the ground that unrestrained access to foreign procedural remedies was liable to cause hardship in the form of increased costs and inconvenience. So far as increased costs are concerned, Griffiths L.J. was referring to increased costs incurred or to be incurred

H

A   by South Carolina in contesting the proceedings in the United States district court. If, however, the re-re-insurers are right in their contention that they have not yet, by reason of the control exercised by South Carolina, had access to all the documents to which they believe that they need access in order to prepare their case in the two English actions, it can reasonably be said that any liability for increased costs incurred by South Carolina is in a sense self-imposed. If they had been

B   willing to permit P.G.A. and Campbell-Husted to allow the re-re-insurers to inspect, and where necessary copy, all the documents to which the latter had sought access, the making or prosecution of the re-re-insurers' application to the United States district court would not have been necessary. In this connection it is right to stress what I have already stated earlier, that P.G.A. and Campbell-Husted, left to

C   themselves, would voluntarily have given the re-re-insurers permission to inspect, and where necessary copy, all the documents to which the latter sought access. It was said for South Carolina that the documents not so far disclosed were not relevant to the issues in the two English actions. If that is so, I cannot help asking myself why South Carolina has gone to such lengths to prevent the disclosure of such documents. So far as inconvenience is concerned, it is apparent that Griffiths L.J. had two

D   kinds of inconvenience in mind: first inconvenience in relation to the two actions immediately concerned in the form of delay in getting them tried and possible prolongation of the trial when it took place; and, secondly, inconvenience to other litigants by reason of the consequent dislocation of the time-table for the trial of other cases in the congested list of the Commercial Court. So far as delay is concerned, it is perhaps

E   ironical that the only result of South Carolina seeking to obtain injunctions against the re-re-insurers has been to increase greatly whatever delay the re-re-insurers' application, if allowed to proceed unopposed, might otherwise have caused. I recognise that the re-re-insurers' application may result in some increased costs to South Carolina, but these could, as I indicated earlier, have easily been avoided by a different attitude on South Carolina's part. I recognise also

F   that some inconvenience of the two kinds to which I have referred may arise from the re-re-insurers' application; but, if there is a reasonable possibility that such inconvenience is the price of justice being fully done at the trial of the two English actions, then it seems to me to be a price which must necessarily be paid. In any event, I cannot see how the re-re-insurers' application, made in what may prove to be a just cause, can,

G   solely on the ground that it occasions the extra costs and inconvenience under discussion, be categorised as an interference with the court's control of its own process. The court can control any excessive delay by fixing such date for the trial of the two actions as may be just, and nothing which the re-re-insurers can do can take away or interfere with the court's control in this respect. As to increased costs these will, no doubt, be a matter for the consideration of the Commercial judge at the

H   conclusion of the trial, and I do not think it would be right for your Lordships to express any views, one way or the other, about such matter. For these reasons I cannot agree with the third ground of decision relied on by the Court of Appeal.

Lord Brandon
of Oakbrook              South Carolina Co. v. Assurantie N.V. (H.L.(E.))              [1987]

My Lords, the result of the views which I have expressed is that    A
there was, in my opinion, no such interference with the procedure of the
English High Court by the re-re-insurers as would amount to
unconscionable conduct on their part, and so justify, in accordance with
the basic principles which I stated earlier, the exercise of the court's
power to grant injunctions against them. It follows that I would allow
the appeal and set aside the orders of Hobhouse J. dated 25 April 1985
and of the Court of Appeal dated 23 May 1985. As regards costs in your    B
Lordships' House, I have no doubt that South Carolina should pay the
costs of the re-re-insurers. As regards costs in the two courts below,
different considerations may apply, first, because of the breadth of the
re-re-insurers' application to the United States district court as originally
framed, and, secondly, because of the misleading nature, in the respect
to which I referred earlier, of the memorandum and affidavit lodged in    C
support of such application. I therefore think it desirable that, in
relation to those costs, your Lordships should have the assistance of
further argument from counsel on either side.

LORD BRIGHTMAN. My Lords, in this appeal I respectfully differ from
the conclusion reached by the Court of Appeal. I have had the privilege
of studying in advance the speech of my noble and learned friend, Lord    D
Brandon of Oakbrook, and I find myself wholly convinced by his
reasons for moving that this appeal should be allowed. I agree with the
orders that he proposes should be made.

LORD MACKAY OF CLASHFERN. My Lords, I have had the advantage
of reading in draft the speeches prepared by my noble and learned
friends, Lord Brandon of Oakbrook and Lord Goff of Chieveley. I    E
agree that it would be wise to make the reservation on the matter to
which Lord Goff of Chieveley has drawn attention but, like him, I agree
with the conclusion reached by Lord Brandon of Oakbrook and with the
reasons he has given for reaching that conclusion.

LORD GOFF OF CHIEVELEY. My Lords, I find myself to be in respectful    F
agreement with the conclusion reached by my noble and learned friend,
Lord Brandon of Oakbrook, on this appeal, and with the reasons given
by him for reaching that conclusion. I wish, however, to draw attention
to one matter upon which I have certain reservations, and to which I
attach importance.
I am reluctant to accept the proposition that the power of the court    G
to grant injunctions is restricted to certain exclusive categories. That
power is unfettered by statute; and it is impossible for us now to foresee
every circumstance in which it may be thought right to make the remedy
available. In particular, I do not regard the exercise of the power to
restrain a person from commencing or continuing proceedings in a
foreign forum as constituting an exception to certain limited categories
of case in which it has been said that the power may alone be exercised.    H
In my opinion, restraint of proceedings in a foreign forum simply
provides one example of circumstances in which, in the interests of
justice, the power to grant an injunction may be exercised. I have

1 A.C.                  South Carolina Co. v. Assurantie N.V. (H.L.(E.))           **Lord Goff**
**of Chieveley**

A   elsewhere explained in detail, for reasons which it is unnecessary for me
to repeat in the present case, why, on the basis of a line of established
authority, I am at present inclined to the opinion that an injunction has
generally been granted in such circumstances for the purpose of
protecting the English jurisdiction, and why I doubt, with all respect,
whether the speech of my noble and learned friend, Lord Scarman, in
*Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557, contains the
B   last word on the subject. I refer, in this connection, to my judgment in
*Bank of Tokyo Ltd. v. Karoon* (Note) [1987] A.C. 45.

Even so, I can see no basis for the grant of an injunction in the
present case. In particular, in agreement with my noble and learned
friend Lord Brandon of Oakbrook, and respectfully differing from
Hobhouse J. and the Court of Appeal, I do not consider that the grant
C   of the injunction can be justified as necessary to protect the English
jurisdiction on the facts of the present case. In this, I find myself
entirely in agreement with the reasons expressed in the speech of my
noble and learned friend, Lord Brandon of Oakbrook. I therefore agree
that the appeal should be allowed.

D                                                        *Appeal allowed with costs.*

*Solicitors: Clyde & Co.; Herbert Smith & Co.*

J. A. G.

E

─────────

F                                        NOTE

[COURT OF APPEAL]

BANK OF TOKYO LTD. v. KAROON AND ANOTHER

1984   April 3, 4, 5;                    Ackner and Robert Goff L.JJ.
         May 24
G

*Injunction—Jurisdiction to grant—Foreign proceedings—Interpleader*
*proceedings to determine ownership of money held by bank in*
*England—Bank's subsidiary in New York providing information*
*concerning claimant and his accounts—Claimant bringing pro-*
*ceedings in New York against subsidiary—Whether bank entitled*
*to injunction to restrain proceedings in New York*

H
APPEAL from Bingham J.
In 1983 Mr. Majid Karoon started proceedings in New York against the
Bank of Tokyo Ltd., a Japanese bank carrying on business in London, and also
against a wholly-owned subsidiary of that bank, the Bank of Tokyo Trust Co.

# EXHIBIT 2

Case No: **HC 04 C01952**
Neutral Citation Number: **[2004] EWHC 2920 (Pat)**
IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION
PATENTS COURT

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: **Wednesday, 8th December 2004**
B e f o r e :

THE HONOURABLE MR. JUSTICE PUMFREY

-


**NOKIA CORPORATION**
(a company incorporated under the laws of Finland)
Claimant
- and -
**INTERDIGITAL TECHNOLOGY CORPORATION**
(a company incorporated under the laws of the State of Delaware, USA)
Defendant


MR. MICHAEL SILVERLEAF QC, MR. HENRY WHITTLE and MR. BRIAN NICHOLSON
(instructed by Messrs. Bird & Bird) for the Claimant
MR. GUY BURKILL QC and MR. COLIN BIRSS (instructed by Messrs. Milbank, Tweed,
Hadley & McCloy) for the Defendant


Approved Judgment


Transcript of the Stenographic Notes of Marten Walsh Cherer Ltd.,
Midway House, 27/29 Cursitor Street, London EC4A 1LT.
Telephone No: 020 7405 5010.  Fax No: 020 7405 5026


Mr. Justice Pumfrey:

1. In this action Nokia seek revocation of three United Kingdom patents owned
by InterDigital Technology Corporation ("InterDigital").  InterDigital is a
patent holding and licensing company for InterDigital Communications
Corporation ("ICC").  The patents in suit are 2,174,571 ("571"), 2,208,774

("774") and 2,224,114 ("414").  They relate to aspects of the transmission of telephony signals over a wireless loop using time-division multiplexing techniques.

2. The significance of these patents to Nokia is that at least two of them are alleged by InterDigital to be not only relevant but actually "essential" to the practice of the GSM standards for digital cellular mobile telephones and infrastructure.  Nokia are leading manufacturers in this field.  These are international standards with which all manufacturers of GSM mobile telephones and associated infrastructure must necessarily comply.  ETSI (the European Telecommunication Standards Institute) requires notification to it of any patents believed to be essential for compliance with its standards or proposed standards.  InterDigital notified the three patents in suit in 2001 (long after the standard was formulated) but had been asserting them to be essential from about 1993.

3. The three patents in suit have equivalents in numerous territories throughout the world, all of which have been notified by InterDigital to ETSI as essential to GSM.  The claimants say that the patents in suit are representative of over 140 corresponding patents (or pending applications) worldwide, which are the core patents of those said to be essential to GSM.

4. There are before me two applications.  The first is the case management conference sought by Nokia.  The second is an application by InterDigital seeking four heads of relief as set out in the notice of application dated 27th October 2004.  The relief sought is:
(a) an injunction to restrain Nokia from pursuing applications made in the US courts under 28 USC, section 1782 for documents and other evidence from Ericsson Inc. and Sony Ericsson Mobile Communications AB;
(b) a declaration that the discovery sought in the above applications is irrelevant to any issue in the present proceedings;
(c) an order striking out parts of the claimant's pleadings which relate to construction of the claims of the patents in suit;
(d) a stay of the proceedings until after the outcome of an ICC arbitration presently taking place between the parties to this action in New York.

5. The background to the action and the present applications may be briefly outlined as follows.  As I have indicated, since the early 1990s, InterDigital have been representing to the mobile communications industry that they require licences under InterDigital's patent portfolio for GSM.  InterDigital has pursued an aggressive licensing policy, threatening litigation if licences are not taken and making it clear that its portfolio of patents is so geographically and technically extensive that it is uneconomic to resist.

6. After several years of negotiation with InterDigital, Nokia took a lump sum licence in 1999, but is allowed by the terms of the licence to bring this action.  The licence is split into two periods – 1 and 2.  Period 1 ran up to the end of 2001 and Nokia paid a royalty of $31.5 million for that period.  For period 2 (from the beginning of 2002, until the expiry of the licence) no royalty is payable unless certain conditions are satisfied.  One of those is that a "major competitor" of Nokia has taken a licence.  There is a dispute between the parties as too whether further royalties have become due for period 2 under the licence, and if so what royalties are payable.  InterDigital relies, as I understand it, upon a licence taken by Ericsson and a joint venture company, Sony-Ericsson, in settlement of a ten-year long action originally commenced in 1993 between InterDigital and Ericsson in the United

States for infringement of a number of InterDigital's patents.  One of the
terms of the settlement between InterDigital and Ericsson was that Ericsson and
its joint venture company took a licence under InterDigital's patent
portfolio.  This dispute, that is to say the dispute between Nokia and
InterDigital as to the payability of royalty, is the subject of an ICC
arbitration in New York.

7. Some of InterDigital's patents have been the subject of litigation.  Action
was brought against Motorola who was largely successful in its resistance to
the claims.  Nokia's contention is that the basket of patents under which a
licence is available contains a number that are either invalid or not infringed
by a manufacturer who seeks to comply with the GSM standards.  Part of the
motive for these proceedings is to obtain a judgment on validity which can be
deployed in the arbitration; although if the timetable for the arbitration
remains as it is, then any use of a putative judgment on invalidity will be
impossible.  The arbitration is due to be heard in January 2005.

8. Surprisingly, perhaps, for patents of the age of those in suit that have
been licensed, the patentee's response to this action is to apply to amend all
three.  Some of the amendments are not mere deletion of claims accepted to be
invalid but involve the rewriting of new claims.  Nokia plead a number of
grounds they say would justify the court in holding that the amendments should
not be allowed in the exercise of the court's discretion.  They plead, inter
alia, that the patents have been known by InterDigital to be invalid and that
the licence with Ericsson (which is, with all the negotiations leading up to
it, entirely secret until disclosure in this action) was entered into at least
in part in bad faith and with a view to putting Nokia at a disadvantage in the
setting of the period 2 royalties which InterDigital publicly estimate to be
about $130 million year on the basis of the Ericsson settlement.
The application for a stay

9. With that brief introduction, I can turn to InterDigital's application for a
stay.  I can discern no basis for a stay of these proceedings whatever.  It is
not suggested that these proceedings are subject to a mandatory stay under the
Arbitration Act 1996.  It is also accepted that by section 72 of the Patents
Act 1977, any person may bring proceedings to revoke a patent.  But it is said
that the underlying motive of these proceedings is to produce what InterDigital
call an advisory opinion on the validity of the patents, that the court should
encourage alternative dispute resolution, and that the arbitration already on
foot involves alternative resolution of this dispute without a
disproportionately expensive recourse to the court, whose decision cannot much
affect the outcome of what is said to be the "real" or "commercial" dispute
between the parties. InterDigital rely also upon the fact that Nokia decided to
take a licence in 1999, albeit one which permitted them to challenge the
validity of the patents.

10. There is no dispute that there is a wide power to stay proceedings whenever
the court thinks fit.  Of course, an action which is an abuse of process will
be stayed or struck out.  Multiplicity of proceedings will be discouraged if
possible and there are numerous specific statutory provisions providing for the
staying of proceedings in certain defined circumstances.  There is also a long
list of specific circumstances in which the Civil Procedure Rules provide for a
staying of proceedings.
11. The case management powers contained in CPR 3.1(1)(f)  apply generally, and
these powers must be exercised with a view to achieving the so-called
overriding objective.  However, when in a properly-constituted action the

claimant seeks appropriate relief, the dispute is not the subject to an arbitration agreement and the action itself cannot be said to be an abuse of process, it seems to me that the primary duty of the court is to bring it on for trial as fairly and  as quickly as the circumstances permit and not to stay it.

12. Validity and infringement of the three patents in suit were removed from purview of the arbitrators by the agreement of Nokia and InterDigital.  Indeed, this appears to have been the result of an objection by InterDigital (see clause 4(vi) of the terms of reference in the arbitration.

13. Having objected to the issues of infringement and validity being considered by the arbitrators in the existing arbitration, InterDigital could not, before me, identify any form of alternative dispute resolution that could even dispose of the issues of infringement and validity inter partes.  It goes without saying that in the absence of an agreement to surrender a patent or consent to its revocation, no private dispute resolution could result in revocation of one or more of the patents if it were found to be invalid.  There is no offer of any such agreement; so the arguments relating to proportionality and alternative dispute resolution have no foundation and must fail.  There is no other basis advanced for a stay.
The Section 1782 application

14. The application which is made in the appropriate district court in the United States is said to relate to these proceedings.  It seeks both evidence on deposition and discovery of documents in specified classes as follows.  The application after formal matters proceeds as follows:
"Nokia is a party to a court proceeding in England before the High Court of Justice, Chancery Division, Patents Court, in which Nokia seeks to revoke certain United Kingdom patents that have been granted to InterDigital Technology Corporation ('InterDigital').  These UK patents are the counterparts of certain US patents that are presently at issue in an arbitration between InterDigital and Nokia in the United States.  Nokia believes that Ericsson, a Delaware corporation that is found in this district [the East District of Texas, Sherman Division] has evidence relevant to the validity and scope of the patents that are at issue in the English patent proceeding.  Nokia submits this application to obtain this evidence from Ericsson by means of an order for discovery from this Court."

15. Without reading through the whole of the application, it is difficult to give a proper flavour of the basis upon which the application is brought, but it is necessary to pay attention first to the description of the Ericsson and InterDigital lawsuit on printed page 3, which is as follows:
"The Ericsson/InterDigital lawsuit continued following the Motorola verdict.  Ericsson and InterDigital eventually settled their dispute, but only after ten years of litigation.  During the course of the litigation, the parties extensively litigated the scope of InterDigital's US patents and exchanged evidence regarding the prior art."

16. On printed page 4:
"InterDigital's patent portfolio includes patents granted by the United Kingdom Patent Office, of which two are counterparts of the US patents involved in the Ericsson/InterDigital litigation.  On June 14, 2004, Nokia initiated a proceeding before the High Court of Justice, Chancery Division, Patents Court, to revoke these UK patents, together with a third InterDigital patent, the Swedish equivalent of which Ericsson opposed in the Swedish Patent Office.  The

UK proceeding will address many of the same issues addressed in the litigation and opposition between Ericsson and InterDigital, and in the licensing discussions between Ericsson and InterDigital, namely the scope and validity of InterDigital's patents.  InterDigital may try to place some reliance upon the fact that other companies have taken licenses to its patents."

17. Then the application seeks to justify the request on the basis of the terms of section 1782.  On page 12 it says this:
"Allowing Nokia to obtain discovery from Ericsson would equitably and efficiently assist Nokia's efforts in the English proceeding.  Nokia seeks to revoke certain of InterDigital's patents that InterDigital contends covered Nokia's technology.  During the course of Ericsson's ten years of United States litigation with InterDigital over the validity and scope of InterDigital's US patents together with many years of opposing InterDigital's Swedish patents, and during the licensing discussions with InterDigital, it amassed a universe of knowledge and evidence relevant to the validity and scope of InterDigital's patents.  It is undisputable that during the protracted litigation, opposition and licensing discussions with InterDigital, Ericsson either provided or received evidence pertinent to the scope and validity of InterDigital's patents.  The patents that were at issue in the Ericsson/InterDigital litigation are the counterparts of the patents Nokia seeks to revoke in the UK revocation proceeding.  The third patent at issue in the UK revocation proceeding was opposed by Ericsson in Sweden.  Moreover, when the litigation ended in early 2003, Ericsson agreed to licence InterDigital's entire patent portfolio.  Ericsson's decision to take a licence to InterDigital's portfolio is, and of itself, a source of evidence material to Nokia's revocation proceeding.  Therefore, for all these reasons, Nokia believes that Ericsson has evidence that can assist Nokia.
Nokia's discovery of this evidence will assist Nokia's efforts in the United Kingdom proceeding.  Many of the same issues present in the Ericsson/InterDigital lawsuit, or close corollaries, may arise in the context of the UK proceeding.  Allowing Nokia's requested discovery will allow the English court, and the parties to that proceeding, to benefit from the ten year effort spent in resolving such issues in the US litigation, the Swedish opposition and from any evidence arising in connection with the licensing discussions.  This request also obviates the need for letters rogatory, or other lengthy and cumbersome procedures, to obtain this evidence from Ericsson, a US resident and a non-participant to the UK proceeding."

18. The relief sought in the district court against Ericsson is set out in two exhibits to the application, exhibit A and exhibit B.  Exhibit A seeks depositions on certain specified deposition topics in a manner which I understand to be usual in the ordinary United States litigation.  As always, it is necessary to read what is already a very broad order with regard to exhibit C, which contains the definitions which render terms which, on their face, are broad into terms which are very wide indeed.  The order is to Ericsson to designate one or more officers, directors, or managing agents, or other persons who consent to testify on Ericsson's behalf, with respect to the following matters.  Four classes of matter are set out.
"1.  Prior art to UK Patent No. 2,174,571, UK Patent No.  2,208,774 or UK Patent 2,224,414 or any prior art to any counterparts within the same patent families of these patents in other jurisdictions, including information concerning the publication date of the said prior art.
2.  Ericsson's claim construction and invalidity contentions in the Ericsson/InterDigital lawsuit and any oppositions carried out by Ericsson against the counterparts of the UK Patents referred to in paragraph 1 above,

and the identity of relevant prior art and factual support for all those contentions.
3.  The negotiation of the 2003 Patent Licences including efforts by Ericsson, Sony-Ericsson, or InterDigital to negotiate, execute, or structure any agreements that were made in connection with, at the time of, or as part of, the resolution of the Ericsson/InterDigital Lawsuit or the execution of the 2003 Patent Licences.
4.  The performance under the 2003 Patent Licences, including of any amendments or modifications (whether oral, written or by conduct) to the 2003 Patent Licences, to the agreements resolving the Ericsson/InterDigital Lawsuit, or to any other agreements within the scope of topic 3 above."

19. The request for documents, which is contained in exhibit B, is that upon which the discussion before me principally turned, but in fact the documents are complimentary to the depositions which are sought in exhibit A.  I need not read paragraph 1, which again seeks prior art in relation to the patents in suit, counterparts of the patents in suit within the same patent families and documents relative to publication dates.  Then paragraph 2 specifies certain classes of documents in relation to the Ericsson/InterDigital lawsuit, including witness expert reports and declarations, affidavits or witness statements relating to construction.  Paragraph 3 relates to the negotiation and execution of the Ericsson settlement agreement, and paragraph 4 relates to any amendments or modifications, rather surprisingly, whether, oral, written or by conduct, which were made to the patents licences and the agreements resolving the Ericsson lawsuit.

20. I am asked to restrain the claimants from further continuing with this application against Ericsson and Sony Ericsson, or in the alternative for the declaratory relief, which I have already set out, indicating that the classes of documents in question are irrelevant in this action.  There is no doubt that I have jurisdiction to restrain the section 1782 proceedings and this jurisdiction is described in the decision of the House of Lords in South Carolina Insurance Co v Assurantie Maatschappij "De Zeven Provincien NV" [1987] AC 24.  The speech of Lord Brandon, with whom the remainder of their Lordships largely concurred, sets out the principles upon which the English court will interfere by injunction with an application made under the United States provision by a party to litigation in this country, and I am bound by it. Before turning to the principles established by this decision, however, I should briefly refer both to Title 28 section 1782 and to the leading case on the exercise of power arising under section 1782, the recent decision of the United States Supreme Court in a case called Intel Corporation v. AMD.

21. In its present form, what I will call subsection (a) of section 1782, which has the cross-head "Assistance to foreign and international tribunals and to litigants before such tribunals" is as follows:
"The district court of the district in which a person resides are is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation.  The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.  By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement.  The order may prescribe the practice and procedure, which may be in whole or in part the practice and procedure of the

foreign country or the international tribunal, for taking the testimony or
statement or producing the document or other thing.  To the extent the
order does not prescribe otherwise, the testimony or statement shall be taken,
and the document or other thing produced, in accordance with the Federal Rules
of Civil Procedure".

22. Intel v. AMD itself concerned an application under section 1782 for
documents with a view to providing them to the European Commission for the
purpose of a complaint under Articles 81 and 82 of the EC Treaty.  Justice
Ginsburg delivered the majority opinion.  I believe that the following
propositions may be derived from that opinion that are directly relevant to the
issues which arise before me today.
(a) Section 1782 authorizes but does not require the federal district court to
grant discovery in aid of the foreign proceedings.
(b) The proceeding in question must be within reasonable contemplation, but
need not be pending or imminent.  I infer from this that the provision may be
used to obtain evidence prior to issue of proceedings in this country.
(c) There is no requirement that the discovery sought in section 1782
proceedings be discoverable in the foreign jurisdiction if located there.
(d) Considerations of comity between jurisdictions and parity between litigants
may be legitimate touchstones for the district court's exercise of discretion
in a particular case, but that is no reason for imposing a general
foreign-discoverability rule.  For example, a foreign court's reluctance to
order discovery of particular documents may be no indication at all of a
reluctance to receive them in evidence -- the example given by Justice Ginsburg
is the South Carolina case itself.  The foreign tribunal may itself place such
limitations as it thinks appropriate on the admission of material obtained
pursuant to section 1782.
(e) In exercising the discretion, a number of factors need to be borne in mind:
 (i) Where the parties to the section 1782 proceedings are the same as those in
the foreign proceedings, the need for aid is not as apparent as it is when
evidence is sought from a non-participant in the matter arising abroad, when
the foreign tribunal can itself decide whether to order the parties to produce
evidence.
(ii)  The stature of the foreign tribunal, the character of the proceedings
underway abroad and the receptivity of the foreign court to federal court
judicial assistance must also be considered.
(iii) Whether the section 1782 request "conceals an attempt to circumvent
foreign proof-gathering limits or other policies of a foreign country or of the
United States is also relevant.
(iv) (iv)  Unduly burdensome requests may be rejected or trimmed.

23. It is clear that the jurisdiction will be exercised having regard to the
attitude that the foreign court will take to the material produced by the
section 1782 request.  As is well known, the attitude of this court, that is to
say the English court, towards disclosure is regulated by the Civil Procedure
Rules and the scope of disclosure is essentially circumscribed by the pleaded
issues.  At the same time, the court is generally indifferent as to the source
of admissible material.  Let me give a simple example.  In a patent action, the
validity of the patent is challenged on the grounds of anticipation or
obviousness on the basis of a single prior publication.  The scope of
disclosure is limited to documents advancing the parties' respective cases,
including their attacks on the other's case, within the time window of four
years around the priority date: see paragraph 5.1(2) of the Practice Direction
under Part 63 of the CPR.

24. This means there will be no disclosure relating to other grounds of invalidity, for example, prior use by the patentee, and the defendant must himself uncover at least the possible existence of such prior uses by the patentee for himself before he can obtain the court's assistance in compelling disclosure from the patentee. On the other hand, if he does obtain evidence of prior use by the patentee, the court is not generally concerned as to how that evidence was obtained. As I understand the decision of the House of Lords in the South Carolina case, to which I now turn, one possible route is by way of a section 1782 request.

25. Mr. Silverleaf QC, who appears on behalf of Nokia, submits that the following propositions may be derived from Lord Brandon's speech in the South Carolina case.
(a) The English courts do not, in general, exercise any control over the way in which a party obtains the evidence it wishes to present to support its case: See [1987] AC 41 G-H.
(b) If a third party voluntarily assists a party by providing evidence, there can be no objection to that evidence being used by the party. The provision of material in this way does not interfere with the court's control of its own process. (Page 42 A).
(c) Consequently, by exercising a right potentially available to it under US law to obtain documents or evidence from a third party, a party to litigation is not departing from or interfering with the procedure of the English court. (Page 42 C).
(d) Accordingly, a party should normally be permitted to exercise its rights under Title 28 of the US Code section 1782.
(e) It is for the US court hearing the section 1782 application to decide upon the merits of the application under US law and to determine the nature and scope of the relief to be granted. The fact that a party is enabled by exercising those rights to obtain documents and evidence which would not otherwise be available to it is not a ground for interference by the English court.
(f) Before the court should restrain a party's use of the section 1782 procedure, it has to be satisfied that the use being made is either a breach of some legal or equitable right of the objecting party (page 41, B to C) or is vexatious or oppressive or is in some other way unconscionable. (Page 41 D).

26. This summary seems to me to be correct and it shows why the decision whether or not to restrain section 1782 proceedings is not a mere case management decision. There can be no doubt that leaving express or implied obligations aside, the jurisdiction to interfere is based on the need to show that the application is abusive in its context in the English proceedings. This is confirmed by Banker's Trust international PLC v PT Dharmala (unreported, 1st December 1995, Mance J, as he then was) and Omega v Viktor Kozeny [2002] CLC 132 (Mr. Peter Gross QC, as he then was). In the former case, the application under section 1782 was made after trial but before judgment, no doubt with a view to improving the evidence in the proceedings and making an application to re-open the trial. Mance J appears to have found little difficulty in concluding that such an application was abusive. In the latter case, Mr. Gross QC was confronted by an application to depose individuals who would be giving evidence in this country, thereby exposing them twice to the burden of cross-examination, which he considered to be abusive in the context of the English proceedings.

27. Mr. Burkill's submission on behalf of InterDigital is that the depositions sought on the present application and the classes of documents sought are of

undue width and purely fishing.  The definitions of the classes make no attempt to distinguish that which is relevant from that which is not, and are for that reason objectionable.  The fact that the second, third and fourth classes closely mirror the terms of a subpoena issued by the arbitrators against Ericsson reveals, he submits, that the real purpose of the section 1782 application is to produce documents in aid of the arbitration and that this is confirmed by the unwillingness of Nokia's advisers to agree to protective orders preventing the employment of the documents in the arbitration.

28. Accordingly, he says that the application is oppressive and is an abuse of process and should be restrained by this court.

29. It is necessary to make a number of elementary observations before turning to Mr. Burkill's contentions.  First, the issues in the English proceedings are defined by the pleadings.  Second, documents and other evidence are not admissible unless either relevant to an issue so defined or (although relevant to the issues in the case) as tending to go impugn the credit of a witness. The court will not compel production of documents going only to credit.  Third, disclosure will only be ordered on the basis set out in the Civil Procedure Rules, which is to say, that a party will only be required to make a search ultimately as is reasonable and proportionate.

30. I agree with Mr. Burkill that the classes of documents as drawn would not be ordered by way of disclosure in the present proceedings.  As he correctly observes, the first class (all prior art to the three patents) covers prior art that has not pleaded and this class is, from the perspective of this court, too broad.  I am equally satisfied, however, that any new prior art discovered could, in principle, be introduced by amendment of the pleadings into the action.

31. If any document obtained in the second, third and fourth categories could be relevant to these proceedings, in the sense that it would be disclosable if in the possession, custody or power of InterDigital, it could only be because it related to Nokia's contention that the court should not exercise its discretion to permit the amendments sought to the three patents in suit. InterDigital is under a duty to disclose documents in its power (a term defined in the relevant provisions of the Civil Procedure Rules) that are disclosable in the light of the pleaded case.  While I might be privately sceptical as to the likelihood that the discovery by Ericsson will turn up material in addition to that which must be disclosed in these proceedings in any event, I certainly cannot say that it will not do so.

32. It follows that it cannot be said a priori or that the material which would be obtained on discovery in this case, as sought in the section 1782 proceedings, would not be capable of being deployed in these proceedings.  This approach, which is quite different from the approach which I would take to a request for specific disclosure of class of documents in the context of English proceedings, is appropriate for the following reasons:
(a) Subject to the restrictions placed on the jurisdiction by Federal law, the request is not circumscribed by the issues at stake in the foreign proceedings.  There do not even have to be any proceedings on foot for the request to be considered.  It is therefore in part investigatory in nature.
(b) It follows that the English court should not seek to circumscribe the discretion possessed by the district court by imposing its own view as to the appropriateness of the classes of documents sought by reference to the issues in proceedings as they stand.  It is legitimate for the requesting party to use

the request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings, if necessary, after appropriate amendment.

(c) The question of the extent to which the district court should accede to the request is a matter for it alone, on the evidence made available, and the English court should only interfere if the invocation of the jurisdiction is either contrary to some legal or equitable right of the other party to the English litigation or is otherwise oppressive or vexatious or tends to interfere with the due process of the English court. In my judgment it should also, if possible, express a view as to the likely deployability of the documents sought if that is possible and if such an expression will be of assistance to the district court.

(d) The final decision on admissibility will be in any event for the English court, in the light of the issues as defined in the pleadings, and the English court should not, subject to the caveat set out above, concern itself with the manner in which the material sought matters sought to be admitted is obtained.

(e) This is a different problem from the problem of ordering disclosure of a class of documents of which it can be said that a substantial proportion are irrelevant. The court will not order disclosure of such a class because the English court will not exercise its coercive powers to compel the production of material irrelevant on the pleadings as they stand. But it is for the district court to form its own view in the United States, having regard to the nature of the jurisdiction and to the fact that it is not circumscribed by the pleaded issues in pending litigation, as to the material the production of which should be compelled.

33. The position in respect of the depositions is more difficult. Experience of the use of transcripts of deposition evidence in other cases suggests that it is most unusual for deposition evidence which is not focused on the issues in the English proceedings to be of any practical utility at all. Again, it is possible, but the possibility is a remote one. In this connection I say nothing about depositions ancillary to the document request whose only purpose is to locate relevant documents.

34. On the whole, I conclude that while it does not seem likely that the material requested in the 1782 proceedings will be of utility in this action, that possibility cannot in any circumstances be excluded. If I am to restrain Nokia from pursuing their request, InterDigital must satisfy me that in the context of these proceedings the request is not merely an of doubtful utility but an abuse of process. If it were the case that the request would be automatically complied with by the district court in the United States, then I would be prepared to confer a wide ambit on the term "abuse of process". But it is clear from the Intel case that the district court is required to exercise a judicial consideration in considering the request and the factors urged on me are equally considerations which can be, and in fact are being, urged upon it as reasons for not exceeding to the request or, in the words of the Supreme Court, trimming it.

35. Accordingly, it seems to me that I must be able to identify abusive behaviour in the sense that the request is intended to, or at least will have the effect of, causing unfair prejudice to the opposing party in the present proceedings. This I cannot do. In this connection, I have not overlooked the question whether the real purpose of the request is to assist in the arbitration. This, it seems to me, is preeminently a matter for the district court. The extent to which a collateral purpose is an objection to a section

1782 request is a matter for the district court in the light of the guidance provided to it by Intel and other cases.  It is not a matter for me.

36. Since there is nothing in the request that could be described as abusive in the context of the English proceedings, I must refuse the injunction sought.

37. Finally, I should mention the question of costs of the section 1782 request.  Dr. Laakkonen from Nokia suggests in his evidence (for some reason) that if successful Nokia will seek its costs of the section 1782 proceedings from InterDigital.  I cannot pre-empt the exercise of this discretion by the judge who ultimately deals with the question, and for present purposes I should only say that this risk is not of itself oppressive of InterDigital and is not enough to justify me in restraining the section 1782 application by injunction.


Declaratory relief

38. While pressing his application for injunctive relief, Mr. Burkill QC submits that in the alternative I should declare that the classes of documents specified in the 1782 request are irrelevant to the action as presently constituted.  For the reasons that I have set out, I agree that the great majority of the documents falling within the second, third and fourth classes are, or are likely to be, irrelevant.  But for the reasons I have also stated, I cannot say that they all are.  For this reason, I cannot make a declaration in the categorical terms that Mr. Burkill requests.  I accept that, as I have indicated, I would not have made an order for disclosure in the current proceedings on the present state of the pleadings of the classes of documents which are specified in the request under section 1782, but for the reasons that I have also stated, that consideration seems to me to be irrelevant to the present question.

Amendment

39. I turn, finally, to an application to amend the pleadings which is made by Nokia.  As pleaded, it is clear that Nokia's case on invalidity of the patents is in part contingent on the allegation that lies at the commercial heart of this dispute, which is that use of the inventions of the patents in suit, among others, is essential at least to G2 and G2.5 mobile digital cellular telephony.  The patents have been notified to ETSI on the basis that the "proprietor believes the [patents] may be considered essential" to the specified standards.  InterDigital say most emphatically that a notification is not an assertion of essentiality, but only of possible or potential essentiality.  In my view, something is only possibly or potentially essential to compliance with the standard during the period before the question of essentiality has been determined, whereafter it is either optional or essential.

40. Before me, InterDigital were initially unwilling to state whether they considered that use of any of the inventions the subject matter of the patents in suit was in fact essential to compliance with the relevant standards.  In response to a direct question from me, Mr. Burkill QC took instructions and then informed me that essentiality was not asserted in relation to 571, use of which was therefore optional, but was asserted in relation to 774 and 414.

41. Once the assertion of essentiality is made, it seems to me that it is open to Nokia to argue that the contents of the standard will force a particular construction of the claims on the patentee if the invention is to be essential

to compliance.  Whether the argument is compelling is not for me to say at this stage, but it is clearly possible without the need for examination of any particular embodiment.  Where the employment of the invention is alleged to be optional, then if there is an assertion of infringement sufficient to support a prayer for a declaration of non-infringement under the inherent jurisdiction of the court, that may also be sufficient.  It depends upon the terms of the assertion

42. Conscious of the difficulties of merely applying to revoke the patents on the basis of a construction which may be disputed in respect of a standard which may or may not be relevant, Nokia seek to amend their claim by adding a declaration of non-infringement in respect (put shortly) of equipment complying with the standards.  InterDigital object on the basis that the claims relate to apparatus; that the specifications do not describe apparatus; and that to grant a declaration of non-infringement (or, I suppose, non-essentiality) in respect of the standard is potentially embarrassing

43. The draft pleading is as follows.  Passing over the matters which are merely common form, I can pick it up as amended at paragraph 4.
"4.  The Defendant's publicly stated position is that the manufacturer of and commercial dealing in mobile telephone equipment which complies with GSM standards infringes the Patents (and corresponding patents worldwide).  'GSM standards' refers to the standards issued by the European Telecommunications Standards Institute (ETSI) relating to the European digital cellular telecommunications systems, known as Global System for Mobile Communications (GSM).
(i) The Defendant has notified ETSI in accordance with the ETSI IPR Policy, that the Patents are 'Essential IPR' in respect of the GSM standards.  A copy of the relevant entries in the database maintained and published by ETSI is attached hereto as Annex 1.
(ii) The Defendant has licensed the Patents (and corresponding patents elsewhere in the world) to manufacturers of equipment falling within the GSM standards, on the basis that such licences are necessary for compliance with those standards.  The Claimant, amongst others, has entered into such a licence.
(iii) 'Essential IPR' under the ETSI IPR Policy, a copy of which is attached as Annex 2 hereto, is defined by clause 15(6) thereof in the following terms: 'ESSENTIAL' as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardisation, to make, sell, lease, otherwise dispose of, repair, use or operate equipment or methods which comply with a standards without infringing that IPR.  For the avoidance of doubt in exceptional cases where a standard can only be implemented by technical solutions, all of which are infringements of IPR, all such IPRs shall be considered ESSENTIAL.'"

44. The particular (iii) under paragraph 4 which is sought to be added by amendment pleads the meaning of the word "essential" upon which Nokia rely, and paragraph 6, which is added by amendment, seeks in the alternative, or in any event, a declaration of non-infringement in relation to all Nokia equipment complying with the relevant standards.  It is claimed that InterDigital have made a general assertion of infringement in relation to all three patents in relation to the handsets and other infrastructure manufactured by Nokia, and it is sought to add to the prayer for relief a declaration that importation, manufacture, sales, supply, offer for sale or supply, and keeping of the relevant hardware in compliance with the specified standards without the consent of the defendant, InterDigital does not require infringement of the

identified patents and that the patents in each of them are not essential IPR for GSM Release 4.

45. That in terms is not a declaration of non-infringement: it is a declaration of non-essentiality. What Nokia are seeking to do is to keep open the possibility which I think Mr. Silverleaf articulated by saying if they are not saying it is essential, we are not worried.

46. I have been in two minds as to whether this is a possible approach to a patent action. However, having regard to the assertion of essentiality which was made to me by Mr. Burkill, I am satisfied, for the reasons that I have endeavoured to express, that the court should, if at all possible, resolve the commercial issue in the terms that it is understood by the parties. The position is far more difficult in relation to the patent whose use is said to be optional. It does seem to me that on ordinary principles the question of non-infringement becomes an entirely theoretical one. Non-essentiality is accepted, and in those circumstances it seems to me that either there must be a clear assertion of infringement identified or a specimen hardware in respect of which InterDigital seek royalty should be identified.

47. It is not clear to me, as at present, whether that has happened and for this reason I will hear further submissions in the light of these observations in relation to the patent whose use is said to be optional. Subject as aforesaid, however, InterDigital's applications fail.

Mr. Justice Pumfrey
Approved JudgmentNokia – v - Interdigital.

Marten Walsh Cherer Ltd

This judgment will be made available on the Court Service web site: http://www.courtservice.gov.uk under the heading "judgments"

# EXHIBIT 3



# SECURITIES-BACKED FINANCING

**A Fixed Instrument, Collateralized Non-Recourse Facility**

**STOCK LOAN AGREEMENT**

Astor Asset Management


Astor Asset Management 3 Ltd

### STOCK LOAN AGREEMENT ("SLA")

July 28, 2021    Guarantor  Borrower  Lender

This Stock Loan Agreement is established as of ~~July 14th, 2021~~ (the "Effective Date") between Astor Asset Management 3 Limited, a Canadian corporation, duly organized under the laws of Canada, with its office located at 777 Dunsmuir Street, Suite 1400, Vancouver, British Columbia, Canada V7Y 1K4 ("Lender") and:

Corporacion RBS SA de CV, a corporation with a principal place of business located at Ave. Ferrocarril de Rio Frio 419 A99, Cuchilla del Moral 1, Iztapalapa 09319 Ciudad de Mexico, Mexico (hereinafter "Borrower") and Ricardo Benjamin Salinas Pleigo, an individual with a principal place of business located at Cristobal Colon 79 INT C, Mexico 09360 (hereinafter "Guarantor"), mutually hereinafter and together with the Lender shall be referred to as the ("Parties").

This Agreement shall remain in effect until (a) fully satisfied and mutually terminated in writing upon mutual satisfaction; (b) all Indebtedness is paid in full and Borrower and Guarantor are released by Lender in writing; or (c) the Agreement is terminated in writing by Lender in accordance with the covenants and terms provided herein.

### WITNESSETH

**STOCK LOAN AGREEMENT** On this date, and from time-to-time hereafter, Lender may make Loans to Borrower, who's performance is guaranteed by Guarantor. Borrower and Lender (collectively, the "Parties") enter into this Stock Loan Agreement ("SLA") which, together with the applicable supplement(s) and other Loan Documents, shall govern each separate Loan and all indebtedness between the Parties and the subject Loan and Borrowers performance is unconditionally guaranteed by the Guarantor. Unless stated to the contrary elsewhere, the provisions of all Loan Documents are incorporated by reference herein as if stated in full. This SLA supersedes all previous term sheets, emails, representations, warranties and discussions and is the final documentation of the Parties' undertakings. For the value received, Borrower promises to pay Lender, all indebtedness governed by this Agreement. Nothing herein shall be construed to obligate Lender to restructure or renew any unpaid balance, forgive any part thereof, fund in full, or to make any additional or future loans or financial accommodations to Borrower.

**GUARANTEE AND SECURITY** In consideration of the Lender making available Loan facilities under this Agreement, the Guarantor hereby irrevocably and unconditionally guarantees to the Lender the due and prompt payment and discharge of Borrowers Obligations and undertakes that the Guarantor will on demand make good any Event of Default by the Borrower in payment or discharge of the Borrowers Obligations or any part thereof as if the Guarantor instead of the Borrower were expressed to be the primary obligor in respect thereof, together with interest and all other indebtedness expressed herein to be payable by the Borrower on the Borrowers Obligations under the Loan Documents until payment thereof in full and all other warranties, representations and covenants are satisfied to Lenders satisfaction and the herein Terms and Conditions.

**GRANT OF GUARANTOR COLLATERAL** Subject to the grant of Security Interest in the subject Collateral by the Guarantor, the Guarantor hereby unconditionally and irrevocably Pledges and grants to the Lender for the duration of the Loan Term and until all indebtedness of Borrower is fully satisfied and discharged, a Lien and Security Interest in and to Lenders right of set-off against the rights, title and interest in the three million five hundred thousand (3,500,000) publicly traded shares of **Grupo Elektra SAB DE CV** and known as ELEKTRA:MX (hereinafter the "Collateral") on deposit in favor of Lender with Weiser Global Capital Markets and the Guarantor

**Astor Asset Management 3 Ltd**

Pledges the Collateral as security for the prompt and complete payment and performance of Borrower when due, whether at the stated maturity, by Acceleration or otherwise.

## I.    DEFINED TERMS WITHIN AGREEMENT:

1) **"Acceleration Notice"** shall mean a written notice given to Borrower and Guarantor after the occurrence and continuation of an Event of Default declaring all amounts and sums accrued and unpaid to be immediately due and payable, at which point the Loan is in state of Default.

2) **"Advance"** shall for purposes of this Agreement refer to any sum of money and in any currency, paid out to any account of Borrower, or any third-party account, whether controlled by Borrower or not, if directed to do so by Borrower, for and on behalf of Borrower. All payments made to any third-party for or on behalf of Borrower shall constitute as payment having been made to Borrower.

3) **"Agreement"** shall mean this Stock Loan Agreement, including any supplements or attachments hereto, and other subsequent written agreements, which shall be incorporated by reference along with all amendments, modifications, and restatements thereof in written form. Emails are expressly excluded, are not binding, and are not to be construed as part of any agreement or modification.

4) **"Approved Loan Amount"** shall mean the maximum total amount the Lender is willing to fund to Borrower based on Pledged Collateral of Guarantor to be deposited with Depository Broker represented throughout as Loan Principal Amount or Principal. For purposes of this Agreement, the Approved Loan Amount may be paid out in draws or in lump sum.

5) **"Balance Payment"** shall mean the Loan Principal Amount less any Origination Fee, costs, or expenses, if applicable, not satisfied in cash by Borrower.

6) **"Borrower"** shall mean the corporate entity and the individual described herein and no other for purposes of this Agreement.

7) **"Breach"** shall mean any of the Events of Default by Borrower or Guarantor specified in this Agreement and unless specified otherwise, other Loan Documents that constitute a default.

8) **"Business Day"** shall mean any day other than Saturday, Sunday or a holiday observed by applicable laws.

9) **"Cash Collateral"** shall mean the Loan Principal Amount to be funded to Borrower, which at all times shall be computed by Lender and reflected in the Closing Statement. The Cash Collateral shall be the net amount to be funded, less fees and costs as stipulated in this Agreement and the Closing Statement and disbursed on the Closing Date.

10) **"Closing"** shall have the same meaning as Closing Date and used interchangeably throughout.

11) **"Closing Date"** shall occur after the Confirmation Day and shall mean the date(s) on which the Closing Statement is issued and thereafter the Loan Principal Amount is disbursed to Borrower. When Loan Principal Amount is disbursed in several tranches, in each case a Closing Statement will be issued. Erratic or unforeseen market conditions may warrant an untimely issuance and delay in funding.

Initials: _____    _____    _____
         Guarantor   Borrower   Lender

Astor Asset Management 3 Ltd

12) **"Closing Statement"** shall mean a Lender issued and determined document which references the final financial provisions, currency conversions and terms of the Loan prior to disbursement.

13) **"Collateral"** shall mean publicly traded securities of Issuer, together with any split-up or dividend payable to shareholder of record.

14) **"Confirmation"** shall have the same meaning as Confirmation Day and used interchangeably.

15) **"Confirmation Day"** shall mean the Business Day after the Pledged Collateral has been received, settled and posted in favor of Lender at the Depository Broker and is adequately ready and valid in all respects to be registered as Pledged Collateral. The Depository Broker shall notify the Borrower and Lender in writing of this event.

16) **"Cure Period"** shall mean a period of time when a Party that breaches a contract can remedy the breach without penalty, provided a Cure Period is afforded and stated as such. The Cure Period when provided as per this Agreement is five (5) Business Days.

17) **"Currency"** shall mean Mexican Pesos ("MXN"). Currency shall include the Loan, including all interest and fees thereof, and any funds transferred in this Agreement. If Pledged Collateral is a security that is priced and traded in a market and currency other than MXN, the Parties agree to convert to MXN for all purposes. Conversions for such currency shall be selected by Lender's choice of bank or those published by Yahoo Finance or comparable news source. Any conversions selected by the Lender's choice of bank the Borrower shall assume a 1.50% - 2.50% conversion rate computed according to the purchase of USD exchange rate published by Banamex, if the Borrower elects to receive funding in Mexican Pesos.

18) **"Default"** shall mean a breach of this Agreement and have the same meaning as Event of Default.

19) **"Depository Broker"** shall mean a regulated financial institution selected by Lender for the receipt of the securities, specifically the Pledged Collateral and any top-up. A Depository Broker is a firm that facilitates the custody of the Pledged Collateral acting as an intermediary between the Borrower, Guarantor and Lender and which will adhere to an executed Custodian Management Agreement, in accordance with all terms and conditions set herein this Agreement.

20) **"Effective Date"** shall mean the date the Agreement is effective.

21) **"Encumbrance"** shall mean Lender's legal claim on Pledged Collateral that affects the Borrower's ability to transfer ownership to anyone or to dispose of the Pledged Collateral without Lenders prior written authorization. For purposes of this definition, Encumbrance shall mean lien, mortgage, charge, hypothecation, rehypothecation, rights, barter, pawn, trade, dispose, deal-in, pledge, re-pledge, repo, borrow or transfer of security interest in Collateral. The Pledged Collateral will be restricted to Guarantor and Encumbrance rights exclusively granted to Lender.

22) **"Event of Default"** with respect to this Loan or any, shall mean any of the events specified in Clause VI hereof in addition to any omission or failure to perform a legal or contractual duty as obligated, stated or outlined herein. An Event of Default will cause Acceleration of the Loan.

Astor Asset Management 3 Ltd

23) **"Fair Market Price" ("FMP")** shall mean the lower of, the average of the last sale price of the Pledged Collateral on three (3) consecutive Business Days prior to closing or recording of the pledge at the Transfer Agent or Depository Broker or the lowest trading price at Closing. The average price shall be the per-share price of the Pledged Collateral establishing its Fair Market Value ("**FMV**").

24) **"FMV"** shall mean the amount, expressed in Mexican Pesos (MXN), equating to the FMP for each share of the Pledged Collateral multiplied by the number of such shares pledged or transferred for lending purpose.

25) **"Guarantor"** shall mean the individual described herein and no other for purposes of this Agreement, who agreed to personally undertake and guarantee in all respects the full and faithful performance of Borrower and hereby agrees to Pledge herein described Collateral to Lender in a form of a Lien.

26) **"Hybrid Loan"** shall have the same meaning as a Loan with respect to purpose but shall mean that this Agreement is structured as an Investment and a Loan, resulting in a Hybrid Loan.

27) **"Interest"** shall mean the sum of money paid regularly at a particular rate for the use of money lent. It represents a charge imposed by Lender for all funds advanced to Borrower in a form of a Loan.

28) **"Investment"** shall mean that this Loan may be construed as a speculative Investment. Borrower and Guarantor being considered a sophisticated professional investors, and both being aware of all the risks associated with making a major Investment where the outcome is unpredictable.

29) **"Investment Risk"** means that margin borrowing entails risk which is commensurate with any type of a speculative investment where the results and the outcome are both unpredictable and whereby the consequences could be materially negative. Borrower and guarantor are fully informed of all risks, is a seasoned professional investor and is prepared to accept an unpredictable outcome having realized that this is a speculative undertaking.

30) **"Issuer"** shall mean the corporate entity that has issued and distributed the shares of: **Grupo Elektra SAB DE CV (ELEKTRA:MX)**.

31) **"Lender"** shall mean specifically the Lender described herein and not any other for purposes of this Agreement.

32) "**Lender's Discretion**" means Lender shall have the right to not proceed with the funding at any time up until the Closing Date.

33) **"Lender's Remedy"** shall mean Acceleration of the Loan and Principal and the termination of this Agreement, specifically termination of the Loan and forfeiture of the Pledged Collateral per Clause VI.4 as provided herein, which may result because of a default by Borrower; in any case, excess funds received by Lender from the sale of Collateral in Event of Default will be returned to Guarantor.

34) **"Lien"** shall mean any Encumbrance of any kind referenced herein concerning the Pledged Collateral of Guarantor. A lien is the Lender's right to retain possession of property belonging to Guarantor until a debt owed by that Borrower is fully discharged per this Agreement.

Astor Asset Management 3 Ltd

35) **"Loan"** shall mean the total contractual gross amount computed together when proportionally Advanced or lent by Lender to Borrower on a nonrecourse basis for the specified duration and subject to the stated conditions. The Loan is funded based on FMP of the Pledged Collateral. For purposes of this Agreement, all fees and costs due to Lender shall fall within this definition. For purposes of this Agreement, the Loan can be sent by bank wire transfer to Borrower or deposited by Lender into Borrower's own account held at the Depository Broker.

36) **"Loan Documents"** shall mean collectively, this Agreement, Custodian Management Agreement, the Closing Statement and any other agreements, documents, instruments, exhibits, or statements delivered in connection with the Loan. Each to be read and construed together in a manner to give meaning and effect to all their provisions.

37) **"Loan Principal Amount"** shall mean full or allotment of monies borrowed by Borrower or advanced by Lender under Clause II.1.a hereof, in accordance with Loan to Value and is due and owed to the Lender. The Loan Principal Amount represents the Approved Loan Amount.

38) **"Loan Term"** see meaning of Term of Loan. For purposes of this Agreement, the phrases may be used interchangeably throughout, but shall have the same meaning.

39) **"Loan-to-Value (LTV)"** shall mean the ratio describing the total amount of the loan in relation to the value of the secured collateral pledged or transferred.

40) **"Material Event"** shall mean any event or possible outcome which may undermine or alter value of Collateral or prejudice Lender's standing Lien.

41) **"Maturity"** shall have the same meaning as Maturity Date and used interchangeably.

42) **"Maturity Date"** shall have the meaning provided in Clause II.6.a herein.

43) **"Obligations"** shall mean any and all promises, commitments and requirements, monetary and otherwise, made by Borrower to Lender. Borrower is morally and legally bound and has a duty to perform as obligated itself herein.

44) **"Party"** shall mean Lender, Guarantor or Borrower, as the case may be, and their agents, representatives, successors, affiliates, and assigns.

45) **"Parties"** when capitalized, the word means both Borrower, Guarantor and Lender and no other. When not capitalized, shall refer to any other third party.

46) **"Pay-Off Amount"** shall mean the amount expressed in Mexican Pesos that Borrower will need to pay to satisfy the Terms of the Loan. Borrower shall request the Pay-Off Amount of Lender in writing ten (10) Business Days in advance of the actual Pay-Off Date. The Pay-Off Amount shall be sent by Borrower to Lender by wire transfer in Mexican Pesos to Lenders designated Depository Broker or Lenders commercial bank account at least three (3) Business Days prior to the Pay-Off Date. The Pay-Off Amount shall be in Mexican Pesos equal to the Loan Principal Amount as referred to in the Closing Statement.

47) **"Pay-Off Date"** shall mean the date determined by Lender on which Borrower will tender the Pay-Off Amount to Lender in exchange for Lender discharging the Lien over the Guarantors Pledged Collateral being held at the Depository Broker.

Initials: _____     _____   _____
         Guarantor    Borrower   Lender



Astor Asset Management 3 Ltd

48) **"Pledged Collateral"** shall mean the total actual shares pledged by Guarantor to Lender as consideration for the Loan to Borrower and any shares or proceeds resulting from any transaction, split-up, revision, reclassification, or other like change that may take place of the Pledged Collateral during the Term of the Loan. The contemplated pledged securities of Guarantor are not a gift or a purchase, instead being pledged to Lender for Loan purposes.

49) **"Principal"** shall have the same meaning as Approved Loan Amount and used interchangeably.

50) **"Proof of Funds"** shall mean written proof of cash or liquid securities held in the Borrower's name.

51) **"Security Interest"** shall mean a Lien or Encumbrance granted by Guarantor to Lender in real property such as securities as Collateral for a Loan to Borrower. The Security Interest granted to Lender prevents the Guarantor from disposing or transferring the property or securities until such time as the Loan is repaid by Borrower to Lender and all Obligations of Borrower to Lender are discharged.

52) **"Statement of Knowledge"** shall mean any statements, representations or warranties which are based upon the knowledge of the Borrower and Guarantor, constructive or otherwise, whether Borrower or Guarantor knew or should have known or was expected to know.

53) **"Term of the Loan"** shall mean the period beginning on the first day when the Approved Loan amount is fully funded to the Borrower and ending on Maturity Date, calculated in months or years.

54) **"Tranche"** shall mean that parts into which the payment of this financial arrangement are divided into.

55) **"Transfer Agent"** shall mean the organization selected by Issuer to maintain and record the ownership of shares by Issuer of securities.

56) **"Underwriting"** shall mean a discretionary and subjective credit qualification process using factors such as stock market dynamics, liquidity, earnings, public data by which Lender approves a Loan based on its risk management policy, Collateral in question and Borrower's ability to repay the Loan.

57) **"Valuation Event"** shall mean that the FMP of the Pledged Collateral has fallen to less than seventy percent (70%) of the FMP used to calculate the Loan Principal Amount as reflected by the average of the last sale price on three (3) consecutive Business Days on a national or international securities exchange. A Valuation Event may also be triggered by erratic market conditions or news reasonably expected to impact the securities of Issuer.

58) **"Voting Rights"** shall mean the right given to shareholder of Issuer to allow shareholder to vote on various matters of corporate policy or issues before the Issuer.

**IN CONSIDERATION THEREOF:** Each Party agrees that the fair value of consideration it is receiving, has been received, and will continue to receive under this Agreement equals to or exceeds the fair value of the consideration it is delivering to the other Party. In consideration of mutual promises provided or to be provided, and other good, valuable, sufficient, equitable consideration, and mutual covenants, the receipt of, adequacy and sufficiency of which is hereby acknowledged, exchanged, and satisfied by all and between all parties, and intending to be bound

Initials: _____ _____ _____
Guarantor   Borrower   Lender


Astor Asset Management 3 Ltd

hereby the performance thereof, and such represents reasonably just, equitable, adequate and reasonable in value, the parties hereto covenant and agree to and stipulate. Consideration will include monetary and non-monetary exchanges, services, in-kind, of every nature and type and otherwise as well as other covenants which the Parties may choose to agree to exchange in the performance thereof. The parties hereto agree as follows:

## II.    SUBSTANTIVE TERMS OF THE LOAN

### 1.  Principal Amount.

a) Subject to and upon the terms and conditions set forth herein, Borrower, Guarantor and Lender hereby further set forth their rights and obligations to one another and Guarantor hereby grants to Lender Lien rights over the Pledged Collateral and in exchange, the Lender agrees to advance to Borrower a Loan consisting of funds up to **THREE BILLION EIGHT MILLION FIVE HUNDRED EIGHTY THOUSAND (3,008,580,000.00)** Mexican Peso (MXN) (constituting the **"Approved Loan Amount"**) of the current FMV of the Pledged Collateral of: **Grupo Elektra SAB DE CV (ELEKTRA:MX)** subject to all the terms, covenants and conditions of this Agreement. The said sum represents the Loan Principal Amount and is advanced to Borrower not permanently, but temporarily for the duration of the subject Loan Term. Funding of Loan Principal Amount will be initiated within one (1) Business Day of the Closing Day (the "Closing Day") and shall be memorialized by Lender's issuance of an executed Closing Statement. The Loan Principal Amount to be secured by Cash Collateral to be deposited by Lender into Borrowers account at the Depository Broker within twenty-four (24) hours of delivery of Pledged Collateral.

b) The Borrower shall be entitled to the appreciation, if any, of the FMV of the Collateral if the Loan is repaid in full by Maturity.

c) The amount that Lender may make available under Loan shall be calculated by multiplying fifty-five percent (55%) of the value of Pledged Collateral by the FMV.

### 2.  Interest Rate.

a) All outstanding amounts of the Loan shall bear an interest rate in an amount equal to **one and fifteen one hundredths of a percent (1.15%)** per year to be paid to Lender in quarterly installments, as directed by Lender, by the issuance of payment statement in advance of due date. Interest payment shall be collected in advance of Loan and shall accrue daily both before and after any default of the loan, demand, court judgment, or arbitral award, and shall be calculated based on the actual number of days elapsed and on the basis of a year of three hundred and sixty-five (365) days (three hundred and sixty-six (366) days in a leap year).

b) All interest and principal must be paid by way of bank certified check, wire transfer or other immediately available funds without undue delay or further demand to address or bank account indicated herein, or as further may be directed by Lender. In Event of Default, to the extent permitted by applicable law, the interest rate on Loan shall be computed at a rate equal to one and one-half percent (1.5%) per month and shall continue until satisfied and cured by Borrower or released by Lender.

c) The first interest payment shall be subtracted from Loan proceeds at the time of the funding. Further interest payments for the Loan shall be due timely on the first Business Day of each month following the Closing Date, and such payment schedule shall be based on twelve

Initials: _____  _____  _____
           Guarantor   Borrower    Lender

Astor Asset Management 3 Ltd

months per calendar year, regardless of the actual number of days between the applicable Closing Date and the date such first interest payment is due.

d) Any funds received as payment from or on behalf of the Borrower shall be applied by Lender in accordance with the following: (i) first, if applicable, to all outstanding interest and fees; (ii) second, to fees and costs due to third-parties engaged by Lender to enforce covenants and provisions of this agreement; (iii) third, to any outstanding Principal balance; and (iv) fourth, any excess funds received by Lender from the sale of Collateral in Event of Default to be returned to Borrower.

**3. Loan Fees and Costs.**

a) **Origination Fee.** Borrower shall pay to Lender an agreed-upon Loan Origination Fee of one percent (1%) of Loan Principal Amount contemporaneous with the funding of the Loan by Lender, **("Lender's Origination Fee")** to be paid to Lender. The Lender is authorized to deduct the 50% of the subject Origination Fee from Loan Principal Amount, with the balance to be paid by the Borrower on the 1st Anniversary of the Loan. The fee is non-refundable and fully earned.

b) **Maintenance Fee.** Borrower shall pay Lender every three (3) months the maintenance fee of six and twenty-five hundredths basis points (0.0625%) of the Loan Principal Amount **("Lender's Maintenance Fee")**. The Lender is authorized to deduct the Maintenance Fee in advance from the Loan Principal Amount for the first period, it shall be memorialized in the Closing Statement and the same exact amount shall be paid by Borrower, automatically and without further demand, every four months thereafter for all the years constituting the Term of the Loan. Lender's Maintenance Fee is non-refundable and will be paid in advance.

c) **Liquidated Damages.** If Borrower or Guarantor shall fail to deliver in full, within forty-five (45) days, the required Pledged Collateral to the Depository Broker into the account of Borrower after both the duly signed Agreement and the Custodian Management Agreement to catalyze and bring about the Approved Loan Amount, then there shall be Liquidated Damages equal to two percent (2%) of the stated Approved Loan Amount. The Liquidated Damages are effective upon the execution of this Agreement by both Parties and shall be Lender's only claim against Borrower for damages as a result of Borrower's failure to deliver the Pledged Collateral to custodian Depository Broke into the account of Borrower. The two percent (2%) Liquidated Damages applies only to Borrower's or Guarantors failure to deliver the Pledged Collateral and does not apply to other Event(s) of Default, which is covered under Clause VI of this Agreement. This two percent (2%) Liquidated Damages if applied due to failure by Borrower to proceed or in failing to deliver Pledged Collateral to the Depository Broker in full, is therefore Lender's rightful claim.

d) **Expenses.** Borrower agrees to pay all of Lender's reasonable costs and fees, including legal fees and out of pocket expenses that might arise in the course of Lender enforcing, collecting, defending, executing, and maintaining this Agreement. For the services provided, the Depository Brokers engaged in the performance of this Agreement are entitled to an annual custodian management charge to be paid by Borrower based on the cumulative net asset value of all Dedicated Depository Account(s) at time of delivery of the Pledged Collateral and limited to fifteen hundredths of one (0.15%) percent. The annual custodian management charge is exclusive of any transaction fee, transfer fee, exit fee, or other administrative costs and fees which Depository Broker may possibly impose. Such fee shall be nonrefundable and shall be paid one (1) year in advance. First year's fee may be deducted from the Loan

Astor Asset Management 3 Ltd

proceeds or charged to Borrower's account directly by the Depository Broker. In subsequent years, the Borrower will remit to Lender the exact same fee every year at least fourteen (14) days prior to the Effective Date, to be remitted by Lender to Depository Broker.

4. **Additional Loan Amount.** In the event of an increase in the FMV of the Pledged Collateral, the Borrower has the right to request that Lender increase the Loan Principal Amount at the same LTV as provided herein, at which time an amendment to this Agreement regarding additional funds to be provided will be incorporated. Lender will have sole discretion in determining whether to fund any additional funds in addition to the Loan Principal Amount, up to the full FMV of the Pledged Collateral at the time of the written request by Borrower. Borrower may exercise this provision not more than once every three (3) months.

5. **Early Prepayment.** There shall be no early prepayment ("Prepayment") of the Loan Principal Amount or of any interest due under the Loan permitted during the first sixty (60) months of the Loan Term ("**Lock-Up Period**") unless any payments are to be received according to a Change in Collateral event or with written permission from Lender. The Borrower may prepay the Loan Principal Amount after a "Lock-Up Period" but shall be subject to a half of one percent (0.5%) administrative and closure fee. Until resolved, the "Lock-Up Period" shall be extended in the event of Lender's inability due to regulatory constraints placed on the securities, Borrower's willful lack of cooperation, circumstances outside of Lender's control or restrictions placed on securities.

6. **Term and Maturity Date of Loan.**

a) **Maturity Date:** The Loan Principal Amount together with all accrued interest and fees and shall be due and payable, five (5) years after the Loan Term begins and subsequently ends (the "Maturity Date"). The Borrower may extend the Maturity Date if the Lender agrees to do so in writing. A fee in the amount of one percent (1%) of the Loan Principal Amount (the "Extension Fee") shall be due and payable on the original Maturity Date if the Lender agrees to extend the Maturity Date at the annual interest rate at the time of an extension. If Lender does not receive the overdue Loan Principal Amount and other Obligations within ten (10) Business Days of the original Maturity Date, Lender will send a notice to Borrower and Guarantor advising Borrower that the Loan will terminate under the default provisions of this Agreement. The Loan Principal Amount is due in entirety at Maturity Date and is irrespective of any action taken by Lender over the Pledged Collateral.

b) **Loan Completion:** No later than thirty (30) calendar days before the Maturity Date, the Borrower shall communicate to Lender in writing whether Borrower intends to repay the Loan Principal Amount on the Maturity Date by requesting the Pay-Off Amount in writing and specifying the Pay-Off Date and Lender shall provide the Pay-Off Amount in written form within three (3) Business Days. No later than fourteen (14) calendar days before the Maturity Date, Borrower shall provide Proof of Funds to repay the Loan Principal Amount plus any other Obligations due to Lender on the Maturity Date.

7. **Loan Termination and Redelivery of Collateral.** This Agreement shall terminate when all of Borrower's Obligations have been paid in full, or in the Event of Default. Upon Event of Default, Lender will diligently and in good conscience dispose of Collateral in order to satisfy Obligations of Borrower and return to Guarantor any excess stock. Lender confirms and will maintain its full ability to release and discharge the Lien and return the Pledged Collateral, to Guarantor, free of any Encumbrance within three (3) Business Days of Borrower's satisfaction of its Obligations. Provided, however, that this Agreement shall be reinstated if any payment



Astor Asset Management 3 Ltd

in respect of the Loan's Obligations is rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be restored or returned by Lender for any reason. A return of identical securities means a return of the Pledged Collateral as modified as a result of any split-up, revision, conversion, reclassification, degradation, or other like change of the Pledged Collateral. Any cash or shares tendered to buy down the Loan as a result of a Valuation Event are subject to redelivery and shall become part of the Pledged Collateral to be returned to Guarantor.

8. **Closing.** The Closing Date in most cases will be no later than one (1) Business Day after the Confirmation Day, provided the conditions to Lender's Obligations as outlined in Clause V herein are satisfied and the written receipt by Lender of a Confirmation that the Pledged Collateral has been deposited and verified with the Depository Broker in a form and manner satisfactory to Lender and its counsel. The balance payment ("Balance Payment") shall be paid within one (1) Business Days of Closing Date. The Balance Payment shall be paid to the Borrower's account at the Depository Broker or to an account of Borrower at a commercial bank account per the following instructions outlined in Schedule A annexed to the back of this Agreement.

### III.    LOAN AND COLLATERAL FEATURES AND ATTRIBUTES

1. **Non-Recourse Loan.** Lender agrees that it will at all times look only to the Pledged Collateral of Guarantor identified in this Agreement for payment of Borrower's Obligations and will not make any claim or institute any action or proceeding against Borrower or Guarantor or any representatives, agents, successors, assigns, or affiliates of Borrower or Guarantor for any deficiency remaining after applying the Pledged Collateral to any sums due Lender. This is a Non-Recourse loan except for the provisions provided under Clause II.3.c of this Agreement.

2. **Due Diligence.** Lender has the right but not the obligation to perform enhanced due diligence on the Pledged Collateral and the Borrower and Guarantor shall fully cooperate.

3. **Material Information.** Borrower and Guarantor have tendered any and all relevant and material information regarding the Pledged Collateral and of the Issuer and all such relevant and material information has been disclosed and provided by Borrower and Guarantor to Lender. During the Loan Term, Borrower and Guarantor will continue to voluntarily provide all such relevant and material information to Lender and not withhold information deemed to be Material.

4. **Depository Broker.** Lender shall have the exclusive right to appoint a Depository Broker which will provide custody for the Pledged Collateral through a known global bank.

### IV.    BORROWER'S WARRANTIES AND OBLIGATIONS

Borrower represents and warrants to Lender that:

1. **Accredited Investor.** Borrower is a "professional accredited investor" as may be defined by ordinance of Borrower domicile, the jurisdiction of securities Issuer or jurisdiction of Governing Law of this Agreement.

2. **Announcement.** Neither Lender nor Depository Broker assume any responsibility or liability for filing on behalf of Borrower or Guarantor regulatory announcement(s) that are or may be

# Astor Asset Management 3 Ltd

required by the laws, rules, and regulations of any securities regulatory authorities or agencies that may have jurisdiction over any transactions with respect to the securities, including without limitation, loan transactions in which the securities are pledged as collateral. Borrower and Guarantor acknowledges and agrees that as a condition for the closing of the loan transaction described in this Agreement, Borrower and Guarantor shall comply with such laws, rules, and regulations, and assumes all such responsibilities and liabilities, including liability for all legal, administrative, and any and all other costs and expenses associated with making and filing all regulatory announcement(s). In the event Borrower or Guarantor fail, refuse or does not timely fulfill its regulatory announcement Obligations described in this Section, then in addition to any and all other remedies available to Lender and/or Depository Broker on account of Borrower's or Guarantor's non-compliance, Lender or Depository Broker may, in their sole and absolute discretion, prepare, file and publish any and all regulatory announcements that either of them may deem to be necessary and/or appropriate in such jurisdictions that Lender or Depository Broker determine to be necessary or appropriate, including without limitation in Borrower's or Guarantor's country of residence or domicile. In such event, and notwithstanding any confidentiality or other provisions in this Agreement or any other documents or agreement among the parties, Borrower or Guarantor may publish and/or file regulatory announcements that include, without limitation: a disclosure of Guarantor's Pledge and the number of shares that Guarantor Pledged to secure the loan; the current disposition of the securities; any party's purchases, sales, conversions, holdings, and exits from such holdings; changes of beneficial or legal ownership of the securities; changes involving successors-in-interest to the securities; repayment of loan principal in whole or in part and termination of the loan; and proxy and other filings involving voting or other control and management of the securities of Issuer, per the laws, rules, and regulations of the governing securities authority or agency.

3. **Depository Broker.** Both Borrower and Guarantor hereby affirm to fully abide by the Terms and Conditions of the Depository Broker and if there is any inconsistency between this Agreement and the Terms and Conditions of the Depository Broker, then the Terms and Conditions of the Depository Broker will prevail over this Agreement.

4. **Full Disclosure.** Borrower and Guarantor further represents and warrants that all statements and documentation it has provided to Lender directly or through its agents in connection with this Agreement are true, complete, and do not omit any material facts or information, which if provided, would have impacted Underwriting prudency. Borrower and Guarantor consent to provide to Lender any and all relevant material information which is necessary for any Lender to conduct a prudent risk assessment evaluation of Issuer, Guarantor and Borrower.

5. **Knowledge.** None of the rights of Guarantor arising as the legal and beneficial owner of the Pledged Collateral have been surrendered, cancelled or terminated. Guarantor has no knowledge of any material non-public information, inside information or similar terms as defined by applicable law with respect to governing the Issuer, which has not been generally disclosed to Lender or the public.

6. **Intentionally left in blank.**

7. **Liens; Reliance; and Cooperation.** As of the date of this Agreement, the securities constituting the Pledged Collateral are owned by Guarantor free and clear of any Liens, Encumbrance or contractual, statutory, or regulatory limitation or restriction of whatever nature; are in good standing in accordance with their country of issue; and are freely tradable and transferable securities and Guarantor hereby grants absolute first position Security

v. 1.05.1020          Page 12 of 31          Initials: _____  _____  _____
                                                       Guarantor  Borrower   Lender

# Astor Asset Management 3 Ltd

Interest as a Lien and Encumbrance rights to Lender in exchange for Borrower receiving a Loan. Both Borrower and Guarantor further represent and warrant that they have not relied on, and that Lender has not made, any representation, advice, or recommendation with respect to securities, either directly or through publication.

Neither Borrower nor Guarantor have relied on any marketing materials or any other written or oral statements of fact or otherwise made by anyone prior to entering into this agreement, and any such materials and/or statements or representations, if any, written or oral, shall be purged from existence as if never having existed. All previous agreements, representations, statements both written or oral, express or implied with respect to subject matter hereof, are superseded by this Agreement and hereby merged into this Agreement. It is encumbered upon Guarantor to initiate and facilitate the transfer of the Pledged Collateral. Borrower and Guarantor will cooperate in executing documents provided by Lender, Lender's Depository Broker, and clearinghouse/registry as requested by Lender, Depository Broker, applicable laws and regulations. Borrower and Guarantor further represents that they shall in good faith cooperate to facilitate this Loan transaction in a timely manner.

Borrower and Guarantor represent, warrant, and covenant that they understand that securities borrowing is highly speculative and requires sophistication and that Guarantor may lose and forfeit the Pledged Collateral when Pledging Collateral in margin borrow. Guarantor should only attempt margin borrowing if Guarantor completely understands its potential losses; is a seasoned speculative securities investor; is an accredited professional investor; and has solid risk management strategies in place in the event of margin-call or any other warranty, representation or action of Lender or market performance of Collateral.

8. **Necessary Filings.** Borrower and Guarantor warrant and concede that any regulatory announcement associated with this Agreement is the sole responsibility of the Borrower and Guarantor, and that both Borrower and Guarantor will comply with all requirements placed by local securities regulatory authorities and any costs associated with such announcements are the sole responsibility of the Borrower and Guarantor. Lender is not responsible for filing any necessary reports for or on behalf of the Borrower or Guarantor, but at its option may elect to do so in order to comply with regulations imposed.

9. **Notification to Lender.** Upon occurrence of any of the foregone events or whenever they shall occur, the Borrower or Guarantor shall promptly inform Lender in writing if a) Borrower or Guarantor has filed for bankruptcy or filed any petition seeking creditor protection; b) any creditor of Borrower or Guarantor has taken legal action against Borrower or Guarantor to recover debts owed to it; c) any creditor has sought or is threatening to seek confiscation or garnishment of property of Borrower or Guarantor. Absent of the preceding events, Borrower and Guarantor will once per year, on each anniversary of the Effective Date, submit a written attestation to Lender representing that to the best of Borrower's knowledge, none of the preceding events had taken place.

10. **Waiver.** Borrower and Guarantor will not take any suit or action against third parties or affiliates who may be acting on behalf of or for the Lender within the scope of this Agreement. Any dispute or controversy with third parties arising from this Agreement will solely be limited to this Agreement which must be resolved in accordance with the dispute resolution provision of Clause VII herein. It is hereby agreed that third parties such as the Depository Broker, Transfer Agent, referral sources or other affiliates, agents, or assignees of Lender facilitating the scope of this Agreement are hereby indemnified, released, forever discharged and absolved from any claim, controversy or action whatsoever. Should there be an incurable

Astor Asset Management 3 Ltd

Event of Default, unjust enrichment, extreme remedy and right of redemption are hereby waived by the Borrower and Guarantor, and neither the Borrower nor Guarantor will assert any right or claim against the forfeited collateral transferred to Lender as a result of an incurable Event of Default. During the pendency of this Loan, neither the Borrower nor Guarantor will seek injunctive relief or interference from any court of law, regulatory body, Transfer Agent, custodian, sub-custodian, Depository Broker, central depository or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement or freeze the shares. Injunctive relief by Borrower or Guarantor or any interference by Borrower or Guarantor, central depository or regulatory agency shall be an immediate and an incurable Event of Default. Neither Borrower nor Guarantor will interfere in any way or challenge the validity or enforceability of this Agreement, and the same shall be a Breach thereof.

11. **Suitability.** Both Borrower and Guarantor have carefully considered, and have discussed with their own respective professional legal, tax and financial advisers the suitability of this Agreement and Investment Risk associated with it and have fully considered for purposes of this Loan the risks of this Investment, and understand that (i) this Loan is an Investment and is suitable only for an investor who is able to bear the economic consequences of losing its entire Investment, (ii) the margin loan backed by the Securities is a speculative Investment which involves a high degree of risk, (iii) that there is lack of predictability in final loan amount, (iv) potential forfeiture of the Collateral, (v) that there are various unforeseen financial implications, independent and dependent on actions of Borrower or Guarantor, including the fluctuating and final value of the Collateral, (vi) Guarantors inability to receive back the Collateral and its adverse value.

## V.    LENDER WARRANTIES AND REPRESENTATIONS

Lender represents and warrants to Borrower that:

1. **Best Efforts Approach.** Despite stock market volatility, erratic trading volume, and pricing fluctuations, best efforts will be employed by Lender to facilitate the funding of the Loan in its entirety for the full Approved Loan Amount, in accordance with this Agreement and as contemplated herein by both Parties. Lender will not act in bad faith at any time during the Term of the Loan.

2. **Cash Collateral.** The lender will deposit Cash Collateral into Borrowers designated account at the Depository Broker which shall coincide with Loan Principal Amount to be funded and released to Borrower at Closing upon execution of the Closing Statement.

3. **Dividend Distributions.** Lender will credit the Guarantor for any, and all dividends received or credited to the Lender. If dividends are not received or credited to the Guarantor's account at the Depository Broker, then Guarantor is not entitled to any to be credited. Lender shall credit Borrower for all dividends received on behalf of Guarantor if any, at Maturity of the loan to be subtracted from outstanding principal balance. No dividends will be credited to Borrower or Guarantor if the Issuer does not pay them to the Depository Broker for any reason whatsoever. Dividends may not be used to offset any sums due to Lender prior to Loan Maturity unless requested so in advance by Borrower and approved by Lender in writing.

4. **Dealing with Securities.**

Initials: _____  _____  _____
Guarantor   Borrower   Lender

# Astor Asset Management 3 Ltd

a) The Borrower and Guarantor acknowledge and agree that upon the transfer of the Pledged Collateral to the Depository Broker by the Guarantor, the subject Pledged Collateral will: (i) have been given value by the Lender for the use of the Pledged Collateral, for purpose of determining Fair Market Value ("FMV"), in establishing that the Lender has Lien and Encumbrance rights in the Pledged Collateral; (ii) including the power to transfer rights in such Pledged Collateral as may be contemplated by Lender, in accordance with the herein Agreement.

b) During the Loan Term, provided that there has not been an Event of Default, the Lender will not sell or short-sell the shares of the Pledged Collateral on any publicly traded securities exchange. However, upon the occurrence of an incurable Event of Default, the Lender reserves the right to dispose of the Collateral on any publicly traded securities exchange, but is not obligated in doing so.

c) The Borrower acknowledges and agrees that the Pledged Collateral will be utilized by Lender to assert its preferential Lien over it.

d) The Lender will not engage in short-selling the Pledge Collateral by borrowing the shares of same Issuer from any entity or person and later buying the shares in the same security, then returning the borrowed shares in an effort to make a profit.

e) The Lender will not engage in Front Running, by buying or selling ahead of arrival of the Pledged Collateral.

5. **Order of Payment.** Payments received from sale of Collateral upon Event of Default shall be applied in the following order: (i) firstly, to all outstanding Principal balance, interest and fees; (ii) second, to any costs and fees charged by Custodian to Lender; and (iii) lastly, to any excess proceeds of sale of Collateral to be returned to Guarantor. Notwithstanding the forgoing, in case of an incurable Event of Default, nothing contained herein shall obligate the Lender to maximize sales proceeds, sell at market, on any specific platform or exchange, or at any specific price, provide accountability on the forfeited Collateral or to qualify the return to Borrower or Guarantor remaining balance of any proceeds.

6. **Transfer of Securities**. The Lender will not transfer the securities to its own account unless an incurable Event of Default has taken place. Only upon an incurable Event of Default will Lender request the Depository Broker to transfer the securities in the Guarantor's account to Lender's sole control and custody in order to satisfy Obligations of Borrower and Guarantor.

7. **Funding Guarantee and Borrowers Remedy.** The Lender guarantees to begin funding the stated Loan and the Approved Loan Amount within one (1) Business Days from the Closing Date. If the Lender or the Depository Broker fails to release the stated funding partially or in full within the one (1) Business Days of Closing Date, then Borrower shall have the right to terminate this Agreement, provided that the shares were in fact delivered in full to effectuate the Approved Loan Amount, all of the conditions stipulated herein have been met, shares are not restricted, are free-trading and neither Borrower nor Guarantor interfered with the Depository Broker or central depository, trading of the Issuer shares were not halted and force majeure conditions did not interfere or prevent Lender from funding.

Should Lender fail to return to Guarantor the Pledged Collateral within five (5) Business Days of receipt of Pay-Off Amount, the Lender shall be liable to Guarantor for two (2) times the amount of the Pledged Collateral on deposit at the Depository Broker.

Initials: _____  _____  _____
          Guarantor  Borrower  Lender

**Astor Asset Management 3 Ltd**

8. **Voting Rights.** Lender represents that it will fully cooperate with the registered owner of the securities of Issuer in exercising its Voting Rights on issues brought by the Issuer before its shareholders and the Lender will either instruct the Depository Broker to vote on behalf of registered owner of the securities of Issuer, or the Lender will vote on registered owner's behalf in accordance with instructions issued by the registered owner. Should the registered owner request that Lender vote on behalf of the registered owner, the registered owner may assign in writing the Voting Rights to Lender and Lender will agree to accept such Voting Rights from the registered owner. However, in no event will the Lender be liable in any way to Borrower or Guarantor or any registered owner as a result of any voting action or inaction.

## VI.  CONDITIONS TO FUNDING; EVENTS OF DEFAULT; AND REMEDIES

1. **Conditions Precedent.** The obligation of the Lender to fund the Loan is subject to the fulfillment of the following conditions precedent to the satisfaction of Lender: (a) The delivery of duly executed Stock Loan Agreement, Closing Statement, Custodian Management Agreement (CMA); (b) that all matters, facts, representations, documentation, announcements, filings, due diligence, regulatory compliance, and instruments in connection with Pledged Collateral, Issuer, and the Loan have been met and are in form and substance satisfactory to Lender's compliance, underwriting team, Global Custodian and Intermediary Custodian, as well its counsel; (c) the delivery of the stock in electronic form to Lender's Depository Broker representing the Pledged Collateral; and (d) Guarantors transfer of Security Interest in the Collateral as a Pledge.

2. **Valid Transactions and Events of Default.** In order for the transaction to be completed to Maturity by the Borrower, the Borrower and Guarantor must fulfill in the performance of and observance of any covenant, representation, provision or agreement contained herein and not default in any other loan document or provision.

3. Borrower is obliged to remedy the following matters, if occurred, in order to avoid being in breach of this or any other loan Agreement:

a) Failure by Borrower or Guarantor to pay the interest and all applicable fees or charges when due as stipulated, or the Approved Loan Amount when due, or any other default in the performance of an obligation that is not cured within the applicable Cure Period;

b) If the Collateral has fallen to less than seventy percent (70%) of the Fair Market Price ("FMP") utilized to compute the Loan Amount published by the average of the closing price on three (3) Business Days by the securities exchange (the "Margin-Call"). If this occurs, then the Borrower will, within five (5) Business Days and without further demand, automatically transfer to the Depository Broker a top-up of shares or cash equal to twenty percent (20%) more than the FMV and cure the deficiency. Hereinafter a new FMP is established at seventy-five percent (75%) of the original FMP. There will not be opportunity to cure if the Pledged Collateral falls by more than fifty percent (50%) of FMP as the Lender will sell the securities to satisfy the Loan Obligations and terminate this Agreement with no further recourse to Borrower;

c) If the class of securities provided as Pledged Collateral is delisted or trading is halted for five (5) or more Business Days by a regulatory agency or otherwise;

d) If any representation or warranty made by Borrower or Guarantor in this Agreement or in any statement furnished in contemplation of obtaining a Loan shall prove to have been knowingly untrue, omitted or misleading in any material respect;

Initials: _____    _____    _____
          Guarantor   Borrower    Lender

Astor Asset Management 3 Ltd

e) If any of the Loan Documents shall at any time after their execution and delivery for any reason, cease to be in full force and effect or shall be declared invalid, null or void or the validity, obligations hereunder or enforceability thereof shall be contested, repudiated, disaffirmed or challenged by Borrower or Guarantor, it's agents or counsel or by any other person or entity acting on behalf of or for the Borrower or Guarantor;

f) A governmental agency which controls the actions of Issuer has commenced an investigation of the Issuer;

g) A Material Event upon the financial condition of Borrower, Guarantor or Issuer;

h) The Issuer is seeking or applied for an extension in which to file the required regulatory reports;

i) An incurable Event of Default occurring in any other Loan between Lender and Borrower.

4. **Lender's Remedy.** If the Obligations aforementioned are not met, the Lender's remedy shall include and not be limited to any course of action against Borrower and Guarantor for Breach of this Agreement, including the occurrence of any of the foregoing Event(s) of Default, if not cured within the designated Cure Period, and if applicable, shall terminate the Stock Loan Agreement, result in Acceleration of all Loan amounts, interest, costs, expenses, and fees due thereunder, and cause forfeiture of the Guarantor's Pledged Collateral; any and all excess proceeds of the sale of Collateral in Event(s) of Default will be returned to Guarantor.

Notwithstanding the above, in case of an incurable Event of Default, nothing contained herein shall obligate or create any duty upon the Lender in any way to apply the proceeds of any sale of the Pledged Collateral to the Loan Principal or against any other Obligation of Borrower or Guarantor or to return remaining balance of proceeds realized as a result of any sale of Pledged Collateral, to maximize sales proceeds, sell the Pledged Collateral in the market, or at any specific price, or in any specific order, or on any specific day or to provide accounting or accountability with respect to the disposition of the Pledged Collateral as a result of an incurable Event of Default. There is no duty owed or implied to Borrower or Guarantor by Lender to maximize the sale of Pledged Collateral upon incurable Event of Default.

5. **Market Conditions.** If the Pledged Collateral experiences a Material Event or Valuation Event, Borrower's or Guarantor's lack of cooperation, restriction or material change in price prior to or post-funding, the Lender will have the right to cease the funding of the Loan or amend the Underwriting criterion, until such circumstances are dissipated and cured, or adjust funding based on new Underwriting criterion.

## VII.    GOVERNING LAW. JURISDICTION.

a) This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of England and Wales.

b) Each party hereto irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against any other party hereto in any way relating to this Agreement or the transactions contemplated hereby, in any forum other than the courts of England and Wales, and any appellate court from any thereof. Each of the parties hereto irrevocably and

Initials: _____  _____  _____
              Guarantor   Borrower    Lender

Astor Asset Management 3 Ltd

unconditionally submits to the exclusive jurisdiction of such courts and agrees that any such action, litigation or proceeding may be brought in any England and Wales court to the fullest extent permitted by applicable law. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding, subject to any permitted appeal, shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

c) Each party hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court referred to in Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

d) Irrespective of any outcome of any such legal proceeding, the Lender will be awarded all of its reasonable legal fees and costs in enforcing, collecting, defending, executing, and maintaining this Agreement.

### VIII.    INDEMNIFICATION AND LIMITED LIABILITY RELEASE

1. Lender will not be liable for any indirect, incidental, special, punitive, opportunity loss, or consequential damages, forgone or speculative profit, including loss of revenue or profits or losses arising from Lender's performance under this Agreement. However, the Borrower and Guarantor will be liable for Lender's recovery, speculative profit and opportunity loss when Borrower or Guarantor willfully obstructs or delay's Lender's recovery and enforcement efforts. Borrower and Guarantor agree to indemnify the Lender, each legal entity, if any, who controls, is controlled by or is under common control with the Lender, and each of their respective directors, assignees, officers and employees (the "Indemnified Parties"), and to hold each Indemnified Party of Lender harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of Borrower or Guarantor), in connection with or arising out of or relating to the matters referred to in this Agreement whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Lender, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority. The indemnity agreement contained in this Section shall survive the termination of this Agreement, payment of any amounts hereunder and the assignment of any rights hereunder.

2. Neither Borrower nor Guarantor will not hold Lender, its agents, directors, shareholders, assignees, Depository Broker or other known and unknown persons responsible for any fluctuations or depreciation in the value of the Pledged Collateral that Guarantor may experience during the pendency of Loan. Borrower and Guarantor agree to indemnify Lender for and to hold Lender harmless from, any loss or expense that such Borrower or Guarantor may sustain or incur as a consequence of default by Borrower or Guarantor in making a borrowing. This covenant shall survive the termination of this Agreement.

Initials: _____   _____   _____
         Guarantor   Borrower    Lender

Astor Asset Management 3 Ltd

### IX.    GENERAL PROVISIONS

1. **Amendments.** Amendments to this Agreement (including the adding or updating of any annexes, appendices, or schedules) will not be enforced unless such amendment is in writing and signed by authorized signatories on behalf of both Parties and added as an Addendum, with the exception of either Party informing the other of change of banks and only notice of such change is sufficient. Electronic email exchanges will not modify this Agreement. No amendment, modification or waiver in respect to this Agreement will be effective unless in writing (including writing evidenced by a facsimile transmission) and executed by each of the Parties.

2. **Assignment.** This Agreement, its equities, and Obligations shall be freely transferrable, pledge-able or assignable in whole or in part as the Parties may see fit or as may be in their best interest. Any transfer or assignment action by either Party shall be followed up by written notice to the other Party.

3. **Balance of Equities.** In the event that this Agreement is reviewed, interpreted or evaluated by any judiciary body or arbitration tribunal in assessing the balance of equities based on this Agreement and law, notwithstanding any of the other terms within this Agreement, the outcome of any decision shall be interpreted to weight in favor of and benefit the Lender at all times irrespective of unjust enrichment and extreme remedy.

4. **Clog on Redemption.** This Agreement is not a mortgage and will not be construed as a mortgage by the Parties or any tribunal or court of law. This is a Hybrid Loan requiring an Investment through Pledge of Collateral by Guarantor. In case there is an Event of Default, neither Borrower nor Guarantor shall have equity of redemption or right to redeem the Pledged Collateral and no incurable Event of Default shall be construed as a clog on equity of redemption and Lenders right to forfeiture of the Pledged Collateral will trump and supersede any right of redemption. No provision of this Agreement or any action of Lender upon an incurable Event of Default will be construed as a clog on equity of redemption and Lenders right to forfeiture of Pledged Collateral is absolute and final. Guarantor shall be able to redeem its Pledged Collateral after the Lock-Up period, provided that all Obligations of Borrower are satisfied, and the Loan has not experienced an incurable Event of Default.

5. **Confidentiality.** This Agreement is to be kept confidential and is not to be reproduced in any manner whatsoever for persons other than the Parties hereto. Specifically, each Party agrees to maintain the confidentiality of the business, trade, finances, and methods ("Confidential Information") of the other Party and not disclose the Confidential Information to any person other than those whose knowledge is essential for the performance of this Loan. Lender will not reveal the existence of this Agreement to the media or any regulatory body or government agency unless ordered to do so by a court of law. Lender may reveal the contents of this Agreement to defend Lender's dignity and reputation and dispel incorrect public information about the subject transaction. A default under this Agreement by the Borrower or Guarantor will deem this clause invalidated. The Parties acknowledge that the existence and the terms of this Agreement and any oral or written information exchanged between the Parties in connection with the preparation and performance of this Agreement are regarded as confidential information. Each Party shall maintain confidentiality of all such confidential information, and without obtaining the written consent of the other Party, it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or

Initials: _____    _____    _____
          Guarantor    Borrower      Lender

Astor Asset Management 3 Ltd

regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, investors, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, investors, legal counsels or financial advisors shall be bound by the confidentiality Obligations similar to those set forth in this Section. Disclosure of any confidential information by the staff members or agencies hired by any Party shall be deemed disclosure of such confidential information by such Party, which Party shall be held liable for breach of this Agreement. This Section shall survive the termination of this Agreement for any reason.

6. **Consideration.** This Agreement and the transaction herein constitute adequate, just and sufficient consideration. There shall be no argument or defense raised at any time that Consideration is in any way insufficient or was not made. For purposes of this provision, Consideration will include Lender coordinating, arranging, advising as well as agreeing to extend financing as stipulated in this Agreement, sufficiency of which is accepted and acknowledged.

7. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement regardless of number in existence or distribution.

8. **Cross-Default.** A default in any other loan will cause an incurable Event of Default in this Loan and a default in this Agreement will cause an incurable Event of Default in other Loan agreements with Lender.

9. **Depository Broker.** The Depository Broker reserves the right to custody and sub-custody the Pledged Collateral to any licensed financial institution in accordance with its Terms & Conditions.

10. **Enforcement of Clauses.** If any arbitrator, court or other party determines that any term, phrase, clause, or provision in this Agreement is in conflict with or contradicts any of its other terms, phrases, clauses, or provisions, then this Agreement shall be allowed to be amended by Lender by modifying or striking the contradictory term, word, phrase, clause, covenant or provision such that the Agreement and remaining provision and covenant is deemed to be fully enforceable and in all cases as to Lender's exclusive and sole benefit, to the full purpose and intent hereof as intended by Lender.

11. **Entire Agreement and Merger Clause.** This Agreement contains the entire Agreement between the Parties hereto and is legally binding upon them as of the date of the execution hereof. There were not and will be any oral, written or electronic modifications other than written Addendums duly executed by both Parties, which will supersede this Agreement. Oral or written or electronic notations or modifications other than written Addendums executed by both Parties are not enforceable, and all previous known and unknown statements and promises, written or oral are hereby merged in to this Agreement. This Agreement shall be final, controlling, and fully merged with respect to any previous discussions, promises, understandings, representations or warranties made by Lender.

12. **Errors and Omissions.** Borrower and Guarantor expressly agree and acknowledges that they had reasonable opportunity to obtain the assistance of its own counsel to fully review and participate in the negotiation and revision of any of the terms, provisions, covenants, representations, warranties and conditions of this Agreement prior to its execution; and the decision of whether or not to seek advice of counsel with respect to this Agreement is the

Initials: _____   _____   _____
            Guarantor      Borrower        Lender

**Astor Asset Management 3 Ltd**

responsibility of Borrower and Guarantor. Therefore, under no circumstances shall Lender be liable to Borrower or to Guarantor for any errors or omissions in this Agreement that may be disadvantageous to Borrower or Guarantor, or which may result in claims of actual or alleged or perceived harm to Borrower or Guarantor. Borrower and Guarantor further agree and acknowledges that any errors or omissions in the Agreement shall be strictly construed to favor the Lender. Once this Agreement is fully executed by both parties, Borrower and Guarantor fully and completely waive all rights to correct any such errors or omissions, or to seek redress against Lender for any such errors or omissions, whether by arbitration, lawsuit or any other equitable remedy. In addition, if Borrower, Guarantor or anyone on its behalf, makes a demand or claim for liability against Lender that arises out of, results from, or relates in any way to any such error or omission in this Agreement, Borrower and Guarantor shall indemnify, defend and hold harmless Lender from any such liability which may be incurred as the result of such demand or claim, including court costs and attorney's fees.

13. **Fiduciary Duty.** This Agreement is not intended to create or impose or give the appearance to the Parties that there is a fiduciary or trustee duty or other similar common law rights that are not expressly stated herein. Notwithstanding anything to the contrary contained in this Agreement, perception drawn or otherwise applicable provision of law or equity, neither Party shall be liable to the other for any act or omission that constitutes a bad faith violation of implied covenant of good faith and fair dealing and the same is expressly excluded. Any fiduciary or trustee duty whatsoever to the other is hereby irrevocably disclaimed and not provided. No duty of any type is owed to Borrower or to Guarantor other than which is explicitly stated.

14. **Force Majeure.** Lender will not be liable to the Borrower or to Guarantor for failure to perform any of its Obligations under this Agreement to the extent such performance is hindered, delayed or prevented by Force Majeure (except for failure to make payments hereunder). If Lender is unable, in whole or in part, to carry out its Obligations under this Agreement due to Force Majeure, it must provide notice to the Borrower and Guarantor. Initial notice may be given orally; however, written notification with reasonably full particulars of the event or occurrence is required as soon as reasonably possible. If Lender will claim Force Majeure, it will promptly give written notice to the Borrower and Guarantor of the termination of such Force Majeure and will resume performance of any suspended obligation as soon as reasonably possible after termination of such Force Majeure. For purposes of this Agreement, "Force Majeure" will mean causes, conditions, events or circumstances which are beyond the reasonable control of the Lender claiming Force Majeure. Notwithstanding any provision of this Agreement, Lender shall not be liable for its inability in performing any of its Obligations hereunder if such inability is caused by or arises as a result of circumstances beyond its reasonable control ("Force Majeure Event"). For the purposes of this Clause, a Force Majeure Event shall include, without limitation, inability or delay in performance caused through acts of God, fire, flood, riot, epidemics or population quarantine, degradation in stock value, stock market crash, illiquidity of the stock, Borrower's or Guarantor's lack of cooperation and other adverse financial market conditions, lightning, explosion, civil commotion, war, malicious damage, storm, tempest, electronic malfunctions, acts or omissions of telecommunications carriers, acts of government or other regulatory authority, acts or omissions of persons or bodies for which Lender affected thereby is not responsible, and any other circumstances beyond the reasonable control of the Lender which may possibly undermine the Pledged Collateral or securities of Issuer. Force Majeure applies only to Lender and does not apply to Borrower, nor shall excuse Borrower from complying with terms of this Agreement.

15. **Intentionally left in blank.**

Initials: _____  _____  _____
          Guarantor  Borrower  Lender

Astor Asset Management 3 Ltd

16. **Headings.** The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

17. **Joint and Several Liability of Borrower.** Borrower and Guarantor shall be jointly and severally liable hereunder and under each of the Loan Documents to which it is a party with respect to all Obligations. Notwithstanding the foregoing, the Borrower's obligations and liabilities with respect to the Loan proceeds which it receives, and related fees, costs and expenses, and it's obligations and liabilities arising as a result of the joint and several liability of the Borrower and Guarantor hereunder with respect to proceeds received by Borrower, together with the related fees, costs and expenses, shall be separate and distinct obligations, both of which are primary obligations of the Borrower, and the Guarantor hereby irrevocably and unconditionally guarantees the payment of all Obligations and performance of the Borrower. Neither the joint and several liability of the Borrower and the Guarantor shall be impaired or released which would or might, in the absence of this provision, operate to release, discharge or otherwise prejudicially affect the obligations of the Borrower. Without limiting the generality of the foregoing in any manner, all representations and warranties of Borrower and Guarantor contained herein are made jointly and severally. For purposes of this Agreement and any other Loan Documents, representations, warranties and covenants contained in this Agreement shall be imputed to the Borrower and the Guarantor and any consent by one Borrower shall constitute the consent of and shall bind the Borrower and Guarantor.

18. **Lender's Obligations.** All of Lender's obligations, representations and warranties in the performance of this Agreement are contingent upon Borrower and Guarantor performing in accordance with this Agreement and as the Lender may at its sole discretion from time to time decide.

19. **Margin Call.** The Borrower and Guarantor must post margin by toping-up additional cash or shares in the event of a Margin Call as stipulated in Section VI(3)(b). This provision may be triggered and called-upon by the Lender irrespective of amount funded to Borrower and the amount funded shall at no time be contingent on Margin Call validity or enforceability. A Margin Call is a standard provision in securities lending whereby the price of the securities has degraded to a point where the status of Pledged Collateral is deemed to be insufficient, and a credit risk from Lender's risk management perspective. Satisfaction of Margin Call by Borrower and Guarantor is required in order for funding to continue and avoid an Event of Default. The Margin Call is set in accordance with the herein sections and at no time shall be waived or forgiven.

20. **Non-Disparagement.** The Borrower and Guarantor agrees not to intentionally make, threaten to make or intentionally cause any other person to make, any public statement that is intended to criticize or disparage the Lender, any of its affiliates, agents or any of their respective officers, managers or directors. This clause shall not be construed to prohibit any person from making truthful statements when required by law, subpoena, court order, or the like. This clause shall remain in full force and survive the execution, delivery, cancellation, and termination of this Agreement regardless of the consummation of events and transactions contemplated hereof and all events to follow.

21. **Non-Illusory.** Notwithstanding the Terms and Conditions set forth herein, Lender and Borrower acknowledge, accept and agree that Collateral is fluid, variable, may vary and fluctuate in value and that Lenders faithful performance is conditional upon the full and faithful performance of Borrower, stability of the Collateral, absence of any Market Conditions,

Initials: _____   _____   _____
         Guarantor   Borrower   Lender

**Astor Asset Management 3 Ltd**

Material Event or an Event of Default and that sufficient and equitable consideration has been exchanged between the Parties, such that this Agreement is not illusory and should not be considered or declared as such. The Borrower acknowledges, accepts and agrees that the Terms and Conditions of this Agreement are reasonable and constitute an enforceable Agreement, the consideration provided by Lender are not illusory but are in fact material and considerable and the restrictions within this Agreement are necessary and reasonable for the protection of the legitimate business interests and goodwill of Lender.

22. **Not Construed Against Drafter.** The rule of construction that a contract be construed against the drafter shall not be applied in interpreting or affecting this Agreement and no ambiguity or conclusion drawn whatsoever in this Agreement or any portion thereof shall be construed or interpreted against the preparer and it will be deemed and established that both Parties actively participated in drafting and concluding this Agreement, each having been represented by its respective counsel.

23. **Notice.** Borrower and Guarantor further represent and warrant that they will yearly, on the anniversary of the Effective Date, submit a written statement to Lender by means of declaration stating whether Borrower or Guarantor obtained any other loans from any third parties pledging securities of same Issuer and whether there has been a material change in Borrowers or Guarantors financial condition, such as bankruptcy or insolvency filing of Borrower or Guarantor or of any entity controlled by Borrower or Guarantor. Borrower and Guarantor must also declare if any material lawsuit has been filed against it.

24. **Notices.** All notices and communications to either of the Parties by the other shall be in writing, sent by government mail, electronic mail or by a reputable commercial carrier and shall be deemed duly given on the earlier of the date the same is sent or when deposited in the mail to each Party as follows:

| If to Lender: | Astor Asset Management 3 Limited |
|---|---|
| Attention: | Operations Manager<br>777 Dunsmuir Street Suite 1400<br>Vancouver, British Columbia, V7Y 1K4<br>Email: compliance@astorcapitalfund.com ; Telephone: +1 888 775 1628 |

| If to Borrower: | Corporacion RBS SA de CV |
|---|---|
| Attention: | Ave. Ferrocarril de Rio Frio 419 A99, Cuchilla del Moral 1, Iztapalapa 09319 Ciudad de Mexico, Mexico<br>Email: egonzalez@gruposalinas.com.mx ;<br>Telephone: 0052551720[0089] |

| If to Guarantor: | Ricardo Benjamin Salinas Pleigo |
|---|---|
| Attention: | Cristobal Colon 79 INT C, Mexico 09360<br>Email: egsalceda@gruposalinas.com.mx ;<br>Telephone: +5215530091016 |

Either Party may designate by notice in writing to the other a new address to which notices, requests, and other communications hereunder shall be given.

25. **Records.** At the request of Lender, Borrower and Guarantor will cooperate in providing financial or other records, including audited financial statement reasonably necessary by

Initials: _____   _____   _____
           Guarantor     Borrower      Lender

# Astor Asset Management 3 Ltd

Lender to establish ongoing Borrower and Guarantor credit-worthiness. Yearly upon the anniversary of the Effective Date, the Borrower and Guarantor will submit to Lender in writing declaration attesting to whether securities of same Issuer were sold or pledged to others in the preceding year. If none were sold or pledged, the Borrower and Guarantor shall inform Lender accordingly. If any were sold or pledged, then Borrower and Guarantor shall identify such transactions.

26. **Redemption.** This is a Hybrid Loan and Borrower and Guarantor expressly waives the benefit of all laws now existing or hereafter enacted providing for redemption of a right or redemption from any sale of Collateral made under this Loan as a result of incurable Event of Default and Borrower hereby releases all rights of redemption to which Borrower or Guarantor would otherwise be entitled, when the Collateral is forfeited and disposed of as a result of an incurable Event of Default by Borrower.

27. **Release and Waiver.** No waiver of any provision of this Agreement shall be effective unless agreed to in writing by the Parties. No course of dealing between Borrower, Guarantor and Lender shall operate as a waiver of any of the rights of the Parties under this Agreement with the exception of an action for injunctive relief, which shall not be permitted or attempted and shall be nullified by the judicial body upon its application. Should Lender fail to timely exercise any of its rights, options or elections hereunder, irrespective of whether Lender continues to fund the Borrower, the Lender shall not be deemed to have waived any breach or default declaration on the part of Borrower or to have released Borrower or Guarantor from any of the Obligations mandated herein, unless such waiver is strictly in writing, is signed by Lender and expressly waives Lenders rights. Delayed or postponed implementation of any of Lenders rights does not waive any rights afforded to Lender herein and the Lender is free to invoke such rights at any time Lender chooses in doing so. For consideration herein provided, Borrower hereby releases, absolves and forever discharges Lender and their respective successors, assigns, partners, directors, shareholders, officers, beneficial owners, advisers, affiliates, agents, attorneys, transferees, and employees from any and all claims, legal fees, demands, torts, cross-actions, controversies, omissions, inaccuracy, nonfulfillment of any representation or warranty, oversight, exclusion, negligence, causes of action, suits, damages, rights, outcomes, liabilities and obligations, at law or in equity whatsoever, known or unknown, whether past, present or future, now held, owned or possessed by Borrower or Guarantor, or which Borrower or Guarantor may, as a result of any of Lenders actions, inactions, going-concern status, assignments, dealings, failings to act, calculations or directives occurring on or prior or after the execution of this Agreement, and hereafter hold or claim to hold under common law or statutory right, arising, directly or indirectly out of the Loan or any of the Loan Documents or any of the documents, instruments or any other transactions contemplated thereby. Borrower and Guarantor understand and agree that this is a full, final and complete release and agrees that this release may be pled as an absolute and the final bar to any or all suit or suits pending, or which may hereafter be filed, claimed or prosecuted by Borrower or Guarantor, or anyone claiming by, through or under Borrower or Guarantor, in respect of any of the matters described herein may hereafter be had from anyone whomsoever. No Waiver is asserted or claimed against the Lender which refutes Lenders dominion and right to foreclose, deal-in or transact in the Pledged Collateral and no Waiver is alleged or claimed against the Lender which prohibits Lender prior to or post an Event of Default to exhaust its recourse against the Borrower or Guarantor or any other person or persons, third party guarantors or against any other security it may hold in respect to the Obligations of Borrower or Guarantor, before realizing upon or otherwise dealing with the Pledged Collateral in such manner as Lender may consider necessary or befitting in its own


Astor Asset Management 3 Ltd

right. All of Lenders rights are reserved and none are Waived. Lenders acceptance of partial payments shall not invalidate, waive or diminish Lenders rights afforded herein.

28. **Severability.** If any of the provisions of this Agreement or in any of the Loan Documents is found by an arbitral tribunal and/or court of competent jurisdiction to be unlawful, then such provision will be further altered and modified in Lender's favor to meet legal conformity or, if impracticable, is stricken out entirely as if it was never even written in the first place, and the remainder of the rights, warranties, provisions, covenants and Obligations contained in this Agreement or any of the Loan Documents shall continue to be in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

29. **Statement of Knowledge.** For purposes of this Agreement, the Borrower and Guarantor shall be deemed to have knowledge of a particular fact or matter referenced herein, unless otherwise qualified hereunder means a statement of the Borrower and Guarantor declaring knowledge of the actual facts or circumstances to which such phrase relates having made inquiries or investigations in connection with such facts and circumstances, Borrower having conducted reasonably diligent inquiry into the relevant subject matter.

30. **Survival**. Except as herein provided, all of the Borrower's and Guarantor's representations, warranties, waivers, Obligations, releases, indemnities, and covenants made in this Agreement shall remain in full force and survive the execution, delivery, cancellation, and termination of this Agreement regardless of the consummation of events and transactions contemplated hereof. All of the Lender's rights, benefits, enforcement covenants and secured interest into the collateral shall survive the termination of this Agreement, except for further funding of the Loan. The Lender shall receive, obtain and retain all the benefits, profit and interest of the securities pledged during the Loan Term and upon its expiration, should any amounts be further owed to Lender.

31. **Termination.** Early termination or rescission is not permitted under the Agreement, regardless of the reason or need to do so, and this Agreement will be valid and in full force and effect after its execution for its full Term, provided it can only be terminated after its maturity, jointly by both Parties in written form only and memorialized as an Addendum or mutual written release, or as stipulated herein and for no other reason. All enforcement covenants, conditions, and waivers will survive termination. If the Loan Documents shall, at any time after their execution and delivery for any reason, cease to be in full force and effect or shall be canceled, declared invalid, null or void by Borrower or Guarantor, their representatives or their agents or the validity or enforceability thereof shall be contested or challenged by Borrower, Guarantor or by any other person for or on the Borrower's or Guarantor's behalf, the Loan will be considered in default. The Lender retains the right to convert the Collateral during the Loan Term, and thereafter should Borrower or Guarantor default.

## X.    REQUIRED DISCLOSURES

**It is mutually understood and agreed that Lender has a financial interest and privilege in the pledged shares according to the parties' understanding and contractual agreement. Borrower assumes the burden of topping up when required to do so. Borrower is aware that market conditions may cause the value of securities to decline. Borrower and Guarantor concede that Lender is not responsible for the degradation of the stock value, whether owing to action(s) or inaction(s) of Lender. A decline in value may require additional securities or cash to increase the value of the collateral. Borrower's or Guarantor's default will cause forfeiture of securities. Borrower and Guarantor now waive and forever discharge Lender against any claims under any applicable securities laws. Tax consequences are the responsibility of Borrower and Guarantor.**

Initials: _____ _____ _____
Guarantor    Borrower    Lender

Astor Asset Management 3 Ltd

Lender and its loan officers have not provided legal or tax advice of any kind to Borrower or Guarantor. Borrower and Guarantor attest that, at all times, they were represented by legal counsel representing its interests and Borrower and Guarantor have had ample opportunity to consult one. Borrower's and Guarantor's decision is at will and solely based on its independent judgment. Borrower and Guarantor have evaluated all risks independently and did not rely on representations made by Lender, if any. Lender does not discriminate based on sex, race, nationality, or religion. Lender is not a broker-dealer or financial advisor. This disclosure provides full transparency of risks involved. Neither Borrower nor Lender will participate in or engage in any money laundering scheme. Lender does not provide investment advice and its loan officers, and sales staff are prohibited from doing so. Borrower must ensure that the Pledged Collateral stays within Lender's value requirement following this Agreement. Loan is non-recourse to Borrower or to Guarantor and recourse will be against Collateral only. Lender has recommended that Borrower consult a professional tax advisor to determine the tax implications of a loan under the terms of this agreement before proceeding. Lender will not be liable for the devaluation of securities during the term of Loan. Lender is not an insider of the securities being pledged by Guarantor and Lender does not and has not offered to buy or sell advice to Borrower. Lender utilizes independent third-party compliance consultants in risk management analyses and underwriting recommendations. A default of Loan will cancel Lender's obligation to Borrower and to Guarantor. Neither Borrower nor Guarantor will undermine or interfere with securities of Issuer. Borrower will not use Loan proceeds for any illegal activity, including without limitation to, use of Loan proceeds in the drug trade or support of terrorist groups. Borrower is to consult a tax professional for any tax advice. Guarantor represents that Guarantor has full ownership of the securities and legal custody and as of the date of this agreement, is not a defendant in any lawsuit where the ownership and control of the pledged shares are challenged because Lender will not be a Party to any such challenge. Borrower will not transact with any entity on any international sanctioned list using the Loan proceeds. Lender is not affiliated with any government agency. Lender may readjust loan criterion due to adverse market conditions, Borrower's lack of cooperation or devaluation of securities. Borrower agrees that Loan is suitable for Borrower's needs. Lender has the right, but not the obligation, to refinance or increase Loan amount if the value of securities increases during the term of Loan. Borrower and Guarantor have risk-tolerance and the financial ability and liquid assets to post margin in the Event of Default. Lender is not and does not hold itself out to be a tax advisor. This is not an offer to or solicitation to purchase or sell securities. Loan will be based on all applicable laws, present Underwriting, and market conditions at the time of funding. Borrower and Guarantor agree to provide information necessary to the contemplated transaction in a timely, complete, and accurate manner. The Borrower and Guarantor further represent and warrant that all statements and documentation provided about Loan are true and complete and do not omit or forgo any material facts or information. Borrower understands that funding correlates and is relative to most current market conditions at time of funding or force majeure, and may cause Lender to advance Loan in tranches, adjust or postpone funding. Due to market dynamics, at all times throughout, the loan is subject to re-analysis and Underwriting reassessment prior to funding. During the Loan Term, all benefits and proceeds of Pledged Collateral inure to Lender. Lender reserves the right to maintain dominion over the Collateral during the Loan Term, which affords Lender the right to deal-in, dispose or convert over the Pledged Collateral. Lender may not call the Loan before Maturity Date unless a default has occurred. The Cash Collateral to be deposited in to Borrowers own account shall be solely computed by the Lender. No notice of any type is due to Borrower or to Guarantor other than the notices described herein. During the pendency of the Loan, neither Borrower nor Guarantor is entitled to receive or retain any benefits or rights not specifically stated or contemplated herein.

**IN WITNESS WHEREOF**, and after review, mutual preparation and consultation with respective legal counsel, the Parties have executed this Loan Agreement as of the date first written above.

**END OF TEXT**

Initials: _____    _____    _____
          Guarantor   Borrower    Lender

 Astor Asset Management 3 Ltd

## SIGNATORY PARTIES

**LENDER:** Astor Asset Management 3 Limited, a Canadian corporation.



| | Mariia Mitsa, Managing Member | 07/28/2021 |
| Signature | Name and Title | Date |

## BORROWER NOTARIZATION

**BORROWER:** Corporacion RBS SA de CV

July 28, 2021

| | Ricardo Benjamin Salinas Pliego | July 14th, 2021 |
| Signature | Name and Title | Date |

Notary Seal

_____
Attorney/Notary/Witness

_____  July 14th 2021
Signature                      Date

_Edvardo Gonzalez Saleeda_
Attorney/Notary/Witness

_Edvardo Gonzalez Saleeda_
Signature                      Date


**Astor Asset Management 3 Ltd**

The Guarantor hereby attests and guarantees unconditionally the due, prompt and faithful performance and discharge by, and compliance with, all of the obligations, covenants, terms, conditions and undertakings under this Agreement in accordance with the terms hereof, including any such obligations, covenants, terms, conditions and undertakings that are required to be performed, discharged or complied with and that Guarantor has the capacity to full fill the full and faithful performance of Borrower as stipulated herein.

GUARANTOR: Ricardo Benjamin Salinas Pliego

July 28, 2021

_____    Ricardo Benjamin Salinas Pliego   _____
Signature                                         Name                                                   Date

_____
Notary Seal

_____                    Edvardo Gonzalez Salcedo
Attorney/Notary/Witness                        Attorney/Notary/Witness

_____  July 14th, 2021    Edvardo Gonzalez Salcedo
Signature                      Date          Signature                              Date

Page 28 of 31


Astor Asset Management 3 Ltd

<u>SCHEDULE A</u>

<u>BANKING INFORMATION</u>

**BORROWER BANKING INFORMATION (CORPORATE):**

| | |
|---|---|
| **Bank/Institution Name:** | |
| **Swift Code No/Routing No:** | |
| **Account Number:** | |
| **Account Name:** | Corporacion RBS SA de CV |
| **Bank Code:** | |
| **Branch Code:** | |
| **Address of Account:** | |

**CASH AND STOCK TOP UP ACCOUNT INFORMATION (CORPORATE):**

| | |
|---|---|
| **Institution's Name:** | Weiser Global Capital Markets |
| **Account Number:** | 200-804762 ; 200-804763 |
| **Account Name:** | Corporacion RBS SA de CV |
| **Address of Account:** | |

## Astor Asset Management 3 Ltd

### BORROWER BANKING INFORMATION (INDIVIDUAL):

| | |
|---|---|
| **Bank/Institution Name:** | |
| **Swift Code No/Routing No:** | |
| **Account Number:** | |
| **Account Name:** | Ricardo Benjamin Salinas Pliego |
| **Bank Code:** | |
| **Branch Code:** | |
| **Address of Account:** | |

### CASH AND STOCK TOP UP ACCOUNT INFORMATION (INDIVIDUAL):

| | |
|---|---|
| **Institution's Name:** | Weiser Global Capital Markets |
| **Account Number:** | 200-804764 ; 200-804765 |
| **Account Name:** | Ricardo Benjamin Salinas Pliego |
| **Address of Account:** | |

### INTEREST, PRINCIPAL AND PAYMENT INFORMATION:

**Please make payment payable to:**
Astor Asset Management 3 Limited
777 Dunsmuir Street, Suite 1400
Vancouver, British Columbia, V7Y 1K4



www.astorassetgroup.com

**Singapore**
Six Battery Road
Level 42
Singapore, 049909

asia.inquiries@astorassetgroup.com
+65 800 492 2419

**Hong Kong**
18 Westlands Road
Level 23
Hong Kong

asia.inquiries@astorassetgroup.com
+852 800 964 226

**United Kingdom**
20 MIDTOWN
20 PROCTER STREET,
LONDON, UK, WC1V 6NX

europe.inquiries@astorassetgroup.com
+44 2 0386 84 620

**Germany**
Niederrad business district
LYONER STRASSE 14
FRANKFURT, GERMANY, 60528

europe.inquiries@astorassetgroup.com
+49 0800 1812772

**Australia**
330 Collins Street,
level 14
Melbourne, Australia, 3000

oceania.inquiries@astorassetgroup.com
+613 8375 7172

# EXHIBIT 4

Claim No: _____

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**B E T W E E N :**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

**Applicants**

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS LTD**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV**

**Respondents**

---

**APPLICANTS' SKELETON ARGUMENT**

---

| | |
|---|---|
| **Time estimate for hearing:** | 2 hours |
| **Time estimate for pre-reading:** | 1 hour |
| **Suggested reading list:** | (1) This skeleton argument; |
| | (2) The first affidavit of Eduardo Salceda Sanchez |

**HEARING IN PRIVATE:** For the reasons addressed in this skeleton argument, it is requested that this hearing take place in private and that, until the Applicants inform the Court in writing that any order made has been served on the Respondents, the Court file be kept sealed.

The Applicants have filed a draft claim form and draft application notices with the Court and undertake to issue the same as soon as possible after the hearing.

1

A.  **<u>INTRODUCTION</u>**

1.  This skeleton argument has been lodged on behalf of Richardo Benjamin Salinas Pleigo ("**Mr Salinas**") and Corporacion RBS SA de CV ("**RBS**") (together, the "**Applicants**") for the urgent *ex parte* without notice hearing of the Applicants' applications for:

    (1)  An interim proprietary injunction against Astor Asset Management 3 Limited ("**Astor 3**"), Weiser Global Capital Market ("**Weiser**"), Tavira Monaco SAM ("**Tavira**") and Vladimir 'Val' Sklarov ("**Mr Sklarov**") in respect of 7,204,296 shares in Grupo Elektra SAB De CV ("**Elektra**") and/or their traceable proceeds;

    (2)  A worldwide freezing order ("**WFO**") against Astor 3 and Mr Sklarov;

    (3)  Ancillary disclosure orders against Astor 3, Weiser, Tavira and Mr Sklarov; and

    (4)  An order permitting the Claimants to serve the Claim Form and any subsequent documents in the Claim on the Respondents out of the jurisdiction by an alternative method.

2.  Mr Sklarov is a convicted felon who has carried out numerous similar frauds. His modus operandi is to set up entities which pose as legitimate and honest financial institutions to gain control of shares by way of collateral before misappropriating them.

3.  In the present case, Mr Sklarov and his company, Astor 3, have sought to misappropriate Elektra shares belonging to Mr Salinas with a value of MXN 7,565,879,616 (approximately US$416,394,035 at current exchange rates).

4.  Those shares in Elektra should be held by Weiser and Tavira under custodian management agreements. However, it appears that Astor 3 has given instructions to Weiser and/or Tavira to dispose of at least some of those shares.

5.  The Applicants wrote to Weiser and Tavira on 10 June 2024 to say that they should not dispose of the shares. Further, on 26 July 2024, Elektra issued a press release stating that it had become aware of a possible fraud in respect of the shares.

6.  Astor 3's response to these developments was to commit further misappropriations which have recently come to light. On 1 August 2024, Tavira informed the Applicants that it had transferred the 6,268,383 Elektra shares "*to Astor's account, as per Astor's instructions*". According to a trade report supplied by Tavira, this transfer to Astor took

place on 29 July 2024. Thus, it seems that Astor 3 responded to the discovery of the fraud by attempting to misappropriate appropriately 86% of shares with a value of approximately US$358 million.

7.  The application is urgent. It is unclear how many of the shares remain in the custody of Weiser, Tavira and Astor 3 and what has happened to the proceeds of any sole shares.

8.  The Applicants fear that, unless restrained by the court, the Respondents may dispose of further shares and/or the proceeds of sale of shares and that Astor 3 and Mr Sklarov may take steps in respect of their assets to frustrate the enforcement of any judgment that the Applicants may obtain against them in due course in these proceedings.

9.  The immediate purpose of the application is to "hold the ring" until a return date hearing can take place in a few weeks' time (on full notice to the Respondents).

10. In the Applicants' submission, this is plainly a case in which the giving of notice to the Respondents could defeat the purpose of the Applicants' application. Accordingly, it is appropriate for the application to be heard ex parte without notice: see, for example, *Re First Express Ltd* [1991] BCC 782 per Hoffmann J at 785 and National Commercial Bank *Jamaica Ltd v Olint Corp Ltd* [2009] 1 WLR 1405 (PC) at [13]. Further, the Applicants seek an order pursuant to CPR 39.2(3)(a), that the present application be heard in private on the basis that publicity would defeat the object of the hearing; *White Book*, [39.2.3] at p.1224. The Applicants also seek an order, with the same objective, pursuant to CPR 5.4B, 5.4C(4) and 39.2(5) and pending its notifying the court that any order made on this application has been served on the Defendants, (a) the court file shall be kept sealed, (b) the documents on the court file shall not appear on any Electronic Working file, (c) no person shall be permitted to inspect the court file, and (d) the court not publish any judgment given or order made on this application on the judiciary website.

## B.  **BACKGROUND**

### (1)  **Mr Salinas**

11. The First Applicant, Mr Salinas, is one of the wealthiest individuals in Mexico with a net worth of several billion U.S. dollars. He is the founder and chairman of Grupo Salinas, a conglomerate with interests in many different businesses in Mexico including financial services, retail, media, telecommunications and the internet.

12.  Mr Salinas is the direct or indirect beneficial owner or controller of approximately 67,544,413 shares in Elektra, representing 30.47% of Elektra's share capital (disregarding the impact of the fraudulent scheme referred to below).

13.  Elektra forms part of Grupo Salinas. It is incorporated in Mexico and is listed on the Mexican stock exchange. It which operates a chain of retail stores selling consumer goods and providing financial services in Mexico and Central and South America.

**(2)**   **The Astor group**

14.  During the summer of 2021, Eduardo Gonzalez Salceda Sanchez ("**Mr Salceda**"), the Vice President (Financial Investment & Analysis) of Grupo Salinas, began to investigate the possibility of raising finance secured over Elektra shares.

15.  Alexandre Torti ("**Mr Torti**") of Fininvesta, a financial advisory firm, introduced Mr Salceda to the Astor group, which he said was owned by the well-known Astor family. (It seems that Mr Torti had been introduced to the Astor group by Zara Akbar ("**Ms Akbar**") of Enness (Jersey) Limited, a financial advisory firm based in Jersey.)

16.  Subsequently, Mr Salceda dealt with Gregory Mitchell, who was said to be a managing director of the Astor group, in emails copied to Thomas Mellon of the Astor group. (As explained below, it now seems that neither of these individuals actually exists.)

**(3)**   **The SLA**

17.  In summary, the proposal was for an entity within the Astor group to make a loan to the Second Applicant, RBS, a company incorporated in Mexico which is beneficially owned and controlled by Mr Salinas, on terms which required Mr Salinas to lodge shares in Elektra with a custodian, Weiser, as collateral for the loan. A term sheet provided by the Astor group identified the key terms of the proposal, including that the lender would not engage in selling or short selling of the collateral shares during the loan term and while the loan remains in full force and effect.

18.  At the outset, it was envisaged that the lender would be Astor Asset Management Ltd, which executed two agreements dated 1 May 2021 and 14 July 2021.

19.  However, Mr Mitchell stated that Astor 3 should be the lender. Therefore, on 28 July 2021, Astor 3 executed a stock-lending agreement (the "**SLA**").

20.   The parties executed an addendum (the "**1st Addendum**") to record that the agreements dated 1 May 2021 and 14 July 2021 had been cancelled.

**(4)   Terms of the SLA**

21.   Pursuant to the SLA, Astor 3 (the "Lender") agreed to advance loans of up to MXN 3,008,580,000 to RBS (the "Borrower"), secured over Elektra shares owned by Mr Salinas (the "Guarantor"). In summary of the key terms of the SLA:

   (1)   By Clause II.1(a), RBS (as Borrower) was entitled to request loan advances in a "Loan Principal Amount" of up to MXN 3,008,580,000 from Astor 3 (as Lender).

   (2)   These loans were to be secured by a "Lien" over the "Pledged Collateral", which was to consist of Elektra shares belonging to Mr Salinas (as Guarantor).

   (3)   By Clause II.1(c), the maximum available lending amount would be equal to 55% of the fair market value ("FMV") of the Pledged Collateral. (The loan-to-value ratio was subsequently reduced to 35%, as explained below.)

   (4)   By Clause II.1(a), the normal interest rate was to be 1.15% per annum. After an Event of Default, the interest rate would be 1.5% per month): see Clause II.1(b).

   (5)   By Clause II.6(a), the Loan Principal Amount would be repayable on the date falling 5 years after the "Loan Term" begins (the "Maturity Date").

   (6)   By Clause III.1, the SLA was to be a non-recourse lending arrangement, such that Astor 3 could not bring proceedings against the Borrower or the Guarantor in the event of non-payment and could have recourse only to the Pledged Collateral.

   (7)   By Clause III.4, the Pledged Collateral (i.e. the shares in Elektra) was to be held with a "Depository Broker" appointed by the Lender.

   (8)   By Clause VII, the SLA is governed by English law and is subject to the exclusive jurisdiction of the English Court.

22.   Importantly, the SLA contained restrictions on dealings in the Elektra shares during the Loan Term (as defined) prior to the occurrence of an Event of Default (as defined):

   (1)   Clause II.7 states that the Astor 3 "*confirms and will maintain its full ability to release and discharge the Lien and return the Pledged Collateral, to Guarantor,*

5

*free of any Encumbrance within three (3) Business Days of Borrower's satisfaction of its Obligations … A return of identical securities means a return of the Pledged Collateral as modified as a result of any split-up, revision, conversion, reclassification, degradation, or other like change of the Pledged Collateral*". The term "*Pledged Collateral*" is defined as meaning (with emphasis added) "*the total **actual** shares pledged by the Guarantor to Lender as consideration for the Loan to Borrower and any shares or proceeds resulting from any transaction, split-up, revision, reclassification or other like change that may take place of the Pledged Collateral during the Term of the loan*". In other words, "*the total actual shares pledged by the Guarantor to the Lender*" must be returned to the Guarantor. It is hard to see how that requirement can be reconciled with any suggestion that some other (albeit equivalent) securities could be returned instead.

(2)  By Clause V.2, Astor 3 represented and warranted that it would deposit "Cash Collateral" into an account held by RBS at the Depository Broker, which would then be released at "Closing" to fund the Loan Principal Amount. This provision was designed to ensure that Astor 3 would fund the lending from its own cash resources (and not by selling the Pledged Collateral belonging to Mr Salinas).

(3)  By Clause V.3, Astor 3 represented and warranted that all dividends on the Pledged Collateral would be credited to Mr Salinas. This presupposes that Astor 3 would retain the shares in accordance with the SLA and not dispose of them prior to the maturity date or any earlier event of default, as such disposal would prevent Astor 3 from receiving dividends paid on the shares and crediting them to Mr Salinas.

(4)  By Clause V.4(b), Astor represented and warranted as follows: "*During the Loan Term, provided that there has not been an Event of Default, the Lender will not sell or short-sell the shares of the Pledged Collateral on any publicly traded securities exchange. However, upon the occurrence of an incurable Event of Default, the Lender reserves the right to dispose of the Collateral on any publicly traded securities exchange, but is not obligated in doing so*". This wording makes expressly clear that Astor 3 was obliged to retain the shares (and was not permitted to sell them) save on the occurrence of an incurable Event of Default.

(5)  By Clause V.5, Astor 3 represented and warranted as follows: "*Payments received from sale of Collateral upon Event of Default shall be applied in the following*

6

*order: (i) firstly, to all outstanding Principal balance, interest and fees ...*" This wording again makes clear that Astor 3 was not to realise collateral save upon the occurrence of an Event of Default: proceeds of such realisation were to be applied in discharge of the principal and interest that would be due in those circumstances.

(6)   By Clause V.6, Astor 3 represented and warranted as follows: "*The Lender will not transfer the securities to its own account unless an incurable Event of Default has taken place. Only upon an incurable Event of Default will Lender request the Depository Broker to transfer securities in the Guarantor's account to Lender's sole control and custody in order to satisfy Obligations of Borrower and Guarantor*". This wording made clear that Astor 3 could not transfer the Collateral Shares to its own account (and would instead be required to leave them in the custody of Weiser and/or Tavira, as appropriate) unless and until the occurrence of an incurable Event of Default. Astor 3 would not be permitted to transfer them to its own account only upon the occurrence of an incurable Event of Default.

(7)   By Clause V.8, Astor 3 represented and warranted that "*it will fully cooperate with the registered owner of the securities of Issuer* [Elektra] *in exercising its Voting Rights ...*" This presupposes that Astor 3 will retain the shares in accordance with the SLA and not dispose of them prior to the maturity date or any earlier event of default, as such disposal would make it impossible to exercise voting rights.

**(5)   The Weiser Agreement**

23.   Weiser is understood to be incorporated in the Bahamas.

24.   Weiser signed a custodian management agreement dated 28 July 2021 (the "**Weiser Agreement**"). The purpose of the Weiser Agreement was to ensure that Weiser could take instructions from Astor 3 (rather than Mr Salinas) in relation to the shares in Elektra. The Weiser Agreement defines the term "Entitlement Order" to mean any form of instruction by Astor 3 (as Lender) to Weiser for the purpose of disposing of the Collateral Shares. Under the Weiser Agreement, Weiser is required to comply with any Entitlement Order given by Astor 3, without regard to any dispute between Astor 3 and the Applicants as to whether Astor 3 had the right to give the Entitlement Order.

**(6)**   **Tranches 1 and 2 of the loan**

25.   Pursuant to a Closing Statement dated 9 August 2021, Astor 3 advanced a sum of MXN 501,591,693 to RBS, secured over 563,569 shares in Elektra owned by Mr Salinas. These shares were held in an account maintained by Weiser.

26.   Pursuant to a Closing Statement dated 10 September 2021, Astor 3 advanced a sum of MXN 327,497,030 to RBS, secured over an additional 372,344 shares in Elektra owned by Mr Salinas. These shares were held in an account maintained by Weiser.

**(7)**   **The events of October 2021**

27.   On 5 October 2021, Weiser notified the Applicants that Astor 3 had issued an Entitlement Order to transfer 935,913 Collateral Shares held by Weiser to the account of Astor Capital Fund Ltd, which appears to be entity affiliated with Astor 3.

28.   The Applicants asked Mr Torti to raise a complaint with Weiser, which he did on 19 October 2021. Weiser responded on 22 October 2021 that it was required to comply with any Entitlement Order given by Astor 3.

29.   On 23 October 2021, Mr Torti emailed Ms Akbar to ask her to obtain an explanation from the Astor group. He complained that Astor 3 and Weiser were acting in breach of contract.

30.   On 25 October 2021, Ms Akbar responded: "*I am happy to advise that I have been informed by Astor that the instructions for the transfer of the 935,913 (collateralised) shares of Group Elektra S.A.B. de CV (ELEKTRA\*:MX) shall be reversed back to the account # 200-804765 of Mr. Ricardo B. Salinas Pliego within the next 24 hours*".

31.   Mr Salceda was reassured to learn that Astor 3 accepted that it was not entitled to take the shares for itself and had returned them. He assumed that there was a mistake or misunderstanding, perhaps involving Weiser.

32.   In these circumstances, the Applicants insisted that Weiser should be replaced with another Depository Broker for all future tranches of lending. As explained below, Weiser was replaced by Tavira in respect of further Elektra shares provided as collateral for subsequent tranches of the loan.

33. On 6 December 2021, in response to the Applicants' concerns as to whether Astor 3 and/or Weiser had wrongfully disposed of the Collateral Shares, the parties executed a further addendum (the "**2nd Addendum**") which states as follows:

> "*It is mutually agreed, understood and represented that all Entitlement Orders issued by Lender in relation to the Custodian Management Agreement executed by and between the Lender, the Depository Broker and the Guarantor will be in accordance with the terms of the Loan Agreement*".

**(8)    The Tavira Agreement**

34. Tavira is incorporated in Monaco.

35. Tavira entered into a custodian management agreement (the "**Tavira Agreement**") which is stated to be effective as of 1 November 2021. As stated above, the purpose was to enable Tavira to replace Weiser in respect of any further collateral.

36. The Tavira Agreement has the same basic provisions as the Weiser Agreement (and it includes the same concept of an "Entitlement Order").

37. By Clause 10, the Tavira Agreement is governed by English law and is subject to the exclusive jurisdiction of the English court.

**(9)    Tranches 3, 4 and 5 of the loan**

38. Pursuant to a Closing Statement dated 4 February 2022, Astor advanced a sum of MXN 532,484,020 to RBS, secured over an additional 1,299,497 shares in Elektra owned by Mr Salinas. These shares were held in an account maintained by Tavira.

39. On 13 June 2022, the parties executed a further addendum (the "**3rd Addendum**") to reduce the LTV ratio to 35%. Clause II contains provisions in respect of margin calls.

40. Pursuant to a fourth Closing Statement dated 22 June 2022, Astor 3 advanced a sum of MXN 613,000,000 to RBS, secured over an additional 2,796,290 shares in Elektra owned by Mr Salinas. These shares were held in an account maintained by Tavira.

41. On 19 July 2022, the parties executed a further addendum (the "**4th Addendum**") to deal with the release of a dividend to the Borrower.

42. Pursuant to a Closing Statement dated 15 September 2022, Astor 3 loaned a sum of MXN 179,645,808 to RBS, secured over an additional 444,389 shares in Elektra owned by Mr Salinas. These shares were held in an account maintained by Tavira.

43. On 24 March 2023, Astor 3 made a margin call for 1,728,207 additional Elektra shares. Mr Salinas complied with that margin call and transferred the relevant shares to his account with Tavira.

**(10)   Summary of the loans and collateral**

44. In summary, therefore, Astor 3 has advanced a total of five loans to RBS pursuant to the SLA, with a total principal amount of MXN 2,154,218,552.55 (approximately US$113,892,457.76 at current exchange rates).

45. These loans were secured over a total of 7,204,296 Elektra shares belonging to Mr Salinas as collateral for the loans advanced by Astor 3 under the SLA (the "**Collateral Shares**"), of which 935,913 should be held by Weiser, and 6,268,383 should be held by Tavira.

46. As explained above, the Collateral Shares were to be held in securities accounts with Weiser and Tavira pursuant to the Depository Agreements.

47. As at 23 July 2024, the Collateral Shares had an aggregate market value of approximately MXN 7,565,879,616 (approximately US$416,394,035 at current exchange rates) – a very significant surplus over the total amount of the five loans.

**(11)   Initial evidence of sales of Elektra shares**

48. Although Elektra is a listed company, it is largely concentrated in private hands. Mr Salinas is the direct or indirect beneficial owner or controller of approximately 67,544,413 shares in Elektra, representing 30.47% of Elektra's share capital (disregarding the impact of the fraudulent scheme perpetrated by the Respondents).

49. Mr Salinas and his team receive a significant amount of data concerning the trading of the Elektra shares (including matters such as trading volume).

50. At the end of November 2021, Mr Salceda became aware of a seller of Elektra shares in the Mexican market, selling and participating with a significant percentage of the daily trading volume. It started with a 30% of the volume and at the end of July 2024, it was participating with the 18% of the volume. The sales were always made through different Mexican brokers, changing every day.

51. Mr Salceda feared that the cause of this unusual situation might be Astor 3, which had the practical ability (even if it lacked the legal right) to sell the Collateral Shares.

52.  On 10 June 2024, Mr Salinas wrote to Weiser and Tavira stating that Weiser and Tavira should not dispose of the Collateral Shares.

53.  Weiser and Tavira did not respond by way of letter. However, on 13 June 2024, Astor 3 responded by way of a letter dated 12 June 2024. It was not written on a normal corporate letterhead and did not identify any individual who sent the letter. The letter itself was sent by email from the "Operations" department at Astor Asset Management Group and the email did not identify any individual who could be contacted to discuss the letter.

54.  In the letter, Astor 3 asserted that it had an unrestricted right to dispose of the Collateral Shares. Astor 3 did not assert that any Event of Default had occurred under the SLA. Instead, Astor 3 stated that Mr Salinas should cease to "interfere" with the Depository Brokers. This letter gave rise to concerns that Astor 3 had disposed of a significant quantity of the Collateral Shares. Far from denying that disposals had taken place, Astor 3 effectively accepted that this had occurred (but sought to justify the disposals).

**(12)   The Applicants' investigations**

55.  These concerns led the Applicants to seek legal advice (privilege in which is not waived) and to appoint investigators to enquire into the affairs of the Astor group.

56.  The results of these investigations are summarised below. In short, it appears that the companies in the Astor group are controlled by Mr Sklarov, a fraudster who commits a particular type of fraud known as stock-lending fraud by which he seeks to gain control of valuable collateral before misappropriating it and/or its proceeds of sale.

57.  The investigators appointed by the Applicants, Forward Risk, have prepared a memorandum summarising their findings (the "**Forward Risk Report**"), which is in the hearing bundle.

**(13)   Mr Sklarov**

58.  Mr Sklarov has a long history of fraud. In the 1990s, for example, Mr Sklarov was convicted of felony charges in respect of Medicare fraud. He was sentenced to one year in prison and ordered to pay US$14 million in restitution.

59.  More recently, Mr Sklarov has been engaged in stock-lending fraud. His *modus operandi* often involves impersonating legitimate financial institutions such as the New York Stock Exchange, Barclays and Rothschild.

60.   For example, in a complaint filed by Barclays against Mr Sklarov in New York dated October 2020 (the "**Barclays Complaint**"), Mr Sklarov was sued for impersonating a lengthy list of entities associated with Barclays including Shearson Lehman.

61.   On 19 March 2021, Judge Kaplan (in the United States District Court for the Southern District of New York) entered a permanent injunction against Mr Sklarov and his attorney, an individual known as Jaitegh "JT" Singh ("**Mr Singh**"). Notably, the order was made with the consent of Mr Sklarov and Mr Singh, who signed the consent order.

62.   Mr Sklarov's long-standing practice of impersonating legitimate and reputable entities is also apparent from the decisions made in the cases involving the New York Stock Exchange (the "**NYSE Decision**") and Rothschild.

63.   The entities controlled by Mr Sklarov, which hold themselves out as being legitimate financial institutions, routinely seek to obtain control of valuable shares with a view to misappropriating those shares and/or their proceeds of sale.

64.   These dishonest activities have given rise to a substantial amount of litigation in various jurisdictions worldwide in which numerous victims of Mr Sklarov's frauds have sought to recover their assets from him.

65.   For example, the Barclays Complaint states as follows (at paragraphs 124 to 125):

> "*[124] Sklarov also has been sued by multiple parties for civil fraud in connection with the purported offering of securities-backed loans.*
>
> *[125] Although Sklarov has used various shell companies to perpetuate each alleged fraud, the fact patterns underlying each of the schemes are nearly identical: a Sklarov-related entity promises to provide a loan to a borrower backed by securities owned by the borrower; the borrower pledges the shares as collateral to the Sklarov-controlled entity; the Sklarov-controlled entity provides little if any of the promised loan funds to the borrower and then sells or attempts to sell the shares proffered only as collateral, and retains the proceeds*".

66.   A summary of the stock-lending frauds perpetrated by Mr Sklarov can be found in paragraphs 126 to 143 of the Barclays Complaint and paragraphs 52 to 62 of a complaint filed against Mr Sklarov by Brent Satterfield (the "**Satterfield Complaint**").

67.   In July 2021, the tribunal dealing with Mr Satterfield's claim against Mr Sklarov held that Mr Sklarov had committed a stock-backed lending fraud (the "**Satterfield Award**").

68. In the Satterfield Award, the tribunal provided a detailed description of Mr Sklarov's fraudulent scheme and held that he gave false and dishonest evidence to the tribunal: see e.g. paragraphs 177 and 178 of the Satterfield Award.

69. It is apparent from the Satterfield Award that the lending documentation in that case was drafted in very similar terms to the SLA in the present case.

70. It is unclear how many of Mr Sklarov's associates or accomplices are fictitious creations of Mr Sklarov's own mind and how many of them are real people. Mr Sklarov deploys an extensive range of pseudonyms, aliases and alter egos. For example, the High Court of St Kitts and Nevis ruled that Mr Sklarov had conspired to commit a stock-backed loan fraud under the alias "Mark Simon Bentley".

**(14)  Evidence that Astor 3 is controlled by Mr Sklarov**

71. The evidence indicates that Astor 3 is controlled by Mr Sklarov.

72. As a preliminary point, it is clear that Astor 3 is not a conventional financial institution: **(i)** Astor 3's letter dated 12 July 2024 is not on a normal corporate letterhead and does not identify any individual person who sent the letter. **(ii)** The website and email addresses set out in the SLA for Astor 3 appear to be invalid. **(iii)** Page 31 of the SLA identifies five offices around the world where Astor 3 is said to be located, but these all appear to be serviced offices. There is no evidence that Astor 3 has any meaningful physical presence anywhere. **(iv)** The SLA itself is very poorly drafted and there is no evidence that Astor 3 has conventional legal representation.

73. In those circumstances, it is difficult to believe that Astor 3 could fund loans worth hundreds of millions of dollars from its own capital (or by borrowing the money from legitimate third parties).

74. The SLA suggests that Astor 3 is registered in Vancouver, British Columbia. However, this does not appear to be correct. Furthermore, the British Columbia Securities Commission issued an Early Intervention Alert on 9 April 2020 stating:

> "*Astor Capital Fund Limited (Astor)*
>
> *Astor claims to have an office in Vancouver, British Columbia (BC), and offers wealth management and advisory services.*
>
> *Astor is not registered to trade in, or advise on, securities or derivatives in BC.*

*We urge BC residents to exercise caution when dealing with firms that are not registered to trade or advise in BC*".

75. The Tavira Agreement states that Astor 3 is registered in Quebec. It appears that this is correct. An extract from Astor 3's entry on the Quebec company registry purports to identify Astor 3's directors and beneficial owners, but the information gives rise to serious questions as to the propriety of the company: **(i)** According to the register, Astor 3 has a single director/administrator known as Jonathan Clifford Bibi, a former defender on the Seychelles national football team who has been involved in a series of cryptocurrency scams and was named as a fraudster by the State of Missouri in 2018. **(ii)** The SLA and the other contractual documents are ostensibly signed by "Mariia Mitsa" on behalf of Astor 3. She is described as a Managing Member of Astor 3. However, no such person is identified in the Quebec register, and the name "Mariia Mitsa" returns no Google search results. This name is likely to be a pseudonym. **(iii)** The register also states that the beneficial owner of Astor 3 is a person known as Oksana Hryn, who is said to be resident in Ukraine. As noted below, Oksana Hryn is a known associate of Mr Sklarov.

76. Astor 3's logo (as shown in the SLA) is the same as the logo of "Astor Wealth Group" which claims to have been founded by Thomas Mellon. As noted above, Thomas Mellon is one of the individuals who was copied to various emails when the SLA was being negotiated. However, it seems that Mr Mellon does not exist: the name is an alias of Mr Sklarov.  The court is referred to the Forward Risk Report on this point.

77. Astor 3 (and "Astor Wealth Group") have names which are similar to a legitimate mutual fund manager known as Astor Investment Management LLC. However, the latter entity appears to have completely different ownership from the Astor entities that are involved in the SLA. It seems that Mr Sklarov is again seeking to trade off the name of an existing legitimate investment manager.

78. There are a number of reasons to believe that Mr Sklarov is the true beneficial owner and controller of Astor 3.

79. Firstly, Indiana corporate records show that an entity called Astor Capital Fund Ltd was registered in the state as a foreign corporation in June 2019. When this entity was registered, Mr Sklarov was listed as the CEO. By April 2020, "Thomas Mellon" had replaced Mr Sklarov in the corporate records and became the CEO, director, and registered agent of Astor Capital Fund Ltd. Mr Sklarov's attorney, Mr Singh, was the

legal representative of Astor Capital Fund Ltd who signed the document authorizing "Thomas Mellon" as head of the company.

80. Secondly, the sole beneficial owner of Astor 3 (namely the supposed Ukraine resident described as "Oksana Hryn") is a known associate of Mr Sklarov. As to this:

81. In October 2021, "Oksana Hryn" was named as a co-plaintiff in a lawsuit alongside numerous other shell companies controlled by Mr Sklarov. Weiser was one of the defendants, and damages of US$450 million were sought. The lawsuit was described as "bizarre and seemingly frivolous" by OffshoreAlert. It was dismissed voluntarily after only 4 days.

82. In August 2023, Mr Singh wrote a letter to OffshoreAlert on behalf of "Oskana Hryn" offering to pay US$25,000 for the removal of an unfavourable article. The letters and emails from Mr Singh to OffshoreAlert are available online and are very surprising.

83. Thirdly, Mr Sklarov (via Mr Singh) attempted to register a trademark in the name of Astor Capital. This incident is described in paragraph 240 of the Barclays Complaint.

84. Fourthly, at least one of Astor 3's employees (namely "Albert Yuen") is a known associate of Mr Sklarov. Albert Yuen and Mr Singh are co-directors of an English company.

85. Fifthly, several online videos and blog posts suggest that "Astor Asset Management" is one of the shell companies used by Mr Sklarov. These blog posts appear to have been created by other victims of Mr Sklarov.

86. Sixthly, the SLA is notably similar to the contractual documents used in other reported cases where Mr Sklarov has been found liable for stock-backed lending fraud. The Satterfield Award is a particularly good example. In that case, the key operative provisions were essentially the same as the SLA in the present case (see paragraph 73); the contract contained a similar lengthy disclaimer at Clause 10 (see paragraph 80); the same "Closing Statements" were used (see paragraphs 82ff); and there were numerous other distinctive words and phrases which are the same or materially the same as those found in the SLA.

87. Seventhly, there is at least one reported case (from the Supreme Court of Jamaica) in which Astor 3 appears to have engaged in a stock-backed lending fraud. Injunctive relief was apparently granted in Hong Kong to restrain Astor 3 from disposing of the shares

(although the case was ultimately resolved on the basis that Astor 3 had operated in breach of the Hong Kong regulatory regime): see paragraph 7. The underlying facts of that case have all the hallmarks of a Sklarov fraud, and the contractual arrangements bear a striking similarity to the present case.

**(15)** **The Applicants' reaction to the discovery of the fraud**

88.    In light of the above, the Applicants believe that they have been victims of a stock-lending fraud conducted by Mr Sklarov via his company Astor 3. Through this fraud, Astor 3 has gained control of the Elektra shares owned by Mr Salinas and is wrongfully disposing of them contrary to the terms of the SLA and the Applicants' intentions.

89.    On 26 July 2024, Elektra issued the following press release:

> "*MEXICO CITY, July 26, 2024 /PRNewswire/ -- Grupo Elektra, S.A.B. de C.V. (BMV: ELEKTRA\* Latibex: XEKT), Latin America's leading specialty retailer and financial services company, and the largest non-bank provider of cash advance services in the United States, informs investors that it has received information from its controlling group regarding a possible fraud by depositaries of their shares, which could cause unusual movements of its share price on the stock markets.*
>
> *Thereafter, the company informs that it has made contact with the corresponding authorities to determine the applicable measures*".

90.    On the same date, Elektra's shares were suspended from trading by the Mexican stock exchange. This has provided some limited protection to the Applicants, since it is now more difficult for Astor 3 to continue selling the Collateral Shares (if there are any left). Nevertheless, the protection created by the trading suspension is temporary (since the suspension could be lifted by the Mexican stock exchange) and Astor 3 may be able to continue misappropriating the Collateral Shares (or their proceeds of sale).

**(16)** **Astor 3's response**

91.    On 30 July 2024, Mr Salceda received an email from "Global Operations" at Astor 3. The email enclosed a letter (erroneously dated 27 July 2024) asserting, for the first time, that the Applicants had committed numerous alleged Events of Default under the SLA. The covering email stated as follows:

> "*According to the Loan Agreement, the Loan is now Accelerated and all sums thereunder are now due, which includes loan amount, custody fees, maintenance*

*fees, collateral transfer fees and any other fees and costs imposed by the Custodian Brokers or Astor Asset Management 3 Ltd.*

*We bring to your attention that the default interest rate according to the Loan Agreement is 1.5% per month and will accrue for all outstanding debts effective immediately. This represents an annual fee of 18%.*

*Should you wish to discuss an informal settlement without prejudice and avoid the publicity surrounding your default, you may do so by contacting us. If your preference is to litigate, we will in the courts of England and Wales seek full remedy afforded to us under the Loan Agreement, including the return of all monies and fees computed at a monthly 1.5% default interest rate until such time as you make full settlement of all debts owed.*

*We would also be willing to enter into a a "Confidential Forbearance Agreement", whereby this Event of Default will be stayed indefinitely confidentially.*

*This Notice of Default and proposed confidential settlement discussion is being served upon you without prejudice and we reserve all rights afforded to us under the Loan Agreement and subsequent Addendums executed by the Lender, Borrower and Guarantor*".

92.   In fact, the Applicants are ready and able to repay all sums owing to Astor 3 immediately, and this would be their preferred course of action. The obvious problem is that Astor 3 has misappropriated Mr Salinas's shares, and Astor 3 might well take any money repaid by the Applicants without returning the shares. That is the whole point of the fraud that Astor 3 appears to be committing.

93.   As stated above, on 1 August 2024, Tavira informed the Applicants that it had transferred the 6,268,383 Elektra shares "*to Astor's account, as per Astor's instructions*".

94.   According to a trade report supplied by Tavira, this transfer to Astor took place on 29 July 2024. Thus, it seems that Astor 3 responded to the discovery of the fraud by attempting to misappropriate a very substantial proportion (approximately 86%) of the total shares with a value of approximately US$358 million at current exchange rates.

95.   Significantly, the transfer to Astor's account is said to have taken place **before** Astor 3 wrote to the Applicants to say that Events of Default had occurred and to demand repayment. This order of events is revealing. Needless to say, if Astor 3 had been operating as a legitimate and honest lender, it would have provided notice of any events of default and demanded repayment **before** taking any steps to appropriate the collateral.

## C.   THE CLAIMS

96.  It is necessary for the Applicants to satisfy the court that the Applicants' claims against the Respondents raise a serious issue to be tried (for the purposes of the proprietary injunctions and leave to serve out of the jurisdiction) and are good arguable claims (for the purposes of the freezing injunctions). Accordingly, the Applicants' claims against the Respondents are set out in this section of the Applicants' skeleton argument.

**(1)    <u>Misrepresentation</u>**

97.  The Applicants have rescinded the SLA on the basis that it was induced by fraudulent misrepresentations, and they seek to recover the Elektra shares on a proprietary basis. They also seek damages against Astor 3 and Mr Sklarov for the tort of deceit.

(i)    <u>The representations</u>

98.  Representations may be express or they may be implied from words or conduct: *Marme Inversiones 2007 SL v NatWest Markets plc* [2019] EWHC 366 (Comm) at [123] per Picken J. In the case of implied representations, "*the court has to consider what a reasonable person would have inferred was being implicitly represented from the words used in the conduct and context in which they were used*": *IFE v Goldman Sachs* [2007] 1 Lloyd's Rep 264 at [50] (in a passage applied subsequently in numerous cases including *Marme Inversiones* at [115] per Picken J and *Ivy Technology Ltd v Martin* [2022] EWHC 1218 (Comm) at [348] per Henshaw J). Whether or not a representation is implied is ultimately a question of fact to be determined in the circumstances of the particular case: see *Marme Inversiones 2007 SL* at [123] per Picken J and *Deutsche Bank AG v Unitech Global Ltd* [2013] EWCA Civ 1372 per Longmore LJ at [25].

99.  In the present case, the key representations were:

(1)    that Astor 3 was a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities; and

(2)    that Astor 3 intended to comply with its obligations under the SLA including in particular its obligations not to sell the Elektra shares prior to maturity or default.

100. The first of those representations was implicit in the circumstances of Astor holding itself out as a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities when offering to enter into the SLA.

101. As regards the second of these representations, *Chitty* explains at [10-14] (by reference to *Kingscroft Insurance v Nissan Fire & Marine Co* [2000] 1 All ER (Comm) 272 and *SK Shipping Europe Ltd v Capital VLCC 3* [2022] EWCA Civ 23): "*Making an offer may amount to a representation that in general terms the offeror intends and has the ability to perform the proposed contract, as they understand it*". See *Civil Fraud* at [1-045] ("*by entering into the contract the company impliedly represents that it has the present intention, and capacity, to perform its obligations*"). In *Kingscroft Insurance*, for example, Moore-Bick J held that "*the representation is likely in most cases to come down to no more than one of honesty in entering into the bargain*". Males LJ confirmed in *SK Shipping* at [51]: "*There are some circumstances where an offer to contract on certain terms carries with it an implied representation as to the party's honesty in relation to the proposed transaction. It is not necessary to see why this should be so. Such honesty is the necessary substratum for all commercial dealings. It goes without saying*". See, e.g., *Property Alliance Group v Royal Bank of Scotland plc* [2018] 1 WLR 3529 at [132]-[144]; *UBS AG v CWL* [2014] EWHC 3615 at [733]-[740]; and *Lindsay v O'Loughane* [2010] EWHC 529 at [103].

102. As set out above, the SLA involved the deposit of high-value shares as collateral for loans. Counterparty honesty is obviously highly important in such circumstances. A representation that the lender, who is given control over those shares, has the intention of complying honestly with its contractual obligations, including his obligation not to dispose of them wrongfully, is so obvious that it goes without saying and will therefore be readily implied. Indeed, no one would contract on any other basis.

(ii)  <u>Inducement</u>

103. It is necessary for the claimant to establish that the representor intended to induce him to act on the representation and that he did, in fact, rely on the representation in the sense intended by the representor: *Ivy Technology* at [361] per Henshaw J and *Marme Inversiones 2007 SL* at [281]-[286] per Picken J.

104. The representee must therefore establish that the misrepresentation operated on his mind and caused him, or helped to cause him, to act as he did. It is necessary for the claimant to establish that he was "*materially influenced*" by the representations in the sense that it was "*actively present to his mind*": *NIVE v Rembrandt Enterprises Inc* [2019] EWCA Civ 596 at [32] per Longmore LJ.

105.  It is not necessary to show that the false representation was the sole influence: see *Barton v County Natwest Ltd* [1999] Lloyd's Rep Bank 408 at 421.

106.  If the representation in question would likely play a part in the decision of a reasonable person to enter into a contract, there is an evidential presumption that the representation induced the representee: *Marme Inversiones 2007 SL* at [291] per Picken J and *NIVE v Rembrandt Enterprises Inc* at [25] per Longmore LJ.

107.  However, the legal burden remains with the claimant, and the court must ultimately determine whether the representee was induced by the representation on the basis of all the evidence available to it: see *Ivy Technology* at [366] and [367].

108.  In the present case:

(1)  Mr Salceda has explained in his affidavit that he understood Astor 3 to have made those representations (prior to the execution of the SLA on 28 July 2021) and that the Applicants executed the SLA on 28 July 2021 in reliance on those representations.

(2)  Mr Salceda has also explained that the Applicants were induced by those representations into executing the SLA and providing the Elektra shares to Weiser and Tavira. The Applicants also entered into the Closing Statements and the Depository Agreements in reliance on the representations made by Astor 3.

(3)  Mr Salceda has explained in his affidavit that the provisions of Clause V of the SLA were expressly discussed in pre-contractual negotiations and that the representations and warranties to be given by Astor 3 in Clause V were of great importance to him and Mr Salinas. He has made clear that, without those representations and warranties, the Applicants would not have entered into the SLA.

(iii)  <u>Falsity</u>

109.  In light of the facts and matters set out above, the representations were false:

(1)  Astor 3 is not a legitimate and honest financial institution which engages in legitimate and honest stock-lending activities. To the contrary, it is a creature of Mr Sklarov, a fraudster, which exists to commit stock-lending fraud.

(2)   It is to be inferred that Astor 3 never honestly intended to comply with its obligations under the SLA including in particular its obligations not to sell the Elektra shares prior to maturity or default. Rather, in accordance with the established modus operandi of Mr Sklarov, it intended from the outset to get control of the Elektra shares with a view to misappropriating them. This must always have been Astor 3's intention. There is no credible reason to believe that Astor 3 ever had any honest intention to act in accordance with its contractual obligations in relation to the Collateral Shares.

(iv)   <u>Rescission</u>

110. Rescission for fraudulent misrepresentation is a self-help remedy. The role of the court is to decide whether a notice of rescission was validly given. See, generally, *Civil Fraud* at [22-029], [22-033]-[22-035] and [22-038]-[22-040].

111. In the present case, on 1 August 2024, the Applicants sent a notice to Astor 3 rescinding the SLA, the Closing Statements and the Depository Agreements.

112. The Applicants seek a declaration that the SLA, the Closing Statements and the Depository Agreements have been rescinded.

(v)   <u>Proprietary claim</u>

113. As a result of rescission for fraudulent misrepresentation, Mr Salinas has a proprietary claim to recover the Collateral Shares: see *Shalson v Russo* [2005] Ch 281 at [106]-[120] per Rimer J and *Civil Fraud* at [22-061]-[22-063].

114. The Applicants seek a declaration that Mr Salinas is the beneficial owner of the Collateral Shares and the traceable proceeds of the Collateral Shares and an order requiring the First to Third Respondents to return the Collateral Shares (comprising 5,476,089 Elektra shares) or their proceeds to Mr Salinas forthwith.

115. The Applicants will of course provide *restitutio in integrum* to the First to Third Respondents in an amount equal to the loans advanced under the SLA, and they are willing and able to do so (against the return of the Collateral Shares in full).

(vi)   <u>Damages for deceit</u>

116. The Applicants seek damages for the tort of deceit from Astor 3.

117. The basic ingredients in a claim for the tort of deceit are that: (i) the defendant made a false representation to the claimant; (ii) the defendant knew the representation to be false, or had no belief in its truth, or was reckless as to whether it was true or false; (iii) the defendant intended the claimant to rely on the representations; (iv) the claimant did rely on the representation; and (v) as a result the claimant has suffered loss and damage.

118. The factual position in the present case has been set out above. In the circumstances, Astor 3 will have known that the representations were false.

119. The Applicants will have suffered loss and damage equal to the value of any Elektra shares which are not recovered by them on a proprietary basis.

120. Accordingly, Astor 3 is liable to pay damages to the Applicants for the tort of deceit in respect of any losses sustained by the Applicants in consequence of entering into the SLA, the Closing Statements and the Depository Agreements.

**(2)** **Contractual claims**

121. In the alternative, if (but only if) the SLA has not been (and cannot be) rescinded, the Applicants seek: (i) an order for redemption; and (ii) damages for breach of contract.

(i) Order for redemption

122. The redemption action is part of equity's long-standing determination to ensure that a mortgagor or chargor is always able to exercise his right to redeem the security. The courts have explained repeatedly that the policy of courts of equity is always to ensure that there is nothing to prevent redemption. See, for example, *Noakes v Rice* [1902] AC 24. The redemption action has been "*well-known to equity for hundreds of years*": see *Shearer v Spring Capital Limited* [2013] EWHC 3148 (Ch) at [123]. A redemption action is brought for the specific purpose of determining how much is due to the lender and facilitating repayment to rid the charged property of any encumbrances: see *Adonis Investments Ltd v Ansbacher Bankers Ltd* [1997] 3 WLUK 619. Typically, redemption actions are brought where the mortgagee fails or refuses to provide a redemption statement or to accept payment or where the mortgagee cannot be found.

123. In the present case, if the SLA cannot be rescinded for misrepresentation, the court will be asked to make an order for redemption of the security held by Astor 3 over the

Collateral Shares. This would involve the delivery up of the Collateral Shares to Mr Salinas against the payment of all sums owing to Astor 3 under the SLA.

124. As mentioned above, the Applicants are willing and able to repay everything owing to Astor 3 (but only against the return of the Collateral Shares in full). Astor 3 purports to have accelerated the loans, such that they are due and payable immediately. Accordingly, Astor 3 cannot validly object to repayment; and, on such repayment, it will be obliged to return the Collateral Shares to Mr Salinas in full.

125. On this basis, it is apparent that Astor 3 cannot have any defence to the Applicants' claim to recover the shares. Either (as the Applicants say) the SLA has been rescinded, such that Astor 3 must return the Collateral Shares as part of the requisite *restitutio in integrum*, or (as Astor 3 contends) the SLA is valid and binding, in which case Astor 3 must return the Collateral Shares on repayment of the loan in full.

126. In short, whether or not the SLA subsists as a valid agreement, Astor 3 must accept repayment of the amount of the five loan tranches and return the Collateral Shares.

(ii)   <u>Damages for breach of contract</u>

127. To the extent that Astor 3 has wrongly sold or otherwise dealt with Collateral Shares contrary to the terms of the SLA, it will be liable to the Applicants in damages for breach of contract. (As noted above, this is a claim which will lie against Astor 3 only in the event that the SLA cannot be rescinded by the Applicants.)

**(3)   <u>Economic torts</u>**

128. Further or alternatively, the Applicants seek damages from Astor 3 and Mr Sklarov for the torts of: (i) intention to cause harm using unlawful means; and/or (ii) conspiracy to cause harm using unlawful means.

129. As regards the former (intention to cause harm using unlawful means), see *Clerk & Lindsell on Torts*, 24th ed., Chapter 23, Section 4. As regards the latter (conspiracy to cause harm using unlawful means), see *Clerk & Lindsell on Torts*, 24th ed., Chapter 23, Section 5. The key difference for present purposes is that the former tort may be committed by one person alone whereas the latter requires a combination of persons. Otherwise, the torts are substantially similar. There must be an intention on the part of

the defendant(s) to cause harm to the claimant using unlawful means and the claimant must suffer harm as a result of the use of those unlawful means against him.

130. In the present case, Astor 3 and Mr Sklarov pursued a course of conduct which they knew would be bound to be injurious to the interests of the Applicants. In other words, the loss to the Applicants was the other side of the coin from gain to Astor 3 and Mr Sklarov: see *OBG Ltd v Allen* [2007] UKHL 21, [2008] 1 AC 1 at [134] and [167].

131. The unlawful means comprised: (i) the making of fraudulent misrepresentations; and/or (ii) breach of contract. These two ingredients of this claim have been addressed above.

132. As matters stand, it is unclear whether the relevant intention was held by anyone other than Mr Sklarov. As explained above, there are indications that some of the individuals who purport to act for Astor 3 are in fact figments of Mr Sklarov's imagination or alter egos. However, this ultimately makes no difference to his liability. If he acted alone, both he and Astor 3 will be liable for the tort of causing harm using unlawful means; whereas, if he acted in concert with other individuals, he and Astor 3 will be liable for the tort of conspiracy to cause harm using unlawful means. The debate as to whether a director of a one-man company can enter into a conspiracy with his own company (see, for example, *R v McDonnell* [1966] 1 QB 233 and the discussion in *Clerk & Lindsell on Torts*, 24th ed., [23-106]) does not have any relevance in the present case.

### D.   **PROPRIETARY INJUNCTION**

133. The Applicants seek an interim proprietary injunction to restrain each of the Respondents from dealing with or disposing of the Collateral Shares or the proceeds of the Collateral Shares. As set out above, it is the Applicants' position that the Collateral Shares (and their proceeds) belong, and have always belonged, to Mr Salinas, *a fortiori* after rescission of the SLA. Injunctive relief is necessary to ensure that the Collateral Shares and their proceeds are not the subject of any further misappropriations.

### (1)   **The law in respect of proprietary injunctions**

134. The relevant principles on the granting of a proprietary injunction were set out by Morgan J in *Sukhoruchkin v Van Bekestein* [2013] EWHC 1993 (Ch) at [7] to [8]:

> "*[7] The established view is that the requirements for a proprietary injunction are not identical to those for a freezing injunction. The principles to be applied are the normal American Cyanamid principles. These are that the Claimants must show*

*that there is a serious issue to be tried, that damages would not be an adequate remedy for the Claimants and that the balance of convenience or balance of justice favours the grant of an injunction. This formulation of the relevant principles refers to a claimant showing a serious issue to be tried rather than showing a good arguable case. It is generally understood that a requirement to show a good arguable case is more onerous than showing only a serious issue to be tried. Nonetheless, it has been said in relation to the American Cyanamid principles that where the scales are evenly balanced in relation to the balance of convenience, one can take into account the relative strengths of the parties' cases …*

*[8] The above statement of the principles, in relation to a claim for a proprietary injunction, does not expressly include a requirement that the Claimants must show that there are substantial grounds for concluding that there is a real risk of the relevant assets being disposed of, so that a judgment in favour of the claimants would go unsatisfied. In this context, the court is considering something which the claimant may establish at the trial is its asset or an asset in which it has an interest and not just the defendant's asset. Nonetheless, the reality of any threat to interfere with the property in which the claimant says that it has a proprietary interest must be relevant to the court's decision whether to intervene by granting an injunction*".

135. As Flaux J explained in *Madoff Securities International Ltd v Raven* [2011] EWHC 3102 (Comm) at [128]:

"*In other words, both the basis for a proprietary injunction and the circumstances in which it will be granted are different from the case of a freezing injunction … In particular, unlike in the case of a freezing injunction, it is not necessary to show any risk of dissipation of assets and, even if there has been delay in making an application which might lead to refusal of a freezing injunction, a proprietary injunction may nonetheless be granted*".

136. See also *Keane v Herbert Reeves & Co* [2015] EWHC 3208 (QB) at [42]:

"*The test for obtaining a proprietary injunction is whether there is a serious issue to be tried rather than, as in the case of a freezing injunction, whether the claimant has a good arguable case. There is good reason for this difference. A claimant who asks for a proprietary injunction is seeking to freeze what he claims is his property. A claimant who seeks a freezing injunction by contrast is seeking to interfere with the property rights of others*".

## (2)  **Proprietary injunction in the present case**

137. In the present case, the Applicants submit that:

(1)  The proprietary claim meets the 'serious issue to be tried' threshold. The factual and legal grounds of the proprietary claims have been set out above.

(2) Damages would not be an adequate remedy, because an unsecured damages claim is plainly no substitute for the recovery of assets on a proprietary basis. Further, there must be (at the very least) serious doubt as to whether Mr Sklarov, a known fraudster with a long track record of dishonest dealings, and his company, Astor 3, would be able to pay, or would pay, any award of damages in full.

(3) The balance of convenience or balance of justice favours the grant of an injunction. The Collateral Shares or their traceable proceeds in the hands of the Respondents should be preserved until trial to provide the Applicants with an opportunity to vindicate their proprietary claims. Proprietary injunctions will enable the Court to preserve the status quo pending the determination of the Applicant's proprietary claim and prevent prejudice to the Applicants.

138. The assets to be covered by the proprietary injunction have been set out clearly and precisely in the draft proprietary injunction.

### E.    **WORLDWIDE FREEZING ORDERS**

139. The Applicants also seek a worldwide freezing injunction against Astor 3 and Mr Sklarov.

### (1)    **The law in respect of worldwide freezing orders**

#### (i)    Good arguable case

137. An applicant must show that he has a "*good arguable case*" on the merits.

138. The test for a good arguable case in the context of freezing injunctions is not a particularly onerous one (*Lakatamia Shipping Co Ltd v Morimoto* [2019] EWCA Civ 2203 per Haddon-Cave LJ at [35]).

139. However, following the decision of Bright J in *Unitel v UIH* [2023] EWHC 3231 (Comm), and pending clarification by the Court of Appeal, it appears necessary to address the threshold test for good arguable case on two bases:

(1) On the basis enunciated by Mustill J in *Ninemia Martitime Corp v Trave Schiffahrtsgesellschaft GmbH ('The Niedersachsen')* [1983] 1 WLR 1412, namely that the Applicants' case is "*more than barely capable of serious argument, but not necessarily one which the judge considers would have a better than 50 per cent*

*chance of success*" (as applied in (for example) *Magomedov v TGP Group Holdings (SBS) LP* [2023] EWHC 3134 (Comm) (Butcher J)); and

(2) On the basis that the Applicants are required to show the better of the argument; e.g., in *Harrington & Charles Trading Co Ltd v Mehta* [2022] EWHC 2960 (Ch) (Edwin Johnson J), "*It is perfectly proper for a court, in applying the test of good arguable case, to adopt the yardstick of considering whether one party or the other has the better of the argument, both on a particular issue and on the relevant case as a whole*"; see *Unitel* at [39]-[43] and also *Chowgule & Co Pte Ltd v Shire* [2023] EWHC 2815 (Comm) per Dias J.

140. In particular, in *Unitel*, Bright J. noted a tension in the authorities ("*I cannot help but note that the law is in a confused state, which cries out for a definitive answer from the Court of Appeal ...* " at [37]), and therefore proceeded to determine the application before him applying both possible threshold tests, with a view to granting permission to appeal if the issue had proved to be determinative (which it did not); see [38] [62] and [69].

141. It is submitted that this approach should be adopted on this application. Whichever test is adopted in terms of good arguable case, it is plainly met.

(ii) <u>Real risk of dissipation</u>

142. The applicant must also satisfy the Court that there is a good arguable case that there is, without an injunction, a real risk that a judgment in favour of the applicant would go unsatisfied, in the sense of a real risk that, unless restrained by an injunction, the defendant will dissipate or dispose of his assets other than in the ordinary course of business (*Ninemia Maritime Corp v Trave Schiffahrtsgesellschaft GmbH (The Niedersachsen)* [1983] 1 WLR 1412 per Kerr LJ at 1422; *Thane Investments Ltd v Tomlinson (No 1)* [2003] EWCA Civ 1272 per Peter Gibson LJ at [21]).

143. See also *Holyoake v Candy* [2017] EWCA Civ 92; [2018] Ch 297 at [34] per Gloster LJ and *Lakatamia Shipping Company Limited v Toshiko Morimoto* [2019] EWCA Civ 2203; [2020] All ER (Comm) 259 at [33]-[34] per Haddon-Cave LJ.

144. An applicant for a freezing order does not need to establish the existence of a risk of dissipation on the balance of probabilities. It is sufficient for the applicant to prove a

danger of dissipation to the 'good arguable case' standard (*Lakatamia Shipping Co Ltd v Morimoto* [2019] EWCA Civ 2203 per Haddon-Cave LJ at [36]).

145.    Further, it is not necessary to show that a judgment would be completely defeated. In order to establish jurisdiction, it is enough to show that the enforcement of any judgment would be more difficult (*Congentra AG v Sixteen Thirteen Marine* [2008] EWHC 1615 (Comm) per Flaux J at [49]; see also *Metropolitan Housing Trust Ltd v Taylor* [2015] EWHC 2897 (Ch) per Warren J at [28]).

146.    The relevant considerations were summarised by Males J in *National Bank Trust v Yurov* [2016] EWHC 1913 (Comm) at [69]-[70]:

> "*(a) The claimant must demonstrate a real risk that a judgment against the defendant may not be satisfied as a result of unjustified dealing with a defendant's assets.*
> *(b) That risk can only be demonstrated with solid evidence; mere inference or generalised assertion is not sufficient.*
> *(c) It is not enough to rely solely on allegations that a defendant has been dishonest; rather it is necessary to scrutinise the evidence to see whether the dishonesty in question does justify a conclusion that assets are likely to be dissipated.*
> *(d) The relevant inquiry is whether there is a current risk of dissipation; past events may be evidentially relevant, but only if they serve to demonstrate a current risk of dissipation of the assets now held.*
> *(e) The nature, location and liquidity of the defendant's assets are important considerations.*
> *(f) Whether or to what extent the assets are already secured or incapable of being dealt with is also relevant.*
> *(g) So too is the defendant's behaviour in response to the claim or anticipated claim*".

147.    The relevant considerations were also usefully summarised by Popplewell J in *Fundo Soberano de Angola v Jose Filomeno dos Santos* [2018] EWHC 2199 (Comm) at [86] (approved in *Lakatamia Shipping Co Ltd v Morimoto* [2019] EWCA Civ 2203 subject to the amendment marked in square brackets below) as including the following:

> "*(1) The claimant must show a real risk, judged objectively, that a future judgment would not be met because of an unjustified dissipation of assets. In this context dissipation means putting the assets out of reach of a judgment whether by concealment or transfer.*
> *(2) The risk of dissipation must be established by solid evidence; mere inference or generalised assertion is not sufficient.*
> *(3) The risk of dissipation must be established separately against each respondent.*
> *(4) It is not enough to establish a sufficient risk of dissipation merely to establish a good arguable case that the defendant has been guilty of dishonesty; it is necessary to scrutinise the evidence to see whether the dishonesty in question points to the*

*conclusion that assets [may] be dissipated. It is also necessary to take account of whether there appear at the interlocutory stage to be properly arguable answers to the allegations of dishonesty.*

*(5) The respondent's former use of offshore structures is relevant but does not itself equate to a risk of dissipation. Businesses and individuals often use offshore structures as part of the normal and legitimate way in which they deal with their assets. Such legitimate reasons may properly include tax planning, privacy and the use of limited liability structures.*

*(6) What must be threatened is unjustified dissipation. The purpose of a freezing order is not to provide the claimant with security; it is to restrain a defendant from evading justice by disposing of, or concealing, assets otherwise than in the normal course of business in a way which will have the effect of making it judgment proof. A freezing order is not intended to stop a corporate defendant from dealing with its assets in the normal course of its business. Similarly, it is not intended to constrain an individual defendant from conducting his personal affairs in the way he has always conducted them, providing of course that such conduct is legitimate. If the defendant is not threatening to change the existing way of handling their assets, it will not be sufficient to show that such continued conduct would prejudice the claimant's ability to enforce a judgment. That would be contrary to the purpose of the freezing order jurisdiction because it would require defendants to change their legitimate behaviour in order to provide preferential security for the claim which the claimant would not otherwise enjoy.*

*(7) Each case is fact specific and relevant factors must be looked at cumulatively*".

148. Where an applicant for a freezing injunction relies on the respondent's dishonesty, the authorities make clear that the court must scrutinise with care whether what is alleged to have been the dishonesty of the person against whom the order is sought in itself really justifies the inference that that person has assets which he is likely to dissipate unless restricted (*Thane Investments Ltd v Tomlinson* [2003] EWCA Civ 1272 *per* Peter Gibson LJ at [28]). However, where the dishonesty alleged is at the heart of the claim against the relevant defendant, the court may well find itself able to draw the inference that the making out, to the necessary standard, of that case against the defendant also establishes sufficiently the risk of dissipation of assets (*VTB Capital Plc v Nutritek International Corp* [2012] 2 Lloyd's Rep 313 (CA) at [169]-[178], citing *Madoff Securities International Ltd v Raven* [2011] EWHC 3102 (Comm) per Flaux J at [163]-[167]).

149. As Haddon-Cave LJ explained in *Lakatamia*, *supra*, at [51]:

"*(1) Where the court accepts that there is a good arguable case that a respondent engaged in wrongdoing against the applicant relevant to the issue of dissipation, that holding will point powerfully in favour of a risk of dissipation.*

*(2) In such circumstances, it may not be necessary to adduce any significant further evidence in support of a real risk of dissipation; but each case will depend upon its own particular facts and evidence*".

**(2)    Worldwide freezing orders in the present case**

140.    On the Applicants' case, Astor 3 and Mr Sklarov have carried out a fraudulent scheme to misappropriate the property of Mr Salinas, worth many hundreds of millions of US dollars. It is submitted that the Applicants have a good arguable case.

141.    Further, it is likely that the Respondents have assets against which the Applicants could enforce. After all, the Respondents have (on the Applicants' case) carried out an enormous fraud, and the fruits of that fraud must be found somewhere. It is possible that any assets held by Respondents are held on trust for the Applicants, but that is not necessarily the case. The Applicants could easily find themselves in a position where they need to execute a sizeable judgment against the Respondents' assets.

142.    Accordingly, there are grounds for believing that the Respondents own assets that will be caught by the proposed worldwide freezing order and that any such order will not be futile: see *Ras Al Khaimah Investment Authority v Bestfort Development LLP* [2017] EWCA Civ 1014; [2018] 1 WLR 1099 at [39].

143.    It is unknown where the Respondents' assets are located, but they could be anywhere around the world. To take Astor 3 as an example, this is an entity incorporated in Canada with a sole purported director in the Seychelles and a sole purported beneficial owner in Ukraine. Tavira is incorporated in Monaco and Weiser is incorporated in the Bahamas. Mr Sklarov is said to be resident in either the United States or Ukraine. This illustrates why a worldwide freezing order is required.

144.    There is a real risk of dissipation. This is a risk that must necessarily arise in circumstances where the Respondents have conspired to commit a large-scale international fraud against the Applicants.

145.    For the same reasons, the Applicants submit that it is just and convenient for a worldwide freezing injunction to be granted.

146.    The draft Order provides that the freezing order is limited to the sum of MXN 5,411,000,000 which is the value of the shares (MXN 7,565,879,616) less the principal amount of the loans (MXN 2,154,218,552), rounded down to the nearest MXN 1 million.

147. The Applicants are willing to give an unlimited cross-undertaking in damages (in the standard form set out in the Commercial Court Guide). As noted above, Mr Salinas is one of the wealthiest individuals in Mexico.

148. The Applications have been made without notice to the Respondents because the Respondents are carrying out a scheme to defraud the Applicants. Mr Sklarov is an experienced and sophisticated fraudster. It is necessary for interim relief to be granted against the Respondents before they have a chance to misappropriate any remaining Collateral Shares (or the proceeds thereof)

149. That is also the reason why the Applications are urgent and need to be heard as quickly as possible. In this regard, the Applicants have acted promptly to issue the Applications. The Applicants and their legal team moved as quickly as possible after the privileged report from Forward Risk was received on Wednesday 31 July 2024, and that report was commissioned on the very same day (Thursday 26 July 2024) that the Applicants were advised by their legal team that a fraud was potentially being committed. Further, the recent correspondence with Tavira that suggests that the entirety of the Collateral Shares formerly held by it have now been transferred to Astor 3 it is imperative that the Applicants obtain interim protection urgently to prevent any further misappropriation of the Collateral Shares or their proceeds.

## F.    DISCLOSURE ORDERS

150. The court is asked to require the Respondents to provide information regarding their assets (in the standard form of disclosure order set out in the Commercial Court Guide).

151. In addition, certain bespoke disclosure orders are required in the present case to support the injunctive relief by assisting the Applicants in identifying the location of Mr Salinas' shares.  The relevant questions, which the Respondents should be ordered to answer, have been set out in Schedule C of the draft order.

## G.    SERVICE

152. By the Service Application, the Applicants seek (i) an order giving them permission to serve the claim form on the Respondents out of the jurisdiction under CPR 6.36 as well as any other subsequent documents arising within the claim pursuant to CPR 6.37(5)(b)(ii); and (ii) an order permitting service of the claim form (and all other documents in the proceedings) by an alternative method under CPR r 6.37(5)(b)(i). In

such circumstances the Court must consider first whether to order service out of the jurisdiction and secondly whether to order alternative service (*Marashen Ltd v Kenvett Ltd* [2017] EWHC 1706 (Ch); [2018] 1 WLR 288 at [17]-[18]).

**(1)** **Service out of the jurisdiction**

(i) The law in respect of service out of the jurisdiction

153. The Privy Council confirmed in *Altimo Holdings & Investment Ltd v Kyrgyz Mobil Tel Ltd* [2012] 1 WLR 1804 at [71] that there are three requirements:

(1) The first requirement is that the claimant must satisfy the court that in relation to the foreign defendant there is a serious issue to be tried on the merits, i.e. a substantial question of fact or law or both: *Altimo* at [71]. This is the same as the test for summary judgment under Part 24 of the CPR, namely whether the claimant has a real prospect of success: see *De Molestina v Ponton* [2002] 1 Lloyd's Rep 271 at 281 per Colman J; *MRG v Engelhard Metals Japan* [2004] 1 Lloyd's Rep 731 at 732 per Toulson J; and C*arvill America Incorporated v Camberdown UK Ltd* [2005] 2 Lloyd's Rep 457 at [24] per Clarke LJ.

(2) The second requirement is that the claimant must satisfy the court that there is a good arguable case that the claim falls within one of the gateways in paragraph 3.1 of Practice Direction 6B: *Altimo* at [71]. See also *Seaconsar Far East Ltd v Bank Markazi Jomhouri Islam Iran* [1994] 1 AC 438 at 453 per Lord Goff. (It has been held that a serviceable test for "good arguable case" in this context is that the party seeking permission to serve out has the better of the argument on the materials available (*Brownlie v Four Seasons Holdings Inc* [2017] UKSC 80; [2018] 1 WLR 192, per Lord Sumption at [7]).)

(3) The third requirement is that the claimant must satisfy the court that England is the appropriate forum for the trial of the dispute, i.e. the forum conveniens: *Altimo* at [71]. In the familiar phrase, this is the place where the claim may be tried "*suitably for the interests of all the parties and for the ends of justice*": see *Spiliada Maritime Corporation v Cansulex* [1987] AC 460 at 482. (The Supreme Court held in *Vedanta Resources plc v Lungowe* [2020] AC 1045 at [68] that the claimant is required to establish that England is the proper place in which the claims against all of the defendants are most suitably tried together.)

(ii)    <u>The position in the present case</u>

a.    *Serious issue to be tried*

154.    For the reasons set out above it is submitted that there is a serious issue to be tried on the merits, i.e. a substantial question of fact or law or both.

b.    *Jurisdictional gateways*

155.    In the present case, the Applicants rely on three jurisdictional gateways.

156.    First, in respect of their primary claim (for a declaration that the SLA has been rescinded and relief consequent upon rescission) and their alternative claim (for redemption and damages for breach of contract), the Applicants rely on para 3.1(6) and (8) of PD6B:

> "*(6) A claim is made in respect of a contract where the contract –*
> *(a) was (i) made within the jurisdiction or (ii) concluded by the acceptance of an offer, which offer was received within the jurisdiction;*
> *(b) was made by or through an agent trading or residing within the jurisdiction or*
> *(c) is governed by the law of England and Wales.*
> *...*
> *(8) A claim is made for a declaration that no contract exists where, if the contract was found to exist, it would comply with the conditions set out in paragraph (6)*".

157.    Secondly, in respect of their tort claims against Astor (seeking damages for the torts of deceit, causing harm by unlawful means and/or conspiracy to cause harm using unlawful means), the Applicants rely on para 3.1(4A) of PD6B:

> "*(4A) A claim is made against the defendant which—*
> *...*
> *(c) falls within one or more of paragraphs ... (6) to (16A) ... and a further claim is made against the same defendant which arises out of the same or closely connected facts*".

158.    Third, in respect of their tort claims against Mr Sklarov (seeking damages for the torts of causing harm by unlawful means and/or conspiracy to cause harm using unlawful means), the Applicants rely on paragraph 3.1(3) of PD6B:

> "*(3) A claim is made against a person ('the defendant') on whom the claim form has been or will be served (otherwise than in reliance on this paragraph) and –*
> *(a) there is between the claimant and the defendant a real issue which it is reasonable for the court to try; and*
> *(b) the claimant wishes to serve the claim form on another person who is a necessary or proper party to that claim*".

33

159. Although there are textual differences between paragraph 3.1(3) of Practice Direction 6B and the former provisions of RSC Ord.11, "*the differences are not intended to reflect any change in the underlying principles*": see *MRG v Engelhard Metals Japan* [2004] 1 Lloyd's Rep 731 per Toulson J at 732 and *United Film Distribution Ltd v Chhabria* [2001] 2 All ER (Comm) 865 (CA). Accordingly, the older authorities remain relevant.

160. The 'necessary or property party' test has two limbs.

161. First, the Court must be satisfied that there is a "*real issue*" between the claimant and the anchor defendant which is "reasonable for the court to try". In substance the "real issue" aspect of the test is the same as the test for summary judgment under Part 24: see *Altimo* at para 82 ("*There is no practical difference between the two tests*"). In *Ellinger v Guinness, Mahon & Co* [1939] 4 All ER 16, Morton J said at 22 (in a passage cited with approval by the Privy Council in *Altimo* at para 65):

> "*I do not think it is part of the function of the court, in considering whether an action is 'properly brought' against a party within the jurisdiction, to arrive at a conclusion as to whether the plaintiff will or will not succeed against that party. It is enough if the court is satisfied that there is a real issue between the plaintiff and that party which the plaintiff may reasonably ask the court to try*".

162. The question whether it is reasonable for the English court to try the claim between the claimant and the anchor defendant is an objective one: it is not the same question as whether it was reasonable for the claimant to start proceedings against that defendant in the jurisdiction: *Erste Group Bank AG v JSC "VMZ Red October"* [2015] 1 CLC 706. It may not be reasonable for the English court to try a claim even if it plainly has jurisdiction (e.g, because of an exclusive jurisdiction clause): *Erste* at [78 (vii)]. As explained in *Gunn v Diaz* [2017] EWHC 157 "*the court will have to consider, among other matters, if there is any utility in trying the claims against the anchor defendant. If the claimant has nothing to gain from a trial of those issues here, even a trial to the stage of obtaining summary judgment (other than using the claim against the anchor defendant as a vehicle for bringing in the target defendant) the second limb* [i.e. reasonable for the English court to try the claim] *will not be satisfied*".

163. Secondly, the Court must be satisfied (to the 'good arguable case' standard) that the foreign defendant is a "*necessary or proper party*" to the claimant's claim against the anchor defendant. The meaning of "*necessary or proper party*" was authoritatively explained by Lord Esher MR in *Massey v Heynes & Co* (1888) 21 QDB 330 at p. 338:

"*The question, whether a person out of the jurisdiction is a 'proper party' to an action against a person who has been served within the jurisdiction, must depend on this – supposing both parties had been within the jurisdiction, would they have been proper parties to the action? If they would, and only one of them is in this country, then the rule says that the other may be served, just as if he had been within the jurisdiction*".

164. This test has been applied repeatedly. See, for example, *Qatar Petroleum Producing Authority v Shell Internationale* [1983] 1 Lloyd's Rep 35 per Ackner LJ at p.41, *Barings plc v Coopers & Lybrand* [1997] I L PR 12 per Chadwick J at paras 14 and 15 and *Nilon Limited v Royal Westminster Investments SA* [2015] UKPC 2 at 15(8).

165. It is accordingly necessary to consider the rules for joinder in CPR 19.2(2):

"*(2) The court may order a person to be added as a new party if –*

*(a) it is desirable to add the new party so that the court can resolve all the matters in dispute in the proceedings; or*

*(b) there is an issue involving the new party and an existing party which is connected to the matters in dispute in the proceedings, and it is desirable to add the new party so that the court can resolve that issue*".

166. A person who could be joined as a new party within CPR 19.2(2) will be a proper party for the purposes of paragraph 3.1(3) of PD6B: see *United Film Distribution Ltd v Chhabria* [2001] EWCA Civ 416 at paras 36 to 38. See also *Barings plc v Coopers & Lybrand* [1997] I L PR 12 per Chadwick J at para 18 and *889457 Alberta Inc v Katanga Mining Ltd* [2008] EWHC 2679 (Comm) per Tomlinson J at para 26.

167. For this reason, it has been said that a foreign defendant will be a 'necessary or proper party' to a claim against a defendant within the jurisdiction "*when the liability of several persons depends on one investigation*" (*Massey v Heynes & Co* (1888) 21 QDB 330 per Lindley LJ at 338; *Petroleo Brasiliero SA v Mellitus Shipping Inc (The Baltic Flame)* [2001] 2 Lloyd's Rep 203 per Potter LJ at para 33); or when the claims "*give rise to common questions of fact*" (*United Film Distribution Ltd v Chhabria* [2001] 2 All ER (Comm) 865 (CA) per Blackburne J at para 40); or when the claimant's claim against the foreign defendant is "*closely bound up*" with the claimant's claim against the defendant within the jurisdiction (*Carvill America Incorporated v Camberdown UK Ltd* [2005] 2 Lloyd's Rep 457 per Clarke LJ at para 46).