168. In the Applicants' submission, the gateway in paragraph 3.1(3) of PD6B is applicable. Claims are being made against Astor 3 (on whom the claim form will be served other than in reliance on para 3.1(3) of PD6B) and that claim gives rise to real issues which it is reasonable for the court to try. Mr Sklarov is a necessary or proper party to the claim against Astor 3. In respect of the claims for causing harm by unlawful means and conspiracy to cause harm by unlawful means, this is a case in which "*the liability of several persons depends on one investigation*" (*Massey v Heynes & Co* (1888) 21 QDB 330 per Lindley LJ at 338). Further, the claims "*give rise to common questions of fact*" (*United Film Distribution Ltd v Chhabria* [2001] 2 All ER (Comm) 865 (CA) per Blackburne J at para 40); and the claims against Mr Sklarov are "*closely bound up*" with the claim against Astor 3.

c.   *Forum conveniens*

169. It is submitted that England is the place where the claim may be tried "*suitably for the interests of all the parties and for the ends of justice*": see *Spiliada Maritime Corporation v Cansulex* [1987] AC 460 at 482.

170. First, and significantly, Astor 3 agreed to the following clauses in the SLA:

(1)   "*This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of England and Wales*" (Clause VII.a)

(2)   "*Each party hereto irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against any other party hereto in any way relating to this Agreement or the transactions contemplated hereby, **in any forum other than the courts of England and Wales, and any appellant court from any thereof**. Each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees that any such action, litigation or proceeding may be brought in any England and Wales court to the fullest extent permitted by applicable law*" (Clause VII.b; emphasis added)

(3)   "***Each party hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court referred to in [this] Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defence of an inconvenient forum to the maintenance of such action or proceeding in any such court***" (Clause VII.c; emphasis added).

36

171. Although the Applicants say that they have rescinded the SLA, the existence and terms of the SPA, the fact that Astor 3 was prepared to agree to such terms in the first place, conferring jurisdiction on the English court and waiving any defence of an inconvenient forum, makes it very difficult for Astor 3 to take any point on *forum conveniens*.

172. Further, the Tavira Agreement is expressly governed by English law and subject to the jurisdiction of the courts of England and Wales.

173. The parties themselves are located in numerous different jurisdictions around the world, including Quebec, the Bahamas, Monaco and the United States. No other forum is more clearly or distinctly more suitable than England and Wales.

174. It is also highly relevant any contractual claim against Astor 3 (in the event that the SLA has not been validly rescinded) will have to proceed in England in any event, given the contractual terms relating to jurisdiction. If the other claims against Astor 3 or claims against Mr Sklarov cannot proceed in England, there will be a risk of a multiplicity of parallel proceedings and a risk of inconsistent judgments, which courts have regarded as a "*potential disaster from a legal point of view*" (see *Aratra Potato Co Ltd v Egyptian Navigation Co* [1981] 2 Lloyd's Rep 119 per Brandon LJ at p.128). See also *Aiglon Ltd v Gau Shan Co Ltd* [1993] 2 Lloyd's Rep 164 per Hirst J at 172 ("the *Court would inevitably have regard to the fact that the … claims against Ltd and SA respectively were inextricably interlinked and that … in the interests of justice they would be heard together, so as to save costs and avoid inconsistent results*"); *Citi-March Ltd v Neptune Orient Lines Ltd* [1996] 1 WLR 1367 per Colman J at 1375F-G ("*there is a risk, if actions in respect of the same loss must be brought in different jurisdictions, that there will be inconsistent decisions on the facts*"); *Barings plc v Coopers & Lybrand* [1997] I L PR 12 per Chadwick J at para 55 ("*The potential for different decisions by different courts on the same underlying facts ought to be avoided if possible*"); *889457 Alberta Inc v Katanga Mining Ltd* [2008] EWHC 2679 (Comm) per Tomlinson J at para 25 (referring to "*the desirability of concentrating proceedings in one jurisdiction so as to avoid the possibility of inconsistent decisions*"); and *JSC BTA Bank v Granton Trade Ltd* [2011] 2 All ER (Comm) 542 per Christopher Clarke J at para 17 ("*If the proceedings ... against the applicants are heard in Kazakhstan ... there is an obvious risk of inconsistent judgments and of waste and duplication of costs. That is a powerful factor in favour of*

*having the applicants as parties to this litigation*"); cf. *Vedanta Resources plc v Lungowe* [2019] UKSC 20 at paras 75 and 79.

**(2)  Service by an alternative method**

175.  It is necessary to demonstrate a "good reason" for ordering alternative service.

176.  Where the court grants injunctive relief against a defendant, the fact that an injunction has been made against the defendant will be a good reason for allowing alternative service. See *Interbunker Holdings SA v W SrL* [2021] EWHC 2649 (Comm) at [15]:

> "*In those circumstances, nonetheless, there has to be a good reason why there must be service by an alternative means. **I am satisfied that in the circumstances of this case there would be a good reason for ordering alternative means namely those which have been relied upon consistently in the authorities, namely that such an order will be appropriate in cases where proceedings have been begun and an injunction granted on a without notice application because injunctions have to be served immediately or in short order if injustice is not to result or potentially result.** The underlying rationale for such an approach was that identified by Mr Justice Calver in <u>Griffin Underwriting Limited v Varouxakis</u> [2021] EWHC 226 at para 57 in these terms: '… in a case … where a party seeks [an] … injunction, because the court is making a number of coercive orders with a risk of committal for contempt, as well as the claimant giving an undertaking in damages, it is important that the proceedings be constituted formally as soon as possible which, in my judgment, fully justifies an order for alternative service, despite this being a Hague Convention case*'" (emphasis added).

177.  In the present case, if the court grants injunctions, this will constitute a good reason.

178.  Further, given the fact that the present case involves a massive international fraud committed by an experienced fraudster (Mr Sklarov), it is important to identify a sensible method of serving documents on the Respondents that cannot readily be evaded, and which does not take months to carry out (such as service through diplomatic channels).

179.  Mr Salceda has communicated with the First to Third Respondents by email at all times, and the Applicants submit that they should all be served by email. Forward Risk have sought to find additional email addresses which are identified in the Service Report that has been prepared by Forward Risk. The Applicants propose to use all available email addresses for the Respondents as set out in the draft order on the Service Application. These include, *inter alia*, the following:

(1)  First Respondent:

- albert.yuen@astorassetgroup.com
- gregory.mitchell@astorassetgroup.com
- <u>operations@astorassetgroup.com</u>

(2)  Second Respondent:

- <u>Collateralservices@weiser.com.bs</u>
- <u>info@weiser.com.bs</u>
- openaccount@weiser.com.bs

(3)  Third Respondent:

- INTLOperations@tavirasecurities.com

180. In light of the factual evidence set out above, the Applicants believe that emails to <u>operations@astorassetgroup.com</u> and <u>gregory.mitchell@astorassetgroup.com</u> will come to the attention of Mr Sklarov. As noted above, the Applicants believe (and have reason to believe) that Mr Sklarov has made use of both email addresses to communicate on behalf of Astor 3. Further, based on information supplied by Forward Risk in their Service Report, the Applicants believe that Mr Sklarov can also be contacted on <u>investments18@msn.com</u> and <u>boychic@tivejo.com</u>.

## H.  **FULL AND FRANK DISCLOSURE**

181. The Applicants are aware of their duty of full and frank disclosure on an *ex parte* without notice. The Applicants and their legal representatives have sought to identify those points that the Respondents might plausibly wish to raise if they were on notice of the hearing.

182. Whilst ultimately the Applicants believe that there is nothing that could be raised by the Respondents which might persuade the court to dismiss the application, the Applicants are conscious that materiality is a matter for the court, not the Applicants.

183. The Applicants therefore draw the court's attention specifically to the following points.

## (1)  **Dealings in Collateral Shares**

184. Astor 3 might seek to contend that it was entitled under the SLA to deal with the Collateral Shares and that (i) the dealings in the Collateral Shares about which the Applicants complain were not a breach of contract and/or (ii) to the extent that Astor 3

39

always intended to dispose of Collateral Shares, such an intention on the part of Astor 3 does not falsify any implied representation that it intended to comply with the SLA.

185.  The Applicants have identified four provisions of the SLA which could conceivably be relied on by the Respondents to say that Astor 3 was entitled to deal with the shares. However, as explained below, the provisions in question are ambiguous or confusing or both and they sit in tension with the substantive provisions of the SLA which the Applicants submit prevents Astor 3 from dealing in the shares prior to the maturity date save in the event of an incurable Event of Default.

186.  **First,** Clause V.4(a) states that Astor 3 "*has Lien and Encumbrance rights in the Pledged Collateral (ii) including the power to transfer rights in such Pledged Collateral as may be contemplated by the Lender, in accordance with the herein agreement*". Clause V.4(a) itself does not, in terms, confer a general right on the part of Astor 3 to deal with the Pledged Collateral. It does, however, suggest that a power to "t*ransfer rights in such Pledged Collateral*" may be found elsewhere in the SLA. On the Applicants' case that power exists under the SLA only where there has been an incurable Event of Default (as explained above). However, it may be suggested by Astor 3 that Clause V.4(a) contemplates broader powers of disposal which are found elsewhere in the agreement (specifically, in the provisions identified below). Whilst the Applicants submit that any such submission by Astor would be wrong (and would not in any event prevent the Applicants from meeting the 'good arguable case' and/or 'serious issue to be tried' thresholds), the Applicants specifically draw this point to the court's attention.

187.  **Second,** Astor 3 has suggested in its letter dated 12 June 2024 that Clause V.4(c) of the SLA conferred a legal entitlement to deal with the Pledged Collateral. In particular, in that letter Astor 3 stated as follows: "*The Lender's rights in the Shares are further defined in Section V.4, Dealing with Securities, of the SLA. Specifically, Section V.4(c) states that "the Borrower acknowledges and agrees that the Pledged Collateral will be utilised by the Lender to assert its preferential Lien over it". Therefore, the Lender has the right to deal-in the Shares to the extent that is defined within the meaning of Encumbrance. The Lender has, at all times, fully complied with and adhered to the language within the SLA*".

188.  It is not entirely clear if, in that letter, Astor 3 is asserting that Clause V.4(c) of the SLA conferred a general right to deal with the Shares in the absence of an Event of Default. If that is what is being suggested, then it is very difficult to understand how Clause V.4(c)

could be said to give rise to such a right. The term "Lien" which appears in Clause V4(c) is defined in the SLA to mean "*any Encumbrance of any kind referenced herein concerning the Pledged Collateral of Guarantor. A lien is the Lender's right to retain possession of property belonging to Guarantor until a debt owed by that Borrower is fully discharged by per this Agreement*". The term "*Encumbrance*" is defined as follows (with emphasis added): "*Lender's legal claim on Pledged Collateral that affects the Borrower's ability to transfer ownership to anyone or to dispose of the Pledged Collateral without Lenders prior written authorization. For purposes of this definition, **Encumbrance shall mean lien, mortgage, charge, hypothecation, re-hypothecation, rights, barter, pawn, trade, dispose, deal in, pledge, re-pledge, repo, borrow or transfer of security interest in Collateral.** The Pledged Collateral will be restricted to Guarantor and Encumbrance rights exclusively granted to Lender*".

189. It may be that Astor 3 would argue, by reference to these provisions that: (a) it is entitled to "*use*" the Pledged Collateral to assert its Lien over it; (b) Lien means "*Encumbrance*"; and (c) Encumbrance is defined to mean "*dispose*" or "*deal in*" the Pledged Collateral.

190. However, a sensible reading of Clause V.4(c) in combination with the definitions of Lien and Encumbrance does not confer a clear or unequivocal right of Astor 3 to dispose of the Shares whenever it wishes to do so.  Clause V.4(c) simply provides that "*the Pledged Collateral will be utilized by the Lender to assert its preferential Lien over it*". There is nothing on the face of that provision which suggests that Astor 3 has a general right to deal in the Shares. Further, the definition of "*Lien*" includes the explanation that "*a lien is the Lender's right to retain possession of property belonging to Guarantor until a debt owed by that Borrower is fully discharged by per this Agreement*". A right to "*retain possession*" of the Shares is obviously very different from a right to dispose of the Shares unilaterally at the lender's whim. Further, the drafting of the definition of "*Encumbrance*" is extremely difficult to follow. It certainly operates to prohibit the Borrower from disposing of the Shares, but it makes very little sense to describe a right of disposal of a secured asset as an "*Encumbrance*" (if that is what might be suggested by Astor 3). More generally, it would be highly surprising if such a commercially-important right could only be found by working through a series of confusing and innocuous-looking definitions.

191. **Third**, Clause IX 27 is a long clause headed "Release and Waiver". It is principally concerned with a wide-ranging purported release of rights and claims by the Claimants

(addressed further below). However, embedded within that clause is the following passage: "*No waiver is asserted or claimed against the Lender which refutes Lenders' dominion and right to foreclose, deal-in or transact in the Pledged Collateral*". It might be argued by the Respondents that these words confers a general right on Astor 3 to sell the Pledged Collateral at any time. However, it is submitted that that is not a correct construction of the words in context. The provision is a "non-waiver" provision. It is not (and does not express itself to be) concerned with conferring rights on Astor 3. Instead, the rights which are the subject of the "non-waiver" need to be found elsewhere in the agreement and, in this regard, the SLA confers limited rights to deal-in or transact in the Pledged Collateral where there has been an incurable Event of Default. The non-waiver provision in Clause IX 27 can properly be understood in that context.

192. **Fourth**, Clause X is entitled "*Required Disclosures*". It takes the form of a lengthy series of apparently boilerplate provisions, typed in small font across nearly a full page of text. The following words are found towards the end of the clause: "*During the Loan Term, all benefits and proceeds of Pledged Collateral inure to Lender. Lender reserves the right to maintain dominion over the Collateral during the Term Loan, which affords Lender the right to deal-in, dispose or convert over the Pledged Collateral*". This provision was referred to by Astor in its letter dated 12 June 2024.

193. However, the provision is found at the end of seemingly boilerplate text within the final clause in the SLA entitled "Required Disclosures". This is a highly unlikely place to find a provision that confers an important and unrestricted power of disposal on Astor 3.

194. Further, insofar as it might be said that the quoted wording in Clause X provides a wide-ranging power of disposal on Astor 3 prior to maturity or any incurable Event of Default, Clause X would be inconsistent with the prior substantive provisions of the SLA. As noted above, Clause V.3 provides that the Astor 3 will credit all dividends on the Pledged Collateral to the Guarantor's account at the Depository Broker. That is inconsistent with any suggestion that "*during the Loan Term, all benefits and proceeds of Pledged Collateral inure to the Lender*". Clause V.8 states that the Lender shall instruct the Depositary Broker to exercise voting rights "*in accordance with the registered owner's instructions*". That is also inconsistent with the quoted wording of Clause X.

**(2)    No representation, no reliance, no remedy and release clauses**

195. The SLA contains a number of clauses purporting to limit liability or restrict liability or to prevent the Applicants for pursuing certain remedies before the Court. Astor 3 and Mr Sklarov might say that those provisions prevent the Applicants from bringing a claim for fraudulent misrepresentation, rescinding the contract or seeking injunctive relief.

196. The clauses in question can be grouped into four categories: (i) no representation and no reliance clauses; (ii) no remedy clauses; and (iii) release clauses.

(i)    <u>No representation and no reliance clauses</u>

197. The SLA contains the following representation and no reliance clauses:

   (1)    "*This SLA supersedes all previous term sheets, emails, representations, warranties and discussions and is the final documentation of the Parties' undertakings*" (first recital)

   (2)    "*Neither Borrower nor Guarantor have relied on any marketing materials or any other written or oral statements of fact or otherwise made by anyone prior to entering into this agreement, and any such materials and / or statements or representations, if any, written or oral, shall be purged from existence as if never having existed. All previous agreements, representations, statements both written or oral, express or implied with respect to the subject matter hereof, are superseded by this Agreement and hereby merged into this Agreement*" (Clause IV.7).

   (3)    "*This Agreement shall be final, controlling and fully merged with respect to any previous discussions, promises, understandings, representations or warranties made by Lender*" (Clause IX.11, last sentence).

198. First and foremost, if (as the Applicants contend) they are entitled to rescind the SLA, those clauses will cease to have effect: it will be as if they never existed.

199. Further, to the extent that any of those provisions purport to exclude liability on the part of Astor 3 or Mr Sklarov for fraud in inducing the contract, they are ineffective as a matter of public policy. More particularly, in *HIH Casualty & General Insurance Ltd v Chase Manhattan Bank* [2003] 1 All ER (Comm) 349, the House of Lords held that it is contrary to public policy for a contracting party to exclude its own liability for fraud in inducing a contract. Lord Bingham held at [15] that "*fraud unravels all: fraus omnia coorrumpit*":

"*Once fraud is proved, 'it vitiates judgments, contracts and all transactions whatsoever':*
*Lazarus Estates Ltd v Beasley [1956] 1 QB 702 at 712 per Denning LJ*".

200. Accordingly, "*the law, on public policy grounds, does not permit a contracting party to*
*exclude liability for his own fraud in inducing the making of the contract*" (ibid, [16]).

201. The same principle applies to entire agreement and non-reliance clauses. In *FoodCo LLP*
*v Henry Boot Development Ltd* [2010] EWHC 358, Lewison J held at [166]: "*Precisely*
*what statements are covered by a non-reliance clause is a question of construction of the*
*clause. But this is subject to the important principles that, as a matter of public policy, a*
*contracting party cannot exclude liability for his own fraud …*"

202. Accordingly, the no-reliance and no representation clauses do not mean that the
Applicants do not have a good arguable case in fraudulent misrepresentation.

(ii)  <u>No remedy clauses</u>

203. The SLA also contains provisions purporting to prevent the Applicants from seeking
injunctive relief and/or exercising rights of rescission:

   (1)  "*During the pendency of this Loan, neither the Borrower nor guarantor will seek*
   *injunctive relief or interference from any court of law, regulatory body, Transfer*
   *Agent, custodian, sub-custodian, Depository Broker, central depository or stock*
   *exchange requesting to invalidate, suspend, limit, impede terminate or restrict this*
   *Agreement or freeze the shares. Injunctive relief by Borrower or Guarantor or any*
   *interference by Borrower or Guarantor, central depository or regulatory agency*
   *shall be an immediate and incurable Event of Default*" (Clause IV.10)

   (2)  "*No course of dealing between Borrower, Guarantor and Lender shall operate as*
   *a waiver of any rights of the Parties under this Agreement with the exception of any*
   *action for injunctive relief, which shall not be permitted or attempted and shall be*
   *nullified by the judicial body upon its application*" (Clause IX.27)

   (3)  "*All of the Lender's rights, benefits, enforcement covenants and secured interest*
   *into the collateral shall survive the termination of this Agreement*" (Clause IX.30)

   (4)  "*Early termination or rescission is not permitted under the Agreement regardless*
   *of the reason or need to do so, and this Agreement will be valid and in full force*
   *and effect after its execution for its full Term*" (Clause IX.31)

204. The Claimants' position in relation to these clauses is that they do not, as matter of
construction, purport to prevent and the Claimants from accessing the usual remedies and
relief associated with a claim for fraudulent misrepresentation. However, if that is wrong,
they are contrary to public policy and unenforceable.

205.  As to the question of construction:

(1)  The Claimants are not aware of a case which has considered the construction of clauses such as these, however it is submitted that an analogy can be drawn with cases considering the scope and meaning of release clauses.

(2)  In this regard, in *BCCI v Ali* [2001] UKHL 8, Lord Nicholls at [26] emphasised that there are no special rules of interpretation in the case of general releases and that the meaning to be given to the words used is "*the meaning which ought reasonably to be ascribed to those words having due regard to the purpose of the contract and the circumstances in which the contract was made*". He went on to hold (at [28]): "*However widely drawn the language, the circumstance in which the release was given may suggest, and frequently they do suggest, that the parties intended, or more precisely, the parties are reasonably to be taken to have intended, that the release should only apply to claims, known or unknown, relating to a particular subject matter. The court has to consider, therefore, what was the type of claims at which the release was directed*".

(3)  Applying that approach to the present case, the parties cannot reasonably be taken to have intended that the Applicants should be prevented by the terms of the SLA from accessing remedies and relief in the event that it became apparent that the SLA (including the non-relief provisions) had been procured or induced by fraud. As Lord Hoffman observed in *HIH Casualty & General Insurance Ltd v Chase Manhattan Bank*, ibid, at [76], "*parties do not contemplate fraud in a making of a contract; as observed by Lord Bingham, there would be no deal. But it is another thing altogether to say that the parties do not contemplate the risk of deliberate wrongdoing at some point in the performance of a valid contract*".

206.  In any event, even if the Claimants are wrong as a matter of construction it is submitted that non-relief provisions in a contract are no more enforceable than no reliance provisions or no representation provisions insofar as they purport to prevent a party from accessing remedies in connection with a fraud in the making of that contract. See *Pearson* [1907] AC 351, 356: "*no subtlety of language, no craft or machinery in the form of contract, can estop a person who complains that he has been defrauded from having that question of fact submitted to a jury*". Further, if the Claimants are right that they are

entitled to (and have) rescinded the SLA, then the provision purporting to prevent them from seeking injunctive relief has already fallen away.

(iii)   <u>Release clause</u>

207.   Clause IX.27 of the SLA contains a release clause in the following terms:

> "*Borrower hereby releases, absolves and forever discharges Lender and their respective successors, assigns, partners, directors, shareholders, officers, beneficial owners, advisers, affiliates, agents, attorneys, transferees, and employees from any and all claims, legal fees, demands, torts, cross-actions controversies, omissions, inaccuracy, nonfulfillment of any representation or warranty, oversight, exclusion, negligence, causes of action, suits, damages, rights, outcomes, liabilities and obligations at law or in equity whatsoever, known or unknown, whether past, present or future, now held, owned or possessed by Borrower or Guarantor, or which Borrower or Guarantor may, as a result of any of Lenders actions, inactions, going concern status, assignments, dealings, failings to act, calculations or directives occurring on or prior or after the execution of this Agreement, and hereafter hold or claim to hold under any common law or statutory right arising, directly or indirectly out of the Loan or any of the Loan Documents or any of the documents, instruments or any other transactions contemplated thereby. Borrower and Guarantor understand and agree that this is a full, final and complete release and agrees that this release may be pled as an absolute and the final bar to any or all suit or suits pending, or which may hereafter be filed, claimed or prosecuted by Borrower or Guarantor, or anyone claiming by, through or under Borrower or Guarantor, in respect of any of the matters described herein and may hereafter be had from anyone whomsoever*."

208.   As to this:

(1)   Astor 3 and Mr Sklarov may argue that the Clause is framed in very wide terms, providing Astor 3 (and others) with a broad release from "*any and all claims*" whether "*known or unknown*" including "*non fulfilment of any representation*" and that it acts as an "*absolute and final bar to any or all suit or suits pending*" such that the language used in the clause therefore encompasses a release of claims for fraudulent misrepresentation inducing entry into the SLA.

(2)   In this regard, in *Maranello v Lohomji* [2022] EWCA Civ 1667, the Court of Appeal held that the terms of a general release in a settlement agreement extended to unknown claims for fraud (see, too, *Riley v National Westminster Bank* [2023] EWHC 2401 (Ch), which also contains a helpful review of the authorities).

209.   However, the case law emphasises the importance of the context in which a release is given such that "*however wide the language in which it is cast, it is always necessary to*

*understand the context in which the release was agreed in order to decide what the parties intended its true scope to be*": *MAN Nutzfahrzeuge AG v Freightliner Ltd* [2005] EWHC 2347 (Comm) at [207]. In that case, Moore-Bick LJ held (at [85]) (albeit on an *obiter* basis) that a generally-worded release clause in a settlement agreement in that case was not intended to grant a release from claims arising out of a party's own fraud since "*fraud is a thing apart because parties contract with one another in the expectation of honest dealing*". Similarly, in *Satyam Computer Services v Unpaid Systems* [2008] EWCA 487, Lawrence Collins LJ (with whom Waller and Rimer LJJ agreed) considered (*obiter*) that a generally worded release clause in a settlement agreement in that case did not release claims based on fraud: "*If a party seeking a release asked the other party to confirm that it would apply to claims based on fraud, it would not, in most cases, be difficult to anticipate the answer*" (at [85]).

210. As the Court of Appeal explained in *Maranello v Lohomji*, ibid, at [44], neither of those decisions involved a departure from the application of the ordinary principles of contractual construction in the case of fraud claims; "*Rather, consistently with those principles, they recognised that part of the commercial context to take into account was that parties would generally proceed on the basis of honest dealing and would not readily release unknown claims in respect of the fraud of their counterparties*".

211. There are two particularly important contextual considerations in the present case. First, the releases in this case are not contained in a settlement agreement but are contained in an agreement for stock-backed lending. That is important context because it cannot be said (as it was in *Marenello* at [46]) that the whole purpose of the agreement was to draw a line under events up to the date of the agreement. Second, parties contract with one another in the expectation of honest dealing. That makes it highly unlikely that the parties the release clause in the SLA to release claims for fraudulently inducing entry into the SLA in the first place. Such a suggestion is bizarre and inconceivable.

212. Further, and relatedly, while the authorities suggest that exclusion clause cases (i.e. such as *HIH v Chase Manhattan*) should not be automatically imported into the area of releases (*Satyam Computer Services v Unpaid Systems*, ibid., at [87]), that has tended to be in the context of considering the scope of a release in a settlement agreement which is not alleged to have been induced by fraud. It is at least arguable that public policy

prevents enforcement of a clause in a contract which purports to release claims for fraudulent misrepresentation inducing entry into that contract.

213. For all these reasons, it is submitted that the release clause does not mean that that Claimants do not have a good arguable case in deceit.

**(3)    No dishonesty**

214. Astor 3 and Mr Sklarov may take the position that there was no dishonesty in a representation that Astor 3 intended to comply with the terms of the SLA insofar as it relates to the use of the shares in Elektra.

215. In particular, they may contend that they honestly believed that the SLA permitted Astor 3 to cause the Pledged Collateral to be sold or disposed of at any time.

216. However, any such contention would be a factual allegation which would have to be established by them at trial in due course. On the basis of information available, and having regard to the evidence suggesting the involvement of Mr Sklarov (a convicted felon) in the transaction, it is submitted that there is a good arguable case of dishonesty.

**(4)    _Hollington v Hewthorn_**

217. As explained above, the Applicants rely on a number of findings of courts in other jurisdictions relating to the conduct and activities of Mr Sklarov. The Applicants rely on that material to establish the existence of a good arguable claim in deceit against Astor 3 and Mr Sklarov.

218. Astor 3 and Mr Sklarov may take the position that those findings are inadmissible, relying on _Hollington v Hewthorn_ [1943] KB 587.

219. However, the rule in _Hollington v Hewthorn_ does not prevent the use of findings in other litigation at an interlocutory stage. This is because the rationale of the rule in _Hollington v Hewthorn_ is to exclude findings that are no more than the opinion of another person, based on unknown facts, so as to preserve the fairness of the trail. There is no risk to fairness of a trial at an interlocutory stage. In _Tulip Trading Limited v Bitcoin Association_ [2023] EWHC 2437 (Ch) at [40], Mellor J summarised the position (after a comprehensive review of the authorities) as follows:

> "_It seems to me that the common theme which is discernible through Medcalf, Berezovsky and Sabbagh is that there is a limited exception to the rule in Hollington_

*v Hewthorn which is applicable in situations where the case is at a preparatory stage yet the court has to consider what evidence at trial there might be. This exception plainly applies where the court is considering whether there is a serious issue to be tried (Berezovsky and Sabbagh) but also when the court has to consider whether counsel had sufficient material to justify a plea of fraud (Medcalf). The material (inadmissible at trial) can assist in identifying the evidence which can reasonable be expected to be available at trial, to which a court is entitled to have regard at the interlocutory stage*".

220. Accordingly, the Applicants are entitled to rely on matters such as the Satterfield Award and the NYSE Decision at this stage of the proceedings.

**(5)** <u>**Affirmation**</u>

221. The Respondents might say that the Applicants had affirmed the SLA in particular by not rescinding it when they first had suspicions about unusual transactions in respect of Elektra shares and by instead providing further shares by way of collateral. However, as set out above, the Applicants have acted promptly by rescinding the SLA as soon as they had firm grounds for considering that it had been induced by fraudulent misrepresentations. Until very recently, the Applicants did not believe that Astor 3 was a front for fraud and continued to trust what Astor 3 had told them. When it comes to questions of affirmation: *there must be knowledge, not simply suspicion*": *SK Shipping Europe Plc v Capital VLCC 3 Corp* [2020] EWHC 3448 (comm) *per* Foxton J at [202(ii)].

## I.   <u>FORM OF DRAFT ORDER</u>

222. The draft order sought by the Applicants follows the standard wording contained in Appendix 11 to the Commercial Court Guide. A version of the order with modifications and additions to that standard wording shown in track changes will be available at the hearing. Those modifications and additions, and reasons for them, are as follows:

(1)   Paragraph 1 includes additional reference to the proprietary injunctions sought against the First, Second and Third Respondents.

(2)   Paragraph 3 includes addition of a time estimate of 1 day for the return date.

(3)   Paragraph 7 contains additional reference to two particular types of assets, namely: (a) any money standing to the credit of the First or Second Respondents in any bank account including the amount of any cheque down on such accounts which has not been cleared; and (b) any shareholdings held by the First or Second Respondents

or the proceeds of sale if any of them have been sold. The former has been included in circumstances where the Claimants are unaware of any particular bank account belonging to the First or Second Respondents. The latter has been included in light of the nature of the fraudulent activity which the Claimants believe to have been conducted by the First and Second Respondents.

(4)   Paragraph 10 contains the terms of the proprietary injunction sought against the Respondents. It is directed towards preventing the Respondents from dealing in the "Collateral Shares" shares or their traceable proceeds. The restrictions on dealing are in a standard form. The "Collateral Shares" are defined at paragraph 22 of the order as meaning any shares (or interests in shares) in the capital of Grupo Elektra SAB De CV held or formally held by or for Mr Salinas. Accordingly, the proprietary injunction is intended only to apply to the shares provided by Mr Salinas as Pledged Collateral and their traceable proceeds.

(5)   Paragraph 11(a) requires the First and Fourth Respondents to provide information to the Applicants' solicitors in writing within 72 hours of service. That information includes, in addition to the standard provision concerning assets:

(i)    whether they hold any Collateral Shares / their traceable proceeds and, if so, the value of the shares or proceeds. That provision has been included to support the injunctive relief by assisting the Applicants in identifying and the location of Mr Salinas' shares; and

(ii)    all their liabilities (including debts) above the value of £5,000; (c) any claims of which they have been notified above the value of £5,000 and (d) details of any pending legal proceedings or legal actions against them. These provisions have been included to support the injunctive relief by assisting the Applicants in understanding the net assets available to the First and Fourth Respondents.

(6)   Paragraph 11(b) requires the Second and Third Respondents to inform the Applicant's solicitors in writing, within 72 hours of service of the order, of whether they hold any Collateral Shares / their traceable proceeds and, if so, the value of the shares or proceeds. Again, that provision has been included to support the

injunctive relief by assisting the Applicants in identifying the location of Mr Salinas' shares.

(7)   Paragraph 12 has been modified to require the Respondents to swear and serve an affidavit within 7 days of service of the order providing (in addition to an affidavit providing the information requested in paragraph 11) certain additional categories information. The information requests are set out in Schedule C to the order. The purpose of those requests to support the proprietary injunction.

(8)   Paragraph 13 has been added to require the Respondents to preserve documents that evidence the existence, location or value of assets (including the Collateral Shares). The purpose of that provision is to support enforcement and policing of the injunctive relief contained in the order.

(9)   The standard wording to the exceptions to the prohibitions contained in the order at paragraph 15 has been modified so as to make it clear that the Respondents are not permitted to fund legal advice and representation from the Collateral Shares or their traceable proceeds.

(10)  Language has been introduced into paragraph 19 of the order to ensure that the Applicants' solicitors are given 3 working days' notice of any intention to apply to Court to vary or discharge the order.

(11)  Paragraphs 23 and 24 contain non-exhaustive definitions of "assets" and "details" of assets for the purposes of the order. Given Mr Sklarov's history of fraudulent activity it is considered that it would be better to fully set out the extent of assets that are subject to the world-wide freezing order and the spell out the extent of the information required to meet the information requests. The wording is based on a precedent on Westlaw from a case called *Re Walsham Chalet Park Ltd* – the order containing this wording was made by Mrs Justice Falk on 16 October 2019.

## J    CONCLUSION

223.  The Applicants seek orders in the terms of the draft orders provided to the court.

224.  One final point of housekeeping should be noted. The deponent (Mr Salceda) signed a near-final version of the affidavit in the early hours of the morning UK time. Some very minor changes were then made by the Applicants' legal team overnight (without affecting

the factual substance of the evidence). In those circumstances, the final version of the affidavit included in the hearing bundle is unsigned (as Mr Salceda, who is in a different time zone, is currently asleep). It is anticipated that a signed version of the affidavit will be provided shortly before or during the hearing. This will then be followed up by a sworn version, which the Applicants will undertake to provide.

**Stephen Robins KC**

**Henry Phillips**

**Matthew Abraham**

**Ryan Perkins**

South Square

Gray's Inn

London WC1R 5HP

Tel: 02076969900

stephenrobins@southsquare.com

henryphillips@southsquare.com

matthewabraham@southsquare.com

2 August 2024

# EXHIBIT 5



# Claim Form

In the **High Court of Justice**
**Business and Property Courts of**
**England and Wales**
**King's Bench Division**
**Commercial Court**

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024
Re-Amended Claim Form under CPR rule 17.1(2)(b) dated [**] August 2024

| | *for court only* |
|---|---|
| Claim no. | CL-2024-000450 |
| Issue date | 02 August 2024 |

**Claimant(s)**

(1)RICARDO BENJAMIN SALINAS PLIEGO
(2)CORPORACION RBS SA DE CV

SEAL

**Defendant(s)**

(1)ASTOR ASSET MANAGEMENT 3 LIMITED
(2)WEISER GLOBAL CAPITAL MARKETS LTD
(3)TAVIRA MONACO SAM
(4)VLADIMIR "VAL" SKLAROV
(5) Cornelius Vanderbilt Capital Management Ltd
(6) Astor Capital Fund Ltd

Name and address of Defendant receiving this claim form

See Annex A to this Claim Form

| | £ |
|---|---|
| Amount claimed | [**] More than £200,000 |
| Court fee | £10,000 |
| Legal representative's costs | |
| **Total amount** | |

The court office at the Admiralty and Commercial Court Listing Office, Rolls Building, 7 Rolls Buildings, Fetter Lane, London EC4A 1NL is open between
10 am and 4.30 pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.

© Crown copyright 2022

| Claim No. | CL-2024-000450 |
|-----------|----------------|

Brief details of claim

See Annex B to this Claim Form

Particulars of claim (*attached)(*will follow if an acknowledgment of service is filed that indicates an intention to defend the claim)

Paul, Weiss, Rifkind, Wharton & Garrison LLP
20 Air Sreett Street,
London
W1 B 5AN

Claimant's or legal representative's address to which documents or payments should be sent if different from overleaf including (if appropriate) details of DX, fax or e-mail.

## Statement of truth

**I understand that proceedings for contempt of court may be brought against a person who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.**

☐ **I believe** that the facts stated in this claim form and any attached sheets are true.

☒ **The Claimant** believes that the facts stated in this claim form and any attached sheets are true. **I am authorised** by the claimant to sign this statement.

### Signature

☐ Claimant

☐ Litigation friend (where claimant is a child or protected party)

☒ Claimant's legal representative (as defined by CPR 2.3(1))

### Date

| Day | Month | Year |
|-----|-------|------|
|     |       |      |

Full name

Stefan Arnold Soulby

Name of claimant's legal representative's firm

Paul, Weiss, Rifkind, Wharton & Garrison LLP

If signing on behalf of firm or company give position or office held

Partner

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024
Re-Amended Claim Form under CPR rule 17.1(2)(b) dated [**] August 2024

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**B E T W E E N :**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

**Claimants**

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV**

**(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

**(6) ASTOR CAPITAL FUND LTD**

**Defendants**

---

**RE-AMENDED ANNEX A – DEFENDANTS' NAMES AND ADDRESSES**

---

**(1)  ASTOR ASSET MANAGEMENT 3 LIMITED:**

    (a)    18C-3107 BC Quebec (Quebec) Hotels G1W4W5 Canada

    (b)    Perseverance Island S12-56-4 Mahe Seychelles

    (c)    Street Kos-Anatolskoho Building 4, Flat 225, Lviv 79066 Ukraine

    (d)    operations@astorassetgroup.com

    (e)    albert.yuen@astorassetgroup.com

    (f)    gregory.mitchell@astorassetgroup.com

**(2) WEISER GLOBAL CAPITAL MARKETS LTD:**

    (a)    Unit A - Balmoral Corporate Center, Balmoral Development, Sanford Drive, Nassau, Bahamas

    (b)    info@weiser.com.bs

    (c)    openaccount@weiser.com.bs

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024
Re-Amended Claim Form under CPR rule 17.1(2)(b) dated [**] August 2024

    (d)    Collateralservices@weiser.com.bs

**(3) TAVIRA MONACO SAM:**

    (a)    Le Montaigne, 6 BD Des Moulins, 1st Floor, Monaco, Monaco 98000

    (b)    INTLOperations@tavirasecurities.com

**(4) VLADIMIR "VAL" SKLAROV**:

    (a)    142 Gold Springs Court, Canton, GA 30114

    (b)    investments18@msn.com

    (c)    boychic@tivejo.com

    (d)    operations@astorassetgroup.com

    (e)    gregory.mitchell@astorassetgroup.com

**(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

    (a)    4 Lombard Street, London, United Kingdom, EC3V9HD

    (b)    SK, Regina - Royal Bank Building, 2010 11th Avenue, 7th Floor, Regina, S4P 0J3, CanadaN

    (c)    info@vanderbilt.ltd

**(6) ASTOR CAPITAL FUND LTD**

    (a)    1730 ST. LAURENT BOULEVARD, OTTAWA, Ontario, Canada, K1G5L1

    (b)    support@astorcapitalfund.ca

    (c)    registrations@mslogic.eu

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024

Re-Amended Claim Form under CPR rule 17.1(2)(b) dated [**] August 2024

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**B E T W E E N :**

(1) RICARDO BENJAMIN SALINAS PLIEGO

(2) CORPORACION RBS SA DE CV

<u>**Claimants**</u>

**-and-**

(1) ASTOR ASSET MANAGEMENT 3 LIMITED

(2) WEISER GLOBAL CAPITAL MARKETS

(3) TAVIRA MONACO SAM

(4) VLADIMIR "VAL" SKLAROV

(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD

(6) ASTOR CAPITAL FUND LTD

<u>**Defendants**</u>

---

## <u>RE-AMENDED</u> ANNEX B – BRIEF DETAILS OF CLAIM

---

The Claimants' re-amended claim arises out of and in connection with (amongst other documents) the following:

(i)     A stock-lending agreement executed on 28 July 2021 (the **SLA**) between Astor Asset Management 3 Limited (**Astor 3**) as lender, Corporacion RBS SA de CV (**RBS**) as borrower and Richard Benjamin Salinas Pliego (**Mr Salinas**) as guarantor, pursuant to which Astor agreed to advance loans of up to MXN 3,008,580,000 to RBS, secured over shares in Grupo Elektra SAB De CV (**Elektra**) owned by Mr Salinas;

(ii)    A custodian management agreement dated 28 July 2021 between Weiser Global Capital Market (**Weiser**) RBS, Mr Salinas and Astor 3 (the **Weiser Agreement**);

(iii)   A control agreement dated 1 November 2021 between Tavira Monaco SAM (**Tavira**), RBS, Mr Salinas and Astor 3 (the **Tavira Agreement** together with the Weiser Agreement the **Depository Agreements**)); and

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024

Re-Amended Claim Form under CPR rule 17.1(2)(b) dated [**] August 2024

(iv)  Five closing statements pursuant to which five tranches of loans were made available to RBS under the SLA (the **Closing Statements**).

The Claimants were induced to enter into the above agreements on the basis of representations (express or implied) by Astor 3 to the effect that:

1.  Astor 3 was a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities; and

2.  Astor 3 intended to comply with its obligations under the SLA, including in particular its obligations not to sell the Elektra shares prior to maturity or default.

(the **Representations**)

Astor 3 has advanced a total of five loans to RBS pursuant to the SLA, with a total principal amount of MXN 2,154,218,552.55 (approximately USD 114 million as at the date of this claim form). These loans are secured over a total of 7,204,296 Elektra shares belonging to Mr Salinas (the **Collateral Shares**), of which 935,913 should be held by Weiser, and 6,268,383 should be held by Tavira pursuant to the Depository Agreements.

It appears that Astor 3 has given instructions to Weiser and/or Tavira to dispose of at least some of the Collateral Shares. The Claimants wrote to Weiser and Tavira on 10 June 2024 to say that they should not dispose of the shares. Further, on 26 July 2024, Elektra issued a press release stating that it had become aware of a possible fraud in respect of the shares. On 1 August 2024, Tavira informed the Claimants that it had transferred the 6,268,383 Elektra shares "*to Astor's account, as per Astor's instructions*". According to a trade report supplied by Tavira, this transfer to Astor took place on 29 July 2024.

As a result of recent investigations, the Claimants are now aware that: (i) Astor 3 is controlled by Vladimir "Val" Sklarov (**Mr Sklarov**) who has a long history of fraud and who has been engaged in stock-lending fraud; and (ii) Astor 3 is not a conventional financial institution with the ability to fund loans worth hundreds of millions of dollars from its own capital (or by borrowing the money from legitimate third parties) but in fact an entity used by Mr Sklarov to perpetrate stock-lending fraud.

In the premises, the Representations were false (to the knowledge of Astor 3 and Mr Sklarov) in that: (i) Astor 3 was not a legitimate and honest financial institution and did not engage in legitimate and honest stock-lending activities; and (ii) from the outset, Astor 3 had no intention

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024

Re-Amended Claim Form under CPR rule 17.1(2)(b) dated [**] August 2024

of complying with its obligations under the SLA, including in particular its obligations not to sell the Elektra shares prior to maturity or default.

In light of the above, the Claimants consider that they have been victims of a stock-lending fraud conducted by Mr Sklarov via his company Astor 3 that fraudulently induced the Claimants to enter into the SLA, the Closing Statements and the Depository Agreements by knowingly making the Representations that were false. Through this fraud, Astor 3 has gained control of the Collateral Shares owned by Mr Salinas and is wrongfully disposing of them contrary to the terms of the SLA and the Claimants' intentions.

On or about 1 August 2024, the Applicants sent a notice to Astor 3 rescinding the SLA, the Closing Statements and the Depository Agreements on the basis that it entered into those agreements as a result of fraudulent misrepresentations.

On 2 August 2024, Mr Justice Jacobs granted the Claimants a freezing order against Astor 3 and Mr Sklarov; a proprietary injunction against each of Astor 3, Weiser, Tavira and Mr Sklarov and orders for associated relief (the **2 August Order**).

In accordance with the 2 August Order, Tavira wrote the Claimants informing them that, amongst other things, Astor 3 "*rehypothecated the shares* [the Collateral Shares] *to Cornelius Vanderbilt Capital Management Ltd.*"

As a result of recent investigations and publicly available information, the Claimants consider that Cornelius Vanderbilt Capital Management Ltd. is controlled by Mr Sklarov and used by Mr Sklarov as part of his fraudulent stock-lending schemes.

On 9 August 2024, Weiser served a witness statement from Mr Christos Livadas responding to information requests in the 2 August Order stating, amongst other things, that "*Astor 3 sold 935,716 Relevant Elektra Shares to Astor Capital Fund Ltd on 30 July 2024 for the price of MXN 233,929,000, which equates to the Traceable Proceeds amount stated above, i.e. USD 12,604,476.49*".

As a result of investigations, the Claimants consider that Astor Capital Fund Ltd (**Astor Capital**) is controlled by Mr Sklarov and used by Mr Sklarov as part of his fraudulent stock-lending schemes.

**(i) Relief arising from Fraudulent Misrepresentation**

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024

Re-Amended Claim Form under CPR rule 17.1(2)(b) dated [**] August 2024

*Recission*

1. The Claimants seek declarations that:

    (1) the SLA, the Closing Statements and the Depository Agreements have been validly rescinded by the Claimants; and

    (2) Mr Salinas is the beneficial owner of the Collateral Shares and the traceable proceeds of the Collateral Shares.

2. In addition, the Claimants seek an order requiring Astor 3, Weiser, ~~and~~ Tavira, ~~and~~ Cornelius Vanderbilt Capital Management Ltd. and Astor Capital to return the Collateral Shares (comprising 7,204,296 Elektra shares) or their proceeds to Mr Salinas forthwith.

*Damages for deceit*

3. The Claimants have suffered loss and damage equal to the value of any Elektra shares which are not recovered by them on a proprietary basis. Accordingly, Astor 3 is liable to pay damages to the Claimants for the tort of deceit in respect of any losses sustained by the Claimants in consequence of entering into the SLA, the Closing Statements and the Depository Agreements.

**(ii) Contractual Claims**

In the alternative, if (but only if) the SLA has not been (and cannot be) rescinded, the Claimants seek the following relief.

*Order for Redemption*

4. The Claimants seek an order that Astor 3, Weiser and Tavira delivery up the Collateral Shares to Mr Salinas against the payment of all sums owing to Astor 3 under the SLA.

*Damages for breach of contract*

5. To the extent that Astor 3 has wrongly sold or otherwise dealt with Collateral Shares contrary to the terms of the SLA, the Claimants seek damages from Astor 3 for the losses suffered as a result of breaches of the terms of the SLA.

**(iii) Economic Tort Claims**

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024

Re-Amended Claim Form under CPR rule 17.1(2)(b) dated [**] August 2024

Further or alternatively, the Claimants have the following causes of action (and seek the following relief) from Astor 3, and Mr Sklarov, and Cornelius Vanderbilt Capital Management Ltd and Astor Capital.

*Intention to cause harm using unlawful means*

6.    If Mr Sklarov alone intended to cause harm to the Claimants by unlawful means by making the fraudulent misrepresentations and/or breaching of the SLA, then the Claimants seek damages from Mr Sklarov equal to the value of any Collateral Shares Elektra shares which are not recovered by them on a proprietary basis.

*Conspiracy to cause harm using unlawful means*

7.    Alternatively, if Mr Sklarov acted in concert with Astor 3 and/or Cornelius Vanderbilt Capital Management Ltd. and/or Astor Capital and/or others with the intention of causing harm to the Claimants by unlawful means (namely the fraudulent misrepresentations and/or the breaches of the SLA), then the Claimants seek damages from both Astor 3, and Mr Sklarov, and Cornelius Vanderbilt Capital Management Ltd. and Astor Capital equal to the value of any Collateral Shares Elektra shares which are not recovered by them on a proprietary basis.

**(v) Other Relief**

8.    The Claimants claim such other relief as the Court thinks fit.

# EXHIBIT 7



# Claim Form

In the  **High Court of Justice**
**Business and Property Courts**
**England and Wales**     02 Aug 2024
**King's Bench Division**
**Commercial Court**

*for court use only*

| Claim no. | CL-2024-000450 |
|-----------|----------------|
| Issue date | |

Claimant(s)

(1) RICARDO BENJAMIN SALINAS PLIEGO
(2) CORPORACION RBS SA DE CV

SEAL

Defendant(s)

(1) ASTOR ASSET MANAGEMENT 3 LIMITED
(2) WEISER GLOBAL CAPITAL MARKETS LTD
(3) TAVIRA MONACO SAM
(4) VLADIMIR "VAL" SKLAROV

Name and address of Defendant receiving this claim form

See Annex A to this Claim Form

|  | £ |
|--|---|
| Amount claimed | [**] |
| Court fee | |
| Legal representative's costs | |
| **Total amount** | |

The court office at the Admiralty and Commercial Court Listing Office, Rolls Building, 7 Rolls Buildings, Fetter Lane, London EC4A 1NL is open between
10 am and 4.30 pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.

| Claim No. | |
|---|---|

Brief details of claim
See Annex B to this Claim Form

Particulars of claim (*attached)(*will follow if an acknowledgment of service is filed that indicates an intention to defend the claim)

Paul, Weiss, Rifkind, Wharton & Garrison LLP
20 Air Sreett,
London
W1B 5AN

Claimant's or legal representative's address to which documents or payments should be sent if different from overleaf including (if appropriate) details of DX, fax or e-mail.

## Statement of truth

**I understand that proceedings for contempt of court may be brought against a person who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.**

☐ **I believe** that the facts stated in this claim form and any attached sheets are true.

☑ **The Claimant** believes that the facts stated in this claim form and any attached sheets are true. **I am authorised** by the claimant to sign this statement.

**Signature**

☐ Claimant

☐ Litigation friend (where claimant is a child or protected party)

☑ Claimant's legal representative (as defined by CPR 2.3(1))

**Date**

| Day | Month | Year |
|-----|-------|------|
| 0 2 | 0 8 | 2 0 2 4 |

Full name

Stefan Arnold Soulby

Name of claimant's legal representative's firm

Paul, Weiss, Rifkind, Wharton & Garrison LLP

If signing on behalf of firm or company give position or office held

Partner

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**B E T W E E N :**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

**Claimants**

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV**

**Defendants**

---

**ANNEX A – DEFENDANTS' NAMES AND ADDRESSES**

---

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED:**

 (a) 18C-3107 BC Quebec (Quebec) Hotels G1W4W5 Canada

 (b) Perseverance Island S12-56-4 Mahe Seychelles

 (c) Street Kos-Anatolskoho Building 4, Flat 225, Lviv 79066 Ukraine

 (d) operations@astorassetgroup.com

 (e) albert.yuen@astorassetgroup.com

 (f) gregory.mitchell@astorassetgroup.com

**(2) WEISER GLOBAL CAPITAL MARKETS LTD:**

 (a) Unit A - Balmoral Corporate Center, Balmoral Development, Sanford Drive, Nassau, Bahamas

 (b) info@weiser.com.bs

 (c) openaccount@weiser.com.bs

 (d) Collateralservices@weiser.com.bs

**(3) TAVIRA MONACO SAM:**

    (a)   Le Montaigne, 6 BD Des Moulins, 1st Floor, Monaco, Monaco 98000

    (b)   INTLOperations@tavirasecurities.com

**(4) VLADIMIR "VAL" SKLAROV**:

    (a)   142 Gold Springs Court, Canton, GA 30114

    (b)   investments18@msn.com

    (c)   boychic@tivejo.com

    (d)   operations@astorassetgroup.com;

    (e)   gregory.mitchell@astorassetgroup.com

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (KBD)**
**B E T W E E N :**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**
**(2) CORPORACION RBS SA DE CV**

**Claimants**

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**
**(2) WEISER GLOBAL CAPITAL MARKETS**
**(3) TAVIRA MONACO SAM**
**(4) VLADIMIR "VAL" SKLAROV**

**Defendants**

---

**ANNEX B – BRIEF DETAILS OF CLAIM**

---

The Claimants' claim arises out of and in connection with (amongst other documents) the following:

(i) A stock-lending agreement executed on 28 July 2021 (the **SLA**) between Astor Asset Management 3 Limited (**Astor 3**) as lender, Corporacion RBS SA de CV (R**BS**) as borrower and Richardo Benjamin Salinas Pleigo (**Mr Salinas**) as guarantor, pursuant to which Astor agreed to advance loans of up to MXN 3,008,580,000 to RBS, secured over shares in Grupo Elektra SAB De CV (**Elektra**) owned by Mr Salinas;

(ii) A custodian management agreement dated 28 July 2021 between Weiser Global Capital Market (**Weiser**) RBS, Mr Salinas and Astor 3 (the **Weiser Agreement**);

(iii) A control agreement dated 1 November 2021 between Tavira Monaco SAM (**Tavira**), RBS, Mr Salinas and Astor 3 (the **Tavira Agreement** together with the Weiser Agreement the **Depository Agreements**)); and

(iv) Five closing statements pursuant to which five tranches of loans were made available to RBS under the SLA (the **Closing Statements**).

The Claimants were induced to enter into the above agreements on the basis of representations (express or implied) by Astor 3 to the effect that:

1.  Astor 3 was a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities; and

2.  Astor 3 intended to comply with its obligations under the SLA, including in particular its obligations not to sell the Elektra shares prior to maturity or default.

(the **Representations**)

Astor 3 has advanced a total of five loans to RBS pursuant to the SLA, with a total principal amount of MXN 2,154,218,552.55 (approximately USD 114 million as at the date of this claim form). These loans are secured over a total of 7,204,296 Elektra shares belonging to Mr Salinas (the **Collateral Shares**), of which 935,913 should be held by Weiser, and 6,268,383 should be held by Tavira pursuant to the Depository Agreements.

It appears that Astor 3 has given instructions to Weiser and/or Tavira to dispose of at least some of the Collateral Shares. The Claimants wrote to Weiser and Tavira on 10 June 2024 to say that they should not dispose of the shares. Further, on 26 July 2024, Elektra issued a press release stating that it had become aware of a possible fraud in respect of the shares. On 1 August 2024, Tavira informed the Claimants that it had transferred the 6,268,383 Elektra shares "*to Astor's account, as per Astor's instructions*". According to a trade report supplied by Tavira, this transfer to Astor took place on 29 July 2024.

As a result of recent investigations, the Claimants are now aware that: (i) Astor 3 is controlled by Vladimir "Val" Sklarov (**Mr Sklarov**) who has a long history of fraud and who has been engaged in stock-lending fraud; and (ii) Astor 3 is not a conventional financial institution with the ability to fund loans worth hundreds of millions of dollars from its own capital (or by borrowing the money from legitimate third parties) but in fact an entity used by Mr Sklarov to perpetrate stock-lending fraud.

In the premises, the Representations were false (to the knowledge of Astor 3 and Mr Sklarov) in that: (i) Astor 3 was not a legitimate and honest financial institution and did not engage in legitimate and honest stock-lending activities; and (ii) from the outset, Astor 3 had no intention of complying with its obligations under the SLA, including in particular its obligations not to sell the Elektra shares prior to maturity or default.

In light of the above, the Claimants consider that they have been victims of a stock-lending fraud conducted by Mr Sklarov via his company Astor 3 that fraudulently induced the Claimants to enter into the SLA, the Closing Statements and the Depository Agreements by knowingly making the Representations that were false. Through this fraud, Astor 3 has gained control of the Collateral Shares owned by Mr Salinas and is wrongfully disposing of them contrary to the terms of the SLA and the Claimants' intentions.

On or about 1 August 2024, the Applicants sent a notice to Astor 3 rescinding the SLA, the Closing Statements and the Depository Agreements on the basis that it entered into those agreements as a result of fraudulent misrepresentations.

By this claim the Claimants seek the following relief:

**(i) Relief arising from Fraudulent Misrepresentation**

*Recission*

1.    The Claimants seek declarations that:

    (1)    the SLA, the Closing Statements and the Depository Agreements have been validly rescinded by the Claimants; and

    (2)    Mr Salinas is the beneficial owner of the Collateral Shares and the traceable proceeds of the Collateral Shares.

2.    In addition, the Claimants seek an order requiring Astor 3, Weiser and Tavira to return the Collateral Shares (comprising 7,204,296 Elektra shares) or their proceeds to Mr Salinas forthwith.

*Damages for deceit*

3.    The Claimants have suffered loss and damage equal to the value of any Elektra shares which are not recovered by them on a proprietary basis. Accordingly, Astor 3 is liable to pay damages to the Claimants for the tort of deceit in respect of any losses sustained by the Claimants in consequence of entering into the SLA, the Closing Statements and the Depository Agreements.

**(ii) Contractual Claims**

In the alternative, if (but only if) the SLA has not been (and cannot be) rescinded, the Claimants seek the following relief.

*Order for Redemption*

4.    The Claimants seek an order that Astor 3, Weiser and Tavira delivery up the Collateral Shares to Mr Salinas against the payment of all sums owing to Astor 3 under the SLA.

*Damages for breach of contract*

5.    To the extent that Astor 3 has wrongly sold or otherwise dealt with Collateral Shares contrary to the terms of the SLA, the Claimants seek damages from Astor 3 for the losses suffered as a result of breaches of the terms of the SLA.

**(iii) Economic Tort Claims**

Further or alternatively, the Claimants have the following causes of action (and seek the following relief) from Astor 3 and Mr Sklarov.

*Intention to cause harm using unlawful means*

6.    If Mr Sklarov alone intended to cause harm to the Claimants by unlawful means by making the fraudulent misrepresentations and/or breaching of the SLA, then the Claimants seek damages from Mr Sklarov equal to the value of any Elektra shares which are not recovered by them on a proprietary basis.

*Conspiracy to cause harm using unlawful means*

7.    Alternatively, if Mr Sklarov acted in concert with Astor 3 and/or others with the intention of causing harm to the Claimants by unlawful means (namely the fraudulent misrepresentations and/or the breaches of the SLA), then the Claimants seek damages from both Astor 3 and Mr Sklarov equal to the value of any Elektra shares which are not recovered by them on a proprietary basis.

**(v) Other Relief**

8.    The Claimants claim such other relief as the Court thinks fit.

# EXHIBIT 8

Claim No: CL-2024-000450

02 Aug 2024

CL-2024-000450

IN THE HIGH COURT OF JUSTICE

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

COMMERCIAL COURT (KBD)

IN PRIVATE

On 2 August 2024

Before the Honourable Mr Justice Jacobs


BETWEEN:

### (1) RICARDO BENJAMIN SALINAS PLIEGO

### (2) CORPORACION RBS SA DE CV

**Applicants/Claimants**

**-and-**

### (1) ASTOR ASSET MANAGEMENT 3 LIMITED

### (2) WEISER GLOBAL CAPITAL MARKETS LTD

### (3) TAVIRA MONACO SAM

### (4) VLADIMIR "VAL" SKLAROV

**Respondents/Defendants**

-------------------------------------------------------

### FREEZING AND PROPRIETARY ORDER
-------------------------------------------------------


### PENAL NOTICE

IF YOU ASTOR ASSET MANAGEMENT 3 LIMITED, WEISER GLOBAL CAPITAL MARKETS LTD, TAVIRA MONACO SAM AND VLADIMIR "VAL" SKLAROV DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE RESPONDENTS TO BREACH THE TERMS OF THIS ORDER

**MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

**THIS ORDER**

1.    This order contains a freezing injunction made against: (1) the First Respondent, Astor Asset Management 3 Limited; and (2) the Fourth Respondent, Vladimir "Val" Sklarov. This Order also contains proprietary injunctions and orders for associated relief against: (1) the First Respondent; (2) the Second Respondent, Weiser Global Capital Markets Ltd; (3) the Third Respondent, Tavira Monaco SAM; and (4) the Fourth Respondent (together, "**the Respondents**"). This order was made on 2 August 2024 by Mrs/Mr Justice Jacobs on the application of: (1) Ricardo Benjamin Salinas Pliego; and (2) Corporacion RBS SA DE CV ("**the Applicants**"). The Judge read the Affidavit listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order.

2.    This order was made at a hearing without notice to the Respondents, at which the Court was satisfied that it was in the interests of justice to sit in private. Pursuant to CPR rule 39.2(5), this order is not to be published on the judiciary website. The Respondents have a right to apply to the Court to vary or discharge the order—see paragraph 18 below.

3.    There will be a further hearing in respect of this order on 29 August 2024 with a time estimate of 1½ hours ("**the return date**").

4.    This order is effective against any Respondent on whom it is served or who is given notice of it.

**FREEZING INJUNCTION AGAINST THE FIRST AND FOURTH RESPONDENTS**

5.    Until after the return date or further order of the Court, each of the First and Fourth Respondent must not:

    (a)    remove from England and Wales any of its or his assets which are in England and Wales up to the value of MXN 5,411,000,000 ("**the Limit**"); or

    (b)    in any way dispose of, deal with or diminish the value of any of its or his assets which are in or outside England and Wales up to the Limit.

6.    Paragraph 5 applies to all of the First and Fourth Respondents' assets whether or not they are in its or his own name and whether they are solely or jointly owned. For the purpose of this order, the First and Fourth Respondents' assets include any asset which it or he has the power, directly or indirectly, to dispose of or deal with as if it were its or his own.

7.    The prohibition at paragraph 5 includes the following assets in particular:

(a)    Any money standing to the credit of the First or Fourth Respondents in any bank account including the amount of any cheque drawn on such accounts which has not been cleared.

(b)    Any interest under any trust or similar entity including any interest which can arise by virtue of the exercise of any power of appointment, discretion or otherwise howsoever.

(c)    Any shareholdings beneficially owned by the First or Fourth Respondents or the proceeds of sale if any of them have been sold.

8.    If the total value free of charges or other securities ("**unencumbered value**") of each of the First and Fourth Respondents' assets in England and Wales exceeds the Limit, the relevant Respondent may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of the Respondent's assets still in England and Wales remains above the Limit.

9.    If the total unencumbered value of each of the First and Fourth Respondent's assets in England and Wales does not exceed the Limit, the relevant Respondent must not remove any of those assets from England and Wales and must not dispose of or deal with any of them. If the relevant Respondent has other assets outside England and Wales, he or it may dispose of or deal with those assets outside England and Wales so long as the total unencumbered value of all its or his assets whether in or outside England and Wales remains above the Limit.

**PROPRIETARY INJUNCTION AGAINST ALL OF THE RESPONDENTS**

10.    Until the return date or further order of the court, the Respondents must not in any way dispose of, diminish, deal with, charge, pledge or in any way howsoever deal with the

legal or equitable title to or diminish the value of any of the Collateral Shares or their proceeds if they have been sold or otherwise disposed of. The term "Collateral Shares" is defined in paragraph 21 below.

**PROVISION OF INFORMATION BY ALL OF THE RESPONDENTS**

11.  Subject to paragraph 13 below:

    (a)  each of the First and Fourth Respondents must by 5pm London time on 6 August 2024 and to the best of their ability inform the Applicants' solicitors in writing of:

        (i)  all their assets worldwide exceeding £10,000 in value whether in their own name or not and whether solely or jointly owned, giving the value, location and details of all such assets;

        (ii)  whether they hold any Collateral Shares and/or their traceable proceeds and if so the value of said shares or proceeds; and

    (b)  each of the Second and Third Respondents must by 5pm London time on 5 August 2024 and to the best of their ability inform the Applicants' solicitors in writing of whether they hold any Collateral Shares and/or their traceable proceeds and if so the value of said shares or proceeds.

12.  Subject to paragraph 13 below, within 7 days of being served with this order, each of the Respondents must swear and serve on the Applicants' solicitors an affidavit providing the information requested in paragraph 11 above and Schedule C below.

13.  If the provision of any of this information is likely to incriminate the Respondent, she or he may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of Court and may render the Respondent liable to be imprisoned, fined or have its, her or his assets seized.

**EXCEPTIONS TO THIS ORDER**

14.  This order does not prohibit the Respondents from dealing with or disposing of any of its assets in the ordinary and proper course of business and does not prevent the Respondents from spending a reasonable sum on legal advice and representation (so

long as this money does not come from the assets set out in paragraph 10 of this order). Further, this order does not prohibit the Fourth Respondent from spending £10,000 a month towards his ordinary living expenses.

15.    The Respondents may agree with the Applicants' legal representatives that the above spending limit should be increased or that this order should be varied in any other respect, but any agreement must be in writing.

16.    The order will cease to have effect as against each Respondent if it or he:

    (a)    provides security by paying an amount equivalent to the Limit (as set out in paragraph 5 of this order) into Court, to be held to the order of the Court; or

    (b)    makes provision for security in that sum by another method agreed with the Applicants' legal representatives.

**COSTS**

17.    The costs of this application are reserved to the Judge hearing the application on the return date.

**VARIATION OR DISCHARGE OF THIS ORDER**

18.    Anyone served with or notified of this order may apply to the Court at any time to vary or discharge this order (or so much of it as affects that person), but they must first give the Applicants' solicitors three working days' notice of their intention to do so. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicants' solicitors.

**INTERPRETATION OF THIS ORDER**

19.    A Respondent who is an individual who is ordered not to do something must not do it herself or himself or in any other way. She or he must not do it through others acting on her or his behalf or on her or his instructions or with her or his encouragement.

20.    A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

21.   The term "Collateral Shares" shall mean any shares (or interests in shares) in the capital of Grupo Elektra SAB De CV held or formerly held by or for the First Applicant (and includes, for the avoidance of doubt, the traceable proceeds thereof if they have been sold or otherwise disposed of).

## PARTIES OTHER THAN THE APPLICANTS AND RESPONDENTS

22.   **Effect of this order**

It is a contempt of Court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

23.   **Set off by banks**

This injunction does not prevent any bank from exercising any right of set of it may have in respect of any facility which it gave to the respondent before it was notified of this order.

24.   **Withdrawals by the Respondents**

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondents if the withdrawal appears to be permitted by this order.

25.   **Persons outside England and Wales**

(a)   Except as provided in paragraph 25(b) below, the terms of this order do not affect or concern anyone outside the jurisdiction of this Court.

(b)   The terms of this order will affect the following persons in a country or state outside the jurisdiction of this Court:

(i)  the Respondents or their officers or their agents appointed by power of attorney;

(ii)  any person who–

1.   is subject to the jurisdiction of this Court;

2.   has been given written notice of this order at its, her or his residence or

place of business within the jurisdiction of this Court; and

    3.    is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this order; and

  (iii)  any other person, only to the extent that this order is declared enforceable by or is enforced by a Court in that country or state

26.    **Assets located outside England and Wales**

Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party from complying with:

(a)  what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

(b)  any orders of the Courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicants' solicitors.

## SEALING OF THE COURT FILE

27.    Until the Applicants inform the Court in writing that this order has been served on the Respondents, pursuant to CPR 5.4B and 5.4C(4):

(a)  the documents on the Court file shall not be open to inspection on the Court file by any person, and shall be kept sealed;

(b)  the documents on the Court file shall not appear on any Electronic Working Case File (as defined in paragraph 2.4 of Practice Direction 51O) or on any part of the Website (as defined in paragraph 2.3(a) of Practice Direction 51O);

(c)  no person other than the Applicants shall be entitled to inspect or obtain copies of any of the documents on the Court file.

## COMMUNICATIONS WITH THE COURT

All communications to the Court about this order should be sent to the Admiralty and Commercial Court Listing Office, 7 Rolls Building, Fetter Lane, London, EC4A 1NL quoting

the case number. The telephone number is 020 7947 6826.

The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.

Dated 2 August 2024

**NAME AND ADDRESS OF APPLICANTS' LEGAL REPRESENTATIVES**

The Applicants' legal representatives are-

Paul, Weiss, Rifkind, Wharton & Garrison LLP
20 Air Street
London
W1B 5AN, U.K.

Attn: Stefan J. Arnold-Soulby

Telephone: +44 207 367 1613

Email: SArnoldSoulby@paulweiss.com

## SCHEDULE A — AFFIDAVITS

The Applicants relied on the following affidavit:

(1)      The First Affidavit of EDUARDO GONZALEZ SALCEDA SANCHEZ.

## SCHEDULE B — UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT

(1)    If the Court later finds that this order has caused loss to the Respondents (or any of them), and decides that the relevant Respondent should be compensated for that loss, the Applicants will comply with any order the Court may make.

(2)    As soon as practicable the Applicants will issue a claim form and application notice seeking the relief in this order in the form of the draft produced to the Court and serve in accordance with the order of this Court regarding service of documents on the Respondents dated 2 August 2024.

(3)    The Applicants will serve upon the Respondents in addition to this order as soon as reasonably practicable:

1. copies of the affidavits and exhibits containing the evidence relied upon by the Applicant, and any other documents provided to the Court on the making of the application;

2. the claim form;

3. the Applicants' skeleton argument and a transcript (if available) or note of the hearing; and

4. an application notice for continuation of the order.

(4)    Anyone notified of this order will be given a copy of it by the Applicants' legal representatives.

(5)    The Applicants will pay the reasonable costs of anyone other than the Respondents which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondents' assets and if the Court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicants will comply with any order the Court may make.

(6)    If this order ceases to have effect (for example, if the Respondents provide security as provided for above) the Applicants will immediately take all reasonable steps

to inform in writing anyone to whom they have given notice of this order, or who they have reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

(7)    The Applicants will not without the permission of the Court use any information obtained as a result of this order for the purpose of any civil or criminal proceedings, either in England and Wales or in any other jurisdiction, other than this claim.

(8)    The Applicants will not without the permission of the Court seek to enforce this order in any country outside England and Wales or seek an order of a similar nature including orders conferring a charge or other security against the Respondents or the Respondents' assets.

## SCHEDULE C — INFORMATION REQUESTS

Requests of the First Respondent:

1.    If and insofar as you hold any of the Collateral Shares, please identify:

    (a)    The dates on which the Collateral Shares were transferred to you; and

    (b)    The basis on which the Collateral Shares were transferred to you;

2.    If and insofar as you held but have subsequently disposed of or transferred away any of the Collateral Shares:

    (a)    Identify the date of every such disposal/transfer and the name of the transferee.

    (b)    Please identify the location of the proceeds of any Collateral Shares that have been disposed of.

Requests of the Second and Third Respondents:

1.    If and insofar as you held but no longer hold any of the Collateral Shares, please:

    (a)    Identify who you transferred the shares to and the dates of each transfer.

    (b)    Identify the basis on which you transferred the shares, including by answering the following questions:

        (i)    On whose instructions you were acting?

        (ii)    If known, who is the specific human person who gave the relevant instructions?

Requests of the Fourth Respondent:

1.    Have you directly or indirectly caused the Collateral Shares to be disposed of?

2.    If the answer to question (1) is "yes":

    (a)    Identify the date of every such disposal and the name of the transferee.

    (b)    What has happened to the proceeds of any Collateral Shares that have been disposed of? Full and complete details must be provided.

# EXHIBIT 9

# Claim Form

In the **High Court of Justice**
**Business and Property Courts of**
**England and Wales***
**King's Bench Division**
**Commercial Court**

06 Aug 2024

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024

| Claim no. | CL-2024-000450 |
|---|---|
| Issue date | 2 August 2024 |

CL-2024-000450

## Claimant(s)

(1)RICARDO BENJAMIN SALINAS PLIEGO
(2)CORPORACION RBS SA DE CV

SEAL

## Defendant(s)

(1)ASTOR ASSET MANAGEMENT 3 LIMITED
(2)WEISER GLOBAL CAPITAL MARKETS LTD
(3)TAVIRA MONACO SAM
(4)VLADIMIR "VAL" SKLAROV
(5) Cornelius Vanderbilt Capital Management Ltd

Name and address of Defendant receiving this claim form

See Annex A to this Claim Form

|  | £ |
|---|---|
| Amount claimed | [**] More than £200,000 |
| Court fee | £10,000 |
| Legal representative's costs |  |
| **Total amount** |  |

The court office at the Admiralty and Commercial Court Listing Office, Rolls Building, 7 Rolls Buildings, Fetter Lane, London EC4A 1NL is open between 10 am and 4.30 pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.

 © Crown copyright 2022

| Claim No. | CL-2024-000450 |
|---|---|

Brief details of claim

See Annex B to this Claim Form

Particulars of claim (*attached)(*will follow if an acknowledgment of service is filed that indicates an intention to defend the claim)

Paul, Weiss, Rifkind, Wharton & Garrison LLP
20 Air Sreett Street,
London
W1B 5AN

Claimant's or legal representative's address to which documents or payments should be sent if different from overleaf including (if appropriate) details of DX, fax or e-mail.

## Statement of truth

**I understand that proceedings for contempt of court may be brought against a person who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.**

[ ] **I believe** that the facts stated in this claim form and any attached sheets are true.

[X] **The Claimant** believes that the facts stated in this claim form and any attached sheets are true. **I am authorised** by the claimant to sign this statement.

**Signature**

S Arnold-Soulby

[ ] Claimant
[ ] Litigation friend (where claimant is a child or protected party)
[X] Claimant's legal representative (as defined by CPR 2.3(1))

**Date**

| Day | Month | Year |
|-----|-------|------|
| 0 6 | 0 8 | 2 0 2 4 |

Full name

Stefan Arnold Soulby

Name of claimant's legal representative's firm

Paul, Weiss, Rifkind, Wharton & Garrison LLP

If signing on behalf of firm or company give position or office held

Partner

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**B E T W E E N :**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

**Claimants**

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV**

**(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

**Defendants**

---

**AMENDED ANNEX A – DEFENDANTS' NAMES AND ADDRESSES**

---

**(1)  ASTOR ASSET MANAGEMENT 3 LIMITED:**

　　(a)　18C-3107 BC Quebec (Quebec) Hotels G1W4W5 Canada

　　(b)　Perseverance Island S12-56-4 Mahe Seychelles

　　(c)　Street Kos-Anatolskoho Building 4, Flat 225, Lviv 79066 Ukraine

　　(d)　operations@astorassetgroup.com

　　(e)　albert.yuen@astorassetgroup.com

　　(f)　gregory.mitchell@astorassetgroup.com

**(2) WEISER GLOBAL CAPITAL MARKETS LTD:**

　　(a)　Unit A - Balmoral Corporate Center, Balmoral Development, Sanford Drive, Nassau, Bahamas

　　(b)　info@weiser.com.bs

　　(c)　openaccount@weiser.com.bs

　　(d)　Collateralservices@weiser.com.bs

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024

**(3) TAVIRA MONACO SAM:**

 (a) Le Montaigne, 6 BD Des Moulins, 1st Floor, Monaco, Monaco 98000

 (b) INTLOperations@tavirasecurities.com

**(4) VLADIMIR "VAL" SKLAROV**:

 (a) 142 Gold Springs Court, Canton, GA 30114

 (b) investments18@msn.com

 (c) boychic@tivejo.com

 (d) operations@astorassetgroup.com

 (e) gregory.mitchell@astorassetgroup.com

**(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

 (a) 4 Lombard Street, London, United Kingdom, EC3V9HD

 (b) SK, Regina - Royal Bank Building, 2010 11th Avenue, 7th Floor, Regina, S4P 0J3, Canada

 (c) info@vanderbilt.ltd

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (KBD)**
**B E T W E E N :**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**
**(2) CORPORACION RBS SA DE CV**

<u>**Claimants**</u>

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**
**(2) WEISER GLOBAL CAPITAL MARKETS**
**(3) TAVIRA MONACO SAM**
**(4) VLADIMIR "VAL" SKLAROV**
**(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

<u>**Defendants**</u>

---

<u>**AMENDED**</u> **ANNEX B – BRIEF DETAILS OF CLAIM**

---

The Claimants' amended claim arises out of and in connection with (amongst other documents) the following:

(i)     A stock-lending agreement executed on 28 July 2021 (the **SLA**) between Astor Asset Management 3 Limited (**Astor 3**) as lender, Corporacion RBS SA de CV (**RBS**) as borrower and Richard Benjamin Salinas Pleigo (**Mr Salinas**) as guarantor, pursuant to which Astor agreed to advance loans of up to MXN 3,008,580,000 to RBS, secured over shares in Grupo Elektra SAB De CV (**Elektra**) owned by Mr Salinas;

(ii)    A custodian management agreement dated 28 July 2021 between Weiser Global Capital Market (**Weiser**) RBS, Mr Salinas and Astor 3 (the **Weiser Agreement**);

(iii)   A control agreement dated 1 November 2021 between Tavira Monaco SAM (**Tavira**), RBS, Mr Salinas and Astor 3 (the **Tavira Agreement** together with the Weiser Agreement the **Depository Agreements**)); and

(iv)    Five closing statements pursuant to which five tranches of loans were made available to RBS under the SLA (the **Closing Statements**).

The Claimants were induced to enter into the above agreements on the basis of representations (express or implied) by Astor 3 to the effect that:

1. Astor 3 was a legitimate and honest financial institution which engaged in legitimate and honest stock-lending activities; and
2. Astor 3 intended to comply with its obligations under the SLA, including in particular its obligations not to sell the Elektra shares prior to maturity or default.

(the **Representations**)

Astor 3 has advanced a total of five loans to RBS pursuant to the SLA, with a total principal amount of MXN 2,154,218,552.55 (approximately USD 114 million as at the date of this claim form). These loans are secured over a total of 7,204,296 Elektra shares belonging to Mr Salinas (the **Collateral Shares**), of which 935,913 should be held by Weiser, and 6,268,383 should be held by Tavira pursuant to the Depository Agreements.

It appears that Astor 3 has given instructions to Weiser and/or Tavira to dispose of at least some of the Collateral Shares. The Claimants wrote to Weiser and Tavira on 10 June 2024 to say that they should not dispose of the shares. Further, on 26 July 2024, Elektra issued a press release stating that it had become aware of a possible fraud in respect of the shares. On 1 August 2024, Tavira informed the Claimants that it had transferred the 6,268,383 Elektra shares "*to Astor's account, as per Astor's instructions*". According to a trade report supplied by Tavira, this transfer to Astor took place on 29 July 2024.

As a result of recent investigations, the Claimants are now aware that: (i) Astor 3 is controlled by Vladimir "Val" Sklarov (**Mr Sklarov**) who has a long history of fraud and who has been engaged in stock-lending fraud; and (ii) Astor 3 is not a conventional financial institution with the ability to fund loans worth hundreds of millions of dollars from its own capital (or by borrowing the money from legitimate third parties) but in fact an entity used by Mr Sklarov to perpetrate stock-lending fraud.

In the premises, the Representations were false (to the knowledge of Astor 3 and Mr Sklarov) in that: (i) Astor 3 was not a legitimate and honest financial institution and did not engage in legitimate and honest stock-lending activities; and (ii) from the outset, Astor 3 had no intention of complying with its obligations under the SLA, including in particular its obligations not to sell the Elektra shares prior to maturity or default.

Amended Claim Form under CPR rule 17.1(1) dated 6 August 2024

In light of the above, the Claimants consider that they have been victims of a stock-lending fraud conducted by Mr Sklarov via his company Astor 3 that fraudulently induced the Claimants to enter into the SLA, the Closing Statements and the Depository Agreements by knowingly making the Representations that were false. Through this fraud, Astor 3 has gained control of the Collateral Shares owned by Mr Salinas and is wrongfully disposing of them contrary to the terms of the SLA and the Claimants' intentions.

On or about 1 August 2024, the Applicants sent a notice to Astor 3 rescinding the SLA, the Closing Statements and the Depository Agreements on the basis that it entered into those agreements as a result of fraudulent misrepresentations.

On 2 August 2024, Mr Justice Jacobs granted the Claimants a freezing order against Astor 3 and Mr Sklarov; a proprietary injunction against each of Astor 3, Weiser, Tavira and Mr Sklarov and orders for associated relief (the **2 August Order**).

In accordance with the 2 August Order, Tavira wrote to the Claimants informing them that, amongst other things, Astor 3 "*rehypothecated the shares* [the Collateral Shares] *to Cornelius Vanderbilt Capital Management Ltd*."

As a result of recent investigations and publicly available information, the Claimants consider that Cornelius Vanderbilt Capital Management Ltd. is controlled by Mr Sklarov and used by Mr Sklarov as part of his fraudulent stock-lending schemes.

**(i) Relief arising from Fraudulent Misrepresentation**

*Recission*

1.    The Claimants seek declarations that:

   (1)    the SLA, the Closing Statements and the Depository Agreements have been validly rescinded by the Claimants; and

   (2)    Mr Salinas is the beneficial owner of the Collateral Shares and the traceable proceeds of the Collateral Shares.

2.    In addition, the Claimants seek an order requiring Astor 3, Weiser, ~~and~~ Tavira and Cornelius Vanderbilt Capital Management Ltd. to return the Collateral Shares (comprising 7,204,296 Elektra shares) or their proceeds to Mr Salinas forthwith.

*Damages for deceit*

3.    The Claimants have suffered loss and damage equal to the value of any Elektra shares which are not recovered by them on a proprietary basis. Accordingly, Astor 3 is liable to pay damages to the Claimants for the tort of deceit in respect of any losses sustained by the Claimants in consequence of entering into the SLA, the Closing Statements and the Depository Agreements.

**(ii) Contractual Claims**

In the alternative, if (but only if) the SLA has not been (and cannot be) rescinded, the Claimants seek the following relief.

*Order for Redemption*

4.    The Claimants seek an order that Astor 3, Weiser and Tavira delivery up the Collateral Shares to Mr Salinas against the payment of all sums owing to Astor 3 under the SLA.

*Damages for breach of contract*

5.    To the extent that Astor 3 has wrongly sold or otherwise dealt with Collateral Shares contrary to the terms of the SLA, the Claimants seek damages from Astor 3 for the losses suffered as a result of breaches of the terms of the SLA.

**(iii) Economic Tort Claims**

Further or alternatively, the Claimants have the following causes of action (and seek the following relief) from Astor 3, and Mr Sklarov and Cornelius Vanderbilt Capital Management Ltd.

*Intention to cause harm using unlawful means*

6.    If Mr Sklarov alone intended to cause harm to the Claimants by unlawful means by making the fraudulent misrepresentations and/or breaching of the SLA, then the Claimants seek damages from Mr Sklarov equal to the value of any Collateral Shares Elektra shares which are not recovered by them on a proprietary basis.

*Conspiracy to cause harm using unlawful means*

7.    Alternatively, if Mr Sklarov acted in concert with Astor 3 and/or Cornelius Vanderbilt Capital Management Ltd. and/or others with the intention of causing harm to the

Claimants by unlawful means (namely the fraudulent misrepresentations and/or the breaches of the SLA), then the Claimants seek damages from both Astor 3, and Mr Sklarov and Cornelius Vanderbilt Capital Management Ltd. equal to the value of any Collateral Shares Elektra shares which are not recovered by them on a proprietary basis.

**(v) Other Relief**

8.    The Claimants claim such other relief as the Court thinks fit.

# EXHIBIT 10

Claim No: CL-2024-000450

07 Aug 2024

CL-2024-000450

IN THE HIGH COURT OF JUSTICE

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

COMMERCIAL COURT (KBD)

On 7 August 2024

Before the Honourable Mr Justice Jacobs


BETWEEN:

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

<u>Applicants/Claimants</u>

-and-

**CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

<u>Respondents/Defendants</u>


---

**FREEZING AND PROPRIETARY ORDER**

---


**PENAL NOTICE**


**IF YOU CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.**

**ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE RESPONDENT TO BREACH THE TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

**THIS ORDER**

1.   This order contains a freezing injunction made against the Respondent, Cornelius Vanderbilt Capital Management Ltd. This Order also contains a proprietary injunction and orders for associated relief against the Respondent. This order was made on 7 August 2024 by Mr Justice Jacobs on the application of: (1) Ricardo Benjamin Salinas Pliego; and (2) Corporacion RBS SA DE CV ("**the Applicants**"). The Judge read the Affidavits listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order.

2.   This order was made at a hearing on short notice to the Respondent. The Respondent has a right to apply to the Court to vary or discharge the order—see paragraph 18 below.

3.   There will be a further hearing in respect of this order on 29 August 2024 at the same time and before the same Judge as the return date in respect of the injunctions granted in this matter by Jacobs J on 2 August 2024 with a combined time estimate of 1½ hours ("**the return date**").

4.   This order is effective against the Respondent when served with it or when notice of it is given.

**FREEZING INJUNCTION**

5.   Until after the return date or further order of the Court, the Respondent must not:

(a)  remove from England and Wales any of its or his assets which are in England and Wales up to the value of MXN 5,411,000,000 ("**the Limit**"); or

(b)  in any way dispose of, deal with or diminish the value of any of its or his assets which are in or outside England and Wales up to the Limit.

6.   Paragraph 5 applies to all of the Respondent's assets whether or not they are in its own name and whether they are solely or jointly owned. For the purpose of this order, the Respondent's assets include any asset which it has the power, directly or indirectly, to dispose of or deal with as if it were its own.

7.   The prohibition at paragraph 5 includes the following assets in particular:

(a) Any money standing to the credit of the Respondent in any bank account including the amount of any cheque drawn on such accounts which has not been cleared.

(b) Any interest under any trust or similar entity including any interest which can arise by virtue of the exercise of any power of appointment, discretion or otherwise howsoever.

(c) Any shareholdings beneficially owned by the Respondent or the proceeds of sale if any of them have been sold.

8. If the total value free of charges or other securities ("**unencumbered value**") of the Respondent's assets in England and Wales exceeds the Limit, the Respondent may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of the Respondent's assets still in England and Wales remains above the Limit.

9. If the total unencumbered value of the Respondent's assets in England and Wales does not exceed the Limit, the Respondent must not remove any of those assets from England and Wales and must not dispose of or deal with any of them. If the relevant Respondent has other assets outside England and Wales, it may dispose of or deal with those assets outside England and Wales so long as the total unencumbered value of all its assets whether in or outside England and Wales remains above the Limit.

**PROPRIETARY INJUNCTION**

10. Until the return date or further order of the court, the Respondent must not in any way dispose of, diminish, deal with, charge, pledge or in any way howsoever deal with the legal or equitable title to or diminish the value of any of the Collateral Shares or their proceeds if they have been sold or otherwise disposed of. The term "Collateral Shares" is defined in paragraph 21 below.

**PROVISION OF INFORMATION**

11. Subject to paragraph 13 below, the Respondent must by noon London time on 12 August 2024 and to the best of its ability inform the Applicants' solicitors in writing of

(a) all its assets worldwide exceeding £10,000 in value whether in its own name or not

and whether solely or jointly owned, giving the value, location and details of all such assets; and

(b) whether it holds any Collateral Shares and/or their traceable proceeds and if so the value of said shares or proceeds.

12. Subject to paragraph 13 below, within 7 days of being served with this order, the Respondent must swear and serve on the Applicants' solicitors an affidavit providing the information requested in paragraph 11 above and Schedule C below.

13. If the provision of any of this information is likely to incriminate the Respondent, it may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of Court and may render the Respondent liable to be imprisoned, fined or have its assets seized.

**EXCEPTIONS TO THIS ORDER**

14. This order does not prohibit the Respondent from dealing with or disposing of any of its assets in the ordinary and proper course of business and does not prevent the Respondent from spending a reasonable sum on legal advice and representation (so long as this money does not come from the assets set out in paragraph 10 of this order).

15. The Respondent may agree with the Applicants' legal representatives that the above spending limit should be increased or that this order should be varied in any other respect, but any agreement must be in writing.

16. The order will cease to have effect as against the Respondent if it:

(a) provides security by paying an amount equivalent to the Limit (as set out in paragraph 5 of this order) into Court, to be held to the order of the Court; or

(b) makes provision for security in that sum by another method agreed with the Applicants' legal representatives.

**COSTS**

17. The costs of this application are reserved to the Judge hearing the application on the

return date.

**VARIATION OR DISCHARGE OF THIS ORDER**

18.  Anyone served with or notified of this order may apply to the Court at any time to vary or discharge this order (or so much of it as affects that person), but they must first give the Applicants' solicitors three working days' notice of their intention to do so. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicants' solicitors.

**INTERPRETATION OF THIS ORDER**

19.  A Respondent who is an individual who is ordered not to do something must not do it herself or himself or in any other way. She or he must not do it through others acting on her or his behalf or on her or his instructions or with her or his encouragement.

20.  A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

21.  The term "Collateral Shares" shall mean any shares (or interests in shares) in the capital of Grupo Elektra SAB De CV held or formerly held by or for the First Applicant (and includes, for the avoidance of doubt, the traceable proceeds thereof if they have been sold or otherwise disposed of).

**PARTIES OTHER THAN THE APPLICANTS AND RESPONDENT**

22.  **Effect of this order**

It is a contempt of Court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

23.  **Set off by banks**

This injunction does not prevent any bank from exercising any right of set of it may have in respect of any facility which it gave to the respondent before it was notified of this order.

24.    **Withdrawals by the Respondent**

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondent if the withdrawal appears to be permitted by this order.

25.    **Persons outside England and Wales**

(a)   Except as provided in paragraph 25(b) below, the terms of this order do not affect or concern anyone outside the jurisdiction of this Court.

(b)   The terms of this order will affect the following persons in a country or state outside the jurisdiction of this Court:

  (i)  the Respondent or its officers or its agents appointed by power of attorney;

  (ii)  any person who–

    1.    is subject to the jurisdiction of this Court;

    2.    has been given written notice of this order at its, her or his residence or place of business within the jurisdiction of this Court; and

    3.    is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this order; and

  (iii)  any other person, only to the extent that this order is declared enforceable by or is enforced by a Court in that country or state

26.    **Assets located outside England and Wales**

Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party from complying with:

(a)   what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

(b)   any orders of the Courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicants' solicitors.

**COMMUNICATIONS WITH THE COURT**

All communications to the Court about this order should be sent to the Admiralty and Commercial Court Listing Office, 7 Rolls Building, Fetter Lane, London, EC4A 1NL quoting the case number. The telephone number is 020 7947 6826.

The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.

Dated 7 August 2024

**NAME AND ADDRESS OF APPLICANTS' LEGAL REPRESENTATIVES**

The Applicants' legal representatives are-

Paul, Weiss, Rifkind, Wharton & Garrison LLP
20 Air Street
London
W1B 5AN, U.K.

Attn: Stefan J. Arnold-Soulby

Telephone: +44 207 367 1613

Email: SArnoldSoulby@paulweiss.com

## SCHEDULE A — AFFIDAVITS

The Applicants relied on the following:

(1)     The First Affidavit of EDUARDO GONZALEZ SALCEDA SANCHEZ sworn on 5 August 2024.

(2)     The witness statement of EDUARDO GONZALEZ SALCEDA SANCHEZ dated 7 August 2024.

## SCHEDULE B — UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT

(1)    If the Court later finds that this order has caused loss to the Respondent, and decides that the Respondent should be compensated for that loss, the Applicants will comply with any order the Court may make.

(2)    As soon as practicable the Applicants will serve the amended claim form and issue and serve the application notice seeking the relief in this order (in the form of the draft produced to the Court) in accordance with the order of this Court regarding service of documents on the Respondent dated 7 August 2024.

(3)    The Applicants will file a sworn affidavit in the form of the witness statement of Eduardo Gonzalez Salceda Sanchez dated 7 August 2024 within 7 days of this order.

(4)    The Applicants will serve upon the Respondent, in addition to this order, as soon as reasonably practicable:

   1.    copies of the affidavits and exhibits containing the evidence relied upon by the Applicants, and any other documents provided to the Court on the making of the application;

   2.    the Applicants' skeleton argument and a transcript (if available) or note of the hearing; and

   3.    an application notice for continuation of the order.

(5)    Anyone notified of this order will be given a copy of it by the Applicants' legal representatives.

(6)    The Applicants will pay the reasonable costs of anyone other than the Respondent which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondent's assets and if the Court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicants will comply with any order the Court may make.

(7)    If this order ceases to have effect (for example, if the Respondent provides security as provided for above) the Applicants will immediately take all reasonable steps to inform in writing anyone to whom they have given notice of this order, or who they have reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

(8)    The Applicants will not without the permission of the Court use any information obtained as a result of this order for the purpose of any civil or criminal proceedings, either in England and Wales or in any other jurisdiction, other than this claim.

(9)    The Applicants will not without the permission of the Court seek to enforce this order in any country outside England and Wales or seek an order of a similar nature including orders conferring a charge or other security against the Respondent or the Respondent's assets.

## SCHEDULE C — INFORMATION REQUESTS

1.  If and insofar as you hold any of the Collateral Shares, please identify:

    (a)  The dates on which the Collateral Shares were transferred to you; and

    (b)  The basis on which the Collateral Shares were transferred to you;

2.  If and insofar as you held but have subsequently disposed of or transferred away any of the Collateral Shares:

    (a)  Identify the date of every such disposal/transfer and the name of the transferee.

    (b)  Please identify the location of the proceeds of any Collateral Shares that have been disposed of.

    (a)  Identify the basis on which you transferred the shares, including by answering the following questions:

        (i)  On whose instructions you were acting?

        (ii)  If known, who is the specific human person who gave the relevant instructions?

# EXHIBIT 11

Claim No: CL-2024-000450

13 Aug 2024

CL-2024-000450

IN THE HIGH COURT OF JUSTICE

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

COMMERCIAL COURT (KBD)

Before: His Honour Judge Pelling KC (Sitting as a Judge of the High Court)


BETWEEN:

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

<u>Applicants/Claimants</u>

-and-

**ASTOR CAPITAL FUND LTD**

<u>Respondent</u>

_____

**FREEZING AND PROPRIETARY ORDER**

_____


**PENAL NOTICE**


**IF YOU ASTOR CAPITAL FUND LTD DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.**

**ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE RESPONDENT TO BREACH THE TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

**THIS ORDER**

1.  This order contains a freezing injunction made against the Respondent, Astor Capital Fund Ltd. This Order also contains a proprietary injunction and orders for associated relief against the Respondent. This order was made on 13 August 2024 by His Honour Judge Pelling KC on the application of: (1) Ricardo Benjamin Salinas Pliego; and (2) Corporacion RBS SA DE CV ("**the Applicants**"). The Judge read the materials listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order.

2.  This order was made at a hearing on short notice to the Respondent. The Respondent has a right to apply to the Court to vary or discharge the order—see paragraph 18 below.

3.  There will be a further hearing in respect of this order on 29 August 2024 at the same time and before the same Judge as the return date in respect of the injunctions granted in this matter by Jacobs J on 2 August 2024 and 7 August 2024 with a combined time estimate of 1½ hours ("**the return date**").

4.  This order is effective against the Respondent when served with it or when notice of it is given.

**FREEZING INJUNCTION**

5.  Until after the return date or further order of the Court, the Respondent must not:

    (a) remove from England and Wales any of its or his assets which are in England and Wales up to the value of MXN 5,411,000,000 ("**the Limit**"); or

    (b) in any way dispose of, deal with or diminish the value of any of its or his assets which are in or outside England and Wales up to the Limit.

6.  Paragraph 5 applies to all of the Respondent's assets whether or not they are in its own name and whether they are solely or jointly owned. For the purpose of this order, the Respondent's assets include any asset which it has the power, directly or indirectly, to dispose of or deal with as if it were its own.

7.  The prohibition at paragraph 5 includes the following assets in particular:

(a) Any money standing to the credit of the Respondent in any bank account including the amount of any cheque drawn on such accounts which has not been cleared.

(b) Any interest under any trust or similar entity including any interest which can arise by virtue of the exercise of any power of appointment, discretion or otherwise howsoever.

(c) Any shareholdings beneficially owned by the Respondent or the proceeds of sale if any of them have been sold.

8. If the total value free of charges or other securities ("**unencumbered value**") of the Respondent's assets in England and Wales exceeds the Limit, the Respondent may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of the Respondent's assets still in England and Wales remains above the Limit.

9. If the total unencumbered value of the Respondent's assets in England and Wales does not exceed the Limit, the Respondent must not remove any of those assets from England and Wales and must not dispose of or deal with any of them. If the relevant Respondent has other assets outside England and Wales, it may dispose of or deal with those assets outside England and Wales so long as the total unencumbered value of all its assets whether in or outside England and Wales remains above the Limit.

**PROPRIETARY INJUNCTION**

10. Until the return date or further order of the court, the Respondent must not in any way dispose of, diminish, deal with, charge, pledge or in any way howsoever deal with the legal or equitable title to or diminish the value of any of the Collateral Shares or their proceeds if they have been sold or otherwise disposed of. The term "Collateral Shares" is defined in paragraph 21 below.

**PROVISION OF INFORMATION**

11. Subject to paragraph 13 below, the Respondent must by 4pm London time on 20 August 2024 and to the best of its ability inform the Applicants' solicitors in writing of

(a) all its assets worldwide exceeding £10,000 in value whether in its own name or not

and whether solely or jointly owned, giving the value, location and details of all such assets; and

(b)   whether it holds any Collateral Shares and/or their traceable proceeds and if so the value of said shares or proceeds.

12.   Subject to paragraph 13 below, within 10 working days of being served with this order, the Respondent must swear and serve on the Applicants' solicitors an affidavit providing the information requested in paragraph 11 above and Schedule C below.

13.   If the provision of any of this information is likely to incriminate the Respondent, it may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of Court and may render the Respondent liable to be imprisoned, fined or have its assets seized.

**EXCEPTIONS TO THIS ORDER**

14.   This order does not prohibit the Respondent from dealing with or disposing of any of its assets in the ordinary and proper course of business and does not prevent the Respondent from spending a reasonable sum on legal advice and representation (so long as this money does not come from the assets set out in paragraph 10 of this order).

15.   The Respondent may agree with the Applicants' legal representatives that the above spending limit should be increased or that this order should be varied in any other respect, but any agreement must be in writing.

16.   The order will cease to have effect as against the Respondent if it:

(a)   provides security by paying an amount equivalent to the Limit (as set out in paragraph 5 of this order) into Court, to be held to the order of the Court; or

(b)   makes provision for security in that sum by another method agreed with the Applicants' legal representatives.

**COSTS**

17.   The costs of this application are reserved to the Judge hearing the application on the

return date.

**VARIATION OR DISCHARGE OF THIS ORDER**

18.   Anyone served with or notified of this order may apply to the Court at any time to vary or discharge this order (or so much of it as affects that person), but they must first give the Applicants' solicitors three working days' notice of their intention to do so. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicants' solicitors.

**INTERPRETATION OF THIS ORDER**

19.   A Respondent who is an individual who is ordered not to do something must not do it herself or himself or in any other way. She or he must not do it through others acting on her or his behalf or on her or his instructions or with her or his encouragement.

20.   A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

21.   The term "Collateral Shares" shall mean any shares (or interests in shares) in the capital of Grupo Elektra SAB De CV held or formerly held by or for the First Applicant (and includes, for the avoidance of doubt, the traceable proceeds thereof if they have been sold or otherwise disposed of).

**PARTIES OTHER THAN THE APPLICANTS AND RESPONDENT**

22.   **Effect of this order**

It is a contempt of Court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

23.   **Set off by banks**

This injunction does not prevent any bank from exercising any right of set of it may have in respect of any facility which it gave to the respondent before it was notified of this order.

24. **Withdrawals by the Respondent**

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondent if the withdrawal appears to be permitted by this order.

25. **Persons outside England and Wales**

(a) Except as provided in paragraph 25(b) below, the terms of this order do not affect or concern anyone outside the jurisdiction of this Court.

(b) The terms of this order will affect the following persons in a country or state outside the jurisdiction of this Court:

(i) the Respondent or its officers or its agents appointed by power of attorney;

(ii) any person who–

    1.    is subject to the jurisdiction of this Court;

    2.    has been given written notice of this order at its, her or his residence or place of business within the jurisdiction of this Court; and

    3.    is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this order; and

(iii) any other person, only to the extent that this order is declared enforceable by or is enforced by a Court in that country or state

26. **Assets located outside England and Wales**

Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party from complying with:

(a) what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

(b) any orders of the Courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicants' solicitors.

**COMMUNICATIONS WITH THE COURT**

All communications to the Court about this order should be sent to the Admiralty and Commercial Court Listing Office, 7 Rolls Building, Fetter Lane, London, EC4A 1NL quoting the case number. The telephone number is 020 7947 6826.

The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.

**DATED this the 13TH day August 2024**

**NAME AND ADDRESS OF APPLICANTS' LEGAL REPRESENTATIVES**

The Applicants' legal representatives are-

Paul, Weiss, Rifkind, Wharton & Garrison LLP
20 Air Street
London
W1B 5AN, U.K.

Attn: Stefan J. Arnold-Soulby

Telephone: +44 207 367 1613

Email: SArnoldSoulby@paulweiss.com

## SCHEDULE A — AFFIDAVITS

The Applicants relied on the following:

(1)    The First Affidavit of EDUARDO GONZALEZ SALCEDA SANCHEZ sworn on 5 August 2024.

(2)    The Second Affidavit of EDUARDO GONZALEZ SALCEDA SANCHEZ sworn on 8 August 2024.

(3)    The Third Affidavit of EDUARDO GONZALEZ SALCEDA SANCHEZ sworn on 12 August 2024

## SCHEDULE B — UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT

(1)    If the Court later finds that this order has caused loss to the Respondent, and decides that the Respondent should be compensated for that loss, the Applicants will comply with any order the Court may make.

(2)    As soon as practicable the Applicants will serve in accordance with the orders of this Court dated 2 August 2024, 7 August 2024 and 13 August 2024 regarding service of documents: (i) the issued application to amend the amended claim form to join the Respondent as the Sixth Defendant; and (ii) the issued application notice seeking the relief in this order.

(3)    The Applicants will serve upon the Respondent, in addition to this order:

    a.    by 4pm on 13 August:

        i.    copies of the affidavits and exhibits containing the evidence relied upon by the Applicants, and any other documents provided to the Court on the making of the application;

        ii.    the Applicants' skeleton argument; and

        iii.    an application notice for continuation of this order.

    b.    as soon as reasonable practicable, a transcript (if available) or note of the hearing

(4)    Anyone notified of this order will be given a copy of it by the Applicants' legal representatives.

(5)    The Applicants will pay the reasonable costs of anyone other than the Respondent which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondent's assets and if the Court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicants will comply with any order the Court may make.

(6)     If this order ceases to have effect (for example, if the Respondent provides security as provided for above) the Applicants will immediately take all reasonable steps to inform in writing anyone to whom they have given notice of this order, or who they have reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

(7)     The Applicants will not without the permission of the Court use any information obtained as a result of this order for the purpose of any civil or criminal proceedings, either in England and Wales or in any other jurisdiction, other than this claim.

(8)     The Applicants will not without the permission of the Court seek to enforce this order in any country outside England and Wales or seek an order of a similar nature including orders conferring a charge or other security against the Respondent or the Respondent's assets.

## SCHEDULE C — INFORMATION REQUESTS

1.   If and insofar as you hold any of the Collateral Shares, please identify:

   (a)   The dates on which the Collateral Shares were transferred to you; and

   (b)   The basis on which the Collateral Shares were transferred to you;

2.   If and insofar as you held but have subsequently disposed of or transferred away any of the Collateral Shares:

   (a)   Identify the date of every such disposal/transfer and the name of the transferee.

   (b)   Please identify the location of the proceeds of any Collateral Shares that have been disposed of.

   (a)   Identify the basis on which you transferred the shares, including by answering the following questions:

      (i)   On whose instructions you were acting?

      (ii)   If known, who is the specific human person who gave the relevant instructions?

# EXHIBIT 12

Corrected pursuant to CPR r.40.12(1) on 15TH day August 2024

Claim No: CL-2024-000450

15 Aug 2024

CL-2024-000450

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**On 13 August 2024**

**Before: His Honour Judge Pelling KC (Sitting as a Judge of the High Court)**

**BETWEEN:**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

**Applicants/Claimants**

**-and-**

**ASTOR CAPITAL FUND LTD**

**Respondent**

_____

**Amended ORDER under the slip rule**

_____

**UPON** the Claimants' claim filed by way of claim form dated 2 August 2024 and amended on 6 August 2024 (the **Amended Claim** and the **Amended Claim Form**)

**AND UPON** the Claimants' undertaking to issue an application to amend the Amended Claim Form so as to bring a claim against the Respondent in the form of the draft re-amended claim form shown to the Court (the **Re-Amended Claim Form**)

**AND UPON** the Claimants' application (the **Service Application**) for permission to serve the Re-Amended Claim Form and all other documents in these proceedings out of the jurisdiction (including for the avoidance of doubt the Claimants' application for interim relief dated 7 August 2024 and any order the Court makes on that application (the **Injunction Application**)) on the Respondent

**AND UPON** the Court reading the evidence filed

**AND UPON** this order being made at a hearing *ex parte* on short notice to the Respondent

1

**AND UPON** hearing Stephen Robins KC for the Claimants

**IT IS ORDERED THAT:**

1.    The Claimant has permission pursuant to CPR 6.36 to serve the Re-Amended Claim Form on the Respondent out of the jurisdiction.

2.    The Claimant has permission pursuant to CPR 6.37(5)(b)(ii) to serve any other documents in these proceedings on the Respondent without obtaining further permission of the Court under CPR 6.36.

3.    The Claimant has permission pursuant to CPR 6.37(5)(b)(i) to serve all documents in these proceedings on the Respondent by email at the following email addresses:

       support@astorcapitalfund.ca

       registrations@mslogic.eu

       Service of documents by email as provided for in this paragraph is to be deemed as served on the Respondent at the time the email is sent even if there is a bounce back from the email address.

4.    The following time periods apply following service of the Re-Amended Claim Form in accordance with paragraph 3 above on the Respondent:

       (1)    within 36 22 days, the Respondent must file an acknowledgment of service and, if appropriate, file and serve an admission;

       (2)    within 28 days of the filing of an acknowledgment of service which indicates an intention to defend, the Claimants must serve particulars of claim; and

       (3)    within 28 days from the service of the particulars of claim, the Respondent must file and serve a defence.

5.    The costs of this application are costs in the case.

**DATED this the 15TH day August 2024**

Corrected pursuant to CPR r.40.12(1) on 15TH day August 2024

**<u>Service of the order</u>**

The Court has provided a sealed copy of this Order to the serving party:

The Applicants/Claimants, care of their solicitors, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 20 Air St, London W1B 5A

<span style="color:red">Corrected pursuant to CPR r.40.12(1) on 15TH August 2024 by His Honour Judge Pelling KC (Sitting as a Judge of the High Court)</span>

Claim No: CL-2024-000450

15 Aug 2024

CL-2024-000450

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**On 7 August 2024**

**Before the Honourable Mr Justice Jacobs**

**BETWEEN:**

**(1) RICARDO BENJAMIN SALINAS PLIEGO**

**(2) CORPORACION RBS SA DE CV**

**Applicants/Claimants**

**-and-**

**(1) ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2) WEISER GLOBAL CAPITAL MARKETS LTD**

**(3) TAVIRA MONACO SAM**

**(4) VLADIMIR "VAL" SKLAROV**

**(5) CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

**Respondents/Defendants**

**Amended ORDER under the slip rule**

**UPON** the Claimants' claim filed by way of claim form dated 2 August 2024 and amended on 6 August 2024 (the **Amended Claim** and the **Amended Claim Form**)

**AND UPON** the Claimants' application (the **Service Application**) for permission to serve the Amended Claim Form and all other documents in these proceedings out of the jurisdiction (including for the avoidance of doubt the Claimants' application for interim relief dated 7 August 2024 and any order the Court makes on that application (the **Injunction Application**)) on the Fifth Defendant

**AND UPON** the Court reading the evidence filed

**AND UPON** this order being made at a hearing *ex parte* on short notice to the Fifth Defendant

**AND UPON** hearing Stephen Robins KC, counsel for the Claimants

Corrected pursuant to CPR r.40.12(1) on 15^(TH) August 2024 by His Honour Judge Pelling KC (Sitting as a Judge of the High Court)

**IT IS ORDERED THAT:**

1.    The Claimant has permission pursuant to CPR 6.36 to serve the Amended Claim Form on the Fifth Defendant out of the jurisdiction.

2.    The Claimant has permission pursuant to CPR 6.37(5)(b)(ii) to serve any other documents in these proceedings on the Fifth Defendant without obtaining further permission of the Court under CPR 6.36.

3.    The Claimant has permission pursuant to CPR 6.37(5)(b)(i) to serve all documents in these proceedings on the Fifth Defendant by email at the following email addresses info@vanderbilt.ltd and snikersok49@gmail.com. Service of documents by email as provided for in this paragraph is to be deemed as served on the Fifth Defendant at the time the email is sent even if there is a bounce back from the email address.

4.    The following time periods apply following service of the Claim Form in accordance with paragraph 3 above on the Fifth Defendant:

   (1)    within ~~14~~ 23 days, the Fifth Defendant must file an acknowledgment of service and, if appropriate, file and serve an admission;

   (2)    within 28 days of the filing of an acknowledgment of service which indicates an intention to defend, the Claimants must serve particulars of claim; and

   (3)    within 28 days from the service of the particulars of claim, the Fifth Defendant must file and serve a defence.

5.    The costs of this application are costs in the case.

**Service of the order**

The Court has provided a sealed copy of this Order to the serving party:

The Applicants/Claimants, care of their solicitors, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 20 Air St, London W1B 5A

Corrected pursuant to CPR r.40.12(1) on 15TH August 2024 by His Honour Judge Pelling KC (Sitting as a Judge of the High Court)

Claim No: CL-2024-000450

15 Aug 2024

CL-2024-000450

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**IN PRIVATE**

**On 2 August 2024**

**Before the Honourable Mr Justice Jacobs**

**BETWEEN:**

### (1) RICARDO BENJAMIN SALINAS PLIEGO

### (2) CORPORACION RBS SA DE CV

**Applicants/Claimants**

**-and-**

### (1) ASTOR ASSET MANAGEMENT 3 LIMITED

### (2) WEISER GLOBAL CAPITAL MARKETS LTD

### (3) TAVIRA MONACO SAM

### (4) VLADIMIR "VAL" SKLAROV

**Respondents/Defendants**

---

### Amended ORDER under the slip rule

---

**UPON** the Claimants' claim (the **Claim**) filed by way of claim form dated 2 August 2024 (the **Claim Form**)

**AND UPON** the Claimants' application (the **Service Application**) for permission to serve the Claim Form and all other documents in these proceedings out of the jurisdiction (including for the avoidance of doubt the Claimants' application for interim relief dated 2 August 2024 and any order the Court makes on that application (the **Injunction Application**))

**AND UPON** the Court reading the evidence filed

**AND UPON** this order being made at a hearing without notice to the Respondents

**AND UPON** hearing Stephen Robins KC, counsel for the Claimants

Corrected pursuant to CPR r.40.12(1) on 15TH August 2024 by His Honour Judge Pelling KC (Sitting as a Judge of the High Court)

**IT IS ORDERED THAT:**

1.    The Claimant has permission pursuant to CPR 6.36 to serve the Claim Form on the Defendants out of the jurisdiction.

2.    The Claimant has permission pursuant to CPR 6.37(5)(b)(ii) to serve any other documents in these proceedings on the Defendants without obtaining further permission of the Court under CPR 6.36.

3.    The Claimant has permission pursuant to CPR 6.37(5)(b)(i) to serve all documents in these proceedings on the Defendants by email at the following email addresses:

   (a)    Astor Asset Management 3 Limited and Vladimir "Val" Sklarov: albert.yuen@astorassetgroup.com; gregory.mitchell@astorassetgroup.com; operations@astorassetgroup.com; investments18@msn.com; boychic@tivejo.com

   (b)    Weiser Global Capital Markets Ltd: Collateralservices@weiser.com.bs; info@weiser.com.bs; openaccount@weiser.com.bs

   (c)    Tavira Monaco SAM: INTLOperations@tavirasecurities.com; Patrick@fietje.com; patrick.fietje@tavirasecurities.com; eliotgoodfellow@gmail.com; eliot.goodfellow@taviramonaco.com; eliot.goodfellow@tavirasecurities.com; compliance@tavirasecurities.com; backup@tavirasecurities.com; simon.mason@tavirasecurities.com

   Service of documents by email as provided for in this paragraph is to be deemed as served on the relevant Defendant at the time the relevant email is sent, even if there is a bounce back from any one or more of the emails.

4.    The following time periods apply following service of the Claim Form in accordance with paragraph 3 above on the Defendants:

   (1)    within ~~14~~ 22 days for the First, Second and Fourth Defendants and 21 days for the Third Defendant, each of the Defendants must file an acknowledgment of service and, if appropriate, file and serve an admission;

Corrected pursuant to CPR r.40.12(1) on 15TH August 2024 by His Honour Judge Pelling KC (Sitting as a Judge of the High Court)

(2)    within 28 days of the filing of an acknowledgment of service which indicates an intention to defend, the Claimants must serve particulars of claim; and

(3)    within 28 days from the service of the particulars of claim, the Defendants must file and serve a defence.

5.    The costs of this application are costs in the case.

### Service of the order

The Court has provided a sealed copy of this Order to the serving party:

The Claimant, care of its solicitors, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 20 Air St, London W1B 5AN

# EXHIBIT 13

First Defendant
Witness Statement of Mr. Vladimir Sklarov
First
Exhibit "VS1"
20 August 2024

**IN THE HIGH COURT OF JUSTICE**                     **CLAIM NO. CL-2024-000450**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**BETWEEN:**

**(1)  RICARDO BENJAMIN SALINAS PLIEGO**

**(2)  CORPORACION RBS SA DE CV**

<b>Applicants</b>

**- v -**

**(1)  ASTOR ASSET MANAGEMENT 3 LIMITED**

**(2)  WEISER GLOBAL CAPITAL MARKETS LTD**

**(3)  TAVIRA MONACO SAM**

**(4)  VLADIMIR "VAL" SKLAROV**

**(5)  CORNELIUS VANDERBILT CAPITAL MANAGEMENT LTD**

**(6)  ASTOR CAPITAL FUND LIMITED**

<b>Respondents</b>

---

**STATEMENT OF VAL SKLAROV**

---

I, **VAL SKLAROV**, c/o DWF Law LLP, 20 Fenchurch Street, London, EC3M 3AG, United Kingdom **WILL SAY AS FOLLOWS:**

1.   I make this statement on behalf of myself and the First, Fourth, Fifth and Sixth Respondents and in support of the application to set aside the Freezing and Proprietary Orders of 2, 7 and 13 August

2024 (the "**Injunction Orders**"), which shall not be construed as submitting to the jurisdiction of the Courts of England and Wales and without prejudice to the Fourth, Fifth and Sixth Respondents' objections to the Court's jurisdiction for which all rights are reserved. In this statement I refer to the First Respondent as "**Astor 3**", the Fifth Respondent as "**Vanderbilt**" and the Sixth Respondent as "**Astor Capital**".

2.  The facts and matters set out in this statement are within my own knowledge unless otherwise stated, and I believe them to be true. Where I refer to information supplied by others or documents I have reviewed, the source of the information is identified; facts and matters derived from other sources are true to the best of my knowledge and belief.

3.  Although I was named Vladimir at birth, I officially changed my name to "Val" on 20 September 2006 by a court process in Illinois, USA. I was living in the USA and at the time there was a lot of distrust of Russian sounding names around the world. I have lived in the USA most of my adult life, consider myself an American and did not wish to remain "Vladimir".

4.  There is now produced and shown to me a paginated bundle of true copy documents marked "**Exhibit VS1**". Unless otherwise stated, all references to documents in this statement are to Exhibit VS1 and all specific page references are marked "**[Exhibit VS1/##]**".

    1.  Overview

5.  The allegations of fraud made in these proceedings by Mr. Salinas and his company RBS are completely baseless, and the Injunction Orders were obtained only by gross misrepresentations and omissions. As I explain in this statement:

    a.  The central complaint of unauthorised stock dealings by Astor 3 in breach of the Stock Lending Agreement between it and RBS and Mr. Salinas (the "**SLA**") is simply incorrect and depends on ignoring provisions of the SLA which plainly contemplate and authorise rehypothecation (further lending-out of, or other transactions in, the stock) by Astor 3.

    b.  Stock which has been loaned out is by its very nature exposed to further transactions which can then be undertaken by the stock borrower, including in particular trading of that stock. This is a main function of the vast global securities lending industry, and a sophisticated and experienced businessman like Mr. Salinas must fully appreciate this.

    c.  Moreover, the intention to engage in such rehypothecation was expressly stated in correspondence in 2021 between Astor 3 and Mr. Salinas's and RBS's representative, Mr. Torti of Fininvesta. An activity now complained of by the Applicants as a breach and indeed a fraudulent breach of the contract was acknowledged at the time as legitimate on behalf of the Applicants.

d.  These provisions of the SLA and this correspondence were not drawn to the attention of Mr. Justice Jacobs (or HHJ Pelling KC on 13 August). Instead, the Court was presented with a selective and extremely limited look at other provisions. The correspondence was never mentioned and does not even feature in the 836-page Hearing Bundle.

e.  The correspondence between Astor 3 and Mr. Salinas's and RBS's representatives also drew attention to the basic commercial logic of the transaction. Astor 3 charged only interest of 1.15% per annum plus a management fee of 0.25% per annum and a one-off 1% origination fee. It was lending at up to 55% of the value of the Elektra stock price (which in 2021 was at an all-time high but typically has been well below that level). This very low return would never itself have motivated a commercial operation to make 5-year loans to RBS. It must always have been obvious to all concerned that there would need to be another way for the lender to make money. That could only be by using the pledged assets in other transactions — as is perfectly common and well-understood in the financial markets.

f.  In addition, the Applicants believed or suspected that Elektra shares were being sold in the market as a result of Astor 3 hypothecating the shares from, at the latest, November 2021 and did not progress the issue until November 2023, or suggest that Astor 3 was acting in breach of contract until July 2024. This delay is not explicable on the Applicants' case and it was glossed over in their evidence and not properly drawn to the Court's attention at the without notice hearings.

g.  Mr. Salinas himself stood to profit under the SLA, which he entered into with the assistance of financial advisors and legal counsel. Mr. Salinas was able to extract liquidity from his shares, while avoiding corporate governance restrictions and capital gains taxes. With an equity-based portfolio heavily reliant on a closely-held stock, Mr. Salinas could not be seen to deal with a significant portion of his shares without a negative market reaction.

h.  Despite all of this, Mr. Salinas and RBS not merely accused the Respondents of breach of contract, but of doing so deliberately and fraudulently. That accusation is not merely incorrect, but has been advanced in a misleading and indeed fundamentally dishonest way.

6.  Mr. Salinas's and RBS's dishonesty was not limited to their allegations of misconduct by the Respondents. They also concealed from the Court vital information as to the commercial and factual background to the proceedings, both in respect of Grupo Elektra SA de CV ("**Elektra**"), Mr. Salinas's principal business whose stock was the subject-matter of the SLA, and in respect of Mr. Salinas himself.

a.  On 26 July 2024, *Simply Wall Street* (a market-leading financial app which claims to have 6 million users) reported that second quarter earnings for 2024 were at a net loss of MXN 644 million (about USD 34 million) versus a profit of MXN 4.94 billion (about USD 250 million) for the same period in 2023. *Simply Wall Street* also stated that earnings had been

declining at an average annual rate of 34% over a 5-year period, and identified Elektra as an investment risk.

b. The Q2 earnings themselves had been reported by the company on 24 July 2024 and had obviously been in preparation and anticipated by the company for some period before then. Elektra's shares then fell by 10% on 26 July 2024 – reported by Bloomberg Financial News as the biggest intraday drop since June 2017.

c. None of this was mentioned to the Court in obtaining the Injunction Orders.

d. On that same day, 26 July 2024, Elektra chose to make an announcement to the market that it had received information from its controlling group of a possible fraud by depositaries of their shares which could cause unusual movements of its price on the stock markets. As a result, the Mexican listing authorities chose to suspend trading in Elektra stock. There has been no further share trading of Elektra shares since 26 July 2024.

e. The impact of Elektra's slide into loss-making has been halted by the suspension of trading which in turn was the predictable result of supposed discovery of fraudulent trading. This however created a need for the company to be seen to be taking action.

f. In short, the supposed dishonest actions of the Respondents provide a convenient escape route for a well-known listed company, which faces disastrous recent financial results, and a run on its shares sufficient for a prominent online investment service to identify it as an investment risk. The share trading suspension has prevented a complete collapse in Elektra's shares but the reason used to obtain that suspension has created a need to find and pursue a scapegoat, which is an obvious (but improper) motivation for these proceedings.

g. This course of events also explains the otherwise inexplicable delay on the part of Mr. Salinas and RBS in acting on the information and suspicions which they accept had for some considerable time concerning the actions of the Respondents and which I referred to above. However despite these supposed concerns, during the period between late 2021 to 2023, Mr. Salinas and RBS were content to receive three further tranches of loan payments, satisfy a margin call by Astor 3 in 2023 by pledging 1,728,207 additional Elektra shares, and request an additional loan from Astor 3 in 2023 against 444,389 newly pledged Elektra shares. Even in late 2023 and early 2024 the Respondents continued discussing potential additional lending of USD 100 million or more.

h. Moreover, Mr. Salinas is not a respectable businessman as the Court obviously assumed in not even requiring him to provide fortification for his and RBS's cross-undertaking.

i. On 20 March 2024, the Mexican tax authorities stated that Mr. Salinas owed MXN 63 billion (almost USD 4 billion), had 17 open and unresolved tax lawsuits, and seized a golf course

4

owned by Mr. Salinas.

ii.   Although Mr. Salinas stated he intended to challenge the tax ruling, on 13 June 2024 it was reported he had been ordered to pay an additional USD 1 billion in taxes. This was not a final order but in itself was reported to represent a substantial amount of Mr. Salinas's assets.

iii.  In 2005, the United States Securities and Exchange Commission ("**SEC**") brought criminal charges against Mr. Salinas for dishonestly, fraudulently and "elaborately concealing" his personal involvement in a target company which one of his other businesses, TV Azteca, was proposing to acquire. The factual basis for those proceedings was extensively set out by the SEC in public documents. When the acquisition was announced, he profited by USD 109 million. His personal interest had been not only concealed by him in breach of disclosure requirements, but he had positively and publicly denied any such interest when questioned about it. Mr. Salinas paid USD 7.5 million (without admitting or denying liability) to settle the SEC's action and also and also undertook not to be a director of any U.S. public company for a period of five years save under limited circumstances.

iv.   This year, the U.S. Department of Justice ("**DOJ**") indicted an officer of Bank Azteca, also controlled by Mr. Salinas and part of Grupo Elektra, for bribery of a US Congressman. The DOJ announced that it is investigating whether Mr. Salinas was involved.

v.    On 15 August 2024, *La Jornada* (a Mexican news outlet) reported that the National Banking and Securities Commission of Mexico ("**CNBV**") had imposed a fine on Mr. Salinas on 11 July 2024 for an amount of MXN 844,900 for disposing of Elektra shares without a public offering or auction authorised by CNBV.

i.    Grupo Elektra's (and Mr. Salinas's) troubles are relevant not only to the overall credibility of the Applicants' case. They also bear directly on the quantum of the supposed loss and damage and therefore on the size of the freezing order. For all these reasons, they also are matters which plainly should have been disclosed to the Court.

7.   A further respect in which Mr. Salinas and RBS failed adequately to present the Respondents' position concerns Events of Default under the SLA. This is of particular significance in relation to the action taken by Astor 3 at the end of July 2024. In accordance with the SLA, Astor 3 instructed the custodians, Weiser and Tavira, to transfer Elektra shares to its own account. The default provisions in the SLA permit expressly this step following an incurable Event of Default, which is precisely what had occurred in circumstances amounting to a Material Event concerning the financial condition of Mr. Salinas, RBS and Elektra. Elektra's declining performance, suspension of trading, Mr. Salinas's muti-billion dollar debt to the Mexican tax authorities, non-payment of interest and other fees, and other breaches of the SLA, singly and in combination, triggered Events of Default.

8.   I am advised that on the basis of the misrepresentations and omissions summarised above, the Injunction Orders should never have been granted against any of the Respondents and in any event, must now be discharged.

9.   Given the blatant abuse of the Court's process, including obtaining a draconian order against me and the other Respondents without any sort of hearing beforehand, it has been very difficult for me to accept that I should provide Mr. Salinas with information which might enable him to inflict yet further damage beyond what the Injunction Orders have already enabled. I have been advised (without waiving privilege) as to the risks involved in not complying with an order of the Court. I have also been advised that there are circumstances in which the Court will consider discharging an order even where a respondent to it has not complied with it. I believe that the blatant failures in this case amount to such circumstances.

10.  I understand that the Applicants have sought relief for the stated purpose of enabling them to trace Elektra shares. I note that records of trading have been provided by the custodian, Tavira, in responding to the Injunction Orders. The First, Fifth and Sixth Respondents did not maintain their own records of trading in Elektra shares (and for the avoidance of doubt, nor did I). Each of these entities left the records to the custodian and relied on these records, as is normal practice in this market. In any event, the individual shares sold are not traceable or identifiable separately from any other shares of that description. The shares are dematerialised and have no individual serial number. The suggestion that the shares could be traced once they had been sold, like the contention that particular identifiable shares needed to be returned to Mr. Salinas and which appears to have been central to the Applicants' legal theories, is nonsensical. Indeed, this is a further respect in which the Applicants' case was presented in a misleading way.

11.  I now set out the detail to show the way in which the Applicants unfairly and misleadingly presented their case to the Court, and why that case is clearly wrong.

   2.   <u>Background</u>

12.  I act as a technical consultant for financial intermediaries. Astor 3, Vanderbilt and Astor Capital are three such entities. I explain this in more detail below. In practice, however, it means that on a day to day basis I have limited knowledge of the precise transactions entered into by those entities and limited access to their correspondence. I am not an owner, nor beneficiary, nor employee or officer of those entities.

   3.   <u>The SLA</u>

13.  I am advised that the crux of the case against me and Astor 3 is that Astor 3 engaged in conduct which it and I understood from the outset was contrary to the terms of the SLA and which was dishonestly concealed from Mr. Salinas and RBS. Thus ultimately, it is my and Astor 3's subjective beliefs which are determinative for the allegation of fraud made against us. I am further advised

that the Applicants' case therefore necessarily involves as a first step showing that the SLA did not permit dealings in Elektra shares, and indeed that this was clearly so. On this basis, the Applicants then advance their central theory that Astor 3 (and I) can only have believed and understood that the SLA prohibited actions which were later taken and were always intended to be taken.[1]

14. As I now explain:

(1) The Applicants' case is clearly wrong and misleading in this respect; and moreover

(2) The presentation of the Applicants' case to the Court in obtaining the Injunction Orders in relation to the terms of the arrangements between the parties was seriously unfair, one-sided and grossly selective.

15. The SLA of 28 July 2021 [**Exhibit VS1/39-69**] <u>expressly</u> permits Astor 3 to act as it has done regarding the Elektra shares, namely to lend the Elektra shares to the Fifth Respondent, Vanderbilt. The Applicants did not refer at all to those express terms of the SLA that permit Astor 3, prior to an Event of Default, to dispose of, trade, deal-in or rehypothecate the pledged shares.

16. As the recital to the SLA records, by the SLA, Mr. Salinas (the Guarantor[2]) granted to Astor 3 (the Lender) a Lien in the 3.6 million publicly traded shares of Elektra.[3]

17. **Clause II(1)(a)** records in terms that Mr. Salinas "*hereby grants to* [Astor 3] *Lien rights over the Pledged Collateral (i.e. the Elektra shares) and in exchange* [Astor 3] *agrees to advance to the Borrower* […] *a loan of up to c. 3 billion Mexican Peso*".

18. **Clause IV(7)** provides that Mr. Salinas "*hereby grants* […] *Encumbrance rights to Lender in exchange for Borrower receiving a Loan*".

19. **Clause V(4)** provided that Astor 3 had "*Lien and Encumbrance rights in the Pledged Collateral*". Lien is defined as to include "*any Encumbrance of any kind referenced herein concerning the Pledged Collateral of Guarantor*". In other words, the SLA expressly provides that Astor 3 could create an Encumbrance over the Pledged Collateral. Encumbrance in the SLA is defined as including "*lien, mortgage, charge, hypothecation, rehypothecation, rights, barter, pawn, trade,*

---

[1] For example, paragraph 101 of the Applicants' Skeleton Argument of 2 August 2024 cites legal authority that "*Making an offer may amount to a representation that in general terms the offeror intends and has the ability to perform the proposed contract, as they understand it.*" [**Exhibit VS/88**] Paragraph 102 contends for an implied representation "*that the lender, who is given control over those shares, has the intention of complying honestly with its contractual obligations*". [**Exhibit VS/88**] Paragraph 109(2) alleges that Astor 3 "*never honestly intended to comply with its obligations under the SLA including in particular its obligations not to sell the Elektra shares prior to maturity or default* […] *it intended from the outset to get control of the Elektra shares with a view to misappropriating them*". [**Exhibit VS/90**]

[2] Capitalised terms in the text have the meaning given to them by the SLA.

[3] Mr. Salinas is said to hold around 67.5 million shares in Elektra, out of a total of c.200 million Elektra shares (para 48 of Claimants' Skeleton Arguments) [**Exhibit VS/79**].

*dispose, deal-in, pledge, re-pledge, repo, borrow or transfer of security interest in Collateral".*[4]

20. Accordingly, pursuant to **Clauses II(1)(a) and IV(7)** of the SLA, Astor 3 was throughout the term of the Loan contractually entitled to (for example) dispose of, deal in, convert, or rehypothecate the Elektra shares.

21. That was reiterated in bold text in the *"Required Disclosures"* at **Clause X**:

> *"It is mutually understood and agreed that Lender has a financial interest and privilege in the pledged shares according to the parties' understanding and contractual agreement […]"*

> *"During the Loan term, all benefits <u>and proceeds</u> of Pledged Collateral inure to Lender."*

> *"Lender reserves the right to maintain dominion over the Collateral during the Loan Term, <u>which affords Lender the right to deal in, dispose, or convert over the Pledged Collateral</u>"* (emphasis added).

22. That entitlement of Astor 3 was subject to the restriction (**Clause V(4)(b)**) that during the Loan Term, provided there has not been an Event of Default, Astor 3 "[would] *not sell or short-sell the shares of the Pledged Collateral <u>on any publicly traded securities exchange</u>"* (emphasis added). There are a number of features and consequences of that restriction to which the Applicants should have drawn attention:

   a. <u>First</u>, the restriction is limited to selling or short-selling on any public securities exchange. Thus no other form of transaction was prohibited. In particular, and given the extremely wide definition of Encumbrance (the rights for which were granted to Astor 3), hypothecation, rehypothecation, trading, bartering, dealing, repledging, and disposals were all permitted. Rehypothecation in the industry means lending out. The borrower on the other side of that transaction may freely trade, convert, hedge, or further rehypothecate the shares.

   b. <u>Second</u>, it is implicit in that restriction that Astor 3 *was* in fact permitted to sell or short-sell the Pledged Collateral in private (known as Over the Counter or "**OTC**" or Off-Market[5]) transactions:  otherwise the prohibition would not have been limited to a sale on any *"publicly traded securities exchange"*, or would simply have been unnecessary. Thus, for that reason alone, the central contention of the Applicants that the self-same shares as were pledged had

---

[4] The full definition of Encumbrance is "*Lender's legal claim on Pledged Collateral that affects the Borrower's ability to transfer ownership to anyone or to dispose of the Pledged Collateral without Lenders prior written authorization. For purposes of this definition, Encumbrance shall mean lien, mortgage, charge, hypothecation, rehypothecation, rights, barter, pawn, trade, dispose, deal-in, pledge, re-pledge, repo, borrow or transfer of security interest in Collateral. The Pledged Collateral will be restricted to Guarantor and Encumbrance rights exclusively granted to Lender.*"

[5] The International Securities Lending Association ("**ISLA**") located in London, whose members include the world's largest banks and brokerage houses in its glossary describes OTC as: "*Over-the-counter or off-exchange trading is done directly between two parties, without the supervision of an exchange. It is contrasted with exchange trading, which occurs via exchanges.*" [**Exhibit VS/178**] A list of members of the ISLA is at [**Exhibit VS/170-177**]

to be returned cannot be correct.

c.   Yet the Applicants' counsel told the Court on 2 August 2024 that "*any change to the pledged collateral that happened as a result of events outside of the lender's control (such as a stock division) will be permissible but subject to that identical securities have to be returned* […] *those shares will continue in existence as collateral and will not be disposed of in the meantime*" [**Exhibit VS1/124**].

d.   <u>Third</u>, as I read and understood that clause at the time Astor 3 entered into the SLA (and as I still understand that clause), that restriction applied to "the Lender". Lender was defined in Clause I(31) to mean "*specifically the Lender described herein* [i.e. Astor 3] *and not any other*". Accordingly, as that definition makes clear, that restriction does not apply to other parties to whom Astor 3 might lend the shares. The restriction would still have value for Mr. Salinas, e.g. in relation to tax which might otherwise be due on his dealings in respect of the shares (avoiding which is a common motivation for securities lending transactions).

23.   It was easier for the Applicants' counsel to make the submission he did because he repeatedly referred to the prohibition in Clause V(4)(b) as being simply against "*selling*", omitting the qualification concerning public exchanges. Paragraph 22(4) of the Skeleton Arguments said that Clause V(4)(b) made it "*expressly clear that Astor 3 was obliged to retain the shares (and was not permitted to sell them) save on the occurrence of an incurable Event of Default*" [**Exhibit VS1/75**]. Then at the hearing on 2 August, counsel stated: "*clause* [V(4)(b)] *there is a representation and warranty from Astor 3 that it will not sell or short sell the shares on the pledged collateral during the main term, provided there has not been an event of default. That is an important obligation*" [**Exhibit VS1/124**].

24.   In fact, that submission was misleading. As the clause made clear, there was not a general prohibition on sale; rather Astor 3 itself as an entity was not permitted to sell or short-sell the shares "*on any publicly traded securities exchange*" (which it has not). But that vital qualification was simply omitted by the Applicants' presentation to the Judge.

25.   Indeed, Vanderbilt, to which Astor 3 lent the shares for a period of 60 months, instructed that the shares be traded but does not know whether these trades were executed by Tavira on-market (i.e. on-exchange) or privately in an OTC (or block) trade since those trades were executed by Tavira. Certainly, the trading instructions make no reference to it [**Exhibit VS1/179**].[6]

26.   Astor 3's entitlement was also subject to the restriction (**Clause V(6)**) that Astor 3 would not transfer the securities to its own account with the Depository Broker (i.e. the custodian) unless an incurable

---

[6] In that email, "*sell at market*" is a reference to market price. "*10 – 25% of VWAP*" is a reference to "Volume Weighted Average Price" and refers to the volume to be traded. "*Use discretion*" is an instruction for the broker to act as it considers appropriate. "*GTC*" means "good till cancelled".

Event of Default has taken place. Clearly, whether or not Astor 3 could transfer the shares to its own account at the custodian is a different matter from whether, during the term of the loan, the shares could be lent out or dealt with from Mr. Salinas's account by virtue of the "*dominion*" and "*grant*" of Encumbrance rights conferred on the Lender by the SLA.

27. Yet, misleadingly, the Applicants did not highlight the distinction. Instead, at paragraph 22(6) of their Skeleton Arguments, the Applicants said "*this wording made clear that Astor 3 could not transfer the Collateral Shares to its own account*" [**Exhibit VS1/76**]. In fact, the clause simply addresses the question of whether the shares could be transferred to Astor 3's custodian account; it says nothing about how the shares could be dealt with when they were still in Mr. Salinas's account (pursuant to the powers Mr. Salinas had given to Astor 3).

28. Likewise, the requirement at **Clause V(3)** for Astor 3 to credit dividends on the shares to the Guarantor's account, which was relied on by the Applicants, is not inconsistent with any of this. It simply obliged Astor 3 to give credit for dividends received or credited to its account at loan maturity. That reflects **Clause X** which provides that "*During the Loan Term, all benefits and proceeds of Pledged Collateral inure to Lender*".

29. It is therefore explicitly clear that, during the Term of the Loan, Astor 3 was permitted to lend, rehypothecate, barter, convert, trade, pawn, charge, pledge, repledge and otherwise deal in the way it has done with the Pledged Collateral.

30. Astor 3 confirmed (**Clause II(7)**) that it would maintain its full ability to release and discharge the Lien and return the Pledged Collateral to Mr. Salinas, *free of any Encumbrance,* within 3 business days of the Borrower's satisfaction of its Obligations (italics added). Again it is implicit in the italicised wording that the parties envisaged that Astor 3 could act in a manner that would lead to the Pledged Collateral being subject to Encumbrances; its obligation was to ensure that at the time it was to be returned the Pledged Collateral would not be subject to Encumbrances.

31. The definition of Pledged Collateral contemplated that Astor 3 would enter into transactions in respect of it during the term of the Loan. Pledged Collateral "*was the total actual shares pledged **and any shares** or proceeds <u>**resulting from any transaction**</u>, split-up, revision, reclassification, or other like change that may take place **of the Pledged Collateral during the term of the Loan***" (emphasis added). Astor 3 could therefore return the relevant volume of securities with identical characteristics; it was not necessary to return the very same securities as were pledged, which makes sense as dematerialised securities are fungible and have no serial numbers or other unique identifiers so that any attempt to identify "the same" individual shares would be meaningless.

4. How the SLA was presented to the Court

32. None of the relevant sections of Clauses II and IV were referred to by the Applicants, either in their Skeleton Arguments or at the without notice hearing itself, and so the Court granted the injunction without ever being shown the clauses which expressly permitted Astor 3 to act as it had done. That is all the more remarkable given that by a letter dated 12 June 2024 to the Applicants, Astor 3 had expressly relied on Clause IV(7) as granting it the right "*to exercise Encumbrance rights over the Shares over during the loan term*" [**Exhibit VS1/477**].

33. Any full and fair presentation of the contractual position would have set out each of the clauses referred to above and identified what the Respondents would be liable to say about them, as well as what it had said about them in its letter of 12 June 2024. Indeed, as I explain below, this exercise did not even require any effort on the part of the Applicants or their advisers: Astor 3 had explained in the clearest terms in the email exchange between the parties on 10 September 2021 that it relied on the fact that the SLA had granted it Encumbrance rights, as defined, to support its declared intention to engage in rehypothecation and other dealings over the Pledged Collateral [**Exhibit VS1/327-328**].

34. By contrast, at paragraph 21 of their Skeleton Arguments for the 2 August hearing, the Applicants purported to summarise what they represented were the "*key terms*" of the SLA, but did so without providing the definition of Lien and Encumbrance and without referring to the fact that the SLA expressly provided by Clause II(1)(a) that, as the *quid pro quo* of the Loan, Astor 3 was to have Encumbrance rights over the Pledged Collateral [**Exhibit VS1/74**]. This was despite the fact that "Encumbrance" is referred to 9 times in the SLA, the word "Lien" is referred to 15 times and "Security Interest" is referred to 6 times

35. In other words, the Applicants omitted from its summary of "*key terms*" the very terms (Clause II(1)(a) and IV(7)) that, on their face, gave Astor 3 the express right to deal with the Pledged Collateral during the term of the Loan as the price of Astor 3 making the loan. Astor 3 had expressly relied on Clause IV(7) in its letter to the Applicants dated 12 June 2024 [**Exhibit VS1/477-479**]. Passing reference was made to the existence of that letter in the Applicants' Skeleton Arguments (paragraphs 187 and 53), but it was not quoted [**Exhibit VS1/109, 80**]. I am advised that it was the Applicants' duty to make sure that the Judge had read that letter in full and in any event was specifically aware of the provisions on which the Respondents relied or might rely. At the hearing, leading counsel for the Applicants suggested that he "*should show*" the Judge the letter and gave a page reference. It is not clear from the note whether the Judge was given time to read it [**Exhibit VS1/129**]. However, counsel stated "*As we set out in our skeleton argument, we do not think any of these clauses have any relevance to this question at all. For example, the fact that there is a clause stating that they have a lien or encumbrance over the collateral does not entitle them to appropriate it prior to maturity and without an event of default*" [**Exhibit VS1/129**]. That was clearly an inaccurate submission – the clauses to which Astor 3's letter referred were directly on point,

and on no view could they fairly be said to only apply in the event of default.

36. The Applicants' treatment of Astor 3's own stated position was deficient not only because they failed to give it proper prominence but because, as I have explained above, the Respondents' subjective understanding of the contract is in fact central to the Applicants' entire case of fraud. The case of fraud in turn is the justification for both the freezing order and the proprietary injunction. Instead the Applicants wrongly suggested at paragraph 186 of their Skeleton Argument that disagreements over the contract "*would not in any event prevent the Applicants from meeting the 'good arguable case' and/or 'serious issue to be tried' thresholds*" [**Exhibit VS1/109**]. Disagreements over the contract would have precisely that effect in the context of a case which depends, as the Applicants' does, not simply on being correct as to the meaning of a contract, but on being indisputably correct.

37. To compound matters, the Applicants simply suggested (at paragraph 21(2) of their Skeleton Arguments) that the effect of the agreement was that the loans were secured by a "Lien" over the Pledged Collateral [**Exhibit VS1/74**]. That gave the misleading impression that the lien simply provided a right of recourse against the Pledged Collateral in the event of default, whereas in fact Lien was defined (as the Applicants only mentioned in a later part of the Skeleton Arguments, when addressing a different clause - paragraph 188) so as to grant Encumbrance rights to Astor 3 [**Exhibit VS1/109-110**]. A full and fair presentation would have identified the words of Clauses II(1)(a) and Clause IV(7) and specifically addressed the definition of Lien and Encumbrance within the context of the SLA, and shown the Court the email of 10 September 2021 in which Astor 3 relied on its Encumbrance rights and explained that it was lending out the shares.

38. At the hearing, leading counsel for the Applicants suggested that "*we have set out the key provisions fairly extensively which your Lordship has looked at. In particular, at paragraph 22 of the skeleton, we set out the key provisions restricting the lender's ability to deal with the collateral shares during the term of the loan*" [**Exhibit VS1/124**]. That was untrue, for the key provisions of the SLA (including the first provision relied on in Astor 3's letter of 12 June 2024) had been omitted from the Court.

39. Instead, the Applicants suggested that they had identified only four provisions of the SLA which the Respondents might conceivably rely upon (paragraph 185 of the Skeleton Arguments), namely V(4)(a) and (c), IX(27), and X [**Exhibit VS1/109-111**]. They noted that none of those provisions were in the section entitled Substantive Terms of the Loan, and made the submission that the provisions which might be said to support the Respondents "*sit in tension with the substantive provisions of the SLA which the Applicants submit prevents Astor 3 from dealing in shares prior to the maturity date save in the event of an incurable Event of Default*" (paragraph 185) [**Exhibit VS1/109**].

40. That was an inaccurate and misleading submission. As set out above, Clause II(1)(a) says in terms

that the Mr. Salinas "*hereby grants to* [Astor 3] *Lien rights over the Pledged Collateral* [i.e. the Elektra shares] *and in exchange,* [Astor 3] *agrees to advance to the Borrower* [….] *a loan consisting of* [c. MXN 3 billion pesos]". Clause IV(7) provided that Mr. Salinas "*hereby grants* [….] *Encumbrance rights to Lender in exchange for Borrower receiving a Loan*". The Applicants did not refer to either provision.

41.  Moreover, the Applicants noted that Clause V(4)(a) merely *suggested* a power to transfer rights in Pledged Collateral was found elsewhere in the SLA. It was implicit in their submission that despite this suggestion there was no power to transfer rights in the Pledged Collateral elsewhere in the agreement. They did not go on to highlight the very provisions of the SLA which in fact conferred those rights to Astor 3, namely Clauses II(1)(a) and Clause IV(7). Instead, they wrongly asserted that power only existed on an incurable Event of Default.

42.  A similar point applies to Clause X, which was quoted in paragraphs 192-194 of the Applicants' Skeleton Argument but dismissed as "*boilerplate*" [**Exhibit VS1/111**]. That in itself was unfair. Clause X is in fact worded in ordinary English and is not a clause simply lifted from a standard form, so far as I am aware, nor a clause dealing with mechanical or administrative matters – rather, it is a clause which summarised the commercial understanding of the transaction and gave frank disclosure of legal rights and obligations. The words in Clause X which I have set out above confirm my interpretation of Clauses II and IV (and all the more so given the SLA's provisions governing its own interpretation at clauses IX(3) and (22)).

43.  In addition, the Applicants placed great weight on the fact that part of the definition of Pledged Collateral referred to "*the total actual shares pledged*" (paragraph 22(1) of the Skeleton Arguments) [**Exhibit VS1/74-75**]. What the Applicants did not, and should have, explained to the Court is that the pledged Elektra shares were not shares with a unique identification number; rather they were dematerialised and fungible shares as are all publicly traded securities, and that accordingly the concept of returning the '*actual shares*' pledged was not a meaningful one: there was no distinction between any of the shares of a given class. With that context, the suggestion (at paragraph 22(1)) that "*it is hard to see how the requirement* [to return the total actual shares pledged] *can be reconciled with any suggestion that some other (albeit equivalent) securities could be returned instead*" falls away [**Exhibit VS1/75**].

44.  I note that the SLA, which is in respect of a high value transaction, is not only explicit that by entering into it the parties are assuming considerable risk,[7] but also contains confirmations that the Borrower and Guarantor have taken legal advice as to the effect of the SLA (Clause X), that the Borrower and Guarantor are sophisticated investors (Clause IV(1)), and requires to be (and was)

---

[7] See for example, the definition of "Hybrid Loan" "*this Agreement is structured as an Investment*" where Investment means "*this Loan may be construed as a speculative Investment.  Borrower and Guarantor being considered a sophisticated professional investors, and both being aware of all the risks associated with making a major investment where the outcome is unpredictable.*"

initialled on each page including those dismissed as "boilerplate".

5.  The Custody Management Agreements

45. In addition to the express provisions of the SLA, to which I have referred, the Custodian Management Agreement dated 2 August 2021 between the Applicants, Astor 3 and Weiser and the Control Agreement between the Applicants and Astor 3 and Tavira Monaco SA dated 13 December 2021 both contained clauses which recorded the Applicants' agreement to Astor 3 dealing with and rehypothecating the pledged shares. See, for example, in the Weiser CMA [**Exhibit VS1/180-187**]:

   a.  Clause 1 "Pledge by Borrower and Guarantor", RBS and Mr. Salinas appointed and authorised Astor 3 during the term of the agreement to have the exclusive lien over the Pledged Collateral, giving Astor 3 "*full power of authority to do and perform all and every act required or necessary to transact in the Pledged Collateral*".

   b.  Clause 3 "Control by Lender", Astor 3's authority included the ability to exercise all rights and privileges that pertain to RBS and Mr. Salinas. By Clause 3.5, during the term of the loan, RBS and Mr. Salinas agreed to unconditionally and irrevocably relinquish, forfeit and renounce any right it may then or in the future have over the accounts in favour of Astor 3, in the form of a lien, and RBS and Mr. Salinas agreed not to inhibit, frustrate or interfere with Astor 3's instructions to Weiser or attempt to seek injunctive relief from any court of law or stock exchange to invalidate, terminate or restrict the CMA.

46. Most strikingly, Clause 1 of the Tavira Control Agreement [**Exhibit VS1/188**], to which the Applicants were parties, provided: "*the parties acknowledge that* [Astor 3] *may from time to time provide notifications to* [Tavira] *directing it to sell, transfer, pledge, hypothecate, lend, withdraw or redeem any* [...] *stocks in the Accounts* [...] *(each an "Entitlement Order"). The parties further acknowledge that* [Tavira] *shall comply with any such Entitlement Order originated by* [Astor 3] *without any requirement for consent from, or notice to, the Claimants. For the avoidance of doubt, the* [Applicants] *shall have no right whatsoever to object to any Entitlement Order originated by* [Astor 3] *and complied with by* [Tavira]*".* This clause also was intentionally omitted and not brought to the Court's attention, either in the Skeleton Arguments or at the without notice hearing.

47. The Weiser Account Terms and Conditions [**Exhibit VS1/194-209**], which were incorporated into the Weiser CMA went substantially further. Also strikingly, those terms confirmed the Applicants' agreement that securities held in the Guarantor's account might be the subject of securities lending by Weiser's custodian, which neither Weiser nor Astor 3 would be able to prevent and would likely be unaware of, but which might result in Mr. Salinas's "shares" being subject to stock lending and sold on-market. I understand this to be a general feature of the equity trading markets where dematerialised fungible securities are held in a chain of custody. This is set out in Clause 3: "*You agree that 'WEISER' may lend any securities held by 'Weiser' for you or on your Account via its*

custodian". "*Account*" is defined in the Weiser CMA as "*The Depository Account(s) maintained by the Borrower and Guarantor and held by the Custodian in favour of the Lender*". Even more strikingly, Clause 9 permitted Weiser itself to trade in the deposited securities, independently and irrespective of any instructions given by Astor 3 and the terms of the SLA: "*You hereby authorise 'WEISER' to manage and control collateralised securities in any manner it deems appropriate, irrespective of any third party contracts you have entered into. Such control includes and is not limited to transfers, hypothecation, repurchase contracts, and transacting in the securities in any manner.*" Once again, this could easily result in large numbers of shares held in Mr. Salinas's account at Weiser being subject to stock lending and sold into the market on exchange or privately as a block trade.

6.   Communication between the Parties regarding rehypothecation and Astor 3's dealing in shares

48. After the First Addendum was signed on 9 August 2021, Astor 3 immediately advanced a sum of MXN 501,591,693 to RBS (USD 25,000,000), secured over 563,569 Elektra shares, which were held in Mr. Salinas's personal account with Weiser [**Exhibit VS1/274-282, 325-326**]. This was deemed a "Test Tranche" to make sure that the payment systems would work.

49. On 10 September 2021, Astor 3 advanced another sum of MXN 327,497,030 to RBS, secured by 372,344 Elektra shares held in Mr. Salinas's personal account with Weiser [**Exhibit VS1/283-291**]. This was therefore the second active advance and corresponding receipt of Pledged Collateral by Astor 3.

50. On that same day, Mr. Torti of Fininvesta wrote an email to Weiser and Astor 3, in which he stated that he had noticed some activity in Elektra shares and wanted confirmation that none of the Elektra shares had been lent [**Exhibit VS1/480**].

> *Dear all,*
>
> *Based on some activity in Elektra shares, we would like you to confirm by return of email that none of the Elektra shares pledged by Weiser has been lent (securities lending), as per our agreement.*
>
> *Thanks for confirming, best regards,*
>
> *Alexa*

51. Astor 3 immediately responded to Mr. Torti at 8:53 pm that day, making very clear that such lending and rehypothecation was permitted under the SLA and CMA, that it was what Astor 3 was going to do (and if not would have to reconsider the loan), and that it was standard practice [**Exhibit VS1/327-328**]. Astor 3 wrote:

> *Dear Alexandre,*
>
> *Thank you for your email.*

15

*Astor will merge or pool collateral rights as a portfolio and underwrites derivatives to hedge its risk and liquidity leverage. This leads to collateral shares being made available for lending to its liquidity providers and other financial institutions who wish to borrow the shares. As we had discussed previously, the shares may be rehypothecated which is standard practice (share borrow-lending between institutions). This can't be stopped or restricted in all cases where the shares are free trading. Otherwise, the shares are restricted and we don't lend against restricted shares. I have never heard of free trading shares being restricted to borrow. When you custody shares with major banks, they all can and do engage in share borrow to each other.*

*This is imperative for loans of this size with very high LTV and at such a low interest rate.*

*You should also note, that everyone's stock can be borrowed. ELEKTRA appears on Interactive Brokers website borrow list. Thus, the entire float, plus some or all of the shares held by insiders can be accessed by major banks, lent out, shorted, etc. Please see the link below to Interactive Brokers Stock Lending program. You will see that ELEKTRA stock is there. Anyone can borrow the stock. Once someone borrows the stock, they can lend it out.*

*Further, we do not see any evidence of stock being hammered by anyone. Price is stable, volume is the same. Not sure what the concern is.*

*[https://www.interactivebrokers.com/en/?f=4587&cntry=mexico&tag=Mexico&ib_entity=llcc&ln=](https://www.interactivebrokers.com/en/?f=4587&cntry=mexico&tag=Mexico&ib_entity=llcc&ln=)*

*Important questions to ask prior to Astor's involvement:*

*1. Is the stock being lent out to anyone by insiders ?*

*2. Is the stock being lent out by any shareholders ?*

*3. Are you aware that the stock can be borrowed and lent out by anyone" ?*

*4. Has the short position increased the past 2 months ?*

*5. Does the Mexican Stock Exchange even allow for the stock to be frozen and not lent out ?*

*This is mostly prohibited in USA, Canada and many other countries.*

*My personal opinion, based on the terms you sought, high LTV and low interest rate, based on the stocks liquidity, I don't think anyone will agree to fund such large sums and not seek ways to enhance their yield. Mathematically it would not make sense.*

*Attached is the closing statement for this months disbursement (MXN 300,000,000).*

*Also, our loan agreement is transparent, the "Encumbrance" clause explains what can potentially take place with the stock, most of which we have no confirm over.*

*If you log into the account at Weiser, you will see that all the stock is there. We have not sold any of it, which is in accordance with the loan agreement.*

*Please speak to Mr Salinas and advise us if this is not an issue. If it is an issue, we would need to revisit internally how to proceed, cause we can't stop or*

*restrict others from borrowing free-trading unrestricted stock.*

*Please advise how you would like to proceed. If nothing has changed, please have the borrowing entity execute the attached Closing Statement and send us back an email with:*

*"<u>On behalf of the borrower, we do not object to the stock being lent out into the lending pool.</u>"*

*Thank you*

*Best Wishes,*

*Gregory Mitchell*

52. Mr. Torti wrote back the same evening confirming that everything was fine and thanking Astor 3 for transferring MXN 300 million [**Exhibit VS1/329**]. (It is clear that his email was in response to what Astor 3 had sent, since it uses the same subject heading as the email cited in the preceding paragraph (which was different from the previous email sent by Mr. Torti).)

*Dear Gregory*

*As long as all the terms of the contracts signed are duly respected, we are fine.*

*Could you please amend the date in the title of the closing statement (it says August instead of September) and send it back to me? Then thanks for proceeding with the transfer of the MXN 300,000,000 and providing us with a Swift confirmation.*

*Best regards,*

*Alexandre Torti*

53. On 14 September 2021, Ms. Akbar (an intermediary involved in setting up the transaction) sent the executed Closing Statement as requested [**Exhibit VS1/330**].

*Dear Gregory,*

*Hope you are well. I saw Alexandre did not cc' everyone into the email re: Richard etc, so have resent the signed Closing Statement Tranche 2.*

*Any questions let us know.*

*Kind regards,*

*Zara*

54. On 15 September 2021, Astor 3 countersigned the Closing Statement and immediately ordered the remittance of funds, which was confirmed by Mr. Salceda on 20 September 2021 [**Exhibit VS1/481-482**].

55. In this email exchange, Astor 3 explained to Mr. Salinas's and RBS's representatives that shares would be rehypothecated, and that this was why Astor 3 required the pledge of unrestricted shares.

Astor 3 even sent Mr. Torti a link to the Interactive Brokers Stock Lending program, which allowed Mr. Torti to see in real time that these shares could be accessed by major banks and lent out [**Exhibit VS1/322-324, 327**]. This exchange of correspondence was not brought to the attention of the Court. It plainly should have been, considering that (1) Mr. Salinas's and RBS's representatives received an explanation about Astor's rights under the SLA and acknowledged their understanding by conduct between 2021 and 2024, and (2) the subjective understanding of the parties, and particularly of Astor 3, is critical to the Applicants' case of fraud.

56. The statements in Astor 3's 10 September 2021 email were not at all surprising. On the contrary, they reflect normal market practice in the very well-established securities lending industry: see, for example, the "*Introduction to Securities Lending*", commissioned by (among others) the Internal Securities Lending Association, British Bankers' Association and London Stock Exchange [**Exhibit VS1/210-271**]. As explained in the Executive Summary to that document, once shares are lent, "*the securities can be sold outright and 'on lent'. Both practices are commonplace and an intrinsic part of the functioning of the market.*" [**Exhibit VS1/219**] Once a party agrees to its stock being lent out, trading in that stock, including on the public market, is highly likely. Again, the "*Interactive Brokers Borrow List*" mentioned in the email showed Elektra stock available for borrowing and the practical effect of this — as the email pointed out - was that any person wishing to borrow the stock could do so (and could then engage in the kind of transactions discussed) [**Exhibit VS1/322-324**].

57. On 7 October 2021, Ms. Akbar contacted Astor 3 as a result of Weiser stating that Astor 3's rehypothecation of shares had resulted in Weiser's records showing a change in beneficial ownership of the shares [**Exhibit VS1/332**]. The Borrower was concerned about this because "*they would not be in a position to provide a statement or custodial representation confirming Mr Salinas is the owner of the shares*". I assume that Mr. Salinas needed such a statement available to him in order to provide an explanation for why he had made no disclosures to the market.

58. As reflected in a later e-mail from Ms. Akbar of 19 October 2021, the position was resolved by opening a custody account with Tavira in the name of Mr. Salinas but "*for the benefit of*" Astor 3 [**Exhibit VS1/333-334**]. I understand that Tavira's practice was not to transfer shares from Mr. Salinas's account when shares were rehypothecated from that account by Astor 3 to Vanderbilt.

59. It is clear that, from at least November 2021, the Applicants themselves believed or suspected that the Elektra shares which had been pledged to Astor 3 were being sold on the open market. At paragraphs 75 to 77 of his Affidavit, Mr. Salceda said "*At the end of November 2021, I was aware that a seller of Elektra shares in the Mexican market had been participating with a significant percentage of the daily trading volume […] I feared that the cause of this unusual situation might be Astor 3*" [**Exhibit VS1/150-151**].

60. Mr. Salceda or Mr. Salinas were therefore able to monitor any significant trades of Elektra shares in the market. Moreover, Mr. Salceda or Mr. Salinas could have asked their sub-custodians in Mexico to check with the Central Depository register, Indeval, to verify ownership records, share transfers, blocked positions and pledges and liens [**Exhibit VS1/272-273**]; and if Mr. Salceda or Mr. Salinas noticed any activity contrary to the SLA, they could have raised concerns with Astor 3. Notably, neither Mr. Salceda nor Mr. Salinas raised any such concerns with Astor 3 for nearly three years.

61. Furthermore, at no stage did the Applicants bring this delay specifically to the Judge's attention. The Affidavit of Mr. Salceda jumped from November 2021 to a meeting which he sought to arrange in November 2023 (of which no detail is given) [**Exhibit VS1/150-151**]. The Skeleton Arguments jumped from November 2021 (at paragraphs 50 and 51, when the issue was allegedly discovered) to 10 June 2024 (when the issue was raised by the Applicants) without any explanation [**Exhibit VS1/79-80**]. At the hearing, leading counsel similarly glossed over the delay of nearly three years stating "*Applicants had concerns that someone was dealing in Elektra shares. The Applicants wrote to the depository brokers, Weiser and Tavira, to say that they should not dispose of the collateral shares. They did not respond. Astor 3 did. The Applicants' concerns led them to seek legal advice and to appoint investigators*" [**Exhibit VS1/125**]. It was implicit in that submission that the Applicants had acted promptly on becoming aware of the dealings in Elektra shares. The opposite was the case. Moreover, the delay was inconsistent with the Applicants' basic position that the Respondents' dealings with the shares had violated the parties' fundamental understandings.

62. The reality, as had been stated expressly to the Applicants in September 2021, was that Astor 3 was rehypothecating the shares through securities lending. As the Applicants must have been aware, such rehypothecation necessarily involves the possibility that the party to whom the shares are loaned would trade in those shares. Whilst Astor 3 itself was restricted from selling shares in the open market, other parties were not.

    7.   The undisclosed problems of Elektra

63. The Applicants also concealed highly material information as to the financial health of Elektra, which contributed to a serious decline of the Elektra share price over the term of the Loan, and then to a free fall at the end of July 2024. This should have been fully and frankly disclosed.

64. When the SLA was signed in July 2021, Elektra's share price was closing at approximately MXN 1,600. However, the Elektra share price was inflated as indicated by its notably high Price to Earnings ratio and Price to Cash/Free Cash Ratio [**Exhibit VS1/335**]. Effectively, the share price did not appear to be reflective of Elektra's performance.

65. From 2021-2024, Elektra's performance as a company was plummeting. Matters became much worse when on 26 July 2024, *Simply Wall Street* (a market-leading financial app which claims to

have 6 million users) reported that earnings had been declining at an average annual rate of 34% over a 5-year period, and declared Elektra to be an investment risk [**Exhibit VS1/338**]. *Simply Wall Street* also stated that Elektra's second quarter earnings for 2024 were at a net loss of MXN 643 million (about USD 34 million) versus a profit of MXN 4.94 billion (about USD 250 million) for the same period in 2023 [**Exhibit VS1/339**]. The drastic turnaround from profit to loss in Q2 2024 is shown in the underlying figures reported by Elektra on 24 July 2024 [**Exhibit VS1/342**].

66. Elektra's underperformance was reflected in the steep decline of its share price. Immediately before the *Simply Wall Street* publication, Elektra's share price had already dropped to MXN 1050, which reflected a 40% drop since 2021 [**Exhibit VS1/355-358**]. The *Financial Times* data below shows the share price since 2008:



67. Once the Q2 2024 results were digested by the market, there then followed an even more precipitous decline:



68. On 26 July 2024, Elektra chose to issue a press release to the market "*to inform investors that it has received information from its controlling group regarding a possible fraud by depositories of their shares, which could cause unusual movements of its share price on the stock markets*" [**Exhibit VS1/359-360**]. As a result of this announcement, the Mexican listing authorities chose to suspend trading in Elektra stock, which remains suspended today.

69. The share suspension and the announcement which led to it were presented to the Court as part of Elektra's response to a discovery of fraud: see paragraphs 124-125 of the Affidavit of Mr. Salceda of 5 August 2024 (which was placed in draft before the Court on 2 August) [**Exhibit VS1/162**]. However, there is an obvious alternative inference – which should itself have been drawn to the Court's attention – that Elektra wished to explain away this share price collapse and to make it appear to the market that it was taking actions to prevent any further price decline. Clearly, Elektra experienced a rapid and troubling decline during the term of the Loan, which

entirely predictably caused a collapse of the share price, with a particularly precipitous drop after publication of the Q2 2024 figures. Although the suspension of trading in Elektra shares prevented a complete collapse, Elektra had to suggest to the market that the reason for the decline was due to supposedly fraudulent transactions. In fact, the transactions carried out with the Pledged Collateral under the SLA (1) were known to and agreed to by Mr. Salinas and RBS, and in any event (2) were not the cause of the sharp fall on 26 July 2024, which was correlated to the release of the highly negative Q2 figures. However, to maintain credibility in the explanation given to the market and the regulator, Mr. Salinas and RBS have proceeded to advance these spurious allegations to seek an injunction against me and the other Respondents.

70. Particularly against the background of the 2021 email correspondence, and the unexplained delay in pursuing suspicions between 2021 and 2023, the Q2 results and resulting share price collapse create an obvious possibility that the legal proceedings are not a genuine response to discovered fraud but are, on the contrary, a manufactured attempt to shore up the price of Mr. Salinas's principal asset. Instead of disclosing that background, however, the Applicants simply concealed it.

71. This concealment was of a piece with the failure to mention Mr. Salinas's major financial problems, which were misleadingly omitted while presenting him in an unqualified manner as one of Mexico's wealthiest individuals, as I now explain.

### 8.   Mr. Salinas's severe financial difficulties

72. In the Skeleton Arguments, Mr. Salinas is claimed to be "*one of the wealthiest individuals in Mexico with a net worth of several billion U.S. dollars*" and is the "*direct or indirect beneficial owner or controller of approximately 67,544,413 shares in Elektra, representing 30.47% of Elektra share capital*" [**Exhibit VS1/73**]. The Applicants relied on this general statement alone to give the Judge comfort that Mr. Salinas could give an unlimited cross-undertaking in damages, without any fortification [**Exhibit VS1/132**]. They also relied on it to make the unsubstantiated assertion (which is a prerequisite of their rescission case) that the Applicants were ready and able to repay the USD 110 million advanced to them.

73. However, due both to Elektra's underperformance from 2021-2024 and the various proceedings involving Mr. Salinas's inability to pay his debt obligations or the debts of his companies to the Mexican tax authorities, the Applicants' claim of Mr. Salinas's net worth warranted further scrutiny.

74. In April 2021, Mr. Salinas filled out a KYC form for on behalf of himself and RBS as part of Astor 3's due diligence process [**Exhibit VS1/361-363**]. In Mr. Salinas's personal KYC form, Mr. Salinas indicated that he was the "*Founder and CEO*" of Elektra (the Issuer), he owned a total of 10% of Elektra shares (not the 30.47% now claimed) and planned to use the loan proceeds to "*refinance some existing loans*". Either Mr. Salinas only owns 10% of Elektra shares or he failed to disclose his entire beneficial Elektra shareholding in the KYC form. At best, Mr. Salinas's claim of his ownership of Elektra shares is confusing.

75. As proof of his ownership of Elektra shares, Mr. Salinas submitted a copy of a BNP Paribas Portfolio Management Report [**Exhibit VS1/363-382**]. The report showed that Mr. Salinas had a negative cash balance of USD 30 million, USD 3.2 million in bonds, and USD 511 million in equities. Notably, 97.85% of his portfolio was tied to 6.9 million Elektra shares, which is again confusing in light of the representations made to the Judge. Moreover, Mr. Salinas's Elektra shares were marked "BLO" (shares held in a blocked position). Reading this report together with Mr. Salinas's KYC form, Mr. Salinas had been heavily shopping around his Elektra shares as collateral for loans with other lenders like Astor 3.

76. In any event, Mr. Salinas's reputation as a wealthy and reputable entrepreneur is further undermined by his involvement in several scandals and open conflicts with various governmental authorities over the years.

   a. In January 2005, the SEC sued TV Azteca and three executives (including Mr. Salinas) for fraud and filed criminal charges, alleging that Mr. Salinas: (i) concealed his role in a series of transactions where Mr. Salinas purchased discounted debt from Unefon and profited on repayment; (ii) sold TV Azteca stock while concealing his self-dealing; (iii) filed false reports and made false public statements; and (iv) failed to disclose to investors his ownership of half of a subsidiary of TV Azteca, Codisco [**Exhibit VS1/385-387**]. The SEC claimed that Mr. Salinas violated several sections of the Securities Exchange Act of 1934, including those related to insider trading, false and misleading statements, and reporting requirements. Although the SEC settled its claims against Mr. Salinas, Mr. Salinas was ordered to pay disgorgement and penalties of USD 7.5 million and to provide an undertaking not to serve as an officer or director of a U.S. public company for a period of five years, except under limited circumstances [**Exhibit VS1/388-390**].

   b. In May 2015, CNBV imposed a fine of MSN 672,900 for a failure to comply with the Securities Marketing Law by failing to lodge a notice of an offer abroad [**Exhibit VS1/391-393**].

   c. In 2017, CNBV imposed a fine of MXN 2,260,000 on TV Azteca, owned by Mr. Salinas, for failing to inform investors of significant operational changes as required by the Bolsa Mexicana de Valores, ("**BMV**") [**Exhibit VS1/394-397**].

   d. In April 2022, *Reuters* reported that TV Azteca was involved in a legal dispute that resulted in an order for the company to pay MXN 2.447 billion to tax authorities concerning income tax, fines and surcharges [**Exhibit VS1/398**].

   e. In February 2023, *The Yucatan Times* reported that the Mexican Tax Administrative Service ("**SAT**") was claiming more than MXN 38 billion from Mr. Salinas's companies, including Grupo Elektra, all derived from irregular tax operations perpetrated from 2013 [**Exhibit VS1/399-400**].

   f. In April 2023, *La Jornada* reported that the CNBV stated that it had applied 32 fines to Banco

Azteca totalling MXN 8.3 m for regulatory breaches [**Exhibit VS1/401–403**].

g.  In November 2023, *AP News* reported that TV Azteca failed to reach an agreement with U.S. bondholders in a dispute involving approximately USD 400 million in bonds and approximately USD 105 million in past-due payments [**Exhibit VS1/404–405**]. These bondholders brought an involuntary bankruptcy petition against TV Azteca.

h.  In December 2023, *Yahoo Finanzas* reported that there were suspicions that Banco Azteca was in on the verge of bankruptcy, which Banco Azteca denied [**Exhibit VS1/406–408**].

i.  In March 2024, *Bloomberg UK* reported that the President of Mexico ordered the seizure of Mr. Salinas's golf course in Oaxaca as part of the government's enforcement against his liability to pay USD 3.8 billion in back taxes [**Exhibit VS1/409–414**].

j.  Also in March 2024, *Fitch Ratings* downgraded Banco Azteca's visibility rating following what is assumed to be the weak corporate governance practices of its controlling group and the sustained high related-party commercial loans [**Exhibit VS1/415–425**].

k.  In May 2024, *Bloomberg UK* reported that U.S. Congressman Henry Cueller had been indicted by U.S. federal prosecutors for bribery payments made by Mr. Salinas's Banco Azteca to a U.S. Congressman and his wife [**Exhibit VS1/426–427**]. The bribes were paid in exchange for help lobbying against U.S. anti-money laundering regulations that threatened the interest of Banco Azteca.

l.  As of May 2024, *Benzinga* (a U.S. financial technology and data company) reported Mr. Salinas's net worth to be only USD 332 million [**Exhibit VS1/428–429**].

m.  On 15 August 2024, *La Jornada* reported that CNBV had imposed a fine on Mr. Salinas on 11 July 2024 in the amount of MXN 844,900 for disposing of Elektra shares without a public offering or auction authorised by CNBV [**Exhibit VS1/430–432**].

77.  As this negative press started to come to light, Astor 3 submitted several information requests to Mr. Salinas and RBS, enquiring about Mr. Salinas's ongoing disputes with the Mexican tax authorities, the seizure of his assets by the Mexican government and whether Mr. Salinas had pledged Elektra shares as collateral in other loan transactions [**Exhibit VS1/433–437**]. To the best of my knowledge, Mr. Salinas and RBS ignored these requests and never responded.

9.   Mr. Salinas and RBS triggered several Events of Default under the SLA

78.  Astor 3 issued a Notice of Default, dated 27 July 2024, alleging 11 different Events of Default that were triggered by acts and omissions of Mr. Salinas and RBS [**Exhibit VS1/438-450**].

79.  Event of Default is defined as "*any of the events specified in Clause VI hereof in addition to any omission or failure to perform a legal or contractual duty as obligated, stated or outlined herein. An Event of Default will cause Acceleration of the Loan*" and forfeiture of the Pledged Collateral.

80.  Upon the Event of Default, Astor 3 would (Clause II(7)) dispose of the Pledged Collateral in order to satisfy the obligations of the Borrower and return any excess collateral to Mr. Salinas.

81.  In addition, Clause IV(10) provides that the Borrower nor Guarantor would seek injunctive relief from any court of law requesting to freeze the shares and that such injunctive relief shall be an immediate and incurable Event of Default.

82.  Astor 3's rights on an Event of Default are not dependent on giving prior notice of it to the Borrower/Guarantor: there is nothing in the SLA to that effect. Of these different Events of Default, which are set out in detail in the Notice, I will highlight some of the most serious examples.

83.  *First*, Elektra's announcement of 26 July 2024 constituted an Event of Default pursuant to Clause VI(3)(g) of the SLA. Clause VI(3)(g) provides that an Event of Default is a Material Event upon the financial condition of Elektra, Mr. Salinas or RBS. A "Material Event" is defined as any event or possible outcome which may undermine or alter the value of collateral or prejudice Astor 3's standing lien. In this announcement, Elektra published misleading information to its investors regarding a possible fraud by depositories. An announcement of that kind could only tend to undermine the value of the shares concerned and thereby prejudice Astor 3's lien.

84.  *Second*, even if the announcement itself is not deemed to be a Material Event triggering an Event of Default, the suspension in trading of Elektra shares also on 26 July 2024 most certainly constitutes an Event of Default for the same reasons. Additionally, Clause VI(3)(c) of the SLA provides that a suspension in trading of five or more Business Days in respect of the same share class as the Pledged Collateral constitutes an Event of Default.

85.  *Third*, in March 2024, SAT made a presentation on tax claims against four companies of Mr. Salinas (including Elektra), totalling MXN 63 billion (USD 3.8 billion), stemming from 17 different court cases covering audits from 2008-2018 [**Exhibit VS1/451-452**]. This tax debt and ongoing tax lawsuits against Mr. Salinas's companies was a Material Event affecting the financial condition of Mr. Salinas and Elektra, and thus constituted an Event of Default pursuant to Clause VI(3)(g) of the SLA.

86.  In addition to these examples, Astor 3 relies on the full detail of the Events of Default referenced in the Notice of Default.

87.  As RBS and Mr. Salinas triggered several Events of Default, which did not require prior notice declaring an event of default, Astor 3 was entitled to exercise its rights under the SLA and CMAs. Astor 3 was entitled to terminate the SLA and dispose of the Pledged Collateral (Clause II(7)). Further, the Events of Default triggered an acceleration of the loan amounts, interests, costs, fees and expenses, and a forfeiture of the Pledged Collateral (Clause VI(4)). As the Events of Default were incurable, Astor 3 was under no obligation to return the remaining balance of proceeds realised as a result of any sale of the Pledged Collateral or provide an accounting of the disposition of the Pledged Collateral (Clause VI(4)).

88.  In accordance with these express provisions of the SLA, Astor 3 issued a Notice of Default, which provided that Mr. Salinas and RBS were "*hereby notified that* [they] *were in default of the SLA which has resulted in* [Astor 3] *terminating the SLA and accelerating any and all amounts due thereunder together with any other remedy which may be afforded to* [Astor 3]" [**Exhibit VS1/439**].

89.  Subsequently, Astor 3 forwarded the Notice of Default to Weiser and Tavira and, as permitted under Clause 9.3 of the Tavira CMA and Clauses 4 and 8 of the Weiser CMA, Astor 3 issued Entitlement Orders instructing a transfer of the Pledged Collateral to into Astor 3's account [**Exhibit VS1/453, 456**]. Astor 3 then issued a separate set of Entitlement Orders to Tavira instructing the transfer of the Pledged Collateral at Tavira to Vanderbilt [**Exhibit VS1/454**]. A separate instruction was sent to Weiser to settle the outstanding hedges on 935,716 shares of Elektra Pledged Collateral held at Weiser [**Exhibit VS1/455**].

10.  My relationship with the Respondents

90.  Weiser and Tavira are completely separate entities, in which I do not have any ownership or control (either directly or indirectly). Mr. Salceda's Affidavit supporting the Injunction Orders states that "*it is clear that Weiser and Astor 3 are under common control*" and suggests the same for Tavira (paragraph 119) [**Exhibit VS1/161**]. This is an invention of the Applicants for which no proper basis was offered but which appears to have been advanced as part of a mindset to treat everything as suspicious.

91.  I do not own (either directly or indirectly) Astor 3 or Vanderbilt. I assisted those companies in the way I now explain. These companies are separate entities, with their own beneficial owners and executives.

92.  I would add that Astor 3 was known to the Applicants to be a new company, specifically formed in Canada for the transaction at the request of Mr. Salinas. The original intention had been to use Astor Capital Fund which is a Bahamian company as the Lender but Mr. Salinas rejected it because it was offshore entity and would trigger a Withholding Tax ("**WHT**") liability [**Exhibit VS1/461**].

Astor 3 was then formed as a Canadian Special Purpose Vehicle ("**SPV**") on Mr. Salinas's own instruction [**Exhibit VS1/461**] to take advantage of tax treatment under the North American Free Trade Agreement ("**NAFTA**"). This was openly discussed in emails in the middle of 2021, with complaints being made by Mr. Salinas about the time being taken to obtain company registration documents from the Quebec authorities [**Exhibit VS1/470–471**]. Although it is now suggested that Astor 3's new existence is something suspicious, that is obviously not so where the fact was fully known to the counterparty at the outset. The Applicants failed to bring to the Court's attention that Mr. Salinas's representatives were kept informed on the company formation and even prompted Astor 3 to speed up the process [**Exhibit VS1/461–471**]. Mr. Salceda's statement in his Affidavit that it was a "red flag" that Astor 3 was incorporated around the same time as the preparation of the SLA was misleading [**Exhibit VS1/157**].

93. In this context, each company is formed on behalf of financial intermediaries in order to facilitate their entry into the stock-based lending market. In fact, the First and Sixth Respondents, Astor 3 and Astor Capital, are perfect examples.

    a. Thomas Mellon approached me to help him set up an entity to engage, amongst other activity, in lending against securities. As a result, Astor Capital was formed in April 2019 in Bahamas.

    b. With an incorporated entity, Mr. Mellon was then able to approach potential agents and clients, to develop business on behalf of his own company. This is probably how Mr. Mellon came into contact with Mr. Salinas's agent, Ms. Akbar.

    c. When Mr. Salinas rejected Astor Capital as the lender for the transaction and at his request, Astor 3 was incorporated in Canada.

    d. Once the Parties were ready to negotiate the SLA, a draft SLA was provided to Mr. Salinas. The SLA was open to review between the Lender and its counterparties, under the advisement of independent legal counsel and other advisors, to establish the precise rights and obligations to be agreed by the parties. The SLA that is the subject of this litigation was developed with the input of legal counsel.

    e. Once executed, Astor 3 would then arrange the custodianship of the shares and direct the use of the shares during the loan term.

94. The Fifth Respondent, Vanderbilt, operates differently. Essentially, Vanderbilt is a hedge fund trading firm, which has experience in trading activities of securities and commodities, but it also has own clients to which it has provided stock-based loans in the past. Vanderbilt may engage in stock lending. In this case, it borrowed Elektra stock from Astor 3 with the promise of returning equivalent securities later. Vanderbilt then trades the borrowed stocks (either on or off market), often with the intention of buying them back at a lower price, profiting from the difference.

95. The relationship between Astor 3 and Vanderbilt is therefore one of contract, typically referred to as a rehypothecation agreement. An example of such an agreement, concerning one of the tranches of Elektra's shares, is at [**Exhibit VS1/472–476**]. Under that agreement, and others in materially identical terms, Astor 3 has agreed to rehypothecate securities to Vanderbilt as a loan of stock for the purpose of generating profit with these securities, which is then split between the parties. Astor 3 therefore does not have title to the subject securities, but rather has lien, encumbrance and rehypothecation rights over them by virtue of its arrangements with the Applicants. Vanderbilt then has the right to manage, lend, rehypothecate, pledge, repledge, pawn, barter or otherwise transact with the securities until termination of that arrangement 60 months hence, at which point Vanderbilt will return equivalent securities back to Astor 3 free of any lien or encumbrance.

11. The prejudice caused by the Injunction Orders

96. Given their blatant abuse of the Court's process, the Applicants have improperly obtained world-wide freezing and proprietary injunctions in respect to assets up to a value of MXN 5 billion. The scope of these Injunction Orders is extremely broad. By their very nature, such Orders cause very significant operational and reputational prejudice to the parties subject to them, at least if those parties are in business, as is the case for me, Astor 3, Vanderbilt and Astor Capital. Moreover, Tavira has now completely frozen the accounts of Astor 3 and Vanderbilt. Even the ability under the Injunction Orders to engage in normal course of business transactions, which is more theoretical than real, is not open to Astor 3 and Vanderbilt.

97. I note that the Applicants state that they are "*ready and able to repay all sums owing to Astor 3 immediately*" (Skeleton Argument, paragraph 92) [**Exhibit VS1/86**]. This statement is not substantiated. The Loan had a lock-up provision for 5 years and was not due to be repaid for a few more years. Furthermore, the SLA states that at maturity, RBS was to provide proof of funds to repay the loan. At no time was this proof presented. Rather, the press reports set out in this statement indicate that Mr. Salinas will not make any such payment willingly. I respectfully submit that the price of any injunction ought to have been for the Applicants to provide a guarantee or other fortification to make good this commitment. If Mr. Salinas is indeed as rich as he portrays himself, then fortification in the order of USD 110 million ought to have been be readily achievable. Such fortification could also then have stood as security for any claim under the cross-undertaking in damages.