**Norwich Pharmacal v. Customs & Excise (C.A.)**        **[1974]**

by way of discovery and disclosing the identity of the wrong-
doers, and for that purpose it mattered not that such involve-  **A**
ment was the result of voluntary action or the consequence of
the performance of a duty statutory or otherwise; and that,
accordingly, prima facie the respondents were under a duty to
disclose the information sought (post, pp. 175B–E, 187F—188E,
195B–G, 197B–G, 203F—204D).

> *Upmann* v. *Elkan* (1871) L.R. 12 Eq. 140; 7 Ch.App. 130;
> *Orr* v. *Diaper* (1876) 4 Ch.D. 92; 25 W.R. 23 and *Post* v. *Toledo,*
> *Cincinnati and St. Louis Railroad Co.* (1887) 11 N.E.Rep. 540  **B**
> applied.

> *Queen of Portugal* v. *Glyn* (1840) 7 Cl. & F. 466, H.L.(E.)
> considered.

(2) That in the circumstances there was no head of public
policy nor statutory provision which precluded the making of
an order for discovery.

Decision of the Court of Appeal, post, p. 137c; [1972] 3  **C**
W.L.R. 870; [1972] 3 All E.R. 813 reversed.

The following cases are referred to in their Lordships' opinions:

*Angel* v. *Angel* (1822) 1 L.J.O.S.Ch. 6.
*Butterworth* v. *Bailey* (1808) 15 Ves.Jun. 358.
*Colonial Gavernment* v. *Tatham* (1902) 23 Natal L.R. 153.
*Dixon* v. *Enoch* (1872) L.R. 13 Eq. 394.                                **D**
*Fenton* v. *Hughes* (1802) 7 Ves.Jun. 287.
*Hart* v. *Stone* (1883) 1 Buch.App.Cas. 309.
*Hunt* v. *Maniere* (1864) 34 Beav. 157.
*London (Mayor and Commonalty and Citizens of)* v. *Levy* (1803) 8
     Ves.Jun. 398.
*Moodalay* v. *Morton* (1785) 1 Bro.C.C. 469; 2 Dick. 652.
*Orr* v. *Diaper* (1876) 4 Ch.D. 92; 25 W.R. 23; 46 L.J.Ch. 41; 35 L.T. 468.  **E**
*Plummer* v. *May* (1750) 1 Ves.Sen. 426.
*Portugal (Queen of)* v. *Glyn* (1840) 7 Cl. & F. 466, H.L.(E.).
*Post* v. *Toledo, Cincinnati and St. Louis Railroad Co.* (1887) 11 N.E.Rep.
     540.
*Rowell* v. *Pratt* [1938] A.C. 101; [1937] 3 All E.R. 660, H.L.(E.).
*Upmann* v. *Elkan* (1871) L.R. 12 Eq. 140; 7 Ch.App. 130.
*Upmann* v. *Forester* (1883) 24 Ch.D. 231.                               **F**

The following additional cases were cited in argument in the House of
     Lords:

*Barnard* v. *National Dock Labour Board* [1953] 2 Q.B. 18; [1953] 2
     W.L.R. 995; [1953] 1 All E.R. 1113, C.A.
*Bass* v. *Board of Customs*, February 20, 1818, F.C.
*Bovill* v. *Cowan* (1867) 15 W.R. 608.                                   **G**
*Brown* v. *McDonald* (1905) 133 F. 897.
*Burchard* v. *MacFarlane* [1891] 2 Q.B. 241, C.A.
*Carver* v. *Pinto Leite* (1871) 7 Ch.App. 90.
*Coca-Cola Co.* v. *City of Atlanta* (1922) 110 S.E. 730.
*Conway* v. *Rimmer* [1968] A.C. 910; [1968] 2 W.L.R. 998; [1968] 1
     All E.R. 874, H.L.(E.).
*Cowan* v. *Stanhill Estates Pty. Ltd.* [1966] V.R. 604.                  **H**
*Dummer* v. *Chippenham Corporation* (1807) 14 Ves.Jun. 245.
*Hancocks & Co.* v. *Lablache* (1878) 3 C.P.D. 197.
*Heathcote* v. *Fleete* (1702) 2 Vern. 442.

A    *Hillman's Airways Ltd.* v. *Société Anonyme d'Éditions Aéronautiques Internationales* [1934] 2 K.B. 356.

*Leven* v. *Board of Excise*, March 3, 1814, F.C.

*McDade* v. *Glasgow Corporation*, 1966 S.L.T.(Notes) 4.

*March* v. *Keith* (1860) 30 L.J.Ch. 127.

*Metropolitan Asylum District* v. *Hill* (1881) 6 App.Cas. 193, H.L.(E.).

*Morse* v. *Buckworth* (1703) 2 Vern. 443.

*Murillo, The* (1873) 28 L.T. 374.

B    *Nobel's Explosives Co.* v. *Jones, Scott & Co.* (1881) 17 Ch.D. 721, C.A.; (1882) 8 App.Cas. 5, H.L.(E.).

*Plymouth Mutual Co-operative and Industrial Society Ltd.* v. *Traders' Publishing Association Ltd.* [1906] 1 K.B. 403, C.A.

*Pressed Steel Car Co.* v. *Union Pacific Railway Co.* (1917) 240 F. 135.

*Reg.* v. *Lewes Justices, Ex parte Secretary of State for Home Department* [1973] A.C. 388; [1972] 3 W.L.R. 279; [1972] 2 All E.R. 1057, H.L.(E.).

C    *Reg.* v. *Lord Leigh* [1897] 1 Q.B. 132, C.A.

*Reg.* v. *Snider* [1953] 2 D.L.R. 9.

*Saltman Engineering Co. Ltd.* v. *Campbell Engineering Co. Ltd.* (1948) 65 R.P.C. 203, C.A.

*Sinclair Refining Co.* v. *Jenkins Petroleum Process Co.* (1933) 53 S.Ct. 736.

*Spokes* v. *Grosvenor and West End Railway Terminus Hotel Co. Ltd.* [1897] 2 Q.B. 124, C.A.

D    *Stuart* v. *Ismail*, 1942 A.D. 327.

*Tetley* v. *Easton* (1856) 18 C.B. 643.

*Utterson* v. *Mair* (1793) 4 Bro.C.C. 270.

*Uzielli, In re, Ponsardin* v. *Peto* (1863) 33 L.J.Ch. 371.

*Vass* v. *Board of Customs*, Feb. 20, 1818, F.C.

*Walker* v. *Pennsylvanian Railway Co.* (1944) 36 A. 2d 597.

E    *Washburn and Moen Manufacturing Co.* v. *Cunard Steamship Co.* (1889) 6 R.P.C. 398.

*Weld-Blundell* v. *Stephens* [1920] A.C. 956, H.L.(E.).

*Zachariassen* v. *The Commonwealth* (1917) 24 C.L.R. 166.


The following cases are referred to in the judgments of the Court of Appeal:

F    *Attorney-General* v. *Mulholland; Attorney-General* v. *Foster* [1963] 2 Q.B. 477; [1963] 2 W.L.R. 658; [1963] 1 All E.R. 767, C.A.

*Conway* v. *Rimmer* [1968] A.C. 910; [1968] 2 W.L.R. 998; [1968] 1 All E.R. 874, H.L.(E.).

*Fraser* v. *Evans* [1969] 1 Q.B. 349; [1968] 3 W.L.R. 1172; [1969] 1 All E.R. 8, C.A.

*Gartside* v. *Outram* (1856) 26 L.J.Ch. 113.

G    *Hubbard* v. *Vosper* [1972] 2 Q.B. 84; [1972] 2 W.L.R. 389; [1972] 1 All E.R. 1023, C.A.

*Hunt* v. *Maniere* (1864) 34 Beav. 157.

*Initial Services Ltd.* v. *Putterill* [1968] 1 Q.B. 396; [1967] 3 W.L.R. 1032; [1967] 3 All E.R. 145, C.A.

*Murray* v. *Clayton* (1872) L.R. 15 Eq. 115.

*Nobel's Explosives Co.* v. *Jones, Scott & Co.* (1881) 17 Ch.D. 721, C.A.; (1882) 8 App.Cas. 5, H.L.(E.).

H    *Orr* v. *Diaper* (1876) 4 Ch.D. 92; 25 W.R. 23; 46 L.J.Ch. 41; 35 L.T. 468.

*Reg.* v. *Lewes Justices, Ex parte Secretary of State for Home Department* [1973] A.C. 388; [1972] 3 W.L.R. 279; [1972] 2 All E.R. 1057, H.L.(E.).

*Saccharin Corporation* v. *Chemicals and Drugs Co.* [1900] 2 Ch. 556; 17   **A**
    R.P.C. 612, C.A.

*Tournier* v. *National Provincial and Union Bank of England* [1924] 1
    K.B. 461, C.A.

*Upmann* v. *Elkan* (1871) L.R. 12 Eq. 140; 7 Ch.App. 130.

*Upmann* v. *Forester* (1883) 24 Ch.D. 231.

*Weld-Blundell* v. *Stephens* [1920] A.C. 956, H.L.(E.).

  **B**

The following additional cases were cited in argument in the Court of
    Appeal:

*British United Shoe Machinery Co. Ltd.* v. *Simon Collier Ltd.* (1910)
    27 R.P.C. 567, H.L.(E.).

*Clayton* v. *Earl of Glengall* (1837) Cr. & Dix Ab.Ca. 70.

*Crompton (Alfred) Amusement Machines Ltd.* v. *Customs and Excise*
    *Commissioners (No. 2)* [1972] 2 Q.B. 102; [1972] 2 W.L.R. 835;   **C**
    [1972] 2 All E.R. 353, C.A.

*Dixon* v. *Enoch* (1871) L.R. 13 Eq. 394.

*Grosvenor Hotel, London, In re* [1964] Ch. 464; [1964] 2 W.L.R. 184;
    [1964] 1 All E.R. 92, C.A.

*Hargreaves (Joseph) Ltd., In re* [1900] 1 Ch. 347, C.A.

*Heathcote* v. *Fleete* (1702) 2 Vern. 442.

*Henderson* v. *M'Gown*, 1916 S.C. 821.   **D**

*Hillman's Airways Ltd.* v. *Société Anonyme d'Éditions Aéronautiques*
    *Internationales* [1934] 2 K.B. 356.

*International General Electric Co. of New York Ltd.* v. *Customs and*
    *Excise Commissioners* [1962] Ch. 784; [1962] 3 W.L.R. 20; [1962]
    2 All E.R. 398; [1962] R.P.C. 235, C.A.

*McDade* v. *Glasgow Corporation*, 1966 S.L.T.(Notes) 4.   **E**

*Morse* v. *Buckworth* (1703) 2 Vern. 443.

*Panthalu* v. *Ramnord Research Laboratories Ltd.* [1966] 2 Q.B. 173;
    [1965] 3 W.L.R. 682; [1965] 2 All E.R. 921, C.A.

*Pfizer Corporation* v. *Ministry of Health* [1965] A.C. 512; [1965] 2
    W.L.R. 387; [1965] 1 All E.R. 450, H.L.(E.).

*Pinder* v. *Spurr* (unreported), February 14, 1972, Lawton L.J.

*Reg.* v. *Lewes Justices, Ex parte Secretary of State for Home Department*   **F**
    [1972] 1 Q.B. 232; [1971] 2 W.L.R. 1466; [1971] 2 All E.R. 1126,
    D.C.

*Shaw* v. *Kay* (1904) 5 T.C. 74.

*Upmann* v. *Currey* (1885) 29 S.J. 735.

*Washburn and Moen Manufacturing Co.* v. *Cunard Steamship Co.* (1889)
    6 R.P.C. 398.

  **G**

APPEAL from the Court of Appeal, post, p. 137c.

This was an appeal, brought by leave of the House of Lords, by the
appellants, Norwich Pharmacal Co. (now known as Morton-Norwich
Products Inc.), Smith Kline and French Laboratories Ltd. and Norwich
Pharmacal Co., the plaintiffs in consolidated actions, from an order of the
Court of Appeal (Lord Denning M.R., Buckley and Roskill L.JJ.) dated   **H**
July 25, 1972, allowing an appeal of the respondents, the Commissioners
of Customs and Excise, defendants to the actions, from the order of
Graham J. [1972] Ch. 566 dated March 14, 1972, requiring them to disclose

A to the appellants the names and addresses of the persons who were infringing the appellants' patent.

The facts are stated in their Lordships' opinions, post, p. 173A.

*Sydney Templeman Q.C., J. P. Warner* and *W. Bruce Spalding* for the appellant commissioners in the Court of Appeal.

*Anthony Walton Q.C.* and *Robin Jacob* for the respondent plaintiffs in
B the Court of Appeal.

The main submissions of counsel in the Court of Appeal were similar to those made later before the House of Lords, post, pp. 152F–172H, where the plaintiffs abandoned the contention that they had a cause of action for infringement.

*Cur. adv. vult.*

C July 25, 1972. The following judgments were read.

LORD DENNING M.R. The Norwich Pharmacal Co. is an American corporation which owns a patent. Smith Kline and French Laboratories Ltd. are an English subsidiary and licensee of the patent. I will call them " the plaintiffs." They have letters patent for a chemical compound.
D In the specification it is designated by a very long name. I will not write it or repeat it. It is claim 2. It has 36 letters and five figures. The plaintiffs have given it a shortened name which I can both write and repeat. It is " furazolidone." This substance is useful for putting into poultry food because it gives the birds some protection against infection by microbes. Very little of it goes a very long way. The plaintiffs mix
E it with chalk in the proportion of about one-quarter of furazolidone to three-quarters of chalk. This I will call the furazolidone mixture. This goes even further. Only half a pound of the mixture goes into one ton of feeding stuff. Some large poultry farms buy pure furazolidone themselves, or the mixture of chalk and furazolidone, and put it themselves into the feeding stuff. But smaller farms buy the final feeding stuff from merchants who have previously injected the furazolidone mixture into it.
F The plaintiffs make the furazolidone in this country, and mix it with chalk here, and sell the mixture here. They have a strong belief, however, that a lot of " pirate " furazolidone is being imported into this country from abroad. Sometimes it is brought in by big farmers. At other times it is brought in by merchants who put it into poultry food which they sell. The plaintiffs want to put a stop to these " pirate " importations. But they do not know who are the people who are importing it. They
G have no means, they say, of finding out: because the final foodstuff contains only a small amount of furazolidone. " It is," says the manager of their legal department, " for practical purposes impossible to show that this furazolidone is not lawful material originating with my company or its associates."

In these circumstances the plaintiffs seek to discover from the customs
H authorities the names of the importers. It appears that in the United States there is a law which enables patentees to get such names from the customs authorities. The plaintiffs seek to do the same here by means of this action. It appears that the customs authorities here publish statistics

showing the total amount of goods imported under the name of furazolidone, but none of the details. The plaintiffs seek to get the customs to disclose the names of the people who imported these quantities of furazolidone. If they can get the names, they intend to sue them for infringement of their patent. This will, they say, enable them to stop the "pirate" importations to a large extent. But it will not be "fool-proof." The goods are sometimes imported as "medicament" without a name: so it will not appear in the statistics as furazolidone.

The customs authorities have in their possession the names of the importers; because, whenever goods are imported, the importer has to fill in the form of entry giving the name of the importers, the description of the goods, and so forth: see section 28 of the Customs and Excise Act 1952. The customs authorities regard this information as confidential. They do not publish it at all. They only publish the statistics showing total quantities imported in the year, but no names or addresses.

This confidence is strongly confirmed in the Finance Act 1967. Section 3 authorises the commissioners to disclose some of the information to others if it is in the national interest, or rather, if the Secretary of State is satisfied that it is in the national interest. But very significantly the section says that the commissioners are not to disclose "the price of the goods or the name of the importer of the goods." Those matters are so sacrosanct that not even the Secretary of State can require them to be disclosed—not even when it is in the national interest.

Yet the judge has held that the commissioners must disclose the names of the importers to the plaintiffs. The commissioners appeal to this court. Let me get one point out of the way at the very first. It was suggested that the commissioners were themselves guilty of infringing the plaintiffs' patents—not whilst they were ignorant, but as soon as they were told that the goods infringed the plaintiffs' patent. I cannot accept this suggestion. The commissioners do not have possession of the goods. All they do is ask the importers to pay the customs duty. They have power, of course, to prevent importation until the duty has been paid. The goods must stay in an approved warehouse till the duty is paid. None of this makes the commissioners guilty of infringement of patents: see *Nobel's Explosives Co.* v. *Jones, Scott & Co.* (1881) 17 Ch.D. 721; (1882) 8 App.Cas. 5. They do not infringe the monopoly. All that the Royal Grant gives to the patentee and his licensees is the right to "make use exercise and vend the said invention within the United Kingdom." The commissioners do none of those things. They do not make, use, exercise or vend it. They only collect duty on it.

But the plaintiffs suggest that the commissioners infringe in another way. The plaintiffs rely on the provision in the Royal Grant which gives them "the whole profit and advantage" accruing by reason of the said invention; and they say that, by taking the duty, the commissioners take some of that profit and advantage. That is quite untenable. The profit is taken by the importer, not by the commissioners. The commissioners charge duty on it, just as the revenue authorities charge tax on profits. But that does not make them participators in it.

Finally, on this part of the case the plaintiffs suggest that, when goods are imported which infringe their patent, they are prohibited goods and

Case 1:24-mc-00394-LAK    Document 4-17    Filed 08/23/24    Page 6 of 60

139
A.C.        Norwich Pharmacal v. Customs & Excise (C.A.)    Lord Denning M.R.

A are liable to forfeiture under section 44 (b) of the Customs and Excise Act 1952: and, therefore, the commissioners are in a position to make use of them. But that prohibition of imports is only available when the prohibition is imposed "under or by virtue of an enactment": as, for instance, when injurious drugs are prohibited. It does not apply to goods which infringe a patent. By no stretch of the imagination could the commissioners be expected to "police" imports so as to see that patents are not

B infringed. Not even if the monopolist asks them, can the commissioners be expected to do it.

I find myself, therefore, in entire agreement with the judge on this part of the case. There is no conceivable cause of action against the commissioners for infringement of patent.

Now I turn to the question whether there can be discovery against the commissioners—so as to compel them to give information as to the

C names of the importers. The cases warrant two propositions. First, discovery can be granted in aid of any reasonable action which the plaintiff has brought or is intending to bring, or is capable of bringing, against the defendant. Thus, where the defendant has been found guilty of infringing a patent, he can be ordered to give the names and addresses of persons to whom he has sold the goods, both in aid of damages: see

D *Murray* v. *Clayton* (1872) L.R. 15 Eq. 115; or of an account of profits: see *Saccharin Corporation* v. *Chemicals and Drugs Co.* [1900] 2 Ch. 556. But that is only in aid of an existing or future action against the defendant.

Secondly, in general, "no independent action for discovery lies against a party against whom no reasonable cause of action can be alleged, or who is in the position of a mere witness." It was so held by the judge, who gives many cases to support this proposition: [1972] Ch. 566,

E 582–584. This proposition is founded on good reason. It would be intolerable if an innocent person—without any interest in a case—were to be subjected to an action in Chancery simply to get papers or information out of him. The only permissible course is to issue a subpoena for him to come as a witness or to produce the documents to the court.

But Mr. Walton urges—and the judge has so held—that there is an

F exception to this second proposition—an exception, it is said, in aid of the administration of justice. Mr. Walton says that, when it is clear that there has been wrongdoing, and the plaintiff is unable to find out the wrongdoers but a third party knows the names, then the court can order discovery from the third party to find out the names, even though there is no reasonable cause of action against him. In support of this proposition Mr. Walton quotes cases of trade marks or passing off, and in

G particular *Hunt* v. *Maniere* (1864) 34 Beav. 157; *Upmann* v. *Elkan* (1871) L.R. 12 Eq. 140; *Orr* v. *Diaper* (1876) 4 Ch.D. 92, but much more fully and better reported in 25 W.R. 23. Those were cases of wharfingers, forwarding agents or shippers who were importing or exporting spurious goods. They handled champagne, cigars and sewing cotton which were dressed up so as to deceive purchasers. They did not know of

H the fraud at first, but later on were given notice of it. The courts held that, on getting to know of the fraud, the wharfingers, forwarding agents or shippers ought not to part with the spurious champagne, cigars or sewing cotton. They ought to give to the aggrieved party such information

as he might reasonably require so as to track down the fraud and sue
the culprits.  They ought to give the names of the consignors who shipped
the goods with the counterfeit marks upon them; or the consignees who
were importing them.

In each of those cases the wharfinger, forwarding agent or shipper
had possession or control of the goods.  As soon as the injured party
complained, it was pretty clear that the goods were spurious and deceptively
marked.  If the wharfinger, forwarding agent or shipper had parted with
the goods after notice, he would be aiding and abetting a fraud.  As soon
as notice was given, the injured party could have obtained an injunction
to restrain the wharfinger, forwarding agent or shipper from parting with
them.  Even without giving him notice, the injured party could have
moved for an injunction; for otherwise the notice might merely serve to
put the defendant on his guard and he might get rid of the goods: see
*Upmann* v. *Forester* (1883) 24 Ch.D. 231, 236.  Seeing that that cause of
action existed, the cases come within the first proposition that the court
can order discovery in aid of a reasonable action which the plaintiff is
intending to bring or is capable of bringing.

But this case is very different.  It falls within the second proposition.
The plaintiffs have no reasonable cause of action which they can conceiv-
ably bring against the commissioners.  They cannot, therefore, bring an
action against them merely for the purpose of discovering from them the
names of importers.

Even if the plaintiffs could overcome that hurdle, they are faced with
another.  It is that the names of the importers were given to the com-
missioners in confidence—for a limited and restricted purpose—and the
courts ought not to compel them to break that confidence.  That principle
was stated by Lord Reid in *Conway* v. *Rimmer* [1968] A.C. 910, 946:
" If the state insists on a man disclosing his private affairs for a particular
purpose it requires a very strong case to justify that disclosure being used
for other purposes."

The law about confidential information has developed much of recent
years.  The cases show that the public interest has two sides to it.  On
the one hand it is usually in the public interest that when information is
received in confidence—for a limited and restricted purpose, as it always
is—it should not be used for other purposes.  In such cases confidences
will be held sacrosanct.  Thus the courts have held in these cases that
confidences should be kept and not broken: where the disclosure would
involve the writer in a libel action, *Weld-Blundell* v. *Stephens* [1920]
A.C. 956; where a banker was asked to disclose the state of a
customer's account, *Tournier* v. *National Provincial and Union Bank of
England* [1924] 1 K.B. 461; and where the Gaming Board were asked to
disclose information obtained about an applicant, *Reg.* v. *Lewes Justices,
Ex parte Secretary of State for Home Department* [1973] A.C. 388.
On the other hand, confidences will sometimes be overcome by a higher
public interest, such as the interest of justice itself, the prevention of
wrongdoing, or the security of the state.  Thus the courts have held
that confidences cannot be used so as to cover up wrongdoing: see *Gartside*
v. *Outram* (1856) 26 L.J.Ch. 113; *Initial Services Ltd.* v. *Putterill* [1968]
1 Q.B. 396, nor to prevent disclosure of practices, which might be dangerous

A to mental health, see *Hubbard* v. *Vosper* [1972] 2 Q.B. 84; nor to hamper an investigation into breaches of security, see *Attorney-General* v. *Mulholland*; *Attorney-General* v. *Foster* [1963] 2 Q.B. 477, 488, 489; nor in affairs of general concern where the public interest requires disclosure, see *Fraser* v. *Evans* [1969] 1 Q.B. 349, 367. So in every case it is a question of weighing the public interest. The courts must consider the relationship, and rule upon it as and when it comes before them.

B    In the present case I am quite clear that the public interest demands that the commissioners should keep secret the names of importers. Parliament emphasised it in section 3 of the Finance Act 1967. It would, no doubt, be a great convenience to the plaintiffs to get the names of importers. It would enable them to assert their monopoly and get an injunction and damages against infringers. This financial gain would, no doubt, be of private benefit to them. And it would help to stop wrong-
C    doing. But it is as nothing compared to the importance of keeping the information secret.

Another aspect of the public interest (often referred to in the cases on Crown privilege) is the interest in ensuring candour. If there was ever a case in which it was in the public interest to ensure candour, it is this very case. If importers thought that the commissioners would
D    disclose their names and addresses, they would soon find ways to circumvent this disclosure. They would use the names of nominees. They would conceal the description of the goods, by giving them a false or invented description, or by making it so general as to be untraceable—such as " medicament." They might resort to forgery. All these things have happened we are told, in the United States where the customs do disclose information. Rather than give scope to those evils, it is better
E    to insist on keeping their names and addresses secret.

I would like to say that I have benefited much from the judgment of Graham J. But, whilst agreeing with much that he says, I am afraid that I cannot agree with his decision. I would allow the appeal and dismiss the application.

F    BUCKLEY L.J. I would like to associate myself with what Lord Denning M.R. has said of the very clear and careful judgment of Graham J.

I will deal first with the plaintiffs' cross-appeal. This asserts that the Commissioners of Customs and Excise have infringed the plaintiffs' patent. This is put on two grounds: (1) that the commissioners by allowing imported furazolidone to be brought into this country with knowledge of the plaintiffs' claim that this commodity infringes their patent aid and
G    abet the infringement, and (2) that by exacting payment of customs duty on the imported furazolidone the commissioners obtain a profit in breach of the grant to the first plaintiff in the letters patent of the full profit of the invention.

It is true that the commissioners were informed by the plaintiffs in 1967 of the claim that the material imported under the name furazolidone infringed the patent, but it is not, in my opinion, a duty or a function of
H    the commissioners to verify the truth of such an assertion. The importation might not be an infringement for a number of reasons. The patent might be invalid, although in the present case its validity is as a matter

of pleading admitted. The importation or the manufacture of the goods might have been licensed. The goods, though described as furazolidone, might not in fact infringe the patent. The plaintiffs would, of course, deny any such suggestions, but it would I think be strange if the commissioners were bound either to accept the plaintiffs' claim without question on the one hand, or to satisfy themselves by inquiry as to its validity on the other. The importation of infringing goods will give rise to a cause of action for damages for infringement against the importers, but it is not illegal. Such goods are not, in my opinion, prohibited goods for the purposes of section 44 (b) of the Customs and Excise Act 1952. Their importation is not prohibited or restricted under or by virtue of any enactment. The Patents Act 1949 cannot, I think, be said to contain any such prohibition. It is true that the grant of the patent in the form prescribed under section 21 (3) of that Act contains a command that no one shall " make use or put in practice the said invention nor in anywise imitate the same without the consent of the patentee," but this prohibition, in my opinion, derives its force from the act of the Crown in making the grant and not under or by virtue of the Act of Parliament. In any case, I do not consider that it is a prohibition of importation. Importation of infringing goods is an infringement of the private rights of a patentee; it is not an infraction of any general law of the land forbidding such importation. The commissioners are, I think, under no obligation to police the plaintiffs' immunity from infringement of the patent and would not, it seems to me, have any justification on that ground for forfeiting the goods or otherwise preventing their importation. The goods are not in the possession or under the control of the commissioners. The commissioners cannot, in my judgment, be accurately said to aid or abet any infringement.

Nor do I think that, by demanding and receiving payment of customs duty in pursuance of their statutory duty, the commissioners participate in any profit of the invention. The liability for duty is a debt due to the Crown by the importer arising out of the act of importation. It is a personal obligation, a debt, just as income tax is a debt. It is, in my judgment, no more a part of the profit of the invention than income tax is a part of the profits in respect of which it is assessed. The whole of the profit on the imported goods is the importer's, notwithstanding that by reason of the importation he has incurred a liability to pay the duty.

In my judgment the cross-appeal fails. So the question whether the plaintiffs can maintain the action against the commissioners for discovery of the names of the importers must be considered upon the basis that the plaintiffs have no cause of action against the commissioners for infringement.

Mr. Walton referred us to certain cases in which defendants, in whose possession or custody infringing goods were, were restrained from parting with them or held to be under a duty to retain them and give information relating to them pending determination of the question of infringement. These are not, I think, relevant to the present case in which, as I have already said, the imported goods are not, and indeed have never been, in the possession of the commissioners, nor have they been in their custody or under their control save in so far as their statutory powers, conferred for purposes exclusively connected with levying customs duties, confer control.

Mr. Walton has contended that a plaintiff can bring an action

A.C.        Norwich Pharmacal v. Customs & Excise (C.A.)        Buckley L.J.

A against a defendant for the sole purpose of extracting information from that defendant which will enable the plaintiff to sue a third party in other proceedings for an admitted wrong. The necessary conditions, he says, are (1) that a wrong has been done to the plaintiff, (2) that he does not know whom to sue, (3) that the defendant knows the identity of the wrongdoer, (4) that the plaintiff knows this, (5) that he has no other way of discovering that information, (6) that the plaintiff can get relief against
B no one other than that wrongdoer in respect of the wrong, and (possibly) (7) that the defendant is more than a mere witness, in the sense that he has an interest in the outcome of the prospective action by the plaintiff against the wrongdoer.

Mr. Templeman says that no authority can be found supporting this proposition and that no one against whom the plaintiff has no reasonable cause of action can be sued merely for discovery.
C On this part of the case Mr. Walton relied mainly on two cases: *Orr* v. *Diaper*, 4 Ch.D. 92; 25 W.R. 23 and *Upmann* v. *Elkan*, L.R. 12 Eq. 140; 7 Ch.App. 130. Graham J., after discussing these and other cases, stated his conclusion thus [1972] Ch. 566, 584:

" Having given these cases careful consideration, they seem to me to
D show that in general it is correct that no independent action for discovery lies against a party against whom no reasonable cause of action can be alleged or who is in the position of a mere witness in the strict sense. This is the normal rule but there is nothing in them which shows that the rule is invariable and is to be understood as excluding cases such as *Orr* v. *Diaper* or *Upmann* v. *Elkan* or indeed *Panthalu*
v. *Ramnord Research Laboratories Ltd.* [1966] 2 Q.B. 173 where it
E can properly be said that the evidence may be relevant to an issue in the main action."

I will refer first to *Upmann* v. *Elkan* L.R. 12 Eq. 140, which is the earlier of these cases in date. A case containing boxes of cigars, some of which were alleged to bear a spurious imitation of the plaintiff's trade mark, had been shipped to St. Katharine's Dock, for importation to this
F country, to the order of Messrs. Elkan, a firm of forwarding agents carrying on business in London. Messrs. Elkan were in possession of forwarding instructions from the consignors directing distribution of the contents of the case to various persons resident in England, whose names and addresses were stated in those instructions. The plaintiff filed a bill against Messrs. Elkan and the dock company for an injunction to restrain Messrs. Elkan from removing the boxes of cigars bearing the spurious mark from St.
G Katharine's Dock and from infringing the plaintiff's mark, for an account and for damages. The plaintiff obtained an interim injunction, first ex parte and subsequently inter partes. Before the bill was filed Messrs. Elkan offered to tell the plaintiff the names of the consignors and of the persons to whom the cigars were to be delivered and gave the plaintiff this information seven days after the filing of the bill. No relief
H was asked against the dock company. It was not established that Messrs. Elkan had been privy to the infringement. In the course of his judgment Lord Romilly M.R. (who was later affirmed on appeal by Lord Hatherley L.C., 7 Ch.App. 130, 132) said, L.R. 12 Eq. 140, 146:

Buckley L.J.        Norwich Pharmacal v. Customs & Excise (C.A.)        [1974]

" It does not, in my opinion, make any difference whether the goods    A
are sent to a person who does not deal in the article consigned, and
whose duty is simply to distribute the goods to other persons, or
whether the goods are sent to him as consignee for his own purposes.
In either case they are sent to the dock to be at his disposal, and
without his signature the goods cannot be disposed of. It will not do
for him to say, as he does in this case, ' I know nothing about the goods
sent. I do not know whether they have any, or, if any, what brand on    B
them, or whose it is.' It is his duty to know this, and if he receives
notice that they bear a fraudulent imitation of another man's brand, he
ought to ascertain this as speedily as possible after such notice, and to
take the proper and necessary steps to prevent their being disposed of in
that state."

And he said of the dock company, at p. 147:    C

" In fact, in many respects the position of the dock company does
not differ from his. For all acts done in ignorance they are excusable,
but as soon as they receive notice of the fraud, and either by bill
filed or by plaintiff's indemnity the dock company is protected, they
must retain the goods until the question is determined, . . ."

It is plain that that case is not authority for the proposition that a suit    D
may be brought for discovery only against a party against whom no other
relief can properly be sought. Not only was an injunction sought against
Messrs. Elkan, but in an interim form it was obtained. In the event no
final order was made against Messrs. Elkan for costs or otherwise, but
they recovered no costs and were required to give an undertaking. The
cigars, which seem to have been in the possession of the dock company,
were at the disposal of Messrs. Elkan. Lord Romilly M.R. held that,    E
upon being informed of the fraud, they were in duty bound to give the
information required and to undertake that the goods should not be removed
or dealt with until the offending mark had been removed. It was doubtless
on this basis that the injunction was granted.

In Orr v. Diaper, 4 Ch.D. 92; 25 W.R. 23 the plaintiffs were manu-
facturers of sewing cotton and thread, and their product was packed and    F
ticketed in a distinctive way. They discovered that inferior sewing cotton
and thread, similarly packed and ticketed, was being shipped to Valparaiso
by Messrs. Diaper, a firm of shippers at Liverpool. The plaintiffs asked
Messrs. Diaper from whom they had received these goods and on whose
behalf they were shipped. They received no answer and commenced pro-
ceedings in which they alleged, inter alia, that Messrs. Diaper were still
shipping the goods. The relief claimed was discovery of the names and    G
addresses of the consignors of the goods to the defendants and particulars
of the shipments in aid of proceedings contemplated by the plaintiffs.
These proceedings, it is evident, were to be against the consignors. The
defendants demurred.

The only report of the case to which the judge's attention was drawn
seems to have been that at 4 Ch.D. 92; but it is more fully and better    H
reported at 25 W.R. 23. From that report it appears that counsel for the
defendants cited the following passage from Mitford on Pleading, 4th
ed. (1827), p. 191:

Case 1:24-mc-00394-LAK    Document 4-17    Filed 08/23/24    Page 12 of 60

145
A.C.          Norwich Pharmacal v. Customs & Excise (C.A.)          Buckley L.J.

A    "If therefore the plaintiff does not show by his bill such a case as renders the discovery which he seeks material to the relief, if he prays relief, or does not show a title to sue the defendant in some other court, or that he is actually involved in litigation with the defendant, or liable to be so, and does not also show that the discovery which he prays is material to enable him to support or defend a suit, he shows no title to the discovery, and consequently a demurrer will hold."

B    It will be noted that the effect of this statement is that a bill would not lie for discovery unless the plaintiff was seeking other relief in the Court of Chancery, or was suing or entitled to sue the defendant in some other court. Hall V.-C. felt strongly that the plaintiff ought to have the information he sought. "Nothing," he said, 25 W.R. 23, 24, "but 'absolute necessity' will compel me to allow this demurrer." Having expressed the opinion that

C    the position of the defendants in shipping the goods was one which might subject them to proceedings by way of injunction to restrain them from continuing to ship the goods, Hall V.-C. said, at p. 25:

    "But it is said that the defendants are in the position of witnesses, and you cannot have a bill of discovery brought against a witness. But I think that the position of the defendants is different from that of a mere witness and the rule that a mere witness cannot be made a party

D    to obtain discovery has no application to this case. That view of the case seems to me to bring it within the rule as stated in *Mitford*. The plaintiffs do show a right to sue the defendants in some other court, which expression, since the change made by the Judicature Acts, must mean this court, in some other proceeding."

E    That part of this passage which starts with the words "That view of the case" is represented in the report in 4 Ch.D. 92, 96, only by the sentence: "I think that the plaintiffs do show a title to sue." I am inclined to think that the judge may have read this equivocal statement as meaning that in the view of Hall V.-C. the plaintiffs were entitled to sue Messrs. Diaper merely for discovery. The fuller report shows that Hall V.-C. was carefully bringing himself within the rule in *Mitford*—that is,

F    he was basing himself on the circumstance that the plaintiffs were in a position to seek not merely discovery but substantive relief against Messrs. Diaper. The case is not, as the judge thought, an exception to the general rule (see *Bray on Discovery* (1885), p. 40) that no person without an interest (such that a decree could be made against him or that he might be affected by the decree) could be made a defendant to a bill in Chancery

G    for the purpose of discovery. Messrs. Diaper had an interest, for in consequence of the prospective proceedings by the plaintiffs against the consignor of the goods, Messrs. Diaper were exposed to the risk of being restrained by injunction from continuing to ship the goods. Properly understood the decision in *Orr* v. *Diaper*, 25 W.R. 23 is, in my judgment, not in Mr. Walton's favour, but against him.

H    The reason why Messrs. Diaper were exposed to the risk of an injunction was, I think, similar to the reason why Messrs. Elkan were in fact restrained by injunction from parting with control of the cigars. If a man has in his possession or control goods the dissemination of which, whether in the way

of trade or, possibly, merely by way of gifts (see *Upmann* v. *Forester*, 24 Ch.D. 231) will infringe another's patent or trade mark, he becomes, as soon as he is aware of this fact, subject to a duty, an equitable duty, not to allow those goods to pass out of his possession or control at any rate in circumstances in which the proprietor of the patent or mark might be injured by infringement ensuing. The man having the goods in his possession or control must not aid the infringement by letting the goods get into the hands of those who may use them or deal with them in a way which will invade the proprietor's rights. Even though by doing so he might not himself infringe the patent or trade mark, he would be in dereliction of his duty to the proprietor. This duty is one which will, if necessary, be enforced in equity by way of injunction: see *Upmann* v. *Elkan*, L.R. 12 Eq. 140; 7 Ch.App 130. The man having possession or control may also be under a duty to give information in relation to the goods to the proprietor of the patent or mark: *Upmann* v. *Elkan*.

The commissioners are not, in my opinion, and never have been, in this position in respect of the imported furazolidone. It has never been in their possession, and the only powers of control which they have ever had in respect of it have been statutory powers conferred upon them for a particular purpose, viz. the collection of customs duty, and only for that purpose. In my judgment, they have never come under any such duty to the plaintiffs as was held to have arisen in *Upmann* v. *Elkan*. The plaintiffs could, in my opinion, never have obtained substantive relief of any kind against the commissioners.

I think that it remains the law that no action for discovery can be brought against a party against whom no other relief is or could be sought, that is to say, against whom the plaintiff has no reasonable cause of action. In this case the plaintiffs disclose no reasonable cause of action against the commissioners, who are on this ground, in my judgment, entitled to have the action dismissed.

This, if right, disposes of this appeal, but I will add that I agree with Lord Denning M.R. in thinking that in this case the balance of public interest is in favour of preserving confidentiality in respect of the information disclosed by the importers to the commissioners, and of avoiding inhibiting candour on the part of importers in respect of the information they are required to give to the commissioners. I also would allow the appeal.

ROSKILL L.J. The issue for decision in this appeal arises out of a summons for inspection of documents dated March 3, 1971, and issued by the plaintiffs in actions, now consolidated, brought by them against the commissioners. The commissioners delivered lists of documents in each action. They properly included all relevant documents in those lists, but claimed privilege against the production of those documents named in part 3 of schedule 1 to each list on the grounds both that they were precluded by law from producing them and that their production would be injurious to the public interest because they contained confidential information about the affairs of persons other than the plaintiffs furnished to the commissioners by such persons pursuant to sections 26, 28 and 29 of the Customs and Excise Act 1952. That objection to production was overruled by Graham J. in circumstances which I will later relate. But both before him and on

A  appeal to this court the objection was maintained not only on these two grounds but on the wider ground that in truth these actions were but actions for discovery and that the pleaded allegations against the defendants of infringement of the plaintiffs' patents were no more than unsupported and unsupportable allegations made by the plaintiffs against the commissioners in an effort to circumvent the well-established rule that the court will not in general permit actions for discovery when no other relief is or can properly

B  be sought.

It is a remarkable fact that when one looks at the writs and statements of claim in these actions one finds that the first two paragraphs of each writ allege infringement, as do the first seven paragraphs of each statement of claim, whereas only the third paragraph of each writ and the last three paragraphs of each statement of claim relate to the issue of discovery.

C  Thus the essential question this court has to decide has been heavily though skilfully disguised under allegations of infringement which, like my Lords and the trial judge, I regard as unfounded in fact and unsupportable in law for reasons I will give later. When therefore this disguise is stripped off, as stripped off it must be, one is left with a prayer in each writ for discovery of the documents to the production of which exception is taken, supported by allegations of fact in the last three paragraphs of each state-

D  ment of claim. The plaintiffs wish to sue those by whom the goods allegedly infringing their patents have been and are being imported into this country. They do not know the names of these alleged infringers. The commissioners know the names. The plaintiffs cannot sue without the information which they say they cannot otherwise obtain. The commissioners have that information but refuse to supply it. Therefore the plaintiffs seek to extract this information from them by legal process. The question is whether the law

E  allows them to do so. The plaintiffs say that the interests of justice require the disclosure of this information by the defendants. Otherwise rights accorded them under patents given under the Royal Prerogative and by statute are denied them. No other consideration can be allowed to prevail against the interests of justice which in this case they say coincides with their own interests, least of all those considerations which have led the

F  commissioners to refuse production. Forensic cries for relief claimed to be in the interests of justice against the restrictive doctrines of what was until the very recent decision of the House of Lords in *Reg.* v. *Lewes Justices, Ex parte Secretary of State for Home Department* [1973] A.C. 388 still called Crown privilege, of confidentiality and of the remnants of the now extinct Chancery bill of discovery should find a sympathetic hearing from any court. But the crucial question remains whether those interests

G  shall prevail against other and perhaps wider interests, also public or national in character, which are relied upon by the commissioners as outweighing the interests on which the plaintiffs rely and as tipping the scale against the plaintiffs.

I have had the advantage of reading in advance the judgments which have been delivered. I would not add to them were it not that we are differing from the careful and helpful judgment of the judge from which

H  like my Lords I have derived much benefit.

Mr. Walton frankly admitted that the claim for alleged infringement was but a peg upon which to hang his clients' claim for discovery. Wisely he

argued this point last preferring to rest his main submission upon what he contended were stronger points. He boldly sought to argue that goods imported into this country which he claimed infringed the plaintiffs' patents were " prohibited goods " for the purposes of the Customs and Excise Act 1952, and should be forfeited, and that the commissioners by levying duty upon such goods, even in pursuance of a statutory power and duty so to do, were infringing those patents because they were taking a profit from those goods whereas the plaintiffs were entitled to the entire profit upon them by virtue of those patents. Mr. Walton even went so far—under some pressure from the court—to submit that the Commissioners of Inland Revenue would be in like position were they to levy taxes upon the profits earned from such importation. Alternatively, he contended that the commissioners and their officers were aiding and abetting infringement because by collecting duty and permitting the import of these goods they were sufficiently connected with the principal offenders as to be equal parties to the infringement with those principal offenders.

With respect I find these propositions almost unarguable. The phrase " prohibited goods " is nowhere defined in the Act of 1952. But it plainly means, when one looks at the various sections which deal, inter alia, with prohibited goods, goods the import or export of which is prohibited or restricted by reason of some statutory enactment currently in force: see, for example, sections 44, 45, 56 and 304. The fact that goods may be imported which infringe a patent does not make them " prohibited goods " or liable to forfeiture. One may ask the questions: " How are the commissioners to know if particular goods do infringe a patent? " " Are they to investigate every consignment? " " Are they to investigate every patent and consider possible challenges to its validity? " I can find nothing in the Act of 1952 which makes such goods prohibited goods or which would justify the commissioners in refusing clearance once the duty upon them was paid. Moreover the suggestion that the commissioners and their officers by permitting the import of these allegedly infringing goods are permitting the import of prohibited goods seemingly involves that each and all are guilty of offences against section 304 of the Act of 1952. It is indeed a curious argument which involves that the commissioners and their officers performing their statutory duty of collecting duty, which in the circumstances of these cases rarely if ever involves them acquiring actual or constructive possession of the goods, should simultaneously when performing that duty be guilty of a serious criminal offence.

As to the allegation of aiding and abetting, it is of the essence of aiding and abetting that the offender in some way should knowingly further the principal offender in his criminal activities. A person cannot be convicted of aiding and abetting if he does not know of the essential matters which constitute the offence by the principal offender. I again ask: are the commissioners to investigate every consignment and each patent? Though I agree with Mr. Walton that in the present case it is unlikely to be so, any patent may be open to challenge as invalid. The particular goods imported may in fact have been licensed. They may in fact not infringe the patent for they may be of different chemical composition even though wrongly described as furazolidone.

**A.C.**        Norwich Pharmacal v. Customs & Excise (C.A.)        **Roskill L.J.**

A    Nor can I accept the argument that by levying duty upon imported goods in pursuance of their statutory duty so to do, the commissioners are infringing or are aiding and abetting any infringement of the patents. They are not thereby participating in the profits of the invention. The importer by importing incurs by statute a liability to pay duty to the Crown. As Buckley L.J. has said, he incurs a personal obligation and a debt to the Crown, independent of all questions of patents.

B    I would only add on this branch of the case that the decision of this court in *Nobel's Explosives Co.* v. *Jones, Scott & Co.,* 17 Ch.D. 721, approved by the House of Lords, 8 App.Cas. 5, is inconsistent with Mr. Walton's submissions: see especially the judgment of James L.J., 17 Ch.D. 721, 741–743 and the speeches of Lord Selborne L.C. and of Lord Blackburn, 8 App.Cas. 5, 10–12. I therefore unhesitatingly reject the plaintiffs' alternative claim in their cross-notice to support the judge's judgment on the ground, rejected by the judge, that the commissioners have infringed their patents. If the claim for discovery is to succeed it must succeed in its own right and independently of any question of infringement.

C    Mr. Walton claimed that even in 1972 there was a cause of action for what has sometimes been called " mere discovery." He accepted that the circumstances when such an action could be brought were very rare because, as he put it, the necessary facts rarely combine together to justify the bringing of such an action. Here he claimed all the necessary facts to be present and thus that the plaintiffs' present action could properly be maintained. The first prerequisite was that a plain and manifest wrong had been done to the plaintiffs; the second, that the plaintiffs did not know who were the authors of their misfortune or whom to sue; third, that the defendants in the action for discovery must be more than what has been called in some of the cases " a mere witness "—he must have an interest in the proceedings; the fourth, that it must be in everyone's interest that justice should be done; the fifth, that the defendants in the intended action for discovery must know the name of the person or persons whom the plaintiffs wished to sue; and the sixth, that the plaintiffs had no alternative means of obtaining that name or those names.

F    The judge [1972] Ch. 566, 583 clearly accepted the existence of what might be called the basic rule, that there is no independent action for discovery against a party against whom no reasonable cause of action existed or who was in the position of a mere witness. But he also accepted from Mr. Walton a submission based on cases such as *Orr* v. *Diaper,* 4 Ch.D. 92; 25 W.R. 23 and *Upmann* v. *Elkan,* L.R. 12 Eq. 140 that the rule was not invariable and that those cases supported the existence of an exception (seemingly at least in cases of alleged infringement of patents, copyrights and trade marks, if in no others) where the facts of which discovery was sought could be said to be relevant to an issue in the action which it was desired to bring once the essential facts had been elicited by the process of discovery. I can readily see the attraction of this view where a plaintiff has been granted a monopoly and yet is deprived by lack of essential knowledge possessed by another of the full benefits of that monopoly. But it is not easy to see the logical reason why if the general rule exists, as the judge accepted that it did exist, the suggested

Roskill L.J.        Norwich Pharmacal v. Customs & Excise (C.A.)        [1974]

exception should be a limited exception operating only in favour of
monopolists such as the plaintiffs. It is true that proof of the existence
of such a limited exception will suffice the present plaintiffs. But if such
an exception should be made for them, others, in fields far removed from
patent, copyright or trade mark law, may equally seek to claim that the
interests of justice in their cases too demand the right to obtain information
in the possession of third parties who are unwilling to disclose it. If this
be correct it is surprising that no case exists in the books where a litigant
or indeed an authority charged with law enforcement has sought this
means of supplying deficiencies of proof in civil or indeed in criminal
proceedings.

    I therefore turn to consider whether authority compels acceptance of
Mr. Walton's main submission, for if it be right I see no logic in con-
fining the exception for which he contends to cases of alleged infringement
of patents, copyright or trade marks, though for obvious reasons he did
not seek to suggest that the exception was of any wider application.

    Buckley L.J. has related the facts in *Upmann* v. *Elkan*, L.R. 12 Eq.
140 and I need not repeat them. There are two important facts to be
observed. First, the defendants Elkan were forwarding agents to whom
were entrusted by goods owners the business of receiving, forwarding and
delivering goods. Secondly, the defendants St. Katharine's Dock Co. had
physical possession of the infringing cigars, holding them to Elkan's order.
Thus the dock company as bailees could not lawfully dispose of the goods
without the instructions and authority of their bailors, Elkan. Together
these two defendants could put these infringing cigars into circulation
and thus damage the plaintiffs' rights deriving from their trade marks.
The common law courts could not at that date assist for there was no
injury to the plaintiffs' title to or right to possession of the goods for
they had none. But equity would and did intervene to prevent injury
to the plaintiffs' trade marks by stopping persons such as the defendants,
who were in a position to injure those trade marks by using their ability
as bailors and bailees of the infringing goods to put them into circulation
to the detriment of the plaintiffs' rights of which the defendants had been
put upon notice, from so doing. The defendants in that case were willing
to give the necessary discovery in the action showing how the infringing
cigars had come into their respective possession and control. The plain-
tiffs' action was not an action for discovery only. It was also initially an
action for an injunction which was obtained in the first instance. I find
nothing in the judgments of Lord Romilly M.R. at first instance and of
Lord Hatherley L.C. on appeal supporting the view that the action was
one for discovery only. It quite plainly was not.

    The earlier decision of Lord Romilly M.R. in *Hunt* v. *Maniere*, 34
Beav. 157 was concerned with spurious Veuve Cliquot champagne and
is similarly explicable. The plaintiffs were the warehousemen. The
defendant was the indorsee of the dock warrants issued by the plaintiffs.
The plaintiffs had been given notice by Veuve Cliquot of the alleged
infringement of their rights. They were also sued at common law by
the defendant who as the bailor of the champagne had claimed delivery
of the champagne from the plaintiffs as his bailees. The common law
courts at that date would have been bound to give effect to the defendant's

A claim. So the plaintiffs successfully sought to restrain the defendant's action at common law and succeeded in so doing since they were in peril of proceedings in equity by Veuve Cliquot if once the plaintiffs knowingly put infringing goods into circulation.

If regard be had only to the report of *Orr* v. *Diaper* in 4 Ch.D. 92, some support can be found for Mr. Walton's basic proposition. The judge was referred only to that single report, from which it might be B deduced that the contention of the defendants that their demurrer should be upheld on the ground that the action was one for discovery only, had been overruled. But the industry of counsel during the argument of this appeal brought to light no less than three other reports of this case, one in 25 W.R. 23, a second in 35 L.T. 468, and a third (1877) 46 L.J.Ch. 41. It is clear from the perusal of the report in 25 W.R. that the report in the Law Reports is regrettably defective, quite apart from the fact that C the headnote is inaccurate in describing the defendants as shipowners which on the facts stated they manifestly were not. They were either shippers or forwarding agents or both.

Buckley L.J. has quoted the relevant passages from the report in `25 W.R. and in particular the citation by counsel for the defence from *Mitford on Pleading*, 4th ed. (1827), p. 191. Hall V.-C. clearly accepted that a D plaintiff was not entitled to sue a defendant merely for discovery. But he regarded the case as one in which the plaintiffs were entitled to seek substantive relief from the defendants. The reason for this conclusion is not far to seek when one looks at the facts stated in the fuller reports. The defendants had shipped in the past and were still shipping goods which infringed the plaintiffs' trade marks. The defendants were on notice of that fact. They as such shippers or forwarding agents were in a position to con-E trol the disposal of these infringing goods, disposal of which would damage the plaintiffs' rights. This court was not prepared to allow. As I read the decision in *Orr* v. *Diaper*, 25 W.R. 23 it is an illustration of the general rule, not of any exception to it. It is entirely consistent with *Upmann* v. *Elkan*, L.R. 12 Eq. 140. The case being after the passing of the Judicature Acts, the procedural complications which arose in *Hunt* v. *Maniere*, 34 Beav. 157 were happily no more—hence the statement of Hall V.-C., 25 F W.R. 23, 25: " The plaintiffs do show a right to sue the defendants in some other court, which expression, since the change made by the Judicature Acts, must mean this court, in some other proceeding."

I therefore agree that *Orr* v. *Diaper* is no support for Mr. Walton's main submission. On the contrary, properly understood it is against that submission.

G The principle to be derived from these cases and others referred to during the argument is not that there is any exception in favour of the proprietors of patents, trade marks and copyrights to the general rule that the courts will not permit an action for discovery unlinked with any sustainable claim for substantive relief, even where the avowed object of such an action is to obtain discovery of the names of alleged infringers. The true H principle is that stated by Buckley L.J. towards the end of his judgment. I respectfully agree with and adopt that statement of principle. Since the commissioners are not and never have been in possession of this imported furazolidone and their only powers of control are those accorded to them

by statute for the purpose of fulfilling the statutory obligation laid upon them by Parliament to levy duty upon these goods when imported, the commissioners do not come within this principle.  At no time could the plaintiffs ever obtain substantive relief against the commissioners.  Accordingly, in my judgment, this is an action for " mere discovery " within the meaning given to that phrase in the authorities.  On the authorities such an action clearly cannot be permitted.  Accordingly, I find myself unable to agree with the judge.  I would allow the appeal and dismiss the summons for inspection.  It was agreed that the effect of dismissing the summons was to dismiss the action as if the application had been an application to strike out the action as disclosing no cause of action, though as a matter of convenience no summons to this effect was ever issued.

This conclusion makes it unnecessary to deal with the other issues, namely, whether the balance of public interest is in favour of withholding inspection on grounds of confidentiality attaching to information disclosed to the defendants by the importers and also of avoiding want of candour in respect of information supplied by them to the defendants.  But since both these matters were fully argued during the appeal, I think it right to say that I, like Buckley L.J., entirely agree with what has fallen from Lord Denning M.R. on these issues and I have nothing to add to that part of my Lord's judgment.  I would allow the appeal accordingly and dismiss the summons.

> *Appeal allowed with costs.*
> *Action dismissed with costs.*
> *Certificate for three counsel refused.*
> *Leave to appeal refused.*

Solicitors: *Solicitor, Commissioners of Customs and Excise; Allen & Overy.*

C. N.

November 7.  The Appeal Committee of the House of Lords (Lord Morris of Borth-y-Gest, Lord Simon of Glaisdale and Lord Cross of Chelsea) allowed a petition by the plaintiffs for leave to appeal.

*Anthony Walton Q.C., Robin Jacob* and *Peter Prescott* for the appellants.

[LORD REID said that their Lordships desired first to hear argument on whether the appellants could establish a prima facie right to the discovery sought.]

The appellants seek from the commissioners and seek only the names of the importers into this country of the chemical compound furazolidone, of which the appellants are the owners and licensees of the patent relating thereto.  They seek discovery of no documents.  This is the distinction between the present case and numerous cases on discovery.  The reported decisions on discovery merely afford guidance.  It is conceded that as a general rule one cannot obtain discovery from a witness.  The question arises: are there exceptions to that rule?  There is a duty in certain circumstances on any member of the public who has knowledge of the commission of a tort to communicate such information that he may possess to

A   any person who has suffered damage in consequence of its commission. If asked, he has a duty to disclose. The rules of discovery were invented by equity for the purpose of furthering the due administration of justice: see *Holdsworth's History of English Law*, 3rd ed., vol. 5 (1947), pp. 281, 282, 332, n. 8.

The respondents are liable to give the limited discovery sought in the present circumstances, namely, the identity of the parties proper to be B   sued, because they would before the Judicature Acts have been liable to give discovery thereof in a suit by bill for discovery. The Court of Appeal wrongly dealt with this issue by applying the mere witness rule.

The respondents contended that there were only " two animals," mere witnesses and infringers, and that there was no " third animal." This is plainly incorrect and entirely overlooks the protective jurisdiction of equity. C   The appellants rely on the statement of principle by Buckley L.J., *ante*, pp. 145H—146B, citing *Upmann* v. *Forester*, 24 Ch.D. 231.

The first and principal case on which the appellants rely to characterise the defendant as someone other than an infringer is *Orr* v. *Diaper* (1876) 4 Ch.D. 92; 25 W.R. 23. That case has been reported in several reports, and the Court of Appeal had before them the report in the Weekly Reporter which they preferred as being fuller than the authorised Law D   Report which was the only report before Graham J. Their Lordships held that this fuller report threw a further light on the decision to that thrown by the Law Report, but they insufficiently analysed that further light.

The facts in that case were that the defendants were shippers, that is, carriers who were acting on behalf of unknown exporters. The plaintiffs E   discovered that spuriously marked goods were being exported from the United Kingdom to their foreign markets, and that they had been shipped by the defendants. They accordingly sought the names of the exporters on whose behalf they were shipped. That is why in that case the names sought were those of the exporters rather than the importers. It is of importance in understanding the nature of the decision, however reported, that all the shipments in respect of which discovery was sought were ship-F   ments which were past (some of them by as much as two years) at the date of the proceedings. It follows that the defendants had parted (or at the lowest could freely part, since no injunction was sought) with all the goods in respect of which discovery was sought. No doubt an injunction could have been obtained in respect of any future shipments, and then the true owners would have had to come forward and reveal themselves if they G   wanted their goods. But the discovery sought of past shipments could not have been relevant to an injunction to restrain future ones.

Against the background of the whole case it is plain that Hall V.-C. can have held only one of two things, either sufficient for the appellants' purpose, namely, either (i) it is possible to have discovery against persons against whom no suit for any relief (other than discovery) could be brought H   (this is the ratio that appears from the Law Report which is the revised report and the one most likely to reflect the true views of the judge), or (ii) that it is possible to have discovery against persons in the position of the defendants, because against them some relief other than relief in respect

of infringement could be obtained, even in the case where no such other
relief was prayed.

    The Court of Appeal rejected the first of the two possible views of
Hall V.-C.  In so doing, they misunderstood the effect of *Mitford on Plead-
ings*, 4th ed. (1827), p. 191, of which they considered only an extract devoid
of its context.  All *Mitford* is stating in the part of his treatise relied on
against the appellants (Part V) is that no action for discovery can be
brought where the information to be gained is irrelevant for the purposes
of an actual or intended litigation.  Even where he deals with the " mere
witness " rule (Part III) he is only stating that no discovery can be sought
of evidence which would be inadmissible.  The Court of Appeal moreover
failed to realise that the appellant should also succeed on the alternative
view of Hall V.-C.'s decision, since they failed to appreciate the implica-
tions with respect to the respondents of the cause of action they found
to exist against Diaper.  In effect, the Court of Appeal held that there was
a " third animal " who, not being himself an infringer was nevertheless
liable to equitable relief, explaining *Orr* v. *Diaper* on this basis but failing
to appreciate that this cause of action also existed against the respondents.
In this action the appellants rely on the observations of Buckley L.J.
quoted above.  In the present case the Court of Appeal did not follow this
principle.

    Where a person is not a party to proceedings and discovery is required
against him, he is made a respondent to the bill of discovery and entitled
to his costs: see *Beames on Costs*, 2nd ed. (1840), section IV, p. 17,
and *Bray on Discovery* (1885), p. 618.  The importance of this is
to answer the query " why should a person be put to expense in answering
proceedings of this kind? "  The answer is that he is not.  It is akin to
the position of witnesses who are called on subpoena who also obtain their
costs.

    The reasons given in the old cases for holding that one cannot obtain
discovery against a mere witness because for example, if evidence were
obtained before the trial a counter-story might be concocted, and because
a bill of discovery put a stay to proceedings at law, do not apply to where
all that is required are the names of tortfeasors.

    It is conceded that *Orr* v. *Diaper*, 4 Ch.D. 92 has not been commented
upon in any subsequent reported case, but it is pertinent to observe that
the standard textbooks support the appellant's proposition: see *Story's
Equity Jurisprudence*, 2nd Engl. ed. (1892), p. 1011, para. 1483 and paras.
1486, 1499, 1500, 1501; *Bray on Discovery*, pp. 609, 612; *Halsbury's Laws
of England*, 3rd ed., vol. 12 (1955), p. 10, para. 11; *Ross on Discovery*
(1912), pp. 10, 11; *Sichel & Chance, Interrogatories and Discovery* (1883),
p. 180; *Snell's Equity*, 1st ed. (1874), p. 516.

    As to the authorities, in *Upmann* v. *Elkan* (1871) L.R. 12 Eq. 140
there were two defendants, Messrs. Elkan who were forwarding agents,
and the London & St. Katharine's Dock Company who were warehouse-
men in possession of the spuriously marked imported goods.  Neither of
these parties was guilty of infringement and neither was held guilty of
infringement.  Yet Lord Romilly M.R. said, at p. 145, that after such an
innocent person was given notice of the fact that the goods bore spurious
marks and was requested to give all information respecting them: " It is

A.C.          **Norwich Pharmacal v. Customs & Excise (H.L.(E.) )**

A his duty at once to give all the information required," and on appeal, 7 Ch.App. 130, 133, Lord Hatherley L.C. said in relation to Messrs. Elkan: " I hold them to be innocent of any part of this contrivance on the part of the consignor; but still it was their duty, from the first moment, to give all the information they possibly could." Lord Hatherley L.C.'s observation is entirely consistent with *Orr* v. *Diaper*, 4 Ch.D. 92. Further, Lord Romilly M.R.'s statement shows that the innocence or guilt of the " third

B animal " is not a relevant factor. Moreover, *Hunt* v. *Maniere* (1864) 34 Beav. 157 shows that when a person has physical possession of goods whose dissemination would infringe another's patent or trade mark, the proprietor of the patent or mark has a right to proceed in equity to prevent the person in whose custody the goods in question are from parting with them, and that the custodian of the goods is protected from actions at law by the rightful owners, whose rights are thus overriden. See also

C the observations of Stirling J. in *Washburn and Moen Manufacturing Co. v. Cunard Steamship Co.* (1889) 6 R.P.C. 398 on the practice of the old Court of Chancery in the exercise of its protective jurisdiction.

There is a line of English cases which illustrates the proposition that the obtaining of the name of a prospective party to proceedings is an exception to the rule that discovery cannot be obtained against a witness:

D *Heathcote* v. *Fleete* (1702) 2 Vern. 442; *Morse* v. *Buckworth* (1703) 2 Vern. 443; *Moodalay* v. *Morton* (1785) 1 Bro.C.C. 469; *Angel* v. *Angel* (1822) 1 L.J.O.S.Ch. 6; *The Murillo* (1873) 28 L.T. 374; *Tetley* v. *Easton* (1856) 18 C.B. 643; *Bovill* v. *Cowan* (1867) 15 W.R. 608; *Hancocks & Co.* v. *Lablache* (1878) 3 C.P.D. 197; *Spokes* v. *Grosvenor and West End Railway Terminus Hotel Co. Ltd.* [1897] 2 Q.B. 124; *Hillman's Airways Ltd.* v. *Société Anonyme d'Éditions Aéronautiques Internationales* [1934] 2 K.B.

E 356.

*The Law of Scotland.* By means of the accessory action of exhibitio ad probandum it has long been possible to enforce production of documents in the hands of third parties where they are required in evidence in a principal action which it is desired to bring: see *Maclaren, Court of Session Practice* (1861) 644. But it has been largely superseded by the

F modern procedure of motion for diligence against havers, now available under the Rules of the Court of Session, II, 95–97. The haver need not himself be liable in any way. Examples of such third party havers include: *Leven* v. *Board of Excise*, March 3, 1814, F.C.; *Vass* v. *Board of Customs*, Feb. 20, 1818, F.C.; *McDade* v. *Glasgow Corporation*, 1966 S.L.T. (Notes) 4.

Under Scots law, therefore, a plaintiff is entitled to discovery of names against persons participating in infringement of trade marks, patents, pass-

G ing off and copyright. This proposition covers innocent participation.

*South African law.* This is based on the English law of discovery, although as pointed out by Bale C.J. in *Colonial Government* v. *Tatham* (1902) 23 Natal L.R. 153 the latter was itself probably adapted from the Roman law. The applicants must have " a bona fide claim against some person or persons whose names he seeks to discover, and whose name can

H be supplied by the respondent, and that he has no other appropriate remedy " (p. 157). See also *Stuart* v. *Ismail*, 1942 A.D. 327. The South African cases are put on the basis that it would be a denial of justice not to grant the relief sought.

**Norwich Pharmacal v. Customs & Excise (H.L.(E.) )**     **[1974]**

*American Law.* A number of cases have held that "the jurisdiction of this court to entertain a bill in equity for discovery . . . will still be exercised even in aid of an action at law, if the plaintiff cannot without it find out whom he should sue ": *per* Judge Learned Hand in *Pressed Steel Car Co.* v. *Union Pacific Railway Co.* (1917) 240 F. 135, 136. See also the observations of Cardozo J. in *Sinclair Refining Co.* v. *Jenkins Petroleum Process Co.* (1933) 53 S.Ct. 736. For examples of an application of the principle, see *Brown* v. *McDonald* (1905) 133 F. 897 and *Coca-Cola Co.* v. *City of Atlanta* (1922) 110 S.E. 730.

*Position of the Customs.* It is common ground that the Customs never had possession of the infringing goods in this case. The fact that even if they had had possession, an injunction could not have been granted against them, they being the Crown, ought not to make any difference to the exercise of the jurisdiction to grant discovery, if they had sufficient control to bring them within the scope of the protective equitable jurisdiction. They plainly did have such control.

The powers of the Customs derive in the first instance from the Customs and Excise Act 1952 and Regulations made thereunder. When goods are imported, they are automatically by operation of law placed into what the Act describes as "Customs charge." This term is not defined, but under section 294 (5) "If any imported goods . . . are without the authority of the proper officer removed from customs charge before they have been examined, those goods shall be liable to forfeiture." It is also an offence to remove any imported goods from Customs charge before they have been examined. In the case of goods imported by sea, they may not be "unloaded, landed or removed from the place of landing or from a transit shed . . . without the authority of the proper officer ": see the Ship's Report, Importation and Exportation by Sea Regulations 1965, S.I. No. 1993, regulation 6. Other relevant provisions are sections 22, 26, 33, 34, 38, 44 and 70.

In the light of the above, it is plain that the charge that the Customs have over goods entering into this country amounts to that control which brings the principle in *Upmann* v. *Elkan,* L.R. 12 Eq. 140 into operation.

There is no statutory right of an importer to receive a clearance through the Customs. Any duty on the part of the Customs, if satisfied that the law has been complied with, to grant a clearance comes from the common law. An arbitrary refusal, or one based on unjustifiable grounds would be a denial of that right: see *Zachariassen* v. *The Commonwealth* (1917) 24 C.L.R. 166. In the case of importation of infringing goods, however, their refusal to allow the goods to enter would not be arbitrary, nor could the importers obtain any relief in court in respect of such refusal in order to further their wrongdoing.

The Court of Appeal erred in viewing the matter in the light of the assumption that the Customs were being asked to assume to themselves a positive power to stop the importation, rather than being asked negatively to refuse unreasonably to exercise their powers to allow the importation. The Court of Appeal also erred in holding that the Customs' powers were conferred only for the purpose of collecting revenue and did not exist for any other purpose.

In fine, the cases on discovery do not support the decision of the Court

A  of Appeal. It is sufficient if the plaintiff can show that the Customs are in some way mixed up with the goods and it is not necessary for the plaintiff to show that he must be able to sue the Customs before he can establish any right to ask the court to exercise its discretion in his favour for relief.

If it be said that the Customs are using their powers for the purpose not contemplated by the statute, then reliance is placed on the observations

B  of Lord Watson in *Metropolitan Asylum District* v. *Hill* (1881) 6 App.Cas. 193, 213.

*Robin Jacob* followed.

*Peter Oliver Q.C.*, *Peter Gibson* and *W. Bruce Spalding* for the respondent commissioners. (1) This is an action solely for discovery and must be approached in the same way as, before 1873, the Court of Chancery would

C  have approached a bill for discovery. (2) Discovery is an example of the equitable auxiliary jurisdiction and consists of the extraction on oath, whether by answering interrogatories or identifying and producing documents, of information material to a pending (or, in rare cases, an anticipated) proceeding. (3) In general, it is not and never has been available against anyone except a party to the pending or anticipated proceedings and it has always been held to be improper to join as a party a person against whom nothing

D  can be alleged except that he is in possession of the relevant documents or information simply for the purpose of obtaining discovery against him, even in cases where that person may have an indirect financial or other interest in the proceedings. (4) Exceptions to this rule have been made in the case of: (i) officers or members of corporations and similar bodies in actions contemplated or pending against the body; (ii) attorneys alleged to be implicated in fraudulent transactions for improperly detaining docu-

E  ments; (iii) auctioneers, agents for sale and possibly other agents, in actions against their principals; (iv) arbitrators in cases where it is sought to satisfy an award on the ground of fraud. In these cases, discovery has been ordered although the officer, attorney, agent or arbitrator is not himself and (in some cases) cannot properly be a party to the proceedings. (5) A further exception arises where the person against whom the discovery is

F  sought has a direct interest in the pending or contemplated action, and for this purpose a " direct interest " means either (i) that a decree can be made against him in respect of some part which he is playing or has played in the matters in issue in the pending or contemplated proceedings or (ii) that any decree made is going directly to affect him so that he could properly be joined as a party: *e.g.*, an administration order will affect directly beneficiaries under a trust; an order in respect of a first mortgage

G  may affect a second mortgagee. (6) There is no further relevant exception. In particular it is not and never has been sufficient, in order for A to obtain discovery from B, for him to allege nothing more than that he needs certain information to enable him to commence or proceed with an action, that B has that information, and that he cannot get that information from any other source.

H  The respondents in this case do not fall within any relevant exception. In particular, nothing that they do, have done, or can lawfully do, renders them, in relation to any matter with which the appellants' proposed proceedings are concerned, liable to a decree, nor would anything that they do

have done, or can lawfully do, render them liable to a decree independently of the provisions of the Crown Proceedings Act 1947.

    In so far as any duty to give information arises as a matter of law from the possession or control of goods and in so far as such duty is enforceable by an action for discovery simpliciter, the respondents do not have and never have had any such control as is capable of giving rise to such duty.

    Discovery, like all equitable remedies, is a discretionary remedy, but that does not mean that it is an arbitrary remedy: and over the past 300 years the courts have resolved distinct and clear rules as to the circumstances in which orders for interrogatories or production and inspection of documents can be made, including what has been referred to as the " mere witness " rule.    There were two ways in which it could be obtained before the Judicature Act.    One was by a bill in equity praying for relief; in which event one would get as part of the process that discovery which was relevant to the relief which was claimed.    The other was by a bill, referred to as a bill of discovery, not claiming any relief but asking for the defendant to the bill to answer certain interrogatories, disclose documents or both.

    By the mid-18th century, the courts had evolved the rule that the procedure could not be used to interrogate before trial (either by making an additional defendant to a bill for relief or by launching a bill for discovery against him) one who had no interest in the suit, but who was a mere witness.

    The rule was applied as early as 1749 in *Plummer* v. *May* (1750) 1 Ves.Sen. 426 where there is found a clear differentiation drawn between a mere witness and a party interested.    A number of exceptions were made —perhaps not wholly logically.    One was the officer or book-keeper of a corporation—an exception subsequently extended to a member.    Others were attorneys, arbitrators and agents.    The agency exception seems to have been confined at first to auctioneers holding deposits, but later became extended to other agents: see *Fenton* v. *Hughes* (1802) 7 Ves.Jun. 287 where there is a rationalisation of *Plummer* v. *May*.

    The rule was accepted by the appellants, but it is claimed (in their case) that it only applies where the plaintiff has his action and not when he has not got his action, but desires the information to enable him to start it.    That this clearly is not or was not the law appears from Lord Eldon L.C.'s decision in *Mayor and Commonalty and Citizens of London* v. *Levy* (1803) 8 Ves.Jun. 398.

    In paragraph 95 of the appellants' printed case, it is said that the rule was excluded whenever the defendant had an interest in the proposed action sufficient to be recognised by equity as excluding the rule.    This is true so far as it goes, but it tells us nothing at all about the type of interest recognised.    It is evident from *Fenton* v. *Hughes*, 7 Ves.Jun. 287 that a mere interest in the outcome, even though the action be brought by the plaintiff at law as agent for the defendant in equity, is not sufficient.    This was recognised and adopted by this House in *Queen of Portugal* v. *Glyn* (1840) 7 Cl. & F. 466 where Lord Cottenham L.C. reviews the authorities and emphasises the rule.    This case is of particular importance, not only because it is a decision of this House, but because it decisively rejected once and for all the very principle for which the appellants contend—namely, that there is some general equity to obtain discovery whenever the needs of

A justice require it.  The House rejected the observations of Lord Abinger C.B. in the court below.  There was a clear recognition by this House of the mere witness rule.  The rule was stated by Wickens V.-C., in *Dixon* v. *Enoch,* L.R. 13 Eq. 394, 399 in 1872 as being that a bill " can only be maintained against a person who is, or is to be, a party to the record at law, and not against a witness whose evidence may go to charge some third person."  See also *Burchard* v. *MacFarlane* [1891] 2 Q.B. 241 where it

B is restated, thus showing that it survived the Judicature Act.

The appellants, however, contend that there is a further exception to the rule beyond those recognised exceptions in *Fenton* v. *Hughes,* 7 Ves.Jun. 287.  But the submission rests in the ultimate analysis on *Orr* v. *Diaper,* 4 Ch.D. 92 and nothing but *Orr* v. *Diaper.*

The principles are conveniently summarised in *Bray on Discovery.*  It is conceded that *Orr* v. *Diaper* is treated by *Bray* as an additional excep-

C tion, but this is wrong.  It was not an additional exception at all.  It was a case where an agent, who was himself actively engaged in infringing the plaintiff's rights by participating with knowledge in passing off goods as those of the plaintiffs, was properly stopped by injunction and made to disclose, as part of the relevant discovery in aid of that cause of action, the details of his wrongdoing.  For the comparable position of one who

D has in his hands goods bearing a false trade mark: see *Upmann* v. *Forester,* 24 Ch.D. 231.

In effect, three propositions are based on *Orr* v. *Diaper,* 4 Ch.D. 92. First, it is said that Diaper was not a person who had any " interest " in the proposed action in the sense that a decree could be made against him. An alternative way of putting it is that, even if there was an interest (in the sense of a liability to a decree arising out of the matter for which the

E proposed action was concerned), this was not treated by Hall V.-C. as of any materiality.  Therefore, it is said, this is a case where the ratio of the decision was that Diaper was not a mere witness because (i) Orr did not know who the consignors were; (ii) Diaper did know; (iii) Orr could not obtain the information he needed from anywhere else.  The proposition is sought to be supported thus: it is true, it is said, that Diaper might

F (consistently with the authorities) have been enjoined under what has been referred to as " the protective jurisdiction of equity " from parting with the goods: and, in that context, the discovery of the names of the consignors of those goods which had been shipped after notice might be material.  But it is said the discovery actually ordered was discovery of the particulars of the consignments right back to 1874 when the defendants were wholly innocent.  No cause of action could be established in relation

G to that period.  Therefore, what was in the Vice-Chancellor's mind was not cause of action at all.  This, it is said, is demonstrated by the reference to *Mitford on Pleading.*  What counsel and the judge were discussing was materiality, not cause of action.

There is an unproven assumption underlying this, namely, that the discovery ordered did go back to 1874.  The whole of the proposition, how-

H ever, even on that assumption, is based upon two complete fallacies.  The first is that the case was one in which the only relief claimable against the defendants was an injunction under the " protective jurisdiction of equity " (whatever that may mean—if it means anything beyond the right of equity

to injunct a wrongdoer or a threatening or intending wrongdoer). This    A
was a case of actual infringement by the defendants for two reasons: (a)
This was a demurrer and it therefore admitted every allegation in the
statement of claim. By admitting this the defendants admitted that they
themselves had been deliberately assisting in the passing off of spurious
goods, that is, that they were actual wrongdoers. Whether they were acting
as principals or agents is wholly immaterial. (b) Secondly, quite apart
from knowledge, the fraudulent goods had been exported by the defen-    B
dants. The decision in *Upmann* v. *Forester*, 24 Ch.D. 231 shows that
guilt or innocence is immaterial. A person may be perfectly innocent, but
he can still be sued for an injunction to restrain passing off. The defendant
in *Orr* v. *Diaper*, 4 Ch.D. 92 had not only rendered himself liable to an
injunction, but, by admission, to an account of profits or damages, the
usual relief in a passing off action where knowledge is established. The
discovery back to 1874 was clearly material to this claim if the plaintiff    C
had sought to pursue it. Here is a man who says: " I admit for the past
two years I have been acting as agent in helping another person to pass
off his goods as yours and have caused you damage." It is self-evident
that the identity of his principal or principals is material: but in any event
the courts are not too tender of the susceptibilities of wrongdoers, nor
when discovery is a matter of indifference to the defendant will the court    D
weigh in golden scales the question of materiality or immateriality: see
*Carver* v. *Pinto Leite* (1871) 7 Ch.App. 90.

The second fallacy is that the Vice-Chancellor was considering only the
question of materiality. Whatever the passage in *Mitford* was directed to
by its author, both counsel and judge were quite clearly considering it in
the context of whether there was any claim for relief which could be made
against the defendant, and the interjection of the Vice-Chancellor in the    E
report in the Law Reports shows that he was not prepared to allow the
case to go off on the point that the plaintiffs did not say in their statement
of claim that they were going to join the defendant as parties to the pro-
posed action. The Court of Appeal's analysis of this case was entirely
correct, once it is appreciated that it was a case of a wrongdoer caught
red-handed and knowingly in the act of wrongdoing (which was what was    F
admitted for the purposes of the demurrer); it then becomes apparent that
it is an example of, and not an exception from, the rule. True, *Bray* treats
*Orr* v. *Diaper*, 4 Ch.D. 92 as if it were an exception, but in so doing he
was wrong. In the hundred-odd years which have passed since *Orr* v.
*Diaper* there does not appear to be any recorded case in England of a
claim like the present one having been made.

As to the reconciliation of *Orr* v. *Diaper* with *Queen of Portugal* v.    G
*Glyn*, 7 Cl. & F. 466, *Queen of Portugal* v. *Glyn* was concerned with the
bill of discovery, not a bill of relief. In the case of a bill of relief, one
could obtain discovery from a defendant against whom one claimed relief
and also against a person who though not joined for relief, was " inter-
ested " in the sense that a decree could be made against him. In dealing
with the pure bill of discovery, one must either have a pending proceeding    H
in which the defendant to the bill is a party or one must aver that one
intends to bring an action against him. But in a bill of relief, one can
join as defendant for discovery a person who is " interested in the suit "

A   in the sense that a decree can be made against him. Now all this is swept away by the Judicature Acts, and in *Orr* v. *Diaper*, Hall V.-C. is applying not the rule applicable to a bill of discovery, but the rule applicable to a bill of relief, where the test is: can the court make a decree?

It is accepted that *Orr* v. *Diaper*, 4 Ch.D. 92 went further than was warranted by previous cases in the sense that it was the first and only case in which discovery was accorded to a person against whom the plain-
B   tiff disclaimed the intention of seeking any relief either at law or in equity. The interesting question is why it went further. There are three possible explanations: (1) Hall V.-C. was simply wrong; (2) the rule had developed and changed since 1840 when *Queen of Portugal* v. *Glyn*, 7 Cl. & F. 466 was decided; (3) the Vice-Chancellor was applying a totally different principle. The difficulty in relation to both situations (2) and (3) is that there is no warrant from the reports for saying that the rule had changed or
C   developed and that Hall V.-C.'s judgment is based on the predicate that he was in fact applying the rule. The inference is therefore that he was, if not wrong, at least a pioneer and the reason why he became a pioneer was that he fell into the self-same error as did Lord Wynford in *Queen of Portugal* v. *Glyn*, 7 Cl. & F. 466 in failing to make the distinction between a bill of relief and a bill of discovery. The distinction was clearly drawn
D   in the cases which have been referred to. The distinction is clearly drawn in *Bray on Discovery*: see pp. 19, 20, 40. A litigant or prospective litigant might want discovery in aid of an action at law or of relief in equity. If the former, he had to bring a bill of discovery simpliciter; and to support it, he had to show not that the defendant was "mixed up" in the thing, but that the defendant actually was a party or intended to be a party to the record at law. Otherwise, he was met with the answer that he could
E   obtain his evidence in the ordinary way. If what he desired was relief in equity, he brought a bill of relief and joined the person from whom he sought discovery as a defendant to the bill. The question was, then, was he properly joined: had he a sufficient interest in the suit to keep him there: and "interest" came to be defined in terms of the possibility of a decree being made (apart from a decree for discovery merely). What
F   he could not do was to join a defendant for the purpose of discovery for some suit at law to which he did not intend to make him a party. With this in mind, it is interesting to peruse the report of the argument in *Orr* v. *Diaper*, to be found in 25 W.R. 23, 24. The logic of Hall V.-C.'s position is that where one has detected one malefactor who knows the name of his confederate or associate, one does not let him resort to the rather technical rule relating to discovery before the Judicature Act in order to
G   escape giving the name of his confederate. But that is no ground for extending the notion beyond the rule which equity applied even in the case for a bill of relief.

The two further propositions based on *Orr* v. *Diaper*, 4 Ch.D. 92 are these: (1) if, the appellants say, they are wrong about the necessity to show a claim for relief against the person from whom information is sought,
H   then they contend that there is such a claim in the instant case against the respondents because wherever a civil wrong is being committed and a third person has a power to prevent it being committed or perfected, equity will interfere in the course of its "protective jurisdiction," at any

rate where the wrong is concerned with goods and the goods are capable
of being held back by the third person concerned exercising a control
which he has in this situation. (2) either cumulatively or alternatively, it is
contended there is a general duty on one who has controlling powers over
goods or who is, as it is put, "mixed up" with them to give all information
about the goods to one who claims that their release or delivery or further
transmission would constitute an infringement of his private rights. The
authority for these two propositions comes from three cases: first, *Hunt*
v. *Maniere*, 34 Beav. 157, the case of the wharfinger. There is nothing
very special about this case. All that it decides is that a person who is in
possession of goods as an agent for another and who may subject himself
to action if he delivers them up to his principal for purposes which he
knows to be tortious has a defence in equity to an action in detinue by the
principal if he declines to deliver them. Secondly, *Upmann* v. *Elkan*,
L.R. 12 Eq. 140 on which a great deal has been made to turn, but which
is in essence a very simple case. It has nothing whatever to do with dis-
covery and the only questions were: (i) should the court grant an injunc-
tion in the circumstances; (ii) the defendants not having opposed the claim,
but submitted to act as the court directed, whether they ought properly
be made to pay the costs. It is in this context of this that Lord Romilly's
judgment has to be read. The case went to appeal (7 Ch.App. 130) where
one finds the Lord Chancellor emphasising in terms that the defendants,
albeit perhaps unwittingly, were wrongdoers against whom the plaintiffs
had a right to an injunction. Accordingly, all that can be deduced from
this decision is that if one finds a man actively and voluntarily engaged
in importing spurious goods, one can obtain an injunction against him as
a wrongdoer and if he wants to avoid that result and avoid paying the costs,
he must give the plaintiff information which will enable him to put a stop
to the matters complained of before the bill is filed. It does not establish
any right of action or duty arising simply from the fact of the defendant
having a power to stop the goods from proceeding further, and certainly
it establishes no such duty in the case of the person who has not voluntarily
engaged in the transaction. Thirdly, *Washburn and Moen Manufacturing
Co.* v. *Cunard Steamship Co.*, 6 R.P.C. 398, a clear case of infringement
by an agent who had control of the goods in question, which does not
assist the appellants, for the respondents are in the same position as were
the defendants in *Nobel's Explosives Co.* v. *Jones, Scott & Co.* (1882) 8
App.Cas. 5, where it was held that the mere facilitating of the passage
of infringing material by lodging documents was not an involvement in the
importation which would subject a Customs House agent to an injunction.

If (contrary to the respondents' submissions) there is a duty arising
from possession or control of goods, and if equity will interfere to stop
the goods against anyone who has possession or control, do the respondents
have, in any relevant sense "control" of goods unloaded at a port or
airport? What has to be postulated in the context of this particular pro-
position advanced by the appellants is: (a) that the commissioners have
a power which they can lawfully use for the purpose solely of preventing
goods from getting into the hands of a consignee; (b) that the respondents
have a duty to exercise that power for that purpose; (c) that a court of

A  equity can and will issue a decree that will (for effective purposes) result
in the exercise of that power.

If the powers conferred by the Customs and Excise Act 1952 be exam-
ined, two things become apparent.  The first is that the powers conferred
at no stage enable the respondents themselves either to take possession
of the goods (except in the case of goods liable to forfeiture) or to influence
their final destination: and the second is that the powers—all the powers
B  —are conferred solely for the purpose of the statutory functions of col-
lecting the proper duty or such other functions as may, by statute, be vested
in the respondents.  [Reference was made to sections 28 and 34 of the
Act.]  In *Reg.* v. *Lord Leigh* [1897] 1 Q.B. 132 it was held that the police
authorities could not use a statutory power conferred upon them for a
collateral purpose.

It was said that Buckley L.J. put the appellants' argument in its widest
C  form.  The way it is put in the appellants' printed case is that the mere
witness rule applies only where the plaintiff is seeking to obtain evidence.
When what is required is simply a sworn statement from the defendant
of a name of another person, the rule does not apply.  If this be right, it
must be because the mere possession of knowledge in circumstances in
which the prospective plaintiff does not have it and cannot obtain it from
D  anywhere else (which is not accepted in the present case) gives rise to a
duty in the person having the knowledge to give the information and a
right in the injured person not having the knowledge to receive it.  This
must be so, because courts of law or equity do not interfere merely for
convenience.  It is a necessary prerequisite to obtaining relief that the
plaintiff seeking it should establish a duty in the defendant to accord that
relief.  The concept of such a duty is not an easy one to envisage in the present
E  circumstances.  Although there is no authority for the proposition in
English law, which may be deemed fortunate because the implications are
far reaching, the duty, if it exists, must be one which arises regardless
of the circumstances in which the information was obtained.

As to the older cases which it is said support the appellants' first pro-
position and *Bray's* treatment of *Orr* v. *Diaper*, 4 Ch.D. 92 as an additional
F  exception to the " mere witness " rule, *Moodalay* v. *Morton*, 1 Bro.C.C.
469 is of no assistance.  There the plaintiff was seeking to sue the com-
pany and was seeking discovery in relation to that suit, that is, it
was a bill for discovery against a wrongdoer.  The plaintiff knew who
had done him wrong: he was merely endeavouring to find out the status
of the actual wrongdoers: it is interesting to observe that in both reports
of the case it appears that the bill was supported by a distinct allegation
G  that the company had done wrong—presumably because the pleader
thought this a necessary allegation.  Accordingly, it is merely an example
of the auxiliary jurisdiction of equity at work in aid of an action at law.

*Angel* v. *Angel*, 1 L.J.O.S.Ch. 6 is of no importance except for its
reference to *Moodalay* v. *Morton*.  *Heathcote* v. *Fleete*, 2 Vern. 442 and
*Morse* v. *Buckworth*, 2 Vern. 443 seem to be merely examples of a well-
H  known exception to the mere witness rule—(a) the defendants were them-
selves persons against whom relief was to be sought and (b) they were
agents for a wrongdoing principal.  *The Murillo*, 28 L.T. 374 depended
upon the special rule relating to discovery in the Admiralty Court.  *Tetley*

v. *Easton*, 18 C.B. 643 was an example of an action against a wrongdoer. A
*Bovill* v. *Cowan*, 15 W.R. 608 is of no assistance for there the plaintiff
required names from a defendant who was already before the court. *Han-
cocks & Co.* v. *Lablache*, 3 C.P.D. 197 is even more remote. There is
no doubt whatsoever that the defendant was liable. There was a demurrer
on the ground of misjoiner. Leave was given to amend by joining the
husband, and interrogatories were ordered to enable this to be done. *March* B
v. *Keith* (1860) 30 L.J.Ch. 127 is simply a decision where the inquiry is
as to whether there are other persons, in addition to those already joined,
whose interest may be affected by the decree.

    *The Scottish Cases. Leven* v. *Board of Excise*, March 3, 1814, and
*Vass* v. *Board of Customs*, Feb. 20, 1818, F.C. were both cases of diligence
in an existing action where the question was one of Crown privilege. *McDade*
v. *Glasgow Corporation*, 1966 S.L.T. (Notes) 4 was also a case of diligence C
in an existing action for the production of documents which would, it was
hoped, prove that the defendants were (as they were allegedly) the persons
responsible for the accident.

    *The South African Cases. Colonial Government* v. *Tatham*, 23 Natal
L.R. 153 was the case of an agent for a syndicate, and the court assumed
that at the material time he himself was a member and therefore liable
on the contract. It is interesting to observe that the Chief Justice thought D
that there was no difference in principle between discovery of names of
parties and any other discovery. *Stuart* v. *Ismail*, 1942 A.D. 327 is an
even clearer case. There the person from whom the names were required
was himself a defendant in the action.

    *The United States Cases. Sinclair Refining Co.* v. *Jenkins Petroleum
Process Co.*, 53 S.Ct. 736 and *Pressed Steel Car Co.* v. *Union Pacific Railway
Co.*, 240 F. 135 are relevant simply for their statements of general principle. E
The respondents concede that *Walker* v. *Pennsylvanian Railway Co.* (1944)
36 A. 2d 597, goes further than any English case and it does so in reliance,
at any rate in part, on the older English cases. But the statement at p.
601 shows that the approach of the courts of New Jersey had by 1944
become that a man is not a " mere witness " unless the evidence which he
has to give is evidence which can be useful at the trial. That is a gloss F
for which the English cases give no support at all. In *Brown* v. *McDonald*,
133 F. 897 it is true, there is a reference to *Orr* v. *Diaper*, 4 Ch.D. 92 but
merely in the context of there being no pending action; there was a specific
finding that the defendants were not mere witnesses. *Coca-Cola Co.* v.
*City of Atlanta*, 110 S.E. 730 is plainly distinguishable, for it proceeded
on the view that the civil code showed a policy to reveal the property of
debtors. In the *Walker* case, 36 A. 2d 597 reliance was placed on *Post* G
v. *Toledo, Cincinnati and St. Louis Railroad Co.*, 11 N.E.Rep. 540. There
there was an action to compel a corporation to disclose the names of its
stockholders in order that the plaintiff could institute a suit against the
corporation and its stockholders. There is really nothing peculiar about
the decision which is in fact in accordance with principle. It is strongly
in favour of the respondents. It distinguishes the respondents' position H
from that of the wharfinger. Further, the court had a full citation of the
relevant authorities in that case.

    It is plain that there is no general principle that merely because a per-

A son has information that discovery can be obtained against him. Such a principle cannot stand in view of the libel cases: see, for example, *Plymouth Mutual Co-operative and Industrial Society Ltd.* v. *Traders' Publishing Association Ltd.* [1906] 1 K.B. 403.

The respondents' case may be summarised as follows: (1) The appellants' case rests on *Orr* v. *Diaper*, 4 Ch.D. 92 alone. (2) That case was wrongly decided at the time. But assuming that it is a sound proposition,

B and it has become the law by being adopted and cited by textbook writers here and in common law jurisdictions outside England, it is authority only for this: where one finds a wrongdoer one can obtain discovery from him of the names of his associates in the wrongdoing without the necessity either of suing him personally for other relief, or by averring that one means to do so. (3) The respondents are not wrongdoers and are therefore in any event outside the proposition for which *Orr* v. *Diaper* is authority. (4)

C If it is to be said that *Orr* v. *Diaper* is authority for a wider proposition, namely, that one can apply to a bill of discovery the rule previously applicable to a bill of relief, namely, that one can obtain discovery against a person " interested " in the action (in the sense that a decree can be made against him) then the respondents are not such persons. (5) They are not such persons because although equity will interfere by injunction to restrain

D a wrongdoer or, quia timet, one who is going to be a wrongdoer if an injunction is not granted, it will not interfere against one who has no voluntary connection at all with the wrong, but who simply has the ability, by activity or inactivity, to prevent or delay other persons from doing wrong. No authority whatever has been cited for the proposition that one can obtain an order against such a person. All the cases cited are cases of persons who: (a) are agents of, or, bailees for, wrongdoers; (b) have

E voluntarily assumed that position; and (c) have either possession or the power to say finally what shall be done with the goods; and (d) are actively assisting, or (unless restrained) will actively assist, in the wrongdoing. There is no third animal. One is either an infringer or a threatened infringer or one is nothing: *Nobel's* case, 8 App.Cas. 5. (6) If it is said that there is some duty to give information arising from the mere existence of the

F statutory powers conferred on the respondents for the fulfilment of their functions (because this is " control " of the goods), these powers do not constitute " control " in any relevant sense. " Control " must mean possession either actual or constructive in the sense of having someone else possessing on one's behalf to whom one can give directions at to the final disposition of the goods. (7) The appellant's own formulation involved, as a necessary ingredient of discovery in the postulated circumstances, the

G inability of the plaintiff to get the action on foot without the information he seeks. The respondents do not accept that he is so able. Their evidence is that obtaining the information from the respondents would be the most direct method and (b) that it is difficult to obtain it in any other way. (8) The innovation which the appellants seek would cause manifest inconvenience to the citizens of this country whose only fault is that they happen

H to have some information that the plaintiff wants—no doubt a popular conception in these egalitarian days, but not an innovation to which this House should lend its assistance.

*Walton Q.C.* in reply. This House is only concerned with rights and

duties.  It is not a court of morals.  There is a general duty on persons to give evidence: see *Wigmore on Evidence*, 1st ed. vol. IV (1905), sect. 2192; " . . . there is a general duty to give what testimony one is capable of giving, and . . . any exemptions which may exist are distinctly exceptional . . ." That statement represents the truth.  What difference is there in the present proceedings, provided the court has full control and the witness obtains his expenses?  If the appellants have a right, then there must be a method of enforcing that right.  The appellants only need names, and this is all that they will obtain for the court will only give minimum relief.  This is an application of what is called "judicial parsimony": see *per* Judge Learned Hand in the *Pressed Steel* case, 240 F. 135.

*The Plymouth Mutual Co-operative* case [1906] 1 K.B. 403 is also an example of application of judicial parsimony for there the plaintiff had a defendant and why should the plaintiff have his damages twice?  There is an historical explanation for the attitude taken by the courts in libel cases. Defamation was originally a crime.  Equity refused to aid the obtaining of evidence in relation to criminal proceedings or evidence which would result in self-incrimination.

The reasons for the mere witness rule must be one or more of the following: (1) because one does not want litigants "fishing" into the other side's evidence in advance, since they would be tempted to concoct contrary evidence; (ii) because any evidence thus obtained would be hearsay evidence; (iii) because otherwise before the Judicature Act it would have enabled defendants to bring actions for discovery against persons who were unwilling to comply, with the object of delaying their own substantive proceedings indefinitely, which is the real explanation of *Queen of Portugal* v. *Glyn*, 7 Cl. & F. 466; (iv) because it would subject innocent persons having nothing to do with the litigation to trouble and expense.  The first three reasons cannot apply here.

In *Dummer* v. *Chippenham Corporation* (1807) 14 Ves.Jun. 245 Lord Eldon L.C. gives failure of justice as the reason for the exception to the mere witness rule in relation to corporations.

In *Queen of Portugal* v. *Glyn*, 7 Cl. & F. 466 it is important to observe that discovery was sought by the defendant and not the plaintiff. It is suggested that the reason for the delay in delivering judgment in that case was that a conflict arose between giving a hard decision in that case and making a bad law.  Because if discovery were given to the defendant in that case, discovery would be sought by a defendant in every case of a bill of exchange and this would hold up proceedings on the bill.  Nevertheless the House of Lords recognised at p. 486 that there are exceptions to the mere witness rule.

There are three reasons for granting discovery here: (1) the case forms an exception to the mere witness rule; (2) the respondents are so mixed up in the relevant transaction, to use the words of Lord Romilly, as to entitle the appellants to discovery; (3) the appellants could bring an action against the respondents.  A person is mixed up in the transaction if innocently or not he facilitates the commission of the wrong complained of.  A test of whether a person is mixed up in a transaction is to see whether if that person had not acted as he did the tort would not have been committed.

A   It was said that the respondents were not volunteers, but neither are dock companies. In *In re Uzielli* (1863) 33 L.J.Ch. 371 an injunction was granted against persons who were acting involuntarily under statutory duties. Dock companies are no more volunteers than are the Customs. *Orr* v. *Diaper*, 4 Ch.D. 92 was a case of the defendant being mixed up in the transaction in question, which also applies to *Brown* v. *McDonald*, 133 F. 897. The Customs are mixed up in these transactions. They play

B   a vital role. The court could order the respondents to stop these goods leaving the docks, which shows that the Customs have sufficient control both for enabling the mixed-up principle to be invoked and also for the purpose of the appellants obtaining a declaration under the equitable protective jurisdiction of the court. [Reference was made to sections 44 and 261 of the Customs and Excise Act 1952.]

    *The protective jurisdiction of equity.* It was said: (1) that this juris-

C   diction never existed; (2) that the protective jurisdiction was abolished by *Nobel's Explosives Co.* v. *Jones, Scott & Co.*, 8 App.Cas. 5; (3) if the jurisdiction still exists, it extends only to agents and bailees. As to (1), for this to succeed, it would be necessary to show that all the defendants in the relevant cases were infringers. In other words, for example, that Diaper was an infringer and that the Cunard Company were infringers. But a

D   carrier, like a shipper, is never an infringer unless he is particeps criminis. In *Orr* v. *Diaper*, 4 Ch.D. 92, the defendant could be enjoined against, but damages could not be obtained against him. Even if Diaper knew all about the transactions, damages could not be obtained against him, but merely an injunction. He was not a tortfeasor at law but a wrongdoer in equity and an injunction could be granted against him under the equitable protective jurisdiction: see also the observations of Stirling J. in *Wash-*

E   *burn and Moen Manufacturing Co.* v. *Cunard S.S. Co.*, 6 R.P.C. 398. As to (2), it is almost impossible to differentiate between the defendants in *Upmann* v. *Elkan*, L.R. 12 Eq. 140 and *Nobel's Explosives Co.* v. *Jones, Scott & Co.*, 8 App.Cas. 5 where there was no attempt by a side wind to abolish the equitable protective jurisdiction. The question of innocence is irrelevant in relation to the equitable protective jurisdiction. All that

F   matters is whether the defendant has the goods under his possession or control.

    In *Washburn's* case, 6 R.P.C. 398, Stirling J. put the basis of jurisdiction on power or control. There is no case where it has been put on the basis of the defendant being an agent or carrier. Accordingly, there is no foundation for proposition (3) above.

    It is relevant to ascertain whether a declaration could be obtained against

G   the respondents because if an injunction could be obtained under the equitable protective jurisdiction, then a declaration could be obtained and a declaration is sufficient to enable a party to obtain discovery: see *Barnard* v. *National Dock Labour Board* [1953] 2 Q.B. 18.

    *Moodalay* v. *Morton*, 1 Bro.C.C. 469 is similar to *Orr* v. *Diaper*, 4 Ch.D. 92. The report of *Moodalay* in 2 Dick. 652 makes plainer than

H   does the report in Brown that it was the case of obtaining names in order to know whom to sue and it was so understood by *Story* in the edition that came out before *Orr* v. *Diaper* and was so understood also in the first edition of *Snell*. *Mayor of London* v. *Levy*, 8 Ves.Jun. 398 unlike *Moodalay*

v. *Morton* was a pure "fishing" case. In *Fenton* v. *Hughes*, 7 Ves.Jun. 287 the facts were not sufficient to warrant making an exception to the rule. *Burchard* v. *MacFarlane* [1891] 2 Q.B. 241 states the general rule. There was no full citation of authority. *Post* v. *Toledo, Cincinnati and St. Louis Railroad Co.*, 11 N.E.Rep. 540 assists the appellants, for there discovery was obtainable against someone who had some relation to the property. Similarly the respondents have some relation to the goods in question here. *Bovill* v. *Cowan*, 15 W.R. 608 involved a defence association and the persons in question were not co-infringers. There was no conspiracy to infringe. There were merely persons who had a common interest.

[Their Lordships conferred. Lord Reid intimated that their Lordships desired to hear argument on the other issues raised in the appeal.]

The appellants have made out a prima facie case for the information they seek. This information involves a contempt of the Crown and is a serious tort. The information required is contained in documents which are mundane. Ship owners and ships masters and dock and harbour authorities and even stevedores handle them. Thus it can be seen that a wide class of persons are in possession of the required information. Without there being an express or implied obligation not to divulge, there is no question of general confidentiality in this case.

As to the respondents' contention on candour, the consignors are required by law to disclose the identity of the product under threat of a penalty. This is factual information that is sought and not what is a mere matter of opinion: contrast *Reg.* v. *Lewes Justices, Ex parte Secretary of State for Home Department* [1973] A.C. 388.

The reliance placed by the Court of Appeal upon the fact that documents might be forged or that the importations might be in the names of nominees does not stand up to examination. Forgery merely at the moment of entry could not be effective and, further, in so far as the importers might give the names of nominees, it is not understood how this could constitute an evil of any kind or lead to evasion of Customs dues. Importers may well be nominees at present. It is conceded that there may be an importation which is licensed. The respondents should give all the names because the possibility that importation of this substance being lawful is a remote possibility.

The respondents rely on this branch of the case on section 3 of the Finance Act 1967. This statutory prohibition is over-ridden by the principle that it is not to be so construed as to hinder the due administration of justice. It is an enabling section, directed to promiscuous publication. That is why it contains safeguards of honest men's secrets.

The Court of Appeal took a wrong approach in that it failed altogether to appreciate that the appellants came before them clothed in a very high public interest. Lord Denning M.R. weighed the matter as primarily one between the appellants' private benefit by way of financial gain, and the public benefit of keeping the information secret. But that fails to appreciate that behind the private rights of any individual litigant there always stands the extremely important public interest that justice must be done. That is an over-riding interest: see *Conway* v. *Rimmer* [1968] A.C. 910. The cases show that not all functions of public departments

A  are to be treated in the same way, that is, they do not all have the same
weight.  There is a very strong public interest that the affairs of taxpayers
should not be disclosed and, therefore, it would need a very strong case
indeed before a court would order the disclosure of a taxpayer's income
tax return.  In the present case, the public interest against disclosure of
these names to the court is minimal.  The principle on which the appel-
lants rely is, namely, that the disclosure of wrongdoing is more essential
B  to public justice than the fact that the Crown Revenue might suffer from
the future failure of the wrongdoers to share the proceeds of their wrong-
doing with the Government: see *Reg.* v. *Snider* [1953] 2 D.L.R. 9, 36.

As to the over-riding power of the court, the authority in this House
is *Rowell* v. *Pratt* [1938] A.C. 101 which shows that there is no presump-
tion either way, but that the court considers the individual statutory provi-
sion in each case.  In *Cowan* v. *Stanhill Estates Pty. Ltd.* [1966] V.R.
C  604 there is a review of the English authorities.

In conclusion, the House should decide that " court " is not a person
in these circumstances, particularly in a section like section 3 which is not
a prohibiting section at all, but an enabling section.  Strong reliance on
this part of the case is placed on *Conway* v. *Rimmer* [1968] A.C. 910.

*Oliver Q.C.*  Confidence in the present context is a head of public
D  policy.  Where information is furnished to a government department (i)
for a particular purpose or (ii) under the compulsion (or possible compul-
sion) of a statute, then in the absence of express statutory power is there
a bar upon the use of that information for other than the statutory purpose
and, in particular, upon its disclosure either (a) to other government depart-
ments or (b) to other persons?  To express the issue thus is to put it much
more widely than it was put by the respondents below and much more
E  widely than is necessary for the purposes of the present case.  For present
purposes, it is sufficient to rely on specific statutory provision.  But on the
wide issue, there are three classes of statutes: (1) An Act requiring the
furnishing of information, but not containing any prohibition, express or
by necessary implication, on disclosure by the recipient, e.g. the Customs
and Excise Act 1952, s. 65; (2) an Act containing power to require infor-
F  mation and a specific prohibition on disclosure either absolute or with
specific exception, e.g. the Agricultural Marketing Act 1931, s. 17; (3) an
Act containing power to require information but with an express provision
authorising disclosure in limited cases or to a limited extent and thereby
by implication prohibiting disclosure in other cases, e.g. the Finance Act
1967, s. 3.

To the question " is there an absolute bar on the disclosure of infor-
G  mation collected pursuant to statutory powers? " the answer is " No."
The respondents do not claim this as a general principle.  The appellants
accept that there is a general obligation of confidence, but it is said that
this is subject to the general principle, that it will yield to a strong case
of public interest (*Conway* v. *Rimmer* [1968] A.C. 910).  This is not
disputed subject to this qualification that if there is a statutory prohibition,
H  either express or implied, on the disclosure of information or on the dis-
closure of information except in particular circumstances, then the statutory
prohibition prevails.

*Rowell* v. *Pratt* [1938] A.C. 101 is a case of an express prohibition

and the following principles are deducible from it: (i) there is no rule of construction which imposes a limitation on a statutory prohibition to the effect that it is only to apply unless a court in legal proceedings otherwise orders; (ii) prohibition may be implied, for example, by imposing a criminal penalty on disclosure; (iii) where there is a statutory prohibition, the court will not over-ride it on the footing that it is transcended by the requirements of the administration of justice. Examples of express prohibitions are: section 11 of the Parliamentary Commissioner Act 1967; section 111 of the Companies Act 1967; and section 21 of the Agriculture Act 1970.

It is conceded that the Customs and Excise Act 1952 contains no express prohibition regarding the disclosure of information gathered under the Act. Prima facie, therefore, the position would be that applicable to any other statutorily gathered information, that is, it is non-disclosable except in the event of the court finding a balance of public interest in favour of disclosure. The difficulties about accepting this, however, arise principally from the provisions of section 3 of the Finance Act 1967. As to this section, it is to be noted: (a) it is permissive, so that it recognises by implication the general confidential nature of the information to which it relates; (b) the disclosure authorised is " to persons other than the Commissioners " so that the implication is that apart from this power there is no power to disclose to any other person (and prima facie) that would include a party to litigation before the court; and (c) the information which can be disclosed is strictly limited in nature, and even the power to increase the ambit of disclosable information cannot be extended to name and price. As to (c), the fact that there is an express prohibition in relation to the factors of name and price shows a very strong public policy against disclosure. If it be said that the information required here is disclosed to many persons, it is information to persons concerned with the transmission of the goods in question. They cannot use it for any other purpose. In relation to the question of confidentiality, it is important to consider section 127 of the Finance Act 1972 which shows that there is nothing very strange in imposing an increasingly strict policy in relation to confidentiality. Further, section 16 (9) of the Agriculture Act 1970 underlines the practice of confidentiality. It indicates the confidentiality of statutory information. A perusal of the relevant statutory provisions shows a thread running through them, that information required to be disclosed to a statutory body is to be deemed confidential. The respondents concede, however, that despite the language of section 3 of the Finance Act 1967, the public interest may over-ride the provisions of the section in certain circumstances, for example, where the information is required in prosecuting a charge of serious crime or in preparing a defence of a charge to serious crime.

For there to be disclosure the factor in favour of disclosure must be very weighty. In the respondents' submission the disclosure of names for the prosecution of private rights is not a sufficient factor. Public policy has two aspects: there is the moral aspect in that a person is entitled to believe that his private affairs will not be disclosed. Secondly, there is the expediency aspect, for it is a relevant consideration what would be the effect of disclosure on the interests of the State.

If it be said that sections 111 and 112 of the National Insurance Act

A   1965 show a relaxation in the relation of the disclosure of names, the answer is albeit there has been a shift in public policy against the general prohibition of the disclosure of names it is a shift away from that position only in relation to matrimonial proceedings.

The contest in the present case, assuming that it is proper in proceedings where no other relief can be claimed to seek disclosure at all, really comes down to a balancing of interests. One starts from the position that

B   there is a strong public interest in maintaining the confidentiality of information extracted from citizens under statutory compulsion. This is no more than the recognition by the legislature and by the courts that if the individual is to be asked to disclose his private affairs to the organs of the State, it is only right that the information so divulged should be used only for the purpose for which, under the statutory power, it has been called. This is something quite separate and apart from the candour

C   argument. It is in the public interest—it is part of public policy and the policy of the law that private confidences should not be abused—this is a moral policy, not an expediency one. There is always this dual aspect of public policy both facets of which were present in *Rowell* v. *Pratt* [1938] A.C. 101.

The countervailing public interest which it is said over-balances this,

D   is the interest of the private litigant in establishing his individual private rights in a civil action in a court of law. So stated the proposition subjects the obligation of confidence to an exception which would reduce it to a mere shell. "This information should be kept confidential except where its disclosure would assist another person to assert a private right."

If it be said that the appellants' right is more than a private right, it can be equally said that it is in the public interest generally that the rights

E   of individuals should be protected.

To the suggestion that the information required by the appellants is purely mundane information, the answer to this is that this is a meaningless concept. It carries the appellants nowhere. The public interest in confidentiality cannot depend solely or even principally on the content of the information sought divorced from the context in which it was imparted

F   or the consequences of its disclosure. On this test, a great deal of highly secret information is "mundane," for example, the name and telephone number of a police informer.

In summary: (1) Information provided under statutory compulsion is to be treated as confidential, although, in the absence of expressed statutory prohibition, the court may order disclosure if the public interest requires it. (2) Whether the court in any given case will order disclosure depends not

G   on any general rule, but on the individual circumstances. Among other things the following factors will be relevant for consideration: (a) the type of information sought; (b) the degree of confidentiality imposed by the legislature so far as deducible from the statutory provisions; (c) the purposes for which the information is sought—for instance, how far can the Department of Social Security disclose names and addresses for proceed-

H   ings other than maintenance proceedings? (3) The confidentiality of information statutorily obtained is not affected by the fact that that information may, and often is, imparted to other persons not under statutory compulsion, *e.g.*, the Inland Revenue may obtain details of invoices and

A  vouchers, etc. which could in fact be obtained from the traders who furnished them in the first instance; (4) Names and addresses of informants in an area to which the legislature has indicated a particular sensitivity. Thus section 3 does not allow the veil to be lifted even in the national interest. (5) It is not in the public interest to foster litigation: *Weld-Blundell* v. *Stephens* [1920] A.C. 956.

B    *Walton Q.C.* in reply. The appellants accept as a general proposition that information primarily given for statutory purposes should not be disclosed without a strong case being made out for such disclosure. Such a strong case must necessarily be furnished where disclosure is necessary to ensure justice. Specifically on Crown privilege the onus of showing that this exists is upon the respondents: see *Reg.* v. *Lewes Justices, Ex parte Secretary of State for Home Department* [1973] A.C. 388. Further, the law of confidence does not apply to guilty secrets. Equity will not protect the guilty secret by whomsoever disclosed.

C    The appellants concede that the present proceedings are ex parte in so far as the Customs cannot be expected to challenge the validity of the patent. But prima facie evidence of validity has been given amply sufficient to secure the grant of an interlocutory injunction. Interlocutory injunctions have been granted in patent matters only in the last decade, and there have only been about six granted. This answers any suggestion that D the granting of the present appeal would open the floodgates for applications of the present character.

If the respondents in any case were to consider that it would be prejudicial to disclose names, they could always refuse and be brought before the court where their costs would have to be paid by the applicant. This procedure protects the Customs. Further, the public interest is served if E the discovery is sufficiently discriminate, that is, that it is only granted on the making out of a prima facie case of wrongdoing. *Practice Note* (*Wardship: Summons*) [1973] 1 W.L.R. 60, 63 shows that a number of government departments are prepared to give names and addresses in certain circumstances.

If it be said that the giving of names is the thin end of the wedge and that applicants will require further evidence, the answer is that the principle of judicial parsimony is applicable: the *Pressed Steel* case, 240 F. F 135, 137, *per* Judge Learned Hand. If names are sufficient for the purpose, the court will not grant the giving of any further information.

As to the respondent's summary of their argument on this issue: (1) this is not disputed save for a change of onus and emphasis; (2) there is no dispute here, save on the application of the principles; (3) this conflicts G with proposition 2 (a). It must help to clarify the question whether information should be disclosed by ascertaining in whose hands the information is. The information here is mundane and is not of that character contemplated by Lord Salmon in *Reg.* v. *Lewes Justices* [1973] A.C. 388 as being immune from disclosure. This information is not like income tax returns; it is information already known to ships masters among others; H (4) is not accepted; (5) is stated far too widely.

Their Lordships took time for consideration.

A     June 26, 1973. LORD REID. My Lords, the appellants own patent no. 735,136 which covers a chemical compound called furazolidone. The validity of the patent is not in dispute. This substance is widely used and matter published by the respondents shows that some 30 consignments of it were imported into the United Kingdom between 1960 and 1970. None of these were licensed by the appellants. Each of these consignments therefore involved a tortious infringement of their right. The appel-

B lants have tried, but with little success, to discover the identity of the importers.

    When any goods are imported the master of the ship bringing them and the importer have to lodge documents with the Customs which disclose the identity of the importer. It is not disputed that the respondents have in their possession documents showing who imported each of these consignments and the appellants now seek to get from the respondents by way of

C discovery the names of those who are shown in their records to have imported furazolidone during the last six years in order that the appellants may be able to take proceedings against such importers. The respondents for a number of reasons say that they are not entitled or are not willing to give this information and they assert that the appellants have no right to obtain discovery.

D     On June 29, 1967, the appellants wrote a long letter to the respondents setting out their contentions and seeking information in respect of the persons responsible for the importation of this substance. On July 25, the respondents replied that they had no authority to give such information. The appellants then issued a writ. They alleged infringement by the respondents and sought wider discovery than they now seek. But they now admit that they have no cause of action against the respondents.

E     The question therefore now is whether the respondents are in law liable to make discovery of the names of the wrongdoers who imported the patented substance. Graham J. held that they were but his decision was reversed by the Court of Appeal.

    Discovery as a remedy in equity has a very long history. The chief occasion for its being ordered was to assist a party in an existing litigation.

F But this was extended at an early date to assist a person who contemplated litigation against the person from whom discovery was sought, if for various reasons it was just and necessary that he should have discovery at that stage. Such discovery might disclose the identity of others who might be joined as defendants with the person from whom discovery was sought. Indeed in some cases it would seem that the main object in seeking discovery was to find the identity of possible other defendants. It is not clear to me

G whether in all these cases the plaintiff had to undertake in some way to proceed against the person from whom he sought discovery if he found on discovery being ordered that it would suit him better to drop his complaint against that person and concentrate on his cause of action against those whose identity was disclosed by the discovery. But I would think that he was entitled to do this if he chose.

H     But it is argued for the respondents that it was an indispensable condition for the ordering of discovery that the person seeking discovery should have a cause of action against the person from whom it was sought. Otherwise it was said the case would come within the "mere witness" rule.

Lord Reid        Norwich Pharmacal v. Customs & Excise (H.L.(E.))        [1974]

I think that there has been a good deal of misunderstanding about this rule. It has been clear at least since the time of Lord Hardwicke that information cannot be obtained by discovery from a person who will in due course be compellable to give that information either by oral testimony as a witness or on a subpoena duces tecum. Whether the reasons justifying that rule are good or bad it is much too late to inquire: the rule is settled. But the foundation of the rule is the assumption that eventually the testimony will be available either in an action already in progress or in an action which will be brought later. It appears to me to have no application to a case like the present case. Here if the information in the possession of the respondents cannot be made available by discovery now, no action can ever be begun because the appellants do not know who are the wrongdoers who have infringed their patent. So the appellants can never get the information.

To apply the mere witness rule to a case like this would be to divorce it entirely from its proper sphere. Its purpose is not to prevent but to postpone the recovery of the information sought. It may sometimes have been misapplied in the past but I see no reason why we should continue to do so.

But that does not mean, as the appellants contend, that discovery will be ordered against anyone who can give information as to the identity of a wrongdoer. There is absolutely no authority for that. A person injured in a road accident might know that a bystander had taken the number of the car which ran him down and have no other means of tracing the driver. Or a person might know that a particular person is in possession of a libellous letter which he has good reason to believe defames him but the author of which he cannot discover. I am satisfied that it would not be proper in either case to order discovery in order that the person who has suffered damage might be able to find and sue the wrongdoer. Neither authority, principle nor public policy would justify that.

So discovery to find the identity of a wrongdoer is available against anyone against whom the plaintiff has a cause of action in relation to the same wrong. It is not available against a person who has no other connection with the wrong than that he was a spectator or has some document relating to it in his possession. But the respondents are in an intermediate position. Their conduct was entirely innocent; it was in execution of their statutory duty. But without certain action on their part the infringements could never have been committed. Does this involvement in the matter make a difference?

On the view which I take of the case I need not set out in detail the powers and duties of the respondents with regard to imported goods. From the moment when they enter the port until the time when the consignee obtains clearance and removes the goods, they are under the control of the Customs in the sense that the Customs authorities can prevent their movement or specify the places where they are to be put, and in the event of their having any suspicions they have full powers to examine or test the goods. When they are satisfied and the appropriate duty has been paid the consignee or his agent is authorised to remove the goods. No doubt the respondents are never in possession of the goods, but they do have considerable control of them during the period from entry into the port until removal by the consignee. And the goods cannot get into the

A hands of the consignee until the respondents have taken a number of steps and have released them.

My noble and learned friends, Lord Cross of Chelsea and Lord Kilbrandon, have dealt with the authorities. They are not very satisfactory, not always easy to reconcile and in the end inconclusive. On the whole I think they favour the appellants, and I am particularly impressed by the views expressed by Lord Romilly M.R. and Lord Hatherley L.C. in

B *Upmann* v. *Elkan* (1871) L.R. 12 Eq. 140; 7 Ch.App. 130. They seem to me to point to a very reasonable principle that if through no fault of his own a person gets mixed up in the tortious acts of others so as to facilitate their wrong-doing he may incur no personal liability but he comes under a duty to assist the person who has been wronged by giving him full information and disclosing the identity of the wrongdoers. I do not think that it matters whether he became so mixed up by voluntary

C action on his part or because it was his duty to do what he did. It may be that if this causes him expense the person seeking the information ought to reimburse him. But justice requires that he should co-operate in righting the wrong if he unwittingly facilitated its perpetration.

I am the more inclined to reach this result because it is clear that if the person mixed up in the affair has to any extent incurred any liability to the

D person wronged, he must make full disclosure even though the person wronged had no intention of proceeding against him. It would I think be quite illogical to make his obligation to disclose the identity of the real offenders depend on whether or not he has himself incurred some minor liability. I would therefore hold that the respondents must disclose the information now sought unless there is some consideration of public policy which prevents that.

E Apart from public policy the respondents say that they are prevented by law from making this disclosure. I agree with your Lordships that that is not so. If it were they could not even disclose such information in a serious criminal case, but their counsel were, quite rightly, not prepared to press their argument so far as that.

So we have to weigh the requirements of justice to the appellants against

F the considerations put forward by the respondents as justifying non-disclosure. They are twofold. First it is said that to make such disclosures would or might impair or hamper the efficient conduct of their important statutory duties. And secondly it is said that such disclosure would or might be prejudicial to those whose identity would be disclosed.

There is nothing secret or confidential in the information sought or in the documents which came into the hands of the respondents containing

G that information. Those documents are ordinary commercial documents which pass through many different hands. But it is said that those who do not wish to have their names disclosed might concoct false documents and thereby hamper the work of the Customs. That would require at least a conspiracy between the foreign consignor and the importer and it seems to me to be in the highest degree improbable. It appears that there are

H already arrangements in operation by the respondents restricting the disclosure of certain matters if the importers do not wish them to be disclosed. It may be that the knowledge that a court might order discovery in certain cases would cause somewhat greater use to be made of these arrangements.

But it was not suggested in argument that that is a matter of any vital importance. The only other point was that such disclosure might cause resentment and impair good relations with other traders: but I find it impossible to believe that honest traders would resent failure to protect wrongdoers.

Protection of traders from having their names disclosed is a more difficult matter. If we could be sure that those whose names are sought are all tortfeasors, they do not deserve any protection. In the present case the possibility that any are not is so remote that I think it can be neglected. The only possible way in which any of these imports could be legitimate and not an infringement would seem to be that someone might have exported some furazolidone from this country and then whoever owned it abroad might have sent it back here. Then there would be no infringement. But again that seems most unlikely.

But there may be other cases where there is much more doubt. The validity of the patent may be doubtful and there could well be other doubts. If the respondents have any doubts in any future case about the propriety of making disclosures they are well entitled to require the matter to be submitted to the court at the expense of the person seeking the disclosure. The court will then only order discovery if satisfied that there is no substantial chance of injustice being done.

I would therefore allow this appeal. The respondents were quite right in requiring the matter to be submitted to the court. So they are entitled to their costs down to the date of the judgment of Graham J. Thereafter the appellants caused much extra expense by putting their case much too high. In the circumstances I would award no costs in the Court of Appeal or in this House.

LORD MORRIS OF BORTH-Y-GEST. My Lords, the question which calls for consideration arises in proceedings which by now have shed many of their original features. Two actions were begun. They were later consolidated. The plaintiffs [the appellants] were respectively the registered proprietors of, and the exclusive licensees in the United Kingdom under, letters patent which covered a specific chemical compound called furazolidone. The claims made by the plaintiffs in each action were as follows. First, there was a claim for a declaration that the defendants (the commissioners) had infringed or had caused, enabled or assisted others to infringe the letters patents. Secondly, there was a claim for a declaration that it was the commissioners' statutory duty to forfeit all the imported furazolidone in their possession custody or control which was not licensed for importation by the plaintiffs. Thirdly, there was a claim for an order that the commissioners should:

" (a) Set forth and disclose to the plaintiffs in the case of each consignment of furazolidone imported without the licence of the plaintiffs or one or other of them the names and addresses of the consignors and consignees thereof, the quantity of furazolidone therein and the date thereof. (b) Give the plaintiffs full and complete discovery of all documents which are or have been in their possession custody or control relating to such imported consignments of furazolidone."

A.C.          Norwich Pharmacal v. Customs & Excise (H.L.(E.) )          Lord Morris
of Borth-y-Gest

A     It was pleaded that third parties whose names were unknown to the plaintiffs had infringed the letters patent by importing furazolidone without the leave and licence of the plaintiffs.  Particulars were given setting out dates, quantities, values and countries from which imported.  The discovery claimed was sought in aid of proceedings which the plaintiffs wished to bring against others but which they could not initiate without at least knowing the names of the importers.

B     After delivery of defences both parties filed lists of documents.  In one part of the commissioners' list there were included the following documents: Special Chemical Register: Customs Entries (comprising Forms XS107 and C.105 and supporting documents) delivered by persons other than the plaintiffs relating to the importation of furazolidone: and ships' reports, cargo manifests, correspondence and books of account relating to such importations.  The commissioners objected to produce those
C documents.  The objection was on the following grounds:

> " (a) that the defendants are precluded by law from disclosing them
> and (b) that their disclosure would be injurious to the public interest,
> because they contain confidential information about the affairs of
> persons other than the plaintiffs furnished to the defendants by such
> persons pursuant to sections 26, 28 and 29 of the Customs and Excise
D Act 1952."

    The plaintiffs took out a summons by which they asked that the defendants be ordered to produce the documents for inspection.  The summons was adjourned into court and was heard by Graham J.

    Though the learned judge held that the plaintiffs had no reasonable cause of action against the commissioners he held in a most careful and
E illuminating judgment that the court could make an order requiring them to disclose to the plaintiffs the names and addresses of the importers of furazolidone.  The commissioners appealed to the Court of Appeal against this order.  The plaintiffs persisted in their contention that they had causes of action against the commissioners and by a respondent's notice they contended (a) that the commissioners had infringed (or had caused or
F enabled or assisted others to infringe) the letters patent and (b) that the commissioners were in breach of a statutory duty to forfeit all imported furazolidone in their possession custody or control which the plaintiffs had not licensed for importation.

    Having lost in the Court of Appeal the plaintiffs by leave appealed to this House.  Though by their printed case the plaintiffs set out that to a limited extent they desired to maintain the contention that they had a cause
G of action for infringement by the commissioners themselves, that contention was abandoned when the appeal was opened.  The case proceeded therefore on the basis (a) that it consisted solely of a claim for limited discovery against the commissioners and (b) that no other relief could be or could have been claimed against the commissioners.  It must be approached on the footing that it was and always had been an action solely for discovery.
H The claim is now expressly limited so as to relate only to the names and addresses of any persons appearing from the customs entry to be the importers (a) in the case of the last importation referred to in paragraph 2 of the amended particulars of breaches in the first action and (b) in the case

of each importation referred to in paragraph 2 of the particulars of
infringements in the second action.                    A

It is important to mention certain matters. (1) The commissioners by
their pleadings admitted (for the purposes of this case) the validity of the
letters patent. But beyond this there was evidence showing that the validity
of the patent (the complete specification of which was published nearly 16
years ago) had never been challenged. Some infringements had been
detected and all infringers who had been detected had been sued: the    B
actions had been settled on the basis that there was infringement. (2) The
commissioners publish certain monthly statistics of goods imported into the
United Kingdom and the importation of furazolidone has been specifically
mentioned. The plaintiffs are in a position to assert that the persons who
have imported, whoever they are, must have been infringers and therefore
wrongdoers. The commissioners know the names and addresses of these
people. The plaintiffs wish to sue such people and intend to sue them if    C
they can find out who they are. The plaintiffs say that they are unable to
find out who the people are unless the commissioners tell them.

The plaintiffs wrote (in June and July 1967) to the commissioners and
asked for the information they sought. The commissioners stated that they
were advised that information furnished to them under a requirement of
the Customs and Excise Act 1952 should not be disclosed to third parties.    D

In my view, it would be reasonable, and in a broad sense of the term
just, if the desired information could be supplied. The facts are very special.
The plaintiffs are fully entitled to protect their interests. Subject always
to the emergence of some possible explanation of a nature not at present
known, the importers whose names are known to the commissioners are
wrongdoers. It will be unfortunate not only from the point of view of the    E
plaintiffs but also of that of the public if the wrongdoers cannot be
challenged. In this situation two questions arise: (1) Is it within the power
of the court to assist the plaintiffs or is the law powerless? (2) If the court
has power to make the desired order—would it be against the public interest
to make it?

In the review of very many authorities to which we were referred in    F
painstaking and learned arguments it seemed clear that as a broad and
general rule it is true to say that a court will not order discovery against a
mere witness. On behalf of the plaintiffs it is not sought to challenge this.
A witness is one who may be able to give testimony in either pending or
anticipated proceedings. Here there are no pending proceedings and unless
the plaintiffs secure the help of the court there are no anticipated proceed-
ings. If the names are given and if the plaintiffs take proceedings it is    G
unlikely that there would be any need to rely on any evidence from the
commissioners.

It is not suggested that in ordinary circumstances a court would require
someone to impart to another some information which he may happen to
have and which the latter would wish to have for the purpose of bringing
some proceedings. At the very least the person possessing the information    H
would have to have become actually involved (or actively concerned) in
some transactions or arrangements as a result of which he has acquired the
information. In all ordinary circumstances there would then be some

A.C.                Norwich Pharmacal v. Customs & Excise (H.L.(E.))        Lord Morris
of Borth-y-Gest

A  proceedings in the course of which the machinery of the court would enable all relevant and admissible evidence to be obtained.

My Lords, the review of numerous authorities undertaken by learned counsel has left me with the impression that unless supplied by the case of *Orr* v. *Diaper* (1876) 4 Ch.D. 92 clear-cut authority is meagre in support of the very limited order now sought by the plaintiffs; equally I am left with the impression that it would be very unfortunate if the law could not come to

B  the aid of the plaintiffs. The commissioners have had public duties to discharge. They have acted with complete propriety. But in the course of their public duties they have come to know, and have been obliged to come to know, the names of those who can reasonably be assumed to be wrongdoers vis-à-vis the plaintiffs. Assuming that only the necessities of the public service (a matter to which I will later refer) have deterred the commissioners

C  from disclosing the names to the plaintiffs, and always assuming that there is no statutory prohibition against such disclosure, is there any reason why the court, in the interests of justice, and in the absence of any real doubt that certain wrongdoers are enjoying a quite fortuitous protection, should not authorise and require the commissioners to disclose the names?

So far as authority goes the main anchor of the appellants is the decision in 1876 in *Orr* v. *Diaper*, which is reported in 4 Ch.D. 92 and in other

D  reports. In the much earlier case of *Moodalay* v. *Morton* (1785) 1 Bro.C.C. 469 there was a bill for discovery against the East India Company and against Morton, their secretary. The plaintiffs had had a lease for a period of 10 years from the East India Company of the permission to supply the inhabitants of Madras with tobacco: the plaintiffs alleged that the company, by their servants in India, had dispossessed the plaintiffs and had granted

E  a lease to others: the plaintiffs intended to sue the East India Company but in order to do so they needed the evidence of persons resident in the East Indies: they therefore prayed for a commission for the examination of witnesses and they required the company and the secretary to discover by whom and under what authority the second lease was granted. The plaintiffs wanted to know whether those who had dispossessed them were or were not servants of the company: if they were not they would be liable in

F  their own persons. A demurrer to the bill was overruled. The fact that no action had been brought was no answer.

*Moodalay* v. *Morton* was much discussed in *Angel* v. *Angel* (1822) 1 L.J.O.S.Ch. 6. It was considered whether it was not exceptional to grant a commission to examine witnesses before an action was begun. Sir John Leach V.-C. said, at p. 9, in reference to *Moodalay* v. *Morton*: "The

G  plaintiff there required a commission, in order to know against whom the action should be brought." While in the present case there is now no suggestion that the commissioners are to be sued the justice of the case would just as much warrant help being given to the plaintiffs as to *Moodalay*.

Numerous cases firmly recognised the rule that a bill of discovery would not lie against a mere witness. *Fenton* v. *Hughes* (1802) 7 Ves.Jun. 287 was

H  but one of many cases which illustrated the rule. Someone who was not being sued and could not be sued would be regarded as a mere witness. The rule was recognised in *Mayor and Commonalty and Citizens of London* v. *Levy* (1803) 8 Ves.Jun. 398, where the demurrer was allowed

**Lord Morris**
**of Borth-y-Gest**          Norwich Pharmacal v. Customs & Excise (H.L.(E.) )          **[1974]**

A

because the bill did not allege with sufficient certainty by whom the duties which were claimed were payable.   Lord Eldon L.C. said, at p. 404:

> "But it has never yet been, nor can it be, laid down, that you can file a bill, not venturing to state, who are the persons, against whom the action is to be brought; not stating such circumstances as may enable the court, which must be taken to know the law, and therefore the liabilities of the defendants, to judge; but stating circumstances; and averring, that you have a right to an action against the defendants or some of them.   That of necessity admits, that some of the defendants may be only witnesses; and against them there is no right to file such a bill."

B

In the present case the appellants are able to say that they have rights which they intend to pursue and rights which as far as can be known must succeed: they know everything except the names and addresses of those whom they desire and intend to sue: they further know that those names and addresses appear on Customs entries in the possession of the commissioners and of which the commissioners have become possessed in pursuance of their duties.   Is there any reason why the court should not sanction and direct discovery?

C

I do not propose to refer to the majority of the cases which were cited for our consideration because I agree with the conclusion reached both by the learned judge and by the Court of Appeal that in general the cases support the view that no independent action for discovery lies against a party against whom no reasonable cause of action can be alleged or who is in the position of a mere witness in the strict sense.   If this is, in general, the conclusion which is reached after a study of numerous decisions how, then, is the decision in *Orr* v. *Diaper*, 4 Ch.D. 92 to be viewed?   No less an authority than Mr. Bray (see *Bray on Discovery* (1885), pp. 40–41) regarded it as a special case.   From the broad general rule Graham J. considered that there could be exceptional cases and that, of such, *Orr* v. *Diaper* was an example. We have studied and re-studied that case and it was the subject of very careful analysis in the Court of Appeal and in particular by Buckley L.J., who most helpfully examined the report of the case in 25 W.R. 23. The conclusion which I for my part have reached, in agreement with the Court of Appeal, is that *Orr* v. *Diaper* perhaps need not on its facts have been regarded as an exception to the broad general rule.   Yet I think it was so regarded.   Nor I think did Mr. Bray regard the decision as heretical but rather as being an exception from a broad general rule which permitted of certain exceptions being made, and an exception which, in the particular case, a court in the interests of justice had been warranted in making.   To prevent a denial of justice must at all times be the aim of a judge and the concluding words of Hall V.-C., 4 Ch.D. 92, 96 would surely have been regarded as wholly commendable in any court of equity:

D

E

F

G

> "In this case the plaintiffs do not know, and cannot discover, who the persons are who have invaded their rights, and who may be said to have abstracted their property.   Their proceedings have come to a deadlock, and it would be a denial of justice if means could not be found in this court to assist the plaintiffs."

H

A  But whatever may be the true view of *Orr* v. *Diaper* I think that it is very significant that it has been quoted as an authority and has not been over-ruled, with the result that after this lapse of time it may be regarded as furnishing a precedent for a course that justice would seem to demand.

We were referred to *Hunt* v. *Maniere* (1864) 34 Beav. 157, *Upmann* v. *Elkan* (1871) L.R. 12 Eq. 140 and *Upmann* v. *Forester* (1883) 24 Ch.D.
B  231. But the position of the commissioners is not I think to be equated with that of wharfingers or forwarding agents or shippers. The position of the commissioners is rather special. They are not engaged in com-mercial activities: they differ from those who voluntarily engage in trade for their own profit. In no ordinary sense are the commissioners in posses-sion of goods though they are endowed with certain wide powers which they need to enable them to discharge their statutory duties. But they are not mere outsiders or volunteers or, so to speak, mere bystanders. They
C  become obliged to have active concern with, to acquire positive knowledge of, and to exercise certain powers in respect of, the affairs of traders and the movement of goods.

What, then, was the position of the commissioners when they were asked by the plaintiffs voluntarily to give the names? Were they entitled or obliged to do so? In this connection the words of Lord Romilly M.R. in
D  *Upmann* v. *Elkan*, L.R. 12 Eq. 140 were referred to. (It may here be mentioned that neither in that case nor in *Upmann* v. *Forester*, 24 Ch.D. 231 did the proceedings take the form of a bill of discovery.) Lord Romilly M.R. said, at p. 145:

> " I begin by assuming (which facts are proved here) that the corres-
> pondent of a London house sends goods to a London dock company
E  > to the order of that London house, and that the goods have on them the
> spurious trade-mark or brand of a person to whom the goods do not
> belong, and who has not been concerned in sending them thither.
> The person whose trade-mark is fraudulently imitated ascertains this
> fact before the goods leave the dock: he applies to the dock company
> not to allow them to leave the dock with the spurious trade-mark, and
> he applies to the persons at whose order they stand, and asks them
F  > to give him all information respecting them, and to undertake not to
> sell or distribute the goods until the spurious brand is removed. I
> assume, then, in addition, that the person so applied to is innocent
> and ignorant of the fraud. It is his duty at once to give all the
> information required, and to undertake that the goods shall not be
> removed or dealt with until the spurious brand has been removed,
> and to offer to give all facilities to the person injured for that purpose."
G
In my view, the position of the commissioners differed from that of the forwarding agents in the case cited. I think that the commissioners were at the date of the request to them warranted in declining voluntarily to give the names. It is quite different if the court having considered all aspects of the public interest authorises and requires them to give the names. But
H  the information possessed by the commissioners was information which others had been obliged to give them under statutory compulsion and for some particular purposes. I think that the commissioners were correct in taking the view that they ought to treat the information possessed by them

A

as confidential. In this respect the provisions of section 3 of the Finance Act 1967 are of importance. The commissioners are given power to disclose some information to some others if the Secretary of State is satisfied that it would be in the national interest, but no power is given to sanction the disclosure of " the price of the goods or the name of the importer of the goods." This shows that the names of importers come within an area indicated by the legislature as being one of special sensitivity: see also section 127 of the Finance Act 1972,

B

The next step is to consider whether the court should make the desired order and whether it would be in the public interest or against the public interest to make the order. If there was some statutory prohibition (such as that contained in section 17 (2) of the Agricultural Marketing Act 1931: see *Rowell* v. *Pratt* [1938] A.C. 101) then that, of course, would be conclusive. In the absence of any such prohibition it seems to me that in the special circumstances of this case, and with some support from authority, the interests of justice warrant the court in making the desired order unless there are some features of the public interest which are of such weight as to out-balance the public interest of advancing the cause of justice. I can well appreciate the importance of the considerations which were advanced and which undoubtedly carry some weight, but having considered them in relation to the very limited order now sought I am firmly of the view that the balance of the public interest warrants the making of the order as now requested. I consider that the fair order as to costs is that the plaintiffs should pay to the commissioners their costs at first instance and that there should be no order as to costs in the Court of Appeal and in this House.

C

D

I would allow the appeal accordingly.

E

VISCOUNT DILHORNE. My Lords, the appellants hold the patent for a chemical called furazolidone which is used in poultry food. The respondents publish monthly statistics of the goods imported into the United Kingdom. Those statistics revealed that in 32 months between March 1960 and February 1970 furazolidone was imported into this country, but they do not reveal who were the importers. Each importation, the appellants say, constituted an infringement of their patent, though they say that it is conceivable that some of the chemical sold by them was reimported into this country, in which case there would be no infringement. The appellants say that although there must have been infringement in, if not all, at least the majority of these importations, they are unable to take any steps to protect their patent as they do not know and cannot find out, unless successful in these proceedings, the names of the importers, all of which are known to the respondents.

F

G

On June 29, 1967, the appellants' solicitors wrote to the respondents asking for the names, not only of the consignees, but also of the consignors of the imported furazolidone and alternatively alleging that they were under a duty to seize and forfeit the imported furazolidone. The respondents in reply said that they were under no such duty and that in the absence of statutory authority it was impossible for them to disclose the names of the importers.

H

A    On February 4, 1969, the appellants issued a writ against the respondents in which they claimed a declaration that the respondents were infringing or enabling or assisting others to infringe their patent, an injunction to restrain them from doing so and an injunction to compel them to forfeit the imported furazolidone.  The writ was later amended to include a claim for discovery by the respondents of the names and addresses of the consignors and consignees and of all documents which were or had been in their possession relating to the imported consignments.

B    On August 5, 1970, the appellants issued another writ claiming similar relief in respect of later importations in five months in 1968, 1969 and 1970.  The two actions were consolidated and a summons for directions was taken out on March 3, 1971.  It was adjourned into court and came before Graham J.  After a five day hearing he gave judgment dealing with all the appellants' claims.  He rejected the claim that the respondents were themselves infringers of the patent and also the claim that they were under a duty to forfeit the furazolidone.

C    By their defence the respondents admitted the validity of the letters patent and at the hearing before Graham J. Mr. Walton for the appellants said that if the respondents gave the information asked for it was improbable that the question of infringement would be pressed against them.  He agreed that the proceedings could be treated as a pure action for discovery for the production of information as to the identity of the importers.  And so although the claims in respect of infringement and forfeiture were not abandoned until the hearing in this House, the proceedings have continued to be treated as those for discovery of the names of the importers alone.  Graham J. held that that discovery should be made and made an order in a form agreed between the parties.

D

E    In the Court of Appeal his decision was reversed, the court holding that the appellants had no conceivable cause of action against the respondents and that they could not bring an action merely for the purpose of discovering from them the names of the importers.  They also held that the information required was received in confidence by the respondents and that the balance of public interest demanded that the respondents should keep the names and addresses of the importers secret.

F    So there are three questions to be decided.  First, on the facts of this case, can the respondents, who are not themselves wrongdoers, be ordered to disclose the names of the importers who, the validity of the patent being admitted, are wrongdoers.  Secondly, in the exercise of the discretion vested in the court, should they be ordered to do so; and thirdly, are the respondents in any event prohibited from disclosing that information.

G    Numerous authorities were referred to on the first question.  Few of them I found of much assistance.  Many of them are very briefly reported and throw little, if any, light on the principles to be applied.  The most recent and the most relevant case on which the appellants relied was decided nearly a hundred years ago, Orr v. Diaper (1876) 4 Ch.D. 92; 25 W.R. 23.

H    In that case the plaintiffs were sewing cotton and thread manufacturers.  The cottons and threads were made up for sale in different coloured papers and specially designed tickets were used to distinguish them from the cottons and threads of other manufacturers.  The defendants were shippers and the plaintiffs discovered that they had for some time been shipping to

Valparaiso and elsewhere cotton thread packed in the same manner as   A
their own and bearing the same tickets.  The plaintiffs sought to find out
the names and addresses of the parties from whom they had received
the cotton for shipment and wrote saying they quite understood that the
defendants were innocent of any intention to act prejudicially to them and
that if they gave the names and addresses " the necessity for further pro-
ceedings would cease."  No reply was sent and proceedings were
commenced, the statement of claim alleging that the defendants " well   B
knew the tickets and of the injury " and that they ought to give the
information that was sought in aid of proceedings in contemplation by
the plaintiffs to restrain the piracy of their tickets and that the proceedings
contemplated could not be maintained without the discovery sought.

The defendants demurred.  There are many differences in the report of
the case in the Law Reports and in the Weekly Reporter, both in the
report of the arguments advanced on behalf of the defendants, counsel for   C
the plaintiff not being called on, and in the report of the judgment of
Hall V.-C.

It appears from the reports of the arguments that the main point taken
on demurrer was that discovery was not obtainable from persons who will
not be and who are not intended to be parties to an action and that to be
granted, " the discovery sought must be material, either to the relief prayed   D
by the bill, or to some other suit actually instituted, or capable of being
instituted ":  4 Ch.D. 92, 94 (Mitford on Pleading, 4th ed. (1827),
p. 191, 3rd ed. (1814), p. 155) (4 Ch.D., at p. 94); and no relief was sought
against the defendants and no other suit instituted or capable of being
instituted against them.  In the report in the Weekly Reporter, 25 W.R.
at p. 24, it is said that it was submitted that " These defendants are merely
witnesses, and you cannot make a mere witness a party to obtain discovery "   E
and then it was recognised that there may be circumstances under which
discovery may be sought against persons who otherwise would not be parties
to the action.  Two examples were given: first, the case of a corporation
where a person holding a representative position is made a party who other-
wise would only be a witness,—that, it was said, was an exception to the rule,
—and, secondly, where there is statutory authority compelling discovery:
Dixon v. Enoch (1872) L.R. 13 Eq. 394.  In that case Wickens V.-C. said   F
that the object of the Act was to enable the plaintiff to extract from the
defendant the name or names of some other person or persons other than
himself who might be sued at law.  He then said, at p. 400:

"The supposition that if the plaintiff knows the name of one proprie-
tor he can make him tell the names of all the others, but that, not
knowing one name, he cannot get the information from the printer and   G
publisher, who is the agent of the proprietors, and is put forth to stand
between them and the public, is one that does not commend itself
to one's common sense, and is not to be accepted without absolute
necessity."

Hall V.-C. began his judgment with the citation of this passage from   H
Wickens V.-C.'s judgment, saying, 25 W.R. at p. 24: " That is the view I
take of this case.  Nothing but ' absolute necessity ' will compel me to
allow this demurrer."  He clearly thought that Wickens V.-C.'s observa-

A  tions, in relation to a case where there was a defendant being sued for libel and a statute provided for the disclosure, were applicable to a case when the person from whom discovery was sought was not in fact a defendant from whom relief was sought.

In the report in the Weekly Reporter, at p. 24, it is said that he expressed the opinion that the position of the defendants in shipping the goods " might subject them to proceedings by way of injunction to restrain them
B  from continuing to ship these goods." He rejected the contention that they were mere witnesses, saying, according to the report of the Law Reports, 4 Ch.D., at p. 96 : " their position, they being the actual shippers, is different from that of mere witnesses "; and according to the report in the Weekly Reporter, at p. 25 :

> " But I think that the position of the defendants is different from that
C  > of a mere witness, . . . That view of the case seems to me to bring
> it within the rule as stated in *Mitford*."

He ended his judgment by saying according to the Law Reports, 4 Ch.D., at p. 96 : " . . . it would be a denial of justice if means could not be found in this court to assist the plaintiffs "; and overruled the demurrer.

As I read the reports of his judgment he based his conclusion on two
D  grounds: first, that the defendants were not mere witnesses and, secondly, on the fact that in his opinion they could themselves have been sued.

Whether he would have overruled the demurrer if he had been of the opinion that the defendants could not have had proceedings brought against them apart from the claim for discovery is not clear, though it would seem probable from Hall V.-C.'s other observations to which I have referred that he would have done all in his power to assist the plaintiffs.
E  In *Plummer* v. *May* (1750) 1 Ves.Sen. 426 Lord Hardwicke L.C. said that a person could not be made a defendant to a bill

> " who is merely a witness, in order to have a discovery of what he can
> say to the matter, . . . But as against a party interested, the plaintiff
> is entitled to have a discovery from him, if he is charged to be con-
F  > cerned in the fraud. . . ."

So the rule that *discovery is not obtainable from a mere witness* is of very considerable antiquity.

There are some more cases decided before *Orr* v. *Diaper* to which I must now refer. The first of these is *Moodalay* v. *Morton* (1785) 1 Bro.C.C. 469. There discovery was sought from the East India Company in order
G  to discover by what authority the plaintiffs were dispossessed of a lease for supplying the inhabitants of Madras with tobacco. The plaintiffs wanted to find out if the persons who had dispossessed them were acting as servants of the company. If they were, then the plaintiffs intended to sue the company. Lord Kenyon M.R. held that the plaintiffs were entitled to the discovery sought.

H  It was sought not to ascertain the identity of anyone but whether the company was responsible for the injury the plaintiffs had suffered. I regard the case as an authority for the proposition that discovery can be granted before an action is instituted, but it was information, not names,

that was sought, information to discover whether the company were respon-  A
sible, not to identify the wrongdoer.

In *Mayor and Commonalty and Citizens of London* v. *Levy* (1803)
8 Ves.Jun. 398 in which *Moodalay* v. *Morton* was not cited, the defendants
had refused to discover whose property were certain goods and without which
discovery an action of law could not be proceeded with.  Lord Eldon L.C.,
in the course of his judgment, said, at p. 404:

B

> "That, where the bill avers, that an action is brought, or, where the
> necessary effect in law of the case stated by the bill appears to be,
> that the plaintiff has a right to bring an action, he has a right to a
> discovery, to aid that action, so alleged to be brought, or which he
> appears to have a right and an intention to bring, cannot be disputed.
> But it has never yet been, nor can it be, laid down, that you can file
> a bill, not venturing to state, who are the persons, against whom
> the action is to be brought; . . . but stating circumstances; and averring,
> that you have a right to an action against the defendants or some of
> them.  That of necessity admits, that some of the defendants may be
> only witnesses; and against them there is no right to file such a bill."

C

*Moodalay* v. *Morton*, 1 Bro.C.C. 469 was commented on in *Angel*
v. *Angel* (1882) 1 L.J.O.S.Ch. 6, 9, where Sir John Leach V.-C. said it was  D
an exception to the general rule

> "for it would be absurd to demand that an action should be brought
> before the commission is granted, where the purpose of the commission
> is to ascertain against whom the action ought to be brought."

I do not see that it is possible to reconcile Lord Eldon L.C.'s observations
with the decision in *Moodalay* v. *Morton* except upon the narrow ground  E
that in *Moodalay* v. *Morton* the name of the proposed defendant was
known and the company would be sued if discovery showed it to be
responsible.  It would indeed be odd if you could get discovery if you
named the party you intended to sue if you could discover his respon-
sibility, but that you could not get discovery though you had suffered an
injury if you were not able to name the person who might be responsible.  F

In *Story on Equity Jurisprudence*, 2nd Eng. ed. (1892), p. 1011, para.
1483, it is stated:

> ". . . in general, it was necessary, in order to maintain a bill of
> discovery, that an action should be already commenced in another
> court, to which it should be auxiliary.  There were exceptions to this
> rule, as where the object of discovery was to ascertain who was the
> proper party against whom the suit should be brought.  But these  G
> were of rare occurrence."

A similar passage appears in the first edition and in a footnote to it
*Moodalay* v. *Morton*, *Angel* v. *Angel* and *City of London* v. *Levy* are
cited.  *Story* thus does not appear to have thought that the right to dis-
covery of the proper party against whom the suit should be brought  H
depended upon the ability of the plaintiff to give his name.

In *Queen of Portugal* v. *Glyn* (1840) 7 Cl. & F. 466, the majority
in this House, Lord Cottenham L.C., Lord Lyndhurst and Lord Brougham,

**A.C.**        Norwich Pharmacal v. Customs & Excise (H.L.(E.) )    Viscount **Dilhorne**

A    Lord Wynford dissenting, held that a bill of discovery could not be granted against the Queen of Portugal who was not a party to an action brought against Glyns, the bankers, but who was clearly an interested party in that action as it was brought by her agent, Lord Cottenham L.C. holding that it was a long established rule that discovery on a bill would only be granted against a party to the action. *Moodalay* v. *Morton*, 1 Bro.C.C. 469 and *Angel* v. *Angel*, 1 L.J.O.S.Ch. 6 were not cited and I do

B    not consider that the decisions in those cases, *Moodalay* v. *Morton* being regarded as an exception to the general rule, are to be regarded as inferentially overruled by this decision of this House.

There *Hunt* v. *Maniere* (1864) 34 Beav. 157 and *Upmann* v. *Elkan* (1871) L.R. 12 Eq. 140 were neither of them cases on discovery. In *Hunt* v. *Maniere* the question was whether wharfingers had rightly refused to deliver up wine with a false label to the consignee. I do not think that this case

C    assists. In *Upmann* v. *Elkan*, L.R. 12 Eq. 140 though the dispute was about costs there were observations by Lord Romilly M.R. at first instance and, by Lord Hatherley L.C. on appeal (7 Ch.App. 130), which are of interest.

There a bill had been filed praying an injunction to restrain Elkans, who were forwarding agents and the consignees, from removing boxes of

D    cigars marked falsely with the plaintiffs' brand from St. Katharine's Docks. With regard to the St. Katharine Dock Company who were also joined as defendants, Lord Romilly M.R. said that there was not the least pretence for making them parties to the suit and, at p. 145, that it was the duty of the consignees, despite their innocence and ignorance of the fraud " at once to give all the information required," and to undertake that the goods should not be removed from their possession. Before the bill was filed the

E    defendants had disclosed the names of the consignors and ultimate consignees. In the Court of Appeal (1871) 7 Ch.App. 130 it was held, affirming the decision of Lord Romilly M.R., that the fact that Elkans were agents and merely carriers was no defence to the suit, and Lord Hatherley L.C., at p. 133, said it was the business of Elkans, once the complaint was made, to give all proper information.

F    This case, while it states the duties of consignees of goods where complaint is made that they are spurious, does not decide that discovery could have been ordered against Elkans.

From these decisions it is apparent that little support is given to the decision in *Orr* v. *Diaper*, 4 Ch.D. 92. The most helpful case is *Moodalay* v. *Morton*, 1 Bro.C.C. 469. However, *Orr* v. *Diaper* has not so far as I am aware, ever been questioned or criticised in any subsequent case or in any

G    textbook and the principle it enunciates has been followed on several occasions in other countries. In the textbooks, in addition to the observations of Story J. in his book on *Equity Jurisprudence* to which I have referred, there are statements to a similar effect in *Bray on Discovery* (1885), p. 40, in *Sichel & Chance, Interrogatories and Discovery* (1883), p. 180, and in *Ross on the Law of Discovery* (1912), p. 11, and it is not without

H    interest to note that in the third edition of *Snell's Equity* published in 1874 before the decision in *Orr* v. *Diaper*, it is said, at p. 516, that there are exceptions to the general rule that to maintain a bill of discovery an action should have been commenced in another court: " as where the object of

Viscount Dilhorne  Norwich Pharmacal v. Customs & Excise (H.L.(E.) )        [1974]

discovery is to ascertain who is the proper party against whom the suit    A
should be brought.  But these are of rare occurrence."

   In these circumstances it is, in my opinion, far too late to challenge that
decision.  What exactly did it decide?  In my view, that a discovery can be
granted against a person who is not a mere witness to discover, the fact of
some wrongdoing being established, who was responsible for it.  The " mere
witness " rule has lost a great deal of its importance since the Common    B
Law Procedure Act removed the bar to persons interested giving evidence,
but it still has significance.  Someone involved in the transaction is not a
mere witness.  If he could be sued, even though there be no intention of
suing him, he is not a mere witness.  In *Orr* v. *Diaper* Diapers were in-
volved, so were Elkans in *Upmann* v. *Elkan*, L.R. 12 Eq. 140, so was the
East India Company in *Moodalay* v. *Morton*, 1 Bro.C.C. 469 and it matters
not that the involvement or participation was innocent and in ignorance of
the wrongdoing.                                                            C

   Are the respondents to be regarded as so involved in this case? I think
the answer is yes.  They were not, it is true, involved of their own volition.
They were involved in the performance of their statutory duty.  The
furazolidone was in Customs charge until cleared and the commissioners
could control its movement until cleared (Customs and Excise Act 1952,
s. 22 (1)).  I do not see how it can be said that they were not involved in    D
the importation of this chemical.

   So for these reasons in my opinion the answer to the first question I
formulated, can the respondents be ordered to disclose the names of the
importers? is in the affirmative.  As to the second question, should they be
ordered to do so? I think that the answer is also yes, unless in consequence
of their special position the answer to the third question is in the negative.
Subject to the public interest in protecting the confidentiality of information    E
given to Customs, in my opinion it is clearly in the public interest and right
for the protection of patent holders, where the validity of the patent is
accepted and the infringement of it not disputed, that they should be able to
obtain by discovery the names and addresses of the wrongdoers from
someone involved but not a party to the wrongdoing.

   I now turn to the third question.  In their list of documents the    F
respondents asserted that they were precluded by law from disclosing the
names of the importers and that that disclosure would be injurious to the
public interest.  In their notice of appeal to the Court of Appeal they gave
notice that the grounds of appeal were:

   " Information about a taxpayer or his affairs furnished to a revenue
   collecting department of the Crown pursuant to the requirements of a
   statute is confidential and, in circumstances in which its disclosure is    G
   not authorised by statute, exceptionally strong reasons must exist to
   permit its disclosure to persons outside that department."

In their case they contend that discovery should not be ordered because
disclosure would be contrary to the public interest on two grounds (1) that
the information is given to the respondents and their officers in confidence    H
and under compulsion in order that the respondents may perform their
statutory duties.  " The informant " it is said " is entitled to assume that
information for this purpose will not be disclosed to others for a different

A.C.          Norwich Pharmacal v. Customs & Excise (H.L.(E.) )   Viscount Dilhorne

A  purpose ": and (2) that it is essential that the confidence of importers should be respected in order to ensure that full and candid information continues to be given by them. " The furnishing of the information " they submit " would inhibit importers from making full and frank disclosure." The affidavit of Sir Louis Petch, the Chairman of the Commissioners of Customs and Excise, sets out these contentions more fully.

B  The respondents were unable to point to any statutory provision prohibiting them from disclosing the names of the importers. I do not accept the proposition that all information given to a government department is to be treated as confidential and protected from disclosure, but I agree that information of a personal character obtained in the exercise of statutory powers, information of such a character that the giver of it would not expect it to be used for any purpose other than that for which it is given, or disclosed to any person not concerned with that purpose, is to be

C  regarded as protected from disclosure, even though there is no statutory prohibition of its disclosure. But not all information given to a government department, whether voluntarily or under compulsion is of this confidential character and the question is whether the names of the importers of the furazolidone were given in confidence. I do not think that that is established. The names and addresses of the importers had to be given to

D  the master of the ship and made known to all those taking part in securing the transit of the chemicals. Presumably the parcels of furazolidone had on them the names and addresses of the consignees for all to see, though they may, I do not know, have not disclosed that the contents of the parcels were furazolidone. The documents completed for the transit of the chemicals and for Customs which show the names of the consignees and the contents of the parcels do not seem to me more confidential than

E  consignment notes completed for British Railways and British Road Services.

I do not doubt that a great deal of the information obtained by Customs is of a highly confidential character which it would be most improper for them to disclose but I do not consider that this information, even if it be of a confidential character, was of a highly confidential nature.

F  I do not forget that by section 127 of the Finance Act 1972, it is provided that no obligation as to secrecy or other restriction upon the disclosure of information imposed by statute or otherwise is to prevent the communication of information by the Commissioners of Inland Revenue to the Commissioners of Customs and Excise and vice versa, or that the disclosure of information obtained by one from the other is prohibited by section 127 (2), save for the purposes there specified, and I do not forget that by

G  section 3 of the Finance Act 1967, power is given to the commissioners to disclose, on it being notified to them by the Secretary of State that it is in the national interest, that certain information about imported goods should be given, and that, though by order the Secretary of State can add to the description of information which can be disclosed, he is expressly debarred from authorising the disclosure of the price of the goods or the name of

H  the importer.

I can well understand that Customs, taking the view that they are prohibited by law from disclosing information obtained by them, would require a provision expressly authorising disclosure to be included in these

Acts. The reasons for the prohibition in section 3 of the Act of 1967 of
the Secretary of State requiring information to be given as to the name of    A
an importer are not apparent from the section. It may have been, I do
not know, on account of the " candour " argument of Customs and Excise.

The inclusion of these provisions in these two recent Acts does not
appear to me to lead to the conclusion that the assumption that Customs
and Excise are prohibited by law from disclosing all information obtained
by them is well based. Much of the information they obtain is no doubt    B
of such a character that it is implicit that it is not to be used or disclosed
for any purpose other than that for which it is given. The question here is
whether the names of importers of furazolidone in infringement of the
patent are of that character.

For the reasons I have given I do not think they are. If any degree of
confidentiality is attached to them I think it must be a low degree. I must
confess that I am not in the least impressed by the " candour " argument.    C
I really cannot conceive it to be realistic to suggest that the vast majority
of importers who do not infringe patents or do other wrongs, will be in the
least deterred from giving proper information to Customs by the know-
ledge that pursuant to an order of the court the names of the wrongdoers
are disclosed by Customs.

Having said this, I want to make it clear that in my opinion Customs    D
and Excise have acted perfectly properly throughout these proceedings.
Applications for discovery by persons who are not sued and who have
done no wrong were a rare occurrence in the last century and are even
rarer in this. Customs are right to be solicitous for the interests of those
who give them information. They were right initially to refuse the
appellants' request. Indeed I think that it may well be that in cases which
are not absolutely on all fours with this, they would be right in future to    E
refuse disclosure except on the order of the court.

And the question is, should the court now order it? If a degree of
confidentiality does attach to the names and addresses of the importers, I
think that on the balance of national interest the interests of justice in this
case far outweigh any interest there may be in non-disclosure.

The appellants now only seek discovery of the names and addresses of    F
the consignees of the imported furazolidone in the last six years and,
in my opinion, that discovery should be ordered in the form which has
been agreed between the parties.

As to costs, I agree with the order proposed by my noble and learned
friend, Lord Reid.

For the reasons I have stated, in my opinion this appeal should be
allowed.    G

LORD CROSS OF CHELSEA. My Lords, on the appellants' summons for
inspection Graham J. held that the respondents had not infringed the
patent and that the goods were not liable to forfeiture under section 44 of
the Customs and Excise Act 1952, as " prohibited goods "; but that
nevertheless they were bound to disclose the names for which the appellants    H
were asking. His order dated December 8, 1971, which gave effect to
this decision was technically an interlocutory order but in reality it dis-
posed of all the issues raised in the consolidated actions. The respondents

A  appealed to the Court of Appeal which by a judgment given on March 27, 1972, agreed with the judge on the question of infringement and on the construction of section 44; but held that, even apart from the question of privilege, the respondents, not being infringers, were under no obligation to disclose the names of the importers; and that in any case it would have been contrary to the public interest to have ordered them to disclose them.  On their appeal to this House the appellants abandoned the con-

B  tention that the respondents had infringed the patent.  They did not, as I understood, abandon their contention that goods imported in infringement of a patent are goods " imported contrary to a prohibition in force with respect thereto under or by virtue of an enactment " within the meaning of section 44; but—in common I think with all your Lordships—I have no doubt that Graham J. and the Court of Appeal were right in rejecting this contention.  The action falls, therefore, to be treated as a pure action

C  for discovery and the questions to be decided are (A) whether in the circumstances the respondents, although not themselves infringers, would be bound—apart from any question of privilege—to make the discovery asked and (B) whether, if so, it would be contrary to the public interest to order them to make it.  For the purpose of answering these questions one must make three assumptions in favour of the appellants, *first* that

D  the patent is valid; *secondly*, that the patent has been infringed by importers whose names are known to the respondents; and *thirdly*, that the appellants cannot discover the identity of the infringers unless the respondents disclose it to them.

The most recent English authority to which the appellants could refer us in support of the proposition that the court can entertain an action by A against B in which the only relief asked is that B disclose to A the identity

E  of someone who has to his knowledge infringed A's rights, in order to enable A to bring an action against him is the case of *Orr* v. *Diaper* decided by Hall V.-C. in 1876 and reported in 4 Ch.D. 92 and, more fully, in 25 W.R. 23.  Unfortunately, however, in order to understand the argument and the judgment in that case it is necessary to plunge still further into the past and consider the practice of the Court of Chancery with regard to

F  bills of discovery.  I say " unfortunately " because the lawyer of today can at best have only a superficial understanding of a procedure developed when law and equity were administered in separate courts and the parties to common law actions were not permitted to give evidence.  A further source of difficulty is that the Chancery reports before the time of Lord Eldon L.C. often take the form of brief notes, which may have been useful to those for whose benefit they were published but mean very little to the modern

G  reader.  I am, therefore, far from confident that what I am about to say is an accurate summary of the position. One starts with the distinction which came to be drawn by equity lawyers between a bill of relief and a bill of discovery.  Since the ordinary Chancery bill asking for relief in equity always included a request that the defendant be ordered to answer on oath a number of interrogatories framed to elicit admissions which would help the petitioner to prove the case set out earlier in the bill it can be said

H  that every Chancery bill was in a sense a bill of discovery.  But a bill of discovery properly so called was a bill which simply asked for the disclosure of facts known to the defendant or of documents in his possession to aid the

petitioner in prosecuting or defending other proceedings and asked no other
equitable relief save, if the petitioner was the defendant to an action at law,
an injunction staying that action until the discovery was given.  A defendant
from whom discovery was sought either by a bill of relief or by a bill of
discovery might object to giving the discovery on the ground that he had no
" interest " in the proceedings but was " a mere witness " and ought not
to be compelled to give his evidence before the hearing.  To this rule
exceptions were allowed in the interests of justice but by the end of the 18th
century the list of exceptions was closed.  Further, what constituted an
" interest " for the purpose of the rule came to be defined.  In the case of a
bill of relief it was such an interest as that a decree could be made against
him or that he would be affected by the decree.  As to a bill of discovery it
was finally decided by this House in the *Queen of Portugal* v. *Glyn*, 7 Cl.
& F. 466 that such a bill could not be maintained against a person who
was not a party to the record in the action in aid of which the discovery
was sought even though he was deeply interested in its success.  It is,
incidentally, not without interest to observe that whereas in earlier days, in
particular at the time of the disputes between Lord Ellesmere L.C. and
Coke C.J., the common lawyers had bitterly resented the granting of injunc-
tions by the Chancellor staying proceedings at law where the defendant
could make out a prima facie case of fraud on the part of the plaintiff with
which the common law was unable to deal, in the case of the *Queen of
Portugal* v. *Glyn* it was common lawyers—Lord Abinger C.B. and Lord
Wynford—who thought that an injunction could and should be granted to
stay an action by an agent of the Queen on bills of exchange to which, if the
allegations in the bill were true, she was not " in conscience " entitled, whereas
it was the equity lawyer, Lord Cottenham L.C., who gave the leading speech
upholding the demurrer to the bill of discovery on the ground that the Queen
was not a party to the record at law and could in theory have been called
as a witness by the defendant.  But the " mere witness " rule has in principle
nothing to do with the question whether or not a defendant to a bill should
be obliged to disclose the identity of someone against whom the plaintiff
wishes to claim relief.  In such cases there can be no question of calling
the defendant to give the evidence at the hearing since without the dis-
closure of the name proceedings cannot be brought at all.  In this field it
was settled that if a party was properly made a defendant to a bill of relief
the petitioner was entitled to discovery from him of the existence or where-
abouts of other persons not parties in order that they might be made parties;
but whether one could bring a bill of discovery in order to find out whom
to sue in proceedings which you had not yet brought was not entirely clear.
On one side reliance could be placed on *Moodalay* v. *Morton*, 1 Bro.C.C.
469; 2 Dick. 652 decided in 1785 by Lord Kenyon M.R.  There the plaintiff
who said that the East India Company had granted him the right to supply
the inhabitants of Madras with tobacco for a term of years and that persons
who were servants of the company had dispossessed him and purported to
grant a lease of the right to someone else filed a bill of discovery against the
company and Morton their secretary asking them to disclose by whom and
under what authority the second lease had been made so that he might know
how to frame the action at law which he wished to bring in respect of the
injury done to him.  Obviously it was material for that purpose for him to

A   discover whether those who had dispossessed him were acting by the autho-
rity of the company or not.  That case differs from the present case in that
there the discovery might well have shown that the proper defendant to the
proposed action was in fact the person—the East India Company—from
whom discovery was sought; but that does not seem a very substantial
distinction.  Further in *Angel* v. *Angel* (1822) 1 L.J.O.S.Ch. 6 Sir John
Leach V.-C. appears to have regarded *Moodalay* v. *Morton*, 1 Bro.C.C.

B   469, as an authority showing that a " would be " plaintiff at law could
bring a bill of discovery in equity to discover against whom the action
should be brought.  On the other side reliance could be placed on some
language used by Lord Eldon L.C. in his judgment in *Mayor and Com-
monalty and Citizens of London* v. *Levy*, 8 Ves.Jr. 398, 402, 404—
though *Moodalay* v. *Morton* was not referred to in that case and the
decision can be justified on the ground that the bill was a " fishing enquiry "

C   by plaintiffs who were trying to find out whether their rights had in fact
been infringed.  It is noteworthy that Story in his *Equity Jurisprudence*,
2nd ed. (1839), para. 1483, states on the authority of *Moodalay* v. *Morton*
and *Angel* v. *Angel* that a bill of discovery may be brought when the
object of the discovery is to ascertain who is the proper party against
whom a suit should be brought and that as his note also contains a

D   reference to the *Mayor of London* v. *Levy* he presumably did not consider
that anything which Lord Eldon L.C. said in that case cast any doubt on
the general principle.

   With this by way of introduction one can now turn to *Orr* v. *Diaper*,
4 Ch.D. 92—though it is not irrelevant to bear in mind that since 1851 the
parties to civil actions at law had been able to give evidence and that by
the Judicature Act a single court had been established in place of the

E   separate courts of law and equity in which both law and equity could be
administered concurrently with the proviso that in case of conflict the rules
of equity should prevail.

   *Orr* v. *Diaper* was argued on demurrer.  The facts alleged in the
statement of claim which must be taken to have been true were that the
plaintiffs were manufacturers of sewing cotton which they packed in a

F   distinctive way and which was sold abroad in—among other countries—
Chile; that sewing cotton of an inferior quality packed according to their
style and bearing counterfeit tickets had been sold in Chile for the past
few years and that in April 1876 they discovered that the defendants who
were shippers in Liverpool had been for some years and were still " ship-
ping " these goods to Valparaiso.  On April 10, 1876, the plaintiffs' solicitors
asked the defendants to give them the names of the consignors and, on their

G   refusal to do so, started an action on April 25 asking for discovery of the
names and addresses of the consignors of the goods bearing the counterfeit
tickets—" in aid of proceedings now in contemplation by the plaintiffs to
restrain the piracy of the said tickets " which could not, as they said, be
maintained without the discovery sought.  There is no doubt that if these
allegations were established—and the demurrer of course proceeded on the

H   footing that they were established—the plaintiff could have obtained an
injunction against Messrs. Diaper, in proceedings framed for that purpose,
to restrain them from continuing to ship goods which were being " passed
off " as the plaintiffs' goods.  This appears from *Upmann* v. *Elkan*, L.R.