194

Lord Cross
of Chelsea        **Norwich Pharmacal v. Customs & Excise (H.L.(E.) )**        [1974]

12 Eq. 140; 7 Ch.App. 130.  The relevant facts there were that on June 14, A
1869, Messrs. Elkan who were continental forwarding agents carrying on
business in London received a letter from a firm in Hamburg saying that
they had shipped to them a case of cigars containing cigars of various
brands, requesting them to pay the duty thereon and to forward the contents
to various persons resident in England whose names and addresses were
given.  The case duly arrived and was warehoused with the St. Katharine's
Dock Company.  The plaintiffs who were cigar manufacturers discovered— B
somehow or other—that the cigars which were not of their manufacture
were packed in boxes bearing an imitation of their brand and on June 19
their solicitors told Messrs. Elkan, who said that up to that time they had
no reason to suspect that anything was wrong, that the cigars consigned
to them bore a forged brand.  After, as they said, verifying that this was
indeed the fact, Messrs. Elkan offered to give the plaintiffs the names of
the consignors and actually gave them the names on July 8.  Meanwhile, C
on July 1, the plaintiffs filed a bill against Messrs. Elkan and the dock com-
pany asking for an injunction to restrain Messrs. Elkan from removing the
cigars from the docks and from infringing their mark and asking for dam-
ages.  They obtained an ex parte injunction on July 2.  A motion for
interim injunction was made on July 8 which stood over until July 15 on
Messrs. Elkan giving an undertaking, and on July 15 the injunction was D
granted—Messrs. Elkan expressing their willingness to act as the court
should direct but saying that they preferred to have an injunction granted
against them to simply continuing their undertaking.  When the suit came
on the court held that Messrs. Elkan were not privy to the infringement
of the mark and the dispute became a dispute as to costs—but to resolve
it the court had to decide what were the rights and duties of the parties on
the footing that Messrs. Elkan had no knowledge of the fraud before the E
plaintiffs' solicitors told them of it.  Lord Romilly M.R., at p. 145, expressed
the view that as soon as Messrs. Elkan were told of the fraud it was their
duty to give the plaintiffs the information as to the identity of the consignors
for which they were asking and to undertake that the goods should not be
taken from the warehouse until the spurious brand had been removed.  He
added that persons in the position of Messrs. Elkan could not reasonably F
complain if proceedings were started against them before they gave the
information.  It was their misfortune that they had dishonest correspon-
dents.  In the result on Messrs. Elkan undertaking that if any fresh cigars
should be sent to them bearing the plaintiffs' brand they would at once
give the plaintiffs notice, he made no order as to costs as between the plain-
tiffs and Messrs. Elkan—leaving each side to pay its own.  That decision
was affirmed on appeal by Lord Hatherley L.C. who agreed with what G
Lord Romilly M.R. had said as to the duty of Messrs. Elkan on hearing
of the fraud.

    To return now to *Orr* v. *Diaper*, 4 Ch.D. 92—counsel for the defendant
pointed out that the action was a pure action for discovery, that no relief
was asked against his clients beyond the disclosure of names to enable the
plaintiff to bring proceedings against the consignors, and he submitted that
the " mere witness " rule applied.  When Hall V.-C. asked whether the H
plaintiff could not add to his suit a claim for relief in equity against the
defendant counsel referred to the rule (laid down by Lord Eldon L.C. in

A  *Butterworth* v. *Bailey* (1808) 15 Ves.Jun. 358) that a bill of discovery could
not be turned by amendment into a bill for relief.  The Vice-Chancellor—
perhaps unfortunately—did not call on counsel for the plaintiff.  If he had
done so it may be that counsel would have pointed out that the " mere wit-
ness " rule could have no application to a case where all that was being asked
for was the identity of a wrongdoer whom the plaintiff would be unable to
sue unless the defendant gave it to him.  As it was the judge overruled

B  the demurrer on the ground that the defendant was not a " mere witness "
because on the facts taken to be admitted the plaintiff could have obtained
*an injunction against him if he had chosen to apply for one.*  To make the
right of a plaintiff to obtain the sort of discovery which was being sought in
*Orr* v. *Diaper* and is being sought in the present case dependent on whether
or not the plaintiff could have obtained some relief against the defendant
if he had chosen to ask for it is to my mind utterly illogical.  Suppose that

C  Diaper after having innocently and unwittingly shipped infringing goods for
some consignor for several years had gone out of business shortly before
the plaintiff asked him for the consignor's name.  In such a state of facts
the plaintiff could not have obtained any relief against him since he was
not continuing to ship infringing goods nor was there any danger that he
would do so in the future.  Yet if Lord Romilly M.R. and Lord Hatherley

D  L.C. were right in saying that a man who has become innocently mixed up in
fraudulent trading is under a duty to disclose the name of the wrongdoer to
the injured party in order to enable him to bring his action that duty must
be just the same in a case where because, for example, some infringing
goods are still in his possession an injunction could be obtained against
him and a case such as I have supposed where it could not.  Bray, in his
well-known work on *Discovery* published in 1885 treats *Orr* v. *Diaper*,

E  4 Ch.D. 92 as a modern example of what he regards as the old principle that
a bill of discovery might be filed against a person in order to discover the
names of other persons for the purpose of bringing an action against them
although no proceedings were to be brought against the defendant to the
bill—and makes no reference to the fact that in *Orr* v. *Diaper* it so
happened that such proceedings could have been brought—see the note

F  on p. 40.  On p. 614 he suggests that the language used by Lord Eldon
in *Mayor of London* v. *Levy,* 8 Ves.Jun. 398 " perhaps requires some little
qualification."  The same view of *Orr* v. *Diaper* was taken in 1887 by the
Supreme Court of Massachusetts in *Post* v. *Toledo, Cincinnati and St.
Louis Railroad Co.* (1887) 11 N.E.Rep. 540.  There an Ohio corporation had
recovered judgment in Ohio against another Ohio corporation under whose
statutes its stockholders were personally responsible for its debts.  The

G  business of the debtor corporation was conducted in Massachusetts and the
creditor corporation brought a bill of discovery in the court of that state
against the debtor corporation and its officers who were resident in Massa-
chusetts for discovery of the names of its stockholders so that the creditor
corporation could take proceedings against them in Ohio.  Although the
debtor corporation was made a defendant it was not served with the bill

H  since there was no way in which effectual service could be made on it.  So
in substance the only defendants to the bill were the officers of the cor-
poration against whom no relief was or could be claimed.  They demurred
to the bill.  In support of the demurrer it was argued that Lord Eldon's

decision in *Mayor of London* v. *Levy*, 8 Ves.Jun. 398 was inconsistent with
the badly reported earlier cases such as *Moodalay* v. *Morton*, 1 Bro.C.C.       A
469 that Hall V.-C. could not have meant to overrule a decision of Lord
Eldon universally accepted for 75 years and that *Orr* v. *Diaper*, 4 Ch.D.
92 should be treated as a special case not to be followed unless the facts
were exactly the same. On the other side it was said that if a plaintiff
could obtain from a person whom he had properly made defendant to a
bill for relief discovery of the names of other parties necessary to be made       B
defendants to the suit, why should he not be able to bring a bill of discovery
against persons against whom he could claim no relief in order to obtain
the names of defendants to a proposed action which he could not bring
unless he knew the names?—*Orr* v. *Diaper* was cited in support of that
argument.

In overruling the demurrer the court said, 11 N.E.Rep. 540, 547:

    " The present case must be determined by the principles declared in      C
the few cases where the plaintiff does not know the names of the
persons against whom he intends to bring a suit, and brings a bill
against persons who stand in some relation to them, or to their
property, in order to discover who the persons are against whom he
may proceed for relief. . . . It is settled that a bill of discovery may
be maintained to aid the plaintiff in a suit which he intends immediately      D
to bring, as well as in a suit already brought, if the bill discloses a cause
of action; and the difficult question is under what circumstances may
such a bill be maintained for the purpose of ascertaining the proper
parties against whom the suit should be brought."

The court then pointed out that the facts in *Mayor of London* v. *Levy*,
8 Ves.Jun. 398 were not such as required Lord Eldon to overrule *Moodalay*      E
v. *Morton*, 1 Bro.C.C. 469 and that in fact no reference is made to that
case in his judgment and they quote *Orr* v. *Diaper*, 4 Ch.D. 92 for the
proposition that under some circumstances discovery may be had for the
purpose of ascertaining the persons against whom the plaintiff may bring
a suit although he does not allege that he has a cause of action against
or intends to sue the persons who are the defendants in the proceedings
for discovery. They then state their conclusion on the facts in the case      F
before them as follows, at p. 547:

    " It is clear that courts do not compel discovery from persons who
sustain no other relation to the contemplated litigation, or to the
subject of the suit, than that of witnesses; and it is also clear that a
bill for discovery cannot be used to enable a plaintiff to fish for
information of any causes of action he may have against other persons      G
than the defendant. . . . But when a plaintiff has a cause of action
against persons who are defined either by statute, or by their relations
to property or a business by the management of which the plaintiff
has suffered injury, and the names and residences of these persons are
unknown to him, it is not clear that there may not be such a state of
facts that a court ought to compel a discovery of the names and      H
residences of these persons from their agents in charge of the property
or business; and the decisions recognise that this may sometimes be
done. In the present case it is the duty of the corporation to pay

A the plaintiff's judgment if it have sufficient assets. A part of its assets for that purpose is the liability of its stockholders. The corporation acts only through its directors and other principal officers; and it is necessary that the plaintiff, in order to enforce the liability of the stockholders, and thus obtain satisfaction of its judgment, should bring suit against the corporation and all its stockholders; and the plaintiff, except by discovery, cannot ascertain who these stockholders are."

B I find that case of great assistance in the solution of the problem before us in this case. The court which decided it was of high standing; it was decided in the light of the old English Chancery authorities which as the case was decided as long ago as 1887 the judges were probably in a better position to understand than we are; and it lays down a reasonable principle by which to judge whether a plaintiff should have this sort of discovery.

C To make his right depend on whether or not he could obtain some other relief against the defendant is to my mind quite irrational. The court in *Post's* case, 11 N.E.Rep. 540 makes it depend on the nature of the relation which subsists or subsisted between the defendant to the action for discovery and the persons the disclosure of whose names is sought. In that case the relation was that of agents in charge of the undertaking of which the persons whose names were sought were in effect the owners.

D In cases such as *Upmann* v. *Elkan*, L.R. 12 Eq. 140 and *Orr* v. *Diaper*, 4 Ch.D. 92 the relation was that of persons engaged by the tortfeasor to deal with the goods in question and who in the course of doing so unwittingly facilitated the commission of the tort. In my judgment no sensible distinction can be drawn in applying the *Post* case principle between the position of the respondent commissioners and the position of Diaper

E or Messrs. Elkan or the St. Katharine's Dock Company. It is true that Messrs. Elkan were under no obligation to enter into the business relations with the dishonest consignors which made them unwitting facilitators of a fraud whereas the commissioners were under a statutory duty to bring under their control for the purpose of exacting duty these infringing imports of furazolidone. But the fact remains that these goods passed through their hands and—assuming that they cannot claim privilege on the grounds

F of public interest—I cannot see any reason why they should not be under the same duty to disclose the names as the dock company who owned the transit shed in which the imports were stored under the surveillance of customs officers. The dock company would certainly have been bound to give discovery of the names if the plaintiffs discovered the furazolidone was in a particular transit shed and that the dock company who were in possession of it knew the names of the importers. If so, why not the

G commissioners who had effective control of the goods?

   That being my conclusion on this part of the case I do not find it necessary to express any opinion on a point to which a good deal of argument was devoted—namely, whether the appellants could have obtained against the commissioners the equivalent of an injunction in the shape of a declaration that they ought not to give clearance to imports of fura-

H zolidone without giving the appellants the name of the importers.

   This brings me to the claim of privilege. In his affidavit sworn on April 28, 1971, Sir Louis Petch put the claim on two grounds; first, that the

commissioners were not entitled to disclose the information requested even
if they wished to do so and, secondly, that assuming that they had the
power to give it the disclosure would be contrary to the public interest. Mr.
Oliver in his able and candid argument wisely did not seek to support the
first ground.  Of course a statute may provide that information of a certain
character shall not be disclosed even for purpose of legal proceedings.  An
example of such a prohibition is section 17 (2) of the Agricultural Marketing
Act 1931, which was considered in *Rowell* v. *Pratt* [1938] A.C. 101.  But
the commissioners are not prohibited by statute from disclosing the names
of importers.  No doubt the commissioners consider very properly that they
ought to treat as confidential and not voluntarily to disclose even to another
government department information which comes to them as a result of the
exercise of the powers given to them by the Customs and Excise Act 1952,
for the purpose of enabling them to collect the revenues of customs and
excise.   Section 3 of the Finance Act 1967, and section 16 (9) of the
Agriculture Act 1970, to which Sir Louis refers—and also section 127 of
the Finance Act 1972, passed after he had sworn his affidavit, were enacted
in order to make it clear that the obligation of secrecy which the com-
missioners very properly consider to be binding on them as a general rule is
not to apply in the cases there specified.  But this has nothing to do with
disclosure under an order of the court for the purpose of legal proceedings
—whether criminal or civil, for outside the field of legal professional pri-
vilege the fact that information has been imparted confidentially is not—in
the absence of an express statutory prohibition—any bar to the court order-
ing its disclosure.   Then is it contrary to the public interest that this
information should be disclosed?   This problem falls to be considered
under two heads—first, from the point of view of the individuals who have
supplied the information; secondly, from the point of view of the efficiency
of the Customs.  Now on the admitted facts in this case the great majority
of those whose names will be disclosed have infringed the appellants'
patent and it does not lie in their mouths to complain that their identity
is revealed.  It is no doubt conceivable—though most unlikely—that some
persons who bought furazolidone from the appellants and exported it for
sale abroad have re-imported it.  Such people, if they exist, might possibly
dislike their identity being disclosed—but in this connection we should bear
in mind that the information in question is given to many others besides the
commissioners.  The shippers, the master of the ship and the employees of
the owners of the transit sheds or warehouses in which the goods are stored
will all know or have means of getting to know the names of the importers.
This information accordingly cannot fairly be regarded as highly con-
fidential information in the hands of the commissioners.  I turn now to
the effect of the disclosure on the efficient working of the Customs service.
Sir Louis says that he is afraid that the good relations and mutual con-
fidence which usually exist between the officers of the Customs and traders
would be seriously impaired if it became known that any information of a
confidential character obtained from traders under statutory powers might
have to be disclosed by the commissioners otherwise than under the
provisions of a statute enabling them to disclose it.  The traders whose
good relations with the Customs Sir Louis is anxious to maintain are,
presumably, honest traders.  Any honest trader who was disturbed at the

A.C.          Norwich Pharmacal v. Customs & Excise (H.L.(E.) )          Lord Cross
                                                                         of Chelsea

A  thought that a court could order the disclosure of importers' names in cir-
cumstances such as exist here would be a most unreasonable man and I
cannot believe that there would be many such.  No doubt dishonest traders
might be disturbed by the knowledge that such disclosure could be ordered,
and Sir Louis gives it as a further ground for the claim of privilege that
dishonest traders who now tell the Customs the truth with regard to the
character of the goods and the identity of the importers may be driven to
B  giving false information.  An argument that one should not try to stop one
form of wrongdoing out of fear that some of the wrongdoers may take to
committing yet further offences in order to be able to maintain their
original course of wrongdoing is not very attractive.  But in any case I
think that Sir Louis' fears on this head are exaggerated.  On the question
of public interest I agree with Graham J. and disagree with the Court of
Appeal.  I would therefore allow the appeal and I agree that the costs should
C  be dealt with in the manner proposed by my noble and learned friend,
Lord Reid.

   In the course of the argument fears were expressed that to order dis-
closure of names in circumstances such as exist in this case might be the
" thin end of the wedge," that we might be opening the door to " fishing
requests " by would-be plaintiffs who want to collect evidence or the requests
D  for names made to persons who had no relevant connection with the person
to be sued or with the events giving rise to the alleged cause of action but
just happened to know the name.  I think that these fears are groundless.
In the first place, there is a clear distinction between simply asking for the
name of a person whom you wish to make a defendant and asking for
evidence.  This case has nothing to do with the collection of evidence.
Secondly, although in any case which was on all fours with this case or any
E  subsequent case which may be decided the commissioners or any other
person who was asked for a name would no doubt give it without putting
the applicant to the expense of obtaining an order of the court; in any
case in which there was the least doubt as to whether disclosure should be
made the person to whom the request was made would be fully justified
in saying that he would only make it under an order of the court.  Then
F  the court would have to decide whether in all the circumstances it was
right to make an order.  In so deciding it would no doubt consider such
matters as the strength of the applicant's case against the unknown alleged
wrongdoer, the relation subsisting between the alleged wrongdoer and the
respondent, whether the information could be obtained from another
source, and whether the giving of the information would put the respondent
to trouble which could not be compensated by the payment of all expenses
G  by the applicant.  The full costs of the respondent of the application and
any expense incurred in providing the information would have to be borne
by the applicant.

   LORD KILBRANDON.  My Lords, the facts which are basic to the question
of law arising in this appeal lie in very narrow compass.  Between May
H  1967, and February 1970, there were in six individual months importations
into the United Kingdom of furazolidone, a chemical substance of which
the first appellants are patentees in U.S.A., and the second appellants
(whom I shall refer to as " the appellants "), are exclusive licensees in the

**Lord Kilbrandon**    Norwich Pharmacal v. Customs & Excise (H.L.(E.) )    **[1974]**

United Kingdom. While it is possible, it is commercially very improbable, that some of these importations may have included importations or re-importations of the patented article manufactured by or under licence from the appellants. In spite of some unhappy ambiguities in the appellants' pleadings, it is right that the appeal should be decided on the footing that the importers of these parcels of furazolidone are by their use of the substance infringers in the United Kingdom of the appellants' patent right, could be restrained by law from future infringement, and are liable in law for the pecuniary consequences of their past infringements.

The appellants have come to know of these infringements through the publication by the respondents, the Commissioners of Customs and Excise, of monthly Special Chemical Returns prepared by them and made available by them to the chemical industry. The name of the importer, otherwise "infringer," does not appear in the return. I do not think it is necessary to go into the details of the compilation of, and the sources of information for, the respondents' published statistics. Nor do I need to refer, except in the broadest way, to the procedures governing the passage of imported goods through customs. In the present context, that is the disclosure of names of importers, it is enough to say that, on the arrival of a ship (or aircraft) at a customs port, the master has to prepare, sign and deliver to customs a "report" of his ship and her lading, which report contains a description of each purchase of goods and the name of the consignee thereof, while the importer or his agent must prepare, sign and deliver to customs a form of "entry" specifying the description, quantity, tariff code number and value of goods consigned to him. No goods can be released out of customs' charge until these forms have been presented, and the appropriate duty paid.

The case has been conducted on the footing that it is impossible for the appellants to find out the names of the infringers of their patent unless the respondents disclose them. The respondents refuse to do so, and the present action, as it is now maintained, is like the old bill of discovery in as much as it prays for no relief, but seeks an order for discovery only. This is not by any means the extent of the claim against the respondents which was before the courts below. Until the appeal was opened in your Lordships' House, the appellants were claiming a declaration that the respondents had infringed, or caused, enabled or assisted others to infringe their patent, a declaration that it was the respondents' duty to forfeit the imported furazolidone, and an order that they make a complete discovery of documents relating to the importations.

It will be convenient to consider first whether such an application as this would succeed against a person not in the position of a department of State, that is, treating as a separate and subsequent question whether any special considerations of public policy apply to such bodies as the Commissioners of Customs and Excise. It is easy to envisage a dock authority, probably operating under powers conferred in a local Act within the frame-work of the Harbours Clauses Act 1847: the authority is empowered to demand sight of a ship's manifest, or otherwise obtain a detailed account of her cargo, broken down into quite narrow categories, in order that the dock charges appropriate to each category of goods can be calculated and imposed. There will be some provision for the detention of goods in the dock area until dues are paid, and the authority will necessarily be aware

A  of the names of the consignees. The dock authority is apprised that the importation of certain goods which passed through the port infringed a patent conceded to be valid—as the respondents concede for the purposes of the present case—and the patentee can get no remedy unless the dock authority disclose the names of the patentee. To make the comparison completely valid, and with an eye to some of the precedents to which it will be necessary to refer, it must also be predicated not only that the

B  patentee has no intention of bringing suit against the dock authority for any relief other than discovery, but also that he has no ground in law or equity for doing so. That would, I apprehend, be the situation if the goods were no longer in the control of the authority, and if there were no grounds which would support an application for an injunction against them at the instance of the patentees in respect of future importations.

C  Among the large number of cases cited to us, I believe it is not possible to find a precedent for the granting of an application for discovery in the precise circumstances I have figured. Indeed, I think I can greatly shorten what I have to say on this topic, which is of a technical character involving an expert knowledge of English legal history in the nature of things denied to me, by saying that I respectfully agree with the analysis made in the Court of Appeal by Buckley L.J. of the cases of *Upmann* v. *Elkan*, L.R. 12

D  Eq. 140 and *Orr* v. *Diaper*, 4 Ch.D. 92; 25 W.R. 23. These seem to be generally regarded as the root cases on the subject, especially perhaps the latter since it post-dates the Judicature Act 1873, and are widely cited as leading cases in the foreign jurisdictions to which we were copiously referred. In both cases the plaintiff claimed to have a right of action against the defendant arising out of the import or export of goods masquerading as his own; in *Upmann*, too, the defendant had refused, wrongly as Lord

E  Hatherley L.C. held, to disclose the names of the twenty consignees. In *Orr* v. *Diaper*, while the plaintiff had no intention of suing the defendant, he alleged in his statement of claim that the defendants " had been for some time and were still shipping " the offending goods; this statement was made after the defendants had acquired knowledge of the offences. This is no doubt the foundation for Hall V.C.'s observation that the plaintiffs showed a right to sue the defendants at law, " which expression,

F  since the change made by the Judicature Acts, must mean this court, in some other proceeding (25 W.R. 23, 25)."

  In *Moodalay* v. *Morton*, 1 Bro.C.C. 469, as I read it, the plaintiff had an action not only against the person who had infringed his right of property by purporting to give it to another, but also against the East India Company if that person turned out to be their servant or agent. With

G  special reference to that case, I would heartily agree with some remarks made by the Vice-Chancellor in *Angel* v. *Angel* (1823) 1 L.J.O.S.Ch. 6, 8. (Presumably the reference in the quotation is to *Mitford's Chancery Pleadings*):

> " In the several cases to be found in the reporters, the expressions are for the most part indistinct and confused; and Lord Redesdale, adher-

H  ing to the language of these authorities, has, with their words, adopted in some measure their inaccuracies and obscurities."

We were offered two reports of the judgment in *Moodalay*, one by Brown,

Lord Kilbrandon    Norwich Pharmacal v. Customs & Excise (H.L.(E.) )    [1974]

which was criticised by the Vice-Chancellor in *Angel*, 1 L.J.O.S.Ch. 6, 9, A
and the other by Dickens; they are entirely different from one another.
Both cannot be authentic, so I suppose it is possible that neither of them is.
We were shown at least three versions of the judgment in *Orr* v. *Diaper*;
the Court of Appeal made a point of preferring that in the Weekly Reporter
to that in the Law Reports. The former is certainly fuller and easier to
follow, but for all I know it was deliberately altered by the learned judge
on revision. These considerations made one reluctant to rely on the old B
cases except in so far as they deal with the actual subject matter arising
for decision in them. To erect on them a structure of principles which
should guide a modern court in the administration of justice seems to me
to be building on quicksands. If, without the positive assistance of the
ancient precedents, it seems possible to identify principles prima facie
acceptable, the only limitation to their adoption might be to see whether
these principles had ever been authoritatively negatived. C

A case which gives rise to some difficulty is *Queen of Portugal* v.
*Glyn* (1840) 7 Cl. & F. 466. One Soares sued Glyns to recover the proceeds
of certain bills. Glyns filed a bill of discovery against Soares and the
Queen, alleging that Soares was a mere agent for the Queen. The Queen
demurred; in the demurrer Glyns' averments had to be accepted pro veritate.
The House, reversing the decision of Lord Abinger C.B., Lord Wynford D
dissenting, sustained the demurrer, on the ground that since the Queen was
not a party to the record in the action at law, she could not be made respon-
dent in the bill of discovery in equity. The case exhibits some curious
features. The appeal was heard in 1837; judgment was given more than
3 years later, after an unusually controversial debate. The case is ignored
by Bray (1885), by Story (1892) and by Snell in his first edition (1868), being
the only one published before the Judicature Acts. The sole reference to E
it in *Halsbury's Laws of England*, 3rd ed., vol. 1 (1952), para. 528, n. (i), is
under " Agency," not " Discovery." Two decisions (1892 and 1906) of the
Court of Appeal are there cited in support of the proposition,

> " In any action brought by an agent, the defendant is entitled to dis-
> covery from the principal as fully as if he were the plaintiff on the
> record, even though he is a foreign principal." F

The footnote concludes, " But see *Queen of Portugal* v. *Glyn*," which
certainly appears to decide the contrary.

The case was not included in the extensive citation before the Court of
Appeal. Since much of the rather acrimonious discussion in this House
related to the technical requirements of bills in Chancery, the opinion may
be ventured that the case, at least since 1873, has not been regarded as G
authoritative; in any event it does not deal with the problem of discovery
for the purpose of finding the name of a proposed defendant. This point
is made in *Bray on Discovery* (1885), note to p. 40, contrasting *Queen of
Portugal* with *Orr* v. *Diaper*, 4 Ch.D. 92.

Assuming that there are some characteristics attaching to a defendant in
such an issue, which will be decisive of the question whether he can be H
called on to make discovery in order to enable the plaintiff in that issue to
maintain a just cause of action against a third party, it seems to me
incredible that one of those characteristics should be the defendant's

A    vulnerability in an action brought against him by the plaintiff.  Why should A be bound to disclose to B the information which he must have before he can sue C if, and only if, B could, if he wished, also have sued A, although he has no intention of doing so?  There is no rational distinction observable here.

This may be the place to dispose of the "mere witness" rule.  It is settled, rightly or wrongly, that you cannot get discovery against someone B who has no connection with the litigious matters other than that he might be called as a witness either to testify or to produce documents at the trial. We are not here in that territory.  The defendant is not a mere witness, or any kind of witness, because the whole basis of the application is that, until the defendant has disclosed what he knows, there can be no litigation in which he could give evidence.  Furthermore, if he were to disclose, either voluntarily or under compulsion, the names of the third parties whom the C plaintiff desires to pursue, even then he might well not be a witness in the ensuing litigation.  He might have no evidence to give; what he knew would not necessarily be required post litem motam.

The most attractive way to state an acceptable principle, intellectually at least, may be as follows.  The dispute between the plaintiff and the defendants is of a peculiar character.  The plaintiff is demanding what he D conceives to be his right, but that right in so far as it has patrimonial substance is not truly opposed to any interest of the defendants; he is demanding access to a court of law, in order that he may establish that third parties are unlawfully causing him damage.  If he is successful, the defendants will not be the losers, except in so far as they may have been put to a little clerical trouble.  If it be objected that their disclosures under pressure may discourage future customers, the answer is that they should be having no E business with wrongdoers.  Nor is their position easily distinguishable from that of the recipient of a subpoena, which, in total disregard of his probable loss of time and money, forces him to attend the court for the very same purpose as that for which discovery is ordered, namely, to assist a private citizen to justify a claim in law.  The policy of the administration of justice demands this service from him.

F    But it is not necessary, in such a case as is being figured, to go as far as this.  The defendants are not mere bystanders—although even if they be such they could in due time be called on to give oral evidence.  The position in which they find themselves has been described in several ways; in a rather different context Lord Romilly M.R. in *Upmann* v. *Elkan*, L.R. 12 Eq. 140, 147 said of the importer that he was "mixed up with the transaction," and, of the dock company who were mere warehousemen, that "in G many respects the position of the dock company does not differ from his [the importer's]."  Again, the case of *Post* v. *Toledo, Cincinnati and St. Louis Railroad Co.* (1887) 11 N.E.Rep. 540, in which the Supreme Judicial Court of Massachusetts reviewed all the earlier English authorities, was concerned to state at p. 547

H    ". . . the principles declared in the few cases where the plaintiff does not know the names of the persons against whom he intends to bring a suit, and brings a bill against persons who stand in some relation to them, or to their property, in order to discover who the persons are against whom he may proceed for relief."

These words appear to me to provide an apt, and by no means too wide, A
classification of those against whom discovery may in such circumstances
be obtained, though I think the court, perhaps misled by the fact that they
had available only the report at 4 Ch.D. 92, may have been wrong in saying
that in *Orr* v. *Diaper* the plaintiffs neither alleged that they had a cause
of action nor intended to sue the defendants. But the state of the reports
does not make this clear.

Turning, then, from the imaginary dock authority we have been con- B
sidering to the Commissioners of Customs, do they stand in some relation
to the goods which makes the commissioners bound to disclose, on an
order of the court, the names of the persons who imported them in pre-
judice of the plaintiffs' rights, in order to enable them to sue? In my
opinion they do. The goods are at the order of the commissioners from
the time they enter the customs port until they go out of customs charge.
The goods are reported to them in detail, are directed by them to a parti- C
cular transit shed, and are constructively in their possession and control
in the sense of being removable only on their authority; the commissioners
have the goods under their control so that they can exact in respect of them
the duties authorised by the legislature. The importation of these goods
infringes the plaintiffs' property right, and the functions which they perform
must I think place the commissioners in a relation with the importers which D
entitles the plaintiffs to demand from them the names of the infringers.

As I have said, I do not know of any direct authority which will support
such an entitlement. But the proposition seems to be not inconsistent with
the ratio of the judgments in *Upmann*, L.R. 12 Eq. 140, *Post*, 11 N.E.Rep.
540, and *Hunt* v. *Maniere*, 34 Beav. 157. What is more important, if one
is searching for principles rather than collating decisions, is that there are
broad statements to be found in authoritative sources which are in harmony E
with the spirit of the decisions, and do not seem to depend on any seemingly
extraneous fact, such as the liability of the defendant in discovery to be
sued, which, as I have said, has in my view no bearing on the liability to
discover in a suit proposed to be brought against a third party. *Bray on
Discovery* (1885), at p. 612 says (of the old Chancery practice, with which
the present action is said to be on all fours),

F
    " A party might file a bill of discovery before he commenced his action,
    where he required discovery in order to ascertain what form of action
    to bring: or in order to ascertain the proper person against whom to
    bring the action : "

he cites inter alia *Orr* v. *Diaper*, 4 Ch.D. 92, *Angel* v. *Angel*, 1 L.J.O.S.
Ch. 6, and *Moodalay* v. *Morton*, 1 Bro.C.C. 469. Story J., in his *Commen-
taries on Equity Jurisprudence*, 2nd Eng. ed. (1892), at p. 1011 says: G

    " in general, it was necessary, in order to maintain a bill of discovery,
    that an action should be already commenced in another court, to which
    it should be auxiliary. There were exceptions to this rule, as where
    the object of discovery was to ascertain who was the proper party
    *against whom the suit should be brought.*"

H
After citing, among other cases, *Moodalay* v. *Morton*, the learned editor
of this edition (W. E. Grigsby) goes on to explain the effect on that excep-
tion of the Judicature Act 1873, as exemplified by *Orr* v. *Diaper*. The

A  first edition of this work was published in 1838, and Snell (whose 1st edition is dated 1868) appears to adopt Story freely: his account is very similar.

In another jurisdiction a similar principle has been applied. In *Colonial Government* v. *Tatham* (1902) 23 Natal L.R. 153, while the familiar relationship of agency could perhaps have been said to make the defendants liable in discovery, the basis is put much more broadly, first by Bale C.J. and Finnemore J. After quoting *Orr* v. *Diaper* they say at p. 157:

B      "Before granting such an application we must be satisfied that the applicant believes that he has a bona fide claim against some person or persons whose names he seeks to discover, and whose name can be supplied by the respondent, and that he has no other appropriate remedy. We are satisfied upon these points ":

C  agency does not seem to have been founded on. Beaumont A.J. refers to the passages in Story to which I have adverted, and says, at p. 158:

       "The principle which underlies the jurisdiction which the law gives to courts of equity in cases of this nature, is that where discovery is absolutely necessary in order to enable a party to proceed with a bona fide claim, it is the duty of the court to assist with the administration of justice by granting an order for discovery, unless some well-founded
D      objection exists against the exercise of such jurisdiction."

I observe that here the duty is said to lie rather on the court to make an order necessary to the administration of justice than on the respondent to satisfy some right existing in the plaintiff. In *Hart* v. *Stone* (1883) 1 Buch. App.Cas. 309, 314, de Villiers C.J. had cited *Voet* as authority for saying that " the judges had very large powers of ordering a disclosure
E  of facts where justice would be defeated without such a disclosure." And in another civil law system, though the example is rather on the margin of relevance, Erskine, in his *Institute of the Law of Scotland* (1838 ed.), at III, Tit. VIII, 54, 55, after pointing out that Scots law had borrowed from Rome the doctrine that the heir is entitled, on succeeding, to deliberate whether his heriditas is to be damnosa or lucrosa (for he will be liable, unless he renounce the succession, for his ancestor's debts), says (56) that
F  the heir has

         " a privilege to pursue for exhibition ad deliberandum, against all possessors, or havers, of writings, whether granted in favour of the ancestor, or by him in favour of others; "

There is no suggestion that in so doing he is pretending to exercise any
G  right of relief against the discoverers.

In my opinion, accordingly, the respondents, in consequence of the relationship in which they stand, arising out of their statutory functions, to the goods imported, can properly be ordered by the court to disclose to the appellants the names of persons whom the appellants bona fide believe to be infringing these rights, this being their only practicable
H  source of information as to whom they should sue, subject to any special right of exception which the respondents may qualify in respect of their position as a department of state. It has to be conceded that there is no direct precedent for the granting of such an application in the precise

**Lord Kilbrandon    Norwich Pharmacal v. Customs & Excise (H.L.(E.))    [1974]**

circumstances of this case, but such an exercise of the power of the court seems to be well within broad principles authoritatively laid down. That exercise will always be subject to judicial discretion, and it may well be that the reason for the limitation in practice on what may be a wider power to order discovery, to any case in which the defendant has been " mixed up with the transaction," to use Lord Romilly's words, or " stands in some relation " to the goods, within the meaning of the decision in *Post*, 11 N.E.Rep. 540, is that that is the way in which judicial discretion ought to be exercised.

I will now turn to an aspect of that public policy which, exceptionally, protects from disclosure, either by discovery or testimony, communications which public policy decrees shall be held confidential. The commonest example arises from the relationship between attorney and client. The aspect relied on by the respondents in the present appeal is that usually but not very happily called " Crown privilege."

The defendants base their claim to refuse discovery on two broad grounds. First, they say they are not permitted by law to disclose matters which they have acquired in the course of the exercise of their statutory functions and have no statutory authority to disclose. They found on section 3 of the Finance Act 1967, as authorising limited disclosure, and impliedly by therefore forbidding wider disclosure. But we are here considering the power of the court to make an order. *Rowell* v. *Pratt* [1938] A.C. 101 provides an instance of a statute which authorises the gathering of information, and also limits disclosure of it so as to prevent the court from exercising such a power. This is not such a case. It was conceded that, for example, the information here called for would in practice be disclosed by the respondents on their own responsibility if that course were shown to be necessary for the prosecution of, or the defence in, criminal proceedings of a grave character, even other than customs prosecutions. If that be so, the court must, in my opinion, be entitled to call for the same sort of information in order to make possible the prevention of a civil wrong.

The other objections were, if I may say so, of a rather stereotyped and unconvincing character. It was said that disclosure of names would, as it were, drive future infringements underground, giving rise to falsehoods, frauds, forgeries and circumventions, so that, as experience in the U.S.A. has shown, the last state of matters would be worse than the first. Even if this plea involved no element of exaggeration, I would not favour refusing to stop one glaring fraud lest another be substituted for it. Lastly came the " candour " point—that if the persons now under statutory obligation to make disclosure to customs in the course of their business come to appreciate that, in certain circumstances, the names of importers may have to be disclosed to the court, the good relations which now exist between them and the defendants would be endangered, and they might not give the information required by statute with their customary candour. Some such argument is generally accepted as convincing when the confidential relationship between the tax-payer and the Inland Revenue is in question. The information here sought is, however, to be found in documents very different from income tax returns. It exists in bills of lading, ships' manifests, masters' " reports," and the records of the keepers of transit sheds, quite apart from " entries " made by importers. This is not a

A.C.    Norwich Pharmacal v. Customs & Excise (H.L.(E.))    Lord Kilbrandon

A  conclusive factor, but it is in my opinion an important factor which the
court should take into account in exercising its judgment as to whether
public policy demands that this information be treated, exceptionally, as
confidential and immune from disclosure on an order of the court. In my
opinion, public policy does not so demand.

I agree with the judgment of Graham J., and would accordingly allow
this appeal. I also agree with the order as to costs proposed by my noble
B  and learned friend on the Woolsack.

*Appeal allowed.*

Solicitors: *Allen & Overy; Solicitor, Customs and Excise.*

J. A. G.

C

---

[HOUSE OF LORDS]

D  DAVIES (A.P.) (SUING AS WIDOW AND ADMINISTRATRIX
OF THE ESTATE OF KENNETH STANLEY DAVIES, DECD.) .    APPELLANT

AND

TAYLOR   .    .    .    .    .    .    .    .    .    . RESPONDENT

1972 June 27, 28, 29;          Lord Reid, Lord Morris of Borth-y-Gest,
E       Oct. 25              Viscount Dilhorne, Lord Simon of Glaisdale,
                                          Lord Cross of Chelsea

*Fatal Accidents Acts—Damages—Assessment—Widow's desertion
of deceased husband five weeks before death—Deceased's in-
structions to institute divorce proceedings—Reconciliation not
probable—Widow's possible dependency—Standard of proof*

F          The plaintiff's husband died in a road accident caused by
the defendant's negligence. They had been married for more
than 13 years, had no children and no complaint had been
made of him as a husband. She had unknown to him while
they were living together committed adultery with a fellow-
employee. She deserted her husband five weeks before his
death and after her desertion he had learnt of her adultery.
He was nevertheless most anxious for a reconciliation and at
several meetings with her after she had left him he asked her
G  to resume cohabitation, but she did not accept his offer.
Shortly before his death he instructed his solicitor to institute
divorce proceedings and an inquiry agent on the solicitor's
instructions had obtained a confession statement from the
fellow-employee. She had refused to make a statement to
the inquiry agent.
          In an action by the plaintiff as widow and administratrix of
H  the estate under the Fatal Accidents Acts 1846–1959 and the
Law Reform (Miscellaneous Provisions) Act 1934, Bridge J.
awarded the plaintiff £556 damages under the Act of 1934,
but dismissed the claim under the Fatal Accidents Acts
1846–1959 on the ground that she had not shown that a

# EXHIBIT 20

Waller L.J.    Rahman (Prince Abdul) v. Abu-Taha (C.A.)    [1980]

raises a strong inference that assets may be removed from the juris-    A
diction; and I agree that this appeal should be allowed.

DUNN L.J.    I also agree.

> *Appeal allowed.*
> *Injunction granted until further order.*    B
> *Costs in action.*
> *Leave to appeal refused.*

Solicitors: *Peter T. James & Co; Joynson-Hicks & Co.*

A. H. B.

C

———————

[COURT OF APPEAL]

* BANKERS TRUST CO. *v.* SHAPIRA AND OTHERS

D

[1980 B. No. 3116]

1980    June 4                        Lord Denning M.R., Waller
                                       and Dunn L.JJ.

*Practice—Discovery—Motion for Bank's customers obtaining
moneys by forgery—Injured party's action seeking reimburse-*    E
*ment—Interlocutory claim for bank to disclose confidential
information concerning customers—Customers neither within
jurisdiction nor served with notice of motion—Whether
obligation on bank to assist in tracing action*

On September 20, 1979, two men presented to the plaintiff
bank in New York two cheques, each for half a million dollars
purportedly drawn on a bank in Saudi Arabia and made pay-    F
able to one of the men. The bank paid over the million
dollars and on instructions from the two men credited $600,000
and later $108,203 to accounts of the two men at the London
branch of the D bank, the third defendants. In April 1980,
the bank in Saudi Arabia informed the plaintiff bank that
the cheques were obvious forgeries. The plaintiff bank
reimbursed the bank in Saudi Arabia in the sum of one
million dollars, and on May 20, 1980, issued a writ in London    G
with statement of claim in an action to trace and recover
the moneys, and on the same date, by a notice of motion
against the two men (who were by then outside the jurisdic-
tion) and against the D Bank in the Commercial Court, asked,
inter alia, for injunctions to prevent any dealings with the
funds in the D bank. They obtained a Mareva injunction
from Robert Goff J. on May 21; and before Mustill J. sought,
inter alia, an interlocutory order that the D bank should    H
disclose and permit the plaintiff bank to inspect and take
copies of (i) all correspondence between the two men and the
D bank relating to any account in either of the two men's
names, (ii) all cheques drawn on such accounts, and (iii) all
debit vouchers, transfer applications and orders and internal
memoranda relating to any account standing in the names of
either of the two men at the D bank, all as from September
20, 1979, onwards. Mustill J. refused the relief by way of
disclosure of confidential banker/customer information at the

A     early interlocutory stage, a fortiori because the two men had
not been served with notice of the motion.

On appeal by the plaintiff bank: —

*Held*, allowing the appeal and granting the order sought
against the D bank, that though the court would not lightly
use its powers to order disclosure of full information touching
the confidential relationship of banker and customer, such an
order was justified even at the early interlocutory stages of an
B     action where plaintiffs sought to trace funds which in equity
belonged to them and of which there was strong evidence
that they had been fraudulently deprived and delay might
result in the dissipation of the funds before the action came
to trial; and that in the new and developing jurisdiction where
neutral and innocent persons were under a duty to assist
plaintiffs who were the victims of wrongdoing, the court would
not hesitate to make strong orders to ascertain the where-
C     abouts and prevent the disposal of such property; but that the
plaintiffs should be correspondingly bound to undertake that
such information would be used only for the purposes of the
action to trace the funds and not for any other purpose.

*Norwich Pharmacal Co.* v. *Customs and Excise Commis-
sioners* [1974] A.C. 133, H.L.(E.) applied.

Decision of Mustill J. reversed.

D     The following cases are referred to in the judgments:

*A* v. *C* (unreported), March 18, 1980, Robert Goff J.

*Anton Piller K.G.* v. *Manufacturing Processes Ltd.* [1976] Ch. 55; [1976]
    2 W.L.R. 162; [1976] 1 All E.R. 779, C.A.

*Banque Belge pour L'Etranger* v. *Hambrouck* [1921] 1 K.B. 321, C.A.

*Initial Services Ltd.* v. *Putterill* [1968] 1 Q.B. 396; [1967] 3 W.L.R.
E     1032; [1967] 3 All E.R. 145, C.A.

*London and Counties Securities Ltd. (In Liquidation)* v. *Caplan* (un-
    reported), May 26, 1978, Templeman J.

*Mediterranea Raffineria Siciliana Petroli S.p.a.* v. *Mabanaft G.m.b.H.*
    December 1, 1978, Court of Appeal (Civil Division) Transcript No. 816
    of 1978, C.A.

*Norwich Pharmacal Co.* v. *Customs and Excise Commissioners* [1974]
    A.C. 133; [1973] 3 W.L.R. 164; [1973] 2 All E.R. 943, H.L.(E.).

F     *Upmann* v. *Elkan* (1871) L.R. 12 Eq. 140; 7 Ch.App. 130.

The following additional cases were cited in argument:

*Chase Manhattan Bank N.A.* v. *Israel-British Bank (London) Ltd.* [1980]
    2 W.L.R. 202; [1979] 3 All E.R. 1025.

*E.M.I. Ltd.* v. *Pandit* [1975] 1 W.L.R. 302; [1975] 1 All E.R. 418.

G     *Third Chandris Shipping Corporation* v. *Unimarine S.A.* [1979] Q.B.
    645; [1979] 3 W.L.R. 122; [1979] 2 All E.R. 972, Mustill J. and
    C.A.

*Tournier* v. *National Provincial & Union Bank of England* [1924] 1
    K.B. 461, C.A.

INTERLOCUTORY APPEAL from Mustill J.

H     The plaintiffs, the Bankers Trust Co. of New York, a company
incorporated under the laws of the United States and having a place
of business at 9, Queen Victoria Street, London E.C.4, issued a writ
on May 20, 1980, against one Walter Shapira and one Max Frei, as
first and second defendants, and against the Discount Bank (Overseas)
Ltd. ("Discount Bank"), a Swiss bank having a London branch at 63,
Hatton Garden, London E.C.1, as third defendants. They claimed relief
against all three defendants in their statement of claim in an action to trace

funds of $1,000,000 as money had and received by Shapira and Frei to the    A
use of the plaintiffs, or alternatively paid to them under a mistake of fact,
and damages for deceit and/or conspiracy as against Shapira and Frei
to defraud the plaintiffs. By a motion of the same date they applied
ex parte in the Commercial Court for relief (A) as against Shapira and
Frei for (1) an injunction restraining them from removing from the
jurisdiction or otherwise disposing of or dealing with any of their assets
within the jurisdiction including and in particular any credit balance or    B
balances in any account in either of their names at Discount Bank
save and in so far as such assets did not exceed in value the sum of
U.S. $1,000.000; and (B) as against all three defendants (2) an order that
each of the defendants disclose to the plaintiffs forthwith the sums or
balances at present standing in any account in either of the names of
Shapira and Frei at Discount Bank; (C) as against Discount Bank, the    C
third defendants (3) an order that they disclose to the plaintiffs forth-
with and permit the plaintiffs to take copies of the following documents
(i) all correspondence passing between Discount Bank and Shapira and
Frei relating to any account at Discount Bank in the names of either
Shapira and/or Frei from July 15, 1979, onwards, (ii) all cheques drawn
on any account at Discount Bank in the names of either Shapira and/or
Frei from July 15, 1979, onwards, (iii) all debit vouchers, transfer appli-    D
cations and orders and internal memoranda relating to any account at
Discount Bank in the names of either Shapira and/or Frei from July 15,
1979, onwards; (4) an injunction restraining Discount Bank from making
any payment or transfer out of any account in the name or names of
Shapira and/or Frei at Discount Bank's branch at 63, Hatton Garden,
London E.C.1, or otherwise dealing with such accounts save for payment    E
to the plaintiffs of any sum found due to them or otherwise pursuant
to order of the court.

    The motion was supported by an affidavit of the legal adviser to the
London branch of Bankers Trust Co. setting out the allegations as to
the matters set out in the judgment of Lord Denning M.R. and adding
that it appears (i) that Shapira was now in jail in Switzerland as a    F
result of a fraud investigation by the Swiss police; and (ii) Frei was
presently believed to be in Liechtenstein.

    On May 21, 1980, Robert Goff J. in chambers granted *Mareva* in-
junctions to the plaintiffs ex parte (subject to an undertaking to amend
the writ to include a claim for the injunctions being granted by Robert
Goff J. and to abide by any order of the court or a judge might make as
to damages in case it should be held that the defendants or any of them    G
should have sustained any damages by reason of the orders) as follows:
(i) that the first and second defendants be restrained from removing
from the jurisdiction or otherwise disposing of or dealing with any of
the assets within the jurisdiction, including any credit balance or balances
in any account in either of their names at Discount Bank (Overseas) Ltd.
save and in so far as such assets did not exceed in value the sum of
U.S. $1,000,000 until after trial of the action or further order, with    H
liberty to apply; and (ii) as against Discount Bank (Overseas) Ltd. as
third defendants an injunction restraining the bank from making any pay-
ment or transfer out of any account in the name or names of Shapira or
Frei at their Hatton Garden branch or otherwise dealing with such accounts
until after the hearing of a summons returnable on May 22, 1980.

    Mustill J. on May 23, 1980, on the hearing of the summons declined

**1 W.L.R.**        **Bankers Trust Co. v. Shapira**

A to make any order under paragraphs (2) and (3) of the statement of claim. His reasons, as noted by counsel for the parties before him, were:

"First, it is a very extreme form of relief and should only be ordered where it is necessary to prevent injustice. This is plain from the judgment of Robert Goff J. in *A* v. *C* (unreported).
B March 18, 1980. Secondly, although a banker can properly be a respondent to such an application care should be taken not unnecessarily to put at risk that confidentiality which is an essential part of banking. The question is where, as here, the true defendants have not been served is it necessary to grant relief against the bank at the present stage? There is no risk of the bank destroying documents. There is no need to make an order for disclosure
C to forestall the disposition of money onwards since the events in question happened eight months ago. The money would have vanished long since. Nor is there any need to grant pre-emptive discovery to support the plaintiff's action against the true defendants or the bank. The actions can proceed in a normal manner, no doubt marked by default on the part of the first two defendants. It
D may be difficult to serve the first two defendants, but substituted service can be granted if necessary. There is no reason why discovery against them should not take place at the normal time. Similarly, in regard to the bank, since the action against it is not necessarily at all a foregone conclusion. It may take the plaintiffs some time to get their money—Discount Bank have disclosed there is some money—but the suggested order would not accelerate the
E process, and even if it would, a court should be very careful not to order a banker to disclose the state of a customer's account unless it is urgently necessary to prevent injustice (which is not the case here), or if the customer is present before the court to make representations. Unlike *A* v. *C* the true defendants are not yet before the court. This is a very important distinction. Accordingly, I
F propose to make no order on the present application at this stage; the plaintiffs can renew their application when the first and second defendants can be present and bound by any decision of the court.

"Leave to appeal to raise questions of principle involved in decision in *A* v. *C*. Costs reserved. Liberty to apply."

The plaintiff bank appealed from so much of the order of Mustill J.
G whereby he made no order on the application of the plaintiffs (a) for an order against all three defendants that each of them disclose to the plaintiffs forthwith the sums or balances at present standing in any account in either of the names of the first or second defendants at the third defendants; (b) for an order against the third defendants that they disclose to the plaintiffs forthwith and permit the plaintiffs to take copies of the documents specified in the order sought in paragraph (2) of the
H notice of appeal, as follows: (1) against the first, second and third defendants that each of them disclose to the plaintiffs forthwith the sums or balances at present standing in any account in either of the names of the first or second defendants at the third defendants; (2) against the third defendants that they disclose to the plaintiffs forthwith and permit the plaintiffs to take copies of the following documents: (i) all correspondence passing between the third defendants and the first and second defendants relating to any account at the third defendants in the names

**Bankers Trust Co. v. Shapira**    **[1980]**

A

of either the first and/or second defendants from September 20, 1979, onwards; (ii) all cheques drawn on any account at the third defendants in the names of either the first and/or second defendants from September 20, 1979, onwards; (iii) all debit vouchers, transfer applications and orders and internal memoranda relating to any account at the third defendants in the names of either the first and/or second defendants from September 20, 1979, onwards.

B

The grounds of the appeal were that the judge, in making no order on the plaintiffs' application (a) exercised his discretion wrongly in disregard of principle and/or (b) misdirected himself in law and/or (c) thereby produced a result leading to injustice to the plaintiffs in support whereof the plaintiffs would rely, inter alia, upon the following matters—(i) the plaintiffs' claim, inter alia, to trace, follow and recover such proportion of the U.S. $1,000,000 paid to the first and/or second defendants on September 20, 1979, and remitted by the first and/or second defendants to the third defendants within the jurisdiction of the court and/or thereafter disposed of by the first and/or second defendants elsewhere; (ii) the books, papers and records of the third defendants would disclose what happened to such proportion of the U.S. $1,000,000 remitted as aforesaid and thereafter disposed of by the first and/or second defendants elsewhere; (iii) the judge in requiring the first and/or second defendants to be served with the proceedings as a pre-requisite to the making of the order sought by the plaintiffs was thereby giving the first and/or second defendants even more time to ensure that any dispositions by them or either of them from any account with the third defendants could not be capable of being traced, followed and recovered by the plaintiffs; (iv) as a matter of principle the court should be astute to provide all such assistance as it properly could to persons in the position of the plaintiffs to enable them to obtain such information as was reasonable and proper at the earliest practicable opportunity to enable them to discover the whereabouts of and/or to follow and recover a trust fund or any remaining part thereof; (v) the approach of the judge in determining that the principle of the decision of Robert Goff J. in *A* v. *C* (unreported), March 18, 1980, only applied where persons such as the first and/or second defendants had been served with a notice of an application such as that made to the judge by the plaintiffs on May 23, 1980, was unnecessarily restrictive of such decision and/or was wrong in law.

C

D

E

F

*Michael Crystal* for the plaintiffs.
*Nicholas Elliott* for the third defendants.

G

LORD DENNING M.R. This is a new case. It illustrates something that happens from time to time—frauds made upon banks. It appears that last September—on September 20, 1979—two men (Walter Shapira and Max Frei) went into a bank in New York, the Bankers Trust Co. They went into the Middle East section. They presented two apparent cheques—each for a half a million dollars—for payment. The cheques purported to be drawn on the Mecca branch of the National Commercial Bank in Saudi Arabia to the Bankers Trust Co. of 16, Wall Street, New York. One of them was for $500,000 to be paid to Mr. Shapira. The other was also for $500,000 to be paid to Mr. Shapira.

H

The Bankers Trust Co. of New York honoured the cheques. They

A    let these men have $1,000,000. They acted on the instructions of the two men. I will not go into detail: but I will mention two particular matters: $600,000 was credited to Mr. Shapira's account at the London branch of a Swiss bank in Hatton Garden—the Discount Bank (Overseas) Ltd. They asked that another sum of $108,203 should be credited to Mr. Frei's account at a bank in the Cayman Islands. But as he had no such account there, that sum was also transferred to the Discount Bank B    (Overseas) Ltd. in Hatton Garden. So, on the face of it, $708,203 was sent over to the Discount Bank in Hatton Garden. That was in September 1979.

In some way those cheques got over to the Mecca branch of the Saudi Arabian bank. They apparently honoured them at the time. But six months later, on April 10, 1980, the head office of the National C    Commercial Bank in Saudi Arabia found that those two cheques were forgeries. They immediately took the matter up with the Bankers Trust Co. of New York. I will read part of the letter they wrote:

D        " On looking into these drafts you will find that signatures do not conform in any way to the signatures number 140 and 141 of our officers in our Mecca Branch, that the validating numbers in red do not compare in any way to our validity machine which has the name of our bank on it, that the draft forms are on poor quality paper while our drafts are printed on safety paper with our logo water mark. We therefore consider these drafts are clearly forged and you should have exercised care in encashing them."

E    When the Bankers Trust Co. of New York received that letter, they felt that they were not free from blame themselves. It appears that they did re-credit the Saudi Arabian Bank with the money. So the Bankers Trust Co. of New York have lost $1,000,000.

They then looked round to see if they could find these rogues. (I call them " rogues " although it has not been proved yet: but the prima facie evidence against them is strong). On May 20, 1980, the Bankers Trust Co. of New York brought an action. The first defendant was F    Mr. Walter Shapira: the second defendant was Mr. Max Frei: and the third defendant was the Discount Bank (Overseas) Ltd., with which the moneys were deposited. They did not serve the documents on either Mr. Shapira or Mr. Frei. We are told, on the evidence, that they investigated the matter. Mr. Shapira is now in jail in Switzerland as a result of a fraud investigation by the Swiss police. Mr. Frei is presently believed to be in Liechtenstein. So they have not served those two. But G    they have served the Discount Bank (Overseas) Ltd. The action they have brought is quite clearly to trace and follow these funds which the Bankers Trust Co. have been fraudulently deprived of. It operates in common law and in equity as a right to follow and trace the moneys. So they brought this action on May 20, 1980.

The Bankers Trust Co. obtained a *Mareva* injunction in the usual H    form to stop the bank from disposing of any of the moneys which they had at that time—which Shapira and Frei had paid into the bank. That is common form nowadays in the Commercial Court when it is desired to prevent money being abstracted from the true creditor.

But this case brings out a new point which we have not had before: because the Bankers Trust Co. of New York want more information from the Discount Bank (Overseas) Ltd. They want information as to these accounts. They want to know how much money is now in the

accounts. Money has been taken out in the last six months. They want A
to know what has happened to the money in the six accounts. It may have
been paid over to third persons: and they may want to follow the money
into the hands of those third persons. So they have asked for discovery
of the documents relating to the moneys which the bank had, and what
has happened to them.

As the question of the form of order has come into question in some B
of the cases, I would like to read the actual form of order which is
sought in this regard by the Bankers Trust Co. of New York:

> "For an order (1) Against the first, second and third defendants
> that each of them do disclose to the plaintiffs forthwith the sums
> or balances at present standing in any account in either of the
> names of the first or second defendants at the third defendants.
> (2) Against the third defendants "—that is, the bank—" that they C
> do disclose to the plaintiffs forthwith and permit the plaintiffs to
> take copies of the following documents: —(i) all correspondence pass-
> ing between the third defendants and the first and second defendants
> relating to any account at the third defendants in the names of either
> the first and/or second defendants from September 20, 1979, on-
> wards: (ii) all cheques drawn on any account at the third defendants D
> in the names of either the first and/or second defendants from
> September 20, 1979, onwards: (iii) all debit vouchers, transfer appli-
> cations and orders and internal memoranda relating to any account
> at the third defendants in the names of either the first and/or
> second defendants from September 20, 1979, onwards."

That is what they applied for in addition to the ordinary *Mareva* in- E
junction.

The matter came before Mustill J. He refused to make any such
order, his reason being that he thought it should not be made while the
first and second defendants (Mr. Shapira and Mr. Frei) had not been
served.

Mr. Crystal has come here today on behalf of the Bankers Trust Co. F
of New York, and asks us to reverse that decision. He has brought to
our attention—very usefully—three recent cases (none of them reported)
in which a similar point has arisen. The first one was on May 26, 1978,
before Templeman J.: *London and Counties Securities (In Liquidation)*
v. *Caplan.* The plaintiff company had been defrauded by a Mr. Caplan
in the sum of £5,000,000. Mr. Caplan was said to have embezzled it. It
was desired to obtain information as to the whereabouts of the moneys G
and what had been done with them. The plaintiffs wanted to trace the
moneys to see where they had gone. Templeman J., having considered
the matter very carefully, made an order under which the bank was to
disclose all the documents and accounts showing where the money had
gone.

Then there was a case before this court on December 1, 1978— H
*Mediterranea Raffineria Siciliana Petroli S.p.a.* v. *Mabanaft G.m.b.H.*
Court of Appeal (Civil Division) Transcript No. 816 of 1978. It was not
a fraud on a bank. Nor a fraud at all. Owing to a mistake in a com-
mercial transaction, moneys payable to the plaintiffs were paid to other
people. It was desired to trace them. A *Mareva* injunction was granted
and also an order for discovery of documents to discover where the
money had gone. Templeman L.J. said:

A
" As Lord Denning M.R. said, it is a strong order, but the plaintiffs'
case is that there is a trust fund of $3,500,000. This has disappeared,
and the gentlemen against whom orders are sought may be able to
give information as to where it is and who is in charge of it. A
court of equity has never hesitated to use the strongest powers to
protect and preserve a trust fund in interlocutory proceedings on
the basis that, if the trust fund disappears by the time the action
B
comes to trial, equity will have been invoked in vain."

The last of the three cases was on March 18, 1980, before Robert
Goff J., entitled *A* v. *C.* That was a case again of a fraud on a bank.
A very large sum of money was involved. It seems to be a case very
similar to the present, but in which the fraudulent rogues—as they may
well turn out to be—had been served. It is on that ground distinguishable
C
from the present case. The rogues were served together with the bank.
Robert Goff J. after considering the two cases which I have mentioned,
said:

" There is no doubt that this jurisdiction is in a process of develop-
ment; and that it is still in the course of throwing up problems
which have yet to be solved."

D
He granted a *Mareva* injunction: but in addition he made an order
for discovery of documents. He did so in order to enable the plaintiffs
to trace what had happened to the moneys.

Mustill J. had *A* v. *C.* case before him. He thought it was distinguish-
able on the ground that in that case the " rogues " had been served.
He refused to order discovery in this case: but he gave leave to appeal
E
in order that the questions of principle could be discussed.

We have had the matter fully argued before us. I would like to
express our gratitude to Mr. Crystal for all the submissions he has made
in support of the order. Equally to Mr. Elliott, for the bank, who has
taken a very proper attitude. He said that the bank are neutral in this
matter: but they felt it right to put forward to the court various con-
F
siderations, such as the confidential relationship between the bank and
their customers.

Having heard all that has been said, it seems to me that Mustill J.
was too hesitant in this matter. In order to enable justice to be done—
in order to enable these funds to be traced—it is a very important part
of the court's armoury to be able to order discovery. The powers in this
regard, and the extent to which they have gone, were exemplified in
G
*Norwich Pharmacal Co.* v. *Customs and Excise Commissioners* [1974]
A.C. 133. The Customs authorities were perfectly innocent: but they
had to disclose the names of infringers of patents whose goods had passed
through their hands. Lord Reid said, at p. 175:

" They seem to me to point to a very reasonable principle that if
through no fault of his own a person gets mixed up in the tortious
H
acts of others so as to facilitate their wrong-doing he may incur
no personal liability but he comes under a duty to assist the person
who has been wronged by giving him full information and disclosing
the identity of the wrongdoers "

referring to the views expressed by Lord Romilly M.R. and Lord
Hatherley L.C. in *Upmann* v. *Elkan* (1871) L.R. 12 Eq. 140; 7 Ch.App.
130.

Lord Denning M.R.          Bankers Trust Co. v. Shapira          [1980]

So here the Discount Bank incur no personal liability: but they got   A
mixed up, through no fault of their own, in the tortious or wrongful
acts of these two men: and they come under a duty to assist the Bankers
Trust Co. of New York by giving them and the court full information
and disclosing the identity of the wrongdoers. In this case the particular
point is "full information."

This new jurisdiction must, of course, be carefully exercised. It is   B
a strong thing to order a bank to disclose the state of its customer's
account and the documents and correspondence relating to it. It should
only be done when there is a good ground for thinking the money in
the bank is the plaintiff's money—as, for instance, when the customer
has got the money by fraud—or other wrongdoing—and paid it into his
account at the bank. The plaintiff who has been defrauded has a right
in equity to follow the money. He is entitled, in Lord Atkin's words,   C
to lift the latch of the banker's door: see *Banque Belge pour l'Etranger*
v. *Hambrouck* [1921] 1 K.B. 321, 355. The customer, who has prima
facie been guilty of fraud, cannot bolt the door against him. Owing to
his fraud, he is disentitled from relying on the confidential relationship
between him and the bank: see *Initial Services Ltd.* v. *Putterill* [1968]
1 Q.B. 396, 405. If the plaintiff's equity is to be of any avail, he must   D
be given access to the bank's books and documents—for that is the only
way of tracing the money or of knowing what has happened to it: see
*Mediterranea Raffineria Siciliana Petroli S.p.a.* v. *Mabanaft G.m.b.H.*
(unreported). So the court, in order to give effect to equity, will be
prepared in a proper case to make an order on the bank for their dis-
covery. The plaintiff must of course give an undertaking in damages
to the bank and must pay all and any expenses to which the bank is   E
put in making the discovery: and the documents, once seen, must be
used solely for the purpose of following and tracing the money: and
not for any other purpose. With these safeguards, I think the new juris-
diction—already exercised in the three unreported cases—should be affirmed
by this court.

Applying this principle, I think the court should go to the aid of   F
the Bankers Trust Co. It should help them follow the money which is
clearly theirs: to follow it to the hands in which it is: and to find out
what has become of it since it was put into the Discount Bank (Overseas)
Ltd.

If the courts were to wait until these two men were served, goodness
knows how many weeks might elapse. Meanwhile, if some of it has
got into the hands of third persons, they may dispose of it elsewhere. It   G
seems to me that the fact that these two men have not been served does
not deprive the court of its power to make such an order. These two
men have gone out of the jurisdiction in circumstances in which it is
clear that the court should do all it can to help the innocent people to
find out where their money has gone.

In those circumstances—while expressing our indebtedness to both   H
counsel—I would allow the appeal and make the order as asked in the
notice of appeal.

WALLER L.J. I agree. I only add a word or two about three points
which were made by Mr. Elliott, appearing on behalf of the bank and
taking, so far as he could, a neutral attitude in this matter. He first of
all emphasised that where the other two parties had not been served, it

A  was very strong action on the part of the court to order the bank to break their duty of confidentiality. It was going further, he said, than an *Anton Piller* order [*Anton Piller K.G.* v. *Manufacturing Processes Ltd.* [1976] Ch. 55], because when an *Anton Piller* order is made, there remains the opportunity of disobeying it or appealing against it.

Clearly it is undesirable that an order such as this should be lightly made. But the answer to this part of Mr. Elliott's submission, in my

B  judgment, is that here there is very strong evidence indeed of fraud on the part of the other two defendants—the first and second defendants. They presented two forged cheques, each for half a million dollars, and as a result a total of $1,000,000 was transferred to accounts in their names or from which they would benefit.

Secondly, Mr. Elliott submitted that, having regard to the amount

C  of time which had gone by, there was no case for making this order now; it could wait until the normal time for discovery; and indeed Mustill J. in his decision adverted to that. But again, in my opinion, where you have a fraud of this nature, although it may be late and although much or perhaps all of the money may be now gone, the sooner that steps are taken to try and trace where it is the better. If steps are going to be taken, it is important that they should be taken at the earliest

D  possible moment.

Thirdly, Mr. Elliott expressed concern at the wideness of the order which it was sought to make—one which required the bank to permit the plaintiffs to take copies of all correspondence, for example, all debit vouchers, transfer applications and orders, and internal memoranda. He submitted that the breadth of that order went far beyond the disclosure

E  which would have to be made under the Bankers' Books Evidence Act 1879. Again, in my opinion, an order of that breadth is completely justified in a case of this sort because, unless there is the fullest possible information, the difficulties of tracing the funds will be well-nigh impossible.

On the other side of the coin in relation to that, there must be an implied undertaking on the part of the plaintiffs that the information

F  which they obtain will only be used for the purposes of this action and of course will not be disclosed otherwise.

DUNN L.J. I agree for the reasons given by Lord Denning M.R. and Waller L.J. that this appeal should be allowed.

G                                    *Appeal allowed.*
                                    *No order for costs as between plain-*
                                        *tiffs and third defendants.*
                                    *Costs in action reserved.*

Solicitors: *Linklaters & Paines; Dawson & Co.*

H                                                        M. M. H.

# EXHIBIT 21



[2023] EWHC 799 (Ch)

**IN THE HIGH COURT OF JUSTICE**                     **Claim No. BL-2022-001711**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**
**B E T W E E N :**

Date: 5 April 2023

**Before** :

**James Pickering KC**
**(sitting as a Deputy High Court Judge)**
- - - - - - - - - - - - - - - - - - - -
**Between :**


**(1) DANIEL CARLOS SCENNA**

**(2) HOST GROWTH INC (a company registered in Ontario)**          <u>Claimants</u>


**And**


**(1) PERSONS UNKNOWN USING THE IDENTITY "NANCY CHEN"**

**(2) PERSONS UNKNOWN USING THE IDENTITY "VERA"**

**(3) PION MARKET LTD (a company incorporated in England)**

**(4) QS TRADING LTD (a company incorporated in Hong Kong)**

**(5) WIN FY PTY LTD (a company incorporated in Australia)**

**(6) TECO INDUSTRIAL PTY LTD (a company incorporated in Australia)**

**(7) AUSTRALIA AND NEW ZEALAND BANKING GROUP LTD**

**(a company incorporated in Australia)**

**(8) WESTPAC BANKING CORPORATION (a company incorporated in Australia)**

**(9) DAH SING BANK LTD (a company incorporated in Hong Kong)**          <u>Defendants</u>

1

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Celso De Azevedo** (instructed by **Giambrone & Partners LLP)** for the **Claimants**
**Edward Harrison** (instructed by **Farrer & Co LLP)** for the **Seventh Defendant**
**Edward Levey KC (**instructed by **Herbert Smith Freehills LLP**) for the **Eighth Defendant**

**Hearing date:** 27 January 2023

- - - - - - - - - - - - - - - - - - - - -

# APPROVED JUDGMENT

**James Pickering KC (sitting as a Deputy High Court Judge):**

PART I: INTRODUCTION
PART II: THE BACKGROUND
PART III: THE CONTINUATION APPLICATION
PART IV: THE DISCLOSURE ORDER APPLICATIONS
PART V: THE JURISDICTION APPLICATIONS
PART VI: THE COSTS APPLICATION
PART VII: CONCLUSION

## PART I: INTRODUCTION

1.  The Claimants are the victims of an alleged fraud. The First to Third Defendants are the alleged fraudsters. The Fourth to Sixth Defendants are the recipients of the allegedly stolen monies (and thought to be connected to the fraudsters). The Seventh to Ninth Defendants are the banks (two of which are incorporated in Australia, the other in Hong Kong) at which the Fourth to Sixth Defendants hold their respective accounts.

2.  On 6 October 2022, the Claimants applied to me for *ex parte* relief. In relation to the First to Third Defendants, I granted worldwide freezing orders (both proprietary and non-proprietary). In relation to the Fourth to Sixth Defendants, I also granted worldwide freezing orders (again, both proprietary and non-proprietary). In relation to the Seventh to Ninth Defendant banks, I refused to grant worldwide freezing orders; I did, however, make certain disclosure orders against them.

2

3.       As part of that order, I also required an undertaking that the Claimants would issue a Claim Form in relation to the underlying substantive claim. Pursuant to that undertaking, the Claimants subsequently issued and served a claim form together with Particulars of Claim. By those documents, substantive relief was sought against not only the First to Sixth Defendants but also the Seventh to Ninth Defendant banks.

4.       Now, several months later, the matter has returned to me to determine the following matters:

(1) the return date of the Claimants' application for the continuation of the worldwide freezing orders as against the First to Sixth Defendants ("**the Continuation Application**");

(2) the applications of the Seventh and Eighth Defendant banks challenging the grant of the disclosure orders ("**the Disclosure Order Applications**");

(3) the applications of the Seventh and Eighth Defendant banks challenging the jurisdiction of the English court in respect of the substantive claim ("**the Jurisdiction Applications**"); and

(4) a short point regarding costs ("**the Costs Application**").

## PART II: THE BACKGROUND

5.       As stated above, the Claimants are the victims of an alleged fraud. The First Claimant is resident in Canada and the Second Claimant is his company, an Ontario registered entity.

6.       As also stated above, the First to Third Defendants are the alleged fraudsters. Pursuant to the alleged fraud, between March and April 2022 the First to Third Defendants persuaded the Claimants to make various payments (totalling around US$2.9 million) to:

(1) an account in the name of the Fourth Defendant held at the Ninth Defendant bank in Hong Kong;

(2) an account in the name of the Fifth Defendant held at the Seventh Defendant bank in Australia; and

(3) an account in the name of the Sixth Defendant held at the Eighth Defendant bank, also in Australia.

7.    In May 2022, the Claimants first suspected that they might have been defrauded. In June 2022, their suspicious were confirmed.

8.    On 6 October 2022, the Claimants applied to me for interim relief. As stated above, while I was prepared to grant worldwide freezing orders against the First to Sixth Defendants, I was not prepared to do so against the Seventh to Ninth Defendant banks. I did, however, make disclosure orders against them requiring them to provide in relation to the relevant bank account in each case:

> "(1) the transaction history starting from the respective dates of transfer of the Relevant Sums onwards to the date of service of this Order, including:
>
> > (i) the deposit history;
> > (ii) the withdrawal history;
> > (iii) the access logs;
> > (iv) the approved devices; and
> > (v) know-you-client information relating to the respective bank and/or online account holders (including name, address, email addresses, and any other contact details available).
>
> (2) the final balance, meaning the balance on the date of service of this Order…"

9.    On about 10 October 2022, the Claimants issued an application to continue the freezing order as against the First to Sixth Defendants – in other words, the Continuation Application.

10.     On about 14 October 2022, the Claimants served a Claim Form and Particulars of Claim. As set out above, the defendants to the substantive claim were not only the First to Sixth Defendants but also the Seventh to Ninth Defendant banks.

11.     On 28 October 2022, the Claimants renewed their application for proprietary interim injunctive relief as against the Seventh to Ninth Defendant banks. Subsequently, however, that application was withdrawn. It is the costs arising out of this withdrawal which are the subject of the Costs Application.

12.     On 10 November 2022, the Seventh and Eighth Defendant banks ("**the Banks**") each issued applications seeking to challenge the disclosure orders made against them – in other words, the Disclosure Order Applications.

13.     On 6 December 2022, the Banks each issued further applications, this time seeking to challenge the jurisdiction of the English court in respect of the substantive claim – in other words, the Jurisdiction Applications.

14.     In due course, each of the Continuation Application, the Disclosure Order Applications, the Jurisdiction Applications and the Costs Application were listed to be heard before me as part of the present hearing.

## PART III: THE CONTINUATION APPLICATION

15.     At the *ex parte* hearing on 6 October 2022, I was satisfied that, in relation to the First to Sixth Defendants, the various requirements for worldwide freezing order relief (both proprietary and non-proprietary) were made out. Since making that order, there has been a complete lack of engagement on the part of the First to Sixth Defendants – no correspondence has been entered into, no evidence has been filed, and none of them appears before me today. In these circumstances, and having reviewed both the evidence which was before me at the *ex parte* hearing and the further evidence which has been filed for today, I remain satisfied that those requirements continue to be met.

16.     Accordingly, and as indicated by me during the course of the hearing, I will continue the worldwide freezing order relief as against the First to Sixth Defendants. The precise

terms of the order can be finalised in due course but I indicate here that I will be sympathetic to any drafting points raised by the Banks to avoid any ambiguity in the *Baltic* proviso which currently appears in paragraph 26 of the order of 6 October 2022.

## PART IV: THE DISCLOSURE ORDER APPLICATIONS

### Approach

17.    By the Disclosure Order Applications, the Banks seek to challenge the disclosure orders which I made as part of the *ex parte* order of 6 October 2022.

18.    Having heard submissions from all counsel, it seems to me that there are 2 approaches open to me.

19.    The first is that I simply consider whether I ought to discharge the disclosure order (in so far as it relates to the Banks) pursuant to paragraphs 2 and 18 of the *ex parte* order which, in the usual way, entitles anyone served with or notified of the order to apply to vary or discharge it. Given that disclosure order relief is effectively final relief, on this basis I simply need to make a final determination as to whether the disclosure order I made should stay in place or whether I should discharge it.

20.    The alternative approach is to focus on the permission to serve the disclosure order out of the jurisdiction contained in paragraph 15 of the *ex parte* order. On this basis, I need to consider whether the well-established requirements for an order for service out have been met and, if they have not, set aside that part of the order accordingly.

21.    I will consider both approaches in turn.

### Should I simply discharge the disclosure order?

22.    In general, the five criteria for making a disclosure order for what is commonly known as **Bankers Trust** relief[1] are set out in **Kyriakou v Christie Manson and Woods Ltd** [2017] EWHC 487 (QB) as follows:

(1) there must be good grounds for concluding that the property in respect of which disclosure is sought belongs to the applicant;

(2) there must be a real prospect that the information sought will lead to the location or preservation of the relevant property;

(3) the order should not be wider than necessary;

(4) the interests of the applicant in getting the disclosure must be balanced against the detriment to the respondent; and

(5) appropriate undertakings must be given in respect of the use of the disclosed information and/or documents.

23.    There is no dispute that criteria one to three and five are met (or could be by an appropriately worded order). The real issue, as if often the case, is with the fourth criterion – the balancing exercise which needs to be undertaken in relation to, on the one hand, the interests of the applicant seeking disclosure and, on the other hand, the potential prejudice and detriment to the respondent bank.

24.    Importantly, however, where the respondent to the application is a foreign bank, additional and special considerations apply. As Hoffman J stated in **Mackinnon v Donaldson, Lufkin & Jenrette Corp** [1986] Ch 482:

"In principle and on authority it seems to me that the court should not, save in exceptional circumstances, impose such a requirement upon a foreigner, and, in particular, upon a foreign bank. The principle is that a state should refrain from

---

[1] Deriving from the judgment of Lord Denning in **Bankers Trust v Shapira** [1980] 1 WLR 1274

demanding obedience to its sovereign authority by foreigners in respect of their conduct outside the jurisdiction… (493G)

The need to exercise the court's jurisdiction with due regard to the sovereignty of others is particularly important in the case of banks. Banks are in a special position because their documents are concerned not only with their own business but with that of their customers. They will owe their customers a duty of confidence regulated by the law of the country where the account is kept… (494B-D)

International law generally recognises the right of a state to regulate the conduct of its own nationals even outside its jurisdiction, provided that this does not involve disobedience to the local law. But banks, as I have already said, are in a special position. The nature of banking business is such that if an English court invokes its jurisdiction even over an English bank in respect of an account at a branch abroad, there is a strong likelihood of conflict with the bank's duties to its customer under the local law. It is therefore not surprising that any bank, whether English or foreign, should as a general rule be entitled to the protection of an order of the foreign court before it is required to disclose documents kept at a branch or head office abroad… (496)

It seems to me that in a case like this, where alternative legitimate procedures are available, an infringement of sovereignty can seldom be justified except perhaps on the grounds of urgent necessity… (499F)"

25.    In short, therefore, where a disclosure order is sought against a foreign bank, although regard should still be taken of the ***Kyriakou*** criteria, because of the strong likelihood that compliance with such an order would put the bank at risk of being in breach of local laws or regulations, ultimately an order should be granted only in exceptional circumstances.

26.    With this in mind, in the present case the Banks, through their respective counsel, submit, in broad terms, as follows:

(1) Compliance with the disclosure order would put them in breach of Australian law. Keeping the disclosure order in place would therefore expose them, so the Banks say, to potentially severe financial and reputational damage in Australia.

(2) There is nothing to stop the Claimants from applying to the Australian courts where a similar procedure for disclosure relief is available. Indeed, the Banks have both confirmed that if the Claimants were to make such an application to the Australian courts, neither would oppose the making of a disclosure order and (unsurprisingly) both would comply with any such order made. Discharging the English disclosure order, so the Banks say, would therefore not cause the Claimants any real prejudice – they could simply apply for the equivalent relief in Australia.

(3) Given the above, the only potential exceptional circumstance which would justify the keeping of the disclosure order was if this was a "hot pursuit" case. This, however, is not such a case; on the contrary, so the Banks say, there has been considerable delay on the Claimants' part.

### (a) Would compliance with the disclosure order put the Banks in breach of Australian law?

27.   As to whether or not compliance with the disclosure order would put the Banks in breach of Australian law, I have had the benefit of expert evidence from both sides. For the Banks, it was suggested that a breach could arise in two ways.

28.   First, under the common law there exists an implied contractual duty of confidentiality: *Tournier v National Provincial and Union Bank of England* [1924] 1 KB 461. Compliance with the disclosure order, so the Banks say, would put them in breach of that duty.

29.   The *Tournier* duty, however, is subject to certain exceptions. These include where a bank is compelled by law to disclose the relevant information. The Claimants' expert therefore suggests that the disclosure order which I made on 6 October 2002 is sufficient to put the Banks within this exception. The Banks' expert, however, disagrees stating that this exception can only arise where the bank is compelled to disclose by way of a *local* law or a *local* court order (i.e. an Australian law or order) and therefore does not cover the position where such compulsion is by way of a *foreign* court order (such as an English disclosure order as in the present case).

30.  Having carefully considered the expert evidence and the submissions, on this point I prefer the position taken by the Banks. First, there is no dispute that the disclosure order which I made could not be recognised or enforced in Australia. It would therefore be slightly curious if an Australian bank could avoid liability for breach of the **_Tournier_** principle in Australia by saying that it was compelled to do so by an order of a foreign court which could never be recognised or enforced in Australia. Second, there is clear commonwealth authority which supports the proposition that the "compelled by law" exception does not apply to foreign law and/or foreign court orders: see **_XY & Z v B_** [1983] 2 Lloyds Rep 548 (an English case); and **_FDC Co Ltd v The Chase Manhattan Bank NA_** [1990] 1 HKLR 277 (Hong Kong). Although there is as yet no Australian authority directly on point, the textbook commentary in **_Neate & Godfrey: Bank Confidentiality_** suggests that the Australian courts would be likely to adopt a similar approach too.

31.  The second way a breach of Australian law could potentially arise, so submit the Banks, is by way of a breach of the Privacy Act 1988 ("**PA 1988**") - an Australian statute which requires certain entities (including banks) not to act or engage in a practice that breaches an "Australian Privacy Principle". It is common ground between the experts that compliance with the disclosure order would _prima facie_ result in a breach of the PA 1988. Again, the difference between the experts is the application (or otherwise) of an exception contained in section 6(2)(b) which permits disclosure where it is "required or authorised by or under an Australian law or a court/tribunal order" with "court/tribunal order" elsewhere being defined as referring to orders issued by the "Commonwealth of Australia". I note the Claimants' expert's contentions as to these provisions but, with respect, they are somewhat difficult to follow and in any event do not persuade me that the clear language of the PA 1988 means anything other than what it says – in other words, that the exception will only apply where the requirement is by an Australian law or court order but not a foreign one (such as the disclosure order in the present case).

32.  In short, therefore, if the disclosure order were to remain in place, it seems to me that the Banks would (or there is at the very least a real risk that the Banks would) be in breach of not only the **_Tournier_** duty at common law but also of the PA 1988. This is

of course a significant factor to be taken into account in the balancing exercise which I have to undertake.

### (b) Availability of an alternative procedure

33.    As stated above, it is common ground that the Australian courts have powers to grant disclosure orders similar to those granted in England. As also stated above, the Banks have confirmed that if the Claimants were to make an application for such an order to the Australian courts, neither would oppose and both would comply with any order made.

34.    This being the case, I asked counsel for the Claimants why, instead of pursuing hard fought relief by way of the current English disclosure order, an application had not been made to the Australian court for equivalent (and unopposed) relief there. I was told that the Claimants were reluctant to have proceedings afoot in two jurisdictions (England and Australia) and possibly, if the Ninth Defendant bank were to belatedly engage, a third too (Hong Kong).

35.    I can well understand this reluctance to avoid instructing multiple legal advisors in multiple jurisdictions and why the Claimants therefore have a clear preference to have all matters dealt with within a single set of proceedings. I am far from persuaded, however, that it provides an answer where the alternative is to expose a respondent bank to some form of liability, although ultimately this is again a matter for the balancing exercise which I have to undertake.

### (c) Hot pursuit

36.    The final point raised on behalf of the Banks is that there has not been the sort of "hot pursuit" (to use the expression used by Hoffman J in ***Mackinnon***) which would justify making a disclosure order against a foreign bank. On the contrary, the Banks criticise the Claimants, accusing them of "significant" delay given the gap between the fraud (in March/April 2022), the discovery of the fraud (in June 2022), and the issuing of the present proceedings (in October 2022).

37. As to this, I do not think that the Claimants can fairly be criticised for delay. The fraud is a complex high value fraud taking place across a number of different jurisdictions. It is therefore understandable that the Claimants would wish to exercise some caution before launching into litigation. Having said that, while I do not find there to have been any material delay, nor do I think that this is a case of hot pursuit – at best the pursuit can described as "luke warm".

38. With this in mind, it is important to remember how hot pursuit fits into the analysis which I have to undertake. Indeed, as counsel for the Claimants correctly reminded me, hot pursuit is not a strict requirement of the ***Bankers Trust***/disclosure order jurisdiction: ***Global Energy Horizons Corp v Gray*** [2014] EWHC 2925 (Ch); see also ***Civil Fraud: Law, Practice & Procedure (Grant & Mumford)*** at 29-119. In short, the fact that an applicant for such relief fails to show hot pursuit is not fatal to its application.

39. Instead, its relevance comes about in this way. In the context of a jurisdiction where a disclosure order will only be made against a foreign bank in exceptional circumstances, one example of where exceptional circumstances might arise is where there is an urgent necessity. Indeed, where there is such an urgent necessity (as for example was the position in the original ***Bankers Trust*** case) "the infringement of sovereignty" (which the making of a disclosure order against a foreign bank necessarily involves) may be "excused by a commercial equivalent of hot pursuit"[2].

40. In short, therefore, where hot pursuit can be shown, it is a factor which is to be taken into account in the overall balancing exercise and, in an appropriate case, may tip the balance in favour of the making of a disclosure order. Where, on the other hand, such hot pursuit cannot be shown, while it is not fatal to an applicant's application, nor does it help it; it will have to find some other reason to show why, exceptionally, such an order should be made against a foreign bank.

---

[2] ***Mackinnon*** at 498H

**(d) The balancing exercise**

41.     As stated above, the process I have to undertake is a balancing exercise (in accordance with the fourth criterion of ***Kyriakou***) but with the added gloss that given that the application is made against foreign banks such an order should only be made in exceptional circumstances (as per ***Mackinnon***).

42.     In that balancing exercise, two matters stand out. First, if the disclosure order stays in place, there is, as I have found, a real risk that the Banks will be in breach of Australian law and thereby be exposed to financial and/or reputational damage. Counsel for the Claimants is correct to remind me that, as was said (in a different context) in ***Bank Mellat v HM Treasury*** [2019] EWCA Civ 449, any threat of a sanction abroad against the disclosing party must not be "more illusory than real" but in the present case, given my findings above, I am satisfied that the threat is indeed real rather than illusory. The short point is that, if the disclosure stays in place, there is a real risk that the Banks will suffer significant prejudice and detriment.

43.     The other stand out matter is the fact that there is an alternative (and broadly equivalent) remedy in Australia which the Banks have indicated they would not oppose and with which they would comply. As stated above, while I understand why the Claimants would prefer to have proceedings open in only one jurisdiction, the reality is that if I were to discharge the disclosure order, the Claimants are not without a remedy – they can simply apply for (and would probably be granted) the same relief in Australia. In short, therefore, while the discharge of the disclosure order might cause the Claimants some added inconvenience and increased costs, it would not cause them to suffer any irremediable damage in their pursuit of the underlying fraudsters.

44.     Against the above, I have also considered whether there are any exceptional circumstances (aside from hot pursuit which I have found not to be applicable to the present case) which might justify the making (or in this case, the keeping) of the disclosure order. In particular, I have considered ***LMN v Bitflyer*** [2022] EWHC 2954 (Comm) where Butcher J found that the approach in ***Mackinnon*** was inapplicable in that case and went on to make a disclosure order against a number of foreign crypto-exchanges. Importantly, however, in that case it was not known where the relevant

documents were located such that the applicants did not know in which jurisdiction to apply. In such circumstances, so the judge found, it would be "impractical and contrary to the interests of justice to require a victim of fraud to make speculative applications in different jurisdictions". The present case, however, is very different – it is known that the information is in Australia, it is known that there is (as I have found) a very real risk that compliance with the order would breach Australian law, and it is known that the Australian courts offer a similar remedy which would probably be granted.

45.    All in all, therefore, it seems to me that in the present case there are no exceptional circumstances (whether hot pursuit as in the ***Bankers Trust*** case itself, the need to avoid speculative applications as in ***LMN***, or otherwise) to justify a departure from the general rule that a disclosure order should not be made against a foreign bank. On the contrary, so it seems to me, the balancing exercise comes down clearly in favour of discharging that order.

### **Should I set aside the permission to serve out the disclosure order?**

46.    The alternative approach open to me is to consider whether the requirements for an order for permission to serve out the disclosure order have been met and, if they have not, set aside that part of the order accordingly.

47.    The test for permission to serve out of the jurisdiction is well established. As summarised by Lords Collins in ***Altimo Holdings and Investment Ltd v Kyrgyz Mobil Tel Ltd*** [2011] UKPC 7; [2012] 1 WLR 1804 at [71]:

(1) there must be a good arguable case that the claim falls within one of the relevant jurisdictional gateways;

(2) there must be a serious issue to be tried on the merits; and

(3) in all the circumstances, England must be clearly or distinctly the most appropriate forum.

48.    As to gateways, while there had been a conflict in recent authorities as to whether a gateway for service out exists in the case of **Norwich Pharmacal** and **Bankers Trust** orders (in other words, disclosure orders), this dispute was overtaken by the new PD6B which came into effect on 1 October 2022 (and therefore just a few days before I made the ex parte order) which at PD3.1(25) provides for a new gateway specifically directed at such disclosure orders. Accordingly, there is no issue that this limb of the **Altimo** test is satisfied.

49.    As to whether there is a serious issue to be tried, for the reasons given in the previous section of this judgment, it seems to me that there is no such serious issue. Given the risk that the disclosure order will expose the Banks to liability, the availability of an alternative remedy in Australia, together with the lack of any exceptional circumstances, it is plain, in my judgment, that the disclosure application has no merit. On this basis, therefore, it seems to me that the permission to serve out which I granted as part of the *ex parte* order should be set aside.

50.    For completeness, however, I go on to consider whether England is clearly or distinctly the most appropriate forum. In short, it is not. The proceedings concern the disclosure by an Australian bank of information in Australia where a key issue is the application of Australian law (and in particular the **Tournier** principle and the operation of the PA 1988). On no basis, so it seems to me, can it be said that England is clearly or distinctly the most appropriate forum. On this basis too, therefore, I would set aside the permission to serve out previously granted.

**Conclusion**

51.    In conclusion, therefore, whichever approach I adopt the outcome is, in effect, the same. In short, for the reasons given above, I will discharge the disclosure order and/or set aside the permission to serve out previously granted.

**PART V: THE JURISDICTION APPLICATIONS**

52.    By the Jurisdiction Applications, the Banks challenge the jurisdiction of the English court in respect of the substantive claim against them. Here, there is no doubt that the

*Altimo* requirements have to be met – in other words, for the claim to be allowed to continue I need to be satisfied that there is a good arguable case that the claim falls within one of the relevant jurisdictional gateways, there must be a serious issue to be tried on the merits and, in all the circumstances, England must be clearly or distinctly the most appropriate forum.

## Gateway

53.    The jurisdictional gateways are of course set out in paragraph 3.1 of CPR PD6B. Of these, the Claimants rely on gateways (3), (5), (15), (16) and (25). The Banks accept that gateway (3) applies but dispute the applicability of the others. Having considered the matter, I agree with the Banks – I do not see how gateways (5), (15), (16) and (25) have any application to the present case. Little turns on this, however, because, as stated above, the Banks (correctly) accept that gateway (3) does apply.

## Serious issue

54.    The substantive claim as against the Banks is set out in paragraphs 25 to 28 of the Particulars of Claim. In short, they set out three causes of action as follows:

(1) an equitable proprietary claim;

(2) a claim in unconscionable/knowing receipt; and

(3) a claim in unjust enrichment.

### (a) The equitable proprietary claim

55.    The first claim made by the Claimants against the Banks is a proprietary claim. In short, it is pleaded that the Claimants have "an equitable proprietary interest" in the relevant sums and that the Banks continue to hold the relevant monies "on constructive trust for the Claimants' benefit".

56.    According to the Banks, there are a number of difficulties with this claim. The most fundamental, however, is that when a bank receives money from a customer (and in the absence of the bank being implicated in the fraud), it does so as a *bona fide* purchaser for value. It gives value and receives good title to the money. So where there is a fraud and money is paid into the bank account of a fraudster, any proprietary claim lies only against the account holder and not the bank (and moreover that proprietary claim would be in respect of the debt owed by the bank to the account holder): ***Foskett v McKeown*** [2001] 1 AC 102 at 127B-128C.

57.    In the present case, there is no suggestion that the Banks were in any way implicated in the fraud itself. The furthest the Particulars of Claim go is to plead that the Banks acted "unconscionably" and had "actual and/or constructive knowledge" that the relevant monies paid into the relevant bank accounts were subject to a constructive trust. Neither of the above pleas, however, was particularised in any way and nor was any evidence led in relation to the same. Indeed, in oral submissions counsel for the Claimants frankly accepted that there was nothing further which could be pleaded at this stage – in other words, the Claimants are simply hoping that something further would turn up on disclosure.

58.    This being the case, it seems to me that there is no proper basis for suggesting that the Banks would be treated as anything other than *bona fide* purchasers for value in the usual way. From this it must follow that, for the reasons given above, there can be no serious issue that proprietary claims lie against the Banks.

**(b) The claim in unconscionable/knowing receipt**

59.    The Claimants' second claim against the Banks is for unconscionable or knowing receipt. Again, the Banks raise a number of issues, the most fundamental of which (once again) being that, as stated above, there is no basis for suggesting other than that the Banks received good title to the monies as *bona fide* purchaser for value – something which, as the law currently stands, is fatal to a knowing receipt claim. Indeed, as was said by the Court of Appeal in ***Byers v Saudi National Bank*** [2022] 4 WLR 22 at [79]:

> "In short, a continuing proprietary interest in the relevant property is required for a knowing receipt claim to be possible. A defendant cannot be liable for knowing receipt if he took the property free of any interest of the claimant…"

60.    It is true that the above case is now subject to an appeal to the Supreme Court but I have to apply the law as it is. Further and in any event, as set out above there is absolutely no basis for the Claimants making out the "knowing" or "unconscionable" element of a knowing receipt claim such that, once again, so it seems to me, it cannot be said that there is a serious issue for trial here either.

### (c) The claim in unjust enrichment

61.    The final claim made by the Claimants against the Banks is for unjust enrichment. As is well established, there are four essential requirements for such a claim, namely, (1) has the defendant been enriched, (2) was the enrichment at the claimant's expense, (3) was the enrichment unjust and (4) are there any defences available to the defendant?

62.    Here, however, it seems to me that the Claimants fall at the first hurdle. It is well established that when a bank receives monies from a customer, although there is a notional increase in the bank's assets, there was an immediate corresponding liability assumed by the bank to the customer. As was stated in **_Test Claimants in the FII Group Litigation v Revenue and Customs Commissioners_** [2021] UKSC 31 at [172]:

> "The point is also recognised in judicial authority. In **_Jeremy Stone Consultants Ltd v National Westminster Bank plc_** [2013] EWHC 208 (Ch) Sales J addressed a claim to recover from the defendant bank money which it was induced by a third party to pay into a company's bank accounts when the company, unbeknown to the claimants, was part of the third party's fraudulent Ponzi scheme. One of the claims against the bank was for restitution of the moneys in those accounts on the basis of NatWest's unjust enrichment as a result of the moneys having been paid on the basis of a mistake. Sales J rejected the claim based on unjust enrichment on two grounds. First, he held that the defendant bank had not been enriched. He stated (para 242):
>
>> "it is true that when the claimants paid sums to NatWest for the account of SEWL, NatWest received those sums and added them to its stock of assets as

moneys to which it was beneficially entitled. However, the increase in its assets was matched by an immediate balancing liability, in the form of the debt which NatWest owed SEWL reflected in the increase in SEWL's bank balance as a result of the payments."

He held that the claimants' unjust enrichment claim properly lay against the company, whose assets were increased by the payments into its bank accounts…"

63.    Further and in any event, a second difficulty faces the Claimants in relation to the fourth element of a claim for unjust enrichment, namely, the availability of any defences. Indeed, the same paragraph from *Test Claimants* continues:

"Secondly, even if there had been enrichment, he held that the bank had a defence of good faith change of position and a defence of ministerial receipt, because it had a contractual obligation to pay out the sums in SEWL's account in accordance with its customer's instructions and had done so."

64.    In the present case, precisely the same thing happened – long before the present proceedings were issued (or indeed before the Banks became aware of the alleged fraud), the monies had been withdrawn at the request of the relevant customer. For this reason too, so it seems to me, it cannot be said that a serious issue exists in relation to the unjust enrichment claim.

**Forum**

65.    As for forum, it is of course for the Claimants to show that England is clearly or distinctly the most appropriate forum.

66.    As to this, the high point of the Claimants' argument is that the Third Defendant is an English company with the principal fraudsters holding themselves out as being employed by that company. The difficulty, however, is that the Claimants are from Canada and the only active Defendants are in Australia and in Hong Kong. The reality, of course, is that no one really knows where the fraudster defendants are in fact based

19

although this is perhaps academic given that they have not engaged to date and no doubt have no intention of doing so going forward.

67.    In short, if the matter were to go to trial, the witnesses would no doubt primarily come from Canada and Australia. Nor is it clear as to the law of which jurisdiction would apply. In circumstances where the burden is on the Claimants to show that England is not just an appropriate forum but clearly or distinctly the most appropriate forum, it has, in my judgment, failed to do so.

**Conclusion**

68.    For these reasons, namely, that there is not a serious issue for trial and nor is England clearly or distinctly the most appropriate forum, I will set aside the service of the Claim Form on the Banks on the basis that the court does not have (or should not exercise any) jurisdiction in relation to the claim.

**PART VI: THE COSTS APPLICATION**

69.    As explained above, at the *ex parte* hearing I had refused to grant worldwide freezing order relief as against the Seventh to Ninth Defendant banks. On 28 October 2022, however, the Claimants renewed their application for the same relief as against those same parties.

70.    Subsequently, that application was withdrawn. The Claimants say that by then they had received appropriate assurances from the Banks and that as a result there was no need for them to proceed with their applications. The Banks, on the other hand, say that there was no material change of circumstances to justify renewing the application which, as a result, amounted to an abuse of process such that they should have their costs.

71.    In my judgment, the renewal of the application was not an abuse. It is true that I dismissed the application when it was first made to me in relation to the Banks on 6 October 2022. That, however, was at the *ex parte* stage and did not in itself preclude a further application being made.

72.     Having said that, the Claimants did renew the application, thereby causing the Banks to incur costs, and then subsequently withdrew it. Moreover, they did so unilaterally and therefore without agreeing any terms with the Banks. There may or may not have been good reasons for the Claimants withdrawing the renewed application but by analogy with the procedure for discontinuance of claims, it seems to me that they ought to pay the relevant costs. This is all the more so since, given my findings above, if the matter had proceeded to a hearing, I would inevitably have dismissed it with costs in any event.

**PART VII: CONCLUSION**

73.     In conclusion, therefore:

(1) I will continue the worldwide freezing order relief as against the First to Sixth Defendants.

(2) I will discharge the disclosure order insofar as it relates to the Banks; alternatively, I will set aside the order permitting to serve out in relation to the same.

(3) I will set aside the service of the Claim Form on the Banks on the basis that the court does not have (or should not exercise any) jurisdiction in relation to the claim.

74.     I conclude by expressing my gratitude to all counsel and their respective instructing solicitors.

# EXHIBIT 22

A

# MACKINNON v. DONALDSON, LUFKIN AND JENRETTE SECURITIES CORPORATION and Others

1985 Oct. 31;
Nov. 1; 5

Hoffmann J.

B

*Evidence—Documentary—Bankers' books—Right to inspect and take copies as evidence—Books relating to account with American bank in New York—Ex parte order and subpoena requiring bank to produce books—Whether infringements of sovereignty of United States—Whether justified—Whether ex parte order appropriate—Bankers' Books Evidence Act 1879 (42 & 43 Vict. c. 11), s. 7*

C

In an action brought by the plaintiff against certain company and individual defendants alleging fraud, the plaintiff obtained an order ex parte under section 7 of the Bankers' Books Evidence Act 1879[1] against an American bank which was not a party to the action. The order required the bank to produce books and other papers, held at its head office in New York, which related to an account of one of the defendants, a Bahamian company, which, having been struck off the Bahamian register of companies since the issue of the writ, had ceased to exist. The plaintiff then issued a subpoena duces tecum against an officer of the bank at its London office.

D

On a motion by the bank to discharge the order and the subpoena on the grounds that they exceeded the jurisdiction of the court and infringed the sovereignty of the United States:—

*Held*, discharging the order and the subpoena, that, save in exceptional circumstances, the court should not require a foreigner who was not a party to an action, and in particular a foreign bank which would owe a duty of confidence to its customers regulated by the law of the country where the customer's account was kept, to produce documents outside the jurisdiction concerning business transacted outside the jurisdiction; that the order and the subpoena, taking effect in New York, were infringements of the sovereignty of the United States; and that, in all the circumstances and particularly as legitimate alternative procedures were available to the plaintiff, such infringements were not justified (post, pp. 493F–G, G—494A, C–G, 500A–C).

E

F

*Reg. v. Grossman* (1981) 73 Cr.App.R. 302, C.A. applied.

*British South Africa Co. v. De Beers Consolidated Mines Ltd.* [1910] 2 Ch. 502, C.A. and *Acrow (Automation) Ltd. v. Rex Chainbelt Inc.* [1971] 1 W.L.R. 1676, C.A. distinguished.

*Bankers Trust Co. v. Shapira* [1980] 1 W.L.R. 1274, C.A. and *X A.G. v. A Bank* [1983] 2 All E.R. 464 considered.

G

*Per curiam.* Orders under the Bankers' Books Evidence Act 1879 concerned with documents outside the jurisdiction are so unusual that they should ordinarily be made on notice to the bank (post, p. 497D–E).

H

[1] Bankers' Books Evidence Act 1879, s. 7: "On the application of any party to a legal proceeding a court or judge may order that such party be at liberty to inspect and take copies of any entries in a banker's book for any of the purposes of such proceedings. An order under this section may be made either with or without summoning the bank or any other party . . ."

**1 Ch.**          Mackinnon v. Donaldson, Lufkin and Jenrette Corpn.

A       The following cases are referred to in the judgment:

*Acrow (Automation) Ltd. v. Rex Chainbelt Inc.* [1971] 1 W.L.R. 1676; [1971] 3 All E.R. 1175, C.A.

*Bankers Trust Co. v. Shapira* [1980] 1 W.L.R. 1274; [1980] 3 All E.R. 353, C.A.

*Bonalumi v. Secretary of State for the Home Department* [1985] Q.B. 675; [1985] 2 W.L.R. 722; [1985] 1 All E.R. 797, C.A.

B       *British South Africa Co. v. De Beers Consolidated Mines Ltd.* [1910] 2 Ch. 502, C.A.

*Laker Airways Ltd. v. Pan American World Airways* (1985) 607 F.Supp. 324

*London & Counties Securities Ltd. (In Liquidation) v. Caplan* (unreported), 26 May 1978, Templeman J.

*Norwich Pharmacal Co. v. Customs and Excise Commissioners* [1974] A.C. C       133; [1973] 3 W.L.R. 164; [1973] 2 All E.R. 943, H.L.(E.)

*Reg. v. Grossman* (1981) 73 Cr.App.R. 302, C.A.

*Société Internationale pour Participations Industrielles et Commerciales S.A. v. Rogers* (1958) 357 U.S. 197, U.S. Supreme Court

*South Carolina Insurance Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.* [1986] Q.B. 348; [1985] 3 W.L.R. 739; [1985] 2 All E.R. 1046, C.A.

D       *Waterhouse v. Barker* [1924] 2 K.B. 759, C.A.

*WEA Records Ltd. v. Visions Channel 4 Ltd.* [1983] 1 W.L.R. 721; [1983] 2 All E.R. 589, C.A.

*Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (No. 1 and No. 2), In re* [1978] A.C. 547; [1978] 2 W.L.R. 81; [1978] 1 All E.R. 434, H.L.(E.)

*X A.G. v. A Bank* [1983] 2 All E.R. 464

E       The following additional cases were cited in argument:

*Becker v. Noel (Practice Note)* [1971] 1 W.L.R. 803; [1971] 2 All E.R. 1248, C.A.

*Boyle v. Sacker* (1888) 39 Ch.D. 249, C.A.

*British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58; [1984] 3 W.L.R. 413; [1984] 3 All E.R. 39, H.L.(E.)

F       *Compagnie Générale Transatlantique v. Thomas Law & Co.* [1899] A.C. 431, H.L.(E.)

*Consolidated Rendering Co., In re* (1907) 66 Atl. 790

*Cook Industries Inc. v. Galliher* [1979] Ch. 439; [1978] 3 W.L.R. 637; [1978] 3 All E.R. 945

*Employers' Liability Assurance Corporation Ltd. v. Sedgwick, Collins & Co. Ltd.* [1927] A.C. 95, H.L.(E.)

*Farquharson v. Balfour* (1823) T. & R. 184

G       *Archer, H.M.S.* [1919] P. 1

*Haggin v. Comptoir D'Escompte de Paris* (1889) 23 Q.B.D. 519, C.A.

*Lhoneux, Limon & Co. v. Hong Kong and Shanghai Banking Corporation* (1886) 33 Ch.D. 446

*Newby v. Colt's Patent Firearms Manufacturing Co.* (1872) L.R. 7 Q.B. 293

*United States v. First National City Bank* ('Citibank') (1968) 396 F. 2d 897

H       MOTION

By a writ dated 22 December 1983, the plaintiff, Kenneth Thomas Mackinnon, sought against the defendants, Donaldson, Lufkin and Jenrette Securities Corporation, Donaldson, Lufkin and Jenrette (Asia)

Ltd., Investment Advisory Services (1979) Ltd., Alan David Shepherd,    A
G. Raymond Lanciault and the Martini Foundation inter alia, (1)
damages for breach of an agreement made in October 1980 between the
plaintiff and the fourth defendant as managing director of the second
defendant whereby it was agreed that the first and/or second defendants
would provide or procure finance for plaintiff; (2) damages for deceit in
respect of false representations deliberately made by the fourth defendant
to the plaintiff on behalf of the first and/or second defendants; (3)    B
damages for breach of an agreement made in October 1980 between the
plaintiff and the fifth defendant whereby it was agreed that the sixth
defendant would provide finance for the plaintiff; (4) damages for deceit
in respect of false representation deliberately made by the fifth defendant
to the plaintiff on behalf of the sixth defendant; (5) damages for
conspiracy to defraud the plaintiff; and (6) the return of U.S. $250,000    C
paid by the plaintiff to the third defendant for a consideration which had
wholly failed as money had and received by the defendant to the use of
the plaintiff. The plaintiff obtained an order ex parte from Master
Gowers on 2 October 1985 under the Bankers' Books Evidence Act
1879 allowing the plaintiff to inspect and take copies of entries in the
books of Bank of America, Chase Manhattan Bank and Citibank N.A.

By a notice of motion dated 25 October 1985, Citibank N.A. and    D
Barry Robinson applied to the court for orders that (1) Citibank N.A.
be joined as seventh defendant to the action, pursuant to R.S.C., Ord.
15, r. 2(6); (2) the order of 2 October 1985 be set aside or varied so as
to exclude all books outside the jurisdiction of the court, or alternatively,
Citibank N.A. be given leave to appeal to the Court of Appeal against
that order; and (3) a subpoena dated 4 October 1985 addressed to Barry    E
Robinson of Citibank N.A. be set aside on the grounds that it was
procured for the purpose of securing the production of documents in the
possession of Citibank N.A.'s head office in New York, United States of
America, and was thus an abuse of the powers of the court, and/or
ought not to have been issued, in that the proper means of securing
production of such documents was by the procedure contained in
R.S.C., Ord. 39, or, alternatively, the subpoena be varied so as to    F
exclude from production all documents out of the court's jurisdiction.

The facts are stated in the judgment.


*Jonathan Hirst* for the bank. There are grave objections of principle
to the master's order. Its purpose is clearly to procure production of the
bank's documents in New York. The plaintiff is seeking to obtain    G
discovery from a non-party of bank documents outside the jurisdiction.
The order short-circuits the internationally agreed procedure under the
Hague Convention on the Taking of Evidence Abroad in Civil or
Commercial Matters in a way which our courts have deprecated when
United States Courts have tried it in the past. The bank is unlikely to be
unco-operative or difficult if the plaintiff applies to the court in New
York; but the bank objects in principle to an application here. It further    H
objects to the fact that the master's order was made ex parte.

It is clear from *Reg. v. Grossman* (1981) 73 Cr.App.R. 302 that a
bank should never (or only in the most exceptional circumstances) be

A ordered to produce a document which it holds abroad. Although it has been held in *Bonalumi v. Secretary of State for the Home Department* [1985] Q.B. 675 that the *Grossman* case was decided per curiam, the judgments are correct insofar as they suggest that the bank cannot apply to set aside an order made ex parte without being joined as a defendant before doing so: see *Boyle v. Sacker* (1888) 39 Ch.D. 249; *H.M.S.*

B *Archer* [1919] P. 1; *WEA Records Ltd v. Visions Channel 4 Ltd.* [1983] 1 W.L.R. 721 and *Becker v. Noel (Practice Note)* [1971] 1 W.L.R. 803. There was a stronger case for making an exception in *Reg. v. Grossman,* 73 Cr.App.R. 302 than in the present case because (a) in that case the bank had its head office within the jurisdiction and (b) the revenue had already tried unsuccessfully to obtain the documents in the Isle of Man. The "fortuitous" aspect is even more striking here where the plaintiff

C has taken advantage of the presence of a branch within the jurisdiction; also no attempt has been made to obtain the documents in New York.

The court should not undermine the system which preserves United Kingdom sovereignty when parties to foreign proceedings seek to obtain evidence in this jurisdiction; compare the Evidence (Proceedings in Other Jurisdictions) Act 1975, section 3. The converse procedure when

D parties to English proceedings wish to obtain evidence abroad is provided by R.S.C., Ord. 39 which is a complete code. The system combines court procedures and diplomacy in a way which preserves the interests of both jurisdictions concerned. Alternatively the plaintiff could apply to the court for leave to make a direct application to the New York court for discovery: *South Carolina Insurance Co. v. Assurantie Maatschappij*

E *"De Zeven Provincien" N.V.* [1986] Q.B. 348. The English courts have objected to the assertion by New York courts of the "long arm of jurisdiction"; compare *In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C. 547, 608D et seq. *per* Lord Wilberforce and *per* Lord Diplock at pp. 639F et seq. So has Parliament: see the Protection of Trading Institute Act 1980. This order and subpoena are invasions of the

F jurisdiction and sovereignty of the U.S.A., and they also deny the bank the opportunity of seeking any protection to which it may be entitled in New York.

*X A.G. v. A Bank* [1983] 2 All E.R. 464 was this case in reverse except that there the bank had its head office in New York. Leggatt J. clearly disapproved of the powers exercised by the United States court which he described as "excessive"; see at p. 480B, and as placing the

G bank in a "dilemma"; see at p. 480F. The English court should not grant the order and subpoena and wait to see if they result in an injunction in New York.

As to the dissolution of the bank's customer, (a) that does not destroy the right of confidentiality and the court cannot be sure that the bank will not be in breach if it complies and (b) the fact that the

H plaintiff would have a strong case if he used the right procedure is no excuse for trying to short-circuit it.

The New York court's recent decision in *Laker Airways Ltd. v. Pan American World Airways* (1985) 607 F.Supp. 324 indicates a welcome

change of attitude on the part of some United States judges which we should encourage by maintaining the same attitude ourselves.

*John McDonnell Q.C.* for the plaintiff. The English court asserts jurisdiction over foreign corporations who carry on business here because they are regarded as "English residents," even though they may also be resident in other jurisdictions: see *Newby v. Colt's Patent Firearms Manufacturing Co.* (1872) L.R. 7 Q.B. 293 and *Compagnie Générale Transatlantique v. Thomas Law & Co.* [1899] A.C. 431. For the application of this principle to banks see *Lhoneux, Limon & Co. v. Hong Kong and Shanghai Banking Corporation* (1886) 33 Ch.D. 446 and *Haggin v. Comptoir D'Escompte de Paris* (1889) 23 Q.B.D. 519. The bank has submitted to the jurisdiction of the English court by (a) taking up residence here, (b) by registering under Part X of the Companies Act 1948 which enables it to be served with process and (c) by securing recognition under the Banking Act 1979, which makes it a "bank" within the meaning of the Bankers' Books Evidence Act 1879, section 9, as amended: see *Employers' Liability Assurance Corporation Ltd. v. Sedgwick, Collins & Co. Ltd.* [1927] A.C. 95. The bank is thus liable to be sued or compelled to give discovery as a defendant or to give evidence or produce documents under subpoena which may assist to do justice between other litigants just like any other resident subject to the jurisdiction.

If, as is plainly the case, an English resident with no second residence can be compelled to produce on discovery, as a defendant, or under subpoena, as a witness, documents which are in his possession or overseas—subject to any excuses justified by applicable foreign law (see *Farquharson v. Balfour* (1823) T. & R. 184), why should a resident who has a second residence be in a different position? The real underlying problems where banks are concerned is that the production of documents by way of discovery or under subpoena may affect the rights of third party customers. Even without a foreign element, a subpoena against a bank to produce documents relating to a third party's account without reference to the third party may well not be enforced; and in that situation the court is always very cautious about orders made under the Bankers' Books Evidence Act 1879. It is a fortiori if the customer is outside the jurisdiction, even if the documents are here and no foreign branch is involved, though in such a case it can be argued that the customer has submitted the documents to the jurisdiction by keeping his accounts here.

The case for non-intervention is even stronger where a customer who is not subject to the English jurisdiction has his account with an overseas branch of a bank which is subject to the jurisdiction; it is accepted that in such a case the court should not use its power in personam over the bank save in exceptional circumstances. But where, as here, both the bank and its customer are, in one way or another, subject to the jurisdiction, the fact that the account is kept at a foreign branch should be irrelevant, unless some actual conflict of law arises.

There is nothing "fortuitous" about the bank having a branch here; that is a choice which the bank has made in its own commercial

A interests. What is "fortuitous" is that the customer who is the real target of the subpoena has chosen to keep its overseas account with a bank which has chosen to submit itself to the English jurisdiction. It would certainly be objectionable to take advantage of the bank's presence here in order to compel it to produce overseas documents where the real target was a customer against whom the court's process would not lie; but it is not objectionable to compel the bank to produce overseas

B documents if (a) the bank is itself the real target, or defendant, or (b) the real target is a customer who *is* amenable to the court's process, but from whom for some reason the document cannot be obtained. A parallel distinction might be drawn if the bank were subpoenaed to produce documents within the jurisdiction relating to a third party customer. That is what Leggatt J. meant by "excessive" in the *X A.G.*

C case [1983] 2 All E.R. 464, 480B. This is also the true explanation of the *Grossman* case, 73 Cr.App.R. 302, where the documents related to the account of a customer who was not amenable to the jurisdiction. When the Court of Appeal referred to the Isle of Man branch as a separate entity, they merely had in mind that the customer had not submitted to the jurisdiction in the sense in which it would have done by keeping its account with the bank's head office in London.

D In the present case, the customer, International Advisory Services (1979) Ltd. (I.A.S.) had submitted to the jurisdiction by having its place of business in London, or at all events the court was prepared to assert it, having given leave to effect service in the Bahamas under R.S.C., Ord. 11. Thus if it had not been dissolved before service it would have had to give discovery.

E The exercise of jurisdiction in personam over a foreigner resident here or over any defendant in respect of property outside the jurisdiction does not usually infringe foreign sovereignty or jurisdiction. It cannot do so where the personal remedy granted does not affect the rights of third parties who are not subject to the jurisdiction. What would be objectionable would be for the court to make an order in personam against a person subject to the jurisdiction which affected the rights of

F another person who was not subject to the jurisdiction; but that is not the present case.

No objection to the order or subpoena can be founded on any rights of I.A.S. because (1) it is not only dissolved but has no assets or liabilities and, even if the right to confidentiality could vest in the Treasurer of the Bahamas as adjunct to some credit balance or other asset, it cannot be "property" in vacuo where there are no assets for the

G confidentiality to protect. (2) I.A.S. would have to disclose the information sought and counterpart documents as a defendant if it had not brought about its own dissolution so any vestigial duty of confidence cannot relieve the bank from producing the documents. (3) The bank has not suggested that it is in fact under any conflicting legal obligation in New York.

H The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters as cutting down the remedies open to litigants: all it sets out to do is to provide an orderly and mutual system for obtaining documents from persons not subject to the jurisdiction of the

**Mackinnon v. Donaldson, Lufkin and Jenrette Corpn.**   **[1986]**

applicant state but subject to the jurisdiction of the respondent state. It   A
would be highly inconvenient to treat it as substituting its own procedure
for existing powers to obtain documents from persons subject to the
jurisdiction of both the states in question.

The bank's reasoning has in fact been adopted in the United States
of America and taken to extreme lengths. Discovery against foreign
parties to litigation is now apparently limited to documents within the
jurisdiction and documents abroad can only be obtained under the   B
Convention. This development may explain the difference between the
attitudes of the New York courts in *United States v. First National City
Bank* (1968) 396 F. 2d 897 and the *Laker* case, 607 F.Supp. 324. That
reasoning has not yet been adopted here. Foreign defendants
are regularly compelled to give discovery of their overseas documents, for
example, orders have been made against the first two defendants in the   C
present case, and according to the relevant department of the court no
letters of request for documents only have yet been issued.

The court should regard the Hague Convention as providing a
procedure for cases where discovery and subpoena are not available and
should not refrain from granting those forms of relief against persons
who are subject to the jurisdiction unless (a) there is a real risk of a   D
clash with foreign sovereignty or jurisdiction or (b) third parties outside
the jurisdiction may be materially affected. That would be consistent
with *South Carolina Insurance Co. v. Assurantie Maatschappij "De
Zeven Provincien" N.V.* [1986] Q.B. 348 which is relied on for (a) the
explanation of the rule that procedure is governed by the lex fori (see at
pp. 355H, and 358B), (b) the indication that the court should use its
control of proceedings to assist in keeping down costs and in particular   E
minimising the need for recourse to other tribunals (see at pp. 358B–D)
and (c) the assumption that production of the documents in question
would have been compellable by subpoena if the possessors—not the
documents—had been within the jurisdiction (see at pp. 354H–355A).

Lord Wilberforce's comment in the *Westinghouse* case [1978] A.C.
547 about the Act of 1975 being more restrictive than the previous law   F
was only referring to the procedure for obtaining evidence from persons
not subject to the jurisdiction. He was not referring to the remedies
available against persons subject to the jurisdiction.

Our "mere witness" rule makes American subpoenas for pre-trial
discovery against non-parties objectionable not because they purport to
operate extra-territorially but because they represent relief not available   G
in English proceedings. That was a major factor in the *Westinghouse*
case: see the comments of Lord Diplock in *British Airways Board v.
Laker Airways Ltd.* [1985] A.C. 58, 78D. Hostility of the English courts
to that procedure has no bearing on the present problem, for here
Citibank is trying to resist a subpoena which would clearly lie against an
English bank for the production of English documents. In effect they say
that the duty of persons subject to the jurisdiction to assist the court as   H
witnesses does not apply to corporations with a domicile or second
residence outside the jurisdiction, or at any rate the duty does not
extend to information or documents of such a corporation outside the

A    jurisdiction. But the plaintiff has a positive right to extract the information and documents in question from anyone subject to the court's jurisdiction under the principle of *Bankers Trust Co. v. Shapira* [1980] 1 W.L.R., 1274 which is an exception to the "mere witness" rule. In these circumstances there is a cause of action for discovery: see *Norwich Pharmacal Co. v. Customs and Excise Commissioners* [1974] A.C. 133; *Bankers Trust Co. v Shapira* [1980] 1 W.L.R. 1274 and

B    *London & Counties Securities Ltd. (In Liquidation) v. Caplan* (unreported), 26 May 1978, Templeman J. Compare *Cook Industries Inc. v. Galliher* [1979] Ch. 439 where the court made an order under this jurisdiction for the inspection of property in France. In these circumstances it goes without saying that the customer cannot object; the right to discovery is founded on the prima facie case of fraud against

C    the customer.
      There is no objection on grounds of comity in the present case. Compare *In re Consolidated Rendering Co.* (1907) 66 Atl. 790; *United States v. First National City Bank,* 396 F. 2d 897 and the expert evidence as to New York law summarised in *X A.G. v. A Bank* [1983] 2 All E.R. 464, 472ᴅ–474ꜰ. Contrast *Reg. v. Grossman*, 73 Cr.App.R. 302 where the order was as objectionable as it could possibly be because it

D    was obtained after the Manx court had refused relief and it had been followed by a Manx injunction.
      In fact the plaintiff is not seeking to obtain discovery from a non-party; the subpoena is part of the court's normal procedure and the order merely relieves the bank from bringing its original books to court. It is normal for the order to be obtained ex parte so far as the bank is concerned; the remarks in the *Grossman* case were directed at the

E    failure to notify the customer which does not arise in the present case since the customer has been dissolved. The procedure adopted does not deny Citibank the opportunity of claiming any protection which would be available to it in New York; it could have raised any such point on this application but has not done so.
      There is no great constitutional issue raised of the kind suggested by

F    the bank. When the remedy sought is in personam the English court's writ does run abroad: compare *Acrow (Automation) Ltd. v. Rex Chainbelt Inc.* [1971] 1 W.L.R. 1676. The true principle at stake is the plaintiff's right to require any person subject to the jurisdiction to produce at the trial of his action any evidence which may assist the court to do justice between the parties. That principle should only be cut down by a conflicting right and there is no such right asserted here but

G    merely a nebulous and unfounded point of diplomatic principle or alleged conflict between the English and New York courts.
      *Hirst*, in reply. The bank does not dispute that the court has jurisdiction over it as a result of its presence within the jurisdiction. The issue is whether the court should exercise the jurisdiction. In international law the United Kingdom has no jurisdiction over the bank in respect of

H    what it has or does outside the United Kingdom. This principle would be modified if the bank had duly been made a party to the litigation; but that is not the case, The English courts have been increasingly cautious about exercising jurisdiction of this kind. The *Norwich Pharmacal* case

[1974] A.C. 133 involving documents within the jurisdiction was an
exceptional case. The *Bankers' Trust* case [1980] 1 W.L.R. 1274 and the
*London & Counties Securities* case (unreported), 26 May 1978,
Templeman J. involved hot pursuit of missing funds. That did not arise
in this case where the trail was cold.

*Cur. adv. vult.*

5 November. HOFFMANN J. read the following judgment. This
motion raises a point of some importance to banks, especially foreign
banks with branches in London. A plaintiff in an action before this court
has served a subpoena and an order obtained ex parte under the
Bankers' Books Evidence Act 1879 upon Citibank at its branch office in
London. Citibank is a New York bank with its head office in Manhattan
and with branches all over the world. It is not a party to the proceedings.
The subpoena and the order require Citibank to produce books and
other papers held at its head office in New York, relating to transactions
which took place in New York on an account maintained there by a
Bahamian company. Citibank has moved to set aside the subpoena and
to discharge the ex parte order on the grounds that in principle it
exceeds the international jurisdiction of this court and infringes the
sovereignty of the United States.

The background to the motion is international fraud. Mr. Mackinnon,
the plaintiff in the action, alleges that he has been swindled out of U.S.
$250,000 by the two personal defendants, Mr. Alan Shepherd and Mr.
Raymond Lanciault. He says that they pretended that through certain
American and Hong Kong companies and a Liechtenstein foundation,
they would procure for him a loan of U.S. $360 million to enable him to
buy a property in Hong Kong. At their request he paid an advance fee
of U.S. $250,000 into an account of International Advisory Services
(1979) Ltd. ("I.A.S."), a Bahamian company represented by Mr.
Lanciault, at Citibank, New York. In truth, says the plaintiff, there was
never any intention or ability to procure a loan. The transaction was
simply a scheme to defraud. His action is to recover the U.S. $250,000
and for damages. The trial is due to begin on the 25th of this month.

I.A.S. is named as a defendant in the writ and ordinarily would have
had to disclose on discovery the documents or copy documents
concerning the operation of its account with Citibank. This would have
shown, for example, on whose authority the account was operated and
what happened to the U.S. $250,000. Unfortunately, however, I.A.S.
has ceased to exist. When an attempt was made in March 1985 to serve
it with notice of the writ pursuant to leave granted under R.S.C., Ord.
11, it was found that on 26 January 1985 it had been struck off the
Bahamian companies register under the Removal of Defunct Companies
Act [c. 185 of the 1965 consolidation] and the Removal of Defunct
Companies (Amendment) Act 1975. The file disclosed that this had been
done at the request of the company's Bahamian directors on the ground
that it had no assets or liabilities and was no longer operating.

The plaintiff therefore wishes to obtain the books and documents
from Citibank itself. If Citibank did not have a branch in England, there

A would be only two ways in which this could be done. The first and more orthodox route would be to apply to a master under R.S.C., Ord. 39 for the issue of letters of request to the courts of New York specifying the documents required to be produced. The United States and the United Kingdom are both parties to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters and, subject to any questions of privilege or public policy under New York law (compare

B section 3 of the Evidence (Proceedings in Other Jurisdictions) Act 1975) this court is entitled under the Convention to the assistance of the New York courts in obtaining evidence for the purposes of the pending action.

The second route is for the plaintiff to apply directly to a court in New York under provisions of United States or New York legislation.

C To adopt this course, the plaintiff would first have to obtain the leave of this court: see *South Carolina Insurance Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.* [1986] Q.B. 348 and the defendants, who are not party to this motion, would be entitled to be heard on an application for leave. At the moment, however, I cannot see why, subject to any question of costs, the plaintiff should not obtain such leave if a direct application is likely to be more expeditious than letters

D of request. Citibank concede that the plaintiff has made out a strong case for the relevance of the documents and would be happy to produce them under the protection of an order of the New York court, whatever method may be used to obtain such an order.

It appears that in September 1985 the plaintiff's legal advisers surveyed the fruits of discovery from the various defendants and decided

E that they needed to obtain the documents in question from Citibank and also other American and Hong Kong documents relevant to the alleged fraud in the possession of the Chase Manhattan Bank and the Bank of America. With the trial two months away, an application for letters of request was thought to be too dilatory. Application was therefore made ex parte to the master for orders upon all three banks under section 7 of the Bankers' Books Evidence Act 1879 requiring, in the case of

F Citibank, that the plaintiff and his solicitors

> "be at liberty to inspect and take copies of any entries in the books . . . relating to the sum of U.S. $250,000 paid on 24 October 1980 . . . to Citibank's [New York] office for the account of Investment Advisory Services (1979) Ltd. number 10776363 including any entries showing what has become of the said sum of $250,000."

G

The master made an order in those terms on 2 October 1985. Two days later, the plaintiff caused subpoenas ad testificandum and duces tecum to be issued to the three banks. In the case of Citibank the subpoena, as now amended, requires it to attend by its proper officer to give evidence on the part of the plaintiff and to produce by its proper

H officer

> "all correspondence, drafts, cheques, vouchers, internal memoranda and any other documents or records or copies thereof relating to account number 10776363 with your head office in New York . . ."

Both the order and subpoena were directed to Citibank at its office at A
336, The Strand, London, and served upon it there.

I conclude this recital of the facts by mentioning two matters. First,
so far as the subpoena ad testificandum is concerned, I was told that
there is an officer of Citibank now resident in England who may have
some knowledge of transactions on the account in question, though
probably not those in issue. There is no objection to his attendance B
pursuant to the subpoena. The only objection is to production of the
documents in New York. Secondly, I was told that Chase Manhattan
Bank and Bank of America have complied with the orders and do not
object to compliance with the subpoenas.

Before turning to the matters in controversy, I should note two
points on which counsel were agreed. The first is that Citibank has locus
standi to bring this motion without being joined as a party to the action. C
In the case of a subpoena there is no doubt that the person served may
apply to have it set aside, in this division by summons to the master or
motion to the judge. The Bankers' Books Evidence Act 1879 was, as
Bankes L.J. said in *Waterhouse v. Barker* [1924] 2 K.B.759, 763:

> "passed in the interest of bankers in order to prevent interference
> with their business, and needless expense and trouble, and to D
> facilitate the giving in evidence of relevant material contained in
> their books."

An order under section 7 of the Act therefore has strong analogies with
a subpoena, tailored to meet the convenience of banks. It would be
illogical if the bank had no locus standi to apply to discharge it. In *Reg.
v. Grossman* (1981) 73 Cr.App.R. 302 a customer who wished to E
discharge an ex parte order made upon its bank went to the lengths of
applying to be joined as a party and then appealing to the Court of
Appeal (Civil Division). Quite apart from the fact that the proceedings
in that case were criminal and that the Court of Appeal, therefore, had
no jurisdiction (see *Bonalumi v. Secretary of State for the Home
Department* [1985] Q.B. 675), the procedure there adopted seems to F
offend against the rule that no appeal may be brought against an order
made ex parte until an application to discharge it has been made under
R.S.C., Ord. 32, r. 6 to the judge who granted the order: see *WEA
Records Ltd. v. Visions Channel 4 Ltd.* [1983] 1 W.L.R. 721. It is true
that the applicant in *Grossman's* case, 73 Cr.App.R. 302 was the
customer rather than the bank itself. Nevertheless, if any person affected
may apply to discharge an injunction (see *Halsbury's Laws of England*, G
4th ed., vol. 24 (1979), para. 1111), I do not see why the same should
not be true of an order under the Bankers' Books Evidence Act 1879.

The analogy between an order under the Act and a subpoena leads
to the other point on which counsel were agreed, namely, that for the
purposes of the jurisdictional point I have to consider no distinction can
be drawn between the order and the subpoena. If it would be improper H
to require production of the New York documents by subpoena, it could
not be proper to require their inspection and copying by order under the
Act.

A    The argument in support of the subpoena and order by Mr. McDonnell, for the plaintiff, is simple. Citibank carries on business in London. It has complied with the provisions of section 691 of the Companies Act 1985 by registering, inter alia, the names and addresses of persons resident within the jurisdiction authorised to accept service of process on the bank's behalf. It has applied for and obtained the privileges of recognition as a bank by the Bank of England under the

B    Banking Act 1979. Citibank has therefore submitted itself to the jurisdiction of the English court. It follows that it can be required to comply with a subpoena in the same way as an English company. Unless there is some good reason for non-production, for example, that production would be unlawful by the law of the place where the documents are kept, the fact that the documents in question happen to

C    be out of the jurisdiction is no reason for discharging the subpoena.
    I think that this argument confuses personal jurisdiction, i.e., who can be brought before the court, with subject matter jurisdiction, i.e., to what extent the court can claim to regulate the conduct of those persons. It does not follow from the fact that a person is within the jurisdiction and liable to be served with process that there is no territorial limit to the matters upon which the court may properly apply its own rules or

D    the things which it can order such a person to do. As Dr. Mann observed in a leading article, "The Doctrine of Jurisdiction in International Law," (1964) 111 Recueil des cours 146:

    "The mere fact that a state's judicial or administrative agencies are internationally entitled to subject a person to their personal or 'curial' jurisdiction does not by any means permit them to regulate

E    by their orders such person's conduct abroad. This they may do only if the state of the forum also has substantive jurisdiction to regulate conduct in the manner defined in the order. In other words, for the purpose of justifying, even in the territory of the forum, the international validity of an order, not only its making, but also its content must be authorised by substantive rules of

F    legislative jurisdiction."

See also by the same author "The Doctrine of International Jurisdiction Revisited after Twenty Years," (1984) 196 Recueil des cours 9, 19.
    The content of the subpoena and order is to require the production by a non-party of documents outside the jurisdiction concerning business which it has transacted outside the jurisdiction. In principle and on authority it seems to me that the court should not, save in exceptional

G    circumstances, impose such a requirement upon a foreigner, and, in particular, upon a foreign bank. The principle is that a state should refrain from demanding obedience to its sovereign authority by foreigners in respect of their conduct outside the jurisdiction. It is perhaps ironic that the most frequent insistence upon this principle by Her Majesty's Government has been as a result of its violation by the courts and

H    government agencies of the United States. In particular, Her Majesty's Government has on several occasions objected to the application by United States courts and agencies of the United States antitrust laws to British companies in respect of their conduct outside the United States.

It has also objected to demands made upon such companies for the     A
production of documents situated outside the United States and
concerned with transactions taking place abroad: see the submissions for
the Crown in *In re Westinghouse Electric Corporation Uranium Contract
Litigation M.D.L. Docket No. 235 (No. 1 and No. 2)* [1978] A.C. 547,
589.

Similarly in *X A.G. v. A Bank* [1983] 2 All E.R. 464, the United
States department of justice issued a subpoena to a New York bank     B
requiring it to produce to a New York grand jury the documents relating
to the accounts maintained at its London branch by two Swiss companies,
one having a major branch in New York, and a Panamanian corporation
resident in Switzerland. An order for the enforcement of this subpoena
was made by a New York court. Leggatt J. described the order, at
p. 480, as "the exercise by the United States court in London of powers     C
which, by English standards, would be regarded as excessive . . ."
Conversely, it seems to me that the subpoena and order in this case,
taking effect in New York, are an infringement of the sovereignty of the
United States. The need to exercise the court's jurisdiction with due
regard to the sovereignty of others is particularly important in the case
of banks. Banks are in a special position because their documents are     D
concerned not only with their own business but with that of their
customers. They will owe their customers a duty of confidence regulated
by the law of the country where the account is kept. That duty is in
some countries reinforced by criminal sanctions and sometimes by
"blocking statutes" which specifically forbid the bank to provide
information for the purpose of foreign legal proceedings: compare
section 2 of our Protection of Trading Interests Act 1980. If every     E
country where a bank happened to carry on business asserted a right to
require that bank to produce documents relating to accounts kept in any
other such country, banks would be in the unhappy position of being
forced to submit to whichever sovereign was able to apply the greatest
pressure.

I have stated the principle as being a self-imposed limitation upon a
state's sovereign authority and I must clarify this concept by distinguishing     F
certain other cases relied on by Mr. McDonnell. First, I am not
concerned with the enforcement of private rights arising out of matters
properly subject to the jurisdiction of the court. For example, a foreigner
may have agreed by a contract over which the court has jurisdiction to
perform various acts abroad. There can be no objection in principle to
the enforcement of those rights by injunction or specific performance,
even though this requires the performance of acts abroad: see *British     G
South Africa Co. v. De Beers Consolidated Mines Ltd.* [1910] 2 Ch. 502;
*Acrow (Automation) Ltd. v. Rex Chainbelt Inc.* [1971] 1 W.L.R. 1676.
But a subpoena does not involve the enforcement of a private right. It is
an exercise of sovereign authority to require citizens and foreigners
within the jurisdiction to assist in the administration of justice.

Secondly, I am not concerned with the discovery required by R.S.C.,     H
Ord. 24 from ordinary parties to English litigation who happen to be
foreigners. If you join the game you must play according to the local
rules. This applies not only to plaintiffs but also to defendants who give

A notice of intention to defend. The recent decision of the Court of Appeal in the *South Carolina Insurance Co.* case [1986] Q.B. 348 shows that adherence to local rules requires also forbearance from taking advantage of more advantageous rules available elsewhere. Of course, a party may be excused from having to produce a document on the grounds that this would violate the law of the place where the document is kept: compare *Société Internationale pour Participations Industrielles et*

B *Commerciales S.A. v. Rogers* (1958) 357 U.S. 197. But, in principle, there is no reason why he should not have to produce all discoverable documents wherever they are.

The authority most in point and upon which Mr. Hirst for the bank mainly relied is the decision of the Court of Appeal (Civil Division) in *Reg. v. Grossman*, 73 Cr.App.R. 302. The fact that this decision was

C given per incuriam without jurisdiction does not detract from its authority on the matters now in issue. It concerned the propriety of an order made ex parte under section 7 of the Bankers' Books Evidence Act 1879 on Barclays Bank Ltd. at its head office in London requiring it to allow the Inland Revenue to inspect and take copies of an account maintained by Savings and Investment Bank Ltd., an Isle of Man company, with Barclays Bank's branch in the Isle of Man. The evidence was required

D for the purpose of a prosecution for tax evasion pending against Mr. Grossman before a criminal court in Wales. It appears that an application for a similar order had previously been made to the court in the Isle of Man and had been refused. Lord Denning M.R. held that the order should not have been made. He said, at pp. 307–308:

E "I think that the branch of Barclays Bank in Douglas, Isle of Man, should be considered in the same way as a branch of the Bank of Ireland or an American bank, or any other bank in the Isle of Man which is not subject to our jurisdiction. The branch of Barclays Bank in Douglas, Isle of Man, should be considered as a different entity separate from the head office in London. It is subject to the laws and regulations of the Isle of Man. It is licensed by the Isle of Man government. It has its customers there who are subject to the

F Manx laws. It seems to me that the court here ought not in its discretion to make an order against the head office here in respect of the books of the branch in the Isle of Man in regard to the customers of that branch. It would not be right to compel the branch—or its customers—to open their books or to reveal their confidences in support of legal proceedings in Wales. Any order in

G respect of the production of the books ought to be made by the courts of the Isle of Man—if they will make such an order. It ought not to be made by these courts. Otherwise there would be danger of a conflict of jurisdictions between the High Court here and the courts of the Isle of Man. That is a conflict which we must always avoid. . . . It seems to me that, although this court has jurisdiction to order the head office here to produce the books, in our discretion

H it should not be done."

Shaw L.J. agreed with Lord Denning M.R. and mentioned, as Lord Denning M.R. had done before the passage I have cited, that since the ex

parte order the court in the Isle of Man had actually granted an injunction    A
restraining Barclays Bank from disclosing the books. Oliver L.J. said that
an order to inspect the account of a foreign customer maintained with a
foreign branch of an English bank was "a very strong thing to seek." He
went on, at p. 309:

> "The English court is asked to order, because of the fortuitous fact
> that the head office of Barclays Bank is situated in this country, the    B
> disclosure of a foreign banker's account maintained at a foreign
> branch of Barclays Bank. That is sought in the face of a subsisting
> injunction of a court of competent jurisdiction in the Isle of Man
> . . . I do not say that an order in such unusual circumstances can
> never be made, but it would I think be one which ought to be made
> only on a case very much stronger than that which the Inland
> Revenue have been able to deploy . . ."    C

Mr. Hirst rightly points out that in two respects this is an a fortiori
case. Barclays was at least an English bank whereas Citibank is foreign.
International law generally recognises the right of a state to regulate the
conduct of its own nationals even outside its jurisdiction, provided that
this does not involve disobedience to the local law. But banks, as I have
already said, are in a special position. The nature of banking business is    D
such that if an English court invokes its jurisdiction even over an
English bank in respect of an account at a branch abroad, there is a
strong likelihood of conflict with the bank's duties to its customer under
the local law. It is therefore not surprising that any bank, whether
English or foreign, should as a general rule be entitled to the protection
of an order of the foreign court before it is required to disclose    E
documents kept at a branch or head office abroad.

Secondly, Mr. Hirst says that in *Reg. v. Grossman*, 73 Cr.App.R.
302 there was no other way to obtain the documents. The court of the
Isle of Man had refused to order production. In this case there are, as I
have mentioned, two methods by which the documents could be obtained
without infringing United States sovereignty and without depriving
Citibank of the protection of a New York order. Mr. Hirst submits that    F
as between states which are party to the Hague Convention or similar
bilateral treaties, evidence should ordinarily be obtained only by the
methods prescribed or permitted in the convention. He referred me to a
recent decision of the New York Federal District Court in *Laker
Airways Ltd. v. Pan American World Airways* (1985) 607 F.Supp. 324 in
which Brieant J. quashed a subpoena served on two English banks at    G
their New York offices requiring them to produce documents held in
England relating to transactions which took place in England. Brieant
J., held that this was in principle "inappropriate" and also constituted
"an end run . . . around the Hague Convention." This decision shows a
welcome revival in a United States court of sensitivity to foreign
sovereign interests and I accept Mr. Hirst's submission that its reasoning
applies equally to this case.    H

Mr. McDonnell argued that *Reg. v. Grossman*, 73 Cr.App.R. 302
was distinguishable on two grounds. First, compliance with the order
would have been unlawful by the law of the Isle of Man whereas in this

Case 1:24-mc-00394-LAK    Document 4-18    Filed 08/23/24    Page 64 of 67
497
1 Ch.                Mackinnon v. Donaldson, Lufkin and Jenrette Corpn.        Hoffmann J.

A   case there is no suggestion that disclosure would violate any law of New
York. Likewise, in *Laker Airways Ltd. v. Pan American World Airways,*
607 F.Supp. 324 Brieant J. said that failure to use the Hague Convention
was "more than a mere technicality" because production of the
documents had been made unlawful in English law by orders made
under the Protection of Trading Interests Act 1980. Secondly, the
customer in *Grossman's* case, 73 Cr.App.R. 302 was a foreign company

B   not party to the proceedings whereas in this case the customer, though
Bahamian by incorporation, appears at some stage to have carried on
business in London and would, if it had not ceased to exist, be a party
to the action.

It seems to me that *Grossman's* case decides that an order in respect
of documents held at a bank's foreign branch or head office should not

C   be made save in very exceptional circumstances. Matters of the kind
mentioned by Mr. McDonnell may be relevant in deciding whether or
not to make an order in exceptional circumstances but do not affect the
general principle. In *Grossman's* case Shaw and Oliver L.JJ. also said
that although the Bankers' Books Evidence Act 1879 allowed an
application to be made ex parte, where the accounts of third parties
were affected the application should ordinarily be made upon notice to

D   the customer. In this case, notice could not be given to the customer
and application was therefore made ex parte. Mr. McDonnell said that
there could be no prejudice to the bank if it was served with the order
and left to apply to discharge it if it objected to compliance. But I think
that orders concerned with documents outside the jurisdiction are so
unusual that they should ordinarily be made on notice to the bank so as
to give the bank full opportunity to investigate the position in the

E   foreign jurisdiction.

Before turning to the question of whether such exceptional
circumstances exist in this case, I must address another argument
advanced by Mr. McDonnell. On the particular facts of this case, he
says, the order and subpoena seeking information about the I.A.S.
account should be equated to ordinary discovery against a defendant. It

F   follows that in accordance with the general rules of discovery, production
should be ordered unless there are grounds on which it should be
excused. The basis of this submission is that under the rule in *Norwich
Pharmacal Co. v. Customs and Excise Commissioners* [1974] A.C. 133,
as extended by the Court of Appeal in *Bankers Trust Co. v. Shapira*
[1980] 1 W.L.R. 1274, the plaintiff would be entitled to join Citibank as
a defendant and demand discovery of the documents in question in

G   order to be able to trace the proceeds of his U.S. $250,000. Mr. Hirst
agreed that for the purpose of deciding this point I should deal with the
matter as if there was a motion before me to join Citibank as a
defendant and require production of the documents by way of *Bankers
Trust Co.* discovery. The *Bankers Trust Co.* case establishes the
jurisdiction of the court to order a bank to give discovery of documents

H   relating to a customer's account when there is, in the words of Lord
Denning M.R., at p. 1282:

"a good ground for thinking the money in the bank is the plaintiff's
money—as, for instance, when the customer has got the money by

fraud—or other wrongdoing—and paid it into his account at the    A
bank."

The purpose of the discovery is to trace the money and find out what
has happened to it. This jurisdiction is in turn founded on the principle
disinterred by the House of Lords in the *Norwich Pharmacal* case [1974]
A.C. 133 and formulated as follows by Lord Reid, at p. 175:

> "if through no fault of his own a person gets mixed up in the    B
> tortious acts of others so as to facilitate their wrong-doing he may
> incur no personal liability but he comes under a duty to assist the
> person who has been wronged by giving him full information and
> disclosing the identity of wrongdoers."

The *Norwich Pharmacal* case is therefore an exceptional case in which a
bank can be named as a defendant solely for the purpose of obtaining    C
discovery and without there being any cause of action against it.

It seems to me that for the purposes of the jurisdictional rules now
under consideration, the *Norwich Pharmacal* case is much more akin to
the subpoena directed to a witness than the discovery required of an
ordinary defendant. It is a general duty imposed upon persons who
become "mixed up" in tortious acts to produce evidence and documents
*before trial* comparable with the general duty upon all persons who have    D
relevant knowledge or documents to give evidence *at the trial*. It is,
therefore, also an exercise of sovereign authority and not merely a
condition of being allowed to take part as plaintiff or defendant in an
English trial. In the United States there is a general right to discovery
from third parties but the fact that this process is characterised as
discovery does not alter its nature for the purposes of international    E
jurisdiction. In addition, the policy grounds for the restraint enjoined in
*Reg. v. Grossman*, 73 Cr.App.R. 302 apply with equal force to discovery
under *Bankers Trust Co. v. Shapira* [1980] 1 W.L.R. 1274.

In *Bankers Trust Co. v. Shapira* the order was made against an
English bank in respect of an account maintained in London. The
question of international jurisdiction was not considered. However, in
one of the cases cited by the Court of Appeal, *London and County*    F
*Securities Ltd. (In Liquidation) v. Caplan* (unreported), 26 May 1978,
Templeman J. had ordered an English bank to procure from its foreign
banking subsidiaries documents relating to accounts connected with the
defendant in order to trace assets which he was said to have embezzled.
Templeman J. described the relief which he was granting as "onerous
and . . . to be granted only in the most exceptional circumstances." The    G
exceptional circumstances were that the case was one of crime and fraud
where "unless effective relief is granted, justice may well become
impossible because the evidence and the fruits of crime and fraud may
disappear." The foreign subsidiary banks were indemnified against
liability in damages under the local law by the cross-undertaking in
damages and the infringement of sovereignty was excused by a
commercial equivalent of hot pursuit.    H

In my judgment, the authorities on *Bankers Trust Co. v. Shapira*
[1980] 1 W.L.R. 1274 discovery against a bank are consistent with what
seems to me to be correct in principle, namely, that its international

A    jurisdictional limits are the same as those of a subpoena duces tecum or
an order under the Bankers' Books Evidence Act 1879.

I therefore come finally to the question of whether this can be
regarded as an exceptional case justifying the making of an exorbitant
order. It does have at least one very unusual feature, namely, that the
customer to whom any duty of confidence is likely to be owed under
New York law has ceased to exist. It is true that under the Bahamian
B    Removal of Defunct Companies Act the assets of a dissolved company
vest in the treasurer of the Bahamas. But the company had no other
assets or liabilities and the possibility that the treasurer may assert a
right of confidence in gross in the courts of New York is somewhat
improbable. Compliance with the order is therefore highly unlikely to
involve Citibank in any civil liability in New York and the plaintiff
C    through Mr. McDonnell has offered to indemnify Citibank by way of
undertaking in damages against any which may arise. There is no
suggestion that compliance would in any other respect be unlawful by
New York law and, as I have noted, Chase Manhattan and Bank of
America have felt able to comply with similar orders. It is accepted that
documents are needed for the purposes of the trial which will shortly
take place.
D    On the other hand, I think that it would be wrong to undertake a
process of weighing the interests of this country in the administration of
justice and the interests of litigants before its courts against those of the
United States. As appears from the evidence before Leggatt J. in *X
A.G. v. A Bank* [1983] 2 All E.R. 464 this is an exercise which has
frequently been undertaken by the courts of the United States. It is
extremely difficult to perform in a way which carries conviction outside
E    the forum. Distinguished American commentators as well as foreign
observers have not failed to notice that the balance invariably comes
down in favour of the interests of the United States. It is equally hard
for a court in this country, with a duty to administer justice here, to put
objectively into the scales the interests of a foreign country in the
integrity of its sovereignty over persons or transactions within its
F    jurisdiction. It is likewise inappropriate to decide the matter on a
balance of convenience between the plaintiff and the bank. It seems to
me that in a case like this, where alternative legitimate procedures are
available, an infringement of sovereignty can seldom be justified except
perhaps on the grounds of urgent necessity relied upon by Templeman J.
in the *London and County Securities Ltd. v. Caplan* (unreported).
G    If this matter had come before me in September 1985, I would have
had no hesitation in saying that the subpoena and order should be
discharged and that the plaintiff should make application, directly or
indirectly, to the courts of New York. There is no question here of hot
pursuit. The money has almost certainly been long ago spirited away.
But I have anxiously considered whether to make an exceptional order
on the grounds that there is now little time before trial. The difficulty is
H    that the plaintiff has no satisfactory explanation for why he has left it so
late. The relevance and importance of the documents concerning the
Citibank account must have been known from the commencement of the
proceedings. The plaintiff has known since March 1985 that I.A.S. has

been struck off. I am told that the file relating to the striking off was    A
mislaid by the Bahamian authorities and was not recovered until
recently, but the affidavit of the plaintiff's solicitor in support of his ex
parte application says unequivocally that he learned in March that
I.A.S. had been struck off. It must have been obvious that the prospects
of getting these documents by ordinary discovery were not high.

Equally, I am not satisfied that even now it will not be possible to
obtain the documents before trial from the New York court. A motion    B
for leave to apply directly under United States or New York legislation
can be brought on two clear days' notice. I would be willing, if asked, to
abridge even this period. Citibank have said that they are willing to co-
operate in obtaining an appropriate New York order as quickly as
possible. In those circumstances, I think that I should exercise my
discretion by following the principle stated in *Reg. v. Grossman*, 73    C
Cr.App.R. 302 and discharge the order and subpoena.

*Order accordingly.*

*Solicitors: Coward Chance; Compton Carr.*

T. C. C. B.    D

E

LUCAS INDUSTRIES PLC. v. WELSH DEVELOPMENT AGENCY

[1986 W. No. 800]

F

1986 March 4; 21                    Sir Nicolas Browne-Wilkinson V.-C.

*Arbitration—Award—Appeal—Application for leave to appeal—Rent
review arbitration—Principles applicable to grant of leave—
Whether leave to be granted—Arbitration Act 1979 (c. 42),
s. 1(4)*[1]

*Landlord and Tenant—Rent—Review—Arbitration to determine review*    G
*rent—No terms specified for letting to hypothetical tenant—
Arbitrator's award based on new form of lease—Less restrictive
than tenant's existing lease—Tenant's application for leave to
appeal—Whether to be granted—Arbitration Act 1979 (c. 42),
s. 1(4)*

In deciding whether to grant leave to appeal against an
arbitrator's decision on a rent review clause in a lease, the    H
guidelines for granting leave to appeal against the decision of a

[1] Arbitration Act 1979, s. 1(4): see post, p. 503c.