UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re

Application of RICARDO BENJAMIN SALINAS PLIEGO,
& CORPORACIÓN RBS S.A. C.V., for an Order Pursuant
to 28 U.S.C. § 1782 Authorizing Discovery for Use in a
Foreign Proceeding

24-mc-0394 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/21/2026

### MEMORANDUM OPINION DENYING
### MOTION FOR PRELIMINARY INJUNCTION
### (CORRECTED)

Appearances:

> Matthew A. Toporowski
> TOPOROWSKI LAW, PLLC
> *Attorney for Proposed Intervenor*
>
> Peter John Veysey, Jr.
> Mark F. Raymond
> NELSON MULLINS RILEY & SCARBOROUGH LLP
> *Attorneys for Applicants*
>
> Louis A. Pellegrino, III
> DENTONS US LLP
> *Attorney for Respondents*

LEWIS A. KAPLAN, *District Judge.*

This action commenced in 2024 upon a request pursuant to 28 U.S.C. § 1782 by

Ricardo Benjamin Salinas Pliego and Corporación RBS S.A. C.V. (collectively, "Section 1782

Applicants") to obtain discovery in relation to a civil proceeding in the United Kingdom. Section

1782 Applicants allege in the English action that they were defrauded, by among others, Val Sklarov

and his then-attorney Jaitegh Singh. Sklarov allegedly posed as a member of the Astor family to

trick Salinas into giving him hundreds of millions of dollars worth of stock in a Mexican business

2

conglomerate.  He and Singh then allegedly misappropriated and at least in part liquidated that stock.

Section 1782 Applicants sought discovery from four parties in their attempts to find the traceable proceeds of the shares that Sklarov allegedly stole and sold.  This Court granted that request, and Section 1782 Applicants obtained from the subpoenaed parties – none of which was Sklarov nor controlled by him – thousands of pages of records, some of which were subject to a protective order this Court entered in the Section 1782 action.  Sklarov now asserts that Section 1782 Applicants have violated that protective order.  He seeks to intervene and obtain a preliminary injunction to stop Section 1782 Applicants' allegedly unauthorized use of the records.

## *Facts*

### *The Alleged Underlying Fraud*

Salinas claims to be the founder and chairman of Grupo Salinas, a Mexican business conglomerate of which Corporación RBS is an affiliate.[1]  He alleges that, in 2021, Corporación RBS and a party representing itself as an affiliate of the "Astor Group" – supposedly associated with the wealthy Astor family – entered a series of lending agreements in which Salinas agreed to transfer over 7 million shares in a publicly traded subsidiary of Grupo Salinas to a custodian to be held as collateral for a loan of over 3 billion Mexican pesos from the supposed "Astor Group" affiliate.[2] In 2024, Section 1782 Applicants came to believe that the so-called "Astor Group" actually was a

---

[1]  Salceda Decl. (Dkt 4-1) ¶ 4.

[2]  *Id.* ¶¶ 10-11, 15, 20, 24-25.

front for Sklarov and his associates, who allegedly were misappropriating the collateral shares and were engaged in stock-backed lending fraud.[3]

*The English Action*

Alleging fraudulent misrepresentation and breach of contract, Section 1782 Applicants filed in the Business and Property Courts of England and Wales, Commercial Court, *ex parte* applications to enjoin Sklarov and his associates from further liquidating the collateral shares and dissipating the related funds.[4]  On August 2, 2024, they obtained a worldwide freezing order against the assets of Sklarov and the other respondents in the English action, an injunction barring Sklarov and the other respondents from further dealing with the collateral shares, and a direction that they provide information about the location of the collateral shares and the proceeds of those that had been sold.[5]  The English court twice expanded its freezing and injunctive orders to include additional parties allegedly associated with the fraudulent scheme.[6]

*The Section 1782 Action*

Based on information Section 1782 Applicants received from one of the respondents in the English action, they believed that some of the shares and allegedly ill-gotten gains were

---

[3]     *Id.* ¶¶ 67-76, 88-108.

[4]     Salceda Decl. (Dkt 4-2) ¶ 121; Mascarenhas Decl. (Dkt 21-1) ¶ 4.

[5]     Allen Decl. (Dkt 4-13) ¶¶ 33-34.

[6]     *Id.* ¶¶ 39, 41.

4

transferred to a J.P. Morgan Chase & Co. ("JPMC") bank account in this district that was associated with Singh and two New York-based entities – Jurist IQ Corp. and Singh Law Firm, P.A. – controlled by Singh (collectively, the "Singh Parties").[7]  Section 1782 Applicants therefore filed their Section 1782 application on August 23, 2024.  This Court, on September 9, 2024, authorized them to issue a subpoena for documents and information to each of JPMC and the three Singh Parties.  The form of the order – which was proposed by Section 1782 Applicants on an *ex parte* basis – contained a recital – but not any order – that "the discovery sought is intended for use in a foreign proceeding before a foreign tribunal, specifically, a civil proceeding in the United Kingdom."[8]

On October 18, 2024, JPMC responded to the subpoena served on it, producing approximately 3,000 pages of bank records relating to the Singh Parties and Sklarov.[9]  The JPMC material was not produced pursuant to a protective order,[10] nor has a protective order in this action ever been negotiated or entered into between or among JPMC and Section 1782 Applicants.

In contrast, the Singh Parties and Section 1782 Applicants negotiated a protective order – entered by the Court on October 21, 2024 – pursuant to which the Singh Parties produced records on a rolling basis.[11]  That order in relevant part defined "Producing Party" to mean the Singh

---

[7]  *Id.* ¶¶ 50-55; Salceda Decl. (Dkt 4-2) ¶¶ 127-28.

[8]  Section 1782 Order (Dkt 9) at 2; *accord id.* at 1.

[9]  Veysey Decl. (Dkt 29-1) ¶ 24; *see* Sklarov Decl. (Dkt 21-8) ¶ 3.

[10]  Veysey Decl. (Dkt 29-1) ¶ 24.

[11]  *Id.* ¶¶ 15-18, 26-29; Protective Order (Dkt 19).

Parties and defined "Receiving Party" to mean Section 1782 Applicants.[12]  It further provided that any discovery material that the Producing Party designated as "confidential" by clearly marking it as such could be disclosed only to persons specified in the protective order, most of whom first had to sign a consent to the terms of the protective order before receiving the material.[13]  The order further provided that "Confidential Discovery Material used in the English Action [would] be subject to the collateral use restrictions set forth in Rule 31.22(1) of the Civil Procedure Rules applicable in the English Action."[14]  Finally, as relevant here, the order stated that "Confidential Discovery Material [would] be used solely for the prosecution and defense of the § 1782 Action and the English Action, and shall not be used in any other proceeding, or for any business, regulatory, commercial, competitive, personal or other purpose whatsoever."[15]

The Singh Parties ultimately produced approximately 2,200 pages in response to the subpoenas and designated every document as "confidential."[16]

---

[12] Protective Order (Dkt 19) ¶¶ 3-4.

[13] *Id.* ¶¶ 5-6, 8-9.

[14] *Id.* ¶ 13.

[15] *Id.* ¶ 18.

[16] Veysey Decl. (Dkt 29-1) ¶¶ 29-30.

On November 1, 2024, Section 1782 Applicants notified Sklarov about the productions and asked him to execute a consent form so that they could share confidential discovery material with him.[17]  Sklarov did not respond.[18]

*Summary Judgment and Contempt Proceedings in the English Action*

On March 5, 2025, Section 1782 Applicants moved in the English action for summary judgment against Sklarov.[19]  They, with the English court's and the Singh Parties' permission, included in that filing a copy of a report prepared by StoneTurn UK Limited.[20]  The StoneTurn report attempts to trace the proceeds of the shares allegedly misappropriated and sold by Sklarov and his associates.[21]  It contains both JPMC material and confidential discovery material from the Singh Parties from the Section 1782 action.[22]  Section 1782 Applicants needed and obtained permission from the English court and the Singh Parties to file the StoneTurn report because they could not otherwise have provided it to Sklarov because Sklarov had not signed the

---

[17] Ford Decl. (Dkt 29-15) ¶ 31.

[18] *Id.*

[19] Section 1782 Applicants' Opp'n (Dkt 29) at 14.

[20] Ford Decl. (Dkt 29-15) ¶¶ 4, 34, 40.

[21] *See* Sklarov Decl., Ex. D (Dkt 21-12) at 3-4.

[22] *Id.* at 4; Ford Decl. (Dkt 29-15) ¶ 36; Sklarov's Apr. 17, 2026 Letter (Dkt 46) at 2.

7

consent form required by the protective order as a condition of receipt of confidential discovery material.[23]

On September 18, 2025, Section 1782 Applicants filed a contempt application against Sklarov in the English action.[24]  They allege that Sklarov has failed to comply with the freezing and injunctive orders entered in the English action.[25]  Their application relies on confidential discovery material from the Section 1782 action.[26]  That material currently is not part of the public record in the English court but, this Court is advised, it may become public after the hearing now scheduled for April 27, 2026.[27]  According to Section 1782 Applicants, a merits hearing on the contempt application realistically could not be scheduled for earlier than November 2026.[28]

---

[23] *See* Veysey Decl. (Dkt 29-1) ¶¶ 33-37; Ford Decl. (Dkt 29-15) ¶¶ 36, 40.

[24] Ford Decl. (Dkt 29-15) ¶ 20.

They filed it under the same claim number as their preexisting action, the claim number being analogous to a docket number in this Court or an index number in a New York State action.

[25] Ford. Decl., Ex. A (Dkt 30-10) ¶ 5.

[26] Sklarov's Apr. 17, 2026 Letter (Dkt 46) at 2-3; *see* Ford Decl. (Dkt 29-15) ¶¶ 4, 26-27.

[27] *See* Ford Decl. (Dkt 29-15) ¶¶ 4, 27.

[28] *See id.* ¶¶ 21, 23-24.

*Other Domestic and Foreign Actions*

In November 2024, after obtaining the Section 1782 discovery, Section 1782 Applicants corresponded with Discover regarding the freezing orders entered in the English action.[29] They requested that Discover freeze accounts that Section 1782 Applicants, based on the Section 1782 discovery, believed to be associated with Sklarov's alleged fraud.[30] The same applicants then filed another Section 1782 action in the Northern District of Georgia seeking additional records from individuals and banks, including Discover, allegedly associated with or holding proceeds of Sklarov's alleged fraud.[31] They supported this application with excerpts from the JPMC materials obtained from the Section 1782 action in this Court.[32]

In December 2024, around the same time, Section 1782 Applicants filed a disclosure procedure in Monaco to obtain information and documents related to bank accounts that had been frozen in the English action.[33] They further moved to intervene in proceedings in which some account holders subsequently sought to have those accounts unfrozen.[34] Finally, they initiated a

---

[29]   *Id.* ¶ 43.

[30]   *See id.*

[31]   Veysey Decl. (Dkt 29-1) ¶¶ 42-43.

[32]   *Id.* ¶ 44.

[33]   Ford Decl. (Dkt 29-15) ¶ 46.

[34]   *Id.*

criminal complaint against Sklarov in Monaco.[35]  Section 1782 Applicants supported their filings in these proceedings with excerpts from the JPMC materials.[36]

In addition to the Monégasque criminal complaint, Section 1782 Applicants have initiated also a criminal complaint against Sklarov in Greece.[37]  They maintain that they have not used any Section 1782 material in the Greek action.[38]  Sklarov, however, asserts that they have used "information derived from § 1782 discovery obtained in this proceeding."[39]  Finally, Sklarov contends that Section 1782 Applicants have provided portions of the StoneTurn Report or other confidential discovery material to the media, Discover, and a private corporate intelligence firm owned by former Mossad agents.[40]  Section 1782 Applicants deny these accusations.[41]

*Prior Proceedings*

This Court entered a temporary restraining order and an order to show cause for a preliminary injunction upon receiving Sklarov's motion for preliminary relief.  The Court temporarily restrained Section 1782 Applicants "from making any further use of, or pursuing or

---

[35]   *Id.*

[36]   *Id.*

[37]   Section 1782 Applicants' Opp'n (Dkt 29) at 14; *see* Ford Decl. (Dkt 29-15) ¶ 45.

[38]   Ford Decl. (Dkt 29-15) ¶ 45.

[39]   Sklarov Decl. (Dkt 21-8) ¶ 12.

[40]   *Id.* ¶¶ 20, 27-31.

[41]   *See* Ford Decl. (Dkt 29-15) ¶¶ 40, 51.

advancing any application in reliance on, Confidential Discovery Material or Derivative Materials in any proceeding, tribunal, or forum other than" the Section 1782 action and the English action.[42] Sklarov and Section 1782 Applicants each submitted lengthy briefs, several supporting declarations, and thousands of pages of exhibits, arguing for and against a preliminary injunction. The Court heard argument on April 8, 2026, and took Sklarov's motion under advisement. Though the Court then vacated the temporary restraining order, it left the record open until April 15, 2026, for submission of further evidence. Sklarov failed to submit further evidence in a timely fashion. He instead, on April 16, 2026, at 3:37 p.m., (again failing to act in a timely fashion) requested an extension of time to April 17, 2026, to make the supplemental submission. The Court granted that request, and Sklarov submitted a five-page letter detailing his counsel's apparently thorough "page-level content comparison of the full Singh production against the full JPMC production" to determine what, if any, material from the Singh Parties was used in the various legal actions against Sklarov.[43]

### Discussion

Sklarov seeks a preliminary injunction because, he alleges, Section 1782 Applicants have used and are using confidential Section 1782 material in their English contempt application, their communications with Discover, and their other legal actions around the world, all in contravention of the protective order entered by this Court. Sklarov asserts that he may face imprisonment as well as continued "vexatious and abusive litigation conduct" if the Court does not

---

[42]    TRO & Order Show Cause (Dkt 22) at 2-3.

[43]    Sklarov's Apr. 17, 2026 Letter (Dkt 46) at 1.

enjoin Section 1782 Applicants' alleged unauthorized use of the Section 1782 material.[44] Accordingly, Sklarov argues that (1) he is entitled to intervene in this proceeding, (2) he is entitled to preliminary injunctive relief, and (3) the Court should hold Section 1782 Applicants in civil contempt for violating the protective order.

To obtain preliminary relief, Sklarov "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[45]  Although Section 1782 Applicants dispute the timeliness of Sklarov's motion to intervene and the likelihood that he would suffer irreparable harm absent preliminary relief, their primary argument is on the merits.  They assert that they never improperly used confidential discovery material in violation of the protective order and that Sklarov's requested relief therefore is unwarranted.  The Court accordingly (and despite substantial evidence to the contrary) assumes for the sake of argument that Sklarov's motion to intervene is timely and (without deciding the point) that he could face irreparable injury at the upcoming hearing on the contempt application.  The Court starts (and ultimately ends) with Sklarov's likelihood of success on the merits.  He argues that this Court's Section 1782 order, the English Civil Procedure Rules ("CPR"), and the protective order entered in the Section 1782 action prohibit Section 1782 Applicants' collateral use of the Section 1782 material.  The Court addresses each argument in turn.

---

[44] Sklarov's Mem. Law (Dkt 21-15) at 3.

[45] *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

*Section 1782 Order*

As an initial matter, the fact that Section 1782 Applicants obtained the material at issue via a Section 1782 action does not support Sklarov's argument. The Second Circuit held as much in *In re Accent Delight International Ltd.*[46] when it wrote, "Section 1782 does not prevent an applicant who lawfully has obtained discovery under the statute with respect to one foreign proceeding from using the discovery elsewhere unless the district court orders otherwise."[47]

The question thus becomes whether this Court elsewhere restricted the use of the Section 1782 material. Sklarov argues that it did because the Section 1782 order itself states (albeit in a prefatory recital) that the desired information was "for use by the Applicants in a foreign civil proceeding in the United Kingdom."[48] This argument is wrong both as a matter of law and as a matter of common sense.

The quoted language on which Sklarov hinges this argument is part of a recital referring to the nature of Section 1782 Applicants' motion. After all, Section 1782 authorizes "[t]he district court of the district in which a person resides or is found [to] order him to give his testimony or statement or to produce a document or other thing for *use in a proceeding in a foreign or international tribunal*."[49] Intended use in a foreign or international tribunal thus is a precondition of a court's ability to grant a Section 1782 application. The language to which Sklarov points

---

[46] 869 F.3d 121 (2d Cir. 2017) (LAK).

[47] *Id.* at 135.

[48] Sklarov's Reply (Dkt 35-10) at 3-4 (quoting Section 1782 Order (Dkt 9) at 1).

[49] 28 U.S.C. § 1782(a) (emphasis added).

simply recorded the fact that the intended-use requirement of Section 1782 had been satisfied. Nothing more.  Indeed, a recital in an order (or a contract, for that matter) as a matter of law has no independent force to change the meaning of a decretal (or contractual undertaking or representation) provision except in a case of ambiguity, where it may shed light on the intent of the issuing court (or contracting parties).[50]  The decretal language here simply stated that "the Court **GRANTS** the Application (Dkt 1) and authorizes the Applicants to serve the subpoenas attached to the Application as Composite Exhibit 3."  Neither that language nor any other language in the Section 1782 order limited the use of the Section 1782 material.

The process by which the Section 1782 order came to include the quoted language on which Sklarov incorrectly relies bears mention too.  Section 1782 Applicants filed this action and, as often occurs, sought an order under Section 1782, *ex parte*.  They submitted a proposed form of order, thereby proposing the language of the Section 1782 order.  Sklarov blinks reality by suggesting that, by including the prefatory language in the recital and in the face of the Second Circuit's decision in *Accent Delight*, the 1782 Applicants intended to tie their own hands as to how they could use the Section 1782 material or, even if they had so intended, that the Court should have understood that to have been their intent.  After all, likely every Section 1782 order contains substantially similar (and unremarkable) language.  That language is intended to do (and indeed does) nothing more than track the statutory language of Section 1782 to reflect satisfaction of a

---

[50] *In re Cont'l Vending Mach. Corp.*, 491 F.2d 813, 820 (2d Cir. 1974); *In re Tamisi*, No. 24-cv-7944, 2025 WL 1400180, at *3 (E.D.N.Y. May 14, 2025) ("[I]t is axiomatic that the decretal paragraph of an Order controls over any document description in the recital paragraphs of an Order."), *appeal filed sub nom. In re Wilmington Sav. Fund Soc'y, FSB*, No. 25-1502 (2d Cir. June 13, 2025); *cf. United States v. Hamdi*, 432 F.3d 115, 123-25 (2d Cir. 2005) (Sotomayor, J.) (discussing how recitals and general prefatory statements in plea agreements, as in contracts, may not alter operative promises to perform).

14

prerequisite to the relief sought.  As the Second Circuit has made clear, it does not prohibit Section 1782 Applicants, "who lawfully ha[ve] obtained discovery under the statute with respect to one foreign proceeding[,] from using the discovery elsewhere" absent a specific provision in the order granting the ability to serve subpoenas under the statute.[51]

*CPR Part 31.22(1)*

Sklarov next argues that CPR Part 31.22(1) independently restricts the use of the Section 1782 material outside the English action.  That Part requires that "a party to whom a document has been disclosed may use the document only for the purpose of the proceedings in which it is disclosed."[52]  But that is a rule of English procedure.  It does not apply here as a matter of law.  And while Section 1782 Applicants and the Singh Parties have a contractual duty to follow the English rule in the English action,[53] the rule imposes no use restrictions of its own force.  At most it authorizes a party to seek an order from a court "restricting or prohibiting the use of a document which has been disclosed."[54]  Any contention that Sklarov has that CPR Part 31.22(1) has

---

[51]  *Accent Delight*, 869 F.3d at 135.

[52]  CPR Part 31.22(1).

[53]  The parties to the protective order agreed that *only* "Confidential Discovery Material used in the English Action shall be subject to the collateral use restrictions set forth in Rule 31.22(1) of the Civil Procedure Rules."  Protective Order (Dkt 19) ¶ 13.  Thus, to the extent that CPR Part 31.22(1) has any force in this action, it does so only with respect to confidential discovery material as defined by the protective order.

[54]  CPR Part 31.22(2).

CPR Part 31.22(1) plainly authorizes the collateral use of documents (a) "read to or by the court, or referred to, at a hearing which has been held in public," (b) where "the court gives permission," or (c) where "the party who disclosed the document and the person to whom

been violated thus more appropriately would be brought before the English court in accordance with the language of the Part,[55] the language of the protective order,[56] and notions of international comity.

*Protective Order*

Now that it is apparent that neither the Section 1782 order nor CPR Part 31.22(1) independently limits the use of the Section 1782 material, acknowledging that the protective order means what it says reveals how utterly meritless Sklarov's claim is.  As previously described, the protective order restricts the disclosure and use of material defined as "Confidential Discovery Material."  To qualify as such, the material must have been produced by the Singh Parties and designated as "confidential."  JPMC is not a party to the protective order.  It could not have designated – nor did it designate – the records it produced as "confidential" and thus subject to the terms of the protective order.  Put simply, the protective order does not apply to the JPMC material. Given that the record indicates that Section 1782 Applicants used only the JPMC material in their

---

the document belongs agree."

[55] *See* CPR Part 31.22(2)-(3).

[56] *See* Protective Order (Dkt 19) ¶ 13.

16

communications with Discover and their other legal actions outside England,[57] Sklarov cannot show that it is likely that Section 1782 Applicants violated the protective order in these instances.

Sklarov attempts to avoid this inevitable conclusion by suggesting that the Court must treat the JPMC material as confidential because the Singh Parties produced and designated as "confidential" copies of various records that JPMC produced without doing so. In Sklarov's view, "[t]he confidentiality protections attach to the underlying information," and "[a] party cannot sanitize protected information by obtaining it from a different source."[58] But Federal Rule of Civil Procedure 26(c) and precedent suggest otherwise.[59] It was JPMC's decision to produce its records without being a party to the protective order or designating those records as "confidential." Neither the Singh Parties' decision to do otherwise nor Sklarov's belated attempt now (after declining to

---

[57] *See* Ford Decl. (Dkt 29-15) ¶¶ 43-51.

As noted, the Court left the evidentiary record open after the preliminary injunction hearing for over a week so that Sklarov could provide evidence of Section 1782 Applicants using confidential discovery material in an unauthorized manner. Upon a seemingly thorough investigation by counsel for Sklarov, even Sklarov concludes that Section 1782 Applicants' "use of Singh-designated [confidential discovery material] borne out by the documentation is limited to the StoneTurn Report and the contempt application." Sklarov's Apr. 17, 2026 Letter (Dkt 46) at 4-5.

[58] Sklarov's Reply (Dkt 35-10) at 12-13.

[59] *See Fayemi v. Hambrecht and Quist, Inc.*, 174 F.R.D. 319, 325 (S.D.N.Y. 1997) ("Rule 26(c) . . . does not provide authority for regulating the use of information obtained by a party independent of the discovery process."); *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 742 F. Supp. 165, 166 (S.D.N.Y. 1990) ("Neither the Federal Rules of Civil Procedure nor courts' inherent powers support an order prohibiting use of information innocently obtained from third parties without use of judicial process."); *see also Bridge C.A.T. Scan Assocs. v. Technicare Corp.*, 710 F.2d 940, 946 (2d Cir. 1983) (holding that First Amendment limits courts' inherent power to restrict dissemination of information gathered independently of judicial processes).

17

seek to intervene for the last year and a half) to argue, in effect, that JPMC should have done otherwise override.

Finally, Sklarov argues that even if the JPMC material were not subject to the protective order, Section 1782 Applicants nonetheless violated the protective order by using confidential discovery material from the Singh Parties in their English contempt application. Section 1782 Applicants maintain that such use is permitted by the protective order.  Thus, this issue turns on whether the contempt proceeding rightfully is considered part of "the prosecution and defense of . . . the English Action."[60]  It plainly is.

CPR Part 81, which governs committal proceedings, provides that "[a] contempt application *made in existing High Court . . . proceedings* is made by an application . . . *in those proceedings*."[61]  Such an application "shall be determined by a High Court judge of the Division in which *the case is proceeding*."[62]

The English action is an existing proceeding in the Business and Property Courts, a specialized division of the High Court.  The fact that the English contempt motion is part of the

---

[60] Protective Order (Dkt 19) ¶ 18.

[61] CPR Part 81.3(1) (emphasis added).

[62] CPR Part 81.3(2) (emphasis added).

Separate rules apply where a contempt application is made outside of "existing" High Court proceedings, CPR Parts 81.3(3), (4), (5)(a), (8) (emphasis added), where "existing" is meant to be interpreted broadly to include even "proceedings that are extant" and those in which judgment has been issued.  1 WHITE BOOK § 81.3.4 (2026).

18

existing English civil action is not merely an "administrative convention," as Sklarov asserts.[63]  That is what English law required.

Sklarov attempts to rely on the United Kingdom Privy Council's decision in *GFN SA v. Bancredit Cayman Ltd.*[64] to argue that a committal application (committal for contempt being among the possible remedies) in substance is a distinct proceeding from the underlying civil action. But in that very decision, the Privy Council said the opposite, writing that "a committal application could be made by interlocutory application and *the hearing of the application would normally be regarded as an interlocutory proceeding.*"[65]  It would be tautological that an interlocutory proceeding is part of the proceeding in which it arises.  And, as the United Kingdom Supreme Court has noted, treating a contempt proceeding as part of the underlying civil action, even when it means having the trial judge preside over also the contempt proceeding, makes sense.  That court explained, "in the absence of special circumstances . . . . [s]uch an approach is likely to be both the most economical and the most just way to proceed."[66]

U.S. law also does not help Sklarov's case.  Contempt proceedings long have been available in civil actions in this country.[67]  Sanctions for contempt – both civil and criminal –

---

[63]    Mascarenhas Decl. (Dkt 21-1) ¶ 12.

[64]    [2009] UKPC 39 (appeal taken from the Cayman Islands).

[65]    *Id.* [23] (emphasis added).

[66]    *Fairclough Homes Ltd. v. Summers* [2012] UKSC 26 [59], [2012] WLR 2004.

[67]    *Bessette v. W.B. Conkey Co.*, 194 U.S. 324, 326 (1904).

regularly are imposed in existing civil actions.[68]  Indeed, a party may move within an existing civil action to hold another party in civil contempt, or the court or the government may institute criminal contempt proceedings within that civil action.[69]  A "wholly new proceeding" need not be created to prosecute alleged contempt.[70]  Federal Rule of Criminal Procedure 42 "permits commencement of such prosecutions by any appropriate form of notice and contemplates that those prosecutions ordinarily will proceed before the judge before whom the allegedly contumacious behavior occurred, whether *as part of a pending civil or pending criminal case*."[71]

In sum, the contempt proceeding falls within the prosecution of the English action. Section 1782 Applicants' use of confidential discovery material in the contempt proceeding therefore appears to accord with the terms of the protective order.

---

[68]  *See, e.g.*, *Rodriguez v. New Generation Hardware Store Corp.*, No. 22-cv-4422, 2024 WL 1406953 (S.D.N.Y. Apr. 2, 2024); *United States v. Donziger*, No. 19-cr-561, 2021 WL 92767 (S.D.N.Y. Jan. 10, 2021) (describing procedural history of contempt sanctions imposed on defendant in civil action and denying defendant's motion to dismiss criminal contempt charges stemming from that action).

[69]  *See, e.g.*, *United States v. Brennerman*, No. 17-cr-155 (LAK), 2017 WL 3421397, at *2-4 (S.D.N.Y. Aug. 8, 2017) (describing procedural history and clarifying that the Court created separate criminal docket for administrative convenience only); *see also* S.D.N.Y. Local Civ. R. 83.6 (providing procedure for initiating contempt proceedings in civil cases).

[70]  *Brennerman*, 2017 WL 3421397, at *8-9.

[71]  *Id.* at *10 (emphasis added).

20

### *Conclusion*

For the foregoing reasons, Sklarov has failed to show that he is likely to succeed on the merits of his claim.  His motion for a preliminary injunction (Dkt 22) is denied.

SO ORDERED.

Dated:      April 18, 2026
Corrected:  April 21, 2026

Lewis A. Kaplan
United States District Judge